ORAL ARGUMENT NOT YET SCHEDULED

# No. 21-3072

**(consolidated with Nos. 21-3073, 21-3078, 22-3016, 23-3015)**

𝕴𝖓 𝖙𝖍𝖊

# United States Court of Appeals

### for the District of Columbia Circuit

————————

## UNITED STATES OF AMERICA,

*Appellee,*

v.

## SEAN COATES, WILLIAM K. SWEENEY, JEROME MARTIN, JR., AND SAMUEL CARSON,

*Appellants.*

————————

On Appeal from the
United States District Court for the District of Columbia
(Nos. 1:98-cr-00329-RCL-002, -003, -004, -006)

————————

# APPELLANTS' APPENDIX

# Volume II of V

John Longstreth
Jonathan M. Cohen
Tre A. Holloway
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Phone: (202) 778-9000
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com

*Counsel for Jerome Martin, Jr.*

Mark Lanpher
ALLEN OVERY
  SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Phone: (202) 508-8000
mark.lanpher@aoshearman.com

Katherine Stoller
ALLEN OVERY
  SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
katherine.stoller@aoshearman.com

*Counsel for Sean Coates*

Eric Hans Kirchman
LAW OFFICE OF ERIC H. KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Phone: (202) 347-4052
kirchlaw@cs.com

*Counsel for William Sweeney*

David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
Phone: (202) 548-8911
dbs@davidbsmithpllc.com

*Counsel for Samuel Carson*

*Counsel for Appellants*

# TABLE OF CONTENTS

**PAGE(S)**

## VOLUME I (APP 1–141)

United States District Court Docket Report, Case No. 98-329
(accessed September 27, 2024)..................................................................................App 1–141

## VOLUME II (APP 141–575)

Excerpts of Transcript
(September 27, 2000)..........................................................................App 142–147

Excerpts of Transcript
(December 10, 1996) ..........................................................................App 148–150

Excerpts of Transcript
(June 8, 2000)....................................................................................App 151–173

Excerpts of Transcript
(January 8, 2001) (AM) ....................................................................App 174–177

Excerpts of Transcript
(January 10, 2001) (AM) ..................................................................App 178–188

Excerpts of Transcript
(January 23, 2001) (PM) ..................................................................App 189–193

Excerpts of Transcript
(January 24, 2001) (AM) ..................................................................App 194–212

Excerpts of Transcript
(January 30, 2001) (PM) ..................................................................App 213–217

Excerpts of Transcript
(February 1, 2001) (AM) ..................................................................App 218–225

Excerpts of Transcript
(February 5, 2001) (AM) ..................................................................App 226–241

Excerpts of Transcript
(February 8, 2001) (PM) ..................................................................App 242–260

Excerpts of Transcript
(February 12, 2001) (AM) ................................................................App 261–274

Excerpts of Transcript
(February 13, 2001) (AM) ...................................................App 275–290

Excerpts of Transcript
(February 15, 2001) (PM) ...................................................App 291–299

Excerpts of Transcript
(March 7, 2001) (PM) ........................................................App 300–322

Excerpts of Transcript
(March 12, 2001) (PM) ......................................................App 323–357

Excerpts of Transcript
(March 13, 2001) (PM) ......................................................App 358–375

Excerpts of Transcript
(March 14, 2001) (AM) ......................................................App 376–395

Excerpts of Transcript
(March 14, 2001) (PM) ......................................................App 396–409

Excerpts of Transcript
(March 15, 2001) (AM) ......................................................App 410–435

Excerpts of Transcript
(April 4, 2001) (AM) .........................................................App 436–455

Excerpts of Transcript
(April 9, 2001) (AM) .........................................................App 456–462

Excerpts of Transcript
(April 9, 2001) (PM) ..........................................................App 463–466

Excerpts of Transcript
(April 24, 2001) (PM) ........................................................App 467–469

Excerpts of Transcript
(April 25, 2001) (AM) ........................................................App 470–476

Excerpts of Transcript
(May 1, 2001) (AM) ...........................................................App 477–485

Excerpts of Transcript
(May 23, 2001) (AM) .........................................................App 486–496

Excerpts of Transcript
(May 23, 2001) (PM) ..........................................................App 497–514

Excerpts of Transcript
(May 29, 2001) (PM) ...................................................................App 515–531

Excerpts of Transcript
(May 30, 2001) (AM) ..................................................................App 532–541

Excerpts of Transcript
(June 14, 2001) (PM) ..................................................................App 542–550

Excerpts of Transcript
(June 26, 2001) (AM) ..................................................................App 551–565

Excerpts of Transcript
(June 26, 2001) (PM) ..................................................................App 566–569

Excerpts of Transcript
(July 2, 2001) (PM) ....................................................................App 570–575

## VOLUME III (APP 576–1043)

Sweeney Motion to Compel Discovery Number 1
(February 9, 1999) (Doc. 71) ......................................................App 576–602

Carson Motion for Dismissal of Counts, to Compel Disclosure of Exculpatory Evidence,
and for Additional Sanctions Due to Violations of *Brady v. Maryland*
(July 16, 2000) (Doc. 329) ..........................................................App 603–616

Sweeney Motion to Admit into Evidence the Maryland Grand Jury Testimony of Two
Unavailable Witnesses Who Were Introduced
by the State's Attorney for Prince George's County
(November 2, 2000) (Doc. 450)....................................................App 617–620

Order Denying Motions to Compel (Jackson, J.)
(September 28, 2000) (Doc. 451) .................................................App 621–625

Carson Motion to Adopt William Sweeney's Motion to Admit into Evidence the Maryland
Grand Jury Testimony of Two Unavailable Witnesses Who Were Introduced by the State's
Attorney for Prince George's County
(November 6, 2000) (Doc. 452)..........................................................App 626

Government's Memorandum in Opposition to Sweeney and Hill's Motions for Admission of
Grand Jury Testimony of Unavailable Witnesses
(November 16, 2000) (Doc. 481).................................................App 627–632

Second Retyped Indictment
(July 2, 2001) (Doc. 760) ............................................................App 633–711

Verdict Form
  (August 16, 2001) (Doc. 810) ................................................................App 712–749

Order Denying Appellants' Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record
  (August 28, 2003) (USCA Case No. 02-3015, Doc. 769196) ......................................App 750

Brief of Appellants Sweeney, Carson, Coates, Martin, and Hill
  (April 25, 2005) ................................................................................App 751–771

Appeal from the United States District Court for the District of Columbia
  (June 14, 2005)................................................................................App 772–814

Reply Brief of Appellants Sweeney, Carson, Coates, Martin, and Hill
  (July 6, 2005) ................................................................................App 815–929

Sweeney Emergency Motion for Access to Court Records and Points and Authorities in Support Thereof
  (February 5, 2008) (Doc. 1013) ................................................................App 930–933

Martin Motion to Vacate, Set Aside, Correct Sentence Pursuant
  to 28 U.S.C. Section 2255
  (February 18, 2008) (Doc. 1021) ................................................................App 934–950

Sweeney Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 USC §2255
  (February 19, 2008) (Doc. 1017) ................................................................App 951–967

Martin Motion to Vacate, Set Aside, Correct Sentence Pursuant to 28 U.S.C. Section 2255
  (February 18, 2008) (Doc. 1021) ................................................................App 968–984

Carson Motion Under 28 USC § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody
  (February 18, 2008) (Doc. 1023) ................................................................App 985–990

Coates Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence
  (February 19, 2008) (Doc. 1020) ................................................................App 991–1043

## **VOLUME IV (APP 1044–1456)**

Carson Motion to Join the Petitions Filed by Co-Defendants for Relief
  Pursuant to 28 U.S.C. § 2255
  (March 17, 2008) (Doc. 1024) ................................................................App 1044–1045

Martin Motion to Stay the 28 U.S.C. 2255 Motion
  (May 7, 2008) (Doc. 1028) ................................................................App 1046–1050

iv

Carson and Sweeney Joint Unopposed Motion for Extension of Time to File Supplements to
Motions to Vacate
(February 2, 2011) (Doc. 1065) ............................................................App 1051, 1056–1057

United States' Unopposed Motion for Extension of Time to File Response to Defendants'
Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255
(July 2, 2010) (Doc. 1053)...............................................................App 1052–1055

Carson Motion to Reconsider Motion for Discovery Based Upon New Evidence
(October 9, 2014) (Doc. 1132)...........................................................App 1058–1068

Sweeney Supplemental Motion to Vacate, Set
Aside or Correct Sentence, Pursuant to 28 USC §2255 and Incorporated Memorandum of
Facts and Law (November 28, 2014) (Doc. 1140-2).........................................App 1069–1152

Carson Motion to Join Petitioner Sweeney's Motion to Unseal Specific Exhibits
(January 29, 2015) (Doc. 1153) .......................................................App 1153–1154

Coates Pro Se Supplemental
Claims in Relation to the Original Motion Pursuant to 28 U.S.C. § 2255
(February 24, 2015) (Doc. 1166) ......................................................App 1155–1163

Exhibit 1 to Sweeney's Supplemental Motion
(February 25, 2015) (Doc. 1156-2)....................................................App 1164–1173

Exhibit 2 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1144-1, 1145-1, 1146-1, 1147-1) .......................App 1174–1226

Exhibit 3 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1141-2) ...................................................App 1227–1230

Exhibit 4 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1141-3) ...................................................App 1231–1236

Exhibit 5 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-1) ...................................................App 1237–1246

Exhibit 6 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1143-1) ...................................................App 1247–1268

Exhibit 7 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-2) ...................................................App 1269–1270

Exhibit 8 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-3) ...................................................App 1271–1272

Exhibit 9 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-4) ...............................................App 1273–1275

Exhibit 10 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-5) ...............................................App 1276–1277

Exhibit 11 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-6) ...............................................App 1278–1280

Exhibit 12 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-7) ...............................................App 1281–1285

Defendants' Unopposed Motion for Extension of Time to File Memorandum in Support of
Defendants' Motion to Vacate Sentence
(February 25, 2015) (Doc. 1158) ....................................................App 1286–1288

Carson Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C.
Section 2255
(April 9, 2015) (Doc. 1170) ............................................................App 1289–1332

Government's Ex Parte Submission of Additional Materials to the Court Regarding James
Montgomery
(April 9, 2015) (Doc. 1174-3).........................................................App 1333–1363

Court Exhibit 8
(April 9, 2015) (Doc. 1175-1)..........................................................App 1364–1424

Affidavit of Lexi Negin Christ
(April 9, 2015) (Doc. 1178-1)..........................................................App 1425–1427

Application for Statement of Charges
(April 9, 2015) (Doc. 1178-3)..........................................................App 1428–1429

Court Exhibit 4
(April 9, 2015) (Doc. 1174) .............................................................App 1430–1456

## VOLUME V (APP 1458–1831)

Carson Unopposed Motion for Leave to File Under Seal
(July 23, 2015) (Doc. 1180).............................................................App 1458–1461

Martin Supplement to Motion to Vacate in Light of *Johnson v. United States*
(June 23, 2016) (Doc. 1182) ............................................................App 1462–1465

Carson Supplement to Motion to Vacate After Johnson Decision
(June 24, 2016) (Doc. 1183) ............................................................App 1466–1468

Coates Supplement to Motion to Vacate in Light of *Johnson v. United States*
    (June 27, 2016) (Doc. 1184) ...........................................................App 1469–1470

Coates Motion for Leave to Join Samuel Carson's Supplemental Motion and to File Under Seal and to Late File This Motion
    (June 27, 2016) (Doc. 1185) ...........................................................App 1471–1517

Carson Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. Section 2255
    (June 27, 2016) (Doc. 1185-1)........................................................App 1518–1561

Order Granting Carson's Motion for a Briefing Schedule (Lamberth, R.)
    (April 7, 2017) (Doc. 1188) ...........................................................App 1562–1563

Sweeney Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC §2255 and Incorporated Memorandum of Facts and Law
    (June 26, 2017) (Doc. 1197) ...........................................................App 1564–1647

Sweeney Supplement to Amended Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC §2255 and Incorporated Memorandum of Facts and Law
    (October 31, 2018) (Doc. 1229).......................................................App 1648–1650

Martin Supplement to Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255 by a Person in Federal Custody
    (November 21, 2018) (Doc. 1233)...................................................App 1651–1688

Affidavit of Jennifer Wicks
    (October 6, 2020) (Doc. 1280).......................................................App 1689–1690

Memorandum Opinion (Lamberth, R.)
    (October 27, 2021) (Doc. 1283).......................................................App 1691–1739

Memorandum Opinion (Lamberth, R.)
    (May 23, 2022) (Doc. 1305) ...........................................................App 1740–1765

Sweeney's Reply to the Government's Opposition to His Motions to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. § 2255
    (July 14, 2020) (Doc. 1277)...........................................................App 1766–1828

Declaration of William K. Sweeney
    (October 6, 2020) (Doc. 1280-2) ...................................................App 1829–1831

```
 1                      UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2
      _____
 3    UNITED STATES,                   :
                GOVERNMENT,            :
 4                                      :
        VS.                             :    CR. NO. 98-329
 5                                      :
      VINCENT HILL,                     :
 6    JEROME MARTIN,                    :
      SAMUEL CARSON,                    :
 7    WILLIAM K. SWEENEY,               :
      MAURICE PROCTOR,                  :
 8    SEAN COATES,                      :
                DEFENDANTS.            :
 9    _____:
      UNITED STATES                     :
10              GOVERNMENT,            :
                                        :
11      VS.                             :    CR. NO. 99-348
                                        :
12    GARY PRICE,                       :
                DEFENDANT              :
13    _____:

14                                           WASHINGTON, D. C.
                                             SEPTEMBER 27, 2000
15

16                      TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE THOMAS P. JACKSON
17

18    FOR THE GOVERNMENT:               PETER ZEIDENBERG, AUSA
                                        ANJALI CHATURVEDI, AUSA
19                                      555 4TH ST., N.W.
                                        WASHINGTON, D. C. 20001
20
      FOR THE DEFENDANT HILL:           CHRISTOPHER DAVIS, ESQ.
21                                      601 INDIANA AVE., N.W.
                                        #901
22                                      WASHINGTON, D. C.  20001

23    FOR THE DEFENDANT MARTIN:         JOANNE HEPWORTH, ESQ.
                                        305 H STREET, N.W.
24                                      2ND FLOOR
                                        WASHINGTON, D. C.  20001
25
```

```
 1   FOR THE DEFENDANT CARSON:        JOSEPH BESHOURI, ESQ.
                                      LEXI NEGIN CHRIST, ESQ.
 2                                    419 7TH STREET, N.W.
                                      WASHINGTON, D. C.  20004
 3
     FOR THE DEFENDANT SWEENEY:       STEVEN R. KIERSH, ESQ.
 4                                    717 D STREET, N.W.
                                      SUITE 400
 5                                    WASHINGTON, D. C.  20004

 6                                    LEONARD LONG, ESQ.
                                      1818 11TH ST., N.W.
 7                                    WASHINGTON, D.C.  20001

 8   FOR THE DEFENDANT PROCTOR:       HOWARD BRAMSON, ESQ.
                                      717 D STREET, N.W.
 9                                    THIRD FLOOR
                                      WASHINGTON, D. C.   20004
10
     FOR THE DEFENDANT COATES:        FREDERICK JONES, ESQ.
11                                    901 6TH STREET, S.W.
                                      #409
12                                    WASHINGTON, D. C.  20024

13   FOR THE DEFENDANT PRICE:         JONATHAN ZUCKER, ESQ.
                                      601 INDIANA AVE., N.W.
14                                    #901
                                      WASHINGTON, D. C.  20004
15

16

17
     COURT REPORTER:              PHYLLIS MERANA
18                                6816 U. S. COURTHOUSE
                                  3RD & CONSTITUTION AVE., N.W.
19                                WASHINGTON, D. C.  20001
```

127

1   KILL ROBERT SMITH.  AND WE ALSO WANT ALL THE RECORDS, FOR

2   INSTANCE, FROM THE HOPE VILLAGE SHOOTING, TO SHOW TO THE

3   JURY TO SAY, "SOMEONE ELSE WAS OUT THERE, NOT EVEN JUST WITH

4   A MOTIVE TO KILL HIM, BUT SOMEONE ELSE TRIED TO KILL HIM."

5              AND THIS ALL COMES WITHIN THE THIRD-PARTY DEFENSE

6   THAT THE D. C. COURT OF APPEALS UNDER THE BROWN BEALE

7   STANDARD HAS SET FORTH.  THAT WE HAVE TO SHOW TO THE JURY

8   THAT THERE IS A FACTUAL BASIS TO ASSERT A THIRD-PARTY

9   DEFENSE -- A THIRD-PARTY PERPETRATED DEFENSE.

10             THE COURT:  I WOULD THINK THAT IF THE GOVERNMENT

11  HAS ANY EVIDENCE -- ANY EVIDENCE THAT SOMEONE OTHER THAN A

12  NAMED DEFENDANT WAS RESPONSIBLE FOR ROBERT SMITH'S DEATH,

13  THEN THAT EVIDENCE WOULD BE PRODUCIBLE AS BRADY MATERIAL.

14             MR. KIERSH:  THAT'S OUR POSITION.

15             THE COURT:  ALL RIGHT.

16             MR. KIERSH:  BUT I JUST WANT TO MAKE THE RECORD

17  CLEAR, TOO, THAT THE GOVERNMENT MAY LOOK AT SOME EVIDENCE

18  AND SAY, "WELL, WE DON'T THINK -- HERE IS SOME EVIDENCE THAT

19  HE WAS SHOT."

20             THE COURT:  THAT'S TRUE OF ANY EVIDENCE.

21             MR. KIERSH:  BUT I WOULD SUBMIT TO THE COURT IT'S

22  BRADY.  IF THERE IS ANY EVIDENCE WHATSOEVER THAT ANYBODY ON

23  THIS PLANET, OTHER THAN WILLIAM SWEENEY, TRIED TO KILL

24  ROBERT SMITH, IT IS BRADY.  AND ANY RECORD THAT THE

25  GOVERNMENT HAS RELATED TO THE SHOOTING, FOR INSTANCE, AT

1           MR. KIERSH:  WELL, SURE HE WAS.

2           THE COURT:  HOW ABOUT UNRELATED ONGOING

3    INVESTIGATIONS?

4           MR. KIERSH:  HE WAS GETTING A BENEFIT FOR IT.

5    THERE ARE TWO REASONS WHY THAT INFORMATION SHOULD BE TURNED

6    OVER.  NUMBER ONE IS TO SHOW THAT MR. SMITH WAS TRYING TO

7    CURRY FAVOR WITH THE GOVERNMENT BECAUSE HE WAS GETTING HUGE

8    BENEFITS FROM THE GOVERNMENT.

9           AGAIN, THIS MAN IS A CAREER CRIMINAL WHO IS OUT ON

10   THE STREET ONLY BY VIRTUE OF THE FACT THAT HE IS COOPERATING

11   WITH THE GOVERNMENT.  BUT THE OTHER REASON IS WHAT WE TALKED

12   ABOUT BEFORE.  THE FACT THAT MR. SMITH WAS GIVING

13   INFORMATION IN UNRELATED CASES, THOSE INDIVIDUALS, IF THEY

14   KNEW ABOUT HIS COOPERATION, HAD A MOTIVE TO KILL HIM.  AND

15   THAT'S EXACTLY WHAT WE WANT TO OFFER TO THE JURY.  THAT

16   THERE WAS MOTIVATION BEYOND THESE PEOPLE TO KILL HIM.  SO

17   THERE ARE TWO VERY SOUND REASONS.

18           THE COURT:  LET ME TAKE A LOOK AT THE 302'S

19   UNREDACTED IN CAMERA.

20           MS. CHATURVEDI:  CERTAINLY, YOUR HONOR.  IF I

21   COULD JUST ADDRESS THIS BRIEFLY.  AGAIN, IT IS SORT OF A

22   LEAP OF FAITH.  IF THE OTHER PEOPLE WHO MR. SMITH

23   IMPLICATED -- IF THEY KNEW THAT HE WAS COOPERATING WITH LAW

24   ENFORCEMENT, PERHAPS THEY HAD A MOTIVE.  THAT IS ONE LEAP OF

25   FAITH.

201

1          THE COURT:  SURE.

2          MS. CHATURVEDI:  AND THE SECOND ONE IS IS THERE

3    ANY EVIDENCE TO SUGGEST ANY OF THOSE PEOPLE, ASSUMING THEY

4    DID KNOW ABOUT THE COOPERATION, TOOK ANY STEPS TO HARM

5    MR. SMITH.

6          THERE IS NO SUCH EVIDENCE.  IF THE DEFENSE IS

7    TRYING TO RAISE THIRD-PARTY CULPABILITY, THERE HAS TO BE

8    MORE THAN MERE SPECULATION.

9          MR. KIERSH CITED TO THE BROWN BEALE CASE FROM THE

10   D. C. COURT OF APPEALS.  THE WINFIELD CASE,

11   WHICH IS THE MOST MOST RECENT CASE ON THAT POINT, SAYS YOU

12   CAN'T JUST DRAW A BLANK.  YOU CAN'T JUST PULL AT STRAWS

13   SPECULATING THAT SOMEONE ELSE MAY HAVE WANTED TO HAVE THIS

14   PERSON KILLED AND WE SHOULD BE ENTITLED TO KNOW THAT.  I

15   WILL PROVIDE --

16          THE COURT:  I AGREE.  THERE HAS TO BE SOME

17   EVIDENCE THAT THERE WERE OTHERS WHO HAD A REASON TO -- THAT

18   THERE WAS A MOTIVE FOR COMMITTING THE HOMICIDE KNOWN TO

19   THOSE WHO WERE IN A POSITION TO EFFECT IT.

20          MS. CHATURVEDI:  RIGHT.  AND WE DON'T HAVE ANY

21   SUCH INFORMATION.  AND WE RECOGNIZE THAT IF WE DID HAVE SUCH

22   INFORMATION AND THAT STEPS HAD BEEN TAKEN TO GIVE THAT, THAT

23   WOULD BE BRADY INFORMATION.  THAT WOULD HAVE BEEN DISCLOSED

24   AS BRADY INFORMATION.

25          THE COURT:  YES.

1              MS. CHATURVEDI:  YOUR HONOR, I WOULD LIKE TO JUST

2    BRIEFLY ADDRESS ONE OTHER MATTER.  IN TERMS OF THE MANNER IN

3    WHICH YOUR HONOR EXPECTS TO HEAR THIS PROFFER, IT'S OUR

4    POSITION THAT AN EVIDENTIARY HEARING ON THE ISSUE IS NOT

5    NEEDED.  THAT IS PROFFERED EVIDENCE -- WHAT WE HAVE

6    PRIMARILY SUBMITTED IN OUR PAPERS, COMBINED WITH THE GIGLIO

7    INFORMATION, INCLUDING IMPEACHMENTS --

8              THE COURT:  YOU MEAN THE EVIDENTIARY PREDICATE FOR

9    ADMITTING THE STATEMENT?

10             MS. CHATURVEDI:  RIGHT.

11             THE COURT:  IT MAY BE THAT I WILL BE SATISFIED

12   WITH THE PROFFER.  I DON'T KNOW.  LET'S SEE.

13             MS. CHATURVEDI:  THE PROFFER -- I WOULD JUST LIKE

14   TO CLARIFY -- IS WHAT WE HAVE PRESENTED IN OUR PAPERS THUS

15   FAR.

16             THE COURT:  ALL RIGHT.

17             MS. CHATURVEDI:  I AM PREPARED TO SUPPLEMENT THAT

18   BY INFORMATION CONCERNING PRIOR CONVICTIONS AND PLEA

19   AGREEMENTS OF THE WITNESSES.  AND WHAT I BELIEVE I SHOULD

20   FILE BY FRIDAY WOULD BE A SUBMISSION TO THE COURT TO TAKE

21   THAT INFORMATION INTO ACCOUNT.

22             THE COURT:  ALL RIGHT.

23             MS. CHATURVEDI:  BUT IT'S NOT OUR INTENTION TO PUT

24   ON WITNESSES OUTSIDE THE PRESENCE OF THE JURY ON THE ISSUE.

25             THE COURT:  LET'S RESERVE ON THAT AND SEE WHETHER

```
 1                    S-E-C-R-E-T
 2               IN THE CIRCUIT COURT
 3         FOR PRINCE GEORGE'S COUNTY, MARYLAND
 4    IN RE:
 5    Special Investigation      Grand Jury No. 56,192
 6    _____/
 7              TRANSCRIPT OF PROCEEDINGS
 8              Grand Jury Room
 9              County Courthouse
10              Upper Marlboro, Maryland
11              Tuesday, December 10, 1996
12         The Grand Inquest for the State of
13    Maryland for the Body of Prince George's County, was
14    convened at 9:30 o'clock a.m., Betty C. Ford,
15    Foreman, presiding.
16         PRESENT:
17              (A quorum of twenty-one members of the
18              Grand Jury was present.)
19              JOHN MALONEY, Assistant State's
20         Attorney for Prince George's County.
21              W. C. LYNN, Clerk-Reporter to the
22         Grand Jury.
23
24
25                    S-E-C-R-E-T
```

FILED
NOV 0 2 2000
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



4

1      forth by me and other people here in the Grand Jury.

2                        Do you understand that?

3           A.      Yes.

4           Q.      First of all, who is John Pinkney?

5           A.      My fiance.

6           Q.      And do you know a person named Dennis

7      Green?

8           A.      Yes.

9           Q.      How did you know him?

10          A.      Through John.

11          Q.      And did there come a time, some days

12     before Thanksgiving, that you saw Dennis Green?

13          A.      Yes.

14          Q.      Describe what happened.

15          A.      Dennis came to my house and asked me

16     could he come in.  I let him in.  He was on the

17     telephone, talking to one of his friends.

18          Q.      And who else was in the -- is it a

19     townhouse?

20          A.      Yes.

21          Q.      Who else was there?

22          A.      Just me and Dennis.

23          Q.      And what, if anything, did you hear?

24          A.      He told whoever he was talking to on

25     the telephone that they should have came around there

5

1    and they must have asked him why, and he said because

2    me just took three people out of the street.

3                Q.      Did you hear anything else?

4                A.      And whoever he was talking to must

5    have asked him who is we.  He said me, California,    _ *Who* _

6    and Free, and the rest of the guys.

7                Q.      Do you know who the rest of the guys

8    are?

9                A.      I know of California and Free, but I

10   don't know them.

11               Q.      Showing you what is a statement made

12   by you, apparently a nine page statement.

13                       Look at that.

14                       Is this the statement that you made to

15   the police yesterday?

16               A.      Yes, it is.

17               Q.      And is that a truthful statement that

18   you gave to them?

19               A.      Yes, it is.

20               Q.      Okay.

21                       MR. MALONEY:  For the record, I am

22   showing a statement given 12-8-96 by Cheree Lenette

23   Owens, and signed by her.    *we are am getting this sou*

24   BY MR. MALONEY:

25               Q.      Describe what happened after you

1

*Clerks File*

```
 1                 UNITED STATES DISTRICT COURT        FILED
                   FOR THE DISTRICT OF COLUMBIA
 2                                                   DEC 1 4 2000

 3   UNITED STATES,
              GOVERNMENT,        :                NANCY MAYER WHITTINGTON, CLERK
 4                                                   U.S. DISTRICT COURT
                                 :
      VS.                        :        CR. NO. 98-329
 5                                            F i l e
     VINCENT HILL,               :      _____
 6   JEROME MARTIN,              :
     SAMUEL CARSON,              :
 7   WILLIAM K. SWEENEY,         :
     MAURICE PROCTOR,            :
 8   SEAN COATES,                :
              DEFENDANTS.        :
 9   _____
     UNITED STATES              :
10            GOVERNMENT,       :
                                :
11    VS.                       :        CR. NO. 99-348
                                :
12   GARY PRICE,                :
              DEFENDANT         :
13   _____

14                               WASHINGTON, D. C.
                                 JUNE 8, 2000
15

16                 TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE THOMAS P. JACKSON
17

18   FOR THE GOVERNMENT:        PETER ZEIDENBERG, AUSA
                                 ANJALI CHATURVEDI, AUSA
19                               555 4TH ST., N.W.
                                 WASHINGTON, D. C. 20001
20
     FOR THE DEFENDANT HILL:     CHRISTOPHER DAVIS, ESQ.
21                               601 INDIANA AVE., N.W.
                                 #901
22                               WASHINGTON, D. C.  20001

23   FOR THE DEFENDANT MARTIN:   JOANNE HEPWORTH, ESQ.
                                 305 H STREET, N.W.
24                               2ND FLOOR
                                 WASHINGTON, D. C.  20001
25
```

506
142

2

```
 1   FOR THE DEFENDANT CARSON:        JOSEPH BESHOURI, ESQ.
                                      LEXI NEGIN-CHRIST, ESQ.
 2                                    419 7TH STREET, N.W.
                                      WASHINGTON, D. C.  20004
 3
     FOR THE DEFENDANT SWEENEY:       STEVEN R. KIERSH, ESQ.
 4                                    717 D STREET, N.W.
                                      SUITE 400
 5                                    WASHINGTON, D. C.  20004

 6                                    LEONARD LONG, ESQ.
                                      1818 11TH ST., N.W.
 7                                    WASHINGTON, D.C.  20001

 8   FOR THE DEFENDANT PROCTOR:       HOWARD BRAMSON, ESQ.
                                      717 D STREET, N.W.
 9                                    THIRD FLOOR
                                      WASHINGTON, D. C.   20004
10
     FOR THE DEFENDANT COATES:        FREDERICK JONES, ESQ.
11                                    901 6TH STREET, S.W.
                                      #409
12                                    WASHINGTON, D. C.  20024

13   FOR THE DEFENDANT PRICE:         JONATHAN ZUCKER, ESQ.
                                      601 INDIANA AVE., N.W.
14                                    #901
                                      WASHINGTON, D. C.  20004

15

16

17
     COURT REPORTER:                  PHYLLIS MERANA
18                                    6816 U. S. COURTHOUSE
                                      3RD & CONSTITUTION AVE., N.W.
19                                    WASHINGTON, D. C.  20001

20

21

22

23

24

25
```

5o

3

```
 1                  P-R-O-C-E-E-D-I-N-G-S

 2          (THE DEFENDANTS AND COUNSEL WERE PRESENT.)

 3          THE DEPUTY CLERK:  CRIMINAL CASE 98-329, UNITED

 4   STATES OF AMERICA VERSUS VINCENT HILL, JEROME MARTIN, SAMUEL

 5   CARSON, WILLIAM SWEENEY, MAURICE PROCTOR AND SEAN COATES,

 6   AND CRIMINAL CASE 99-348, UNITED STATES OF AMERICA VERSUS

 7   GARY PRICE.

 8          PETER ZEIDENBERG AND ANJALI CHATURVEDI FOR THE

 9   GOVERNMENT.

10          CHRISTOPHER DAVIS FOR THE DEFENDANT HILL.

11          JOANNE HEPWORTH FOR THE DEFENDANT MARTIN.

12          JOSEPH BESHOURI FOR THE DEFENDANT CARSON.

13          STEVEN KIERSH AND PAUL DEWOLFE FOR THE DEFENDANT

14   SWEENEY.

15          HOWARD BRAMSON FOR THE DEFENDANT PROCTOR.

16          FRED JONES FOR THE DEFENDANT COATES.

17          JONATHAN ZUCKER FOR THE DEFENDANT GARY PRICE.)

18          THE DEPUTY CLERK:  IS MR. BRAMSON HERE?

19          MR. ZUCKER:  NO.

20          THE DEPUTY CLERK:  MR. BRAMSON IS NOT PRESENT,

21   YOUR HONOR.

22          THE COURT:  DOES ANYONE KNOW WHERE HE IS?

23          MR. ZEIDENBERG:  I DON'T, YOUR HONOR.  IT'S

24   POSSIBLE THAT -- I NEVER CALLED HIM ABOUT THIS DATE.  I DID

25   SPEAK WITH THEM A COUPLE OF WEEKS AGO, BUT I THINK, IN
```

4

1    RETROSPECT, IT MAY HAVE BEEN PRIOR TO THIS DATE BEING SET.

2    AND IF CHAMBERS DIDN'T CALL HIM, I DIDN'T CALL HIM TO REMIND

3    HIM OR TO INFORM HIM OF THE DATE.  SO IT IS POSSIBLE HE WAS

4    NEVER APPRISED.

5            THE COURT:  ALL RIGHT.  WELL, WE'RE GOING TO DO

6    NOTHING SUBSTANTIVE TODAY.  WHAT WE'RE GOING TO DO IS SIMPLY

7    ESTABLISH A SCHEDULE FOR FURTHER PROCEEDINGS IN THE CASE.

8    AND IF MR. BRAMSON, AFTER REVIEWING THE SCHEDULE THAT WE

9    ESTABLISH, FEELS THAT IT IS NECESSARY TO ADDRESS THE COURT,

10   WE'LL MAKE ARRANGEMENTS FOR HIM TO DO SO.

11           DO I NOW HAVE ALL DEFENSE MOTIONS?

12           MS. HEPWORTH:  NO, YOUR HONOR.

13           THE COURT:  I DON'T?

14           MS. HEPWORTH:  NO, YOUR HONOR.  NOT ON BEHALF OF

15   MR. MARTIN.

16           THE COURT:  I HAVE GOT A LOT OF MOTIONS.  I CAN

17   TELL YOU THAT.

18           MS. HEPWORTH:  YOU DON'T HAVE ANY FROM MR. MARTIN,

19   OTHER THAN THE EARLIER ONES.

20           THE COURT:  AND YOU ARE PLANNING TO FILE MOTIONS?

21           MS. HEPWORTH:  YES, YOUR HONOR.

22           THE COURT:  ALL RIGHT.  NOT SIMPLY TO JOIN MOTIONS

23   ALREADY OF RECORD?

24           MS. HEPWORTH:  NO.  WE WILL JOIN SOME OF

25   MR. SWEENEY'S MOTIONS, BUT WE WILL ALSO BE FILING OUR OWN.

5

```
1              THE COURT:  ALL RIGHT.

2              MR. ZUCKER:  YOUR HONOR --

3              THE COURT:  MR. ZUCKER.

4              MR. ZUCKER:  -- ON BEHALF OF MR. PRICE, SINCE WE

5    WERE JUST JOINED, I DON'T EVEN KNOW WHAT HAS BEEN FILED IN

6    THIS CASE.  I HAD PREVIOUSLY JOINED IN THE CO-DEFENDANTS'

7    MOTIONS IN THE OTHER CASE, BUT I NEED TO REVIEW AND SEE WHAT

8    THERE IS TO JOIN AND ASSESS IF THERE IS ANYTHING ELSE TO

9    FILE.

10             MR. KIERSH:  STEVEN KIERSH ON BEHALF OF WILLIAM

11   SWEENEY.

12             THE COURT:  YES.

13             MR. KIERSH:  GOOD MORNING.

14             WE FILED, SO FAR, ABOUT 15 SUBSTANTIVE MOTIONS.

15   WE HAVE MORE COMING.  AND THE GOVERNMENT FILED A VERY

16   EXTENSIVE PLEADING THIS WEEK ON A MOTION TO ADMIT STATEMENTS

17   OF MURDERED WITNESSES.  THAT IS OPENING UP, I WOULD SUBMIT

18   TO THE COURT -- AND I HAVE ALREADY SPOKEN TO

19   MR. ZEIDENBERG --  A PANDORA'S BOX OF ADDITIONAL MOTIONS

20   THAT ARE GOING TO BE COMING IN.

21             SO I THINK THAT THERE IS A SUBSTANTIAL AMOUNT OF

22   ADDITIONAL LITIGATION COMING, BASED ON THE INFORMATION WE

23   RECEIVED THIS WEEK FROM THE GOVERNMENT.

24             THE COURT:  WELL, WHAT WOULD BE A REALISTIC DATE

25   TO ASK FOR ALL DEFENSE MOTIONS?
```

6

1          MS. HEPWORTH:   YOUR HONOR, JOANNE HEPWORTH FOR

2    MR. MARTIN.

3          FOR MR. MARTIN, I BELIEVE THAT WE CAN HAVE OUR

4    MOTIONS IN BY THE END OF JUNE OR THE FIRST WEEK IN JULY.

5          MR. DAVIS:   YOUR HONOR, I AM AT THE END OF THE

6    TABLE HERE, AND THERE ARE TWO OTHER DEFENSE COUNSEL.   WE

7    SEEM TO BE OF THE MIND THAT PERHAPS MID-JULY WOULD BE A GOOD

8    TIME FOR THE DEFENSE TO FILE THEIR MOTIONS.

9          THE COURT:   ALL RIGHT.   WHAT YOU'RE TELLING ME

10   MAKES THE TRIAL DATE THAT WE HAVE SET SOUND UNREALISTIC.

11         MR. DAVIS:   WELL, PERHAPS IF WE FILE IN MID-JULY

12   AND THE UNITED STATES HAS A PERIOD OF TIME --

13         THE DEPUTY MARSHAL:   STEP UP TO THE PODIUM.

14         MR. DAVIS:   CERTAINLY.

15         USUALLY MY PROBLEM IS THE EXACT OPPOSITE, YOUR

16   HONOR.   PEOPLE TELL ME I AM TOO LOUD.

17         IF WE FILE IN MID-JULY, AND THE UNITED STATES

18   FILES PERHAPS AT THE END OF THE FIRST WEEK OF AUGUST, I

19   THINK WE WOULD STILL BE ABLE TO DO THE MOTIONS, PERHAPS,

20   DURING THE END OF AUGUST OR THE FIRST WEEK IN SEPTEMBER AND

21   THEN BEGIN.

22         THE COURT:   ALL RIGHT.   MID-JULY?

23         MR. KIERSH:   YOUR HONOR, I THINK I SHOULD RAISE

24   ANOTHER MATTER BEFORE WE ACTUALLY PROCEED TO SETTING A FIRM

25   DATE ON THE MOTIONS, BECAUSE I THINK THE MATTER I WANT TO

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 25 of 443
Case 1:98-cr-00329-RCL  Document 506  Filed 12/14/00  Page 7 of 23

7

1   RAISE WILL AFFECT THE SCHEDULING.

2          IN THIS PLEADING -- AND I SPOKE WITH

3   MR. ZEIDENBERG YESTERDAY ABOUT THIS.  IN THIS PLEADING THAT

4   THE GOVERNMENT FILED TO ADMIT EVIDENCE --

5          THE COURT:  I HAVEN'T LOOKED AT IT.

6          MR. KIERSH:  IT IS 30 PAGES.  AND WHAT THE

7   GOVERNMENT, IN ESSENCE, IS TRYING TO DO IS ADMIT STATEMENTS

8   OF PEOPLE WHO ARE DECEASED THROUGH THE LEAD F.B.I.

9   INVESTIGATOR IN THIS CASE.

10         THE INVESTIGATOR WILL COME IN AND SAY, "WELL, THIS

11  PERSON, WHO IS NOW DECEASED, TOLD ME THIS, TOLD ME THAT,"

12  AND SO ON AND SO FORTH.

13         THE PROBLEM IS THAT IT IS RAISING IN ITS PLEADING

14  A NUMBER OF NEW SUBSTANTIVE OFFENSES, PARTICULARLY AGAINST

15  MY CLIENT, MR. SWEENEY, INCLUDING ADDITIONAL MURDERS.  AND I

16  ASKED MR. ZEIDENBERG YESTERDAY WHETHER OR NOT THAT

17  INFORMATION IS IN THE PLEADING SIMPLY AS CONTEXT TO SUPPORT

18  THEIR POSITION THAT THIS INFORMATION COMES IN, OR ARE THEY

19  GOING TO TRY TO ADMIT ACTUAL TESTIMONY ABOUT THESE

20  ADDITIONAL MURDERS AND OTHER VERY SERIOUS OFFENSES AS

21  SUBSTANTIVE EVIDENCE -- AS UNCHARGED ACTS.

22         IF THE GOVERNMENT'S POSITION IS THAT THEY WANT TO

23  ADMIT IT SUBSTANTIVELY AS UNCHARGED ACTS IN SUPPORT OF THE

24  RACKETEERING COUNTS IN THE INDICTMENT, WE NOW HAVE TO DEAL

25  WITH A NUMBER OF NEW VERY SERIOUS SUBSTANTIVE OFFENSES,

8

1    WHICH WE WOULD SUBMIT WE'RE ENTITLED TO DISCOVERY ON, THAT

2    WE NEED TO LITIGATE, AND THAT WE NEED A SUBSTANTIAL AMOUNT

3    OF TIME INVESTIGATE, GIVEN THAT THESE MURDERS OCCURRED

4    THREE, FOUR, OR FIVE YEARS AGO.

5         SO IF THE GOVERNMENT IS SEEKING TO ADMIT THAT AS

6    SUBSTANTIVE EVIDENCE, THEN THE SEPTEMBER 5TH DATE IS

7    ENTIRELY UNREALISTIC.

8         THE COURT:  IN WHAT OTHER CONTEXT WOULD THEY COME

9    IN?

10        MR. KIERSH:  WELL, I DON'T KNOW.  I DON'T KNOW

11   WHETHER OR NOT THE GOVERNMENT PUT THAT IN AS CONTEXT TO

12   SUPPORT THEIR LEGAL POSITION AND THEY JUST WANT THE COURT TO

13   UNDERSTAND WHAT'S OUT THERE, AND THEN THEY MAY LIMIT IT AND

14   NOT INTRODUCE ACTUALLY THE EVIDENCE OF OTHER OFFENSES.

15        FOR INSTANCE, THERE IS A WITNESS NAMED ROBERT

16   SMITH.  I THINK THE COURT IS FAMILIAR WITH THIS PERSON.  AND

17   MR. SWEENEY, IN A SUPERSEDING INDICTMENT, IS CHARGED WITH

18   CONSPIRING TO KILL MR. SMITH.

19        NOW, WE KNEW THAT THAT IS A SUBSTANTIVE COUNT IN

20   THE INDICTMENT.  THE GOVERNMENT IS NOW SAYING, "WELL,

21   BECAUSE MR. SMITH IS DEAD, VINCENT LISI, THE F.B.I. AGENT IN

22   CHARGE OF THE INVESTIGATION, SHOULD BE ABLE TO TELL THE JURY

23   WHAT MR. SMITH SAID TO HIM."

24        THAT'S THE FIRST PART OF THEIR MOTION, AND THAT'S

25   WHAT THEY ARE TRYING TO ACCOMPLISH THROUGH THEIR MOTION.

9

1       THE COURT:  ALL RIGHT.

2       MR. KIERSH:  BUT THEN THEY ALSO PUT IN THEIR

3  MOTION EVIDENCE THAT RELATES TO UNCHARGED ACTS IN THIS CASE,

4  INCLUDING OTHER MURDERS.  AND THEY SAY THAT, WELL, MR. SMITH

5  TOLD AGENT LISI THAT MR. SWEENEY WAS INVOLVED IN ANOTHER

6  MURDER, ANOTHER SHOOTING, SO ON AND SO FORTH.

7       IT'S THOSE ASPECTS OF THE GOVERNMENT'S PLEADING,

8  NOT RELATED TO MR. SMITH, THAT WE DON'T KNOW YET IF THE

9  GOVERNMENT IS GOING TO TRY TO ADMIT THOSE INTO EVIDENCE.  SO

10. IF THEY ARE TRYING --

11      THE COURT:  WHAT YOU'RE SAYING IS THAT THE OTHER

12  MURDERS WERE SIMPLY PART OF THE ARGUMENT THAT THE

13  GOVERNMENT --

14      MR. KIERSH:  PART OF THE ARGUMENT.  AND WE DON'T

15  KNOW IF IT IS JUST PART OF THE ARGUMENT FOR CONTEXT OR IF

16  THEY WANT TO PUT IT IN AS EVIDENCE -- AS UNCHARGED ACTS.

17  AND, AGAIN, IF IT IS GOING IN AS UNCHARGED ACTS, WE NEED TO

18  INVESTIGATE IT TO REBUT IT.  AND THEN IF THAT IS THEIR

19  POSITION, WE CAN'T POSSIBLY GO TO TRIAL SEPTEMBER 5TH.

20      SO I THINK WE NEED A PRELIMINARY DETERMINATION AS

21  TO WHETHER OR NOT THAT IS PART OF THE GOVERNMENT'S CASE IN

22  CHIEF.

23      THE COURT:  WELL, I AM NOT GOING TO ASK HIM TO

24  COMMIT ON THAT RIGHT NOW UNTIL I SEE WHAT YOUR OPPOSITION IS

25  TO HIS MOTION.

10

1          ALL RIGHT.

2          MS. HEPWORTH:  YOUR HONOR, AGAIN, JOANNE HEPWORTH

3   ON BEHALF OF JEROME MARTIN.

4          IT IS OUR POSITION THAT THIS TRIAL HAS BEEN

5   PENDING FOR A LONG, LONG TIME AND THAT WE ALL --

6          THE COURT:  YOU HAVE TOLD ME THAT BEFORE.

7          MS. HEPWORTH:  I UNDERSTAND, YOUR HONOR.  I JUST

8   NEED TO MAKE THE RECORD.  WE OBJECT TO ANY MOVING OF THE

9   TRIAL DATE.

10          THANK YOU.

11          YOUR HONOR, GIVE ME CREDIT FOR CONSISTENCY.

12          THE COURT:  I BEG YOUR PARDON?

13          MS. HEPWORTH:  YOU HAVE GIVE TO ME CREDIT FOR

14   CONSISTENCY.

15          THE COURT:  PERSISTENCY I THINK I WILL GIVE YOU

16   CREDIT FOR.

17          ALL RIGHT.  I UNDERSTAND.

18          AGAIN, LET ME COME BACK TO A JULY 14TH DATE FOR

19   ALL DEFENSE MOTIONS.

20          MR. ZEIDENBERG, WHAT WOULD BE A REALISTIC RESPONSE

21   DATE?

22          MR. ZEIDENBERG:  WE HAVE THE --

23          THE COURT:  I THINK THE TRIAL DATE IS ALREADY

24   VULNERABLE.  I DO NOT SEE THAT --

25          MR. ZEIDENBERG:  WELL, I WOULD ASK FOR THE 18TH OF

11

1    AUGUST. THAT WOULD BE JUST OVER THIRTY DAYS.

2                THE COURT:  THE 18TH OF AUGUST, YOU SAY?

3                MR. ZEIDENBERG:  YES.

4                THE COURT:  ALL RIGHT.  THE DEFENSE REPLIES?

5                MR. KIERSH:  MAY WE HAVE ABOUT TWO WEEKS, AT LEAST

6    ON BEHALF OF MR. SWEENEY, FOR REPLIES?

7                THE COURT:  IS THERE ANY DEFENSE COUNSEL WHO DOES

8    NOT THINK THAT A TWO-WEEK PERIOD IS GOING TO BE SUFFICIENT

9    TO REPLY TO THE GOVERNMENT'S OPPOSITION?

10               MR. ZUCKER:  YOUR HONOR, OUT OF AN ABUNDANCE OF

11   CAUTION, BECAUSE I AM GOING TO BE IN TRIAL PART OF THAT

12   TIME -- ONLY IF WE'RE PUTTING OFF THE TRIAL DATE ANYWAY, I

13   WOULD ASK FOR --

14               THE COURT:  I'M SORRY?  YOU WOULD ASK FOR WHAT?

15               MR. ZUCKER:  IF YOU'RE PUTTING OFF THE SEPTEMBER

16   5TH TRIAL DATE -- AND YOU ARE CERTAINLY DOING THAT -- THEN I

17   WOULD ASK FOR THREE WEEKS TO REPLY, ONLY BECAUSE ONCE HE

18   FILES ON AUGUST 18TH, I AM GOING TO BE IN TRIAL FOR AWHILE

19   AND WON'T BE ABLE TO GET TO IT FOR A WEEK OR TWO.

20               THE COURT:  ALL RIGHT.  REPLIES BY SEPTEMBER 8TH.

21   AND WE SHOULD PROBABLY SET A MOTIONS HEARING DATE --

22   PROBABLY A MOTIONS HEARING WEEK -- THE WEEK OF SEPTEMBER

23   25TH, BEGINNING ON SEPTEMBER 25TH AND EXTENDING FOR AS LONG

24   DURING THAT WEEK AS WE NEED TO GO.

25               MR. ZUCKER:  I HAVE AN ORAL ARGUMENT IN THE COURT

12

1    OF APPEALS IN THIS CIRCUIT THAT MORNING.   IF WE START IN THE

2    AFTERNOON, I AM FINE.

3              THE COURT:   THE 26TH?

4              MR. ZUCKER:   THE 26TH IS FINE.

5              THE COURT:   ALL RIGHT.   THE HEARING TO COMMENCE ON

6    THE 26TH.

7              MR. ZUCKER:   SHOULD WE ALL BLOCK OUT THAT ENTIRE

8    WEEK THEN?

9              THE COURT:   I'M SORRY?

10             MR. ZUCKER:   SHOULD WE ALL BLOCK OUT THAT ENTIRE

11   WEEK?

12             THE COURT:   YES.   EVERYBODY BUT YOU OUGHT TO HAVE

13   THE REMAINDER OF THE YEAR PRETTY WELL BLOCKED OUT.

14             I HAVEN'T SCANNED THE MOTIONS.   I HAVEN'T REVIEWED

15   THE MOTIONS CAREFULLY.   ARE THERE ANY THAT ARE LIKELY TO

16   REQUIRE THE TAKING OF TESTIMONY?

17             MR. KIERSH:   YOUR HONOR, ON BEHALF OF MR. SWEENEY,

18   WE HAVE A MOTION TO SUPPRESS CUSTODIAL STATEMENTS THAT I

19   WOULD ANTICIPATE WILL TAKE MORE THAN A FEW DAYS TO ACTUALLY

20   HAVE A HEARING ON.   WE HAVE GOT A MOTION TO SUPPRESS

21   PHYSICAL EVIDENCE THAT MAY TAKE SOME TIME.

22             WE ALSO HAVE A MOTION -- WELL, WE HAVE REQUESTED

23   PRETRIAL HEARINGS AS TO THE ACTUAL EXISTENCE OF BOTH THE

24   CONSPIRACY AND THE RACKETEERING ENTERPRISE.   THOSE ARE

25   PENDING BEFORE THE COURT.

USCA Case #21-3072    Document #2077668        Filed: 10/01/2024      Page 31 of 443
Case 1:98-cr-00329-RCL   Document 506   Filed 12/14/00   Page 13 of 23

13

```
 1              THE COURT:  YES.

 2              MR. KIERSH:  SO THE COURT WILL HAVE TO MAKE A

 3    RULING ON THOSE.  AND, AGAIN, GOING BACK TO THE GOVERNMENT'S

 4    MOTION THAT WAS FILED THIS WEEK, PART OF OUR POSITION IS

 5    GOING TO BE THAT THE COURT SHOULD HOLD A PRETRIAL

 6    EVIDENTIARY HEARING TO SEE IF THERE IS ANY BASIS -- IF THE

 7    GOVERNMENT STILL IS SEEKING TO ADMIT THAT TESTIMONY, IF

 8    THERE IS A FACTUAL BASIS -- A SUFFICIENT FACTUAL BASIS TO

 9    ADMIT THAT.  SO IT COULD BE LENGTHY HEARINGS.

10              MS. HEPWORTH:  ALSO, ON BEHALF OF MR. MARTIN, WE

11    WILL ALSO HAVE EVIDENTIARY MOTIONS ON STATEMENTS AND

12    EVIDENCE.

13              THE COURT:  SO WE ARE GOING TO HEAR TESTIMONY FROM

14    MORE THAN ONE WITNESS, I TAKE IT, IN CONNECTION WITH THESE

15    MOTIONS?

16              MS. HEPWORTH:  I WOULD IMAGINE, YES.

17              THE COURT:  ALL RIGHT.  WELL, THEN WE'LL START ON

18    THE 26TH AND GO AS LONG AS NECESSARY.

19              IT DOES NOT SEEM REALISTIC TO ME TO ASSIGN A NEW

20    TRIAL DATE TODAY, BUT MAYBE IT IS.  MAYBE IT WOULD BE BETTER

21    SIMPLY TO ASSIGN A NEW TRIAL DATE SO YOU CAN BEGIN WORKING

22    ON YOUR CALENDARS FOR THAT.

23              MS. HEPWORTH:  YOUR HONOR, WOULD THE NEW TRIAL

24    DATE BE IMMEDIATELY FOLLOWING THE MOTIONS HEARINGS?

25              THE COURT:  WELL, REASONABLY PROXIMATE, BUT, OF
```

14

1    COURSE, WE HAVE GOT A LONG JURY SELECTION PROCESS HERE.

2              MS. HEPWORTH:  I WOULD BE IN FAVOR OF SETTING A

3    TRIAL DATE TODAY.

4              THE COURT:  IS THERE ANYBODY WHO WOULD NOT WANT TO

5    SET A TENTATIVE TRIAL DATE TODAY?

6              (NO RESPONSE.)

7              THE COURT:  HEARING NONE, WE WILL DO THAT.

8              NOVEMBER 13TH?

9              HEARING NO DISSENT, NOVEMBER 13TH WILL BE OUR

10   TENTATIVE NEW TRIAL DATE.

11             I WOULD LIKE TO HAVE VOIR DIRE QUESTIONS FROM THE

12   DEFENSE BY NOVEMBER 1 AND BY NOVEMBER 8TH FROM THE

13   GOVERNMENT.

14             ARE THERE ANY OTHER DATES THAT YOU ARE OF A MIND

15   WE NEED TO FIX AT THIS TIME?

16             MR. BESHOURI:  JOSEPH BESHOURI ON BEHALF OF

17   MR. CARSON.

18             GOOD MORNING, YOUR HONOR.

19             THE COURT:  GOOD MORNING.

20             MR. BESHOURI:  CAN THE COURT GIVE US A SENSE ON

21   WHAT DAY OF THE WEEK THE COURT WILL NOT BE IN TRIAL AND WHAT

22   THE SCHEDULE WILL BE DURING THE HOLIDAYS?

23             THE COURT:  SURE.  SURE.  IT IS MY CONTEMPLATION

24   THAT WE WILL FOLLOW A NORMAL TRIAL DAY MONDAY THROUGH

25   THURSDAY.  FRIDAY IS GOING TO BE A LAY DAY THROUGHOUT THE

15

1    TRIAL.  AND WHEN I SAY A "NORMAL DAY," A NORMAL DAY IS TRIAL

2    COMMENCING AT 10:00 O'CLOCK IN THE MORNING, AN HOUR TO AN

3    HOUR AND A HALF FOR LUNCH, AND RECESSING BEFORE, OR, AT THE

4    LATEST, 5:00 O'CLOCK.

5          MR. BESHOURI:  AND FOR THE HOLIDAYS, YOUR HONOR

6    FOR THOSE OF US THAT GO OUT OF TOWN?

7          THE COURT:  ORDINARY HOLIDAYS ARE GOING TO BE

8    OBSERVED.  WHICH ONES ARE YOU CONCERNED ABOUT?

9          MR. BESHOURI:  WELL, PARTICULARLY, THE

10   THANKSGIVING PERIOD AND CHRISTMAS.

11         THE COURT:  SURE.  WE WILL BE IN RECESS OVER THE

12   HOLIDAYS.

13         MR. BESHOURI:  FOR THOSE WEEK PERIODS, I GUESS IS

14   WHAT I AM ASKING, AS OPPOSED TO JUST THE ONE DAY?

15         THE COURT:  OH, SURE.  SURE.  WHATEVER PERIOD THE

16   COURT IN EXECUTIVE SESSION ELECTS TO BE IN RECESS, WE WILL

17   BE IN RECESS.  AND THAT USUALLY SPANS A NUMBER OF DAYS,

18   ENCOMPASSING THE HOLIDAY ITSELF.

19         AND I URGE YOU, ONCE AGAIN, TO PROTECT YOUR

20   CALENDARS, AND TO THE EXTENT THAT YOU NEED TO CALL UPON ME

21   TO ASSIST IN PROTECTING YOUR CALENDARS, I AM AVAILABLE.  I

22   WILL DO SO.

23         MR. KIERSH:  YOUR HONOR, A FEW OTHER MATTERS.  CAN

24   WE HAVE ONE OF THE WITNESS ROOMS ACROSS THE HALL ASSIGNED TO

25   US DURING THE TRIAL SO THAT WE CAN MOVE IN FILING CABINETS?

16

1    THIS IS A VERY DOCUMENT-HEAVY CASE.  IF WE COULD SET UP --

2            THE COURT:  I AM NOT SURE ABOUT THE WITNESS ROOM,

3    BUT I WILL FIND YOU SPACE.  THERE IS A PROTRACTED LITIGATION

4    SUPPORT SPACE, WHICH IS ADJACENT TO MY CHAMBERS ON THE

5    SECOND FLOOR.  AND I WILL TRY TO ARRANGE TO MAKE SURE THAT

6    THAT'S AVAILABLE TO YOU.  IT HAS THE NECESSARY EQUIPMENT,

7    TELEPHONE CONNECTIONS, FILE SPACE AND THINGS OF THAT NATURE.

8            MR. KIERSH:  FINE.

9            AND ON BEHALF OF MR. SWEENEY, WE HAVE PENDING A

10   MOTION TO COMPEL DISCOVERY AND AN ADDENDUM TO THE MOTION TO

11   COMPEL DISCOVERY.  WE WOULD ASK FOR AN IMMEDIATE HEARING, AS

12   SOON AS THE COURT CAN SET THAT, SO THAT WE CAN MOVE FORWARD

13   IN OUR INVESTIGATION.  WE ARE REQUESTING VERY SIGNIFICANT

14   MATTERS RELATED TO THE PREPARATION OF OUR CASE.  WE WOULD

15   ALSO ASK THE COURT TO SET IT DOWN AT THE EARLIEST TIME.

16           THE COURT:  WHICH MOTIONS ARE YOU ADVERTING TO?

17           MR. KIERSH:  IT'S OUR INITIAL MOTION TO COMPEL

18   DISCOVERY, WHICH WAS FILED.  AND THE GOVERNMENT HAS FILED A

19   RESPONSE TO THAT.  AND THEN WE FILED AN ADDENDUM TO THE

20   MOTION TO COMPEL DISCOVERY.  AND THESE MOTIONS RELATE TO THE

21   INVESTIGATIVE FILES PERTAINING TO ALL OF THE SUSPECTS IN THE

22   TRIPLE HOMICIDE, WHICH OCCURRED IN TEMPLE HILLS, MARYLAND,

23   WHICH IS BOTH SUBSTANTIVE COUNTS AND RACKETEERING COUNTS IN

24   THIS INDICTMENT.

25           THE COURT:  IS THAT MATERIAL WHICH IS WITHIN THE

17

1    CONTROL OF THE GOVERNMENT?

2           MR. KIERSH:  YES, IT IS.  THIS INDICTMENT AROSE AS

3    PART OF A JOINT TASK FORCE WITH PRINCE GEORGE'S COUNTY,

4    MONTGOMERY COUNTY, THE FEDERAL BUREAU OF INVESTIGATION AND

5    D. C. HOMICIDE.  AND THEY HAVE BEEN PASSING THIS INFORMATION

6    BACK AND FORTH FOR A NUMBER OF YEARS.

7           THE COURT:  HAS THE GOVERNMENT RESPONDED TO ALL OF

8    THE MOTIONS EXCEPT THE ADDENDUM?

9           MR. KIERSH:  YES.  AND THERE IS ALSO A BILL OF

10   PARTICULARS THAT WE FILED THAT WE WOULD ALSO LIKE TO HAVE

11   RESOLVED.

12          THE COURT:  A MOTION FOR A BILL OF PARTICULARS?

13          MR. KIERSH:  THAT'S CORRECT.

14          THE COURT:  AND HAS THE GOVERNMENT RESPONDED TO

15   THAT?

16          MR. KIERSH:  YES.

17          THE COURT:  ALL RIGHT.

18          WILL IT BE NECESSARY TO TAKE TESTIMONY IN

19   CONNECTION WITH ANY OF THESE MOTIONS?

20          MR. KIERSH:  WELL, I THINK IT IS A LEGAL ARGUMENT.

21   I DON'T KNOW IF MR. ZEIDENBERG WANTS TO PUT ON TESTIMONY

22   PERTAINING TO THE AVAILABILITY OF THE INFORMATION, BUT I

23   THINK AS A THRESHOLD, IT IS A LEGAL ARGUMENT UNDER BRADY, AS

24   WELL AS THE OTHER CASES WE CITED.

25          THE COURT:  ALL RIGHT.

18

1      IF THEY ARE ALL READY TO BE HEARD, HOW ABOUT JULY

2  18TH?  THAT'S A TUESDAY.

3      MR. KIERSH:  THAT'S NOT A GOOD DAY FOR

4  MR. DE WOLFE.  IF AT ALL POSSIBLE, WE WOULD LIKE TO DO IT

5  SOONER THAN THAT.  IT IS REALLY IMPACTING ON OUR

6  INVESTIGATION, NOT HAVING ACCESS TO THIS INFORMATION.  IF

7  THE COURT HAS ANY AVAILABILITY --

8      THE COURT:  I AM STARTING A TRIAL ON MONDAY.  I

9  DON'T KNOW HOW LONG THAT ONE IS GOING TO GO.  I HAVE GOT

10  ANOTHER ONE ON THE 19TH.

11      JUNE 26TH OR 27TH?  LET'S SAY THE 27TH.

12      MR. ZEIDENBERG:  YOUR HONOR, I APOLOGIZE.  THAT'S

13  GOING TO BE THE ONE WEEK THAT I AM GOING TO BE OUT OF TOWN,

14  THE WEEK OF THE 26TH THROUGH THE 30TH.  I AM AVAILABLE

15  LITERALLY ANY DAY BETWEEN NOW AND JULY 18TH.  I KNOW THE

16  COURT IS LEAVING TOWN.

17      THE COURT:  CAN WE DO THEM IN ONE DAY, DO YOU

18  THINK?

19      MR. KIERSH:  OH, I BELIEVE SO.

20      THE COURT:  ALL RIGHT.

21      MR. ZEIDENBERG:  I THINK IT WOULD BE AN HOUR.

22      THE COURT:  HOW ABOUT JUNE 15TH THEN, OR JUNE

23  16TH, RATHER.  JUNE 16TH.

24      MR. KIERSH:  WHAT TIME, YOUR HONOR?

25      THE COURT:  WE'LL START AT 10:00 O'CLOCK.

19

1          MR. KIERSH:  VERY WELL.

2          MR. DE WOLFE:  YOUR HONOR, I HAVE A SCHEDULING

3  CONFERENCE THAT DAY.

4          THE COURT:  YOU HAVE GOT A SCHEDULING CONFERENCE

5  SOMEWHERE?

6          MR. DE WOLFE: AND A HEARING IN DISTRICT COURT.

7          MR. KIERSH:  WELL, IF THE 16TH IS THE EARLIEST

8  DATE, BECAUSE THIS IS IMPORTANT, I THINK WE WOULD PREFER TO

9  GO FORWARD.

10         THE COURT:  ALL RIGHT.  JUNE 16TH.

11         THESE ARE THE MOTIONS THAT CAN BE CHARACTERIZED AS

12  DISCOVERY MOTIONS?

13         MR. KIERSH:  THAT'S CORRECT.

14         MR. ZUCKER:  YOUR HONOR, MR. PRICE HAS ASKED IF HE

15  CAN BE EXCUSED FROM ATTENDING THAT.

16         THE COURT:  I AM SORRY.

17         MR. ZUCKER:  MR. PRICE HAS ASKED IF HE COULD BE

18  EXCUSED FROM ATTENDING THAT.  HE WOULD LIKE TO GO TO WORK

19  THAT DAY I WILL BE HERE.

20         THE COURT:  ALL RIGHT.  HE MAY BE EXCUSED.

21         MR. KIERSH:  MAY MR. DE WOLFE AND I APPROACH THE

22  BENCH EX PARTE?

23         MS. HEPWORTH:  MAY I JUST ASK THAT MR. MARTIN BE

24  EXCUSED FROM THE JUNE 16TH HEARING?  WE HAVE ONGOING

25  DISCUSSIONS WITH THE GOVERNMENT.  WE DON'T KNOW -- AT THIS

20

```
 1   POINT, WE DON'T HAVE ANY DISPUTES THAT AREN'T RESOLVED.

 2           THE COURT:  ALL RIGHT.  AT YOUR REQUEST, YOU MAY

 3   BE EXCUSED FROM THAT HEARING.

 4           MS. HEPWORTH:  THANK YOU.

 5           MR. DAVIS:  YOUR HONOR, ON BEHALF OF VINCENT HILL,

 6   WE ARE ALSO REQUESTING THAT WE BE EXCUSED FROM THAT HEARING.

 7           THE COURT:  YOU MAY BE EXCUSED.

 8           ALL RIGHT.  YOU WANT TO APPROACH?

 9           MR. KIERSH:  WE WOULD ASK THAT IT BE PLACED UNDER

10   SEAL.

11           (SEALED BENCH CONFERENCE.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

21

1          (IN OPEN COURT.)

2          THE COURT:  ALL RIGHT.  ARE THERE ANY OTHER

3   MATTERS THAT WE NEED TO ADDRESS THIS MORNING?  IF NOT, I

4   WILL ENTER AN ORDER VACATING THE TRIAL DATE AND SETTING

5   FORTH THIS SCHEDULE.

6          MR. KIERSH:  THERE IS ONE MORE PENDING MOTION THAT

7   WE HAVE THAT I WOULD ASK THE COURT TO RULE ON TODAY.  THIS

8   IS OUR MOTION ON BEHALF OF MR. SWEENEY.  I THINK SOME OF THE

9   OTHER GENTLEMEN FROM WARSAW MAY HAVE JOINED, BUT WE HAVE

10  MOVED AND ASKED THE COURT FOR A CHANGE IN HIS LOCATION.  THE

11  GOVERNMENT YESTERDAY FILED THEIR OPPOSITION.

12         THE COURT:  WELL, THEN I AM NOT GOING TO HEAR IT.

13  I HAVEN'T LOOKED AT THE PAPERS ON IT --

14         MR. KIERSH:  VERY WELL.

15         THE COURT:  -- AND WOULD NOT BE IN A POSITION TO

16  TO BE ABLE TO RULE TODAY.  I WILL RULE ON THE PAPERS.

17         MR. KIERSH:  VERY WELL.  AND IF THE COURT WANTS

18  TO, AT LEAST FOR ME TO PRESENT, FURTHER ARGUMENT ON JUNE

19  16TH ON THIS ISSUE, I CAN DO THAT.

20         THE COURT:  I WILL LET YOU KNOW.

21         MR. KIERSH:  VERY WELL.

22         THE COURT:  ALL RIGHT.

23         ALL RIGHT.  THANK YOU, COUNSEL.

24         (WHEREUPON, THE ABOVE-ENTITLED MATTER WAS

25  ADJOURNED.)

22

1              CERTIFICATE OF REPORTER

2        THIS RECORD IS CERTIFIED BY THE UNDERSIGNED REPORTER TO

3    BE THE OFFICIAL TRANSCRIPT OF THE PROCEEDINGS INDICATED.

4

5                        PHYLLIS MERANA

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RECEIVED

Dec 14   8 07 AM '06

N. MAYER-WHITTINGTON
CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

1

```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


UNITED STATES,                    :
          GOVERNMENT,             :
                                  :
 VS.                              :    CR. NO. 98-329
                                  :
VINCENT HILL,                     :
JEROME MARTIN,                    :
SAMUEL CARSON,                    :
WILLIAM K. SWEENEY,               :        FILED
MAURICE PROCTOR,                  :
SEAN COATES,                      :       JUL 1 9 2001
          DEFENDANTS.             :
                                  :    NANCY MAYER-WHITTINGTON, CLERK
UNITED STATES                     :        U.S. DISTRICT COURT
          GOVERNMENT,             :
                                  :
 VS.                              :    CR. NO. 99-348
                                  :
GARY PRICE,                       :
          DEFENDANT               :
                                  :
```

```
                              WASHINGTON, D. C.
                              JANUARY 8, 2001
                              (MORNING SESSION.)

                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE THOMAS P. JACKSON
```

COURT REPORTER:          PHYLLIS MERANA
                         6816 U. S. DISTRICT COURT
                         3RD & CONSTITUTION AVE., N.W.
                         WASHINGTON, D. C. 20001

2

```
 1   FOR THE GOVERNMENT:           PETER ZEIDENBERG, AUSA
                                   ANJALI CHATURVEDI, AUSA
 2                                 555 4TH ST., N.W.
                                   WASHINGTON, D. C. 20001
 3
     FOR THE DEFENDANT HILL:       CHRISTOPHER DAVIS, ESQ.
 4                                 601 INDIANA AVE., N.W.
                                   #910
 5                                 WASHINGTON, D. C. 20001

 6   FOR THE DEFENDANT MARTIN:     JOANNE HEPWORTH, ESQ.
                                   305 H STREET, N.W.
 7                                 2ND FLOOR
                                   WASHINGTON, D. C. 20001
 8

 9   FOR THE DEFENDANT CARSON:     JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
10                                 419 7TH STREET, N.W.
                                   WASHINGTON, D. C. 20004
11
     FOR THE DEFENDANT SWEENEY:    STEVEN R. KIERSH, ESQ.
12                                 717 D STREET, N.W.
                                   SUITE 400
13                                 WASHINGTON, D. C. 20004

14   FOR THE DEFENDANT PROCTOR:    HOWARD BRAMSON, ESQ.
                                   717 D STREET, N.W.
15                                 THIRD FLOOR
                                   WASHINGTON, D. C. 20004
16
     FOR THE DEFENDANT COATES:     FREDERICK JONES, ESQ.
17                                 901 6TH STREET, S.W.
                                   #409
18                                 WASHINGTON, D. C. 20024

19   FOR THE DEFENDANT PRICE:      JONATHAN ZUCKER, ESQ.
                                   601 INDIANA AVE., N.W.
20                                 #901
                                   WASHINGTON, D. C. 20004

21

22

23

24

25
```

```
 1              THE COURT:  AND IF YOU WILL JUST PICK AN

 2   APPROPRIATE POINT IN THE COURSE OF YOUR OPENING TO

 3   INTERRUPT --

 4              MR. ZEIDENBERG:  THAT'S FINE.

 5              THE COURT:  -- I WOULD APPRECIATE IT.

 6              ALL RIGHT, MARSHAL.  WOULD YOU BRING THE JURY IN.

 7              THE DEPUTY MARSHAL:  THE JURY PANEL, YOUR HONOR.

 8              (JURY BROUGHT IN.)

 9              THE DEPUTY MARSHAL:  THE JURY PANEL IS ALL

10   PRESENT, YOUR HONOR.

11              THE COURT:  THANK YOU, MARSHAL.

12              MR. ZEIDENBERG, YOU MAY OPEN.

13              MR. ZEIDENBERG:  THANK YOU, YOUR HONOR.

14               OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

15              MR. ZEIDENBERG:  GOOD MORNING, LADIES AND

16   GENTLEMEN.

17              THE JURORS:  GOOD MORNING.

18              MR.  ZEIDENBERG:  ON THE EVENING OF AUGUST 29TH,

19   1992, A FIFTEEN-YEAR-OLD GIRL, NAMED CHRISHAUNA GLADDEN, WHO

20   IS KNOWN TO HER FRIENDS AS CHRISSY, WAS A WITNESS TO A

21   MURDER.  IT WAS A MURDER THAT OCCURRED IN THE AREA OF 37TH

22   PLACE, SOUTHEAST.

23              CHRISSY WASN'T THE ONLY WITNESS TO IT.  THERE WERE

24   A NUMBER OF PEOPLE FROM THAT NEIGHBORHOOD WHO SAW THE

25   MURDER.  IT WAS A MURDER THAT WAS COMMITTED B
```

1    OF WHOM IS SEATED HERE IN COURT.  THAT MAN'S NAME IS JEROME

2    MARTIN, SEATED RIGHT HERE AT THE END OF COUNSEL TABLE.  HIS

3    STREET NAME IS "PIMP".

4          HE COMMITTED THAT MURDER WITH SOMEONE NAMED

5    ANTONIO KNIGHT.

6          NOW, THE METROPOLITAN POLICE DEPARTMENT

7    INVESTIGATED THAT CASE, AND IT TOOK AWHILE TO SOLVE.  IT

8    TOOK AWHILE PRIMARILY BECAUSE THE PEOPLE IN THE NEIGHBORHOOD

9    THAT SAW IT WERE AFRAID AND RELUCTANT TO COOPERATE.  THEY

10   DIDN'T WANT TO GET INVOLVED BECAUSE THE PEOPLE WHO WERE

11   INVOLVED IN THE MURDER HUNG OUT OR LIVED -- I AM TALKING

12   ABOUT JEROME MARTIN, "PIMP," AND ANTONIO KNIGHT WERE FROM

13   THAT NEIGHBORHOOD AND HUNG OUT THERE.

14         AND OVER TIME, LADIES AND GENTLEMEN, THE F.B.I.,

15   FOR REASONS THAT WILL BECOME CLEAR TO YOU AS THIS CASE

16   PROGRESSES, BECAME INVOLVED IN THAT INVESTIGATION, AND THEY

17   WORKED ON IT.  AND, EVENTUALLY, THEY TALKED TO CHRISSY

18   GLADDEN.  SHE WAS PUT INTO THE GRAND JURY AND TOLD THE GRAND

19   JURY WHAT IT IS THAT SHE KNEW, AND SHE WAS SERVED WITH A

20   SUBPOENA TO TESTIFY AT A TRIAL.  IT WAS GOING TO BE THE

21   TRIAL OF JEROME MARTIN AND ANTONIO KNIGHT IN THE SUPERIOR

22   COURT HERE IN D. C.  THAT TRIAL WAS SCHEDULED FOR OCTOBER

23   9TH, 1996.

24         NOW, PRIOR TO THAT TRIAL, CHRISSY GLADDEN WAS

25   MOVED OUT OF THE NEIGHBORHOOD WITH THE ASSISTANCE OF THE

1

1     UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA

2

3 ————————————————
 UNITED STATES,      :
    GOVERNMENT,   :

4           :
 VS.        :  CR. NO. 98-329

5           :

6 VINCENT HILL,     :
 JEROME MARTIN,    :  **FILED**
 SAMUEL CARSON,    :

7 WILLIAM K. SWEENEY,  :  JUL 1 9 2001
 MAURICE PROCTOR,   :

8 SEAN COATES,     : NANCY MAYER-WHITTINGTON, CLERK
    DEFENDANTS.  :   U.S. DISTRICT COURT

9           :
 ————————————————
 UNITED STATES     :

10    GOVERNMENT,   :
           :

11 VS.        :  CR. NO. 99-348
           :

12 GARY PRICE,      :
    DEFENDANT    :

13 ————————————————

14        WASHINGTON, D. C.
         JANUARY 10, 2001

15         (MORNING SESSION.)

16     TRANSCRIPT OF PROCEEDINGS
   BEFORE THE HONORABLE THOMAS P. JACKSON

17

18

19

20 COURT REPORTER:    PHYLLIS MERANA
         6816 U. S. DISTRICT COURT

21         3RD & CONSTITUTION AVE., N.W.
         WASHINGTON, D. C. 20001

22

23

24

25

2

| | | |
|---|---|---|
| 1 | FOR THE GOVERNMENT: | PETER ZEIDENBERG, AUSA |
| 2 | | ANJALI CHATURVEDI, AUSA |
| | | 555 4TH ST., N.W. |
| 3 | | WASHINGTON, D. C. 20001 |
| 4 | FOR THE DEFENDANT HILL: | CHRISTOPHER DAVIS, ESQ. |
| | | 601 INDIANA AVE., N.W. |
| 5 | | #910 |
| | | WASHINGTON, D. C.  20004 |
| 6 | FOR THE DEFENDANT MARTIN: | JOANNE HEPWORTH, ESQ. |
| | | 305 H STREET, N.W. |
| 7 | | 2ND FLOOR |
| 8 | | WASHINGTON, D. C.  20001 |
| 9 | FOR THE DEFENDANT CARSON: | JOSEPH BESHOURI, ESQ. |
| | | LEXI NEGIN-CHRIST, ESQ. |
| 10 | | 419 7TH STREET, N.W. |
| 11 | | WASHINGTON, D. C.  20004 |
| 12 | FOR THE DEFENDANT SWEENEY: | STEVEN R. KIERSH, ESQ. |
| | | 717 D STREET, N.W. |
| 13 | | SUITE 400 |
| | | WASHINGTON, D. C.  20004 |
| 14 | FOR THE DEFENDANT PROCTOR: | HOWARD BRAMSON, ESQ. |
| | | 717 D STREET, N.W. |
| 15 | | THIRD FLOOR |
| 16 | | WASHINGTON, D. C.  20004 |
| 17 | FOR THE DEFENDANT COATES: | FREDERICK JONES, ESQ. |
| | | 901 6TH STREET, S.W. |
| 18 | | #409 |
| | | WASHINGTON, D. C.  20024 |
| 19 | FOR THE DEFENDANT PRICE: | JONATHAN ZUCKER, ESQ. |
| | | 601 INDIANA AVE., N.W. |
| 20 | | #901 |
| | | WASHINGTON, D. C.  20004 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

14

1        MS. HEPWORTH:  THANK YOU, YOUR HONOR.

2        THE COURT:  NOW, I HAVE LOOKED AT THE CASE

3    AUTHORITY THAT YOU HAVE PROVIDED ME WITH RESPECT TO THE

4    JENCKS ACT AND ITS APPLICATION TO GRAND JURY TESTIMONY AND

5    302'S OF SPECIAL AGENT LISI.

6        I BELIEVE THE MOST PERTINENT CASE IS THE CASE OF

7    UNITED STATES VERSUS MASON, D. C. CIRCUIT, AT 523 F. 2D,

8    1122, DECIDED IN 1975, WHICH, IN EFFECT, HOLDS THAT

9    STATEMENTS OF A WITNESS WHICH ARE NOT RELEVANT TO HIS

10   TESTIMONY AT TRIAL NEED NOT BE DISCLOSED UNDER THE JENCKS

11   ACT.  THE COURT, HOWEVER, OBSERVES THAT THE UNREDACTED

12   STATEMENTS OUGHT TO BE FILED UNDER SEAL WITH THE COURT, AND

13   I WILL ASK THE GOVERNMENT TO PROVIDE THE UNREDACTED

14   STATEMENTS.

15       MS. HEPWORTH:  GOOD MORNING, YOUR HONOR.  JOANNE

16   HEPWORTH FOR MR. MARTIN.

17       THE COURT:  I ALSO AM RELYING UPON THE CASE OF

18   UNITED STATES VERSUS CARTER, ALSO THE D. C. CIRCUIT, 70 F.3D

19   146, DECIDED IN 1995, WHERE THE COURT STATES, QUOTE, IF THE

20   UNPRODUCED STATEMENT COULD NOT HAVE ASSISTED THE DEFENSE IN

21   CROSS-EXAMINING THE WITNESS, THERE IS NO REASON FOR THE

22   TRIAL COURT TO ORDER A MISTRIAL OR FOR AN APPELLATE COURT TO

23   REVERSE A CONVICTION.

24       IF I UNDERSTAND THE GOVERNMENT'S REPRESENTATION

25   CORRECTLY, THAT MATERIAL WHICH HAS BEEN EXCISED FROM SPECIAL

USCA Case #21-3072    Document #2077668      Filed: 10/01/2024    Page 49 of 443
Case 1:98-cr-00329-RCL  Document 654  Filed 07/19/01  Page 15 of 77

15

1   AGENT LISI'S GRAND JURY TESTIMONY AND HIS 302'S IS HIS

2   PARAPHRASE OF THE QUOTATIONS OF OTHER PERSONS WHO MAY OR MAY

3   NOT BECOME WITNESSES IN THE CASE, RATHER THAN STATEMENTS OF

4   HIS OWN, AND HE DOES NOT INTEND, ON HIS DIRECT TESTIMONY AT

5   THIS TIME, TO RELATE ANY OF THOSE STATEMENTS OF OTHER

6   PERSONS, AND SO THEY ARE NOT RELEVANT TO THE SUBJECT OF HIS

7   TESTIMONY.

8           I AM NOT PREPARED AT THIS POINT, HOWEVER,

9   MR. ZEIDENBERG, TO CONCLUDE THAT THEY WILL NOT BECOME JENCKS

10  MATERIAL IF THE OTHER PERSONS ARE THEMSELVES CALLED TO

11  TESTIFY.

12          NOW, YOU WANTED TO BE HEARD, MS. HEPWORTH?

13          MS. HEPWORTH:  I AM SORRY, YOUR HONOR.  I THINK

14  MR. KIERSH WANTED TO BE HEARD FIRST.

15          MR. KIERSH:  THANK YOU, YOUR HONOR.  GOOD MORNING.

16          YOUR HONOR, WE WOULD ASK, AND WE THINK IT'S

17  CONSISTENT WITH THE VERY SPECIFIC LANGUAGE OF THE JENCKS ACT

18  THAT THE INFORMATION THAT THE GOVERNMENT SEEKS -- WELL, THE

19  REDACTED INFORMATION -- NOT THAT IT JUST BE PLACED UNDER

20  SEAL, BUT THAT THE COURT REVIEW IT IN CAMERA.

21          AND I WOULD SUBMIT TO THE COURT THE ACT REQUIRES

22  THE COURT TO CONDUCT A FULL IN CAMERA EVALUATION OF THE

23  SUBSTANCE OF THE TESTIMONY, AND I POINT OUT THAT WE SUBMIT

24  THIS IS VERY IMPORTANT.

25          AND I WANT TO GO BACK TO SOMETHING THAT OCCURRED

16

1    IN SEPTEMBER AT THE MOTIONS HEARINGS.  WE HAD FILED A BRADY

2    MOTION PURSUANT TO THE 302 STATEMENTS OF AGENT LISI.  THE

3    GOVERNMENT REPRESENTED TO THE COURT, "WELL, THERE IS NO

4    BRADY IN THERE."  THE COURT THEN REVIEWED THE 302'S IN

5    CAMERA AND THEN THE COURT CAME BACK AND SAID, "WELL, THERE

6    IS BRADY," AND THEN YOU ORDERED THAT THE GOVERNMENT TURN

7    OVER --

8              THE COURT:  I FOUND ONE INSTANCE OF BRADY.

9              MR. KIERSH:  WELL, WHATEVER IT IS, YOU DID FIND

10   BRADY, WHICH WAS INCONSISTENT WITH WHAT THE GOVERNMENT WAS

11   PROFFERING TO THE COURT.  AND UNDER SECTION (C) OF THE BRADY

12   ACT OR THE JENCKS ACT, IT REQUIRES THE COURT TO CONDUCT AN

13   IN CAMERA REVIEW.

14             AND WE WOULD ASK THAT -- I KNOW IT'S BURDENSOME,

15   BUT THIS IS SOMETHING THAT SHOULD HAVE BEEN -- WE ALL SHOULD

16   HAVE BEEN ALERTED TO THIS PRETRIAL.  BUT I WOULD ASK THE

17   COURT TO REVIEW ALL OF THE GRAND JURY TESTIMONY THAT IS

18   REDACTED AND ALL THE 302'S SO THAT THE COURT CAN MAKE AN

19   INDEPENDENT EVALUATION, BECAUSE I WOULD SUBMIT TO THE COURT

20   THAT, YOUR HONOR, YOU ARE IN A MUCH, MUCH BETTER SITUATION

21   AND POSTURE TO EVALUATE THIS TESTIMONY THAN THE COURT OF

22   APPEALS IS.

23             YOU'RE FAMILIAR WITH THIS CASE.  YOU KNOW WHAT THE

24   RESPECTIVE PARTIES' THEORIES ARE.  YOU HAVE MUCH MORE

25   ABILITY TO GIVE THIS A CONTEXTUAL ANALYSIS THAN THE COURT OF

17

1   APPEALS CAN.  SO WE WOULD ASK FOR THAT PROCESS TO BE DONE.

2          THE COURT:  MR. ZEIDENBERG?

3          MR. ZEIDENBERG:  YOUR HONOR, WE WILL PROVIDE THE

4   REDACTED AND UNREDACTED GRAND JURY TESTIMONY, AND IF THE

5   COURT WISHES --

6          THE COURT:  IT ISN'T THAT THE COURT WISHES.  IT'S

7   THAT THE ACT REQUIRES IT UPON REQUEST OF THE DEFENSE.

8          MR. ZEIDENBERG:  WE CERTAINLY HAVE NO OBJECTION IF

9   THE COURT WISHES TO DO IT.  WE'RE NOT REQUESTING IT.  I

10  UNDERSTAND THAT, PERHAPS OUT OF AN ABUNDANCE OF CAUTION, SO

11  THERE IS NO QUESTION --

12         THE COURT:  THE ACT REQUIRES IT.

13         MR. ZEIDENBERG:  THAT'S FINE, YOUR HONOR.

14         THE COURT:  YOUR MASON CASE REQUIRES IT.

15         MR. ZEIDENBERG:  WE'RE PREPARED TO GIVE THE COURT

16  THAT MATERIAL.

17         THE COURT:  ALL RIGHT.

18         MR. ZEIDENBERG:  AND I THINK THAT THE COURT WILL

19  SEE IT'S QUITE VOLUMINOUS.

20         THE COURT:  I AM SURE IT IS.

21         MR. ZEIDENBERG:  BUT I THINK THAT IN SOME WAY, THE

22  COURT'S JOB WILL BE MADE EASIER WHEN THE COURT HEARS THE

23  NATURE OF THE DIRECT EXAMINATION BECAUSE THE DIRECT

24  EXAMINATION IS GOING TO BE -- THE ONE WE INTEND TO PROVIDE

25  IS A VERY GENERAL OVERVIEW.  AND THE MATERIAL THAT IS

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 52 of 443
Case 1:98-cr-00329-RCL   Document 654   Filed 07/19/01   Page 30 of 77

30

1    BLOCKS.

2    Q.   THANK YOU.  YOU CAN RESUME THE STAND.

3          (WITNESS RETAKING STAND.)

4    Q.   NOW, AGENT LISI, AFTER WAYNE PERRY WAS ARRESTED AND

5    INCARCERATED, CAN YOU TELL US WHETHER OR NOT YOU NOTICED ANY

6    MARKED DIFFERENCE IN THE LEVEL OF VIOLENCE OR DRUG ACTIVITY

7    IN SOUTHWEST WHERE YOU'RE REFERRING TO?

8          MR. BRAMSON:  OBJECTION.

9          THE COURT:  OVERRULED.

10         THE WITNESS:  NO, WE DID NOT.

11   BY MR. ZEIDENBERG:

12   Q.   CAN YOU DESCRIBE WHAT OBSERVATIONS -- PERSONAL

13   OBSERVATIONS YOU HAD MADE -- AND I AM REFERRING NOW TO

14   POST-1993, GOING INTO 1994 -- OF THE DRUG ACTIVITY IN THE

15   AREA OF GREENLEAF GARDENS?

16   A.   SURE.

17         DURING THAT TIME, AS SOME MAY REMEMBER, THE SOUTH

18   CAPITOL STREET RAMP WAS UNDER CONSTRUCTION.  OUR OFFICE IS

19   LOCATED IN SOUTHWEST, DOWN NEAR BUZZARD'S POINT ALL THE WAY

20   AT THE WATER, NEAR THE COAST GUARD BUILDING.

21         THE ROUTE THAT WE HAVE HAD TO TAKE FROM OUR OFFICE

22   AND TO OUR OFFICE THROUGHOUT THE DAY WOULD GO NEAR THIS

23   AREA.

24         WE WERE ALREADY FAMILIAR WITH THIS AREA FROM THE

25   WAYNE PERRY INVESTIGATION, AND WE WOULD RIDE BY, AND WE

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 53 of 443
Case 1:98-cr-00329-RCL  Document 654  Filed 07/19/01  Page 31 of 77

31

1    WOULD NOTICE --

2              MR. BRAMSON:  OBJECTION.  HE IS TALKING ABOUT WHAT

3    OTHER PEOPLE WOULD NOTICE.

4              THE COURT:  HE IS TALKING ABOUT WHAT HE NOTICED, I

5    BELIEVE.

6              MR. BRAMSON:  BUT HE IS SAYING "WE," YOUR HONOR.

7              THE COURT:  THE OBJECTION IS OVERRULED.

8              MR. BRAMSON:  THANK YOU.

9              THE WITNESS:  I NOTICED, WHILE RIDING THROUGH

10   THERE, AN INCREASE IN THE VEHICLE TRAFFIC.  SPECIFICALLY,

11   YOU COULD RIDE THROUGH THERE, AND IT WAS AN OPEN-AIR MARKET.

12             THERE WERE TIMES WHEN CARS WOULD BE LINED UP IN

13   THE EVENINGS ON WEEKENDS, FRIDAY NIGHTS -- THREE OR FOUR

14   CARS LINED UP, AND PEOPLE COMING TO THE WINDOW, AND YOU

15   COULD SEE THEM REACH IN THE WINDOW AND TAKE MONEY AND HAND

16   SOMETHING IN.  AND THIS KIND OF TRAFFIC REALLY PICKED UP.

17   BY MR. ZEIDENBERG:

18   Q.  WHAT TIMES OF THE DAY, NIGHTS, OR WEEKENDS DID YOU

19   NOTICE THAT?

20   A.  ALL TIMES.  MORNING, AFTERNOON, AND EVENING.  ON

21   WEEKENDS -- YOU KNOW, IF I WOULD HAVE A CHANCE TO RIDE

22   THROUGH THERE ON THE WEEKEND.  ALL TYPES OF WEATHER.  HEAVY

23   SNOW AND HEAVY RAIN.

24   Q.  NOW, IN REGARDS TO VIOLENCE -- SPECIFIC ACTS OF VIOLENCE

25   IN THE AREA -- DID YOU RECEIVE REPORTS OF VIOLENCE IN THAT

USCA Case #21-3072    Document #2077668      Filed: 10/01/2024    Page 54 of 443
Case 1:98-cr-00329-RCL  Document 654  Filed 07/19/01  Page 32 of 77

32

1    AREA?

2    A.  YES, SIR.

3    Q.  AND AS A RESULT OF THOSE REPORTS AND AS A RESULT OF YOUR

4    OBSERVATIONS AND THOSE OBSERVATIONS OF OTHER AGENTS, WAS A

5    DECISION MADE REGARDING CONDUCTING AN INVESTIGATION THERE?

6    A.  YES, SIR.  IN LATE 1995 -- THROUGHOUT 1995, WE WERE

7    URGED BY SOME PEOPLE TO OPEN AN INVESTIGATION INTO THAT

8    AREA.  AND IN LATE 1995, WE DID OPEN AN INVESTIGATION.

9    Q.  WHAT DOES THAT MEAN?

10   A.  IT MEANS A COUPLE OF THINGS.  ADMINISTRATIVELY FOR US,

11   THE F.B.I. -- THE TYPES OF CASES THAT WE WORK, WE HAVE TO

12   SIT DOWN AND DOCUMENT WHAT WE PLAN TO DO, WHERE OUR

13   INVESTIGATION WILL BE FOCUSED, AND WHAT WE EXPECT THE

14   INVESTIGATION TO COVER.

15        WE DID THIS.  WE ARE GIVEN A CASE NUMBER.  ONCE WE

16   HAVE THAT CASE NUMBER, THAT IS THE CASE NUMBER FOR THAT

17   INVESTIGATION.  AND ANYTHING WE DO IS A PART OF THAT

18   INVESTIGATION THROUGHOUT THE INVESTIGATION.

19   Q.  WHAT DID YOU HAVE TO DO -- WELL, SPECIFICALLY, WHAT WAS

20   THE GOAL OF YOUR INVESTIGATION?

21   A.  WHEN WE BEGAN THE INVESTIGATION, OUR SQUAD OR TASK FORCE

22   PRIMARILY WOULD HAVE TWO TYPES OF INVESTIGATIONS.  ONE WOULD

23   FOCUS ON INDIVIDUALS -- PEOPLE THAT WERE BELIEVED TO HAVE

24   BEEN RESPONSIBLE FOR VIOLENT CRIMES.  OTHERS WOULD BE TO

25   FOCUS ON NEIGHBORHOODS.

1          THIS WAS TO FOCUS ON THAT NEIGHBORHOOD, TO

2    IDENTIFY WHO WAS RESPONSIBLE FOR THE VIOLENCE IN THAT AREA

3    AND INVESTIGATE THEM AND ULTIMATELY PROSECUTE THE PEOPLE

4    RESPONSIBLE.

5    Q.  DID YOU HAVE SPECIFIC INDIVIDUALS -- WHEN YOU OPENED

6    THIS INVESTIGATION, DID YOU HAVE SPECIFIC INDIVIDUALS IN

7    MIND AS TO WHO YOU INTENDED TO TARGET AND ARREST IN THE

8    COURSE OF THAT INVESTIGATION?

9    A.  NO, NOT SPECIFICALLY.  WE LOOKED AT THE AREA, AND WE

10   TRIED TO GET AN IDEA OF HOW WE WANTED TO PROCEED WITH THE

11   INVESTIGATION, BUT THERE WERE NO SPECIFIC PEOPLE THAT WE

12   TARGETED.  IT WAS MOSTLY THE AREA THAT WE FOCUSED ON.

13   Q.  NOW, ARE YOU FAMILIAR WITH THE DEFENDANTS THAT ARE

14   PRESENT IN THE COURTROOM TODAY?

15   A.  YES, SIR.

16   Q.  AND COULD YOU PLEASE IDENTIFY THEM BY NAME AND INDICATE

17   WHERE IT IS THEY ARE SEATED?

18   A.  SURE.

19   Q.  AND IF YOU COULD ALSO INDICATE WHETHER YOU'RE FAMILIAR

20   WITH ANY PARTICULAR STREET NAMES THAT ARE ASSOCIATED WITH

21   THAT DEFENDANT.

22   A.  SURE.  SITTING -- I GUESS WE'LL START THE FURTHEREST

23   FROM ME -- AT THE END OF DEFENSE TABLE, WEARING A DARK SUIT,

24   A WHITE SHIRT, AND A DARK TIE IS GARY PRICE.  HE IS KNOWN AS

25   "HARRY O."

41

```
 1            THE COURT:  OVERRULED.  GOVERNMENT'S PB-12 IS
 2   ADMITTED.
 3                           (WHEREUPON, GOVERNMENT'S
 4                           EXHIBIT NUMBER PB-12 WAS
 5                           RECEIVED IN EVIDENCE.)
 6   BY MR. ZEIDENBERG:
 7   Q.  NOW, YOU SAID THE DECISION WAS MADE TO CONDUCT AN
 8   INVESTIGATION INTO THIS AREA?
 9   A.  YES, SIR.
10   Q.  CAN YOU TELL THE LADIES AND GENTLEMEN, FIRST OF ALL,
11   WHAT YOUR ROLE WAS IN THAT INVESTIGATION?
12   A.  SURE.  I WAS THE CASE AGENT FOR THE INVESTIGATION.
13            THERE WERE SEVERAL AGENTS, AS WELL AS DETECTIVES
14   AND/OR OFFICERS, WHO WOULD WORK ON IT.  ONE PERSON IS LISTED
15   AS THE CASE AGENT.  HOWEVER, WE ALL WORKED AS CO-CASE
16   AGENTS.  IT WAS MORE OF A TEAM.
17            AT ONE POINT, I WOULD SAY WE HAD AS MANY AS FIVE
18   AGENTS WORKING ON THE INVESTIGATION AND PERHAPS THREE
19   DETECTIVES.  SOMETIMES IT WAS AS LITTLE AS TWO AGENTS AND
20   TWO DETECTIVES.
21   Q.  WHAT DID YOU DO INITIALLY WHEN YOU DECIDED TO CONDUCT OR
22   INITIATE THIS INVESTIGATION?  WHAT WERE THE FIRST STEPS YOU
23   HAD TO TAKE?
24   A.  WHEN WE FIRST DECIDE TO OPEN UP A CASE, WE GET A GENERAL
25   PLAN OF ATTACK -- WHAT WE WANT TO DO.  TO GIVE US AN IDEA OF
```

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,         .    Docket No. CR 98-329

          Government,             .    Washington, D.C.
                                  .    January 23, 2001
     vs.                          .    2:15 p.m.
                                  .
VINCENT HILL,                     .    (AFTERNOON SESSION)
JEROME MARTIN,                    .
SAMUEL CARSON,                    .
WILLIAM K. SWEENEY,               .
MAURICE PROCTOR,                  .
SEAN COATES,                      .
                                  .                    FILED
          Defendants              .
                                  .               MAR 1 1 2003
. . . . . . . . . . . . . . . .   .
                                  .         NANCY MAYER WHITTINGTON, CLERK
UNITED STATES OF AMERICA,         .              U.S. DISTRICT COURT
                                  .
          Government,             .
                                  .    Docket No. CR 99-348
     vs.                          .
                                  .
GARY PRICE,                       .
                                  .
          Defendant.              .
                                  .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.   20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.   20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.   20001

2

```
For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                               LEXI NEGIN-CHRIST, ESQ.
                               419 7th Street, N.W.
                               Washington, D.C.  20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                               717 D Street, N.W.
                               Suite 400
                               Washington, D.C.  20004

For the Defendant Proctor:     HOWARD BRAMSON, ESQ.
                               717 D Street, N.W.
                               Third Floor
                               Washington, D.C.  20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                               901 6th Street, S.W.
                               Suite 409
                               Washington, D.C.  20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                               601 Indiana Ave., N.W.
                               Suite 901
                               Washington, D.C.  20024

Court Reporter:                BEVERLY J. BYRNE
                               Official Court Reporter
                               Room 6810 U.S. Courthouse
                               Washington, D.C.  20001
                               (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

3

## I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WITNESSES FOR THE<br>GOVERNMENT: |  |  |  |  |
| Vincent Lisi | -- | -- | 5 | 36 |
| Reginald Switzer | 61 | -- | -- | -- |

| EXHIBITS: |  | MARKED | RECEIVED |
|---|---|---|---|
| Defendant Martin's Exhibit No. 6 |  | 48 | -- |
| Defendant Martin's Exhibit No. 7 |  | 54 | -- |
| Government's Exhibit No. 2 |  | 69 | 69 |
| Government's Exhibit Nos. IA404 & IA405 |  | 90 | 90 |

62

```
1    A.    33.

2    Q.    And can you tell us how far you went in school?

3    A.    Tenth grade.

4    Q.    And what was the last school that you attended?

5    A.    Coolidge Senior High School.

6          THE COURT:  I'm sorry?

7          THE WITNESS:  Coolidge Senior High School.

8    BY MS. CHATURVEDI:

9    Q.    Now, while you were attending Coolidge Senior High

10   School, can you tell us in what quadrant of the city you were

11   living at the time?

12   A.    Southwest, D.C.

13   Q.    Do you have any nicknames, Mr. Switzer?

14   A.    Doo Doo.

15   Q.    And how did you get that nickname?

16   A.    Vito gave it to me.

17   Q.    And when you say, Vito, do you know Vito by another name?

18   A.    Vincent Hill.

19   Q.    Do you see Mr. Hill in the courtroom today?

20   A.    Yeah, he's right there to my right with the coovie on.

21         MS. CHATURVEDI:  If the record would reflect that

22   the witness has identified Vincent Hill.

23         THE COURT:  All right.  The record will so reflect.

24   I missed your nickname.  What is it?

25         THE WITNESS:  Doo Doo.
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 61 of 443
Case 1:98-cr-00329-RCL   Document 940   Filed 03/11/03   Page 63 of 99

63

1           THE COURT:  How do you spell it?

2           THE WITNESS:  Doo Doo.

3           THE COURT:  Doo Doo.  All right.

4    BY MS. CHATURVEDI:

5    Q.   And Mr. Switzer, can you tell us about how old you were

6    when you first got that nickname?

7    A.   I was about 12 or 13.

8    Q.   And can you also tell us for how long it's been that

9    you've known Vincent Hill?

10   A.   I known him ever since I was about 11, 12 years old.

11   Q.   Okay.  Now, Mr. Switzer, were you originally charged in

12   this case that's on trial?  Were you charged as part of this

13   indictment?

14   A.   Yes.

15   Q.   And are you testifying in connection with a plea

16   agreement that you've entered into with the United States?

17   A.   Yes.

18           MS. CHATURVEDI:  May I approach the witness, Your

19   Honor?

20           THE COURT:  Surely may.

21   BY MS. CHATURVEDI:

22   Q.   Mr. Switzer, I'm going to hand you what's been marked

23   Government's Exhibit No. G2 for identification.  Do you know

24   what that is, sir?

25   A.   Yes.

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 62 of 443
Case 1:98-cr-00329-RCL    Document 658    Filed 07/19/01    Page 1 of 61

1

1          UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES,                    :
                   GOVERNMENT,          :
4                                      :
      VS.                              :    CR. NO. 98-329
5                                      :
     VINCENT HILL,                     :
6    JEROME MARTIN,                    :
     SAMUEL CARSON,                    :
7    WILLIAM K. SWEENEY,               :         FILED
     MAURICE PROCTOR,                  :
8    SEAN COATES,                      :        JUL 1 9 2001
                   DEFENDANTS.          :
9                                      :    NANCY MAYER WHITTINGTON, CLERK
                                             U.S. DISTRICT COURT
     UNITED STATES                     :
10                 GOVERNMENT,          :
                                       :
11    VS.                              :    CR. NO. 99-348
                                       :
12   GARY PRICE,                       :
                   DEFENDANT            :
13   _____:

14                                 WASHINGTON, D. C.
                                   JANUARY 24, 2001
15                                 (MORNING SESSION)
                                   (11:17 A.M.)
16

17                 TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE THOMAS P. JACKSON
18

19

20

21   COURT REPORTER:          PHYLLIS MERANA
                              6816 U. S. DISTRICT COURT
22                            3RD & CONSTITUTION AVE., N.W.
                              WASHINGTON, D. C. 20001
23

24

25

2

```
 1   FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                     ANJALI CHATURVEDI, AUSA
 2                                   555 4TH ST., N.W.
                                     WASHINGTON, D. C. 20001
 3
     FOR THE DEFENDANT HILL:         CHRISTOPHER DAVIS, ESQ.
 4                                   601 INDIANA AVE., N.W.
                                     #910
 5                                   WASHINGTON, D. C.   20004

 6   FOR THE DEFENDANT MARTIN:       JOANNE HEPWORTH, ESQ.
                                     305 H STREET, N.W.
 7                                   2ND FLOOR
                                     WASHINGTON, D. C.   20001
 8

 9   FOR THE DEFENDANT CARSON:       JOSEPH BESHOURI, ESQ.
                                     LEXI NEGIN-CHRIST, ESQ.
10                                   419 7TH STREET, N.W.
                                     WASHINGTON, D. C.   20004
11
     FOR THE DEFENDANT SWEENEY:      STEVEN R. KIERSH, ESQ.
12                                   717 D STREET, N.W.
                                     SUITE 400
13                                   WASHINGTON, D. C.   20004

14   FOR THE DEFENDANT PROCTOR:      HOWARD BRAMSON, ESQ.
                                     717 D STREET, N.W.
15                                   THIRD FLOOR
                                     WASHINGTON, D. C.    20004
16
     FOR THE DEFENDANT COATES:       FREDERICK JONES, ESQ.
17                                   901 6TH STREET, S.W.
                                     #409
18                                   WASHINGTON, D. C.   20024

19   FOR THE DEFENDANT PRICE:        JONATHAN ZUCKER, ESQ.
                                     601 INDIANA AVE., N.W.
20                                   #901
                                     WASHINGTON, D. C.   20004
21

22

23

24

25
```

```
 1                    I N D E X

 2    WITNESS                    DIRECT (CONTINUED.)

 3    REGINALD SWITZER

 4          BY MS. CHATURVEDI          5

 5

 6

 7                  E X H I B I T S

 8    GOVERNMENT'S                IN EVIDENCE

 9    M-1                              37

10    IA-400, IA-401 AND IA-403        52

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6

```
 1   AND YOU INDICATED TO US WHEN IT WAS THIS PHOTOGRAPH WAS

 2   TAKEN.  CAN YOU REMIND US OF THAT DATE?

 3   A.  IT WAS 1989.

 4   Q.  AND CAN YOU TELL US ABOUT HOW OLD YOU WERE AT THE TIME

 5   THIS PHOTOGRAPH WAS TAKEN?

 6   A.  ABOUT 19 OR 20.

 7   Q.  AND HOW MUCH OF AN AGE DIFFERENCE WAS THERE BETWEEN YOU

 8   AND MR. PERRY, ROUGHLY?

 9   A.  I THINK IT WAS LIKE FIVE OR SIX YEARS.  SOMETHING LIKE

10   THAT.

11   Q.  KEEP YOUR VOICE UP.

12   A.  ABOUT FIVE OR SIX YEARS DIFFERENCE.

13   Q.  AND WHO WAS OLDER?

14   A. HE WAS.

15   Q.  OKAY.

16        YOU TOLD US YESTERDAY THAT MR. HILL -- VINCENT

17   HILL HAD BEEN THE PERSON WHO HAD GIVEN YOU YOUR NICKNAME OF

18   "DOO-DOO," YOU SAID.

19        HOW OLD WERE YOU, AGAIN, WHEN YOU FIRST HAD

20   CONTACT WITH MR. HILL?

21   A.  BETWEEN 10 AND 11.

22   Q.  ALL RIGHT.  I AM GOING TO SAY TO YOU ONE LAST TIME,

23   HOPEFULLY, KEEP YOUR VOICE UP JUST A LITTLE BIT MORE SO THAT

24   ALL THE MEMBERS OF THE JURY CAN HEAR YOU.  OKAY?

25   A.  ALL RIGHT.
```

7

```
 1   Q.  ALL RIGHT.

 2            AND HOW WAS IT THAT YOU FIRST MET MR. HILL?

 3   A.  I MET HIM THROUGH MY SISTER'S BOYFRIEND.

 4   Q.  AND WHO WAS YOUR SISTER'S BOYFRIEND?

 5   A.  "DINO" ROACH?

 6   Q.  AND IS "DINO" ROACH ANY RELATION TO THE PERSON YOU

 7   IDENTIFIED YESTERDAY IN ONE OF THOSE PHOTOGRAPHS, ANOTHER

 8   INDIVIDUAL WITH THE LAST NAME OF ROACH?

 9   A.  YES.

10   Q.  WHO WAS THE PERSON YOU IDENTIFIED IN THE PHOTOGRAPH?

11   A.  DANA ROACH.

12   Q.  AND WHAT IS DANA ROACH AND DINO ROACH'S RELATIONSHIP?

13   A.  THEY ARE BROTHERS.

14   Q.  WHAT WAS THE AGE DIFFERENCE AND WHAT IS THE AGE

15   DIFFERENCE BETWEEN YOU AND MR. HILL, APPROXIMATELY?

16   A.  PROBABLY ABOUT FIVE -- FOUR OR FIVE YEARS DIFFERENCE, OR

17   SIX.  BETWEEN FOUR AND SIX YEARS DIFFERENCE.

18   Q.  OKAY.  AND WHO IS OLDER?

19   A.  HE IS.

20   Q.  BACK WHEN YOU FIRST MET MR. HILL, CAN YOU DESCRIBE FOR

21   US WHAT YOUR RELATIONSHIP WAS LIKE WITH HIM?

22   A.  WHAT OUR RELATIONSHIP WAS LIKE?

23            BIG BROTHER/LITTLE BROTHER RELATIONSHIP.

24   Q.  AND WHAT DO YOU MEAN BY THAT?

25   A.  I LOOKED UP TO HIM.
```

8

```
 1   Q.  WHY?
 2   A.  AS A BIG BROTHER.
 3   Q.  WHY?
 4   A.  HE HAD MONEY.  HE HAD OTHER INDIVIDUALS.
 5            THE COURT:  I AM SORRY.  HE HAD WHAT?
 6            THE WITNESS:  HE HAD OTHER INDIVIDUALS THE SAME
 7   AGE AS I -- OTHERS WHO SOLD DRUGS.  AND I LOOKED UP TO HIM,
 8   AND I LIKED THAT.
 9   BY MS. CHATURVEDI:
10   Q.  WHAT DID YOU LIKE?
11   A.  I LIKED THE MONEY, YOU KNOW, AND THE POWER THAT HE HAD.
12   I MEAN I COULD -- I MEAN, BASICALLY, AFTER I GOT IN THE
13   FAMILY, I COULD DO ANYTHING I WOULD LIKE, MEANING --
14            MR. DAVIS:  OBJECTION TO THE CHARACTERIZATION.
15            THE COURT:  OBJECTION TO WHAT?
16            MR. DAVIS:  THE CHARACTERIZATION.  HE
17   CHARACTERIZED SOMETHING AS BEING A FAMILY.  I OBJECT TO THE
18   CHARACTERIZATION.
19            THE COURT:  OVERRULED.
20   BY MS. CHATURVEDI:
21   Q.  AND WHEN YOU FIRST MET MR. HILL, HOW FREQUENTLY WERE YOU
22   IN CONTACT WITH HIM WHEN YOU FIRST MET HIM?
23   A.  I STAYED IN CONTACT WITH HIM QUITE FREQUENTLY.
24   Q.  AND WHAT KINDS OF THINGS DID YOU DO WITH MR. HILL WHEN
25   YOU FIRST MET HIM WHEN YOU WERE AROUND 11 YEARS OLD?
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 68 of 443
Case 1:98-cr-00329-RCL   Document 658   Filed 07/19/01   Page 9 of 61

9

| | |
|---|---|
| 1 | A.  WELL, WHEN I FIRST MET MR. HILL, I STARTED OUT WITH HIM |
| 2 | AS A LOOKOUT GUY.  A LOOKOUT GUY IS A PERSON THAT BASICALLY |
| 3 | INFORMS HIM AND THE OTHER INDIVIDUALS THAT WERE DOING DRUGS |
| 4 | FOR HIM THAT THE POLICE ARE CLOSE BY -- THAT THEY ARE |
| 5 | SOMEWHERE IN THE AREA.  AND I MIGHT SEE THE POLICE AT A |
| 6 | LIGHT OR ANYTHING.  AND I HAD GOT SO GOOD AT IT THAT I COULD |
| 7 | SEE THE SIGNALS -- THE TURN SIGNALS AND LET YOU KNOW IF THE |
| 8 | POLICE WAS GOING TO TURN OR IF HE WAS GOING TO KEEP |
| 9 | STRAIGHT.  AND I WOULD LIKE LET HIM KNOW AND THE OTHER |
| 10 | INDIVIDUALS KNOW BY HOLLERING OUT, "HEY, V., THE POLICE ARE |
| 11 | GOING STRAIGHT," OR "THE POLICE ARE MAKING A RIGHT." |
| 12 | AND THAT'S WHAT I WOULD DO AS A LOOKOUT.  AND, |
| 13 | ALSO, I WOULD CASE THE JOINT -- "CASE THE JOINT" MEANING |
| 14 | THAT I WOULD WALK AROUND AND LET THEM KNOW, YOU KNOW, HAVE I |
| 15 | STILL SEEN ANY POLICE OR NOT. |
| 16 | Q.  NOW, WHEN YOU FIRST STARTED SPENDING TIME WITH MR. HILL, |
| 17 | DID YOU IMMEDIATELY BECOME A LOOKOUT FOR HIM? |
| 18 | A.  NO, I DIDN'T IMMEDIATELY BECOME A LOOKOUT. |
| 19 | Q.  WHAT DID YOU DO BEFORE YOU BECAME A LOOKOUT FOR HIM? |
| 20 | A.  WELL, I STARTED OUT BY DOING THINGS TO IMPRESS HIM. |
| 21 | Q.  WHY? |
| 22 | A.  BECAUSE I JUST LIKED WHAT HE WAS DOING.  AND I WANTED, |
| 23 | YOU KNOW -- I WANTED TO BE A PART OF THAT FAMILY.  IT WAS |
| 24 | LIKE A FAMILY THING GOING ON.  AND I JUST LOOKED UP TO HIM |
| 25 | LIKE THAT. |

```
 1   Q.  AND WHAT KINDS OF THINGS WOULD YOU DO TO TRY TO IMPRESS
 2   HIM?
 3   A.  I WOULD SEE HIM SOMETIMES ARGUE WITH PEOPLE -- NOT
 4   NECESSARILY ARGUE, BUT HE MIGHT HAVE DISAGREEMENTS WITH
 5   SOMEBODY, AND THAT SAME PERSON WHO HE HAD A DISAGREEMENT
 6   WITH, I MIGHT LATER ON SEE THAT PERSON, AND I MIGHT JUST
 7   BEAT THAT PERSON UP FOR NO REASON.
 8   Q.  AND WHAT WAS YOUR GOAL BY BEATING UP THAT PERSON FOR NO
 9   REASON?
10   A.  MY GOAL WAS, YOU KNOW, TO IMPRESS VINCENT -- TO LET HIM
11   KNOW I WANTED TO BE A PART OF FAMILY AND TO GET INVOLVED
12   WITH HIM AS FAR AS SELLING DRUGS.
13   Q.  AND DID YOU HAVE ANY CONVERSATIONS WITH MR. HILL AT THE
14   TIME YOU WERE TRYING TO IMPRESS HIM?
15   A.  HE WOULD SAY -- HE WOULD SAY, YOU KNOW, THINGS LIKE --
16   LET ME KNOW -- I DON'T REMEMBER EXACTLY WHAT WAS SAID, BUT I
17   KNOW HE WOULD LET ME KNOW THAT, YOU KNOW, HE LIKED WHAT I
18   DID.  AND WHAT HE DID WAS SAY THINGS TO HAVE ME CONTINUE TO
19   DO THE THINGS THAT I WAS DOING.
20   Q.  LIKE WHAT?
21   A.  HE WOULD SAY LIKE -- LIKE AFTER I FINISHED FIGHTING
22   SOMEBODY OR BEATING SOMEBODY UP OR WHATEVER, HE WOULD BRAG
23   ABOUT IT.
24   Q.  HOW?
25   A.  "GOD DAMN.  DOO-DOO KNOCKED HIM OUT.  DOO-DOO THIS.
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 70 of 443
Case 1:98-cr-00329-RCL    Document 658    Filed 07/19/01    Page 11 of 61

11

```
 1   DOO-DOO THAT," YOU KNOW, AND THIS AND THAT.  AND THAT WOULD
 2   MAKE ME -- MOTIVATE ME TO CONTINUE TO GO FURTHER AND TO DO
 3   IT MORE.
 4   Q.  AND DID YOU GO FURTHER?
 5   A.  YES.
 6   Q.  HOW?
 7   A.  I WENT AS FAR AS TO -- I REMEMBER ONE INCIDENT I WAS IN
 8   THE 203 AREA.  AND I THINK I WAS LIKE ABOUT 11 AT THE
 9   TIME -- 11 OR 12 AT THE TIME.  AND --
10              MR. KIERSH:  YOUR HONOR, OBJECTION.  THIS
11   PREDATES, ACCORDING TO HIS CALCULATION, THE CONSPIRACY THAT
12   IS CHARGED IN THIS COUNT.
13              THE COURT:  OVERRULED.
14   BY MS. CHATURVEDI:
15   Q.  WHAT HAPPENED AT 203 AT THAT TIME?
16   A.  THIS WAS -- LIKE I SAID, I WAS ABOUT 11 YEARS OLD, AND I
17   GOT INTO IT WITH A GUY, AND I THINK -- I DON'T REMEMBER
18   QUITE THE INCIDENT, BUT I GOT INTO IT WITH A GUY, AND I
19   ENDED UP BEATING THE GUY UP OR WHATEVER.
20              HE CONTINUED TO CONGRATULATE ME FROM THE LAST TIME
21   THAT I BEAT THE GUY UP.  AND I TOOK IT UPON MYSELF TO DO IT
22   AGAIN.
23   Q.  WHO CONGRATULATED YOU?
24   A.  "VITO"
25   Q.  AND WHEN HE WOULD CONGRATULATE YOU, WOULD THERE BE OTHER
```

USCA Case #21-3072  Case 1:98-cr-00329-RCL  Document #2077668  Document 658  Filed 07/19/01  Filed: 10/01/2024  Page 12 of 61  Page 71 of 443

12

```
1    PEOPLE AROUND OR WERE YOU ON YOUR OWN?

2              MR. DAVIS:  OBJECTION TO THE LEADING NATURE OF THE

3    QUESTION.

4              THE COURT:  DO YOU WANT TO REPHRASE YOUR QUESTION?

5    BY MS. CHATURVEDI:

6    Q.  CAN YOU DESCRIBE FOR US WHAT WAS GOING ON AT THE TIME

7    THAT MR. HILL WOULD CONGRATULATE YOU?

8    A.  IT WAS DURING THE TIME ME AND A COUPLE OTHER GUYS THAT

9    WERE OUT, YOU KNOW -- THEY WERE A LITTLE HIGHER THAN I WAS

10   BECAUSE I WAS STILL -- AS I SAY, I WAS A LOOKOUT GUY, AND

11   LIKE I SAID, I DID THINGS TO IMPRESS HIM SO I COULD GRADUATE

12   INTO DOING DRUGS AS THE OTHER GUYS.

13   Q.  ALL RIGHT.  YOU TALKED A LITTLE BIT A FEW MINUTES AGO

14   ABOUT BECOMING A LOOKOUT.  HOW OLD WERE YOU, WOULD YOU SAY,

15   AT THE TIME YOU STARTED AS A LOOKOUT?

16             MR. ZUCKER:  OBJECTION.  ASKED AND ANSWERED.

17             THE COURT:  I DON'T THINK IT HAS BEEN.  OVERRULED.

18   BY MS. CHATURVEDI:

19   Q.  ABOUT HOW OLD WERE YOU?

20   A.  I WAS BETWEEN 10 AND 12 YEARS OLD.

21   Q.  AND YOU WERE TELLING US WHAT YOU DID AS A LOOKOUT.  TELL

22   US WHAT YOUR PURPOSE WAS AT THE TIME THAT YOU WERE A

23   LOOKOUT.  WHAT WAS YOUR GOAL?

24   A. MY GOAL WAS TO BE ABLE TO SELL DRUGS AS THE OTHER

25   INDIVIDUALS WERE SELLING FOR HIM.
```

1   EVERYTHING ELSE, BUT HE DIDN'T PAY US.  HE DIDN'T PAY ME AT

2   THE TIME.

3   Q.  SO THEN WHY DID YOU DO IT?

4   A.  IT WAS FOR -- YOU KNOW, HAVING THE POWER, AND KNOWING

5   THAT I COULD, YOU KNOW, DO ANYTHING I WANTED AS FAR AS, YOU

6   KNOW, IN THE COMMUNITY.  I JUST WANTED TO BE A PART OF THE

7   FAMILY.

8   Q.  DID THERE COME A TIME -- YOU MENTIONED THE WORD -- THAT

9   YOU WANTED TO GRADUATE.  DID THERE COME A TIME WHEN YOU

10  GRADUATED?

11  A.  YES.

12  Q.  WHAT CHANGED?

13  A.  I STOPPED BEING A LOOKOUT GUY, AND I STARTED SELLING.

14  Q.  AND WHAT WERE YOU SELLING WHEN YOU STARTED SELLING?

15  A.  I SOLD MARIJUANA IN THE YELLOW ENVELOPES FIRST, AND THEN

16  I STARTED SELLING P.C.P., WHICH --

17  Q.  SORRY.

18  A.  -- WHICH IS CALLED "BOAT."

19  Q.  WHERE DID YOU GET THE MARIJUANA IN THE YELLOW ENVELOPES

20  FROM?

21  A.  I GOT IT FROM VINCENT HILL.

22  Q.  AND CAN YOU REMIND US AGAIN ABOUT HOW OLD YOU WERE AT

23  THE TIME YOU STARTED SELLING?

24  A.  I WOULD SAY BETWEEN 11 AND 13.

25  Q.  OKAY.  AND AT THE TIME YOU STARTED SELLING, WHERE WAS IT

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 73 of 443
Case 1:98-cr-00329-RCL   Document 658   Filed 07/19/01   Page 39 of 61

39

| 1 | THAT YOU STARTED SELLING AT? |
| 2 | A.  I STARTED SELLING AT 203 N STREET, SOUTHWEST. |
| 3 | Q.  AND WHAT WAS THE ARRANGEMENT THAT YOU HAD IN TERMS OF |
| 4 | GETTING THIS MARIJUANA FROM MR. HILL? |
| 5 | A.  WELL, HE WOULD ACTUALLY TELL ME TO HOLD THE MARIJUANA |
| 6 | UNTIL HE WOULD GET BACK.  SO I WOULD BE UNDER THE TUNNEL |
| 7 | AREA AT 203, AND A LONG PERIOD OF TIME WENT PAST BEFORE HE |
| 8 | CAME BACK.  BUT I KNEW THAT THAT WAS DESIGNED FOR ME TO -- |
| 9 | WHEN I FIRST STARTED SELLING, YOU KNOW, BECAUSE SALES WERE |
| 10 | COMING WHILE I HAD THE DRUGS, AND NOBODY -- SOME OF THE |
| 11 | OTHER GUYS PROBABLY WERE OUT, AND I WAS THE ONLY ONE THAT |
| 12 | HAD DRUGS.  SO I KNEW THAT I COULDN'T LET THOSE SALES GET |
| 13 | AWAY. |
| 14 | Q.  SO WHAT WOULD YOU DO? |
| 15 | A.  SO I WOULD GET THE SALES. |
| 16 | Q.  AND WHAT WOULD YOU DO WITH THE MONEY THAT YOU GOT FROM |
| 17 | THE SALES? |
| 18 | A.  ALL THE MONEY THAT I RECEIVED FROM CUSTOMERS I GAVE |
| 19 | RIGHT TO VINCENT HILL. |
| 20 | Q.  NOW, AT THE TIME YOU WERE SELLING THIS MARIJUANA, CAN |
| 21 | YOU TELL US WHAT TIME OF DAY YOU WERE OUT THERE SELLING? |
| 22 | A.  I KNOW WHEN I CAME HOME FROM SCHOOL, I WAS OUT THERE |
| 23 | UNTIL LATE HOURS.  I THINK THE LATEST HOUR I WAS OUT THERE |
| 24 | WAS LIKE 11:00 OR 12:00 O'CLOCK. |
| 25 | Q.  AND WHEN IT GOT THAT LATE AT NIGHT -- WHEN IT GOT DARK, |

1   CAN YOU TELL US WHAT THE LIGHTING WAS LIKE OUT IN THE 203

2   BUILDING WHERE YOU WERE SELLING?

3   A.   WELL, THE APARTMENT BUILDING HAD -- IT WAS WELL LIT

4   INSIDE -- IN AND OUT, BUT THERE CAME A TIME WHEN VINCENT --

5   AND HE HAD OTHER GUYS TO KNOCK THE LIGHTS OUT.

6   Q.   DID YOU ACTUALLY SEE MR. HILL DO THAT?

7   A.   YES.

8   Q.   HOW WOULD HE KNOCK THE LIGHTS OUT?

9   A.   WELL, I REMEMBER ONE TIME HIM SHOOTING ONE OF THE LIGHTS

10  OUT AND OTHER TIMES HIM JUST TAKING A BRICK AND KNOCKING THE

11  LIGHTS OUT.

12  Q.   AND AT THAT SAME TIME THAT YOU SAW HIM DOING THIS, WERE

13  YOU STILL LIVING IN THAT BUILDING?

14  A.   YES.

15  Q.   WERE YOU AWARE OF HOW PEOPLE WERE WALKING AROUND IN THE

16  BUILDING AT NIGHT?

17  A.   WELL, AT NIGHTTIME -- WHEN NIGHTTIME CAME, I SEEN THE

18  PEOPLE THAT LIVED IN THE BUILDING -- THE PARENTS, THE

19  MOTHERS OR WHATEVER -- EVERYONE HAD TO GET FLASHLIGHTS.  I

20  MEAN PEOPLE WENT WHEREVER THEY COULD TO GET FLASHLIGHTS

21  BECAUSE THEY KNEW WHEN THEY CAME BACK IN THE BUILDING, THERE

22  WAS A CHANCE, DAY OR NIGHT, THAT THE LIGHTS WOULD BE ALL

23  OUT.

24  Q.   YOU ALSO INDICATED THAT THERE WAS A TIME YOU SOLD

25  "BOAT."  CAN YOU DESCRIBE THAT FOR US?

1   A.   YES.   WHEN I SOLD THE "BOAT," I STOOD OUT THERE MANY

2   DAYS -- LATE DAYS AND LATE NIGHTS AND ON THE WEEKENDS AND

3   SOLD "BOAT" FOR VINCENT HILL.

4   Q.   NOW, AT THE TIME THAT YOU WERE SELLING THE "BOAT," WHEN

5   YOU WOULD MAKE MONEY FOR THAT FROM POTENTIAL BUYERS OR FROM

6   BUYERS, WHAT WOULD YOU DO WITH THE MONEY?

7   A.   I WOULD GIVE ALL OF THE MONEY TO VINCENT.

8   Q.   AND AT THAT TIME, THE ENVELOPES THAT YOU WERE SELLING

9   THE MARIJUANA IN -- HOW MUCH DID THE MARIJUANA GO FOR?

10   A.   THE MARIJUANA WAS $5.00.

11   Q.   AND THE "BOAT"?

12   A.   IT WAS 15 AT ONE TIME, AND THEN IT WENT DOWN TO 10.

13   Q.   AND CAN YOU DESCRIBE FOR US WHEN YOU WOULD SELL

14   MARIJUANA, DID YOU JUST HAVE ONE ENVELOPE WITH YOU AT A

15   TIME, OR HOW DID THAT WORK?

16   A.   WELL, VINCENT WOULD GIVE US THE MARIJUANA IN -- LIKE 25

17   BAGS IN A ZIPLOCK-LIKE SANDWICH BAG.   THERE WOULD BE LIKE

18   20 TO 30 BAGS INSIDE OF IT.

19   Q.   AND ON A GIVEN DAY, HOW MANY BAGS WOULD YOU -- ZIPLOCK

20   BAGS, I GUESS, WOULD YOU GO THROUGH IN TERMS OF HOW MANY YOU

21   WOULD SELL?

22   A.   IN THE COURSE OF A DAY, I WOULD SELL AT LEAST FOUR

23   PACKAGES.

24   Q.   DOES THAT MEAN FOUR ZIPLOCK BAGS?

25   A.   YES.

42

```
1   Q.   AND WHAT ABOUT THE "BOAT?"   HOW WAS THAT GIVEN TO YOU TO
2   SELL?
3   A.   HE WOULD GIVE THAT TO US LIKE -- BETWEEN LIKE 40 AND 50
4   TINFOILS IN A ZIPLOCK BAG.
5   Q.   AND HOW MANY OF THOSE PACKETS WOULD YOU GO THROUGH IN A
6   DAY?
7   A.   MOST DAYS, IT WOULD BE LIKE THREE TO FOUR OF THEM.
8   Q.   AND WERE YOU THE ONLY PERSON DOING THIS?
9   A.   NO.
10  Q.   DID YOU ACTUALLY SEE MR. HILL TAKE MONEY FROM ANYONE
11  ELSE WHO WAS SELLING FOR HIM?
12  A.   YES.
13  Q.   AND THE AGE OF THE PEOPLE -- HOW DID THAT COMPARE TO
14  YOU -- THE PEOPLE THAT WERE GIVING HIM MONEY AT THE END OF
15  THE DAY AFTER SELLING DRUGS?
16  A.   SOME OF THEM WERE ABOUT, I WOULD SAY, MAYBE TWO TO THREE
17  YEARS OLDER AND TWO OR THREE YEARS YOUNGER.
18  Q.   NOW, CAN YOU DESCRIBE FOR US IN TERMS OF THE SELLING
19  PATTERN -- WERE YOU SELLING CONSTANTLY, OR WERE THERE
20  BREAKS, OR HOW DID THAT WORK?
21  A.   THERE WERE NO BREAKS.  I HAD MY SHIFT -- "SHIFT" MEANING
22  WHEN I CAME HOME OR WHENEVER, I WOULD SELL MINE, AND I KNEW
23  I HAD TO BE IN, YOU KNOW, THE LATEST BY 11:00 O'CLOCK.  SO,
24  BASICALLY, I WOULD SELL HOWEVER MUCH IN THAT PERIOD OF TIME,
25  BUT I KNEW THAT IT CONTINUED AFTER I LEFT.
```

43

```
 1    Q.  WHEN YOU WOULD GO IN AT THE END OF THE DAY, WHAT, IF
 2    ANYTHING, DID MR. HILL GIVE YOU IN EXCHANGE FOR YOU SELLING
 3    THE DRUGS ON HIS BEHALF?
 4              MR. DAVIS:  OBJECTION, YOUR HONOR.  I THINK THIS
 5    HAS BEEN ASKED AND ANSWERED.
 6              THE COURT:  OVERRULED.
 7    BY MS. CHATURVEDI:
 8    Q.  WHEN YOU WOULD SELL THE DRUGS -- WHEN YOU WERE ACTUALLY
 9    SELLING THE DRUGS, WHAT WOULD YOU GET FOR IT?
10    A.  I GOT NOTING IN RETURN.  I MEAN THERE CAME DAYS WHEN I
11    SOLD -- AND I KNOW THAT I WAS SO GOOD AT IT, YOU KNOW.  I
12    MEAN I SOLD SO MUCH FOR HIM.  I MEAN THERE WERE DAYS WHEN I
13    WAS HUNGRY.  I MEAN I STOOD OUT ALL DAY SELLING, WATCHING
14    OUT OR WHATEVER, AND HE WOULDN'T EVEN HAVE THE DECENCY TO
15    ASK ME DID I WANT SOMETHING TO EAT, OR WAS I HUNGRY, OR
16    WHATEVER.
17    Q.  SO WHAT MOTIVATED YOU TO DO THIS?
18              MR. DAVIS:  OBJECTION.
19              THE COURT:  OVERRULED.
20    BY MS. CHATURVEDI:
21    Q.  YOU CAN ANSWER.
22    A.  JUST THE MONEY -- THE POWER, YOU KNOW.  I MEAN THAT'S
23    JUST WHAT I LOVED AT THE TIME.
24    Q.  DID THERE COME A TIME WHEN YOU DECIDED TO CHANGE YOUR
25    RELATIONSHIP WITH MR. HILL?
```

USCA Case #21-3072 Document #2007066658 Filed 07/19/2011 Page 44 of 61 Case 1:98-cr-00329-RCL Document #2007266 78 of 443

44

```
 1   A.   YES.

 2   Q.   AND ABOUT HOW OLD WERE YOU WHEN YOU DECIDED TO CHANGE

 3   THAT?

 4   A.   I THINK I WAS BETWEEN 15 AND 18.  SOMETHING LIKE THAT.

 5   Q.   AND WHAT STEPS DID YOU TAKE?  WHAT CHANGED?

 6   A.   WELL, I KNEW THAT I WAS BEING A FLUNKY.

 7   Q.   WHAT DO YOU MEAN?

 8   A.   A "FLUNKY" JUST MEANS THAT YOU WILL JUST DO ANYTHING FOR

 9   SOMEBODY WITHOUT GETTING PAID FOR IT.  SO I TOOK IT UPON

10   MYSELF, YOU KNOW, BECAUSE I WAS STILL SELLING FOR HIM AT THE

11   TIME.  SO I STOLE BAGS FROM HIM.  LIKE HE MIGHT GIVE ME A

12   PACKAGE, AND I MIGHT TAKE LIKE FOUR OR FIVE BAGS OUT OF EACH

13   PACKAGE AND JUST TELL HIM THAT WAS THE SHORTS.

14   Q.   WHAT DO YOU MEAN THE "SHORTS?"

15   A.   "SHORTS" MEANS LIKE SOMEBODY WOULD COME -- THE "BOAT" OR

16   THE MARIJUANA COST -- THE MARIJUANA COST $5.00.  THE "BOAT"

17   COST $15 OR $10.  SO THEY MIGHT COME WITH 8.  FOR THE

18   MARIJUANA, THEY MIGHT COME WITH $4 OR $3.

19            SO I WOULD TAKE -- I WOULD ACTUALLY TAKE SOME OF

20   THE BAGS AND THEN SAVE THEM UP DURING THE COURSE OF THE TIME

21   BECAUSE I KNEW I WAS GOING TO BRANCH OUT ON MY OWN AND LEAVE

22   HIM ALONE.

23   Q.   AND WHAT DID YOU DO WITH THE BAGS THAT YOU TOOK FROM

24   HIM?

25   A. WELL, I SOLD -- I SOLD THOSE BAGS AND GOT THE MONEY.
```

USCA Case #21-3072 Document #2077668 Filed 10/01/2024 Page 79 of 443
Case 1:98-cr-00329-RCL Document 658 Filed 07/19/01 Page 45 of 61

45

```
 1   THEN I MOVED TO THE OTHER SIDE.

 2   Q.  HOW DID YOUR RELATIONSHIP CHANGE WITH MR. HILL AS YOU

 3   STARTED TO DO THIS -- AS YOU STARTED TO SELL SOME OF THESE

 4   BAGS ON YOUR OWN?

 5   A.  WELL, HE WASN'T -- HE WASN'T HAPPY AT ALL ABOUT THAT.

 6   WHEN I MOVED TO THE OTHER SIDE, ME AND A GUY NAMED

 7   "IRKY BERK" -- WE WERE REAL CLOSE.  WE STARTED, YOU KNOW,

 8   MESSING WITH EACH OTHER, MEANING WE STARTED MESSING WITH

 9   EACH OTHER AS FAR AS DRUGS.  YOU KNOW, I WOULD HELP HIM OUT

10   SOMETIMES AND SOMETIMES HE WOULD HELP ME OUT, MEANING THAT

11   HE WOULD SOMETIMES SELL FOR ME AND WHATEVER, AND, YOU KNOW,

12   WE WOULD JUST HELP EACH OTHER OUT.

13   Q.  DID YOU EVER SPEAK WITH MR. HILL ABOUT YOUR CHANGE OF

14   HEART?

15   A.  IT DIDN'T ACTUALLY ALL THE WAY STOP RIGHT AT THAT POINT.

16   I MEAN I FOUND MYSELF SOMETIMES -- HE'D ASKED ME -- YOU

17   KNOW, LIKE HE CAME TO ME ONE TIME AND SAID, "TAKE THESE TWO

18   BOTTLES OF WATER TO THE TWO WHITE GUYS THAT ARE IN THE CAR

19   IN THE PARKING LOT."  AND HE WOULD SAY, "THEY ARE GOING TO

20   GIVE YOU $1400.00.  MAKE SURE YOU COUNT THE MONEY BEFORE YOU

21   COME BACK."

22   Q.  WHAT BOTTLES WERE YOU TAKING?  WHAT KIND OF BOTTLES?

23   A.  WELL, THEY PUT THE P.C.P. IN LITTLE VANILLA EXTRACT

24   BOTTLES.  AND THESE BOTTLES AT THIS TIME WOULD COST $700.00

25   WHEN IT FIRST STARTED OUT -- LITTLE EXTRACT BOTTLES OF
```

```
1    P.C.P.  $700.00.

2    Q.  WHY DID YOU CONTINUE TO DO THAT FOR MR. HILL IF YOU

3    CONSIDERED YOURSELF A FLUNKY?

4    A.  IT WAS A RELATIONSHIP THAT I HAD WITH MR. WAYNE PERRY --

5    THAT I HAD WITH HIM BASICALLY WHILE I STILL BASICALLY STAYED

6    IN IT WITH MR. HILL.

7    Q.  EXPLAIN THAT TO US.

8    A. WELL, THE RELATIONSHIP BETWEEN ME AND MR. PERRY WAS QUITE

9    DIFFERENT THAN ME AND VINCENT.  AT ONE PERIOD OF TIME, HE

10   HAD GOTTEN LOCKED UP AND CAME HOME.

11         MR. KIERSH:  YOUR HONOR, OBJECTION TO THIS LINE

12   FOR THE REASONS I OUTLINED YESTERDAY AT THE RECESS.

13         THE COURT:  OVERRULED.

14   BY MS. CHATURVEDI:

15   Q.  TELL US WHY YOU CONTINUED THE RELATIONSHIP WITH

16   MR. HILL.

17   A.  BECAUSE WAYNE PERRY -- I MEAN AT THAT PERIOD OF TIME,

18   THEY WERE REAL, REAL TIGHT.

19   Q.  WHO?

20   A.  VINCENT HILL AND WAYNE PERRY.

21   Q.  OKAY.

22   A.  SO I BASICALLY DID WHATEVER I COULD TO MAKE SURE -- NOT

23   SO MUCH THAT "VITO" WOULD BE HAPPY, BUT TO MAKE SURE THAT

24   WAYNE WOULD BE HAPPY.

25   Q.  ALL RIGHT.
```

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Docket No. CR 98-329 |
| Government, | . | Washington, D.C. |
| | . | January 30, 2001 |
| vs. | . | 2:10 p.m. |
| | . | |
| VINCENT HILL, | . | (AFTERNOON SESSION) |
| JEROME MARTIN, | . | |
| SAMUEL CARSON, | . | |
| WILLIAM K. SWEENEY, | . | |
| MAURICE PROCTOR, | . | |
| SEAN COATES, | . | |
| | . | |
| Defendants | . | |

. . . . . . . . . . . . . . . .

UNITED STATES OF AMERICA,          .

       Government,          .

       .          Docket No. CR 99-348

   vs.          .

GARY PRICE,          .

       Defendant.          .

. . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                          ANJALI CHATURVEDI, AUSA
                          U.S. Attorney's Office
                          555 Fourth Street, N.W.
                          Washington, D.C.  20001

For the Defendant Hill:          CHRISTOPHER DAVIS, ESQ.
                          601 Indiana Avenue, N.W.
                          Suite 910
                          Washington, D.C.  20004

For the Defendant Martin:          JOANNE HEPWORTH, ESQ.
                          305 H Street, N.W.
                          Second Floor
                          Washington, D.C.  20001

2

For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                                  LEXI NEGIN-CHRIST, ESQ.
                                  419 7th Street, N.W.
                                  Washington, D.C.  20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                                  717 D Street, N.W.
                                  Suite 400
                                  Washington, D.C.  20004

For the Defendant Proctor:     HOWARD BRAMSON, ESQ.
                                  717 D Street, N.W.
                                  Third Floor
                                  Washington, D.C.  20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                                  901 6th Street, S.W.
                                  Suite 409
                                  Washington, D.C.  20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                                  601 Indiana Ave., N.W.
                                  Suite 901
                                  Washington, D.C.  20024

Court Reporter:               BEVERLY J. BYRNE
                                  Official Court Reporter
                                  Room 6810 U.S. Courthouse
                                  Washington, D.C.  20001
                                  (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

3

## I N D E X

|                                    | DIRECT | CROSS | REDIRECT | RECROSS |
|------------------------------------|--------|-------|----------|---------|
| WITNESSES FOR THE GOVERNMENT:      |        |       |          |         |
| Reginald Switzer                   | --     | 7     | 25       | 31      |
| Rodney Armstrong                   | 44     | 50    | --       | --      |
| Cindy Perkins                      | 51     | 70    | --       | --      |

|                                    | MARKED | RECEIVED |
|------------------------------------|--------|----------|
| EXHIBITS:                          |        |          |
| Defendant Price Exhibit No. 3      | 20     | --       |
| Government's Exhibit No. LW300     | 49     | 49       |

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 215

4

```
1                     P R O C E E D I N G S

2              THE COURT:  During the noontime recess I have looked

3     at the handwritten notes of Mr. Zeidenberg and Ms. Chaturvedi

4     as you requested, Mr. Zucker.

5              I looked at them for both what might be described as

6     Brady material and Jencks material, and I find they contain

7     neither in their entirety.  So, Ms. Chaturvedi, you may have

8     your notes back.

9              MS. CHATURVEDI:  Thank you, Your Honor.

10             MR. ZUCKER:  The inquiry and the request was based

11    on Jencks, but the Brady request regarding the three witnesses

12    had nothing to do with the notes from Switzer.  The Brady

13    request was for the three witnesses that we're still --

14             THE COURT:  Well, all I can tell you is that I

15    looked at those file notes for both -- material of both

16    characterizations.

17             MR. ZUCKER:  No, I understand that.  But those would

18    have only been the notes of Switzer.  The Brady request

19    relates to the three witnesses that were referenced in the

20    Mayrant murder by the government as providing testimony that

21    contradicted with Mr. Switzer.  That was the Brady request.

22             THE COURT:  I have not examined anything that meets

23    that description yet.

24             MR. ZUCKER:  And my recollection is Mr. Zeidenberg

25    said he was tracking it down and would provide it.
```

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 216

```
 1                MR. KIERSH:  Your Honor, if I --
 2                THE COURT:  If it exists.
 3                MR. KIERSH:  If I could just be heard on the Jencks
 4     issue.  What we were provided I presume is what the Court
 5     reviewed in camera in terms of the Jencks, but that's
 6     inconsistent -- well, we received a certain Jencks package
 7     with respect to Mr. Switzer.  Based on Mr. Zucker's cross-
 8     examination, it appeared from Mr. Switzer's testimony that
 9     there was additional Jencks.  Mr. Switzer was very clear.  He
10     said other people were taking notes.
11                THE COURT:  And I have looked at the notes that were
12     taken by Mr. Zeidenberg and Ms. Chaturvedi.
13                MR. KIERSH:  And you consider them not to be Jencks?
14                THE COURT:  They are not Jencks material.
15                MR. KIERSH:  Okay.  Well, I would ask that a copy of
16     those documents be made and made a part of this record and
17     placed under seal so the record has a copy of that material.
18                THE COURT:  All right.
19                MR. ZUCKER:  Along with that, Switzer also made
20     reference to Brigidini and confirming it in the first arrest
21     meeting.  I'd ask for production --
22                THE COURT:  The Brigidini notes, they will be
23     examined as well.
24                MR. ZUCKER:  Well, is the government being
25     instructed to obtain them or to at least request them of Mr.
```

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES,                :
          GOVERNMENT,         :
                             :
  VS.                        :    CR. NO. 98-329
                             :
VINCENT HILL,                :
JEROME MARTIN,               :
SAMUEL CARSON,               :
WILLIAM K. SWEENEY,          :
MAURICE PROCTOR,             :
SEAN COATES,                 :
          DEFENDANTS.        :
                             :
UNITED STATES                :
          GOVERNMENT,        :
                             :
  VS.                        :    CR. NO. 99-348
                             :
GARY PRICE,                  :
          DEFENDANT          :
                             :
```

**FILED**

**JUL 1 9 2001**

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
FEBRUARY 1, 2001
(MORNING SESSION)
(10:24 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:                 PHYLLIS MERANA
                                6816 U. S. DISTRICT COURT
                                3RD & CONSTITUTION AVE., N.W.
                                WASHINGTON, D. C. 20001

2



```
 1   FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                      ANJALI CHATURVEDI, AUSA
 2                                    555 4TH ST., N.W.
                                      WASHINGTON, D. C. 20001
 3
     FOR THE DEFENDANT HILL:          CHRISTOPHER DAVIS, ESQ.
 4                                    601 INDIANA AVE., N.W.
                                      #910
 5                                    WASHINGTON, D. C.  20004

 6   FOR THE DEFENDANT MARTIN:        JOANNE HEPWORTH, ESQ.
                                      305 H STREET, N.W.
 7                                    2ND FLOOR
                                      WASHINGTON, D. C.  20001
 8

 9   FOR THE DEFENDANT CARSON:        JOSEPH BESHOURI, ESQ.
                                      LEXI NEGIN-CHRIST, ESQ.
10                                    419 7TH STREET, N.W.
                                      WASHINGTON, D. C.  20004
11
     FOR THE DEFENDANT SWEENEY:       STEVEN R. KIERSH, ESQ.
12                                    717 D STREET, N.W.
                                      SUITE 400
13                                    WASHINGTON, D. C.  20004

14   FOR THE DEFENDANT PROCTOR:       HOWARD BRAMSON, ESQ.
                                      717 D STREET, N.W.
15                                    THIRD FLOOR
                                      WASHINGTON, D. C.   20004
16
     FOR THE DEFENDANT COATES:        FREDERICK JONES, ESQ.
17                                    901 6TH STREET, S.W.
                                      #409
18                                    WASHINGTON, D. C.  20024

19   FOR THE DEFENDANT PRICE:         JONATHAN ZUCKER, ESQ.
                                      601 INDIANA AVE., N.W.
20                                    #901
                                      WASHINGTON, D. C.  20004
21

22

23

24

25
```

```
 1                    I N D E X

 2    WITNESS              DIRECT    CROSS

 3    ANDRE MURRAY

 4        BY MR. ZEIDENBERG    9

 5        BY MR. KIERSH                 69

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   PROCTOR OR "POO POO?"

 2   A.   YES.

 3   Q.   AND DO YOU SEE HIM IN COURT?

 4   A.   YES.

 5   Q.   AND COULD YOU POINT OUT MR. PROCTOR?

 6   A. "POO POO" IN THE BLACK.  HE HAS ON A BLACK TOP.

 7             MR. ZEIDENBERG:  YOUR HONOR, MAY THE RECORD

 8   REFLECT THE IDENTIFICATION OF MR. PROCTOR?

 9             MR. BRAMSON:  OBJECTION.  HE DID NOT IDENTIFY

10   MR. PROCTOR, BUT SOMEBODY ELSE.

11             THE COURT:  WHAT WAS YOUR OBJECTION?

12             MR. BRAMSON:  THE WITNESS DID NOT IDENTIFY

13   MR. PROCTOR, BUT ANOTHER INDIVIDUAL.

14             THE COURT:  ALL RIGHT.  WHO DO YOU THINK IS

15   MR. PROCTOR?

16             THE WITNESS:  SITTING IN FRONT OF THE SCREEN.

17             THE COURT:  SITTING IN FRONT OF THE SCREEN?

18             THE WITNESS:  YES.

19             THE COURT:  MR. BRAMSON?

20             MR. BRAMSON:  A CONTINUING OBJECTION.

21             THE COURT:  THE OBJECTION IS OVERRULED.  THE

22   RECORD WILL REFLECT AN IDENTIFICATION.

23   BY MR. ZEIDENBERG:

24   Q.   AND HOW LONG HAVE YOU KNOWN MR. PROCTOR, "POO POO."

25   A.   SINCE HE WAS YOUNG.
```

1   Q.  AND WAS THERE ONE INDIVIDUAL THAT YOU GENERALLY

2   ASSOCIATED WITH MR. PROCTOR IN TERMS OF BEING EITHER FRIENDS

3   OR ASSOCIATES -- CLOSE FRIENDS OR ASSOCIATES OF HIS?

4           MR. BRAMSON:  OBJECTION.

5           THE COURT:  OVERRULED.  YOU CAN CROSS-EXAMINE.

6           MR. BRAMSON:  YOUR HONOR --

7           THE COURT:  YOU CAN CROSS-EXAMINE.

8           MR. BRAMSON:  GUILT BY ASSOCIATION IS NOT

9   LEGITIMATE EXAMINATION.

10          THE COURT:  WOULD YOU PLEASE SIT DOWN,

11  MR. BRAMSON.  THE OBJECTION IS OVERRULED.  YOU CAN

12  CROSS-EXAMINE.

13  BY MR. ZEIDENBERG:

14  Q.  WAS THERE AN INDIVIDUAL THAT HE WAS PARTICULARLY CLOSE

15  WITH, TO YOUR KNOWLEDGE?

16          MR. BRAMSON:  OBJECTION.  IT CALLS FOR OPINION AND

17  SPECULATION.

18          THE COURT:  OVERRULED, MR. BRAMSON.

19  BY MR. ZEIDENBERG:

20  Q.  IF YOU KNOW.

21  A.  SIR?

22  Q.  IF YOU KNOW, WAS THERE SOMEONE THAT HE WAS PARTICULARLY

23  CLOSE TO, TO YOUR KNOWLEDGE -- MR. PROCTOR, "POO POO"

24  A.  YES.

25  Q.  WHO WAS THAT?

1          (JURY OUT.)

2          (AFTER RECESS.)

3          THE COURT:  ALL RIGHT.  MR. KIERSH, ARE YOU READY

4   FOR THE JURY?

5          MR. KIERSH:  YES, YOUR HONOR.  I HAVE JUST ONE

6   PRELIMINARY MATTER.

7          MR. DAVIS BROUGHT UP THIS ISSUE OF THE PRESENTENCE

8   REPORT EARLIER THAT YOUR HONOR SAID YOU WOULD SIGN AN ORDER

9   FOR.

10          QUITE FRANKLY, I CAME IN HERE THIS MORNING NOT

11   EXPECTING TO HAVE TO EXAMINE MR. MURRAY, BUT GIVEN HIS

12   TESTIMONY, I DO HAVE TO EXAMINE HIM.

13          I WOULD JUST ASK THE COURT TO ALLOW ME TO LATER ON

14   COME BACK, IF THERE IS SOMETHING IN THE PRESENTENCE REPORT,

15   AND REOPEN MY CROSS.

16          I WILL GO FORWARD NOW, BUT IF THERE IS SOMETHING

17   IN THE PRESENTENCE REPORT THAT IS RELEVANT, I WOULD ASK TO

18   REOPEN.

19          THE COURT:  I WILL HOLD THAT IN RESERVE.

20          MR. KIERSH:  VERY WELL.

21          THE COURT:  LET'S BRING THE JURY IN.

22          MS. NEGIN-CHRIST:  GOOD MORNING, YOUR HONOR.

23          CAN I ASK THE COURT'S INDULGENCE A MINUTE?

24          WITH RESPECT TO THIS WITNESS, I WOULD MAKE TWO

25   JENCKS REQUESTS.  THE FIRST ONE IS THAT HE TESTIFIED THAT HE

1   HAD A RELATIONSHIP WITH DETECTIVE OR OFFICER FULTON, WHO I

2   KNOW IS IN THE COURTROOM, AND THAT HE HAD, ON SEVERAL

3   OCCASIONS, INFORMED OFFICER FULTON ABOUT PLACES THAT HE

4   COULD -- THAT OFFICER FULTON COULD RECOVER GUNS.  AND TO THE

5   EXTENT THAT OFFICER FULTON WOULD HAVE ANY DOCUMENTATION OF

6   THIS PERSON BEING A RELIABLE INFORMANT, OR, ON THE OTHER

7   HAND, BEING AN UNRELIABLE INFORMANT, THAT WOULD BE JENCKS

8   AND POTENTIALLY BRADY MATERIAL.

9          THE SECOND JENCKS REQUEST I HAVE IS FOR THE

10  GOVERNMENT TO PROVIDE US WITH THE LETTER THAT MR. MURRAY

11  WROTE TO ASSISTANT UNITED STATES ATTORNEY WAINSTEIN AT THE

12  TIME THAT HE WAS ASKING FOR HELP WITH PAROLE, BECAUSE THIS

13  WITNESS HAS BASICALLY SAID IN HIS DIRECT TESTIMONY THAT, YOU

14  KNOW, HE DIDN'T -- HE DOESN'T WANT ANY HELP FROM

15  MR. ZEIDENBERG.

16         HE DIDN'T WANT ANY HELP.  HE DID THIS BECAUSE HE

17  WAS CONCERNED FOR THE COMMUNITY.  BUT, ON THE OTHER HAND,

18  THERE IS THIS LETTER TO MR. WAINSTEIN, AND I WOULD ASK THE

19  GOVERNMENT TO PRODUCE THAT, IF THEY HAVE IT IN THEIR

20  POSSESSION.

21         THE COURT:  MR. ZEIDENBERG.

22         MR. ZEIDENBERG:  WELL, ON THE FIRST ISSUE, I WOULD

23  DISAGREE RESPECTFULLY THAT ANYTHING HE TALKED ABOUT TO

24  OFFICER FULTON WOULD BE JENCKS.  IT WOULDN'T BE JENCKS

25  UNLESS IT CONCERNED THE EVENTS ABOUT WHICH HE TESTIFIED.

1    Q.  AND YOU WENT TO A SENTENCING HEARING THEN, CORRECT?

2    A.  I WENT TO A WHAT?

3    Q.  A SENTENCING HEARING.

4    A.  NO, I DIDN'T.

5    Q.  WELL, THE JUDGE HAD TO IMPOSE A SENTENCE BECAUSE

6    SOMEBODY GAVE YOU TWO TO SIX YEARS IN JAIL FOR THAT.

7    A.  YES.  A SENTENCING HEARING MEANING WHAT?

8    Q.  DID YOU PRESENT AN ARGUMENT TO THE JUDGE AS TO WHAT YOU

9    BELIEVED YOUR SENTENCE SHOULD BE?

10   A.  DID I PRESENT IT?

11   Q.  OR YOUR COUNSEL.

12   A.  YES.

13   Q.  OKAY.  SO THE JUDGE HEARD BOTH SIDES?

14   A. BY A P.S.I. REPORT.

15   Q.  OKAY. AND DID THE JUDGE SAY TO YOU, "WELL, MR. MURRAY,

16   BEFORE I IMPOSE A SENTENCE, I WANT TO HEAR WHAT YOU HAVE TO

17   SAY"?

18   A.  YES.

19   Q.  AND DID YOU ANSWER.

20   A. YES, I DID.

21   Q.  AND YOU SAID SOMETHING TO THE EFFECT, "I AM SORRY, AND I

22   AM CHANGING MY LIFE, AND I AM GOING TO FOLLOW THE RULES

23   NOW"?

24   A.  I NEVER TOLD HIM I WAS CHANGING MY LIFE.

25   Q.  WELL, YOU SAID, "I AM GOING TO FOLLOW THE RULES NOW"?

Clerk's File

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
          GOVERNMENT,                    :
                                         :
                                         :
     VS.                                 :    CR. NO. 98-329
                                         :
VINCENT HILL,                            :
JEROME MARTIN,                           :
SAMUEL CARSON,                           :
WILLIAM K. SWEENEY,                      :
MAURICE PROCTOR,                         :
SEAN COATES,                             :
          DEFENDANTS.                    :

**FILED**

**JUL 1 9 2001**

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES                            :
          GOVERNMENT,                    :
                                         :
                                         :
     VS.                                 :    CR. NO. 99-348
                                         :
GARY PRICE,                              :
          DEFENDANT                      :
                                         :

WASHINGTON, D. C.
FEBRUARY 5, 2001
(MORNING SESSION)
(10:25 A.M.)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON


COURT REPORTER:              PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
                             3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001



2



```
 1   FOR THE GOVERNMENT:            PETER ZEIDENBERG, AUSA
                                   ANJALI CHATURVEDI, AUSA
 2                                 555 4TH ST., N.W.
                                   WASHINGTON, D. C. 20001
 3
     FOR THE DEFENDANT HILL:       CHRISTOPHER DAVIS, ESQ.
 4                                 601 INDIANA AVE., N.W.
                                   #910
 5                                 WASHINGTON, D. C.  20004

 6   FOR THE DEFENDANT MARTIN:     JOANNE HEPWORTH, ESQ.
                                   305 H STREET, N.W.
 7                                 2ND FLOOR
                                   WASHINGTON, D. C.  20001
 8

 9   FOR THE DEFENDANT CARSON:     JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
10                                 419 7TH STREET, N.W.
                                   WASHINGTON, D. C.  20004
11
     FOR THE DEFENDANT SWEENEY:    STEVEN R. KIERSH, ESQ.
12                                 717 D STREET, N.W.
                                   SUITE 400
13                                 WASHINGTON, D. C.  20004

14   FOR THE DEFENDANT PROCTOR:    HOWARD BRAMSON, ESQ.
                                   717 D STREET, N.W.
15                                 THIRD FLOOR
                                   WASHINGTON, D. C.   20004
16
     FOR THE DEFENDANT COATES:     FREDERICK JONES, ESQ.
17                                 901 6TH STREET, S.W.
                                   #409
18                                 WASHINGTON, D. C.  20024

19   FOR THE DEFENDANT PRICE:      JONATHAN ZUCKER, ESQ.
                                   601 INDIANA AVE., N.W.
20                                 #901
                                   WASHINGTON, D. C.  20004
21

22

23

24

25
```

```
 1                    I N D E X

 2    WITNESS              DIRECT      CROSS

 3    ANDRE MURRAY

 4       BY MR. ZUCKER        8

 5

 6

 7                    E X H I B I T S

 8    DEFENDANTS'

 9    4                        48

10    5                        85

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P-R-O-C-E-E-D-I-N-G-S

 2         THE DEPUTY CLERK:  CRIMINAL CASE 98-329, UNITED

 3   STATES OF AMERICA VERSUS VINCENT HILL, JEROME MARTIN, SAMUEL

 4   CARSON, WILLIAM SWEENEY, MAURICE PROCTOR AND SEAN COATES,

 5   AND CRIMINAL 99-348, UNITED STATES VERSUS GARY PRICE.

 6         ANJALI CHATURVEDI AND PETER ZEIDENBERG FOR THE

 7   GOVERNMENT.

 8         CHRISTOPHER DAVIS FOR THE DEFENDANT HILL.

 9         JOANNE HEPWORTH FOR THE DEFENDANT MARTIN.

10         MR. BESHOURI AND ALEXANDRA NEGIN-CHRIST FOR THE

11   DEFENDANT CARSON.

12         STEVEN KIERSH FOR THE DEFENDANT SWEENEY.

13         HOWARD BRAMSON FOR THE DEFENDANT PROCTOR.

14         FRED JONES FOR THE DEFENDANT COATES.

15         JONATHAN ZUCKER FOR THE DEFENDANT PRICE.

16         (THE DEFENDANTS AND COUNSEL WERE PRESENT.)

17         MS. HEPWORTH:  GOOD MORNING, YOUR HONOR.

18         MR. ZEIDENBERG:  GOOD MORNING, YOUR HONOR.

19         THE COURT:  GOOD MORNING, EVERYONE.

20         MR. ZUCKER:  GOOD MORNING, JUDGE HONOR.

21         THE COURT:  I HAVE REVIEWED MR. ZEIDENBERG'S NOTES

22   OF HIS INTERVIEWS WITH MR. MURRAY, AND MR. MURRAY'S

23   CORRESPONDENCE, WHICH WAS ALL ONE WAY WITH MR. WAINSTEIN.

24         I HAVE REVIEWED THEM IN CAMERA.  ONCE AGAIN, I

25   FIND THAT THEY CONTAIN NOTHING THAT COULD BE CHARACTERIZED
```

```
 1 | AS EITHER JENCKS OR BRADY MATERIAL.
 2 |         THEY WILL, AS WAS DONE WITH RESPECT TO OTHER
 3 | SIMILAR MATERIALS, BE PLACED UNDER SEAL AND KEPT AS PART OF
 4 | THE COURT RECORD AS A COURT EXHIBIT.
 5 |         MR. WEST.  (COURT PASSING TO MR. WEST.)
 6 |         MR. ZUCKER:  YOUR HONOR, COULD I INQUIRE, JUST FOR
 7 | CLARIFICATION, BECAUSE I EXPECT IT TO BE PART OF MY
 8 | EXAMINATION?  YOU SAID YOU ESTIMATED THAT THERE WERE SIX TO
 9 | EIGHT LETTERS TO MR. WAINSTEIN REGARDING PAROLE?
10 |         THE COURT:  YES.
11 |         MR. ZUCKER:  IS THERE AN EXACT NUMBER?  I'LL GO
12 | WITH THAT NUMBER.  I JUST DON'T WANT TO --
13 |         THE COURT:  SIX TO EIGHT.
14 |         MR. ZUCKER:  OKAY.
15 |         THE COURT:  I DIDN'T COUNT THEM EXACTLY.
16 |         MR. ZUCKER:  OKAY.  ALL RIGHT.
17 |         THE COURT:  DO YOU WANT ME TO COUNT THEM?
18 |         MR. ZUCKER:  WELL, I ANTICIPATE I WILL BE ASKING
19 | HIM.
20 |         THE COURT:  ALL RIGHT.  LET ME COUNT THEM.
21 |         MR. ZUCKER:  AND THAT MIGHT BE SLOPPY.
22 |         THE COURT:  THERE ARE SEVEN.
23 |         MR. ZUCKER:  THANK YOU, JUDGE.
24 |         THE COURT:  THAT IS SIX TO EIGHT.
25 |         ARE YOU READY FOR THE JURY, MS. NEGIN-CHRIST?
```

1    COLLATERAL MATTER OF TRYING THE UNDERLYING FACTS OF THE

2    PARTICULAR OFFENSE.  AND PUTTING ASIDE, FOR INSTANCE,

3    WHETHER THIS IS EVEN A PROPER MEANS OF PROVING THOSE

4    FACTS --

5         THE COURT:  WELL, DID YOU TAKE A LOOK AT THE

6    MORGAN CASE, WHICH WAS CITED TO ME BY MR. DAVIS THE OTHER

7    DAY?

8         MR. ZEIDENBERG:  YES, YOUR HONOR, I DID.

9         THE COURT:  THE MORGAN CASE WOULD SEEM TO STAND

10   FOR THE PROPOSITION THAT IF THE GOVERNMENT SPONSORS A

11   PARTICULAR FACTUAL VIEW, IT'S THE ADMISSION OF A PARTY

12   OPPONENT.

13        THE DIFFERENCE IN THAT CASE WAS THAT THAT WAS AN

14   AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT.

15        MR. ZEIDENBERG:  RIGHT.

16        THE COURT:  BUT I DON'T DRAW ANY SIGNIFICANCE IN

17   TERMS OF ITS OPERATIVE EFFECT AS AN ADMISSION BY A PARTY

18   OPPONENT BETWEEN AN AFFIDAVIT BY A POLICE OFFICER AND A

19   PLEADING FORMALLY SIGNED AND FILED BY AN ASSISTANT UNITED

20   STATES' ATTORNEY.

21        MR. ZEIDENBERG:  I WOULD AGREE WITH THE COURT'S

22   ANALYSIS ON THAT.  MY POSITION IS THAT THIS IS NOT, AT LEAST

23   ARGUABLY, AN ADMISSION ANALOGOUS TO THAT ADMITTED IN THE

24   MORGAN CASE.

25        OUR POSITION IS THAT THE SCENARIO IN WHICH IT IS

```
 1   COMING IN IS ENTIRELY DIFFERENT IN THAT HE IS ATTEMPTING TO
 2   IMPEACH -- WE ALL KNOW YOU CAN USE PRIOR CONVICTIONS TO
 3   IMPEACH.  I THINK IT'S FAR LESS CLEAR AND, IN FACT, IS AN
 4   INCORRECT ASSERTION OF THE LAW TO SAY THAT WE CAN THEN
 5   IMPEACH THE PERSON BY INQUIRING AS TO THE UNDERLYING FACTS
 6   OF AN UNDERLYING CONVICTION, AND THEN WITH COLLATERAL
 7   MATTERS, ATTACK THAT TO PROVE THAT THE PERSON IS NOT TELLING
 8   THE TRUTH HERE AT TRIAL.
 9           AND THAT IS WHAT MR. ZUCKER IS TRYING TO DO.  HE
10   IS INQUIRING WHAT WERE THE UNDERLYING FACTS OF THAT
11   CONVICTION.  "OH, NO, THEY WEREN'T, AND I AM GOING TO PROVE,
12   THROUGH A COLLATERAL MEANS, WHAT ACTUALLY HAPPENED.
13   THEREFORE, WE CAN ARGUE LATER TO THE JURY THAT YOU'RE NOT A
14   TRUTHFUL PERSON."
15           THE COURT:  I DON'T THINK HE IS CONCERNED ABOUT
16   THE CONVICTION SO MUCH AS THE WITNESS' DENIAL THAT THOSE
17   WERE THE UNDERLYING FACTS OF THAT PARTICULAR OFFENSE.
18           MR. ZEIDENBERG:  EXACTLY.  THAT'S RIGHT.  HE IS
19   TRYING TO GET AT THE UNDERLYING FACTS OF THE OFFENSE, NOT
20   SIMPLY THAT HE PLED TO THE CONVICTION.  AND WE HAVE THE
21   CONVICTION, AND YOU CAN USE THAT, BUT LET'S FIND OUT WHAT
22   HAPPENED TO THAT CONVICTION.
23           OBVIOUSLY, THIS WITNESS HAS A NUMBER OF
24   CONVICTIONS, WHICH HE HAS TALKED ABOUT AT LENGTH.  OTHER
25   WITNESSES WILL HAVE, AS YOUR HONOR CAN WELL ANTICIPATE, LONG
```

40

```
 1    RECORDS.  AND IF THE COURT WERE TO PERMIT CROSS-EXAMINATION
 2    ALONG THOSE LINES -- "WHAT HAPPENED IN THAT PARTICULAR
 3    OFFENSE?  OH, LET'S ATTACK WHAT HAPPENED IN THAT 1997
 4    CONVICTION.  AND WE HAVE INDEPENDENT MEANS TO SHOW THAT
 5    THOSE WERE NOT THE ACTUAL FACTS.  EVEN THOUGH YOU HAVE
 6    ALREADY PLED GUILTY TO THEM, IT DIDN'T HAPPEN THE WAY YOU
 7    SAID IT HAPPENED."
 8             I SIMPLY THINK IT'S A COLLATERAL MATTER.  HE HAS
 9    PLED GUILTY.
10             THE COURT:  THAT WOULD BE THE ONLY BASIS ON WHICH
11    TO EXCLUDE IT.
12             MR. ZEIDENBERG:  AND THAT IS THE BASIS WE'RE
13    REQUESTING.
14             THE COURT:  BUT NOW THAT HE HAS BEEN ASKED ABOUT
15    IT AND HAS DENIED THAT THOSE WERE THE UNDERLYING
16    CIRCUMSTANCES, SINCE HE IS SPONSORED BY THE GOVERNMENT AND
17    THE GOVERNMENT IS, IN EFFECT, VOUCHING FOR HIS TESTIMONY, I
18    THINK HE CAN BE IMPEACHED BY USE OF THAT PLEADING FILED BY
19    THE GOVERNMENT IN THE OTHER CASE -- SIGNED AND FILED BY AND
20    UNDER THE AUSPICES OF THE UNITED STATES ATTORNEY.  BUT IT'S
21    GOING TO COME INTO EVIDENCE, IF YOU WANT TO ASK HIM --
22             MR. ZUCKER:  AGREED.  I WANT BOTH THAT AND THE
23    INDICTMENT INTO EVIDENCE.  AND I WILL PROFFER TO THE COURT
24    THE INDICTMENT THAT IS MARKED CURRENTLY HAS A COUPLE OF
25    NOTES ON IT, WHICH I WILL WHITE OUT.
```

1          THE COURT:  YES.  THIS IS NOT COMING IN THE WAY IT
2    IS.  THAT IS ANOTHER ISSUE.
3          MR. ZUCKER:  I UNDERSTAND.  I DIDN'T EXPECT THE
4    COURT'S RULING TO BE THAT WAY.  SO I HAD MY NOTES RIGHT ON
5    THE INDICTMENT.
6          IF ANY OF MY CO-COUNSEL HAVE A CLEAN COPY OF THE
7    INDICTMENT, I WILL DO IT RIGHT NOW.  OTHERWISE, I WILL
8    SUBMIT A WHITED-OUT COPY.
9          THE COURT:  THIS IS NOT TO BE DISPLAYED TO THE
10   JURY.
11         MR. ZUCKER:  FINE.
12         MR. DAVIS, DO YOU HAVE A COPY?
13         MR. DAVIS:  YES.
14         MR. ZUCKER:  I WILL SUBSTITUTE HIS FOR MINE.
15         THE COURT:  ALL RIGHT.  I DON'T UNDERSTAND THE
16   EXHIBIT NUMBER.  IT SAYS "DEFENDANTS' 4, NUMBER 3 PRICE."
17         MR. ZUCKER:  THAT IS MR. WEST'S.  I WILL LET HIM
18   ADDRESS THAT.
19         THE COURT:  WELL, MR. WEST HAS DONE THINGS THAT I
20   HAVEN'T UNDERSTOOD BEFORE.
21         MR. ZUCKER:  BUT I AM SURE THEY WILL COME OUT
22   RIGHT.
23         THE COURT:  THEY USUALLY DO.
24         MR. ZUCKER:  WE CAN SUBSTITUTE THAT.
25         AND I WILL NOTE, JUDGE, THE COPY I HAVE,

1   DEFENDANTS' 5, WHICH IS THE PROPOSED FINDINGS OF FACT AND

2   CONCLUSIONS OF LAW -- BECAUSE IT'S COMING IN AS A STATEMENT

3   OF A PARTY OPPONENT -- WELL, FACTUALLY, THAT WAS THE ONE

4   SIGNED OFF BY THE HEARING COMMISSIONER.  IF THEY WANT THAT

5   WHITED OUT, I HAVE NO PROBLEM BECAUSE IT'S COMING IN AS A

6   STATEMENT OF A PARTY OPPONENT.

7          THE COURT:  I THOUGHT YOU SAID IT WAS PROPOSED

8   FINDINGS OF FACTS AND CONCLUSIONS OF LAW.

9          MR. ZUCKER:  IT IS.  IT IS.  IT IS.  BUT THEN THE

10  ONE THAT WAS IN THE COURT FILE, THE JUDGE SIGNED.  SO I HAVE

11  NO OBJECTION TO WHITING OUT THAT.  I DON'T HAVE A COPY THAT

12  ISN'T SIGNED, BUT I WILL MAKE IT INTO ONE.

13         THE ONE THEY FILED, HE SIGNED.  AND IF THEY HAVE

14  AN OBJECTION TO HIS SIGNATURE BEING ON IT, I DON'T MIND

15  WHITING IT OUT.  I SHOULDN'T HAVE THE ADDED ADVANTAGE OF A

16  JUDICIAL FINDING THAT THEY WERE RIGHT, UNLESS THEY AGREE TO

17  IT OR HAVE NO OBJECTION TO IT.

18         THE COURT:  WHAT'S YOUR PLEASURE?  IT IS BEING

19  ADMITTED AS THE ADMISSION OF A PARTY OPPONENT FOR WHICH THE

20  OPERATIVE SIGNATURE IS THE SIGNATURE OF THE ASSISTANT UNITED

21  STATES ATTORNEY WHO SUBMITTED IT?

22         MR. ZEIDENBERG:  I BELIEVE THAT'S CORRECT, YOUR

23  HONOR.

24         THE COURT:  WHAT?

25         MR. ZEIDENBERG:  I BELIEVE THAT'S CORRECT.

1        THE COURT:  DO YOU WANT TO HAVE THE SIGNATURE OF

2    COMMISSIONER BYRD OBLITERATED?

3        MR. ZEIDENBERG:  YES.  YES, YOUR HONOR.

4        THE COURT:  ALL RIGHT.

5        MR. ZEIDENBERG:  AND I WOULD, JUST FOR FUTURE

6    REFERENCE, BECAUSE I THINK THE SITUATION MAY ARISE WITH

7    OTHER WITNESSES -- I WOULD JUST LIKE THE RECORD AND THE

8    COURT TO REMEMBER THAT THE REASON THAT MR. DAVIS PROFFERED

9    FOR THE COURT WHY HE SHOULD BE PERMITTED TO INQUIRE AS TO

10   THE UNDERLYING FACTS OF THAT OFFENSE WAS UNDER THE RATIONALE

11   THAT MR. MURRAY STATED THAT HE HAD AN AVERSION TO VIOLENCE,

12   AND HE WANTED TO HELP CLEAN UP THE VIOLENCE IN THE CITY.

13   AND UNDER THAT, HE SAID TO YOUR HONOR, "WELL, I SHOULD BE

14   PERMITTED TO INQUIRE AS TO THE FACTS OF THIS CASE TO SHOW

15   THAT THIS WAS A VIOLENT OFFENSE."  AND THE COURT SAID,

16   "OKAY.  FOR THAT PURPOSE, YOU CAN INQUIRE AS TO VIOLENCE."

17   AND THEN ONCE HE SAYS "YES, IT WAS VIOLENT," THEN THEY COME

18   BACK AND THEY SAY, "OH, BUT IT WASN'T THE SAME ACCOUNT AS

19   YOU GOT EARLIER."

20        THE COURT:  I UNDERSTAND YOUR RATIONALE, BUT I

21   DON'T THINK IT'S A SIGNIFICANT DISTINCTION OF ITS ADMISSION.

22        MR. ZEIDENBERG:  VERY WELL.

23        THE COURT:  I ALSO THINK IT IS SOMETHING THAT YOU

24   CAN ADDRESS ON REDIRECT EXAMINATION.

25        MR. ZEIDENBERG:  VERY WELL, YOUR HONOR.

44

```
 1              THE COURT:  THIS IS OFF THE RECORD.
 2              (THE COURT CONFERRING WITH THE COURTROOM CLERK AT
 3    THE BENCH.)
 4              THE COURT:  MR. WEST HAS EXPLAINED HIS LABELING OF
 5    THE EXHIBIT TO ME.  IT'S CORRECT.
 6              MR. ZUCKER:  OKAY.
 7              UPON INQUIRY, I WILL BE ASKING HIM IF HE IS AWARE
 8    OF THE SENTENCING EXPOSURE, AND I WILL ATTEMPT TO REFRESH
 9    HIS RECOLLECTION WITH THE D. C. CODE -- THAT HE OBVIOUSLY
10    KNOWS --
11              THE COURT:  IF HE SAYS HE IS NOT AWARE OF IT, THEN
12    IT'S CLOSED.
13              MR. ZUCKER:  I WILL THEN ASK THE COURT TO TAKE
14    JUDICIAL NOTICE.  IF HE SAYS THAT HE KNEW AT THE TIME -- OR
15    DIDN'T KNOW, I WILL ASK THE COURT TO TAKE JUDICIAL NOTICE OF
16    WHAT THE SENTENCES ARE, ACCORDING TO THE D. C. CODE, AND I
17    HAVE THE CODE WITH ME FOR EACH OFFENSE.
18              THE COURT:  THE CODE SAYS WHAT IT SAYS.
19              MR. ZUCKER:  RIGHT, BUT THE JURY DOESN'T KNOW IT.
20    I HAVE TO ESTABLISH WHAT HIS EXPOSURE WAS.
21              THE COURT:  IT'S NOT RELEVANT.
22              MR. ZUCKER:  IT'S NOT RELEVANT?
23              THE COURT:  IT'S NOT RELEVANT IF HE IS NOT AWARE
24    OF IT BECAUSE YOU'RE TRYING TO SHOW THAT HE AVOIDED A LIFE
25    SENTENCE WITHOUT PAROLE BY CUTTING A DEAL WITH THE
```

```
 1   PROSECUTION.  IF HE IS NOT AWARE THAT HE AVOIDED IT, THEN
 2   IT'S NOT RELEVANT.
 3            MR. ZUCKER:  ALL RIGHT.  I WILL INQUIRE OF HIM
 4   WHETHER AT THE TIME HE KNEW.
 5            THE COURT:  THAT'S RIGHT.
 6            MR. ZUCKER:  OKAY.
 7            THE COURT:  AND YOU'RE GOING TO LIVE WITH HIS
 8   ANSWER.
 9            OKAY.  ARE YOU READY TO BRING THEM BACK?
10            MR. ZUCKER:  SURE.
11            MR. JONES:  COULD I HAVE A RESTROOM BREAK?
12            THE COURT:  I'M SORRY?  I BEG YOUR PARDON?
13            MR. JONES:  COULD I HAVE A RESTROOM BREAK?
14            THE COURT:  ALL RIGHT.  TELL THE JURY WE'RE GOING
15   TO BE OUT FOR ANOTHER TEN MINUTES.
16            THE DEPUTY MARSHAL:  OKAY, JUDGE.
17            THE COURT:  WHAT IS THIS CHART ON THE MONITOR?
18            MR. ZUCKER:  IT'S JUST A LIST OF WHAT THE FOUR
19   CHARGES WERE.
20            THE COURT:  IT HASN'T BEEN ADMITTED INTO EVIDENCE,
21   AND IT HAS COME ACROSS THE MONITOR.
22            MR. ZUCKER:  IT IS ILLUSTRATIVE.  IT WOULDN'T BE
23   ADMITTED INTO EVIDENCE.  IT IS JUST A LIST.
24            THE COURT:  IT DOESN'T MAKE ANY DIFFERENCE.  IT IS
25   NOT TO BE SHOWN TO THE JURY UNTIL IT HAS BEEN ADMITTED.
```

46

1            (RECESS WAS TAKEN.)

2            (AFTER RECESS.)

3            THE COURT:  ARE YOU READY FOR THE JURY?

4            MR. ZUCKER:  YES.

5            THE DEPUTY MARSHAL:  THE JURY PANEL, YOUR HONOR.

6            (JURY IN.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE COURT:  ALL RIGHT.  DEFENDANTS' NUMBER 5 IS IN

 2   EVIDENCE.

 3                         (WHEREUPON, DEFENDANTS'

 4                         EXHIBIT NUMBER 5 WAS

 5                         RECEIVED IN EVIDENCE.)

 6            THE WITNESS:  SIR, YOU KEEP TRYING TO INSINUATE

 7   THAT I AM DOING THIS OUT OF A SIX-YEAR SENTENCE, AND I'VE

 8   BEEN IN FOUR YEARS ALREADY.  COME ON, SIR.  YOU'RE A DEFENSE

 9   ATTORNEY.

10   Q.  SO YOU'RE SAYING THAT THOSE TWO EVENTS, THE FACT THAT

11   THEY AGREED TO YOUR RELEASE AND YOU GOT A TWO-TO-SIX, IS

12   JUST A COINCIDENCE?

13   A.  WHO AGREED TO MY RELEASE?

14   Q.  THE PROSECUTORS.

15   A.  NO.

16   Q.  THEY AGREED TO YOUR RELEASE AT THE TIME OF THE PLEA,

17   DIDN'T THEY?

18   A.  NO.

19   Q.  WELL, THEY AGREED TO YOUR GOING INTO WORK RELEASE,

20   RIGHT?

21   A.  SIR?

22   Q.  THEY AGREED TO YOUR GOING INTO WORK RELEASE?

23   A.  THEY NEVER AGREED WITH ANYTHING.  I HAVE ASKED THEM TO

24   SEND ME TO A DRUG TREATMENT PROGRAM, BUT --

25   Q.  I AM NOT TALKING ABOUT SINCE SENTENCING.
```

1   A.   NOT THAT I KNOW OF HAVE THEY AGREED WITH ANYTHING.

2   Q.   SIR, I WANT TO BE CLEAR WE'RE TALKING ABOUT THE SAME

3   THING.   I AM NOT TALKING ABOUT AT THE TIME OF SENTENCING.   I

4   AM TALKING ABOUT THE DAY OF THE PLEA, FIVE DAYS AFTER YOU

5   TESTIFIED.   THEY AGREED TO YOUR BEING RELEASED FROM JAIL, NO

6   LONGER BEING HELD WITHOUT BOND, AND GOING INTO A WORK

7   RELEASE PROGRAM, DIDN'T THEY?

8   A.   NOT THAT I KNOW OF.   I KNOW I WAS SENT TO A HALFWAY

9   HOUSE, BUT AS FAR AS ME KNOWING THEM AGREEING TO IT, NO, I

10  DON'T KNOW THAT.

11  Q.   THAT'S BECAUSE SOMEBODY WROTE "WAIVED STEPBACK" ON THE

12  FORM AFTER IT WAS FILED WITH THE COURT, RIGHT?

13  A.   YES, BECAUSE I HAVE NEVER SEEN THAT.

14          MR. ZEIDENBERG:   OBJECTION.

15          THE COURT:   SUSTAINED.

16  BY MR. ZUCKER:

17  Q.   INCIDENTALLY, YOU ACKNOWLEDGE THAT YOU WROTE TO

18  MR. WAINSTEIN TO ASK HIM FOR HELP WITH THE PAROLE BOARD;

19  ISN'T THAT CORRECT?

20  A.   SIR?

21  Q.   I SAID YOU ACKNOWLEDGE THAT YOU DID WRITE TO

22  MR. WAINSTEIN, THE PRIOR PROSECUTOR, AND ASK HIM FOR HELP

23  WITH THE PAROLE BOARD; ISN'T THAT CORRECT?

24  A.   NO.   I ASKED HIM FOR HELP FOR RECEIVING DRUG TREATMENT.

25  Q.   YOU NEVER ASKED MR. WAINSTEIN -- YOU NEVER WROTE TO

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .   Docket No. CR 98-329

          Government,              .   Washington, D.C.
                                   .   February 8, 2001
     vs.                           .   2:20 p.m.
                                   .
VINCENT HILL,                      .   (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,                .
MAURICE PROCTOR,                   .
SEAN COATES,                       .

          Defendants               .
. . . . . . . . . . . . . . .      .

UNITED STATES OF AMERICA,          .

          Government,              .
                                   .   Docket No. CR 99-348
     vs.                           .
                                   .
GARY PRICE,                        .

          Defendant.               .
                                   .
. . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Proctor:       HOWARD BRAMSON, ESQ.
                                 717 D Street, N.W.
                                 Third Floor
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

45

1   Q.   Yes.

2   A.   Maybe a few weeks.

3   Q.   And after you were in Charles County, where did you go?

4   A.   I was transferred from Charles County to Northern Neck

5   Virginia Regional Jail, Warsaw County.

6   Q.   Approximately when did you get to Northern Neck?

7   A.   Sometime in March

8   Q.   That would be March of what year?

9   A.   2000.

10   Q.   How long were you at Northern Neck?

11   A.   Oh, about three weeks.

12   Q.   Now, while you were at Northern Neck Regional Jail, did

13   you meet someone there by the name of Draper?

14   A.   Yes.

15   Q.   Did you ever get to know his true name?

16   A.   Yes.

17   Q.   What was that?

18   A.   William Sweeney.

19   Q.   Do you see Mr. Sweeney in court today?

20   A.   Yes.

21   Q.   Could you point him out please?

22   A.   The gentleman sitting there with the yellow shirt on and

23   the glasses.

24         MR. ZEIDENBERG:   Your Honor, may the record reflect

25   the identification of William Sweeney?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 244

46

1          MR. KIERSH:  No objection.

2          THE COURT:  The record will so reflect.

3    BY MR. ZEIDENBERG:

4    Q.   Now, can you describe how it was you met Mr. Sweeney?

5    A.   Another gentleman by the name of Wayne Johnson and I were

6    in his room --

7    Q.   Mr. Johnson's room?

8    A.   Mr. Johnson's room discussing law.  And he said, one of

9    your homey's is here.  I said, excuse me?  Yeah, he said, one

10   of my homey's is here.  I said, yeah, where?  He said, the

11   next room to me.  His name is Sweeney.

12         So I said, I'll holler at him.  So when we finished

13   talking, I went and introduced myself to Mr. Sweeney, and we

14   started our conversation from there.

15   Q.   Now, when you first met Mr. Sweeney, how did he identify

16   himself?

17   A.   Well, when I spoke to him, he said, my name -- I'm

18   Draper, and I said, eh?  Because, you know, I never heard of

19   him.  And he said, you haven't heard of me?  I said, no.  I

20   said, besides, I'm old enough to be your grandfather, you

21   know.  I said, I haven't heard of you, you know.  And we went

22   from there.

23   Q.   Now, where were you housed in Northern Neck in relation

24   to Mr. Sweeney during the time that you were there?

25   A.   We were on the second tier.  We were about three cells

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 114 of 443
Case 1:98-cr-00329-RCL    Document 948    Filed 03/11/03    Page 55 of 87

55

1    he was faring or how he was enjoying life at Northern Neck?

2    A.    Well, it wasn't the same as it was at D.C. Jail.  Just

3    the regular jail time he was doing there.  Was no big deal

4    about this one here at Northern Neck.

5    Q.    Did he say what he was going to do about it?

6    A.    At one point he said, we got to make a power move and get

7    the fuck up out of here.

8    Q.    A power move?

9    A.    Yes.

10   Q.    Now, what did you understand that to mean?

11              MR. BRAMSON:   Objection.

12              THE COURT:   Overruled.

13              THE WITNESS:   They were going to escape.

14   BY MR. ZEIDENBERG:

15   Q.    Now, did you have any conversations with Mr. Sweeney

16   about criminal activity that he had been involved in?

17   A.    Yes.

18   Q.    Can you tell us about what Mr. Sweeney said about that?

19   A.    Well, he had told me that during the conversation that he

20   was doing everything, and which consisted of kidnapping,

21   murder and drugs.

22   Q.    Now, when he mentioned kidnappings, did you ask him any

23   questions about that?

24   A.    Yes.

25   Q.    What was your reaction when he said, kidnappings?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

56

1    A.    I was a little amazed.  That's something that you rarely

2    hear about.  People kidnapping people unless they're going to

3    do it for revenge or something like that, but just something

4    that people don't usually do.

5    Q.    Did you ask Mr. Sweeney any questions about the

6    kidnappings?

7    A.    Yes.

8    Q.    What did you say and what did he say?

9          MR. BRAMSON:  Objection.  May we approach?

10         THE COURT:  Are you sure this is necessary?

11         MR. BRAMSON:  I think it's necessary.

12         THE COURT:  All right.

13    (Bench conference on the record.)

14

15

16

17

18

19

20

21

22

23

24

25

57

1          (Bench conference on the record.)

2          MR. BRAMSON:  I'm going to ask for assurances that

3    this witness is only going to talk about Mr. Sweeney and what

4    Mr. Sweeney had done, and not Mr. Sweeney and others.

5          THE COURT:  I understand he is not going to mention

6    the names of any other persons.

7          MR. BRAMSON:  That was for the other matter.  Let me

8    make sure that no matters -- again, even if he says, we, you

9    know, we were doing is an improper inference to the rest of

10   the defendants in this case.  I think if the Court allows this

11   kind of testimony that the Court should limit it to what

12   Sweeney said Sweeney was doing and nobody -- there's no, we

13   were going to, or me and the boys or anything of that nature.

14         THE COURT:  If he was doing it collectively, then he

15   is going to be allowed to -- the witness is going to be

16   allowed to disclose that the admission was made as to

17   collective behavior.  As long as he doesn't mention any names

18   at this point.

19         MR. KIERSH:  Your Honor, while we're up here, again,

20   I'm learning information during this examination from my

21   client.  I mean, information is coming to me from both sides,

22   and it's -- this is a bombshell, the information that's coming

23   out, the testimony that's coming out

24         THE COURT:  I imagine it's somewhat of a surprise.

25         MR. KIERSH:  It's a surprise, and the substance of

58

1    it is obviously very damning to my client.

2         THE COURT:  I wouldn't think so.

3         MR. KIERSH:  Well, it is.  We all can see that.  But

4    what I'm also learning is that apparently this man in Charles

5    County did the same thing.  Went down to Charles County.

6    Someone who is awaiting trial, and became friendly with that

7    person and provided testimony --

8         THE COURT:  Why are you telling me this right now?

9         MR. KIERSH:  Because I'm telling this to you because

10   I need time.

11        THE COURT:  This is in the middle of the

12   examination.  I have ruled on an objection.

13        MR. KIERSH:  Right.  And I need time to investigate.

14        THE COURT:  I'll talk to you about that at the

15   appropriate time.

16        MR. KIERSH:  Fine.

17        (End of bench conference.)

18

19

20

21

22

23

24

25

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

59

1          (End of bench conference.)

2              THE COURT:  The objection is overruled.  What's your

3     question again?

4     BY MR. ZEIDENBERG:

5     Q.   I think my question was what questions, if any, did you

6     ask Mr. Sweeney about the kidnappings he had been involved

7     with, and what was his response?

8     A.   I asked was kidnapping profitable?  He said, yes.

9     Q.   Did he elaborate?

10    A.   Yes.

11    Q.   What did he say?

12    A.   He told me that he kidnapped one person twice, and he

13    kidnapped another person.

14    Q.   What was your reaction when he said that he kidnapped one

15    person two times?

16    A.   I wanted to know why?

17             MR. KIERSH:  Objection, Your Honor.

18             THE COURT:  Overruled.

19    BY MR. ZEIDENBERG:

20    Q.   What was your reaction?

21    A.   I was kind of stunned, you know, at the fact he had hit

22    the same person twice.  And I asked him, I said, so you all

23    must have had masks or something on?  He said, yeah.

24         Sorry.  I was talking too fast.  I asked him did they

25    have masks or something one when they kidnapped him, and he

60

1   said, yes.

2       The first time he said he kidnapped this guy, his name

3   was Kenneth or Keith Johnson, Whitey, something like that.

4   And they got a big chunk of money from somebody by the name of

5   Gooch.  I don't know him either.

6       I said, well, what happened on the second time?  He said,

7   second time we snatched him at Potomac Gardens, and he tried

8   to jump out the car and run, and I shot him.

9   Q.   Did Mr. Sweeney indicate whether or not the person lived

10  or died?

11  A.   No.

12  Q.   This was one particular kidnapping he described to you

13  involving Whitey?

14  A.   Yes.

15  Q.   And he said Whitey was kidnapped two times, is that your

16  testimony?

17  A.   Yes.

18  Q.   Now, did he tell you about another kidnapping involving

19  another individual?

20  A.   Yes, but it wasn't any name.

21  Q.   What did Mr. Sweeney tell you about the second

22  kidnapping?  And when I say second kidnapping I mean other

23  victim.

24  A.   He said they had snatched him and threw him in the trunk

25  of the car, and while they were driving the guy kicked the car

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 251

61

1    trunk open and got out and started running, and they jumped

2    out of the car and shot him in his hip or his ass and he still

3    got away.  I said, that's kind of preposterous.  I said you

4    shot him and he still got away?  And he said yes.

5    Q.    Did you believe that story?

6    A.    No, I still don't.

7    Q.    What was Mr. Sweeney's tone of voice when he was

8    describing these events to you?

9    A.    As a matter of fact, he, you know, -- just an every day

10   thing, it wasn't no big deal about it.

11   Q.    Now, did you talk to Mr. Sweeney about his pending case

12   that he was awaiting trial on?

13   A.    Yes.

14   Q.    What did Mr. Sweeney tell you about that?

15   A.    Well, at different intervals he said that he didn't think

16   the government had anything on him.  And I said -- my response

17   to that, I said, Draper, I said, generally when the feds,

18   meaning the federal government, put their hands on you they

19   generally are right.  They don't just grab you up and don't

20   have anything.  I said, either you did it, you're deeply

21   involved, or you know a whole lot about it.

22   Q.    What was Mr. Sweeney's response when you said that?

23   A.    You know, I still don't think they have anything on me,

24   you know.

25   Q.    Did he tell you what his concerns were about the case

62

1    against him?

2    A.    Yes.

3    Q.    What was that?

4    A.    A certain fellow by the name of James Montgomery.

5    Q.    What did he tell you about James Montgomery?

6    A.    That he had brought him into the organization and sort of

7    groomed him and brought him along and then the guy turned on

8    him.

9    Q.    If you could just fill in the he there and tell us that

10   again, Mr. Watson.   In other words, when he said he brought

11   him into the organization --

12   A.    Mr. Sweeney brought Mr. Montgomery into the organization.

13   Is that okay?

14   A.    Yes, thank you.   And what did Mr. Sweeney say about that?

15   A.    Well, he was somewhat disappointed because Mr. Montgomery

16   had been on several murders with him and did as much as he had

17   done and now he is flipping the script.   Because he got busted

18   on something else, now he is flipping on him to save himself.

19   Q.    Who is flipping on --

20   A.    Mr. Montgomery is turning on Mr. Sweeney to save himself.

21   Q.    Did Mr. Sweeney ask you any advice about that?

22   A.    Yes.

23   Q.    What did Mr. Sweeney ask you about that?

24   A.    He asked me if he could prove that Mr. Montgomery was in

25   on the killings and did as much killing as he did that would

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 253

63

1  they, the jury or whatever, try to work in his favor.  I told

2  him no, I didn't think so because it doesn't usually work like

3  that.  I said usually the first person that testifies is

4  usually what they go with.  And if they got you targeted as

5  the ring leader then that makes the difference.

6  Q.   What was Mr. Sweeney's response?

7  A.   Yeah, I figured as much.

8          THE COURT:  I'm sorry?

9          THE WITNESS:  Yes, I figured as much.

10 BY MR. ZEIDENBERG:

11 Q.   Now, did Mr. Sweeney talk to you about what role Mr.

12 Montgomery was to play in this case?

13 A.   He was suppose to testify against him.

14 Q.   Did you have any conversation about that fact?

15 A.   Yes.  He was talking that Montgomery is going to testify

16 against him.  And I said, well, if you got all this muscle and

17 all this gun power and everything, I said, why don't you just

18 kill him, you know.  And he said, we been trying to get to

19 that mother fucker but the feds got him hid away too well.

20 Q.   Did he say where they had been looking for him?

21 A.   No.

22 Q.   Now, did Mr. Sweeney talk to you about his personal life?

23 A.   Yes.

24 Q.   What do you recall him telling you about that?

25 A.   He was a little down, despondent, depressed about the

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 254

64

 1   fact that he had just had a new baby boy I think he said, just

 2   born baby boy, and he hadn't had a chance to really cuddle him

 3   and be with him or anything, you know.  And my advice was to

 4   him, you know, that maybe he should just go on and tell the

 5   lady to go on and get her own life, go ahead and find another

 6   life, because from what you're telling me all the time you're

 7   going to have, you know, you can't expect her to wait around

 8   for you.  And he said, yeah.  He said, -- he said, these

 9   bitches are no good anyway.  He said, I had to down a couple

10   of them anyway, you know, so --

11   Q.   Let me go back over it.  What is it -- when you told him

12   that he should tell the woman, his girlfriend or wife, to go

13   on without him, what was his response?

14        MR. BRAMSON:  Objection, Your Honor, relevance to

15   this trial.

16        THE COURT:  Approach the bench.

17        (Bench conference on the record.)

18

19

20

21

22

23

24

25

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 255

67

1        (End of bench conference.)

2   BY MR. ZEIDENBERG:

3   Q.    Mr. Watson, going back to the conversation you had about

4   Mr. Sweeney's domestic situation, after you advised Mr.

5   Sweeney that perhaps he should tell his baby's mother, wife,

6   however you described it, as someone who should go on with her

7   life without him, can you tell us what his response was to

8   that?

9   A.    Well, he kind of agreed with it, and he felt that -- he

10  said he had a little animosity towards women, particular

11  women.  And he said, yeah, these bitches no good anyway, you

12  know, because I had to down a couple of them anyway.

13  Q.    He said, I had to down a couple of them anyway?

14  A.    Yeah.  Yeah.

15  Q.    And when you say the term, down a couple of them, what

16  did you understand that to mean?

17            MR. BRAMSON:  Objection.

18            THE COURT:  Overruled.

19            THE WITNESS:  Kill them.

20  BY MR. ZEIDENBERG:

21  Q.    I'm sorry?

22  A.    Kill them.

23  Q.    Now, did Mr. Sweeney tell you how it was, other than

24  kidnapping, he was able to make money while he was out on the

25  outside?

68

1   A.    He said he did a whole lot of crack cocaine and had boat
2   loads of weed.

3   Q.    Weed?

4   A.    Marijuana.

5   Q.    Now, Mr. Watson, if you could, could you tell the ladies
6   and gentlemen how it is you came to the attention of the U.S.
7   Attorney's Office, you personally?

8   A.    I had spoken with Mr. Sweeney but really I had forgotten
9   all about him, because things he was saying was somewhat
10  preposterous and ludicrous to me, so I didn't really pay him
11  any more attention, and that was back in March of 2000.  And
12  around December 2000, when I was at this institution, my buddy
13  and I came into the mess hall and as we were about to leave he
14  was finishing up his meal, and I was sitting there talking to
15  him, and four young fellows came in behind us and sat down
16  behind us and they were talking.  They said, yeah --

17             MR. BRAMSON:  Objection.

18  BY MR. ZEIDENBERG:

19  Q.    I am not going to ask you -- in fact, I am going to ask
20  you not to repeat the conversation.  But let me try and do it
21  this way.  At some point did you contact an attorney?

22  A.    Yes.

23  Q.    What was your purpose in contacting an attorney?

24  A.    Well, I have 105 months to do.  I am 67 years old.  And I
25  wanted to try to get some time off me, and I felt this was one

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

79

1 | reveal an investigation method that they may not be obliged to
2 | reveal.

3 | MR. KIERSH: Again, I think that an inquiry -- we
4 | could save us all a lot of time if the Court would simply
5 | inquire of government counsel how it is, what he knows, then
6 | the issue may get resolved without us having to spend a lot of
7 | additional time.

8 | MR. ZEIDENBERG: If I may, Your Honor. I have no
9 | idea how it is that this witness ended up in that jail. I
10 | don't know if they have a contract with the local jail, that
11 | facility, because of over-crowding. I simply do not know.
12 | But I do know that there was certainly no targeting of Mr.
13 | Sweeney, or any other defendant in this case, by a government
14 | agent. And, frankly, I'm surprised that Mr. Kiersh would make
15 | such a suggestion.

16 | Obviously, we wouldn't be disclosing it, we wouldn't
17 | be calling a witness if he was in that position and then turn
18 | it over as Brady. It would be a situation we would never put
19 | ourselves in.

20 | THE COURT: All right. Your office disclaims any
21 | connection with Mr. Watson's presence in Northern --

22 | MR. ZEIDENBERG: And I don't, frankly, think that --
23 | I don't know how he got there, but Mr. Kiersh has no --
24 | certainly I have no better connections with the Bureau of
25 | Prisons --

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 258

80

1          THE COURT:  A call to the Marshal in the District of

2    Maryland would give an answer to it.  But he can spend his

3    weekend any way he wants to spend it.

4          MR. KIERSH:  I don't want to waste time

5    unnecessarily.  There is a lot of things I have to do in this

6    case, and I want to be prepared to go forward on Monday.  But

7    what I do want to know, if the Court would inquire of

8    government counsel, is whether or not the United States

9    Attorney's Office for the District of Maryland was involved

10   with Mr. Watson in getting him to Charles County.  That sounds

11   like how it probably occurred.

12          THE COURT:  You call --

13          MR. KIERSH:  They are not going to answer my

14   question.

15          THE COURT:  I am not going to have Mr. Zeidenberg

16   call.

17          MR. KIERSH:  Well, can you inquire of Mr. Zeidenberg

18   if he knows whether or not the Office of the United States

19   Attorney for the District of Maryland --

20          MR. ZEIDENBERG:  Your Honor, there has been no

21   collaboration between our office and the U.S. Attorney's

22   Office in Greenbelt about this case.  As far as I know, they

23   don't even know who Mr. Sweeney is.  There has not been any --

24          THE COURT:  I take your assurance.

25          MR. ZEIDENBERG:  -- investigative sharing between

81

1    our offices regarding this case, at least maybe in a most

2    peripheral way, but certainly not in this context.

3              THE COURT:  Okay.

4              MR. KIERSH:  What I would inquire of the Court -- we

5    talked about jury instructions on impeachment earlier in the

6    week.

7              THE COURT:  Why in the world would I give these

8    three instructions, four instructions, now -- five

9    instructions -- why would I give these five instructions now?

10             MR. KIERSH:  And the answer to your question is that

11   on Tuesday afternoon at just about this hour of the day you

12   asked me to provide you with those instructions.

13             THE COURT:  An instruction which addressed the

14   question of --

15             MR. KIERSH:  No, you --

16             THE COURT:  -- the various methods by which

17   impeachment can be done and why certain questions are being

18   asked.  And all you did is copy the Red Book instructions.

19             MR. KIERSH:  That's what you asked me to do.

20             THE COURT:  No, I didn't.  I have got a Red Book, I

21   don't need you to copy it for me.  I need a thoughtful

22   instruction which represents a little legal craftsmanship

23   which will get across the idea to the jury that you were

24   trying to express to me the other day, which I thought, as you

25   expressed it, had some superficial validity.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 260

USCA Case #21-3072   Document #2077668   Filed: 10/01/2024   Page 129 of 443
Case 1:98-cr-00329-RCL   Document 669   Filed 07/19/01   Page 1 of 78

1

1                   UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES,                    :
              GOVERNMENT,              :
4                                      :
      VS.                              :     CR. NO. 98-329
5                                      :
     VINCENT HILL,                     :
6    JEROME MARTIN,                    :
     SAMUEL CARSON,                    :
7    WILLIAM K. SWEENEY,               :          FILED
     MAURICE PROCTOR,                  :
8    SEAN COATES,                      :       JUL 1 9 2001
              DEFENDANTS.              :
9    _____   :     NANCY MAYER-WHITTINGTON, CLERK
                                             U.S. DISTRICT COURT
     UNITED STATES                     :
10            GOVERNMENT,              :
                                       :
11    VS.                              :     CR. NO. 99-348
                                       :
12   GARY PRICE,                       :
              DEFENDANT                :
13   _____   :

14                                     WASHINGTON, D. C.
                                       FEBRUARY 12, 2001
15                                     (MORNING SESSION)
                                       (10:55 A.M.)
16

17                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE THOMAS P. JACKSON
18

19

20

21   COURT REPORTER:           PHYLLIS MERANA
                                6816 U. S. DISTRICT COURT
22                              3RD & CONSTITUTION AVE., N.W.
                                WASHINGTON, D. C. 20001
23

24

25

2

|    |                              |                              |
|----|------------------------------|------------------------------|
| 1  | FOR THE GOVERNMENT:          | PETER ZEIDENBERG, AUSA       |
|    |                              | ANJALI CHATURVEDI, AUSA      |
| 2  |                              | 555 4TH ST., N.W.            |
|    |                              | WASHINGTON, D. C. 20001      |
| 3  |                              |                              |
|    | FOR THE DEFENDANT HILL:      | CHRISTOPHER DAVIS, ESQ.      |
| 4  |                              | 601 INDIANA AVE., N.W.       |
|    |                              | #910                         |
| 5  |                              | WASHINGTON, D. C.  20004     |
|    |                              |                              |
| 6  | FOR THE DEFENDANT MARTIN:    | JOANNE HEPWORTH, ESQ.        |
|    |                              | 305 H STREET, N.W.           |
| 7  |                              | 2ND FLOOR                    |
|    |                              | WASHINGTON, D. C.  20001     |
| 8  |                              |                              |
| 9  | FOR THE DEFENDANT CARSON:    | JOSEPH BESHOURI, ESQ.        |
|    |                              | LEXI NEGIN-CHRIST, ESQ.      |
| 10 |                              | 419 7TH STREET, N.W.         |
|    |                              | WASHINGTON, D. C.  20004     |
| 11 |                              |                              |
|    | FOR THE DEFENDANT SWEENEY:   | STEVEN R. KIERSH, ESQ.       |
| 12 |                              | 717 D STREET, N.W.           |
|    |                              | SUITE 400                    |
| 13 |                              | WASHINGTON, D. C.  20004     |
| 14 | FOR THE DEFENDANT PROCTOR:   | HOWARD BRAMSON, ESQ.         |
|    |                              | 717 D STREET, N.W.           |
| 15 |                              | THIRD FLOOR                  |
|    |                              | WASHINGTON, D. C.   20004    |
| 16 |                              |                              |
|    | FOR THE DEFENDANT COATES:    | FREDERICK JONES, ESQ.        |
| 17 |                              | 901 6TH STREET, S.W.         |
|    |                              | #409                         |
| 18 |                              | WASHINGTON, D. C.  20024     |
| 19 | FOR THE DEFENDANT PRICE:     | JONATHAN ZUCKER, ESQ.        |
|    |                              | 601 INDIANA AVE., N.W.       |
| 20 |                              | #901                         |
|    |                              | WASHINGTON, D. C.  20004     |
| 21 |                              |                              |
| 22 |                              |                              |
| 23 |                              |                              |
| 24 |                              |                              |
| 25 |                              |                              |

3

1                          I N D E X

2    WITNESS                        DIRECT    CROSS

3    THEODORE R. WATSON

4          BY MR. KIERSH                       10

5          BY MR. DAVIS                        45

6          BY MS. HEPWORTH                     55

7          BY MR. BRAMSON                      62

8          BY MR. ZUCKER                       67

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(Page 131 of Total)

19

```
 1   BY MR. KIERSH:

 2   Q.  IF YOU KNOW, SIR.

 3   A.  REPEAT IT AGAIN NOW.

 4   Q.  OKAY.  LET ME JUST GO BACK.  AGAIN, IF I AM NOT MAKING

 5   SENSE, JUST LET ME KNOW.

 6   A.  YOU'RE MAKING SENSE.  JUST GO HEAD.

 7   Q.  YOU HAVE ALREADY TOLD US THAT YOU MET WITH

 8   MS. WILKINSON; CORRECT?

 9   A.  CORRECT.

10   Q.  AND THAT YOU GAVE YOU HER INFORMATION, CORRECT?

11   A.  CORRECT.

12   Q.  AND YOU DID NOT GET THE 5K1 LETTER FOR SUBSTANTIAL

13   ASSISTANCE; CORRECT?

14   A.  CORRECT.

15   Q.  OKAY.

16           MY QUESTION IS DO YOU KNOW WHY YOU DID NOT GET THE

17   5K1 LETTER FROM MS. WILKINSON?

18   A.  YES.

19   Q.  WHAT WAS THE REASON?

20   A.  SHE MADE IT VERY CLEAR SHE DID NOT LIKE ME AND SHE

21   DIDN'T WANT TO GIVE ME ANYTHING.

22           THE COURT:  I AM SORRY?

23           THE WITNESS:  SHE MADE IT VERY CLEAR THAT SHE DID

24   NOT LIKE ME AND SHE DID NOT WANT TO GIVE ME ANYTHING.

25   BY MR. KIERSH:
```

App 264

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 133 of 443
Case 1:98-cr-00329-RCL    Document 669    Filed 07/19/01    Page 20 of 78

20

 1 | Q.   OKAY.

 2 |           AND WHEN YOU TELL US THAT SHE MADE IT VERY CLEAR

 3 | THAT SHE DID NOT LIKE YOU, WHAT DID SHE SAY THAT LED YOU TO

 4 | FORMULATE THE BELIEF THAT SHE DID NOT LIKE YOU?

 5 | A.   NUMBER ONE WAS HER ATTITUDE TOWARDS ME, AND MY ATTORNEYS

 6 | HAD TOLD ME, "MS. WILKINSON DOESN'T LIKE YOU, AND SHE

 7 | DOESN'T WANT TO GIVE YOU ANYTHING.  SHE DOESN'T WANT TO HEAR

 8 | ANYTHING FROM YOU.  SHE DOESN'T WANT TO TALK TO YOU ABOUT

 9 | ANYTHING.  THE ONLY TIME SHE WANTS TO SEE YOU IS AT TRIAL."

10 | Q.   OKAY.  BUT YOU DIDN'T GO TO TRIAL BECAUSE SHE NEGOTIATED

11 | A PLEA?

12 | A.   SHE CAME BACK WITH A PLEA, YES.

13 | Q.   OKAY.  THE PLEA, INCLUDING THE NOTATION THAT IF YOU

14 | PROVIDED SUBSTANTIAL ASSISTANCE, SHE WOULD SUBMIT THE 5K1

15 | LETTER?

16 | A.   THAT WAS IN THE PLEA AGREEMENT.

17 | Q.   RIGHT.  BUT THE 5K1 LETTER WAS NEVER SUBMITTED ON YOUR

18 | BEHALF?

19 | A.   NO, IT WASN'T.

20 | Q.   OKAY.

21 |           NOW, THE CIRCUMSTANCES BEHIND YOUR ARREST -- I

22 | JUST WANT TO GO INTO THOSE BRIEFLY -- THAT LED YOU TO APPEAR

23 | BEFORE THE FEDERAL JUDGE IN GREENBELT -- YOU TOLD THIS JURY,

24 | WHEN YOU WERE HERE LAST WEEK, ON DIRECT EXAMINATION, THAT

25 | YOU HAD WORKED AS A PHARMACEUTICAL ADMINISTRATIVE ASSISTANT;

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 134 of 443
Case 1:98-cr-00329-RCL  Document 669  Filed 07/19/01  Page 31 of 78

31

1           (BENCH CONFERENCE.)

2           THE COURT:  YOU'RE GOING TO SHOW THAT HE WAS IN

3    PROTECTIVE CUSTODY BECAUSE HE FEARED REPRISAL?

4           MR. KIERSH:  BECAUSE HE WAS GIVING INFORMATION

5    ABOUT THESE INMATES, AND THAT HE DID FEAR REPRISAL.  THAT'S

6    WHY THEY PUT HIM IN PROTECTIVE CUSTODY, THE SAME TYPE OF

7    CIRCUMSTANCES THAT LED HIM TO GIVE TESTIMONY AGAINST

8    MR. SWEENEY.

9           THE COURT:  ALL RIGHT.  IF THAT'S THE PURPOSE OF

10   OFFERING THE EVIDENCE, WHAT'S THE RELEVANCE?

11          MR. KIERSH:  THE RELEVANCE IS THAT THIS IS HIS

12   PATTERN OF CONDUCT.  THAT HE GOES AND HE JUST GETS SENT TO

13   THESE JAILS.  HE IS AN OLDER MAN.  HE SPEAKS TO THE YOUNGER

14   GUYS AND GETS THEM TO TRUST HIM, AND THEN HE GOES AND TRIES

15   TO GET INFORMATION THAT HE CAN USE FOR REDUCTION OF HIS OWN

16   SENTENCE.

17          THE COURT:  HOW DOES THAT BEAR ON HIS CREDIBILITY?

18          MR. KIERSH:  WELL, BECAUSE THE FACT THAT -- IT

19   BEARS DIRECTLY ON HIS CREDIBILITY, BECAUSE IF HE IS DOING

20   THIS AS A PATTERN, THEN IT SUGGESTS THAT IT MAY NOT BE

21   TRUTHFUL WHAT HE IS SAYING, AND THE FACT THAT THERE IS A

22   SUGGESTION, AT LEAST, THAT THE U.S. ATTORNEY'S OFFICE IN

23   GREENBELT REJECTED JUST THIS TYPE OF TESTIMONY FROM HIM.

24          THE COURT:  WHAT'S THE BASIS OF THE OBJECTION?

25          MR. ZEIDENBERG:  MY QUERY WOULD BE THE SAME AS THE

USCA Case #21-3072   Document #2077668   Filed: 10/01/2024   Page 135 of 443
Case 1:98-cr-00329-RCL   Document 669   Filed 07/19/01   Page 32 of 78

32

1  COURT'S.  I DON'T UNDERSTAND HOW THE FACT THAT HE

2  PROVIDED -- IF HE IS GOING TO DEMONSTRATE THAT HE PROVIDED A

3  PATTERN OF UNTRUTHFUL TESTIMONY, THEN HE COULD SAY, "WELL,

4  IT SEEMS THAT HE CONSTANTLY GIVES UNTRUTHFUL TESTIMONY AND

5  TRIES TO PASS IT OFF AS TRUTHFUL."  THAT IS ONE THING, BUT

6  THE FACT THAT HE DID OR DID NOT OBTAIN INFORMATION ON OTHER

7  INMATES ON PRIOR OCCASIONS -- THERE IS NO INDICATION OF

8  WHICH I AM AWARE.  IN FACT, TO THE CONTRARY.  THE

9  INFORMATION HE PROVIDED, AT LEAST FROM MY UNDERSTANDING, WAS

10  COMPLETELY CORRECT.  IT WAS JUST THAT THE PROSECUTOR IN

11  MARYLAND, AS MR. WATSON SAID, SAID SHE DIDN'T CARE WHAT

12  INFORMATION HE HAD ABOUT WHATEVER.  SHE WASN'T GIVING HIM

13  ANYTHING.

14        SO I DON'T HAVE ANY EVIDENCE THAT SUGGESTS THAT

15  HIS TESTIMONY OR THAT ANY INFORMATION HE HAS PROVIDED WAS

16  UNTRUSTWORTHY.

17        THE COURT:  WELL, I THINK IT'S TENUOUS, BUT THE

18  RATIONALE IS THAT HE VIEWS HIS TESTIMONY OR THE INFORMATION

19  THAT HE MAY HAVE THAT CAN BE USED AGAINST OTHER

20  DEFENDANTS -- HE VIEWS IT AS SOMETHING OF A COMMODITY TO

21  THAT EXTENT.

22        WHY DOES THAT SUGGEST IT IS ANY LESS RELIABLE?

23        MR. KIERSH:  WELL, BECAUSE IF IT'S A PATTERN OF

24  CONDUCT ON SOMEONE'S PART, THAT'S WHY I SUGGEST IT'S

25  UNRELIABLE.  THAT HE IS DOING WHATEVER HE CAN TO GET

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 136 of 443
Case 1:98-cr-00329-RCL   Document 669   Filed 07/19/01   Page 33 of 78

33

1    INFORMATION TO USE AGAINST PEOPLE FOR HIS OWN BENEFIT.  SO

2    THAT SIMPLY IT'S A HABIT.  IT'S A PATTERN FOR A MAN WHO HAS

3    ALREADY TESTIFIED THAT HE IS TRYING TO GET HIS SENTENCE

4    REDUCED.  THAT'S HIS GOAL IN THIS WHOLE PROCESS.

5            THE COURT:  ALL RIGHT.  THE OBJECTION IS

6    OVERRULED.

7            (END OF BENCH CONFERENCE.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 137 of 443
Case 1:98-cr-00329-RCL    Document 669    Filed 07/19/01    Page 35 of 78

35

| | |
|---|---|
| 1 | A. BECAUSE HE THOUGHT THAT A GENTLEMAN THAT WAS TESTIFYING |
| 2 | AGAINST HIS ORGANIZATION -- HE AND SOME OTHER FRIENDS HAD |
| 3 | TALKED TO ME AND TOLD ME WHAT WAS GOING ON. AND IT HADN'T |
| 4 | HAPPENED. HE HAD THAT GRUDGE. AND HE THOUGHT THAT I |
| 5 | OVERHEARD SOME OF HIS CONVERSATIONS. THEY WERE OFTEN |
| 6 | TALKING IN THE ROOM NEXT TO ME. AND HE FEARED THAT I |
| 7 | OVERHEARD A LOT OF THOSE CONVERSATIONS. AND THAT ENTAILED |
| 8 | THE ALTERCATION. |
| 9 | Q. SO IT WAS YOUR UNDERSTANDING THAT HE HAD OVERHEARD A |
| 10 | CONVERSATION YOU WERE INVOLVED WITH? |
| 11 | A. NO. |
| 12 | Q. COULD YOU REPEAT THAT? COULD YOU REPEAT YOUR ANSWER? |
| 13 | A. HIS ROOM WAS ABOUT A DOOR FROM MY ROOM, AND HE WOULD |
| 14 | OFTEN HAVE CONVERSATIONS WITH OTHER CO-DEFENDANTS IN HIS |
| 15 | ROOM. AND HE THOUGHT I OVERHEARD SOME OF HIS CONVERSATIONS, |
| 16 | AND COUPLED WITH THE FACT THAT HE BELIEVED I ALREADY WAS |
| 17 | TESTIFYING AGAINST HIM, THAT PROVOKED THE ALTERCATION. |
| 18 | Q. SO HE THOUGHT YOU WERE ALREADY COMMITTED TO TESTIFYING |
| 19 | AGAINST HIM? |
| 20 | A. THAT IS CORRECT. |
| 21 | Q. OKAY. |
| 22 | NOW, YOU KNOW A PRIVATE INVESTIGATOR BY THE NAME |
| 23 | OF JAMES BRADLEY, DON'T YOU? |
| 24 | A. YES, I DO. |
| 25 | Q. AS A MATTER OF FACT, AFTER YOU WERE SENTENCED IN |

USCA Case #21-3072   Document #2077668   Filed: 10/01/2024   Page 138 of 443
Case 1:98-cr-00329-RCL   Document 669   Filed 07/19/01   Page 36 of 78

36

1   FEBRUARY OF 2000, YOU HIRED MR. BRADLEY?

2   A.   YES.

3   Q.   OKAY.

4              AND YOU KNOW THAT MR. BRADLEY USED TO BE EMPLOYED

5   BY THE METROPOLITAN POLICE DEPARTMENT?

6   A.   SO HE SAYS, YES.

7   Q.   YOU ALSO KNOW THAT HE WAS EMPLOYED BY THE DRUG

8   ENFORCEMENT AGENCY?

9   A.   THAT'S WHAT HE SAID.

10  Q.   AND YOU ALSO KNOW THAT HE IS NOW A PRIVATE INVESTIGATOR,

11  WHEREBY HE COULD BE HIRED BY INDIVIDUALS TO DO PRIVATE

12  INVESTIGATIVE WORK?

13  A.   YES.

14  Q.   AND YOU PAID HIM A SUBSTANTIAL AMOUNT OF MONEY TO WORK

15  WITH YOU; ISN'T THAT CORRECT?

16  A.   YES.

17  Q.   OKAY.  AND THE REASON THAT YOU HIRED MR. BRADLEY IS THAT

18  YOU ASKED HIM IF HE COULD BRING YOU SOME INFORMATION ABOUT

19  CRIMINAL ACTIVITY THAT YOU COULD THEN USE TO BRING TO THE

20  ATTENTION OF THE PROSECUTING AUTHORITIES IN MARYLAND?

21  A.   THAT IS TOTALLY INCORRECT.

22  Q.   OKAY.  WHY DID YOU HIRE MR. BRADLEY?

23  A.   I HAD INFORMATION THAT I WANTED -- I THOUGHT HE WAS

24  SUPPOSED TO HAVE BEEN WORKING WITH DRUG ENFORCEMENT AND THE

25  METROPOLITAN POLICE AND THAT HE COULD GET SOMEONE TO COME

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 139 of 443
Case 1:98-cr-00329-RCL    Document 669    Filed 07/19/01    Page 44 of 78

44

1              (END OF BENCH CONFERENCE.)

2              THE COURT:   THE OBJECTION HAS BEEN WITHDRAWN.

3    BY MR. KIRSCH:

4    Q.  SIR, WHAT WAS THE SUBSTANCE OF THE CONVERSATION THAT

5    DAY?

6    A.  WELL, MS. BARBARA SKYLER, ONE OF THE PROSECUTORS FOR THE

7    DISTRICT COURT IN GREENBELT -- SHE WANTED SOME INFORMATION

8    THAT ONE OF MY ATTORNEYS HAD PASSED ON TO MS. WILKINSON,

9    WHICH MS. WILKINSON PASSED ON TO MS. SKYLER.   SANDRA

10   WILKINSON, WAS THE DISTRICT ATTORNEY WHO WAS PROSECUTING MY

11   CASE.   AND WHEN I FIRST CAME IN, MS. WILKINSON TOLD ME, YOU

12   KNOW, "YOU'RE NOT ON OUR TEAM, AND YOU'RE NOT LIKELY TO BE

13   ON OUR TEAM.   AND I WANT YOU TO ANSWER ALL THE QUESTIONS

14   THAT MS. SKYLER ASKS YOU TRUTHFULLY AND HONESTLY."

15             AND I EXPLAINED TO HER SOME THINGS THAT HAPPENED

16   IN HER CASE -- TWO OF THE CASES SHE WAS PROSECUTING.   AND

17   WHEN I FINISHED TALKING WITH HER, SHE MADE A STATEMENT --

18   AND THIS CAN BE VERIFIED -- SHE SAID, "WHY DIDN'T I HEAR

19   ABOUT THIS BEFORE I GAVE ALL THESE LENIENT PLEAS OUT?"   AND

20   I LOOKED AT MS. WILKINSON AND I LOOKED AT MY ATTORNEY.   I

21   SAID, "I TOLD YOU THIS MONTHS AGO BEFORE YOU DID THAT."   SHE

22   JUST LOOKED AT MS. WILKINSON, AND THAT WAS THE END OF IT.

23   MS. WILKINSON PULLED A CHAIR UP AND SAID, "WELL, I WANT TO

24   TALK TO YOU, AND I DON'T WANT TO HEAR NOTHING ELSE YOU'VE

25   GOT TO TALK ABOUT OR ANY OTHER INFORMATION YOU WANT TO GIVE

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 140 of 443
Case 1:98-cr-00329-RCL    Document 669    Filed 07/19/01    Page 45 of 78

45

1    ME.  I JUST WANT TO HEAR ABOUT ERSKINE HARTWELL AND PEOPLE

2    SURROUNDING HIM."  AND THAT WAS EXTENT OF THAT MEETING.

3    Q.  OKAY.  THAT'S ALL I HAVE.  THANK YOU, MR. WATSON.

4         THE COURT:  MR. DAVIS?

5         MR. DAVIS:  I JUST HAVE A COUPLE QUESTIONS, YOUR

6    HONOR.

7         THE COURT:  OF COURSE.

8              CROSS EXAMINATION

9    BY MR. DAVIS:

10   Q.  MR. WATSON, AM I CORRECT IN UNDERSTANDING YOUR TESTIMONY

11   TO BE THAT YOU MET WITH SEVERAL DIFFERENT PROSECUTORS IN

12   GREENBELT?

13   A.  TWO.  I THINK I STATED THAT I MET WITH TWO THAT I KNEW

14   WERE PROSECUTORS.  THERE WAS A D.E.A. AGENT AND A FEW OTHER

15   GENTLEMEN IN THERE, BUT I DIDN'T KNOW WHO THEY WERE.

16   Q.  SO YOU HAD BEEN UP TO THE COURTHOUSE IN GREENBELT ON

17   SEVERAL OCCASIONS IN YOUR EFFORTS TO PROVIDE ASSISTANCE TO

18   THE PROSECUTORS, CORRECT?

19   A.  TWO OR THREE, YES.

20   Q.  AND THEY TOLD YOU THAT IT WAS UNLIKELY THAT YOU WOULD BE

21   ABLE TO GET ON THEIR TEAM?

22   A.  THEY DIDN'T SAY IT.  MS. SANDRA WILKINSON SAID IT.

23   Q.  HOW LONG DID IT TAKE YOU TO GET ON THE TEAM OF THE

24   DISTRICT OF COLUMBIA'S U.S. ATTORNEY'S OFFICE?

25              MR. ZEIDENBERG:  I OBJECT TO THE FORM OF THAT

USCA Case #21-3072 Document #2077668 Filed: 10/01/2024 Page 141 of 443
Case 1:98-cr-00329-RCL Document 669 Filed 07/19/01 Page 76 of 78

76

 1   OR RIGHT DOWN TO THE FACT THAT HE SAID HE DIDN'T COOPERATE

 2   AGAINST "PEEWEE", IF THERE ARE INDICATIONS THAT HE

 3   COOPERATED AGAINST "PEEWEE", WE WOULD ASK THAT THESE

 4   MATERIALS BE MADE AVAILABLE TO US OR THE INFORMATION BE MADE

 5   AVAILABLE TO YOU.

 6            THE COURT:   THAT HE COOPERATED AGAINST WHO?

 7            MR. DAVIS:   HE NAMED SEVERAL PROSECUTORS AND

 8   SEVERAL DEFENDANTS.   ONE DEFENDANT HE REFERENCED WAS

 9   "PEEWEE".

10            THE COURT:   ALL RIGHT.

11            MR. DAVIS: AND THIS WAS A FAIRLY NOTORIOUS CASE

12   OUT IN GREENBELT, AND A LOT OF PEOPLE WERE BROUGHT IN TO

13   PROVIDE --

14            THE COURT:   WELL, YOU TELL ME WHY THE FACT THAT HE

15   MAY HAVE GIVEN TESTIMONY IN ANOTHER CASE REPRESENTS BRADY

16   MATERIAL.

17            MR. DAVIS:   OH, IT WOULD JUST BE GIGLIO MATERIAL.

18   IT WOULD BE IMPEACHMENT MATERIAL.   IF HE SAYS HE DID NOT

19   PROVIDE THAT, THAT WOULD IMPEACH HIM.

20            I AM PARTICULARLY INTERESTED IN IF HE WROTE

21   LETTERS, BECAUSE HE SEEMS LIKE THE TYPE OF INDIVIDUAL THAT

22   WOULD BE VERY -- IT JUST SEEMS LIKE HE WOULD BE VERY

23   PERSISTENT IN HIS EFFORTS TO DO SOMETHING.

24            I GUESS THE BOTTOM-LINE REASON I AM MAKING THIS

25   REQUEST IS THAT THEY MADE A DETERMINATION THAT HE WAS

77

1   UNRELIABLE.  AND I DON'T KNOW IF IT WAS BASED ON SPECIFIC

2   FACTS THAT CAME TO LIGHT AS THEY WERE WORKING WITH HIM OR

3   THINGS FROM HIS PAST, BUT I BELIEVE THAT WE HAVE A BASIS --

4           THE COURT:  THE GOVERNMENT IS NOT REQUIRED TO DO

5   YOUR INVESTIGATIVE WORK FOR YOU, MR. DAVIS.

6           MR. DAVIS:  WELL, YOUR HONOR, I'M NOT --

7           THE COURT:  AS A MATTER OF FACT, I RECALL PAYING

8   AN INVESTIGATOR OF YOURS A FAIR AMOUNT OF MONEY.

9           MR. DAVIS:  LAST MONTH, YES.  I SAW THAT, YOUR

10  HONOR.  THAT'S ANOTHER MATTER THOUGH.  IN REFERENCE TO THIS,

11  I WILL BE HAPPY TO PROVIDE THE COURT WITH THE CASE CITATION,

12  BUT THE CASE IS PRETTY SPECIFIC.

13          THE COURT:  I WILL TAKE YOUR REPRESENTATION AS TO

14  WHAT THE CASE STANDS FOR.

15          MR. DAVIS:  AND I WOULD ASK THAT THE UNITED STATES

16  ATTORNEY'S OFFICE REVIEW THAT FILE.

17          THE COURT:  IF THEY HAVE NOT DONE THAT, AND I

18  WOULD ASK THAT THEY CALL THE PROSECUTOR'S OFFICE IN

19  GREENBELT TO FIND OUT WHETHER OR NOT THERE IS ANYTHING THAT

20  COULD BE CHARACTERIZED AS, QUOTE, BRADY MATERIAL IN THEIR

21  FILE.  OTHER THAN THAT --

22          MR. DAVIS:  THANK YOU, YOUR HONOR.

23          THE COURT:  -- THAT'S THE EXTENT OF THE

24  GOVERNMENT'S OBLIGATION.

25          OKAY?

1

1                        UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
2

3      UNITED STATES,                    :
                  GOVERNMENT,            :
4                                        :
        VS.                              :    CR. NO. 98-329
5                                        :
        VINCENT HILL,                    :
6      JEROME MARTIN,                    :
       SAMUEL CARSON,                    :            FILED
7      WILLIAM K. SWEENEY,               :
       MAURICE PROCTOR,                  :         JUL 1 9 2001
8      SEAN COATES,                      :
                  DEFENDANTS.            :    NANCY MAYER WHITTINGTON, CLERK
9      _____          :         U.S. DISTRICT COURT
       UNITED STATES                     :
10                GOVERNMENT,            :
                                         :
11      VS.                              :    CR. NO. 99-348
                                         :
12     GARY PRICE,                       :
                  DEFENDANT              :
13     _____          :

14                                           WASHINGTON, D. C.
                                             FEBRUARY 13, 2001
15                                           (MORNING SESSION)
                                             (10:25 A.M.)
16

17                        TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE THOMAS P. JACKSON
18

19

20

21     COURT REPORTER:             PHYLLIS MERANA
                                   6816 U. S. DISTRICT COURT
22                                 3RD & CONSTITUTION AVE., N.W.
                                   WASHINGTON, D. C. 20001
23

24

25

2

| | | |
|---|---|---|
| 1 | FOR THE GOVERNMENT: | PETER ZEIDENBERG, AUSA |
| | | ANJALI CHATURVEDI, AUSA |
| 2 | | 555 4TH ST., N.W. |
| | | WASHINGTON, D. C. 20001 |
| 3 | | |
| | FOR THE DEFENDANT HILL: | CHRISTOPHER DAVIS, ESQ. |
| 4 | | 601 INDIANA AVE., N.W. |
| | | #910 |
| 5 | | WASHINGTON, D. C.  20004 |
| 6 | FOR THE DEFENDANT MARTIN: | JOANNE HEPWORTH, ESQ. |
| | | 305 H STREET, N.W. |
| 7 | | 2ND FLOOR |
| | | WASHINGTON, D. C.  20001 |
| 8 | | |
| 9 | FOR THE DEFENDANT CARSON: | JOSEPH BESHOURI, ESQ. |
| | | LEXI NEGIN-CHRIST, ESQ. |
| 10 | | 419 7TH STREET, N.W. |
| | | WASHINGTON, D. C.  20004 |
| 11 | | |
| | FOR THE DEFENDANT SWEENEY: | STEVEN R. KIERSH, ESQ. |
| 12 | | 717 D STREET, N.W. |
| | | SUITE 400 |
| 13 | | WASHINGTON, D. C.  20004 |
| 14 | FOR THE DEFENDANT PROCTOR: | HOWARD BRAMSON, ESQ. |
| | | 717 D STREET, N.W. |
| 15 | | THIRD FLOOR |
| | | WASHINGTON, D. C.   20004 |
| 16 | | |
| | FOR THE DEFENDANT COATES: | FREDERICK JONES, ESQ. |
| 17 | | 901 6TH STREET, S.W. |
| | | #409 |
| 18 | | WASHINGTON, D. C.  20024 |
| 19 | FOR THE DEFENDANT PRICE: | JONATHAN ZUCKER, ESQ. |
| | | 601 INDIANA AVE., N.W. |
| 20 | | #901 |
| | | WASHINGTON, D. C.  20004 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

3

```
 1                    I N D E X

 2    WITNESS                  DIRECT    CROSS

 3    CHARLENE WILSON

 4         BY MS. CHATURVEDI        7

 5         BY MR. BESHOURI                   40

 6

 7    GOVERNMENT'S         IN EVIDENCE

 8    TF107                    29

 9

10

11    DEFENDANT CARSON'S    IN EVIDENCE

12    8                        65

13

14

15

16

17

18

19

20

21

22

23

24

25
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 146 of 443
Case 1:98-cr-00329-RCL    Document 668    Filed 07/19/01    Page 5 of 79

5

```
 1              MR. ZEIDENBERG:  I BELIEVE WE ARE, YOUR HONOR.

 2              JUST ON A MATTER LEFT OVER FROM YESTERDAY,

 3     PURSUANT TO THE COURT'S INSTRUCTION, WE CONTACTED THE U.S.

 4     ATTORNEY'S OFFICE IN GREENBELT.  WE RETRIEVED THEIR FILE

 5     YESTERDAY EVENING AND HAVE REVIEWED IT.

 6              THERE IS NOTHING, IN OUR VIEW, THAT SUGGESTS ANY

 7     BRADY OR JENCKS MATERIAL IN THE FILE.  THE ASSISTANT U. S.

 8     ATTORNEY OUT THERE INDICATES IN ONE LETTER THAT THE REASON

 9     THAT MR. WATSON DID NOT GET A 5K LETTER WAS SIMPLY BECAUSE

10     SHE DIDN'T BELIEVE HIS COOPERATION WAS OF A SIGNIFICANT

11     ENOUGH NATURE TO QUALIFY.  THERE WAS NOTHING TO SUGGEST THAT

12     IT WAS NOT WORTHY OF BELIEF OR IT WAS INCREDIBLE.  THERE WAS

13     NOTHING OF THAT NATURE.

14              DETECTIVE NORRIS -- WE SPOKE WITH HIM BRIEFLY

15     YESTERDAY.  AND HE HAD CALLED -- WE TRIED TO GET IN TOUCH

16     WITH HIM -- AND HE INDICATED SIMILARLY THAT MR. WATSON HAD

17     NEVER PROVIDED HIM WITH INFORMATION THAT HE FELT WAS

18     UNTRUSTWORTHY OF ANY KIND.  NEVERTHELESS, WE DO HAVE THE

19     FILE, AND I DON'T KNOW IF THE COURT WISHES TO HAVE IT TO

20     PERUSE.  THERE ARE LETTERS --

21              THE COURT:  YOU MEAN THE FILE FROM GREENBELT?

22              MR. ZEIDENBERG:  YES.  THERE ARE LETTERS FROM

23     MR. WATSON TO THE PROSECUTOR, AS HE DESCRIBES -- SEVERAL

24     LENGTHY LETTERS, TALKING ABOUT A VARIETY OF MATTERS,

25     INCLUDING HIS OWN CASE AND OTHER CASES THAT HE KNOWS ABOUT
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 147 of 443
Case 1:98-cr-00329-RCL    Document 668    Filed 07/19/01    Page 6 of 79

6

```
 1   AND THINGS OF THAT NATURE.

 2            THE COURT:  DO YOU WANT TO HAVE IT MADE PART OF

 3   THE COURT RECORD?

 4            MR. KIERSH:  YES, YOUR HONOR.

 5            THE COURT:  ALL RIGHT.

 6            MR. KIERSH:  I ASK THAT IT BE PLACED UNDER SEAL

 7   AND MADE A PART OF THE RECORD.

 8            THE COURT:  WE WILL PLACE IT UNDER SEAL AND MARK

 9   IT AS COURT EXHIBIT, I BELIEVE, NUMBER 3.  IS THAT CORRECT,

10   MR. WEST?

11            THE DEPUTY CLERK:  I BELIEVE SO, YOUR HONOR.

12            MR. ZUCKER:  YOUR HONOR, I CONCUR IN THAT, BUT I'D

13   ALSO ASK THAT THE COURT --

14            THE COURT:  WAIT A MINUTE.

15            THE DEPUTY CLERK:  NUMBER 5, YOUR HONOR.

16            THE COURT:  NUMBER 5.  ALL RIGHT.  NUMBER 5.  I DO

17   NOT INTEND TO REVIEW IT IN CAMERA.

18            MR. ZUCKER:  THAT WOULD BE MY REQUEST.

19            THE COURT:  ALL RIGHT.  ARE WE READY FOR THE JURY?

20            MS. CHATURVEDI:  YES, YOUR HONOR.

21            THE COURT:  LET'S ASK FOR MS. WILSON.

22            THE DEPUTY MARSHAL:  THE JURY PANEL, YOUR HONOR.

23            THE COURT:  VERY WELL.

24            (JURY IN.)

25
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 148 of 443
Case 1:98-cr-00329-RCL   Document 668   Filed 07/19/01   Page 13 of 79

13

```
 1    Q.   OKAY.

 2              HOW WOULD YOU, WHEN YOU WOULD GO TO -- DID YOU

 3    EVER VISIT --

 4              THE COURT:   WHAT WAS THAT EXHIBIT NUMBER AGAIN?

 5              MS. CHATURVEDI:   IT'S THE SAME EXHIBIT, A-17.

 6    IT'S JUST AN ENLARGEMENT OF A PORTION OF IT, YOUR HONOR.

 7              THE COURT:   OKAY.   ALL RIGHT.

 8    BY MS. CHATURVEDI:

 9    Q.   DID YOU EVER VISIT MS. KNIGHT'S APARTMENT -- REGINA

10    KNIGHT'S APARTMENT?

11    A.   YES.

12    Q.   HOW WOULD YOU GO FROM YOUR APARTMENT OVER TO REGINA

13    KNIGHT'S APARTMENT?

14    A.   OVER THE ROOF.

15    Q.   WHAT DO YOU MEAN BY THAT?

16    A.   I WOULD CLIMB OVER THE ROOF.

17    Q.   WHAT FLOOR WAS YOUR APARTMENT ON?

18    A.   THE THIRD FLOOR.

19    Q.   AND HOW MANY FLOORS DID THE BUILDING HAVE?

20    A.   THREE.

21    Q.   SO YOU WOULD WALK UP TO THE ROOF AND WALK ACROSS?

22    A.   YES.

23    Q.   AND THEN DO WHAT?

24    A.   GO OVER TO THE NEXT BUILDING AND THEN DOWN.

25    Q.   OKAY.   HOW MANY TIMES DO YOU THINK YOU VISITED REGINA
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 149 of 443
Case 1:98-cr-00329-RCL  Document 668   Filed 07/19/01   Page 14 of 79

14

1   KNIGHT'S APARTMENT IN THE TIME THAT YOU LIVED DOWN THERE?

2   A.   MANY TIMES.

3   Q.   LET ME DIRECT YOUR ATTENTION TO THE MONTH OF AUGUST OF

4   1991.  DID YOU KNOW SOMEONE BY THE NAME OF TONY FORTUNE?

5   A.   NOT PERSONALLY.

6   Q.   DID YOU KNOW OF HIM?

7   A.   YES.

8   Q.   AND DO YOU KNOW WHAT HAPPENED TO HIM THAT DAY -- THAT

9   MONTH IN 1991?

10  A.   YES.

11  Q.   WHAT'S THAT?

12  A.   HE GOT KILLED.

13  Q.   ON THE DAY THAT HE WAS KILLED -- THAT TONY FORTUNE WAS

14  KILLED -- DID YOU GO TO REGINA KNIGHT'S HOUSE ON THAT

15  PARTICULAR DAY?

16  A.   YES.

17  Q.   APPROXIMATELY WHAT TIME WAS IT THAT YOU WENT TO REGINA'S

18  HOUSE?

19  A. I'M NOT SURE.

20  Q.   WAS IT DAYTIME, OR AFTERNOON, OR EVENING?

21  A.   IT WAS IN THE EVENING.

22  Q.   OKAY.  AND THAT DAY, DID YOU GET OVER TO MS. KNIGHT'S

23  APARTMENT BY WALKING OVER THE ROOF?

24  A.   YES, I DID.

25  Q.   WHEN YOU GOT INTO HER APARTMENT, WERE THERE PEOPLE

```
 1    THERE?

 2    A.   YES.

 3    Q.   WHO WAS THERE?

 4    A.   "PIMP", "LITTLE COW", MIKIE, REGINA, RINA, "BIG COW,"

 5    SAM, ME MYSELF, AND MY LITTLE DAUGHTER.

 6    Q.   OKAY.  DO YOU KNOW SOMEBODY BY THE NAME OF CARLOS?

 7    A. YES.

 8    Q.   WAS HE THERE?

 9    A.   YES, HE WAS.

10    Q.   AND THE PERSON THAT YOU HAVE IDENTIFIED AS "PIMP" -- DO

11    YOU SEE THAT PERSON IN THE COURTROOM TODAY?

12    A.   YES.

13    Q.   CAN YOU PLEASE IDENTIFY HIM BY WHERE HE IS SITTING AND

14    AN ARTICLE OF CLOTHING THAT HE IS WEARING?

15    A.   HE IS SITTING TO MY RIGHT WITH A WHITE T-SHIRT ON.

16    Q.   CAN YOU BE MORE SPECIFIC?

17    A.   RIGHT THERE.  (INDICATING.)

18    Q.   CAN YOU DESCRIBE WHO HE IS SITTING NEXT TO?  JUST A

19    DESCRIPTION OF THAT PERSON?

20    A.   IT'S A LADY.

21         MS. CHATURVEDI:  MAY THE RECORD REFLECT AN

22    IDENTIFICATION OF MR. MARTIN, YOUR HONOR?

23         THE COURT:  THE RECORD WILL SO REFLECT.

24    BY MS. CHATURVEDI:

25    Q.   THE PERSON THAT YOU HAVE INDICATED BY THE NAME OF SAM --
```

24

```
 1   Q.  DID YOU NOTICE ANYONE COME OUT OF THE BUILDING WHILE YOU
 2   WERE WAITING WITH REGINA?
 3   A.  YES.
 4   Q.  WHO DID YOU NOTICE COME OUT OF THE BUILDING?
 5   A.  "MIKIE", CARLOS, "PIMP", AND SAM.  THAT'S IT.
 6   Q.  DID YOU KNOW "COW"?
 7   A.  YES.
 8   Q.  DID YOU SEE HIM COME OUT OF THE BUILDING; DO YOU RECALL?
 9   A.  YES, ALSO.
10   Q.  OKAY.
11           DID YOU PAY ANY PARTICULAR ATTENTION TO WHERE ANY
12   OF THESE FIVE MEN WENT?
13   A.  NO, I DID NOT.
14   Q.  DID GINA'S DATE SHOW UP?
15   A.  YES.
16   Q.  WHAT HAPPENED WHEN GINA'S DATE SHOWED UP OR THE RIDE
17   SHOWED UP?
18   A.  WE WERE AT THE CAR TALKING TO THE GUY.
19   Q.  WHILE YOU WERE TALKING TO THE GUY, DID SOMETHING TAKE
20   YOUR ATTENTION AWAY FROM THAT CONVERSATION?
21   A.  YES, IT DID.  GUNSHOTS.
22   Q.  WHERE WERE THE GUNSHOTS COMING FROM?
23   A.  AT MY LEFT.
24   Q.  WHEN YOU HEARD THE GUNSHOTS, WHAT DID YOU DO,
25   MS. WILSON?
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 152 of 443
Case 1:98-cr-00329-RCL   Document 668   Filed 07/19/01   Page 25 of 79

25

1    A.   I STOOD THERE.

2    Q.   DID YOU LOOK IN ANY PARTICULAR DIRECTION?

3    A.   YES, I DID.

4    Q.   WHERE DID YOU LOOK?

5    A.   TO WHERE THE SHOTS WERE BEING FIRED.

6              THE COURT:  SAY AGAIN.

7              THE WITNESS:  WHERE THE SHOTS WERE BEING FIRED.

8    BY MS. CHATURVEDI:

9    Q.   WHEN YOU LOOKED IN THE DIRECTION WHERE THE SHOTS WERE

10   BEING FIRED, WHAT DID YOU SEE?

11   A.   SAM.

12   Q.   WHAT WAS SAM DOING?

13   A.   WALKING TOWARDS TONY FORTUNE, SHOOTING.  HE THEN STOOD

14   OVER TOP OF HIM AND SHOT HIM.

15   Q.   AT WHAT POINT DID YOU NOTICE TONY FORTUNE BEING OUT

16   THERE?

17   A.   WHILE I WAS STANDING OUT THERE WITH REGINA, HE WAS

18   WALKING TOWARDS HIS CAR.  THERE WAS A CRAPGAME GOING ON

19   ACROSS THE STREET WHERE HE HAD ROBBED AND WAS ON HIS WAY TO

20   HIS CAR.

21   Q.   WHAT KIND OF CAR DID HE HAVE?

22   A.   I BELIEVE A BLACK MERCEDES.

23   Q.   OKAY.  ARE YOU SURE ABOUT THAT?

24   A.   I BELIEVE SO.

25   Q.   OKAY.

26

```
1          AS TONY FORTUNE WAS WALKING TO HIS CAR, WHAT WAS
2    SAM DOING?
3    A.  WALKING TOWARDS HIM, SHOOTING.   THEN HE STOOD OVER TOP
4    OF HIM AND SHOT HIM.
5    Q.  DID YOU SEE "PIMP" AT THIS TIME?
6    A.  NO, I DID NOT.
7    Q.  DID THE SHOOTING FINALLY STOP?
8    A.  YES, IT DID.
9    Q.  WHEN THE SHOOTING STOPPED, DID YOU SEE WHAT SAM DID AT
10   THAT POINT?
11   A.  HE RAN DOWN THE STREET.
12   Q.  NOW, CAN YOU TAKE THAT ARROW AGAIN ON THAT PEN AND POINT
13   TO APPROXIMATELY WHERE IT WAS WHERE YOU SAW SAM SHOOTING
14   TONY FORTUNE?
15   A.  RIGHT ABOUT HERE.   (INDICATING.)
16   Q.  OKAY.  AND FOR THE RECORD, YOU'RE INDICATING ON 58TH
17   STREET IN FRONT OF 255 58TH STREET, JUST ON THE ROADWAY
18   AREA; IS THAT RIGHT?
19   A.  YES.
20   Q.  OKAY.  AND YOU HAVE LEFT A GREEN DOT THERE.  CAN YOU
21   INDICATE -- TAKE THAT PEN AGAIN AND, LIKE YOU DID EARLIER,
22   MAKE A LINE IN THE DIRECTION THAT YOU SAW SAM GO AFTER THE
23   SHOOTING STOPPED?
24   A.  (DOING AS DIRECTED.)
25   Q.  OKAY.  AND YOU HAVE GOT A LINE GOING FROM UP TO DOWN --
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 154 of 443
Case 1:98-cr-00329-RCL   Document 668   Filed 07/19/01   Page 72 of 79

72

```
1    PARKED ON THE SAME SIDE OF 58TH STREET THAT YOU LIVED ON;
2    CORRECT?
3    A.   YES.
4    Q.   AND IT IS YOUR TESTIMONY THAT MR. CARSON WALKED OR CAME
5    FROM THE AREA OF CLAY STREET TO THE AREA AT LEAST OF THE
6    MERCEDES BENZ?
7    A.   YES.
8    Q.   AND THAT IS WHERE HE SHOT MR. FORTUNE?
9    A.   YES.
10   Q.   AND WALKED OVER AND STOOD OVER HIM AND SHOT HIM AGAIN?
11   A.   YES.
12   Q.   AND THEN HE GOT INTO A VAN WITH MR. MARTIN, AND THEY
13   DROVE AWAY?
14   A.   YES.
15   Q.   MS. WILSON, HAVE YOU EVER OWNED A GUN?
16   A.   NO.
17   Q.   HAVE YOU EVER USED A GUN?
18   A.   NO.
19   Q.   DO YOU KNOW WHAT A SEMI-AUTOMATIC WEAPON IS?
20   A.   NOT IF I WAS TO SEE IT, NO.
21   Q.   DO YOU KNOW THAT SEMI-AUTOMATIC WEAPONS EJECT CASINGS
22   AFTER THE BULLETS ARE FIRED?
23   A.   NO, I DON'T.
24   Q.   SO YOU DON'T KNOW THAT TYPICALLY WHEN A SEMI-AUTOMATIC
25   WEAPON FIRES A BULLET, THE CASING LANDS A FEW FEET AWAY FROM
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 155 of 443
Case 1:98-cr-00329-RCL   Document 668   Filed 07/19/01   Page 73 of 79

73

 1 | THE SHOOTER?  YOU DON'T KNOW THAT?

 2 | A. NO, I DON'T.

 3 | Q.  WOULD YOU BE SURPRISED THEN, MS. WILSON, IF YOU WERE TO

 4 | LEARN THAT CASINGS WERE FOUND 60 TO 80 FEET AWAY FROM

 5 | MR. FORTUNE?

 6 |             MS. CHATURVEDI:  OBJECTION, YOUR HONOR.

 7 |             MR. BESHOURI:  I AM ASKING HER IF SHE WOULD BE

 8 | SURPRISED.

 9 |             THE COURT:  APPROACH THE BENCH.

10 |             (BENCH CONFERENCE.)

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 156 of 443
Case 1:98-cr-00329-RCL    Document 668    Filed 07/19/01    Page 76 of 79

76

```
 1              (END OF BENCH CONFERENCE.)

 2         THE COURT:  DO YOU WANT TO PUT THE QUESTION AGAIN?

 3         MR. BESHOURI:  I WILL, YOUR HONOR.  I AM GOING TO

 4   ASK A PREDICATE QUESTION.

 5   BY MR. BESHOURI:

 6   Q.  MS. WILSON, PROCEEDING FROM EAST CAPITOL, AS I AM

 7   POINTING ON THE MAP, DOWN TOWARDS AMES, DOWN TOWARDS BLAINE,

 8   AND THEN ON TOWARDS CLAY --

 9         THE COURT:  NO, THAT WASN'T YOUR QUESTION.  THE

10   QUESTION WAS WOULD SHE BE SURPRISED IF CASINGS WERE FOUND 60

11   FEET TO 80 FEET AWAY.

12         MR. BESHOURI:  I WILL ASK THAT QUESTION FIRST, IF

13   THE COURT PREFERS, BUT I WANT TO --

14         THE COURT:  I BEG YOUR PARDON?

15         MR. BESHOURI:  I'LL ASK THAT QUESTION, IF THE

16   COURT PREFERS, FIRST, BUT I WANTED TO LAY A PREDICATE HERE.

17   I'LL ASK IT.

18         THE COURT:  THAT'S THE QUESTION BEFORE YOU.  WOULD

19   YOU BE SURPRISED?

20         THE WITNESS:  NO.

21         THE COURT:  ALL RIGHT.  NOW, YOU CAN DO WHATEVER

22   YOU WANT.

23   BY MR. BESHOURI:

24   Q.  AND WOULD YOU BE -- WELL, THE PREDICATE.  PROCEEDING

25   FROM EAST CAPITOL, MS. WILSON, DOWN TOWARDS AMES, DOWN
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 157 of 443
Case 1:98-cr-00329-RCL   Document 668   Filed 07/19/01   Page 77 of 79

77

1   TOWARDS BLAINE -- THAT'S A DOWNHILL RUN; ISN'T IT?

2   A.   YES, IT IS.

3   Q.   AT THE BOTTOM OF THAT RUN DOWNHILL IS APPROXIMATELY

4   WHERE MR. FORTUNE WAS SHOOT; RIGHT?

5   A.   YES.

6   Q.   WOULD YOU BE SURPRISED THEN TO LEARN THAT THE SHELL

7   CASINGS WERE FOUND BETWEEN BLAINE AND WHERE MR. FORTUNE WAS

8   FOUND DEAD?   WOULD YOU BE SURPRISED TO LEARN THAT?

9   A.   NO.

10   Q.   YOU WOULDN'T BE?

11   A.   NO.

12   Q.   IN SPITE OF THE FACT THAT MR. CARSON APPROACHED FROM THE

13   DIRECTION OF CLAY, ACCORDING TO YOUR TESTIMONY, AND SHOT

14   MR. FORTUNE DEAD?

15        MS. CHATURVEDI:  OBJECTION, YOUR HONOR.

16        THE COURT:  SUSTAINED.

17   BY MR. BESHOURI:

18   Q.   WOULD YOU BE SURPRISED TO LEARN, MS. WILSON, THAT EACH

19   AND EVERY ONE OF THOSE CASINGS WERE FOUND TO HAVE COME FROM

20   THE SAME GUN?

21   A.   I DON'T KNOW ANYTHING ABOUT A GUN.

22   Q.   WELL, THAT IS THE POINT, MS. WILSON.  YOU DIDN'T TAKE

23   THAT INTO ACCOUNT, DID YOU, WHEN YOU MADE UP THE STORY ABOUT

24   SAM CARSON SHOOTING MR. FORTUNE?

25   A.   MY STORY IS NOT MADE UP.

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 158 of 443
Case 1:98-cr-00329-RCL  Document 668  Filed 07/19/01  Page 78 of 79

78

1   Q.   IT'S NOT MADE UP?

2   A.   NO, IT'S NOT.

3   Q.   BUT YOU DIDN'T KNOW ANYTHING ABOUT SHELL CASINGS AT THE

4   TIME YOU TALKED TO THE F.B.I. ABOUT WHAT YOU SAY YOU SAW OUT

5   THERE, DID YOU?

6   A.   NO.

7             MR. BESHOURI:  MAY I HAVE A MOMENT, YOUR HONOR?

8             THE COURT:  SURE.

9   BY MR. BESHOURI:

10  Q.   MS. WILSON, DID YOU STAY THERE AFTER ANTHONY FORTUNE --

11  DID YOU SEE ANTHONY FORTUNE, IN FACT, BE KILLED?

12  A.   YES.

13            THE COURT:  SAY THAT AGAIN.

14            MR. BESHOURI:  I ASKED HER IF SHE, IN FACT, SAW

15  MR. FORTUNE BE SHOT.

16            THE WITNESS:  YES.

17            MR. BESHOURI:  YOUR HONOR, I HAVE TO LOOK FOR A

18  PHOTO.  IS THIS A GOOD TIME TO TAKE A BREAK?

19            THE COURT:  HOW MUCH LONGER ARE YOU LIKELY TO BE?

20            MR. BESHOURI:  TEN MINUTES.

21            THE COURT:  WE WILL HAVE OUR NOONTIME RECESS,

22  LADIES AND GENTLEMEN.  WE WILL SEE YOU AT 2:00 O'CLOCK.

23            (WHEREUPON, AT 12:22, THE ABOVE-ENTITLED MATTER

24  WAS RECESSED FOR LUNCH.)

25

Case 1:98-cr-00329-RCL    Document 951    Filed 03/11/03    Page 1 of 82

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .    Docket No. CR 98-329

       Government,              .    Washington, D.C.
                        .    February 15, 2001
  vs.                               .    2:30 p.m.

VINCENT HILL,                      .    (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,               .
MAURICE PROCTOR,                  .
SEAN COATES,                       .

       Defendants                .

. . . . . . . . . . . . . . . .    .

UNITED STATES OF AMERICA,          .

       Government,              .
                        .    Docket No. CR 99-348
  vs.                               .

GARY PRICE,                        .

       Defendant.                .

. . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

2

```
For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                               LEXI NEGIN-CHRIST, ESQ.
                               419 7th Street, N.W.
                               Washington, D.C.  20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                               717 D Street, N.W.
                               Suite 400
                               Washington, D.C.  20004

For the Defendant Proctor:     HOWARD BRAMSON, ESQ.
                               717 D Street, N.W.
                               Third Floor
                               Washington, D.C.  20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                               901 6th Street, S.W.
                               Suite 409
                               Washington, D.C.  20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                               601 Indiana Ave., N.W.
                               Suite 901
                               Washington, D.C.  20024

Court Reporter:                BEVERLY J. BYRNE
                               Official Court Reporter
                               Room 6810 U.S. Courthouse
                               Washington, D.C.  20001
                               (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from
dictation.

57

1  warrant out for me or I knew I didn't have a license in my

2  name then I would use an alias name.

3  Q.    And if you could just explain to the ladies and gentlemen

4  how that would work.  What type of information would you have

5  to have?

6  A.    Well, you would -- you would generally try to find

7  somebody who you knew didn't get in trouble with the police,

8  who was basically an upstanding citizen whose license was

9  valid, and you knew that it was a high probability that they

10  wouldn't have a warrant or wouldn't be wanted by the police in

11  any type of way.

12  Q.    And what information would you need from that person?

13  A.    Their name, birth date, Social Security number, and

14  probably their address.

15  Q.    And you would have that memorized?

16  A.    Yes.

17  Q.    Now, were you familiar with an alias that Mr. Sweeney was

18  using?

19  A.    I heard -- I heard at one time that he was using the

20  alias name Kirk Newton

21  Q.    Were you familiar with an individual named Kirk Newton?

22  A.    I knew him.

23  Q.    It was an actual person?

24  A.    Yes.

25  Q.    Now, when you were home in 1995 did your relationship

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 162 of 443
Case 1:98-cr-00329-RCL    Document 951    Filed 03/11/03    Page 58 of 82

58

1   with Jerome Martin become closer?

2            THE COURT:  Become what?

3            MR. ZEIDENBERG:  Closer.

4            THE WITNESS:  Yeah, out of all of the defendants I

5   would say I had a relationship with him as opposed to any

6   other one of them besides Switzer and probably Paul Franklin.

7   BY MR. ZEIDENBERG:

8   Q.   And when you say that you mean you had a close

9   relationship with him, is that what you're saying?

10  A.   Yeah, I would say so, yes.

11  Q.   Now, do you recall during 1995 having a conversation with

12  Mr. Martin regarding Tony Fortune?

13  A.   I recall having a conversation in which I was asking why

14  was it a beef going on with 37th, and at the time I thought it

15  was Kenilworth.  And they were saying that a guy named Tony

16  Fortune had tried to rob them in a crap game, or actually did

17  rob the crap game, and that Tony robbed them and he wasn't

18  going to let him get away with it.

19  Q.   And who was this conversation with?

20  A.   Jerome Martin.

21  Q.   And when he said -- did he say he wasn't going to let him

22  get away with it or they weren't going to let him get away

23  with it?

24  A.   He said he wasn't going to let him get away with it.

25  Q.   And did he say what he did to Tony Fortune?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

59

1   A.   He said he shot him.

2           THE COURT:   I'm sorry?

3           THE WITNESS:   He said he shot him.

4           THE COURT:   He shot him?

5           THE WITNESS:   Yes.

6   BY MR. ZEIDENBERG:

7   Q.   Now, after you were indicted and after you were

8   incarcerated in D.C. Jail did you have a conversation with Mr.

9   Martin regarding the shootout with the police, which was part

10  of the indictment?

11  A.   When we would meet -- when we would come over the jail in

12  a group and meet in the courtroom it would be some things that

13  we might look at in the indictment and just be like, it's

14  absurd, or it's just ridiculous.   I mean, we would -- in one

15  instance he was just like, you know, they got in there that he

16  was shooting at the police over at Kenilworth, and he was just

17  like, they was shooting at me, what else was I suppose to do

18  but shoot back at them.

19  Q.   Had you been familiar with that incident?

20  A.   No.

21  Q.   Now, are you familiar with someone named Creeko?

22  A.   Yeah.

23  Q.   And back in '95 was there talk amongst you and others

24  that Creeko was either hot, or was a snitch, or had been

25  cooperating with the police?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 295

63

1  A.   Generally anybody that I saw Vincent Hill talking -- Mr.

2  Martin's response was just no response.  I mean, I didn't

3  hear, you know, really any dialog or anything going back and

4  forth.

5  Q.   Now, did you have a conversation with Mr. Martin while he

6  was incarcerated regarding James Coulter, Creeko, and his

7  being charged in connection with that case?

8  A.   I had a conversation in which he had asked me to talk to

9  Creeko, to have Creeko give his investigator a statement, and

10  it was something about Creeko being shot.  He wanted Creeko to

11  give his investigator a statement.

12  Q.   So Mr. Martin asked you to assist in that way?

13  A.   He asked me to just talk to Creeko to see if he would

14  give his investigator a statement.

15  Q.   Now, when you were talking to Mr. Martin about this were

16  you -- you were in jail or out of jail?

17  A.   I was out of jail.

18  Q.   Mr. Martin was in jail or out of jail?

19  A.   In jail.

20  Q.   And did he say what kind of statement he wanted you to

21  get Creeko to give to his investigator?

22  A.   He said -- he just said he wanted Creeko to talk to  his

23  investigator and give him a statement.  He didn't specifically

24  say what he wanted him to give the statement about.

25  Q.   Did you attempt to do this?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL   Document 951   Filed 03/11/03   Page 64 of 82

64

```
 1   A.    I mean, I had talked to Creeko and asked him to give up

 2   his statement.  And initially he was saying that he wasn't

 3   going to give up a statement because he didn't know, you

 4   know,, why Pimp wanted a statement so, you know, he wasn't to

 5   give up a statement.  And the next time I talked to Pimp I

 6   told him that.  And he was like, well, you know, just see if

 7   he will give up the statement.  So I talked to him again.  And

 8   he said he wouldn't give up -- I asked him then, really if

 9   you're not suppose to be testifying or, you know, if you're

10   saying that nothing happened, then give up a statement to that

11   effect, saying that nothing happened.  And he was just like --

12   Creeko was just like, well, I'm  not going to get involved in

13   it, you know, I'm not coming to court and testifying period,

14   so I ain't going to get involved in it.

15   Q.    Did you relay that message to Mr. Martin?

16   A.    Yeah, I told him that, you know, Creeko -- me and Mr.

17   Martin's investigator, whose name was Andy, we had rode, you

18   know, to try to get the statement, and I don't know -- yeah, I

19   relayed the message to Mr. Martin.

20   Q.    Now, are you familiar with someone name Michael Floyd?

21   A.    Yes.

22   Q.    And did you have a conversation with Mr. Martin regarding

23   getting a statement from Michael Floyd?

24   A.    Yeah.  I had had a conversation where he had asked me to

25   --
```

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 297

65

1  Q.   Who asked you?

2  A.   Mr. Martin asked me to see if Michael Floyd will give up

3  a statement saying that, you know, he was out there that

4  night, and just testify as to what he saw that night.

5  Q.   And did you speak with Mr. Floyd?

6  A.   Yeah, I had spoke to him.

7  Q.   And was he willing to give a statement?

8  A.   He was saying that he was not going to give up a

9  statement because he didn't want to get involved with the FBI,

10 and he just didn't want to get involved with the case.

11 Q.   Now, did you relay that message to Mr. Martin that Mr.

12 Floyd said he didn't want to get involved?

13 A.   Yeah, I had told Mr. Martin that Mike said he wasn't

14 going to give up a statement, and he was just like, just smack

15 his bitch ass for me.  I was just like -- just trying to see

16 if he was going -- you know, see if Mike was going to give up

17 a statement for Mr. Martin.

18 Q.   Now, at some point did Mr. Martin  ask you to do

19 something regarding Mr. Floyd and Creeko?

20 A.   He had asked me to show Creeko and Mike Floyd to his

21 uncle named Dino.

22 Q.   Did you know who Dino was?

23 A.   I knew he -- I didn't really know him.

24 Q.   And what was your understanding -- what exactly was it

25 that Mr. Martin asked you to do with Dino, Michael Floyd, and

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

66

1   Creeko, what did he want you to do?

2   A.    He just asked that I show Michael Floyd and Creeko to

3   Dino.  And one day I rode out there with Dino to see if I saw

4   him, but I didn't see Michael Floyd or Creeko, so --

5   Q.    Well, why did you take -- so you attempted to follow

6   through on that request?

7   A.    Yes.

8   Q.    Now, what was your understanding of why Mr. Martin wanted

9   you to do this?

10              MS. HEPWORTH:   Objection.

11              THE COURT:   Approach the bench.

12         (Bench conference on the record.)

13

14

15

16

17

18

19

20

21

22

23

24

25

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .   Docket No. CR 98-329

          Government,              .   Washington, D.C.
                                   .   March 7, 2001
     vs.                           .   2:12 p.m.

VINCENT HILL,                      .   (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,                .
SEAN COATES,                       .   **FILED**

          Defendants              .    MAR 1 1 2003

. . . . . . . . . . . . . . .      .   NANCY MAYER WHITTINGTON, CLERK
                                       U.S. DISTRICT COURT
UNITED STATES OF AMERICA,          .

          Government,              .
                                   .   Docket No. CR 99-348
     vs.                           .

GARY PRICE,                        .

          Defendant.               .

. . . . . . . . . . . . . . .      .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

2

```
For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                               LEXI NEGIN-CHRIST, ESQ.
                               419 7th Street, N.W.
                               Washington, D.C.  20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                               717 D Street, N.W.
                               Suite 400
                               Washington, D.C.  20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                               901 6th Street, S.W.
                               Suite 409
                               Washington, D.C.  20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                               601 Indiana Ave., N.W.
                               Suite 901
                               Washington, D.C.  20024

Court Reporter:                BEVERLY J. BYRNE
                               Official Court Reporter
                               Room 6810 U.S. Courthouse
                               Washington, D.C.  20001
                               (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

3

1                    P R O C E E D I N G S

2        THE COURT:   Would you ask Officer Best, please, to

3    return.   You can bring the jury in now.

4        (Jury In.)

52

1        (Bench conference on the record.)

2        MS. CHATURVEDI:  Your Honor, the next witness is

3    James Montgomery, and the marshals have asked for us to take a

4    recess to allow them to bring him up.  He's the next witness.

5        MR. BESHOURI:  Your Honor, before the government

6    goes, can we take up an issue or two briefly?  The Court was

7    provided some months ago with a James Montgomery file, and the

8    Court noted within that file were a number of FBI 302's.  I

9    think amounting to 10 or 11 of them.

10        The government has advised that they don't intend to

11    turn those over as Jencks.  It's my recollection when we took

12    this issue up before in another context that the Court

13    believed that 302's were statements of the witness, and I

14    would ask the government to turn those over.  That's the first

15    point.

16        THE COURT:  I don't recall that they were statements

17    of the witness.  I mean, in the case of Montgomery, if you're

18    talking about the materials that I reviewed in camera --

19        MR. BESHOURI:  Yes.

20        THE COURT:  -- then I will ask the government to

21    double-check and see whether or not any one of them is in

22    substance a statement of the witness.

23        MR. ZEIDENBERG:  Your Honor, we have reviewed the

24    302's.  All the 302's that pertain to Robert Smith, Butchie,

25    have been turned over.  The other 302's do not in our view

53

1    constitute Jencks.  They are not -- they are -- Agent Lisi

2    takes rough notes, and then from them he writes up a narrative

3    that is not shown to the witness.  It is not meant to be

4    substantially verbatim and is not substantially verbatim and

5    in no way can be construed under the Jencks Act in the cases

6    interpreting it as statements of James Montgomery.

7           MR. BESHOURI:  If I may reply briefly.

8           MR. ZEIDENBERG:  I'm happy -- if I may -- we've

9    litigated this I believe in the context of another witness,

10   but I'm happy to provide the Court with case authority to

11   support that proposition.  302's drafted in that fashion do

12   not constitute Jencks.

13          MR. BESHOURI:  My view, if I may, Your Honor?

14          THE COURT:  Sure.

15          MR. BESHOURI:  My view is -- I'm in total agreement

16   with the government when it comes to rough notes.  That is not

17   Jencks.  But when rough notes evolve into from phrases and

18   words into full statements and sentences, we come much, much

19   closer if not substantially verbatim in terms -- as to the

20   witness' statements to the FBI agent.

21          I have to defer to the Court, because obviously I

22   can't look at these to make an argument that they are

23   substantially verbatim.

24          THE COURT:  How many of them are there?  How many of

25   them are we talking about?

54

1          MR. ZEIDENBERG:  I can't --

2          MS. CHATURVEDI:  Rather lengthy, Your Honor.  We

3    previously submitted a three-ring notebook to Your Honor with

4    a table of contents, and it listed -- it included all of the

5    302's.

6          THE COURT:  Well, I gather that the only ones that I

7    have looked at are the ones that deal with Butchie?

8          MS. CHATURVEDI:  No, Your Honor.

9          THE COURT:  I've looked at all of them?

10          MS. CHATURVEDI:  Actually, Your Honor, you had asked

11    the government to provide in camera all the 302's relating to

12    James Montgomery.  I did do that previously.  Your Honor

13    reviewed those documents.

14          THE COURT:  We did review those?

15          MS. CHATURVEDI:  In camera.

16          THE COURT:  All right.

17          MS. CHATURVEDI:  Your Honor previously ruled that

18    they weren't Jencks.

19          THE COURT:  Then my prior determination stands.

20          MR. BESHOURI:  With all due respect, I do remember

21    the Court saying that there was no Brady in those 302's save

22    for one point that the Court advised us of in that order, but

23    I don't recall the Court taking any position on whether they

24    were Jencks.

25          THE COURT:  Maybe that's true.  I am not sure that I

55

1    did look for Jencks.

2            MS. CHATURVEDI:  I think Your Honor returned the

3    notebook to the government.

4            THE COURT:  Would you see if you can find it and let

5    me look at it again.

6            MS. CHATURVEDI:  In addition, Your Honor, as Mr.

7    Zeidenberg has said, we have case authority as to whether or

8    not 302's constitute Jencks material and we can provide that

9    to counsel and the Court at the same time.

10           MR. KIERSH:  On a related matter, we'd like to see

11   the --

12           THE COURT:  Let me let the jury go.

13           MR. KIERSH:  Okay.

14        (End of bench conference.)

15

16

17

18

19

20

21

22

23

24

25

76

1   Q.   Subsequent to that, Mr. Montgomery, on November 2, 2000,

2   did you enter into a third plea agreement with the United

3   States?

4   A.   Yes, I did.

5           MR. ZEIDENBERG:  Can I approach again, Your Honor?

6           THE COURT:  Yes.

7   BY MR. ZEIDENBERG:

8   Q.   Showing you what's been marked G42A, do you recognize

9   that, sir?

10  A.   Yes.

11  Q.   Is that the plea agreement that you entered into on

12  November 2, 2000?

13  A.   Yes.

14  Q.   Can you tell the ladies and gentlemen what it is you pled

15  guilty to on November 2, 2000?

16  A.   Each count?

17  Q.   Well, the count to which you pled guilty was what, the

18  charge you pled guilty to was what?

19  A.   RICO conspiracy.

20  Q.   And in pleading guilty to that RICO conspiracy did you

21  have to admit your responsibility for a number of criminal

22  acts?

23  A.   Yes.

24  Q.   Okay.

25          MR. ZEIDENBERG:  Your Honor, if I haven't already

77

1    done so, I move to admit Government Exhibit G42E and G42A.

2            THE COURT:  E is already in, G42A is admitted.

3            MR. ZEIDENBERG:  Thank you.

4        (Whereupon, Government's Exhibit G42A was marked for

5    identification and received in evidence.)

6    BY MR. ZEIDENBERG:

7    Q.    Now, going to the overt acts, or the predicate acts,

8    going to the first one, Mr. Montgomery, can you tell the

9    ladies and gentlemen what the first predicate act you pled

10   guilty to pursuant to that plea agreement?

11   A.    To the December 19, 1989 murders of Maurice Hallman and

12   Leonard Hyson.

13   Q.    Actually that's number two.  I would ask you to look just

14   above that.  It should be on the --

15   A.    I'm sorry.  To conspiracy, conspiracy to distribute and

16   possess with intent to distribute 1,000 kilograms of

17   marijuana.

18   Q.    Okay.  And let me just stop you and ask you about that.

19   Were you involved in a marijuana conspiracy in the 1990's?

20   A.    Once it was explained to me, yes, I realized that I was.

21   Q.    At the time you were selling marijuana did you believe

22   you were involved in a conspiracy?

23   A.    No.

24   Q.    As you understand it, your responsibility here, you say

25   that you pled guilty to distribute and possess over a thousand

78

1   kilos of marijuana, did you -- do you believe you personally

2   sold a thousand kilos of marijuana?

3   A.    No.

4   Q.    What is your understanding of why it is you're

5   responsible for selling 1,000 kilos of marijuana?

6   A.    I don't remember -- I don't remember how it was explained

7   to me, but I remember certain aspects.

8   Q.    Well, what is your understanding of why it is you are

9   responsible for selling a thousand kilos if you didn't

10  personally sell a thousand kilos?

11  A.    If I am correct, that any conspiracy that everyone is

12  responsible for -- everyone who sold it is responsible for

13  each other.

14  Q.    Now, going to number two, what was the second predicate

15  act that you admitted your responsibility for?

16  A.    For the December 19, 1989 murders of Maurice Hallman and

17  Leonard Hyson.

18  Q.    Did you participate in the murders of Maurice Hallman and

19  Leonard Hyson?

20  A.    Yes.

21  Q.    Going to number three, what was the third predicate act

22  that you admitted responsibility for in that plea?

23  A.    Assault with intent to kill of a police officer on

24  September 10, 1991.

25  Q.    Where did that shooting occur?

79

1   A.    On East Capitol Street.

2   Q.    Did you participate in that shooting?

3   A.    Yes.

4   Q.    What was the fourth predicate act that you admitted

5   responsibility for?

6   A.    First degree murder while armed on June 22, 1994, the

7   murder of Timothy Benton.

8   Q.    Did you participate in the murder of Timothy Benton on

9   June 22, 1994?

10  A.    Yes.

11  Q.    What was the fifth predicate act that you pled guilty to,

12  or I should say admitted responsibility for?

13  A.    Conspiracy to commit murder in connection with the

14  efforts made to kill Kenneth Adams.

15  Q.    And Kenneth Adams, as far as you knew at the time, was a

16  government witness at the time you were trying to kill him?

17  A.    Yes.

18  Q.    Is that why you were trying to kill him?

19  A.    Yes.

20  Q.    What was the sixth predicate act that you admitted

21  responsibility for in that plea?

22  A.    Aiding and abetting in first degree premeditated murder

23  in connection with Chrishauna Gladden's murder.

24  Q.    Which occurred when?

25  A.    October 5, 1996.

80

1    Q.   What was the seventh -- let me jump back.  Did you

2    participate in the murder of Chrissy Gladden and assist in

3    that murder?

4    A.   Yes.

5    Q.   And number seven, what was that predicate act that you

6    admitted responsibility for?

7    A.   Three counts of attempted armed robbery and three counts

8    of murder in connection with the November 17, 1996 murders of

9    Alonzo Gaskins,  Darnell Mack, and Melody Anderson.

10   Q.   Mr. Montgomery, did you participate in that home invasion

11   and subsequent murders of those three individuals?

12   A.   Yes.

13   Q.   What was the eighth and final predicate act that you

14   admitted responsibility for in connection with this plea?

15   A.   Conspiracy to commit murder in connection with the

16   efforts to find and kill Robert Smith, aka Butchie, a

17   government witness.

18   Q.   Did you make efforts to try and find and kill Butchie?

19   A.   Yes.

20   Q.   What was the reason you were trying to kill Butchie, was

21   it because of his status as a government witness?

22   A.   No.  Because of some information he found out about us.

23            MR. KIERSH:  Objection.

24            MR. ZEIDENBERG:  I will rephrase it, Your Honor.

25            THE COURT:  Do you want to approach the bench?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

81

1          MR. KIERSH:  If the question is going to be

2    rephrased so that we avoid the problem then we don't need to.

3          THE COURT:  Well, I'm not sure what the rephrasing

4    is that needs to be made.  Do you mean it was a leading

5    question?

6          MR. KIERSH:  No, no, Your Honor.  It's the substance

7    of it.  Mr. Zeidenberg has already agreed to rephrase it to

8    avoid problems.

9    BY MR. ZEIDENBERG:

10   Q.   Did you believe that Butchie, Robert Smith, might end up

11   testifying against you and others?

12   A.   Yes.

13   Q.   Is that why you wanted to kill him?

14   A.   Yes.

15   Q.   Now, what is your understanding, Mr. Montgomery, of what

16   penalties you face potentially in connection with this plea

17   agreement that you signed, this last plea agreement, in

18   November of 2000?

19   A.   Excuse me?

20   Q.   What do you think -- what's your penalty?  What's the

21   possible penalty in this case?

22   A.   Life without parole.

23   Q.   Mr. Montgomery, can you tell the ladies and gentlemen

24   when you first started committing robberies in the District of

25   Columbia, how old were you?  When I say robberies -- let me

82

1    rephrase it.  Why don't we rephrase it as stealing.

2              THE COURT:  As what?

3              MR. ZEIDENBERG:  Stealing.

4              THE WITNESS:  When I was about 7 or 8.

5    BY MR. ZEIDENBERG:

6    Q.    Where were you stealing from?

7    A.    From out of stores.

8    Q.    What kind of stores?

9    A.    Like food stores.

10   Q.    Such as?

11   A.    Safeway, People's Drug Store.

12   Q.    What were you stealing?

13   A.    Toys, candy.

14   Q.    Did that stealing from stores, such as the Safeway or

15   drug stores, progress into other activities?

16   A.    Yes.

17   Q.    Such as what?

18   A.    Going to shopping malls and shoplifting and breaking into

19   things.

20   Q.    Did you do that alone or did you do that with other

21   people?

22   A.    With other people.

23   Q.    Who did you do it with?

24   A.    A lot of other people.

25   Q.    I am asking if you could confine your answer to the

83

1   defendants that are involved in this case.

2   A.   Me, Chin, Bird, and Pimp.

3   Q.   What type of activities were you involved in with Chin,

4   Birdy, and Pimp, and if you could give us an age range, how

5   old were you at the time?

6   A.   Personally myself I had been doing it longer than they

7   had.

8   Q.   Okay.

9   A.   I think it was maybe around the age of 13 or 14.

10  Q.   And what type of activities were you getting involved in

11  by that time?

12  A.   Pretty much breaking into video game machines and parking

13  meters.

14  Q.   Who were you involved in this activity with?

15  A.   Chin, Bird, and Pimp.

16  Q.   What did you -- after you were 13-14 what type of

17  activities subsequent to that did you get involved in?

18  A.   Selling drugs.

19  Q.   At some point were you stealing dirt bikes?

20  A.   Yes.  Yeah, I was stealing dirt bikes before I was

21  selling drugs.

22  Q.   And where were you stealing dirt bikes from?

23  A.   From different places.  But at times, if I couldn't find

24  a dirt bike nowhere out in the community, I would go down to

25  the police station and steal one.

84

1   Q.    How would you steal a dirt bike from the police station?

2   A.    I would have to have somebody to go with me to keep

3   lookout.

4   Q.    I'm sorry?

5   A.    I would have to take somebody with me to keep lookout.

6   Q.    Who did you bring with you as lookouts?

7   A.    Chin a few times.

8   Q.    And can you just explain how it is that you could go to

9   the police station and steal a dirt bike?

10  A.    Well, back then I assume that because we was so young

11  they would never expect us to be up to nothing, so it made it

12  kind of pretty easy.

13          THE COURT:  You can pick a convenient point, Mr.

14  Zeidenberg.

15          MR. ZEIDENBERG:  This is as good as any, Your Honor.

16          THE COURT:  All right.  Ladies and gentlemen, we are

17  going to conclude for the day.  And as you recall, we are not

18  going to be in session tomorrow.  So we will be back on Monday

19  morning at 10:00.  Have a nice weekend.  Be healthy.

20          (Jury out.)

21

22

23

24

25

85

1      (Jury out.)

2          MR. DAVIS:  Your Honor, after Mr. Montgomery is out

3      of the courtroom I would like to address the Court very

4      briefly.

5          THE COURT:  You may address the Court briefly.

6          MR. DAVIS:  Very briefly, Your Honor, we would make

7      -- on behalf of Mr. Hill I would make a Jencks and a

8      combination Jencks and Brady request regarding Mr.

9      Montgomery's witness protection file and related paperwork.  I

10     do this for several reasons.  The Witness Protection Program -

11     - I have been through this in other cases -- it involves a

12     process of interviewing witnesses, interviewing the witness

13     that wants to enter the program, and it also -- a series of

14     evaluations are done to determine whether the witness is

15     appropriate for the program.

16          And once the individual is accepted then there are

17     evaluations done to determine whether the witness' continued

18     acceptance and continuance in the program is acceptable.

19     Polygraphs are done, psychologicals are done -- I don't know

20     much about Mr. Montgomery's background, and I mean no

21     disrespect to him, but he sounds a bit slow.  Say, for

22     example, if he were retarded, there is a wealth of information

23     out there that indicates that individuals that suffer from

24     retardation are literally extremely easily led.  They thrive

25     on pleasing other individuals.  This is something we would

86

1    consider Brady.

2         I have some unsubstantiated information that Mr.

3    Montgomery has suffered brain damage in the past.  I noticed

4    he has a very large scar on the side of his head.  When they

5    did the psychological testing these are factors that would

6    have been touched upon possibly during the evaluation process.

7         But I think since the whole objective of the Witness

8    Protection Program is to interview the witness and determine

9    that witness' fitness in the program, there must be some

10   Jencks material or Brady material that has come out of it.

11        Now, since we are going to be in recess for several

12   days, what I would request, understanding the sensitive nature

13   of all these materials, what I would request is is that the

14   United States make his complete Witness Protection file and

15   related paperwork available to Your Honor, and Your Honor can

16   review it ex parte and make a determination as to whether or

17   not there is Brady material or Jencks contained in it.

18        I have received these materials in the past in cases

19   of this nature.

20        THE COURT:  Do you have any authority on it?

21        MR. DAVIS:  Well, I haven't.  I have never had it

22   contested before.

23        THE COURT:  What other Judges have you had it --

24        MR. DAVIS:  Well, most recently with Judge Sporkin

25   in the Fern Street case, where several polygraphs that were

87

1    turned over, there were some evaluations that were turned over

2    that were within like a report format.

3              MR. ZEIDENBERG:  Your Honor, if I could, I don't

4    mean to interrupt.

5              MR. DAVIS:  I think Mr. Volkov turned them over to

6    us before.  And I think he is the head of the gang unit now.

7    I don't know why he did it.  But we didn't even have to file

8    for it, we just requested it and the Judge reviewed it.

9              MR. ZEIDENBERG:  Your Honor, as a matter of fact, we

10   have already turned that material over to Your Honor.  That

11   was part of the material that the Court reviewed months ago.

12             THE COURT:  In camera?

13             MR. ZEIDENBERG:  In camera review, pursuant to a

14   request -- I think Mr. Kiersh made the request at that time --

15   the entire paperwork pertaining that Mr. Davis is referring to

16   was reviewed already by Your Honor.

17             THE COURT:  Okay.

18             MR. ZEIDENBERG:  And the Court ruled that there was

19   no Brady of any type.

20             THE COURT:  That's correct.  And it's already been

21   placed under seal and is a Court exhibit as I recall.

22             MR. ZEIDENBERG:  Your Honor, I --

23             MR. DAVIS:  Your Honor, I don't mean to interrupt,

24   but the very fact that Mr. Montgomery was discharged from the

25   program shows that he was not in compliance with the rules.

88

1    And I have a glimpse of what was -- of the reason, as to why

2    he was discharged from the grand jury materials.  But in the

3    context of not being able to follow the rules or not being

4    totally forthright with individuals or having been caught

5    making misrepresentations, these are things that at this stage

6    of the case -- this is probably the most critical witness in

7    this case for all of these defendants.  And I think we have to

8    be very careful in reviewing his materials.

9            THE COURT:  Whatever exists, according to Mr.

10   Zeidenberg, I have already reviewed.

11           MR. DAVIS:  Plus, I am not an expert, but there are

12   some mental health issues with this man, either in terms of

13   retardation or in terms of brain damage.  There is something

14   going on here, just from watching him, what little I can see

15   from where I am seated.

16           THE COURT:  I will, once again, review the materials

17   if they are available to me.

18           MR. DAVIS:  That's what I would ask, Your Honor.  I

19   would ask that you be provided the complete materials, and

20   then in the context of my representations now, check them

21   again to see if there is something.

22           THE COURT:  I will look.

23           MS. CHATURVEDI:  Your Honor, just factually, Mr.

24   Montgomery was not discharged from the Witness Protection

25   Program, contrary to Mr. Davis' assertions.  I will return the

89

1    notebook to chambers that I had previously provided, so that

2    Your Honor can have a chance to look at those materials again.

3    And there is no evidence of any sort of brain damage or

4    retardation found in any of the documents provided to the

5    Court, but I will provide them by the close of business

6    tomorrow.

7            THE COURT:  All right.

8            MR. KIERSH:  Maybe I can shed some light on this.

9    There is a document, and I don't have it with me now so I

10   can't identify it with precision  -- what I will do is I will

11   find it and I will provide it to all counsel.  But there is a

12   document in Mr. Montgomery's past that talks about him having

13   brain damage.  So this notion of him --

14           THE COURT:  Well, if you can find a document it

15   might help us identify what it is that you're talking about.

16           MR. KIERSH:  Yes, I will.  Over the recess I will

17   get that and supply it to everyone so everyone knows -- give

18   it some context.

19           THE COURT:  Okay.

20           MR. BESHOURI:  Separate issue, Your Honor.  I have

21   resisted objecting up until now about these events that

22   happened when Mr. Montgomery was a young teenager, an

23   adolescent, parking meters, stealing -- breaking into parking

24   meters, that sort of thing -- he has included my client in

25   that activity.  That's, of course, way beyond or prior to the

90

1    conspiracy alleged here.

2         THE COURT:  And I will reiterate the instruction, if

3    you will remind me on Monday, that this background material is

4    not charged in the indictment and is to be considered by the

5    jury only in connection with Mr. Montgomery's credibility.

6         MR. BESHOURI:  I appreciate that, Your Honor.  It,

7    obviously, has an impact on my client.  And I am asking the

8    Court to put some brakes on to what extent the government can

9    go into this just to establish a relationship.  They have,

10   obviously, established a relationship, so the need for this

11   kind of testimony is -- frankly, it's unnecessary to establish

12   a relationship any longer.  All it's doing is piling on during

13   a period that precedes the conspiracy by many, many years.

14        THE COURT:  At the moment it does not appear to me

15   to be excessive, but I will keep that in mind.  If you will

16   remind me on Monday, if you wish a repetition of the

17   cautionary instruction, I will be glad to give it.

18        MR. BESHOURI:  Very well.

19        MR. ZUCKER:  Your Honor, if I may, it was touched on

20   before by Mr. Beshouri but it seems to have fallen by the

21   wayside.  On the 302s -- in connection with the conversation

22   on the 302s that Agent Lisi prepared there was also reference

23   to some notes he prepared, notes he made while interviewing

24   Mr. Montgomery, and I would ask that those be --

25        THE COURT:  I have reviewed those.

91

1          MR. ZUCKER:  You have?

2          THE COURT:  I have reviewed Agent Lisi's notes.

3    They do not constitute Brady material --

4          MR. ZUCKER:  Or Jencks?

5          THE COURT:  And none that I saw would be

6    characterized as Jencks Act statements.

7          MR. ZUCKER:  Thank you.

8          THE COURT:  Monday morning at 10:00.

9          (Whereupon, the hearing was adjourned at 4:35 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           .   Docket No. CR 98-329

       Government,               .   Washington, D.C.
                                    .   March 12, 2001
  vs.                             .   1:42 p.m.
                                    .
VINCENT HILL,                       .   (AFTERNOON SESSION)
JEROME MARTIN,                      .
SAMUEL CARSON,                      .
WILLIAM K. SWEENEY,                 .
SEAN COATES,                        .

       Defendants                .

. . . . . . . . . . . . . . . .     .

UNITED STATES OF AMERICA,           .

       Government,               .

  vs.                             .   Docket No. CR 99-348

GARY PRICE,                         .

       Defendant.                .

. . . . . . . . . . . . . . . .

FILED

MAR 1 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER



2

```
For the Defendant Carson:     JOSEPH BESHOURI, ESQ.
                              LEXI NEGIN-CHRIST, ESQ.
                              419 7th Street, N.W.
                              Washington, D.C.  20004

For the Defendant Sweeney:    STEVEN R. KIERSH, ESQ.
                              717 D Street, N.W.
                              Suite 400
                              Washington, D.C.  20004

For the Defendant Coates:     FREDERICK JONES, ESQ.
                              901 6th Street, S.W.
                              Suite 409
                              Washington, D.C.  20024

For the Defendant Price:      JONATHAN ZUCKER, ESQ.
                              601 Indiana Ave., N.W.
                              Suite 901
                              Washington, D.C.  20024

Court Reporter:               BEVERLY J. BYRNE
                              Official Court Reporter
                              Room 6810 U.S. Courthouse
                              Washington, D.C.  20001
                              (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

3

<u>P R O C E E D I N G S</u>

1

2        THE COURT:  Ready for the jury?

3        MR. ZEIDENBERG:  Yes, Your Honor.

4        THE COURT:  All right.  Mr. Montgomery, you may

5   resume the stand, and we can bring the jury in.

6        THE DEPUTY MARSHAL:  Jury panel, Your Honor.

7        (Jury In.)

8        THE DEPUTY MARSHAL:  Jury panel is all present. THE

9   COURT:  Thank you, Marshal.  We're all set.

10       MR. ZEIDENBERG:  Thank you, Your Honor.

11      JAMES MONTGOMERY, GOVERNMENT'S WITNESS, RESUMED THE STAND

12                   DIRECT EXAMINATION (Cont.)

13   BY MR. ZEIDENBERG:

14   Q.   Mr. Montgomery, I just have a -- want to go back and ask

15   you a couple of more questions about the murders of Maurice

16   Hallman and Leonard Hyson, who you knew as Slick.

17       Immediately after the shootings while you were still in

18   the alley or leaving the alley with Mr. Carson, did you talk

19   to Mr. Carson about whether or not he had fired his gun?

20   A.   I mean, it was obvious that he had fired his gun, cause I

21   seen Slick laying right there bleeding in the head.  He said

22   to me that I was scared.  So I was like I ain't scared.  And I

23   told him -- so I told him do he think that this is my first

24   time ever killing someone, like that.

25   Q.   When the shooting happened, you said that you couldn't

4

1    hear the other gunshots; is that right?

2    A.    I told him that when I was shooting Maurice, I ain't hear

3    his gun go off, and he told me that that's because he's sharp.

4    Q.    He's sharp?

5    A.    Right.  And he said that he hit him in the head six times

6    before he hit the ground.

7    Q.    Did he say where he had shot the victim, Mr. Hyson?

8    A.    In the head.

9    Q.    Did you say where you had shot Mr. Hallman?

10   A.    I told him that I hit him one in the body and the rest in

11   the head.

12   Q.    Did you know whether or not that was true?

13   A.    I wasn't sure if I hit them all in his head, but I know I

14   hit him in his head.

15   Q.    Now, I want to direct your attention to 1991.  Do you

16   recall Samuel Carson getting a red Acura Legend in 1991 at

17   some point?

18   A.    Yes.

19   Q.    Do you remember the first time you had gotten inside that

20   car?

21   A.    Yeah.

22   Q.    Can you tell the ladies and gentlemen about that?

23   A.    I don't remember exactly what time of the year it was.  I

24   know it was warm outside.  I had this scooter, so he told me

25   to park it in front of his mother house.  And his mother was

14

1   associated with?

2   A.    The Fifth and O and Sursum Corda.

3   Q.    How did you know that he was her baby's father?

4   A.    Because I heard Chin saying it before.

5   Q.    Now, did you have a conversation with Mr. Carson shortly

6   before those young women were killed about him possibly

7   getting killed with his own gun?

8   A.    Yes.

9   Q.    Can you tell the ladies and gentlemen about that

10  conversation, what you remember of it?

11  A.    Chin was saying that he had an AK, and he put it over

12  T.T. house.

13  Q.    What's an AK?

14  A.    AK-47 is a assault rifle.

15  Q.    What did he say he had done with it?

16  A.    Put it over T.T. house.  He kept it over T.T. house.  And

17  she was -- she kept telling Chin that she put the gun in a

18  closet behind a lot of stuff so her kids wouldn't find it and

19  play with it or whatever.

20        Chin said that he kept on asking her about the gun, and

21  she kept giving him excuses.  So he say that Pimp told him

22  that he going soft over a broad.

23  Q.    I'm sorry?

24  A.    Chin said that Pimp told -- Pimp kept saying to him that

25  he going soft over a broad.

15

1   Q.    Soft over a broad?

2   A.    Right.  And that she going to end up letting him get

3   killed by his own gun.

4   Q.    Now, had you ever been in that apartment?

5   A.    Yeah.

6   Q.    When you were in the apartment, did you notice any

7   photographs of Sam Carson?

8   A.    One.

9   Q.    Where was it?

10  A.    Not exactly sure, but I believe it was on the wall over

11  top of the table like where the little kitchen area is.

12  Q.    What did the picture look like?

13  A.    Chin had on a Kufie and a stripy shirt and some blue

14  jeans.

15  Q.    What size was the picture?

16  A.    A poster size.

17  Q.    Now, in the spring or summer of 1991, did you have a

18  conversation with Sam Carson about the murders of T.T. and

19  Terita?

20  A.    I believe when I first seen it on the news that they had

21  got killed, I asked Chin was that his work, and he told me,

22  no.  And then one day I was coming over his mother house, and

23  he was coming in, and he said he was about to lay down because

24  the homicide detectives had came and got him and questioned

25  him about T.T. and Terita murder.

16

1    Q.    Did he tell you about what happened when he got picked up

2    by the homicide?

3    A.    They questioned him.

4    Q.    What did h say about it?

5    A.    That they ain't have nothing on him.  But, I mean, at

6    that particular time he didn't tell me that whether he did or

7    whether he didn't commit those murders or not.

8    Q.    Did he subsequently talk to you about what happened?

9    A.    Yes.

10   Q.    What did he tell you?

11   A.    That Meechie and Poo-Poo and Chin, they went over T.T.

12   house, and Meechie was driving, and Poo-Poo was in the back,

13   and Chin said that he went in.  You know, he came up the steps

14   and knocked on the door, and she came downstairs and opened

15   the door.

16   Q.    I'm going to ask you to keep your voice up, Mr.

17   Montgomery so everyone can hear you.

18   A.    He say that she came downstairs to open the door, and he

19   came in.  He closed the door behind him, and he went up the

20   steps, and they went into the living room area, and he was

21   talking to her, and she asked him who was with him, and he

22   said, that he told her nobody wasn't with him.  But Poo-Poo

23   and Meechie was outside waiting for him.

24        So he said that they sat down on the couch and was

25   talking, and he kept asking her about the gun, and she kept on

17

1    saying that she got to get the knob fixed or whatever and --

2    Q.    I'm sorry?

3    A.    She kept saying that she had to get the knob fixed.

4    Q.    The knob to what?

5    A.    To her door.  She said the knob was broke off the door.

6    And Chin said he told her that he know how to open it with a

7    butter knife.  So he said that she kept on saying that she'll

8    get the gun for him, but she couldn't get it right now because

9    it was behind a lot of stuff; and she didn't want to wake her

10   kids up or wake the kids up, whatever.

11        So Chin said that he got up and went to the bathroom, and

12   put his gun in a clothes hamper, and he said he came back out.

13   And he said he yawned in front of her, and lift his shirt up

14   so she could see that he wasn't strapped.

15        So he said he sat back down, and he said he was trying to

16   give her the benefit of the doubt, you know, so she could get

17   the gun.  And she kept giving him excuses and kept giving him

18   excuses.  So he said that he got back up and he went in the

19   bathroom.  Told her that he had to go back to the bathroom and

20   got the gun.

21        And he said that he came out and he shot her in the head,

22   and then Terita was in the bed, and he said that she was

23   lifting up, and before she opened her eyes that he shot her in

24   the head, and she just laid back down.

25   Q.    Did he say what he did at that point?

18

1   A.    He said that he wiped off everything that he touched, and

2   he took his picture and left.  And he said, when he got back

3   outside and got in the car, then Meechie pulled off fast and

4   made the tires screech, and he got mad at him about that, and

5   told him, don't never pull off like that.

6   Q.    Now, going back to the picture, did he tell you why it is

7   he took the picture?

8   A.    I'm not sure if he told me the reason why he took the

9   picture.

10  Q.    Did he say what he did with the picture once he took it?

11  A.    I don't know what he did with the picture.

12  Q.    Now, did you have a conversation with Meechie about this

13  homicide, double homicide?

14  A.    Yeah, down at Lorton.

15  Q.    And when was it that you were down in Lorton?

16  A.    From '91 to '94.

17  Q.    And do you remember when it was in '91 that you got

18  arrested?

19  A.    November 13.

20  Q.    I'm sorry?

21  A.    November 13.

22  Q.    1991?

23  A.    Yes.

24  Q.    How long before you got sent to Lorton after you got

25  arrested in November of '91?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

28

1  A.   Off a phone.

2  Q.   What do you mean?

3  A.   Off the phone.  It was posted on the phone in the jail.

4  Q.   I'm sorry?

5  A.   It was posted on the phone in the D.C. Jail.

6  Q.   What's posted on the phone there?

7  A.   The number to the FBI.  So I called them and lied to them

8  telling them that I knew of some murders that had happened,

9  and they questioned me about it, and I blamed it on Wayne.

10 Q.   On who?

11 A.   On Wayne.

12 Q.   Wayne who?

13 A.   On Wayne Perry.

14 Q.   Now, after you called the FBI, did they bring you some

15 place to speak with them?

16 A.   Yeah.

17 Q.   And what murders did you blame on Wayne Perry?

18 A.   T.T. and Terita murder and Penny Baker.

19 Q.   Penny Baker?

20 A.   Yeah.

21 Q.   And when you told them that Wayne Perry was responsible

22 for that, can you tell the ladies and gentlemen why it was you

23 picked Wayne Perry's name?

24 A.   Because Alpo already had got locked up, and when Alpo got

25 locked up, Wayne and them was making bets that Alpo was going

29

1   to snitch on them.

2   Q.   Okay.  Let me stop you there, because that's a name that

3   we haven't heard before.  Who is Alpo?

4   A.   Alberto Martinez.

5   Q.   And what relationship did Alpo have with Wayne Perry?

6   A.   Drug dealer.

7   Q.   Okay.  So you're saying that Alpo -- he was close to

8   Wayne?

9   A.   I don't know what their friendship relationship was.

10  Q.   Alpo gets arrested?

11  A.   Yeah.

12  Q.   And what was Wayne saying about what was going to happen

13  once Alpo got arrested?

14  A.   That Alpo was going to snitch on him, because they said

15  Alpo was crying in court.

16  Q.   So as a result that you knew that Alpo was likely to

17  snitch on Wayne, why did you think it was a good idea to blame

18  these murders on Wayne?

19  A.   So that -- I was trying -- well, really, I got charged

20  for the assault on a police officer, and I knew that I didn't

21  assault the police officer.  I ain't know how I was going to

22  beat it, so I more or less I was trying to make a fake bargain

23  with them to get me off of it.  I mean, basically that's it.

24  Q.   So was it -- was there any truth to that story that Wayne

25  Perry was involved in killing those two women?

33

1    something to do with Boo-Boo getting killed or getting Boo-Boo

2    killed.

3    Q.    So as far as you understood, they were responsible?

4    A.    Right.

5    Q.    So what happened while you were at Chin's mother's house

6    this day, right after Boo-Boo gets killed?  What is the

7    discussion about?

8    A.    Pimp was calling around trying to find a van within a

9    reasonable price, because he was saying that they knew his van

10   when they see it.

11   Q.    So what happened?

12   A.    So he never got another van from out of that book or

13   nothing.  Basically I don't think nothing will happen that

14   particular day.

15   Q.    Now, after Boo-Boo got killed, did you have a

16   conversation with Sam Carson about what led up to Boo-Boo

17   getting killed and the murder of Tony Fortune?

18   A.    Yeah.

19   Q.    Can you tell the ladies and gentlemen about your

20   conversation with Sam Carson about that?

21   A.    Chin was saying that -- let me say this first.  Once Boo-

22   Boo got killed, I really didn't care why the beef was on, but

23   Chin was telling me that Boo-Boo got killed because he killed

24   Tony Fortune.

25   Q.    Because who killed Tony Fortune?

34

1    A.    Chin.

2    Q.    Did you know who Tony Fortune was?

3    A.    I heard of him.  I didn't know him.

4    Q.    What did Chin tell you about what happened with Tony

5    Fortune?

6    A.    He say that Pimp and Tony Fortune had had some words

7    before, and Tony Fortune was trying to lean on Pimp.

8    Q.    Lean on Pimp?

9    A.    Yeah.  Like trying to -- they said -- I heard a lot of

10   different rumors about Tony Fortune, but I don't know him.

11   But Chin was telling me that Tony Fortune was trying to make

12   Pimp pay him, pay him money.  And, you know, they had a brief

13   brush right then and there, but nothing happened.

14        Then he was saying that at the crap game Pimp had won

15   most of the money, and Tony Fortune was mad about it, and

16   telling Pimp that he couldn't quit or that he had to give him

17   back some of his money.

18        So Chin say that he whispered in Pimp ear and ask him, do

19   you want me to kill this piece of shit?

20   Q.    Did he say what, if any, response Mr. Martin, Pimp, said

21   when Chin asked him if he wanted him to kill Tony Fortune?

22   A.    He didn't say Pimp say yes or no, but he said he went and

23   got a gun.

24   Q.    Did he say where he went to get his gun?

25   A.    He said he went to the car.  But as to what car, I don't

35

1    know.

2    Q.    What did he say happened once he got his gun?

3    A.    That he shot Tony and he fell, and then he went over top

4    of him and hit him some more.

5    Q.    Did Chin say what happened after he had killed Tony

6    Fortune in terms of a beef starting up?

7    A.    Yeah, and he said that they had came through -- that

8    Boot-Em-Up and them had came through before and had shot or

9    whatever and Boo-Boo and Pimp was mad at each other because

10    Pimp was creeping with Boo-Boo baby mother, Shaun, so they was

11    having words.  They wasn't beefing with each other, but they

12    just wasn't having words.

13    Q.    Now, after Boo-Boo was killed, do you recall visiting

14    Boo-Boo's baby's -- strike that.

15         Do you remember visiting Boo-Boo's mother's house on

16    Ridge Road?

17    A.    Yeah.

18    Q.    And do you recall who else was there?

19    A.    Me and Ty was together, and we came in.  Boo-Boo was

20    already dead, so we came in Boo-Boo mother house, and Pimp and

21    South was in there cleaning their guns.  So me and Ty came in

22    there to put our guns up.  The gun I had belonged to Ty.

23    Q.    Ty, the individual you identified from a picture the

24    other day?

25    A.    Right.

36

1    Q.    Okay.   What happened next?

2    A.    So we was about to leave back out, and Pimp said that

3    Kyle had just gave him a call saying that Block and them was

4    around 58th.

5    Q.    And who is Block again?   Remind us.

6    A.    What do you mean, who is he?

7    Q.    Who is Block?

8    A.    I don't know him personally.

9    Q.    No, who did you understand Block to be?   What role did he

10   have?

11   A.    Drug dealer.

12   Q.    I'm sorry?

13   A.    A drug dealer as far as I know.   I mean, as far as from

14   being around 58th

15   Q.    Okay.   And was he someone that you associated with being

16   responsible for Boo-Boo getting killed?

17   A.    Right.   That he had something to do with Boo-Boo getting

18   killed.

19   Q.    Now, what was your plan for that evening, this particular

20   evening?

21   A.    Before this?

22   Q.    Well, once you got into the house this evening, at Boo-

23   Boo's mother's house, what was the plan?   Was there just a

24   plan discussed for that evening?

25   A.    No.

37

1  Q.   What happened?

2  A.   We was putting the guns -- Ty was about to put the guns

3  in Boo-Boo mother house, so Pimp said that Kyle called him

4  saying that Block was around there.  So Pimp asked me was I

5  going?  So I say, no doubt.

6  Q.   Going where?

7  A.   Around there to where Block was at.  So I say, no doubt.

8  And he ask me did I have a gun?  So I showed him the pistol I

9  had.  It was a revolver.  So he gave me another pistol.

10  Q.   What kind of gun did he give you?

11  A.   An automatic, a 9 millimeter automatic.

12  Q.   So what happened once you had that 9 millimeter.

13  A.   What do you mean, what happened?

14  Q.   What happened?  Did you guys stay in the house or did you

15  go out?

16  A.   We left.

17  Q.   Tell us.

18  A.   So Pimp had a AR 15, so he asked me did I want to take

19  that.  And I was like, no, cause it was too big, and I didn't

20  want somebody to see me coming out Boo mother house with that

21  gun.

22      So we get in Anthony car, and Pimp driving and South in

23  the passenger seat.  Ty sitting behind Pimp, and I was sitting

24  behind South.  So we go around there, and I'm telling Pimp

25  that I don't know none of them.  I say the only one I know is

38

1  Keith Holmes.  I said I know him when I see him.  I don't

2  really know him, but I know him when I see him.

3      So I said if you see anybody that you think with it, let

4  me know, and I said, I'm going to blast them.  You know what I

5  mean?  And I had every intention of doing it.  So I said, I'm

6  going off of whatever you go off of.  So we kind of finished

7  and went through the alley.  Pimp was telling everybody to

8  spread out in case they see us and try to bust.  So we won't

9  -- so one of us won't shoot one of our own.

10     So we walked out, came out the alley and was walking up

11 Blaine, and we had our guns out in full view.  So we walked

12 almost to the top of Blaine.

13 Q.   Is this daytime or nighttime?

14 A.   It's nighttime.

15 Q.   And what happened when you got to the top of Blaine?

16 A.   So it was mostly like little kids.  Other people was

17 running as they seen us coming up the street.  So I say, you

18 don't see nobody?  I was pressed to bust somebody.  I was

19 pressed.

20 Q.   What does that mean?

21 A.   I was pressed to shoot somebody.  I wanted to get some

22 get-back for them killing Boo-Boo.

23 Q.   What happened?

24 A.   It could have been a person that didn't have nothing to

25 do with it.  If he had pointed to them and said they did, I

39

1   was going to give it to them.

2   Q.    What happened?

3   A.    So I said, you don't see nobody that look like -- he was

4   like, no, and we left.  So we go back the same way that we

5   came up there, and we come back through the alley and went

6   back to the car.

7         So as we was getting in the car, Putney pulled up.

8   Q.    Who did?

9   A.    Putney.

10  Q.    Who is Putney?

11  A.    Lawrence Brown.

12  Q.    Who is he?

13  A.    Putney is a friend of ours.

14  Q.    Where is -- does he work?

15  A.    He work in the court building.

16  Q.    What court building?

17  A.    Superior Court.

18  Q.    What happened when you saw Putney?

19  A.    He pulled up on us.  He pulled up on us unexpectedly, and

20  all of us drew our guns on him, and he was scared.

21  Q.    What was Putney driving?

22  A.    He was driving a Jetta.

23  Q.    What happened when you pointed your guns at him?

24  A.    I mean, you could just see the look of fear on his face.

25  And Pimp was saying, no, no, no, no, no, like that.  And so we

40

1    got in the car, and Putney was saying, man, I was just

2    speechless.  That's it.  Like that.

3        So, you know, we laughed about it real brief and then he

4    pulled off.  And then we got back in the car and we pulled

5    off.

6    Q.    Now, on this particular night, did you end up shooting

7    your gun?

8    A.    Yeah.

9    Q.    Tell us about when the shooting started.

10   A.    We was going back down East Capitol Street.  So we got by

11   where East Capitol and Benning Road, and Pimp spotted Block

12   van and said he was going by way of Texas Avenue.  So he was

13   like, they go right there.  Saying he trying to come through

14   there, trying to come through.  So we hurry up and got back

15   around B Street.

16       So Pimp parked Anthony car on B Street.  So we got out

17   and we ran behind these big green trash cans.  And so we was

18   waiting for them to come.  Pimp was saying, they probably

19   going to come from the top, meaning they going to come down

20   Ridge Road.  So I didn't know what type of vehicle they was in

21   at the time.  I knew that he's saying they was in a van,  but

22   I didn't see the van when he was saying that they was in the

23   van.  There they go.  There they go.

24       So I told him, I said, I don't know how the vehicle look.

25   I say, whatever you go on, I'm going on, like that.  So we

41

1    stay right there behind the trash cans.  It seemed like it

2    took forever, like he must have just kept going or maybe it

3    wasn't them or whatever, so we started walking out, and sure

4    enough, the van came through.

5    Q.    What did the van look like?

6    A.    It was a white Caravan.

7    Q.    A white Caravan?

8    A.    Yeah.

9    Q.    And when you saw the white caravan, who started shooting

10   first?

11   A.    We was walking out, about to walk back out to B Street,

12   so Pimp said, there they go right there.  And he ran out

13   busting his gun.  So I started busting my guns.

14   Q.    Who else was shooting, do you recall?

15   A.    South and Ty.  They started busting their guns.

16   Q.    What happened?

17   A.    We shot the van up, and it sped off across Minnesota

18   Avenue and South had the Mac, so he was still shooting after

19   we had got done.

20   Q.    What happened after you finished shooting?

21   A.    So we was walking back through these woods.  We was going

22   through this path, and so Pimp said, man, you ain't even

23   shooting.  So I said, yes, I did.  I said, shit, I was

24   lighting that joint up.

25       So he was like, let me see your gun.  So I gave him the

42

1   gun that he gave me.  I give it to him, and he checked the

2   clip and see that I did.  I bust that joint.  So the other

3   revolver I had, I think I only shot like two or three times

4   out of that.

5   Q.    What did he say after he saw that you had shot?

6   A.    He said that I did good.

7   Q.    Now, --

8   A.    And I told him, I said, let's go reload and get their

9   ass.

10  Q.    I'm sorry?

11  A.    I said, let's go reload and get their ass some more.

12  Q.    What did he say?

13  A.    He said, that's enough for tonight.

14  Q.    Now, did you even know who it was that you were shooting

15  at in that van?

16  A.    No.

17  Q.    Did you care who it was?

18  A.    No.

19  Q.    Why were you shooting at it?

20  A.    Because he said that it's Block and them.  He knew better

21  than I knew.

22  Q.    And your reason for wanting to kill Block was what?

23  A.    Cause he had something to do with Boo-Boo getting killed.

24          THE COURT:  I'm going to interrupt you now, Mr.

25  Zeidenberg.  We're going to take a brief recess.

45

1      (Jury In.)

2              THE DEPUTY MARSHAL:   Jury panel is all present, Your

3      Honor.

4              THE COURT:   Thank you, Marshal.

5      BY MR. ZEIDENBERG:

6      Q.   Good afternoon.   Mr. Montgomery, I'd like to direct your

7      attention to the evening of September 10, 1991.   Were you

8      involved in a shootout with the Metropolitan Police on that

9      evening?

10     A.   Yes.

11     Q.   And directing your attention to slightly earlier in the

12     evening, prior to the shootout actually beginning, can you

13     tell the ladies and gentlemen what led up to that shooting?

14     A.   I had came around Ridge Road probably about -- around

15     noontime to meet with Pimp.   We had discussed the day before

16     that I was going to meet him there so that we could try to

17     catch up with the dudes that we was trying to retaliate on.

18     Q.   And specifically who was it you were looking for?

19     A.   Keith Holmes and Block and Sugar Spoon.

20     Q.   Again, did you know them by face or just by name?

21     A.   I only knew Keith Holmes by face.

22     Q.   So when you came around on September 10 around noontime,

23     what happened?   Did you see Pimp?

24     A.   No, I'm not sure what time it was when he came, but I was

25     waiting there for awhile before he got there.

46

1    Q.    Then what happened?

2    A.    Then we went to get South.  We went to get South, and

3    then we come got a dude, Boo.  He got this dude named Boo,

4    Juan Bowie, to -- Juan Bow.  It's Bow or Bowie.  It's one or

5    the other -- to get him some illegal paper tags.

6    Q.    Paper tags?

7    A.    For his Mazda van.

8    Q.    Right.

9    A.    So after we had got that, then me, Pimp and South went

10   down to Southwest and got Chin.  Went over to Chin mother

11   house and got Chin.  So then we went riding around looking for

12   Boot-Em-Up and Block, Keith Holmes, Sugar Spoon, Pee-Wee or

13   anybody else affiliated with them or with the death of Boo-

14   Boo.

15   Q.    What were you planning on doing if you saw any of those

16   individuals?

17   A.    We discussed that if we catch Boot-Em-Up that we was

18   going to rob him and torture him and we was going to kill him.

19   Q.    And any of the others?

20   A.    On sight, anybody else on sight we was going to deal with

21   them right then and there.

22   Q.    Meaning what?

23   A.    We was going to kill them right there.

24   Q.    What happened?  Did you find them?

25   A.    No, we went around Wheeler Road, through Paradise.  We

47

1   went around Fifth and Sixth Street, Northeast.  We went around

2   58th.  We went up Eastern High School, and we went to

3   Anacostia High School and we went over H.D. Woodson.

4   Q.    Did you find anyone you were looking for?

5   A.    No.

6   Q.    Now, did you go back out later that evening shortly --

7   right around dark?

8   A.    When it started getting dark, I was keeping -- Ty let me

9   keep his motorcycle, so I already had it.  It was parked at

10  the top of Ridge Road.

11  Q.    And this is Ty, the individual you identified the other

12  day?

13  A.    Right.  So I told -- I made the suggestion that one of

14  them could get on the bike with me and shoot off the back of

15  the bike, since they know the van, since they know Pimp van.

16  So if they see Pimp van, they might not be focused on a

17  motorcycle.  You know what I mean?  We came back out.  We went

18  through Mayfair and Paradise.

19  Q.    Now, at this point are you on a motorcycle or in a van?

20  A.    I'm on a motorcycle and Pimp is on the back.

21          THE COURT:  Who are these guys you were looking for?

22  What neighborhood are they associated with?

23          THE WITNESS:  In various neighborhoods.  It's like a

24  few different neighborhoods.

25          THE COURT:  Okay.  This Ridge Road crowd or --

48

1        THE WITNESS:  Two of us was from Southwest, and the

2   rest was from Ridge Road.

3        THE COURT:  And where were these guys that you were

4   looking for?

5        THE WITNESS:  In various parts of D.C.

6        THE COURT:  Okay.

7   BY MR. ZEIDENBERG:

8   Q.   What neighborhood --

9        MR. ZEIDENBERG:  If I may, Your Honor.

10  BY MR. ZEIDENBERG:

11  Q.   What neighborhood did you associate -- the individuals

12  that you were looking for, what neighborhood did you associate

13  them with?

14  A.   Paradise and 58th.

15  Q.   58th Street, Northeast?

16  A.   Right.

17  Q.   And that was the area around where Tony Fortune hung out?

18  A.   Yes.

19  Q.   Now, the second time that you go out on this September

20  10, 1991, when you're on the motorcycle, who is on the

21  motorcycle with you?

22  A.   Pimp.

23  Q.   Who is in the van?

24  A.   Chin, Chin was driving the van, and South was in the

25  passenger seat, and Man and Steve Bay in the back.

49

1   Q.    I'm sorry.  In the back are who?

2   A.    Man and Steve Bay.

3   Q.    Steve Bay?

4   A.    Yeah.

5   Q.    Do you know Steve Bay's true name?

6   A.    No.

7   Q.    Have you ever heard the name Steve Ellington?

8   A.    No.

9   Q.    Are you armed at the time?

10  A.    Yeah.

11  Q.    How are you armed?

12  A.    With a semiautomatic pistol.

13  Q.    Was Jerome Martin, Pimp, armed?

14  A.    Yes.

15  Q.    What was he armed with?

16  A.    Glock.

17  Q.    A Glock?  Do you know what caliber?

18  A.    I'm not sure, but I believe it was a 9 millimeter.

19  Q.    The individuals in the van, Sam Carson, Steve Bay, South,

20  and Man, were they armed?

21  A.    Yes.

22  Q.    Do you know -- could you tell us what you know about

23  that, what you recall?

24  A.    Chin had a semiautomatic pistol and -- everybody had a

25  semiautomatic pistol except for South.  He had a Mac-11.

55

1  Q.    Okay.  The car -- the van -- strike that.

2        The car that you saw, was it turning in the direction of

3  Southern Avenue such as that (indicating)?

4  A.    I'm not sure if it went on the right side or if it went

5  down the wrong way of the street, but it did go in that

6  direction.

7  Q.    Okay.  And what did you see Jerome Martin do?

8  A.    Shooting at the car.

9  Q.    On foot or on the motorcycle?

10  A.    On foot.

11  Q.    And while he was shooting at the car, was his helmet on

12  or off?

13  A.    He was taking it off.  He was running and trying to

14  unfasten the helmet while he was busting.

15  Q.    And then what do you recall happening next?

16  A.    The van pulled out into by the median strip diagonal.  It

17  was diagonal.

18  Q.    Diagonally across the street?

19  A.    Diagonally in the lane.

20  Q.    Okay.

21  A.    I pulled out and was telling Pimp to hop on, because I

22  wanted him to hop on so that we could continue to chase the

23  car going out Maryland so he could shoot at them while I was

24  riding the bike.

25  Q.    What happened?

56

1   A.    He didn't hop back on, so I just kept on hollering for

2   him to hop back on the bike, to hop on, hop on. I kept saying

3   that. And then he turned around and was shooting from the

4   direction where the high-rise was at.

5        So I didn't know at that particular time who he was

6   shooting at. I'm thinking that it was probably more of them

7   dudes.

8   Q.    At some point did you look in the direction of the high-

9   rises?

10  A.    Yeah. I mean, I could see some shots coming from that

11  way, but I just didn't realize at that time that they was

12  police.

13  Q.    At some point did you realize it was the police?

14  A.    Yeah, when one of them fell.

15  Q.    I'm sorry?

16  A.    When they fell.

17  Q.    What did you see happen?

18  A.    I could see the badge.

19  Q.    What did you see? Tell --

20  A.    I was thinking that it was more or less a security guard

21  or something probably from that building.

22  Q.    What did you see happen?

23  A.    The person was shooting at Pimp, and Pimp was shooting

24  back, and he was saying, get your ass back.

25  Q.    Who was saying, get your ass back?

57

1   A.    Pimp.

2   Q.    What direction was Pimp shooting at at the time he was

3   saying that?

4   A.    In the direction where the officer or the security was

5   shooting from.

6   Q.    Did you notice how many police officers there were?

7   A.    I only seen one, but there could have been more.

8   Q.    How long -- strike that.

9         What happened next after Pimp was shooting in the

10  direction of the police officers?

11  A.    They opened the door on the side of the van and South

12  started busting.  South started shooting out the side of the

13  van.

14  Q.    In what direction?

15  A.    In the direction of the security or the officers.

16  Q.    Then what happened?

17  A.    Pimp hopped in the van and they sped -- we took off.

18  Q.    Now, which direction did you take off?

19  A.    We went up South Capitol -- I mean, Southern Avenue.

20  Q.    Now, as you look at this picture, EC300, was it a right

21  turn or a left turn on to Southern Avenue?

22  A.    A right turn.

23  Q.    Now, where were you in relation to the van?

24  A.    On the motorcycle.  I was behind the van.

25  Q.    Okay.  Did you follow after the van?

58

1   A.    Yeah.

2   Q.    Now, while this shooting was going on, did you -- where

3   were you in relation to where all these bullets were flying?

4   A.    Right in the middle.

5   Q.    Did you get hit?

6   A.    No.

7   Q.    Did you consider taking off and leaving while the bullets

8   were flying?

9   A.    No.

10  Q.    Why not?

11  A.    Because I was responsible for Pimp, and if I would have

12  left him, then I would have got killed.

13  Q.    What do you mean when you say you were responsible for

14  Pimp?

15  A.    He was on the bike with me.

16  Q.    So what?

17  A.    So he my responsibility if he on the bike with me.

18  Q.    What does that mean that he's your responsibility?

19  A.    That if he on the bike with me, I can't leave him.   I

20  can't leave him.

21  Q.    Why not?

22  A.    For the reason I just explained.  He's my responsibility.

23  I mean, I wouldn't have left him anyway, though.

24  Q.    Now, where did the van and you go once you turned right

25  on to Southern Avenue?

59

1    A.    We stayed on Southern Avenue going all the way up

2    Southern Avenue, and then I seen -- no, we stayed on Southern

3    Avenue and I'm not sure -- I knew it was from the passenger

4    side of the van that Pimp shot at somebody that was going down

5    the street.  At that time I didn't -- put it like this.  I'm

6    not going to say Pimp shot at the person, because I didn't

7    know at that particular time, but somebody shot at a person on

8    the sidewalk.

9    Q.    Okay.  So while you're driving along you hear a shot come

10   from the van?

11   A.    Right.

12   Q.    And you believe it was directed at someone on the street?

13   A.    Right.

14   Q.    What did you do when you heard the shot come?

15   A.    So I slowed down on the bike, and I was about to stop and

16   shoot the person because I was thinking that that was one of

17   the people.  I'm thinking that's one of them has something to

18   do with Boo being killed.

19   Q.    Did you shoot at that person?

20   A.    Did I shoot them?

21   Q.    Yes.

22   A.    No.

23   Q.    What happened next?

24   A.    The van kept going and I sped back up to keep up with

25   them.

60

1    Q.    Now, at some point did you see a police car?

2    A.    Yeah.

3    Q.    Can you tell us about that?

4    A.    The police was coming in the opposite direction of where

5    we was traveling. So as -- and he had his lights on. He

6    didn't have his siren on, but he had his lights on, so I

7    slowed down, and I was watching the police, and he slowed --

8    after he went past us, I could see him looking at the van, and

9    that was the reason why I slowed down and was watching him.

10        So the police car, I seen his brake lights come on and

11   looked like he was about to make a U-turn. So I sped up and

12   was pointing back telling Chin and them the police is about to

13   come. I said, the police is about to come.

14   Q.    Who is driving the van at this point?

15   A.    Chin was driving.

16   Q.    Okay. What happened when you notified -- when you

17   signaled to Chin that the police were coming?

18   A.    They turned on a side street.

19   Q.    What did you see happen next?

20   A.    I turned on the side street with them, and then they

21   turned on another street and pulled over briefly and threw

22   their guns out, and I stopped and got their guns and got back

23   on the bike. I ain't never throw my gun. I picked their guns

24   up.

25   Q.    Now, how many guns did you see come flying -- how did the

61

1  guns get out of the van?  What did you see?

2  A.   I don't know who particularly threw the guns out.

3  Q.   Did the van come to a complete stop?

4  A.   Right.

5  Q.   Where were the guns thrown?

6  A.   In somebody yard.

7  Q.   Now, after the guns came out of the van, did the van

8  continue on?

9  A.   Yeah.

10  Q.   What did you do?

11  A.   I stopped.  I stopped and put the bike in neutral and

12  picked up -- I picked up Pimp gun, and I picked up South gun,

13  and I picked up Steve Bay gun and got back on the bike.  I

14  didn't see Chin gun.

15  Q.   And how were you able to carry all those guns?

16  A.   I put them in my waistband, and I pushed some of them in

17  my pants pocket.

18  Q.   What did you do at that point?

19  A.   I went back around Ridge Road.

20  Q.   What happened when you got back to Ridge Road?

21  A.   When I got back around there, I parked the bike and

22  knocked on Steve Bay and them door, and I think it's his uncle

23  or his nephew, Darrell, or somebody answered the door, and I

24  asked him could he hold the guns till Steve Bay and them got

25  back.  And he did, he held them.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

62

1   Q.   Now, at some point later did you meet up again with Chin

2   and Pimp?

3   A.   Yeah.

4   Q.   How much later?

5   A.   I'm not sure.  Probably about -- maybe 30 to 45 minutes.

6   Q.   When you saw them again, were they in the van or were

7   they on foot or how would they get there?

8   A.   They was in the car with Anthony.

9   Q.   Any sign of Pimp's van?

10  A.   No.

11  Q.   Did you talk about what happened with Pimp and Chin?

12  A.   Well, when they first pulled up, I told -- I just said, I

13  said, I got you all guns.  And Pimp says, you got mine?  I

14  said, yeah.  And South said, you got mine?  I said, yeah.  I

15  said I got everybody gun except for Chin.

16  Q.   What happened then?

17  A.   So we went back up there to the yard.  I showed him where

18  the yard was that I found their guns, and we looked, and we

19  never found Chin gun.  Then we rode on the street where they

20  had abandoned the van, and Pimp was mad saying that -- he

21  said, he was like, shit.  He was like, man, we should have hit

22  the Maryland side like that.  And then he was mad because he

23  left his ID and his pager.

24  Q.   I'm sorry?

25  A.   He was mad because he left his ID and pager in the van.

67

1   A.    We needed them for that particular beef for Block and

2   them.   We hardly had no guns.

3   Q.    And what about 37th Place?  Do you know how Mr. Martin

4   was able to get guns?

5   A.    Chin told me that Pimp uncle be having guns.   That he get

6   his guns.   I don't know.   I'm not saying that just because

7   that's Pimp uncle, but that's where Pimp got his guns, but

8   Chin particularly told me that he gets his guns from Pimp

9   uncle.

10  Q.    Now, when these beefs were going on, and I'm talking

11  about this beef with 58th Street, was the two evenings that

12  you just talked about, September 10 and you talked before the

13  break about another evening you went out looking for them,

14  were these the only occasions that you went out looking to

15  shoot at the people from 58th Street?

16  A.    No.

17  Q.    Can you just -- without going into the details of every

18  time, give the ladies and gentlemen some idea of how

19  frequently you did this and who you were with?

20  A.    Pretty much of the time I didn't know any of the people

21  by face except for Keith Holmes.   A lot of times whenever I

22  had the transportation, a motorcycle or car or whatever, and

23  then I go around Mayfair trying to find any car that looked

24  like a car that belonged to them or could possibly belong to

25  one of them and write down the tag number.

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .   Docket No. CR 98-329

            Government,            .   Washington, D.C.
                                   .   March 13, 2001
    vs.                            .   2:20 p.m.

VINCENT HILL,                      .   (AFTERNOON SESSION)
JEROME MARTIN,
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,
SEAN COATES,                       .

            Defendants             .

. . . . . . . . . . . . . . . . .      **FILED**

UNITED STATES OF AMERICA,          .   MAR 1 1 2003

            Government,            .   NANCY MAYER WHITTINGTON, CLERK
                                       U.S. DISTRICT COURT
    vs.                            .   Docket No. CR 99-348

GARY PRICE,                        .

            Defendant.             .

. . . . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001

2

For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                               LEXI NEGIN-CHRIST, ESQ.
                               419 7th Street, N.W.
                               Washington, D.C.  20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                               717 D Street, N.W.
                               Suite 400
                               Washington, D.C.  20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                               901 6th Street, S.W.
                               Suite 409
                               Washington, D.C.  20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                               601 Indiana Ave., N.W.
                               Suite 901
                               Washington, D.C.  20024

Court Reporter:                BEVERLY J. BYRNE
                               Official Court Reporter
                               Room 6810 U.S. Courthouse
                               Washington, D.C.  20001
                               (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

30

1       I said, let me think about it.  Then he kept on saying,

2   you bull shitting.  You ain't trying to get this money.

3   Q.   You ain't -- I'm going to ask you to keep your voice up,

4   Mr. Montgomery.

5   A.   He said, you're bull shitting.  You ain't trying to get

6   this money.  So I said, would you let me think about it?  So

7   he's like, man, you bull shitting.  He said, I'm going to let

8   Bird get this money then.

9   Q.   I'm sorry?

10  A.   He said, I'm going to let Bird get this money then.

11  Q.   Mr. Montgomery, I'm going to ask you now about the murder

12  of someone by the name of Tim-Tim or Timothy Benton.  Are you

13  familiar with somebody by the name of Tim-Tim?

14  A.   Yes.

15  Q.   And were you a witness to and a participant in the murder

16  of Tim-Tim?

17  A.   Yes.

18  Q.   And directing your attention to the evening of June 22,

19  1994, were you driving your car in Southeast, D.C.?

20  A.   Yes.

21  Q.   Did you see Tim-Tim?

22  A.   Yes.

23  Q.   Can you tell the ladies and gentlemen what happened?

24  First of all, who Tim-Tim was and what happened when you saw

25  him?

31

1   A.   Tim-Tim was a person, he was a friend of Poo-Poo's.  I

2   really didn't know him that well.  I had just recently met

3   him.  I was coming through Capers, and he flagged me down and

4   asked me where Poo-Poo was at.  So I told him that I didn't

5   know.

6        And he asked me was I about to go down to Southwest.  I

7   told him, yeah.  He asked me could I take him down there.  So

8   I told him I'd take him down there, but I wasn't bringing him

9   back.  So he agreed.

10  Q.   What car are you driving?

11  A.   My Cadillac.

12  Q.   What happened?

13  A.   So when we first came down Southwest, we came through K

14  Street, and Poo-Poo wasn't out there.  So I took him around

15  Second Street.  I was going to drop him off around Second

16  Street.  So we seen Poo-Poo around Second Street in the court.

17       So when we pulled up, Poo-Poo came over to the car and

18  was talking to Tim-Tim.  So he was saying that something about

19  Tim-Tim been ducking him and this and that and this and that,

20  and told me to pull down in front of where his mother was

21  living at.

22  Q.   Who told you to pull down?

23  A.   Poo-Poo.

24  Q.   What happened?  Did you do that?

25  A.   Yeah.

32

1   Q.   What happened at that point?

2   A.   So Poo-Poo went to -- he said he had to go put his stash

3   up.  To my knowledge, he wanted to put his stash up.  And he

4   got in the back seat and was telling Tim-Tim that he fucked up

5   with him for messing up his money, this and that, this and

6   that.

7   Q.   Now, let me stop you.  Where are people seated in the

8   car?

9   A.   I'm driving.

10  Q.   Okay.  Who is in the front passenger seat?

11  A.   Tim-Tim.

12  Q.   Who is in the back seat?

13  A.   Poo-Poo.

14  Q.   Now, what is the conversation between Poo-Poo and Tim-Tim

15  once Poo-Poo gets in the car?

16  A.   Poo-Poo wasn't·hollering at him, but he told him that he

17  was mad at him for messing up his money.

18  Q.   Did he say what he was messing his money up over?

19  A.   That's all he said was that Tim-Tim messed up his money.

20  Q.   What happened next?

21  A.   So Tim-Tim was telling him that if you make another move

22  with him that he wasn't going to mess it up.  So Poo-Poo told

23  him that he'll give him some more coke, but Tim-Tim had to

24  bring him back all the money for them to be back on ground

25  level.

33

1    Q.    Did Tim-Tim agree to this?

2    A.    He did agree.  So I told Poo-Poo that I was about to go

3    back around the other side of the house, so he told me to take

4    him -- to drive him to get this coke to give to Tim-Tim right

5    quick.  It wasn't going to take long.  So I agreed, and I took

6    them.

7    Q.    Where were you at this point?  What part of town?

8    A.    We were still sitting in front of his mother house.

9    Q.    Where is this?

10   A.    On Canal Street.

11   Q.    Then what happened?

12   A.    So we -- I'm listening to the directions he's telling me

13   to go.  So we get on M Street, and we come across South

14   Capitol Street Bridge, and then we come down where Barry Farm

15   is at and we're on Martin Luther King Avenue.

16   Q.    What part of town?

17   A.    Southeast.

18   Q.    What happened then?

19   A.    So we go up Good Hope Road, and then we get on Minnesota

20   Avenue.  So Poo-Poo in the back seat, and he keep like jumping

21   around, acting silly or whatever.  So I'm looking at him in

22   the rearview mirror.

23        So I'm really not saying nothing.  Tim-Tim not saying

24   nothing.  Poo-Poo really not saying much.  We continued down

25   Minnesota Avenue and we turn on some street that he told me to

34

1    turn onto.  So I made the left turn on the street.

2        So I was assuming we was where wherever Poo-Poo said his

3    father lived at or whatever.  So then he told me to make

4    another turn.  So we turned, and he was like slow down right

5    here.  So I slowed down.

6        Then he shot Tim-Tim in the head.  And when he shot him

7    in the head, I jumped.

8    Q.   What was the first indication you had that that was

9    happening?

10   A.   Well, when he shot him, his blood splashed all over the

11   side of my face, and it was warm.  So I wiped it off.  And I

12   looked back at Poo-Poo, and he's sitting with his arms on the

13   seat, and he going like this (indicating).  So I was mad.  I

14   was mad, because he shot him in my car.  So I look at Tim-Tim,

15   and he got blood running down his face, and it's like dripping

16   off his nose.

17   Q.   Could you see where he had been shot?

18   A.   No.  I could see the blood running off his nose.

19   Q.   What did you notice about Tim-Tim's face?

20   A.   So his eyes was just blinking like he was dazed.  So I

21   was like, damn, you fucked up.  So I said, hit him again.

22   Q.   You said that to who?

23   A.   I said it to Poo-Poo.  So I said, hit him again.

24   Q.   What did Poo-Poo say?

25   A.   So Poo-Poo shot again, bam, he missed, and he shot my

35

1    car.  I said, damn, man, you shot my mother fucker car.  Man,

2    good night.

3        So he said, push him out.  So I leaned over and pushed

4    him out and pulled forward and let his feet fall out.  So we

5    was pulling off.  So I looked in the rearview mirror and Tim-

6    Tim is lifting up off the ground.

7        So I said, ho, I said, he's getting up.  I busted a U-

8    turn, and I don't know or I'm not sure if I ran him over.  But

9    my intent was to run him over with the car.  So Poo-Poo got

10   out, and he shot him again in the head and got back in the

11   car.

12   Q.   Did you have any conversation with Poo-Poo when he got

13   back in the car?

14   A.   He got back in the back.  He got back in the back seat.

15   So I told him to get up front.  So he climbed over the seat

16   and got up front.  So then he was like, man, it's a good thing

17   I did killing him, man, because if I would give him some more

18   coke, he was going to kill both of us.  You know he had a gun

19   on him.

20       So I said, did you get his gun?  So he was like, no.  So

21   I said, why you ain't get his gun?  He said, no, that joint

22   probably got bodies on it.  But as I say, all of us is we kill

23   somebody, we're going to get their gun.  You going to get

24   their gun.  So I didn't argue with him or nothing.  I didn't

25   say nothing, but in my mind I was thinking that he just trying

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

36

1   to say that to make me feel better about him shooting him in

2   my car.

3   Q.   What did the inside of your car look like?

4   A.   There was blood specks everywhere.

5   Q.   What did you do with your car?

6   A.   So we got back on 295, and I came off the Howard Road

7   exit and came back down, came back across South Capitol

8   Street.  We got back down to Southwest, and we parked in front

9   of Poo-Poo mother live at.  So we seen the uncle, Poo-Poo

10  Uncle Willy.

11  So Poo-Poo got his uncle to wash my car, wipe the inside of it

12  out, to wash it up.  And me and Poo-Poo walked down to the

13  waterfront to throw the gun away.

14  Q.   Where did you throw the gun away?

15  A.   In the river, in the Potomac River.

16  Q.   What part of the waterfront were you at when you threw it

17  in?

18  A.   The same part where I threw the .30 carbine.

19  Q.   That's over by Ft. McNair?

20  A.   Yeah.

21  Q.   Mr. Montgomery, I'm going to ask you now about the murder

22  of Chrishauna Gladden.  Did you have a conversation in the

23  summer, late summer of 1996 with Meat about some witnesses?

24  A.   Yes.

25  Q.   Can you tell us about that conversation?

37

1   A.   He came to me one day and said that Pimp was trying to

2   get in contact with me and that he needed me to get on top of

3   some witnesses for him.

4   Q.   Now, what does that mean to you when you heard that?

5           THE COURT:  Say it again?

6           MR. ZEIDENBERG:  The question or the answer, Your

7   Honor?

8           THE COURT:  His answer.

9   BY MR. ZEIDENBERG:

10  Q.   What was it that you recall Meat saying to you?

11  A.   He came to me and said that Pimp was trying to get in

12  contact with me, and that Pimp needed for me to get on top of

13  some witnesses for him.

14  Q.   Now, what does that mean to you when he said, you were

15  needed to get on top of some witnesses for Pimp?

16  A.   It mean that whatever witnesses he have, he want me to

17  get rid of them.

18  Q.   And when you say, get rid of them, what do you mean?

19  A.   To kill them.

20  Q.   How many conversations did you have with Meat about this?

21  Do you remember exactly?

22  A.   I don't remember exactly how many, but a few.

23  Q.   And what else did Meat tell you during this first

24  conversation?

25  A.   He said that Pimp said he going to call me at 907.

58

1   A.    44.

2   Q.    M44?

3   A.    Yes.

4   Q.    Is that a fair and accurate representation of what the

5   area of 37th Place looked like at the time?

6   A.    This is 37th.  I'm not sure if it looked like this at

7   that time.

8   Q.    Okay.  Does that show the building that you were in the

9   night that Chrissy Gladden was killed, is that shown on that

10  photograph?

11  A.    It shows the row of houses.  I can't see the actual

12  house.

13  Q.    All right.  Mr. Montgomery, let me ask you about what

14  happened once you are in the house and Big Jim left.  You said

15  you had a conversation with Chin?

16  A.    Yes.

17  Q.    What happened next?

18  A.    Nothing.  They went in the house.

19  Q.    How long did the girls go in the house?

20  A.    For maybe an hour or an hour and a half.

21  Q.    What did you and Chin do for that hour or hour and a

22  half?

23  A.    Stayed looking out the window.

24  Q.    What happened after about an hour or an hour and a half?

25  A.    When they first went in the house it was our assumption

59

1   that they was in the bedroom downstairs, because no sooner

2   they went in the house a light in the room downstairs -- a

3   light in the room downstairs came on.  And we could see people

4   moving around in there, so we assumed that it was them.

5        After about an hour or hour and a half of waiting the

6   light went out.  So I said -- I said, I think they are about

7   to come out, and for sure they came out.

8   Q.   What happened when they came out?

9   A.   First Chrissy came out, then Trina came out, and then

10  Rashida came out.  So Chin hopped down and put his hood on.

11  Q.   What was Chin wearing that night?

12  A.   He had on a blue and white polo sweatshirt, it was a

13  white sweatshirt with a blue hood.

14  Q.   I'm sorry?

15  A.   A white sweatshirt with a blue hood on it, and a black

16  leather jacket.

17  Q.   What type of jacket?

18  A.   A black leather jacket.

19  Q.   Okay.

20  A.   And some blue jeans.

21  Q.   What happened next?

22  A.   So when he jumped down, I said, -- I said, you sure you

23  don't want me to do it, because I still wasn't sure.

24  Q.   You were not sure about what?

25  A.   I still wasn't sure if he had listened to me when I asked

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

60

1   him not to shoot Trina.  So he said, no, I got it.  He said,

2   just let me know when to go.  So I stayed looking out the

3   window, and I waited until I seen Rashida locking the door.

4   That way I knew they wasn't going to be able to run back in

5   the house.

6       So when I seen her locking the door, as soon as she

7   turned around to walk away from the door, so I said, go, go,

8   go, like that.  And he ran out there and had his hand up like

9   this (indicating).

10  Q.   You're indicating he had his arm --

11  A.   His right hand.

12  Q.   In front of his face?

13  A.   Right.

14  Q.   And then what happened?

15  A.   And he bust a few shots in the girl, and Chrissy started

16  screaming -- all of them, all of them started screaming.  And

17  Chrissy and Rashida ran back to the door and was bunched up in

18  the door.  And I jumped down and ran out the back and met Chin

19  back at the car.

20  Q.   How many shots did you see Chin fire?

21  A.   Maybe once or twice.

22          THE COURT:  I'm sorry?

23          THE WITNESS:  Maybe once or twice.

24  BY MR. ZEIDENBERG:

25  Q.   Did you stick around to see him finish or did you leave

61

1    before it was all over?

2    A.    I left before it was over.

3    Q.    Where did you run?

4    A.    Back to the car.

5    Q.    What route did you take?

6    A.    The same route we took to get there.

7    Q.    Back out the back door?

8    A.    Right.  And through those fences.

9    Q.    What happened when you got back to the car?

10   A.    Right after I got there Chin was -- Chin was right on my

11   heels, he was right there.

12   Q.    What happened once he got back to the car?

13   A.    Chin was driving, I was in the passenger's seat.  And I

14   still had my scanner on, my police scanner.

15   Q.    Where was the scanner while you were inside the house?

16   A.    I had it in my ear.  I had an ear plug in my ear.

17   Q.    And once you got into the car and started going where did

18   you go?

19   A.    We left out and we went up Ridge Road.  We went going --

20   I guess that's east or north up Ridge Road.

21   Q.    Where did you go once you got up Ridge Road?

22   A.    Made a right onto I think that's Alabama Avenue, I

23   believe that's Alabama Avenue, and we went down to

24   Pennsylvania Avenue, and then came straight over down

25   Pennsylvania Avenue and got on 295.

62

1   Q.    Where did you go from there?

2   A.    We came off the Howard Road exit and came back across

3   South Capitol Street Bridge.

4   Q.    What did you do once you got off the South Capitol Street

5   Bridge?

6   A.    We went -- we parked the Caddy behind Chin mother

7   building, and then we walked down the waterfront and threw the

8   gun away.

9   Q.    Who threw the gun away?

10  A.    I don't remember if I threw it away or Chin threw it

11  away.

12  Q.    Were you together?

13  A.    Yeah.  It's either I threw the gun away and he threw the

14  clip away or vice-versa.

15  Q.    What happened after you threw the gun in the river?

16  A.    We was walking back down to our neighborhood.  So I asked

17  Chin did he want to go get Robin.

18          THE COURT:  Did he want to do what?

19          THE WITNESS:  Did he feel like going to get Robin.

20  So he said, do you want to?  So I said, it don't matter to me,

21  I don't give a fuck, like that.  So he said, I don't got not

22  more iron.  So I said, take me to get mine.  So I went to get

23  my .30 carbine, the gun that you showed earlier.

24  BY MR. ZEIDENBERG:

25  Q.    Where did you get it from?

63

1   A.   From over this girl's house that I was messing with at

2   the time.

3   Q.   Did you get the gun?

4   A.   Yeah.

5   Q.   What happened after you got the gun?

6   A.   So we went around Wheeler Road.   So I was strapped and

7   he wasn't strapped.

8   Q.   Why were you going to Wheeler Road?

9   A.   To try to catch Robin so we can kill her.

10  Q.   What happened when you got to Wheeler Road?

11  A.   When we got there we didn't see her car there, so we went

12  and parked.   And I still had the scanner in my ear, my police

13  scanner, I still had it on.   So we went into -- we got in some

14  bushes whereas so we could see when she pulled up, we got in

15  some bushes.   So we stayed right there for a while.   We stayed

16  right there for probably about an hour.

17       On my police scanner I kept on hearing the police was

18  nearby, they was like a couple of streets over.   So I told --

19  I told Chin that it sounded like -- I took the plug out so he

20  can hear it.   I didn't want him to think I was faking, so I

21  let him hear it.   I let him hear the police thing come across

22  the scanner.   And I told him that the police was in the area,

23  and let him hear it.   So he asked me did I want to leave.   So

24  I said, it would probably be the safest thing to do for right

25  now.   So we left.

64

1  Q.    When Chin ran back to the car initially after you left

2  the house, did you have any conversation with him while you

3  were driving back to the waterfront?

4  A.    When we was going up Ridge Road, right after we left, --

5  before any of this even took place he -- Chin used to always

6  keep on saying that the scanner was fake, and this and that,

7  it don't pick up shit, and all this stuff.  So after when --

8  after we killed Chrissy -- so we was going up Ridge Road -- so

9  I took the ear plug out and turned the scanner up so he can

10  hear the call, so he can hear the call for gunshots going

11  across -- coming out on the radio.  So I turned down the radio

12  in the car -- so I said, do you hear that, do you hear that

13  shit, I said, you talking about this joint don't work, do you

14  hear that, like that.  And then he rubbed me on my head like

15  that, like I was a little boy, way to be there Bama, like

16  that.  He just said, way to be there Bama, like that.

17  Q.    Mr. Montgomery, when you were at the window, before you

18  ran out the back of the house, did you see who it was Chin was

19  running up to, which of the three women?

20  A.    If she was in this room right now today I don't know how

21  she looks.

22  Q.    But you said there were three women that you did know --

23  I mean, there were two women -- there were three women

24  altogether, correct?

25  A.    Right.

65

1   Q.   And you knew two of them?

2   A.   Right.

3   Q.   Who were the two you knew?

4   A.   Rashida and Trina.

5   Q.   The person that Chin ran up to was it Trina?

6   A.   No.

7   Q.   Was it Rashida?

8   A.   No.

9   Q.   Was it the person that Big Jim had identified as Chrissy?

10  A.   Yes.

11  Q.   What did you see Chrissy do when Chin ran up to her?

12  A.   She was screaming.

13  Q.   After she screamed what happened?

14  A.   She fell.

15  Q.   After Chrissy fell did you see what Chin did?

16  A.   No.

17  Q.   Is that when you ran out?

18  A.   Yes.

19       MR. ZEIDENBERG:   Your Honor, this might be a good

20  time to break for the day.

21       THE COURT:   Very well.  We will recess for the day,

22  ladies and gentlemen, and reconvene tomorrow morning at 10:00.

23       (Jury out.)

24       (Whereupon, the hearing was adjourned at 4:20 p.m.)

25             - - - - - -



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES, | : |
| GOVERNMENT, | : |
| | : |
| VS. | : CR. NO. 98-329 |
| | : |
| VINCENT HILL, | : |
| JEROME MARTIN, | : |
| SAMUEL CARSON, | : |
| WILLIAM K. SWEENEY, | : |
| SEAN COATES, | : |
| DEFENDANTS. | : |
| | : |
| UNITED STATES | : |
| GOVERNMENT, | : |
| | : |
| VS. | : CR. NO. 99-348 |
| | : |
| GARY PRICE, | : |
| DEFENDANT | : |

FILED

JUL 19 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
MARCH 14, 2001
(MORNING SESSION)
(10:20 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:            PHYLLIS MERANA
                          6816 U. S. DISTRICT COURT
                          3RD & CONSTITUTION AVE., N.W.
                          WASHINGTON, D. C. 20001

2



| | | |
|---|---|---|
| 1 | FOR THE GOVERNMENT: | PETER ZEIDENBERG, AUSA |
| | | ANJALI CHATURVEDI, AUSA |
| 2 | | 555 4TH ST., N.W. |
| | | WASHINGTON, D. C. 20001 |
| 3 | | |
| | FOR THE DEFENDANT HILL: | CHRISTOPHER DAVIS, ESQ. |
| 4 | | 601 INDIANA AVE., N.W. |
| | | #910 |
| 5 | | WASHINGTON, D. C. 20004 |
| 6 | FOR THE DEFENDANT MARTIN: | JOANNE HEPWORTH, ESQ. |
| | | 305 H STREET, N.W. |
| 7 | | 2ND FLOOR |
| | | WASHINGTON, D. C. 20001 |
| 8 | | |
| 9 | FOR THE DEFENDANT CARSON: | JOSEPH BESHOURI, ESQ. |
| | | LEXI NEGIN-CHRIST, ESQ. |
| 10 | | 419 7TH STREET, N.W. |
| | | WASHINGTON, D. C. 20004 |
| 11 | | |
| | FOR THE DEFENDANT SWEENEY: | STEVEN R. KIERSH, ESQ. |
| 12 | | 717 D STREET, N.W. |
| | | SUITE 400 |
| 13 | | WASHINGTON, D. C. 20004 |
| 14 | | |
| | FOR THE DEFENDANT COATES: | FREDERICK JONES, ESQ. |
| 15 | | 901 6TH STREET, S.W. |
| | | #409 |
| 16 | | WASHINGTON, D. C. 20024 |
| 17 | FOR THE DEFENDANT PRICE: | JONATHAN ZUCKER, ESQ. |
| | | 601 INDIANA AVE., N.W. |
| 18 | | #901 |
| | | WASHINGTON, D. C. 20004 |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

```
 1   A.   (INDICATING.)

 2   Q.   OKAY.  SO IT'S BEFORE YOU GET TO THE SIDEWALK WHICH RUNS

 3   IN BETWEEN THE TWO SETS OF BUILDINGS?

 4   A.   YES.

 5   Q.   AND THE WOMAN THAT YOU BELIEVED TO HAVE BEEN CHRISSY,

 6   MR. MONTGOMERY -- WHERE WAS SHE THE LAST TIME YOU SAW HER?

 7   A.   IN THE YARD.

 8   Q.   OKAY.  WHERE WAS SHE -- IF YOU COULD JUST INDICATE AGAIN

 9   WITH THE POINTER.  LET ME ERASE THE MARK YOU HAVE THERE.  AS

10   NEARLY AS YOU CAN REMEMBER, WHERE WAS CHRISSY THE LAST TIME

11   YOU SAW HER ALIVE?

12   A.   COMING OUT OF -- COMING OUT -- WALKING TOWARDS THE EXIT

13   TO COME OUT OF THE YARD.

14   Q.   TO THE SIDEWALK?

15   A.   RIGHT.

16   Q.   MR. MONTGOMERY, I'D LIKE TO ASK YOU SOME QUESTIONS NOW

17   ABOUT A TRIPLE MURDER WHICH OCCURRED IN TEMPLE HILLS,

18   MARYLAND ON NOVEMBER 17, 1996.  WERE YOU PRESENT WHEN THOSE

19   MURDERS TOOK PLACE?

20   A.   YES.

21   Q.   AND HAVE YOU PLED GUILTY TO PARTICIPATING IN THOSE

22   MURDERS?

23   A. YES.

24   Q.   I'D LIKE TO TALK TO YOU ABOUT THOSE MURDERS AND THE

25   EVENTS THAT LED UP TO THEM AT THIS TIME.
```

```
 1          NOW, SOMETIME PRIOR TO THESE MURDERS, WAS THERE --
 2   DID YOU HAVE A CONVERSATION WITH ANY OF YOUR CO-DEFENDANTS
 3   OR YOUR FORMER -- ANY OF THE DEFENDANTS IN THIS CASE ABOUT
 4   ATTENDING A FIGHT IN LAS VEGAS?
 5   A.  ME AND "CHIN".
 6   Q.  CAN YOU TELL US ABOUT THAT CONVERSATION -- WHAT YOU
 7   REMEMBER OF IT?
 8   A.  BASICALLY, HE ASKED ME WAS I GOING TO THE FIGHT.
 9   Q.  WHAT FIGHT WAS IT?
10   A.  HOLYFIELD-TYSON.  HOLYFIELD-TYSON ONE.
11   Q.  AND DO YOU RECALL WHERE THAT FIGHT WAS GOING TO BE HELD?
12   A.  LAS VEGAS.
13   Q.  DID "CHIN" TELL YOU WHO WAS GOING TO BE GOING TO THE
14   FIGHT?
15   A.  I DON'T KNOW IF HE TOLD ME AT THAT PARTICULAR TIME.
16   Q.  AT SOME POINT, DID HE?
17   A.  YES.
18   Q.  WHO DID HE SAY WAS GOING TO GO?
19   A.  THAT HIM AND "DRAPER" WAS GOING, AND THAT IF I WAS
20   GOING, THAT I NEEDED TO GIVE "DRAPER" MY -- GIVE HIM MY
21   MONEY OR EITHER GIVE THE MONEY TO "DRAPER" SO THAT "DRAPER"
22   COULD GIVE IT TO SOMEBODY HE KNEW -- A TRAVEL AGENT OR
23   SOMETHING, SO THEY COULD BOOK MY RESERVATIONS.
24   Q.  DID YOU GO TO THE FIGHT?
25   A.  NO.
```

```
 1   Q.  WHY NOT?

 2   A.  MY FINANCIAL STATUS WAS MESSED UP.

 3   Q.  WHAT DO YOU MEAN BY THAT?

 4   A.  I DIDN'T HAVE THAT MUCH MONEY.

 5   Q.  NOW, DID YOU HAVE A CONVERSATION WITH "CHIN" AFTER THE

 6   FIGHT -- AFTER HE GOT BACK FROM THE FIGHT?

 7   A.  YES.

 8   Q.  WHAT DID HE TELL YOU ABOUT HIS TRIP?

 9   A.  BASICALLY, WHEN WE FIRST SPOKE ABOUT IT, HE WAS JUST

10   TELLING ME HOW THE GIRLS WAS UP THERE AND STUFF LIKE THAT.

11   THAT THEY HAD A NICE TIME.  IT WAS REAL NICE.  HE SAID THAT

12   HIM, "DRAPER" AND -- "CHIN," "DRAPER" AND BAM AND "GOOCH"

13   HUNG TOGETHER MOST OF THE TIME THEY WAS UP THERE.  AND HE

14   SAID THAT THE DUDE, "LONNIE," HAD WON LIKE $50,000.00.

15   LONNIE -- HE SAID HE HAD WON LIKE $50,000.00 WHILE HE WAS UP

16   THERE.

17   Q.  DID YOU KNOW THE NAME "LONNIE?"

18   A. NO.

19   Q.  WHAT DID "CHIN" TELL YOU ABOUT "LONNIE" AND WHO HE WAS?

20   A.  "CHIN" SAID THAT "DRAPER" TOLD HIM THAT "LONNIE" WAS

21   WORTH LIKE A HALF A MILLION OR BETTER.

22   Q.  WHERE WAS "LONNIE" FROM?

23   A.  I DON'T KNOW.

24   Q.  DID "CHIN" AT SOME POINT TELL YOU WHERE HE LIVED?

25   A.  IT HAD LATER BEEN DISCUSSED.  I DON'T KNOW IF "DRAPER"
```

1    SAID IT OR "CHIN" SAID IT, BUT --

2    Q.   WHERE DID THEY TELL YOU HE LIVED OR HE WAS FROM?

3    A.   TEMPLE HILLS.   THAT HE HAD A CRAP HOUSE OUT THERE.

4    Q.   I AM SORRY?

5    A. THAT HE HAD A CRAP HOUSE OUT IN TEMPLE HILLS.

6    Q.   WAS THERE A DISCUSSION BETWEEN YOU AND "CHIN" AND

7    "DRAPER" ABOUT ROBBING "LONNIE"?

8    A.   YES.

9    Q.   CAN YOU TELL THE LADIES AND GENTLEMEN ABOUT THAT?

10    A.   FIRST, "CHIN" HAD TOLD ME THAT "DRAPER" HAD A MOVE LINED

11    UP WITH THE DUDE, "LONNIE", THAT HE HAD ALREADY TOLD ME

12    ABOUT.   IT'S THE SAME DUDE THAT HE WAS SAYING WON THE

13    $50,000.00.  SO WHEN HE WAS TELLING ME THAT "DRAPER" HAD THE

14    MOVE LINED UP, I ASKED HIM WAS I WITH IT.  AND HE SAID

15    "YES."  BUT HE TOLD ME, "DON'T TELL `BIRD' ABOUT IT."

16    Q.   DID "CHIN" SAY WHY NOT TO TELL "BIRD" ABOUT IT?

17    A. BECAUSE "BIRD" DON'T EVER WANT TO DO NOTHING.  WHENEVER

18    THINGS HAPPEN, "BIRD" DON'T EVER WANT TO DO NOTHING.  HE

19    JUST ALWAYS WANTS TO BE THE DRIVER.

20    Q.   WHAT ELSE DID "CHIN" TELL YOU ABOUT IT?

21    A.   I MEAN, AT THAT PARTICULAR TIME, I BELIEVE THAT WAS ALL

22    THAT PARTICULAR CONVERSATION WAS.

23    Q.   DID "CHIN" TELL YOU HOW MUCH MONEY HE HOPED TO MAKE OUT

24    OF THIS MOVE?

25    A.   NOT AT THAT PARTICULAR TIME.

1   Q.  AT SOME POINT LATER, DID HE?

2   A.  YES.  WHEN WE FURTHER DISCUSSED ROBBING "LONNIE".

3   Q.  WHAT DID "CHIN" TELL YOU ABOUT THAT?

4   A.  I AM NOT SURE WHO GAVE THE MOST INSIGHT AS FAR AS ABOUT

5   THE DUDE "LONNIE" OR WHATEVER.  I DON'T KNOW "LONNIE".  I

6   NEVER KNEW HIM.  IF I SEEN HIM TODAY, I WOULDN'T KNOW WHO HE

7   WAS.  BUT I KNOW MORE OR LESS THE CONVERSATION CONSISTED OF

8   THAT "LONNIE" WAS A BITCH ASS NIGGER, THAT HE WAS SOFT, THIS

9   AND THAT, AND THAT WE COULD ROB HIM AND WE DIDN'T HAVE TO

10  KILL HIM.  AND THAT IF WE EVER GET LOW ON MONEY AGAIN, WE

11  COULD SNATCH HIM AGAIN.

12  Q.  IF YOU EVER WHAT?

13  A.  IF WE EVER GET LOW ON MONEY AGAIN, THAT WE WOULD BE ABLE

14  TO SNATCH HIM AGAIN.

15  Q.  WAS THERE AN AMOUNT OF MONEY DISCUSSED ABOUT HOW MUCH

16  YOU WERE HOPING TO GET FROM THIS?

17  A.  250,000.00.

18  Q.  WHO HAD THAT FIGURE?

19  A.  "CHIN"

20  Q.  DID "CHIN" SAY HOW THE MONEY WOULD BE DIVIDED?

21  A.  THAT WE WOULD GET $83,000.00 APIECE.

22  Q.  SPLIT BETWEEN WHOM?

23  A.  ME, "CHIN" AND "DRAPER".

24  Q.  NOW, AT THIS TIME IN NOVEMBER OF 1996, WHAT WAS YOUR

25  FINANCIAL SITUATION LIKE?

USCA Case #21-3072    Document #2077668    Filed 07/19/01    Page 19 of 79
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 251 of 443

19

1   A.  MESSED UP.

2   Q.  HOW SO?

3   A.  WELL, MY HUSTLING WEED HAD SLOWED DOWN A LOT.  SO I

4   MEAN, MORE OR LESS, I WAS JUST HUSTLING DAY-TO-DAY.

5   Q.  WHAT WAS THE PROBLEM WITH HUSTLING OUT IN SOUTHWEST AT

6   THIS POINT, IF ANYTHING?

7   A. I WAS SELLING DIME BAGS OF WEED THEN.  SO IT TOOK LONGER

8   TO MAKE A NICE AMOUNT OF MONEY, AND TENSION WAS RUNNING HIGH

9   BECAUSE WE WERE "BEEFING" WITH L STREET.

10  Q.  AND WHAT ABOUT THE FACT THAT YOU WERE "BEEFING" WITH L

11  STREET?  HOW DID THAT AFFECT SELLING MARIJUANA OUT THERE?

12  A.  BECAUSE YOU HAVE TO BE CAUTIOUS AS TO WHO YOU SERVE OR

13  WHO YOU LET WALK UP ON YOU.  YOU HAVE TO PRETTY MUCH TRY TO

14  JUST STAY ON POINT AND TRY NOT TO LET NOBODY, YOU KNOW, GET

15  UP ON YOU THAT COULD SHOOT YOU OR WHATEVER.

16  Q.  WHAT WERE YOU GOING TO DO WITH THIS MONEY?

17  A.  WE WERE GOING TO GET SOME MORE GUNS SO WE CAN GO BACK SO

18  WE CAN GET AT "WOOZIE" AND THEM -- SO WE COULD KILL "WOOZIE"

19  AND THEM.

20  Q.  WHAT WAS THE SITUATION WITH GUNS AT THIS POINT, AS FAR

21  AS YOUR GROUP WAS CONCERNED?

22  A.  WE DIDN'T HAVE ANY.

23  Q.  WHAT HAPPENED TO THEM ALL?

24  A.  I MEAN I HAD A FEW GUNS, BUT AT THAT PARTICULAR TIME, I

25  DIDN'T HAVE THEM ANY MORE.

USCA Case #21-3072    Case 1:98-cr-00329-RCL    Document #2077668    Document 681    Filed 07/19/01    Filed 07/19/01 / Page 20 of 79    Page 252 of 443

20

1   Q.  WHAT HAD HAPPENED TO THEM?

2   A.  I HAD A S.K.S. AND THE GUY I GOT IT FROM WANTED -- I HAD

3   A S.K.S., AN ASSAULT RIFLE, AND THE GUY THAT I GOT IT FROM

4   WANTED IT BACK.  SO I HAD TO GIVE IT BACK TO HIM.  AND THEN

5   I HAD A MACHINE GUN.  I DON'T KNOW WHAT PARTICULAR KIND IT

6   WAS, BUT IN ONE INSTANCE I SHOT AT "WOOZIE" AND THEM, AND

7   THE GUN KEPT JAMMING.  I HAD CLEANED IT AND OILED IT, AND IT

8   JUST KEPT JAMMING.  SO I GOT RID OF IT.  I GAVE IT BACK TO

9   THE DUDE THAT I GOT IT FROM AND GOT MY MONEY BACK.

10  Q.  AS FAR AS YOU KNOW, WHAT DID "CHIN" TELL YOU ABOUT

11  WHETHER OR NOT HE HAD A GUN IN THAT TIMEFRAME?

12  A.  WHAT TIMEFRAME ARE YOU TALKING ABOUT?

13  Q.  WE'RE TALKING ABOUT NOVEMBER OF '96.

14  A.  DURING THE TIME WE WERE IN THE DISCUSSION TALKING ABOUT

15  ROBBING "LONNIE"?

16  Q.  YES.

17  A.  NO, WE DIDN'T HAVE A GUN.

18  Q.  DID HE HAVE A GUN?

19  A. NO.

20  Q.  WHAT ABOUT "DRAPER"?

21  A.  NONE OF US HAD GUNS.

22  Q.  OKAY.  WAS THERE A DISCUSSION BETWEEN YOU AND "CHIN"

23  ABOUT INVESTING SOME OF THE PROCEEDS YOU HOPED TO GET FROM

24  THIS ROBBERY?

25  A.  YES.

```
 1   A.  "CHIN" IS DRIVING, "DRAPER" IS IN THE PASSENGER'S SEAT,

 2   AND I AM SITTING IN THE BACK

 3   Q.  WHAT HAPPENED WHEN YOU GOT TO TEMPLE HILLS?

 4   A.  WE PARKED -- WE PARKED ON THE SAME STREET, BUT AT THE

 5   TOP OF -- THE TOP END OF THE CORNER OF WHERE THE HOUSE WAS

 6   AT.

 7   Q.  NOW, IF I COULD HAVE A25.

 8       CAN YOU TURN OFF THE JURY'S MONITOR.

 9       CAN YOU SEE THAT, MR. MONTGOMERY, ON YOUR SCREEN?

10   A.  I CAN SEE IT, BUT NOT REAL CLEAR.

11   Q.  ALL RIGHT.  HAVE YOU HAD AN OPPORTUNITY TO LOOK AT -- IN

12   FACT, I HAVE A --

13       MAY I APPROACH, YOUR HONOR?

14       THE COURT:  SURELY.

15   BY MR. ZEIDENBERG:

16   Q.  I AM SHOWING YOU WHAT'S BEEN MARKED A25, A HARD COPY OF

17   THAT PHOTOGRAPH.  DO YOU RECOGNIZE THAT?

18   A.  YES.

19   Q.  IS THAT THE AREA IN TEMPLE HILLS, MARYLAND THAT YOU WENT

20   OUT TO ON NOVEMBER 17, 1996?

21   A.  YES.

22   Q.  AND DOES THAT APPEAR TO BE A FAIR AND ACCURATE AERIAL

23   PHOTOGRAPH OF THAT AREA?

24   A.  YES.

25       MR. ZEIDENBERG:  YOUR HONOR, I MOVE TO INTRODUCE
```

```
 1    GOVERNMENT'S EXHIBIT A25.

 2              THE COURT:  GOVERNMENT'S EXHIBIT A25 IS ADMITTED.

 3                         (WHEREUPON, GOVERNMENT'S

 4                         EXHIBIT NUMBER A25 WAS

 5                         RECEIVED IN EVIDENCE.)

 6              MR. ZEIDENBERG:  AGENT LISI, I'D ASK IF YOU COULD

 7    FOCUS IN ON 25TH AVENUE, KEEPING A PORTION OF 25TH AVENUE

 8    BOTH ON IVERSON STREET AND IT LOOKS LIKE THE STREET OPPOSITE

 9    OR PARALLEL TO IVERSON.

10              THANK YOU.

11    BY MR. ZEIDENBERG:

12    Q.  ALL RIGHT, MR. MONTGOMERY.  CAN YOU SEE THAT ON YOUR

13    SCREEN NOW?

14    A.  YES.

15    Q.  ALL RIGHT.  THE STREET WHERE -- THE LOCATION YOU WERE

16    LOOKING FOR -- WHAT TYPE OF RESIDENCE OR LOCATION WAS IT?

17    WHAT DO YOU UNDERSTAND TOOK PLACE AT THAT HOUSE?

18    A.  THEY GAMBLE IN THERE.  IT WAS A CRAP HOUSE.

19    Q.  OKAY.  AND DO YOU SEE THE LOCATION OF WHERE THAT CRAP

20    HOUSE WAS LOCATED ON 25TH AVENUE IN THAT PICTURE?

21    A.  I SEE IT.  YES.

22    Q.  OKAY.  USING THE PEN -- THE LIGHT PEN NEXT TO YOUR

23    MONITOR, CAN YOU PUT AN ARROW, THE BEST YOU CAN RECALL,

24    WHERE THAT LOCATION IS?

25    A.  (DOING AS DIRECTED.)
```

1   Q.  AND IF YOU JUST TOUCH IT AGAINST THE SCREEN -- YOU HAVE

2   LEFT AN ARROW.  IS THAT THE APPROXIMATE LOCATION?

3   A.  YES.

4   Q.  AND, FOR THE RECORD, YOU'RE INDICATING A RESIDENCE

5   THAT'S LOCATED IN THE MIDDLE OF 25TH AVENUE; IS THAT

6   CORRECT?

7   A.  YES.

8   Q.  NOW, WHEN YOU FIRST CAME UP TO TEMPLE HILLS THAT NIGHT,

9   WHERE EXACTLY DID YOU, "CHIN" AND "DRAPER" GO?  WHERE DID

10  YOU PARK THE CAR?

11  A.  (INDICATING.)

12  Q.  OKAY.  AND YOU'RE INDICATING ON THE CORNER OF -- WELL,

13  YOU WERE ON 25TH AVENUE; IS THAT CORRECT?

14  A.  YES.

15  Q.  YOU WERE ON THE SAME SIDE OF THE STREET AS WHERE THE

16  CRAP HOUSE WAS LOCATED?

17  A.  RIGHT.

18  Q.  AND I TAKE IT YOU WERE POINTING TOWARDS IVERSON STREET?

19  A.  RIGHT.  YES.

20  Q.  NOW, WHEN YOU GOT THERE, WHAT HAPPENED?  WHAT DID YOU

21  DO?

22  A.  WE SAT THERE FOR A WHILE.  AND THEN "CHIN" HAD DECIDED

23  THAT IT WAS A BAD SPOT SITTING RIGHT THERE.  SO WE LEFT.  WE

24  LEFT FROM RIGHT THERE.  WE RODE AROUND.  WE WENT PAST WHERE

25  HIS BARBER SHOP WAS AT.  IT WAS CLOSED.  IT WAS ALREADY

USCA Case #21-3072    Case 1:98-cr-00329-RCL   Document #2077669   Document 681   Filed 07/19/01   Page 32 of 79   Filed 07/19/01   Page 256 of 443

32

1   CLOSED.  WE WENT TO WENDY'S AND GOT SOMETHING TO EAT.  WE

2   CAME BACK.  THEN WE PARKED OVER HERE.  (INDICATING.)

3   Q.  NOW, YOU'RE INDICATING 25TH AVENUE ON THE OTHER SIDE OF

4   COLEBROOK ROAD?

5   A. YES.

6   Q.  OR COLEBROOK DRIVE.  YOU'RE STILL ON THE SAME SIDE OF

7   THE STREET AS WHERE THE CRAP HOUSE IS LOCATED?

8   A.  YES.

9   Q.  NOW, AT SOME POINT DID YOU GO BACK TO YOUR HOUSE?

10  A.  YES.

11  Q.  AND I SAY "YOUR HOUSE."  THAT WOULD BE YOUR MOTHER'S

12  HOUSE?

13  A.  RIGHT.

14  Q.  DID SHE LIVE NEARBY THERE?

15  A.  ONE BLOCK OVER.

16  Q.  WHAT STREET DID SHE LIVE ON AT THE TIME?

17  A. 26TH AVENUE.

18  Q.  WHY DID YOU GO TO YOUR HOUSE?

19  A.  WE HAD CUT THE ENGINE OFF IN THE VAN.  SO WE WENT IN MY

20  MOTHER'S HOUSE AND DRUNK SOME TEA AND HOT CHOCOLATE.

21  Q.  HOW LONG WERE YOU AT YOUR MOTHER'S HOUSE, WOULD YOU

22  ESTIMATE?

23  A.  BETWEEN 15 AND 30 MINUTES.

24  Q.  DID YOU STAY THERE OR DID YOU LEAVE?

25  A.  WE LEFT BACK OUT.

1   Q.   WHERE DID YOU GO?

2   A.   WE CAME BACK -- WE CAME BACK AND DROVE -- WE DROVE -- WE

3   DROVE IN THE BACK ON THE PARKING LOT TO SEE IF WE SEE ANY

4   CAR THAT "LONNIE" MIGHT BE DRIVING BECAUSE "DRAPER" WAS

5   SAYING THAT HE DIDN'T SEE "LONNIE" -- I GUESS WHATEVER CAR

6   "LONNIE" NORMALLY DRIVES, HE DIDN'T SEE IT.

7   Q.   NOW, WHAT PARKING LOT ARE YOU REFERRING TO?

8   A.   THE PARKING LOT BEHIND "LONNIE'S HOUSE -- BEHIND THE

9   CRAP HOUSE.

10  Q.   IS THAT SHOWN HERE IN THIS PICTURE?

11  A.   YES.

12  Q.   OKAY.   THAT WOULD BE WHAT LOOKS LIKE A PARKING LOT RIGHT

13  BEHIND WHERE THE CRAP HOUSE IS LOCATED?

14  A.   RIGHT.

15  Q.   WHAT HAPPENED THEN?

16  A.   WE CAME FROM BEHIND THERE.  WE MADE A RIGHT COMING OUT

17  OF THERE AND RODE BACK DOWN TOWARDS WHERE IVERSON STREET IS

18  AT.

19  Q.   AND WENT WHERE?

20  A.   AND WE WAS LOOKING ON THAT STREET TO SEE -- SO WE COULD

21  SEE IF LONNIE'S CAR WAS OUT THERE.

22  Q.   DID YOU SPOT LONNIE'S CAR AT THAT POINT?

23  A.   NO.

24  Q.   WHERE DID YOU GO THEN?

25  A.   SO WE WENT AND GOT "BIRD."

34

```
 1   Q.  WHERE DO YOU GO TO GET "BIRD"?

 2   A.  KENNILWORTH.

 3   Q.  TELL US ABOUT THAT.

 4   A. BEFORE WE WENT AND GOT HIM, "DRAPER" CALLED HIM ON HIS

 5   CELLPHONE TO MAKE SURE HE WAS THERE TO LET HIM KNOW WE WERE

 6   ABOUT TO COME AND PICK HIM UP.

 7   Q.  AT THIS POINT, HAD "BIRD" BEEN TOLD WHAT WAS GOING TO

 8   HAPPEN THAT NIGHT?

 9   A.  NO.

10   Q.  WHAT HAD CHANGED?  WHY DID YOU MAKE A DECISION TO GET

11   "BIRD"?

12   A.  BECAUSE WE DIDN'T KNOW IF "LONNIE" WAS IN THE HOUSE, AND

13   WE DIDN'T KNOW HOW MANY PEOPLE WAS IN THE HOUSE, IF, INDEED,

14   "LONNIE" WAS IN THERE.

15   Q.  HOW WAS "BIRD" GOING TO HELP YOU WITH THAT?

16   A.  BECAUSE THEY SAID THAT "BIRD" GO THERE SOMETIMES AND

17   GAMBLE AND THAT "BIRD" AND "LONNIE" WAS COOL AND THAT

18   "LONNIE" BE GIVING "BIRD" TABLE SCRAPS -- LIKE GIVING HIM

19   TWO OR THREE HUNDRED DOLLARS.  THEY SAID THAT LONNIE USED TO

20   GIVE "BIRD" TABLE SCRAPS -- LIKE GIVE HIM TWO OR THREE

21   HUNDRED DOLLARS FOR NOTHING.

22   Q.  AND WHY WAS IT HELPFUL, IN YOUR UNDERSTANDING, TO HAVE

23   "BIRD" ALONG IF HE WAS COOL WITH "LONNIE"?

24   A.  SO THAT "BIRD" COULD GO IN TO SEE HOW MANY PEOPLE WAS IN

25   THE HOUSE OR TO SEE IF "LONNIE" WAS IN THERE.
```

1    A.   THE LIVING ROOM.

2    Q.   WHAT HAPPENED NEXT?  DID YOU SEE WHERE "DRAPER" WAS AT

3    THIS POINT?

4    A.   NOT FULLY.  I SEEN HIM.  HE WAS TO MY LEFT, BUT I DIDN'T

5    SEE WHAT EXACTLY HE WAS DOING.

6    Q.   WHO DID HE HAVE?

7    A.   HE HAD THE OTHER GUY, "LONNIE".

8    Q.   WHAT HAPPENED NEXT?

9    A.   SO DARNELL MACK WAS -- HE SAID, "I AIN'T EVEN LOOKING AT

10   YOU."  HE SAID, "I AIN'T TRYING TO SEE YOUR FACE."

11            I WASN'T WORRIED ABOUT HIM SEEING MY FACE ANYWAY

12   BECAUSE HE HAD THE MASKS ON," BUT I TRIED TO LIFT UP HIS --

13   I WAS IN THE PROCESS OF LIFTING UP HIS JACKET SO I COULD

14   SHOCK HIM WITH THE STUN GUN.  AND THEN --

15            MR. KIERSH:  YOUR HONOR, I WAS NOT ABLE TO

16   UNDERSTAND THE LAST RESPONSE OF THE WITNESS.

17            THE COURT:  HE WAS LIFTING UP HIS JACKET SO HE

18   COULD STUN HIM WITH THE STUN GUN.

19            MR. KIERSH:  OKAY.

20            THE WITNESS:  SO THEN "DRAPER" STARTED SHOOTING --

21   STARTED BUSTING.  I DIDN'T KNOW WHY.  SO I MEAN I WAS

22   LIKE -- WHEN THE SHOTS FIRST HAPPENED, I WAS KIND OF LIKE

23   AWESTRUCK AS TO WHY HE WOULD SHOOT "LONNIE" WHEN THAT'S THE

24   ONE WE WANT.  THEN HE CAME -- HE HIT -- HE SHOT DARNELL

25   MACK.

USCA Case #21-3072    Case 1:98-cr-00329-RCL    Document #2077668    Document 681    Filed 07/19/01    Filed 07/18/2024    Page 52 of 79    Page 260 of 443

52

1        AND I MEAN I WAS RIGHT -- WE WAS CLOSE.  AND THE

2  GUNPOWDER RESIDUE HAD GOT UP MY NOSE.  SO I WAS LIKE --

3  (SNIFFING) -- DOING LIKE THAT TO CLEAR MY SINUSES UP.  THEN

4  HE SHOT "LONNIE" SOME MORE.  AND THEN HE SHOT DARNELL MACK

5  SOME MORE AND THEN RAN OUT THE DOOR.  SO I WAS STILL

6  STANDING RIGHT THERE DOING LIKE THIS -- (INDICATING) --

7  CLEARING MY SINUSES.  THEN I RAN OUT.  I RAN OUT THE DOOR AS

8  WELL.

9  Q.  WHO RAN OUT THE DOOR FIRST?

10  A.  "DRAPER" DID.

11  Q.  DID THE DOOR ACTUALLY CLOSE BEFORE YOU WENT OUT?

12  A.  YES.

13  Q.  WHAT TYPE OF DOOR ARE WE TALKING ABOUT?

14  A.  A SCREEN DOOR.

15  Q.  DID YOU OPEN THE SCREEN DOOR?

16  A.  I PUSHED IT OPEN WITH MY THUMB.

17  Q.  WHAT HAPPENED OR WHAT DID YOU SEE ONCE YOU GOT TO THE

18  DOOR?

19  A.  I WAS COMING OUT BASICALLY LIKE RIGHT -- PRETTY MUCH

20  RIGHT AFTER HIM.  AND HE SHOT WHILE WE WERE OUTSIDE, BUT I

21  DIDN'T SEE HIM ACTUALLY SHOOT THE GIRL, BUT HE DID SHOOT

22  WHEN WE WAS OUTSIDE WHEN I WAS COMING OUT.

23  Q.  HOW MANY GUNSHOTS DID YOU HEAR AS YOU WERE GOING OUT?

24  A.  WELL, WE WERE RUNNING ACROSS THE LAWN -- THE GRASS.  AND

25  HE SHOT BACK.  AND I JUMPED.  I JUMPED WHILE I WAS RUNNING

1   BECAUSE HE ALMOST SHOT ME.  HE WAS SHOOTING BACK WHILE HE

2   WAS RUNNING.  AND I WAS THINKING THAT HE ALMOST SHOT ME.  SO

3   JUST, OUT OF INSTINCT, I JUMPED.

4   Q.  WHEN YOU RAN OUT THE DOOR, DID YOU SEE ANYONE LAYING IN

5   YOUR PATH?

6   A.  WHEN I CAME OUT, I HAD TO JUMP ACROSS THE GIRL.  SHE WAS

7   LAYING ON THE PORCH.

8   Q.  WHERE DID YOU GO ONCE YOU JUMPED OVER THE GIRL ON THE

9   PORCH?

10  A.  I RAN BACK TO THE VAN.

11  Q.  WHO GOT INTO THE VAN FIRST?

12  A.  "DRAPER" DID.

13  Q.  AND THEN?

14  A.  AND THEN ME.

15          MR. ZEIDENBERG:  WOULD YOU TURN OFF THE JURY'S

16  MONITOR.

17          THE COURT:  WOULD THIS BE AN APPROPRIATE TIME FOR

18  A RECESS?

19          MR. ZEIDENBERG:  THAT WOULD BE FINE, YOUR HONOR.

20          THE COURT:  ALL RIGHT.  TEN MINUTES, LADIES AND

21  GENTLEMEN.

22          (RECESS WAS TAKEN.)

23          (JURY OUT.)

24

25

1    YOUNG WOMAN?

2    A.   YES.

3              THE COURT:   WHO SHOT DARNELL MACK?

4              THE WITNESS:   "DRAPER"

5              THE COURT:   ALL RIGHT.   YOU HAD ONLY A STUN GUN;

6    IS THAT RIGHT?

7              THE WITNESS:   YES.

8              THE COURT:   ALL RIGHT.

9    BY MR. ZEIDENBERG:

10   Q.   AND JUST SO IT'S CLEAR, WHO SHOT "LONNIE" GASKINS?

11   A.   "DRAPER."

12   Q.   WHAT WERE YOU DOING AT THE TIME "DRAPER" SHOT GASKINS

13   AND MACK?

14   A.   TRYING TO CLEAR MY SINUSES AT FIRST.   I MEAN HE SHOT THE

15   GUY WITH THE BLUE JACKET, "LONNIE," FIRST.   AND THEN WHEN HE

16   SHOT DARNELL MACK -- WHEN HE FIRST SHOT "LONNIE," I LOOKED

17   BECAUSE I HAD JUMPED WHEN I FIRST HEARD THE GUNSHOT.   I

18   JUMPED FROM THE BLAST.   AND THEN HE SHOT DARNELL MACK.   AND

19   THE GUN WAS CLOSE TO MY FACE, SO THE GUNPOWDER RESIDUE OR

20   WHATEVER HAD GOT INTO MY SINUSES.   I WAS DOING LIKE THAT TO

21   CLEAR MY SINUSES.   (INDICATING.)

22   Q.   THEN YOU SAID HE WENT BACK AND SHOT GASKINS?

23   A.   HE WENT BACK AND SHOT "LONNIE", AND THEN SHOT DARNELL

24   MACK AGAIN.

25   Q.   NOW, WHEN YOU WERE LEAVING THE HOUSE, YOU SAID YOU

```
 1   STEPPED OVER A WOMAN?
 2   A.   YES.
 3   Q.   AND IF WE COULD TURN OFF THE JURY'S MONITOR, MR. WEST.
 4         I WOULD LIKE TO SHOW YOU WHAT'S MARKED PG102 AND
 5   PG103.  HAVE YOU HAD AN OPPORTUNITY TO LOOK AT THOSE
 6   PHOTOGRAPHS TODAY AND ALSO PRIOR TO THIS MORNING?
 7   A.   YES.
 8   Q.   AND ARE THEY FAIR AND ACCURATE REPRESENTATIONS OF WHAT
 9   THE SCENE LOOKED LIKE AS YOU WERE LEAVING THE HOUSE THAT
10   DAY?
11   A.   YES.
12         MR. ZEIDENBERG:  YOUR HONOR, I MOVE TO INTRODUCE
13   PG102 AND 103 AND ASK TO PUBLISH THEM TO THE JURY, STARTING
14   WITH PG102.
15         THE COURT:  AND THAT'S 103?
16         MR. ZEIDENBERG:  THE ONE THAT IS ON THE MONITOR
17   RIGHT NOW IS 102, YOUR HONOR, AND THE CLOSE-UP IS 103.
18         THE COURT:  ALL RIGHT.
19         YOU HAVE SEEN THEM BOTH?
20         THE WITNESS:  YES.
21         THE COURT:  ARE THEY BOTH FAIR AND ACCURATE?
22         THE WITNESS:  YES.
23         THE COURT:  GOVERNMENT'S EXHIBITS PG102 AND 103
24   ARE ADMITTED.
25
```



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          . Docket No. CR 98-329

      Government,                      . Washington, D.C.
                                   . March 14, 2001
  vs.                              . 2:20 p.m.

VINCENT HILL,                      . (AFTERNOON SESSION)
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
SEAN COATES,                       . **FILED**

    Defendants                     . MAR 1 1 2003

. . . . . . . . . . . . . . . .    .
                                   . NANCY MAYER WHITTINGTON, CLERK
                                   .   U.S. DISTRICT COURT
UNITED STATES OF AMERICA,          .

      Government,                      .
                                   . Docket No. CR 99-348
  vs.                              .

GARY PRICE,                        .

    Defendant.                     .

. . . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001



BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

2

```
For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                               LEXI NEGIN-CHRIST, ESQ.
                               419 7th Street, N.W.
                               Washington, D.C.  20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                               717 D Street, N.W.
                               Suite 400
                               Washington, D.C.  20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                               901 6th Street, S.W.
                               Suite 409
                               Washington, D.C.  20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                               601 Indiana Ave., N.W.
                               Suite 901
                               Washington, D.C.  20024

Court Reporter:                BEVERLY J. BYRNE
                               Official Court Reporter
                               Room 6810 U.S. Courthouse
                               Washington, D.C.  20001
                               (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

8

1      (End of bench conference.)

2          THE COURT:  The objection is overruled.  You may

3   proceed.

4   BY MR. ZEIDENBERG:

5   Q.   What did Chin tell you about his conversation with

6   Draper?

7   A.   He said that when he went to see Draper, he specifically

8   asked him, who did he tell about the murder that happened out

9   in Temple Hill.  He said that Draper told him the only person

10  he told was Butchie, his cousin.

11  Q.   And did you know who Butchie was?

12  A.   Yes.

13  Q.   Who --

14  A.   Butchie is Draper cousin.

15  Q.   What did Chin say about the fact that Draper had told

16  Butchie?

17  A.   He said that if we hit Butchie, then they don't have no

18  case, but eventually they was going to come and get us, if we

19  don't hit Butchie.

20  Q.   And when he said hit Butchie or get Butchie, what did you

21  understand that to mean?

22  A.   To kill him.

23  Q.   When he explained that to you, did that sound like a

24  reasonable proposition, a reasonable plan?

25  A.   Yes.

9

1  Q.   Did Chin tell you what he thought would happen to you and

2  him if you didn't kill Butchie?

3  A.   Eventually that they was going to come and pick us up

4  too.

5  Q.   On the triple?

6  A.   Yes.

7  Q.   Now, directing your attention to July 31, 1997, were you

8  arrested, along with Sam Carson, Chin, on that date?

9  A.   Yes.

10  Q.   Where was it that you were arrested?

11  A.   On Second Street in Southwest.

12         THE COURT:  I'm sorry.  I didn't get your date

13  again?

14         MR. ZEIDENBERG:  July 31, '97.

15  BY MR. ZEIDENBERG:

16  Q.   At the time you were arrested, what did you understand

17  you were being charged in connection with?

18  A.   When we first got arrested, they didn't say what we was

19  being charged for.  I mean, when the Metropolitan Police first

20  grabbed us, they didn't say where they was taking us or why we

21  was being handcuffed.

22  Q.   Where did they take you eventually?

23  A.   To the Metropolitan Police Department Homicide.

24  Q.   At some point did you come to learn what it was they

25  wanted to talk to you about and what you were arrested for?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

14

1   and shot the girl and I said when the gunshots started that I

2   was telling Chin to pull off, to pull off, and we left.

3   Q.   Now, did you identify the person that you believe Draper

4   went into the house with?

5   A.   Yes.

6   Q.   Who did you say Draper went into the house with?

7   A.   J.P.

8   Q.   And who is J.P.?

9   A.   I don't really know.

10  Q.   Is he an actual person?

11  A.   Yeah, I know him from -- met him one time with Draper,

12  and me and Bird talked about robbing him before.

13  Q.   Can you explain -- first of all, when you were talking to

14  the police, before you gave this statement, who did they tell

15  you they knew was involved in the murder?

16  A.   Excuse me?

17  Q.   When you were talking to the police prior to giving this

18  statement, who did they tell you they believed was involved in

19  this?

20  A.   Me, Chin, Bird, and Draper.

21  Q.   And when you gave this statement that you gave, blaming

22  basically Draper and this person named J.P. -- well, let me

23  ask you this.

24      What did you tell in your statement to the police abut

25  whether what you, Chin, and Birdy knew about what was going to

15

1   happen?

2   A.    I told them that we didn't have no knowledge of what was

3   going to happen, and I told them we didn't have nothing to do

4   with it or have any knowledge of what was going to happen.

5   Q.    Now, what was going through your mind when you gave this

6   statement?  What was your thinking?

7   A.    I was upset that -- I was already upset that Draper had

8   told his cousin about what had happened.  Because of him

9   telling Butchie, it brought the heat on all of us.

10  Q.    So, therefore, what?

11  A.    So I tried to disassociate me, Bird, and Chin with having

12  anything to do with it and blame it on Draper.

13  Q.    And your reason for wanting to blame it on Draper was

14  what?

15  A.    Because he told his cousin, and his cousin was an

16  informant.

17  Q.    How did you learn that his cousin was an informant?

18  A.    Chin said that Draper later found out that Butchie was

19  cooperating with the FBI.

20  Q.    When did Chin tell you that?

21  A.    Not the same day when he went to see Draper.  It was at a

22  later time.

23  Q.    Now, after you gave this statement, the statement was an

24  oral statement or a written statement at this point?

25  A.    What do you mean?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

16

1  Q.  Was it -- at this point was it a written statement or are

2  you just telling them what happened?

3  A.  I believe I just told them.  I'm not certain.

4  Q.  Okay.  At some point did you give a written statement

5  saying basically the same thing that you just said to the

6  Prince George's County Homicide?

7  A.  Yes.

8        MR. ZEIDENBERG:  May I approach?

9        THE COURT:  Surely.

10  BY MR. ZEIDENBERG:

11  Q.  Showing you what's been marked M47 and ask you if you

12  recognize it?

13  A.  Yes.

14  Q.  What is M47?

15  A.  It's a statement of victim, witness, suspect.  This is

16  the statement that I wrote.

17  Q.  Is that your handwriting?

18  A.  Yes.

19        MR. ZEIDENBERG:  Your Honor, I'd move to introduce

20  Government's Exhibit M47?

21        MR. KIERSH:  Objection.

22        THE COURT:  Approach the bench.

23      (Bench conference on the record.)

24

25

22

1          THE COURT:  August 5 he went into the Grand Jury in

2    Prince George's County?

3          MR. ZEIDENBERG:  Yes, Your Honor.

4          THE COURT:  All right.

5    BY MR. ZEIDENBERG:

6    Q.    And at the time you appeared in the Grand Jury at Prince

7    George's County, were you asked to adopt that statement that's

8    before you, sitting right before you, M47?

9    A.    What do you mean by adopt?

10   Q.    Were you asked whether or not your statement about the

11   triple murder was true and accurate?

12   A.    Yes.

13   Q.    And they referred specifically to that handwritten

14   statement?

15   A.    Yes.

16   Q.    They asked you in the Grand Jury is that a truthful

17   recitation of what happened?

18   A.    Yes.

19   Q.    What did you say about it?

20   A.    I said that it was.

21   Q.    And I take it was that the truth or a lie?

22   A.    That was a lie.

23   Q.    Now, after you left the Grand Jury in Prince George's

24   County, were you brought over to the District of Columbia and

25   asked to go into the Grand Jury here?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

23

1    A.    Yes.

2    Q.    And I take it after you -- well, why don't you tell us.

3    After you gave that statement in Prince George's County and

4    you went into the Grand Jury, what happened to the charges

5    against you in Prince George's County?

6    A.    They was -- I was charged in D.C. with them.

7    Q.    Okay.  You were charged in D.C.  What were you told about

8    what you were facing in D.C.?

9    A.    That an indictment was about to be brought against

10   Southwest on a conspiracy.

11   Q.    What kind of a conspiracy?

12   A.    On a  marijuana conspiracy, narcotics.

13   Q.    And what was the evidence -- did someone explain to you

14   what the evidence was against you in regards to that?

15   A.    Yes.

16   Q.    What was told to you about that?

17          MR. ZUCKER:  Your Honor, I'd ask -- it's hearsay.

18   Could he at least tell us who the defendant was?

19          THE COURT:  Tell what?

20          MR. ZUCKER:  He said, was it explained to you?  And

21   he's about to say what was explained.  Could we at least find

22   out who gave this explanation, which prosecutor?

23          THE COURT:  Okay.

24   BY MR. ZEIDENBERG:

25   Q.    Did someone tell you about what the charges were or what

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL    Document 956    Filed 09/11/03    Page 29 of 38

29

1   Q.   Was money spent direct -- just explain to the ladies and

2   gentlemen how you received this money that you did get?

3   A.   Each time that they gave me money, I always had to sign

4   for it.

5   Q.   And what was the money to go for?

6   A.   When I first got out, they gave me money for cosmetics

7   and things like that and money to eat with and things like

8   that.

9   Q.   What about your housing?

10  A.   I didn't have a house at that time.

11  Q.   No, but, I mean, as far as paying rent?

12  A.   I was given money to pay my rent, and maybe a little

13  extra money to like get groceries and things like that, but

14  not a substantial amount of money, not a whole lot.

15  Q.   Now, at this location you were at, were you visited by

16  Agent Lisi?

17  A.   Yes.

18  Q.   And during one of these visits in 1997, after you had

19  pled guilty the first time, did you tell Agent Lisi that there

20  was more information that you had not disclosed?

21  A.   Yes.

22  Q.   And what information did you tell Agent Lisi?  Without

23  going into the specifics, what incidents did you tell him

24  about?

25  A.   T.T. and Terita murder and Chrissy, Chrissy murder.

30

1   Q.   T.T. and Terita, the two women?

2   A.   Yes.

3   Q.   And Chrissy Gladden up on 37th Place?

4   A.   Yes.

5   Q.   Did you tell him about what you knew about those

6   incidents, those murders?

7   A.   Yes.

8   Q.   Can you tell the ladies and gentlemen what prompted you

9   to tell Agent Lisi at that point about T.T. and Terita and

10  Chrissy Gladden?

11  A.   Because of the conversation I had with the U.S. Attorney

12  Jim Dinan.

13  Q.   What about that conversation?

14  A.   That --

15  Q.   Was it a recent conversation or an old conversation?

16  A.   It was a recent conversation.

17  Q.   And what had he said in that conversation?

18  A.   That if they find out, like if he said, if, for instance,

19  someone else come forward and cooperate and they tell -- and

20  that person tell them about incidents or something that I was

21  involved in that I did not tell them about, that especially if

22  it was like murder or whatever, that I would definitely be

23  charged with it, and it's better for me to be up front and put

24  it all on the table with them so that they -- it would be

25  better if they hear it from me than to hear it from someone

35

1   Q.   And at that point when you entered into that plea

2   agreement, did you tell about all the criminal activity about

3   which you knew about?

4   A.   No.

5   Q.   Did you tell about all the criminal activity you were

6   involved in?

7   A.   No.

8   Q.   So you didn't fulfill the obligations under that second

9   plea agreement, did you?

10  A.   No.

11  Q.   Now, going back to the beginning of 1999, did you contact

12  Agent Lisi again and tell him you had additional information

13  you wanted to give him?

14  A.   Yes.

15  Q.   What was that information you wanted to tell him about?

16  A.   I told him the truth about the murder of Maurice and

17  Slick.   I told him about my involvement in Tim-Tim's murder.

18  I told him that -- I told him about 95 percent of the truth of

19  the triple homicide murder.

20  Q.   What did you tell him about the triple homicide at this

21  point?

22  A.   Told him that me, Chin, Bird, and Draper, that it was,

23  indeed, us, and not somebody else with Draper.

24  Q.   So you put -- you took J.P. out of it?

25  A.   Right.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

36

1   Q.   And what did you say what your particular roles were in

2   it at this point when you talked to Agent Lisi?

3   A.   I told him that it was the truth that Chin did not go in

4   the house, and that -- I told him that I was the actual person

5   that went in the house, but I told him that I didn't go in the

6   house, that Bird went in the house.

7   Q.   Okay.  So at this point you're saying you did or did not

8   go in the house?

9   A.   Right.

10  Q.   Which one?

11  A.   Say that I didn't go in the house.

12  Q.   Did not?

13  A.   Did not.

14  Q.   And who did you say went in the house?

15  A.   Bird.

16  Q.   And who else?

17  A.   And Draper.

18  Q.   Was that the truth?

19  A.   No.

20  Q.   Why was it -- first of all, as to the other incidents,

21  the other murders, Tim-Tim's, Slick and Mo, why did you decide

22  to disclose this information to Agent Lisi in the beginning of

23  1999?

24  A.   Because after -- when we first killed Maurice and Slick,

25  Raymond knew about it, and Raymond used to be running his

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

66

1  Q.   And you said, well, you know, Draper over there, he went

2  on some of the moves with me; is that right?

3  A.   I don't recall me saying that.

4  Q.   Well, you said that Mr. Sweeney went into that house in

5  Maryland and committed the triple murder.   That was your

6  testimony about an hour and a half ago; is that right?  Didn't

7  you testify to that?

8  A.   Yes.

9  Q.   Okay.   That event, is that one of the moves that you

10  talked about?

11  A.   Yes, it wasn't my move.

12  Q.   Well, but you said it was a move, correct?

13  A.   Yes.

14  Q.   All right.   And you're saying that Mr. Sweeney was part

15  of that, right?

16  A.   Yes.

17  Q.   And you said you knew him from the streets; is that

18  right?

19  A.   Yes.

20  Q.   Okay.   On August 5, 1997, when you spoke with the Prince

21  George's County Police, you had known Mr. Sweeney for about

22  six or seven years; is that correct?

23  A.   I'm not sure.

24  Q.   Well, if you know him for about 11 years, and the

25  statement to the police was about 4 years ago, 11 minus 4 is

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
          GOVERNMENT,                    :
                                         :
                                         :
 VS.                                     :    CR. NO. 98-329
                                         :
VINCENT HILL,                            :
JEROME MARTIN,                           :    **FILED**
SAMUEL CARSON,                           :
WILLIAM K. SWEENEY,                      :    JUL 1 9 2001
SEAN COATES,                             :
          DEFENDANTS.                    :    NANCY MAYER-WHITTINGTON, CLERK
                                         :    U.S. DISTRICT COURT
                                         :
UNITED STATES                            :
          GOVERNMENT,                    :
                                         :
                                         :
 VS.                                     :    CR. NO. 99-348
                                         :
GARY PRICE,                              :
          DEFENDANT                      :
                                         :

                                    WASHINGTON, D. C.
                                    MARCH 15, 2001
                                    (MORNING SESSION)
                                    (10:15 A.M.)


                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE THOMAS P. JACKSON




 COURT REPORTER:              PHYLLIS MERANA
                              6816 U. S. DISTRICT COURT
                              3RD & CONSTITUTION AVE., N.W.
                              WASHINGTON, D. C. 20001

2



```
1    FOR THE GOVERNMENT:            PETER ZEIDENBERG, AUSA
                                    ANJALI CHATURVEDI, AUSA
2                                   555 4TH ST., N.W.
                                    WASHINGTON, D. C. 20001
3
     FOR THE DEFENDANT HILL:        CHRISTOPHER DAVIS, ESQ.
4                                   601 INDIANA AVE., N.W.
                                    #910
5                                   WASHINGTON, D. C.  20004

6    FOR THE DEFENDANT MARTIN:      JOANNE HEPWORTH, ESQ.
                                    305 H STREET, N.W.
7                                   2ND FLOOR
                                    WASHINGTON, D. C.  20001
8

9    FOR THE DEFENDANT CARSON:      JOSEPH BESHOURI, ESQ.
                                    LEXI NEGIN-CHRIST, ESQ.
10                                  419 7TH STREET, N.W.
                                    WASHINGTON, D. C.  20004
11
     FOR THE DEFENDANT SWEENEY:     STEVEN R. KIERSH, ESQ.
12                                  717 D STREET, N.W.
                                    SUITE 400
13                                  WASHINGTON, D. C.  20004

14
     FOR THE DEFENDANT COATES:      FREDERICK JONES, ESQ.
15                                  901 6TH STREET, S.W.
                                    #409
16                                  WASHINGTON, D. C.  20024

17   FOR THE DEFENDANT PRICE:       JONATHAN ZUCKER, ESQ.
                                    601 INDIANA AVE., N.W.
18                                  #901
                                    WASHINGTON, D. C.  20004
19

20

21

22

23

24

25
```

3

```
 1                        INDEX

 2    WITNESS:              CROSS (CONTINUED.)

 3    JAMES MONTGOMERY

 4       BY MR. KIERSH          6

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          YOU TALKED ABOUT -- YOU ADMITTED YOUR INVOLVEMENT
 2   IN THE FIRST DEGREE MURDERS OF MAURICE HALLMAN AND LEONARD
 3   HYSON; CORRECT?
 4   A.   CORRECT.
 5   Q.   OKAY.  NOW, WHEN DID THOSE MURDERS OCCUR?
 6   A.   1989.
 7   Q.   OKAY.  NOW, MR. SWEENEY, MY CLIENT, HAD NOTHING TO DO
 8   WITH THOSE MURDERS?
 9   A.   NOT AT ALL.
10   Q.   RIGHT.
11          NOW, THOSE MURDERS -- THOSE MURDERS OF MR. HALLMAN
12   AND MR. HYSON -- WHERE DID THEY OCCUR?
13   A. IN SOUTHWEST.
14   Q.   OKAY.  WHERE IN SOUTHWEST?
15   A.   IN THE JAMES CREEK HOUSING AREA.
16   Q.   OKAY.  WHERE IS THAT IN RELATION TO K STREET,
17   SOUTHWEST?
18   A.   BETWEEN FIRST STREET AND HALF STREET, SOUTHWEST.
19   Q.   NOW, MR. HALLMAN AND MR. HYSON -- WERE THESE PEOPLE, AS
20   FAR AS YOU KNEW, USING THE TERMINOLOGY YOU USED YESTERDAY,
21   "SNITCHES"?
22   A.   NO.
23   Q.   YOU DIDN'T KILL THEM BECAUSE THEY WERE "SNITCHES," IS
24   THAT RIGHT?
25   A.   NO.
```

1  Q.  YOU DIDN'T KILL THEM BECAUSE OF SELLING MARIJUANA ON K

2  STREET; DID YOU?

3  A.  NO.

4  Q.  IT HAD NOTHING TO DO WITH SOME CONSPIRACY; ISN'T THAT

5  RIGHT?

6  A.  CORRECT.

7  Q.  OKAY.   THEN YOU TOLD THE LADIES AND GENTLEMEN OF THE

8  JURY ABOUT YOUR INVOLVEMENT IN THE MURDER OF TIMOTHY BENTON.

9  DO YOU REMEMBER THAT?

10  A.  YES.

11  Q.  OKAY.  WHEN WERE YOU INVOLVED WITH THE MURDER OF

12  MR. BENTON?

13  A.  1994.

14  Q.  AND WHERE WAS MR. BENTON KILLED?

15  A.  IN MY CAR.

16  Q.  AND WHERE WAS YOUR CAR AT THE TIME MR. BENTON WAS

17  KILLED?

18  A.  WE WERE IN SOUTHEAST.

19  Q.  OKAY.  SOUTHEAST WASHINGTON?

20  A.  YES.

21  Q.  OKAY.  AND HOW FAR FROM K STREET IN SOUTHWEST WASHINGTON

22  AT THE TIME WERE YOU INVOLVED WITH THE MURDER OF MR. BENTON?

23  A.  HOW FAR?

24  Q.  YES.

25  A.  IT'S A GREAT DISTANCE.  IT'S A GREAT DISTANCE.  I'M NOT

13

```
 1   A.  NO.

 2   Q.  AS A MATTER OF FACT, THE ONLY THING -- THE GUY WAS SHOT

 3   WHERE?  IN THE HEAD IN YOUR CAR?

 4   A.  YES.

 5   Q.  OKAY.  AND WHAT UPSET YOU ABOUT MR. BENTON BEING SHOT IN

 6   THE HEAD IN YOUR CAR WAS NOT THAT THE GUY GOT SHOT IN THE

 7   HEAD, BUT IT WAS THAT YOUR CAR GOT HURT OR TOOK SOME DAMAGE?

 8   A.  NOT ONLY THAT.  IT WAS BECAUSE IT WAS DONE WITHOUT MY

 9   KNOWLEDGE AND BECAUSE HE DONE IT IN MY CAR.

10   Q.  RIGHT.  YOU DIDN'T LIKE THAT HE DID IT IN YOUR CAR?

11   A.  CORRECT.

12   Q.  AND YOU DIDN'T LIKE THAT HE KILLED A GUY WITHOUT LETTING

13   YOU KNOW AHEAD OF TIME?

14   A.  CORRECT.

15   Q.  HAD MR. BENTON DONE ANYTHING TO HURT YOU BEFORE THIS

16   EVENT?

17   A.  NOT AT ALL.

18   Q.  AND SO THIS MAN IS LYING ON THE GROUND AFTER YOUR THREW

19   HIM OUT OF THE CAR, SUFFERING FROM A GUNSHOT WOUND -- AT

20   LEAST YOU THOUGHT TO HIS HEAD -- AND THIS IS A GUY WHO HAD

21   DONE NOTHING WRONG TO YOU, BUT YET YOU TURN YOUR CAR AROUND

22   AND TRY TO DRIVE OVER HIM?

23   A.  CORRECT.

24   Q.  AND THAT'S NOT PART OF ANY CONSPIRACY; IS THAT RIGHT --

25   MR. BENTON'S MURDER, AS FAR AS YOU KNOW?
```

1    A.   PRETTY MUCH FOR MYSELF.

2    Q.   FOR YOURSELF.

3          AND YOU ALSO TOLD US THAT WHEN YOU WERE SENT TO

4    THE HALFWAY HOUSE, YOU LIED ABOUT WORKING; CORRECT?

5    A.   YES.

6    Q.   AND THAT'S BECAUSE YOU DIDN'T WANT TO BE IN THE HALFWAY

7    HOUSE?

8    A.   CORRECT.

9    Q.   NOW, A HALFWAY HOUSE IS MUCH LESS RESTRICTIVE THAN A

10   JAIL OR PRISON; ISN'T THAT RIGHT?

11   A.   YES.

12   Q.   LIKE IN A HALFWAY HOUSE, DURING THE DAY YOU CAN BE

13   OUT DOING YOUR BUSINESS; RIGHT?

14   A.   YES.

15   Q.   YOU JUST HAVE TO BE IN THERE AT NIGHT?   THEY SET A

16   CURFEW FOR YOU?

17   A.   RIGHT.

18   Q.   SO IT'S NOT SO BAD; RIGHT?

19   A.   CORRECT.

20   Q.   BUT YOU WOULD STILL LIE TO GET YOURSELF OUT OF JUST A

21   HALFWAY HOUSE?

22   A.   YES.

23   Q.   BECAUSE THAT SUITED YOUR NEEDS?

24   A.   YES.

25   Q.   AND YOU ALSO TOLD US THAT YOU HAVE LIED TO COURTS?

1    A.   YES.

2    Q.   LIKE, FOR INSTANCE, EVERY TIME YOU'D COME UP FOR A

3    SENTENCING IN ONE OF YOUR CRIMINAL CASES, YOU WOULD TELL THE

4    JUDGE OR TELL THE PROBATION OFFICER, WHEN THEY DRAFTED THE

5    PRESENTENCE REPORT, "LOOK, I AM OKAY NOW.  I AM GOING TO

6    LEAD A STRAIGHT LIFE.  I AM GOING TO BE CLEAN."  BUT YOU HAD

7    NO INTENTION OF DOING SO; ISN'T THAT RIGHT?

8    A.   I THINK ON A FEW OCCASIONS I MIGHT HAVE HAD INTENTIONS

9    OF DOING RIGHT, BUT I THINK AT SOME POINT AFTER I GOT

10   SENTENCED OR WHATEVER, I ABANDONED THOSE PLANS.

11   Q.   OKAY.

12   A.   BUT I BELIEVE THAT AT THAT PRESENT TIME, I DID INTEND ON

13   DOING RIGHT.

14   Q.   AND YOU HAVE ALSO LIED, AS YOU TOLD US IN RESPONSE TO A

15   QUESTION BY MR. ZEIDENBERG YESTERDAY -- YOU'VE LIED TO A

16   GRAND JURY IN MARYLAND?

17   A.   YES.

18   Q.   AND THAT WAS BECAUSE YOU THOUGHT IT WAS IN YOUR INTEREST

19   TO LIE TO THE GRAND JURY.  SO YOU MADE UP A LIE; CORRECT?

20   A.   YES.

21   Q.   ALSO, DIDN'T YOU TELL US ABOUT A CONSPIRACY TO KILL

22   SOMEONE NAMED ROBIN?

23   A.   YES.

24   Q.   WHO IS THAT?

25   A.   SHE WAS A GOVERNMENT WITNESS AS WELL.

```
1   Q.  AND WHEN YOU CAME BEFORE JUDGE JACKSON ON MARCH 4TH OF

2   2000 -- THAT WAS THE DAY THAT FINALLY YOU WERE TAKEN INTO

3   CUSTODY -- YOU SAID TO JUDGE JACKSON, "JUDGE, NOBODY HAS

4   THREATENED ME."  DO YOU REMEMBER THAT?

5   A.  WHEN WAS THIS?

6   Q.  MARCH 4TH, THE DAY THAT YOU WERE STEPPED BACK AND TAKEN

7   INTO CUSTODY.

8   A.  MARCH 4TH?

9   Q.  MARCH 4TH, 2000.  YOU CAME BEFORE JUDGE JACKSON.  DO YOU

10  REMEMBER THAT?

11  A.  THAT'S INCORRECT.

12  Q.  EXCUSE ME.  MARCH 15TH, 2000.

13  A.  YES.

14  Q.  OKAY.  IT WAS ACTUALLY ONE YEAR AGO TODAY?

15  A.  YES.

16  Q.  OKAY. YOU CAME BEFORE JUDGE JACKSON; CORRECT?

17  A.  CORRECT.

18  Q.  BECAUSE YOU WALKED OUT OF THE WITNESS PROTECTION

19  PROGRAM; CORRECT?

20  A.  CORRECT.

21  Q.  AND YOU SAID TO JUDGE JACKSON, "YOUR HONOR, NOBODY HAS

22  THREATENED ME."  DO YOU RECALL THAT?

23  A.  NO, I DO NOT RECALL THAT.

24  Q.  WOULD SEEING THE TRANSCRIPT FROM MARCH 4TH, 2000 REFRESH

25  YOUR RECOLLECTION?
```

1    A.   MAYBE.

2    Q.   OKAY.

3             IF I MAY HAVE THE COURT'S INDULGENCE.

4             MR. MONTGOMERY, I AM GOING TO SHOW YOU WHAT HAS

5    BEEN MARKED FOR IDENTIFICATION AS SWEENEY'S EXHIBIT NUMBER

6    4, THE MARCH 15, 2000 TRANSCRIPT.

7             MR. KIERSH:  MAY I APPROACH THE WITNESS, YOUR

8    HONOR?

9             THE COURT:  SURE.

10   BY MR. KIERSH:

11   Q.   SIR, I ASK YOU FIRST TO JUST TAKE A LOOK AT THIS.  CAN

12   YOU READ THIS?

13   A.   YES, I READ VERY WELL.

14   Q.   TAKE A LOOK AT THIS AND SEE WHAT'S UP AT THE TOP.

15   A.   UNITED STATES GOVERNMENT VERSUS --

16   Q.   JUST READ IT TO YOURSELF.

17   A.   ALL RIGHT.

18   Q.   OKAY?

19   A.   UH-HUH.

20   Q.   NOW, I DIRECT YOUR ATTENTION -- COUNSEL, IT'S PAGE 4,

21   LINE 7.

22             READ THAT TO YOURSELF.  OKAY?

23   A.   FROM PAGE 7 ON DOWN?  I MEAN  --

24   Q.   LINE 7, PAGE 4.

25   A.   HERE YOU GO, SIR.

43

```
 1   Q.  NOW, HAVING READ THIS DOCUMENT, DOES THIS REFRESH YOUR
 2   RECOLLECTION AS TO WHAT YOU TOLD JUDGE JACKSON ON MARCH
 3   15TH, 2000?
 4   A.  I MEAN IF IT'S IN THE TRANSCRIPT, I GUESS I MUST HAVE
 5   SAID IT.
 6   Q.  YOU DON'T DISPUTE IT, DO YOU?
 7   A.  NO, I AM NOT DISPUTING IT.
 8   Q.  OKAY.  YOU TOLD THE JUDGE, "EVEN THOUGH MY LIFE WASN'T
 9   THREATENED OR ANYTHING," CORRECT?
10   A.  BUT I DID TELL AGENT LISI THAT I SPOKE WITH "LOVEY" AND
11   "LOVEY" TOLD ME THAT "PIMP" TOLD HER --
12            MS. HEPWORTH:  OBJECTION.
13            THE WITNESS:  -- THAT I HAD BETTER KEEP MY MOUTH
14   SHUT --
15            MR. HEPWORTH:  OBJECTION.
16            THE WITNESS:  -- IF I KNOW WHAT'S GOOD FOR ME.
17   AND I ALSO TOLD THEM THAT --
18            MS. HEPWORTH:  OBJECTION, YOUR HONOR.
19            THE WITNESS:  -- MY SISTER'S BOYFRIEND, KIM, TOLD
20   ME THAT --
21            MS. HEPWORTH:  OBJECTION, YOUR HONOR.
22            THE COURT:  WAIT A MINUTE.  THERE IS NO QUESTION
23   PENDING.
24   BY MR. KIERSH:
25   Q.  NOW, LET'S ME JUST GO BACK.  YOU TOLD JUDGE JACKSON --
```

1    OF 1997, BEFORE YOU ENTERED INTO THE PLEA, DID YOU TELL THE

2    GOVERNMENT -- DID YOU TELL AGENT LISI THAT YOU HAD LIED TO

3    THE GRAND JURY IN PRINCE GEORGE'S COUNTY?

4    A.   WHAT PARTICULAR TIME ARE YOU SPEAKING ABOUT?

5    Q.   IN AUGUST OF 1997 WHEN YOU WENT INTO THE GRAND JURY IN

6    PRINCE GEORGE'S COUNTY AND SAID, "JOHNNIE PROCTOR WENT INTO

7    THE HOUSE AND DID THE TRIPLE."

8    A.   NO, I WAS NOT TRUTHFUL.

9    Q.   I KNOW YOU WEREN'T TRUTHFUL, BUT HAD YOU TOLD THEM PRIOR

10   TO NOVEMBER 4TH OR 5TH, 1997, THAT YOU HAD LIED IN THE

11   PRINCE GEORGE'S COUNTY GRAND JURY?

12   A.   I DON'T THINK I DID TELL THEM AT THAT TIME.

13   Q.   WHEN YOU ENTERED INTO THE SECOND AGREEMENT, THAT

14   AGREEMENT HAD THE SAME REQUIREMENT THAT YOU BE

15   FORTHRIGHT AND TELL THEM EVERYTHING YOU KNOW; RIGHT?

16   A.   THE SECOND AGREEMENT WAS NOT IN AUGUST OF '97.

17   Q.   NO.  NO.  OKAY.  I AM SORRY.  THE SECOND AGREEMENT WAS

18   SIGNED ON NOVEMBER 4TH, '97, AND FORMALLY ENTERED IN THIS

19   COURT ON NOVEMBER 5TH, '97; IS THAT RIGHT?

20   A.   YES.

21   Q.   AND THE SECOND AGREEMENT HAD THE SAME REQUIREMENTS AS

22   THE FIRST AGREEMENT, THAT YOU BE FORTHRIGHT AND YOU TELL THE

23   GOVERNMENT EVERYTHING YOU KNOW; ISN'T THAT RIGHT?

24   A.   CORRECT.

25   Q.   OKAY.  MY QUESTION IS DID YOU TELL THE GOVERNMENT,

```
 1   BEFORE YOU ENTERED INTO THE SECOND AGREEMENT, THAT YOU HAD

 2   LIED TO THE GRAND JURY IN PRINCE GEORGE'S COUNTY?

 3   A.  I DON'T THINK I DID.

 4   Q.  SO YOU WERE VIOLATING THE AGREEMENT RIGHT FROM THE

 5   BEGINNING; WEREN'T YOU?

 6   A.  YES.

 7   Q.  AND YOU DIDN'T TELL THE GOVERNMENT, PRIOR TO ENTERING

 8   INTO THE SECOND AGREEMENT, THAT YOU WERE INVOLVED IN THE

 9   MURDER OF MR. HALLMAN; ISN'T THAT RIGHT?

10   A.  CORRECT.

11   Q.  SO YOU WERE VIOLATING ON THAT LEVEL; CORRECT?

12   A.  YES.

13   Q.  YOU DIDN'T TELL THE GOVERNMENT ON NOVEMBER 4TH AND

14   NOVEMBER 5TH THAT YOU WERE INVOLVED IN THE MURDER OF

15   MR. HYSON; ISN'T THAT CORRECT?

16   A.  CORRECT.

17   Q.  YOU DIDN'T TELL THE GOVERNMENT YOU WERE INVOLVED IN THE

18   MURDER OF MR. BENTON; ISN'T THAT CORRECT?

19   A.  CORRECT.

20   Q.  YOU DIDN'T TELL THE GOVERNMENT YOU WERE INVOLVED IN THE

21   TRIPLE MURDER IN TEMPLE HILLS; ISN'T THAT CORRECT?

22   A. CORRECT.

23   Q.  SO ON NOVEMBER 4TH AND NOVEMBER 5TH, EVEN THOUGH THIS IS

24   THE SECOND TIME BACK AND EVEN THOUGH YOU SWORE TO TELL THE

25   TRUTH TO JUDGE JACKSON, YOU WERE LYING?
```

1   A.   I THINK WITHHOLDING INFORMATION IS MORE LIKE IT.

2   Q.   OKAY.  WELL, DIDN'T THE AGREEMENT SAY YOU HAVE TO TELL

3   EVERYTHING?

4   A.   YES.

5   Q.   AND YOU SAID YOU WOULD TELL EVERYTHING; RIGHT?

6   A.   YES.

7   Q.   BUT YOU DIDN'T DO IT; RIGHT?

8   A.   TRUE.

9   Q.   SO WHEN YOU SIGNED THE AGREEMENT WITH THE UNITED STATES

10   ON NOVEMBER 4TH, WHERE YOU PROMISED TO TELL EVERYTHING, YOU

11   WERE LYING BECAUSE YOU DIDN'T TELL THEM EVERYTHING?

12   A.   YES.

13   Q.   ISN'T THAT RIGHT?

14   A.   YES, YOU ARE CORRECT.

15   Q.   AND YOU LIED BECAUSE YOU THOUGHT IT WAS IN YOUR BEST

16   INTEREST TO LIE; ISN'T THAT RIGHT?

17   A. YES.

18            MAY I ADD SOMETHING ELSE?

19   Q.   JUST ANSWER MY QUESTIONS.

20   A.   ALL RIGHT.

21            THE COURT:  YOU WILL GET A CHANCE ON REDIRECT

22   EXAMINATION TO OFFER ANY EXPLANATION YOU NEED.

23            MR. KIERSH:  THE COURT'S INDULGENCE.

24   BY MR. KIRSCH:

25   Q.   NOW, YOU CAME BACK BEFORE JUDGE JACKSON IN FEBRUARY --

```
1    A.   NO.
2    Q.   AS A MATTER OF FACT, THE ONLY THING -- THE GUY WAS SHOT
3    WHERE?  IN THE HEAD IN YOUR CAR?
4    A.   YES.
5    Q.   OKAY.  AND WHAT UPSET YOU ABOUT MR. BENTON BEING SHOT IN
6    THE HEAD IN YOUR CAR WAS NOT THAT THE GUY GOT SHOT IN THE
7    HEAD, BUT IT WAS THAT YOUR CAR GOT HURT OR TOOK SOME DAMAGE?
8    A.   NOT ONLY THAT.  IT WAS BECAUSE IT WAS DONE WITHOUT MY
9    KNOWLEDGE AND BECAUSE HE DONE IT IN MY CAR.
10   Q.   RIGHT.  YOU DIDN'T LIKE THAT HE DID IT IN YOUR CAR?
11   A.   CORRECT.
12   Q.   AND YOU DIDN'T LIKE THAT HE KILLED A GUY WITHOUT LETTING
13   YOU KNOW AHEAD OF TIME?
14   A. CORRECT.
15   Q.   HAD MR. BENTON DONE ANYTHING TO HURT YOU BEFORE THIS
16   EVENT?
17   A.   NOT AT ALL.
18   Q.   AND SO THIS MAN IS LYING ON THE GROUND AFTER YOUR THREW
19   HIM OUT OF THE CAR, SUFFERING FROM A GUNSHOT WOUND -- AT
20   LEAST YOU THOUGHT TO HIS HEAD -- AND THIS IS A GUY WHO HAD
21   DONE NOTHING WRONG TO YOU, BUT YET YOU TURN YOUR CAR AROUND
22   AND TRY TO DRIVE OVER HIM?
23   A.   CORRECT.
24   Q.   AND THAT'S NOT PART OF ANY CONSPIRACY; IS THAT RIGHT --
25   MR. BENTON'S MURDER, AS FAR AS YOU KNOW?
```

```
1    PERRY AND DARNELL MACK?

2    A.   TO MY UNDERSTANDING, YES.

3    Q.   AND YOU WERE INVITED TO THE PARTY?

4    A.   YES.

5    Q.   OKAY.

6              SO IN TERMS OF THE PREDICATE ACTS TO THE RICO

7    CONSPIRACY THAT YOU ACKNOWLEDGE INVOLVEMENT WITH, THERE WERE

8    SIX MURDERS SO FAR THAT WE'VE TALKED ABOUT; CORRECT?

9    A.   YES.

10   Q.   OKAY.  AND THEN YOU ALSO TOLD THE LADIES AND GENTLEMEN

11   OF THE JURY ABOUT YOUR INVOLVEMENT IN THE MURDER OF

12   CHRISHAUNA GLADDEN; CORRECT?

13   A. CORRECT.

14   Q.   SO THERE ARE SEVEN MURDERS THAT YOU'RE DIRECTLY INVOLVED

15   WITH AND YOU ACKNOWLEDGE AS PREDICATE ACTS AS PART OF YOUR

16   PLEA BEFORE THIS COURT; CORRECT?

17   A.   CORRECT.

18   Q.   OKAY.  NOW, DO YOU KNOW ANYTHING ABOUT A DOMINICO

19   BENSON?

20   A.   YES.

21   Q.   WERE YOU INVOLVED IN HIS MURDER?

22   A. NO.

23   Q.   MICHAEL SALTERS?  WERE YOU INVOLVED IN HIS MURDER?

24   A.   NO.

25   Q.   NOW, WE HAVE GOT SEVEN MURDERS THAT YOU HAVE TOLD THE
```

```
1    LADIES AND GENTLEMEN OF THE JURY ABOUT.

2         YOU TOLD US THAT YOU WERE INVOLVED WITH AN ASSAULT

3    WITH INTENT TO KILL A POLICE OFFICER; IS THAT CORRECT?

4    A.  YES.

5    Q.  THAT YOU WERE DIRECTLY INVOLVED WITH, RIGHT?

6    A.  CORRECT.

7    Q.  OKAY.  AND YOU TOLD THE LADIES AND GENTLEMEN OF THE JURY

8    ABOUT YOUR PLANS TO DISCUSS KILLING "WOOZIE," WHOSE REAL

9    NAME IS THOMAS FIELDS; IS THAT RIGHT?

10   A.  YES.

11   Q.  OKAY.  AND MR. FIELDS WAS FROM L STREET; RIGHT?

12   A.  YES.

13   Q.  YOU DIDN'T KNOW MR. FIELDS?

14   A. I DIDN'T KNOW HIM?

15   Q.  DID YOU KNOW HIM?

16   A.  YES.

17   Q.  YOU KNEW HIM PERSONALLY?

18   A. YES.

19   Q.  DID YOU CONSIDER HIM TO BE A FRIEND?

20   A.  YES, BEFORE THE BEEF HIT.  BEFORE THE BEEF CAME DOWN,

21   YES.

22   Q.  HE WAS A FRIEND OF YOURS?

23   A.  HE WAS ALL RIGHT.

24   Q.  ALL RIGHT, BUT THEN HE WAS A GUY, YOU KNOW, YOU GOT INTO

25   THIS BEEF WITH, AND THEN YOU SAID, "I AM GOING TO GO OUT AND
```

31

```
 1    A.   PRETTY MUCH FOR MYSELF.

 2    Q.   FOR YOURSELF.

 3              AND YOU ALSO TOLD US THAT WHEN YOU WERE SENT TO

 4    THE HALFWAY HOUSE, YOU LIED ABOUT WORKING; CORRECT?

 5    A.   YES.

 6    Q.   AND THAT'S BECAUSE YOU DIDN'T WANT TO BE IN THE HALFWAY

 7    HOUSE?

 8    A.   CORRECT.

 9    Q.   NOW, A HALFWAY HOUSE IS MUCH LESS RESTRICTIVE THAN A

10    JAIL OR PRISON; ISN'T THAT RIGHT?

11    A.   YES.

12    Q.   LIKE IN A HALFWAY HOUSE, DURING THE DAY YOU CAN BE

13    OUT DOING YOUR BUSINESS; RIGHT?

14    A.   YES.

15    Q.   YOU JUST HAVE TO BE IN THERE AT NIGHT?  THEY SET A

16    CURFEW FOR YOU?

17    A.   RIGHT.

18    Q.   SO IT'S NOT SO BAD; RIGHT?

19    A.   CORRECT.

20    Q.   BUT YOU WOULD STILL LIE TO GET YOURSELF OUT OF JUST A

21    HALFWAY HOUSE?

22    A.   YES.

23    Q.   BECAUSE THAT SUITED YOUR NEEDS?

24    A.   YES.

25    Q.   AND YOU ALSO TOLD US THAT YOU HAVE LIED TO COURTS?
```

1   A.   YES.

2   Q.   LIKE, FOR INSTANCE, EVERY TIME YOU'D COME UP FOR A

3   SENTENCING IN ONE OF YOUR CRIMINAL CASES, YOU WOULD TELL THE

4   JUDGE OR TELL THE PROBATION OFFICER, WHEN THEY DRAFTED THE

5   PRESENTENCE REPORT, "LOOK, I AM OKAY NOW.  I AM GOING TO

6   LEAD A STRAIGHT LIFE.  I AM GOING TO BE CLEAN."  BUT YOU HAD

7   NO INTENTION OF DOING SO; ISN'T THAT RIGHT?

8   A.   I THINK ON A FEW OCCASIONS I MIGHT HAVE HAD INTENTIONS

9   OF DOING RIGHT, BUT I THINK AT SOME POINT AFTER I GOT

10  SENTENCED OR WHATEVER, I ABANDONED THOSE PLANS.

11  Q.   OKAY.

12  A.   BUT I BELIEVE THAT AT THAT PRESENT TIME, I DID INTEND ON

13  DOING RIGHT.

14  Q.   AND YOU HAVE ALSO LIED, AS YOU TOLD US IN RESPONSE TO A

15  QUESTION BY MR. ZEIDENBERG YESTERDAY -- YOU'VE LIED TO A

16  GRAND JURY IN MARYLAND?

17  A.   YES.

18  Q.   AND THAT WAS BECAUSE YOU THOUGHT IT WAS IN YOUR INTEREST

19  TO LIE TO THE GRAND JURY.  SO YOU MADE UP A LIE; CORRECT?

20  A.   YES.

21  Q.   ALSO, DIDN'T YOU TELL US ABOUT A CONSPIRACY TO KILL

22  SOMEONE NAMED ROBIN?

23  A.   YES.

24  Q.   WHO IS THAT?

25  A.   SHE WAS A GOVERNMENT WITNESS AS WELL.

1    Q.   OKAY.   SHE WAS ONE OF THOSE SNITCHES -- MAGGOTS TYPE OF

2    PEOPLE YOU TALKED ABOUT?

3    A. YES.

4    Q.   OKAY.   AND HAVE YOU TOLD THE GOVERNMENT -- THE

5    PROSECUTORS AND AGENT LISI -- ABOUT ALL OF THESE DIFFERENT

6    CRIMES:   THE ROBBERIES, THE LIES, THE CONSPIRACIES, AND THE

7    MURDERS?   DID YOU TELL THEM ALL THIS OVER SOME COURSE OF

8    TIME?

9    A.   YES.

10   Q.   OKAY.   AND AFTER YOU TOLD THEM ABOUT YOUR INVOLVEMENT

11   IN THIS CASE, FROM 1997 UNTIL 2000 -- UNTIL MARCH OF 2000,

12   YOU WEREN'T EVEN LOCKED UP; ISN'T THAT RIGHT?

13   A.   CORRECT.

14   Q.   OKAY.

15         AND YOU WEREN'T LOCKED UP -- YOU WERE IN COURT

16   WHEN THE GOVERNMENT WOULD COME IN UP UNTIL MARCH -- UP UNTIL

17   NOVEMBER OF 1999 -- THE GOVERNMENT WOULD COME IN AND SAY,

18   "WE'RE NOT ASKING FOR MR. MONTGOMERY TO BE LOCKED UP"?

19   A.   THAT'S NOT CORRECT.

20   Q.   WELL, WEREN'T YOU IN COURT WHEN THE GOVERNMENT SAID, "WE

21   DO NOT OPPOSE MR. MONTGOMERY'S BEING RELEASED"?

22   A.   THAT WAS IN '97.

23   Q.   OKAY.   AND IN '98?

24   A.   I WAS STILL OUT.

25   Q.   RIGHT.   YOU DIDN'T GET LOCKED UP UNTIL MARCH OF 2000?

1    A.   CORRECT.

2    Q.   AND THAT'S AFTER TELLING THE GOVERNMENT, OVER THE COURSE

3    OF TIME, ABOUT ALL OF THESE CRIMES THAT YOU HAVE BEEN

4    INVOLVED WITH; ISN'T THAT RIGHT?

5    A.   ON TWO OCCASIONS, THEY DID ASK FOR ME TO GET STEPPED

6    BACK.

7    Q.   RIGHT, BUT JUDGE JACKSON DIDN'T STEP YOU BACK, RIGHT?

8    A.   CORRECT.

9    Q.   HE LET YOU STAY OUT ON THE STREET; ISN'T THAT RIGHT?

10   A.   CORRECT.

11   Q.   AND YOU KNOW THAT MY CLIENT, WILLIAM SWEENEY, SINCE

12   1997 -- YOU KNOW HE HAS BEEN LOCKED UP THE WHOLE TIME; ISN'T

13   THAT RIGHT?

14   A.   YES.

15   Q.   OKAY.  YOU KNOW THAT THE ONLY REASON THAT YOU WEREN'T

16   LOCKED UP DURING THIS TIME IS BECAUSE YOU WERE PROVIDING

17   INFORMATION TO THE GOVERNMENT; ISN'T THAT RIGHT?

18   A.   COULD YOU ASK THAT QUESTION AGAIN?

19   Q.   YES.  THE REASON WHY YOU WEREN'T LOCKED UP DURING THIS

20   PERIOD OF TIME FROM 1997 TO 2000 WAS BECAUSE YOU WERE

21   PROVIDING INFORMATION TO THE GOVERNMENT?

22   A.   TO MY UNDERSTANDING?

23   Q.   TO YOUR UNDERSTANDING.

24   A.   TO MY UNDERSTANDING, IN 1997, WHEN I TOLD MR. LISI ABOUT

25   MY INVOLVEMENT IN CHRISSY'S MURDER, THEY BROUGHT ME BACK TO

41

```
 1   Q.   AND WHEN YOU CAME BEFORE JUDGE JACKSON ON MARCH 4TH OF
 2   2000 -- THAT WAS THE DAY THAT FINALLY YOU WERE TAKEN INTO
 3   CUSTODY -- YOU SAID TO JUDGE JACKSON, "JUDGE, NOBODY HAS
 4   THREATENED ME."  DO YOU REMEMBER THAT?
 5   A.   WHEN WAS THIS?
 6   Q.   MARCH 4TH, THE DAY THAT YOU WERE STEPPED BACK AND TAKEN
 7   INTO CUSTODY.
 8   A.   MARCH 4TH?
 9   Q.   MARCH 4TH, 2000.  YOU CAME BEFORE JUDGE JACKSON.  DO YOU
10   REMEMBER THAT?
11   A.   THAT'S INCORRECT.
12   Q.   EXCUSE ME.  MARCH 15TH, 2000.
13   A.   YES.
14   Q.   OKAY.  IT WAS ACTUALLY ONE YEAR AGO TODAY?
15   A.   YES.
16   Q.   OKAY. YOU CAME BEFORE JUDGE JACKSON; CORRECT?
17   A.   CORRECT.
18   Q.   BECAUSE YOU WALKED OUT OF THE WITNESS PROTECTION
19   PROGRAM; CORRECT?
20   A.   CORRECT.
21   Q.   AND YOU SAID TO JUDGE JACKSON, "YOUR HONOR, NOBODY HAS
22   THREATENED ME."  DO YOU RECALL THAT?
23   A.   NO, I DO NOT RECALL THAT.
24   Q.   WOULD SEEING THE TRANSCRIPT FROM MARCH 4TH, 2000 REFRESH
25   YOUR RECOLLECTION?
```

```
 1   A.   MAYBE.

 2   Q.   OKAY.

 3             IF I MAY HAVE THE COURT'S INDULGENCE.

 4             MR. MONTGOMERY, I AM GOING TO SHOW YOU WHAT HAS

 5   BEEN MARKED FOR IDENTIFICATION AS SWEENEY'S EXHIBIT NUMBER

 6   4, THE MARCH 15, 2000 TRANSCRIPT.

 7             MR. KIERSH:  MAY I APPROACH THE WITNESS, YOUR

 8   HONOR?

 9             THE COURT:  SURE.

10   BY MR. KIERSH:

11   Q.   SIR, I ASK YOU FIRST TO JUST TAKE A LOOK AT THIS.  CAN

12   YOU READ THIS?

13   A.   YES, I READ VERY WELL.

14   Q.   TAKE A LOOK AT THIS AND SEE WHAT'S UP AT THE TOP.

15   A.   UNITED STATES GOVERNMENT VERSUS --

16   Q.   JUST READ IT TO YOURSELF.

17   A.   ALL RIGHT.

18   Q.   OKAY?

19   A.   UH-HUH.

20   Q.   NOW, I DIRECT YOUR ATTENTION -- COUNSEL, IT'S PAGE 4,

21   LINE 7.

22             READ THAT TO YOURSELF.  OKAY?

23   A.   FROM PAGE 7 ON DOWN?  I MEAN  --

24   Q.   LINE 7, PAGE 4.

25   A.   HERE YOU GO, SIR.
```

1    Q.  NOW, HAVING READ THIS DOCUMENT, DOES THIS REFRESH YOUR

2    RECOLLECTION AS TO WHAT YOU TOLD JUDGE JACKSON ON MARCH

3    15TH, 2000?

4    A.  I MEAN IF IT'S IN THE TRANSCRIPT, I GUESS I MUST HAVE

5    SAID IT.

6    Q.  YOU DON'T DISPUTE IT, DO YOU?

7    A.  NO, I AM NOT DISPUTING IT.

8    Q.  OKAY.  YOU TOLD THE JUDGE, "EVEN THOUGH MY LIFE WASN'T

9    THREATENED OR ANYTHING," CORRECT?

10   A.  BUT I DID TELL AGENT LISI THAT I SPOKE WITH "LOVEY" AND

11   "LOVEY" TOLD ME THAT "PIMP" TOLD HER --

12          MS. HEPWORTH:  OBJECTION.

13          THE WITNESS:  -- THAT I HAD BETTER KEEP MY MOUTH

14   SHUT --

15          MR. HEPWORTH:  OBJECTION.

16          THE WITNESS:  -- IF I KNOW WHAT'S GOOD FOR ME.

17   AND I ALSO TOLD THEM THAT --

18          MS. HEPWORTH:  OBJECTION, YOUR HONOR.

19          THE WITNESS:  -- MY SISTER'S BOYFRIEND, KIM, TOLD

20   ME THAT --

21          MS. HEPWORTH:  OBJECTION, YOUR HONOR.

22          THE COURT:  WAIT A MINUTE.  THERE IS NO QUESTION

23   PENDING.

24   BY MR. KIERSH:

25   Q.  NOW, LET'S ME JUST GO BACK.  YOU TOLD JUDGE JACKSON --

1    A.   I GOT ARRESTED IN WASHINGTON, D. C.

2    Q.   OKAY.  YOU GOT ARRESTED ON AUGUST 5TH; CORRECT?

3    A.   THAT'S INCORRECT.

4    Q.   OKAY.  ON AUGUST 7, 1997, YOU SIGNED THIS LETTER WITH

5    YOUR LAWYER SAYING YOU AGREE TO MEET WITH THE OFFICE OF THE

6    UNITED STATES ATTORNEY HERE IN THE DISTRICT OF COLUMBIA TO

7    HAVE AN OFF-THE-RECORD DISCUSSION; CORRECT?

8    A.   I GUESS IT MUST BE CORRECT BECAUSE IT IS SIGNED BY ME.

9    Q.   YOU DON'T DISPUTE THIS LETTER -- THE AUTHENTICITY; DO

10   YOU?

11   A.   NO, I AM NOT DISPUTING IT.

12   Q.   AS A MATTER OF FACT, NOT ONLY DID YOU SIGN IT, BUT YOU

13   ALSO DATED IT AUGUST 7, 1997; IS THAT RIGHT?

14   A.   CORRECT.

15   Q.   AND THAT'S SIX DAYS BEFORE YOU ENTERED INTO YOUR PLEA

16   THAT TALKS ABOUT THE 5K1.1 LETTER; CORRECT?

17   A.   CORRECT.

18   Q.   OKAY.

19        SO ON AUGUST 12TH, 1997, WHEN YOU SIGNED THE PLEA

20   LETTER WHERE IT TALKED ABOUT THE 5K1.1, YOU HAD SOME

21   UNDERSTANDING THAT IF YOU WERE COOPERATING WITH THE

22   GOVERNMENT, YOU COULD GET OUT OF THE GUIDELINE SENTENCE;

23   ISN'T THAT RIGHT?

24   A.   COULD YOU REPEAT THAT?

25   Q.   OKAY.  YOU WEREN'T JUST GOING TO WALK INTO COURT AND

```
 1   PLEAD GUILTY AND HAVE THE JUDGE SENTENCE YOU TO LIFE AND

 2   HAVE HIM TAKE YOU AWAY?  THAT WOULDN'T HAVE BEEN VERY SMART;

 3   RIGHT?

 4   A.  BASICALLY, MY MINDSET WAS FOR THEM TO JUST LET ME GO.  I

 5   TOLD THEM I DON'T WANT NO LAWYER.  I SAID, "I DON'T WANT NO

 6   LAWYER.  JUST LET ME GO."  THAT'S IT.

 7   Q.  OKAY.  JUST LET YOU GO?

 8   A.  THAT'S IT.

 9   Q.  OKAY.

10   A.  I MEAN IT WAS JUST THAT CUT AND DRY.

11   Q.  OKAY.  NOW --

12   A.  AND THEY EXPLAINED TO ME THAT LEGALLY THEY COULDN'T DO

13   IT LIKE THAT.  THAT I HAD TO BE REPRESENTED BY AN ATTORNEY.

14   Q.  OKAY.

15       IF YOU GO UP A FEW PAGES TO PARAGRAPH 14, SIR, ON

16   YOUR AUGUST 12TH LETTER -- DO YOU SEE THAT?

17   A.  YES.

18   Q.  AND IF YOU GO ON TO THE NEXT PAGE, IT'S 14, SUBSECTION

19   (B).  CAN YOU GO THERE?

20       NOW, THE GOVERNMENT MADE SOME OTHER CONCESSIONS --

21   OTHER AGREEMENTS WITH YOU WHEN YOU SIGNED THIS LETTER;

22   CORRECT?

23   A.  CORRECT.

24   Q.  AND IT SAYS:  THE GOVERNMENT, AS PART OF THIS PLEA

25   AGREEMENT, AGREES TO, NUMBER ONE, DISMISS CASE M-5819-97,
```

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
      GOVERNMENT,      :

                  :

 VS.                :     CR. NO. 98-329

                  :

VINCENT HILL,        :

JEROME MARTIN,       :

SAMUEL CARSON,       :

WILLIAM K. SWEENEY,  :

SEAN COATES,        :

      DEFENDANTS.    :

UNITED STATES        :

      GOVERNMENT,      :

                  :

 VS.                :     CR. NO. 99-348

                  :

GARY PRICE,        :

      DEFENDANT      :

                  :

FILED
JUL 1 9 2001
NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
APRIL 4, 2001
(MORNING SESSION)
(10:15 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:          PHYLLIS MERANA
                          6816 U. S. DISTRICT COURT
                          3RD & CONSTITUTION AVE., N.W.
                          WASHINGTON, D. C. 20001

2

```
 1    FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                      ANJALI CHATURVEDI, AUSA
 2                                    555 4TH ST., N.W.
                                      WASHINGTON, D. C. 20001
 3
      FOR THE DEFENDANT HILL:         CHRISTOPHER DAVIS, ESQ.
 4                                    601 INDIANA AVE., N.W.
                                      #910
 5                                    WASHINGTON, D. C.  20004

 6    FOR THE DEFENDANT MARTIN:       JOANNE HEPWORTH, ESQ.
                                      305 H STREET, N.W.
 7                                    2ND FLOOR
                                      WASHINGTON, D. C.  20001
 8

 9    FOR THE DEFENDANT CARSON:       JOSEPH BESHOURI, ESQ.
                                      LEXI NEGIN-CHRIST, ESQ.
10                                    419 7TH STREET, N.W.
                                      WASHINGTON, D. C.  20004
11
      FOR THE DEFENDANT SWEENEY:      STEVEN R. KIERSH, ESQ.
12                                    717 D STREET, N.W.
                                      SUITE 400
13                                    WASHINGTON, D. C.  20004

14
      FOR THE DEFENDANT COATES:       FREDERICK JONES, ESQ.
15                                    901 6TH STREET, S.W.
                                      #409
16                                    WASHINGTON, D. C.  20024

17    FOR THE DEFENDANT PRICE:        JONATHAN ZUCKER, ESQ.
                                      601 INDIANA AVE., N.W.
18                                    #901
                                      WASHINGTON, D. C.  20004
19

20

21

22

23

24

25
```

3

```
 1                           INDEX

 2   WITNESS:                 DIRECT   CROSS   REDIRECT   RECROSS

 3   MARK WHITMORE

 4           BY MR. ZEIDENBERG   6

 5           BY MR. KIERSH                21

 6           BY MR. ZUCKER               30

 7   CHARLES BENDER

 8           BY MS. CHATURVEDI 38

 9

10                       E X H I B I T S

11   GOVERNMENT'S            IN EVIDENCE

12   M60                          9

13   M61                         12

14   M63 THROUGH M71             16

15   G152-A                      50

16

17

18

19

20

21

22

23

24

25
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 307 of 443
Case 1:98-cr-00329-RCL   Document 689   Filed 07/19/01   Page 67 of 95

67

```
 1   A.  YES.

 2   Q.  CAN YOU TELL US BY NAME OR NICKNAME THOSE INDIVIDUALS

 3   WHO YOU KNOW OR RECOGNIZE?

 4   A.  I RECOGNIZE "PUG", "PIMP" AND LARRY.

 5   Q.  MR. BENDER, YOU INDICATED THAT YOU KNEW SOMEONE OR YOU

 6   KNOW "DRAPER"?

 7   A.  YES.

 8   Q.  DID YOU ALSO KNOW SOMEONE BY THE NICKNAME OF "ROBOCOP"?

 9   A.  YES.

10   Q.  AND WHILE YOU WERE IN OAK HILL, DID THERE COME A TIME

11   THAT YOU LEARNED THAT SOMETHING HAD HAPPENED TO "ROBOCOP"?

12   A.  YES.

13   Q.  WHAT HAPPENED TO HIM?

14            MR. KIERSH:  OBJECTION.  IT CALLS FOR HEARSAY.

15            MS. CHATURVEDI:  I CAN REPHRASE THE QUESTION.

16            THE COURT:  I BEG YOUR PARDON?

17            MS. CHATURVEDI:  I CAN JUST REPHRASE THE QUESTION,

18   YOUR HONOR.

19            THE COURT:  I THINK YOU CAN REPHRASE IT.  OKAY.

20   REPHRASE IT.

21   BY MS. CHATURVEDI:

22   Q.  DID THERE COME A TIME WHEN YOU WERE IN OAK HILL THAT YOU

23   LEARNED SIMPLY THAT "ROBOCOP" HAD BEEN MURDERED?

24   A. YES.

25   Q.  DID YOU EVER SPEAK WITH WILLIAM SWEENEY, "DRAPER," ABOUT
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 308 of 443
Case 1:98-cr-00329-RCL    Document 689    Filed 07/19/01    Page 68 of 95

68

```
 1   THE MURDER OF "ROBOCOP"?

 2   A. YES.

 3   Q.   WHERE DID THAT CONVERSATION TAKE PLACE?

 4   A.   ON K STREET, SOUTHWEST.

 5   Q.   HOW LONG AFTER YOU WERE RELEASED FROM OAK HILL, ROUGHLY,

 6   WOULD YOU SAY IT WAS THAT YOU HAD THE CONVERSATION WITH

 7   "DRAPER"?

 8   A.   NOT LONG.   IT WAS BEFORE '95.   SO IT WAS LIKE THE END OF

 9   '94.

10   Q.   AND WHAT DID "DRAPER" TELL YOU?

11   A.   WELL, I HAD INITIATED THE CONVERSATION.   I ASKED HIM --

12   I SAID THAT I HEARD THAT HIM AND "ROBOCOP," YOU KNOW, HAD

13   GOTTEN INTO IT.   HE SAID, "NO, HE SWUNG ON ME," YOU KNOW,

14   LIKE HE WAS SHOCKED THAT IT HAPPENED.

15   Q.   SAY THAT AGAIN?   DRAPER SAID THAT WHAT?

16   A.   THAT "ROBOCOP" HAD STOLE HIM IN A CLUB OR SOMETHING.

17   Q.   THAT "ROBOCOP" HAD STOLE --

18   A.   HAD PUNCHED HIM.   PUNCHED HIM.   STOLE, MEANING PUNCHED.

19   Q.   THAT "ROBOCOP" HAD PUNCHED WHO?

20   A.   "DRAPER."

21   Q.   AND THEN WHAT DID "DRAPER" SAY?

22   A.   HE SAID THEY WERE FIGHTING IN THE CLUB, THE MIRAGE.

23   Q.   AND THEN WHAT HAPPENED?

24   A.   AND IT LED TO GUN PLAY LATER ON.   THEY WERE SHOOTING.

25   THEY WERE SHOOTING AT EACH OTHER.
```

69

```
 1   Q.  MR. BENDER, I ASK YOU TO STAY A LITTLE BIT OF A DISTANCE
 2   FROM THE MICROPHONE.  IT WILL MAKE IT A LITTLE BIT EASIER TO
 3   HEAR.  OKAY?
 4           "DRAPER" SAID THAT WHAT HAPPENED AFTER THEY LEFT
 5   THE NIGHTCLUB?
 6   A.  THEY HAD A SHOOT-OUT.
 7   Q.  AFTER THAT SHOOT-OUT, DID "DRAPER" TELL YOU WHAT
 8   HAPPENED?
 9   A.  HE SAID HE CAUGHT HIM AT A CRAPGAME.
10   A.  WHO CAUGHT WHO AT A CRAP GAME?
11   A.  "DRAPER" CAUGHT HIM AT A CRAP GAME.
12   Q.  CAUGHT WHO?
13   A.  "ROBO."
14   Q.  AND WHEN "DRAPER" CAUGHT "ROBO" AT THE CRAP GAME, WHAT
15   HAPPENED?
16   A.  HE SAID HE PUNISHED HIM.
17   Q.  PUNISHED HIM?
18   A.  HE PUNISHED HIM.
19   Q.  DID "DRAPER" SAY WHERE IT WAS -- WHERE THE CRAPGAME WAS?
20   A.  SURSUM CORDAS.
21   Q.  ONCE "DRAPER" TOLD YOU ABOUT HAVING PUNISHED "ROBOCOP",
22   DID YOU SAY ANYTHING?
23   A.  I SAID I HEARD THAT "ROBOCOP" AND SWITZER WAS "BEEFING"
24   BEFORE.
25   Q.  AND DID "DRAPER" MAKE ANY RESPONSE ABOUT THAT?
```

```
 1   A.  HE SAID -- I CAN'T RECALL IF HE SAID THE POLICE OR
 2   PEOPLE -- DUDES IN GENERAL IN THE NEIGHBORHOOD THAT "ROBO"
 3   HAD TOLD THAT SWITZER WAS STANDING OUTSIDE HIS WINDOW OR
 4   SOMETHING.  HE SEEN SWITZER.
 5   Q.  AFTER YOU WERE INCARCERATED AFTER 1995, DID THERE COME A
 6   TIME WHEN YOU CAME INTO CONTACT WITH "DRAPER" IN WHAT'S
 7   CALLED R AND D AT THE JAIL?
 8   A.  YES.
 9   Q.  WILL YOU TELL US FIRST WHAT "R AND D" IS?
10   A.  RECEIVE AND DEPARTURE.
11   Q.  AND WHAT IS THAT?
12   A.  THAT'S WHEN YOU FIRST ENTER THE FACILITY, YOU KNOW, YOU
13   GO THROUGH THE PROCESS OF INTAKE.  AND DEPARTURE IS IF
14   YOU'RE GOING TO COURT OR WHATEVER.
15   A.  WHEN YOU SAW "DRAPER" IN R AND D, DID YOU SPEAK WITH HIM
16   ABOUT A NUMBER OF THINGS?
17   A.  YES.
18   Q.  DID THE NAME JAMES MONTGOMERY COME UP?
19   A.  YES.
20   Q.  TELL US ABOUT WHAT WAS SAID.
21   A.  HE WAS JUST -- HE WAS JUST SAYING JIM WAS TELLING ON
22   THEM.  WELL, HE BASICALLY SAID THAT -- HE EXPLAINED HIS
23   PURPOSES FOR BEING OVER THERE.  HE SAID HE HAD A MISDEMEANOR
24   B.R.A.  AND I TOLD HIM I HEARD ABOUT JIM.  AND HE WAS LIKE,
25   "YEAH, HE WAS TELLING ON A CASE THAT HE WAS IN IN MARYLAND,
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 311 of 443
Case 1:98-cr-00329-RCL    Document 689    Filed 07/19/01    Page 71 of 95

71

```
 1   A TRIPLE HOMICIDE."  HE SAID -- YOU KNOW, HE JUST MADE A

 2   STATEMENT ABOUT IF HE SEEN HIM, HE'D KILL HIM.

 3   Q.  IF WHO SAW HIM?

 4   A.  "DRAPER."

 5   Q.  IF HE SAW WHO?

 6   A.  JIM.

 7   Q.  THAT HE WOULD DO WHAT?

 8   A.  KILL HIM.

 9   Q.  DID "POOPOO'S" NAME COME UP IN THE COURSE OF THAT

10   CONVERSATION?

11   A.  "POO POO," AMONG OTHER PEOPLE'S NAMES, CAME UP.

12   Q.  AND WHAT, IF ANYTHING, DID "DRAPER" SAY ABOUT "POO POO"?

13   A.  HE SAID THAT "POO POO'S" NAME WAS ON A WITNESS LIST, AND

14   HE SAID THAT "POO POO," AS WELL AS "BIRDY" AND A COUPLE

15   OTHER -- WELL, A LOT OF OTHER PERSONS' FROM SOUTHWEST NAMES

16   WAS ON A WITNESS LIST THAT HE SHOWED ME THAT WERE SUPPOSED

17   TO HAVE BEEN TESTIFYING AGAINST HIM.

18   Q.  DID HE SAY WHY THEY WOULD BE TESTIFYING AGAINST HIM?  ON

19   WHAT CASE?

20   A.  THE TRIPLE HOMICIDE IN MARYLAND.

21   Q.  HE ACTUALLY SHOWED YOU A DOCUMENT?

22   A.  YES.

23   Q.  "DRAPER" DID?

24   A.  YES.

25   Q.  AND ONCE HE SHOWED YOU THE DOCUMENT AND INDICATED THE
```

USCA Case #21-3072    Document #2077668    Filed 10/01/2024    Page 312 of 443
Case 1:98-cr-00329-RCL    Document 689    Filed 07/19/01    Page 72 of 95

72

1    NAMES OF THE PEOPLE WHO HE SAID WERE SNITCHING ON HIM, WHAT

2    ELSE DID HE SAY ABOUT THOSE FOLKS?

3    A.   HE SAID HE THOUGHT "VITO" WAS TELLING ON HIM, HE SAID,

4    BECAUSE THEY HAD SOME WORDS OR SOMETHING ABOUT SOMETHING.

5    AND HE SAID "VITO" TRIED TO SAY HE WAS TELLING ON HIM.  HE

6    SAID HE THOUGHT "VITO" WAS TELLING ON HIM.

7    Q.   DID "DRAPER" MAKE ANY COMMENTS ABOUT THE WITNESS LIST --

8    THE FACT THAT THE NAMES WERE ON A WITNESS LIST?

9    A.   HE SAID -- HE SAID THAT HE THOUGHT THAT THE PROSECUTORS

10   WERE TRYING TO SCARE HIM AND THAT WAS A FABRICATED LIST, AND

11   HE SAID A LOT OF PEOPLE -- I MEAN THEY CAN HAVE A LAWSUIT

12   AGAINST THEM BECAUSE A LOT OF PEOPLE AND THEIR FAMILIES CAN

13   GET KILLED.

14   Q.   WHO COULD HAVE A LAWSUIT AGAINST THEM?

15   A.   THE PROSECUTORS.

16   Q.   WHY?

17   A.   BECAUSE A LOT OF PEOPLE AND THEIR FAMILIES COULD GET

18   KILLED, YOU KNOW, FOR THAT LIST.

19   Q.   WHY?

20   A.   BECAUSE IT HAD WITNESSES OR ALLEGED WITNESSES.

21   Q.   THIS TRIPLE HOMICIDE -- WERE YOU FAMILIAR WITH THAT

22   INCIDENT?

23   A.   NO.  NOT REALLY.

24   Q.   WERE YOU AWARE THAT "DRAPER" HAD BEEN CHARGED IN

25   CONNECTION WITH THE TRIPLE HOMICIDE?

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 313 of 443
Case 1:98-cr-00329-RCL    Document 689    Filed 07/19/01    Page 73 of 95

73

```
 1   A.   YES.
 2   Q.   IN FACT, ONCE YOU BECAME AWARE THAT "DRAPER" HAD BEEN
 3   CHARGED WITH THIS TRIPLE HOMICIDE, DID YOU DO SOMETHING?
 4   A.   YES.  I WROTE HIM A LETTER.
 5   Q.   WHERE?
 6   A.   WHEREVER HE WAS.  I CAN'T EVEN RECALL THE ADDRESS.
 7   Q.   WHY DID YOU WRITE HIM A LETTER?
 8   A.   BECAUSE, YOU KNOW, WE WAS CLOSE.  WE WAS OKAY.  I MEAN
 9   WE WAS COOL, YOU KNOW.  SO I MEAN I, YOU KNOW, JUST SENT HIM
10   A LETTER.
11   Q.   SAYING WHAT?
12   A.   IT WASN'T REALLY -- IT WAS BASICALLY TELLING HIM TO KEEP
13   HIS HEAD UP.  IT WASN'T BASICALLY NOTHING IN REFERENCE TO
14   THE CASE OR MY CASE.  JUST A FRIENDLY LETTER.
15   Q.   DID "DRAPER" SPEAK ABOUT ANY ADVICE THAT HE HAD GIVEN TO
16   "POO POO"?
17   A.   HE TOLD HIM -- HE SAID THAT HE SHOULD TAKE A PLEA
18   BECAUSE THEY COULDN'T GET AT THE WITNESSES.
19   Q.   AT THE TIME THAT YOU AND "DRAPER" WERE HAVING THIS
20   CONVERSATION, TO YOUR KNOWLEDGE WAS "POO POO" IN CUSTODY?
21   A.   YES.
22   Q.   ON WHAT CHARGE?
23   A.   MURDER.
24   Q.   MURDER OF WHOM?
25   A.   PHIL SOMETHING.  I DON'T KNOW HIS LAST NAME.
```

USCA Case #21-3072    Document #2077668    Filed 10/01/2024    Page 314 of 443
Case 1:98-cr-00329-RCL   Document 689   Filed 07/19/01   Page 74 of 95

74

```
 1   Q.  AND IN TERMS OF "POO POO" AND JAMES' RELATIONSHIP, DID
 2   "DRAPER" MAKE ANY COMMENTS ABOUT "POO POO" AND JAMES'
 3   RELATIONSHIP?
 4   A.  HE JUST SAID THAT "POO POO" SHOULD BE WORRIED ABOUT
 5   JAMES TELLING ON HIM BECAUSE HE DID A LOT OF THINGS WITH
 6   HIM.
 7   Q.  DID "BUTCHIE'S" NAME COME UP --
 8   A.  YES.
 9   Q.  -- WHEN YOU SPOKE WITH "DRAPER"?
10   A.  YEAH.
11   Q.  DID YOU KNOW WHO "BUTCHIE" WAS?
12   A.  NO.  NOT REALLY.  HUH-UH.
13   Q.  HAD YOU HEARD THAT NAME BEFORE?
14   A. YES.
15   Q.  AND WHAT WAS YOUR UNDERSTANDING AS TO THE RELATIONSHIP,
16   IF ANY, BETWEEN "BUTCHIE" AND "DRAPER"?
17          MR. KIERSH:  OBJECTION, YOUR HONOR.  THAT'S
18   HEARSAY.
19          THE COURT:  OVERRULED.
20          THE WITNESS: WELL, PRIOR TO THE CONVERSATION WITH
21   "DRAPER" ABOUT "BUTCHIE", ME AND HIS UNCLE -- WELL, I CALL
22   HIM -- I ACKNOWLEDGE HIM AS "DRE."  I AM NOT SURE IF IT WAS
23   ANDRE SWEENEY OR NOT, BUT I KNEW HIS LAST NAME WAS SWEENEY.
24   AND WE ACKNOWLEDGED HIM AS "DRE."  AND HE WAS A CELLMATE OF
25   MINE BEFORE SEEING "DRAPER" LATER ON.  WE WAS IN THE CELL,
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 315 of 443
Case 1:98-cr-00329-RCL   Document 689   Filed 07/19/01   Page 75 of 95

75

```
 1   AND HE INFORMED ME OF --
 2            MR. KIERSH:  YOUR HONOR, THIS IS SIMPLY HEARSAY.
 3            THE COURT:  IT SOUNDS LIKE IT TO ME.
 4            MS. CHATURVEDI:  I CAN REPHRASE THE QUESTION.
 5            THE COURT:  ALL RIGHT.
 6            MS. CHATURVEDI:  STRIKE THAT QUESTION AND I WILL
 7   ASK A DIFFERENT QUESTION.
 8   BY MS. CHATURVEDI:
 9   Q.  MR. BENDER, WHEN YOU WERE SPEAKING WITH "DRAPER" --
10   A.  I UNDERSTOOD YOUR QUESTION.  I WAS GOING TO GET -- I WAS
11   GOING TO GET TO IT.
12   Q.  I'M ASKING A DIFFERENT QUESTION THOUGH.
13   A.  OKAY.
14   Q.  I KNOW.  I AM ASKING A DIFFERENT QUESTION THOUGH.
15            THE COURT:  SHE HAS GOT TO REPHRASE THE QUESTION.
16            THE WITNESS:  OKAY.
17   BY MS. CHATURVEDI:
18   Q.  WHEN YOU SPOKE WITH "DRAPER," WHAT DID "DRAPER" SAY
19   ABOUT "BUTCHIE"?
20   A.  HE SAID THAT "BUTCHIE" WAS SNITCHING ON HIM, AND HE
21   SAID, "FAMILY OR NOT, HE HAS GOT TO GET DEALT WITH."
22   Q.  HE HAS GOT TO GET WHAT?
23   A. DEALT WITH.
24   Q.  AND WHAT DID YOU TAKE THAT TO MEAN?
25   A.  HE HAS GOT TO DIE, BASICALLY.
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 316 of 443
Case 1:98-cr-00329-RCL   Document 689   Filed 07/19/01   Page 76 of 95

76

1  Q.  AT THE TIME YOU SPOKE WITH "DRAPER" ABOUT "BUTCHIE",

2  WERE YOU AWARE AS TO WHETHER OR NOT "BUTCHIE" WAS ALIVE OR

3  DEAD?

4  A. I WAS AWARE.

5  Q.  WHAT WERE YOU AWARE OF?

6  A.  I WAS AWARE THAT HE -- YOU KNOW, HE WAS ALREADY

7  DECEASED.

8  Q.  AND DID "DRAPER" SAY ANYTHING TO YOU ABOUT "BUTCHIE"

9  BEING KILLED?

10  A.  WELL, I MEAN IT WAS ALREADY DONE, SO I KNEW.  SO I MEAN

11  THERE WASN'T REALLY NO POINT OF HIM SAYING NOTHING THAT I

12  ALREADY KNEW.

13  Q.  SO MY QUESTION, I GUESS, SIMPLY IS DID HE SAY ANYTHING

14  SPECIFICALLY ABOUT "BUTCHIE'S" MURDER OR NOT?

15  A.  WELL, HE JUST BASICALLY SAID THAT -- I MEAN --

16         MR. BESHOURI:  OBJECTION, YOUR HONOR.  MAY WE

17  APPROACH?

18         THE COURT:  SURE.

19         (BENCH CONFERENCE.)

20

21

22

23

24

25

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 317 of 443
Case 1:98-cr-00329-RCL    Document 689    Filed 07/19/01    Page 81 of 95

81

```
 1   A.   "PUG."

 2   Q.   FROM WHICH NEIGHBORHOOD?

 3   A.   37TH.

 4   Q.   DID YOU HEAR MR. MARTIN TALKING AT THE PRAYER SERVICE?

 5   A.   YES.

 6   Q.   WHAT WAS HE SAYING?

 7   A.   HE WAS BASICALLY INFORMING "VITO," YOU KNOW, ABOUT A

 8   WITNESS -- ALLEGED WITNESS AGAINST HIM AND "PUG" ON THE CASE

 9   THEY WAS INCARCERATED ON.

10   Q.   WHAT DID HE SAY ABOUT THIS ALLEGED WITNESS?

11   A. HE SAID THAT -- HE BASICALLY TOLD HIM THEY NEEDED

12   SOMEBODY TO GET AT THE BROAD THAT WAS SNITCHING ON THEM.

13   Q.   THE WHAT?

14   A.   GET AT THE BROAD, BUT I MEAN THE "BROAD" WASN'T THE

15   WORD --

16        MR. JONES:   I'M SORRY.   I DON'T UNDERSTAND WHAT

17   HE'S SAYING.

18        MS. CHATURVEDI:   IF I COULD JUST HAVE A MOMENT, I

19   THINK I CAN CLEAR IT UP.

20   BY MS. CHATURVEDI:

21   Q.   IS THE WORD THAT YOU'RE USING "BROAD"?

22   A.   WELL, THAT WASN'T REALLY THE WORD.   I JUST SAID BROAD,

23   BUT HE SAID -- I MEAN, YOUR HONOR, IF I MAY --

24   Q.   SAY THE WORD.

25   A.   HE SAID, "WE NEED SOMEBODY TO GET AT THAT BITCH."
```

```
 1    Q.  WHAT IF ANYTHING ELSE DID MR. MARTIN SAY ABOUT GETTING

 2    AT THAT ALLEGED WITNESS?

 3    A.  NOTHING AFTER THAT.

 4    Q.  DID THERE COME A TIME, AGAIN WHILE YOU WERE IN CUSTODY,

 5    THAT JEROME MARTIN WAS IN THE SAME BLOCK AS YOU WERE?

 6    A.  YES.

 7    Q.  DID YOU EVER HAVE ANY CONVERSATIONS WITH MR. MARTIN AT

 8    THAT TIME ABOUT JAMES MONTGOMERY?

 9            MS. HEPWORTH:  CAN WE HAVE A TIME?  YOUR HONOR,

10    MAY WE HAVE A TIME -- A TIME FOR THIS CONVERSATION?

11            THE COURT:  IT WAS WHILE HE WAS AT D. C. JAIL

12    WHILE THEY WERE THERE TOGETHER, I GUESS.

13            MS. HEPWORTH:  THE OTHER CONVERSATION WAS IN '96.

14    I WOULD JUST LIKE TO KNOW THE TIME.

15            THE COURT:  I'M SORRY?

16            MS. HEPWORTH:  I WOULD LIKE TO KNOW IF HE CAN

17    SPECIFY THE TIME.

18            THE COURT:  WELL, ASK HIM IF HE CAN SPECIFY THE

19    TIME.

20    BY MS. CHATURVEDI:

21    Q.  TO THE BEST OF YOUR RECOLLECTION, MR. BENDER, CAN YOU

22    GIVE US A YEAR?

23    A.  IT WAS IN '97.

24    Q.  AND IN THAT CONVERSATION YOU HAD WITH MR. MARTIN IN

25    1997, DID JAMES MONTGOMERY'S NAME COME UP?
```

83

```
 1   A.  YES.

 2   Q.  WHAT DID "PIMP" SAY -- MR. MARTIN SAY?

 3   A. HE INFORMED ME THAT JIM WAS TESTIFYING AGAINST

 4   "DRAPER" AND "CHIN" IN THE TRIPLE HOMICIDE IN MARYLAND.

 5   Q.  DID THE SUBJECT OF --

 6           MS. HEPWORTH:  OBJECTION.

 7           THE COURT:  I BEG YOUR PARDON?

 8           MS. HEPWORTH:  I AM OBJECTING TO THE ANTICIPATED

 9   LEADING NATURE OF THIS QUESTION.

10           THE COURT:  LET HER FINISH THE QUESTION AND THEN

11   MAKE THE OBJECTION.

12           MS. HEPWORTH:  YES, YOUR HONOR.

13   BY MS. CHATURVEDI:

14   Q.  DID THE SUBJECT OF WHAT MR. MARTIN FELT ABOUT JAMES

15   MONTGOMERY COME UP IN THE COURSE OF THAT CONVERSATION?

16   A.  YES.

17   Q.  WHAT DID HE SAY?

18   A.  HE SAID HE WAS FUCKED UP AT JIM.  YOU KNOW, HE WOULD

19   KILL FOR HIM, YOU KNOW.  I MEAN HE JUST COULDN'T BELIEVE HE

20   WOULD DO SOMETHING LIKE THAT.

21           HE ALSO STATED THAT JIM WAS TELLING ON HIM -- WAS

22   SNITCHING ON HIM ON THE OLD '91 CASE.

23   Q.  THAT JIM WAS SNITCHING ON WHO?

24   A.  "PIMP."

25   Q.  ON WHAT?
```

84

| 1 | A. AN OLD '91 CASE. |
| 2 | Q. WHAT KIND OF CASE? |
| 3 | A. HE BASICALLY REALLY DIDN'T -- HE DIDN'T REALLY CLARIFY. |
| 4 | Q. AND WHAT DID MR. MARTIN SAY ABOUT JIM SNITCHING ON HIS |
| 5 | OLD CASE? |
| 6 | A. HE SAID HE WASN'T WORRYING ABOUT IT BECAUSE ALL THEY HAD |
| 7 | WAS JIM. |
| 8 | Q. NOW, AT SOME POINT -- WELL, IN 1997, WHEN YOU SAW |
| 9 | MR. MARTIN, DID THERE COME A TIME WHEN HE LEFT THE JAIL? |
| 10 | A. YES. |
| 11 | Q. WHEN HE RETURNED BACK TO THE JAIL, DID YOU HAVE A |
| 12 | CONVERSATION WITH HIM ABOUT WHERE HE HAD BEEN? |
| 13 | A. YES. |
| 14 | Q. WHAT DID HE TELL YOU? |
| 15 | A. HE SAID THAT THEY HAD SENT ON A LOAD DOWN TO LORTON. |
| 16 | Q. ON A LOAD, L-O-A-D? |
| 17 | A. TO THE LORTON FACILITY. AND HE SAID HE THOUGHT THAT AN |
| 18 | INDIVIDUAL BY NAME OF RODNEY SHORT HAD SOMETHING TO DO WITH |
| 19 | IT. |
| 20 | Q. DID YOU KNOW THAT NAME, RODNEY SHORT? |
| 21 | A. YES. |
| 22 | Q. WHAT NEIGHBORHOOD WAS HE FROM? |
| 23 | A. 58TH. |
| 24 | Q. 58TH? |
| 25 | A. YES. |

App 452

```
1    Q.  WHAT IF ANYTHING ELSE DID MR. MARTIN SAY ABOUT HIS
2    BELIEF THAT RODNEY SHORT HAD ARRANGED FOR HIM TO BE SENT TO
3    LORTON?
4    A.  BECAUSE THEY HAD A "BEEF" -- 58TH AND 37TH HAD A BEEF
5    AND ABOUT HIM KILLING TONY FORTUNE.
6    Q.  YOU HAD A CONVERSATION WITH HIM ABOUT -- I AM SORRY.
7    THE LAST PART OF YOUR ANSWER, I GOT DISTRACTED.  WHAT DID
8    YOU SAY?
9    A.  KILLING TONY FORTUNE.
10   Q.  WHO KILLED TONY FORTUNE, ACCORDING TO "PIMP"?
11   A.  "PIMP."
12   Q.  AND DID "PIMP" SPEAK ABOUT THE MURDER OF TONY FORTUNE
13   WITH YOU?
14   A.  YES.
15   Q.  WHAT DID "PIMP" TELL YOU ABOUT THE MURDER --
16            MS. HEPWORTH:  YOUR HONOR, THIS IS SO LEADING.
17   IT'S SO LEADING.
18            THE COURT:  NO, IT'S NOT LEADING.  THE OBJECTION
19   IS OVERRULED.
20            GO AHEAD.
21   BY MS. CHATURVEDI:
22   Q.  WHAT DID MR. MARTIN SAY TO YOU ABOUT THE MURDER OF TONY
23   FORTUNE?
24   A.  HE SAID THAT HE TRIED -- WELL, HE WAS MAKING MOTIONS
25   LIKE HE WAS GOING TO TRY TO ROB THE CRAPGAME.
```

86

```
 1    Q.   WHO WAS MAKING MOTIONS?

 2    A.   TONY FORTUNE.

 3    Q.   AND WHAT HAPPENED AT THAT POINT?

 4              MR. BESHOURI: OBJECTION.  IF WE CAN APPROACH.

 5              MS. CHATURVEDI:  OKAY.

 6              THE COURT:  CAN YOU ANTICIPATE WHAT HIS OBJECTION

 7    IS?

 8              MS. CHATURVEDI:  YES.  I DON'T BELIEVE THE ISSUE

 9    IS GOING TO ARISE.

10              MR. BESHOURI:  ALL RIGHT.  WITHDRAWN.

11              THE COURT:  ALL RIGHT.  GO AHEAD.

12    BY MS. CHATURVEDI:

13    Q.   ALL RIGHT.  WHAT DID "PIMP," MR. MARTIN, TELL YOU ABOUT

14    THE MURDER OF TONY FORTUNE?

15    A.   HE BASICALLY SAID THAT TONY FORTUNE WAS BASICALLY MAKING

16    GESTURES LIKE HE WAS GOING TO ROB THE CRAPGAME.  AND HE SAID

17    HE PUNISHED HIM.

18    Q.   WHO PUNISHED HIM?

19    A.   "PIMP."

20    Q.   WHAT DID YOU UNDERSTAND IT TO MEAN WHEN HE SAID THAT HE

21    PUNISHED HIM?

22    A.   HE KILLED HIM.

23    Q.   DID "PIMP" DESCRIBE FOR YOU WHAT HAPPENED AFTER TONY

24    FORTUNE WAS KILLED?

25    A.   HE STATED THAT HE COULD HAVE SURVIVED BUT --
```

```
 1    Q.   WHO COULD HAVE SURVIVED?

 2    A. TONY FORTUNE, BUT THEY JUST LET HIM DIE.  THE POLICE JUST

 3    DIDN'T CALL FOR NO PARAMEDIC OR NOTHING.

 4    Q.   NOW, FINALLY, AND BRIEFLY -- YOUR HONOR, I ONLY HAVE A

 5    FEW MORE MINUTES LEFT -- DID YOU HAVE AN OPPORTUNITY, WHILE

 6    YOU WERE IN CUSTODY, TO SPEAK WITH MAURICE PROCTOR?

 7    A. YES.

 8    Q.   WHEN YOU SPOKE WITH MAURICE PROCTOR, DO YOU KNOW WHAT IT

 9    WAS HE WAS INCARCERATED FOR AT THE TIME?

10    A. YES.

11    Q.   WHAT WAS THAT?

12    A.   THE MURDER OF PHIL.

13    Q.   DID YOU SPEAK WITH MR. PROCTOR ABOUT HIS CASE?

14    A.   YES.

15    Q.   AND PRIOR TO GOING TO TRIAL, DID MR. PROCTOR -- DID

16    "POO POO" TELL YOU WHERE OR THE CIRCUMSTANCES OF THAT

17    MURDER?

18    A.   YES.

19    Q.   WHAT DID HE TELL YOU?

20               MR. ZUCKER:  OBJECTION.

21               THE COURT:  YOU HAD BETTER APPROACH THE BENCH.

22               (BENCH CONFERENCE.)

23

24

25
```



1

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA

2

3    UNITED STATES,                    :
              GOVERNMENT,              :

4                                      :
     VS.                               :        CR. NO. 98-329

5                                      :
     VINCENT HILL,                     :
6    JEROME MARTIN,                    :
     SAMUEL CARSON,                    :
7    WILLIAM K. SWEENEY,               :
     SEAN COATES,                      :
8              DEFENDANTS.             :
                                       :

9    UNITED STATES                     :
              GOVERNMENT,              :

10                                     :
     VS.                               :        CR. NO. 99-348

11                                     :
     GARY PRICE,                       :
12             DEFENDANT               :

13

14                                     WASHINGTON, D. C.
                                       APRIL 9, 2001

15                                     (MORNING SESSION)
                                       (10:15 A.M.)

16

17              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE THOMAS P. JACKSON

18

19

20

21   COURT REPORTER:         PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT

22                           3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001

23

24

25

**FILED**

**JUL 1 9 2001**

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

690



2.

```
 1   FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                     ANJALI CHATURVEDI, AUSA
 2                                   555 4TH ST., N.W.
                                     WASHINGTON, D. C. 20001
 3
     FOR THE DEFENDANT HILL:         CHRISTOPHER DAVIS, ESQ.
 4                                   601 INDIANA AVE., N.W.
                                     #910
 5                                   WASHINGTON, D. C.  20004

 6   FOR THE DEFENDANT MARTIN:       JOANNE HEPWORTH, ESQ.
                                     305 H STREET, N.W.
 7                                   2ND FLOOR
                                     WASHINGTON, D. C.  20001
 8

 9   FOR THE DEFENDANT CARSON:       JOSEPH BESHOURI, ESQ.
                                     LEXI NEGIN-CHRIST, ESQ.
10                                   419 7TH STREET, N.W.
                                     WASHINGTON, D. C.  20004
11
     FOR THE DEFENDANT SWEENEY:      STEVEN R. KIERSH, ESQ.
12                                   717 D STREET, N.W.
                                     SUITE 400
13                                   WASHINGTON, D. C.  20004

14
     FOR THE DEFENDANT COATES:       FREDERICK JONES, ESQ.
15                                   901 6TH STREET, S.W.
                                     #409
16                                   WASHINGTON, D. C.  20024

17   FOR THE DEFENDANT PRICE:        JONATHAN ZUCKER, ESQ.
                                     601 INDIANA AVE., N.W.
18                                   #901
                                     WASHINGTON, D. C.  20004
19

20

21

22

23

24

25
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 326 of 443
Case 1:98-cr-00329-RCL   Document 690   Filed 07/19/01   Page 3 of 83

3

```
 1                        INDEX

 2  WITNESS:                    DIRECT   CROSS   REDIRECT   RECROSS

 3  DR. JONATHAN ARDEN

 4        BY MS. CHATURVEDI     7

 5        BY MR. ZUCKER                  49

 6        BY MR. BESHOURI               56

 7  EUGENE BYARS

 8        BY MR. ZEIDENBERG     64

 9

10                    E X H I B I T S

11  GOVERNMENT'S            IN EVIDENCE

12  HH207 & HH208              9

13  HH200                     11

14  HH201                     13

15  HH204                     16

16  HH202                     18

17  HH203                     22

18  HH205                     24

19  TF203                     27

20  TF202                     32

21  TF201                     34

22  TB203                     35

23  TB200                     37

24  TB202                     42

25  TB201                     44
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 327 of 443
Case 1:98-cr-00329-RCL   Document 690   Filed 07/19/01   Page 70 of 83

70

1                  THE COURT:  THE RECORD WILL SO REFLECT.

2    BY MR. ZEIDENBERG:

3    Q.  WHAT NAME DID YOU KNOW VINCENT HILL BY?

4    A.  "VITO."

5    Q.  NOW, MR. BYARS, DIRECTING YOU BACK TO WHEN YOU

6    WERE APPROXIMATELY -- YOU SAID YOU'RE 29 YEARS OLD?

7    A.  YES.

8    Q.  YOU WERE BORN IN WHAT YEAR?

9    A.  1972.

10   Q.  BACK AROUND 1986, WHEN YOU WERE ABOUT 14 YEARS OLD, DID

11   YOU BEGIN SELLING DRUGS?

12   A.  YES.

13   Q.  WHERE DID YOU BEGIN SELLING DRUGS?

14   A.  203 N STREET, SOUTHWEST.

15   Q.  WHAT DRUG DID YOU START SELLING?

16   A.  P.C.P.

17   Q.  DID YOU HAVE A SUPPLIER?

18   A.  YES.

19   Q.  WHO WAS THAT?

20   A.  VINCENT HILL.

21                  MR. DAVIS:  YOUR HONOR, I WOULD ASK FOR A

22   CAUTIONARY INSTRUCTION SINCE WE'RE OUTSIDE THE TIMEFRAME OF

23   THE INDICTMENT NOW.

24                  THE COURT:  ALL RIGHT.

25                  YOU RECALL, LADIES AND GENTLEMEN, THAT THE PERIOD

1   AS TO WHICH HE IS TESTIFYING NOW IN 1986 IS OUTSIDE THE

2   PERIOD CONTAINED IN THE INDICTMENT.

3           MR. ZEIDENBERG:  THANK YOU, YOUR HONOR.

4           THE COURT:  OKAY.

5   BY MR. ZEIDENBERG:

6   Q.  CAN YOU TELL THE LADIES AND GENTLEMEN A LITTLE BIT ABOUT

7   HOW YOU WERE HUSTLING BACK IN 1986?

8   A.  WELL, I WAS HUSTLING UNDERNEATH THE 203 TUNNEL.  IT'S

9   LIKE AN APARTMENT BUILDING.

10           MR. JONES:  SPEAK UP.

11           THE WITNESS:  I  WAS HUSTLING UNDER THE 203

12   TUNNEL.  IT'S LIKE AN APARTMENT BUILDING.

13   BY MR. ZEIDENBERG:

14   Q.  AND YOU SAID YOU WERE SELLING P.C.P.?

15   A.  YES.

16   Q.  HOW DID YOU GET THE P.C.P.?

17   A.  I WAS GETTING IT FROM VINCENT HILL AT NIGHT, AND I WOULD

18   SELL IT IN THE MORNING.

19   Q.  HOW MUCH P.C.P. WERE YOU GETTING FROM VINCENT HILL EVERY

20   DAY?

21   A.  A THOUSAND DOLLARS.  ABOUT A HUNDRED BAGS.

22   Q.  A HUNDRED BAGS?

23   A. YES.

24   Q.  A HUNDRED BAGS -- HOW MUCH IS A SINGLE BAG OF P.C.P. --

25   DO YOU SELL IT FOR?

72

```
 1   A.   $10.00.

 2   Q.   SO FROM A HUNDRED BAGS, YOU WOULD GENERATE HOW MUCH

 3   INCOME?

 4   A. 1000.

 5   Q.   WHAT TIME OF THE DAY WERE YOU SELLING?

 6   A.   IN THE MORNING TO AROUND 4:00 O'CLOCK.  SOMETHING LIKE

 7   THAT.

 8   Q.   4:00 O'CLOCK IN THE AFTERNOON?

 9   A.   YES.

10   Q.   YOU WOULD START WHAT TIME IN THE MORNING?

11   A.   ABOUT 8:30.

12   Q.   DID YOU GO TO SCHOOL DURING THIS TIME?

13   A.   NO.

14   Q.   WHAT HAPPENED TO SCHOOL?

15   A.   I DROPPED OUT OF SCHOOL AND STARTED HUSTLING.

16   Q.   NOW, WHAT WOULD HAPPEN -- WHAT DID YOU DO WITH THE MONEY

17   AT THE END OF THE DAY?

18   A.   I'D HOLD IT AND WAIT UNTIL VINCENT WOULD COME AND PICK

19   IT UP.

20   Q.   WHERE WOULD HE PICK IT UP FROM?

21   A.   HE WOULD COME ON P STREET TO PICK IT UP.  I WOULD BE

22   OUTSIDE.

23   Q.   HOW MUCH OF THAT THOUSAND DOLLARS DID YOU HAVE TO GIVE

24   BACK TO VINCENT HILL?

25   A.   ALL OF IT.
```

73

1    Q.   HOW MUCH MONEY WERE YOU GETTING?

2    A. BASICALLY NOTHING.   PROBABLY ABOUT $50.00 OR SOMETHING

3    LIKE THAT, AND THAT'S IT.

4    Q.   NOW, FROM WHAT YOU COULD SEE, MR. BYARS, WERE YOU THE

5    ONLY ONE THAT WAS SELLING FOR VINCENT HILL?

6    A.   NO.

7    Q.   WERE THERE OTHERS LIKE YOU?

8    A.   YES.

9    Q.   WHAT AGES?

10   A.   YOUNGER AND OLDER.

11   Q.   AND IF YOU COULD JUST REMIND US, HOW OLD WERE YOU AT THE

12   TIME?

13   A. FOURTEEN.

14   Q.   IF YOU WEREN'T MAKING ANY SIGNIFICANT AMOUNT OF MONEY,

15   WHY WERE YOU DOING IT?

16   A.   WELL, I WANTED TO BE LIKE "VITO" AND WAYNE, YOU KNOW,

17   AND HAVE POWER AND HAVE PEOPLE RESPECT ME, YOU KNOW.   I WAS

18   TRYING TO IDOLIZE THEM.

19   Q.   WHEN YOU SAY "WAYNE," WHO ARE YOU REFERRING TO?

20   A.   WAYNE PERRY.

21   Q.   WHO IS WAYNE PERRY?

22   A. HE IS FROM SOUTHWEST.  HE IS A FRIEND OF VINCENT HILL'S.

23   Q.   WHAT WAS THE RELATIONSHIP, IF ANY, BETWEEN WAYNE PERRY

24   AND VINCENT HILL?

25   A.   WELL, THEY WERE REAL CLOSE.

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .    Docket No. CR 98-329

      Government,               .    Washington, D.C.
                                   .    April 9, 2001
  vs.                              .    2:12 p.m.

VINCENT HILL,                      .    (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,                .
SEAN COATES,                       .

     Defendants                  .

. . . . . . . . . . . . . .        .

UNITED STATES OF AMERICA,          .

      Government,               .
                                   .    Docket No. CR 99-348
  vs.                              .

GARY PRICE,                        .

     Defendant.                  .

. . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

2

```
For the Defendant Carson:     JOSEPH BESHOURI, ESQ.
                              LEXI NEGIN-CHRIST, ESQ.
                              419 7th Street, N.W.
                              Washington, D.C.  20004

For the Defendant Sweeney:    STEVEN R. KIERSH, ESQ.
                              717 D Street, N.W.
                              Suite 400
                              Washington, D.C.  20004

For the Defendant Coates:     FREDERICK JONES, ESQ.
                              901 6th Street, S.W.
                              Suite 409
                              Washington, D.C.  20024

For the Defendant Price:      JONATHAN ZUCKER, ESQ.
                              601 Indiana Ave., N.W.
                              Suite 901
                              Washington, D.C.  20024

Court Reporter:               BEVERLY J. BYRNE
                              Official Court Reporter
                              Room 6810 U.S. Courthouse
                              Washington, D.C.  20001
                              (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from
dictation.

13

1   A.    I was just basically telling him about guys that's down

2   Lorton talking about they wanted to kill him.

3   Q.    Mr. Byars, if you could put your hand down.

4   A.    I was basically telling him about guys that's down Lorton

5   talking about they wanted to kill him and do things to him

6   because of the results of Tony Fortune.

7   Q.    The people that you had talked to in Lorton who wanted to

8   kill -- said they wanted to kill Mr. Martin, where were they

9   from?

10  A.    They was from 58th and Paradise.

11  Q.    What did Pimp say when you told him that there were

12  people down at Lorton from 58th and Paradise who wanted to

13  kill him?

14  A.    It didn't matter.  He was saying things like, he ain't

15  tripping off that shit, and what happens just happens.

16  Q.    Did you ask him what the problem was between him and 58th

17  and Paradise?

18  A.    Yes.  He told me -- he was telling me that Tony jumped

19  out there, was trying to advantage take when they was

20  gambling.

21  Q.    Now, when he said Tony, did you know who he was referring

22  to?

23  A.    I don't know the dude personally, but I know the name,

24  because the guys in 58 was accusing him of -- that's the

25  reason why they was beefing with them.

14

1    Q.    And the individual that the beef was over was named whom?

2    A.    Tony Fortune.

3    Q.    What did Pimp tell you about Tony Fortune?

4    A.    He would just say that he was trying to advantage take,

5    you know, at a crap game.  And a guy named Block was with

6    Tony, and he wasn't having it.

7    Q.    Did Pimp tell you what happened when Tony tried to take

8    advantage?

9    A.    Yes.

10   Q.    What did he say?

11   A.    He said he shot him.

12   Q.    Now, did Pimp tell you what happened as a result of the

13   murder of Tony Fortune?

14   A.    Yes, it started a turf war.

15   Q.    Between where?

16   A.    58th, Paradise and Southwest and Ridge Road.

17   Q.    Now, as a result of this turf war, did he tell you

18   whether or not there were any casualties?

19   A.    Repeat that?

20   Q.    Was anyone hurt or injured or killed as a result of this

21   turf battle?

22   A.    Yes.

23   Q.    Who?

24   A.    A guy named Boo-Boo and a girl named Felicia.  She was

25   paralyzed.

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .   Docket No. CR 98-329
                                   .
          Government,              .   Washington, D.C.
                                   .   April 24, 2001
     vs.                           .   2:15 p.m.
                                   .
VINCENT HILL,                      .   (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,                .
SEAN COATES,                       .
                                   .
          Defendants               .
                                   .
 . . . . . . . . . . . . . . . .   .
                                   .
UNITED STATES OF AMERICA,          .
                                   .
          Government,              .
                                   .   Docket No. CR 99-348
     vs.                           .
                                   .
GARY PRICE,                        .
                                   .
          Defendant.               .
                                   .
 . . . . . . . . . . . . . . . .

                      TRANSCRIPT OF TRIAL
       BEFORE THE HONORABLE THOMAS P. JACKSON
      UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.   20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.   20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.   20001

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

3

```
 1                      P R O C E E D I N G S

 2            THE COURT:  The record will reflect that over the

 3   noon hour I have reviewed the FBI 302 dated January 27, 1999

 4   as being the 302 related to testimony about to be given by Mr.

 5   Rice, and I find nothing in it to permit it to be

 6   characterized as Brady material, and it is clearly not a

 7   Jencks Act statement.

 8            Consequently I'm going to direct that the Clerk of

 9   the Court file this again under seal as a court exhibit and

10   make it part of the record.

11            Are you ready?

12            MS. CHATURVEDI:  Yes, sir.

13            THE DEPUTY MARSHAL:  Jury panel, Your Honor.

14       (Jury In.)

15

16

17

18

19

20

21

22

23

24

25
```

*Clerks File*

1

1

2                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
3

     _____
4    UNITED STATES,
               GOVERNMENT,                    :
5                                             :
       VS.                                    :     CR. NO. 98-329
6                                             :
     VINCENT HILL,                            :
7    JEROME MARTIN,                           :
     SAMUEL CARSON,                           :
8    WILLIAM K. SWEENEY,                       :
     SEAN COATES,                             :
9              DEFENDANTS.                     :
     _____              :
10   UNITED STATES                            :
               GOVERNMENT,                    :
11                                            :
       VS.                                    :     CR. NO. 99-348
12                                            :
     GARY PRICE,                              :
13             DEFENDANT                       :
     _____              :
14
                              WASHINGTON, D. C.
15                            APRIL 25, 2001
                              (MORNING SESSION)
16                            (10:35 A.M.)

17
                     TRANSCRIPT OF PROCEEDINGS
18            BEFORE THE HONORABLE THOMAS P. JACKSON

19

20

21

     COURT REPORTER:          PHYLLIS MERANA
22                            6816 U. S. DISTRICT COURT
                              3RD & CONSTITUTION AVE., N.W.
23                            WASHINGTON, D. C. 20001

24

25

**FILED**

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

2

```
 1

 2    FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
 3                                     555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001
 4
      FOR THE DEFENDANT HILL:          CHRISTOPHER DAVIS, ESQ.
 5                                     601 INDIANA AVE., N.W.
                                       #910
 6                                     WASHINGTON, D. C.  20004

 7    FOR THE DEFENDANT MARTIN:        JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
 8                                     2ND FLOOR
                                       WASHINGTON, D. C.  20001
 9

10    FOR THE DEFENDANT CARSON:        JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
11                                     419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004
12
      FOR THE DEFENDANT SWEENEY:       STEVEN R. KIERSH, ESQ.
13                                     717 D STREET, N.W.
                                       SUITE 400
14                                     WASHINGTON, D. C.  20004

15
      FOR THE DEFENDANT COATES:        FREDERICK JONES, ESQ.
16                                     901 6TH STREET, S.W.
                                       #409
17                                     WASHINGTON, D. C.  20024

18    FOR THE DEFENDANT PRICE:         JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
19                                     #901
                                       WASHINGTON, D. C.  20004
20

21

22

23

24

25
```

3

```
1                              INDEX

2   WITNESS:              DIRECT  CROSS  REDIRECT  RECROSS

3   ARTHUR RICE

4        BY MS. CHATURVEDI    8

5

6

7

8

9

10

11

12

13

14                  ———

15

16

17

18

19

20

21

22

23

24

25
```

40

1       (END OF BENCH CONFERENCE.)

2       THE COURT:  ALL RIGHT.  THE OBJECTION IS

3   OVERRULED.  YOU CAN ASK YOUR QUESTION AGAIN.

4   BY MS. CHATURVEDI:

5   Q.  MR. RICE, YOU HAD INDICATED THAT EVEN BEFORE YOU HAD

6   BEEN INCARCERATED IN 1994, YOU HAD AN UNDERSTANDING AS TO

7   WHO WAS RESPONSIBLE FOR THE MURDER OF TONY FORTUNE.

8   A. YES, I DID.

9   Q.  AND WHAT WAS YOUR UNDERSTANDING AS TO WHO WAS

10  RESPONSIBLE FOR THAT MURDER?

11  A. MY UNDERSTANDING WAS THAT IT WAS "PIMP" AND THAT IT WAS

12  37TH PLACE BECAUSE 58TH WAS ALWAYS "BEEFING" WITH 37TH PLACE

13  AND NOT US.

14  Q.  WHEN YOU WERE AT THE CHINESE CARRY-OUT WITH "CHIN" AND

15  DAVE CARSON, CAN YOU TELL US HOW YOU BROUGHT UP THE MURDER

16  OF TONY FORTUNE?

17  A.  WELL, "CHIN" RARELY SAID ANYTHING EVER TO ME ABOUT

18  ANYTHING HE'D EVER DONE.  AND I REALLY DIDN'T KNOW HOW TO

19  ASK HIM.  I WAS KIND OF -- I HAD HEARD ALL KINDS OF -- NOT

20  RUMORS, BUT PEOPLE TALKED TO ME A LOT BECAUSE ON THE STREET

21  WHEN WE WAS LOCKED UP, DUDES ALWAYS RESPECTED ME FROM JAIL.

22  Q.  SO WHAT DID YOU SAY TO "CHIN"?

23  A.  I SAID, "MAN, ALL THAT TIME I THOUGHT IT WAS `PIMP,' AND

24  COME TO FIND OUT IT WAS YOU, MAN."

25  Q.  WHAT DID "CHIN" SAY WHEN YOU SAID THAT TO HIM?

41

1  A. HE STARTED LAUGHING. HE SAID, "WELL, NOW YOU KNOW." HE

2  DIDN'T SAY NOTHING FURTHER. I KIND OF EXPRESSED THE FACT,

3  "THIS IS HOW THE DUDE SAID IT HAPPENED," YOU KNOW. HE

4  REALLY JUST SAID, "NOW YOU KNOW."

5  Q. AGAIN, HAD YOU SAID THE NAME OF THE PERSON TO HIM?

6  A. YES. I DIDN'T SAY "TONY FORTUNE." I JUST SAID "TONY"

7  AT 58TH.

8  Q. WHEN "CHIN" SAID TO YOU, "NOW YOU KNOW," CAN YOU

9  DESCRIBE HOW HE LOOKED AT YOU WHEN HE SAID THAT TO YOU?

10  A. IT'S TIME FOR ME TO SHUT UP, MAN, AND MIND MY BUSINESS,

11  LIKE I HAD REALLY KIND OF LIKE MESSED UP BY EVEN ASKING HIM.

12  Q. WHY DID YOU ASK HIM?

13  A. WHY DID I ASK HIM?

14  Q. YES.

15  A. BECAUSE THE WAY IT WAS BROUGHT TO ME, I DIDN'T LIKE IT

16  BECAUSE "BOO-BOO" WAS KILLED BEHIND THAT, AND SEVERAL PEOPLE

17  TOLD ME --

18  Q. I AM NOT GOING TO ASK YOU WHAT OTHER PEOPLE TOLD YOU.

19  "BOO BOO," THE PERSON THAT YOU MENTIONED WAS KILLED BEHIND

20  THAT -- "BOO BOO" WAS SOMEONE THAT YOU WERE CLOSE WITH?

21  A. YES, WE WAS COOL WHEN WE WAS YOUNGER. I NEVER HAD A

22  PROBLEM WITH "BOO-BOO."

23  Q. IN 1996 WHEN YOU WERE ON THE STREET AS WELL, MR. RICE,

24  WERE YOU IN THE AREA OF SECOND AND P STREET AT A TIME WHEN

25  YOU HEARD GUNSHOTS AND "CHIN" WAS IN THE AREA?

46

1  Q.  AFTER YOU WERE LOCKED UP --

2          THE COURT:  WHAT YEAR WAS THIS?

3          THE WITNESS:  1996.  JULY 12TH.

4  BY MS. CHATURVEDI:

5  Q.  WHILE YOU WERE LOCKED UP -- DID YOU GO BACK TO THE D. C.

6  JAIL AFTER YOU WERE LOCKED UP IN JULY OF 1996?

7  A. YES.  THAT'S WHERE I WENT.

8  Q.  DID THERE COME A TIME YOU SAW "PIMP" WHILE YOU WERE

9  LOCKED UP AT THE D. C. JAIL?

10  A. YES, I DID.

11  Q.  WERE YOU AWARE OF WHY "PIMP" WAS LOCKED UP -- WHAT HE

12  HAD BEEN CHARGED WITH?

13  A.  MURDER.

14  Q.  AND WERE YOU AWARE OF WHERE THAT MURDER HAD TAKEN PLACE?

15  A.  NOT REALLY AWARE WHERE THE MURDER TOOK PLACE, NO.

16  Q.  BEFORE YOU HAD GONE INTO THE D.C. JAIL IN 1996 -- WE'RE

17  TALKING BETWEEN FEBRUARY OF 1996 AND JULY OF 1996 -- AT THAT

18  POINT, WERE YOU AWARE AS TO WHETHER OR NOT THAT MURDER

19  CHARGE WAS PENDING AGAINST "PIMP"?

20  A. YEAH.  I WAS AWARE OF THAT.  YEAH.

21  Q.  IT WAS?

22  A. YES.

23  Q.  DID YOU EVER HAVE ANY CONVERSATIONS WITH SAM ABOUT

24  "PIMP'S" MURDER CASE?

25  A.  YES, I DID.

47

1   Q.   AND CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY

2   WHAT CONVERSATIONS YOU AND SAM HAD ABOUT "PIMP'S" MURDER

3   CASE?

4   A.   WELL, AT THE TIME I WAS HANGING WITH DAVE REAL TIGHT.

5   WE WAS OVER AT SAM'S MOTHER'S HOUSE -- ME, HIM AND DAVE.

6   SAM CAME IN, AND HE KNEW THAT I WAS HANGING AROUND 37TH --

7   ME AND "HEAVY HEAD" WAS GOING AROUND 37TH PLACE LIKE EVERY

8   DAY.  HE ASKED ME DID I KNOW A GIRL -- I FORGET HER NAME.

9   "SISSY."  I THINK HER NAME WAS "SISSY."

10  Q.   WHO ASKED YOU IF YOU KNEW A GIRL BY THE NAME OF "SISSY"?

11  A.   SAM.  AND I SAID, "I DON'T THINK I KNOW HER."  SO HE

12  SAID -- DESCRIBED HER TO ME.  HE TOLD ME WHERE SHE LIVED AT.

13  Q.   WHERE DID SAM TELL YOU THAT THE GIRL LIVED AT?

14  A.   HE SAID SHE LIVED AT THE TOP OF 37TH PLACE.  YOU GO TO

15  THE TOP OF 37TH AND YOU MAKE A LEFT.  IT IS LIKE FIVE HOUSES

16  DOWN BEFORE YOU GO DOWN TO THE BOTTOM OF THE STEPS.

17  Q.   AND WHAT DID SAM TELL YOU ABOUT THE GIRL?

18  A. SHE WAS TESTIFYING AGAINST "PIMP."

19  Q.   WHAT DID SAM ASK YOU TO DO ABOUT THIS GIRL?

20  A. HE LET ME KNOW -- FIRST, HE SAID -- HE STARTED LAUGHING.

21  I CAN'T REMEMBER EXACTLY WHAT HE SAID.

22  Q.   MR. RICE, MOVE A LITTLE BIT BACK FROM THE MICROPHONE.

23  A.   OKAY.  I CAN'T REMEMBER EXACTLY WHAT HE SAID RIGHT

24  NOW -- THE EXACT WORDS THAT WERE USED, BUT HE TOLD ME, "IF

25  YOU SEE HER, MAN, SHE IS TESTIFYING AGAINST `PIMP.'"

1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2

3   ────────────────────────────
    UNITED STATES,                     :
              GOVERNMENT,              :
4                                      :
     VS.                               :      CR. NO. 98-329
5                                      :
                                       :      **FILED**
    VINCENT HILL,                      :
6   JEROME MARTIN,                     :      JUL 1 9 2001
    SAMUEL CARSON,                     :
7   WILLIAM K. SWEENEY,                :      NANCY MAYER WHITTINGTON, CLERK
    SEAN COATES,                       :            U.S. DISTRICT COURT
8             DEFENDANTS.              :
    ────────────────────────────      :
9   UNITED STATES                      :
              GOVERNMENT,              :
10                                     :
     VS.                               :      CR. NO. 99-348
11                                     :
    GARY PRICE,                        :
12            DEFENDANT                 :
    ────────────────────────────      :

13

14                                     WASHINGTON, D. C.
                                       MAY 1, 2001
15                                     (MORNING SESSION)
                                       (10:23 A.M.)
16

17                 TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE THOMAS P. JACKSON
18

19

20

21   COURT REPORTER:          PHYLLIS MERANA
                              6816 U. S. DISTRICT COURT
22                            3RD & CONSTITUTION AVE., N.W.
                              WASHINGTON, D. C. 20001
23

24

25

2

```
 1   FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                     ANJALI CHATURVEDI, AUSA
 2                                   555 4TH ST., N.W.
                                     WASHINGTON, D. C. 20001
 3
     FOR THE DEFENDANT HILL:         CHRISTOPHER DAVIS, ESQ.
 4                                   601 INDIANA AVE., N.W.
                                     #910
 5                                   WASHINGTON, D. C.  20004

 6   FOR THE DEFENDANT MARTIN:       JOANNE HEPWORTH, ESQ.
                                     305 H STREET, N.W.
 7                                   2ND FLOOR
                                     WASHINGTON, D. C.  20001
 8

 9   FOR THE DEFENDANT CARSON:       JOSEPH BESHOURI, ESQ.
                                     LEXI NEGIN-CHRIST, ESQ.
10                                   419 7TH STREET, N.W.
                                     WASHINGTON, D. C.  20004
11
     FOR THE DEFENDANT SWEENEY:      STEVEN R. KIERSH, ESQ.
12                                   717 D STREET, N.W.
                                     SUITE 400
13                                   WASHINGTON, D. C.  20004

14
     FOR THE DEFENDANT COATES:       FREDERICK JONES, ESQ.
15                                   901 6TH STREET, S.W.
                                     #409
16                                   WASHINGTON, D. C.  20024

17   FOR THE DEFENDANT PRICE:        JONATHAN ZUCKER, ESQ.
                                     601 INDIANA AVE., N.W.
18                                   #901
                                     WASHINGTON, D. C.  20004
19

20

21

22

23

24

25
```

3

```
1                         I-N-D-E-X

2   WITNESS:                DIRECT  CROSS  REDIRECT  RECROSS

3   OFC. SHEILA HUDNELL

4         BY MS. CHATURVEDI    6

5   OFC. KEVIN JETER

6         BY MS. CHATURVEDI   20

7         BY MS. NEGIN-CHRIST            33

8   PAUL FRANKLIN

9      BY MS. CHATURVEDI        35

10

11  GOVERNMENT'S EXHIBITS            IN EVIDENCE

12  MJ102                        9

13  M80                          10

14  MJ300                        13

15  MJ400, MJ401 & MJ402         15

16  MJ101                        18

17  CG300                        23

18  CG400, CG401 AND CG402       24

19  CG403 & CG404                25

20  CG101                        26

21  M46                          27

22  M82                          28

23  M83                          29

24  CG104                        31

25  CG103                        32
```

4



I N D E X (CONTINUED.)

1

2    M84                          37

3    M85                          51

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

```
 1              MS. CHATURVEDI:  IF THE RECORD WOULD REFLECT AN

 2   IDENTIFICATION OF GARY PRICE, YOUR HONOR.

 3              THE COURT:  THE RECORD WILL SO REFLECT.

 4   BY MS. CHATURVEDI:

 5   Q.  MR. FRANKLIN, DO YOU ALSO KNOW SOMEONE BY THE NAME OF

 6   VINCENT HILL?

 7   A.  YES.

 8   Q.  WHERE WAS IT THAT YOU FIRST MET HIM?

 9   A.  1200.

10   Q.  1200 DELAWARE?

11   A.  YES.

12   Q.  DOWN IN SOUTHWEST?

13   A.  YES.

14   Q.  ABOUT HOW OLD WERE YOU WHEN YOU FIRST MET VINCENT?

15   A.  ABOUT 16 OR 17.

16   Q.  AND CAN YOU TELL US WHETHER OR NOT THERE IS AN AGE

17   DIFFERENCE BETWEEN YOU AND VINCENT HILL?

18   A.  HE IS ABOUT SEVEN YEARS OLDER THAN ME.  SIX OR SEVEN.

19   Q.  WHO IS OLDER?

20   A.  HE IS THE OLDEST.

21   Q.  AND WHEN YOU MET MR. HILL, DID YOU START SPENDING TIME

22   WITH HIM?

23   A.  YES.

24   Q.  WHY?

25   A.  HE WAS AN INTERESTING GUY.
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 350 of 443
Case 1:98-cr-00329-RCL   Document 699   Filed 07/19/01   Page 56 of 93

56

1    Q.   WHAT WAS INTERESTING ABOUT HIM?

2    A.   HE HAD POWER.  HE HAD EVERYTHING THAT YOU WANTED.

3    Q.   AND DID YOU LOOK UP TO THAT?

4    A.   YES, I DID.

5    Q.   DID THERE COME A TIME WHEN YOU WERE EXPECTING, IN THE

6    LATE 1980'S, THE BIRTH OF YOUR FIRST CHILD?

7    A.   YES.

8    Q.   DURING THE TIME WHEN YOU WERE EXPECTING THE BIRTH OF

9    YOUR FIRST CHILD, DID YOU DEVELOP EVEN A CLOSER RELATIONSHIP

10   WITH VINCENT HILL?

11   A.   YES, I DID.

12   Q.   WHY?

13   A.   MY SON WAS COMING.  I HAD NO WAY OF GETTING MONEY.  I

14   WENT TO HIM.  HE HELPED ME OUT.  HE ASSISTED ME.

15   Q.   HOW DID HE HELP YOU OUT -- VINCENT HILL?

16   A.   HE GAVE ME SOME DRUGS.  HE GAVE ME SOME MONEY.

17   Q.   DO YOU SEE VINCENT HILL IN THE COURTROOM?

18   A.   YES.

19   Q.   COULD YOU PLEASE IDENTIFY VINCENT HILL BY WHERE HE IS

20   SITTING OR AN ARTICLE OF CLOTHING THAT HE IS WEARING?

21   A.   HE'S SITTING BESIDE "DRAPER" WITH A BLACK CAP ON.

22          MS. CHATURVEDI:  MAY THE RECORD REFLECT AN

23   IDENTIFICATION OF VINCENT HILL, YOUR HONOR?

24          THE COURT:  THE RECORD WILL SO REFLECT.

25   BY MS. CHATURVEDI:

USCA Case #21-3072     Document #2077668     Filed: 10/01/2024     Page 351 of 443
Case 1:98-cr-00329-RCL   Document 699   Filed 07/19/01   Page 58 of 93

58

1   A.   GIVE IT BACK TO HIM.

2   Q.   HOW WERE YOU MAKING ANY MONEY OUT OF THIS?

3   A.   HE WAS GIVING ME MONEY LIKE ON FRIDAYS.

4   Q.   LIKE A PAYDAY?

5   A.   YES, LIKE A PAYDAY.

6   Q.   WHERE WAS IT THAT YOU WERE SELLING THESE DRUGS?

7   A.   203 N STREET.

8   Q.   AND THE P.C.P. THAT YOU WERE SELLING, IT WAS IN THE FORM

9   OF WHAT?

10  A.   WATER.

11  Q.   LIQUID?

12  A. YES.

13  Q.   WHEN YOU FIRST STARTED SELLING THESE DRUGS FOR VINCENT

14  HILL AND RETURNING THE MONEY BACK TO VINCENT HILL, HOW MANY

15  DAYS A WEEK WERE YOU SELLING?

16  A.   REGULAR.

17  Q.   AND DID THIS CONTINUE THROUGH THE BIRTH OF YOUR SON?

18  A.   YES, IT DID.

19  Q.   FOR HOW LONG DID YOU HAVE THIS ARRANGEMENT WITH VINCENT

20  HILL, ROUGHLY?

21  A.   ABOUT TWO YEARS, ROUGHLY.

22  Q.   AFTER THAT --

23        MR. DAVIS:  YOUR HONOR, I AM SORRY TO INTERRUPT.

24  MAY WE HAVE THAT INSTRUCTION?

25        HE JUST TOOK US UP TO THE TIME PERIOD WHEN THE

LIA 2041

59

1    INDICTMENT BEGINS.  I REQUEST THE INSTRUCTION YOUR HONOR HAS

2    GIVEN IN THE PAST ABOUT ACTIVITIES THAT PRECEDE THE

3    INDICTMENT PERIOD.

4            THE COURT:  ALL RIGHT.

5            I HAVE BEEN ASKED TO REMIND YOU THAT TESTIMONY

6    HAVING TO DO WITH MATTERS THAT PRECEDE THE INDICTMENT -- THE

7    INTERVAL COVERED BY THE INDICTMENT IN THIS CASE -- ARE NOT

8    CHARGED CRIMES HERE.

9            MS. CHATURVEDI:  MAY I PROCEED, YOUR HONOR?

10            THE COURT:  I BEG YOUR PARDON?

11            MS. CHATURVEDI:  MAY I PROCEED?

12            THE COURT:  YOU MAY.

13   BY MS. CHATURVEDI:

14   Q.  NOW, MR. FRANKLIN, WERE YOU EVER IN A POSITION TO SEE

15   WHETHER OR NOT VINCENT HILL WAS GIVING ONLY YOU DRUGS TO

16   SELL, OR DID YOU EVER SEE HIM GIVING OTHER PEOPLE DRUGS TO

17   SELL?

18   A. YES, I DID SEE HIM GIVE OTHER PEOPLE DRUGS TO SELL.

19   Q.  AND THE AGE RANGE OF THE PEOPLE TO WHOM YOU SAW VINCENT

20   HILL GIVE DRUGS TO SELL, COMPARED TO YOURS?

21   A.  THEY WERE YOUNGER THAN HIM.

22   Q.  YOUNGER THAN HIM?

23   A.  YES.

24   Q.  WHAT ABOUT COMPARED TO YOU?

25   A. ROUGHLY ABOUT MY AGE.

LIA 2042

60

1          MR. JONES:  MAY WE HAVE THE TIME PERIOD, YOUR

2     HONOR?

3          MS. CHATURVEDI:  I HAVE ASKED THAT QUESTION, YOUR

4     HONOR.  COUNSEL CAN INQUIRE ON CROSS-EXAMINATION.

5          THE COURT:  YES.

6     BY MS. CHATURVEDI:

7     Q.  MR. FRANKLIN, WERE YOU EVER PRESENT WHEN PEOPLE WOULD

8     RETURN MONEY OR COME BACK TO VINCENT HILL AND RETURN MONEY

9     TO HIM?

10    A.  YES.

11    Q.  DID YOU EVER SEE VINCENT HILL GET UPSET WITH PEOPLE?

12    A.  YES, I DID.

13    Q.  CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY UNDER

14    THOSE CIRCUMSTANCES WHAT WOULD GET VINCENT HILL UPSET?

15    A. MONEY SHORT.  STUFF WASN'T RIGHT.

16    Q.  WHAT DO YOU MEAN STUFF WASN'T RIGHT?

17    A.  THE BOAT WASN'T RIGHT.  IT WAS DRIED UP.  IT WASN'T

18    RIGHT.

19    Q.  AND BOAT IS WHAT?

20    A. P.C.P. POURED ON MARIJUANA.

21    Q.  DID VINCENT HILL EVER GET UPSET WITH YOU?

22    A.  YES.

23    Q.  OVER WHAT?

24    A.  MONEY BEING SHORT.

25    Q.  NOW, YOU INDICATED THAT YOU HAD THIS ARRANGEMENT WITH

1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES,                :
              GOVERNMENT,          :
 4                                 :
      VS.                          :    CR. NO. 98-329
 5                                 :
     VINCENT HILL,                 :    FILED
 6   JEROME MARTIN,                :
     SAMUEL CARSON,                :    JUL 1 9 2001
 7   WILLIAM K. SWEENEY,           :
     SEAN COATES,                  :    NANCY MAYER WHITTINGTON, CLERK
 8            DEFENDANTS.          :         U.S. DISTRICT COURT
     _____:
 9   UNITED STATES                 :
              GOVERNMENT,          :
10                                 :
      VS.                          :    CR. NO. 99-348
11                                 :
     GARY PRICE,                   :
12            DEFENDANT            :
     _____:
13
                                   WASHINGTON, D. C.
14                                 MAY 23, 2001
                                   (MORNING SESSION)
15                                 (10:25 A.M.)

16
                    TRANSCRIPT OF PROCEEDINGS
17          BEFORE THE HONORABLE THOMAS P. JACKSON

18

19

20
     COURT REPORTER:            PHYLLIS MERANA
21                              6816 U. S. DISTRICT COURT
                                3RD & CONSTITUTION AVE., N.W.
22                              WASHINGTON, D. C. 20001

23

24

25
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 355 of 443
Case 1:98-cr-00329-RCL   Document 711   Filed 07/19/01   Page 2 of 78

2

```
 1    FOR THE GOVERNMENT:           PETER ZEIDENBERG, AUSA
                                    ANJALI CHATURVEDI, AUSA
 2                                  555 4TH ST., N.W.
                                    WASHINGTON, D. C. 20001
 3
      FOR THE DEFENDANT HILL:       CHRISTOPHER DAVIS, ESQ.
 4                                  601 INDIANA AVE., N.W.
                                    #910
 5                                  WASHINGTON, D. C.  20004

 6    FOR THE DEFENDANT MARTIN:     JOANNE HEPWORTH, ESQ.
                                    305 H STREET, N.W.
 7                                  2ND FLOOR
                                    WASHINGTON, D. C.  20001
 8

 9    FOR THE DEFENDANT CARSON:     JOSEPH BESHOURI, ESQ.
                                    LEXI NEGIN-CHRIST, ESQ.
10                                  419 7TH STREET, N.W.
                                    WASHINGTON, D. C.  20004
11
      FOR THE DEFENDANT SWEENEY:    STEVEN R. KIERSH, ESQ.
12                                  717 D STREET, N.W.
                                    SUITE 400
13                                  WASHINGTON, D. C.  20004

14
      FOR THE DEFENDANT COATES:     FREDERICK JONES, ESQ.
15                                  901 6TH STREET, S.W.
                                    #409
16                                  WASHINGTON, D. C.  20024

17    FOR THE DEFENDANT PRICE:      JONATHAN ZUCKER, ESQ.
                                    601 INDIANA AVE., N.W.
18                                  #901
                                    WASHINGTON, D. C.  20004
19

20

21

22

23

24

25
```

USCA Case #21-3072   Document #2077668   Filed: 10/01/2024   Page 356 of 443
Case 1:98-cr-00329-RCL   Document 711   Filed 07/19/01   Page 3 of 78

3

| 1 | | | INDEX | | | |
|---|---|---|---|---|---|---|
| 2 | WITNESS: | | DIRECT | CROSS | REDIRECT | RECROSS |
| 3 | SP. AGT. VINCENT LISI | | | | | |
| 4 | BY MS. CHATURVEDI | 7 | | | | |
| 5 | BY MR. DAVIS | | | 11 | | |
| 6 | BY MR. ZUCKER | | | 22 | | |
| 7 | JAMES MONTGOMERY | | | | | |
| 8 | BY MR. ZEIDENBERG | 24 | | | | |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

)

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 357 of 443
Case 1:98-cr-00329-RCL  Document 711  Filed 07/19/01  Page 24 of 78

24

```
 1              (JAMES MONTGOMERY, GOVERNMENT'S WITNESS,
 2    PREVIOUSLY SWORN.)
 3              THE COURT:  GOOD MORNING, MR. MONTGOMERY.
 4              THE WITNESS:  GOOD MORNING, YOUR HONOR.
 5              THE COURT:  YOU ARE STILL UNDER OATH, SIR.
 6              THE WITNESS:  YES.
 7                       DIRECT EXAMINATION
 8    BY MR. ZEIDENBERG:
 9    Q.  GOOD MORNING, SIR.
10    A.  GOOD MORNING.
11    Q.  COULD YOU PLEASE JUST REMIND US -- STATE YOUR NAME AGAIN
12    FOR THE COURT REPORTER?
13    A.  MY NAME IS JAMES MONTGOMERY.
14    Q.  NOW, MR. MONTGOMERY, YOU TESTIFIED SOME MONTHS AGO IN
15    THIS CASE.  AND I JUST HAVE A COUPLE OTHER INCIDENTS THAT I
16    WANT TO ASK YOU ABOUT TODAY.
17              SPECIFICALLY, I WANT TO DIRECT YOUR ATTENTION BACK
18    TO 1994 -- THE SUMMER OF 1994 -- AND ASK YOU IF YOU WERE
19    FAMILIAR BACK AT THAT TIME WITH SOMEONE BY THE NAME OF LOU
20    OR LOU ENGLISH FROM THE K STREET AREA?
21    A.  YES.
22    Q.  WHO WAS LOU?
23    A.  IT WAS AN INDIVIDUAL THAT LIVED IN THAT NEIGHBORHOOD.
24    Q.  WAS HE SOMEONE WHO FREQUENTED OR WAS COMMONLY OUT ON K
25    STREET SELLING MARIJUANA?
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 358 of 443
Case 1:98-cr-00329-RCL  Document 711  Filed 07/19/01  Page 25 of 78

25

1   A.   HE CAME THERE OCCASIONALLY.  NOT DAY IN, DAY OUT.

2   Q.   OCCASIONALLY, YOU'RE SAYING?

3   A.   YES.

4   Q.   NOW, HAD YOU EVER HAD OCCASION TO SPEAK WITH SAM CARSON,

5   "CHIN," ABOUT LOU PRIOR TO LOU BEING SHOT?

6   A.   YES.

7   Q.   CAN YOU TELL US ABOUT SOME OF THOSE CONVERSATIONS?

8   A.   WELL, ONE TIME HE SPOKE TO ME AND HE TOLD ME THAT --

9   Q.   WHO ARE WE REFERRING TO?  WHEN YOU SAY "HE," WHO ARE YOU

10  REFERRING TO?

11  A.   "CHIN"

12  Q.   OKAY.

13  A.   THAT HE THINKS THAT -- HE SAID THAT HE WAS ALMOST

14  CERTAIN THAT LOU HAD TOLD KEITH HOLMES AND THEM WHERE HIS

15  MOTHER LIVES AT.

16  Q.   REMIND US AGAIN WHO KEITH HOLMES WAS.

17  A.   KEITH HOLMES AND "BLOCK" AND THEM -- AND THERE WERE SOME

18  MORE INDIVIDUALS -- THEY HAD SOMETHING TO DO WITH "BOO-BOO"

19  GETTING KILLED -- ONE OF MY FRIENDS NAMED "BOO BOO."

20  Q.   AND KEITH HOLMES YOU ASSOCIATED WITH WHAT NEIGHBORHOOD?

21  A.   58TH AND PARADISE.

22  Q.   OKAY. SO "CHIN" SAID SOMETHING ABOUT LOU TELLING KEITH

23  HOLMES WHERE "CHIN'S" MOTHER LIVED?

24  A.   YES.

25  Q.   AND COULD YOU TELL US WHAT SIGNIFICANCE THERE IS, IN

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 359 of 443
Case 1:98-cr-00329-RCL   Document 711   Filed 07/19/01   Page 26 of 78

26

```
 1   YOUR EXPERIENCE, WITH TELLING PEOPLE IN THE NEIGHBORHOOD

 2   WHERE YOU LIVE?  IS THAT INFORMATION THAT IS GENERALLY KEPT

 3   PRIVATE?

 4   A. PRETTY MUCH.

 5   Q.  WHY IS THAT?

 6   A.  BECAUSE IT COULD BRING TROUBLE TO YOUR HOME.

 7   Q.  WHAT DID "CHIN" SAY ABOUT LOU TELLING -- WHAT DID "CHIN"

 8   TELL YOU ABOUT THE FACT THAT HE THOUGHT LOU HAD TOLD KEITH

 9   HOLMES THIS INFORMATION?

10   A.  HE SAID THAT KEITH HOLMES AND LOU WAS COUSINS AND THAT

11   HE BELIEVED THAT LOU MAY HAVE TOLD KEITH WHERE HIS MOTHER

12   LIVED AT, BUT HE SAID FOR SURE THAT HE KNEW THAT KEITH AND

13   THEM KNEW EXACTLY WHERE HIS MOTHER LIVED AT.

14   Q.  WAS HE CONCERNED ABOUT THAT?

15   A.  YES.  I WAS CONCERNED, TOO.

16   Q.  WHY WERE YOU CONCERNED?

17   A.  BECAUSE I DIDN'T WANT NOTHING TO HAPPEN TO HIM.

18   Q.  "CHIN"?

19   A.  RIGHT.

20   Q.  DID "CHIN" SAY WHAT HE WANTED TO DO TO LOU?

21   A.  HE SAID THAT IF I SEE LOU ON THAT SIDE -- ON THE SIDE

22   WHERE -- ON THE 203 SIDE OF SOUTHWEST -- I'M GOING TO PUT IT

23   LIKE THAT.  THAT'S THE BEST WAY I COULD PUT IT.

24   Q.  OKAY.

25   A.  THAT LOU DIDN'T HAVE NO REASON TO BE AROUND THERE.  THAT
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 360 of 443
Case 1:98-cr-00329-RCL  Document 711  Filed 07/19/01  Page 27 of 78

27

```
 1   HE DIDN'T FUCK WITH NOBODY AROUND THERE.  AND IF I SEE HIM

 2   AROUND THERE, TO LET HIM KNOW, OR IF I SEE HIM IN A GOOD

 3   POSITION, TO HIT HIM.

 4   Q.  AND WHEN YOU SAY "HIT HIM," WHAT DOES THAT MEAN?

 5   A.  KILL HIM.

 6   Q.  AND WOULD YOU HAVE DONE THAT?

 7   A.  MORE THAN LIKELY, YES.

 8   Q.  NOW, I WANT TO DIRECT YOUR ATTENTION TO -- DO YOU

 9   REMEMBER THE EVENING IN THE SUMMER OF '94 WHEN LOU GOT SHOT?

10   I AM NOT ASKING WHAT THE DATE WAS, BUT DO YOU REMEMBER THE

11   OCCASION -- THE INCIDENT ITSELF?

12   A.  YES.

13   Q.  AND CAN YOU TELL US WHAT YOU REMEMBER ABOUT THAT EVENING

14   PRIOR TO THE SHOOTING?

15   A.  WELL, NOT LONG -- I HAD JUST GOT FINISHED SELLING WEED.

16   Q.  WHERE WERE YOU SELLING YOUR WEED THAT NIGHT?

17   A.  K STREET IN THE COURT.  IN THE COURTYARD WHERE K STREET

18   IS AT.

19   Q.  WHAT HAPPENED WHEN YOU FINISHED SELLING YOUR WEED?

20   A. I WAS OUT THERE.  THERE WAS A FEW OTHER PEOPLE OUT THERE.

21   I DON'T REMEMBER EVERYONE.  I DON'T REMEMBER EVERY

22   INDIVIDUAL THAT WAS OUT THERE.  "CHIN" AND "POO POO" WASN'T

23   OUT THERE AT FIRST.  THEY CAME OUT THERE.  SO "CHIN" ASKED

24   ME WHAT WAS I DOING.  SO I TOLD HIM, "NOTHING."  AND HE SAID

25   THAT SOMETHING WAS ABOUT TO HAPPEN.
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 361 of 443
Case 1:98-cr-00329-RCL   Document 711   Filed 07/19/01   Page 28 of 78

28

1   Q.   SOMETHING WAS ABOUT TO HAPPEN?

2   A.   RIGHT.

3   Q.   DID HE SAY WHAT IT WAS THAT WAS ABOUT TO HAPPEN?

4   A.   NO.

5   Q.   WHAT DID YOU SAY WHEN HE TOLD YOU SOMETHING WAS ABOUT TO

6   HAPPEN?

7   A.   SO I ASKED HIM WAS HE ALL RIGHT.  HE SAID, "YEAH."  I

8   SAID, "YOU DON'T NEED ME?"  AND HE SAID, "NO."

9   Q.   SO WHAT DID YOU DO?

10  A.   SO I LEFT.

11  Q.   WHERE DID YOU GO?

12  A.   I WENT UP TO THE GRAND CHINA AND GOT ME SOMETHING TO

13  EAT.

14  Q.   GRAND CHINA IS A RESTAURANT?

15  A.   YES.

16  Q.   HOW DID YOU GET THE GRAND CHINA?

17  A.   I DROVE UP THERE.

18  Q.   NOW, DID YOU RETURN BACK TO K STREET A SHORT TIME LATER?

19  A.   I CAME BACK -- I CAME BACK DOWN K STREET.  I PARKED -- I

20  CAME DOWN.  I PARKED BACK IN THE ALLEY WHERE I NORMALLY

21  PARKED AT.

22  Q.   AND WHEN YOU GOT OUT THERE, CAN YOU TELL US WHAT YOU

23  SAW?

24  A.   THE POLICE AND PARAMEDICS AND STUFF WAS OUT THERE, AND

25  LOU WAS LAYING ON THE GROUND, AND THEY WERE WORKING ON HIM.

USCA Case #21-3072     Document #2077668          Filed: 10/01/2024     Page 362 of 443
Case 1:98-cr-00329-RCL   Document 711   Filed 07/19/01   Page 29 of 78

29

1    Q.   DID YOU SEE ANY SIGN OF SAM CARSON OR "CHIN" WHEN YOU

2    GOT BACK THERE?

3    A.   NO.   NOBODY WASN'T OUT THERE REALLY.   THERE WAS LIKE

4    PEOPLE THAT LIVED AROUND THERE.   I'M TALKING ABOUT LIKE

5    PEOPLE THAT LIVED IN THE HOUSES -- LIKE OLDER PEOPLE OR

6    WHATEVER.

7    Q.   OKAY.

8         NOW, THE FOLLOWING DAY DID YOU HAVE A CONVERSATION

9    WITH "CHIN" AND "POO POO" ABOUT WHAT HAD HAPPENED TO LOU

10   ENGLISH?

11   A.   I WAS TAKING "CHIN" AND "POO POO" BACK AROUND TO THE

12   OTHER SIDE -- AROUND TO THE P STREET SIDE IN SOUTHWEST.

13   Q.   THIS IS THE DAY AFTER?

14   A.   RIGHT.

15   Q.   WHAT HAPPENED?

16   A.   AND BASICALLY THEY WERE TALKING ABOUT THAT LOU DIDN'T

17   DIE.   AND "POO POO" SAID SOMETHING ABOUT LOU SNITCHING, AND

18   "CHIN" SAID THAT HE DON'T THINK LOU WAS GOING TO SNITCH, BUT

19   HE SAID THAT LOU WAS GOOD AT CREEPING.   THAT HE WAS SNEAKY.

20   Q.   AND WHAT DID "CHIN" SAY ABOUT THE FACT THAT HE THOUGHT

21   THAT LOU WAS GOOD AT CREEPING?

22   A.   THAT THERE WAS A POSSIBILITY --

23          THE COURT:   GOOD AT WHAT?

24          MR. ZEIDENBERG:   HE'S GOOD AT CREEPING.

25   C-R-E-E-P-I-N-G.

App 494

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 363 of 443
Case 1:98-cr-00329-RCL   Document 711   Filed 07/19/01   Page 30 of 78

30

```
 1                 THE COURT:  LOU WAS GOOD AT CREEPING?

 2                 MR. ZEIDENBERG:  AND HE WAS SNEAKY.

 3      BY MR. ZEIDENBERG:

 4      Q.  IS THAT CORRECT, MR. MONTGOMERY?

 5      A.  RIGHT.  YES.

 6      Q.  AND WHAT WAS "CHIN'S" CONCERN ABOUT THAT?

 7      A.  THAT LOU MIGHT TRY TO RETALIATE BECAUSE OF WHAT THEY HAD

 8      DONE TO HIM.

 9      Q.  WHAT DID "CHIN" SAY, IF ANYTHING, SHOULD BE DONE ABOUT

10      LOU?

11      A.  I AM NOT SURE IF HE SAID ANYTHING, BUT I KNEW THAT -- I

12      KNEW THAT FROM HIS CONCERN THAT, WITHOUT SAYING IT, IF I AM

13      ABLE TO CATCH LOU -- IT WAS, I MEAN, UNSPOKEN.

14                 MR. BESHOURI:  OBJECTION.  OBJECTION.

15                 MR. ZEIDENBERG:  LET ME ASK A DIFFERENT QUESTION,

16      IF I MAY, YOUR HONOR.

17                 THE COURT:  I THINK HE HAS FINISHED HIS ANSWER.

18      GO AHEAD.

19      BY MR. ZEIDENBERG:

20      Q.  IF YOU HAD SEEN LOU AFTER THAT CONVERSATION WITH "CHIN",

21      WHAT WOULD YOU HAVE DONE TO HIM?

22      A.  IF HE WAS IN A GOOD POSITION, MORE THAN LIKELY -- I AM

23      ALMOST A HUNDRED PERCENT SURE THAT I WOULD HAVE GOT WITH

24      HIM.

25      Q.  WHEN YOU SAY "GOT WITH HIM"?
```

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 364 of 443
Case 1:98-cr-00329-RCL   Document 711   Filed 07/19/01   Page 31 of 78

31

1    A.   I WOULD HAVE KILLED HIM.

2    Q.   FOR WHAT REASON?

3    A.   TO MAKE SURE HE DON'T TRY TO GET BACK AT "CHIN" OR TO

4    MAKE SURE HE DON'T TRY TO GET AT ME BECAUSE HE KNEW ME AND

5    "CHIN" WAS COOL.

6    Q.   AND WHY WOULD YOU BE CONCERNED THAT LOU WOULD RETALIATE

7    AGAINST YOU?  DID YOU HAVE ANYTHING TO DO WITH HIS SHOOTING?

8    A. NO, BUT HE KNEW ME AND "CHIN" WAS COOL.  SO HE WOULD VIEW

9    ME AS HE VIEWED "CHIN", AS A THREAT.

10   Q.   NOW, I WANT TO TURN YOUR ATTENTION, MR. MONTGOMERY, TO

11   ANOTHER INCIDENT THE FOLLOWING SUMMER -- LATE SUMMER OF

12   1996.  DO YOU REMEMBER BEING APPROACHED BY "CHIN" IN THE

13   LATE SUMMER OF 1996, WHERE HE ASKED YOU ABOUT WHERE YOU HAD

14   BEEN THE PREVIOUS DAY BECAUSE HE HAD NEEDED YOU?

15   A.   YES.

16   Q.   ALL RIGHT.  CAN YOU TELL US ABOUT THAT CONVERSATION?

17   WHERE DID IT TAKE PLACE AND HOW DID IT START?

18   A.   I WAS AROUND SECOND STREET, AND ON THE PARTICULAR DAY

19   WHEN IT HAPPENED, I DIDN'T KNOW NOTHING ABOUT IT AT ALL.

20   THE NEXT DAY WHEN I SEE "CHIN," HE ASKED ME WHERE WAS I AT

21   YESTERDAY.  I DON'T RECALL AT THIS TIME WHERE I WAS AT.  BUT

22   HE SAID THAT HE NEEDED ME BECAUSE SOME "JAKES" HAD GOT HIM

23   FOR HIS MONEY.

24   Q.   AND THE TERM "JAKES" -- WHAT DOES THAT MEAN?

25   A.   SOME JAMAICANS.

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .   Docket No. CR 98-329

        Government,                .   Washington, D.C.
                                   .   May 23, 2001
    vs.                            .   2:43 p.m.
                                   .
VINCENT HILL,                      .   (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,                .
SEAN COATES,                       .
                                   .        FILED
        Defendants                 .
                                   .      MAR 1 1 2003
. . . . . . . . . . . . . .        .
                                   .   NANCY MAYER WHITTINGTON
UNITED STATES OF AMERICA,          .        U.S. DISTRICT COURT
                                   .
        Government,                .
                                   .   Docket No. CR 99-348
    vs.                            .
                                   .
GARY PRICE,                        .
                                   .
        Defendant.                 .
                                   .
. . . . . . . . . . . . . .


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001

2

```
For the Defendant Carson:       JOSEPH BESHOURI, ESQ.
                                LEXI NEGIN-CHRIST, ESQ.
                                419 7th Street, N.W.
                                Washington, D.C.  20004

For the Defendant Sweeney:      STEVEN R. KIERSH, ESQ.
                                717 D Street, N.W.
                                Suite 400
                                Washington, D.C.  20004

For the Defendant Coates:       FREDERICK JONES, ESQ.
                                901 6th Street, S.W.
                                Suite 409
                                Washington, D.C.  20024

For the Defendant Price:        JONATHAN ZUCKER, ESQ.
                                601 Indiana Ave., N.W.
                                Suite 901
                                Washington, D.C.  20024

Court Reporter:                 BEVERLY J. BYRNE
                                Official Court Reporter
                                Room 6810 U.S. Courthouse
                                Washington, D.C.  20001
                                (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

3

1            P R O C E E D I N G S

2            THE COURT:  Mr. Kiersh.

3            MR. KIERSH:  Thank you, Your Honor.  Your Honor, I

4    want to raise a Brady violation and move for sanctions.  I

5    don't know if you want to take it up now or -- well, actually

6    I'd like to do it before Mr. Montgomery resumes his testimony,

7    because it relates to Mr. Montgomery.

8            THE COURT:  Go ahead.

9            MR. KIERSH:  The Brady violation is this.  For the

10   first time today I was informed through the testimony of Mr.

11   Montgomery that Mr. Montgomery had cooperated with Mr. Switzer

12   in planning to kill Robocop, aka Donnell Whitfield.  It's my

13   client, Mr. Sweeney, who is the only one charged with the

14   murder of Donnell Whitfield.

15            And this -- I had never heard this before.  I had

16   never been given notice of this before, and I'll go through my

17   analysis and explain why it's Brady.

18            It's Brady, and I gave the Court a copy of Strickler

19   versus Green, a Supreme Court decision from 1999.  I think

20   it's the most recent Supreme Court interpretation of Brady.

21   And on page 5 of the opinion, the Supreme Court says there are

22   three essential components of a true Brady violation.  The

23   evidence at issue must be favorable to the accused either

24   because it is exculpatory or because it is impeaching.  The

25   evidence must have been suppressed by the state either

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

4

1    willfully or inadvertently, and prejudice must have ensued.

2         I would submit to the Court we've satisfied all of

3    the criteria as set forth in Strickler.  My whole theory of

4    defense with respect to murder of Donnell Whitfield, as the

5    Court will recall, is that Reginald Switzer perpetrated that

6    murder.  It was Mr. Whitfield and Mr. Seabrooks who Mr.

7    Switzer testified to who had assaulted him in the '80s.

8         Mr. Switzer very clearly testified that he murdered

9    George Seabrooks in retaliation for an assault that Seabrooks

10   and Whitfield committed against him, and he said that, yeah,

11   he wanted to kill Whitfield, but then he denies doing it.  And

12   he also said at one point, he said, I went up to his window.

13   I was looking.  I was taking that many steps to actually look

14   in and follow him, but I decided not to shoot him because

15   there were other people around, and I did not want to alert

16   anyone else that I was involved in the planning and the

17   formulation and intent to kill Robocop.

18        And Mr. Montgomery tells us this morning that he

19   spoke with Mr. Switzer.  That Mr. Montgomery was going to

20   retaliate for Mr. Switzer.  The term that Mr. Montgomery said

21   was, I will bust his ass, and that they had planned together

22   to kill Robocop, and that's completely consistent with my

23   theory that it was Switzer and not Mr. Sweeney who killed

24   Robocop.

25        THE COURT:  All right.  That having been said, show

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

5

1   me where the prejudice is.

2          MR. KIERSH:  The prejudice is here.  I've been

3   deprived of the opportunity to cross Mr. Switzer on whether or

4   not he had these conversations and took these actions with Mr.

5   Montgomery.

6          THE COURT:  Call him back.

7          MR. KIERSH:  And anticipating that the Court was

8   going to say that, I'm going to respond to the Court that I

9   have no interest in calling Mr. Switzer back.  I'm not

10  interested in sponsoring his testimony, even though it would

11  be an adverse witness.  I believe I spent a great deal of time

12  impeaching his credibility.  I believe that he has lied in

13  this court.  I believe he has lied on other occasions.

14          I have been prohibited from speaking with him

15  directly by his counsel, and I do not want to be put in the

16  position where to clarify my record, my theory of defense

17  based on new information that was brought out for the first

18  time today by having to put this witness on who I have no

19  faith in the truthfulness of his answers.

20          And my cross-examination of Mr. Switzer would have

21  been different, and my cross-examination of Mr. Montgomery

22  today would have been different.  Mr. Montgomery's testimony

23  today completely contradicts Mr. Switzer's denial of

24  complicity in that murder.  It shows that, in fact, not only

25  did Mr. Switzer said he had the motive, he had the intent.

6

1    Here we have Mr. Montgomery saying he took the next
2    step.  He talked to me about doing it for him.  And it also
3    contradicts Mr. Switzer's testimony when he said he went up to
4    the window to track this guy down, and then I backed off of it
5    because I didn't want to alert anybody.  Here he is alerting
6    another person to the fact that he wanted to commit this
7    murder.

8    I believe we've satisfied all of the criteria set
9    forth by the Supreme Court in Strickler, and I've also given
10   the Court a copy, and counsel for the government copies of
11   cases from our Circuit, the D.C. Circuit, in which United
12   States versus Smith, Appeal Number 923220, where our Court of
13   Appeals says where there is a Brady violation, it says, we do
14   not lightly excuse Brady violations.

15   Because the government's non-disclosures in this
16   case significantly impaired defense counsel's ability to
17   impeach the credibility of a principal prosecution witness.
18   We reverse and remand for a new trial.  Now, that's exactly
19   what we have here is that I have been impaired in my ability
20   to impeach the credibility of Mr. Switzer and maybe impeach
21   the credibility of Mr. Montgomery.

22   And that this is a clear violation because it is
23   exculpatory testimony because it completely -- it not only is
24   impeachment, but the testimony of Mr. Montgomery perfectly
25   fits within the defense theory of someone other than Mr.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

7

1    Sweeney committing this key murder in this indictment.    And

2    that if this case were to go all the way to verdict, and if

3    Mr. Sweeney were to be found guilty of the murder of Mr.

4    Whitfield, I would submit to the Court it would require

5    reversal because of the failure of the government to disclose

6    the information.

7            I would suggest to the Court that the appropriate

8    sanction now is to strike the testimony of Mr. Montgomery on

9    this issue as it relates to Mr. Sweeney and to strike the

10   entire testimony of Bernard Switzer as it relates to Mr.

11   Sweeney in the context of the Donnell Whitfield murder.

12           THE COURT:  I've got your point.

13           MR. DAVIS:  Your Honor, I hate to disrupt your

14   proceedings, but I need to go outside for a meeting.  I'm not

15   feeling very good.

16           THE COURT:  You don't look well.

17           MR. DAVIS:  No.  Actually I feel like I'm about

18   ready to go under.  If I may go out for a moment and get some

19   water.

20           THE COURT:  Sure.

21           MR. JONES:  Need some help?  May I help him?

22           THE COURT:  Yes.

23       (Whereupon, Mr. Davis and Mr. Jones exited the

24   courtroom.)

25           MR. KIERSH:  Just a -- I think I referred to Mr.

23

1   information on it, but it wouldn't have been accepted by --

2   probably by that jail thing.

3   Q.   So did you go to see Draper at the jail?

4   A.   No.

5   Q.   Did Chin go?

6   A.   Yes.

7   Q.   And after he went, did he tell you about his conversation

8   with Draper?

9   A.   Chin say that him and Draper father went to see him,

10  and --

11          THE COURT:  Him and Draper what?

12          THE WITNESS:  Him and Draper father.  Chin and

13  Draper's father went to see Draper.

14          THE COURT:  Oh, I see.  Draper's father.  All right.

15          THE WITNESS:  And said that he asked Draper

16  distinctively who did you tell anybody about what had

17  happened?  And he said that Draper admitted to him that he

18  told Butchie, and that Butchie was cooperating with the Feds.

19  BY MR. ZEIDENBERG:

20  Q.   Did Chin say what had to be done or what should be done

21  about Butchie?

22  A.   So Chin told me that if they had no Butchie -- without

23  Butchie, they don't have no case.  They wouldn't have no case.

24  Q.   And when you were talking about a case, what case was it

25  that you were all concerned about?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

24

1   A.   The triple murder.

2   Q.   Now, did you and Chin make attempts together to find and

3   kill Butchie?

4   A.   Yes.

5   Q.   Can you tell the ladies and gentlemen about that?

6   A.   Sometimes when we used to -- when we would go to this

7   carry-out, Leo's --

8   Q.   Where is that located?

9   A.   It's on N Street.

10  Q.   I'm sorry?

11  A.   South Capitol and N.

12  Q.   N as in Nancy?

13  A.   Yes.   South Capitol and N.

14  Q.   Okay.

15  A.   That's near the area where Butchie would more than likely

16  be, as far as when he was in Southwest.  So sometimes when we

17  walked to Leo's we would -- we would already be going to Leo's

18  anyhow, but we would try to see if we see Butchie out there as

19  we are going or coming from there, and sometimes we would

20  drive through, through there.

21  Q.   What were you going to do if you saw Butchie?

22  A.   Well, we saw him numerous amount of times, but we

23  couldn't do nothing to him in front of like everybody just

24  like that, do you know what I mean.  We're from Southwest and

25  he is -- he knowed the same people we know, so we couldn't

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 505

25

1   just walk right up to him just like that and do anything to

2   him.

3   Q.    What were you hoping to find?  What were you hoping to

4   do?

5   A.    To catch him in a nice position.

6   Q.    What is a nice position?

7   A.    To catch him in a position where we could get up on him

8   without a person knowing who we are or without him seeing us

9   coming.

10  Q.    Now, was there an occasion when you and Chin were in a

11  car and you happened to see Butchie?

12  A.    We was in my car.

13  Q.    Can you tell us about that?

14  A.    We rode through housing -- I mean, through Half Street,

15  and Butchie was out there.  He was sitting on the steps that

16  lead to Syphax playground. So we hurried up and went to Chin

17  house, I stayed in the car.  And he got out and he went and

18  got his sweatsuit, and the gun, and his gut-buster.

19  Q.    What's a gut-buster?

20  A.    Like elastic velcro, like a waistband.

21  Q.    And what's the purpose of that?

22  A.    To hold the gun.

23  Q.    What did Chin do with his sweatsuit -- what kind of a

24  sweatsuit did he get?

25  A.    It was a black sweatsuit.

26

1   Q.   What did he do with it?

2   A.   He was putting in on while I was driving.

3   Q.   Where was he putting it on?

4   A.   In the car.

5   Q.   What car did you have?

6   A.   Oldsmobile 98.

7   Q.   Where did you go once Chin got back in the car with his

8   gun and his sweatsuit?

9   A.   We went down Canal Street, and then got on -- got onto

10  First Street, and then hit M Street, and then hit South

11  Capitol Street.  And I pulled on -- he told me to pull on the

12  side -- on the side of -- like the sidewalk.  It's like a

13  little car dealership thing right there.

14        So I stayed right there, and Chin got out to go --

15  to go through the alley to try to catch him from behind.

16  Q.   Now, was there a discussion between you and Chin about an

17  escape route you were going to take?

18  A.   When he came back to the car then I was suppose to pull

19  straight over the curb and go straight across South Capitol

20  Street Bridge so he could throw the pistol out while we were

21  going over the river, and go around 37th.  And that was going

22  to be our alibi.

23  Q.   And that was a plan you discussed before Chin got out of

24  the car?

25  A.   Right.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

27

1   Q.   And again, the purpose in going up and ending up at 37th

2   Place was going to be what?

3   A.   Our alibi.

4   Q.   What happened when Chin got out of the car?

5   A.   He went around there, and he came back, and he said that

6   Butchie was gone.  When he got back in the car the first thing

7   I said, I said, what happened?  Because I didn't hear the

8   gunshots or nothing.  So I said, what happened?  And he said

9   that Butchie wasn't there, that he was gone, he said he left

10  that quick.

11  Q.   Now, I want to talk to you about the day that Butchie was

12  actually killed, do you remember that day?

13  A.   Yes.

14  Q.   Where were you the day that Butchie was killed, starting

15  in the afternoon?

16  A.   On Second Street.

17  Q.   Second Street, Southwest?

18  A.   Yes.

19  Q.   And what were you doing there?

20  A.   Selling weed.

21          THE COURT:   What was the date?

22          MR. ZEIDENBERG:   I'm sorry?

23          THE COURT:   What was the date?

24          MR. ZEIDENBERG:   I didn't refer to the date.   It is

25  June 16, 1997.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 508

28

1          THE COURT:  June 16th?

2          MR. ZEIDENBERG:  Yes.

3          THE COURT:  All right.  Go ahead.  I'm sorry.

4    BY MR. ZEIDENBERG:

5    Q.   Where were you -- you were on Second Street?

6    A.   Yes.

7    Q.   And what were you doing?

8    A.   Selling weed.

9    Q.   Now, at some point did you see Chin?

10   A.   Chin came out of his house and came and got my car keys.

11   Q.   Did you give it to him?

12   A.   Yes.

13   Q.   Did you ask him why he needed your car?

14   A.   No.

15   Q.   Was it uncommon for Chin to come by and take your car?

16   A.   No.  I mean, he would get it all the time, whenever.

17   Q.   Now, did he tell you where he was going?

18   A.   No.

19   Q.   Now, sometime later, after Chin -- did he leave with your

20   car?

21   A.   Yes.

22   Q.   Okay.  Sometime later did you come to find out that there

23   had been a shooting over on Half Street?

24   A.   Yes.

25   Q.   And at some point did you learn that that was Butchie?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

29

1   A.   Yes.

2   Q.   What did you do when you found out that Butchie had been

3   killed?

4   A.   I got somebody's -- I got a bicycle from somebody and I

5   rode up there, I rode the bicycle up there.

6   Q.   And where did you ride to?

7   A.   To the corner of Half and O Street.

8   Q.   What did you see when you got there?

9   A.   There was a lot of marked and unmarked police cars and a

10  lot of people was out there.

11  Q.   Was Butchie's body still on the ground?

12  A.   I didn't see his body.  I seen like the crime scene tape

13  and stuff like that.  I didn't go all the way down there

14  because it was a lot of polices down there.

15  Q.   I take it you heard -- you had heard from people out

16  there that it had been Butchie that was killed?

17  A.   Yes.

18  Q.   How did you feel when you heard that Butchie was killed?

19  A.   I was happy.

20  Q.   How concerned were you, prior to Butchie being killed,

21  how concerned were you about the fact that he was still alive?

22  A.   It was of great concern.

23  Q.   Why is that?

24  A.   Because Draper had told him about what had happened, and

25  I knew that if they pick us up for it that he could be a

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 510

30

1    witness as to what Draper told him.

2    Q.    Now, after you went to the scene did you return back to

3    Second Street?

4    A.    Yes.

5    Q.    And at some point later that evening did Chin return?

6    A.    Yes.

7    Q.    Can you tell us about that?

8    A.    He came -- I was standing on the corner of Second and P

9    Street and he came from the direction -- I'm not sure if he

10   came straight down P Street or if he turned off of First

11   Street, but I seen him on P Street turning into the alley

12   where I normally -- where I had my car parked at at first.

13   So when I seen him going into the alley, so I was walking down

14   -- I was walking down towards that direction.  So no soon as I

15   seen him, so I told him, I said, you know them peoples got

16   hit.

17   Q.    Your term was what?

18   A.    I said, you know them peoples got hit.

19   Q.    You used the term peoples?

20   A.    That's what I said.  I said, you know them peoples got

21   hit.  He was like, yeah, I know.  So he was like, we're all

22   right.  So I said, yeah.  He said, -- so I said, you know who

23   I'm talking about?  He was like, yeah.  He said, man, trust

24   me, we're all right, just like that.  And then he was like,

25   oh, here are your keys, and gave me my keys.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

1  Q.    Did he seem at all surprised when you told him about
2  that?
3  A.    No.  And he told me to stay from up Half Street with my
4  car and not to drive it if I didn't have to.
5  Q.    I'm sorry?
6  A.    He told me to stay from up Half Street with my car and to
7  not drive it that much if I didn't have to.
8  Q.    Now, had there been a previous occasion when Mr. Carson,
9  Chin, took your car and then later told you not to drive it in
10  a particular neighborhood?
11  A.    Yes.
12  Q.    Can you tell us about that?
13  A.    In '94, when I had my Caddie, I let Chin keep it, him and
14  Poo-Poo had it, and they shot at Craig out of my car at
15  Capers.
16  Q.    How do you know that?
17  A.    Because Chin told me.  He told me to stay from up Capers
18  in my car, and he told me that they had took my car to get it
19  washed and wiped down because they had shot out of it.
20  Q.    Talking about in 1994 now, did Chin tell you why it was
21  that you should not drive your car up to Capers?
22  A.    No, that was all he said.
23  Q.    What did you understand that to mean, why you shouldn't
24  go up to Capers?
25  A.    My knowledge would be that Craig might be able to

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 381 of 443
Case 1:98-cr-00329-RCL   Document 972   Filed 03/11/03   Page 32 of 65

32

1   identify  my car and may think that I was the person who was

2   shooting at him and shoot at me, or somebody else might have

3   seen it and be able to identify my car, and they might not

4   have known who was shooting out of it and may have been

5   thinking that I was the one who was shooting or whatever.

6   Q.   Mr. Montgomery, after you had learned that Butchie had

7   been killed what did you think -- how were you feeling in

8   terms about that triple murder and your possibly being

9   implicated in it?

10  A.   Would you repeat your question?

11  Q.   After you learned that Butchie had been killed how were

12  you feeling about the fact about your chances of being

13  implicated in the triple murder?

14  A.   I was feeling good pretty much.  To a certain extent I

15  was feeling good.

16  Q.   Did you think you were in the clear?

17  A.   To a certain extent I felt as though I was in the clear.

18          MR. ZEIDENBERG:  I have no further questions, Your

19  Honor.

20          MR. KIERSH:  May I proceed, Your Honor?

21          THE COURT:  You may.

22          MR. KIERSH:  Good afternoon, ladies and gentlemen.

23          THE JURORS:  Good afternoon.

24                  CROSS EXAMINATION

25  BY MR. KIERSH:

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

57

1  cold outside.

2  Q.   You were arrested in July of that year.

3  A.   It was cold outside during that period.

4  Q.   So it would have had to have been in the early part of

5  the year?  Because you were arrested July 30 of that year,

6  correct?

7  A.   I agree that I was arrested at the end of July, and I

8  know that it was cold outside during the time when we was

9  trying to get at Boo, when we was trying to get a lot of those

10  guys.

11  Q.   If you're not certain, that's fine, Mr. Montgomery.  Let

12  me move to the next question.  Are you clear or not about --

13  A.   I'm trying to be certain.  I mean, I'm trying to be as

14  clear to you as possible.  Let me put it like this.  I know it

15  was a cold season.  It probably was like cold from '96 going

16  to '97.  Let me put it to you like that.

17  Q.   And when was it that you wanted to do harm to Ronnie

18  Horns, the testimony you gave today about that?

19  A.   It was after Chin got shot.

20  Q.   And Chin got shot in -- Sam Carson got shot January of

21  1997, right?

22  A.   I'm not sure.  I know it was cold outside.

23  Q.   Now, Mr. Montgomery, it wasn't until a few months after

24  you admitted to the first degree murder of Chrishauna Gladden

25  that you first mentioned to Agent Lisi anything about the

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 514

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .   Docket No. CR 98-329

           Government,             .   Washington, D.C.
                                   .   May 29, 2001
    vs.                            .   2:20 p.m.
                                   .
VINCENT HILL,                      .   (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,                .
SEAN COATES,                       .
                                   .         FILED
           Defendants             .
                                   .      MAR 1 1 2003
. . . . . . . . . . . . . . . .   .
                                   .   NANCY MAYER WHITTINGTON, CLERK
UNITED STATES OF AMERICA,          .         U.S. DISTRICT COURT

           Government,             .
                                   .
    vs.                            .   Docket No. CR 99-348
                                   .
GARY PRICE,                        .
                                   .
           Defendant.              .
                                   .
. . . . . . . . . . . . . . . .   .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 516

12

1   under which he would be speaking with you, did he continue

2   then after hearing that to tell you about conversations he had

3   with a number of people, but specifically William Sweeney?

4   A.   Yes, he did.   At first we started talking about drug

5   things, his sources of supply of marijuana, how he got into

6   selling marijuana.   We went through, you know, how his drug

7   operation worked, and then he told me that he knew about quite

8   a few murders and crimes of violence that had been committed

9   by Mr. Sweeney and some of his associates.

10  Q.   When you -- well, at that point were you interested in

11  hearing about what Mr. Smith knew that Mr. Sweeney had told

12  him?

13  A.   Yes.   It was kind of -- while I was talking to him, he

14  didn't want to come out and tell me everything he knew.   He

15  wanted to give me --

16       MR. ZUCKER:   Objection.   The witness can say what

17  the person he's speaking with said.   He cannot say what he was

18  thinking.

19       THE COURT:   Well, that's correct.

20  BY MS. CHATURVEDI:

21  Q.   Did Mr. Smith tell you -- well, what did Mr. Smith tell

22  you?

23  A.   He told me of crimes that had been committed and gave me

24  kind of a thumbnail sketch of the crimes.   For instance, he

25  would say something to the effect that, well, the triple,

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 517

13

1   Donnell Mack's murder. He said Shorty and them did that.

2       I said, what do you mean by Shorty and them? And he said

3   Shorty and James Montgomery. And I said, okay, what else

4   about it. And he says, well, I know about that. So he let me

5   know that he knew the details about that murder, and he did

6   that with several different murders.

7   Q.   Did you press him at that moment to go through --

8   A.   No.

9   Q.   -- to identify the other people or other facts that he

10  knew about those crimes of violence?

11  A.   No, it wasn't the time. It was kind of feeling each

12  other out. Although, he, as I said, showed that he was

13  willing to provide this information. He was still -- he

14  wasn't very comfortable in doing so, so I didn't push him on

15  it.

16  Q.   Now, while you were speaking with Mr. Smith this first

17  night upon his arrest, can you tell the ladies and gentlemen

18  and of the jury how you were recording, if you will, what

19  information Mr. Smith was providing you?

20  A.   The first night, the first time that we sat down and

21  talked, when we were talking about the drug things, I would

22  sit and ask him some questions, and he would go through it,

23  and I would sit and listen. Then I would say, well, let me go

24  back and make sure I understand this and take some notes

25  regarding the drug matters.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 518

14

1     And then when it got time for the violence, he was a

2  little more uneasy, and he told me about them.  I didn't want

3  to take any notes or make him feel more uneasy about it that

4  might quiet him down.  So regarding the violence, I don't

5  think I took many notes, if at all, about the violence when I

6  was talking to him.

7  Q.   December 5, 1996, when Mr. Smith was arrested, was he

8  released on his own at that point?

9  A.   The following day he was released.

10 Q.   Did there come a time then on December 12, 1996 when his

11 case was called into court, into U.S. District Court?

12 A.   Yes, it was.

13 Q.   What happened at that court hearing?

14 A.   One of our main concerns, and his main concern was trying

15 to make sure that nobody on the street thought that he was

16 cooperating.  And we tried to figure out a way to best do it

17 so that any suspicions would be alleviated, that nobody would

18 think that he was, in fact, cooperating.

19     So on that date he came into court with his lawyer, and

20 the government dismissed in open court the charges against

21 him, and the Court from what -- I wasn't in the courtroom, but

22 it was with the idea that the person who made the undercover

23 purchases wasn't willing to testify against him; therefore,

24 the charges were dropped.

25     So the charges were dropped.  He agreed to that with the

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 519

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 388 of 443
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 29 of 102

29

1  wasn't certain as to what rental car company was used.

2  Q.   Now, that name, Kirk Ivory Newton, did that name later

3  assist you in, in fact, arresting Mr. Sweeney when he was

4  arrested and charged in connection with the kidnapping of

5  Wysocki and the triple murder?

6  A.   Yes, because we knew that the name Kirk Ivory Newton was

7  being used by Mr. Sweeney as an alias.  There were various

8  jails in the area that we believed he might be visiting, so

9  that information was given to the jails, and they were told

10 that if somebody comes in with this name, detain them, and

11 that the FBI would be there to see if that was, in fact,

12 William Sweeney, and that's how we ultimately arrested him.

13 Q.   Did Mr. Smith tell you about conversations he had with

14 Mr. Sweeney involving the shooting of an individual by the

15 name of Michael Jones?

16 A.   Yes, but he didn't know the name Michael Jones.  What he

17 told me was that, he said that back in 1992, Meechie, and

18 that's just the name he gave me, Meechie was charged with

19 shooting somebody from Condon Terrace.

20 Q.   Let me just stop you for a second.  When you say he told

21 you, this is what Mr. Smith told you?

22 A.   Yes, ma'am.

23 Q.   And the source of his knowledge was what?

24 A.   Mr. Sweeney.

25 Q.   All right.  I'm sorry to interrupt.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

30

1   A.    That's okay.  So Mr. Smith is telling me that Mr. Sweeney

2   told him that Meechie got charged with shooting a person from

3   Condon Terrace, and that one of the persons or the victims was

4   cooperating against Mr. -- was cooperating against Meechie.

5   So that Mr. Sweeney went to an area in Southeast near

6   Mississippi Avenue to kill the person who was testifying or

7   who was going to testify against Meechie.

8        And Mr. Smith was under the impression that the person

9   did die, that there actually was a murder.  And he said that

10  Mr. Sweeney went down there, chased a person through the alley

11  and it was some place near Mississippi Avenue, caught up with

12  him, shot him, and stood over him and shot him some more.  And

13  it was Mr. Smith's understanding that the person died.

14       And I tried going back and finding this crime, and this

15  is an example of where I'd call him and ask him a question,

16  and I'm trying to find -- I said, hey, you know, tell me about

17  that again.  And then he told me that, yeah, he said, it was

18  Draper or Shorty are the words he used and Birdy and he knew

19  Birdy.

20       He said Birdy was with Draper when they went down there,

21  and he said Birdy also shot somebody during the same event.

22  So we looked back through and based on what he had told us, it

23  matched up exactly with the shooting of Michael Jones.

24  However, Michael Jones did not die.  Let me back up.  Match

25  exactly.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 390 of 443
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 31 of 102

31

1    It matched up -- all the facts matched up with the

2  shooting of Michael Jones.  However, there was only one

3  victim.  So, you know, he was trying to recount to me the

4  conversation that was relayed to him, and he told me that he

5  thought that two people were shot, but he said that Draper and

6  Birdy were the two that went down there to do the shooting.

7  Q.    In the course of speaking with Robert Smith, did he also

8  inform you about a conversation that he had had with William

9  Sweeney about a witness by the name of Kenny Adams?

10 A.    Yes.  This is whenever I was away in 1997.  I was

11 speaking to him on the phone.  And he was -- I don't want to

12 use -- he was excited telling me about a witness named Little

13 Wayne.  He said, man, there's this dude, Little Wayne, that's

14 testifying against Poo-Poo.  He said, you better move that

15 guy, because Draper and those guys found out where he's at.

16 He said, supposedly they got him hiding out in Centreville,

17 Virginia, and those guys have been clocking him.

18    That's what he used clocking.  He said, Draper and them

19 been clocking him, and he said, they're going to kill that

20 little dude.  You better move him real quick before they get

21 to him.

22 Q.    Had anyone told you about any effort to get, well, Wayne

23 Wayne or Little Wayne?  What's his real name?

24 A.    Kenny Adams.

25 Q.    At that point had you had any information that efforts

32

1   were being made to locate and harm Kenny Adams?

2   A.   No, and I knew that Kenny Adams was cooperating.  I knew

3   he'd been released.  I didn't know where he was staying at

4   that time.  I called another FBI agent who was dealing

5   directly with Kenny Adams.  I said, hey, is Little Wayne out

6   in Centreville?

7        He said, yeah, he's out in Centreville.  And then I

8   relayed the information to him that Mr. Smith told me.  So

9   then they made the appropriate or took the appropriate steps

10  to have Little Wayne moved.

11  Q.   In that same conversation you had with Robert Smith about

12  Draper and them, the phrase you used, clocking Little Wayne,

13  did Mr. Smith tell you anything that William Sweeney had told

14  him about an employee at Superior Court?

15  A.   Yes.  He told me that there was a female at the Superior

16  Court who would get information and pass it along to Mr.

17  Sweeney and that this female had access to computers and it

18  was Mr. Smith's understanding that she could even manipulate

19  the computer system to make charges disappear.  I don't know

20  how that could happen, but that was his understanding.

21       And whenever I asked him, do you know how they got --

22  found Little Wayne out there?  He said, I'm not sure, maybe

23  it's the female, but he had no idea if it was the female or

24  not, but he knew that there was a female with access to

25  sensitive information in Superior Court.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 523

33

1  Q.  Did Mr. Smith tell you about conversations he had with
2  William Sweeney about the kidnapping of Wysocki, Anthony
3  Pryor?
4  A.  Yes, he did.
5  Q.  What did Mr. Smith tell you that Mr. Sweeney had told
6  him?
7  A.  He said that Mr. Sweeney, and these are the words that
8  Mr. Hill used, he said, Draper, Vito, Birdy, Poo-Poo and Sam
9  went to kidnap Wysocki.  And he said that they were waiting
10  for him out in Maryland.  I think he said Montgomery County,
11  Maryland, but he said they were sitting waiting for him to
12  come out of the house, and as they were coming out of the
13  house, they went to grab him, and he fought with them and
14  struggled and started to get away and they shot him in the
15  back with a .45.
16      After they shot him in the back with a .45, they threw
17  him in the trunk of a car, and he says, they're driving away
18  and the trunk of the car caved in somehow, and Wysocki was
19  able to escape.
20      And he said that Draper and the others were very upset
21  with Birdy because it was his car that was used when the trunk
22  caved in.  So they blamed him for that.  And he said because
23  of that and he said other things that happened over the years,
24  that they wanted to kill Birdy for.
25  Q.  Did Mr. Sweeney indicate to Mr. Smith whether or not he,

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 524

34

1  Mr. Sweeney, knew that he was wanted for that kidnapping?

2  A.   Yes.   There came a time in 1997 when an arrest warrant

3  was obtained for Mr. Sweeney for that kidnapping of Wysocki,

4  Anthony Pryor.   Mr. Sweeney had told Mr. Smith that, yeah, he

5  found out that he was wanted, that they had a warrant for him

6  for Wysocki's kidnapping.   But he said he wasn't worried,

7  because he sent his investigator to interview Wysocki and

8  that, I think he said he saw him twice maybe and got a

9  statement from him, and that Wysocki said that he didn't know

10  who shot him.   They were wearing masks and he couldn't

11  identify them.

12      So Mr. Sweeney told Mr. Smith that he wasn't very

13  concerned about that, but he did know that he was wanted.

14  Q.   Did Mr. Sweeney tell Mr. Smith about Mr. Sweeney's

15  involvement in the murder of Donnell, Robocop, Whitfield?

16  A.   Yes.   He told us that Mr. Sweeney had bumped into Robocop

17  while they were at the Mirage nightclub one night.

18  Q.   I'm going to interrupt you again just one second.   This

19  is what Mr. Sweeney told Mr. Smith?

20  A.   Yes.

21  Q.   Mr. Smith didn't observe this himself?

22  A.   No.

23  Q.   Okay.

24  A.   I don't think he observed any of this.   This is just what

25  he was told by Mr. Sweeney.

53

35

1   Q.   All right.

2   A.   Mr. Sweeney said that he was at the Mirage nightclub and

3   had somehow bumped into Robocop and they had got into some

4   kind of altercation.  Sometime after that Mr. Smith said that

5   he was at 211 I Street, and he saw Mr. Sweeney and Erik Jones

6   in the house.

7        They were talking.  Mr. Smith left.  He came back

8   sometime later to 211 I Street, and he said those two were

9   there again.  They told him how they had just come back from

10  killing Robocop.  And they said that they went up there

11  together.  That Draper got out of the car, shot Robocop, and

12  then left the area.

13       And then he told us that what happened was the gun that

14  he had used to shoot Robocop --

15  Q.   The gun that who used?

16  A.   Draper or Mr. Sweeney had used to kill Robocop, he was

17  worried about it, that it would come back to the murder.  So

18  there is an individual named -- they call him Colonel Klink.

19  His real name I think is William Howard Young.

20       Anyway, he said that Colonel Klink, everybody on the

21  streets has used him as an expert on guns.  He knows all about

22  guns.  So Mr. Sweeney gave the gun to Colonel Klink and said,

23  hey, can you fix this for me so it won't come back as being

24  the murder weapon.  So he said that he changed the barrel in

25  it, but he didn't change all the parts, and therefore, the

38

1          (End of bench conference.)

2              THE COURT:  Please rephrase your question.

3    BY MS. CHATURVEDI:

4    Q.    Agent Lisi, did Mr. Sweeney tell Mr. Smith where it was

5    that Robocop had been murdered?

6    A.    Yes, in Sursum Corda.

7    Q.    Did Mr. Sweeney, Draper, talk to Robert Smith about the

8    triple murder that happened out in PG County?

9    A.    Yes, he did.

10   Q.    What did Mr. Sweeney tell Mr. Smith about that?

11   A.    He told him that the whole plan started after Mr. Sweeney

12   had gone to Las Vegas to see the Tyson-Holyfield fight.  While

13   he was there he had seen Lonnie or Alonzo Gaskins, with a lot

14   of money.

15        And to back up a little bit, we asked Mr. Smith a little

16   bit about the trip, and Mr. Smith told us that he was the one

17   who even introduced somehow Mr. Sweeney to the real estate

18   agent who booked the trip for them.

19   Q.    The real estate agent?

20   A.    I'm sorry, travel agent.  The travel agent.  He said he

21   introduced Mr. Sweeney to the travel agent and the travel

22   agent was able to book the trip for Mr. Sweeney and others who

23   went to Las Vegas to see the fight.

24        As I said, while they were there, Mr. Sweeney saw Lonnie

25   win quite a bit of money.  So when he came home, he decided he

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 527

39

1   was going to try to kidnap him and rob him for his money.  He
2   said on the night that they went out there, Mr. Sweeney, James
3   Montgomery, Sam Carson, and Sean Coates went in a minivan.

4        They sat on the house for several hours.  At some point
5   they went in the house.  He said they only had one gun, and
6   that Draper was the one who had the gun.  He said it was a
7   Glock .40 caliber that was used.

8        I think he said that there's a laser sight on it, too.
9   And he said Mr. Sweeney had the Glock .40 caliber and James
10  Montgomery had a stun gun that he was going to use to try to
11  stun one of the people inside the house.

12       They went in the house to try to kidnap Lonnie, and
13  something went bad, and Mr. Sweeney said that Darnell Mack
14  mouthed off, and that he had to kill him.  So he said he shot
15  the two guys inside the house, and then on the way out of the
16  house, he said there was a female standing there, and he said,
17  she was just like frozen, like she was in shock and she
18  couldn't move.  And he said he walked out and looked at her
19  and just shot her in the head and left her there.

20  Q.   In the course of speaking with Robert Smith, from the
21  time you first talked to him on December 5, 1996, until he was
22  murdered in June of 1997, did Mr. Smith ever tell you that he
23  was in fear with respect to his safety?

24  A.   Yes.  There was nothing specific.

25            THE COURT:  Let me interrupt you for a minute.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 528

41

1        (Jury Out.)

2            THE COURT:  Did you have something you wanted to

3    bring up?

4        (Recess.)

5            THE COURT:  All set?  Bring them in.

6        (Jury In.)

7            THE DEPUTY CLERK:  Jury panel is all present, Your

8    Honor.

9            THE COURT:  All right.  Thank you, Marshal.  You

10   might want to start your line of inquiry again.  I interrupted

11   you.

12           MS. CHATURVEDI:  Yes, sir.

13   BY MS. CHATURVEDI:

14   Q.   Agent Lisi, in the course of speaking with Mr. Smith

15   starting in December of 1996 up until the time he was

16   murdered, did Mr. Smith ever express to you any fears he had

17   about his safety?

18   A.   Yes.  There was nothing specific, no specific threats

19   that were ever made to him, but he told me many times, he

20   said, man, I'm telling you, he said, if anything ever happens

21   to me, it's Shorty.  He said, anything happens, if he ever

22   found out what I was doing, he'd have no problem killing me,

23   and he told me that many times.  If anything ever happens to

24   me, it's Shorty.  Just look at him first.

25   Q.   Shorty being, of course?

42

```
 1   A.   Draper or Mr. Sweeney.
 2   Q.   And can you tell the ladies and gentlemen of the jury if
 3   there was a time that Mr. Smith's cooperation was acknowledged
 4   in a public document?
 5   A.   His information, the information that he -- the
 6   information about the triple murder was put in the charging
 7   document in PG County.  His name wasn't put in there, but all
 8   of the information that he had provided us was put in there,
 9   and they also put in there something to the fact that it was
10   an FBI confidential informant, FBI Washington Field Office,
11   things of that nature.
12   Q.   I neglected to ask you this.  Other than saying to you
13   that if anything happened to him, to look to Shorty, did Mr.
14   Smith ever express to you any fears about anyone else who Mr.
15   Smith told you about in the course of your six months speaking
16   with him?
17   A.   No, he never expressed any problems or problems with
18   anybody else or concerns about anybody else.
19   Q.   On June 16, 1997, Agent Lisi, did you receive a call
20   about a shooting done in broad daylight in the 1300 block of
21   Half Street, Southwest?
22   A.   Yes, ma'am.
23   Q.   How many times had that victim been shot in that
24   shooting?
25   A.   I believe 11.
```

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 530

43

1    Q.    Who was it that was murdered?

2    A.    Robert Smith.

3              MS. CHATURVEDI:  No further questions, Your Honor.

4              MR. KIERSH:  Your Honor, may I inquire?

5              THE COURT:  You certainly may.

6                        CROSS-EXAMINATION

7    BY MR. KIERSH:

8    Q.    Good afternoon, Agent.

9    A.    Good afternoon.

10   Q.    Agent Lisi, you said that Butchie was not known as a

11   violent person; is that right?

12   A.    Yes, sir.

13   Q.    You said that you had no problem letting him out on the

14   street?

15   A.    Correct.

16   Q.    Is that right?

17   A.    I said correct.

18   Q.    Okay.  That was what distinguished him from someone else

19   in terms of your agreeing not to ask that he be held without

20   bond pending trial?

21   A.    I think that's one of the factors that's considered.

22   Q.    Okay.  Now, --

23   A.    I mean, yeah, it's one of the factors that's considered.

24   Q.    And just to remind the jury, because we'll go back and

25   forth on this, Robert Smith was also known as Butchie,

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

1

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES,                    :
              GOVERNMENT,               :
4                                       :
                                        :
     VS.                                :    CR. NO. 98-329
5                                       :
                                        :
     VINCENT HILL,                      :
6    JEROME MARTIN,                     :
     SAMUEL CARSON,                     :       FILED
7    WILLIAM K. SWEENEY,                :
     SEAN COATES,                       :     JUL 1 9 2001
8             DEFENDANTS.               :
                                        :    NANCY MAYER WHITTINGTON, CLERK
9    UNITED STATES                      :        U.S. DISTRICT COURT
              GOVERNMENT,               :
10                                      :
                                        :
     VS.                                :    CR. NO. 99-348
11                                      :
                                        :
     GARY PRICE,                        :
12            DEFENDANT                  :
     _____:
13

14                                 WASHINGTON, D. C.
                                   MAY 30, 2001
15                                 (10:37 A.M.)

16

17               TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE THOMAS P. JACKSON

18

19

20

21   COURT REPORTER:         PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
22                           3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001

23

24

25

2

```
 1   FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                      ANJALI CHATURVEDI, AUSA
 2                                    555 4TH ST., N.W.
                                      WASHINGTON, D. C. 20001
 3
     FOR THE DEFENDANT HILL:          CHRISTOPHER DAVIS, ESQ.
 4                                    601 INDIANA AVE., N.W.
                                      #910
 5                                    WASHINGTON, D. C.  20004

 6   FOR THE DEFENDANT MARTIN:        JOANNE HEPWORTH, ESQ.
                                      305 H STREET, N.W.
 7                                    2ND FLOOR
                                      WASHINGTON, D. C.  20001
 8

 9   FOR THE DEFENDANT CARSON:        JOSEPH BESHOURI, ESQ.
                                      LEXI NEGIN-CHRIST, ESQ.
10                                    419 7TH STREET, N.W.
                                      WASHINGTON, D. C.  20004
11
     FOR THE DEFENDANT SWEENEY:       STEVEN R. KIERSH, ESQ.
12                                    717 D STREET, N.W.
                                      SUITE 400
13                                    WASHINGTON, D. C.  20004

14
     FOR THE DEFENDANT COATES:        FREDERICK JONES, ESQ.
15                                    901 6TH STREET, S.W.
                                      #409
16                                    WASHINGTON, D. C.  20024

17   FOR THE DEFENDANT PRICE:         JONATHAN ZUCKER, ESQ.
                                      601 INDIANA AVE., N.W.
18                                    #901
                                      WASHINGTON, D. C.  20004
19

20

21

22

23

24

25
```

3

```
 1                          INDEX

 2    WITNESS:                 DIRECT  CROSS  REDIRECT  RECROSS

 3    SP. AGT. VINCENT LISI

 4          BY MR. KIERSH              7                 . 109

 5          BY MR. DAVIS              57

 6          BY MR. ZUCKER          · 98               .110

 7          BY MS. CHATURVEDI              106

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  I SUPPOSE HIS THESIS IS THAT MICHAEL

 2   FARRAR MIGHT HAVE BEEN A SUSPECT IN "BUTCHIE'S" MURDER.

 3              MS. CHATURVEDI:  I WILL LET THE AGENT ANSWER, YOUR

 4   HONOR.

 5              THE COURT:  I BEG YOUR PARDON?

 6              MS. CHATURVEDI:  I WILL LET THE AGENT ANSWER.

 7   BY MR. KIERSH:

 8   Q.  YOU DON'T RECALL PICKING HIM UP AND QUESTIONING HIM?

 9   A.  NO, SIR, I DON'T.

10   Q.  OKAY.

11              HOW ABOUT PETEY JOHNSON?

12   A.  I WILL TELL YOU RIGHT NOW, I NEVER AFTER "BUTCHIE'S"

13   MURDER, PICKED UP MICHAEL FARRAR AND INTERVIEWED HIM.

14   Q.  HOW ABOUT PETEY JOHNSON?  DID YOU PICK HIM UP?

15   A.  YES, SIR, BECAUSE IT WAS BELIEVED HE WAS A WITNESS.

16   Q.  TO ROBERT SMITH'S MURDER?

17   A.  YES, SIR.

18   Q.  OKAY.  AND YOU QUESTIONED PETEY JOHNSON ABOUT ROBERT

19   SMITH'S MURDER?

20   A.  YES, SIR.

21   Q.  OKAY.  AND YOU QUESTIONED HIM NOT JUST AS A WITNESS, BUT

22   AS A POSSIBLE SUSPECT?

23   A.  I WOULD SAY AS A WITNESS AND MAYBE SOMEBODY -- IT WAS

24   JUST A HUNCH THAT HE WAS THERE AND THEN HE WALKED AWAY, WE

25   BELIEVED, AT THE TIME "BUTCHIE" WAS KILLED.  SO HE MAY HAVE
```

20

1   CALLED SOMEBODY TO ALERT THEM THAT "BUTCHIE" WAS THERE.

2   Q.  AND YOU DON'T SEE PETEY JOHNSON'S FACE UP ON THAT PHOTO

3   BOARD, DO YOU?

4   A.  NO, SIR.

5   Q.  AND YOU DIDN'T SEE PETEY JOHNSON COME INTO THIS

6   COURTROOM TO TESTIFY IN THIS CASE, DID YOU?

7   A.  NO, SIR.

8   Q.  OKAY.

9           NOW, WHEN YOU WENT OUT TO THIS HOUSE IN MARYLAND

10  THAT BOTH ROBERT SMITH AND MICHAEL FARRAR WERE EITHER LIVING

11  AT OR HAD ACCESS TO, DID YOU RECOVER THE CASH FROM THE

12  HOUSE?

13  A.  NO.  WHAT HAPPENED WAS MYSELF AND ANOTHER AGENT DROVE TO

14  THE GENERAL AREA AND LET MR. SMITH OUT.  HE WENT TO THE

15  HOUSE, RECOVERED THE ITEMS AND BROUGHT THEM BACK TO US.  I

16  NEVER WENT INSIDE THE HOUSE BECAUSE WE DIDN'T WANT ANYBODY

17  IN THE HOUSE TO SEE US OR KNOW THAT WE WERE THERE.

18  Q.  WHO RECOVERED THE EVIDENCE?

19  A.  ROBERT SMITH.

20  Q.  OKAY.  AND HE BROUGHT IT BACK OUT TO YOU?

21  A.  YES, SIR.

22  Q.  OKAY. DID HE BRING YOU THE CASH?

23  A.  YES, SIR.

24  Q.  ALL OF THE $5,000.00?

25  A.  I THINK IT WAS $5,005.00.

LJA 2241

45

1              MS. CHATURVEDI:  OBJECTION, YOUR HONOR.  IT'S

2    BEYOND THE SCOPE.

3              THE COURT:  SUSTAINED.

4    BY MR. KIRSCH:

5    Q.  NOW, OTHER THAN -- AFTER ROBERT SMITH WAS SHOT AND

6    KILLED IN JUNE OF '97, OTHER THAN PETEY JOHNSON, DID YOU

7    SPEAK WITH ANYONE ELSE, EITHER AS A SUSPECT OR AS A

8    POTENTIAL WITNESS, REGARDING THIS EVENT?

9    A.  YES, SIR.

10   Q.  WHO WAS THAT?

11   A.  RICHARD --

12             MS. CHATURVEDI:  OBJECTION, YOUR HONOR.  THIS IS

13   BEYOND THE SCOPE AGAIN AS TO WHO HE SPOKE WITH TO SOLVE THAT

14   CRIME.  THE MURDER IS NOT CHARGED IN THIS CASE, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  IT'S PROBABLY BEYOND THE

16   SCOPE.

17             MR. KIERSH:  MAY I APPROACH THE BENCH?

18             THE COURT:  YES, YOU MAY.  YOU CAN COME FORWARD

19   AND TELL ME WHY YOU THINK IT'S WITHIN THE SCOPE.

20             (BENCH CONFERENCE.)

21

22

23

24

25

LIA 2265

1              (BENCH CONFERENCE.)

2          MR. KIERSH:  THE LAST PIECE OF EVIDENCE OR

3    INFORMATION ELICITED FROM THIS WITNESS ON DIRECT WAS THAT

4    ROBERT SMITH SAID, "I WAS AFRAID OF WILLIAM SWEENEY."

5          THE COURT:  OKAY.

6          MR. KIERSH:  SO THIS IS DIRECTLY RELEVANT.  THE

7    FACT THAT THEY ARE ARRESTING OTHER PEOPLE OR QUESTIONING

8    OTHER PEOPLE, IT CONTRADICTS THIS FEAR OF WILLIAM SWEENEY.

9    THEY ARE LOOKING AT OTHER PEOPLE FOR HAVING COMMITTED THIS

10   OFFENSE.

11         THE COURT:  YOU ALREADY DEALT WITH PETEY JOHNSON

12   AND MICHAEL FARRAR AND ALL OF THESE OTHER PEOPLE.

13         MR. KIERSH:  THERE ARE OTHER PEOPLE WHO HE SPOKE

14   TO AS BEING POSSIBLE SUSPECTS.  SO IT IS DIRECTLY RELEVANT

15   TO CONTRADICTING THIS SUPPOSED FEAR OF WILLIAM SWEENEY.  HE

16   SAID THAT'S THE ONLY PERSON WHO ROBERT SMITH EXPRESSED FEAR

17   ABOUT.  THEN WHY ARE THEY ARRESTING OTHER PEOPLE?  THERE

18   MUST BE A REASON.

19         THE COURT:  WHAT DO YOU MEAN ARRESTING OTHER

20   PEOPLE?

21         MR. KIERSH:  HE IS QUESTIONING OTHER PEOPLE ABOUT

22   SMITH'S MURDER.  IF SMITH IS TO BE BELIEVED THAT THE ONLY

23   PERSON HE FEARED WAS WILLIAM SWEENEY, YOU DON'T NEED TO TALK

24   TO ANYBODY ELSE.

25         THE COURT:  IT DOESN'T PRECLUDE HIS QUESTIONING

LLA 2267

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 407 of 443
Case 1:98-cr-00329-RCL  Document 713  Filed 07/19/01  Page 47 of 115

47

1   OTHER PEOPLE.

2        MR. KIERSH:  IT CONTRADICTS THE VERACITY OF THAT

3   STATEMENT, JUDGE.  IT IS TOTALLY RELEVANT AND IT'S

4   COMPLETELY ON POINT.

5        MS. CHATURVEDI:  YOUR HONOR, I THINK MR. KIERSH IS

6   MAYBE MISUNDERSTANDING WHAT AGENT LISI IS SAYING.  AND I

7   THINK WE'RE GOING TO JUST GET INTO A LINE OF INQUIRY THAT IS

8   INAPPROPRIATE.  HE WAS QUESTIONING OTHER PEOPLE ABOUT

9   WILLIAM SWEENEY DOING THE MURDER.  IT WASN'T THAT THERE WERE

10  OTHER SUSPECTS.

11       THE COURT:  WHY CAN'T YOU BRING THAT OUT ON

12  REDIRECT?

13       MS.  CHATURVEDI:  YOUR HONOR, WE COULD, BUT THE

14  CASE IS --

15       MR. KIERSH:  WHY DON'T I JUST REPHRASE THE

16  QUESTION:  WERE THESE OTHER PEOPLE QUESTIONED AS SUSPECTS?

17       MS. CHATURVEDI:  THAT'S FINE.  IF HE SAYS THEY

18  WERE NOT QUESTIONED AS SUSPECTS, YOUR HONOR, I THINK THEN WE

19  SHOULD GET OFF OF THIS POINT.

20       THE ONLY SUSPECT -- IF MR. KIERSH WANTS TO HEAR IT

21  AGAIN -- THE ONLY SUSPECT IN AGENT LISI'S MIND THAT ORDERED

22  THAT MURDER WAS WILLIAM SWEENEY.  IF MR. KIERSH WANTS HIM TO

23  REPEAT IT, THAT IS FINE, BUT TO IDENTIFY WITNESSES BY

24  NAME -- POTENTIAL WITNESSES IN THE MURDER OF ROBERT

25  SMITH, WHEN THAT MURDER IS NOT CHARGED, IT PUTS THOSE PEOPLE

LLA 2368

48

1  AT RISK TREMENDOUSLY, I THINK, IF THEY ARE WITNESSES TO THAT

2  MURDER.

3        THE COURT:  WHY ARE THEY AT RISK CERTAINLY FROM

4  ANYBODY RELATED TO THIS CASE?

5        MS. CHATURVEDI:  WELL, IF THAT MURDER GETS CLOSED,

6  YOUR HONOR -- IT IS STILL AN OPEN CASE.  NO ONE HAS BEEN

7  CHARGED WITH THE MURDER ITSELF.  FOR AGENT LISI TO SAY WHO

8  HE TALKED WITH AND WHAT THOSE PEOPLE TOLD HIM ABOUT WHY THEY

9  THINK WILLIAM SWEENEY WAS INVOLVED IN THAT MURDER I THINK

10  PUTS THEM AT RISK.  AND IT IS NOT CHARGED.  IT'S AN

11  UNCHARGED MURDER.

12        THE COURT:  ALL RIGHT.  YOU SAID THAT.

13        MR. KIERSH:  A CONSPIRACY TO MURDER.  I MEAN I

14  AGREE WITH MS. CHATURVEDI THAT THE ACTUAL MURDER IS NOT

15  CHARGED.

16        THE COURT:  ALL RIGHT.

17        MR. KIERSH:  YOU KNOW WHAT?  I AM NOT GOING TO

18  SPEND A LONG TIME ON THIS.  I WILL JUST ASK HIM IF THERE ARE

19  OTHER SUSPECTS.

20        THE COURT:  ASK HIM IF THERE ARE OTHER SUSPECTS.

21        MR. KIERSH:  THAT'S IT.

22        (END OF BENCH CONFERENCE.)

23

24

25

1          (END OF BENCH CONFERENCE.)

2     BY MR. KIRSCH:

3     Q.   AGENT LISI, THE QUESTION IS AFTER ROBERT SMITH WAS

4     MURDERED, DID YOU QUESTION OTHER SUSPECTS IN HIS MURDER?

5     A.   SUSPECTS?   YES.

6     Q.   AND HOW MANY OTHER SUSPECTS?

7     A.   ONE.

8     Q.   OKAY.   IS THAT OTHER SUSPECT DEPICTED ON THE PHOTO

9     BOARD?

10    A.   NO, SIR.

11    Q.   NOW, IN YOUR NOTES THAT YOU WROTE -- AND, AGAIN, IF YOU

12    NEED TO TAKE A LOOK AT IT, JUST LET ME KNOW.   YOU TALKED

13    ABOUT STEPHON'S COUSIN SAYING HE GOT A GUN FROM DRAPER THAT

14    WAS USED IN THE TRIPLE, A .40 CALIBER WITH A LASER SIGHT.

15    DO YOU REMEMBER THAT?

16    A.   YES, SIR.

17    Q.   OKAY.   NOW, STEPHON'S COUSIN, WHO YOU'RE REFERENCING IN

18    THIS NOTE, IS JOHNNIE PROCTOR, ISN'T THAT RIGHT?

19    A.   I CAME TO LEARN IT WAS JOHNNIE PROCTOR, YES.

20    Q.   OKAY.   NOW, JOHNNIE PROCTOR -- REMINDING THE LADIES AND

21    GENTLEMEN OF THE JURY -- IS THE SAME JOHNNIE PROCTOR WHO

22    JAMES MONTGOMERY HAD FALSELY ACCUSED OF BEING INVOLVED IN

23    THE TRIPLE MURDER WHEN HE SPOKE TO THE PRINCE GEORGE'S

24    COUNTY POLICE, ISN'T THAT RIGHT?

25          MS. CHATURVEDI:   OBJECTION.   IT'S BEYOND THE

LIA 2270

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,         .    Docket No. CR 98-329
                                  .
         Government,              .    Washington, D.C.
                                  .    June 14, 2001
    vs.                           .    2:30 p.m.
                                  .
VINCENT HILL,                     .    (AFTERNOON SESSION)
JEROME MARTIN,                    .
SAMUEL CARSON,                    .
WILLIAM K. SWEENEY,               .
SEAN COATES,                      .
                                  .
         Defendants              .
                                  .
. . . . . . . . . . . . . . .     .
                                  .
UNITED STATES OF AMERICA,         .
                                  .
         Government,              .
                                  .    Docket No. CR 99-348
    vs.                           .
                                  .
GARY PRICE,                       .
                                  .
         Defendant.              .
                                  .
. . . . . . . . . . . . . .      .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

29

1   Q.   You wouldn't quibble with that?

2   A.   No.

3   Q.   Was she being -- that is, Ms. Wilson, Ms. Wilson-Wise,

4   was she being paid in exchange for information?

5   A.   She was being paid for information.

6   Q.   Is that, yes?

7   A.   That's correct.

8   Q.   Agent Warrener,  if you'd be kind enough to speak up or

9   move to the microphone just a little bit more, a little bit

10  closer.

11       And was she given to understand that she was being paid

12  for information?

13  A.   I believe she came to have that understanding, but

14  initially when I met with her, she voluntarily provided

15  information, and I paid her for that information because it

16  was valuable to the investigations that we had.

17  Q.   All right.  Now, did you have any knowledge yourself

18  about the status of her personal finances at the time?

19  A.   Yes, I did.  I believe that she was struggling.  She had

20  two children, and I know that she had a tough financial

21  situation.

22  Q.   All right.  Now, at some point, did she talk to you about

23  the murder of Anthony Fortune?

24  A.   Yes.

25  Q.   And was that before or was that after the FBI began to

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

5

App 544

30

1   pay her money?

2   A.   I believe I paid her prior to the information she gave me

3   about the Tony Fortune murder.

4   Q.   Was Ms. Wilson given to understand that some information

5   would be more valuable than other?

6   A.   I think that she probably could get that impression

7   after, you know, dealing with me for a period of time.

8   Q.   And at any time did you impose or did you tell her that

9   there would be a limit to how much money you could pay her?

10   A.   No.

11   Q.   Is that, no?

12   A.   That's a, no.

13   Q.   All right.  So, again, the information that was provided

14   about the shooting murder of Anthony Fortune, that was after

15   the FBI began to pay her money, pay Ms. Wilson money?

16   A.   Yes.

17   Q.   Could you approximate the number of meetings you had,

18   Agent Warrener, with Ms. Wilson prior to when she gave

19   information about Anthony Fortune?

20   A.   Without seeing the records, it would be difficult for me

21   to recall how many times I had meetings with her prior to

22   that.

23   Q.   Would you agree that some three or four months time

24   passed between when she first started providing information

25   and when she first spoke about Anthony Fortune?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

31

1   A.    Yes.

2   Q.    During the course of your conversations with her, with

3   Ms. Wilson, Agent Warrener, did you have the benefit of any

4   crime scene reports from the Anthony Fortune shooting?

5   A.    I don't believe so.  It's difficult for me to recall.  It

6   was a long time ago.  I probably was aware of the murder

7   because it was an investigation that was associated with a

8   case that we had on the squad.  I don't recall if I saw

9   reports or not, because it wasn't an investigation that I was

10  working.

11  Q.    All right.  That information that she gave you, did you

12  turn that over to somebody?

13  A.    Yes.

14  Q.    And who did you turn that over to?

15  A.    I turned it over to police officers and agents on the

16  squad that were looking at this particular group.

17  Q.    And did that group of agents on the squad, was that the

18  group to which Agent Vincent Lisi belonged?

19  A.    Yes.

20  Q.    Now, during the course of your conversations with Ms.

21  Wilson, Agent Warrener, did you ever come to believe that she

22  had any experience with firearms or with the working mechanics

23  of a firearm, a handgun?

24        MR. ZEIDENBERG:  Objection.

25        THE COURT:  You want to approach the bench?

55

```
 1   you.

 2              MS. HEPWORTH:  May I inquire, Your Honor?

 3              THE COURT:  Yes.

 4                    CROSS-EXAMINATION

 5   BY MS. HEPWORTH:

 6   Q.   Good afternoon, Agent Warrener.

 7   A.   Good afternoon.

 8   Q.   Agent Warrener, isn't it true that Charlene Wilson told

 9   you that she heard this information?

10   A.   That's what I wrote in my report, but that's a style of

11   writing that we use to protect the identity of an informant.

12   Q.   This is a lie, right?

13   A.   This was never intended to be -- when she gave me this

14   information, it was given to me on a confidential basis, and

15   in order to protect the informant's identity, we might say

16   that the informant heard when the informant was actually

17   there.

18   Q.   And that's to mislead the defense; is that right?

19   A.   No, because it was never intended to go to trial.

20   Q.   Who is it intended to mislead?

21   A.   It's not intended to mislead anyone.  It's intended to

22   protect the identity of the informant.

23   Q.   So who is it protecting the identity from?

24   A.   Protecting the identity from anybody who might try to

25   harm the confidential nature of the relationship.
```

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 547

56

1    Q.    You said yourself that this report was not intended to be

2    revealed to anyone; isn't that right?

3    A.    It was intended to be disseminated to the appropriate law

4    enforcement personnel, but as I stated earlier, we never

5    anticipated calling her as a witness, because I didn't want to

6    put her in that situation because she had young children.

7    Q.    But your report does say that the source heard this

8    information; isn't that right?

9    A.    That's correct.

10   Q.    This information -- Charlene Wilson allegedly gave this

11   information to you on January 28, 1993, correct?

12   A.    Correct.

13   Q.    That was more than six months after the death of Tony

14   Fortune, correct?

15   A.    I don't know actually.

16   Q.    No, make that more than 16 months after the death of Tony

17   Fortune?

18   A.    Yeah, I don't really actually have a knowledge of when

19   actually the shooting took place.  At the time she told me

20   about it, like I said, I was not investigating it, so I don't

21   -- I'm not that familiar with the case.

22   Q.    And you had previously talked to this witness; is that

23   right?

24   A.    Correct.

25   Q.    And she had previously provided you other information,

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 548

59

 1   Tony Fortune for many years after this information was

 2   provided?

 3   A.   I think I'm aware of that.

 4         MS. HEPWORTH:  I have nothing more at this time,

 5   Your Honor.

 6         MR. BESHOURI:  Your Honor, will the Court permit me

 7   one or two additional questions?

 8         THE COURT:  Of course.

 9               FURTHER REDIRECT EXAMINATION

10   BY MR. BESHOURI:

11   Q.   Agent Warrener, this insert to your report that I'm

12   looking at is essentially -- after the introductory paragraph,

13   essentially two paragraphs; am I right?

14   A.   Yes.

15   Q.   In the first paragraph, you've explained that you used

16   the word heard, that the source heard something --

17   A.   Right.

18   Q.   -- and that this was a protective technique?

19   A.   Yes.

20   Q.   Is there a reason you don't use that same technique in

21   the second paragraph where we're talking about Anthony Fortune

22   and his shooting?

23   A.   Well, again, I don't think she -- in the second paragraph

24   it really says that she witnessed it.  It says, source

25   advised, and then it goes into a description of what happened.

60

1   So she doesn't -- in that second paragraph, it doesn't state

2   that she actually witnessed this.  It's as if she's relaying

3   facts which she could have, you know, received secondhand.

4        But at the time that I interviewed her, it was clear -- I

5   mean, she provided to me the information as an eyewitness.

6   Q.   Was it not equally clear what she was telling you she saw

7   about the events in the apartment?  Wasn't she saying to you

8   she was an eyewitness to that as well?

9   A.   That's correct.

10  Q.   Yet in the first paragraph you use the phrase, the source

11  heard?

12  A.   That's correct.

13  Q.   Believing her to be an eyewitness to that?

14  A.   It bears no significance, I can tell you, that she told

15  me that she witnessed both events, and it really bears no

16  significance in terms of -- in both cases I did not state that

17  she witnessed this or she was an eyewitness.  It was just two

18  different ways of protecting her identity.

19  Q.   All right.  So that I can get over my confusion, the

20  first paragraph, you say the source heard, although you

21  believed her to be an eyewitness?

22  A.   She was.

23  Q.   And in the second paragraph -- well, you weren't there,

24  sir, were you?

25  A.   That's correct.



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES,                :
            GOVERNMENT,       :
                             :
 VS.                         :    CR. NO. 98-329
                             :
VINCENT HILL,                :
JEROME MARTIN,               :
SAMUEL CARSON,               :
WILLIAM K. SWEENEY,          :
SEAN COATES,                 :
            DEFENDANTS.       :
_____:
UNITED STATES                :
            GOVERNMENT,       :
                             :
 VS.                         :    CR. NO. 99-348
                             :
GARY PRICE,                  :
            DEFENDANT         :
_____:
```

FILED

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
JUNE 26, 2001
(9:43 A.M.)
(A. M. SESSION)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON



COURT REPORTER:            PHYLLIS MERANA
                          6816 U. S. DISTRICT COURT
                          3RD & CONSTITUTION AVE., N.W.
                          WASHINGTON, D. C. 20001

2

```
 1   FOR THE GOVERNMENT:           PETER ZEIDENBERG, AUSA
                                   ANJALI CHATURVEDI, AUSA
 2                                 555 4TH ST., N.W.
                                   WASHINGTON, D. C. 20001
 3
     FOR THE DEFENDANT HILL:       CHRISTOPHER DAVIS, ESQ.
 4                                 601 INDIANA AVE., N.W.
                                   #910
 5                                 WASHINGTON, D. C.  20004

 6   FOR THE DEFENDANT MARTIN:     JOANNE HEPWORTH, ESQ.
                                   305 H STREET, N.W.
 7                                 2ND FLOOR
                                   WASHINGTON, D. C.  20001
 8

 9   FOR THE DEFENDANT CARSON:     JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
10                                 419 7TH STREET, N.W.
                                   WASHINGTON, D. C.  20004
11
     FOR THE DEFENDANT SWEENEY:    STEVEN R. KIERSH, ESQ.
12                                 717 D STREET, N.W.
                                   SUITE 400
13                                 WASHINGTON, D. C.  20004

14
     FOR THE DEFENDANT COATES:     FREDERICK JONES, ESQ.
15                                 901 6TH STREET, S.W.
                                   #409
16                                 WASHINGTON, D. C.  20024

17   FOR THE DEFENDANT PRICE:      JONATHAN ZUCKER, ESQ.
                                   601 INDIANA AVE., N.W.
18                                 #901
                                   WASHINGTON, D. C.  20004
19

20

21

22

23

24

25
```

25

1    IF ROBERT SMITH HAD BEEN PERMITTED TO TESTIFY --

2    IF HE HAD NOT BEEN MURDERED, HE WOULD HAVE TOLD YOU ABOUT A

3    LOT OF THINGS THAT HIS NEPHEW, WILLIAM SWEENEY, "DRAPER,"

4    TOLD HIM.

5    ROBERT SMITH COULD HAVE COME INTO THIS COURTROOM,

6    AND HE WOULD HAVE TOLD YOU THAT HIS NEPHEW, "DRAPER,"

7    CONFESSED TO HIM THAT DRAPER WAS RESPONSIBLE FOR THE TRIPLE

8    MURDER, THAT DRAPER WAS RESPONSIBLE FOR THE MURDER OF

9    "ROBOCOP," AND THAT DRAPER WAS RESPONSIBLE FOR THE KILLING

10   OF "WHITEY," THAT "DRAPER" WAS RESPONSIBLE FOR ASSISTING IN

11   LOCATING AND TRYING TO KILL WITNESSES IN THE CASE AGAINST

12   CLIFTON EDWARDS, "MEECHIE", AND THAT DRAPER CONFESSED TO

13   "BUTCHIE" THAT, IN FACT, "DRAPER" HAD PARTICIPATED IN THE

14   KIDNAPPING OF "WYSOCKI."

15   AND "BUTCHIE" WOULD HAVE TOLD YOU HIMSELF THAT

16   "DRAPER" MADE EFFORTS TO TRY TO KILL KENNETH ADAMS, YET

17   ANOTHER GOVERNMENT WITNESS.  BUT THE REASON YOU DIDN'T HEAR

18   THE WORDS FROM THEM IS BECAUSE THOSE WITNESSES WERE

19   MURDERED.

20   FOR OVER TEN YEARS THE VIOLENCE CONTINUED ON AND

21   ON.  THE EFFORTS TO OBSTRUCT JUSTICE WENT ON AND ON.  FOR SO

22   MANY YEARS, LADIES AND GENTLEMEN, THESE MEN REMAINED LARGELY

23   UNTOUCHED.

24   AND BECAUSE OF WHO THEY WERE, AND PERHAPS EVEN

25   BECAUSE OF WHO THEY BELIEVE THEY STILL ARE, THEY MAY THINK

1    OPPOSED TO THEIR FULL NAME.

2         NOW, IN TERMS OF THE WITNESSES THAT TESTIFIED, WE

3    BROUGHT YOU IN THIS COURTROOM THEIR FRIENDS.  WE BROUGHT YOU

4    THEIR ASSOCIATES.  WE BROUGHT YOU THEIR FAMILY.

5         WHAT DO I MEAN WHEN I SAY THAT?  YOU HEARD ON THAT

6    WITNESS STAND FROM MEMBERS OF THE K STREET CREW -- MEMBERS

7    OF THE K STREET CREW, WHO THEMSELVES HAVE PLED GUILTY AND

8    ADMITTED THEIR INVOLVEMENT IN CRIMINAL ACTIVITY.

9         NOW, THERE'S NO DOUBT ABOUT IT.  PEOPLE WITH PLEA

10   AGREEMENTS ARE CRIMINALS.  THEY HAVE, BY THEIR NATURE,

11   COMMITTED CRIMES.

12        BUT, LADIES AND GENTLEMEN, THOSE PEOPLE -- THOSE

13   CRIMINALS THAT YOU HEARD FROM ARE THE PEOPLE WHO WERE IN THE

14   BEST POSITION TO TELL YOU HOW THIS CREW OPERATED BECAUSE

15   THEY WERE WITH THE DEFENDANTS WHEN THE PLANS WERE MADE.

16   THEY WERE WITH THE DEFENDANTS WHEN THE CRIMES WERE

17   COMMITTED.  AND THEY ARE THE TYPE OF PEOPLE THAT THESE MEN

18   CONFIDED IN AFTER CRIMES WERE COMMITTED AND CONFIDED IN AS

19   TO WHAT HAD HAPPENED DURING THE COURSE OF THE CRIME.

20        JUDGE JACKSON WILL BE GIVING YOU AN INSTRUCTION

21   ABOUT HOW TO CONSIDER THE TESTIMONY OF A WITNESS WITH A PLEA

22   AGREEMENT.  THE LAW REFERS TO THOSE TYPES OF PEOPLE AS

23   CO-CONSPIRATORS OR ACCOMPLICES.

24        YOU HAVE HEARD A LOT OF WORDS USED TO DESCRIBE

25   PEOPLE WITH PLEA AGREEMENTS:  "SNITCHES" AND "HOT."  YOU CAN

1    BEING LOCATED WAS SO THAT THEY COULD BE KILLED.

2         THESE PLEA AGREEMENTS, LADIES AND GENTLEMEN, ARE

3    NOT JUST A SLAP ON THE WRIST.  FOR THOSE FOUR MEN I JUST

4    DESCRIBED FOR YOU, EACH AND EVERY ONE OF THEM IS LOOKING AT

5    A SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE.

6         EACH OF THOSE COOPERATING WITNESSES KNOWS THAT IF

7    THEY LIE, THEY LOSE THAT PLEA AGREEMENT, AND THEY GO

8    IMMEDIATELY TO SENTENCING BEFORE THE JUDGE THAT HEARD THEIR

9    TESTIMONY.

10        THOSE COOPERATING WITNESSES KNOW THAT IF THEY LIE,

11   THEY LOSE WHAT YOU HAVE HEARD REPEATEDLY IN THIS COURTROOM,

12   THAT 5K LETTER, ANY CHANCE THAT THEY WOULD HAVE A BREAK ON

13   SENTENCING.  THEY LOSE THAT.

14        SO FOR THEM, THE STAKES ARE HIGH BECAUSE EACH AND

15   EVERY ONE OF THEM IS LOOKING AT A POTENTIAL SENTENCE OF LIFE

16   WITHOUT THE POSSIBILITY OF PAROLE.

17        NOW, WITH RESPECT TO HAVING COOPERATING WITNESSES

18   TESTIFY, IN THIS INSTRUCTION THAT JUDGE JACKSON WILL BE

19   GIVING YOU, YOU WILL BE TOLD THAT YOU CAN DECIDE THIS CASE

20   BASED SOLELY ON WHAT THE COOPERATING WITNESSES TOLD YOU --

21   THE CREW MEMBERS.

22        YOU CAN JUST STOP AND REFLECT ON WHAT THEY SAID IN

23   THIS COURTROOM AND DECIDE THAT'S ENOUGH.  JUST THOSE FOUR

24   MEN ALONE, THAT'S ENOUGH.  THESE DEFENDANTS ARE GUILTY.

25        YOU CAN DO THAT.  WE GAVE YOU MORE.  WE GAVE YOU

1    EVIDENCE WHICH I AM GOING TO REFER TO YOU THROUGHOUT THIS

2    CLOSING ARGUMENT AS JUST CORROBORATION -- SUPPORT --

3    EVIDENCE WHICH YOU CAN LOOK AT AND CONSIDER AND DECIDE

4    WHETHER OR NOT THESE COOPERATING WITNESSES HAVE TOLD YOU THE

5    TRUTH.

6         NOW, SOMETIMES THE CORROBORATION OR THE SUPPORT

7    COMES FROM ANOTHER COOPERATING WITNESS.  TWO PEOPLE THAT

8    WERE INVOLVED IN THE SAME INCIDENT OR HEARD ABOUT THE SAME

9    INCIDENT, AND THEY BOTH DESCRIBE IT -- THAT'S CORROBORATION.

10        SOMETIMES, OF COURSE, YOU HEARD FROM JUST ORDINARY

11   CITIZENS, PEOPLE WHO JUST, QUITE FRANKLY, HAPPENED TO BE IN

12   THE WRONG PLACE AT THE WRONG TIME.  THEY SAW SOMETHING AND

13   REPORTED IT -- PEOPLE LIKE DORENE KEY.

14        DO YOU REMEMBER HER?  SHE IS THE WOMAN WHO BACK IN

15   OCTOBER OF 1993 WAS LOOKING OUT HER SECOND-STORY BEDROOM

16   WINDOW AND SAW DRAPER, WHO SHE KNEW FOR MANY YEARS FROM THE

17   NEIGHBORHOOD.  SHE SAW "DRAPER" TRYING TO GET RID OF THINGS

18   IN THE BACK OF A CAR THAT HAD NO TRUNK.  DO YOU REMEMBER

19   HER?

20        CHARLENE WILSON, BACK IN 1991, WHILE LIVING ON

21   58TH PLACE -- 58TH STREET -- EXCUSE ME -- NORTHEAST, WAS

22   OUTSIDE AND SAW SAM CARSON KILL TONY FORTUNE.

23        YOU HAVE SUPPORT, LADIES AND GENTLEMEN, FROM

24   PEOPLE LIKE CINAMA HAWKINS, WHO TO THIS DAY DOES NOT KNOW

25   WHO MURDERED HER BEST FRIEND.  BUT THE TESTIMONY THAT SHE

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 425 of 443
Case 1:98-cr-00329-RCL   Document 723   Filed 07/19/01   Page 37 of 91

37

1          AN ATTACK ON ONE OF THEM WAS AN ATTACK ON ALL OF

2     THEM.  THEY WOULD COME TOGETHER WHEN ANY ONE OF THEM NEEDED

3     HELP.  THEY WOULD COME TOGETHER TO ENRICH THEMSELVES, AND

4     THEY WOULD COME TOGETHER TO ATTACK.

5          NOW, WHEN I SAY THAT THEY WANTED TO ENRICH

6     THEMSELVES, I MENTIONED EARLIER THAT THE WAY THIS CREW

7     ENRICHED THEMSELVES -- THE ONE THAT YOU HEARD ABOUT THE

8     MOST -- THE MOST REGULAR ONE WAS SELLING MARIJUANA.

9          YOU KNOW FOR OTHERS IT INVOLVED SELLING COCAINE

10    AND P.C.P.  AND ALSO FOR SOME OF THEM IT INVOLVED KIDNAPPING

11    AND ROBBERIES.

12         I AM GOING TO START WITH THE DISTRIBUTION OF

13    MARIJUANA.  I AM GOING TO START WITH THE DISTRIBUTION OF

14    NARCOTICS BECAUSE THAT WAS THE BREAD AND BUTTER OF THIS

15    GROUP.  THAT IS HOW THEY MADE THEIR MONEY REGULARLY FROM

16    1989 TO THE TIME THAT THEY WERE TAKEN OFF THE STREET.

17         AND WHEN I TAKE YOU BACK TO THE 1980'S WHERE THIS

18    STARTED, REMEMBER 203 N STREET, THE BUILDING THAT WAS

19    DESCRIBED TO YOU.  YOU HAVE SEEN IT IN A NUMBER OF

20    PHOTOGRAPHS.

21         IN THAT BUILDING, THERE WAS A TUNNEL.  AND INSIDE

22    OF THAT TUNNEL, YOU'VE HEARD THAT THERE WAS AN OPERATION

23    THAT WAS FOCUSED AND THAT WAS CENTERED AND THAT WAS

24    PROFITABLE.  AND THAT OPERATION WAS STARTED BY AND

25    CONTROLLED BY TWO MEN:  VINCENT HILL AND WAYNE PERRY.

1      WAYNE PERRY, YOU KNOW, IS PRESENTLY SERVING FIVE

2   CONSECUTIVE LIFE SENTENCES IN THE FEDERAL CORRECTIONS

3   INSTITUTION IN FLORENCE, COLORADO.  AND BACK IN THE LATE

4   '80'S, WAYNE PERRY AND VINCENT HILL GOT TOGETHER.  AND THEY

5   GOT TOGETHER AND THEY TOOK ADVANTAGE OF SOMETHING.  THEY

6   TOOK ADVANTAGE OF THEIR REPUTATION.

7      YOU KNOW THAT BOTH OF THEM, VINCENT HILL AND WAYNE

8   PERRY, HAD THE REPUTATION.  THEY HAD THE MONEY.  THEY HAD

9   THE POWER.  THEY HAD THE GIRLS.  THEY HAD THE CARS.  THEY

10  HAD IT ALL.

11      AND THE YOUNG MEN THAT CAME UP BEHIND THEM, PEOPLE

12  LIKE REGINALD SWITZER AND PAUL FRANKLIN -- THEY LOOKED UP TO

13  THEM.  AND SO VINCENT HILL AND WAYNE PERRY TOOK ADVANTAGE OF

14  THAT.  AND WHAT THEY DID IS THEY ENLISTED THESE MEN TO WORK

15  FOR THEM.

16      VINCENT HILL, YOU MAY RECALL, EMPLOYED OR

17  CONTROLLED REGINALD SWITZER, PAUL FRANKLIN, AND EUGENE BYARS

18  AT A VERY YOUNG AGE, 11, 12 AND 13 YEARS OLD.

19      THESE YOUNG BOYS WORKED FOR VINCENT HILL.  THEY

20  WOULD BE THE LOOKOUTS.  THEY WOULD BE OUT ON THE STREET

21  MAKING SURE THAT IF THE POLICE CAME BY, SELLERS WERE

22  NOTIFIED.

23      THESE YOUNG BOYS CARRIED WALKIE-TALKIES AROUND

24  WITH THEM, SUPPLIED BY VINCENT HILL, SO THAT THEY COULD

25  ALERT ONE ANOTHER AS TO THE ACTIVITY THAT WAS GOING ON DOWN

1  AND AROUND 203 N STREET.

2       BUT AS HAPPENS OVER LIFE, PEOPLE GROW UP.

3  REGINALD SWITZER, PAUL FRANKLIN AND THE OTHERS, WHILE THEY

4  CONTINUED TO SELL WITH VINCENT HILL, THEY DIDN'T SELL FOR

5  VINCENT HILL.  AND THEY EXPANDED.

6       YOU KNOW THAT AT THE BEGINNING, IN THE LATE

7  1980'S, WHAT WAS BEING SOLD MOST REGULARLY WAS SOMETHING

8  CALLED "LOVE BOAT," MARIJUANA LACED WITH P.C.P.  IT WAS

9  BEING SOLD IN LITTLE TINFOILS.

10       BUT AS THIS OPERATION OR THIS ENTERPRISE

11  DEVELOPED, IT EXPANDED, AND COCAINE BECAME THE NEXT DRUG OF

12  CHOICE.

13       AND HEARING ABOUT WHO IT WAS THAT WAS INVOLVED

14  WITH THE COCAINE SALES, YOU NEED LOOK NO FURTHER THAN THE

15  TABLE TO MY RIGHT.

16       YOU HEARD THAT STARTING IN THE 1990'S AND

17  CONTINUING, ALTHOUGH DIMINISHING OVER TIME, THE DEFENDANTS

18  WERE ENGAGED IN THE SALE OF COCAINE.  THEY SOLD THE COCAINE

19  AT 203 N STREET.  THEY SOLD THE COCAINE AT FIRST AND P AND

20  SECOND AND P, SOUTHWEST.  AND SOME OF THEM WENT OVER ON THE

21  OTHER SIDE OF N STREET AND SOLD COCAINE AT THE CORNER OF

22  DELAWARE AND L AND DELAWARE AND K.

23       AND, AGAIN, THE OPERATION ROLLED ON.  YOU LEARNED

24  THAT AS THE DEFENDANTS MOVED FROM 203 N STREET OVER TO THE

25  OTHER SIDE, TOWARDS DELAWARE AND K, THERE WAS ALREADY AN

1    JEROME MARTIN AND VINCENT HILL WOULD BE OUT THERE

2  THE SAME DAY.  YOU SAW A NUMBER OF TAPES THAT SHOWED THEM

3  BOTH OUT THERE THE SAME DAY.

4    THINK ABOUT A DAY LIKE THAT.  VINCENT HILL IS

5  MAKING SOME SALES.  JEROME MARTIN IS MAKING OTHER SALES.

6  "REASON FORESEEABILITY" COMES INTO PLAY HERE.

7    MY FRIEND, STANDING TO MY LEFT, IS MAKING MONEY

8  SELLING MARIJUANA.  IS IT REASONABLY FORESEEABLE TO ME THAT

9  I AM GOING TO KNOW THAT HE IS SELLING?  YES.  AND AS A

10  RESULT OF THAT, LADIES AND GENTLEMEN, THE LAW SAYS THAT I AM

11  RESPONSIBLE FOR WHAT HE SOLD.

12    JEROME MARTIN IS RESPONSIBLE FOR WHAT VINCENT HILL

13  SOLD.  VINCENT HILL IS RESPONSIBLE FOR WHAT JEROME MARTIN

14  SOLD.  HAND-IN-HAND.  THEY'RE A TEAM.

15    THE SAME IS TRUE WITH DRAPER AND SEAN COATES.

16  BOTH OF THOSE MEN WERE PART OF THE ROTATION BACK IN THE I

17  STREET ALLEY.  BOTH OF THEM WERE OUT THERE ON K STREET

18  SELLING MARIJUANA HAND-TO-HAND.

19    BOTH OF THEM WERE PART OF THIS CREW -- THIS CREW,

20  WHERE BEING A MEMBER OF IT ALLOWED YOU TO PROFIT.  IT

21  ALLOWED YOU TO STAND WHERE YOU WANTED TO STAND AND SELL

22  MARIJUANA.

23    SO FOR EACH AND EVERY ONE OF THEM, THEY ARE

24  RESPONSIBLE FOR WHAT THE OTHER MEMBERS SOLD, AND THEY ARE

25  ALSO RESPONSIBLE FOR WHAT OTHER CO-CONSPIRATORS -- OTHER

```
 1   PEOPLE -- OTHER MEMBERS OF THIS CREW SOLD.

 2          MR. ZUCKER:  OBJECTION.

 3          MS. CHATURVEDI:  THERE IS AN OBJECTION, YOUR

 4   HONOR.

 5          MR. ZUCKER:  I OBJECTED, JUDGE.

 6          THE COURT:  OVERRULED.

 7          MS. CHATURVEDI:  REGINALD SWITZER, JAMES

 8   MONTGOMERY, DONALD NICHOLS, PAUL FRANKLIN, BILL HILL, ANTON

 9   GETHERS AND PAUL TAYLOR -- ALL OF THEM WERE MEMBERS OF THIS

10   CREW, THIS K STREET CONSPIRACY.

11          SO THAT CONCEPT OF "REASONABLE FORESEEABILITY"

12   GOES OUTSIDE OF THIS ROOM.  IT GOES TO EACH AND EVERY MEMBER

13   OF THAT CONSPIRACY.  THAT'S WHAT WE'RE TALKING ABOUT WHEN WE

14   SAY "REASONABLE FORESEEABILITY."

15          IN 1992 THROUGH 1994, YOU KNOW THAT MOST OF THE

16   DRUG SALES OCCURRED BACK IN THE I STREET ALLEY.  AND I WANT

17   YOU TO THINK ABOUT HOW MANY POUNDS OF MARIJUANA WE'RE

18   TALKING ABOUT WHEN THESE CONSPIRATORS, WHEN THESE

19   CO-DEFENDANTS, WHEN THESE COOPERATING WITNESSES CAME INTO

20   THE COURTROOM AND TOLD YOU ABOUT THE NUMBERS.

21          YOU HEARD THAT IN 1992 TO 1993 -- THOSE TWO YEARS

22   ALONE -- PEOPLE WERE SELLING IN THE I STREET ALLEY.

23          NOW, I JUST MENTIONED THE NAMES OF THE MEN WHO YOU

24   HEARD ABOUT WHO SOLD IN THE I STREET ALLEY.  BY MY COUNT, I

25   MENTIONED 13.  BUT I AM GOING TO LIMIT IT TO TEN BECAUSE THE
```

1  CONSPIRACY SOLD OVER A THOUSAND KILOGRAMS OF MARIJUANA.  A

2  THOUSAND KILOGRAMS IS 2200 POUNDS.  WE HAVE PROVED THAT.

3          I WANT TO USE ONE MORE MATH EXAMPLE JUST TO MAKE

4  MY POINT COMPLETELY CLEAR.  1994 TO 1996 -- THAT IS THE

5  YEARS WHERE THE VIDEOTAPE WAS INVOLVED.  LET'S SAY YOU GO

6  BACK AND WHEN YOU DELIBERATE, YOU THINK, "BOY, THOSE NUMBERS

7  MS. CHATURVEDI GAVE ME, THOSE ARE HUGE."

8          I AM GOING TO CUT IT ALL IN HALF.  1994 TO 1996,

9  CUT IT IN HALF.  AS OPPOSED TO TEN PEOPLE SELLING MARIJUANA,

10  LET'S MAKE IT FIVE.  AND AS OPPOSED TO IT BEING A POUND AND

11  HALF OF MARIJUANA EACH PERSON WAS SELLING, LET'S JUST MAKE

12  IT THREE-QUARTERS OF A POUND.  AND RATHER THAN SAYING THESE

13  PEOPLE WERE SELLING SEVEN DAYS A WEEK, LET'S CUT IT DOWN TO

14  FIVE.

15          WHEN YOU TAKE THOSE NUMBERS, FIVE PEOPLE,

16  THREE-QUARTERS OF A POUND A DAY, THAT'S 3 3/4 POUNDS A DAY

17  TOTAL FOR THE GROUP.  OVER A WEEK, THAT'S 18.75 POUNDS.

18  OVER A MONTH, THAT'S 75 POUNDS.  75 POUNDS TIMES 12

19  MONTHS, THAT'S 900 POUNDS PER YEAR.  AND IF WE JUST LIMIT

20  OURSELVES TO '94, '95 AND '96, THAT'S 2700 POUNDS RIGHT

21  THERE ALONE.

22          THAT'S THREE YEARS THAT WE'RE TALKING ABOUT.  ALL

23  WE HAVE TO SHOW IS 2200 POUNDS.  AND BY THIS ESTIMATION, WE

24  HAVE EXCEEDED THAT.  WE HAVE SURPASSED IT.

25          SO WHEN YOU'RE DELIBERATING ABOUT THE AMOUNTS OF

1      AND IN THE COURSE OF DISCUSSING THIS PLAN, SAM

2  CARSON TOLD JAMES MONTGOMERY EXACTLY WHAT HAD HAPPENED UP AT

3  THAT CRAPS GAME.  SAM CARSON TOLD JAMES MONTGOMERY THAT HE,

4  SAM CARSON, HAD SHOT AND KILLED JEROME MARTIN. (SIC.)

5      LET ME USE THIS INCIDENT TO DISCUSS ANOTHER TOPIC

6  THAT I HAVE ON HERE, AIDING AND ABETTING.  YOU WILL SEE WHEN

7  YOU DELIBERATE THAT BOTH JEROME MARTIN AND SAM CARSON ARE

8  BOTH CHARGED WITH THE MURDER OF TONY FORTUNE.

9      NOW, THE EVIDENCE HAS BEEN THROUGHOUT THIS TRIAL

10  THAT IT WAS SAM CARSON THAT ACTUALLY PULLED THE TRIGGER.

11  HE'S THE ONE THAT ACTUALLY PUT THE BULLETS INTO TONY

12  FORTUNE.  HE'S THE ONE THAT ACTUALLY DID THE ACT -- THE

13  DIRECT ACT THAT CAUSED THE DEATH OF TONY FORTUNE.

14      BUT UNDER THE LAW, LADIES AND GENTLEMEN, THERE IS

15  SOMETHING CALLED AIDING AND ABETTING.  AIDING AND

16  ABETTING -- A PERSON THAT IS AN AIDER AND ABETTOR IS A

17  PERSON THAT HELPS MAKE THE CRIME SUCCEED.  IT'S THE PERSON

18  WHO MAKES SURE THAT EVERYONE ELSE AROUND THE SHOOTER IS

19  TAKEN CARE OF.  IT'S THE PERSON WHO OFTENTIMES THINKS OF A

20  PLAN, APPROVES THE PLAN, DRIVES THE SHOOTER THERE, AND

21  DRIVES THE SHOOTER AWAY.

22      THAT PERSON ISN'T PULLING THE TRIGGER, BUT THE LAW

23  SAYS THAT IF YOU ARE WITH A CRIME -- IF YOU, BY YOUR

24  ACTIONS, WANT THAT CRIME TO SUCCEED, YOU ARE JUST AS GUILTY

25  AS THE PERSON WHO PULLED THE TRIGGER.  THE LAW MAKES NO

1    DISTINCTION.  NONE.

2          THE WORDS THAT WE USE ARE AIDER AND ABETTOR AND

3    PRINCIPAL.  A PRINCIPAL IS A PERSON THAT PULLS THE TRIGGER.

4    THE AIDER AND ABETTOR IS THE PERSON THAT HELPS.

5          AND YOU KNOW BACK IN AUGUST OF 1991 THAT JEROME

6    MARTIN WAS THE AIDER AND ABETTOR.  AND I USE THAT WORD AND I

7    AM GOING TO REPEAT THAT WORD BECAUSE YOU HAVE AIDING AND

8    ABETTING COMING UP A NUMBER OF TIMES DURING THE COURSE OF

9    THIS TRIAL, BUT THAT DOESN'T LESSEN FOR A MOMENT THE

10   RESPONSIBILITY THAT RESTS ON JEROME MARTIN'S SHOULDERS.

11         HE WAS THE ONE THAT WAS UPSET WITH TONY FORTUNE AT

12   THAT CRAPS GAME.  HE WAS THE ONE THAT WHEN SAM CARSON SAYS

13   TO JEROME MARTIN, "DO YOU WANT ME TO TAKE CARE OF THIS PIECE

14   OF SHIT?" YOU KNOW THAT JEROME MARTIN WANTED HIM TO, OF

15   COURSE.

16         JEROME MARTIN WAS THE ONE TO BENEFIT FROM THAT

17   CONDUCT, AND JEROME MARTIN MADE SURE THAT SAM CARSON GOT

18   AWAY.  HE DROVE HIM FROM THAT SCENE.

19         SO SAM CARSON AND JEROME MARTIN, ARE LIKE THIS.

20   (CROSSING FINGERS.)  AND IT IS THOSE RELATIONSHIPS -- THOSE

21   BONDS BETWEEN THOSE TWO MEN THAT IF SOMEBODY STEPS TO JEROME

22   MARTIN, SAM CARSON IS GOING TO BE RIGHT THERE.  IT IS THAT

23   BOND THAT YOU HEARD OF DURING THE COURSE OF THIS TRIAL THAT

24   THESE MEN RELIED ON.  THEIR BOND.

25         AND LET ME GO BACK JUST A LITTLE BIT AND A LITTLE

```
 1   THE MEMBERS OF THE K STREET CREW WENT LOOKING -- THEY WENT

 2   HUNTING FOR GUYS BY THE NAME OF "PEE-WEE."  YOU HEARD

 3   "SUGARSPOON," YOU HEARD KEITH HOLMES, AND YOU HEARD "BLOCK."

 4   YOU  HEARD A NUMBER OF NAMES OF MEN ASSOCIATED WITH 58TH.

 5            ON SEPTEMBER 10TH, 1991, ANOTHER EFFORT WAS MADE.

 6   ON SEPTEMBER 10TH, 1991, YOU HEARD THAT JAMES MONTGOMERY,

 7   JEROME MARTIN, SAM CARSON, AND OTHER GUYS FROM 37TH GOT

 8   TOGETHER, WENT OVER TO 58TH AND GOT IN A SHOOT-OUT.  THEY

 9   WERE SHOOTING AT GUYS FROM 58TH, BUT WHEN THE POLICE CAME UP

10   AND WERE TRYING TO DO THEIR JOB, THEY SHOT AT THE POLICE.

11            SEPTEMBER 10TH, 1991.  HOW DID YOU LEARN ABOUT

12   WHAT HAPPENED OUT IN THE AREA OF 58TH AND 60TH AND EAST

13   CAPITOL AND BLAINE THAT DAY?

14            WELL, YOU LEARNED WHAT HAPPENED THAT DAY BECAUSE

15   ONE OF THE PARTICIPANTS OF THAT CRIME TOLD YOU ALL ABOUT IT,

16   JAMES MONTGOMERY -- JAMES MONTGOMERY, WHO HAS ADMITTED HIS

17   GUILT TO HIS ROLE IN THE SHOOTING ON SEPTEMBER 10TH, 1991.

18   JAMES MONTGOMERY CAME TO THE COURTROOM AND HE TOLD YOU THAT

19   ON SEPTEMBER 10TH, THEY HAD A PLAN TO GO UP TO 58TH LOOKING

20   FOR "SUGARSPOON" AND "PEE-WEE" OR WHOEVER ELSE THEY COULD

21   FIND.

22            THERE WAS A VAN, AN MPV VAN THAT JEROME MARTIN

23   HAD.  SAM CARSON WAS IN THE VAN.  JEROME MARTIN AND JAMES

24   MONTGOMERY WERE ON A MOTORCYCLE.  JAMES MONTGOMERY, DRIVING.

25   JEROME MARTIN, "PIMP," ON THE BACK.
```

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,              .    Docket No. CR 98-329

    Government,                        .    Washington, D.C.
                                       .    June 26, 2001
   vs.                                 .    2:18 p.m.

VINCENT HILL,                          .    (AFTERNOON SESSION)
JEROME MARTIN,                         .
SAMUEL CARSON,                         .
WILLIAM K. SWEENEY,                    .
SEAN COATES,                           .

    Defendants                     .

. . . . . . . . . . . . . . . .        .

UNITED STATES OF AMERICA,              .

    Government,                     .

                                       .    Docket No. CR 99-348
   vs.                                 .

GARY PRICE,                            .

    Defendant.                     .

. . . . . . . . . . . . . . . .        .

FILED

MAR 1 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:            PETER ZEIDENBERG, AUSA
                               ANJALI CHATURVEDI, AUSA
                               U.S. Attorney's Office
                               555 Fourth Street, N.W.
                               Washington, D.C.  20001

For the Defendant Hill:        CHRISTOPHER DAVIS, ESQ.
                               601 Indiana Avenue, N.W.
                               Suite 910
                               Washington, D.C.  20004

For the Defendant Martin:      JOANNE HEPWORTH, ESQ.
                               305 H Street, N.W.
                               Second Floor
                               Washington, D.C.  20001

2

For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                               LEXI NEGIN-CHRIST, ESQ.
                               419 7th Street, N.W.
                               Washington, D.C.  20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                               717 D Street, N.W.
                               Suite 400
                               Washington, D.C.  20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                               901 6th Street, S.W.
                               Suite 409
                               Washington, D.C.  20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                               601 Indiana Ave., N.W.
                               Suite 901
                               Washington, D.C.  20024

Court Reporter:                BEVERLY J. BYRNE
                               Official Court Reporter
                               Room 6810 U.S. Courthouse
                               Washington, D.C.  20001
                               (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

29

1    cousin, T.T.  She sees the blood, and she sees a baby, and no

2    one is moving.

3          Crystal turns and runs down the hallway, grabs her

4    child, runs out that door, and she's thinking, they must be

5    playing, they must be playing, they must be playing, can't be

6    happening.  But it was.  Because when the police showed up and

7    wanted to find out what was going on, they took Crystal back.

8          Crystal goes into the apartment with them, and she's

9    thinking T.T. is down in the living room, her bedroom, and one

10   of the officers goes into Terita and Crystal's bedroom, that

11   bedroom with the door open, and the officer comes out holding

12   baby, C.J., and says, there's a body in there, Terita.

13         Both girls dead.  You heard from the officers that

14   came to process that crime scene that the children, the

15   babies, had blood all over them.  They had brain matter in

16   their hair.  But amazingly enough, they were fine.  They were

17   just left there overnight in their mother's blood.

18         From that crime scene, ladies and gentlemen, and in

19   speaking with Wanda Edwards and Crystal Bobbitt and Renee

20   Brown, the police had some evidence.  But that case you heard

21   remained open for several years.  Not until James Montgomery

22   came forward were the police able to fit those clues and find

23   the support needed to come to the conclusion which the

24   evidence supports, which is that Sam Carson murdered those

25   girls.

46

1    And you also heard from Arthur Rice that Arthur Rice

2  was involved in a conversation with Erik Jones where they saw

3  Wysocki.  And when they saw Wysocki, Erik Jones, Irky Berk,

4  said, you know, the way that Vito can get at Wysocki is try to

5  get some girls involved, because Wysocki, he likes young

6  girls.

7    So this was part of their way of operating.  This

8  was their job.  This was the way in which they enriched

9  themselves, to plan and then carry out efforts to kidnap and

10  rob people.

11    And like I've said before, with respect to the

12  charge of this kidnapping, we don't know who physically got

13  Wysocki up and put him in that trunk.  We don't know which of

14  these defendants actually shot him.  But it doesn't matter.

15    They were all in the plan to kidnap Wysocki.  They

16  were all there.  They wanted quite desperately for that plan

17  to succeed, and they tried to get away.  And you know that

18  they tried to get away, ladies and gentlemen, because of what

19  Dorene Key described for you from October 22, 1993.

20    You know they tried to get away, because what Dorene

21  saw them doing, Draper and them doing, was taking pieces of

22  evidence that they had from this crime and trying to destroy

23  it.

24    Pieces of evidence, ladies and gentlemen, includes

25  these three sets of gloves and the duct tape.  Because how are

sm

PRB

# ORIGINAL

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA,       :
                                :
        Government,             :
                                :   Case No.
                                :   CR 98-329
        v.                      :
                                :
VINCENT HILL,                   :
JEROME MARTIN,                  :
SAMUEL CARSON,                  :
WILLIAM K. SWEENEY,             :
SEAN COATES,                    :
                                :
        Defendants.             :
                                :
- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA,       :
                                :
        Government,             :
                                :
        v.                      :   Case No.
                                :   CR 99-348
GARY PRICE,                     :
                                :
        Defendant.              :
                                :
- - - - - - - - - - - - - - - - x

FILED

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

                        Washington, D.C.
                        Tuesday, July 2, 2001
                        2:15 p.m.
                        (P.M. SESSION)


                TRANSCRIPT OF JURY TRIAL
        BEFORE THE HONORABLE THOMAS P. JACKSON
        UNITED STATES DISTRICT JUDGE, and a jury



COURT REPORTER:             PAMELA BRIGGLE
                            Miller Reporting Company
                            735-8th Street, S.E.
                            Washington, D.C.  20003
                            (202)  546-6666

            MILLER REPORTING COMPANY, INC.
                735 8th Street, S.E.
            Washington, D.C. 20003-2802
                (202) 546-6666

sm                                                                              2

| | |
|---|---|
| For the Government: | PETER ZEIDENBERG, AUSA<br>ANJALI CHATURVEDI, AUSA<br>555 4th Street, N.W.<br>Washington, D.C. 20001 |
| For the Defendant Hill: | CHRISTOPHER DAVIS, ESQ.<br>601 Indiana Ave., N.W.<br>Washington, D.C. 20004 |
| For the Defendant Martin: | JOANNE HEPWORTH, ESQ.<br>305 H Street, N.W.<br>2nd Floor<br>Washington, D.C. 20001 |
| For the Defendant Carson: | JOSEPH BESHOURI, ESQ.<br>LEXI NEGIN-CHRIST, ESQ.<br>419 7th Street, N.W.<br>Washington, D.C. 20004 |
| For the Defendant Sweeney: | STEVEN R. KIERSH, ESQ.<br>717 D Street, N.W.<br>Suite 400<br>Washington, D.C. 20004 |
| For the Defendant Coates: | FREDERICK JONES, ESQ.<br>901 6th Street, S.W.<br>#409<br>Washington, D.C. 20024 |
| For the Defendant Price: | JONATHAN ZUCKER, ESQ.<br>601 Indiana Ave., N.W.<br>#901<br>Washington, D.C. 20004 |

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

App 571

sm                                                                          3


#                   C O N T E N T S

Closing argument:                                              PAGE

  by counsel for Defendant Carson (Cont.)                          4

  by counsel for Defendant Martin                                  8

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

1          So, members of the jury, there has to

2    exist in your mind a substantial doubt as to

3    whether or not Mr. Martin can be held responsible

4    for those weapons, even though it clearly was an

5    apartment on which he had a lease.  And one of the

6    most telling things is he was never charged with

7    them until today, until this case.

8          And, again, this is not a substantive

9    count.  It is an alleged overt act of the drug

10   conspiracy, which has no relationship to the K

11   Street marijuana.  So, again, on these two charges

12   and this, we have to have a not guilty.

13         Now, we come to the AWIK of James Coulter,

14   "Creeko."  Now this case is remarkable for the

15   evidence you have not been presented with by the

16   government.  The government has presented no police

17   evidence.  There have been no police reports.

18   There have been no police diagrams.  There's been

19   no crime scene officer, no ballistics evidence, no

20   crime scene photographs, no charts or diagrams,

21   none.

22         The civilian evidence that you have not

23   been presented, the complainant, who is alive and

24   well, did not come in to testify for you.

25         MR. ZEIDENBERG:  Objection.

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

pab                                                                    37

1            THE COURT:   I'm sorry.   I didn't hear what

2    she said.

3            MS. HEPWORTH:   The complainant did not--

4            THE COURT:   Approach the bench.

5            [Bench conference.]

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

App 574

pab                                                                    38

1              [Bench conference begins.]

2              THE COURT:  I've asked you several times

3    to move out from behind that chart, and I cannot

4    hear you.  It muffles your voice.  Now what was it

5    that you said?

6              MR. ZEIDENBERG:  I objected, Your Honor,

7    because she stated that Creeko is alive and well,

8    of which there is no evidence on the record, and

9    that the government could have called him.  And I

10   think that's inviting the jury to make a missing

11   witness instruction.  She could call him as well.

12             MS. HEPWORTH:  This is the same situation

13   that we had--

14             THE COURT:  Is he alive and well?

15             MS. HEPWORTH:  Of course he is, yes.

16             THE COURT:  Then why didn't you call him?

17             MS. HEPWORTH:  Because I can't get him in

18   here.  I couldn't serve him.  The government has

19   the power to--and they have the burden.  I don't

20   have any obligation to bring him in.  He's the

21   complainant in an alleged shooting of my client.  I

22   have no burden to bring him in.  They have the

23   burden.

24             MR. ZEIDENBERG:  The point is, Your Honor,

25   he's equally available to both sides.  There's no

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

App 575