ORAL ARGUMENT NOT YET SCHEDULED

# No. 21-3072

**(consolidated with Nos. 21-3073, 21-3078, 22-3016, 23-3015)**

In the

# United States Court of Appeals

### for the District of Columbia Circuit

———————————

## UNITED STATES OF AMERICA,

*Appellee,*

v.

## SEAN COATES, WILLIAM K. SWEENEY, JEROME MARTIN, JR., AND SAMUEL CARSON,

*Appellants.*

———————————

On Appeal from the
United States District Court for the District of Columbia
(Nos. 1:98-cr-00329-RCL-002, -003, -004, -006)

———————————

# APPELLANTS' APPENDIX

## Volume III of V

John Longstreth
Jonathan M. Cohen
Tre A. Holloway
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Phone: (202) 778-9000
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com

*Counsel for Jerome Martin, Jr.*

Mark Lanpher
ALLEN OVERY
  SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Phone: (202) 508-8000
mark.lanpher@aoshearman.com

Katherine Stoller
ALLEN OVERY
  SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
katherine.stoller@aoshearman.com

*Counsel for Sean Coates*

Eric Hans Kirchman
LAW OFFICE OF ERIC H. KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Phone: (202) 347-4052
kirchlaw@cs.com

*Counsel for William Sweeney*

David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
Phone: (202) 548-8911
dbs@davidbsmithpllc.com

*Counsel for Samuel Carson*

*Counsel for Appellants*

**TABLE OF CONTENTS**

PAGE(S)

## VOLUME I (APP 1–141)

United States District Court Docket Report, Case No. 98-329
(accessed September 27, 2024)................................................................................App 1–141

## VOLUME II (APP 141–575)

Excerpts of Transcript
(September 27, 2000)................................................................................App 142–147

Excerpts of Transcript
(December 10, 1996)................................................................................App 148–150

Excerpts of Transcript
(June 8, 2000)................................................................................App 151–173

Excerpts of Transcript
(January 8, 2001) (AM)................................................................................App 174–177

Excerpts of Transcript
(January 10, 2001) (AM)................................................................................App 178–188

Excerpts of Transcript
(January 23, 2001) (PM)................................................................................App 189–193

Excerpts of Transcript
(January 24, 2001) (AM)................................................................................App 194–212

Excerpts of Transcript
(January 30, 2001) (PM)................................................................................App 213–217

Excerpts of Transcript
(February 1, 2001) (AM)................................................................................App 218–225

Excerpts of Transcript
(February 5, 2001) (AM)................................................................................App 226–241

Excerpts of Transcript
(February 8, 2001) (PM)................................................................................App 242–260

Excerpts of Transcript
(February 12, 2001) (AM)................................................................................App 261–274

Excerpts of Transcript
(February 13, 2001) (AM) ...................................................App 275–290

Excerpts of Transcript
(February 15, 2001) (PM) ...................................................App 291–299

Excerpts of Transcript
(March 7, 2001) (PM) ........................................................App 300–322

Excerpts of Transcript
(March 12, 2001) (PM) ......................................................App 323–357

Excerpts of Transcript
(March 13, 2001) (PM) ......................................................App 358–375

Excerpts of Transcript
(March 14, 2001) (AM) ......................................................App 376–395

Excerpts of Transcript
(March 14, 2001) (PM) ......................................................App 396–409

Excerpts of Transcript
(March 15, 2001) (AM) ......................................................App 410–435

Excerpts of Transcript
(April 4, 2001) (AM) ..........................................................App 436–455

Excerpts of Transcript
(April 9, 2001) (AM) ..........................................................App 456–462

Excerpts of Transcript
(April 9, 2001) (PM) ..........................................................App 463–466

Excerpts of Transcript
(April 24, 2001) (PM) ........................................................App 467–469

Excerpts of Transcript
(April 25, 2001) (AM) ........................................................App 470–476

Excerpts of Transcript
(May 1, 2001) (AM) ...........................................................App 477–485

Excerpts of Transcript
(May 23, 2001) (AM) .........................................................App 486–496

Excerpts of Transcript
(May 23, 2001) (PM) ..........................................................App 497–514

Excerpts of Transcript
(May 29, 2001) (PM) ................................................................App 515–531

Excerpts of Transcript
(May 30, 2001) (AM) ...............................................................App 532–541

Excerpts of Transcript
(June 14, 2001) (PM) ...............................................................App 542–550

Excerpts of Transcript
(June 26, 2001) (AM) ..............................................................App 551–565

Excerpts of Transcript
(June 26, 2001) (PM) ...............................................................App 566–569

Excerpts of Transcript
(July 2, 2001) (PM).................................................................App 570–575

## VOLUME III (APP 576–1043)

Sweeney Motion to Compel Discovery Number 1
(February 9, 1999) (Doc. 71) ..................................................App 576–602

Carson Motion for Dismissal of Counts, to Compel Disclosure of Exculpatory Evidence,
and for Additional Sanctions Due to Violations of *Brady v. Maryland*
(July 16, 2000) (Doc. 329) ......................................................App 603–616

Sweeney Motion to Admit into Evidence the Maryland Grand Jury Testimony of Two
Unavailable Witnesses Who Were Introduced
by the State's Attorney for Prince George's County
(November 2, 2000) (Doc. 450)...............................................App 617–620

Order Denying Motions to Compel (Jackson, J.)
(September 28, 2000) (Doc. 451) .............................................App 621–625

Carson Motion to Adopt William Sweeney's Motion to Admit into Evidence the Maryland
Grand Jury Testimony of Two Unavailable Witnesses Who Were Introduced by the State's
Attorney for Prince George's County
(November 6, 2000) (Doc. 452).................................................App 626

Government's Memorandum in Opposition to Sweeney and Hill's Motions for Admission of
Grand Jury Testimony of Unavailable Witnesses
(November 16, 2000) (Doc. 481)..............................................App 627–632

Second Retyped Indictment
(July 2, 2001) (Doc. 760) .......................................................App 633–711

Verdict Form
    (August 16, 2001) (Doc. 810) ................................................................App 712–749

Order Denying Appellants' Motion to Allow Counsel to Review Specific Sealed Portions of the
    Trial Record
    (August 28, 2003) (USCA Case No. 02-3015, Doc. 769196) ......................................App 750

Brief of Appellants Sweeney, Carson, Coates, Martin, and Hill
    (April 25, 2005) ................................................................................App 751–771

Appeal from the United States District Court for the District of Columbia
    (June 14, 2005)................................................................................App 772–814

Reply Brief of Appellants Sweeney, Carson, Coates, Martin, and Hill
    (July 6, 2005) ................................................................................App 815–929

Sweeney Emergency Motion for Access to Court Records and Points and Authorities in Support
    Thereof
    (February 5, 2008) (Doc. 1013) ................................................................App 930–933

Martin Motion to Vacate, Set Aside, Correct Sentence Pursuant
    to 28 U.S.C. Section 2255
    (February 18, 2008) (Doc. 1021) ................................................................App 934–950

Sweeney Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 USC §2255
    (February 19, 2008) (Doc. 1017) ................................................................App 951–967

Martin Motion to Vacate, Set Aside, Correct Sentence Pursuant to 28 U.S.C. Section 2255
    (February 18, 2008) (Doc. 1021) ................................................................App 968–984

Carson Motion Under 28 USC § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in
    Federal Custody
    (February 18, 2008) (Doc. 1023) ................................................................App 985–990

Coates Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence
    (February 19, 2008) (Doc. 1020) ................................................................App 991–1043

## **<u>VOLUME IV (APP 1044–1456)</u>**

Carson Motion to Join the Petitions Filed by Co-Defendants for Relief
    Pursuant to 28 U.S.C. § 2255
    (March 17, 2008) (Doc. 1024) ................................................................App 1044–1045

Martin Motion to Stay the 28 U.S.C. 2255 Motion
    (May 7, 2008) (Doc. 1028) ................................................................App 1046–1050

Carson and Sweeney Joint Unopposed Motion for Extension of Time to File Supplements to
Motions to Vacate
(February 2, 2011) (Doc. 1065) ............................................................App 1051, 1056–1057

United States' Unopposed Motion for Extension of Time to File Response to Defendants'
Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255
(July 2, 2010) (Doc. 1053) ...............................................................................App 1052–1055

Carson Motion to Reconsider Motion for Discovery Based Upon New Evidence
(October 9, 2014) (Doc. 1132)...........................................................................App 1058–1068

Sweeney Supplemental Motion to Vacate, Set
Aside or Correct Sentence, Pursuant to 28 USC §2255 and Incorporated Memorandum of
Facts and Law (November 28, 2014) (Doc. 1140-2) .........................................App 1069–1152

Carson Motion to Join Petitioner Sweeney's Motion to Unseal Specific Exhibits
(January 29, 2015) (Doc. 1153) .........................................................................App 1153–1154

Coates Pro Se Supplemental
Claims in Relation to the Original Motion Pursuant to 28 U.S.C. § 2255
(February 24, 2015) (Doc. 1166) .......................................................................App 1155–1163

Exhibit 1 to Sweeney's Supplemental Motion
(February 25, 2015) (Doc. 1156-2).....................................................................App 1164–1173

Exhibit 2 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1144-1, 1145-1, 1146-1, 1147-1) ..........................App 1174–1226

Exhibit 3 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1141-2) ..................................................................App 1227–1230

Exhibit 4 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1141-3) ..................................................................App 1231–1236

Exhibit 5 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-1) ..................................................................App 1237–1246

Exhibit 6 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1143-1) ..................................................................App 1247–1268

Exhibit 7 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-2) ..................................................................App 1269–1270

Exhibit 8 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-3) ..................................................................App 1271–1272

Exhibit 9 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-4) ...............................................App 1273–1275

Exhibit 10 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-5) ...............................................App 1276–1277

Exhibit 11 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-6) ...............................................App 1278–1280

Exhibit 12 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-7) ...............................................App 1281–1285

Defendants' Unopposed Motion for Extension of Time to File Memorandum in Support of
Defendants' Motion to Vacate Sentence
(February 25, 2015) (Doc. 1158) ....................................................App 1286–1288

Carson Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C.
Section 2255
(April 9, 2015) (Doc. 1170) ...........................................................App 1289–1332

Government's Ex Parte Submission of Additional Materials to the Court Regarding James
Montgomery
(April 9, 2015) (Doc. 1174-3)........................................................App 1333–1363

Court Exhibit 8
(April 9, 2015) (Doc. 1175-1).........................................................App 1364–1424

Affidavit of Lexi Negin Christ
(April 9, 2015) (Doc. 1178-1).........................................................App 1425–1427

Application for Statement of Charges
(April 9, 2015) (Doc. 1178-3).........................................................App 1428–1429

Court Exhibit 4
(April 9, 2015) (Doc. 1174) ...........................................................App 1430–1456

## VOLUME V (APP 1458–1831)

Carson Unopposed Motion for Leave to File Under Seal
(July 23, 2015) (Doc. 1180).............................................................App 1458–1461

Martin Supplement to Motion to Vacate in Light of *Johnson v. United States*
(June 23, 2016) (Doc. 1182) ...........................................................App 1462–1465

Carson Supplement to Motion to Vacate After Johnson Decision
(June 24, 2016) (Doc. 1183) ...........................................................App 1466–1468

Coates Supplement to Motion to Vacate in Light of *Johnson v. United States*
(June 27, 2016) (Doc. 1184) ..............................................................App 1469–1470

Coates Motion for Leave to Join Samuel Carson's Supplemental Motion and to File Under Seal and to Late File This Motion
(June 27, 2016) (Doc. 1185) ..............................................................App 1471–1517

Carson Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. Section 2255
(June 27, 2016) (Doc. 1185-1) ..........................................................App 1518–1561

Order Granting Carson's Motion for a Briefing Schedule (Lamberth, R.)
(April 7, 2017) (Doc. 1188) ...............................................................App 1562–1563

Sweeney Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC §2255 and Incorporated Memorandum of Facts and Law
(June 26, 2017) (Doc. 1197) .............................................................App 1564–1647

Sweeney Supplement to Amended Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC §2255 and Incorporated Memorandum of Facts and Law
(October 31, 2018) (Doc. 1229).........................................................App 1648–1650

Martin Supplement to Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255 by a Person in Federal Custody
(November 21, 2018) (Doc. 1233)......................................................App 1651–1688

Affidavit of Jennifer Wicks
(October 6, 2020) (Doc. 1280)............................................................App 1689–1690

Memorandum Opinion (Lamberth, R.)
(October 27, 2021) (Doc. 1283)..........................................................App 1691–1739

Memorandum Opinion (Lamberth, R.)
(May 23, 2022) (Doc. 1305) ..............................................................App 1740–1765

Sweeney's Reply to the Government's Opposition to His Motions to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. § 2255
(July 14, 2020) (Doc. 1277)...............................................................App 1766–1828

Declaration of William K. Sweeney
(October 6, 2020) (Doc. 1280-2) .......................................................App 1829–1831

RECEIVED

FEB 9  12 01 PH '99

N. MAYER-WHITTINGTON
CLERK
UNITED STATES OF AMERICA
DISTRICT OF COLUMBIA

RECEIVED

FEB 9  12 01 PH '99

N. MAYER-WHITTINGTON
CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

V.

WILLIAM SWEENEY

)
)
)
)
)
)
)

**Criminal No. 98-329
(TPJ)**

**FILED**

FEB 0 9 1999

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**MOTION TO COMPEL DISCOVERY
NUMBER 1**

Defendant, William Sweeney, by and through undersigned counsel, respectfully

sets forth to this Honorable Court as follows:

### I) OVERVIEW

1.) This case is a multiple count, multiple party indictment alleging criminal

activity spanning a period of time in excess of ten years.

2.) The United States has announced that it may seek the death penalty against

William Sweeney.  Counsel for Mr. Sweeney will meet with the death penalty review

committee of the United States Attorney's Office prior to April 12, 1999 to discuss

issues related to the death penalty.

3.) A principle component of the government's case relates to a triple homicide

which is alleged to have occurred in Prince George's County, Maryland on November

17, 1996.  The triple homicide is identified in paragraph 79 of the indictment and

alleges that William Sweeney killed Alonzo Gaskins, Darnell Mack and Melody

Anderson.  The allegations against Mr. Sweeney with respect to the triple homicide are

among the primary bases for the following counts against him in this indictment:

Narcotics conspiracy and Rico conspiracy. In addition, the allegations pertaining to the
triple homicide in Maryland are the subject of **Racketeering Act 65 (a)-(g)** of the Rico
count of the indictment.

4.) The events surrounding the triple homicide in Maryland were the subject of
an exhaustive investigation by members of law enforcement in Prince George's County,
Maryland.

5.) The events surrounding the triple homicide were the subject of an indictment
in Prince George's County, Maryland in which William Sweeney was named as a
defendant. That indictment in Maryland has been dismissed by the State's Attorney's
Office as it is now a subject of this indictment.

6.) Upon information and belief, an individual by the name James Montgomery
was taken into custody and spoken to by both the Metropolitan Police Department and
the Prince George's County Police Department as a suspect in the Maryland triple
homicide.

7.) Upon information and belief, James Montgomery was not charged with the
triple homicide. Rather, in return for a benefit, or a promise of benefit, James
Montgomery has become a witness against William Sweeney and it is expected that
James Montgomery will either testify at trial against Mr. Sweeney or will provide
information that will be used in attempt to incriminate Mr. Sweeney.

## II.) SPECIFIC BRADY REQUEST

The request which is the subject of this motion to the United States was made
pursuant to **Brady v. Maryland, 373 U.S. 83 (1963)**. The specific request is for any

App 577



and all information pertaining to why James Montgomery was investigated and/or

charged with the triple homicide in Maryland which occurred on November 17, 1996.

The request related to any and all information in the possession of Mr. Wainstein, the

possession of any member of the Office of the United States Attorney for the District of

Columbia, the possession of any law enforcement agency in any jurisdiction, and in the

possession of the Maryland State's Attorney's Office.

In response to this specific request for exculpatory information, Mr. Wainstein

represented to counsel that he has reviewed the investigative file and there is no

information therein that would exculpate Mr. Sweeney.

For the reasons discussed later herein, the response of Mr. Wainstein is

inadequate and does not satisfy the obligations of the United States pursuant to **Brady**

**v. Maryland**

### III.) CHRONOLOGY OF REQUESTS

On November 17, 1998, counsel served upon Kenneth Wainstein and Nancy

Jackson a nine page letter detailing numerous discovery requests pursuant to Rule 16

and controlling legal precedent. On page seven of the letter, under the category **Brady**

**Disclosures at part (d)**, defendant made the following request for information:

> **Any information which has come or may
> come to the attention of the government
> from any source indicating that persons
> other than the defendant may have caused
> or have been responsible for any of the
> offenses alleged in the indictment.**

A copy of the discovery letter is attached hereto and identified as Defendant's

Exhibit #1.

On January 19, 1999, counsel for Mr. Sweeney sent a letter to Mr. Wainstein making the specific Brady demand related to James Montgomery which is the subject of this motion (Defendant's Exhibit #2).

On January 29, 1999, counsel for William Sweeney sent a letter to Mr. Wainstein reiterating their need to obtain the requested information pertaining to James Montgomery (Defendant's Exhibit #3).

On February 1, 1999, counsel for William Sweeney and Mr. Wainstein spoke directly to address, among other issues, the investigative materials as they related to James Montgomery. It was at that time that Mr. Wainstein represented to counsel that he had seen the investigative file and there was not any information that would exculpate Mr. Sweeney. Mr. Wainstein declined to make available to counsel the investigative files.

On February 1, 1999, counsel memorialized the subject of the telephone conversation identified in the preceding paragraph in a letter to Mr. Wainstein (Defendant's Exhibit #4).

## IV.) **LEGAL BASIS FOR REQUEST**

In **Brady v. Maryland, 373 U.S. 83 (1963)**, the United States Supreme Court required the government to disclose in criminal cases, upon request, evidence in its



possession that is material and favorable to a charged defendant.  The duty of

disclosure arises from the Due Process Clause of the Fifth Amendment to the United

States Constitution.

In **United States** v. **Bagley**, the Supreme Court held that favorable evidence is

material, and constitutional error results from its suppression by the government if there

is a reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different. **473 U.S. 667 at 682 (1985).**

The Supreme Court in **Kyles v. Whitney** elaborated on the definition of

materiality in the context of a Brady demand.

> **[A] showing of materiality does not require
> demonstration by a preponderance that
> disclosure of the suppressed evidence
> would have resulted ultimately in the
> defendant's acquittal.... Bagley's touchstone
> of materiality is a "reasonable probability"
> of a different result, and the adjective is
> important.  The question is not whether the
> defendant would more likely than not have
> received a different verdict with the evidence,
> but whether in its absence he received a fair
> trial, understood as a trial resulting in a verdict
> worthy of confidence.  A "reasonable probability"
> of a different result is accordingly shown when
> the Government's evidentiary suppression
> "undermines confidence in the outcome
> of the trial."**

**115 S.Ct. 1555 at 1566 (1995).**

The request of defendant for any and all information in the possession of any

and all law enforcement agencies or prosecutor's offices that investigated the matter is

consistent with the law of this jurisdiction which extends the prosecutor's Brady

obligations to files in possessions of agencies other than the individual prosecutor's

offices.  See **United States** v. **Brooks, 966 F.2d 1500, 296 U.S. App. D.C. 219 (1992)**,

appeal after remand **55 F.3d 684, 312 U.S. App. D.C. 119**, rehearing and suggestion

for rehearing denied; **United States** v. **Caldwell, 543 F.2d 1333, 178 U.S. App. D.C.**

**20 (1974)**, cert. denied, **96 S.Ct. 877**.

    It may be an argument of the defense that persons other than William Sweeney

had both the motivation and opportunity to commit the triple homicide in Maryland.  The

right to suggest, through the introduction of testimony, evidence that someone other

than the defendant committed a charged offense is guaranteed by the Due Process

Clause and has been recognized as such by the District of Columbia Court of Appeals.

See **Brown** v. **United States, 409 A.2d 1093, 1097 (D.C. App. 1979)**.

    In **Winfield** v. **United States, 676 A.2d 1 (D.C. App. 1996)**, the Court analyzed

the standard of admissibility of evidence proffered by a defendant that another person

or persons committed the crime alleged.  In so ruling, the Court adopted the

"reasonable probability" formulation first announced in **Johnson** v. **United States, 552**

**A.2d 513 (D.C. App. 1989)**.

    The importance and practical application of the "reasonable probability"

standard of admissibility as it relates to the facts herein was predicted in Johnson.

> **There is no requirement that proffered evidence
> must prove or even raise a strong probability that
> someone other than the defendant committed the
> offense.  Rather, the evidence need only** tend **to
> create a reasonable doubt that the defendant
> committed the offense.  In this regard, our focus
> is on the effect the evidence has upon the defendant's
> culpability, and** not **the third party's culpability.**

App 581

**Id. at 517,** citations omitted.

With respect to the facts herein, any and all information pertaining to the investigation and/or arrest of James Montgomery for the triple homicide undoubtedly creates a reasonable probability that someone other Mr. Sweeney committed the triple homicide.

There had to have been paperwork generated as a result of Mr. Montgomery being a suspect in this event. Defense counsel must have the opportunity to review this paperwork in order to properly investigate this massive indictment.

Mr. Wainstein's position that there was nothing produced in the investigation of James Montgomery that would exculpate Mr. Sweeney is entirely inconsistent with the law of this jurisdiction.

There simply can be no reasonable dispute that the products of an investigation focusing upon someone other than the defendant are material and fall within the disclosure mandate set forth in **Brady v. Maryland** and guaranteed by the United States Constitution.

As part of defendant's defense, he will also be challenging the bias and credibility of James Montgomery. Any promise, or benefit of promise, will have to be made available to the defense. See **Giglio v. United States, 405 U.S. 150 (1972).** However, in order to fully explore the scope of Mr. Montgomery's bias arising from his agreement with the United States, it is absolutely imperative that counsel be provided with the basis for his inclusion in the case as a suspect or as a detainee.

The jury can only evaluate the bias and credibility of this essential Government witness if it learns how close Mr. Montgomery came to being indicted for the triple


homicide.

Counsel can only learn about Mr. Montgomery's involvement and conduct an appropriate investigation if the investigate file is made available.

## V. CONCLUSION

It is only the attorneys who are representing Mr. Sweeney that can make tactical decisions regarding what use to make of evidence. Mr. Wainstein is no position to substitute his judgment for that of defense counsel by representing that he has reviewed Montgomery's investigative file and it does not contain exculpatory information related to William Sweeney.

Counsel for Mr. Sweeney must have access to this information as it is clearly the type of information contemplated by Brady and is essential to the preparation of the defense.

**WHEREFORE,** defendant prays this Honorable Court for an Order requiring the United States to produce to counsel any and all information pertaining to the investigation and/or arrest of James Montgomery for the triple homicide in Maryland.

Respectfully Submitted,

Steven R. Kiersh #323329
1825 K Street, NW
Suite 901
Washington, D.C. 20006
(202) 347-0200

/s/ s&k

Paul DeWolfe, Esquire
20 Courthouse Square
Suite 214
Rockville, Maryland 20850

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 98-329 |
| | ) (TPJ) |
| WILLIAM SWEENEY | ) |

### CERTIFICATE OF COUNSEL

Undersigned counsel do hereby certify that they have made a bona fide attempt

to secure the necessary relief from the prosecutor on a voluntary basis and that the

prosecutor has not complied with such request.

Respectfully Submitted,

Steven R. Kiersh #323329
1825 K Street, NW
Suite 901
Washington, D.C. 20006
(202) 347-0200

Paul DeWolfe, Esquire
20 Courthouse Square
Suite 214
Rockville, Maryland 20850

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) )  ) ) |
| V. | ) )  Criminal No. 98-329 |
| | )  (TPJ) |
| WILLIAM SWEENEY | ) |

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the **Motion To Compel**

**Discovery Number 1** was mailed postage pre-paid, on this 9th day of February, 1999

to:

Kenneth Wainstein, Esquire
Assistant U.S. Attorneys
555 4th St, NW
Fourth Floor
Washington, D.C. 20001

Joanne Roney Hepworth, Esquire
305 H Street, NW
Washington, D.C. 20001

Gerald Fisher, Esquire
Joseph Beshouri, Esquire
419 7th Street, NW
Suite 201
Washington, D.C. 20004

Frederick Sullivan, Esquire
12427 Sadler Lane
Bowie, Maryland 20715

Christopher M. Davis, Esquire
601 Indiana Avenue, NW
Washington, D.C. 20004

Frederick D. Jones, III, Esquire
901 6th Street, S.W.
Suite 409
Washington, D.C. 20024

Pleasant S. Brodnax, III, Esquire
2861 Duke Street
Alexandria, Virginia 22314

Patrick Donahue, Esquire
18 West Street
Annapolis, Maryland 21401

Steven R. Kiersh

STEVEN R. KIERSH
ATTORNEY AT LAW
1823 K STREET, N.W.
SUITE 901
WASHINGTON, D.C. 20006
TEL. (202) 347-0200
FAX. (202) 835-1543


EXHIBIT
A

STEVEN R. KIERSH (DC)

NICHOLAS G. KARAMBELAS (DC, NY)
OF COUNSEL

November 17, 1998

TELEFAX AND REGULAR MAIL

Nancy Jackson, Esquire
Kenneth Wainstein, Esquire
Assistant United States Attorneys
555 4th Street, NW
Fourth Floor
Washington, D.C. 20001

Re | *United States v William Sweeney*
98-CR-329 (TPJ)

Dear Ms. Jackson & Mr. Wainstein:

In accordance with Rule 16 of the Federal Rules of Criminal Procedure, we are writing to request discovery and disclosure of the items which are enumerated below and to permit the defendant to inspect and copy or photograph all items which are in the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known to you and which are material to the preparation of the defense, *viz*:

## STATEMENTS OF WILLIAM SWEENEY/ CO-CONSPIRATORS

### Defendant's Statements:

1.      Any and all written and recorded statements made by William Sweeney, or copies of those writings and recordings, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence should or may become known, to the attorney for the government. Defendant specifically requests that government counsel inquire of all law enforcement personnel whom they know to have been connected with this case as well as any and all potential government witnesses or other people who have supplied information to the government whether they are aware of any written or recorded statements of the defendants, and if so, to make those statements available for inspection.

2.      The substance of any and all oral statements made by any defendant which government intends to offer in evidence at the trial.

3.      Any oral or written statement which any defendant has made in any jurisdiction.

**FILED**

FEB 0 9 1999

cr 98-329

NANCY MAYER WHITTI
U.S. DISTRICT

## STEVEN R. KIERSH

Nancy Jackson, Esquire
Kenneth Wainstein, Esquire
Assistant U.S. Attorneys
Re: United States v. William Sweeney
98-329 (TPJ)
November 17, 1998
Page 2 of 9

4.    Any and all or written or oral statement made by any defendant which you
contend was made in furtherance of the conspiracy.

5.    With regard to any statements claimed to have been made by any co-
conspirator during the course of or in furtherance of the alleged conspiracy, William
Sweeney requests disclosure of:

a.    The date of the alleged statement;

b.    Thenames,addresses and present whereabouts of all persons
present when the statements were made;

c    The substance of each statement;

d.    Whether the statement was memorialized in any manner, including
rough notes, reports or tape recordings; and

e.    Copies of all memorializations or any explanations of their
absence.

6.    Any oral, written or recorded statement made by any other person which
the government intends to introduce at trial or which evidences, reflects or relates in
any way to the conspiracy charged in the indictment. This request includes, but is not
limited to, any statement by an informant to the government.

### WITNESS LISTS

7.    A list of the names and addresses of each and every person whom the
government intends to call as a witness in the presentation of its case in chief;

8.    A list of the names and addresses of each and every person who was
interviewed by the government as a prospective, possible, or potential witness for the
trial of this matter.

9.    The names, addresses and phone numbers of, or access to, all witnesses
who have material and relevant information and will not be called by the government.

10.    The names, addresses and phone numbers of each expert witness the
government intends to call at trial including, but not limited to, government agents
whether federal, state or local agents, along with any reports, studies or other data
upon which the expert will rely in giving his/her testimony.

11.    A list of the names of any witnesses or prospective witnesses or
prospective witnesses to enter the Witness Protection Program.

12.    Any and all reports of the Federal Bureau of Investigation or any other
governmental agency which reveal the arrest, conviction or prior criminal record of any
co-conspirator or any prospective government witness.

STEVEN R. KIERSH

Nancy Jackson, Esquire
Kenneth Wainstein, Esquire
Assistant U.S. Attorneys
Re: United States v. William Sweeney
98-329 (TPJ)
Discovery Letter
November 17, 1998
Page 3 of 9

13.    Any and all statements, notes, recordings or any other form of transcription of statements made by any and all prospective government witnesses.

14.    Any and all reports, documents or written notes or, if not in writing, the substance of any agreement between the government and any prospective government witness concerning leniency or favorable treatment he or she might receive at the hands of the government.

15.    Any and all promises, representations, offers or any other statements made to any witness in this case involving either grants of immunity or representations that the witness would not be prosecuted for either the conduct which is the subject of this indictment or any other misconduct that the prosecutor knows of.

16.    State whether any witness or prospective witness was subjected to polygraph examinations. If so, provide the identity of the witnesses and examiners and copies of any reports or tapes.

17.    Set forth all judicial proceedings in any criminal case involving any person who is a potential government witness at the trial in this action.

## DISCLOSURE OF INFORMANTS AND REQUEST FOR INTERVIEW

18.    The identity of any informant from whom the government has obtained information, regardless of whether the government actually intends to call that informant at trial.

19.    Defendant also requests access to all informants for the purpose of interviewing them and that the government neither bar access nor instruct the informants to deny any request for an interview.

20.    The Defendant requests that the government disclose whether any informers were acting as agents of the prosecution in obtaining information concerning the alleged offenses and supplying it to the government; whether those informers were paid or unpaid, or received any consideration and whether they were federal or state employees.

## AGENTS DISCLOSURE

21.    Defendant requests disclosure of the names and places of work of all the agents and law enforcement officials that participated in the investigation of this case.

STEVEN R. KIERSH

Nancy Jackson, Esquire
Kenneth Wainstein, Esquire
Assistant U.S. Attorneys
Re: United States v. William Sweeney
98-329 (TPJ)
Discovery Letter
November 17, 1998
Page 4 of 9

## DOCUMENTS AND TANGIBLE OBJECTS

22.    In accordance with Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure, all books, papers, documents, photographs, tangible objects, buildings or places, or pictures or copies of portions thereof which:

      a.    Are material to the preparation of the defense, including those obtained from third parties to this indictment;

      b.    Are intended for use by the government as evidence in its case in chief at trial; or

      c.    Were obtained from or belong to any defendants. This request includes, but is not limited to, any books, papers, documents, photographs or other tangible objects, or copies, which came into the possession, custody or control of the prosecution by subpoena, seizure or request directed to:

      a.    Any person whom the prosecution intends to call as a witness at trial; and

      b.    Any corporation, partnership, employee, organization, pension fund, financial institution, enterprise or other association where a person whom the prosecution intends to call as a witness at trial was an officer, employee, agent, member, trustee, associate, partner or had and interest therein.

23.    Pursuant to Rule 16(a)(1)(D) of the Federal Rules of Criminal Procedure, any and all results or reports of physical or mental examinations and of scientific tests, eg, fingerprint, ballistic, handwriting, etc. or experiment, or copies thereof.

24.    State whether any inks, dyes or other markings were used by government agents on any tangible items to be offered into evidence. If so, identify the item and describe the nature of the marking.

## SEARCHES, MAIL COVER, PEN REGISTERS, TELEPHONE TOLL RECORDS, VIDEO, TELESCOPIC OR PHYSICAL SURVEILLANCE

25.    Any and all records or other documents which reflect telephone calls or toll call records or telephone charges over any instrument in which any defendant or co-conspirator maintained a possessory interest or over which the government knew or believed any defendant utilized.

26.    Any and all applications, affidavits, testimony, inventories and/or orders seeking, granting or denying judicial permission to conduct a physical search of any person or premises which relate to this case.

STEVEN R. KIERSH

Nancy Jackson, Esquire
Kenneth Wainstein, Esquire
Assistant U.S. Attorneys
Re: United States v. William Sweeney
98-329 (TPJ)
Discovry Letter
November 17, 1998
Page 5 of 9

27. Any and all documents, objects or other tangible things which were obtained by virtue of any physical search and/or seizure of any person or place, with or without prior judicial authorization.

28. Any and all pre-trial identification procedures used, including, but not limited to photographic displays, lineups, show-up identifications, etc. State the nature and circumstances of any identification procedure as well as the time, date and place of the identification. State whether any witnesses were unable to identify any defendant, made a mistaken identification or were uncertain in making an identification.

29. Any and all information, documents. reports, orders. affidavits, etc., which relate in any way to any "mail cover" operations of the examination of the mail of any individuals involved in this case.

30. Any and all information, documents, reports, orders, affidavits, etc., which relate in any way to any "pen register" operations or to the affixing of any instruments to record the telephone number of any incoming or outgoing telephone calls which were utilized in the investigation of this case, and which are within the possession, custody or control of the government, the existence of which is known or through the exercise of due diligence may become known to counsel for the government.

31. Any and all photographs, video recordings or motion pictures which were made in conjunction with this case, or which relate in any manner to this case.

32. Any and all applications, affidavits, orders or other documents which relate to any telescopically-enhanced surveillance which was conducted in conjunction with the investigation underlying this case.

33. Any and all forms, affidavits, or other documents which purport to grant consent to search any individuals, persons or premises which relate in any manner to this case.

34. Any and all notes, memoranda. reports or other writings made by officers or agents of any law enforcement agency during physical surveillance of any defendant or alleged co-conspirator in this case.

## WIRETAPPING, EAVESDROPPING AND CONSENSUAL RECORDINGS

35. Any and all documents, applications, affidavits, supplemental affidavits, exhibits, transcripts. testimony, memoranda. warrants, orders, etc. which relate to this case and which pertain to the use of mechanical or electronic interception devices which were made written or issued by any representative of federal, state or city government.

## STEVEN R. KIERSH

Nancy Jackson, Esquire
Kenneth Wainstein, Esquire
Assistant U.S. Attorneys
Re: United States v. William Sweeney
Discovery Letter
November 17, 1998
Page 6 of 9

36.    Any and all statements of defendants, co-conspirators, or other individuals, whether oral, recorded or written which were seized by electronic or mechanical means.

37.    Any and all mechanical or electronic recordings and/or tapes that contain any defendant's or co-conspirator's conversations or which emanated from any premises or over any instrument in which any defendant possessed a proprietary interest or which were made in connection with a court ordered eavesdropping warrant in which a defendant was named as a party to be intercepted or was a person who was in fact intercepted.

38.    Any and all memoranda, logs, reports, notes, summaries, transcripts, periodic reports to the court or other written communications whatsoever which were made by any public\c servant and which are germane to this case and relate in any way to wiretapping or eavesdropping conducted by government agents.

### GRAND JURY INFORMATION

39.    The names, present addresses and telephone numbers of each and every witness appearing before the Grand Jury in connection with the return of the indictment.

40.    The names, present addresses and telephone numbers of each and every persons whose testimony was given to the Grand Jury by or through someone else in connection with the return of said indictment.

41.    Copies of all documents and exhibits presented to the Grand Jury.

42.    Transcripts of the testimony of all witnesses appearing before the Grand Jury. If no transcript or minutes exits, a summary of the testimony.

43.    Summaries and copies of the statements of witnesses which were not presented or conveyed to Grand Jury.

44.    Copies of all documents in possession of the government potentially relevant to the charges in the indictment and which the government did not present to the Grand Jury at the time this case was presented for Grand Jury consideration.

45.    A copy of the charge of the Court to the Grand Jury that returned this indictment.

46.    A list of the names and titles of each government employee who was present in the Grand Jury room during the taking of any testimony in the course of the investigations of this case, or who was present during any other portion of the Grand Jury proceedings.

STEVEN R. KIERSH

Nancy Jackson, Esquire
Kenneth Wainstein, Esquire
Assistant U.S. Attorneys
Re: United States v. William Sweeney
Discovery Letter
November 17, 1998
Page 7 of 9

47.    A list of the names and titles of each government employee who, prior to
the return of the indictment, examined outside of the grand jury's presence any
document or other items obtained by means of any Grand Jury subpoena issued in the
course of the investigation of this case.

48.    A copy of any letter or other document authorizing the examination of
Grand Jury materials by each of the government employees.

49.    A list of all Grand Jury subpoenas issued for documents and/or testimony
in this case.

### BRADY DISCLOSURES

50.    The defendant requests that the Government disclose and produce any
evidence in its possession favorable to the accused, regardless of whether the
evidence is deemed to be admissible at trial.  The disclosure and production should
include, but not be limited to, the following:

a.    Any written or stenographic, mechanical, electrical or other
recording of statements made by any witness, non-witness or co-conspirator, which
may be exculpatory in nature or favorable to the accused or which may be used for
impeachment of government witnesses and which are within the possession, custody or
control of the government, the existence of which is known or through the exercise of
due diligence may become known to counsel for the government.

b.    All information which illustrates that the acts, conduct and efforts of
each defendant or others at his or her direction were done without criminal intent and
evidence that could or may arguably be used by defense counsel in support of the
defendant's contention that he lacked any criminal knowledge or criminal intent and
that he did not act knowingly with knowledge of the existence of any conspiracy to
participate in a conspiracy to distribute controlled substance.

c.    All evidence arguably helpful to the defendant's claim that he was
not involved or connected with or had no part in activities or statements made by the
co-defendants or of other persons which the government contends were co-
conspirators but who have not been named as defendants.

d.    Any information which has come or may come to the attention of
the government from any source indication that persons other than the defendant may
caused or have been responsible for any of the offenses alleged in the indictment.

STEVEN R. KIERSH

Nancy Jackson, Esquire
Kenneth Wainstein, Esquire
Assistant U.S. Attorneys
Re: United States v. William Sweeney
98-329 (TPJ)
Discovery Letter
November 17, 1998
Page 8 of 9

       e.    Any and all criminal records of any witnesses whom the government intends to use in any way, or any other information demonstrating that commission on their part, or participation in any illegal activity, or any so-called "bad acts" or other instances of immoral or criminal conduct or conduct bearing on veracity.

       f.    Any and all statements that any individual may have given or other information tending to reflect in any way inconsistent statements concerning and relevant to the charges against Mr. Sweeney.

       g.    The criminal record and any list or summary reflecting the criminal record of any and all persons the government intends to call as witnesses at the trial of each defendant, including, but not limited to, the FBI arrest and conviction records.

       h.    Any evidence of the existence of, and the substance of, any promises, agreements, understandings and arrangements, either verbal or written, between the government and any person the government intends to call as a witness, in which the government agreed, either expressly or impliedly, not to prosecute the witness for any crime or crimes, not to prosecute a third party for informal assurance that the government would not prosecute the witness in connection with any testimony he or she might give.

       i.    Any evidence of the existence of, and the substance of, any promises, agreements, understandings and arrangements, either verbal or written, between the government and any person the government intends to call as a witness, in which the government agreed, either expressly or impliedly, to recommend leniency in sentencing or to recommend a certain sentence for any crime or crimes for which the witness has been, is, or will be convicted, or to advise the court of any cooperation with the government.

       j.    Any evidence of the existence of, and the substance of, any promises, agreements, understandings and arrangements, either verbal or written, between the government and any person the government intends to call as a witness, in which the government agreed, either expressly or impliedly, to provide favorable treatment or payment of monies in return for the witness' cooperation and testimony.

       k.    Any evidence of any and all actions, promises or efforts on the part of the government to aid, assist or obtain benefits of nay kind for any person whom the government considers a potential witness at trial, or a member of the immediate family of the witness, or friends of the witness.

STEVEN R. KIERSH

Nancy Jackson, Esquire
Kenneth Wainstein, Esquire
Assistant U.S. Attorneys
Re: United States v. William Sweeney
98-329 (TPJ)
Discovery Letter
November 17, 1998
Page 9 of 9


l.    Any evidence of the existence of, and substance of, any promises, agreements, understandings and arrangements, either verbal or written, between the government and any person the government intends to call as a witness, in which government agreed, either expressly or impliedly, to removal or destruction of the criminal record of any witness or to cause any change of identity of the witness.

m.    Any evidence of threats made to the witness or any member of his or her family y any law enforcement officer or agent of the government.

n.    Any and all personnel files for the witness and the existence and identity of all government files for the witness.

o.    Any and all records and/or information relating to witnesses and non-witness declarant which could arguably be useful to the defense for impeachment purposes.

p.    Any and all evidence of mental examinations of the witnesses, whether psychiatric or psychological, including, but not limited to, any tests conducted during those examinations.

q.    Any evidence of polygraph examinations given to any witness, including the tapes, reports and identities of witnesses and examiners.

r.    Any and all evidence of the use of illegal drugs of narcotics or prescription drugs which have a mind or sensory altering effect, by any witness from one week before through the date of testifying under oath in any proceeding, including any sworn testimony provided to any Grand Jury, and at any time since commencing his or her cooperation with the government.


Thank you for your earliest attention to this letter.

Very truly yours,

Steven R. Kiersh

Paul DeWolfe

SRK:ps
cc: Court jacket

# STEVEN R. KIERSH

ATTORNEY AT LAW
1825 K STREET, N.W.
SUITE 901
WASHINGTON, D.C. 20006
TEL. (202) 347-0200
FAX. (202) 835-1543

STEVEN R. KIERSH (DC)

NICHOLAS G. KARAMBELAS (DC, NY)
OF COUNSEL

EXHIBIT
B

January 19, 1999

TELEFAX (202) 307-2022 AND REGULAR MAIL

Kenneth L. Wainstein, Esquire
Assistant U.S. Attorney
555 4th Street, N.W.
Washington, D.C. 20001

Re: United States v. William Sweeney
Cr. 98-329

Dear Mr. Wainstein:

This letter is in regard to government witness James
Montgomery.

It is our position that Mr. Montgomery, and the police
investigation of his conduct, can provide information which will
exculpate Mr. Sweeney of some of the overt acts and charges for
which he has been indicted. Accordingly, pursuant to Brady v.
Maryland, this letter is a request for the following specific
information pertaining to Mr. Montgomery:

1. We are requesting the precise location of Mr. Montgomery. Mr.
DeWolfe and I have not been able to locate Mr. Montgomery. If he is
in the Witness Protection Program, please immediately so advise us
so that we can make arrangements to interview him at a time and
location which will not jeopardize his security concerns.

2. Please provide us with all information pertaining to why James
montgomery was investigated and/or charged with the triple homicide
in Maryland which occurred on November 17, 1996. This request
relates to any and all information in your possession, the
possession of any member of the Office of the United States
Attorney for the District of Columbia, the possession of any law
enforcement agency in any jurisdiction, and the possession of the
Maryland State's Attorney's office.

3. Pursuant to Giglio v. United States, please provide us with the
full terms of any agreement reached between James Montgomery and
any prosecutor's office which in any manner relates to his
anticipated testimony in the above-referenced matter. If an
agreement has been reduced to writing, please provide us with a
copy of the written agreement.

FILED

CR 98-329

FEB 0 9 1999

NANCY MAYER WHIT···
U.S. DIST···

STEVEN R. KIERSH

Kenneth L. Wainstein, Esquire
Page Two
January 19, 1999

Re: United States v. William Sweeney

    Please advise Mr. DeWolfe and myself of your position
regarding these requests no later than January 26, 1999 so that we
will learn whether it will be necessary to litigate these requests.

    Thank you for your attention to this letter.

                Very truly yours,

                Steven R. Kiersh
                Paul DeWolfe

SRK:le

EXHIBIT

## STEVEN R. KIERSH
ATTORNEY AT LAW
1825 K STREET, N.W.
SUITE 901
WASHINGTON, D.C. 20006
TEL. (202) 347-0200
FAX. (202) 835-1543

STEVEN R. KIERSH (DC)

NICHOLAS G. KARAMBELAS (DC, NY)
OF COUNSEL

January 29, 1999

TELEFAX AND REGULAR MAIL

Kenneth L. Wainstein, Esquire
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001

Re: United States v. William Sweeney
Cr. 98-329

Dear Mr. Wainstein:

On January 4, 1999 and on two separate occasions on January 19, 1999, Paul Dewolfe and I, on behalf of William Sweeney, made three very specific Brady requests.

I want to reiterate that the Brady requests we made are for information absolutely essential to our ability to investigate the charges against our client.

We have not received any response from you to our Brady demands and we had previously requested that you respond to our requests by January 26, 1999.

Please immediately advise me whether you will provide us with the requested information. We need to have your response by February 1, 1999. If we do not hear from you by that date, we will assume that you have chosen to deny our requests and we will have no alternative but to move to compel disclosure of the information.

Thank you for your attention to this letter.

Very truly yours,

FILED

FEB 0 9 1999

Steven R. Kiersh

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

CR 98-329

SRK:le



# STEVEN R. KIERSH

ATTORNEY AT LAW
1828 K STREET, N.W.
SUITE 901
WASHINGTON, D.C. 20006
TEL. (202) 347-0200
FAX. (202) 835-1543

STEVEN R. KIERSH (DC)

NICHOLAS G. KARAMBELAS (DC, NY)
OF COUNSEL

February 1, 1999

TELEFAX AND REGULAR MAIL

Kenneth L. Wainstein, Esquire
Assistant U.S. Attorney
555 4th Street, N.W.
Washington, D.C. 20001

                Re: United States v. William Sweeney
                        Cr. 98-329

Dear Mr. Wainstein:

        This letter will memorialize my understanding of the substance
of our telephone conversation this afternoon related to defendant's
outstanding discovery requests made pursuant to Brady v. Maryland.

1. James Montgomery: You would not reveal his whereabouts and
referred me to his attorney Alan Dale regarding availability for a
statement. With respect to my request for information linking Mr.
Montgomery to the triple homicide in Maryland, you stated that
there was nothing you have seen in that investigation that would
tend to exculpate Mr. Sweeney.

        Our position regarding the investigation of Mr. Montgomery for
the triple homicide is that the mere fact that he was considered a
suspect is in and of itself Brady. Any information developed by any
law enforcement agency or any prosecutor's office that in any
manner related to Mr. Montgomery as a suspect, in the defense view,
should immediately be turned over.

        I am confident as a matter of fact that Mr. Montgomery was
investigated as a suspect for the triple murder. We feel that any
person involved in the investigation and any product of the
investigation is Brady.

        We obviously disagree on this issue and I will file a motion
to litigate the issue.

        You did state that you will look into the investigation of Mr.
Montgomery in Maryland and advise me if your views change after
looking into the matter.

FILED

CR 98-329

FEB 0 9 1999

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# STEVEN R. KIERSH

Kenneth L. Wainstein, Esquire
Page Two
February 1, 1999

Re: United States v. William Sweeney


2. Dennis Green: You stated that AUSA Peter Zeidenberg is investigating this matter and will advise me in two weeks whether there was an arrest of Dennis Green.

Our position on Dennis Green is that any and all information related to any investigation of him as a suspect in the case is Brady regardless of whether he was arrested.

I will follow up on this in two weeks. If we can not reach agreement on disclosure of this information, we will file the appropriate pleading.

3. Pinckney & Owens: We are reiterating our request for any and all information regarding the whereabouts of these exculpatory witnesses regarding the triple murder in Maryland. They have been interviewed by the State's Attorney in Maryland and I requested that you contact that prosecutor for any and all information regarding their whereabouts. We agreed to wait two weeks while you investigate this information and will so advise me.

4. Sprint telephone records. You agreed to check whether these records are in the possession of the State's attorney in Maryland and will advise me in two weeks of their availability.

Please let me know if the representations in this letter do not comport with your understanding of our conversation.


Very truly yours,

Steven R. Kiersh

SRK:le

[RECEIVED]

FEB 9   12 02 PM '99

N. MAYER-WHITTINGTON
CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**FILED**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**JUL 1 6 2000**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| V. | )    **Criminal No. 98-329** |
| | )    **(TPJ)** |
| SAMUEL CARSON | ) |

### MOTION FOR DISMISSAL OF COUNTS,
### TO COMPEL DISCLOSURE OF EXCULPATORY EVIDENCE,
### AND FOR ADDITIONAL SANCTIONS
### DUE TO VIOLATIONS OF *BRADY V. MARYLAND*

Defendant Samuel Carson, by and through undersigned counsel, Gerald I. Fisher and

Joseph Beshouri, moves this Court, pursuant to the Due Process Clause of the Fifth Amendment

and *Brady v. Maryland,* 373 U.S. 83 (1963), for an Order (1) dismissing Counts 5-8 of the

Indictment, (2) precluding the Government from introducing evidence related to those charges at

trial, (3) requiring disclosure of other material and witnesses requested by the defense, and (4)

establishing a mechanism for independent review of the files of the United States Attorney and the

law enforcement agencies involved in this case for the presence of information/evidence which

may be deemed exculpatory under *Brady.* These requests are made due to the Government's[1]

repeated violation of *Brady* through disclosure of clearly exculpatory evidence so belatedly that

the defense cannot effectively use the evidence at trial.

---

[1] In this motion Mr. Carson uses the term "Government" to apply collectively to all
members of the United States Attorney's Office and all law enforcement officials involved in the
investigation and prosecution of this case. Consequently, no assertion of a failure to comply with
*Brady* is directed at a particular individual. The two Assistant United States Attorneys currently
prosecuting this case made the disclosures mentioned in this motion and have assured defense
counsel that they did so as soon as possible after discovering the exculpatory materials. Neither
Mr. Carson nor his counsel have any reason to question the truth of that representation.

1

In support of this Motion, Mr. Carson states:

1. Mr. Carson and his co-defendants are charged in a Superseding Indictment with conspiracy to distribute controlled substances, conspiracy to participate in a racketeer influenced corrupt organization ("RICO"), and 99 other counts of criminal activity spanning a period of time from 1988 through March 1999, including numerous counts of first-degree murder and other violent crimes. The original Indictment in this case was handed down in late-August 1998. The Superseding Indictment was returned in March 1999. Among the specific charges pending against Mr. Carson are:

(a) The December 19, 1989 murders of Maurice Hallman and Leonard Hyson **(OA 3; RA 51; Cts. 5-6)**.

(b) The March 22, 1991 murders of Teresa Thomas and Terita Lucas. **(OA 7; RA 52; Ct. 7-8)**. Though not charged until the instant Indictment was handed down, Mr. Carson has been a prime suspect since the day these homicides were committed and was questioned extensively by the police shortly after the murders took place. Also, on at least one occasion, the police sought a warrant for Mr. Carson's arrest, but the warrant was refused.

(c) The August 6, 1991 murder of Anthony Fortune, allegedly in retaliation for a prior robbery of Co-Defendant Jerome Martin by Fortune **(OA 8; RA 33, Ct. 9)**. Mr. Martin is also charged with this crime.

(d) The November 17, 1996 murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson during a robbery at Mr. Mack's home in Prince George's County, Maryland. **(OA 92; RA70; Cts. 48-50)**. Co-Defendants William Sweeney and Sean

2

Coates are charged along with Mr. Carson.

Recently, the Government also informed counsel that they will present evidence that Mr. Carson

was involved in the August 6, 1992 murder of Kevin Hart. Co-Defendants Proctor and Martin

are charged in the Superseding Indictment with that murder. **(OA 20; RA 54-55; Ct. 20)**

2. Counsel for Mr. Carson have made both specific and general requests of the

Government for the disclosure of *Brady* material as to each of these charges.

3. Between late-April 2000 and today, the Government provided defense counsel the

following *Brady* material relating to the 1989 Hallman/Hyson murder, which has been in the

Government's files *for more than ten years*:

(a) A police report prepared by Off.. Daniel Whalen on December 29, 1989 (Bate-

stamped 00902303-04) concerning an interview with one Randy Givens, an eyewitness

who described the two individuals responsible for the murders and identified them by

nicknames.

(b) A one-page resume prepared by Det. Bob Vacin on December 25, 1989 (Bate-

stamped 00902436), regarding an interview Vacin conducted that same day with Lance

Lyles. Lyles related that he had received a telephone call on the date of the murders from

one Wayne Perry threatening Hallman and Hyson. Lyles also stated that he knew Hallman

had "messed up" some cocaine belonging to Perry and that Hallman was an associate of

Perry's.

(c) A one-page resume prepared by Off. Whalen and Det. Daniel Wagner on

January 4, 1990 (Bate-stamped 00902435), less than a month after the murders,

concerning the observation of an automobile identified by Randy Givens as belonging to

3

one of the murderers. The automobile was registered to and driven by an Alonzo
Washington. Arthur Keys was a passenger in the car.

4. Also between late-April 2000 and today, the Government provided the following
*Brady* material concerning the Thomas/Lucas murders, which has been in the Government's files
for *at least five years*:

(a) A three-page FBI report, dated January 21, 1992 (Bate-stamped 00902306)
concerning an interview with James Montgomery, a government informant and probable
witness at trial. In the interview Montgomery provided extensive information about
murders committed by two drug dealers, Alberto Martinez (AKA "Alpo") and Wayne
Perry. Much of the information known to Montgomery was derived from conversations
he either overheard or participated in with Martinez and Perry. Among the murders
Montgomery discussed with the FBI were the murders of Ms. Thomas and Ms. Lucas.
Montgomery told the FBI that Perry killed the two women because an individual known
as "Kenny Man," robbed a good friend of Perry's and Ms. Thomas was the mother of
Kenny Man's child.

(b) A one-page report by MPD Homicide Det. Munsey (Bate-stamped
00902309), dated April 24, 1995 concerning an anonymous phone call he received that
day. The caller informed the detective that s/he overheard a conversation between two
individuals in February who said that they had spoken with a woman named Tameka Hill
who told them she had helped the murderers by knocking on the door of Teresa Thomas'
apartment in the early morning hours of March 22, 1991, and when Ms. Thomas opened
the door, two men in Ms. Hill's company, known as "Ant" and "Mark," rushed in and

4

I. I.

App 606

killed Ms. Thomas and Ms. Lucas. In the report provided to the defense, the Government
blacked out the names of the two women who had spoken with Ms. Hill.

　　　　(c) Two pages of a running resume relating to the investigation of the murders
(Bate-stamped 00902310-11) and containing the following information:

　　　　　　　　(i) After being arrested on an unrelated rape and unauthorized use of a
vehicle on April 10, 1991, Anthony Bragdon, the last known person to be in Ms.
Thomas' apartment, was questioned about the murders. He contended that he had
left the apartment at 12:30 a.m. He had previously provided the police with the
same information and had claimed that he had been seen leaving by a little boy.
However, the police had interviewed 14 boys who had been playing outside the
apartment and had stated they had last seen Bragdon entering the apartment, at
approximately 9:30 p.m. The report goes on to note that Bragdon had taken three
polygraphs and had been found to be deceptive when he stated he did not kill the
decedents; that he did not leave the apartment with a 9mm gun[2]; that he did not
know where the gun was; and that he was telling the truth. The running resume
also noted that the rape victim had told the police that during his assault of her
Bragdon told her he was carrying a 9mm gun.

　　　　　　　　(ii) On June 10, 1991, David Duarte spoke with a woman named Wanda
Dixon, who told Duarte that Kenny Man wanted Ms. Thomas to set up a drug
dealer, and that Thomas had done so in the past. For unknown reasons, said
Dixon, Thomas refused to do and then told the dealer what Kenny Man had asked

---

[2]A 9mm gun was used to kill Ms. Thomas and Ms. Lucas.

5

I.I.

her to do. Kenny Man learned what Thomas had done, and killed her then killed Ms. Lucas so there would be no witnesses. Later, Kenny Man bragged to others about what he had done. The resume also reports that a few days after relating his conversation with Ms. Dixon, Duarte learned that the drug dealer Kenny Man had wanted Ms. Thomas to set up was named "Wayne."

(d) A one-page report prepared by Det. Parson and Det. Queen on April 4, 1991 (Bate-stamped 00902312), relating to a phone call from one Renee Brown. Ms. Brown informed the detectives that she had been told that a man named "Deph" was involved in the shootings. Ms. Brown also related that Ms. Thomas had gotten into an argument with "Deph's" mother during a birthday party for Wanda Edwards and the mother had threatened Ms. Thomas.

(e) A one-page resume prepared by Dets. Parson and Queen on June 11, 1991 (Bate-stamped 00902433), stating that an Off. Hines had spoken with David Duarte, who had spoken with an unidentified female who told Duarte that Kenny Man told her he killed Ms. Thomas and Ms. Lucas.

(f) Grand jury testimony given on January 12, 1995 by Anna B. Davis (Bate-stamped 00902477-79), in which Ms. Davis stated that she had been told that an individual named Mark Ford had committed the murders along with "Dep" and "Ant," and that Ford had admitted to her that he had done so.

(g) A one-page resume prepared by Det. Pearson and Det. Queen on April 15, 1991 noting that one of the decedents had been involved a fist fight with "Ant's" mother and that "Ant" had told her he was going to "bust" her. The resume identifies "Ant" as

6

Lamar Allen.

5. On June 16, 2000, the Government provided counsel with a one-page resume
(Bate-stamped 00902481) identifying Anthony Chandler, Eric Jones, and Antoine Gaithers as
suspects in the murder of Kevin Hart.

6. By letter dated June 1, 2000, the Government refused to disclose the following
information until trial:

(a) The names and addresses of witnesses to the murder of Anthony Fortune who
heard co-defendant Martin claim sole responsibility for the murder.

(b) A statement by Government witness James Montgomery concerning the
November 13, 1996 murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson
which omitted any mention of Mr. Carson's involvement. Despite the omission of Mr.
Carson in his statement, Mr. Montgomery is expected to implicate Mr. Carson at trial.
Counsel for Mr. Carson also understand that in his statement Montgomery ascribed
different roles to the alleged participants than he now claims.

7. In a June 30, 2000 pleading he Government has also refused to disclose all statements
by James Montgomery until trial on the theory that all such statements are simply impeachment
and, therefore, governed by the Jencks Act,18 U.S.C. § 3500, *et seq.* Government's Notice of
Submission of Ex Parte Materials to the Court Regarding James Montgomery (hereinafter
"Montgomery Notice").

**Argument**

In *Brady*, the Supreme Court held that, regardless of good or bad faith, suppression by the
prosecution of evidence in its possession that is favorable to the accused violates due process

7

when that evidence is material either to guilt or punishment. 373 U.S. at 87. The *Brady* doctrine

imputes the knowledge of law enforcement agencies to the prosecution, *Kyles v. Whitley,* 514

U.S. 419, 434-38 (1995), and imposes on the prosecutor the affirmative duty to search the files of

all law enforcement agencies for exculpatory evidence. *United States v. Butler,* 499 F.2d 1006

(D.C. Cir. 1974).

     The doctrine also requires the prosecution to produce the exculpatory evidence in its

possession "at such time as to allow the defense to use the favorable material effectively in the

preparation and presentation of its case." *United States v. Pollack,* 534 F.2d 964, 973 (D.C.

Cir.), *cert. denied,* 429 U.S. 924 (1976); *see also United States v Allain,* 671 F.2d 248, 255 (7th

Cir. 1982); *Edelen v. United States,* 627 A.2d 968, 970 (D.C. 1993). Both the duty to disclose

and the requirement that disclosure be effective are independent of other discovery obligations on

the part of the prosecution, such as the Jencks Act and Rule 16 of the Federal Rules of Criminal

Procedure, which may allow the Government to withhold some discoverable evidence until trial.

*Brady* evidence, in contrast, should be disclosed "as soon as practicable following the filing of

charges." American Bar Association <u>Standards for Criminal Justice,</u> 11-2.1(c), 11-2.2. *See also*

*id.* at 3-3.11(a) (disclosure of *Brady* material should take place "at the earliest feasible

opportunity"); *Pollack,* 534 F.2d at 973-74; *Grant v. Alldredge,* 498 F.2d 376, 382 (2nd Cir.

1974); *United States v. Deutsch,* 373 F. Supp. 289, 290-91 (S.D.N.Y. 1974).

     The determination of what constitutes *Brady* material should not necessarily be left to the

prosecutor, or even the court. *Dennis v. United States,* 384 U.S. 855, 875 (1966) ("In our

adversary system, it is enough for judges to judge. The determination of what may be useful to

the defense can properly and effectively by made only by an advocate."). And even when the

8

App 610

determination whether to disclose rests entirely with the prosecution, the prosecution should not

apply a narrow definition of what constitutes exculpatory material. "[B]ecause the significance of

an item of evidence can seldom be predicted accurately until the entire record is complete, the

prudent prosecutor will resolve doubtful questions in favor of disclosure." *Agurs v. United

States*, 427 U.S. 97, 108 (1976). *See also Kyles*, 514 U.S. at 439 ("This means, naturally, that a

prosecutor anxious about tacking too close to the wind will disclose a favorable piece of

evidence.); *Lewis v. United States*, 408 A.2d 303, 308 (D.C. 1979).

  For unknown reasons, the Government did not turn over the clearly exculpatory evidence

about the Maurice Hallman/Leonard Hyson murders and the Teresa Thomas/Terita Lucas

murders until more than *two years* after the charges were brought against Mr. Carson and his Co-

Defendants and between *five and ten years* after the information came into the Government's

possession. The evidence as to both crimes is obviously and compellingly exculpatory; if true, it

exonerates Mr. Carson from those charges. Although the Government has offered to make those

witnesses known to them available for the defense to interview, that is a woefully inadequate

remedy for this violation of *Brady*. The Government simply cannot say with confidence that there

were not other witnesses to these events who could have provided additional exculpatory

testimony but are now unavailable; that leads which once would have been fresh are not now

stale; or that the witnesses who remain will remember the events in sufficient detail to permit the

defense to present the evidence of Mr. Carson's innocence as effectively as would have been

possible had the information been promptly disclosed. The Government offers no explanation for

its inaction other than simple oversight. But, as noted, *Brady* does not differentiate between good

and bad faith non-disclosure. The obligation to disclose is measured by the "character of the

9

App 611

evidence, not the character of the prosecutor." *Agurs,* 427 U.S. at 110.

The refusal by the Government to immediately disclose the names and addresses of the witnesses and the other exculpatory information requested by the defense is equally, if not more, troubling. The Government acknowledges that the evidence is exculpatory, but asserts in its June 30th pleading that it need not disclose that evidence until trial or shortly beforehand. In that pleading the Government takes the position that it need not disclose contradictory statements of its witnesses prior to trial because such evidence is merely impeachment. *See* Montgomery Notice at 1-2. It relies on *United States v. Tarantino,* 846 F.2d 1384, 1416 (D.C. Cir. 1988) as authority for this position. Montgomery Notice at 2, 3. That reliance, however, is misplaced.

*Tarantino* did not involve a *Brady* request. Rather, as clearly stated by the Court of Appeals, the issue was whether the Government was required under the Jencks Act, 18 U.S.C. § 3500 (1982), to turn over witness statements prior to trial "because access to these statements would have enhanced defense counsel's ability to cross-examine Strickland – the key government witness." *Tarantino,* 846 F.2d at 1413. The Court held that the Jencks Act did not so require. However, the Court went on to explicitly remark that the Government's duty relating to the disclosure of statements does not end with the Jencks Act. "Of course, under *Brady v. Maryland,* . . . the government has additional obligations deriving from the Fifth Amendment to dislcose exculpatory material, and the limitations on discovery contained in the Jencks Act do not lessen those obligations." *Tarantino,* 846 F.2d at 1414 n.11 (citations omitted).

That admonition is particularly appropriate here. In the first place, statements from witnesses which contradict their expected trial testimony, even if it only serves to impeach, qualifies as exculpatory evidence under *Brady. See Kyles,* 514 U.S. at 421-22; *Giles v.*

10

App 612

*Maryland,* 386 U.S. 66, 76-77 (1967) (plurality opinion). But contradictory statements may also

contain a rendition of events or other information that, if true, lends to exoneration of the

defendant or reduces his culpability. That information is not simply "impeachment" but is

affirmative *Brady* evidence which must be disclosed when it can be effectively used by the defense

to investigate the case. Based upon investigation and what has been obtained in discovery, it is

undersigned counsel's good faith belief that the statements in the Government's possession are

not merely impeachment and must be disclosed now.

Furthermore, the Government has not yet provided the supporting information or the

persons who supplied it which led the police to consider Anthony Chandler, Eric Jones, and

Antoine Gaithers, and not Mr. Carson, to be suspects in the murder of Kevin Hart. *Brady* would

appear to require disclosure of that information, too.

Courts are empowered to fashion remedies that are commensurate with the violations of

*Brady. See United States v. Bryant,* 439 F.2d 642, 652 (D.C. Cir. 1971). Because the impact of

the Government's inexcusably dilatory disclosure of exculpatory evidence as to the

Hallmon/Hyson and Thomas/Lucas murders cannot be remedied, this Court should exercise its

supervisory powers to dismiss those charges. In order to further ensure that the remedy of

dismissal is effective, the Court should additionally prevent the Government from introducing any

evidence about those charges at trial.

As to the other exculpatory evidence known to and being withheld by the Government,

this Court should require its immediate revelation to the defense and consider additional sanctions

should the delay in disclosure diminish the defense presentation at trial.

Finally, due to these multiple violations of *Brady*, Mr. Carson asks that this Court appoint

11

an attorney independent of the prosecution and the defense to examine the Government's files to

determine whether other non-disclosed exculpatory evidence exists.  Only in that way can this

Court be confident that the defense has received all exculpatory material and that *Brady* and its

progeny are being properly interpreted and applied.

        Respectfully submitted,

        Gerald I. Fisher
        FISHER & HANSEN, P.C.
        419 Seventh St., N.W., Suite 201
        Washington, D.C.  20004
        (202) 638-6700

        Joseph E. Beshouri
        419 Seventh St., N.W., Suite 201
        Washington, D.C.  20004
        (202) 842-0420

        Counsel for Samuel Carson

12

App 614

## CERTIFICATE OF SERVICE

I hereby certify that this 15th day of July, 2000, I have served copies of the foregoing

pleading upon:

Peter R. Zeidenberg, Esq.
Anjali Chaturvedi
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20001

Joanne Roney Hepworth, Esq.
305 H. Street, N.W.
Washington, D.C. 20001

Steven R. Kiersh, Esq.
717 D Street, N.W.
Washington, D.C. 20004

Paul DeWolfe, Esq.
20 Courthouse Square
Suite 214
Rockville, MD 20850

Christopher M. Davis, Esq.
601 Indiana Ave., N.W.
Washington, D.C. 20004

Frederick D. Jones, III, Esq.
901 6th Street, S.W.
Suite 409
Washington, D.C. 20024

Howard Bramson, Esq.
400 Seventh St., N.W., Suite 700
Washington, D.C. 20004

Jonathan Zucker, Esq.
601 Indiana Avenue, N.W., Suite 910
Washington, D.C. 20004

Gerald I. Fisher

13

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

7⁰ JUL 16 PM 11: 03

NANCY M.
MAYER-WHITTINGTON
CLERK

FILE[

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NOV 0 2 20__

NANCY MAYER WHITTI..  ` .. .`
U.S. DISTRICT COu...

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 98-329** |
| | ) | **(TPJ)** |
| **WILLIAM SWEENEY** | ) | |
| | ) | |

### MOTION TO ADMIT INTO EVIDENCE THE MARYLAND
### GRAND JURY TESTIMONY OF TWO UNAVAILABLE WITNESSES
### WHO WERE INTRODUCED BY THE STATE'S ATTORNEY FOR
### PRINCE GEORGE'S COUNTY

Defendant, by and through undersigned counsel, Steven R. Kiersh and Leonard

Long, does hereby set forth to this Honorable Court as follows:

1.) This pleading relates to two individuals who have provided exculpatory

information regarding William Sweeney in the context of the triple murder in Temple

Hills, Maryland which is a subject of this indictment. The two witnesses, John Pinckney

and Cheree Owens, can not be located and thus are unavailable to testify at trial.

2.) When the Maryland triple murder was prosecuted in the Circuit Court for

Prince George's County, both Pinckney and Owens were called by the State's Attorney

to testify before the grand jury on December 10, 1996 ( less than one month following

the commission of the triple murders). Cheree Owens testified that prior to the past

Thanksgiving she had been living in Temple Hills, Maryland with her fiancé John

Pinckney. A man by the name Dennis Green came to her home and began talking on

the telephone. She overheard Green say that **"Me (sic) just took three people out of**

**the street."** Afterwards, Owens told Green that he could no longer come to her house.

1

Green replied by demanding $200.00 in cash from Owens. Their dispute, over the

course of the next few days, escalated with Green trying to kick her back door in. She

said that he had a weapon and he and a friend were firing a weapon.

Cheree Owens was asked to adopt as truthful a nine page statement that she

provided to the police prior to her appearance before the grand jury. She adopted the

statement which in relevant part read as follows:

> **Q: In response to the telephone conversation between Dennis Green and the unknown person, what was Dennis' exact words?**
>
> **A: Man you should had come around here yesterday. Cause we went up the street and had to take these people out already. The person he was talking to asked who were we and he said me, Khalis and Frank and the rest of the guys. That is when I learned about a killing around here.**
>
> **Q: Did Dennis say why they killed these people?**
>
> **A: No.**
>
> **Q: When was this telephone conversation?**
>
> **A: Almost two weeks after the killing. That is when he stayed over night at my house.**

3.) John Pinckney also appeared before the Maryland grand jury. Pinckney

acknowledged talking to the police about the triple homicide which is a subject of this

indictment. The homicides occurred right down the street from the home he shared with

Cheree Owens.

Pinckney addressed his activities with Dennis Green (the man who Owens

testified was talking about murders). Pinckney testified that he was involved in drug

running with Dennis Green. He further testified that after Green left his home, Ms.

2

App 618

Owens was shaking and crying. His testimony included the following statement. **"And**

**so after he (Green) had left, she told me what he had said on the cell phone while**

**he was upstairs in one of the bedrooms, and that it had something to do with the**

**homicide down the street."**

    4.) Defendant submits that the respective grand jury testimony of Cheree Owens

and John Pinckney is relevant and material as follows:

> **a.) It demonstrates that Dennis Green, a person entirely unknown to**
> **Mr. Sweeney, was a suspect in the investigation of the triple**
> **murders;**
> **b.) It demonstrates that Dennis Green acknowledged responsibility**
> **for the triple murders and provides a motive for the murders;**
> **c.) It demonstrates that Dennis Green was involved in narcotics**
> **trafficking, possessed weapons, and used threats to intimidate**
> **individuals. This is the type of conduct that can very easily lead to**
> **murder.**

    5.) The Grand Jury testimony of the unavailable witnesses is clearly exculpatory

and should be admitted into evidence for consideration by the jury.

    6.) The United States Marshal has been unable to locate either Mr. Pinckney or

Ms. Owens

    7.) Attached to this Pleading are the following Exhibits to this Motion.

> **a.) Grand jury testimony of John Pinckney;**
> **b.) Grand jury testimony of Cheree Owens;**
> **c.) Statement of Cheree Owens;**
> **d.) Returns of service from the U.S. Marshal evidencing an inability**
> **To locate either Pinckney or Owens;**
> **e.) Statement of charges against Dennis Green.**

---

Footnote #1: In September, 1999, Defendant's investigator was able to locate Pinckney and
Owens. They could not be subpoened because there was no pending trial date. They told the
investigator substantially the same story as is in the respective Grand Jury transcripts. The
investigator could not again locate them.

3

**WHEREFORE**, the foregoing considered, Defendant prays this Honorable Court

for an Order authorizing the admission of the grand jury testimony of John Pinckney

and Cheree Owens into evidence.

Respectfully submitted.

Steven R. Kiersh # 323329
717 D Street, NW
Suite 400
Washington, D.C. 20004
(202)347-0200

Leonard Long
1818 11th Street, NW
Washington, D.C. 20001

4

App 620

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>VINCENT K. HILL, et al.,<br><br>       Defendants.<br><br>———————————————<br>UNITED STATES,<br><br>v.<br><br>GARY PRICE,<br><br>       Defendant. | ) <br> ) <br> ) <br> ) Criminal No. 98-329-01 (TPJ)<br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Criminal No. 99-348-03 (TPJ)<br> ) <br> ) <br> ) <br> ) |

F I L E D

SEP 2 8 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ORDER

In accordance with the proceedings in open court at the motions hearing of September 26 and 27, 2000, and upon consideration of the evidence taken and the representations of counsel, for the reasons advanced by the government or set forth on the record, it is this 28th day of September, 2000,

ORDERED, that the government's motions to quash defendant Carson's subpoenas duces tecum addressed to the acting chief of human resources at the U.S. Department of Agriculture and to the medical examiners office [#197, #193] are denied as moot; and it is

FURTHER ORDERED, that the government's motion for an anonymous jury [#289] is granted, subject to conditions to be determined at a later date; and it is

FURTHER ORDERED, that the government's motion to admit out-of-court statements of murdered witnesses [#314] is granted as to the statements of Robert Smith and Kevin Hart, subject to the condition that the government disclose any and all evidence in its possess

may impeach the out-of-court statements of Smith and/or Hart or may indicate that persons other than defendants attempted or had reason to murder Smith and/or Hart, and is denied as moot as to the statements of Chrishuana Gladden; and it is

FURTHER ORDERED, the defendants' joint motion to strike all racketeering counts and counts under the Violent Crime in Aid of Racketeering Statute, 18 U.S.C. § 1959 et seq., [#338] is denied without prejudice; and it is

FURTHER ORDERED, that defendant Sweeney's motion to dismiss counts 48, 49, and 50, and to strike overt acts and racketeering act 70(a)-(g) of Count 2 and to strike all references to the triple murder in Maryland [#307] is denied without prejudice; and it is

FURTHER ORDERED, that defendant Martin's motion to dismiss the indictment for prejudicial pre-accusatorial delay, violations of the statute of limitations, and Speedy Trial Act provisions [#337] is granted as to Counts 10, 11, 12, 13, 14, 15, 16, 18, and 19, on statute of limitations grounds only, and denied in all other respects; and it is

FURTHER ORDERED, that defendant Martin's motion to dismiss Counts 1 and 2 on Fifth and Sixth Amendment grounds [#336] is denied; and it is

FURTHER ORDERED, the defendant Carson's motion for dismissal of counts, to compel disclosure of exculpatory evidence, and for sanctions [#329] is denied; and it is

FURTHER ORDERED, that defendant Carson's and Martin's motions to strike all aliases from the indictment [#330, #335] are denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to identify witnesses with juvenile adjudications and pending juvenile proceedings and to inspect juvenile files [#311] is denied without prejudice as moot; and it is

2

App 622

FURTHER ORDERED, that defendant Sweeney's motion to disclose identities of each confidential informant regardless of whether the informant will be called as a witness at trial [#303] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for pretrial identification and production of <u>Jencks</u> material [#302] is denied as moot, provided that the government shall disclose <u>Jencks</u> and <u>Giglio</u> materials relating to a witness the Friday before the week in which the witness testifies; and it is

FURTHER ORDERED, that defendant Sweeney's motion for pretrial production of statements of persons who will not be called as witnesses at trial [#308] is denied; and it is

FURTHER ORDERED, that defendant Carson's motion for discovery of statements of co-defendants and co-conspirators [#326] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for an order directing the government to give notice of its intention to rely upon other crimes evidence [#310] is denied without prejudice, to the extent that notice has not otherwise been furnished; and it is

FURTHER ORDERED, that defendant Carson's motion for notice of government's intention to use the residual hearsay exception under Fed. R. Evid. 807 [#325] and defendant Sweeney's motions for notice of government's intention to use the residual hearsay exception under Fed. R. Evid. 804(b)(5) [#304] and 803(24) [#309] are denied as moot; and it is

FURTHER ORDERED, that defendant Sweeney's motion for a pretrial hearing to determine the admissibility of the testimony of each of the government's proposed expert witnesses [#230] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for <u>in camera</u> review of grand jury testimony to determine existence of racketeering enterprise [#301] is denied; and it is

3

FURTHER ORDERED, that defendant Sweeney's motion for a pretrial hearing to determine existence of conspiracy and admissibility of co-conspirators' statements [#312] is denied; and it is

FURTHER ORDERED, that defendant Carson's motion to compel disclosure of evidence subject to suppression under Fed. R. Crim. P. 12(b)(3) [#328] is denied as moot; and it is

FURTHER ORDERED, that defendant Carson's motion for bill of particulars [#327] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's third motion to compel discovery [#340] is granted to the extent that the government must disclose the above-mentioned evidence regarding Robert Smith and is denied in all other respects; and it is

FURTHER ORDERED, that defendant Martin's motion to suppress evidence from the seizure that occurred on or about September 14, 1991, [#334] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress physical evidence seized from the November 1, 1994, search at 211 I Street, SE, [#306] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress identification testimony from February 19, 1997, [#344] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's second motion to suppress identification testimony [#378] is denied as moot; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress custodial statements made on or about April 20, 1997, [#305] is denied; and it is

FURTHER ORDERED, defendant Martin's motion to suppress statements [#333] is denied as moot as to the statements made January 24, 1992, October 27, 1992, and June 9, 1994,

4

and denied on the merits as to the statements made on or about August 7, 1991, and September 16, 1997; and it is

FURTHER ORDERED, that defendant Hill's motion to suppress evidence and statements from the April 21, 1992, search [#374 exhibits] is denied; and it is

FURTHER ORDERED. that defendant Hill's motion to suppress identification from February 3, 1997 [#374 exhibits] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for change in location pending trial [#296] is granted to the extent that defendant will be incarcerated in D.C. Jail or elsewhere in the metropolitan area during trial; and it is

FURTHER ORDERED, that defendant Sweeney's motion for an order granting leave to serve subpoenas on two assistant United States attorneys [#291] is denied; and it is

FURTHER ORDERED, that defendant Coates' motion for reconsideration of motion for severance [#366] and all other defendants' oral renewed motions for severance are denied; and it is

FURTHER ORDERED, that defendant Carson's supplemental motion to compel disclosure of exculpatory evidence (filed September 26, 2000) is denied; and it is

FURTHER ORDERED, that defendant Carson's supplemental motion for bill of particulars of unindicted crimes which the government intends to prove at trial (filed September 27, 2000) is denied; and it is

FURTHER ORDERED, that defendant Proctor's motion to compel discovery (filed September 27, 2000) is denied without prejudice.

Thomas Penfield Jackson
U.S. District Judge

FILED

NOV 0 6 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Crim. No. 98-329 (TPJ)** |
| | : | |
| v. | : | |
| | : | |
| SAMUEL CARSON, et al. | : | |
| Defendants | : | |

## SAMUEL CARSON'S MOTION TO ADOPT WILLIAM SWEENEY'S MOTION TO ADMIT INTO EVIDENCE THE MARYLAND GRAND JURY TESTIMONY OF TWO UNAVAILABLE WITNESSES WHO WERE INTRODUCED BY THE STATE'S ATTORNEY FOR PRINCE GEORGE'S COUNTY

Samuel Carson, by and through his undersigned counsel, respectfully moves this

Honorable Court to adopt and conform to the motion previously filed by William Sweeney

captioned "Motion to Admit into Evidence the Maryland Grand Jury Testimony of Two

Unavailable Witnesses Who Were Introduced by the State's Attorney for Prince George's

County."

Respectfully submitted,

Joseph E. Beshouri by jnc

Joseph E. Beshouri
419 Seventh St., N.W., Suite 201
Washington, D.C. 20004
(202) 842-0420

Lexi Negin Christ
419 Seventh St., N.W., Suite 201
Washington, D.C. 20004
(202) 638-6700

Counsel for Samuel Carson

452 –

NOV 1 ~  FILED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NANCY MAYER
U.S. DIS..  NOV 1 6 2000

UNITED STATES OF AMERICA,                    :        Criminal No. 98-329 (TPJ)

                                                     NANCY ... RTINGTON, CLERK
                                                     ... COURT

      v.                                                   :

                                             :

VINCENT HILL, ET. AL.                          :
            Defendants.                         :

### GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
### DEFENDANTS SWEENEY AND HILL'S MOTIONS FOR ADMISSION OF
### GRAND JURY TESTIMONY OF UNAVAILABLE WITNESSES

       The United States of America, by and through its attorney, the United States Attorney for the

District of Columbia, hereby requests that this Court deny the motions of defendants Sweeney and

Hill to admit the grand jury testimony of unavailable witnesses. In support of this opposition, the

government states as follows:

       1.     Defendants Sweeney, Carson and Coates have been charged in connection with the

triple murder that occurred in Temple Hills, Maryland on November 17, 1996. That homicide was

originally investigated by the Prince George's County Police Department, along with the State's

Attorney's Office in Prince George's County. Initially, the investigators had no identifying

eyewitnesses to this murder and had no strong investigative leads. Within several weeks,

investigators identified John Pinckney and Cheree Owens as potential witnesses. Pinckney and

Owens told investigators that they overheard a telephone conversation by an individual named Dennis

Green in which Green claimed responsibility for what sounded like the triple murder in Temple Hills.

Both Pinckney and Owens were put into the grand jury and testified regarding Dennis Green and his

alleged involvement in the triple homicide. At the time Pinckney and Owens testified, the

$\psi(\langle)$

investigators had no reason to believe that either Pinckney or Owens were lying.[1] After testifying in the grand jury in Prince George's County, both Pinckney and Owens seemingly disappeared. Defendant Sweeney is now seeking to admit the testimony of both Pinckney and Owens.

    2.      Defendant Hill is also seeking to admit the testimony of an unavailable witness, named Michael Jenifer, who testified on March 20, 1990, regarding the murder of Larry "Patcho" Wright, a homicide that defendant Hill is now alleged to have committed. At the time Mr. Jenifer testified, however, one Tyrone Brawner was charged with having committed the murder of Mr. Wright. Mr. Jenifer professed to have no knowledge of the murder of Larry Wright, but claimed that he was in the company of Vincent Hill for virtually the entire day that Mr. Wright was killed. Mr. Jenifer was subsequently killed in November 3, 1990[2], and defendant Hill is seeking the admission of Mr. Jenifer's grand jury testimony.

### Argument

    The precise argument advanced by defendants Sweeney and Hill -- that exculpatory grand jury testimony of an unavailable witness should be admissible by the defense – was made in United States v. Salerno, 505 U.S. 317 (1992). In Salerno, a RICO prosecution, the defendants sought to introduce

---

[1]This view quickly changed. The police soon came to believe that they were being used by Pinckney and Owens. This belief was based on the fact that Pinckney and Owens were given a considerable amount of money that was to be used for their relocation and was meant to last several weeks. The pair went through the funds in a matter of days and then demanded additional funds. The police also learned that Pinckney and Owens owed Dennis Green – the person they implicated in the triple murder -- money for drugs. After investigating more fully, the police found nothing to corroborate the stories of Pinckney and Owens. A short time later, Pinckney and Owens seemingly disappeared.

[2]The government is unaware of the circumstances surrounding the murder of Mr. Jenifer. The defense has not suggested that Mr. Jenifer was killed because of his status as a potential witness in the murder of Larry Wright.

the exculpatory grand jury testimony of unavailable witnesses.[3]    The Court first looked to Rule

804(b)(1), which states, in pertinent part:

> The following are not excluded by the hearsay rule if the declarant is
> unavailable as a witness:
>     Former Testimony. – Testimony given as a witness at another
> hearing . . if the party against whom the testimony is now offered .
> . . had an opportunity and similar motive to develop the testimony by
> direct, cross, or redirect examination.

The Salerno Court held that the grand jury testimony that the defense sought to introduce was

inadmissible absent a showing that the government had a "similar motive" in "developing" the

testimony at issue.  Salerno at 322.  The defendants here cannot make such a showing.  In the case

of defendant Sweeney, the government had absolutely no motive to impeach either Pinckney or

Owens.  On the contrary, at the time the witnesses were presented to the grand jury, the government

believed they were being truthful.  Certainly the government had no reason to believe at that time that

the witnesses were falsely implicating Mr. Green.  Thus, there was absolutely no motive for the

assistant state's attorney to cross-examine either witness when they testified in the grand jury.

Similarly, the government had no motive to cross-examine Mr. Jenifer when he testified that

he was with Vincent Hill at the time of the murder of Larry Wright.  As pointed out previously,

Vincent Hill was not charged with Mr. Wright's murder at the time of the testimony of Mr. Jenifer;

an individual name Tyrone Brawner was charged with this offense.  There was no reason for the

prosecutor to attempt to impeach or attack Mr. Jenifer's testimony when that testimony did not

exculpate the individual was at that time being prosecuted for Larry Wright's murder.

---

[3]In Salerno, the witnesses were unavailable because they asserted their Fifth Amendment
privilege.

Because the defendants have failed to establish that the government had a similar motive to develop the grand jury testimony of the proffered witnesses, the admission of this testimony is barred by Fed. R. 804(b)(1).

WHEREFORE, it is respectfully requested that defendants' motion be denied.

Respectfully submitted,

WILMA A. LEWIS
UNITED STATES ATTORNEY

By:

PETER R. ZEIDENBERG
Assistant United States Attorney
D.C. Bar #440-803
555 4th Street, N.W.
Washington, D.C. 20001
(202)353-8831

By:

ANJALI CHATURVEDI
Assistant United States Attorney
D.C. Bar # 446-177

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served by mail upon the attorneys for the defendants as set forth below, this _16th_ day of November, 2000.

Steven R. Kiersh, Esq.
1825 K Street, N.W.
Suite 901
Washington, D.C. 20006

Christopher M. Davis, Esq.
601 Indiana Avenue, N.W. #910
Washington, D.C. 20004

Joanne Hepworth, Esq.
305 H Street, N.W., 2nd Floor
Washington, D.C. 20001

Joseph Beshouri, Esq.
307 G Street, N.W.
Washington, D.C. 20001

Howard Bramson, Esq.
717 D Street, N.W., #300
Washington, D.C. 20004

Frederick Jones, Esq.
901 6th Street, S.W., #409
Washington, D.C. 20024

Jonathan Zucker
601 Indiana Avenue, N.W. # 910
Washington, D.C. 20004

PETER R. ZEIDENBERG
Assistant United States Attorney

Steven R. Kiersh, Esq.
1825 K Street, N.W.
Suite 901
Washington, D.C. 20006

Christopher M. Davis, Esq.
601 Indiana Avenue, N.W. #910
Washington, D.C. 20004

Joanne Hepworth, Esq.
305 H Street, N.W., 2nd Floor
Washington, D.C. 20001

Joseph Beshouri, Esq.
307 G Street, N.W.
Washington, D.C. 20001

Howard Bramson, Esq.
400 7th Street, N.W., #400
Washington, D.C. 20004

Frederick Jones, Esq.
901 6th Street, S.W., #409
Washington, D.C. 20024

Jonathan Zucker
601 Indiana Avenue, N.W. # 910
Washington, D.C. 20004

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

GRAND JURY SWORN IN JULY 22, 1998

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 98-329(TPJ) |
| | : | |
| v. | : | Grand Jury Original |
| | : | |
| VINCENT HILL, | : | Violations: |
| a/k/a "Vito," | : | |
| | : | 21 U.S.C. §846 |
| JEROME MARTIN, | : | (Conspiracy to Distribute |
| a/k/a "Pimp," | : | and Possess with Intent to |
| | : | Distribute Controlled |
| SAMUEL CARSON, | : | Substances) |
| a/k/a "Chin," | : | |
| | : | 18 U.S.C. §1962(d) |
| WILLIAM KYLE SWEENEY, | : | (Conspiracy to Participate |
| a/k/a "Draper," | : | in a Racketeer Influenced |
| | : | Corrupt Organization) |
| SEAN COATES, | : | |
| a/k/a "Birdy," | : | 22 D.C. Code §§2401, 3202 |
| | : | (First Degree Murder While |
| | : | Armed) |
| | : | |
| | : | 22 D.C. Code §§501, 3202 |
| | : | (Assault with Intent to |
| | : | Kill While Armed) |
| | : | |
| | : | 18 U.S.C. §1959 |
| | : | (Violent Crime in Aid of |
| | : | Racketeering Activity) |
| | : | |
| | : | 22 D.C. Code §§2101, 3202 |
| | : | (Kidnaping While Armed) |
| | : | |
| | : | 22 D.C. Code §505(b) |
| | : | (Assaulting a Police Officer) |
| | : | |
| | : | 18 U.S.C. §924(c)(1) |
| | : | (Use of a Firearm) |
| | : | |
| | : | 22 D.C. Code §3204(b) |
| | : | (Possession of a Firearm |
| | : | During a Crime of Violence) |

FILED
JUL 2 2001
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

```
:      21 U.S.C. §841(a)(1)
:      (Possession With Intent to
:      Distribute and Distribution of
:      Controlled Substances)
:
:      22 D.C. Code §105
:      (Aiding and Abetting)
:
:      18 U.S.C. §2
:      (Aiding and Abetting)
```

SECOND RETYPED

**INDICTMENT**

THE GRAND JURY CHARGES THAT:

### COUNT ONE

### NARCOTICS CONSPIRACY

A.   The Conspiracy

From on or about sometime in at least 1988, the exact date being unknown to the Grand Jury, and continuing thereafter up to and including March 1999, in the District of Columbia and elsewhere, the defendants, **VINCENT HILL, a/k/a "Vito," JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, did unlawfully, knowingly and intentionally combine, conspire, confederate and agree together, with each other, with co-conspirators not indicted herein, and with others known and unknown to the Grand Jury, to unlawfully, knowingly, and intentionally possess with intent to distribute and to distribute the following:

2

(1)   Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance, and the amount of said mixtures and substances was 1000 kilograms or more, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(vii).

(2)   Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic controlled substance, and the quantity of said mixtures and substances was fifty (50) grams or more, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(iii).

(3)   Phencyclidine (PCP), a Schedule III controlled substance, and mixtures and substances containing a detectable amount of phencyclidine (PCP), in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

          B.   Goals of the Conspiracy

     The conspiracy had the following goals and objectives:

     (1)   It was a principal goal of the conspiracy for the defendants and co-conspirators to obtain as much money and other things of value as possible through the trafficking of controlled substances, namely marijuana, cocaine base, also known as crack cocaine, PCP and other drugs, in the District of Columbia, Maryland, Virginia and elsewhere.

     (2)   It was a further goal of the conspiracy to commit acts of robbery, kidnaping, murder and other acts of violence for the

                              3

following purposes, among others: to enrich the members of the conspiracy; to create, maintain and control a market place for the distribution of its controlled substances; to enforce discipline among members of the conspiracy; to collect monies owed to members of the conspiracy; to protect the conspiracy and its members from detection, apprehension and prosecution by law enforcement; to intimidate and prevent persons from testifying as witnesses in criminal prosecutions against members of the conspiracy; to prevent, thwart, and retaliate against acts of violence perpetrated by rivals against the conspiracy and its members; and to promote and enhance the reputation and standing of the enterprise and its members.

C.    Ways, Manner and Means To
      Accomplish the Conspiracy

The ways, manner and means by which the defendants and co-conspirators operated their illegal drug trafficking organization, include, but are not limited to, the following:

(1)   The members of the conspiracy knowingly and intentionally distributed and possessed with intent to distribute marijuana, cocaine base, also known as crack, PCP and other illegal drugs, and aided and abetted such distribution and possession with intent to distribute. The locations at which members of the conspiracy conducted their illegal narcotics business included areas within the Greenleaf Gardens housing complex in Southwest Washington, D.C. --including, but not limited to, the 200 block of K Street, S.W.,

4

the 900 and 1000 blocks of Delaware Avenue, S.W., and the 900 block of 3rd Street, S.W.-the 1500 block of Canal Street, S.W., the 200 blocks of 37th Street and 37th Place, S.E.

(2)  It was part of the conspiracy that the defendants would and did play different roles in the conspiracy, take upon themselves different tasks and participate in the conduct of the organization through various criminal acts.  The defendants made themselves and their services available at various times throughout the life of the conspiracy and participated in certain drug trafficking ventures as required to promote and protect the distribution operation.  The roles assumed by some defendants were interchangeable at various times throughout the conspiracy.  Some of the roles assumed and carried out by the defendants included, among others, holder, helper, packager, lookout, supplier of drugs, organizer, intermediary, courier, driver, enforcer, protector, street seller and runner.

(3)  It was further part of the conspiracy that marijuana, crack cocaine, PCP and other illegal drugs were stored, prior to distribution to street sellers, runners, and customers, in and around designated stash locations.  The defendants used these stash locations to store illegal drugs and weapons in order to prevent them from being found by the police or rivals and to hide their connection to members of the organization.  Some of these stash locations were also used for processing, cutting, packaging, and

5

distributing the organization's marijuana, crack cocaine, PCP and other illegal drugs.

(4)  It was further part of the conspiracy that the defendants and co-conspirators used telephones, cellular and portable telephones, and beepers/pagers to facilitate their illegal narcotics business; that is, making telephone calls to communicate with each other, their suppliers and their customers, to direct or facilitate acts of violence in furtherance of the conspiracy, and to protect against the detection of the conspiracy by law enforcement officials.

(5)  It was further part of the conspiracy that the defendants and co-conspirators possessed, carried and used firearms, including semi-automatic pistols, machine pistols, and revolvers, to protect their drug trafficking operation from theft, robbery and competition from rival sellers, and to do violence in furtherance of the conspiracy. These weapons were possessed, carried and used for various reasons, including, but not limited to: to ensure the personal safety of the members of the organization; to protect the organization's illegal drugs, including marijuana and crack cocaine, and the proceeds of drug distribution; to intimidate rival drug dealers from distributing illegal drugs in the areas of Washington, D.C. that the organization claimed to control; to rob rival drug dealers of their drugs and monies in order to prevent them from competing for illegal drug sales in the organization's

6

area; to rob customers of monies used to purchase illegal drugs; to retaliate against rival drug dealers for harm caused to members of the organization; and to ensure that drug distribution activities were controlled by the defendants and their co-conspirators.

(6)    It was further part of the conspiracy that the defendants and co-conspirators engaged in acts of violence, including murder, armed robbery, kidnaping and armed assaults and threatened acts of violence to protect themselves, to eliminate rival sellers, to retaliate for acts of violence against members of the organization, to prevent potential witnesses from cooperating with law enforcement agencies investigating the drug organization, to prevent potential witnesses from testifying against members of the organization at criminal proceedings, to conceal the conspiracy from law enforcement authorities, to promote and perpetuate the organization's distribution operation and to enhance the organization's reputation.

(7)    It was further part of the conspiracy that members caused third parties to purchase and/or register automobiles and to rent apartments used by members of the conspiracy, a practice designed to conceal from law enforcement authorities the connection between the members of the conspiracy and their automobiles and apartments.

(8)    It was further part of the conspiracy that its members took efforts to avoid detection, investigation by law enforcement

7

authorities and conviction for criminal charges against any members of the organization.

           D.    <u>Overt Acts</u>

In furtherance of the conspiracy and in order to effect the objects thereof, the defendants, co-conspirators not indicted herein, and others who are known and unknown to the Grand Jury, in various combinations, directly and indirectly, within the District of Columbia, Maryland, Virginia and elsewhere, committed overt acts, including, but not limited to, the following:

1.    On or about June 29, 1989, within the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Larry Wright, by shooting him with a pistol.

2.    On or about December 19, 1989, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Maurice Hallman and Leonard Hyson, by shooting them with pistols.

3.    On or about April 28, 1990, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, seized, confined, kidnaped, abducted and carried away Norman Yusef Simmons and held him for ransom.

8

4.    Between in or about 1991 and on or about June 20, 1992, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and co-conspirators not indicted herein, while armed with pistols, assaulted persons in the Kentucky Courts neighborhood of Southeast Washington, D.C. whose identities are unknown to the Grand Jury with intent to kill them.

5.    Between in or about 1991 and on or about June 20, 1992, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, assaulted persons in the Kentucky Courts neighborhood of Southeast Washington, D.C. whose identities are unknown to the Grand Jury with intent to kill them.

6.    On or about March 22, 1991, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Teresa Thomas and Terita Lucas, by shooting them with a pistol.

7.    On or about August 6, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Anthony Fortune, by shooting him with a pistol.

8.    On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols,

9

App 641

assaulted Ofc. Adrian Treadwell, Ofc. Edward McDonald, Ofc. Marc Little and Ofc. Alvin Ray with intent to kill them.

9.   On or about October 26, 1991, in the area of 8th Street and Massachusetts Avenue, N.E., in the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, possessed a loaded .45 caliber semi-automatic pistol.

10.   On or about January 23, 1992, inside of Apartment 21, 241 37th Place, S.E., in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** possessed a loaded 9mm semi-automatic pistol and a bullet-proof vest.

11.   On or about April 7, 1992, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with a dangerous weapon, that is, an automobile, assaulted Ofc. Alfred Moss of the Prince George's County Police Department with intent to kill him.

12.   On or about April 22, 1992, in the area of the 900 block of the Southeast Freeway, in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** possessed a loaded "Tec-9" 9mm semi-automatic pistol.

13.   On or about June 20, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Jermaine Hall and Michael Jones with intent to kill them.

10

14.  Between on or about June 20, 1992 and June 28, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, conspired to kill Michael Jones to prevent him from implicating and testifying against a co-conspirator not indicted herein, regarding the shooting of Jermaine Hall on June 20, 1992.

15.  On or about June 28, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Michael Jones with intent to kill him.

16.  On or about August 29, 1992, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, assaulted Curtis Edwards, Richard Burton and Keith Jones with intent to kill them, and thereby killed Curtis Edwards, by shooting him with a pistol.

17.  On or about October 27, 1992, in the area of 300 Yoakum Parkway, in Alexandria, Virginia, **JEROME MARTIN, a/k/a "Pimp,"** possessed a 9mm semi-automatic Intratec pistol, a 12-gauge Mossberg shotgun, and a loaded 9mm Beretta pistol with an obliterated serial number.

18.  On or about January 7, 1993, in the area of Half and T Streets, S.W., in the District of Columbia, **SEAN COATES, a/k/a "Birdy",** possessed a loaded Glock 9mm semi-automatic pistol.

11

19. On or about July 7, 1993, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Glenn Jenkins, by shooting him with a pistol.

20. On or about October 22, 1993, in the state of Maryland, **VINCENT HILL, a/k/a "Vito," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy"** and other co-conspirators not indicted herein, while armed with pistols, attempted to kidnap, rob and murder Anthony Pryor.

21. On or about October 28, 1993, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, assaulted Roland Brown with intent to kill him.

22. On or about April 9, 1994, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and other co-conspirators not indicted herein, conspired to kill Steven Dunbar.

23. On or about April 9, 1994, within the District of Columbia, co-conspirators not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Steven Dunbar by shooting him with a pistol.

24. On or about June 26, 1994, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, assaulted Ulysses English with intent to kill him.

12

25.  On or about September 21, 1994, within the District of Columbia, co-conspirators not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Phillip Clayborne, by shooting him with a pistol.

26.  On or about September 26, 1994, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Donnell Whitfield, by shooting him with a pistol.

27.  On or about November 1, 1994, inside of 211 I Street, S.E., in the District of Columbia, **WILLIAM SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, possessed a loaded 9mm semi-automatic Makarov pistol, a loaded 9mm semi-automatic Beretta pistol and a loaded 9mm semi-automatic Star pistol.

28.  On or about May 30, 1995, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** while armed with a pistol, assaulted James Coulter with intent to kill him.

29.  On or about June 6, 1995, in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** obstructed justice by threatening to kill an individual **HILL** believed to be assisting the government in its investigation into the criminal activities of **HILL** and his co-conspirators.

30.  On or about September 27, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL,**

13

**a/k/a "Vito,"** possessed with intent to distribute a mixture and substance containing marijuana.

31.  On or about October 4, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana.

32.  On or about November 2, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana.

33.  On or about November 3, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana, during which **HILL** identified a co-conspirator not indicted herein as a person who could sell marijuana to the buyer in the future.

34.  On or about November 15, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and **JEROME MARTIN, a/k/a "Pimp,"** distributed a mixture and substance containing marijuana.

35.  On or about November 16, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing

14

App 646

marijuana, during which transaction **HILL** and **JEROME MARTIN, a/k/a**
**"Pimp,"** spoke with the buyer about future purchases of marijuana.

36.  On or about November 28, 1995, in the area of the 200
block of K Street, S.W., in the District of Columbia, **VINCENT HILL,**
**a/k/a "Vito,"** distributed a mixture and substance containing
marijuana.

37.  On or about November 29, 1995, in the area of the 200
block of K Street, S.W., in the District of Columbia, **VINCENT HILL,**
**a/k/a "Vito,"** distributed a mixture and substance containing
marijuana in the presence of **JEROME MARTIN, a/k/a "Pimp,"** who
explained to the buyer how to repackage and resell the marijuana.

38.  On or about December 6, 1995, in the area of the 200
block of K Street, S.W., in the District of Columbia, **JEROME**
**MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein,
distributed a mixture and substance containing marijuana.

39.  On or about December 8, 1995, in the area of the 200
block of K Street, S.W., in the District of Columbia, **VINCENT HILL,**
**a/k/a "Vito,"** while in the company of co-conspirators not indicted
herein, distributed a mixture and substance containing marijuana.

40.  On or about December 13, 1995, in the area of the 200
block of K Street, S.W., in the District of Columbia, **JEROME**
**MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein,
distributed a mixture and substance containing marijuana.

15

41.   On or about December 13, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and a co-conspirator not indicted herein, distributed a mixture and substance containing marijuana.

42.   On or about December 13, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana.

43.   On or about December 15, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and co-conspirators not indicted herein, distributed a mixture and substance containing marijuana.

44.   In or about 1996 and 1997, within the District of Columbia and the Commonwealth of Virginia, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and another co-conspirator not indicted herein, drove to Centerville, Virginia in search of Kenneth Adams, in order to find and kill Kenneth Adams to prevent him from testifying in the murder trial of a co-conspirator not indicted herein.

45.   On or about February 1, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** possessed with intent to distribute a mixture and substance containing marijuana.

16

46. On or about February 14, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana, during which transaction **HILL** provided the buyer with his pager number (202-519-9153) so that the buyer could arrange future drug purchases from **HILL.**

47. On or about February 20, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and a co-conspirator not indicted herein, distributed a mixture and substance containing marijuana.

48. On or about February 26, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** distributed a mixture and substance containing marijuana.

49. On or about February 26, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** distributed a mixture and substance containing marijuana.

50. On or about March 5, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and a co-conspirator not indicted herein, distributed a mixture and substance containing marijuana.

17

App 649

51.   On or about March 15, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and a co-conspirator not indicted herein, distributed a mixture and substance containing marijuana.

52.   On or about August 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, assaulted Popa Mark Phillip with intent to kill him.

53.   In or about October 1996, within the District of Columbia and the Commonwealth of Virginia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, conspired to kill the witnesses who were expected to testify in the murder trial of **JEROME MARTIN, a/k/a "Pimp."**

54.   On or about October 5, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Chrishauna Gladden, by shooting her with a pistol.

55.   On or about October 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and **SEAN COATES, a/k/a "Birdy,"** while armed with a pistol, assaulted Ronald Sowells with intent to kill him.

18

App 650

56. On or about November 13, 1996, a co-conspirator not indicted herein, possessed a loaded Glock .40 caliber semi-automatic pistol as he fled from police officers who were attempting to stop him.

57. On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, and in perpetrating and attempting to perpetrate the crime of attempted armed robbery, killed Alonzo Gaskins, Darnell Mack and Melody Anderson, by shooting them with a pistol.

58. On or about November 21, 1996, in the area of 11th Street, S.E., and Interstate 295, in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** led police officers on a high-speed automobile chase and then assaulted a police officer with a loaded Browning 9mm semi-automatic pistol.

59. Between in or about April 1997 and on or about June 17, 1997, within the District of Columbia and the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, conspired to murder Robert Smith, a/k/a "Butchie," in order to prevent Smith from implicating them in the triple murder they committed in Temple Hills on November 17, 1996.

19

(**Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances**, in violation of Title 21, United States Code, Section 846)

**COUNT TWO**

**RICO CONSPIRACY**

### A.    The Enterprise

1.    From in or about sometime in 1988, up through and including in or about March 1999, defendants **VINCENT HILL, a/k/a "Vito," JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, were members and associates of a drug trafficking organization which was based in the District of Columbia and elsewhere and which operated in various locations including, but not limited to, areas within the Greenleaf Gardens housing complex in Southwest Washington, D.C.-- including, but not limited to, the 200 block of K Street, S.W., the 900 and 1000 blocks of Delaware Avenue, S.W., and the 900 block of 3rd Street, S.W.--the 1500 block of Canal Street, S.W., the 200 blocks of 37th Street and 37th Place, S.E.    The organization constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact.    The enterprise engaged in, and the activities of the enterprise affected, interstate and foreign commerce, and the activities of the enterprise were conducted in the District of Columbia, Maryland, Virginia and elsewhere.

20

2.    A principal goal of the organization was to obtain as much money and other things of value through the trafficking of controlled substances, including marijuana, cocaine base, also known as crack cocaine, and PCP.  It was a further goal of the enterprise to commit acts of robbery, kidnaping, murder and other acts of violence for the following purposes, among others:  to enrich the enterprise and its members; to create, maintain and control a market place for the distribution of its controlled substances; to enforce discipline among members of the enterprise; to protect the enterprise and its members from detection, apprehension and prosecution by law enforcement; to intimidate and prevent persons from testifying as witnesses in criminal prosecutions against members of the conspiracy; to prevent, thwart, and retaliate against acts of violence perpetrated by rivals against the enterprise and its members; and to promote and enhance the reputation and standing of the enterprise and its members.

21

B.    Roles of the Defendants

The defendants have performed, or agreed to perform, the following roles and have committed, or agreed to commit, the following crimes--among others that are charged in later sections of this indictment--in furtherance of the enterprise:

VINCENT HILL a/k/a "Vito"

3.    **VINCENT HILL** was one of the leaders of the organization. Prior to his arrest and incarceration in 1996, he consistently sold quantities of marijuana in concert with his co-conspirators in the area of the Greenleaf Gardens public housing complex.  In addition to providing marijuana in wholesale amounts to co-conspirators and other individuals, he and co-conspirators worked together to sell retail amounts to customers who met him on the street.  **HILL** and his co-conspirators centered their street-level distribution in the area surrounding the intersection of Delaware Avenue and K Street, S.W.  **HILL** and his co-conspirators considered that distribution spot reserved for the use of himself and the co-conspirators, and they guarded against incursions by other drug sellers who tried to do business in that area without permission from **HILL** and the co-conspirators.  On occasion, **HILL** resorted to beating competitors with sticks or bats when they did not follow his orders to leave the area.  **HILL** also used firearms to settle disputes between himself and his co-conspirators and rival drug dealers.  On June 29, 1989, he shot and killed Larry Wright in the area of First and

22

App 654

O Streets, S.W.  On October 22, 1993, he planned and participated with co-conspirators in the attempted robbery and shooting of another drug dealer named Anthony Pryor.

### JEROME MARTIN a/k/a "Pimp"

4.  **JEROME MARTIN** grew up in Southwest Washington, D.C. and has been associated with most of the co-conspirators since his childhood.  Since approximately 1989, he has routinely engaged in drug distribution--including street-level sales of marijuana in the area of the 200 block of K Street, S.W.--carried firearms and resorted to violence to fend off real or perceived threats to himself and his co-conspirators.  In approximately 1991, **MARTIN** and several of his co-conspirators expanded their narcotics operation over to the area of 37th Place, S.E.  After being introduced to that neighborhood by a friend who had moved there from Southwest, D.C. and getting acquainted with the local narcotics dealers, **MARTIN** quickly became one of the leading distributors of crack cocaine in the area.  He and his co-conspirators set up a network of street-level dealers who sold crack cocaine for them.  This narcotics business netted **MARTIN** handsome profits which permitted him to buy luxury automobiles and to live in a luxury apartment.

On August 6, 1991, **MARTIN** and co-conspirator **SAMUEL CARSON** initiated a violent feud with a group of drug dealers in the 58th Street neighborhood when they killed a member of that group named Anthony Fortune in retaliation for Fortune having earlier robbed

23

**MARTIN** and others at gunpoint. The ensuing feud resulted in a series of shootings between **MARTIN** and his co-conspirators who were involved in drug distribution in the 37th Place neighborhood and friends of Anthony Fortune from the 58th Street neighborhood. Over the next year, members of the rival groups routinely drove through their rivals' neighborhood and shot people who happened to be standing outside. On September 10, 1991, for example, **MARTIN, CARSON** and several co-conspirators drove through the 58th Street neighborhood and shot at two rivals. In the process, they got into a shootout with four policemen who happened to be nearby when the co-conspirators opened fire on their targets.

**MARTIN** also went to extreme efforts to avoid prosecution and conviction for the crimes he committed in furtherance of this conspiracy. When tried for a murder arising during the feud with the 58th Street group, **MARTIN** directed co-conspirators to murder persons he suspected were witnesses against him. At his request, co-conspirators staked out the houses of several prospective witnesses and murdered one witness--Ms. Chrishauna Gladden--four days prior to the commencement of **MARTIN'S** trial.

24

App 656

### SAMUEL CARSON a/k/a "Chin"

5.    **SAMUEL  CARSON**  associated  closely  with  the  co-
conspirators, and participated in numerous acts of violence in
furtherance of the conspiracy. He participated with **JEROME MARTIN**
in the murder of Anthony Fortune and the drive-by shooting that was
part of the ensuing feud with Fortune's friends from the 58th
Street neighborhood.  He also sought to help his co-conspirators
avoid prosecution for their crimes by executing the witnesses
against them.  In 1995, he and co-conspirators **WILLIAM KYLE SWEENEY**
and **SEAN COATES** tried to locate and kill Kenneth Adams, who was a
witness in the murder trial of co-conspirator **MAURICE PROCTOR**.  On
October 5, 1996, he killed Chrishauna Gladden at **MARTIN'S** behest,
four days before she was scheduled to testify in the trial of a
case in which **MARTIN** was charged with murder.    Carson also
participated in other shootings and murders that were committed in
furtherance of the racketeering conspiracy, as charged in this and
subsequent counts of this indictment, between 1991 and his arrest
and incarceration in 1997.

### WILLIAM KYLE SWEENEY a/k/a "Draper"

6.    **WILLIAM KYLE SWEENEY** actively distributed narcotics and
participated in numerous shootings and robberies in concert with
the  co-conspirators  in  this  case  and  in  furtherance  of  the
conspiracy. He routinely carried firearms and used them to commit
robberies in order to enrich himself and his co-conspirators, to

25

App 657

kill persons he perceived as a threat to himself or his co-conspirators and to enhance the reputation of the membership of the conspiracy. **SWEENEY** committed a number of shootings in furtherance of this conspiracy, including shootings that were directed at persons from the Condon Terrace neighborhood of Southeast Washington, D.C. who were feuding with **SWEENEY** and his co-conspirators; the kidnaping, shooting and attempted robbery of Anthony Pryor on October 22, 1993; the murder of Donnell Whitfield on September 26, 1994; and the murder and attempted robbery of three persons in Temple Hills, Maryland on November 17, 1996.

## SEAN COATES a/k/a "Birdy"

7.    **SEAN COATES** was a central member of the conspiracy, and he consistently participated in narcotics distribution with the co-conspirators and committed violent acts related to the conspiracy. For example, on April 28, 1990, he and co-conspirators kidnaped Norman Yusef Simmons in order to collect ransom from Simmons' brother, who was a successful rival drug dealer. On June 28, 1992, he participated in the attempted murder of Michael Jones, who was a witness against co-conspirator Clifton Edwards. On October 22, 1993, he joined **SWEENEY** and other co-conspirators in the abduction, attempted robbery and shooting of Anthony Pryor, another rival drug dealer. On October 30, 1996, **COATES** ambushed and fired two gunshots into Ronald Sowells-a member of a rival gang--as retaliation for Sowells' alleged participation in the shooting of

26

App 658

co-conspirator **VINCENT HILL** on July 10, 1996.    On November 17,
1996, he participated in the robbery and triple murder of three
victims in Temple Hills, Maryland.

    C.    <u>The RICO Conspiracy</u>

    8.    From in or about sometime in at least 1988, the exact
date being unknown to the Grand Jury, and continuing thereafter up
to and including March 1999, in the District of Columbia, Virginia,
Maryland and elsewhere, the defendants, **VINCENT HILL, a/k/a "Vito,"**
**JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," WILLIAM**
**KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** together
with other persons known and unknown, being persons employed by and
associated with the enterprise described above, which enterprise
was engaged in, and the activities of which affected, interstate
and foreign commerce, unlawfully, knowingly and intentionally did
combine, conspire, confederate and agree with each other, and with
persons known and unknown to the Grand Jury, to violate Title 18,
United States Code, Section 1962(c); that is, to conduct and
participate, directly and indirectly, in the conduct of the affairs
of the enterprise through a pattern of racketeering activity, as
that term is defined by Title 18, United States Code, Section
1961(1) and 1961(5), consisting of the following:

    (a) offenses involving distribution and possession with intent
to distribute controlled substances, including marijuana, cocaine
base, also known as crack cocaine, and PCP, in violation of Title

27

App 659

21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2;

(b) conspiracy to distribute and to possess with intent to distribute controlled substances, including marijuana, cocaine base, also known as crack cocaine, and PCP, in violation of Title 21, United States Code, Section 846; and

(c) acts and threats involving murder, kidnaping and robbery, in violation of Title 22, D.C. Code, Sections 103, 105, 105a, 106, 501, 503, 2101, 2401, 2901, 2902, 3202 and 3204(b); Title 18, United States Code, Section 1959; and Title 27, Maryland Code, Sections 12, 337, 407, 410, 486, and 488.

9.  It was further part of the conspiracy that each defendant agreed that a co-conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

D.  The Pattern of Racketeering Activity

10.  The pattern of racketeering activity through which the defendants conspired to conduct and participate in the conduct of the affairs of the enterprise consisted of racketeering acts set forth below, which are set forth in the corresponding overt acts (OA) of Count One and the corresponding counts of this indictment, which are realleged and incorporated by reference herein:

28

**Racketeering Act 1**        Act Involving Distribution of a
                              Controlled Substance
                              (Conspiracy)

From on or about sometime in 1988, the exact date being

unknown to the Grand Jury, and continuing thereafter up to and

including September 1998, in the District of Columbia and

elsewhere, the defendants, **VINCENT HILL, a/k/a "Vito," JEROME**

**MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE**

**SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** did

unlawfully, knowingly and intentionally combine, conspire,

confederate and agree together, with each other, with co-

conspirators not indicted herein, and with others known and unknown

to the Grand Jury, to unlawfully, knowingly, and intentionally

possess with intent to distribute and to distribute narcotic

controlled substances, in violation of Title 21, United States

Code, Section 846, as set forth more fully in Count One of this

indictment.

**Racketeering Acts 2-20**     Acts Involving Distribution of a
                               Controlled Substance
                               (Distribution)

On or about the dates set forth below, in the District of

Columbia, Maryland and elsewhere, the defendants named below did,

in violation of Title 21, United States Code, Section 841(a)(1),

and Title 18, United States Code, Section 2, unlawfully, knowingly

and intentionally distribute a mixture and substance containing a

detectable amount of marijuana, a Schedule I controlled substance,

29

App 661

as more fully set forth in the specified overt acts of Count One,

which are realleged and incorporated by reference herein:

| Rack. Act | Defendant or Co-Conspirator | Nature of Offense/Date | Overt Act | Violation |
|-----------|-----------------------------|------------------------|-----------|-----------|
| 2 | **VINCENT HILL** | Dist. Marijuana (October 4, 1995) | OA 31 | 21 U.S.C. §841 (a)(1) |
| 3 | **VINCENT HILL** | Dist. Marijuana (November 2, 1995) | OA 32 | 21 U.S.C. §841 (a)(1) |
| 4 | **VINCENT HILL** | Dist. Marijuana (November 3, 1995) | OA 33 | 21 U.S.C. §841 (a)(1) |
| 5 | **VINCENT HILL JEROME MARTIN** | Dist. Marijuana (November 15, 1995) | OA 34 | 21 U.S.C. §841 (a)(1) |
| 6 | **VINCENT HILL** | Dist. Marijuana (November 16, 1995) | OA 35 | 21 U.S.C. §841 (a)(1) |
| 7 | **VINCENT HILL** | Dist. Marijuana (November 28, 1995) | OA 36 | 21 U.S.C. §841 (a)(1) |
| 8 | **VINCENT HILL** | Dist. Marijuana (November 29, 1995) | OA 37 | 21 U.S.C. §841 (a)(1) |
| 9 | **JEROME MARTIN** | Dist. Marijuana (December 6, 1995) | OA 38 | 21 U.S.C. §841 (a)(1) |
| 10 | **VINCENT HILL** | Dist. Marijuana (December 8, 1995) | OA 39 | 21 U.S.C. §841 (a)(1) |
| 11 | **JEROME MARTIN** | Dist. Marijuana (December 13, 1995) | OA 40 | 21 U.S.C. §841 (a)(1) |
| 12 | **VINCENT HILL** | Dist. Marijuana (December 13, 1995) | OA 41 | 21 U.S.C. §841 (a)(1) |
| 13 | **VINCENT HILL** | Dist. Marijuana (December 13, 1995) | OA 42 | 21 U.S.C. §841 (a)(1) |
| 14 | **VINCENT HILL** | Dist. Marijuana (December 15, 1995) | OA 43 | 21 U.S.C. §841 (a)(1) |

30

App 662

| 15 | **VINCENT HILL** | Dist. Marijuana   OA 46 | 21 U.S.C. §841 |
|    |                  | (February 14, 1996)     | (a)(1)         |

| 16 | **VINCENT HILL** | Dist. Marijuana   OA 47 | 21 U.S.C. §841 |
|    |                  | (February 20, 1996)     | (a)(1)         |

| 17 | **JEROME MARTIN** | Dist. Marijuana   OA 48 | 21 U.S.C. §841 |
|    |                   | (February 26, 1996)     | (a)(1)         |

| 18 | **JEROME MARTIN** | Dist. Marijuana   OA 49 | 21 U.S.C. §841 |
|    |                   | (February 26, 1996)     | (a)(1)         |

| 19 | **VINCENT HILL** | Dist. Marijuana   OA 50 | 21 U.S.C. §841 |
|    |                  | (March 5, 1996)         | (a)(1)         |

| 20 | **VINCENT HILL** | Dist. Marijuana   OA 51 | 21 U.S.C. §841 |
|    |                  | (March 15, 1996)        | (a)(1)         |

**Racketeering Acts 21-22**    <u>Acts Involving Distribution of a</u>
<u>Controlled Substance</u>
<u>(Possession with Intent to Distribute)</u>

On or about the dates set forth below, in the District of Columbia, Maryland and elsewhere, the defendants named below, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2, unlawfully, knowingly and intentionally did possess with intent to distribute a mixture and substance containing a detectable amount of a Schedule I or II controlled substance, as more fully set forth in the specified overt acts of Count One, which are realleged and incorporated by reference herein:

31

| Rack.<br>Act | Defendant or<br>Co-Conspirator | Nature of<br>Offense/Date | Overt Act | Violation |
|------|------|------|------|------|
| 21 | **VINCENT HILL** | PWID Marijuana<br>(September 27, 1995) | OA 30 | 21 U.S.C.§841<br>(a)(1) |
| 22 | **JEROME MARTIN** | PWID Marijuana<br>(February 1, 1996) | OA 45 | 21 U.S.C.§841<br>(a)(1) |

**Racketeering Acts 23-50**   Acts and Threats Involving
                              Murder, Kidnaping and Robbery

On or about the dates set forth below, in the District of
Columbia, Maryland and elsewhere, the defendants named below in
Acts 23-50, in violation of Title 22, D.C. Code, Sections 103, 105,
105a, 106, 501, 503, 2101, 2401, 2901, 2902, 3202 and 3204(b);
Title 18, United States Code, Section 1959; and Title 27, Maryland
Code, Sections 12, 337, 407, 410, 486, and 488, did commit acts and
threats involving murder, kidnaping and robbery, as set forth
below.

A number of the acts and threats involving murder, kidnaping
and robbery through which the defendants conspired to conduct and
participate in the conduct of the affairs of the racketeering
enterprise related to violent feuds between the defendants'
enterprise and other criminal groups in and around the District of
Columbia. This indictment charges the defendants with committing
racketeering acts of murder, kidnaping and robbery in relation to
four separate feuds. In addition, it charges the defendants with
"General Racketeering Acts"--acts of murder, kidnaping and robbery
committed in furtherance of the racketeering enterprise that are

32

not related to these three feuds. The acts and threats involving murder, kidnaping and robbery are set forth in Racketeering Acts 24 through 53.

### THE 37TH PLACE/58TH STREET FEUD

#### Racketeering Act 23

On or about August 6, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Anthony Fortune, by shooting him with a pistol on or about August 6, 1991, thereby causing injuries from which Anthony Fortune died on or about August 6, 1991, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

#### Racketeering Act 24

The defendants named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 24:

(a) On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Keith Bradley, a/k/a "PeeWee," with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(b) On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Jimmy Thomas, Jr., a/k/a "Sugarspoon," with intent to

33

murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(c)   On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Officer Adrian Treadwell with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(d)   On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Officer Edward McDonald with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(e)   On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Officer Marc Little with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(f)   On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Officer Alvin Ray with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

34

App 666

**Racketeering Act 25**

The defendant named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 25:

(a)  On or about August 29, 1992, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Curtis Edwards, by shooting him with a pistol on or about August 29, 1992, thereby causing injuries from which Curtis Edwards died on or about August 29, 1992, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

(b)  On or about August 29, 1992, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein, while armed with a pistol, assaulted Richard Burton with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(c)  On or about August 29, 1992, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein, while armed with a pistol, assaulted Keith Jones with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

<em>THE SOUTHWEST/CONDON TERRACE FEUD</em>

**Racketeering Act 26**

The defendants named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 26:

35

(a) On or about June 20, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, assaulted Jermaine Hall with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(b) On or about June 20, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, assaulted Michael Jones with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

**Racketeering Act 27**

Between on or about June 20, 1992 and June 28, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, unlawfully, wilfully, and knowingly did conspire and agree with each other to commit the crime of first degree murder while armed (premeditated) of Michael Jones in order to prevent Michael Jones from implicating and testifying against a co-conspirator not indicted herein regarding the shooting of Jermaine Hall on June 20, 1992, in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 27 was for the co-conspirators to murder Michael Jones to prevent him from testifying against the co-conspirator not indicted herein. In furtherance of this conspiracy and to effect the object thereof,

36

**SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, committed the following overt acts in the District of Columbia:

(1)    After the arrest of the co-conspirator not indicted herein on June 20, 1992, the co-conspirators discussed over the telephone the fact that Michael Jones was a witness against the co-conspirator not indicted herein and agreed that they needed to kill Michael Jones to prevent the co-conspirator not indicted herein from being convicted for the shooting of Jermaine Hall.

(2)    On or about June 28, 1992, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, drove to the area of the 1000 block of Mississippi Avenue, S.E. where they spotted Michael Jones.

(3)    On or about June 28, 1992, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, approached Michael Jones, chased him down and shot him multiple times.

### Racketeering Act 28

On or about June 28, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Michael Jones with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

37

**Racketeering Act 29**

On or about July 7, 1993, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Glenn Jenkins, by shooting him with a pistol on or about July 7, 1993, thereby causing injuries from which Glenn Jenkins died on or about July 7, 1993, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

### *THE SOUTHWEST/KENTUCKY COURTS FEUD*

**Racketeering Act 30**

Between in or about 1991 and on or about June 20, 1992, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirators not indicted herein, while armed with pistols, assaulted persons in the Kentucky Courts neighborhood of Southeast Washington, D.C. whose identities are unknown to the Grand Jury with intent to murder them, in violation of 22 D.C. Code Sections 105, 503 and 3202.

**Racketeering Act 31**

Between in or about 1991 and on or about June 20, 1992, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, assaulted persons in the Kentucky Courts neighborhood of Southeast Washington, D.C. whose identities

38

are unknown to the Grand Jury with intent to murder them, in violation of 22 D.C. Code Sections 105, 503 and 3202.

*THE K STREET/L STREET FEUD*

**Racketeering Act 32**

On or about June 29, 1989, within the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Larry Wright, Jr., by shooting him with a pistol on or about June 29, 1989, thereby causing injuries from which Larry Wright, Jr. died on or about June 29, 1989, in violation of 22 D.C. Code Sections 2401 and 3202.

**Racketeering Act 33**

On or about April 28, 1990, in the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, seized, confined, kidnaped, abducted and carried away Norman Yusef Simmons, with intent to hold and detain Norman Yusef Simmons for ransom, reward and otherwise, in violation of 22 D.C. Code Sections 105, 2101 and 3202.

**Racketeering Act 34**

In or about July 1996, in the Commonwealth of Virginia, **SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, knowingly did conspire and agree with each other and with others to commit the crime of first degree murder while armed (premeditated) of members of a rival criminal group which operated in the area of

39

I.I,

App 671

L Street, S.W., in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 34 was for the conspirators to retaliate against the members of the criminal group from L Street, S.W. for their alleged responsibility for the July 6, 1996, murder of an individual's brother.

In furtherance of this conspiracy and to effect the object thereof, **SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, committed the following overt act in the District of Columbia:

(1) On or about October 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, participated in the shooting of Ronald Sowells, a recognized member of the L Street criminal group.

**Racketeering Act 35**

On or about October 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and **SEAN COATES, a/k/a "Birdy,"** while armed with a pistol, assaulted Ronald Sowells with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

*GENERAL RACKETEERING ACTS*

**Racketeering Act 36**

The defendant named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 36:

40

I I.

App 672

(a) On or about December 19, 1989, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Maurice Hallman, by shooting him with a pistol on or about December 19, 1989, thereby causing injuries from which Maurice Hallman died on or about December 19, 1989, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

(b) On or about December 19, 1989, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Leonard Hyson, by shooting him with a pistol on or about December 19, 1989, thereby causing injuries from which Leonard Hyson died on or about December 19, 1989, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

## Racketeering Act 37

The defendant named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 37:

(a) On or about March 22, 1991, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Teresa Thomas, by shooting her with a pistol on or about March 22, 1991, thereby causing injuries from which Teresa Thomas died on or

41

I.I.

App 673

about March 22, 1991, in violation of 22 D.C. Code Sections 2401 and 3202.

(b)   On or about March 22, 1991, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Terita Lucas, by shooting her with a pistol on or about March 22, 1991, thereby causing injuries from which Terita Lucas died on or about March 22, 1991, in violation of 22 D.C. Code Sections 2401 and 3202.

### Racketeering Act 38

On or about April 7, 1992, in the state of Maryland, **SAMUEL CARSON,** while armed with a dangerous weapon, that is, an automobile, assaulted Ofc. Alfred Moss of the Prince George's County Police Department with intent to murder him, in violation of 27 M.D. Code Section 12.

### Racketeering Act 39

The defendants named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 39:

(a)   On or about October 22, 1993, in the state of Maryland, **VINCENT HILL, a/k/a "Vito," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and other co-conspirators not indicted herein, while armed with pistols, did attempt, by violence and by putting in fear, to take and carry away money or other valuable

42

11

App 674

property from the person of Anthony Pryor, in violation of 27 M.D. Code, Sections 486 and 488.

(b)   On or about October 22, 1993, in the state of Maryland, **VINCENT HILL, a/k/a "Vito," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and other co-conspirators not indicted herein, while armed with pistols, seized, confined, kidnaped, abducted and carried away Anthony Pryor, with intent to hold and detain Anthony Pryor, in violation of 27 M.D. Code, Section 337.

(c)   On or about October 22, 1993, in the state of Maryland, **VINCENT HILL, a/k/a "Vito," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and other co-conspirators not indicted herein, while armed with pistols, assaulted Anthony Pryor with intent to murder him, in violation of 27 M.D. Code, Section 12.

## Racketeering Act 40

On or about October 28, 1993, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, assaulted Roland Brown with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

## Racketeering Act 41

On or about April 9, 1994, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and other co-conspirators not indicted herein, unlawfully, willfully, and knowingly did conspire and agree with each other and with others to commit the crime of first degree

43

I.I.

App 675

murder while armed (premeditated) of Steven Dunbar, in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 41 was to murder Steven Dunbar. In furtherance of this conspiracy and to effect the object thereof, **SAMUEL CARSON, a/k/a "Chin,"** and other co-conspirators not indicted herein, committed the following overt acts in the District of Columbia:

(1) Prior to the murder of Steven Dunbar on the evening of April 9, 1994, two co-conspirators not indicted herein had a conversation in which they agreed to murder Steven Dunbar that night and one of the co-conspirators not indicted herein told the other co-conspirator not indicted herein that Dunbar was sitting up the street.

(2) Moments prior to the murder of Steven Dunbar on the evening of April 9, 1994, a co-conspirator not indicted herein produced two handguns and gave one to the other co-conspirator not indicted herein for the purpose of murdering Steven Dunbar.

(3) Moments prior to the murder of Steven Dunbar, **SAMUEL CARSON, a/k/a "Chin,"** arranged for a co-conspirator not indicted herein to wait in a parked car nearby where Steven Dunbar was sitting so that that co-conspirator could be ready to drive the murder weapons away from the scene after the murder was committed.

(4) While a co-conspirator not indicted herein waited nearby, a co-conspirator not indicted herein walked up behind

44

I I.

Steven Dunbar in the 200 block of K Street, S.W., Washington, D.C., and murdered Dunbar by shooting him approximately seven times.

(5) Within seconds after the co-conspirator not indicted herein shot Steven Dunbar, co-conspirators not indicted herein, opened fire on an eyewitness to the murder named Rogest Webb in order to prevent Rogest Webb from implicating and testifying against the co-conspirators in the murder of Steven Dunbar.

(6) After the co-conspirator not indicted herein shot Steven Dunbar, he handed the murder weapon to a co-conspirator not indicted herein.

(7) After the co-conspirator not indicted herein handed the murder weapon to another co-conspirator not indicted herein, they both went into an alley and met other co-conspirators.

(8) A co-conspirator not indicted herein then took the two handguns from the co-conspirator not indicted herein and ran to the car that was waiting nearby.

(9) The co-conspirator not indicted herein who had been told by **SAMUEL CARSON, a/k/a "Chin,"** to park nearby then drove the co-conspirator not indicted herein who was carrying the two handguns away from the area.

### Racketeering Act 42

On or about June 26, 1994, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, assaulted

45

I.I.

App 677

Ulysses English with intent to murder him, in violation of 22 D.C. Code Sections 503 and 3202.

## Racketeering Act 43

On or about September 26, 1994, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Donnell Whitfield by shooting him with a pistol on or about September 26, 1994, thereby causing injuries from which Donnell Whitfield died on or about September 26, 1994, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

## Racketeering Act 44

On or about May 30, 1995, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** while armed with a pistol, assaulted James Coulter with intent to murder him, in violation of 22 D.C. Code Sections 503 and 3202.

## Racketeering Act 45

Between in or about 1996 and in or about 1997, within the District of Columbia and the Commonwealth of Virginia, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and another co-conspirator not indicted herein, unlawfully, wilfully, and knowingly did conspire and agree with each other to commit the crime of first degree murder while

46

I I.

armed (premeditated), in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 45 was for the conspirators to eliminate those people who were expected to testify as witnesses for the government in the murder trial of <u>United States v. Maurice Proctor a/k/a "PooPoo</u>," Criminal Case No. F9885-94, in the District of Columbia Superior Court, by killing the witnesses prior to their testimony.

In furtherance of this conspiracy and to effect the object thereof, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and another co-conspirator not indicted herein committed the following overt acts in the District of Columbia and the Commonwealth of Virginia:

(1) **CARSON, SWEENEY** and a co-conspirator not indicted herein discussed a plan whereby they would kill Kenneth Adams, an individual who was expected to testify at the trial of a co-conspirator.

(2) **CARSON, SWEENEY, COATES** and a co-conspirator not indicted herein drove to an address in Centerville, Virginia which **SWEENEY** believed to be the residence of Kenneth Adams in order to find and kill Kenneth Adams.

(3) **CARSON, SWEENEY** and a co-conspirator not indicted herein drove to the area of Kenneth Adams' residence in Centerville, Virginia and stashed a gun in a nearby wooded area in

47

I.I.

Case 1:98-cr-00329-RCL    Document 760    Filed 07/02/01    Page 48 of 79

order to facilitate future attempts to hunt for and kill Kenneth Adams.

## Racketeering Act 46

On or about August 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, assaulted Popa Mark Phillip with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

## Racketeering Act 47

In or about October, 1996, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, unlawfully, willfully, and knowingly did conspire and agree with each other and with others to commit the crime of first degree murder while armed (premeditated) of persons who were expected to testify as witnesses for the government in the murder trial of United States v. Jerome Martin, a/k/a "Pimp," Criminal Case No. F8414-94, in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 47 was for the conspirators to eliminate those people who were expected to testify as witnesses for the government in the murder trial of United States v. Jerome Martin, a/k/a "Pimp," Criminal

48

I I.

(Page 114 of Total)

Case No. F8414-94, in the District of Columbia Superior Court, by killing them prior to their testimony.

In furtherance of this conspiracy and to effect the object thereof, **JEROME MARTIN, a/k/a** "Pimp," and **SAMUEL CARSON, a/k/a** "**Chin**," and other co-conspirators not indicted herein, committed the following overt acts in the District of Columbia:

(1) Shortly before the trial, **SAMUEL CARSON, a/k/a** "**Chin**," told a co-conspirator not indicted herein that he needed to "bust" a woman who lived on 37th Place, S.E. because that woman was scheduled to testify at "Pimp's trial."

(2) **SAMUEL CARSON, a/k/a** "**Chin**," enlisted the support of a co-conspirator not indicted herein in eliminating the witnesses at "Pimp's trial," telling him that they had to approach eliminating the witnesses like a job and that they had to do whatever was necessary to kill the witnesses.

(3) On several occasions in 1996, **SAMUEL CARSON, a/k/a** "**Chin**," and that co-conspirator not indicted herein waited outside the witnesses' homes in an attempt to locate and ambush them.

(4) On or about October 5, 1996--four days before the trial of <u>United States v. Jerome Martin, a/k/a "Pimp,"</u> Criminal Case No. F8414-94--**SAMUEL CARSON, a/k/a** "**Chin**," and that co-conspirator not indicted herein spoke to an associate and learned that Chrishauna Gladden, one of the potential witnesses on the list

49

I I.

that **JEROME MARTIN, a/k/a "Pimp,"** had provided was attending a party at a house on 37th Place, S.E.

(5) On or about October 5, 1996, **SAMUEL CARSON, a/k/a** "Chin," and that co-conspirator not indicted herein waited in an abandoned house across the alley from the house where the party was taking place until Chrishauna Gladden emerged from the house. When Chrishauna Gladden walked out the door, **SAMUEL CARSON, a/k/a** "Chin," ran out of the abandoned house and shot Ms. Gladden to death.

## Racketeering Act 48

On or about October 5, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Chrishauna Gladden, by shooting her with a pistol on or about October 5, 1996, thereby causing injuries from which Chrishauna Gladden died on or about October 5, 1996, in violation of 22 D.C. Code Sections 2401 and 3202.

## Racketeering Act 49

The defendant named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 49:

(a)  On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, did attempt, by violence and by

50

I I.

App 682

putting in fear, to take and carry away money or·other valuable property from the persons of Alonzo Gaskins, Darnell Mack and Melody Anderson, in violation of 27 M.D. Code, Sections 486 and 488.

(b)   On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, in perpetrating or attempting to perpetrate the crime of attempted armed robbery as set forth in Paragraph a) of Racketeering Act 49, killed Alonzo Gaskins by shooting him with a pistol, thereby causing injuries from which Alonzo Gaskins died on or about November 17, 1996, in violation of 27 M.D. Code, Section 410.

(c)   On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, in perpetrating or attempting to perpetrate the crime of attempted armed robbery as set forth in Paragraph a) of Racketeering Act 49, killed Darnell Mack by shooting him with a pistol, thereby causing injuries from which Darnell Mack died on or about November 17, 1996, in violation of 27 M.D. Code, Section 410.

(d)   On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper,"**

51

I I.

App 683

**SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, in perpetrating or attempting to perpetrate the crime of attempted armed robbery as set forth in Paragraph a) of Racketeering Act 49, killed Melody Anderson by shooting her with a pistol, thereby causing injuries from which Melody Anderson died on or about November 17, 1996, in violation of 27 M.D. Code, Section 410.

(e)   On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein,  while armed with a pistol, purposely and with deliberate and premeditated malice, killed Alonzo Gaskins by shooting him with a pistol, thereby causing injuries from which Alonzo Gaskins died on or about November 17, 1996, in violation of 27 M.D. Code, Section 407.

(f)   On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein,  while armed with a pistol, purposely and with deliberate and premeditated malice, killed Darnell Mack by shooting him with a pistol, thereby causing injuries from which Darnell Mack died on or about November 17, 1996, in violation of 27 M.D. Code, Section 407.

App 684

(q) On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Melody Anderson by shooting her with a pistol, thereby causing injuries from which Melody Anderson died on or about November 17, 1996, in violation of 27 M.D. Code, Section 407.

## Racketeering Act 50

Between in or about April 1997 and on or about June 17, 1997, within the District of Columbia and the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, knowingly did conspire and agree with each other and with others to commit the crime of first degree murder while armed (premeditated) of Robert Smith, a/k/a "Butchie," in order to prevent Robert Smith from implicating them in the murders of Alonzo Gaskins, Darnell Mack and Melody Anderson on November 17, 1996, in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 50 was for the conspirators to prevent Robert Smith from implicating and testifying against them regarding the triple murder on November 17, 1996. In furtherance of this conspiracy and to effect the object thereof, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY,**

53

11.

App 685

a/k/a "**Draper**," and a co-conspirator not indicted herein, committed the following overt acts in the District of Columbia and the state of Maryland:

(1) At some point after his arrest on April 20, 1997, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** told **SAMUEL CARSON, a/k/a "Chin,"** that he had admitted to Robert Smith, a/k/a "Butchie," that they had committed the triple murder on November 17, 1996 and asked **SAMUEL CARSON, a/k/a "Chin,"** to kill Smith.

(2) At some point after that conversation, **SAMUEL CARSON, a/k/a "Chin,"** told a co-conspirator not indicted herein that they needed to kill Robert Smith, and that they would not have to worry about being implicated in the November 17, 1996 triple murder once Robert Smith was dead.

(3) At some point after **SAMUEL CARSON, a/k/a "Chin,"** solicited the co-conspirator not indicted herein to murder Robert Smith, those two men spotted Robert Smith on Half Street, S.W., Washington, D.C.

(4) After spotting Robert Smith, **SAMUEL CARSON, a/k/a "Chin,"** and the co-conspirator not indicted herein drove to Carson's house, where Carson retrieved a gun and a hooded sweatshirt.

(5) **SAMUEL CARSON, a/k/a "Chin,"** and the co-conspirator not indicted herein then devised a plan whereby the following would take place: (a) the co-conspirator would drop **SAMUEL CARSON, a/k/a**

54

I I.

"Chin," off near where they had spotted Robert Smith; (b) **SAMUEL CARSON, a/k/a "Chin,"** would shoot Robert Smith to death and run back to the car; (c) the co-conspirator not indicted herein would then drive over the South Capitol Street bridge from which they would throw the gun in the river; and (d) they would continue on to the area of 37th Street, S.E. where they would establish an alibi for themselves by standing outside and being seen by other persons who could later say that they were in that area and not around Half Street, S.W. on the day of Robert Smith's murder.

(6) In accordance with their plan, the co-conspirator not indicted herein dropped **SAMUEL CARSON, a/k/a "Chin,"** in the 1400 block of South Capitol Street, S.W.

(7) **SAMUEL CARSON, a/k/a "Chin,"** walked through an alley from the 1400 block of South Capitol Street, S.W. toward where they had seen Robert Smith on Half Street, S.W.

(8) **SAMUEL CARSON, a/k/a "Chin,"** came back to the car a short time later, telling the co-conspirator not indicted herein that he had been unable to commit the murder as Robert Smith was no longer on Half Street, S.W.

(**Conspiracy to Participate in Racketeer Influenced Corrupt Organization**, in violation of Title 18, United States Code, Section 1962(d))

55

I.I.

App 687

*JUNE 29, 1989 MURDER OF LARRY WRIGHT*

## COUNT THREE

### FIRST-DEGREE MURDER WHILE ARMED OF LARRY WRIGHT

On or about June 29, 1989, within the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Larry Wright by shooting him with a pistol on or about June 29, 1989, thereby causing injuries from which Larry Wright died on or about June 29, 1989.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 2401 and 3202)

*DECEMBER 19, 1989 MURDERS OF MAURICE HALLMAN AND LEONARD HYSON*

## COUNT FOUR

### FIRST-DEGREE MURDER WHILE ARMED OF MAURICE HALLMAN

On or about December 19, 1989, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Maurice Hallman, by shooting him with a pistol on or about December 19, 1989, thereby causing injuries from which Maurice Hallman died on or about December 19, 1989.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 105, 2401 and 3202)

56

## COUNT FIVE

### FIRST-DEGREE MURDER WHILE ARMED OF LEONARD HYSON

On or about December 19, 1989, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Leonard Hyson, by shooting him with a pistol on or about December 19, 1989, thereby causing injuries from which Leonard Hyson died on or about December 19, 1989.

**(First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 105, 2401 and 3202)

### MARCH 22, 1991 MURDERS OF TERESA THOMAS AND TERITA LUCAS

## COUNT SIX

### FIRST-DEGREE MURDER WHILE ARMED OF TERESA THOMAS

On or about March 22, 1991, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Teresa Thomas, by shooting her with a pistol on or about March 22, 1991, thereby

57

I I.

App 689

causing injuries from which Teresa Thomas died on or about March 22, 1991.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 2401 and 3202)

### COUNT SEVEN

### FIRST-DEGREE MURDER WHILE ARMED OF TERITA LUCAS

On or about March 22, 1991, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Terita Lucas, by shooting her with a pistol on or about March 22, 1991, thereby causing injuries from which Terita Lucas died on or about March 22, 1991.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 2401 and 3202)

### *AUGUST 6, 1991 MURDER OF ANTHONY FORTUNE*

### COUNT EIGHT

### FIRST-DEGREE MURDER WHILE ARMED OF ANTHONY FORTUNE

On or about August 6, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Anthony Fortune, by shooting him with a pistol on or about August 6, 1991, thereby causing injuries from which Anthony Fortune died on or about August 6, 1991.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 105, 2401 and 3202)

58

*SEPTEMBER 10, 1991 SHOOTING AT 60TH AND EAST CAPITOL STREETS*

### COUNT NINE

### ASSAULTING, RESISTING AND INTERFERING WITH
### OFC. LITTLE WITH A DANGEROUS WEAPON

On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and co-conspirators not indicted herein, without justifiable and excusable cause, and with deadly and dangerous weapons, that is, pistols, did assault, resist, oppose, impede, and interfere with Marc Little, a member of a police force operating in the District of Columbia, knowing him to be a police officer, while Marc Little was engaged in and on account of the performance of his official duties.

**(Assaulting, Resisting and Interfering with a Police Officer with a Dangerous Weapon,** in violation of Title 22, D.C. Code, Sections 105 and 505(b))

*JULY 7, 1993 MURDER OF GLENN JENKINS*

### COUNT TEN

### FIRST-DEGREE MURDER WHILE ARMED OF GLENN JENKINS

On or about July 7, 1993, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Glenn Jenkins, by shooting him with a pistol on or about July 7, 1993,

59

| |

App 691

thereby causing injuries from which Glenn Jenkins died on or about July 7, 1993.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 105, 2401 and 3202)

<u>OCTOBER 22, 1993 KIDNAPING AND SHOOTING OF ANTHONY PRYOR</u>

**COUNT ELEVEN**

**ATTEMPTED MURDER IN AID OF RACKETEERING ACTIVITY OF ANTHONY PRYOR**

The defendants named below committed the following violent crime in aid of racketeering activity:

(1) At all times relevant to this Indictment, the racketeering enterprise, as more fully described in paragraphs One through Ten of Count Two of this Indictment, which are realleged and incorporated by reference as though set forth fully herein, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact which was engaged in, and the activities of which affected, interstate and foreign commerce.

(2) At all times relevant to this Indictment, the above-described enterprise, through its members and associates, engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), namely, offenses involving the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance, in violation of Title 21, United States Code, Sections 841 and 846,

60

I I

and acts involving murder, kidnaping and robbery, in violation of Title 22, D.C. Code, Sections 103, 105, 105a, 106, 501, 503, 2101, 2401, 2901 and 3202 and Title 27, Maryland Code, Sections 12, 337, 407, 410, 486, and 488.

(3)   On or about October 22, 1993, in the state of Maryland, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **VINCENT HILL, a/k/a "Vito,"** **WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and others unknown to the Grand Jury unlawfully, willfully and knowingly, while armed with pistols, attempted to kidnap and murder, and assaulted Anthony Pryor with a dangerous weapon resulting in serious bodily injury, in violation of 27 M.D. Code, Sections 12, 337, 486 and 488.

**(Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Sections 2 and 1959(a)(3)&(5))

### *OCTOBER 28, 1993 SHOOTING OF ROLAND BROWN*

### COUNT TWELVE

### ASSAULT WITH INTENT TO KILL WHILE ARMED OF ROLAND BROWN

On or about October 28, 1993, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted

61

herein, while armed with pistols, assaulted Roland Brown with intent to kill him.

**(Assault with Intent to Kill While Armed**, in violation of Title 22, D.C. Code, Sections 501 and 3202)

### *JUNE 26, 1994 SHOOTING OF ULYSSES ENGLISH*

### COUNT THIRTEEN

### ASSAULT WITH INTENT TO KILL WHILE ARMED OF ULYSSES ENGLISH

On or about June 26, 1994, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, assaulted Ulysses English with intent to kill him.

**(Assault with Intent to Kill While Armed**, in violation of Title 22, D.C. Code, Sections 501 and 3202)

### COUNT FOURTEEN

### ATTEMPTED MURDER IN AID OF RACKETEERING ACTIVITY OF ULYSSES ENGLISH

The defendant named below committed the following violent crime in aid of racketeering activity:

(1)    Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)    On or about June 26, 1994, in the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing his position in the enterprise, an

62

I I

enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin,"** unlawfully, willfully and knowingly, while armed with a pistol, attempted to murder and assaulted Ulysses English with a dangerous weapon resulting in serious bodily injury, in violation of 22 D.C. Code, Sections 501 and 3202.

**(Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Section 1959(a)(3)&(5))

### *SEPTEMBER 26, 1994 MURDER OF DONNELL "ROBOCOP" WHITFIELD*

### COUNT FIFTEEN

### FIRST-DEGREE MURDER WHILE ARMED OF DONNELL WHITFIELD

On or about September 26, 1994, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Donnell Whitfield by shooting him with a pistol on or about September 26, 1994, thereby causing injuries from which Donnell Whitfield died on or about September 26, 1994.

**(First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 105, 2401 and 3202)

### COUNT SIXTEEN

### MURDER IN AID OF RACKETEERING ACTIVITY OF DONNELL WHITFIELD

The defendants named below committed the following violent crime in aid of racketeering activity:

63

l.l.

App 695

(1)    Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)    On or about September 26, 1994, in the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, unlawfully, willfully, knowingly, and with deliberate and premeditated malice, while armed with a pistol, killed Donnell Whitfield, by shooting him with a pistol, thereby causing injuries from which Donnell Whitfield died on or about September 26, 1994, in violation of 22 D.C. Code, Sections 105, 2401 and 3202.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Sections 2 and 1959(a)(1))

64

I I

App 696

_MAY 30, 1995 SHOOTING OF JAMES "CREEKO" COULTER_

## COUNT SEVENTEEN

### ASSAULT WITH INTENT TO KILL WHILE ARMED OF JAMES COULTER

On or about May 30, 1995, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** while armed with a pistol, assaulted James Coulter with intent to kill him.

(**Assault with Intent to Kill While Armed**, in violation of Title 22, D.C. Code, Sections 501 and 3202)

## COUNT EIGHTEEN

### ATTEMPTED MURDER IN AID OF RACKETEERING ACTIVITY OF JAMES COULTER

The defendant named below committed the following violent crime in aid of racketeering activity:

(1)   Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)   On or about May 30, 1995, in the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing his position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **JEROME MARTIN, a/k/a "Pimp,"** unlawfully, willfully and knowingly, while armed with a pistol, attempted to murder and assaulted James Coulter with a dangerous

65

I.I.

weapon resulting in serious bodily injury, in violation of 22 D.C. Code, Sections 501 and 3202.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Section 1959(a)(3)&(5))

<u>AUGUST 30, 1996 SHOOTING OF POPA MARK PHILLIP</u>

### COUNT NINETEEN

### <u>ASSAULT WITH INTENT TO KILL WHILE ARMED OF POPA MARK PHILLIP</u>

On or about August 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, assaulted Popa Mark Phillip with intent to kill him.

(**Assault with Intent to Kill While Armed**, in violation of Title 22, D.C. Code, Sections 105, 501 and 3202)

### COUNT TWENTY

### <u>ATTEMPTED MURDER IN AID OF RACKETEERING ACTIVITY OF POPA MARK PHILLIP</u>

The defendants named below committed the following violent crime in aid of racketeering activity:

(1)    Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)    On or about August 30, 1996, in the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and

66

11

App 698

maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, unlawfully, willfully and knowingly, while armed with pistols, attempted to murder and assaulted Popa Mark Phillip with a dangerous weapon resulting in serious bodily injury, in violation of 22 D.C. Code, Sections 105, 501 and 3202.

**(Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Sections 2 and 1959(a)(3)&(5))

### *OCTOBER 5, 1996 MURDER OF CHRISHAUNA GLADDEN*

### COUNT TWENTY-ONE

### FIRST-DEGREE MURDER WHILE ARMED OF CHRISHAUNA GLADDEN

On or about October 5, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Chrishauna Gladden, by shooting her with a pistol on or about October 5, 1996, thereby causing injuries from which Chrishauna Gladden died on or about October 5, 1996.

**(First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 2401 and 3202)

67

I.I.

App 699

## COUNT TWENTY-TWO

### MURDER IN AID OF RACKETEERING ACTIVITY
### OF CHRISHAUNA GLADDEN

The defendant named below committed the following violent crime in aid of racketeering activity:

(1)   Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)   On or about October 5, 1996, within the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, unlawfully, willfully, knowingly, and with deliberate and premeditated malice, while armed with a pistol, killed Chrishauna Gladden, by shooting her with a pistol, thereby causing injuries from which Chrishauna Gladden died on or about October 5, 1996, in violation of 22 D.C. Code, Sections 2401 and 3202.

**(Violent Crime in Aid of Racketeering Activity,** in violation of Title 18, United States Code, Section 1959(a)(1))

68

I I

App 700

*OCTOBER 30, 1996 SHOOTING OF RONALD SOWELLS*

### COUNT TWENTY-THREE

### ASSAULT WITH INTENT TO KILL WHILE ARMED OF RONALD SOWELLS

On or about October 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and **SEAN COATES, a/k/a "Birdy,"** while armed with a pistol, assaulted Ronald Sowells with intent to kill him.

(**Assault with Intent to Kill While Armed**, in violation of Title 22, D.C. Code, Sections 105, 501 and 3202)

### COUNT TWENTY-FOUR

### ATTEMPTED MURDER IN AID OF RACKETEERING ACTIVITY OF RONALD SOWELLS

The defendants named below committed the following violent crime in aid of racketeering activity:

(1) Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2) On or about October 30, 1996, in the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin,"** and **SEAN COATES, a/k/a "Birdy,"** unlawfully, willfully and

69

knowingly, while armed with a pistol, attempted to murder and assaulted Ronald Sowells with a dangerous weapon resulting in serious bodily injury, in violation of 22 D.C. Code, Sections 105, 501 and 3202.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Sections 2 and 1959(a)(3)&(5))

<u>*NOVEMBER 17, 1996 TRIPLE MURDER*</u>

### COUNT TWENTY-FIVE

#### MURDER IN AID OF RACKETEERING ACTIVITY OF ALONZO GASKINS

The defendants named below committed the following violent crime in aid of racketeering activity:

(1) Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2) On or about November 17, 1996, within the state of Maryland, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, unlawfully, willfully, knowingly, and with deliberate and premeditated malice, and in the

70

IJ,

App 702

perpetration of, or attempt to perpetrate, the crime of robbery, while armed with a pistol, killed Alonzo Gaskins, by shooting him with a pistol, thereby causing injuries from which Alonzo Gaskins died on or about November 17, 1996, in violation of 27 M.D. Code, Sections 407 and 410.

**(Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Section 1959(a)(1))

### COUNT TWENTY-SIX

### MURDER IN AID OF RACKETEERING ACTIVITY
### OF DARNELL MACK

The defendants named below committed the following violent crime in aid of racketeering activity:

(1)  Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)  On or about November 17, 1996, within the state of Maryland, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, unlawfully, willfully, knowingly, and with deliberate and premeditated malice, and in the

71

IJ.

App 703

perpetration of, or attempt to perpetrate, the crime of robbery, while armed with a pistol, killed Darnell Mack, by shooting him with a pistol, thereby causing injuries from which Darnell Mack died on or about November 17, 1996, in violation of 27 M.D. Code, Sections 407 and 410.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Section 1959(a)(1))

**COUNT TWENTY-SEVEN**

**MURDER IN AID OF RACKETEERING ACTIVITY**
**OF MELODY ANDERSON**

The defendants named below committed the following violent crime in aid of racketeering activity:

(1)    Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)    On or about November 17, 1996, within the state of Maryland, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, unlawfully, willfully, knowingly, and with deliberate and premeditated malice, and in the

72

IJ

App 704

perpetration of, or attempt to perpetrate, the crime of robbery, while armed with a pistol, killed Melody Anderson, by shooting her with a pistol, thereby causing injuries from which Melody Anderson died on or about November 17, 1996, in violation of 27 M.D. Code, Sections 407 and 410.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Section 1959(a)(1))

## COUNTS 28-37

## USE OF A FIREARM

On or about the dates set forth below, in the District of Columbia, the defendants named below did knowingly, willfully and unlawfully use and carry a firearm during and in relation to a crime of violence and a drug trafficking crime, which are felonies prosecutable in a court of the United States, as set forth below and as further described in counts and overt acts of Count One of this indictment which are realleged and incorporated as if fully set forth herein:

| CT | DATE | DEFENDANTS | PREDICATE OFFENSE | FOUND IN COUNT NO. |
|----|------|-----------|-------------------|--------------------|
| 28 | 10-22-93 | **VINCENT HILL** **WILLIAM SWEENEY** **SEAN COATES** | RICO Assault 18 U.S.C. §1959 (Anthony Pryor: Victim) | 11 |
| 29 | 6-26-94 | **SAMUEL CARSON** | RICO Assault 18 U.S.C. §1959 (Ulysses English: Victim) | 14 |

73

App 705

| 30 | 9-26-94 | **WILLIAM SWEENEY** | RICO Murder<br>18 U.S.C. §1959<br>(Donnell Whitfield:<br>Decedent) | 16 |
| 31 | 5-30-95 | **JEROME MARTIN** | RICO Assault<br>18 U.S.C. §1959<br>(James Coulter:<br>Victim) | 18 |
| 32 | 8-30-96 | **SAMUEL CARSON** | Rico Assault<br>18 U.S.C. §1959<br>(Popa Mark Phillip:<br>Victim) | 20 |
| 33 | 10-5-96 | **SAMUEL CARSON** | RICO Murder<br>18 U.S.C. §1959<br>(Chrishauna Gladden:<br>Decedent) | 22 |
| 34 | 10-30-96 | **SAMUEL CARSON<br>SEAN COATES** | RICO Assault<br>18 U.S.C. §1959<br>(Ronald Sowells:<br>Victim) | 24 |
| 35 | 11-17-96 | **SAMUEL CARSON<br>WILLIAM SWEENEY<br>SEAN COATES** | RICO Murder<br>18 U.S.C. §1959<br>(Alonzo Gaskins:<br>Decedent) | 25 |
| 36 | 11-17-96 | **SAMUEL CARSON<br>WILLIAM SWEENEY<br>SEAN COATES** | RICO Murder<br>18 U.S.C. §1959<br>(Darnell Mack:<br>Decedent) | 26 |
| 37 | 11-17-96 | **SAMUEL CARSON<br>WILLIAM SWEENEY<br>SEAN COATES** | RICO Murder<br>18 U.S.C. §1959<br>(Melody Anderson:<br>Decedent) | 27 |

(**Use of a Firearm**, in violation of Title 18, United States Code,
Sections 2 and 924(c))

74

## COUNTS 38-45

### POSSESSION OF A FIREARM DURING CRIME
### OF VIOLENCE OR DANGEROUS OFFENSE

On or about the dates set forth below, in the District of Columbia, the defendants named below did possess a firearm, that is, a pistol or imitation thereof, while committing the specified crimes of violence and dangerous crimes as set forth in the specified counts of this indictment which are realleged and incorporated by reference as if fully set forth herein:

| CT | DATE | DEFENDANTS | PREDICATE OFFENSE | FOUND IN COUNT NO. |
|----|------|-----------|-------------------|--------------------|
| 38 | 7-7-93 | WILLIAM SWEENEY SEAN COATES | First Degree Murder While Armed 22 D.C. Code §§ 2401 and 3202 (Glenn Jenkins: Decedent) | 10 |
| 39 | 10-28-93 | SAMUEL CARSON | Assault With Intent To Kill While Armed 22 D.C. Code §§ 501 and 3202 (Roland Brown: Victim) | 12 |
| 40 | 6-26-94 | SAMUEL CARSON | Assault With Intent To Kill While Armed 22 D.C. Code §§ 501 and 3202 (Ulysses English: Victim) | 13 |
| 41 | 9-26-94 | WILLIAM SWEENEY | First Degree Murder While Armed 22 D.C. Code §§ 2401 and 3202 (Donnell Whitfield: Decedent) | 15 |

75

IJ,

App 707

| 42 | 5-30-95 | **JEROME MARTIN** | Assault With Intent To Kill While Armed 22 D.C. Code §§ 501 and 3202 (James Coulter: Victim) | 17 |
| 43 | 8-30-96 | **SAMUEL CARSON** | Assault With Intent To Kill While Armed 22 D.C. Code §§ 501 and 3202 (Popa Mark Phillip: Victim) | 19 |
| 44 | 10-5-96 | **SAMUEL CARSON** | First Degree Murder While Armed 22 D.C. Code §§ 2401 and 3202 (Chrishauna Gladden: Decedent) | 21 |
| 45 | 10-30-96 | **SAMUEL CARSON SEAN COATES** | Assault With Intent To Kill While Armed 22 D.C. Code §§ 501 and 3202 (Ronald Sowells: Victim) | 23 |

(**Possession of Firearm During Crime of Violence or Dangerous Offense**, in violation of Title 22, D.C. Code, Sections 105 and 3204(b))

## COUNTS 46-62

### DISTRIBUTION OF CONTROLLED SUBSTANCES

On or about the dates set forth below, in the District of Columbia, Maryland and elsewhere, the defendants named below did, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D), and Title 18, United States Code, Section 2, unlawfully, knowingly and intentionally distribute a mixture and substance containing a detectable amount of marijuana, a Schedule

76

IJ.

II controlled substance, as more fully set forth in the specified overt acts of Count One, which are realleged and incorporated by reference herein:

| Ct. | Defendant or Co-Conspirator | Nature of Offense/Date | Overt Act | Violation |
|-----|-----|-----|-----|-----|
| 46 | **VINCENT HILL** | Dist. Marijuana (October 4, 1995) | OA 31 | 21 U.S.C. §841 (a)(1) |
| 47 | **VINCENT HILL** | Dist. Marijuana (November 2, 1995) | OA 32 | 21 U.S.C. §841 (a)(1) |
| 48 | **VINCENT HILL** | Dist. Marijuana (November 3, 1995) | OA 33 | 21 U.S.C. §841 (a)(1) |
| 49 | **VINCENT HILL** **JEROME MARTIN** | Dist. Marijuana (November 15, 1995) | OA 34 | 1 U.S.C. §841 (a)(1) |
| 50 | **VINCENT HILL** | Dist. Marijuana (November 16, 1995) | OA 35 | 21 U.S.C. §841 (a)(1) |
| 51 | **VINCENT HILL** | Dist. Marijuana (November 28, 1995) | OA 36 | 21 U.S.C. §841 (a)(1) |
| 52 | VINCENT HILL | Dist. Marijuana (November 29, 1995) | OA 37 | 21 U.S.C. §841 (a)(1) |
| 53 | **JEROME MARTIN** | Dist. Marijuana (December 6, 1995) | OA 38 | 21 U.S.C. §841 (a)(1) |
| 54 | **VINCENT HILL** | Dist. Marijuana (December 8, 1995) | OA 39 | 21 U.S.C. §841 (a)(1) |
| 55 | **JEROME MARTIN** | Dist. Marijuana (December 13, 1995) | OA 40 | 21 U.S.C. §841 (a)(1) |
| 56 | **VINCENT HILL** | Dist. Marijuana (December 13, 1995) | OA 41 | 21 U.S.C. §841 (a)(1) |
| 57 | **VINCENT HILL** | Dist. Marijuana (December 13, 1995) | OA 42 | 21 U.S.C. §841 (a)(1) |
| 58 | **VINCENT HILL** | Dist. Marijuana (December 15, 1995) | OA 43 | 21 U.S.C. §841 (a)(1) |

77

IJ.

| 59 | **VINCENT HILL** | Dist. Marijuana OA 46 (February 14, 1996) | 21 U.S.C. §841 (a)(1) |
| 60 | **VINCENT HILL** | Dist. Marijuana OA 47 (February 20, 1996) | 21 U.S.C. §841 (a)(1) |
| 61 | **VINCENT HILL** | Dist. Marijuana OA 50 (March 5, 1996) | 21 U.S.C. §841 (a)(1) |
| 62 | **VINCENT HILL** | Dist. Marijuana OA 51 (March 15, 1996) | 21 U.S.C. §841 (a)(1) |

(**Distribution of Controlled Substances**, in violation of Title 18, United States Code, Section 2 and Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D))

## COUNTS 63-64

### POSSESSION WITH INTENT TO DISTRIBUTE CONTROLLED SUBSTANCES

On or about the dates set forth below, in the District of Columbia, Maryland and elsewhere, the defendants named below, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D), and Title 18, United States Code, Section 2, unlawfully, knowingly and intentionally did possess with intent to distribute a mixture and substance containing a detectable amount of marijuana, a Schedules II controlled substance, as more fully set forth in the specified overt acts of Count One, which are realleged and incorporated by reference herein:

78

IJ,

App 710

| Ct. | Defendant or Co-Conspirator | Nature of Offense/Date | Overt Act | Violation |
|-----|------------------------------|------------------------|-----------|-----------|
| 63 | **VINCENT HILL** | PWID Marijuana (September 27, 1995) | OA 30 | 21 U.S.C.§841 (a)(1) |
| 64 | **JEROME MARTIN** | PWID Marijuana (February 1, 1996) | OA 45 | 21 U.S.C.§841 (a)(1) |

(**Possession with Intent to Distribute Controlled Substances**, in violation of Title 18, United States Code, Section 2 and Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D))

A TRUE BILL:

FOREPERSON.

Attorney of the United States in
and for the District of Columbia

79

App 711

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Nos. 98-329 & 99-348 (TPJ) |
| | ) | |
| VINCENT HILL | ) | |
| JEROME MARTIN | ) | |
| SAMUEL CARSON | ) | |
| WILLIAM SWEENEY | ) | |
| SEAN COATES | ) | |
| GARY PRICE | ) | |
| | ) | |
| Defendants. | ) | |

FILED

AUG 16 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# VERDICT FORM

## WE, THE JURY, UNANIMOUSLY FIND AS FOLLOWS:

### 1. **VINCENT HILL, a/k/a "Vito"**

**Count One**  Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 52-63, 103-06)

Guilty: **✓**          Not Guilty:_____

#### Controlled Substances

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

Proven: **✓**          Not Proven:_____

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

Proven:_____          Not Proven: **✓**

(C) Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

Proven: _____          Not Proven: ✓

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

### Cannabis, also known as Marijuana

(A) 1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven: ✓          Not Proven: _____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven: _____          Not Proven: _____

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven: _____          Not Proven: _____

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven: _____          Not Proven: _____

### Cocaine Base, also known as Crack Cocaine

(A) 50 grams or more of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**_____     **Not Proven:**_____

If you are unable to find unanimously that the quantity of cocaine base was 50 grams or more, then you should consider whether the drug quantity was:

(B) 5 grams or more but less than 50 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**_____     **Not Proven:**_____

If you are unable to find unanimously that the quantity of cocaine base was 5 grams or more but less than 50 grams, then you should consider whether the drug quantity was:

(C) Less than 5 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**_____     **Not Proven:**_____

**Count Two** Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from in at least 1988, and continuing thereafter up to and including March 1999.

**Guilty:** ✓     **Not Guilty:**_____

In order to find the defendant guilty of this Count, you must unanimously find that the defendant agreed to commit at least two of the racketeering acts listed below. You should make unanimous findings with respect to each of the racketeering acts listed below by marking "Proven" or "Not Proven." (See Final Jury Instructions, pp. 64-81)

**Racketeering Act 1** Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 64-81, 52-63)

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓     **Not Proven:**_____

3

(B)  Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

Proven:_____          Not Proven: _✓_

(C)  Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

Proven:_____          Not Proven: _✓_

**Racketeering Act 2**  Distribution of marijuana on or about October 4, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: _✓_          Not Proven:_____

**Racketeering Act 3**  Distribution of marijuana on or about November 2, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: _✓_          Not Proven:_____

**Racketeering Act 4** Distribution of marijuana on or about November 3, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: _✓_          Not Proven:_____

**Racketeering Act 5**  Distribution of marijuana on or about November 15, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: _✓_          Not Proven:_____

**Racketeering Act 6**  Distribution of marijuana on or about November 16, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: _✓_          Not Proven:_____

**Racketeering Act 7**  Distribution of marijuana on or about November 28, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: _✓_          Not Proven:_____

**Racketeering Act 8**  Distribution of marijuana on or about November 29, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: _✓_          Not Proven:_____

4

**Racketeering Act 10**   Distribution of marijuana on or about December 8, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓                    **Not Proven:**____

**Racketeering Act 12**   Distribution of marijuana on or about December 13, 1995 (co-conspirator Bill Hill aided and abetted distribution). (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓                    **Not Proven:**____

**Racketeering Act 13**   Distribution of marijuana on or about December 13, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓                    **Not Proven:**____

**Racketeering Act 14**   Distribution of marijuana on or about December 15, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓                    **Not Proven:**____

**Racketeering Act 15**   Distribution of marijuana on or about February 14, 1996. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓                    **Not Proven:**____

**Racketeering Act 16**   Distribution of marijuana on or about February 20, 1996. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓                    **Not Proven:**____

**Racketeering Act 19**  Distribution of marijuana on or about March 5, 1996. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓                    **Not Proven:**____

**Racketeering Act 20**  Distribution of marijuana on or about March 15, 1996. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓                    **Not Proven:**____

**Racketeering Act 21**  Possession with intent to distribute marijuana on or about September 27, 1995. (See Final Jury Instructions, pp. 64-69, 105-06)

**Proven:** ✓                    **Not Proven:** ____

5

**Racketeering Act 32** First-degree murder while armed of Larry Wright, Jr., a/k/a "Patcho," on or about June 29, 1989. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven:_✓__          Not Proven:_____

**Racketeering Act 39**

(A) Attempted armed robbery of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993. (See Final Jury Instructions, pp. 64-69, 76)

Proven:_____          Not Proven:_✓___

(B) Armed kidnaping of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993. (See Final Jury Instructions, pp. 64-69, 75)

Proven:_____          Not Proven:_✓___

(C) Assault with intent to murder while armed of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993. (See Final Jury Instructions, pp. 64-69, 77)

Proven:_____          Not Proven:_✓___

**Count Three** First-degree murder while armed of Larry Wright, Jr., a/k/a "Patcho," on or about June 29, 1989. (See Final Jury Instructions, pp. 83-85)

Guilty:_✓__          Not Guilty:_____

**Count Eleven** Attempted murder in aid of racketeering activity of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993. (See Final Jury Instructions, pp. 86-90, 75-77)

Guilty:_____          Not Guilty:_✓___

**Count Twenty-Eight** Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 22, 1993 (Attempted murder in aid of racketeering activity of Anthony Pryor, a/k/a "Wysocki"). (See Final Jury Instructions, pp. 95-99)

Guilty:_____          Not Guilty:_✓___

**Count Forty-Six** Distribution of marijuana on or about October 4, 1995. (See Final Jury Instructions, pp. 103-04)

Guilty:_✓__          Not Guilty:_____

6

**Count Forty-Seven**  Distribution of marijuana on or about November 2, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓     Not Guilty:_____

**Count Forty-Eight**  Distribution of marijuana on or about November 3, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓     Not Guilty:_____

**Count Forty-Nine**  Distribution of marijuana on or about November 15, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓     Not Guilty:_____

**Count Fifty**  Distribution of marijuana on or about November 16, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓     Not Guilty:_____

**Count Fifty-One**  Distribution of marijuana on or about November 28, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓     Not Guilty:_____

**Count Fifty-Two**  Distribution of marijuana on or about November 29, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓     Not Guilty:_____

**Count Fifty-Four**  Distribution of marijuana on or about December 8, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓     Not Guilty:_____

**Count Fifty-Six**  Distribution of marijuana on or about December 13, 1995 (co-conspirator Bill Hill aided and abetted distribution).  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓     Not Guilty:_____

**Count Fifty-Seven**  Distribution of marijuana on or about December 13, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓     Not Guilty:_____

7

**Count Fifty-Eight** Distribution of marijuana on or about December 15, 1995. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:_____

**Count Fifty-Nine** Distribution of marijuana on or about February 14, 1996. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:_____

**Count Sixty** Distribution of marijuana on or about February 20, 1996. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:_____

**Count Sixty-One** Distribution of marijuana on or about March 5, 1996. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:_____

**Count Sixty-Two** Distribution of marijuana on or about March 15, 1996. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:_____

**Count Sixty-Three** Possession with intent to distribute marijuana on or about September 27, 1995. (See Final Jury Instructions, pp. 105-06)

Guilty: ✓          Not Guilty:_____

8

## 2. JEROME MARTIN, a/k/a "Pimp"

**Count One**  Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999.  (See Final Jury Instructions, pp. 52-63, 103-06)

Guilty: V/_____          Not Guilty:_____

### Controlled Substances

(A)  Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

Proven: V/_____          Not Proven:_____

(B)  Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

Proven:_____          Not Proven: V/_____

(C)  Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

Proven:_____          Not Proven: V/_____

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

### Cannabis, also known as Marijuana

(A)  1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven: V/_____          Not Proven:_____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

9

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**_____          **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**_____          **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**_____          **Not Proven:**_____

**Cocaine Base, also known as Crack Cocaine**

(A) 50 grams or more of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**_____          **Not Proven:**_____

If you are unable to find unanimously that the quantity of cocaine base was 50 grams or more, then you should consider whether the drug quantity was:

(B) 5 grams or more but less than 50 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**_____          **Not Proven:**_____

If you are unable to find unanimously that the quantity of cocaine base was 5 grams or more but less than 50 grams, then you should consider whether the drug quantity was:

10

IJA 2003

(C) Less than 5 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

Proven:_____          Not Proven:_____ J#1

**Count Two**  Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from in at least 1988, and continuing thereafter up to and including March 1999.

Guilty: ✓          Not Guilty:_____

In order to find the defendant guilty of this Count, you must unanimously find that the defendant agreed to commit at least two of the racketeering acts listed below. You should make unanimous findings with respect to each of the racketeering acts listed below by marking "Proven" or "Not Proven." (See Final Jury Instructions, pp. 64-81)

**Racketeering Act 1**  Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 64-81, 52-63)

(A)  Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

Proven: ✓          Not Proven:_____

(B)  Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

Proven:_____          Not Proven: ✓

(C)  Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

Proven:_____          Not Proven: ✓

**Racketeering Act 5**  Distribution of marijuana on or about November 15, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: ✓          Not Proven:_____

**Racketeering Act 9**  Distribution of marijuana on or about December 6, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: ✓          Not Proven:_____

11

**Racketeering Act 11** Distribution of marijuana on or about December 13, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: √            Not Proven:_____

**Racketeering Act 17** Distribution of marijuana on or about February 26, 1996 (buyer Tobias Carrington). (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: √            Not Proven:_____

**Racketeering Act 18** Distribution of marijuana on or about February 26, 1996 (buyer James Bellflower). (See Final Jury Instructions, pp. 64-69, 103-04)

Proven: √            Not Proven:_____

**Racketeering Act 22** Possession with intent to distribute marijuana on or about February 1, 1996. (See Final Jury Instructions, pp. 64-69, 105-06)

Proven: √            Not Proven:_____

**Racketeering Act 23** First-degree murder while armed of Anthony Fortune on or about August 6, 1991. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: √            Not Proven:_____

**Racketeering Act 24**

(A) Assault with intent to murder while armed of Keith Bradley, a/k/a "PeeWee," on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √            Not Proven:_____

(B) Assault with intent to murder while armed of Jimmy Thomas, Jr., a/k/a "Sugarspoon," on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √            Not Proven:_____

(C) Assault with intent to murder while armed of Officer Adrian Treadwell on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √            Not Proven:_____

12

(D)  Assault with intent to murder while armed of Officer Edward McDonald on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √          Not Proven:_____

(E)  Assault with intent to murder while armed of Officer Marc Little on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √          Not Proven:_____

(F)  Assault with intent to murder while armed of Officer Alvin Ray on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √          Not Proven:_____

**Racketeering Act 25**

(A)  First-degree murder while armed of Curtis Edwards on or about August 29, 1992.  (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: √          Not Proven:_____

(B)  Assault with intent to murder while armed of Richard Burton on or about August 29, 1992.  (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √          Not Proven:_____

(C)  Assault with intent to murder while armed of Keith Jones on or about August 29, 1992.  (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √          Not Proven:_____

**Racketeering Act 44**   Assault with intent to murder while armed of James Coulter, a/k/a "Creeko," on or about May 30, 1995.  (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √          Not Proven:_____

**Racketeering Act 47**   Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Jerome Martin, a/k/a "Pimp", in or about October 1996.  (See Final Jury Instructions, pp. 64-69, 72-73)

Proven: √          Not Proven:_____

13

**Count Eight**    First-degree murder while armed of Anthony Fortune on or about August 6, 1991. (See Final Jury Instructions, pp. 83-85)

Guilty: ✓        Not Guilty: _____

**Count Nine**    Assaulting, resisting, and interfering with Officer Marc Little with a dangerous weapon on or about September 10, 1991. (See Final Jury Instructions, pp. 94)

Guilty: ✓        Not Guilty: _____

**Count Seventeen**    Assault with intent to kill while armed of James Coulter, a/k/a "Creeko," on or about May 30, 1995. (See Final Jury Instructions, pp. 91-92)

Guilty: ✓        Not Guilty: _____

**Count Eighteen**    Attempted murder in aid of racketeering activity of James Coulter, a/k/a "Creeko," on or about May 30, 1995. (See Final Jury Instructions, pp. 86-90, 91-92)

Guilty: ✓        Not Guilty: _____

**Count Thirty-One**    Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about May 30, 1995 (Attempted murder in aid of racketeering activity of James Coulter, a/k/a "Creeko"). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓        Not Guilty: _____

**Count Forty-Two**    Possession of a firearm during a crime of violence or dangerous offense on or about May 30, 1995 (Assault with intent to kill while armed of James Coulter, a/k/a "Creeko"). (See Final Jury Instructions, pp. 100-02)

Guilty: ✓        Not Guilty: _____

**Count Forty-Nine**    Distribution of marijuana on or about November 15, 1995. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓        Not Guilty: _____

**Count Fifty-Three**    Distribution of marijuana on or about December 6, 1995. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓        Not Guilty: _____

14

**Count Fifty-Five**   Distribution of marijuana on or about December 13, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓       Not Guilty:_____

**Count Sixty-Four**   Possession with intent to distribute marijuana on or about February 1, 1996.  (See Final Jury Instructions, pp. 105-06)

Guilty: ✓       Not Guilty:_____

15

### 3. SAMUEL CARSON, a/k/a "Chin"

**Count One** Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 52-63, 103-06)    ⬛ J^th |

**Guilty:** ✓___     **Not Guilty:**_____

#### Controlled Substances

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓___     **Not Proven:**_____

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

**Proven:**_____     **Not Proven:** ✓___

(C) Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:**_____     **Not Proven:** ✓___

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

#### Cannabis, also known as Marijuana

(A) 1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:** ✓___     **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

16

(B)  100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**\_\_\_\_\_          **Not Proven:**\_\_\_\_\_  J#-1

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**\_\_\_\_\_          **Not Proven:**\_\_\_\_\_  J#1

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**\_\_\_\_\_          **Not Proven:**\_\_\_\_\_  J#1

### Cocaine Base, also known as Crack Cocaine

(A)  50 grams or more of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**\_\_\_\_\_          **Not Proven:**\_\_\_\_\_

If you are unable to find unanimously that the quantity of cocaine base was 50 grams or more, then you should consider whether the drug quantity was:

(B)  5 grams or more but less than 50 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**\_\_\_\_\_          **Not Proven:**\_\_\_\_\_

If you are unable to find unanimously that the quantity of cocaine base was 5 grams or more but less than 50 grams, then you should consider whether the drug quantity was:

17

(C) Less than 5 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**_____          **Not Proven:**_____

**Count Two**   Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from in at least 1988, and continuing thereafter up to and including March 1999.

**Guilty:** √____          **Not Guilty:** ____

In order to find the defendant guilty of this Count, you must unanimously find that the defendant agreed to commit at least two of the racketeering acts listed below.  You should make unanimous findings with respect to each of the racketeering acts listed below by marking "Proven" or "Not Proven." (See Final Jury Instructions, pp. 64-81)

**Racketeering Act 1**   Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 64-81, 52-63)

(A)  Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** √____          **Not Proven:** ____

(B)  Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

**Proven:**_____          **Not Proven:** √____

(C)  Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:**_____          **Not Proven:** √____

**Racketeering Act 23**   First-degree murder while armed of Anthony Fortune on or about August 6, 1991. (See Final Jury Instructions, pp. 64-69, 83-85)

**Proven:** √____          **Not Proven:**_____

18

**Racketeering Act 24**

(A) Assault with intent to murder while armed of Keith Bradley, a/k/a "PeeWee," on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √                 Not Proven:_____

(B) Assault with intent to murder while armed of Jimmy Thomas, Jr., a/k/a "Sugarspoon," on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √                 Not Proven:_____

(C) Assault with intent to murder while armed of Officer Adrian Treadwell on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √                 Not Proven:_____

(D) Assault with intent to murder while armed of Officer Edward McDonald on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √                 Not Proven:_____

(E) Assault with intent to murder while armed of Officer Marc Little on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √                 Not Proven:_____

(F) Assault with intent to murder while armed of Officer Alvin Ray on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: √                 Not Proven:_____

**Racketeering Act 34**   Conspiracy to commit murder of members of L Street group in or about July 1996. (See Final Jury Instructions, pp. 64-69, 72-73)

Proven: √                 Not Proven:_____

**Racketeering Act 35**   Assault with intent to murder while armed of Ronald Sowells, a/k/a "Manute," on or about October 30, 1996. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven:_____                 Not Proven: √

19

**Racketeering Act 36**

(A)  First-degree murder while armed of Maurice Hallman, a/k/a "Mo," on or about December 19, 1989.  (See Final Jury Instructions, pp. 64-69, 83-85)

**Proven:** ✓          **Not Proven:**_____

(B)  First-degree murder while armed of Leonard Hyson, a/k/a "Slick," on or about December 19, 1989.  (See Final Jury Instructions, pp. 64-69, 83-85)

**Proven:** ✓          **Not Proven:**_____

**Racketeering Act 37**

(A)  First-degree murder while armed of Teresa Thomas, a/k/a "T.T.," on or about March 22, 1991.  (See Final Jury Instructions, pp. 64-69, 83-85)

**Proven:** ✓          **Not Proven:**_____

(B)  First-degree murder while armed of Terita Lucas on or about March 22, 1991.  (See Final Jury Instructions, pp. 64-69, 83-85)

**Proven:** ✓          **Not Proven:**_____

**Racketeering Act 38**   Assault with intent to murder while armed with a dangerous weapon of Officer Alfred Moss on or about April 7, 1992.  (See Final Jury Instructions, pp. 64-69, 77)

**Proven:**_____          **Not Proven:** ✓

**Racketeering Act 40**   Assault with intent to murder while armed of Roland Brown on or about October 28, 1993.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:**_____          **Not Proven:** ✓

**Racketeering Act 41**   Conspiracy to commit murder of Steve Dunbar on or about April 9, 1994.  (See Final Jury Instructions, pp. 64-69, 72-73)

**Proven:**_____          **Not Proven:** ✓

**Racketeering Act 42**   Assault with intent to murder while armed of Ulysses English, a/k/a "Lou," on or about June 26, 1994.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:** ✓          **Not Proven:**_____

20

**Racketeering Act 45**  Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Maurice Proctor, a/k/a "PooPoo", between in or about 1996 and in or about 1997.  (See Final Jury Instructions, pp. 64-69, 72-73)

**Proven:** ✓         **Not Proven:**_____

**Racketeering Act 46**  Assault with intent to murder while armed of Popa Mark Phillip on or about August 30, 1996.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:**_____         **Not Proven:** ✓

**Racketeering Act 47**  Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Jerome Martin, a/k/a "Pimp", in or about October 1996.  (See Final Jury Instructions, pp. 64-69, 72-73)

**Proven:** ✓         **Not Proven:**_____

**Racketeering Act 48**  First-degree murder while armed of Chrishauna Gladden on or about October 5, 1996.  (See Final Jury Instructions, pp. 64-69, 83-85)

**Proven:** ✓         **Not Proven:**_____

**Racketeering Act 49**

(A)  Attempted robbery while armed of Alonzo Gaskins, Darnell Mack, and Melody Anderson on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 76)

**Proven:** ✓         **Not Proven:**_____

(B)  First-degree felony-murder while armed of Alonzo Gaskins on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 79-80)

**Proven:** ✓         **Not Proven:**_____

(C)  First-degree felony-murder while armed of Darnell Mack on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 79-80)

**Proven:** ✓         **Not Proven:**_____

21

(D)  First-degree felony-murder while armed of Melody Anderson on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 79-80)

**Proven:** ✓____          **Not Proven:**____

(E)  First-degree premeditated murder while armed of Alonzo Gaskins on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 78)

**Proven:**____          **Not Proven:** ✓____

(F)  First-degree premeditated murder while armed of Darnell Mack on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 78)

**Proven:**____          **Not Proven:** ✓

(G)  First-degree premeditated murder while armed of Melody Anderson on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 78)

**Proven:**____          **Not Proven:** ✓

**Racketeering Act 50**   Conspiracy to commit murder of Robert Smith, a/k/a "Butchie," between in or about April 1997 and on or about June 17, 1997.  (See Final Jury Instructions, pp. 64-69, 72-73)

**Proven:** ✓____          **Not Proven:**____

**Count Four**   First-degree murder while armed of Maurice Hallman, a/k/a "Mo," on or about December 19, 1989.  (See Final Jury Instructions, pp. 83-85)

**Guilty:** ✓____          **Not Guilty:**____

**Count Five**   First-degree murder while armed of Leonard Hyson, a/k/a "Slick," on or about December 19, 1989.  (See Final Jury Instructions, pp. 83-85)

**Guilty:** ✓____          **Not Guilty:**____

**Count Six**   First-degree murder while armed of Teresa Thomas, a/k/a "T.T.," on or about March 22, 1991.  (See Final Jury Instructions, pp. 83-85)

**Guilty:** ✓____          **Not Guilty:**____

**Count Seven**   First-degree murder while armed of Terita Lucas on or about March 22, 1991.  (See Final Jury Instructions, pp. 83-85)

**Guilty:** ✓____          **Not Guilty:**____

22

**Count Eight**   First-degree murder while armed of Anthony Fortune on or about August 6, 1991. (See Final Jury Instructions, pp. 83-85)

Guilty: ✓          Not Guilty:_____

**Count Twelve**   Assault with intent to kill while armed of Roland Brown on or about October 28, 1993. (See Final Jury Instructions, pp. 91-92)

Guilty:_____          Not Guilty:_✓_

**Count Thirteen**   Assault with intent to kill while armed of Ulysses English, a/k/a "Lou," on or about June 26, 1994. (See Final Jury Instructions, pp. 91-92)

Guilty:_✓_          Not Guilty: _____

**Count Fourteen**   Attempted murder in aid of racketeering activity of Ulysses English, a/k/a "Lou," on or about June 26, 1994. (See Final Jury Instructions, pp. 86-90, 91-92)

Guilty:_✓_          Not Guilty:_____

**Count Nineteen**   Assault with intent to kill while armed of Popa Mark Phillip on or about August 30, 1996. (See Final Jury Instructions, pp. 91-92)

Guilty:_____          Not Guilty:_✓_

**Count Twenty**   Attempted murder in aid of racketeering activity of Popa Mark Phillip on or about August 30, 1996. (See Final Jury Instructions, pp. 86-90, 91-92)

Guilty:_____          Not Guilty:_✓_

**Count Twenty-One**   First-degree murder while armed of Chrishauna Gladden on or about October 5, 1996. (See Final Jury Instructions, pp. 83-85)

Guilty:_✓_          Not Guilty:_____

**Count Twenty-Two**   Murder in aid of racketeering activity of Chrishauna Gladden on or about October 5, 1996. (See Final Jury Instructions, pp. 86-90, 83-85)

Guilty:_✓_          Not Guilty:_____

**Count Twenty-Three**   Assault with intent to kill while armed of Ronald Sowells, a/k/a "Manute," on or about October 30, 1996. (See Final Jury Instructions, pp. 91-92)

Guilty:_____          Not Guilty:_✓_

23

**Count Twenty-Four**  Attempted murder in aid of racketeering activity of Ronald Sowells, a/k/a "Manute," on or about October 30, 1996.  (See Final Jury Instructions, pp. 86-90, 91-92)

Guilty: _____       Not Guilty: _✓_

**Count Twenty-Five**  Murder in aid of racketeering activity of Alonzo Gaskins on or about November 17, 1996.  (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty: _✓_       Not Guilty: _____

**Count Twenty-Six**  Murder in aid of racketeering activity of Darnell Mack on or about November 17, 1996.  (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty: _✓_       Not Guilty: _____

**Count Twenty-Seven**  Murder in aid of racketeering activity of Melody Anderson on or about November 17, 1996.  (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty: _✓_       Not Guilty: _____

**Count Twenty-Nine**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about June 26, 1994 (Attempted murder in aid of racketeering activity of Ulysses English, a/k/a "Lou").  (See Final Jury Instructions, pp. 95-99)

Guilty: _✓_       Not Guilty: _____

**Count Thirty-Two**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about August 30, 1996 (Attempted murder in aid of racketeering activity of Popa Mark Phillip).  (See Final Jury Instructions, pp. 95-99)

Guilty: _____       Not Guilty: _✓_

**Count Thirty-Three**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 5, 1996 (Murder in aid of racketeering activity of Chrishauna Gladden).  (See Final Jury Instructions, pp. 95-99)

Guilty: _✓_       Not Guilty: _____

**Count Thirty-Four**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 30, 1996 (Attempted murder in aid of racketeering activity of Ronald Sowells, a/k/a "Manute").  (See Final Jury Instructions, pp. 95-99)

Guilty: _'_       Not Guilty: _✓_

24

**Count Forty-Five**  Possession of a firearm during a crime of violence or dangerous offense on or about October 30, 1996 (Assault with intent to kill while armed of Ronald Sowells, a/k/a "Manute"). (See Final Jury Instructions, pp. 100-02)

**Guilty:**\_\_\_\_\_        **Not Guilty:**\_\_✓\_\_\_

26

(Page 170 of Total)

App 736

### 4. <u>WILLIAM SWEENEY, a/k/a "Draper"</u>

**Count One**  Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999.  (<u>See</u> Final Jury Instructions, pp. 52-63, 103-06) ▮▮▮▮ J*|

**Guilty:** ✓_____     **Not Guilty:** ▮▮___ J*|

#### <u>Controlled Substances</u>

(A)  Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓_____         **Not Proven:**_____

(B)  Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

**Proven:**_____         **Not Proven:** ✓_____

(C)  Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:**_____         **Not Proven:** ✓_____

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

#### <u>Cannabis, also known as Marijuana</u>

(A)  1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:** ✓_____         **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

27

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**_____          **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**_____          **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**_____          **Not Proven:**_____

### Cocaine Base, also known as Crack Cocaine

(A) 50 grams or more of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**_____          **Not Proven:**_____

If you are unable to find unanimously that the quantity of cocaine base was 50 grams or more, then you should consider whether the drug quantity was:

(B) 5 grams or more but less than 50 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**_____          **Not Proven:**_____

If you are unable to find unanimously that the quantity of cocaine base was 5 grams or more but less than 50 grams, then you should consider whether the drug quantity was:

28

App 738

(C) Less than 5 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:** _____          **Not Proven:** _____

**Count Two**   Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from in at least 1988, and continuing thereafter up to and including March 1999.

**Guilty:** ✓_____          **Not Guilty:** _____

In order to find the defendant guilty of this Count, you must unanimously find that the defendant agreed to commit at least two of the racketeering acts listed below. You should make unanimous findings with respect to each of the racketeering acts listed below by marking "Proven" or "Not Proven." (See Final Jury Instructions, pp. 64-81)

**Racketeering Act 1**   Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 64-81, 52-63)

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓_____          **Not Proven:** _____

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotics drug controlled substance.

**Proven:** _____          **Not Proven:** ✓_____

(C) Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:** _____          **Not Proven:** ✓_____

**Racketeering Act 29**   First-degree murder while armed of Glenn Jenkins on or about July 7, 1993. (See Final Jury Instructions, pp. 64-69, 83-85)

**Proven:** _____          **Not Proven:** ✓_____

**Racketeering Act 30**   Assault with intent to murder while armed of persons in the Kentucky Courts neighborhood between in or about 1991 and on or about June 20, 1992. (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:** _____          **Not Proven:** ✓_____

29

**Racketeering Act 31**  Assault with intent to murder while armed of persons in the Kentucky Courts neighborhood between in or about 1991 and on or about June 20, 1992 (committed with co-defendant Sean Coates).  (See Final Jury Instructions, pp. 64-69, 70-71)

Proven:_____          Not Proven: ✓

**Racketeering Act 39**

(A)  Attempted armed robbery of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993.  (See Final Jury Instructions, pp. 64-69, 76)

Proven: ✓          Not Proven:_____

(B)  Armed kidnaping of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993.  (See Final Jury Instructions, pp. 64-69, 75)

Proven: ✓          Not Proven:_____

(C)  Assault with intent to murder while armed of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993.  (See Final Jury Instructions, pp. 64-69, 77)

Proven: ✓          Not Proven:_____

**Racketeering Act 43**  First-degree murder while armed of Donnell Whitfield, a/k/a "Robocop," on or about September 26, 1994.  (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓          Not Proven:_____

**Racketeering Act 45**  Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Maurice Proctor, a/k/a "PooPoo", between in or about 1996 and in or about 1997.  (See Final Jury Instructions, pp. 64-69, 72-73)

Proven: ✓          Not Proven:_____

**Racketeering Act 49**

(A)  Attempted robbery while armed of Alonzo Gaskins, Darnell Mack, and Melody Anderson on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 76)

Proven: ✓          Not Proven:_____

30

**Count Fifteen**   First-degree murder while armed of Donnell Whitfield, a/k/a "Robocop," on or about September 26, 1994.  (See Final Jury Instructions, pp. 83-85)

Guilty: ✓____      Not Guilty: ▉ J*¹

**Count Sixteen**   Murder in aid of racketeering activity of Donnell Whitfield, a/k/a "Robocop," on or about September 26, 1994.  (See Final Jury Instructions, pp. 86-90, 83-85)

Guilty: ✓      Not Guilty:____

**Count Twenty-Five**   Murder in aid of racketeering activity of Alonzo Gaskins on or about November 17, 1996.  (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty: ✓      Not Guilty:____

**Count Twenty-Six**   Murder in aid of racketeering activity of Darnell Mack on or about November 17, 1996.  (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty: ✓____      Not Guilty:____

**Count Twenty-Seven**   Murder in aid of racketeering activity of Melody Anderson on or about November 17, 1996.  (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty:____ ✓      Not Guilty:____

**Count Twenty-Eight**   Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 22, 1993 (Attempted murder in aid of racketeering activity of Anthony Pryor, a/k/a "Wysocki").  (See Final Jury Instructions, pp. 95-99)

Guilty: ✓      Not Guilty:____

**Count Thirty**   Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about September 26, 1994 (Murder in aid of racketeering activity of Donnell Whitfield, a/k/a "Robocop").  (See Final Jury Instructions, pp. 95-99)

Guilty: ✓____      Not Guilty:____

**Count Thirty-Five**   Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Alonzo Gaskins).  (See Final Jury Instructions, pp. 95-99)

Guilty: ✓__      Not Guilty:____

32

**Count Thirty-Six**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Darnell Mack).  (See Final Jury Instructions, pp. 95-99)

Guilty: ✓        Not Guilty:_____

**Count Thirty-Seven**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Melody Anderson).  (See Final Jury Instructions, pp. 95-99)

Guilty: ✓        Not Guilty:_____

**Count Thirty-Eight**  Possession of a firearm during a crime of violence or dangerous offense on or about July 7, 1993 (First-degree murder while armed of Glenn Jenkins).  (See Final Jury Instructions, pp. 100-02)

Guilty:_____        Not Guilty: ✓

**Count Forty-One**  Possession of a firearm during a crime of violence or dangerous offense on or about September 26, 1994 (First-degree murder while armed of Donnell Whitfield, a/k/a "Robocop").  (See Final Jury Instructions, pp. 100-02)

Guilty: ✓        Not Guilty:_____

33

App 742

5. **SEAN COATES, a/k/a "Birdy"**

**Count One**  Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999.  (See Final Jury Instructions, pp. 52-63, 103-06)

Guilty: ✓          Not Guilty: _____

## Controlled Substances

(A)  Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

Proven: ✓          Not Proven: _____

(B)  Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

Proven: _____          Not Proven: ✓

(C)  Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

Proven: _____          Not Proven: ✓

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

## Cannabis, also known as Marijuana

(A)  1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven: ✓          Not Proven: _____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

34

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven:_____          Not Proven:_____

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven:_____          Not Proven:_____

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven:_____          Not Proven:_____

### Cocaine Base, also known as Crack Cocaine

(A) 50 grams or more of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

Proven:_____          Not Proven:_____

If you are unable to find unanimously that the quantity of cocaine base was 50 grams or more, then you should consider whether the drug quantity was:

(B) 5 grams or more but less than 50 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

Proven:_____          Not Proven:_____

If you are unable to find unanimously that the quantity of cocaine base was 5 grams or more but less than 50 grams, then you should consider whether the drug quantity was:

35

(C) Less than 5 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**_____          **Not Proven:**_____

**Count Two**   Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from in at least 1988, and continuing thereafter up to and including March 1999.

**Guilty:** ✓          **Not Guilty:**_____

In order to find the defendant guilty of this Count, you must unanimously find that the defendant agreed to commit at least two of the racketeering acts listed below. You should make unanimous findings with respect to each of the racketeering acts listed below by marking "Proven" or "Not Proven." (See Final Jury Instructions, pp. 64-81)

**Racketeering Act 1**   Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 64-81, 52-63)

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓          **Not Proven:**_____

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

**Proven:**_____          **Not Proven:** ✓

(C) Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:**_____          **Not Proven:** ✓

**Racketeering Act 26**

(A) Assault with intent to murder while armed of Jermaine Hall on or about June 20, 1992. (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:**_____          **Not Proven:** ✓

36

(B) Armed kidnaping of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993. (See Final Jury Instructions, pp. 64-69, 75)

Proven: ✓            Not Proven:_____

(C) Assault with intent to murder while armed of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993. (See Final Jury Instructions, pp. 64-69, 77)

Proven: ✓            Not Proven:_____

**Racketeering Act 45**   Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Maurice Proctor, a/k/a "PooPoo", between in or about 1996 and in or about 1997. (See Final Jury Instructions, pp. 64-69, 72-73)

Proven:_____            Not Proven: ✓

**Racketeering Act 49**

(A) Attempted robbery while armed of Alonzo Gaskins, Darnell Mack, and Melody Anderson on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 76)

Proven: ✓            Not Proven:_____

(B) First-degree felony-murder while armed of Alonzo Gaskins on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 79-80)

Proven: ✓            Not Proven:_____

(C) First-degree felony-murder while armed of Darnell Mack on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 79-80)

Proven: ✓            Not Proven:_____

(D) First-degree felony-murder while armed of Melody Anderson on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 79-80)

Proven: ✓            Not Proven:_____

(E) First-degree premeditated murder while armed of Alonzo Gaskins on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 78)

Proven:_____            Not Proven: ✓

38

**Count Twenty-Eight**   Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 22, 1993 (Attempted murder in aid of racketeering activity of Anthony Pryor, a/k/a "Wysocki"). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓_____        Not Guilty:_____

**Count Thirty-Four**   Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 30, 1996 (Attempted murder in aid of racketeering activity of Ronald Sowells, a/k/a "Manute"). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓_____        Not Guilty:_____

**Count Thirty-Five**   Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Alonzo Gaskins). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓_____        Not Guilty:_____

**Count Thirty-Six**   Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Darnell Mack). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓_____        Not Guilty:_____

**Count Thirty-Seven**   Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Melody Anderson). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓_____        Not Guilty:_____

**Count Thirty-Eight**   Possession of a firearm during a crime of violence or dangerous offense on or about July 7, 1993 (First-degree premeditated murder while armed of Glenn Jenkins). (See Final Jury Instructions, pp. 100-02)

Guilty:_____        Not Guilty: ✓_____

**Count Forty-Five**   Possession of a firearm during a crime of violence or dangerous offense on or about October 30, 1996 (Assault with intent to kill while armed of Ronald Sowells, a/k/a "Manute"). (See Final Jury Instructions, pp. 100-02)

Guilty: ✓_____        Not Guilty:_____

40

### 6. GARY PRICE, a/k/a "Harry-O"

**Count One** Conspiracy to distribute and possess with intent to distribute cannabis, also known as marijuana, a Schedule I controlled substance from on or about sometime in September 1994 and continuing thereafter up to and including September 1999. (See Final Jury Instructions, pp. 52-63, 103-06)

Guilty: ✓    Not Guilty:_____

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

### Cannabis, also known as Marijuana

(A) 1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven: ✓    Not Proven:_____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven:_____    Not Proven:_____

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven:_____    Not Proven:_____

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

41

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:** _____     **Not Proven:** _____

Date: _8/16/01_

$\underline{\smash{\bigvee}\text{UROR}^{\#}\,1}$

Foreperson

$\text{J}^{\#}1 = \text{INITIALS USED AT CORRECTIONS}$

42

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 02-3015**                    **September Term, 2002**

98cr00329-01
98cr00329-02
98cr00329-03
98cr00329-04
98cr00329-06

United States of America,
      Appellee

    v.

Samuel Carson, _a/k/a_ Chin,
      Appellant

**Filed On: August 28, 2003** [769196]

_____

Consolidated with 02-3016, 02-3017, 02-3018,
02-3019, 02-3046

      **BEFORE:**    Sentelle, Tatel, and Roberts, Circuit Judges

## O R D E R

Upon consideration of appellants' motion to allow counsel to review specific sealed portions of the trial record and the opposition thereto, it is

**ORDERED** that the motion be denied.  As explained in the order filed October 2, 2002, appellants may not review the sealed portions of the trial record in order to mount a challenge to the district court's rulings under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500.  <u>See</u> <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 59 (1987); <u>United States v. North American Reporting, Inc.</u>, 761 F.2d 735, 740 (D.C. Cir. 1985).   Rather, appellants must identify the specific rulings that they believe are erroneous, and if they present a colorable claim, this court may review the sealed material <u>in camera</u> to determine whether a <u>Brady</u> or Jencks Act violation has in fact occurred.  <u>See</u> 18 U.S.C. § 3500(c); <u>United States v. Williams-Davis</u>, 90 F.3d 490, 514 (D.C. Cir. 1996); <u>United States v. Brooks</u>, 966 F.2d 1500, 1505 (D.C. Cir. 1992).

Because appellants seek to review the sealed material themselves, their motion must be denied.  Any future arguments concerning the district court's application of <u>Brady</u> and/or the Jencks Act should be presented in the appellants' brief, rather than by motion.

### Per Curiam

ORAL ARGUMENT SCHEDULED FOR OCTOBER 5, 2005

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 02-3015, 02-3016, 02-3017
02-3018, 02-3019, 02-3046
[Consolidated]

UNITED STATES OF AMERICA,
Appellee,

v.

WILLIAM SWEENEY, SAMUEL CARSON,
SEAN COATES, JEROME MARTIN, and VINCENT HILL,
Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIEF OF APPELLANTS SWEENEY, CARSON,
COATES, MARTIN, and HILL

Paul Rosenzweig, Esq.
c/o Heritage Foundation*
214 Massachusetts Ave., NE
Washington, DC 20002
*Attorney for Samuel Carson*

Stephen C. Leckar, Esq.
1301 Pennsylvania Ave., NW, Ste. 500
Washington, DC 20004
*Attorney for Sean Coates*

Reita Pendry, Esq.
P.O. Box 42249
Charlotte, NC 28215
*Attorney for Jerome Martin*

Steven R. Kiersh, Esq.
717 D. St. NW, Ste 400
Washington, DC 20004
*Attorney for William Sweeney*

Mary Davis, Esq.
Christopher Davis, Esq.
601 Indiana Ave. NW, Ste. 910
Washington, DC 20004

Jensen E. Barber, Esq.
400 7th St. NW, Ste. 400
Washington, DC 20004
*Attorneys for Vincent Hill*

* For identification and mailing purposes only

# TABLE OF CONTENTS[*]

**Page**

CERTIFICATION AS TO PARTIES, RULINGS, AND RELATED CASES ................................. i

TABLE OF CONTENTS ................................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................................ x

JURISDICTIONAL STATEMENT ................................................................................................ 1

STATEMENT OF THE ISSUES ..................................................................................................... 2

STATUTES AND REGULATIONS ............................................................................................... 9

STATEMENT OF THE CASE ......................................................................................................... 9

STATEMENT OF FACTS ............................................................................................................... 11

SUMMARY OF ARGUMENT ....................................................................................................... 14

ARGUMENT ..................................................................................................................................... 23

I.    The trial court's indiscriminate dismissal of a deliberating juror compromised the trial's structural integrity ........................................................................................................... 23

     A.    Standard of review ......................................................................................................... 24

     B.    Factual background ........................................................................................................ 24

     C.    Argument ........................................................................................................................ 31

         1.    The court failed to conduct a sufficient inquiry on the record to support the removal of Juror No. 3 after deliberations had begun ................................... 33

         2.    No evidence showed that Juror No. 3 was suffering from a debilitating mental illness that would have rendered him unfit to serve on a jury ............. 34

         3.    Juror No. 3 was removed in order to hasten the deliberations because his views appeared to question the Government's case ......................................... 39

---

[*] We do not include a Glossary of Abbreviations as all of the acronyms used in this brief are of common usage and, thus, do not require definition.

4.      The district court's reasons for dismissing Juror No. 3 were insufficient
        to support the use of Rule 23(b). Its findings that Juror No. 3's answers to
        the *voir dire* questionnaire were "deceptive" are unsupportable ......................46

5.      Had good cause legitimately existed to remove Juror No. 3 then the
        proper next step would have been to declare a mistrial. ..................................50

D.   Conclusion ............................................................................................................51

II.   Defendants were prejudiced by the trial court's failure to conduct the *voir dire* and trial
      in an even-handed, unbiased manner .........................................................................51

A.   Standard of review ..................................................................................................52

B.   Argument .................................................................................................................52

1.      The trial court conducted the pretrial hearings in a way that made plain
        its sympathies lay with the Government .......................................................57

2.      The trial judge failed to administer jury selection in a fair manner that
        would have enabled counsel to assess the prospective jurors' impartiality.
        His actions probably had the opposite effect ................................................58

3.      The district court threatened and demeaned defense counsel ......................68

4.      The district court made clear where its sympathies lay during the trial by
        placing undue restrictions on cross-examination..........................................76

5.      The district court imposed other unusual and inappropriate procedural and
        evidentiary restrictions on defense counsel .................................................82

6.       The district court allowed the Government to present inadmissible
         evidence .......................................................................................................85

7.      The trial judge sometimes acted as a third prosecutor.................................87

8.      The Court's response to *Brady* and *Jencks* requests was lackadaisical ...........90

9.      The district court afforded the Government greater lenity in the presentation
        of its case and argument than it did the defense .........................................92

10.     The presence of acquittals on some counts does not affect the result,
        for Appellants did not receive a fair trial ...................................................95

-iii-

D.    Conclusion ................................................................................................95

III.  The district court erred in admitting Robert "Butchie" Smith's hearsay statements
      to Montgomery and Agent Lisi. The statements violated defendants' Confrontation
      Clause rights and were highly prejudicial.............................................................96

A.    Introduction...............................................................................................97

B.    Standard of review ...................................................................................100

C.    The court erroneously concluded that Smith's hearsay could be admitted against
      all defendants ..........................................................................................100

D.    The district court's admission of Sweeney's statement to Smith to be used
      against Carson and Coates violated the *Bruton* rule ..............................103

      1.    There was no evidence presented by the Government that Robert Smith
            was a member of the charged conspiracy ........................................103

            a.    Smith's sales to Ferrar, Johnson, Hines and Jenkins ...............104

            b.    Smith's sales to the Government witnesses and the defendants.............104

      2.    The Court erred in holding that the coconspirator statement exception to
            the hearsay rule applied to the statements of William Sweeney to
            Robert Smith ....................................................................................105

E.    The court erroneously concluded that Smith's hearsay could be admitted
      against defendants not even implicated in Smith's murder .......................108

      1.    Imputed waiver of confrontation rights as applied by the courts of
            appeals..............................................................................................109

      2.    Imputed waiver of confrontation rights as applied by this court ........112

      3.    Coates and Sweeney did not solicit Smith's murder .........................113

F.    The error in admitting Smith's hearsay was highly prejudicial.................114

      1.    Sweeney and Carson .........................................................................114

      2.    Coates.................................................................................................115

-iv-

G.    Conclusion .................................................................................................118

IV.    The VICAR and First Degree Murder convictions must be vacated ................................119

A.    Standard of review .................................................................................................120

B.    The Government failed to present any evidence of an element necessary to sustain certain of Appellants' convictions under the Violent Crimes In Aid Of Racketeering statute and RICO – namely a connection to interstate commerce.................................................................................................120

     1.    The offenses alleged did not satisfy the Commerce Clause requirements enunciated in *Lopez*.................................................................................................122

     2.    The Government must show an effect on interstate commerce and prove the Defendant's motive in order to satisfy its burden of proof under the VICAR statute.................................................................................................125

     3.    The Government failed to prove a necessary element of the VICAR statute in certain of the counts for which the Defendants were convicted.....128

         a.    Attempted murder – Ulysses English (Carson) ...................................128

         b.    The triple murder (Coates).................................................................................129

C.    The D.C. First Degree Murder convictions were misjoined and must be vacated .................................................................................................131

     1.    The murders of Hallman and Hyson: (Carson)...............................................132

     2.    Murder of Anthony Fortune (Carson and Martin) ............................... ....... ....133

     3.    Murder of Teresa Thomas and Terita Lucas (Carson)....................................134

V.    Reversal of the VICAR convictions requires reversal of the corresponding convictions for using or carrying a firearm in connection with a crime of violence ...........................135

VI.    The district court erred by refusing Defendants' request to admit the grand jury testimony of two witnesses whose testimony would have implicated persons other than defendants in the triple murders .................................................................................................136

A.    Introduction.................................................................................................136

-v-

B.   Standard of review ....................................................................137

C.   The grand jury testimony should have been admitted ...........................137

VII.   The district court erroneously allowed the Government to argue on rebuttal without a cautionary instruction that the jury could use the cooperating witnesses' guilty pleas as substantive evidence of Appellants' guilt ...............................140

A.   Standard of review ....................................................................141

B.   Analysis......................................................................................141

VIII.   The Government's *Brady* violation requires that Carson's and Martin's convictions for the Tony Fortune murder be vacated......................................................143

A.   Standard of review ....................................................................144

B.   Argument ..................................................................................144

IX.   The counts in the indictment relating to activities at 37th Street were improperly joined with the trial of the conspiracy and RICO counts, and the denial of the severance motion was error............................................................................148

A.   Standard of Review ....................................................................148

B.   Argument ..................................................................................149

    1.   Procedural background ..........................................................149

    2.   The trial evidence..................................................................150

    3.   Summary of facts ..................................................................151

    4.   The counts related to activity at 37th Street were misjoined with the RICO and conspiracy counts and with the substantive counts relating to the 200 block of K Street, SW ........................................153

    5.   Defendants were prejudiced by the misjoinder of offenses and defendants and the motions to sever should have been granted..........................156

    6.   Even if the 37th Street offenses were properly joined, the evidence at trial revealed multiple conspiracies rather than the single conspiracy charged in the indictment and Defendants were prejudiced by the variance....................................................................................160

-vi-

X.   The District Court's *Ex Parte* contacts with jurors violated Due Process and Rule 43 of the Rules of Criminal Procedure ................................................................... 162

A.   Standard of Review ................................................................................. 162

B.   Argument ................................................................................................. 162

XI.  Appellant Sweeney is entitled to a new trial................................................. 168

A.   The District Court erred by not allowing Wesley Smith and Frederick Miller to testify ..................................................................................................... 168

1.   Standard of review ........................................................................... 168

2.   Argument .......................................................................................... 168

a. The district court's refusal to allow Wesley Smith's testimony was erroneous............................................................................. 168

b. The district court erroneously refused to allow Frederick Miller to testify............................................................................................ 171

B.   The district court erred in denying Sweeney's motions for severance .................... 171

1.   Standard of review ........................................................................... 172

2.   Argument .......................................................................................... 172

C.   The district court erred in admitting evidence regarding Wayne Perry ................ 174

1.   Standard of review ........................................................................... 174

2.   Introduction ...................................................................................... 174

3.   Argument .......................................................................................... 177

D.   The district court erred in denying defendant sanctions for *Brady* violations ........ 179

1.   Standard of review ........................................................................... 179

2.   Argument .......................................................................................... 179

-vii-

E.    The district court erred in denying defense counsel the right to review Charles Bender's psychiatric records .................................................................180

    1.    Standard of review ..............................................................................180

    2.    Argument ..............................................................................................180

XII.    Appellant Carson is entitled to have his RICO conviction vacated..................181

A.    Standard of review ........................................................................................181

B.    The legal standard for a RICO enterprise ....................................................181

C.    The evidence against Mr. Carson failed to demonstrate his participation in the affairs of a RICO enterprise ...................................................................184

XIII.    The evidence was insufficient to convict Coates and Martin of violating the RICO conspiracy statute..............................................................................................187

A.    Standard of review ........................................................................................188

B.    Coates' RICO conspiracy conviction must be vacated because the Government failed to prove that he conspired to operate or manage the enterprise or that he conspired with those who were doing so and that he was at a sufficiently high level to incur liability under § 1962(d).........................................188

XIV.    Appellant Hill is entitled to a new trial ...........................................................192

A.    The district court erred when it refused to allow Appellant Hill to introduce into evidence the grand jury testimony of an alibi witness who was not available at the time of trial ...........................................................................................192

    1.    Standard of review ..............................................................................192

    2.    Introduction..........................................................................................192

    3.    Argument ..............................................................................................194

B.    The trial judge's error in refusing to strike prejudicial hearsay is grounds for reversal of Hill's murder conviction .......................................................195

    1.    Standard of review ..............................................................................195

    2.    Argument ..............................................................................................196

-viii-

a.   Introduction ............................................................................ 196

b.   The testimony was unquestionably inadmissible hearsay ...................... 197

c.   The trial court's failure to strike Byars' testimony was not harmless error.................................................................................. 198

C.   The district court erroneously allowed the Government to introduce a letter it recovered from Hill's jail cell that had been prepared during plea negotiations ................................................................................. 199

1.   Standard of review ....................................................................... 199

2.   Argument ..................................................................................... 199

a.   Introduction ........................................................................... 199

b.   The letter was inadmissible......................................................... 199

XV.   Appellants' sentences were imposed in violation of *Booker* ............................................ 202

A.   Standard of review ............................................................................ 202

B.   Factual background ........................................................................... 203

C.   Appellants' cases must be remanded for a redetermination of sentence ................ 209

1.   The *Coles* decision ......................................................................... 209

2.   The record regarding sentencing is ambiguous, requiring remand................ 210

3.   Appellant Coates was especially prejudiced by the error ............................... 213

D.   Mandatory sentencing violates *Booker* .............................................................. 216

1.   The *Booker* decision ....................................................................... 217

2.   Automatic remand for discretionary re-sentencing is required........................ 218

-ix-

E.     Resolution of Appellants' substantive challenges to their convictions may
       magnify the *Booker* error by importing a direct violation of the Sixth
       Amendment .......................................................................................................226

CONCLUSION ...............................................................................................................228

ADDENDUM

REQUEST FOR ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

-x-

The district judge's reaction was wrong. Witnesses are neither side's "property" and no one has the right to prevent the other side from seeking to discuss matters with prospective witnesses.[267]

### 8. The Court's response to *Brady* and *Jencks* requests was lackadaisical.

The defense was further frustrated by the judge's unwarranted belief in the prosecutors' diligence when defense counsel sought *Jencks* statements or requested *Brady* materials. In fact, the judge's confidence in the prosecutors to turn over such materials proved to be misplaced. For instance, when a woman named Charlene Wilson testified about the murder of Tony Fortune, which was an act charged against Martin and Carson, she said that she was present at the time of the murder, that Carson had killed Fortune, and that Martin had driven Carson from the scene of the murder.[268] Yet she had earlier given an oral statement to the Government that she was *not* present at the murder, but heard about it from others – a plainly inconsistent earlier statement.[269] The Government provided the FBI report reflecting the oral statement *four* months after Wilson left the witness stand. Indeed, had a testifying agent not made the mistake of refreshing his recollection by using the notes of his conversation with Ms. Wilson, it is likely that this jarring evidence of fabrication or gross inconsistency (either by Ms. Wilson or the agent) would not have been disclosed.[270]

---

[267] *Gregory v. United States*, 369 F.2d 185, 187-88 (D.C. Cir. 1966) (" But we know of nothing in the law which gives the prosecutor the right to interfere with the preparation of the defense by effectively denying defense counsel access to the witnesses except in his presence. Presumably the prosecutor, in interviewing the witnesses, was unencumbered by the presence of defense counsel, and there seems to be no reason why defense counsel should not have an equal opportunity to determine, through interviews with the witnesses, what they know about the case and what they will testify to.").

[268] (2/13/01 AM 24-27, App. 2264-67).

[269] (6/14/01 PM 55, App. 3437).

[270] (6/14/01 PM 48-49, App. 3434-35)

-90-

App 761

The Government explained this fabrication and bolstered Wilson's testimony with the testimony of the officer who wrote the report, saying that he had lied in his official report in order to "protect" Wilson.[271] Thereafter, given the time constraints placed upon defense counsel by the judge, the defense was not able to recall Ms. Wilson for impeachment with the prior statement.

In another instance, defense counsel complained that the Government had not disclosed close to a thousand pages of *Jencks* materials in sufficient time to be read and understood. The Government's disclosures violated a standing order to turn over *Jencks* material within 48 hours of the time the witness would be called to the stand.[272] The judge characterized that as defense counsel's problem and ordered them to commence cross-examination or forego it.[273] His unwillingness to allow a brief and necessary recess is hard to fathom.[274]

Martin's counsel also ran afoul of a similar perplexing situation when she requested *Jencks* materials that the Government had agreed to provide before she finished her cross-examination of Agent Lisi, who had given extensive testimony implicating Martin in several of the underlying events charged. The judge told her to "sit down," and then decided she would have to proceed, regardless of whether she had the materials.[275] Later she requested notes of a witness that had not been made available as *Jencks*. This prompted the judge to lament that he

---

[271]   (*Id.* at 55, App. 3437). Ms. Wilson was not, however, identified in the report, but rather was named as confidential informant WF14687C. (6/14/01 PM 63, App.). This incident is sufficiently egregious that it forms an independent basis for reversal of Carson's and Martin's convictions for the Fortune murder. Our reasoning is set forth in more detail in § VIII below.

[272]   (1/11/01 AM 79, App. 1742).

[273]   (*Id.*, App. 1742).

[274]   *United States v. Dellinger*, 472 F.2d at 387 n. 81 ("On occasion [the judge] declined defense requests for a short recess for convenience of defense counsel....").

[275]   (1/22/01 PM 34, App. 3970 (Vol. XVII)).

-91-

was "extremely weary" of *Jencks* requests and to put on the ***defense*** the burden of proving that the materials were not turned over, although the law imposes on the ***Government*** the affirmative obligation to turn over exculpatory information that is materially significant to the defense.[276]

What is more, the Government admitted that the witness said he had made notes that it had not, in fact, turned over. Its explanation was that the witness had been mistaken.[277]

The direct examination of Ronald Sowells, another cooperating Government witness who implicated several of those on trial with acts of narcotics trafficking and violent use of firearms, revealed that he had falsely implicated three people in murders and lied at his own trial. The Government knew of this, because in a debriefing well before trial, he had confessed to lying. The defense complained that it had not been provided this *Brady* evidence. The judge incorrectly told the defense that it was their burden to investigate whether there was *Brady* information regarding any witness that the Government had not turned over.[278]

### 9.    The district court afforded the Government greater lenity in the presentation of its case and argument than it did the defense.

Even though the Government's case lasted for several months, the judge never groused about the length of the Government's presentation, or threatened to limit it. When he was presented with a Government witness list of 170-odd names, his reaction was to rush the defense, rather than the Government.[279] He accommodated the Government in every way, allowing them to repeatedly recall witnesses so that the presentation could be accomplished in an orderly

---

[276] *United States v. Agurs*, 427 U.S. 97, 96 S. Ct.. 2392, 2399-2400 (1976) (*Brady* disclosure); *United States v. Bagley*, 473 U.S. 667, 105 S. Ct.. 3375, 3380-81 (1985) (impeachment); *United States v. Cuffie*, 80 F.3d 514, 518 (D.C. Cir. 1996) (due process violation when Government fails to disclose evidence of witness' perjury, even though witness had already been impeached on basis of drug addiction, cooperation agreement, incentives to lie, and so forth).

[277] (2/13/01 PM 91-92, App. 2279-80).

[278] (4/18/01 AM 5-8, App. 2820-23).

[279] (2/27/01 PM 101, App. 2413).

App 763

In this case, the evidence was far from overwhelming and credibility of the Government's numerous cooperating witnesses (by our account there were at least eleven[449]) was a key, if not *the* key, factor. By arguing that the witnesses' guilty pleas could be used as substantive evidence the Government gave added credibility to the otherwise conflicting and questionable testimony of many of these witnesses.

Additionally, the improper argument went to the issue of Appellants' guilt as to the conspiracy and the substantive crimes of violence. Finally, not only did the trial judge not instruct the jury that they could not use the witnesses' pleas as evidence of the defendants' guilty, the court thought that there was nothing at all wrong with the argument.[450]

Because the improper argument was prejudicial and had a substantial injurious effect on Appellants, the error was not harmless and the convictions must be reversed.

## VIII.  The Government's *Brady* violation requires that Carson and Martin's convictions for the Tony Fortune murder be vacated.

Charlene Wilson was the sole witness to provide substantive testimony about the murder of Anthony ("Tony") Fortune -- an act charged against Martin and Carson. Wilson testified that she was present at the time of the murder, that Carson had killed Fortune, and that Martin had driven Carson from the scene of the murder.[451] Yet, unbeknownst to the defendants, Wilson had

---

[449] James Montgomery, Paul Franklin, "L.A." Bender, Arthur Rice, Paul Taylor, Reginald Switzer, Donald Nichols, Ronald Sowles, Eugene Byars, Demetrius Hunter, and James Rochester were on the stand for lengthy periods.

[450] *See Watson, supra* (standard instruction that arguments of counsel are not evidence insufficient to overcome prejudice to defendant where case was close and improper argument concerned central issue in case.)

[451] (2/13/01 AM 24-27, App. 2264-67).

earlier given an oral statement to the Government that she was *not* present at the murder, but had only heard about it from others – a plainly inconsistent earlier statement.[452]

The Government did not provide the FBI report reflecting the oral statement to the defendants as part of its *Brady* discovery. Rather, it made the disclosure only after Wilson had left the witness stand and four months had elapsed. Indeed, had the FBI agent who took Wilson's statement not made the mistake of refreshing his recollection by using the notes of his conversation with Wilson, it is likely that this damning evidence of fabrication (either by Ms. Wilson or the agent) would not have been disclosed.[453] This palpable *Brady* violation materially effected the convictions of Carson and Martin for the Fortune murder and requires reversal of those convictions.

### A.    Standard of review.

This Court reviews an alleged due process violation under *Brady v. Maryland*,[454] for a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense.[455] It reviews the related denial of the motion for a new trial for abuse of discretion.[456]

### B.    Argument.

In *Brady* the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either

---

[452] (6/14/01 PM 55, App. 3437).

[453] (*Id.* at 48-49, App. 3435-36).

[454] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

[455] *See Moore v. Illinois*, 408 U.S. 786, 794-95, 92 S. Ct. 2562 (1972).

[456] *See United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985).

App 765

to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[457] To effectuate this general rule, a three-part test has been recognized to assess alleged *Brady* violations: As the Court of Appeals for the Fourth Circuit said in *Spicer v. Roxbury Correctional Inst.*, to establish a due process violation based on the prosecution's failure to disclose information, a defendant must show that: "(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material."[458] Of course "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[459] The materiality of "suppressed evidence [must be] considered collectively, not item by item."[460] The remedy for a *Brady* violation is a new trial.[461]

Here, the Government's suppression of Charlene Wilson's oral statements to the FBI clearly met all three prongs of this Court's test. When she testified on February 13th, her testimony was damning for Appellants. As the only purported eyewitness to Fortune's death , she first testified that she saw "Sam" (*i.e.*, Mr. Carson) come out of the building. While engaged in conversation she heard gunshots and turned to look "to where the shots were being fired." When she looked in that direction, she claimed, she saw Carson "walking towards Tony Fortune, shooting. He then stood over top of him and shot him." She further averred that she then saw

---

[457] *Id.* at 1487.

[458] *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4ᵗʰ Cir. 1999).

[459] *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S. Ct. 989 (1987) (internal quotation marks omitted).

[460] *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555 (1995).

[461] *Spicer*, 194 F.3d at 562.

App 766

Carson run down the street and get into a van driving by "Pimp" (*i.e.* Mr. Martin) and drive away.[462] Manifestly, this testimony to a cold-blooded murder which was the *only* substantive testimony linking either Carson or Martin to the Fortune shooting, could only have had a powerful effect on the jury. If credited, it would be sufficient evidence to establish their guilt.

Cross-examination of Ms. Wilson would, therefore, have been substantially effected had the defendants known that her oral statement to the FBI differed materially from her direct testimony. But defendants were deprived of that knowledge – indeed it was not until *four months later* in June, when FBI Agent Warrener took the stand, that defendants learned of the existence of a contrary, undisclosed FBI record of Ms. Wilson's prior inconsistent testimony.

Agent Warrener was initially called by Carson to testify for the rather mundane purpose of establishing that Wilson was a paid informant.[463] Though perhaps of some utility in establishing Wilson's bias, this testimony was of relatively minor importance, given her gripping claim on the stand to have seen the killing. On cross-examination, however the Government sought (over Carson's objection) to rehabilitate Wilson's testimony by establishing her prior consistent statements to the FBI in her interviews, before she had been paid.[464] Warrener asserted that Wilson had told him that Carson shot Fortune and Martin drove Carson away.[465] In testifying to Wilson's prior consistent statements, the agent relied upon his report of his interview with Wilson to refresh his recollection.[466] Thus, even though the report of the

---

[462] (2/13/01 AM 24, 25-27, App. 2264-67).

[463] (6/14/01 PM 28, App. 3245).

[464] (6/14/01 PM 38-39, App. 3429-30) (overruling objection to use of prior consistent statement for rehabilitation).

[465] (*Id.* at 40, App. 3431) (FBI agent testifying to prior consistent statement of Wilson identifying Carson as murderer and Martin as driver).

[466] *E.g.* (6/14/01 PM 44, App. 3432) ("Can I refer to my report?");(*Id.* at 45, App. _ (reading report to himself and then testifying). Because Wilson was a confidential informant

interview with Wilson was not subject to production under the Jencks Act, the Court directed the Government to produce the report, since it had been used to refresh the agent's recollection.[467]

To the defendants' surprise, when they received the report they learned that it contradicted, not only Wilson's sworn testimony in court that she was an eyewitness, but also Agent Warrener's sworn testimony that Wilson previously had told him as well that she was an eye witness. Specifically Agent Warrener's investigative insert said that Charlene Wilson had told him that she had "heard" the information about the Fortune murder – not that she had seen it occur.[468]

Agent Warrener acknowledged that his investigative insert was a fabrication but testified that he had written his official report as he did in order to "protect" Wilson.[469] The use of the word "heard" he explained as purportedly being of "no significance." According to Warrener, Wilson had "told [him] that she witnessed both events."[470] Agent Warrener maintained this position even though Ms. Wilson was not, in fact, identified in the report, but rather was named as confidential informant WF14687C.[471]

To be sure, the Government presented some indirect evidence that purported to connect Martin and Carson to the murder – but that evidence was conflicting and unreliable, as we

---

identity was to be protected, Agent Warrener's interview notes were not placed in a formal FBI 302 report. Rather they were made part of an investigative "insert" included in the investigative files. (*Id.* at 35, App. 3428).

[467] (*Id* at 48-49, App. 3434-35) (ordering production of report).

[468] (*Id.* at 55,56, App. 3438-39) ("Q: [Y]our report does say that the source heard this information; isn't that right? A: That's correct.").

[469] (6/14/01 PM 55, App. 3437).

[470] (6/14/01 PM 60, App. 3440).

[471] (6/14/01 PM 63, App. 3443)

explained in discussing the VICAR convictions' shortfalls.[472] While some cooperating Government witnesses testified that Jerome Martin confessed to them that he had killed Tony Fortune,[473] another testified that Mr. Carson had acknowledged his responsibility.[474] As with all of the cooperating witnesses, each of these had a substantial criminal record, rendering his uncorroborated testimony, of little value. And the only corroborative extrinsic evidence offered was that of Officer Tyrone who testified that two days after the Tony Fortune murder, Jerome Martin had "hash" marks on his hand which the Officer believed to be caused by slide of a semi automatic gun.[475]

Given the time constraints placed upon defense counsel by the judge the defense was not able to recall Ms. Wilson for impeachment with her prior statement. Thus, we will never know if: a) Wilson, in fact, told Agent Warrener she only "heard" about the murder and later changed her testimony to portray herself as an eye witness; or b) Agent Warrener falsely characterized Wilson's statement in his report to protect her already protected, identity. But that is a determination that the *jury* should have been permitted to make.

Here, the sole eyewitness to the Fortune murder would have been subject to devastating cross-examination based upon the inconsistency between her claimed "eye witness" status and her prior statements to the FBI. Maybe she would have explained the inconsistency in the same way Agent Warrener did. But the Government's concealment of the inconsistency quite plainly deprived the defense of information that was of significant exculpatory value. And given

---

[472] *See supra* § IV.C.2.

[473] (4/4/01 AM 86; 4/9/01 PM 14, App. 2735, 2764).

[474] (4/25/01 AM 40-41, App. 2917-18); *see also* (3/12/01 PM 34, App. 2942) (testimony of Montgomery).

[475] (3/6/01 PM 70, App. 2435).

App 769

Wilson's status as the only witness to the alleged crime, there is no colorable argument to be made that the potentially significant cross-examination was not "material." The Government's concealment clearly meets the *Spicer* test and a new trial on this count is warranted.[476]

## IX. The counts in the indictment relating to activities at 37th Street were improperly joined with the trial of the conspiracy and RICO counts, and the denial of defendants' severance motion was error.

### A. Standard of review.

Whether defendants or counts in an indictment are properly joined for trial is a legal question, subject to *de novo* review. Where counts are properly joined, the question whether the court should have granted a severance motion is reviewed for abuse of discretion. If joinder is not permitted by Fed.R.Crim.P. 8(b), the convictions will be reversed unless the Government can demonstrate that the error is harmless, because misjoinder affects substantial rights.[477]

### B. Argument.

#### 1. Procedural background.

Counts 8 and 9 of the indictment charged Martin with murder of Anthony Fortune and assault on officer Marc Little. Count 2 charged a RICO conspiracy, with Predicate Act Number 23 relating to the murder of Anthony Fortune, Number 24 relating to assaults with intent to kill Keith Bradley, Keith Thomas, and Officers Treadwell, McDonald, Little and Ray, and Number 25 relating to the murder of Curtis Edwards and assaults with intent to kill Richard Burton and Keith Jones. All these counts and predicate acts grew out of events on 37th Street, SE[478]

---

[476] *Spicer*, 194 F.3d at 555.

[477] *United States v. (James) Brown*, 16 F.3d 423, 426 (D.C. Cir. 1994).

[478] Witnesses referred to the area as either "37th Street" or "37th Place." For conven
(Page 204 of Total) will denominate the area "37th Street."

App 770

## REQUEST FOR ORAL ARGUMENT

The Appellants hereby request oral argument as this appeal: a) involves legal issues that warrant the Court's plenary consideration; and b) requires review of factual matters of complexity where counsels' familiarity with the record will be of assistance to the Court.

## CERTIFICATE OF COMPLIANCE

I certify that this brief has been prepared using Microsoft Word Times New Roman 12-point typeface. Exclusive of the table of contents; table of citations; statement with respect to oral argument; addendum; certificate of compliance; and certificate of service the brief contains 71,583 words in conformance with the Court's February 23, 2005 Order respecting brief length.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line printout.

Paul Rosenzweig

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by Electronic Mail (and First Class Mail) on this 25th day of April, 2005 upon:

John R. Fisher, Esq.
Mary McCord Esq.
Assistant United States Attorney
555 4th St. NW
Washington, DC 20004

Paul Rosenzweig

App 771

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUN 1 4 2005

RECEIVED

**ORAL ARGUMENT SCHEDULED FOR OCTOBER 5, 2005**

**BRIEF FOR APPELLEE**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUN 1 4 2005

CLERK

Nos. 02-3015, 02-3016, 02-3017
02-3018, 02-3019, 02-3046

UNITED STATES OF AMERICA,                                    Appellee,

        v.

WILLIAM SWEENEY,
SAMUEL CARSON,
SEAN COATES,
JEROME MARTIN, and
VINCENT HILL                                                 Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ORIGINAL

KENNETH L. WAINSTEIN,
United States Attorney.

PETER ZEIDENBERG,
Trial Attorney
Dept. of Justice
Public Integrity Section
Bond Building
1400 New York Ave., NW
Washington, DC 20005

JOHN R. FISHER,
ROY W. McLEESE III,
ANJALI CHATURVEDI,
* MARY B. McCORD, DC BAR #427563,
Assistant United States Attorneys.

* Counsel for Oral Argument

555 Fourth Street, NW, Room 8104
Washington, D.C.  20530
(202) 514-7088

Crim. No. 98-329(TPJ)

ORIGINAL

## CERTIFICATE OF PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee, the United States of America, hereby states as follows:

A.    <u>Parties and Amici</u>:    The parties to this appeal are appellants William Sweeney, Samuel Carson, Sean Coates, Jerome Martin, and Vincent Hill; and appellee, the United States of America.  There are no <u>amici</u>.

B.    <u>Rulings Under Review</u>:    This is an appeal from the judgments of United States District Court Judge Thomas Penfield Jackson after appellants were found guilty in July and August 2001 of narcotics conspiracy, racketeering conspiracy, murder and other violent crimes, narcotics trafficking, and weapons possession. Appellants challenge numerous rulings made by the district judge throughout the course of the trial and during jury deliberations.

C.    <u>Related Cases</u>:    There are no related cases and this case has not been before this Court previously.

I N D E X

Page

COUNTERSTATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . 1

    Vincent Hill . . . . . . . . . . . . . . . . . . . . . . . . 2

    Jerome Martin . . . . . . . . . . . . . . . . . . . . . . . 3

    Samuel Carson . . . . . . . . . . . . . . . . . . . . . . . 4

    William Sweeney . . . . . . . . . . . . . . . . . . . . . . 5

    Sean Coates . . . . . . . . . . . . . . . . . . . . . . . . 5

COUNTERSTATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . 7

I.    THE GOVERNMENT'S CASE . . . . . . . . . . . . . . . . . . . 7

A.    The narcotics conspiracy . . . . . . . . . . . . . 8

B.    The RICO conspiracy . . . . . . . . . . . . . . . 13

    1.    Violence to protect turf or
        reputation. . . . . . . . . . . . . . . . . 14

        a.    Murder of Larry Wright . . . . . . . 14

        b.    Murders of Maurice
            Hallman and Leonard
            Hyson . . . . . . . . . . . . . . . 17

        c.    Murders of Teresa
            Thomas and Terita
            Lucas . . . . . . . . . . . . . . . 19

        d.    Murder of Anthony Fortune . . . . . 22

        e.    Shoot-out at 60th and East
            Capitol Streets . . . . . . . . . . 23

        f.    Shooting of Ulysses English . . . . 27

        g.    Feud with Kentucky Courts . . . . . 28

        h.    Feud with Condon Terrace . . . . . . 28

ii

      i.   Murder of Donnell Whitfield . . . .  30

      j.   Feud with L Street . . . . . . . . .  32

      k.  Shooting of Popa Mark Phillip . . .  35

  2.  Violence to enrich themselves . . . . . .  37

      a.  Simmons kidnaping . . . . . . . . .  37

      b.  Pryor kidnaping . . . . . . . . . .  38

      c.  Murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson . . . . . . . . . . . . . .  40

  3.  Witness intimidation . . . . . . . . . .  43

      a.  Conspiracy to murder witnesses in case against Maurice Proctor . . . . . . . . . . . . . .  43

      b.  Conspiracy to murder witnesses in case against Jerome Martin, and murder of Chrishauna Gladden . . . . . . . . . . . . . .  46

      c.  Shooting of James Coulter . . . . .  48

      d.  Murder of Robert Smith . . . . . .  51

II.  THE DEFENSE EVIDENCE . . . . . . . . . . . . . .  53

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . .  57

App 775

iii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

I.   THE TRIAL JUDGE DID NOT ABUSE HIS DISCRETION
     BY EXCUSING JUROR 3 FOR GOOD CAUSE UNDER
     RULE 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . 64

     A.   Factual and procedural background . . . . . . 64

     B.   Standard of review . . . . . . . . . . . . . . 75

     C.   The trial court's finding of good cause
          to remove juror 3 was adequately
          supported by the record. . . . . . . . . . . . 76

     D.   The trial court did not abuse its
          discretion by denying a motion for a
          mistrial. . . . . . . . . . . . . . . . . . . . 91

     E.   The ex parte communications with jurors
          1, 3, and 17 did not violate appellants'
          constitutional or statutory rights. . . . . . 92

II.  THE DISTRICT JUDGE DID NOT DENY APPELLANTS
     A FAIR TRIAL. . . . . . . . . . . . . . . . . . . . . . . 96

     A.   Legal principles and standard of review. . . . 96

     B.   Appellants have not shown that the
          district judge denied them a fair
          trial. . . . . . . . . . . . . . . . . . . . . 99

III. THE ADMISSION OF STATEMENTS BY ROBERT SMITH
     DID NOT VIOLATE APPELLANTS' CONFRONTATION
     CLAUSE RIGHTS. . . . . . . . . . . . . . . . . . . . . . 112

     A.   Factual and procedural background . . . . . . 112

     B.   Legal principles and standard of review . . . 113

     C.   The trial court did not clearly err
          in determining that all defendants
          had waived their Confrontation
          Clause and hearsay objections to
          Smith's testimony. . . . . . . . . . . . . . . 117

D.   The trial court did not clearly err by
     determining that Smith was a co-
     conspirator and that Sweeney's statements
     were in furtherance of the conspiracy.  . . . 124

E.   Any error in the admission of Smith's
     statements was harmless. . . . . . . . . . . 130

IV.  APPELLANTS WAIVED THEIR CONSTITUTIONAL CHALLENGE
     TO 18 U.S.C. § 1959, AND THERE WAS SUFFICIENT
     EVIDENCE TO SUPPORT THEIR CONVICTIONS UNDER THAT
     STATUTE. . . . . . . . . . . . . . . . . . . . . . . 134

A.   Appellants waived their facial
     constitutional challenge to 18 U.S.C.
     § 1959 . . . . . . . . . . . . . . . . . . . . 134

B.   The VICAR statute is constitutional . . . . . 136

C.   The evidence was sufficient to establish
     the elements of 18 U.S.C. § 1959 on the
     challenged counts. . . . . . . . . . . . . . . 142

D.   There is no reason to vacate the 18
     U.S.C. § 924(c) convictions. . . . . . . . . . 151

V.   THE FIRST-DEGREE MURDER CHARGES AND CHARGES RELATED
     TO 37ᵀᴴ PLACE WERE PROPERLY JOINED   . . . . . . . . 152

A.   Legal principles and standard of review  . . . 152

B.   The first-degree murder charges were
     properly joined. . . . . . . . . . . . . . . . 153

C.   The charges involving 37ᵗʰ Place were
     properly joined. . . . . . . . . . . . . . . . 159

VI.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
     EXCLUDING THE GRAND-JURY TESTIMONY OF UNAVAILABLE
     WITNESSES . . . . . . . . . . . . . . . . . . . . . . 173

A.   Legal principles and standard of review. . . . 173

v

B.    Sweeney's proffered evidence.  .  .  .  .  .  .  .  . 173

    1.    Factual    and    procedural
       background.  .  .  .  .  .  .  .  .  .  .  .  .  .  . 173

    2.    The  district  court  did  not
       abuse its discretion in finding
       no similarity of motive.  .  .  .  .  .  .  .  . 176

    3.    Any  error  in  excluding  the
       grand jury testimony of Pinkney
       and Owens was harmless.  .  .  .  .  .  .  .  . 183

C.    Hill's proffered evidence.  .  .  .  .  .  .  .  .  .  . 184

    1.    Factual    and    procedural
       background  .  .  .  .  .  .  .  .  .  .  .  .  .  . 184

    2.    Any  error  in  excluding  the
       grand-jury testimony of Jenifer
       was harmless.  .  .  .  .  .  .  .  .  .  .  .  .  . 184

VII. THE    PROSECUTOR'S  REBUTTAL  ARGUMENT  WAS  NOT
    IMPERMISSIBLE AND DID NOT SUBSTANTIALLY PREJUDICE
    APPELLANTS.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 188

A.    Factual and procedural background.  .  .  .  .  .  . 188

B.    The    prosecutor's    statement    was
    permissible and did not substantially
    prejudice the trial.  .  .  .  .  .  .  .  .  .  .  .  .  . 191

VIII.  APPELLANTS HAVE NOT ESTABLISHED ANY BRADY
    VIOLATIONS  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 196

A.    Legal principles and standard of
    review.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 196

B.    Carson and Martin have not shown that the
    belated  disclosure  of  alleged  Brady
    information was plain error.  .  .  .  .  .  .  .  . 197

C.    Sweeney  has  not  established  a  Brady
    violation.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 202

App 778

vi

IX.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
     DISALLOWING THE HEARSAY TESTIMONY OF WESLEY SMITH
     AS SUBSTANTIVE EVIDENCE. . . . . . . . . . . . . . 206

     A.   Factual and procedural background. . . . . . . 206

     B.   The  statement  was  not  admissible  as
          substantive evidence under any hearsay
          exception. . . . . . . . . . . . . . . . . . . 207

     C.   Even  if  Robert  Smith's  statement  was
          admissible   under   Rule   806   for
          impeachment, its exclusion was
          harmless. . . . . . . . . . . . . . . . . . . . 210

X.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
     ADMITTING A DOCUMENT SEIZED FROM HILL'S JAIL CELL,
     AND DID NOT PLAINLY ERR BY FAILING TO SUA SPONTE
     SEVER THE CASE AGAINST SWEENEY OR REDACT THE
     DOCUMENT'S REFERENCES TO "SHORTY." . . . . . . . . 212

     A.   Factual and procedural background. . . . . . . 212

     B.   The document was not made "in the course
          of plea discussions with an attorney for
          the Government." . . . . . . . . . . . . . . . 213

     C.   The district court did not plainly err in
          failing to sua sponte grant a severance
          or order the document redacted. . . . . . . . 216

XI.  THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY
     PERMITTING LIMITED EVIDENCE ABOUT WAYNE PERRY. . . 222

     A.   Factual and procedural background. . . . . . . 222

     B.   The  trial  court  did  not  abuse  its
          discretion by admitting evidence about
          Wayne Perry. . . . . . . . . . . . . . . . . . 226

XII.  SWEENEY   ABANDONED   ANY   REQUEST   FOR   BENDER'S
      PSYCHIATRIC  RECORDS  AND,  IN  ANY  EVENT,  WAS  NOT
      RESTRICTED FROM   CROSS-EXAMINING BENDER ABOUT HIS
      MENTAL-HEALTH TREATMENT . . . . . . . . . . . . . . 231

      A.   Factual and procedural background. . . . . . 231

XIII.  THE REFUSAL TO STRIKE THE HEARSAY TESTIMONY OF
       EUGENE BYARS WAS HARMLESS.  . . . . . . . . . . . 236

      A.   Factual and procedural background. . . . . . 236

      B.   The refusal to strike Byars's hearsay
           testimony does not warrant reversal. . . . . 241

XIV.  THERE  WAS   SUFFICIENT  EVIDENCE   OF   THE   RICO
      CONSPIRACY  AND  OF  APPELLANTS'  AGREEMENT   TO
      PARTICIPATE IN THE CONSPIRACY. . . . . . . . . . . 243

      A.   Carson's claims . . . . . . . . . . . . . . . 243

      B.   Coates's and Martin's claims. . . . . . . . . 251

XV.   THE SUPREME COURT'S DECISION IN BOOKER DOES NOT
      REQUIRE A REMAND FOR RESENTENCING IN THIS CASE . . 261

      A.   Procedural background. . . . . . . . . . . . . 261

           1.   Vincent Hill . . . . . . . . . . . . . . 262

           2.   Samuel Carson . . . . . . . . . . . . . . 263

           3.   William Sweeney . . . . . . . . . . . . . 264

           4.   Sean Coates . . . . . . . . . . . . . . . 265

           5.   Jerome Martin . . . . . . . . . . . . . . 266

App 780

viii

B.   The district court would not have imposed
     different sentences, materially more
     favorable to the appellants, had it
     sentenced under the post-Booker regime.  . . . 267

     1.   Carson, Sweeney, and Coates
          were not prejudiced because the
          district court was statutorily
          required to impose life
          sentences on certain counts and
          additional consecutive
          sentences on other counts that
          added up to the functional
          equivalent of life sentences. . . . . . . 271

     2.   The record shows that the
          district court would not have
          sentenced appellants Hill,
          Carson, or Martin to materially
          more favorable sentences had
          the court been aware of the
          post-Booker sentencing
          regime. . . . . . . . . . . . . . . . . . 275

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . 281

App 781

196

1260 n.3 (without finding error in admission of guilty pleas of testifying cooperators, holding any error was harmless because jury was instructed not to consider guilty pleas as substantive evidence against appellants). See also United States v. Perholtz, 842 F.2d 343, 361 (D.C. Cir. 1988) (citing cases emphasizing "curative power" of such instructions).

Finally, this was not a close case. Although the strength of the government's evidence varied from count to count and defendant to defendant, the government presented an extremely strong case overall that appellants were part of an organization whose goals included the distribution of marijuana and the enrichment and protection of its members through violence. Every crime about which there was evidence presented was shown to be in furtherance of those goals. Viewed against this background, the single statement by the prosecutor, buried in a lengthy rebuttal argument after more than six months of testimony, could not have substantially prejudiced appellants.

## VIII.  APPELLANTS HAVE NOT ESTABLISHED ANY BRADY VIOLATIONS.

### A.  Legal principles and standard of review.

Where a Brady[128] violation is alleged, the materiality of the undisclosed or belatedly disclosed evidence is a question of law,

---

[128]    Brady v. Maryland, 373 U.S. 83 (1963).

197

reviewed de novo.  United States v. Cuffie, 80 F.3d 514, 517 (D.C. Cir. 1996).

Not every failure to disclose potentially exculpatory or impeaching evidence establishes a Brady violation.  Although the term "Brady violation" is "sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence  .  .  . strictly speaking, there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  Strickler v. Greene, 527 U.S. 263, 281 (1999). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. 667, 682 (1985).

> B.   Carson and Martin have not shown that the belated disclosure of alleged Brady information was plain error.

Appellant Carson called FBI Special Agent Chris Warrener to impeach Charlene Wilson by establishing that she was a paid FBI informant at the time she provided information that she had seen Carson shoot Anthony Fortune and drive away with Martin (6/14PM Tr. 29-30).  During his redirect examination by Carson, Agent Warrener referred to his notes in order to refresh his recollection (6/14PM Tr. 44-45).  The district judge for this reason ordered the notes turned over to defense counsel (6/14PM Tr. 48-49).  Warrener had

already explained that, in order to protect Wilson's identity, he did not write up the information she provided in a standard Form 302 (used for interviews with people expected to be called as witnesses in the future), but wrote it up in an anonymous fashion as an "insert" (6/14PM Tr. 35). Warrener testified that FBI agents use this procedure for informants whose identity they want to protect and who they do not anticipate will testify in the future (id.).

After a recess for defense counsel to read the "insert," Carson's counsel resumed his examination of Warrener without claiming that the insert revealed any "Brady" information (6/14PM Tr. 52). Martin's counsel then examined Warrener, also without claiming that the insert contained undisclosed Brady information (6/14PM Tr. 55). Martin's counsel did, however, question Warrener extensively about the fact that his report said that Wilson had told him that she "heard" the information about the Fortune murder (6/14PM Tr. 55-56). Warrener explained that this is the style of writing the FBI uses in order to protect the identity of an ongoing informant (id.). He disagreed that it was intended to mislead the defense, explaining that it was never anticipated that Wilson would become a testifying witness at trial (id.). Because he expected that the report would be disseminated to other law-enforcement personnel, and he wanted to protect Wilson's confidentiality,

199

Warrener wrote the report to say that Wilson had "heard" the information, even though she was actually an eyewitness (id.).

Carson's attorney then was permitted to resume his examination, and further questioned Warrener about the reference in the insert to the "source" having "heard" about what happened, rather than seeing it herself (6/14PM Tr. 59-61). Carson's counsel suggested that Warrener had been inconsistent in his report, sometimes using "heard" and other times writing it up as though Wilson had been a witness (id.). Gary Price's attorney also examined Warrener extensively on the matter (6/14PM Tr. 61-63). Price's attorney elicited that Wilson was not referred to by name in the document, thus suggesting that Warrener's explanation was incredible because Wilson's identity was already well protected (6/14PM Tr. 63).

Although appellants now claim (at 143) that Warrener's insert contained Brady material that should have been disclosed earlier, appellants do not claim to have ever made such a Brady claim in the district court, nor have we found one in the record. Similarly, although appellants now claim (at 147) that they were unable to recall Wilson as a witness because of time constraints placed on them by the district court, they point to no request to recall her, no request for assistance in locating her, and no request for a continuance in the record, and we have found none. In fact, there

was ample time to recall Wilson if the defense had desired to do
so, as the defense case continued for another five trial days over
the course of 11 calendar days.

Having failed to preserve their Brady claim in the district
court, appellants' claim is reviewed for plain error only. United
States v. (Ralph) Wilson, 160 F.3d 732, 741 (D.C. Cir. 1998) (where
alleged Brady material disclosed mid-trial and appellants did not
request a continuance or a mistrial, or even claim a Brady
violation, Brady claim reviewed on appeal for plain error). There
was no error, much less plain error.

"[U]nder Brady, 'the prosecutor is not required to deliver his
entire file to defense counsel, but only to disclose evidence
favorable to the accused that, if suppressed, would deprive the
defendant of a fair trial.'" United States v. Tarantino, 846 F.2d
1384, 1416-17 (D.C. Cir. 1988) (quoting Bagley, 473 U.S. at 675).
To prevail on a claim of a Brady violation based on belated
disclosure, appellants must show that, "had the statements been
disclosed earlier, there is a probability sufficient to undermine
our confidence in the actual outcome that the jury would have
acquitted." Tarantino, 846 F.2d at 1417. Appellants have made no
such showing here, nor could they, given that they made full use of
the information in their examinations of Agent Warrener. See
(Ralph) Wilson, 160 F.3d at 742 (no Brady violation where

App 786

statements disclosed in time for defendants to make effective use of them at trial); Tarantino, 846 F.2d at 1417 (no reasonable probability of different result where Court "doubt[ed] whether earlier discovery" would have "appreciably increased the effectiveness" of the cross-examination and where the defense was not foreclosed from arguing inconsistencies between testimony of key witness and disclosed statements of another witness later in the trial); United States v. Pollack, 534 F.2d 964, 974 (D.C. Cir. 1976) (no Brady violation where, "[w]hatever additional examination could have been produced by earlier revelation" of belatedly disclosed information "would not have introduced an element of reasonable doubt" of defendant's guilt).

Appellants here "fully exhausted" the alleged discrepancy during their examinations of Agent Warrener. Pollack, 534 F.2d at 974 (no prejudice where "it is obvious that appellant fully exhausted the subject"). Appellants made no motion for a continuance in order to call Ms. Wilson, nor did appellants ever file a new-trial motion alleging that, had they recalled Wilson, she would have testified that she was not an eyewitness to Fortune's murder. Agent Warrener fully explained that his notes were purposefully written to indicate that his source had only "heard" about the murder in order to protect the identity of Wilson, who was continuing to work as an informant for the FBI. In

light of Wilson's testimony that she saw Carson "st[and] over top of [Fortune] and sho[ot] him," (2/13AM Tr. 25), as well as Agent Warrener's unequivocal testimony that Wilson "provided to me the information as an eyewitness," there is no plain error and no reasonable probability that, had the information been disclosed earlier, the result would have been different.

### C. Sweeney has not established a Brady violation.

Appellant Sweeney was convicted of the murder of Donnell Whitfield, committed in retaliation for an altercation at a nightclub (J.A. 1180; see supra at 30-32). Sweeney's theory at trial was that Reginald Switzer killed Whitfield in retaliation for having been shot by Whitfield and George Seabrooks in 1989 or 1990 (5/23PM Tr. 4). Indeed, Switzer testified that he had killed Seabrooks in retaliation for the shooting and that he had staked out Whitfield's residence at least twice, while armed, but did not take the opportunity to kill him (5/15PM Tr. 7-8). Sweeney's counsel fully cross-examined Switzer about his motive to kill Whitfield and his attempts to do so (5/15PM Tr. 30-35). Sweeney's counsel also elicited that, when Sweeney had a conversation with Switzer about Sweeney's altercation with Whitfield at a nightclub, Switzer told Sweeney not to kill Whitfield because Switzer wanted to kill Whitfield (5/15PM Tr. 40). Switzer had already testified

that Sweeney not only told Switzer that he was going to kill Whitfield, but also that, after Whitfield's murder, Sweeney stopped by Switzer's house to tell Switzer that he had killed Whitfield (5/15PM Tr. 9). Switzer had also testified that, while he was incarcerated with Eric Jones, Jones told him that he had been with Sweeney when Sweeney killed Whitfield in Sursum Corda (5/15PM Tr. 10-11).

After Switzer's testimony, James Montgomery testified that Sweeney had admitted, while they were waiting together with Carson and Coates in the van before the triple murder, that he had killed Whitfield in Sursum Corda in retaliation for Whitfield having smacked him in the face at a nightclub (5/23AM Tr. 51-53). Montgomery also testified that, before Whitfield's murder, Switzer had told him about Switzer's desire to "get" Whitfield (5/23AM Tr. 53). Montgomery and Switzer were in a car together at the time of this conversation, and they drove past the building where Whitfield was hustling (id.). When they did so, Montgomery claimed that he offered to "go up there and blast [Whitfield's] ass right now," but that Switzer said he did not have a gun with him (5/23AM Tr. 54). Montgomery further testified that he later told Carson that Switzer wanted him to kill Whitfield for Switzer, and Carson advised him not to do it because Switzer should handle it himself (id.).

After a recess, but before cross-examination of Montgomery had begun, Sweeney's counsel moved the court to sanction the government for failing to disclose that "Mr. Montgomery had cooperated with Mr. Switzer in planning to kill Robocop, aka Donnell Whitfield" (5/23PM Tr. 3). Sweeney alleged that Montgomery's testimony was both exculpatory and impeaching and, as a sanction for the government's failure to disclose it, asked the court to strike the testimony of both Montgomery and Switzer regarding Sweeney's involvement in Whitfield's murder (5/23PM Tr. 3-7). Sweeney argued that his cross-examination of Switzer and Montgomery would have been different had he known of this information earlier (5/23PM Tr. 5).[122/] When told by the court that he could recall Switzer, Sweeney's counsel said "I have no interest in calling Mr. Switzer back" (id.). The district court denied the motion, stating:

> I do not deem it as necessarily exculpatory evidence.  I cannot imagine how it could have been used effectively for purposes of impeachment, and in any event, the testimony is before the jury for such use as you choose to make of it, [defense counsel], so I perceive no prejudice in the matter.  (5/23PM Tr. 12.)

On cross-examination, Sweeney's counsel questioned Montgomery extensively regarding his conversation with Switzer about killing Whitfield (5/23PM Tr. 39-44). Sweeney probed not only the conversation and Montgomery's offer to kill Whitfield for Switzer,

---

[122/] Montgomery was still being questioned on direct examination at the time Sweeney's counsel made this argument.

but also Montgomery's knowledge of Switzer's motive to kill Whitfield (id.).

Sweeney now argues (at 179) that "he was deprived of the opportunity to cross-examine Switzer as to whether or not he had these conversations and took these actions with Montgomery and impeach Switzer's credibility." But Sweeney expressly declined the opportunity to recall Switzer and engage in this cross-examination, stating that he had "no interest" in calling Switzer (5/23PM Tr. 5). This being so, Sweeney is in no position to now argue that there is a reasonable probability that he would have been acquitted of Whitfield's murder if he had known the information earlier. Cf. United States v. Mangieri, 694 F.2d 1270, 1280 (D.C. Cir. 1982) (court reluctant to reverse for invited error). Moreover, Sweeney took advantage of the opportunity to cross-examine Montgomery on the subject. Montgomery's testimony was completely corroborative of Switzer's testimony. Further cross-examination of Switzer on the issue would have done nothing more to exculpate Sweeney than Switzer's own admission that he had a motive to kill Whitfield and had, in fact, set out to do so on more than two occasions. Because Sweeney made full use of the information to cross-examine Montgomery, and declined the opportunity to recall Switzer, Sweeney has utterly failed to show that, "had the statements been disclosed earlier, there is a probability sufficient to undermine our

confidence in the actual outcome that the jury would have acquitted." Tarantino, 846 F.2d at 1417.

IX. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DISALLOWING THE HEARSAY TESTIMONY OF WESLEY SMITH AS SUBSTANTIVE EVIDENCE.

A. Factual and procedural background.

In his opening statement, Sweeney's attorney stated that Wesley Smith, the great-uncle of Sweeney and the uncle of Robert Smith, would testify that Robert Smith told him, around July 1996, that "he had gotten beaten out of $60,000" (6/6AM Tr. 28). Upon the government's objection, a bench conference ensued, during which Sweeney proffered that Wesley Smith would testify that Robert Smith told him that he was beaten out of $60,000 and he "was going to go back one day and take care of the guys in that house" (6/6AM Tr. 29). He further proffered that, a week after the triple murder, Robert Smith told Wesley Smith "I took care of Darnell Mack and those guys." (6/6AM Tr. 29.)

Sweeney argued that the hearsay was admissible as a co-conspirator's statement, a statement against penal interest, and a prior inconsistent statement (6/6AM Tr. 29). The government argued that co-conspirators' statements can only be introduced against a party who is a co-conspirator, and that the hearsay statements were not otherwise admissible because Sweeney had procured the unavailability of Robert Smith (6/6AM Tr. 30-32). After hearing

Rather, it shows that Coates preferred to have someone else do the dirty work while he reaped the benefit. Whether this Court follows the lead of the other circuits interpreting Salinas, as it should, or employs the operation-and-management test of Reves, the evidence in this case was more than sufficient for a rational juror to conclude that both Coates and Martin conspired to violate the substantive provisions of RICO.

### XV. THE SUPREME COURT'S DECISION IN BOOKER DOES NOT REQUIRE A REMAND FOR RESENTENCING IN THIS CASE

#### A. Procedural background.

The jury found "proven" that each of the appellants had committed at least one first-degree murder as a racketeering act (J.A. 1154, 1160, 1168, 1178, 1186). In addition, Carson, Sweeney, and Coates were each found guilty of several counts of murder in aid of racketeering (J.A. 1171-72, 1180, 1187). Consequently, under the Sentencing Guidelines, each of the appellants was assessed a total offense level of 43, the base offense level for first-degree murder and murder in aid of racketeering activity (J.A. 4028, 4083, 4131, 4175, 4218). See United States Sentencing Guidelines (U.S.S.G.) § 2A1.1(a).[134/] The Guidelines mandated a sentence of life imprisonment for total offense level 43,

---

[134/] Some of the appellants had higher offense levels, but the Guidelines require that higher offense levels be treated as offense level 43. U.S.S.G. Ch. 5 Pt. A, comment. (n.2).

262

regardless of criminal history category. U.S.S.G. Ch. 5, Pt. A (Sentencing Table). Consequently, each of the appellants was sentenced to life imprisonment. In addition, each of the appellants was sentenced to additional terms of imprisonment on other counts for which they had been convicted.

### 1. Vincent Hill

Vincent Hill was sentenced on January 29, 2002. The district court first imposed two terms of life imprisonment for the narcotics conspiracy (count 1) and the RICO conspiracy (count 2), to be served *consecutively* to each other (J.A. 3898). The court then imposed a sentence of 20 years to life on the D.C. Code offense of first-degree murder while armed of Larry Wright (count 3), and sentences of 60 months each on the distribution of marijuana and possession with intent to distribute marijuana counts (counts 46-52, 54, 56-63) (id.). These sentences were to run concurrently with the two consecutive life sentences (id.).

Two days later, the district court reconvened the sentencing proceeding in order to correct the sentence imposed. Judge Jackson stated that, although there was no controlling D.C. Circuit precedent on the issue, other circuits had concluded that the Guidelines precluded consecutive life sentences on federal counts (J.A. 3925). Thus, Judge Jackson resentenced Hill to two life terms of imprisonment for the narcotics and RICO conspiracies, to

263

be served concurrently (J.A. 3926). He followed this with a sentence of 20 years to life on the D.C. Code first-degree murder conviction, this time imposing the sentence *consecutive* to, rather than concurrent with, the life sentence (id.). The remaining 60-month concurrent sentences on the marijuana counts were re-imposed unchanged (id.).

## 2.    Samuel Carson

Samuel Carson was sentenced on January 30, 2002. Consistent with the Guidelines, the district court imposed concurrent life sentences for the narcotics conspiracy (count 1) and the RICO conspiracy (count 2), as well as for the four counts of murder in aid of racketeering (of Chrishauna Gladden, Alonzo Gaskins, Darnell Mack, and Melody Anderson) (counts 22, 25, 26, and 27) (J.A. 3919). The court also imposed a concurrent sentence for the federal offense of attempted murder in aid of racketeering (of Ulysses English) (count 14) (id.). The court imposed statutorily mandated *consecutive* sentences of 5 years on the first count of use of a firearm during and in relation to attempted murder (count 29), and 20 years each on four additional counts of use of a firearm during and in relation to murder (counts 33, 35, 36, and 37) (id.)

For the D.C. Code offenses, the district court imposed all *consecutive* sentences: On five D.C. Code counts of first-degree murder while armed (of Maurice Hallman, Leonard Hyson, Teresa

Thomas, Terita Lucas, and Anthony Fortune) (counts 4-8), the district court imposed *consecutive* sentences of 20 years to life; on the sixth D.C. Code count of first-degree murder while armed (of Chrishauna Gladden) (count 21), which occurred after a change in the statutory penalty, the court imposed another *consecutive* sentence of 30 years to life (J.A. 3919).[135/] And on the count of AWIKWA (of Ulysses English) (count 13), the district court imposed another *consecutive* sentence of 5 years to life (id.). All together, Carson received a life sentence followed by 220 years of consecutive time, 85 years of which were mandated to be served consecutively by the applicable federal statute, 18 U.S.C. § 924(c)(1).

### 3.   William Sweeney

William Sweeney was sentenced on February 5, 2002. The district court sentenced Sweeney to life imprisonment for the narcotics and RICO conspiracies (counts 1 and 2), and for the four federal counts of murder in aid of racketeering (of Donnell Whitfield, Alonzo Gaskins, Darnell Mack, and Melody Anderson) (counts 16, 25, 26, 27), all to run concurrently (J.A. 3946). The

------

[135/]    The government had noted in its sentencing memorandum that this count of first-degree murder of Chrishauna Gladden under the D.C. Code (count 21) merged with the federal count of murder in aid of racketeering of Chrishauna Gladden (count 22). From the record, however, it appears that the district court neglected to merge the counts and vacate the conviction for count 21. See J.A. 1432 (Judgment and Commitment for Samuel Carson).

265

court also imposed a 20-year concurrent sentence for the attempted murder of Anthony Pryor in aid of racketeering (id.). The court then imposed *consecutive* sentences of 5 years for the first count of use of a firearm during and in relation to attempted murder (count 28), and 20 years for each of four additional counts of use of a firearm during and in relation to murder (counts 30, 35, 36, and 37) (id.). There were no D.C. Code offenses for which the court needed to impose sentence because the only two D.C. Code offenses for which Sweeney was found guilty merged with the federal offenses (J.A. 3945). All together, Sweeney was sentenced to life imprisonment followed by 85 years of statutorily mandated consecutive time under 18 U.S.C. § 924(c)(1).

### 4.    Sean Coates

Sean Coates was sentenced on February 7, 2002. The district court sentenced Coates to life imprisonment for the narcotics and RICO conspiracies (counts 1 and 2), and for the three federal counts of murder in aid of racketeering (of Alonzo Gaskins, Darnell Mack, and Melody Anderson) (counts 25, 26, and 27), all to run concurrently (J.A. 3951). The district court imposed 20-year concurrent sentences on each of two counts of attempted murder in aid of racketeering (of Anthony Pryor and Ronald Sowells) (counts 11 and 24) (J.A. 3952, 3955). The court then imposed *consecutive* sentences of 5 years for the first count of use of a firearm during

App 797

266

and in relation to attempted murder (count 28), and 20 years for each of four additional counts of use of a firearm during and in relation to murder (counts 34, 35, 36, and 37) (J.A. 3952). There were no D.C. Code offenses for which the court needed to impose sentence because the only two D.C. Code offenses for which Coates was found guilty merged with the federal offenses (J.A. 3949). All together, Coates was sentenced to life imprisonment followed by 85 years of statutorily mandated consecutive time under 18 U.S.C. § 924(c)(1).

### 5.  Jerome Martin

Jerome Martin was sentenced on February 13, 2002. The district court sentenced him to life imprisonment for the narcotics and RICO conspiracies (counts 1 and 2), to run concurrently (J.A. 3963). The court sentenced Martin to 20 years' imprisonment for the federal count of attempted murder in aid of racketeering (of James Coulter) (count 18), and 60 months' imprisonment on each of three federal counts of distribution of marijuana (counts 49, 53, 55) and one federal count of possession with intent to distribute marijuana (count 64), also to run concurrently (J.A. 3963-64). The court sentenced Martin to a *consecutive* sentence of 5 years on the federal count of using a firearm during and in relation to attempted murder (count 31), as required by 18 U.S.C. § 924(c)(1) (J.A. 3964). And finally, with regard to the two D.C. Code

offenses for which Martin was found guilty, the court sentenced him to a *consecutive* sentence of 20 years to life imprisonment for first-degree murder while armed of Anthony Fortune (count 8), and a *consecutive* sentence of 40 to 120 months' imprisonment for assaulting a police officer with a dangerous weapon (count 9) (J.A. 3963). All together, Martin was sentenced to life imprisonment followed by a minimum of 28 years of consecutive time, 5 years of which was statutorily mandated by 18 U.S.C. § 924(c)(1).

>    B.    The district court would not have imposed
>          different sentences, materially more
>          favorable to the appellants, had it
>          sentenced under the post-Booker regime.

In United States v. Booker, 125 S. Ct. 738, 755-56 (2005), the Supreme Court held that it would be a Sixth Amendment violation to impose a sentence under the mandatory United States Sentencing Guidelines if enhancements were based on judge-determined facts. As a remedy, the Court excised those portions of the Sentencing Reform Act of 1984 (which established the Sentencing Guidelines) that made the Guidelines mandatory. Id. at 764. See United States v. Coles, 403 F.3d 764, 765-66 (D.C. Cir. 2005) (summarizing Booker's holdings). The Supreme Court cautioned, however, that although "its holdings should be applied 'to all cases on direct review,'" it "did not 'believe that every appeal will lead to a new sentencing hearing.'" Coles, 403 F.3d at 766-67 (quoting Booker,

268

125 S. Ct. at 769). Rather, the Court explained, "we expect reviewing courts to apply ordinary prudential doctrines," including harmless-error and plain-error review. 125 S. Ct. at 769.

In this case, appellants acknowledge (at 201) that they did not challenge at their sentencings either the constitutionality or the mandatory application of the Guidelines. Accordingly, their Booker claims are reviewed for plain error only. Coles, 403 F.3d at 767. Under the plain-error standard, "'there must be (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights."'" Id. (quoting (Joyce) Johnson v. United States, 520 U.S. 461, 466-67 (1997) (quoting United States v. Olano, 507 U.S. 725, 732 (1998) (alteration in Johnson)). "'If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" Id. (internal quotations marks and alteration omitted).

This Court has twice had occasion to apply plain-error review to a Booker claim. In United States v. (Arnett) Smith, 401 F.3d 497, 499 (D.C. Cir. 2005), the Court found no plain error where the district court had twice sentenced the appellant (the second time after a remand on grounds not relevant to his Booker claim), and had both times departed upward. At the first sentencing, the

269

district judge had stated, "I believe, in my view, that you deserve the sentence that will be imposed here." Id. At the second sentencing, the judge again departed upward even though the government had not requested it. Id. Based on that record, this Court found that the appellant was not prejudiced by the impermissibly mandatory nature of the Guidelines, and thus could not meet the plain-error test. Id.

In Coles, this Court further elaborated on the application of plain-error review to Booker claims. It was clear in Coles, as it is in this case, that application of the Guidelines on the assumption that they were mandatory satisfied the first two components of the plain-error test. In Coles, this Court held that, if the error was prejudicial, it would "'seriously affect[] the fairness, integrity, or public reputation of judicial proceedings.'" 403 F.3d at 767. Thus, the question in Coles, as it is in this case, was "whether there would have been a materially different result, more favorable to the defendant, had the sentence been imposed in accordance with the post-Booker sentencing regime." Id. Citing its earlier decision in Smith, the Court in Coles noted that "[t]here undoubtedly will be some cases in which a reviewing court will be confident that a defendant has suffered no prejudice." Id. at 769. It went on to explain: "[f]or example,

'if a judge were to impose a sentence at the statutory maximum and say that if he could he would have imposed an even longer sentence, there would be no basis for thinking that if he had known that the sentencing guidelines are merely advisory he would have given the defendant a lighter sentence.'" Id. (quoting United States v. Paladino, 401 F.3d 471, 483 (7th Cir. 2005). The Coles Court also noted that "there will be some cases in which we are confident that the defendant suffered prejudice, say, for example, if the sentencing judge indicated on the record that, but for the Guidelines, she would have imposed a lower sentence." Id. In other cases, the Court cautioned, "the record simply [will not be] sufficient for an appellate court to determine prejudice with any confidence." Id. The Court found that Coles was such a case. In that case, the district judge had sentenced the appellant to 36 months in prison, which was "'somewhat above the lower end' of the 33-to-41 months Guidelines range," but the Court found that fact inconclusive. Id. at 769-70 (quoting government's argument). It thus remanded the record to the district court "for the limited purpose of allowing it to determine whether it would have imposed a different sentence, materially more favorable to the defendant, had it been fully aware of the post-Booker sentencing regime." Id. at 770.

This is a case, unlike Coles, in which this Court can be "confident" that appellants have suffered no prejudice. Although the Guidelines mandated life sentences for each of the appellants, because of the statutory mandatory minimum sentences that Carson, Sweeney, and Coates received, there was no prejudice from the district court's imposition of life sentences under the Guidelines on those appellants. In addition, because of the consecutive sentences that the district judge imposed, in its discretion, on appellants Hill, Carson, and Martin, this Court can be confident that the district judge would not have imposed different sentences "materially more favorable" to those appellants, had he been fully aware of the post-Booker sentencing regime.

> 1. Carson, Sweeney, and Coates were not prejudiced because the district court was statutorily required to impose life sentences on certain counts and additional consecutive sentences on other counts that added up to the functional equivalent of life sentences.

Carson, Sweeney, and Coates were each found guilty of multiple counts of murder in aid of racketeering (four counts each for Carson and Sweeney and three counts for Coates). The VICAR statute provides that individuals convicted of murder in aid of racketeering "shall be punished . . . by death or life imprisonment, or a fine under this title, or both." 18 U.S.C. § 1959(a)(1). Although the penalty for murder in aid of

racketeering has not been at issue before this Circuit, the Second Circuit has held that the statute carries a mandatory minimum sentence of life imprisonment. United States v. James, 239 F.3d 120, 127 (2000) (rejecting argument that statute permits court to reject a death sentence or life imprisonment by sentencing the defendant to a fine without prison time).[115/] Consequently, the district court would be bound in any remand to sentence appellants Carson, Sweeney, and Coates to the statutory mandatory minimum of life imprisonment. A case in which a defendant "cannot obtain any improvement in his sentence in resentencing" is "a prototypical example of harmless error." United States v. Sharpley, 399 F.3d 123, 127 (2d Cir. 2005). Cf. also United States v. Raad, 2005 WL 913599, at *1 n.1 (11ᵗʰ Cir. Apr. 21, 2005) (where sentence based on statutory mandatory minimum rather than on application of Guidelines, there is no Booker error); United States v. Childs, 403

---

[115/]  Before its amendment in 1994, § 1959(a)(1) provided punishment, "for murder or kidnaping, by imprisonment for any term of years or for life or a fine of not more than $50,000." The Federal Death Penalty Act of 1994 (FDPA) amended several sections of Title 18 of the U.S. Code to authorize the death penalty for certain crimes, including murder in aid of racketeering. In amending § 1959(a)(1), the FDPA authorized the death penalty for murder in aid of racketeering, but not for kidnaping in aid of racketeering. It also continued to authorize punishment of "any term of years" for kidnaping in aid of racketeering, but eliminated that as a sentencing option for murder in aid of racketeering. Pub. L. 103-322, Title VI, § 60003(a)(12).

273

F.3d 970, 972 (8ᵗʰ Cir. 2005) (same); United States v. Moore, 401 F.3d 1220, 1222 n.1 (10ᵗʰ Cir. 2005) (same).

The same result would obtain even were it not for the life sentences on the VICAR counts. Carson, Sweeney, and Coates were also found guilty of five counts each of using a firearm during and in relation to murder or attempted murder, in violation of 18 U.S.C. § 924(c)(1). As written at the time, that statute mandated a minimum consecutive sentence of 5 years' imprisonment for the first conviction and 20 years' imprisonment for second and subsequent convictions.[137/] Thus, Carson, Sweeney, and Coates each received 85 years of statutory mandatory consecutive prison time, which the district court judge would be obliged to impose during any resentencing proceeding. For men of their ages, the sentences for their § 924(c)(1) convictions alone would be tantamount to life sentences.[138/]  See United States v. Lott, 310 F.3d 1231,

_____

[137/] The statute has since been amended to require a 5-year mandatory consecutive sentence for the first § 924(c)(1) conviction and 25-year mandatory consecutive sentences for second and subsequent § 924(c)(1) convictions.

[138/] Carson was born on August 18, 1970, and has been incarcerated in this case since his arrest on September 2, 1998 (J.A. 4044-45). Carson would be 113 years old at the expiration of an 85-year-term of imprisonment. Sweeney was born on August 13, 1976, and has been incarcerated since his arrest on April 20, 1997 (J.A. 3996-97). Sweeney would be 106 years old at the expiration of an 85-year-term of imprisonment. Coates was born on May 13, 1972, and has been incarcerated since his arrest on October 2, 1998 (J.A. 4099-4100). Coates would be 111 years old at the expiration (continued...)

274

1244(10ᵗʰ Cir. 2002) (125-year sentence is effective equivalent of
life sentence). Because of the mandatory consecutive sentences
required for the § 924(c)(1) convictions, neither Carson, Sweeney,
nor Coates would be eligible for a "materially more favorable"
sentence on remand, even with the Guidelines as advisory rather
than mandatory. The district court's error in sentencing these
three defendants under the mandatory Guidelines regime caused them
no harm, and there is no need for this Court to remand to the
district court for resentencing. Cf. id. (no harm from imposing
life sentence in violation of Apprendi v. New Jersey, 530 U.S. 466
(2000),¹¹⁹/ where stacking provision of Guidelines (§ 5G1.2(d)) would
have required imposition of consecutive sentences on individual
counts to add up to functional equivalent of life sentence); United
States v. Lafayette, 337 F.3d 1043, 1050 (D.C. Cir. 2003) (agreeing
with sister circuits that where stacking provision of Guidelines
requires imposition of consecutive sentences as necessary to reach
total punishment called for by application of Guidelines, Apprendi
error is harmless).

—————————————————

¹¹⁸/ (...continued)
of an 85-year-term of imprisonment.

¹¹⁹/    Apprendi held that "[o]ther than the fact of a prior
conviction, any fact that increases the penalty for a crime beyond
the prescribed statutory maximum must be submitted to a jury, and
proved beyond a reasonable doubt." 530 U.S. at 490. Booker
extended the holding of Apprendi to facts supporting enhancements
under the Guidelines. 125 S. Ct. at 755-56.

    2. The record shows that the district court
        would not have sentenced appellants Hill,
        Carson, or Martin to materially more
        favorable sentences had the court been
        aware of the post-Booker sentencing
        regime.

In this case, the Court can feel confident that the district

court would not have sentenced Hill, Carson, or Martin to terms of

imprisonment of less than life because the court sentenced each of

these three defendants to terms *longer* than life even when it had

the discretion not to.

First, with regard to appellant Hill, the district court

originally imposed two *consecutive* life sentences on the narcotics

and RICO conspiracies (J.A. 3898). In so doing, the district court

fully conveyed his desire to impose the longest sentence possible

on appellant Hill. It was only after recognizing authority from

other circuits holding that the Guidelines precluded such

consecutive life sentences that the court resentenced Hill to

concurrent life terms (J.A. 3925-26). See also U.S.S.G. 5G1.2(c)

(if sentence imposed on count carrying highest statutory maximum is

adequate to achieve the total punishment determined by grouping

federal counts under the Guidelines, then the sentences on all

counts shall run concurrently except as otherwise required by law).

Again, however, the court expressed its intent to sentence Hill to

the longest possible term of imprisonment by imposing a *consecutive*

sentence of 20 years to life imprisonment on the D.C. Code offense of first-degree murder while armed (J.A. 3926). The district court had the discretion to impose the sentence for the D.C. Code conviction *concurrently*, but deliberately chose not to. As in Smith, where the district court twice departed upward, here, the district court twice chose to sentence Hill to a term *longer* than the life sentence mandated by the Guidelines. As in Smith, Hill has not shown that he was prejudiced by any Booker error in this case. See (Arnett) Smith, 401 F.3d at 499 ("Booker's requirement that the sentencing judge appreciate that he is not bound by the Guidelines thus plainly cannot help Smith.").[140/]

The district court similarly made his intentions clear in sentencing appellant Carson. Although the district court ran all of the sentences on the federal counts concurrently, in accordance with the Guidelines, the court imposed *consecutive* sentences for each and every one of the D.C. Code offenses for which Carson was

_____

[140/] As noted *supra*, this Court has indicated that "'if a judge were to impose a sentence at the statutory maximum and say that if he could he would have imposed an even longer sentence, there would be no basis for thinking that if he had known that the sentencing guidelines are merely advisory he would have given the defendant a lighter sentence.'" Coles, 403 F.3d at 769 (quoting Paladino, 401 F.3d at 483. Here, although the district judge did not explicitly state that he would have imposed a longer sentence if he could, his actions spoke louder than words. In this case, the district court actually *imposed* a longer sentence than the statutory maximum of life imprisonment by adding a consecutive sentence to the life sentence.

found guilty.    This included five *consecutive* 20-year-to-life
sentences for each of five first-degree murder convictions, and one
*consecutive* 30-year-to-life sentence on a sixth first-degree murder
conviction, which occurred after the penalty was raised from a
mandatory minimum of 20 years to a mandatory minimum of 30 years
(J.A. 3919).    The court imposed this sixth *consecutive* sentence
even though the government had stated in its sentencing memorandum
that the sixth first-degree murder conviction, relating to the
murder of Chrishauna Gladden, should merge with the murder in aid
of racketeering conviction involving the same victim. The district
court then imposed yet another *consecutive* sentence of 5 years to
life imprisonment on the count of AWIKWA of Ulysses English (J.A.
3919).    And this was after the court had already sentenced Carson
to 85 years of statutorily mandated consecutive time for Carson's
five counts of use of a firearm during and in relation to a murder
or attempted murder (*id.*).    Although the court had no discretion in
imposing those sentences consecutively, it had the discretion to
impose the sentences for the D.C. Code offenses concurrently but
chose not to.    Instead, the court imposed an additional minimum of
135 years of consecutive time, for a total of a life sentence
followed by at least 220 years.    If this sentence did not loudly
and clearly convey what the district court would have done had it
realized that the Guidelines were merely advisory, it is hard to

App 809

imagine what else the court could have done to make it clear. This Court can be confident that the district court would not have imposed a sentence "materially more favorable" to appellant Carson had it been fully aware of the post-Booker sentencing regime. Coles, 403 F.3d at 770.

Finally, with regard to appellant Martin, again the district court clearly expressed its intent to impose a sentence even longer than the Guidelines sentence by imposing *consecutive* sentences for each D.C. Code offense for which Martin was found guilty. Although it could have run the sentences concurrent with the Guidelines sentence, the court sentenced Martin to a consecutive term of 20 years to life imprisonment on the first-degree murder count and 40 to 120 months' imprisonment on the count of assaulting a police officer with a dangerous weapon (J.A. 3963). And, as it did for appellant Carson, the district court sentenced Martin to consecutive sentences on the D.C. Code offenses even after imposing a mandatory consecutive sentence on Martin's § 924(c) conviction. In Martin's case, as in Carson's and Hill's cases, this Court can be confident that the district court would not have imposed a sentence "materially more favorable" to Martin had it been aware of the post-Booker sentencing regime.

Appellants argue (at 210) that, although the district court "could" consider the Guidelines as advisory on remand, there might

App 810

be other factors that the appellants could bring to the court's attention that would warrant a sentence of less than life. Booker makes clear not that, on remand, the district court "could" consider the Guidelines, but that it "must consult those Guidelines and take them into account when sentencing." 125 S. Ct. at 767. The Guidelines, while no longer mandatory, continue to call for life sentences of imprisonment for each of the appellants. Although the formerly mandatory nature of the Guidelines perhaps resulted in a lack of incentive by appellants to argue other "considerations" warranting lower sentences, appellants have suggested no such other "considerations" that could have conceivably influenced the district court, especially given the consecutive sentences that it purposely imposed on top of the life sentences.[14]/

_____

[14]/ Appellants argue that the district court, on remand, might consider that a District of Columbia Superior Court judge has characterized the government as arguing, in a case brought pursuant to the Innocence Protection Act, D.C. Code § 22-4131, et. seq. (IPA), that James Montgomery was lying when he testified that Sam Carson, and not the petitioner, Steven DeWitt, had committed the murder for which DeWitt had been convicted. United States v. DeWitt, No. F5548-91 (Dec. 17, 2004). Montgomery testified at the IPA evidentiary hearing that Carson had admitted committing the murder. The government argued that Montgomery's testimony was based solely on hearsay and thus should be accorded little weight when compared to the testimony of the eyewitnesses. As appellants note, the government disagrees with the Superior Court judge's characterization of its argument, and intends to file a motion to amend the opinion to correct this inaccuracy. (The government advised appellants in this case about the Superior Court opinion
(continued...)

Only Coates attempts to offer possible factors a district court might consider at a resentencing. But each of these factors - that the prosecution had at one time been willing to enter a plea agreement with Coates; that some K Street members perceived him as "timid," "scared," and "effeminate'; and that he was the product of a "broken home" - were well known to the district court from the nine months of trial testimony and from the sentencing proceedings. Nevertheless, with this knowledge, the district court gave no indication that it was troubled by the sentence that it imposed or that it would have given a lesser sentence if it had the discretion to do so. Moreover, as argued supra, even if the court had viewed the Guidelines as advisory only, it would have been bound by the VICAR statute to impose a life sentence on each count of murder in aid of racketeering, and would have been bound by § 924(c)(1) to impose 85 years of consecutive sentences for five § 924(c)(1) firearms convictions. Thus, none of the "circumstances" appellant Coates now points to would have led to a sentence "materially more favorable" to him than the life sentence he received.

---

191/ (...continued)

shortly after it was issued, and has since provided appellants with the transcript of the government's argument, which will be the basis for the government's motion to amend). At any rate, the Superior Court judge credited Montgomery's testimony in granting relief under the IPA, and there is no reason to think that the district court would find anything about this unrelated case to be a mitigating circumstance that should lead to shorter sentences for any of the appellants.

281

## CONCLUSION

WHEREFORE, appellee respectfully requests that the judgments

of the district court be affirmed.

Respectfully submitted,

KENNETH L. WAINSTEIN,
United States Attorney.

JOHN R. FISHER,
ROY W. McLEESE III,
ANJALI CHATURVEDI,
PETER ZEIDENBERG,
Assistant United States Attorneys.

MARY B. McCORD, DC BAR #427563
Assistant United States Attorney
555 Fourth Street, NW, Room 8104
Washington, D.C.   20530
(202) 514-7088

App 813

## CERTIFICATE OF WORD COUNT

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(a)(7)(C) that this brief contains 68,824 words.

MARY B. McCORD
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that an electronic copy of the foregoing brief has transmitted to counsel for appellant Samuel Carson, Paul Rosenzweig, Esq.; counsel for appellant Sean Coates, Stephen C. Leckar, Esq.; counsel for appellant Jerome Martin, Reita Pendry, Esq.; counsel for appellant William Sweeney, Steven R. Kiersh, Esq.; and counsel for appellant Vincent Hill, Mary Davis, Esq., Christopher Davis, Esq., and Jensen E. Barber, Esq., on this 14th day of June, 2005.

MARY B. McCORD
Assistant United States Attorney

ORAL ARGUMENT SCHEDULED FOR OCTOBER 20, 2005

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

JUL – 6 2005

RECEIVED

Nos. 02-3015, 02-3016, 02-3017
02-3018, 02-3019, 02-3046
[Consolidated]

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUL – 6 2005

CLERK

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM SWEENEY, SAMUEL CARSON,
SEAN COATES, JEROME MARTIN, and VINCENT HILL,

Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REPLY BRIEF OF APPELLANTS SWEENEY, CARSON,
COATES, MARTIN, and HILL

Paul Rosenzweig, Esq.
c/o Heritage Foundation*
214 Massachusetts Ave., NE
Washington, DC 20002
Attorney for Samuel Carson

Stephen C. Leckar, Esq.
1301 Pennsylvania Ave., NW, Ste. 500
Washington, DC 20004
Attorney for Sean Coates

Reita Pendry, Esq.
P.O. Box 42249
Charlotte, NC 28215
Attorney for Jerome Martin

Steven R. Kiersh, Esq.
717 D. St. NW, Ste 400
Washington, DC 20004
Attorney for William Sweeney

Mary Davis, Esq.
Christopher Davis, Esq.
The Lincoln Bldg.
514 10th St. NW, Ninth Flr.
Washington, DC 20004

Jensen E. Barber, Esq.
400 7th St. NW, Ste. 400
Washington, DC 20004
Attorneys for Vincent Hill

* For identification and mailing purposes only

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................... v

INTRODUCTION ........................................................................................................................... 1

SUMMARY OF ARGUMENT ....................................................................................................... 3

ARGUMENT ................................................................................................................................... 7

I.  The Government has not refuted Appellants' proof that the District Court's dismissal of a
    deliberating juror was unjustified, marred by *ex parte* communications, based upon flawed
    and inconsistent reasoning, and constituted reversible structural error ...................................... 7

    A. The district court's erroneous decision constituted structural error .................................... 9

    B. The grounds that the Government has offered to support the trial court's decision
       collapse under inspection ............................................................................................... 11

       1.   The process by which the court conducted its inquiry was deeply flawed ............... 11

       2.   This *ad hoc* process produced the inevitable result – a deeply flawed decision
            with an ever-changing rationale ............................................................................. 14

            a.  There is an irreconcilable inconsistency between the district judge's initial
                decision that Juror No. 3 could serve and his ultimate conclusion to
                remove the juror ........................................................................................... 15

            b.  The court's articulated basis: the shifting "good cause" foundation ......... 16

                i.  Juror No. 3 plainly was not incapacitated ...................................... 17

                ii. The Government has not shown that Juror No. 3's voir dire
                    answers were inaccurate or deceptive ............................................ 19

            c.  The trial court disavowed its own analysis ................................................. 22

       3.   The Government relies chiefly on precedent that serves to confirm Appellants'
            position that the approach the trial court took was fatally flawed ............................ 24

       4.   The extensive nature of the *ex parte* proceedings between the court and deputy
            marshal and the jurors further impair the potential for informed appellate review ..... 26

App 816

5. The evidence strongly suggests that Juror No. 3 was a holdout removed to coerce a speedy verdict ............................................................................28

C. Conclusion.........................................................................................................30

II. Appellants were denied a fair trial by the conduct of the trial judge .......................31

A. Standard of review ............................................................................................31

B. Appellants' rights to a fair trial before a disinterested tribunal were eviscerated........33

1. The Government resorts to rhetoric over particularization.................................34

2. The Government has misstated the record............................................................35

3. The Government has also misstated the law..........................................................38

4. The Government's use of a "trial management" theory to excuse the trial court's artificial limits on the defense case rings unconvincingly...................40

5. The jury would have to have been deaf not to notice the district court's undue comments towards defense counsel .............................................................41

III. The introduction of Robert Smith's hearsay statements to Agent Lisi requires reversal .......44

A. Whether Smith was a co-conspirator is immaterial ......................................................46

B. Sweeney's purported statements to Smith were not "in furtherance of" the conspiracy.......46

C. No legal basis justified admissibility under a Rule 804(b) waiver theory. ...................55

D. The error was not harmless ............................................................................................58

E. Conclusion ......................................................................................................................61

IV. Appellants' convictions under the Violent Crimes In Aid Of Racketeering and the D.C. murder statute must be overturned. ..........................................................................................62

A. The VICAR statute is unconstitutional ..........................................................................63

1. The constitutional challenge was not waived ..................................................63

-ii-

App 817

2. VICAR is facially unconstitutional...........................................................................64

B. The evidence did not establish the charged VICAR violations ...........................................66

    1. The Government's stated reasons do not suffice to save the VICAR charge brought against Carson. .................................................................................67

    2. The VICAR case against Mr. Coates does not hold up any more than the one against Mr. Carson ...........................................................................67

C. The D.C. murder convictions were misjoined.........................................................69

V. The District Court abused its discretion by excluding the grand jury testimony of unavailable witnesses...........................................................................................72

A. The refusal to admit the testimony was error..........................................................72

B. The error was not harmless .................................................................................75

VI. The prosecutor's rebuttal argument was improper and substantially prejudiced the Appellants ...........................................................................................................76

VII. The failure to disclose Wilson's prior inconsistent statement was a Brady violation, requiring reversal of Carson and Martin's convictions for the murder of Anthony Fortune ...............................................................................................................80

VIII. The First Degree Murder charges and the charges related to 37th Place were not properly joined ................................................................................................................86

A. The Government incorrectly perceives the standard of review ..................................86

B. These proceedings violated Rule 8.......................................................................87

    1. There was no basis for joinder of the murders of Hallman and Hyson ............87

    2. Joinder of the Fortune murder was improper...................................................90

    3. The Thomas-Lucas murders also were misjoined ............................................91

    4. Joinder of the 37th St. shootings was also impermissible .................................92

-iii-

App 818

IX.  *Ex parte* contacts between the Judge and the Jurors violated Rule 43 and the
Due Process Clause ......................................................................................................... 95

CONCLUSION ................................................................................................................. 99

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

-iv-

App 819

## TABLE OF AUTHORITIES[*]

| Cases | Page |
|---|---|
| *Arizona v. Fulminante*, 499 U.S. 279 (1991) ........................................................................10 |
| *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288 (1936) ...............................................44-45 |
| *Blackledge v. Perry*, 417 U.S. 21 (1974) ...........................................................................33 |
| *Blakely v. Washington*, -- U.S. --, 124 S.Ct. 2531 (2004)..............................................95 |
| *Brookhart v. Janis*, 384 U.S. 1 (1966) ...............................................................................57 |
| *Bruton v. United States*, 391 U.S. 123 (1968) ...................................................................46 |
| *California v. Green*, 399 U.S. 149 (1970) ...........................................................................56 |
| *Cotto v. Herbert*, 331 F.3d 217 (2d Cir. 2003) ...............................................................57 |
| *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004) .......................................56 |
| *Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ..................................................................2 |
| *Dutton v. Evan*, 400 U.S. 74 (1970)....................................................................................58 |
| *Hunter v. Moore*, 304 F.3d 1066 (11th Cir. 2002).............................................................57 |
| *ITT Indus. v. NLRB*, 251 F.3d 995 (D.C. Cir. 2001).........................................................56 |
| *Johnson v. Zerbst*, 304 U.S. 458 (1938) ..............................................................................57 |
| *Jones v. United States*, 529 U.S. 848 (2000) ......................................................................66 |
| *Karriem v. Barry*, 743 F.2d 30 (D.C. Cir. 1984) .............................................................45 |
| *Kotteakos v. United States*, 328 U.S. 750 (1946).................................................................26 |
| *Krulewitch v. United States*, 336 U.S. 440 (1949) .............................................................79 |
| *Lamprecht v. FCC*, 958 F.2d 382 (D.C. Cir. 1992) ...........................................................44 |

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

App 820

*Neder v. United States*, 527 U.S. 1 (1999) ..................................................................................10

*North Carolina v. Pearce*, 395 U.S. 711 (1969) ..........................................................................33

*Offutt v. United States*, 348 U.S. 11 (1954) ................................................................................33

*Olson v. Green*, 668 F.2d 421 (8th Cir. 1982) ............................................................................57

*Oses v. Massachusetts*, 775 F. Supp. 443 (D. Mass. 1991),
    aff'd, 961 F.2d 985 (1st Cir. 1992) ...............................................................................35, 40

*Page v. Frank*, 343 F.3d 901 (7th Cir. 2003) ............................................................................. 57

*Parts and Electric Motors, Inc. v. Sterling Electric, Inc.*, 866 F.2d 228 (7th Cir. 1988) ..................9

*Petrycki v. Youngstown & N. Ry. Co.*, 531 F.2d 1363 (6th Cir. 1976) .........................................28

*Pointer v. Texas*, 380 U.S. 400 (1965) ........................................................................................56

*Quinones v. United States*, 489 U.S. 1032 (1989) ......................................................................29

*Remmer v. United States*, 347 U.S. 227 (1954) ....................................................................27, 30

*Reynolds v. United States*, 98 U.S. 145 (1878) ..........................................................................57

*Rogers v. United States*, 422 U.S. 35 (1975) ..............................................................12, 27, 38

*Rush v. Smith*, 56 F.3d 918 (8th Cir. 1995) ................................................................................33

*Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547 (4th Cir. 1999) ....................................................... 84

*Strickland v. Washington*, 466 U.S. 668 (1984) ..........................................................................41

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ................................................................................31

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ............................................................................3

*United States v. Araujo*, 62 F.3d 930 (7th Cir.1995) ..............................................................10, 11

*United States v. Badru*, 97 F.3d 1471 (D.C. Cir. 1996) ............................................................ 63

*United States v. Barry*, 938 F.2d 1327(D.C. Cir. 1991) .............................................................. 32

-vi-

App 821

*United States v. Baucum*, 80 F.3d 539 (D.C. Cir. 1996)................................................................ 63

*United States v. Beech-Nut Nutrition Corp*, 871 F.2d 1181 (2d Cir. 1989)................................... 49

*United States v. Bibbero*, 749 F.2d 581 (9th Cir. 1984) ................................................................54

*United States v. Blevins*, 960 F.2d 1252 (4th Cir. 1992) ...............................................................78

*United States v. Boney*, 68 F.3d 497, 502 (D.C. Cir. 1995)......................................................19

*United States v. Booker*, -- U.S. --, 125 S.Ct. 738 (2005).......................................................99

*United States v. Boylan*, 898 F 2d 230 (1st Cir. 1990) ...............................................................30

*United States v. Buishas*, 791 F.2d 1310 (7th Cir. 1986)................................................................ 48

*United States v. Butler*, 822 F.2d 1191 (D.C. Cir. 1987)............................................................27

*United States v. Capra*, 271 F.3d 962 (11th Cir. 2001)...............................................................20

*United States v. Chavez-Salais*, 337 F.3d 1170 (10th Cir. 2003) ..................................................57

*United States v. Cherry*, 217 F.3d 811 (10th Cir. 2000)........................................................56, 57

*United States v. Cornett*, 195 F.3d 776 (5th Cir. 1999)......................................................... 53, 54

*United States v. Cotton*, 535 U.S. 625 (2002)...........................................................................64

*United States v. Curbelo*, 343 F.3d 273 (4th Cir. 2003) .................................................. 9,10,11

*United States v. David*, 96 F.3d 1477 (D.C. Cir. 1996)............................................................63

*United States v. Desena*, 260 F.3d 150 (2d Cir. 2001) ......................................................... 50, 54

*United States v. Degraffenried*, 339 F.3d 576 (7th Cir. 2003)......................................................38

*United States v. Deutsch*, 373 F. Supp. 289 (S.D.N.Y. 1974) ...................................................83

*United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001)......................................................... 57, 58

*United States v. Doerr*, 886 F.2d 944 (7th Cir. 1989) ..........................................................49, 50

*United States v. Edmond*, 52 F.3d 1080 (D.C. Cir. 1995) ..........................................................54

-vii-

App 822

*United States v. Elmore*, 423 F.2d 775 (4th Cir. 1970) ........................................................... 83

*\*United States v. Essex*, 734 F.2d 832 (D.C. Cir. 1984) ...................................................... 9, 10, 11

*United States v. Feliciano*, 223 F.3d 102 (2d Cir. 2000) .............................................................. 63

*United States v. Florea*, 541 F.2d 568 (6th Cir. 1976) ...................................................... 28

*United States v. Gagnon*, 470 U.S. 522 (1985) ...................................................... 95, 96, 97

*United States v. Gagnon*, 721 F.2d 672 (9th Cir. 1983), *rev'd*, 470 U.S. 522 (1985) ............... 96

*United States v. Gajo*, 290 F.3d 922 (7th Cir. 2002) ...................................................... 47

*\*United States v. Gartmon*, 146 F.3d 1015 (D.C. Cir. 1998) ................................................. 27, 77

*United States v. Glick*, 463 F.2d 491 (2d Cir. 1972) ...................................................... 26

*United States v. Godinez*, 110 F.3d 448 (7th Cir. 1997) ...................................................... 47

*\*United States v. Griffin*, 778 F.2d 707 (11th Cir. 1985) ...................................................... 79

*United States v. Guerrero-Peralta*, 446 F.2d 876 (9th Cir. 1971) ....................................... 10

*United States v. Halliman*, 923 F.2d 873 (D.C. Cir. 1991) ...................................................... 72

*\*United States v. Hernandez*, 862 F. 2d 17 (2d Cir. 1988) ...................................................... 30

*United States v. Houlihan*, 92 F.3d 1271 (1st Cir. 1996) ...................................................... 58, 68, 70

*United States v. Huntress*, 956 F.2d 1309 (5th Cir. 1992) ...................................................... 24, 49

*United States v. Johnson*, 927 F.2d 999 (7th Cir. 1991) ...................................................... 49, 50

*United States v. Jordan*, 260 F.3d 930 (8th Cir. 2001) ...................................................... 48

*United States v. Lechuga*, 888 F.2d 1472 (5th Cir. 1989) ...................................................... 48

*United States v. Liteky*, 510 U.S. 540 (1994) ...................................................... 33

*United States v. Kaden*, 819 F.2d 813 (7th Cir. 1987) ...................................................... 48

*\*United States v. LiCausi*, 167 F.3d 36 (1st Cir. 1999) ...................................................... 53

-viii-

App 823

*United States v. Lieberman*, 637 F.2d 95 (2d Cir. 1980) ........................................................ 49, 50

*United States v. Lopez*, 340 F.3d 169 (3d Cir. 2003) ................................................................. 62

*United States v. Magee*, 821 F.2d 234 (5th Cir. 1987) ................................................................ 47

*United States v. McConnell*, 988 F.2d 530 (5th Cir. 1993) .......................................................... 53

*United States v. Means*, 695 F.2d 811 (5th Cir. 1983) ................................................................. 49

*United States v. Miller*, 664 F.2d 94 (5th Cir. 1981) ................................................................... 48

*United States v. Miller*, 904 F.2d 65 (D.C. Cir. 1990) ................................................................ 75

*United States v. Molt*, 772 F.2d 366 (7th Cir. 1985) ................................................................... 48

*United States v. Morrison*, 529 U.S. 598 (2000) ..................................................................... 64-65

*United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985) ............................................................ 32

*United States v. Nazemian*, 948 F.2d 522 (9th Cir. 1991) ................................................. 47, 48, 50

*United States v. Newell*, 315 F.3d 510 (5th Cir. 2002) ................................................................ 57

*United States v. O'Brien*, 898 F.2d 983 (5th Cir. 1990) .............................................................. 24

*United States v. Olano*, 507 U.S. 725 (1993) ....................................................................... 32, 33

*United States v. Pallais*, 921 F.2d 684 (7th Cir. 1990) ............................................................... 48

*United States v. Paone*, 782 F.2d 386 (2d Cir. 1986) ................................................................. 49

*United States v. Patterson*, 26 F.3d 1127 (D.C. Cir. 1994) ........................................................... 9

*United States v. Perez*, 989 F.2d 1574 (10th Cir. 1993) .......................................................... 48, 49

*United States v. Perry*, 731 F.2d 985 (D.C. Cir. 1984) ............................................................... 86

*United States v. Peterson*, 100 F.3d 7 (2d Cir. 1996) ..................................................... 72, 73, 74

*United States v. Phillips*, 664 F.2d 971 (5th Cir. 1981) ............................................................. 49

*United States v. Phillip*, 239 F.3d 829 (7th Cir. 2001) ............................................................... 70

-ix-

*United States v. Pollack*, 534 F.2d 964 (D.C. Cir. 1976)................................................................82

*United States v. Posner*, 764 F.2d 1535 (11th Cir. 1985) ...............................................................50

*United States v. Potts*, 840 F.2d 368 (7th Cir. 1987)....................................................................48

*United States v. Resko*, 3 F.3d 684 (3d Cir. 1993)........................................................................40

*United States v. Reyes*, 603 F.2d 69 (9th Cir.1979).......................................................................10

*United States v. (John) Richardson*, 161 F.3d 728, (D.C. Cir. 1998)............................................87

*United States v. Roberts*, 14 F.3d 502 (10th Cir. 1993)...............................................................50

*United States v. Robinson*, 560 F.2d 507 (2d Cir. 1977)..............................................................26

*United States v. Rodriguez-Marrero*, 390 F.3d 1 (1st Cir. 2004)..................................................56

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990).....................................................47

*United States v. Ronder*, 639 F.2d 931 (2d Cir. 1981) ................................................................26

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002)....................................................................51

*United States v. Sallins*, 993 F.2d 344 (3d Cir. 1993) .................................................................62

*United States v. Santos*, 20 F.3d 280 (7th Cir. 1994)...............................................................47, 50

*United States v. Schor*, 418 F.2d 26 (2d Cir. 1969) ...................................................................26

*United States v. Shoffner*, 826 F.2d 619 (7th Cir. 1987)..............................................................47

*United States v. Shores*, 33 F.3d 438 (4th Cir. 1994) .................................................................48

*United States v. Smart*, 98 F.3d 1379 (D.C. Cir. 1996) ..............................................................80

*United States v. Smith*, 31 F. 3d 469 (7th Cir. 1994).................................................................12

*United States v. Snider*, 720 F.2d 985 (8th Cir. 1983)............................................................50, 53

*United States v. Spriggs*, 102 F.3d 1245 (D.C. Cir. 1996)...........................................................86

*United States v. Tabacca*, 924 F.2d 906 (9th Cir 1991) .................................................10, 11, 30

-x-

App 825

*United States v. Tarantino, 846 F.2d 1384 (D.C. Cir 1988)............................................... 53, 54, 82

United States v. Taylor, 498 F.2d 390 (6th Cir.1974)..... ........................... .. ........................ 10

*United States v. Thai, 29 F.3d 785 (2d Cir. 1994)........................................................ 58, 68, 69, 70

United States v. Thevis, 84 F.R.D. 57 (N.D. Ga. 1979)............................... ..............................57

United States v. Tipton, 90 F.3d 861 (4th Cir. 1996)...............................................................70

*United States v. Thomas, 116 F. 3d 606 (2d Cir. 1997)................. ...........................................29

United States v. Thompson, 286 F.3d 950 (7th Cir. 2002).............................................................56

United States v. United States Gypsum Co., 438 U.S. 422 (1978) ..............................................27, 98

*United States v. Urbanik, 801 F.2d 692 (4th Cir. 1986)........................................... 50, 52-53

United States v. Van Daal Wyk, 840 F.2d 494 (7th Cir. 1988)........................................................47

United States v. Walsh, 75 F.3d 1 (1st Cir. 1996)...............................................................25

United States v. Weathers, 186 F.3d 948 (D.C. Cir. 1999)..............................................................63

United States v. Webster, 162 F.3d 308 (5th Cir. 1998) ...........................................................25

United States v. Westmoreland, 312 F.3d 302 (7th Cir. 2002) .............................................. 50-51

*United States v. White, 838 F.Supp. 618 (D.D.C. 1993), aff'd,
116 F.3d 903 (D.C. Cir. 1997)....................................................................................56, 57

United States v. Williams-Davis, 90 F.3d 490 (D.C. Cir. 1996).......................................................27

United States v. Williamson, 53 F.3d 1500 (10th Cir. 1995) ................... ......................46, 47, 48

United States v. (Ralph) Wilson, 160 F.3d 732 (D.C. Cir. 1998) ...........................................44, 82

United States v. Wolf, 839 F.2d 1387 (10th Cir. 1988).............................................................48

United States v. Wyatt 442 F.2d 858 (D.C. Cir. 1971) .............................................................32

United States v. Young, 470 U.S. 1 (1985) ........................................................................40

App 826

## Constitutional, Statutory, and Regulatory Authorities

U.S. Const., Am. 5 ................................................................................................................73

*U.S. Const., Am. 6 ................................................................................ 5, 26, 44, 45, 55-58

18 U.S.C. § 144 ....................................................................................................................33

18 U.S.C. § 924(c) ...............................................................................................................62

18 U.S.C. § 1959 ...............................................................................................6, 62, 68, 70

Fed. R. Crim.P. 8 ..........................................................................................................86, 87

Fed. R. Crim.P. 14 ..............................................................................................................86

Fed. R. Crim.P. 23 ..........................................................................................8, 9, 10, 11, 31

Fed. R. Crim.P. 43 .........................................................................................................12, 38

Fed. R. Crim. P. 52(b) .........................................................................................................64

*Fed .R. Evid. 801(d)(2)(E) ........................................................................45, 47, 8, 52, 54

Fed. R. Evid. 804 (b)(1) .................................................................................................72, 73

D.C. Code, § 22-2401 .....................................................................................................6, 62

## Other Authorities

James F. Flanagan, "Forfeiture By Wrongdoing and Those Who Acquiesce in Witness
Intimidation: A Reach Exceeding Its Grasp and Other Problems With Federal Rule of
Evidence 804(b)(6)," 51 *Drake L. Rev.* 459 (2003) ..............................................................58

*John R. Kroger, "The Confrontation Waiver Rule," 76 *B.U.L.Rev.* 835(1996) ....................57, 58

4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(2)(E)[01] (1992) ..........................49

R. Bolt, A Man for All Seasons, (Three Plays, Heinemann ed. 1967) .............................................3

-xii-

App 827

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 02-3015, 02-3016, 02-3017
02-3018, 02-3109, 02-3046
[Consolidated]

UNITED STATES OF AMERICA,
Appellee,

v.

WILLIAM SWEENEY, SAMUEL CARSON,
SEAN COATES, JEROME MARTIN, and VINCENT HILL,
Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REPLY BRIEF OF APPELLANTS SWEENEY, CARSON, COATES,
MARTIN, and HILL

## INTRODUCTION

The Government's brief[1] demonstrates (albeit unwittingly) that the trial of this matter was

substantially infected with prejudicial error – so much so that for the reasons set forth below and

in our opening brief, the verdicts must be set aside.

The first signal of the weakness of the Government's argument lies, paradoxically, in the

seeming strength of its factual presentation. The Government opens its brief with a lengthy,

almost painstaking presentation of its case,[2] devoting fully twenty percent of its word allotment

to the task. Apparently, the Government thought this presentation imperative to its response,

---

[1] In this reply brief we will cite to the Government's brief as "Govt. Br. __" and to our opening
brief as "App. Br. __." The remaining citation forms will be the same as those used in our opening brief.

[2] See Govt. Br. 7-57.

since it chose to include its version of events rather than, for example, "respond[ing] to each of appellant's cited examples" of judicial misconduct.[3]

Yet, in strictly legal terms the Government's exposition of the facts was generally unnecessary. Except for a few relatively narrow factual challenges, appellants did not question the sufficiency of the evidence presented – and those challenges were readily dealt with in the other portions of the Government brief.[4] It is evident, therefore, that the only real reason for the Government's 50-page disquisition on the facts adduced at trial is an attempt to reinforce a "bad man" theory of appellate review – that "bad men" should lose their appeals.

We spoke of the dangers of this approach to the law in our opening brief.[5] The temptation, surely, is great: When defendants are perceived as having done terrible acts and when the Government and courts have gone to great expense and trouble in bringing a trial to fruition there is every reason for this Court to seek grounds for affirmance. The Government's extensive recitation of concededly horrific testimony and evidence is designed to reinforce that understandable instinct and, implicitly, to ask this Court to ground its interpretation of the law in a reaction to the nature of the crimes with which Appellants are charged.

The Government doubtless defends this approach as providing "context" and we do not dispute that context matters. But so does the law – even more so than context. And the law here is on Appellants' side. As we conceded in our initial brief, the law does not require perfection -- "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."[6] But justice does require fairness – *and, we repeat, this trial was not fair*.

---

[3] *Id.* at 100. For our discussion of the Government's response and its notable failure to address the issue of judicial bias, *see infra* § II.

[4] *E.g.* Govt. Br. 243-60.

[5] *See* App. Br. 14-15.

[6] *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

-2-

Indeed, given recent developments in other "mega-trials,"[7] affirming the convictions in

*this* case now has the prospect of undermining the rule of law for *other* trials in this jurisdiction.

If dismissal of a juror at the conclusion of a lengthy trial is to become a commonplace tactic in

our efforts to combat "heinous" crime, then where will the Constitutional protection of trial by

jury be when the Government's attention next turns to lesser criminal offenses?

The thoughts ascribed to Sir Thomas More by playwright Robert Bolt offer a cautionary

vision of especial applicability here -- one to which the Supreme Court has subscribed:

> The law, Roper, the law. I know what's legal, not what's right. And I'll stick to what's
> legal.... I'm *not* God. The currents and eddies of right and wrong, which you find such
> plain-sailing, I can't navigate, I'm no voyager. But in the thickets of the law, oh there I'm
> a forester.... What would you do? Cut a great road through the law to get after the Devil?
> ... And when the last law was down, and the Devil turned round on you--where would
> you hide, Roper, the laws all being flat? ... This country's planted thick with laws from
> coast to coast—Man's laws, not God's--and if you cut them down ... d'you really think
> you could stand upright in the winds that would blow then?... Yes, I'd give the Devil
> benefit of law, for my own safety's sake.[8]

With all due respect, the Government would have this Court cut down the laws which

protect all Americans – most notably the right to trial by jury and to an impartial judicial officer

– so that it may get at the Devil it sees in Appellants. For the Government to prevail must enlist

the Court as a fellow lumberjack. This Court, with greater issues in mind, should reject the

invitation to join in any further clear-cutting of constitutional rights.

## SUMMARY OF ARGUMENT

1) The district court's finding of "just cause" to dismiss Juror No. 3 during deliberations

in July, 2001 is not supported by the record. The Government's response fails to establish that

---

[7] We refer here to the publicly reported decision in *United States v. Simmons et al* and *United States v. McGill*, (D.D.C. Nos. 00-157 (RCL), 02-045(RCL)), dismissing a holdout juror who expressed the view that the Government's informant-witnesses lacked credibility. *See e.g.*, Carol Leonnig, "Trial of D.C. Drug Gang Ends with Six Convicted; Judge Replaced Holdout Juror in 'Murder Inc.' Case Which Lasted Six Months," *Washington Post* at B03 (May 11, 2004).

[8] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194-95 (1978) (*quoting* R. Bolt, A Man for All Seasons, Act I, p. 147 (Three Plays, Heinemann ed. 1967)).

App 830

there was any legitimate factual basis to conclude that Juror No. 3 was mentally incapacitated and unable to serve as a juror. Nor does the record support the proposition that Juror No. 3's answers on the jury questionnaire that he had filled out in December 2000 were deceptive and required his summary dismissal.

Moreover, the process used by the district court appears to have been a preordained quest for "just cause" to remove the juror and obtain speedy verdicts after more than six months of trial. There were numerous *ex parte* communications between several jurors and court personnel, including the district judge, concerning Juror No. 3. The court's deputy marshal conducted a lackadaisical "investigation" of Juror No. 3 and shared his findings (if they can be described as such) *ex parte* with the judge and the prosecutors. The district court then held evidentiary hearings notable more for what they didn't ask than for what they did focus on and for the way that the defense counsel were excluded from meaningful participation. Guilty verdicts began to be returned hours after the juror's removal.

The trial judge's ultimate reasons for dismissing Juror No. 3 were factually unsupported, illogical, and shifting. For instance, the court consulted a *Physicians' Desk Reference* and reached the groundless conclusion that the juror's use of a soporific medication somehow rendered the juror incapable of participating in deliberations. Because the juror admitted taking a handgun from his homeless brother and throwing it away because he knew it was illegal to possess handguns in D.C., the court also reached the baseless conclusion that this must have happened before the juror filled out a juror questionnaire eight months previously, in which he denied possessing a weapon since military service.

Worse yet, the trial court later disavowed its finding that Juror No. 3 was removed for supposedly having been "deceptive" in answering the questionnaire. Seven months later, long

after the verdicts had been returned, the district court backtracked. The juror hadn't acted with *scienter*, after all – he had only been "inaccurate." These irreconcilable statements further confirm that the process used below was askew and that structural error occurred. .

2) The trial judge repeatedly exhibited bias against the defendants, making clear to the parties and the jury his belief in the defendants' guilt. He imposed undue restrictions on cross-examination and made repetitive, openly expressed, and chilling threats that he would impose sanctions or withhold CJA vouchers. This bias conveyed the judge's views of the case to the jury, influencing their decision, and curtailed counsels' advocacy. Moreover, this judicial conduct provides the important context within which to view the decision to excuse Juror No. 3.

The Government's principal response is to argue that we have not met our legal burden of showing error. Confessing that the cited errors are too numerous to respond to individually, the Government's simply disregards the particular facts – an inability that demonstrates the sheer magnitude of the judicial bias. When examined carefully, the judge's conduct warrants reversal.

3) The district court allowed the Government to introduce substantial hearsay evidence of statements made by Robert ("Butchie") Smith. The trial court mistakenly decided that Smith's murder justified forfeiture of the defendants' Sixth Amendment Confrontation Clause rights to object to Smith's hearsay statements. But the court was wrong – it first incorrectly concluded that Sweeney's statements to Smith were "in furtherance" of the conspiracy and then disregarded the nature of the hearsay evidence which, even had it been offered as live testimony by Smith, would have violated *Bruton* as to defendants Carson and Coates. Indeed, the court's decision, remarkably, put the Government in a *better* evidentiary position than it would have been in had Smith been alive to testify. This was error.

App 832

4) The district court should have granted Appellants' timely motions for judgment of acquittal on the VICAR (18 U.S.C. §1959) counts. The Government's theory of the case requires an expansion of VICAR beyond its confines and violates the interstate commerce principles of *Lopez* and *Morrison*. Moreover, as to certain acts, there was no evidence a connection acts to an enterprise that affected interstate commerce. To the contrary, the evidence showed that these actions were personal in nature and weren't related to the organization's affairs.

5) Appellants' convictions for several murders under D.C. Code § 22-2401 must be vacated as the charges were improperly joined to the federal trial. Because they involved violent acts unconnected to the alleged enterprise the charges should have been severed and tried in Superior Court.

6) The district court prohibited the defendants from propounding to the jury sworn state grand jury testimony of two unavailable witnesses whose statements tended to exculpate defendants from complicity in the triple murder. That limited Appellants' ability to present a defense and prevented them from advising the jury of this powerful exculpatory testimony.

7) In rebuttal closing argument the Assistant United States Attorney asked whether the jury considered it "as strange or an incredible coincidence that the Government is part of a conspiracy to charge innocent people with crimes" and that "only the people that came in and admitted their guilt were really guilty and everyone else completely innocent?" Contrary to the Government's assertion, Defendant's preserved their objection to this misconduct. The prosecutor's statement asked the jury to infer defendants' guilt based on the pleas of those who testified. This was error and the error was not harmless.

**8)** Charlene Wilson was the sole purported eyewitness to the murder of a man named Anthony ("Tony") Fortune. She testified to seeing Carson commit the murder and drive away with Martin. But earlier, FBI Agent Warrener had recorded in his investigative notes that Ms. Wilson had only "heard" about the murder – not that she had seen it. That prior inconsistent statement was not disclosed to Appellants until nearly *four* months after Ms. Wilson testified – long after it was possible to effectively cross-examine her. The Government's response that disclosure four months after testimony cures any *Brady* error blinks at reality.

**9)** There was a prejudicial misjoinder of the offenses related to 37th Street with the RICO and conspiracy counts involving activities at 200 K Street, SW. Those alleged acts of gratuitous violence, which occurred in the 37th St. neighborhood, were unrelated to the underlying charged conspiracy.

## ARGUMENT

The Government has reorganized its response to our opening brief and grouped its argument in ways that it deems more appropriate. Given the structure of our opening argument, including the divergent applicability of various arguments to individual Appellants, we adhere to our opening brief's organization.[9]

**I.    The Government has not refuted Appellants' proof that the District Court's dismissal of a deliberating juror was unjustified, marred by *ex parte* communications, based upon flawed and inconsistent reasoning, and constituted reversible structural error.**

The trial court lacked the requisite *just cause* to dismiss a deliberating juror and then proceed over their objections to verdicts from an eleven-member jury. The district court, after

---

[9] In this Reply Brief we answer only the Government's response to issues 1 through 11 of our appeal. With respect to issues 12 through 23 (analyzed in §§ XI, XII, XIII, XIV and XV of our opening brief), we incorporate our opening arguments as our response. In our view no additional briefing is necessary for the Court to have a clear understanding of the questions involved in resolution of those issues.

nearly eight months of trial proceedings,[10] must have recognized by the close of business on July 19, 2001, that it was facing a mistrial.[11] It then indiscriminately dismissed a deliberating juror, whom it and the prosecutors perceived to be a holdout. Its decision eviscerated Appellants' due process rights to a unanimous verdict from an impartial jury, as well as their rights under Rule 23(b) to a decision from a jury of twelve. The court's finding of "just cause" to dismiss Juror No. 3 cannot be supported by the record. In fact the opposite holds true.

The Government asserts that Juror No. 3's dismissal was based "entirely on information obtained independently of the court's and the deputy marshal's *ex parte* communications with Juror No. 3."[12] That's not accurate. The record demonstrates that the court erroneously discharged the juror from further deliberations based on its *ex parte* communications with him and on Deputy Marshal Adams's numerous *ex parte* communications with the juror, with other jurors, with V.A. hospital security personnel, and with the prosecutors themselves. The court then compounded that error by relying upon misinformation derived largely from those *ex parte* contacts, by inflating or misinterpreting what had been conveyed to it, and ultimately by erroneously characterizing as "deceptive" the juror's answers to ambiguous questions posed in a prolix *voir dire* questionnaire administered seven months earlier -- a characterization the court later *disavowed* in deciding Appellants' new trial motions.

---

[10] The case had consumed approximately six weeks of jury selection, six months of trial, and one week of jury deliberations. (Government's Omnibus Opposition to Defendants' Motion for a New Trial, at 2, 1/7/02, R. 827) (App. 1347-1429).

[11] This apprehension, no doubt, was fueled by the lack of any verdicts after seven days of deliberation although the court had instructed the jury it could return partial verdicts. (7/19/01 AM 4, App. 3787). *See also* (7/25/01 AM 54-55, App. 3849-50)("If at any time you are of a mind that you wish to return a partial verdict and continue deliberations with a view to reaching a verdict on the remainder of the charges and defendants, all you need to do is to notify me by note, and we will take your partial verdict.").

[12] Govt. Br. 77 n.42.

The trial judge's conclusions do not serially or synergistically support dismissal. And no matter how the Government recasts the facts, the district court's decision is not defensible, even given a trial judge's great discretion in trial management. Appellants' convictions must be vacated without regard to prejudice because the court lacked just cause to dismiss Juror No. 3.

## A.    The district court's erroneous decision constituted structural error.

Appellants initially argued that the district court's decision to remove a deliberating juror should be reviewed under an abuse of discretion standard.[13] The Government's effort to rationalize the court's words and deeds confirms that, when the entire record is reviewed, the decision to dismiss Juror No. 3 does not pass the "olfactory test of discretion,"[14] under an abuse of discretion standard.

Moreover, this standard may be too generous. The Fourth Circuit decision in *United States v. Curbelo*, reversed a conviction obtained after the district court improvidently dismissed a juror and forced the case to continue on with eleven jurors.[15] Looking to this Court's decisions in *United States v. Essex*[16] and *United States v. Patterson*,[17] *Curbelo* held that the erroneous deprivation of a defendant's right under Rule 23(b), to a twelve-person jury "tainted the process by which guilt was determined, and it therefore inherently casts doubt on the reliability of the

---

[13] App. Br. 24.

[14] *Parts and Electric Motors, Inc. v. Sterling Electric, Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)(abuse of discretion assessed by whether proffered explanations "'strike us as wrong with the force of a five-week old, unrefrigerated dead fish.'").

[15] *United States v. Curbelo*, 343 F.3d 273 (4th Cir. 2003).

[16] *United States v. Essex*, 734 F.2d 832, 834, 842 (D.C. Cir. 1984)(*cited in Curbelo*, 343 F.3d at 283-84)).

[17] *United States v. Patterson*, 26 F.3d 1127, 1129, 842 (D.C. Cir. 1994)(*cited in Curbelo*, 343 F.3d at 284).

jury's verdict."[18] The panel majority concluded that such error constituted structural error[19] that was automatically reversible.[20]

To be sure, *Curbelo* conceivably could be limited to its facts (as the Government suggests it should be),[21] for there the jury had not begun deliberations before the juror's removal. So the Government argues that Rule 23(b) was not implicated there, since the rule becomes operative only after the jury retires to deliberate.[22] However, *Curbelo* relied on a number of cases addressing the removal of a deliberating juror.[23] In nearly all of these cases, the district court failed to establish sufficient "just cause" for excusing a juror before proceeding with an 11-member jury. The appellate decisions overturning the verdicts reflect the importance of preventing jurors--particularly those who *might* have dissenting views--from simply "opt[ing] out at will."[24]

Appellants do not view the *time* at which a sitting juror is dismissed as the critical distinction. Regardless of when a juror is dismissed, during trial or deliberations, Rule 23(b) manifests Congress's "particular care" to preserve the venerable common law right to a trial by

---

[18] *Curbelo*, 343 F.3d at 283.

[19] Structural errors affect the very "'framework within which the trial proceeds, rather than simply ... the trial process itself.'" *Neder v. United States*, 527 U.S. 1, 8 (1999) (*quoting Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).

[20] *Curbelo*, 343 F.3d at 283.

[21] Govt. Br. 76 n.40.

[22] *Curbelo*, 343 F.3d at 280.

[23] *See, e.g., United States v. Araujo*, 62 F.3d 930 (7ᵗʰ Cir.1995)(violation of Rule 23(b) entitles a defendant to a new trial, without regard to actual prejudice); *United States v. Tabacca*, 924 F.2d 906 (9ᵗʰ Cir.1991)(Rule 23(b) violated when juror excused because his wife had taken his car keys); *United States v. Guerrero-Peralta*, 446 F.2d 876 (9ᵗʰ Cir.1971); *United States v. Reyes*, 603 F.2d 69, 71-72 (9th Cir.1979) (declining to apply harmless error standard to violation of Rule 23(b)'s written stipulation requirement); *United States v. Taylor*, 498 F.2d 390 (6th Cir.1974) (per curiam), (rejecting proposition that harmless error review applies to a violation of Rule 23(b)).

[24] *Essex*, 734 F.2d at 841.

twelve jurors.[25] As this Court's decision in *Essex* makes plain, "even defendants who are obviously guilty are entitled to the basic procedural safeguards of a fair trial, including those required by Rule 23(b)."[26] Thus a district court's erroneous decision to remove a deliberating juror is "inherently prejudicial and *per se* reversible."[27]

## B. The grounds that the Government has offered to support the trial court's decision collapse under inspection.

In its reply, the Government makes essentially two counter arguments: that the district court made an adequate record to support removing Juror No. 3;[28] and that the lower court did not commit error by failing to grant a mistrial.[29] These contentions miss the mark.

*First*, there was no factual basis to conclude that Juror No. 3 either was mentally incapacitated or unable to perform his service as a juror or that he had provided anything other than truthful answers to the questions posed in the juror questionnaire and during *voir dire*. *Second*, by allowing the case to go forward with eleven jurors and in failing to grant a mistrial, the court committed structural error.

### 1. The process by which the Court conducted its inquiry was deeply flawed.

Appellants were deprived of their right to a verdict by twelve impartial jurors. The record is replete with harmful excess engaged in by a trial court seeking to conjure a finding of "just cause" to dismiss an apparent holdout juror. As a part of its "investigation" into the possible

---

[25] *Curbelo*, 343 F.3d at 283-84.

[26] *Essex*, 734 F.2d at 845 (*quoted in Curbelo*, 343 F.3d at 285).

[27] *Curbelo*, 343 F.3d at 283-85 (*quoting Essex*, 734 F.2d at 845). *Accord United States v. Araujo*, 62 F.3d 930 (7th Cir. 1995)(no harmless error where Rule 23(b) violated); *Tabacca*, 924 F.2d at 913-15 (same).

[28] Govt. Br. 76.

[29] Govt. Br. 91.

holdout juror's conduct the district court, alone (or in concert with DUSM Adams)[30] crossed the line into structural error when:

-- it interfered with the juror's medical privacy by tolerating DUSM Adams's eavesdropping on Juror No. 3's treatment by courthouse medical personnel and Adam's subsequent inveigling Juror No. 3 into disclosing his prescriptive medication;[31]

-- it issued a covert writ of attachment hauling the juror from the hospital in the U.S. Marshals' custody without informing the parties;

-- it appears to have rescheduled the juror's medical appointment,[32] (the record is silent as to what the Juror knew and when he was informed of his appointment change);

-- it researched in an unguided manner the juror's medication in the *Physicians Desk Reference* and then, without benefit of medical training, expertise, or any input from a qualified mental health professional, inaccurately diagnosed the illness for which the juror was prescribed the medication;[33]

-- it interrogated the juror in chambers *ex parte*,[34] and without benefit of transcription, so that there is no record of what occurred;

---

[30] (7/25/01 AM 24, App. 3822) (court coordinates actions with DUSM Adams).

[31] (7/25/0 AM 22, App. 3820).

[32] (7/24/01 PM 7, App. 3793).

[33] The district court accepted DUSM Adams's unsupported "diagnosis" of what Juror No. 3 was taking medication for and thus misdiagnosed Juror No. 3's condition and relied upon this error in deciding to discharge the juror for being untruthful on his questionnaire.

[34] The *ex parte* nature of these contacts is significant for three reasons. First, they had the effect of depriving Appellants of any meaningful opportunity to be heard on the merits of the Court's decision. Second, *see infra* § I.B.4, the *ex parte* proceedings deprived this Court of any meaningful record with which to review that decision. Finally, as we discussed at length in our opening brief, *see* App. Br. § X, and below, *infra* § IX, consideration of a jury inquiry must take place on the record in the presence of the defendant. *United States v. Smith*, 31 F. 3d 469, 471 (7th Cir. 1994). Private contacts between a judge and a jury are rife with the opportunity to err. *Rogers v. United States*, 422 U.S. 35, 41 (1975). The *ex parte* discussions were, therefore, independently error, violating both Due Process and Rule 43(a).

App 839

-- it authorized DUSM Adams to act as its agent in conducting additional surreptitious investigations;[35]

-- it either permitted DUSM Adams to meet with the prosecutors, *ex parte,* and exchange information with them the night before the critical evidentiary hearing on whether to remove Juror No. 3, or upon learning of the meeting failed to inquire whether Adams's covert assistance had given the prosecutors an undue advantage;

-- it allowed DUSM Adams to use his considerable influence[36] in an attempt to discover in a clandestine way additional information that could support dismissal of the juror;

-- it relied upon third-hand hearsay[37] without making *any* critical inquiry into the underlying sources;

-- it withheld the foregoing information, much of which was incorrect, from the parties for the better part of a week;

-- it arbitrarily truncated the defendants' efforts to learn from DUSM Adams about his private contacts with deliberating jurors and the prosecutors – which itself ought to be grounds for a remand;[38]

-- it asked no questions of Jurors Nos. 1 and 17, whom DUSM Adams said had complained about Juror No. 3, regarding the substance of their *ex parte* allegations concerning

---

[35] (7/25/01 AM 24, App. 3822).

[36] The jury was anonymous. For six months, they assembled each day and were transported *en masse* to and from the US Courthouse to sit as jurors in this trial. At all times they were accompanied by US Marshals, including DUSM Adams.

[37] Security guards at the Veteran's Hospital supposedly advised Adams during his covert investigation that they knew Juror No. 3. The nature of that acquaintance was fuzzy in the extreme. The guards thought that the juror either had been a patient in the past for some unknown illness or that they simply had seen him and chatted. (7/25/01 AM 31, App. 3829). The latter explanation, as noted in our opening brief, is consistent with the juror's employment as a bus driver whose route stopped at the hospital.

[38] (7/25/01 AM 22-24, App. 3820-22).

-13-

Juror No. 3's vague statements about homicide, suicide, or violence, thus leaving a skewed record replete with hearsay;[39]

-- it refused to allow defense inquiry into possible jury contamination by the events surrounding the dismissal of Juror No. 3 by, *inter alia*, refusing to allow *voir dire* of Juror No. 17 regarding her *ex parte* communications with DUSM Adams. Nor did the court inquire of Jurors Nos. 1 or 17 concerning whether their encounters with Juror No. 3 could affect their impartiality;[40]

-- it refused all defense requests for further *voir dire* of Juror No. 3 to determine whether there were legitimate grounds to remove him from deliberations;[41]

-- it shaped its limited inquiry of Juror No. 3 at the Government's prompting, giving this Court a one-sided record; and

-- it refused a *voir dire* of the remaining jurors to determine the effects, if any, of the circumstances underlying Juror No. 3's dismissal.[42]

## 2.    This *ad hoc* process produced the inevitable result – a deeply flawed decision with an ever-changing rationale.

The Government has embraced the grounds that the district court proffered for its decision to discharge Juror No. 3 from deliberations.[43] But those grounds were, in effect, an ever-shifting effort to find some reason – *any* reason – to discharge the holdout juror. To see this

---

[39] (7/24/01 PM 10-13, App. 3796-99).

[40] (7/25/01 AM 39, App. 3837).

[40] (7/25/01 AM 37, App. 3835).

[42] (7/25/01 AM 39, App. 3837).

[43] The Government bears partial responsibility for the silent record this Court faces inasmuch as it shaped the court's inquiry, objected to *voir dire* of the remaining jurors, and specifically objected to any inquiry of Juror No. 17, who had reported to DUSM Adams that she felt threatened by Juror No. 3 and supposedly "was scared." The Government assured the court that on the basis of this record, "it is not incumbent upon the court to make further inquiry." (*Id.* at 37, App. 3835). Moreover, when the court announced it would not allow inquiry by any other party, the Government agreed: "I think that is advisable." *Id.*

App 841

clearly one need only examine the course of events and the trial court's internally inconsistent, morphing analysis.

a.  **There is an irreconcilable inconsistency between the district judge's initial decision that Juror No. 3 could serve and his ultimate conclusion to remove the juror.**

An irreconcilable and material inconsistency undermines the district judge's assessment of Juror No. 3. Initially Juror No. 3 was found capable of serving even though the trial court questioned his literacy. A few months later the juror's same lack of literacy became a tool to drive him off the jury and obtain quick verdicts.

On December 5, 2000, during the individual *voir dire* of the venire, defendants believed that Juror No. 3 had misunderstood some of the inquiries in the written questionnaire. For example, his response to question 101 (E), which inquired, "How do you think if you would react if something you learned during the trial of this case was different from what you saw, read or heard in the media?" was "ask attorney questions."[44]

Based upon this answer (and other responses, which the defense unsuccessfully sought to explore,[45]) Appellants argued that Juror No. 3 had manifest difficulty answering some of the questions on the lengthy (and sometimes ambiguous) juror questionnaire.[46] The trial court found

---

[44] (12/5/00 AM, 48-49, App. 1580-81).

[45] Question 88 asked the juror his opinion of whether or not criminals are being dealt with severely enough. The juror responded that changing procedure in trying to prevent crimes might be helpful. When the defense attempted to follow up and determine how his answer responded to the question asked, the court announced that, "All right. It has already been pursued. ... That's enough." (*Id* at 50, App. 3968 (Vol. XVII)).

[46] The *voir dire* form contained 132 questions and was 37 pages long. (App. 952-1000); *see also* App. Br., 47 n.102.

-15-

that the venireman was perhaps somewhat illiterate but concluded that this problem was not an impediment to serving as a juror.[47]

Nonetheless the trial judge months later removed Juror No. 3 for supposedly fibbing by not disclosing that he lived in a "bad neighborhood" (whatever that means).[48] This even though, at the time of jury selection the juror had commented indirectly about his neighborhood when he reported he had been robbed at gunpoint on his way to work some 12 years earlier.[49] He blamed himself for taking a short cut to the Metro station, for which he "should have known better."

In other words, despite the finding that Juror No. 3's illiteracy was not a bar to jury service, the district court later summarily dismissed him from deliberations based largely upon his answers to several ambiguous questions posed in that same questionnaire. The judge's and the deputy marshal's numerous *ex parte* meetings with Juror No. 3 must be deemed to have played some ill-defined but nevertheless decisive role in reaching this inconsistent result.

The Government has chosen to deal with the court's initial decision (denying the defense motion to strike Juror No. 3) by pretending it never occurred, for one can scour its response in vain for any reference to that event. But that decision makes the trial judge's ultimate decision to remove Juror No. seem all the more outlandish.

### b.    The court's articulated basis: the shifting "good cause" foundation.

Contrary to its initial finding of adequate literacy, seven months later, during the deliberations, the court determined that the Juror No. 3 was mentally incapacitated and had lied

---

[47] The Court: "I think he may have some difficulty with literacy, but that certainly doesn't disqualify him." (12/5/ 00 AM 51, App. 1582).

[48] The prospective juror responded that he did not feel there was a crime problem in his neighborhood. Question 80 (page 23) (App. 971).To this day no one has proved otherwise.

[49] (12/5/ 00 AM 41, App.1579). *See* Question 86 (b) inquiring if he had been a victim of a crime: "Yes, robbed at gun point on way to work." (App. 972). His answer to Question 6 indicated that Juror No. 3 had lived in same neighborhood for 17 years. (App. 952).

-16-

App 843

on his questionnaire. The Government for all practical purposes concedes that the record does
not support the finding of mental incompetence. Consequently it is left defending the decision to
remove Juror No. 3 on the basis of the "deceptive" answer rationale offered by the Court.

However, the court *rejected* that same basis, embraced in its memorandum opinion,
during the hearing determining Appellants' motion for new trials. The Government's response
makes no mention of this fact either. But while the memorandum says the juror was "deceptive,"
the Court later denied that it intended to impute to Juror No. 3 any *scienter* – and said that its
only conclusion was that the juror had been "inaccurate." And so the final ground on which the
trial court rested its decision is effectively this – misspell your name on the juror form and you
can be dismissed. Quite literally, that is the rule the trial court offered.

The Government, now forced to support the court's decision or accept retrial, does not
attempt to justify the court's action on those grounds. Rather, it responds to Appellants'
arguments by ignoring the court's initial decision empanelling the juror, basically conceding the
record does not support mental incapacity, and focusing exclusively on the juror's alleged
deception. The Government essentially argues that two wrongs (no incapacity, no deception)
somehow make it right: just cause can be sustained by the combination of two erroneous
findings.

### i. Juror No. 3 plainly was not incapacitated.

The Government conceded below that the record evidence did not "necessarily" establish
that Juror No. 3 was mentally incompetent.[50] Nevertheless it insisted that he was removed
legitimately because of his ostensibly deceptive[51] answers to the jury questionnaire – a ground

---

[50] Government's Omnibus Opposition to Defendants' Motion for a New Trial, 1/7/2002, at 65
(R. 827) (App. 1411).

[51] Govt. Br. 74. *See also* Memorandum and Order, 8/16/01, at 4 (R.779)(App. 1148).

-17-

App 844

that, as we demonstrate below, the district court itself rejected.[52] Notwithstanding the Government's concession, we briefly address the question of incapacity, for that was one of the articulated bases upon which Juror No. 3 was dismissed, despite his representation that he could continue to deliberate.

There was no factual basis for concluding that Juror No. 3 was mentally incapacitated – and thus the Government's second-order argument that his answers about mental illness on the jury questionnaire were deceptive also fails. In fact, the available evidence clearly lends no support to a finding of incapacity:

1.      On July 19, 2001, the court permitted Juror No. 3 to continue deliberating, implicitly concluding that he was competent to do so at that time.

2.      On July 24, 2001, in response to concerns voiced by Jurors Nos.1 and 17, the court revisited the issue of Juror No. 3's service. However, when the court briefly inquired of those two jurors, it failed to ask them questions about Juror No. 3's mental capacity. Nor did it ask about their purported statements to Adams that Juror No. 3 had expressed violent tendencies. The only significant thing that happened on July 24, 2001, was that Jurors Nos. 1 and 17 advised the court that the jury would reach verdicts more rapidly if Juror No. 3 were to be excused.

3.      The dismissal hearing on July 25, 2001, disclosed DUSM Adams's heretofore-secret *ex parte* interview with Juror No. 3 on July 19, 2001. The Government sought to recall DUSM Adams to reveal previously omitted contents of his *ex parte* interview with Juror No. 3, which it then argued demonstrated that Juror No. 3 should be discharged for providing "deceptive" answers on his questionnaire.[53]

---

[52] (1/29/02 PM 15, App. 3886). *See also* Memorandum and Order at 4 (R.779)(App. 1148).

[53] (7/25/01 AM 5-9, App. 3803). The manner in which the Government "discovered" Juror No. 3's alleged misconduct is itself perplexing. Although Adams testified on July 24, 2001, concerning Juror

App 845

The trial judge's concern with the fact that Juror No. 3 admitted "being acquainted with the security personnel at the hospital because he was a patient at the mental hygiene unit"[54] is markedly insufficient to indicate that Juror No. 3 could not serve because he was mentally unfit. Juror No. 3 never admitted to being a "patient" at the VA Hospital's Mental Hygiene Unit for any period of time,[55] or to suffering from mental illness, or to having gone to the VA facility for any reason other than to get some sleeping pills. We daresay that if sleeplessness were a ground for removing jurors that the jury pools in urban America would be vastly depleted.

In short, though the court initially examined Juror No. 3's mental capacity, the evidence makes clear that incapacity as a ground for dismissal was abandoned in favor of the alternative explanation offered for Juror No. 3's removal -- that his answers to some of the jury questionnaire were deceptive. That decision, too, was pretextual.

### ii..    The Government has not shown that Juror No. 3's voir dire answers were inaccurate or deceptive.

Rather than relying on incapacity, the Government contended "that the court can make a clear finding that he [Juror No. 3] simply was not forthcoming when he responded on the questionnaire, and that it's for those reasons he should not be a part of the panel."[56] It contended that Juror No. 3 had not been candid in denying that he had an alcohol problem, that he took prescription drugs for a mental health problem, that he handled a firearm outside of military

---

3, he never mentioned that he had interviewed the juror. It was only after the Government met with Adams, outside of the presence of defense counsel, that the contents of the interview were disclosed and a claim asserted that Juror No. 3 might have given untruthful answers on his questionnaire.

[54] (7/25/01 AM 49, App. 3487).

[55] The juror acknowledged that he had been sent to the mental health unit for the first time on July 19, 2001 as a secondary referral to address his sleeping problems. (7/25/01 AM 47, App. 3845).

[56] (7/25/01 AM 43, App. 3841)

App 846

service, and in denying that he felt there was a "crime problem"[57] in his neighborhood.

The district court's investigation conducted to conclude whether Juror No. 3 had given intentionally deceptive[58] answers was abbreviated. The court limited itself to DUSM Adams' testimony about his interview of Juror No. 3 and some perfunctory questioning of Juror No. 3. It did not directly confront Juror No. 3 about the truthfulness of his questionnaire answers. Nor did Juror No. 3 admit that his questionnaire answers were false, much less intentionally so.[59]

The district court's limited inquiry of Juror No. 3 on these matters, given its recognition during the initial *voir dire* that Juror No. 3 "had some difficulty with literacy,"[60] failed to establish in any cogent way that the juror had dissembled in filling out the questionnaire. To compound the problem, the trial court failed to do anything other than ask irrelevant questions and made no effort to give Juror No. 3 an opportunity to explain his answers or to take into account the "literacy problem" it had recognized before.

The trial court's initial finding that Juror No. 3 intentionally lied on the questionnaire was clearly erroneous and at odds with its later statement denying that Juror No. 3 had been deceptive. *The court simply never determined whether Juror No. 3 misinterpreted the questions or could have been honestly confused or mistaken in his answers.* Rather, based upon an incomplete record[61] composed primarily of the hearsay and double hearsay testimony of DUSM

---

[57] The inartfully posed question No. 80 on the jury questionnaire read as follows: "Do you feel there is a crime problem in your neighborhood? Please explain." (App. 971). Denying the existence of a "crime problem" does not necessarily signify satisfaction with the safety of one's residential surroundings.

[58] Only "lying or failing to disclose relevant information during *voir dire*," is grounds for removal. *United States v. Boney*, 68 F.3d 497, 502 (D.C. Cir. 1995).

[59] *Cf. United States v. Breen*, 243 F.3d 591, 598 (2d Cir. 2001)(judge questioned juror about truthfulness of his *voir dire* answers and juror conceded that he had lied).

[60] (12/5/00 AM 51, App. 1582).

[61] *See United States v. Capra*, 271 F.3d 962 (11th Cir. 2001)(on similarly inadequate record, the Eleventh Circuit vacated district court's denial of a motion for a new trial based upon juror misconduct).

Adams, the court mistakenly assumed that Juror No. 3 gave intentionally false answers.

The four questions that so exercised the trial court:

1.    With respect to Juror No. 3's denial that he took prescription medication for a mental health condition, the Government did not establish that his answer was not truthful when given during *voir dire* in December 2000. When questioned on July 25, 2001, Juror No. 3 stated that "as of last Thursday" he was a patient of the mental health unit of the VA hospital and had been prescribed Trazodone there.[62] There was no evidence that he was a patient in the mental health unit prior to "last Thursday" (July 19, 2001) or that he was on Tradozone prior to that date or that he was taking Trazodone for anything other than to help him sleep. The conclusion that Juror No. 3 was a patient of the mental health unit because the security officers at the hospital knew him was a leap of faith. He was a bus driver who transported patients to the VA hospital.[63] For all anyone knows, his was a face that was seen around because of his bus route.

2.    Likewise, Juror No. 3's disavowal of a drinking problem is understandable. Jury Questionnaire No. 65 asked: "[H]ave you, any members of your family, or any close personal friends ever had an alcohol or drug related problem, or ever sought counseling, treatment, or consultation with any mental health professional or received inpatient treatment for any type of alcohol or drug abuse?" This is a compound question with a possible $(3x2x6x2=) 72$ permutations of the question. The answer "No" was reasonable and truthful, for Juror No. 3 told DUSM Adams that he had not had a drink in thirteen years. No one claimed otherwise then and no one claims otherwise today.

3.    Similarly, the trial court attempted to lead Juror No. 3 into admitting that he had owned a firearm but Juror No. 3 denied that forcefully. The juror admitted having taken a firearm

---

[62] (7/25/01 47-48, App. 3845-46).

[63] App. Br. 369 n. 61.

from his brother, a homeless person, and then disposing of it because he knew that one cannot own weapons in D.C. Moreover, no one ever claimed that Juror No. 3 had the weapon in his hands *before* he filled out the juror questionnaire. The district court may have thought otherwise but there was no evidence to support that belief and the Government does not seriously claim there was.

4.    The notion that Juror No. 3's admitting to living in a "generally bad neighborhood" proved that he must have lied when he denied eight months earlier that there was a "crime problem" in his neighborhood (the *only* question that he was asked), is an elitist one. The judicial officer never asked what living in a "generally bad neighborhood" meant and the Government doesn't quite have an answer for it, either.

In essence, the trial court appears to have drawn any and all possible negative inferences from the juror's answers that would support a contention of dissembling, if not dishonesty, even when those inferences were mutually contradictory. Juror No. 3's answers on July 25, 2001 were baselessly imputed in one instance to a time frame prior to *voir dire* (handgun possession), and in another instance to a time frame six months after trial had begun (mental health issues). Yet the judge never asked the commonsense questions -- *when* Juror No. 3 had taken the handgun from his brother; *when* he started going to the V.A. clinic; and *what for* -- although the court had discretion to do so and the Government had every opportunity to request that he do so.

### c.    The trial court disavowed its own analysis.

On August 16, 2001,[64] the court wrote that "certain behavior" on the juror's part had cast doubt on his capacity to concentrate on the deliberations and that Juror No. 3 had given "deceptive answers" to *voir dire* questions eight months earlier when he filled out a juror

---

[63] *See* Memorandum and Order (Aug. 16, 2001) (R.779) (App. 1145-48).

App 849

questionnaire. The court decided that based on this "deception" it was unwilling to credit Juror

No. 3's assurances that he could continue to deliberate and that in conjunction with the testimony

of Jurors Nos. 1 and 17, there was "good cause" to remove Juror No. 3.[65]  Thus, the lynchpin of

the trial court's written analysis was its conclusion that Juror No. 3 had acted with deceptive

intent – rending his July 25 protestations of good faith and capacity to deliberate unreliable.

    The Court's written words were little more than a *post-hoc* rationalization for a decision

it had already made -- a decision intended to expedite a jury verdict.  This conclusion is

substantially buttressed by the trial court's apparent disavowal of its written memorandum at the

hearing on Appellants' motion for a new trial.

    In January 2002 a hearing was held to consider a new trial motion – the principal ground

of which was the dismissal of Juror No. 3.  Perhaps forgetting its own earlier written

conclusions, the court acknowledged in open court that Juror No. 3 had neither lied nor been

deceptive in his answers:

    The Court: I never characterized his answers as being untruthful, inaccurate.[66]

    * * *

    Mr. Zucker: To the extent the answers on the voir dire [questionnaire] provided a basis
    for his being struck, if they weren't inaccurate, what was it - - - or if they weren't
    untruthful, what was it?

    The Court: They were *inaccurate*.[67]

    In other words, it was not that Juror No. 3 was willfully deceptive, merely that he was

"inaccurate" (perhaps because of the very illiteracy that did not disqualify him in the first

---

[64] *Id.* at 1-4.

[65] (1/29/02 PM, 15, App. 3886).

[67] *Id.* (emphasis supplied).

App 850

instance). And this disavowal by the court of its own reasoning reflects either impossible
confusion or inappropriate willfulness.

The Government makes only a half-hearted attempt to defend the Judge's *faux pas*,
arguing that he was merely "explaining" his prior order.[68] But the fact remains that there is a
fundamental inconsistency between a conclusion of "deceptiveness" (as in the August order) and
a disavaowal of "untruthfulness" (as at the January hearing). We are at a loss to understand how
deceptiveness could not be equated with untruthfulness or, alternatively, how the Judge (or the
Government) could sanction the removal of a jury for "deceptiveness" that was the product of
mere "inaccuracy" (that is, not willful, but rather innocent error).

Surely, if the Government concedes that the juror's mistakes were mere innocence, it
must concede that the dismissal was wrong. The court's written words are an attempt to
ameliorate and rationalize its abuse of discretion for earlier dismissing the juror. Its later implicit
admission that the written decision was overstated should, in our view, end the inquiry.

### 3.  The Government relies chiefly on precedent that serves to confirm Appellants' position that the approach the trial court took was fatally flawed.

The Government has also recast and distorted several of Appellants' legal arguments.[69]
For example, it states that Appellants fault the trial judge for failing to solicit a medical opinion
regarding Juror No. 3's mental condition. This misstates our argument: clearly the judge was not
required to do so, as Appellants stated in their opening brief. We fault him for not doing so and
then making the wrong decision.

The Government also recites a number of "good cause" cases and argues that many of
them sustained the removal of a deliberating juror on a less detailed record. It specifically

---

[68] Govt. Br. 85 n.44

[69] Govt. Br. 79.

App 851

focuses on *United States v. Huntress*[70] and *United States v. O'Brien*,[71] both of which Appellants discussed in their opening brief as examples of proper ways to handle these types of situations.[72] In both cases the trial judges secured medical opinions that the jurors could not participate. That did not happen here.

Likewise the Government's reliance on *United States v. Walsh* (another decision which Appellants commended as being representative of a correct disposition of a situation in which a juror plainly couldn't continue deliberating)[73] to support what happened here is equally misplaced. *Walsh* involved the dismissal of a juror due to incapacity, even though there was no medical opinion that the juror was unable to complete service. There, however, the trial court interviewed the juror only after repeated consultation with counsel "in determining the course of the inquiry and the question to be put to juror X." The interview elicited "disjointed and rambling comments by juror X" from which the court concluded that the juror was "not a person capable of engaging in rational discussions based on the evidence."[74] The First Circuit affirmed, holding that the transcript of juror X's voir dire "gave the trial judge ample basis for concluding that the juror was not able to perform his duties."[75] This case falls far short of this model, for the record does not depict Juror No. 3 as mentally disjointed, and the defense lawyers' role here was largely circumscribed.

---

[70] *United States v. Huntress*, 956 F.2d 1309, 1311-1312 (5th Cir. 1992) (deliberating juror's physician advised court that juror was "distraught and suicidal" and suffering from paranoia stemming from a history of drug abuse).

[71] *United States v. O'Brien*, 898 F.2d 983, 986 (5th Cir. 1990) (court dismissed juror after physician verified that juror could not continue serving; juror's wife advised that the juror "was severely disturbed, had a recent history of severe depression and that she had taken him to a psychiatric clinic for consultation").

[72] App. Br. 35-36

[73] App. Br. 36.

[74] *United States v. Walsh*, 75 F.3d 1, 4 (1st Cir. 1996)(emphasis added)

[75] Id. at 5.

-25-

The Government's reliance on *United States v. Webster*[76] is equally unavailing. The Government suggests that a court can dismiss a deliberating juror without inquiry if it believes the juror dissembled. The *Webster* juror, however, was not deliberating, but was merely qualified by the court to be a juror. Prior to commencement of the trial, the Government uncovered the prospective juror's criminal record, which had not been mentioned in the juror's questionnaire answers.[77] The prosecution challenged the juror for cause and the court dismissed the juror for providing false information, without recalling him for questioning.

This is no *Webster* scenario: there was no indisputable, jarring discrepancy between the juror's questionnaire responses and the underlying facts. *To the contrary, in this case the line was artificial and created by the court below to force a speedy verdict.*

> **4.     The extensive nature of the *ex parte* proceedings between the court and deputy marshal and the jurors further impaired the potential for informed appellate review.**

Once we remove all of the *ex parte* conversations, interrogations, debriefings, "informal interviews," and third-hand hearsay from the calculus, a new trial remains as the only option. The record does not provide a basis upon which either to sustain *any* action by the district court or to provide a foundation for this Court to analyze the actions of the district court, DUSM Adams, and the jurors. Although the Government seems disinclined to discuss this with the necessary focus on the overall context of the proceedings, we will.

We know that the trial judge had *ex parte* contact with *at least* one of the jurors -- Juror No. 3. And we also know that DUSM Adams spoke *ex parte* with *at least* three jurors -- Jurors

---

[76] *United States v. Webster*, 162 F.3d 308, 347 (5th Cir. 1998)

[75] The juror had been convicted of aggravated assault on a police officer and aggravated assault with a deadly weapon. Neither of these convictions had been mentioned in his answers to a questionnaire. *Id*

Nos. 1, 3, and 17 (and perhaps several others)[78] concerning Juror No. 3. DUSM Adams then testified to his meetings with Jurors No. 1 and No. 17, as well as his talks with Juror No. 3.

Yet when Jurors No. 1 and No. 17 were questioned on the stand later that day, the trial court did not ask *them* to verify what DUSM Adams had relayed, although presumably they would have been the ones to know. Moreover they stated that Juror No. 3 was *not* being disruptive. Instead they said that he was not contributing to the deliberations and was having problems staying focused due to concerns with his job and that the jury would reach verdicts faster if he were dismissed.

But this approach begged the questions concerning Adams's *ex parte* contacts. Any *ex parte* contact between a judge or an officer of the court and jury raises a strong potential, if not a presumption, of reversible error prejudice.[79] Such contacts are "pregnant with possibilities for error."[80] Normally a trial judge confronted with an allegation of improper conduct on the part of one of the deliberating jurors is expected to give notice to the parties and to question the jurors

---

[78] Appellants use the term "at least" in light of the Government's brief, which asserts that all the jurors shared concern for the "health and well-being" of Juror No. 3. *See* Govt. Br. 89. Perhaps this was momentary over-exuberance on the part of the Government. If it wasn't, then the entire panel may well have been compromised. Because Adams and the court were proceeding through *ex parte* communications, Appellants were unaware that there might have been more contacts with jurors than those identified in open court. Certainly if there have been such additional contacts that, standing alone, would be ample grounds for a remand to conduct an inquiry into that issue.

[79] In *United States v. Gartmon*, 146 F.3d 1015, 1028-29 (D.C. Cir. 1998), this Court noticed a "tension" between its decision in *United States v. Williams-Davis*, 90 F.3d 490, 495-96 (D.C. Cir. 1996) and other decisions, such as *United States v. Butler*, 822 F.2d 1191, 1195-96 & n.2 (D.C. Cir. 1987), over whether the so-called *Remmer* (*Remmer v. United States*, 347 U.S. 227, 229 (1954)) presumption of prejudice remains valid law. In light of the high value placed by the Supreme Court on the right to a trial by an impartial jury, (*e.g., United States v. United States Gypsum Co.*, 438 U.S. 422 (1978); *Rogers v. United States*, 422 U.S. 35 (1975)), we contend that *Remmer* remains good law. Under any set of circumstances, the length and nature of DUSM Adams's contact with Jurors Nos. 1, 3, and 17, as well as any other members of the jury, simply is unknown. No record was kept nor was notice given to the parties. Under these circumstances, the potential for reversible error is even more pronounced.

[80] *United States Gypsum Co.*, 438 U.S. at 460.

on the record about any alleged incident.[81] Throughout the hearings here, however, the defense

objected to not being seasonably informed of the *ex parte* communications between the trial

court and deliberating jurors, and between DUSM Adams and deliberating jurors.[82] The district

court thwarted Appellants' efforts to examine the jurors about their *ex parte* discussions with the

court and with Adams. Worse yet, there is now some indication that a good bit more surreptitious

discussions with the jury went on behind Appellants' backs.

Because this Court is deprived of a record upon which to discern the effect of the

contacts, and, absent any showing that the contact between Adams and Jurors No. 1 and No. 17

(and the rest of the jury, given the Government's intimation that he communicated with others)

was inconsequential, this Court must act upon the presumption of impropriety, reverse and order

a new trial.

### 5.      The evidence strongly suggests that Juror No. 3 was a holdout removed to coerce a speedy verdict.

Appellants contend that faced with the possibility of a hung jury, the trial judge's

decision to forge ahead toward a verdict with only 11 jurors was preordained: Juror No. 3's days

on the jury were destined to be very short. The process employed to reach that end was

improperly coercive.

On July 19, 2001, the court told the 11 member jury (Juror No. 3 being absent) that,

under certain circumstances, a "court has the authority to allow a jury of 11 to continue to

---

[81] *See Petrycki v. Youngstown & N. Ry. Co.*, 531 F.2d 1363 (6th Cir. 1976). *See also United States v. Florea*, 541 F.2d 568, 572-73 (6th Cir. 1976).

[82] For example, as Mr. Kiersh stated:

But I would ask the court, if these issues come up, that I would like to be made aware of this information before action is taken before a juror is segregated from the rest of the jurors and questioned by a United States Marshal. There are so many problems that can arise from that type of situation during the process. (7/25/01 AM 25, App. 3823)

deliberate and return a verdict."[83]  On July 24, 2001, after the court's limited inquiry of Jurors

Nos. 1 and 17, the government announced that it was "vigorously opposed" to allowing the jury

a mid-August recess.[84] The next day, the court urged the eleven-member rump jury to reach a

"verdict now," and added that it was postponing any consideration of any vacation time.[85] The

court *sua sponte* reinstructed the jury on Jury Instruction 34, which allowed for partial verdicts.[86]

One defense counsel advised the trial judge: "I am concerned here that what maybe we

don't know exactly what's going on. There is obviously something going on, but what may be

going on is that Juror No. 3 is expressing a different decision than the majority of the jurors, and

Juror 1 and 17, in view of that, are attempting to eliminate him."[87]

The concern that Jurors No. 1 and No. 17 were trying to eliminate Juror No. 3 in order to

break a deadlock in the voting is based on compelling circumstantial evidence that the

Government has not refuted. The jury had been in deliberations since July 9, without reaching a

verdict. After the trial judge removed Juror No. 3, the remaining eleven jurors immediately

(within two hours) returned verdicts in this case. As the district court stated in its order of August

16, 2001: "[T]he Court concluded that just cause existed to dismiss Juror No. 3. That conclusion

has since been confirmed by the orderly return of verdicts."

The law is to the contrary, for "a district court may under no circumstance remove a juror

in an effort to break a deadlock."[88] Within two hours after Juror No. 3 was excused, the rump

---

[83] (7/19/01 AM 7, App. 3788).

[84] (7/24/01 PM 15, App. 3801)

[85] (7/25/01 AM 54, App. 3849).

[86] (*Id* at 54-55, App. 3849-50).

[87] (7/25/01 AM 40, App. 3838).

[88] *United States v. Thomas*, 116 F. 3d 606, 624 (2d Cir. 1997). *See also Quinones v. United States*, 489 U.S. 1032 (1989)(error in decision to dismiss juror where possible cause of the removal was as much to avoid a mistrial because of a hung jury as to excuse an incompetent juror); *United States v.*

jury returned a guilty verdict against four defendants[89]on the key narcotics conspiracy charge. These facts certainly create a reasonable inference that Juror No. 3's views of the merits were contrary to those of some of the other jurors.[90]

The Government asserts that the Appellants failed to prove that Juror No. 3's discharge had to do with his views on the merits. But that is not our burden, when Appellants were denied the opportunity to participate in the inquiry of Juror No. 3 and were not present when the court privately interviewed Juror No. 3, nor when DUSM Adams covertly interviewed Juror No. 3, nor when the prosecutors interviewed DUSM Adams about his interview of Juror No. 3. Nor were Appellants allowed to question the remaining jurors about Juror No. 3 or to interview Juror No. 3 after he was discharged. The absence of proof is the fault of the court, not Appellants.

Dismissal of jurors has been upheld only when "the lawyers were not shut out of the process."[91] As we have shown here the defense lawyers were not merely shut out; they were never invited in. The court's directives concerning return of verdicts and removal of Juror No. 3 were coercive, violating Appellants' due process rights to a fair, impartial and a unanimous verdict.

## C.    Conclusion

The district court's decision to excuse the twelfth juror without just cause and over

---

*Hernandez*, 862 F. 2d 17, 23 (2ⁿᵈ Cir. 1988).

[89] Three co-defendants were convicted of conspiracy at the same time.

[90] *See United States v. Tabacca*, 924 F.2d 906 (9ᵗʰ Cir. 1991)(conviction reversed for improper dismissal of a juror during deliberations; deadlocked jury returned a verdict of guilty within two hours after reconvening in his absence).

[91] *United States v. Boylan*, 898 F.2d 230, 259 (1ˢᵗ Cir. 1990)("On at least six occasions, defense counsel suggested supplementary questions which were then put to jurors"); *United States v. Sharpe*, 193 F.3d 852 (5ᵗʰ Cir. 1999) (court "consulted with the lawyers throughout, giving thoughtful consideration to their suggestions."); *Cf.*, *Remmer*, 347 U.S. at 227, 229 (judgment vacated and case remanded for factual findings, where a juror was contacted during trial by another about the case, the issue was brought to the court's attention, was investigated by the FBI, and determined harmless by the court without knowledge or participation of defense counsel).

Appellants' objections falls into the special category of errors that "defy analysis by harmless-error standards" and require automatic reversal because they are "necessarily unquantifiable and indeterminate."[92] Viewed as a whole, the process leading to Juror No. 3's dismissal was neither fair nor open, and Appellants' convictions must be vacated.

## II.    Appellants were denied a fair trial by the conduct of the trial judge.

The Government chooses not to reply to the particulars of our presentation on this issue. The choice is understandable, given the sheer magnitude of the number of the errors made. But the Government's very unwillingness to undertake the defense proves our point – the errors in this trial were of sufficient number to constitute a qualitatively different sort of error. This was a difference in kind, not one of degree.

Rather than address fully the merits of our claim, the Government chooses, instead, to hide behind a mistaken construction of the standard of review, incorrectly arguing that Appellants did not adequately preserve their objections below. The Government is wrong, but even if it is right – even if a plain error standard governs this issue -- Appellants meet that standard. Indeed, the Government's response simply reinforces our showing of how the trial court's unfair treatment of the defense influenced the jury.

### A.    Standard of review.

The Government argues for a plain error standard of review because defense counsel neither objected to the trial court's conduct at trial on bias grounds nor sought recusal.[93]

---

[92] *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993). As a final sally, the Government submits that there was no reason at that late stage of the case to declare a mistrial and that Rule 23(b) was adopted for this type of situation. Appellants do not quarrel with the use of Rule 23(b) in appropriate circumstances. Those presented here differ so significantly as to cast doubt on the reliability of the jury's verdict.

[93] Govt. Br. 98.

-31-

App 858

However, the Government concedes that in *United States v. Barry*, [94] this Court reserved the question of whether failure to make an express objection based upon bias requires only limited, plain error review. In *Barry*, the court declined to decide whether failure to seek recusal would constitute a waiver of a bias claim but acknowledged that at least one other circuit took the position that we endorse, namely, that actual bias could be raised explicitly as a theory of relief for the first time on appeal.[95]

The Government also recognizes that this Circuit's precedent established in *United States v. Wyatt*[96] supports the proposition that the absence of an express objection is not a waiver, but contends that *Wyatt* is limited to claims of excessive judicial questioning. Unsurprisingly, the Government offers no rationale to distinguish issues of undue judicial questioning from any other form of judicial bias in applying a standard of review. And, as the Government also concedes, counsel objected to much of the challenged conduct below, although not explicitly on bias grounds.[97] Accordingly, we contend that the objections were preserved below.

But even if the standard of review is plain error, Appellants meet it. The first two prongs of *United States v. Olano*'s plain error test are met where (1) there was error; and (2) the error was plain.[98] The trial court greatly overstepped the bounds of judicial decorum, as we have shown, and to treat defendants as pariahs while treating the prosecutors as honored guests could not more plainly offend notions of fairness.

The third prong of *Olano* is also met, in that the errors affected substantial rights. The right to a fair trial unimpeded by judicial maltreatment a substantial fundamental constitutional

---

[94] *United States v. Barry*, 938 F.2d 1327, 1340 n. 15 (D.C. Cir. 1991).

[95] *See id.* (citing *United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985)).

[96] *United States v. Wyatt*, 442 F.2d 858, 860 (D.C. Cir. 1971).

[97] Govt. Br. 98.

[98] *United States v. Olano*, 507 U.S. 725, 732-34 (1993).

-32-

right.[99] Breach of that right in the ways set forth, demeans the system of justice and erodes public faith in the system. If this Court finds, as we submit it must, that the trial judge was so biased against Appellants and their counsel that his conduct robbed the proceedings of fairness and dignity, then Appellants have made an adequate case for relief under *Olano*.[100]

## B.   Appellants' rights to a fair trial before a disinterested tribunal were eviscerated.

The Government's defense to Appellants' judicial bias claims rests upon broad and unexceptionable legal principles but overlooks the underlying facts. Everyone agrees that under *United States v. Liteky*[101] a bias or partiality challenge can be supported if the record reveals the trial judge demonstrated a high degree of favoritism or antagonism and made fair judgment impossible. In that vein, *Liteky's* words, although offered in the context of the federal recusal statute (which is not at issue here) remain instructive: "[T]he revision brought into [the recusal statute] elements of general 'bias and prejudice' recusal that had previously been addressed only in [18 U.S.C.§]144 . . . requiring them *all* to be evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance."[102] This is essentially a restatement of the *Offutt* doctrine, which decrees "justice must satisfy the appearance of justice."[103] That guideline was not met here, as we once more show.

---

[99] *See, e.g., North Carolina v. Pearce*, 395 U.S. 711 (1969) (Due Process limits authority to increase sentence after retrial); *Blackledge v. Perry*, 417 U.S. 21 (1974) (Due Process limits prosecutor's discretion to add new charges or counts).

[100] 507 U.S. at 736. *See also Rush v. Smith*, 56 F.3d 918, 925 (8th Cir. 1995)(finding plain error in civil rights case due to trial judge's deportment before jury; applying *Olano*).

[101] 510 U.S. 540 (1994).

[102] *Id.* at 548.

[103] *Offutt v. United States*, 348 U.S. 11, 13 (1954).

## 1.    The Government resorts to rhetoric over particularization.

*Liteky* does not confer upon trial judges a license to treat people badly, to castigate them
for no reason, to impugn their motives at opportune moments, blindly to ascribe misconduct to
them, and to threaten them because judges hold positions of power. Yet the Government's
response to Appellants' argument that the trial judge was so biased and pro-prosecution as to
deny them a fair trial can be distilled into one word: "avoidance." The Government frequently
conceded that the defense accurately set forth the trial judge's conduct. For example, the
Government did not dispute Appellants' contention that the trial judge purposefully put artificial
time limitations on the defense's cross-examinations. Instead it made a "one size fits all" claim
that the restrictions were merely an exercise of judicial discretion over complex trials.[104]

It is not insignificant, we think, that the Government declined to tackle most of the
examples Appellants proffered by consigning them *en masse* to a lengthy footnote, contending
that it cannot respond to each example Appellants proffered because of word limitations. The
Government made no motion to exceed the word limitation in order to try to refute Appellants'
claims of bias. Instead it chose to dedicate fifty-two pages of its brief to reciting the underlying
facts, even though this appeal largely focuses on the unfairness of the trial process. Hence the
Government's resort to word limits as a constraint on its ability to take on the bias claim is, we
believe, untenable.

Frankly, if the storied shoe were on the other foot, we submit that the Government's
outcry would be pronounced. But the facts remain, and those facts demonstrate an atmosphere of
repression. A reading of the trial transcripts conveys what Appellants contended in their opening

---

[104] Govt. Br. 101-02.

-34-

App 861

brief: this trial was anything but fair, and the trial judge was as accommodating to the Government as he was contentious to the defense.

The Government tells us that the trial judge ruled against it occasionally and professes that it is not challenging his impartiality. Those few rulings do not mitigate the Appellants' complaint. Our concern is that the defense case was infected with so much overt animosity from the trial judge that no juror who was sensate could but conclude that the judge intensely disliked the defendants, their counsel, and their theories. The repetitive, clear message from the passages recited in our opening brief was that the defendants were guilty.[105] To say that they were not prejudiced by the trial court's conduct is to deny reality.

## 2. The Government has misstated the record.

In its attempt to divert attention from the trial process, the Government sometimes misstated testimony. For example, Appellants claimed that court below truncated Hill's cross-examination of Cindy Perkins (who accused Hill of killing James Coulter). The Government tells us that Hill's counsel implicitly confessed to an improper cross-examination by admitting that that he did not believe that Ms. Perkins had ever been charged with stabbing Mr. Coulter and should not have brought up a line of cross designed to show that she had been cosseted by the prosecutors.[106] The Government's representation is incorrect, as the following colloquy ensued:

BY MR. DAVIS:

Q. Did you ever stab your boyfriend between the time of when the incident that you have testified about regarding Mr. Hill and now?

MR. ZEIDENBERG: Objection.

---

[105] *Oses v. Massachusetts,* 775 F. Supp. 443, 460-623, 467 (D. Mass. 1991)("But Judge Chmielinski's actions went beyond any reasonable bounds of maintaining control; instead of preserving the ideal of dignity, order, and decorum, his gratuitously sarcastic remarks served to destroy it. From the jury's perspective, the trial judge's actions could only be interpreted as a wholesale judicial rejection of the validity of Oses's *pro se* defense.")(granting *habeas* relief), *aff'd,* 961 F.2d 985 (1ˢᵗ Cir. 1992).

[106] Govt.Br. 100, n.52 (*citing* 1/30/01 98, App. 1893)

MR. DAVIS: Your Honor, if law enforcement intervened, I am entitled to bring it out. I am just asking her. If they didn't, she can answer no.

THE COURT: What do you mean by law enforcement intervened?

MR. DAVIS: I have a credible basis-

THE COURT: You mean some law enforcement officer connected with this case procured the dismissal of that charge -

MR. DAVIS: Perhaps I should approach and show Your Honor what I am referring to.

THE COURT: I guess you better do that.

(Bench conference on the record).

MR. DAVIS: Your Honor, just so Your Honor knows what I was doing a few moments ago, the reason I was asking her about this is that she was charged with ADW and attempting to stab the young woman with a pair of scissors, and the charge was dismissed approximately a year later. Since she was a witness in the K Street case, I was inquiring about this to determine whether-

THE COURT: May 4, 1997-

MR. DAVIS: Well, Your Honor, witnesses have charges dismissed and many times it's as a result of their cooperation. I'm just asking. If it isn't, I have moved on.

MR. ZEIDENBERG: She answered that.

MR. DAVIS: I know, and I am done with that. Now I have -

THE COURT: The complainant reported to the Metropolitan Police Department that she had been assaulted by the defendant with a pole.

MR. DAVIS: If you read further, Your Honor, it's in there.

THE COURT: All right. It's a fight between two women over the same man.

MR. DAVIS: It involved Mr. Coulter. But I am done with that.

THE COURT: What is the further relevance? Is it your contention that some law enforcement officer connected with this case procured this complaint's dismissal in return for some cooperation?

MR. DAVIS: That's what I asked. And she said no, so it's done. I am moving on. Now I have --

THE COURT: Did you have any basis to suspect that?

MR. DAVIS: Yes, just given the fact that she was charged with stabbing someone with a pair of scissors and they didn't prosecute her. I mean, it's fairly routine that people have charges

App 863

overlooked or law enforcement intervenes. Your Honor, I have had clients that have been arrested on things. Now there is another incident –

THE COURT: The objection is sustained.

MR. DAVIS: Well, no, Your Honor, we have already done this. Now I have another incident where I have information -

THE COURT: If you have no further connection, no better connection with this case for that other incident –

MR. DAVIS: It's James Coulter. My information is that she stabbed her boyfriend. And since they are both intricately involved in this case, I want to --

THE COURT: What is the connection with this case?

MR. DAVIS: They are both --

THE COURT: Are you contending that was a charge that was dismissed?

MR. DAVIS: I don't think she was ever charged. But I guess we can do it up at the bench. I mean, I just found out about this this afternoon. I heard --

THE COURT: Both of these charges were dismissed, she was never convicted of them?

MR. DAVIS: That's correct. And I am asking -

THE COURT: Are you trying to impeach her, is that what you are trying to do?

MR. DAVIS: No, I'm trying to find out if the gained any -

THE COURT: This is not a discovery deposition, Mr. Davis.

MR. DAVIS: Your Honor, I am simply trying --

THE COURT: The objection is sustained. Do not go into the subsequent incident.

MR. DAVIS: The subsequent incident –

THE COURT: If for some reason you think you ought to be allowed --

MR. DAVIS: Well, your Honor, can we get a proffer for the record if that's even true?

MR. ZEIDENBERG: I am not aware of the incident. I don't know what Mr. Davis is alleging to. I don't know what he is basing this other incident on.

THE COURT: I think he has had, like other defense counsel, investigators out roaming all over the city picking up whatever dirt that he can pick up, and he is going to use it.[107]

---

[107] (1/30/01 PM 95-99, App. 1890-94).

App. 864

Quite plainly defense counsel had a good faith basis to demonstrate the relevance of a line of bias-type of cross-examination. The court interrupted him repeatedly and then cut off the cross-examination. And its comments then needlessly chastised defense counsel for carrying out their constitutionally mandated duty to thoroughly investigate the case and develop impeachment information concerning Government witnesses.[108]

### 3. The Government has also misstated the law.

The Government also advances some incorrect legal principles. For instance it suggests that the trial judge was under no obligation to retain notes from jurors seeking excusal and to show the notes to counsel. In fact, Rule 43 and the Constitution, forbid *ex parte* communications between the court and jurors, and it is the practice that whenever jurors communicate to the court in writing, the writing will be preserved.[109] Thus seen, the following colloquy confirms that the trial court ran afoul of the rule:

> THE COURT; I alert counsel that we are getting repeated requests from jurors who protest that they are being imposed upon by being required to remain here. So far I have yet to see one that I think is sufficiently meritorious to justify excusing them from service. But I am genuinely concerned that we could very well end up in a situation where we have less than the minimum number of jurors.
>
> MS. HEPWORTH: Your Honor, may we be advised as to the communications from the jurors?
>
> THE COURT: No, because most of them are signed, and I send them back.
>
> MS. HEPWORTH: Perhaps some sort of indication of the juror number and what was the --

---

[108] (1/30/01 PM 99-99, App. 1893-94).

[109] *Rogers v. United States*, 422 U.S. 35 (1975) (Judge's reply *ex parte* to jury note violated defendant's right to be present in person or by counsel at all proceedings from the time the jury is empanelled until it is discharged after rendering a verdict; trial court correctly ordered note to be filed on the record); *United States v. Degraffenried*, 339 F.3d 576 (7th Cir. 2003) (discussion of jury note outside defendant's presence violated Rule 43).

THE COURT: I can identify them from the numbers, yes, but none of them in my judgment, and it is my judgment which controls, represents a sufficient justification for excusal from service here.

Whether that situation will continue to obtain, I don't know. If it appears that it is likely that the jury is becoming so restive that we cannot count on their continued voluntary acquiescence, and continued service here, I will very reluctantly, but not hesitate to sequester this jury. I don't think anybody wants this jury sequestered.

MS. HEPWORTH: No, Your Honor.

MR. ZUCKER: Your Honor, just so I understand. Would it be possible so that we could at least address the issue - I understand your concern for anonymity. Can we find out what the subject matter of the complaint is with a redacted version so we don't know who it is? We don't know their identity but at least we could address it. Because there are - we're setting up -

THE COURT: Address what?

MR. ZUCKER: You['re] saying that -

THE COURT: Are you talking about the jury or are you talking about agent Lisi's -

MR. ZUCKER: Oh, no, no, no. The jury, the jury, the jury. You're saying you cannot disclose - you did not consider any of the complaints sufficient enough to warrant excusal. We might want to address that. And if we did it, you said your concern was that they're not anonymous. They're signed.

Well, fine. Take out the signature and let us know the seat number, and what the complaint is, because we might want to take a position on some of them.

THE COURT: Denied. I'm going to exercise my prerogative and keep them until such time as I think I see a sufficient justification for excusal.

MR. BESHOURI: Your Honor, will the court at least put them under seal then to be part of the record?

THE COURT: I have returned them to the jurors.[110]

This case involved an anonymous jury, and it is unrealistic to think they did not realize

something was afoot under those circumstances. Denying the defense access to complaints that

were conveyed privately to the district court prevents Appellants and this Court from knowing

what the jurors were protesting. Suppose the notes had told the trial judge that the jurors had

---

[110] (1/9/01 PM 59-61, App. 1650-52).

App 866

conferred, had begun to discuss the evidence amongst themselves, and decided they had heard enough and were ready to proceed to a verdict. Would anyone not think that would give some reason for concern?[111]

### 4. The Government's use of a "trial management" theory to excuse the trial court's artificial limits on the defense case rings unconvincingly.

In response to Appellants' proof that the trial judge all-too-frequently limited cross-examination, the Government argues that the trial court allegedly needed to constrain defense counsel in order to prevent the trial from becoming unmanageable. It claims that this need became apparent after the defense had cross-examined the first cooperating witness for 214 pages of trial transcript, although his direct examination had consumed only 60 pages of transcript.[112]

This is a red herring designed to distract from the overall record which demonstrates the *in terrorem* effect of the judge's actions. "'In reviewing criminal cases it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure.'" [113] The question is not a single witness, but limits on defense cross-examination of *all* witnesses

Moreover, the witness to whom the Government alludes, Andre Murray, was a major informant against Hill, Sweeney, Carson, and Proctor. Mr. Murray also admitted on direct examination to being a heroin addict, to having been arrested "about a hundred" times and having been convicted of a dozen serious crimes, to selling narcotics throughout D.C., and to and

---

[111] *See, e.g., United States v. Resko,* 3 F.3d 684 (3d Cir. 1993)(finding error where trial court not alert to indications that jurors were engaging in premature deliberations).

[112] Govt. Br. 102.

[113] *United States v. Young,* 470 U.S. 1, 16 (1985)(internal quotations omitted)(*quoted in Oses,* 775 F.Supp. at 467).

-40-

to cooperating with the Government and seeking its help with the Parole Board.[114] Defense

counsel had an obligation to cross-examine him vigorously, and there was ample fodder for that

effort.[115]

### 5.    The jury would have to have been deaf not to notice the district court's undue comments towards defense counsel.

The Government suggests that the demeaning and disrespectful comments of the trial

judge to counsel were "innocuous." Doubtless its position would be different had it been the butt

of the repetitive and gratuitous comments. Worse yet, it has misstated their context by claiming

that defense attorneys had invited the judge's approbation.[116] In fact, some of the instances it

cites actually were points during the trial that defense counsel merely sought either to understand

the court's rulings in order to abide by them or to make a record of their grounds for objection.[117]

---

[114] (2/1/01 AM 12-15, 18-20, 22- 25, 29-65, App. 1996-99, 2002-04, 2006-09, 2013-49).

[115] *Strickland v. Washington*, 466 U.S. 668 (1984).  The Government also exaggerates in asserting that the defense requested one half day to prepare for closing arguments and when the court granted them a full day, declined in favor of a half-day break. *See* Govt. Br. 98.  In fact, after initial discussions, (6/25/01 PM 55-62, App. 3533-40), the final structure was adopted at the urging of the *Government* who wished to commence closing arguments while the families of the decedents and victims were present – a request to which defense counsel acquiesced. *See* (6/26/01 AM, 4-5, App. 3541-42).

[116] Govt. Br. 104-05.

[117] For example, counsel objected when the Government asked Andre Murray his opinion as to whom Proctor considered friends or associates. The court overruled the objection. When counsel succinctly asked: "Guilt by association is not legitimate examination?," the court then said "Would you please sit down, Mr. Bramson. The objection is overruled.  You can cross-examine." (2/1/01 AM 63, App. 1499). Counsel was hardly guilty of "continued persistence in areas where the judge had ruled." Govt. Br. 104.

As for Martin's counsel's being admonished that she was running out of the court's "time" and "patience," the Government grudgingly concedes that this did "openly reflect[ ] some exasperation" but say that the judge needed to maintain order. Govt. Br. 104-05. Counsel was confronted by an evasive witness. Instead of directing the witness to answer the questions, the court sustained objections to the questions. When counsel tried to impeach the witness, asking about his need to please the Government in order to gain the benefit of his cooperation arrangement, the Government successfully objected and the court gratuitously added: "Ms. Hepworth, you are just about out of...time and patience." When counsel asked permission to put two more questions to the witness, the court curtly responded: "I hope they are better than the last ones. Go ahead." One of those questions elicited from the witness an admission that he was hoping by his cooperation with the Government to avoid a life sentence. (5/2/01 PM 90-91, App. 2484-85).

The Government says that the "arguably critical" comments about which the defense complains were all made outside the jury's presence, either at the bench or when the jury was on recess.[118] We beg to differ. While the disparate treatment of defense counsel alone strongly signals judicial bias, the fact that the jury overheard some of the exchanges further buttresses our position. Indeed the Government's transcript references,[119] when put in proper context, reveal the following:

**1/24/01 AM 18-19:** Counsel for Hill had objected to testimony by cooperating witness Reginald Switzer, on the grounds that there was no foundation for the testimony and that the witness was stating his opinion. During a bench conference the court deemed the objection "frivolous" and threatened "[I]f you make any more frivolous objections, I am going to discipline you." Counsel tried to explain that that the witness was not testifying from personal knowledge. After further discussion the court overruled the objection, warning counsel, "Do not make any more frivolous objections." When counsel asked for clarification as to what objections would be deemed frivolous, the court responded "[y]ou do what you do at your peril. I have warned you now. Take your seat." [120] The level of annoyance demonstrated by the court's comments were conveyed through gesture and body language and must have been detected by the jury.[121]

---

[118] Govt. Br. 106.

[119] *See id.*

[120] (1/24/01 AM 18-20, App. 1802-04).

[121] A similar event occurred on February 14th, when Martin's counsel objected to a witness being asked why she was testifying. The court, after further discussion at a bench conference, stated: "[t]hat is a frivolous objection." Counsel replied "I don't think so." The court responded that "[y]ou make another frivolous objection like that, and you're going to be the next one to find yourself at the wrong end of a sanction. Why are you testifying? There is absolutely nothing objectionable about that. Objection is overruled."(2/14/01 PM 38-39, App. 2312-13). The jury could not have been insensitive to what was happening.

**2/6/01 AM 90:** Price's counsel was cross-examining cooperating witness Norman Yusuf

Simmons about murders he and Thomas Fields had committed.[122] Counsel then asked:

> MR. ZUCKER: Okay, and when you went over to Thomas Fields' house and they were gang-raping that woman for hours and had her handcuffed in the bed, you were agreeable with that; right?
>
> WITNESS: I was agreeable? There was nothing I could do as far as me stopping someone from raping her.
>
> MR. ZUCKER: You didn't try to do anything?
>
> WITNESS: No, I didn't.
>
> MR. ZUCKER: You didn't try to disassociate yourself in any way, did you?
>
> WITNESS: There came a point in time when I did disassociate myself.
>
> MS. CHATURVEDI: Objection, Your Honor. This has been asked and answered.
>
> THE COURT: Sustained.
>
> MR. ZUCKER: May I approach.
>
> THE COURT: No.
>
> MR. ZUCKER: Well, I need clarification on the court's ruling.
>
> THE COURT: You don't need any clarification except my sustaining of the objection.
>
> MR. ZUCKER: Well, I don't want to breach the court's ruling by going into other stuff.
>
> THE COURT: Will you please continue with your examination, Mr. Zucker.
>
> Mr. ZUCKER: I don't want to do so if it would be in -
>
> THE COURT: Your examination is concluded. Sit down.
>
> We'll take our noontime recess now, ladies and gentlemen. (Jury Out).
>
> MR. ZUCKER: May I address the Court before we leave?
>
> THE COURT: No, you may not. Mr. Zucker, you were warned. I find you in contempt of court. You are fined the sum of $500.00.[123]

---

[122] (2/6/01 AM 85-88, App. 2206-09).

[123] (2/6/01 AM 88-90, App. 2209-11).

-43-

The only thing that happened outside the jury's presence was the actual finding of contempt. The other demeaning statements occurred in front of the jury.[124]

For these reasons, and those previously stated in Appellants' opening brief, judicial bias so infected the proceedings below that Appellants were denied due process.

## III.     The introduction of Robert Smith's hearsay statements to Agent Lisi requires reversal.

The district court's decision to admit Agent Lisi's account of what Robert ("Butchie") Smith told him, and to deem Appellants to have waived their Confrontation Clause objections was error and the error was not harmless.

The Government approaches this issue by framing the question as (1) whether the district court "clearly erred" in deeming Appellants to have waived their rights; and then asking whether it was clear error for the trial judge to have found: (2) that Smith was a co-conspirator; and (3) that Sweeney's statements to Smith were in furtherance of the conspiracy.[125] We think the prosecution has it in reverse order and wrong on the merits

The proper questions are (1) was it clear error to conclude that Sweeney's statements to Smith were made with intent to further the conspiracy; and (2) whether (under the requisite *de novo* standard of review[126]) it was error to strip away Appellants' Confrontation rights. Approaching the questions from this perspective is more logical and allows the issue to be resolved in way that does not implicate constitutional considerations.[127]

---

[124] *See also* (5/2/01 PM 90-91, App. 2984-85)(Martin's counsel remonstrated in jury's presence that she was running out of the court's "time" and "patience" and that trial judge hoped any further questions "are better than the last ones.").

[125] Govt. Br. 117, 124.

[126] *United States v. (Ralph) Wilson*, 160 F.3d 732, 739 (D.C. Cir. 1998).

[127] *Lamprecht v. FCC*, 958 F.2d 382, 389-90 (D.C. Cir. 1992)("When a federal court is asked to answer a constitutional question, basic tenets of judicial restraint and separation of powers call upon it first to consider alternative grounds for resolution.")(*citing Ashwander v. Tenn. Valley Auth.*, 297 U.S.

Whether or not Mr. Smith was a coconspirator is, in the end, not material. The critical question is whether Sweeney's statements to him (as reported by Agent Lisi) were in furtherance of the conspiracy. The context and contents of Sweeney's comments' makes it evident that his words were idle chatter and that their admission at trial cannot be justified under Rule 801(d)(2)(E) , F.R.Evid..

The constitutional question need only be addressed if the Court concludes (contrary to our view) that Sweeney's declarations would have been admissible had Smith testified in person. On that issue, we maintain that the evidence was insufficient to permit waiver of Defendants' Confrontation Clause rights and admit Sweeney's statements. The Government has not shown that defendants "*engaged or acquiesced* in wrongdoing that was intended to, and did, procure the unavailability of [Smith] as a witness."[128] Any finding otherwise, especially as to Carson and Coates (the latter not even being shown to have any knowledge of a plot to eliminate Smith) is unsupported by the record.

Finally, the Government's brief confirms (albeit unwittingly) that admission of Smith's testimony was far from harmless. Smith's statements corroborated claims made by convicted felons testifying under plea agreements. For the most part, Lisi's rendition of what Smith supposedly told him was not corroborated by physical evidence or by testimony from disinterested witnesses, as compared to cooperating felons. Thus its admission was reversible error.

---

288, 347 (1936)(Brandeis, J., concurring)); *Karriem v. Barry,* 743 F.2d 30, 39 (D.C. Cir. 1984)("[I]t is the general policy of the federal courts to avoid addressing broad constitutional issues unless their resolution is imperative in the context of the case at hand.").

[128] Fed. R. Evid. 804(b)(6) (emphasis added).

-45-

## A.    Whether Smith was a co-conspirator is immaterial.

The Government itself says that Smith was "a large-scale drug dealer,"[129] who sold drugs

to Appellants. On that the evidence is clear. The parties dispute, however, whether Smith joined

as a member of the appellants' alleged conspiracy. In the end, however, this dispute doesn't

matter. Rule 801(d)(2)(E) "does not embody a requirement that the statement in question 'be

made by a coconspirator *to a coconspirator*.'"[130]  As a consequence, the parties' disagreement on

this subsidiary factual question is irrelevant.[131]

## B.    Sweeney's purported statements to Smith were not "in furtherance of" the conspiracy.

It is worth repeating here an important point – the Government now embraces a theory of

admissibility (that Sweeney's statements to Smith were "in furtherance" of the conspiracy) that it

did not rely on initially below. As we have already detailed,[132] when the Government first

proffered Lisi's recitation of Smith's statements, it acknowledged that there was "No question"

that had Smith been present to testify the *Bruton* doctrine would have made Smith's statements

inadmissible as against Carson and Coates.[133]  Recognizing this reality, the Government

explicitly sought an exception to *Bruton* in cases of waiver-by-misconduct. The district court

rejected that approach, yet offered the Government an even more untenable alternative – holding

that the statements by Sweeney to Smith were "in furtherance" of the conspiracy.

---

[129] Govt. Br. 125 n. 72 ("a major supplier of marijuana in Southwest"), 127 n. 73 ("Smith admitted to having trafficked in cocaine and heroin').

[130] *United States v. Williamson,* 53 F.3d 1500, 1519 (10th Cir. 1995)(emphasis original).

[131] Our initial submission discussed this factual question. In our view, as we note above, that factual question is irrelevant. To the extent however that it is not, our initial submission, App. Br. 103-05, demonstrates that the Government's view of Smith's role lacks factual foundation.

[132] *See* App. Br. 98.

[133] (5/29/01 AM 58, App. 3277) (acknowledging that *Bruton v. United States*, 391 U.S. 123 (1968) would preclude admission of Smith's statements against Carson and Coates).

The Government's initial unwillingness to embrace an "in furtherance" theory of admissibility was understandable. Despite its vigorous attempts to defend the result, in the end there simply is no factual predicate for the district court's conclusions.

Before a statement can be said to have been made "in furtherance" of a conspiracy, there must be a reasonable basis upon which to conclude that the statement was made during the course of the conspiracy and actually furthered the conspiracy's objectives.[134] Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy, and the statement need not have been exclusively, or even primarily, made to further the conspiracy.[135] Nor need the statement be important or essential to the conspiracy; it need only be important enough to serve some purpose to promote the conspiracy's objectives in order to be admissible.[136]

In this respect, we acknowledge that a statement that is "part of the information flow between conspirators intended to help each perform a role" is admissible under Rule 801(d)(2)(E).[137] We recognize that a wide range of statements satisfy the "in furtherance" requirement. These include statements made: (1) to identify other members of the conspiracy and their roles;[138] (2) to recruit potential coconspirators;[139] (3) to control damage to an ongoing conspiracy and prevent the desertion of coconspirators;[140]; (4) to keep coconspirators advised as

---

[134] *United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987).

[135] *Id.*

[136] *United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002).

[137] *United States v. Santos*, 20 F.3d 280, 286 (7th Cir. 1994).

[138] *United States v. Williamson*, 53 F.3d at 1520; *United States v. Magee*, 821 F.2d 234, 244 (5th Cir. 1987); *United States v. Roldan-Zapata*, 916 F.2d 795, 803 (2d Cir. 1990).

[139] *United States v. Godinez*, 110 F.3d 448, 454 (7th Cir. 1997); *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994); *United States v. Nazemian*, 948 F.2d 522, 529 (9th Cir. 1991); *Shoffner*, 826 F.2d at 628.

[140] *Godinez*, 110 F.3d at 454; *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988).

to the progress of the conspiracy,[141] (5) to conceal the criminal objectives of the conspiracy or help avoid detection by law enforcement officials;[142] or (6) to plan or to review a coconspirator's exploits.[143] Some courts have admitted extrajudicial statements as being in furtherance of a conspiracy where the comments were made (7) to describe proper sources, avenues or conduits to promote the conspiracy;[144] (8) to prompt further action by a coconspirator,[145] or (9) to allay suspicions or serve as an assurance that a coconspirator can be trusted to perform his role.[146]

The Government (and this line of cases) cannot, however, escape the fundamental rationale for permitting this species of hearsay to be introduced. It stems from the fiction of the agency theory of a conspiracy, under which "'each member of a conspiracy is [deemed] the agent of each other conspirators whenever he is acting – including speaking – to promote the conspiracy (hence the requirement that the statement be in furtherance of the conspiracy).'"[147] "The requirements that the statement be both 'during the course' and 'in furtherance of' the conspiracy are therefore not only compelled by the agency fiction, they are in fact the reason why the drafters of the federal rule incorporated the agency approach into Rule 801(d)(2)(E). Thus, Rule 801(d)(2)(E) is a *limitation* on the admissibility of co-conspirators' statements that is

---

[141] *United States v. Jordan,* 260 F.3d 930, 933 (8th Cir. 2001); *Nazemian,* 948 F.2d at 529; *United States v. Potts,* 840 F.2d 368, 371 (7th Cir. 1987).

[142] *Williamson,* 53 F.3d at 1520; *United States v. Kaden,* 819 F.2d 813, 820 (7th Cir. 1987).

[143] *United States v. Molt,* 772 F.2d 366, 368-69 (7th Cir. 1985).

[144] *Jordan,* 260 F.3d at 933; *Williamson,* 53 F.3d at 1520 (*quoting United States v. Lechuga,* 888 F.2d 1472, 1480 (5th Cir. 1989)).

[145] *Nazemian,* 948 F.2d at 529.

[146] *United States v. Wolf,* 839 F.2d 1387, 1393, 1395 (10th Cir. 1988); *United States v. Buishas,* 791 F.2d 1310, 1315 (7th Cir. 1986); *United States v. Miller,* 664 F.2d 94, 98 (5th Cir. 1981).

[147] *United States v. Perez,* 989 F.2d 1574, 1577 (10th Cir. 1993)(*quoting United States v. Pallais,* 921 F.2d 684, 687 (7th Cir. 1990)).

App 876

meant to be taken seriously."[148] "The 'in furtherance' requirement embodies the drafters' 'desire to strike a balance between the great need for conspirators' statements in combating undesirable criminal activity which is inherently secretive and difficult of proof, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence.'"[149]

The Government's argument for the admissibility of Lisi's testimony concerning Smith's statements unmoors the co-conspirator exception from its foundations. To meet the "in furtherance" requirement the statements must be more than "mere . . . narrative" description by one conspirator of the acts of another.[150] Rather, the statements must prompt the listener to respond in a manner that promotes or facilitates the carrying out of the criminal activity.[151] A statement is "in furtherance," only if either the statement itself or the conversation as a whole was intended to advance the ultimate conspiratorial objective. Conversely, conversations that represent "mere idle chatter" or which are mere descriptions of past conduct are not in furtherance of the conspiracy because the statement and the conversation were not intended to advance the conspiracy, regardless of whether an individual co-conspirator was implicated in the conversation.[152]

---

[148] *Perez,* 989 F.2d at 1577 (emphasis original) *(quoting United States v. Johnson,* 927 F.2d 999, 1001 (7th Cir. 1991)(internal quotation omitted)); *United States v. Doerr,* 886 F.2d 944, 951 (7th Cir. 1989).

[149] *Perez,* 989 F.2d at 1577 *(quoting* 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(2)(E)[01]at 801-311 to -312 (1992)) (footnotes omitted).

[150] *United States v. Lieberman,* 637 F.2d 95, 102-03 (2d Cir. 1980). *See also United States v. Paone,* 782 F.2d 386, 390 (2d Cir. 1986)(mere "idle chatter" does not satisfy Rule 801(d)(2)(E)). *Cf., United States v. Beech-Nut Nutrition Corp.,* 871 F.2d 1181, 1199 (2d Cir. 1987).

[151] *Beech-Nut,* 871 F.2d at 1199.

[152] *See United States v. Means,* 695 F.2d 811, 818 (5th Cir. 1983). *See also United States v. Phillips,* 664 F.2d 971, 1027 (5th Cir. 1980)(abrogation on other grounds recognized by *United States v. Huntress,* 956 F.2d 1309 (5th Cir. 1992)).

The threshold question that must be asked in each of these cases is: What was the declarant's intent in making the underlying statement?[153] This fundamental distinction -- between conversations in furtherance of the conspiracy and prejudicial statements made in conversations that were not in furtherance of that conspiracy -- has been recognized by every circuit court of appeals that has considered the question.[154] Understanding the distinction is vital to proper resolution of this case, as well.

The most difficult questions regarding admissibility of coconspirator statements involve statements such as those at hand, in which one alleged conspirator supposedly said that "X" defendant perpetrated some bad act or played some role in the conspiracy. The argument against admissibility in such situations is simple -- recitations of past history do not generally further the cause of the conspiracy. In most instances they are little more than "idle chatter." To be sure, sometimes relating past crimes and current roles does "further" the conspiracy – but that is the exception rather than the rule.

To see this, consider the situation where such information is conveyed to keep the conspiracy intact. In *United States v. Westmoreland,*[155] a witness testified that her husband had

---

[153] *United States v. Roberts,* 14 F.3d 502, 515 (10ᵗʰ Cir. 1993)(*citing Nazemian,* 948 F.2d at 529); *Doerr,* 886 F.2d at 951-52.

[154] *See, e.g., United States v. Desena,* 260 F.3d 150, 158 (2d Cir. 2001)(certain conversations held hearsay narratives); *United States v. Santos,* 20 F.3d 280, 286 (7ᵗʰ Cir. 1994)("These statements are best described as narrative discussions of past events, which do not satisfy the 'in furtherance' requirement of Rule 801(d)(2)(E)"); *Roberts,* 14 F.3d at 514 ("mere narratives between co-conspirators . . . of past events are not in furtherance"); *United States v. Johnson,* 927 F.2d 999, 1002 (7ᵗʰ Cir. 1991)( Statements that consist of "idle chatter, narrative declarations and superfluous casual remarks" do not satisfy the "in furtherance" requirement)(quotations and citation omitted); *United States v. Urbanik,* 801 F.2d 692, 698 (4ᵗʰ Cir. 1986) ("this statement can fairly be treated only as the sort of idle conversation which though it touches upon, does not 'further' a conspiracy."); *United States v. Posner,* 764 F.2d 1535, 1538 (11ᵗʰ Cir. 1985)(evidence which "spilled the beans" could not be said to have advanced any object of the conspiracy); *United States v. Snider,* 720 F.2d 985, 992 (8ᵗʰ Cir. 1983); *Lieberman,* 637 F.2d at 102 ("The conversation . . . smacks of nothing more than casual conversation about past events. It is difficult to envision how it would have furthered the conspiracy").

[155] *United States v. Westmoreland,* 312 F.3d 302 (7ᵗʰ Cir. 2002).

---

App 878

come home covered in blood and told her that he had helped the defendant on trial bury someone who had owed the defendant money and who had "talked too much." The Seventh Circuit held that this statement furthered the conspiracy because the statement, which the witness perceived as a threat, was intended to preserve the conspiracy by frightening the witness and dissuading her from informing the authorities about the defendant's drug scheme.[156]

There is also a line of cases involving criminal organizations in which information about participants in a conspiracy and their respective roles substantially furthers the conspiracy. For example, in *United States v. Russo*,[157] a witness was told that the defendant on trial had become a captain within an organized crime family and that the defendant's son told him and another individual that the codefendant was "with" the family. The Second Circuit held that these statements were in furtherance of the conspiracy because they helped maintain the syndicate by giving associates information about its membership.[158].

Here the Government asserts that the information Sweeney imparted to Smith "help[ed] him carry out his duties."[159] It is not surprising that the Government makes no effort to particularize those duties or connect them to the hearsay statements. Just what Smith's "duties" were, let alone how the information helped Smith *fulfill* these duties, is left dangling, as if the Government's *ipse dixit* should suffice to carry the day.

Even if Smith's role was, as the government asserts, that of a supplier of narcotics, the government's case is illogical. It is implausible that a description of three murders that, as the Government concedes, arose out of an unrelated robbery that occurred several months earlier,

---

[156] *See id.* at 309-10.

[157] *United States v. Russo*, 302 F.3d 37 (2nd Cir. 2002).

[158] *See id* at 46-47.

[159] Govt. Br. 128.

App 879

would assist Smith in fulfilling his function of supplying drugs. Yet the Government would have this Court assume, in the absence of any evidence, that the information was sufficiently vital to Smith's business that conveying information about the murders was an essential act by Sweeney in furtherance of some larger conspiracy. To conclude so is not only unsupported by the evidence, it is rank speculation.

By the same token, Smith's ostensibly learning that Coates had kidnapped Anthony Pryor years before, and being told that Carson had attempted to find and kill Kenneth Adams years earlier, can hardly be said to have helped Smith "fulfill his duties" to the group.

In our view, the present case is factually similar to the one addressed by the Fourth Circuit in *United States v. Urbanik*. There two co-conspirators conducted a conversation in furtherance of the conspiracy. Afterwards they moved to a different part of the house and began lifting weights. One of the co-conspirators then implicated a third co-conspirator. The Fourth Circuit held that this statement was not in furtherance of the conspiracy. It was evident that the conversation was between two co-conspirators and that it was made during the course of the conspiracy -- they had, after all, just finished conducting the business of the conspiracy. However, it was also clear that the co-conspirators had ceased discussing the operations of the conspiracy and had begun engaging in "mere idle chatter" as they pursued an unrelated activity. In the words of the Fourth Circuit:

> The statement identifying Urbanik as Pelino's "connection" for marijuana was merely a casual aside to the discussion of Urbanik the weight-lifter. In no sense but a most speculative one could it be thought to have been made to further the purposes of the conspiracy. Haselhuhn himself testified that this identification of Pelino's marijuana supplier could have had no effect on the conspiratorial relationship between him and Pelino. We think that this statement can fairly be treated only as the sort of idle conversation which though it touches upon, does not "further," a conspiracy, and which accordingly should not be admitted under Rule 801(d)(2)(E). *See United States v. Means*, 695 F.2d 811, 818 (5ᵗʰ Cir. 1983); *United States v. Lieberman*, 637 F.2d 95, 102 (2ⁿᵈ Cir. 1980); *United States v. Eubanks*, 513, 520 (9th Cir. 1979). The requirement that the statements have been in furtherance of the conspiracy is designed both to assure their

> reliability and to be consistent with the presumption that the coconspirator would have authorized them... The requirement is not satisfied by a conversation ... which amounted to no more than idle chatter."[160]

It is, therefore, important to understand the *context* in which the hearsay statements related by Smith to Lisi supposedly were made.[161]

An examination of the Government's principal authorities proves the point even more, for Sweeney's statements to Smith (again, indulging the belief that Lisi was not exaggerating his discussions with Smith) cannot be admitted under the *Tarantino* analysis the Government advances.[162] None of the underlying admissions were made with the objective of inducing Smith to do anything to further the charged conspiracy.[163] And the Government's claim that Sweeney's comments were a means of updating Smith[164] is speculative in the extreme. The record contains absolutely no indication that Sweeney told Smith any of this information with the intent of having Smith do anything for the conspiracy.

Instead the statements fall within the class of "'casual comments to people outside or inside of the conspiracy'" which *Tarantino* recognizes as a ground for exclusion.[165] As in *United States v. Snider,* the decision that *Tarantino* cites to illustrate the point, "nothing in the record suggests that [any of Appellants'] descriptions to [Smith] of the operation, and the duties of the participants, in any way furthered the objectives of the conspiracy."[166]

---

[160] *United States v. Cornett,* 195 F.3d 776, 784 (5th Cir. 1999) (*quoting Urbanik,* 801 F.2d at 698). *See also United States v. LiCausi,* 167 F.3d 36, 50 (1st Cir. 1999)(admission of narrative erroneous).

[161] *United States v. McConnell,* 988 F.2d 530, 534 (5th Cir. 1993)(reversing conviction where inadmissible evidence was introduced under Rule 801(d)92)(E)).

[162] *United States v. Tarantino,* 846 F.2d 1384 (D.C. Cir 1988).

[163] *Tarantino,* 846 F.2d at 1412-13.

[164] Govt. Br. 128-29.

[165] *See id.* at 1412 (*quoting United States v. Snider,* 720 F.2d 985, 992 (8th Cir. 1983)).

[166] *Snider,* 720 F.2d at 992.

-53-

Nor is this matter akin to Alta Rae Zanville's fateful lunchtime conversation with Rayful Edmond's mother in *United States v. Edmond,*[167] the admission of which this Court described as "a close question."[168] There, Constance Perry's statements to Ms. Zanville arguably were made to keep her "'current on the status of the business.'"[169] Here, on the other hand, even if one indulged the belief that Smith was part of the conspiracy, what he purportedly told Lisi consisted of entirely of statements of historical events, none of which could reasonably be construed as having been made initially to Smith with the intent to further the conspiracy's future business. That, however, is the touchstone of the Rule 801(d)(2)(E) analysis.[170]

The shortfalls are even more pronounced in Coates' case. It would be particularly odd and counterfactual, to say that the conspiracy's business was being advanced when Smith learned that, many years before, Coates had been involved in shooting Michael Jones and in kidnapping Anthony ("Wysocki") Pryor.[171] *Tarantino* recognizes that it is difficult to argue that the recapitulation of events months or years after they occurred can be deemed to be in furtherance of a conspiracy.[172] The Government never established that anything Smith was told conveyed to him any message about how future business in the conspiracy was to be conducted. At most these conversations might have been the kind of conversation that touched upon the conspiracy, but they cannot fairly be said to have furthered the conspiracy and thus their admissibility was not authorized by Rule 801(d)(2)(E).

---

[167] *United States v. Edmond,* 52 F.3d 1080 (D.C. Cir. 1995).

[168] *See id* at 1110-11.

[169] *See id* at 1111.

[170] *See, e.g., Cornett,* 195 F.3d at 784-85; *United States v. Bibbero,* 749 F.2d 581, 583-84 (9th Cir. 1984).

[171] Govt. Br. 132-33.

[172] *Tarantino,* 846 F.2d at 1412. *See also Desena,* 260 F.3d at 158.

-54-

## C.    No legal basis justified admissibility under a Rule 804(b) waiver theory.

We come, finally, to the Confrontation concern – an issue the Court need not reach if it accepts our submission on the factual "in furtherance" question. At the threshold we submit there are two glaring discrepancies in the Government's theory of admissibility. The first is that it never charged any of the defendants directly with killing Smith. The Government concedes that the indictment accuses Sweeney and Carson of conspiring to kill him, but not of murdering him, and did not charge Coates at all with those steps.[173]

It bears reiterating that the evidence regarding the cause of Smith's death is completely circumstantial. Indeed, the only speculative testimony offered by Montgomery was that Carson had borrowed Montgomery's car the day Smith was killed and later told Montgomery not to drive on Half St. where Smith's body was found.[174] Neither is at all probative and, indeed, the later precaution is a sensible one whenever a murder has occurred, irrespective of one's role in that event.

The second concern arises from an even more curious notion. Smith was a man whom the Government itself concedes was a major drug dealer in Southwest Washington, D.C., who sold a wide array of drugs at wholesale quantities to a lot of people in the city.[175] Word indisputably had leaked out to some person or persons who never were identified that he had become an informant. Such a public identification carries with it a great deal of baggage -- there is both the danger of being out on the "street" under the cloud of being a "snitch" and the changed circumstance of being an informant with every incentive to embellish or fabricate his claims. This informant was killed under mysterious circumstances and no one ever was charged with the

---

[173] Govt. Br. 120 n. 66.

[174] (5/23/01 PM 27-32, App. 3246-51) (Montgomery).

[175] Govt. Br. 127.

-55-

killing. The Government nonetheless convinced a federal court to forfeit the Confrontation Clause rights of those on trial, including the rights of one defendant (Coates) as to whom it admittedly had no evidence that he had any idea Smith was an informant, let alone knew about, acquiesced to, or participated in the man's killing. This decision was flawed.

Appellants do not suggest that it is improper to forfeit the Confrontation rights of a defendant who has participated in planning to eliminate or in eliminating a potential witness.[176] That defendant has made a conscious choice and can hardly be permitted to take advantage of his wrongdoing.

But that situation is far removed from the one presented here, where there is scant – or no – evidence connecting any defendant with the witness' elimination. At its core the prosecution's waiver theory is based solely on the defendants' being members of a group that has killed witnesses in the past. While the 2-1 holding in *United States v. Cherry*[177] permitted waiver under those circumstances, that decision is not binding on this Circuit.[178] Allowing *Cherry* to control the admission of rank, inculpatory hearsay against persons not involved remotely in Smith's murder disserves the Confrontation Clause's significance as a "bedrock personal guarantee" to the accused[179] and undermines the constitutional "barrier against flagrant abuses, trial by anonymous accusers, and absentee witnesses."[180]

---

[176] *United States v. White*, 116 F.3d 903, 911-16 (D.C. Cir. 1997).

[177] *United States v. Cherry*, 217 F.3d 811, 816-820 (10th Cir. 2000). *Accord United States v. Thompson*, 286 F.3d 950, 963-66 (7th Cir. 2002). The First Circuit's recent *dicta* of seeming approval is, as *dicta*, no more that an aside of little persuasive force. *United States v. Rodriguez-Marrero*, 390 F.3d 1, 18 n.8 (1st Cir. 2004) (cited in Govt. Br. 121 n.69).

[178] *ITT Industries, Inc. v. NLRB*, 251 F.3d 995, 1003 (D.C. Cir. 2001).

[179] *See., e.g., Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 1359 (2004). *See also California v. Green*, 399 U.S. 149, 158 (1970); *Pointer v. Texas,* 380 U.S. 400, 406 (1965).

[180] *Green,* 399 U.S. at 179 (Burger, C.J., concurring).

-56-

As we noted in our opening brief, the better view is that adopted by the *Cherry* dissent: a finding of forfeiture simply on the basis of participation in a drug conspiracy that had murdered in the past "is too expansive and goes against the rule of fundamental fairness."[181] In particular, "the right to confront witnesses is a constitutional right personal to the accused and . . . only the defendant or someone acting on his behalf may waive or forfeit that constitutional right."[182] This is consistent with a long line of cases holding that constitutional guarantees are not lightly deemed waived,[183] including those conferred by the Confrontation Clause.[184]

Remarkably, the Government's brief says absolutely nothing of the *Cherry* dissent. In our view, *Cherry* marks a singular break with established law, which has traditionally viewed the forfeiture-by-misconduct doctrine as linking individual responsibility with causation. The waiver-by-forfeiture rule "'has its foundation in the maxim that no one shall be permitted to take advantage of his *own* wrong.'"[185] Thus acts of one defendant to procure the unavailability of a particular witness historically have not been imputed to codefendants absent some evidence that the codefendants participated in or knew of the attempt to silence the witness."[186] And that circumspection has also extended to the element of intent, for the Government has been required

---

[181] *Cherry*, 217 F.3d at 823 (Holloway, J., dissenting).

[182] *See id. (citing Olson v. Green,* 668 F.2d 421, 429 (8th Cir. 1982)). *See also United States* v. *White,* 838 F.Supp. 618, 623 (D.D.C. 1993), *aff'd,* 116 F.3d 903 (D.C. Cir. 1997).

[183] *United States v. Chavez-Salais,* 337 F.3d 1170, 1172-73 (10th Cir. 2003); *Page v. Frank,* 343 F.3d 901, 909 (7th Cir. 2003); *United States v. Newell,* 315 F.3d 510, 519-20 (5th Cir. 2002); *Hunter v. Moore,* 304 F.3d 1066, 1071-72 (11th Cir. 2002).

[184] *E.g., Brookhart v. Janis,* 384 U.S. 1, 4 (1966); *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938); *Cotto v. Herbert,* 331 F.3d 217, 248-53 (2nd Cir. 2003)(granting writ of habeas corpus). *Cf., United States v. Dhinsa,* 243 F.3d 635, 651 (2nd Cir. 2001).

[185] *See Cotto,* 331 F.3d at 251 (*quoting Reynolds v. United States,* 98 U.S. 145, 149 (1878) (emphasis supplied)).

[186] John R. Kroger, "The Confrontation Waiver Rule," 76 *B.U.L.Rev.* 835, 853 (1996)(*citing Olson,* 668 F.2d at 429, and *United States v. Thevis,* 84 F.R.D. 57, 72 (N.D. Ga. 1979)(defendant having no responsibility for witness's murder did not waive confrontation right), *aff'd,* 665 F.2d 616 (5th Cir. 1982)).

-57-

App 885

to show that the defendant whose confrontation rights it seeks to forfeit sought to secure the witness's unavailability.[187]

It is at those two junctures, causation and intent, that the *Cherry* rationale founders. *Cherry* substitutes a new test of foreseeability constructed on a legal fiction (the conspiracy doctrine of agency) for one that demands proximate causation and intent (did the defendant intend to make *this* witness unavailable). What *Cherry* yields, then, is the scenario that the Supreme Court condemned in *Dutton v. Evans*,[188] a wholesale and complete denial of cross-examination without an informed waiver. That is a "constitutional error of the first magnitude."[189]

## D.    The error was not harmless.

Applying a *Cherry* approach has the potential of sweeping within its ambit defendants who are not shown to have murdered or threatened or agreed to participate in or otherwise acquiesced in the specific acts of witness intimidation of which the Government complains.[190] In the case of Coates this shortcoming is most pronounced; in Carson's and Sweeney's situation it is nearly as strong. Nothing the Government has stated convincingly overcomes the prejudice that we showed inured to Appellants' case.

---

[187] Kroger, "The Confrontation Waiver Rule," 76 *B.U.L.Rev.* at 854 (*citing United States v. Houlihan*, 92 F.3d 1271, 1280 (1st Cir. 1996)). *See also Dhinsa*, 243 F.3d at 651-52.; *United States v. Thai*, 29 F.3d 785, 815 (2nd Cir. 1994)("If a witness' silence is procured by the defendant himself . . . by actual violence or murder . . . the defendant cannot then assert his confrontation clause rights in order to prevent prior . . . testimony of that witness from being admitted against him.")(conspiracy prosecution)(citation omitted).

[188] *Dutton v. Evans*, 400 U.S. 74 (1970).

[189] *See id.* at 85.

[190] James F. Flanagan, "Forfeiture By Wrongdoing and Those Who Acquiesce in Witness Intimidation: A Reach Exceeding Its Grasp and Other Problems With Federal Rule of Evidence 804(b)(6),"51 *Drake L. Rev.* 459, 544-45 (2003).

-58-

1.    To begin with, the Government blandly asserts that "Smith's statements did not provide new information about any violent crimes that had not already been provided by other witnesses, but it did corroborate details of other witnesses' testimony."[191] From this, the Government reasons that any error in admitting Lisi's recounting of Smith's statements was harmless.[192]

But this claim belies the record in this case. If it were true, then Lisi's testimony about Smith's statements should have been excluded as cumulative. The truth is that the Government fought for the admission of Smith's hearsay, and it fought hard. It began the fight with a pre-trial motion *in limine*. During trial, when Carson and Coates filed a cross-motion to exclude the Smith hearsay, it responded at length. For the Government to now advance, with a straight face, the argument that Smith's hearsay really wasn't that significant blinks at reality. Is it really credible to suggest that the Government has vigorously advanced and defended a position, which, as even the Government must acknowledge, is subject to substantial legal uncertainty, for the mere advantage of a mildly corroborative hearsay statement? Surely not.

Rather, the Government's position appears to be the more typical one indulged in routinely by prosecutors: Identify significant, yet legally problematic testimony; advance it on any possible theory, change theories as necessary; and, if successful, defend the decision as "harmless" on appeal. If the Court were to accept the Government's position in this case it would, effectively, insulate from all appellate review virtually any controversial evidentiary decision. Simply on procedural grounds, the harmless error argument must fail.

---

[191] Govt. Br. 113.
[192] *Id.* at 130-34.

-59-

App 887

2. The argument fails on the merits as well. Only Montgomery's naked testimony linked Coates and Carson to the triple murder.[193] No ballistics, fingerprints, or disinterested witnesses accused Coates of complicity in this event. The jury did not agree with Montgomery on all counts charged in the indictment, for as the Government elsewhere concedes some of the defendants were acquitted on charges for which Montgomery was the star witness or a key witness.[194] The jury's suspicion of Montgomery is consistent with the Government's own new-found hesitancy about his testimony.[195] Accordingly, on this record one cannot say that admission of Smith's hearsay and the forced waiver of Confrontation rights did not affect the disposition of those charges and/or racketeering acts arising from the triple killings that were lodged against Coates.[196]

3. The Government agrees that the admission of Smith's hearsay also bore on its accusation that Coates had shot Michael Jones. It claims, however, that the jury undoubtedly relied instead on the testimony of Arthur Rice, and so any error was (in its view) harmless.[197] We are not so sanguine. Once more there was no ballistics or crime scene evidence. Rice was the

---

[193] App. Br. 115-16; Govt. Br. 130. The Government's reference to Sweeney's revelation to Demetrius Hunter that he knew Coates was not "telling" on him (Govt. Br. at 131-32) was not admissible as a coconspirator statement and in any event did not directly tie Coates into the killings.

[194] A prime example was Hill's acquittal of the Pryor kidnapping notwithstanding Montgomery's accusations of Hill's and Coates' complicity. Govt. Br. 134 n. 77. Additionally the jury credited Montgomery in convicting Coates of shooting Ronald Sowells but acquitted Carson of those charges, notwithstanding Montgomery's testimony. *Id.* at 35 n.21. The jury did not credit Montgomery's claims that Carson had shot Mark Phillips, either. *Id* at 37 n. 22.

[195] In collateral proceedings in Superior Court relating to the prosecution Steven R. DeWitt for the murder of Paul Ridley, Montgomery attributed the Ridley murder to Samuel Carson. *See* App. Br. 211-12. In argument to the court, the Government challenged Montgomery's credibility, contending that his testimony was "not borne out or ... supported by other evidence;" that he was "confused about details" in his testimony; and that his testimony contained numerous "inconsistencies." *See United States v. DeWitt*, (D.C. Super. Ct. No. F5548-91) Transcript of Oct. 26, 2004 at 40, 43, 49. This belated concession by the Government goes a long way towards establishing the weakness of Montgomery's naked testimony and, thus, the saliency of Lisi's account of Smith's statements.

[196] These charges and racketeering counts are: Counts 25, 36, and 27, and Racketeering Act 49.

[197] Govt. Br. 132-33.

-60-

App 888

only person to identify Coates as having a motive (revenge) and having shot Mr. Jones. But Rice was hardly a disinterested bystander. He, too, was a convicted felon working under a cooperation agreement, and had plenty of reason to implicate those on trial. In these circumstances one cannot depreciate Smith's hearsay as being insignificant, contrary to the prosecution's version of the trial.

4.    What Smith said to bolster the Government's charges arising from the Pryor kidnapping was perhaps less significant than what Smith's hearsay added to the other charges. But it was not inconsequential. Our main brief explained that the disinterested witnesses didn't identify Coates as one of the perpetrators and the discovery of his fingerprint from the car said to have been used in the kidnapping merely showed that he had been in it at some point.[198] So once more Coates' fate rested on the jury's appraisal of informants' testimony, and insofar as these charges went, damning hearsay from the grave.

### E.    Conclusion.

In sum, the admission of Smith's statements through the mouth of Agent Lisi was error of the worst sort. The first error lies in the district court's mistaken conclusion that Sweeney's statement to Smith was "in furtherance" of the conspiracy. That conclusion is without factual foundation and is so divergent from the record that the Government declined, initially, to seek admission of Smith's statements on this basis. Only now, with the protective imprimatur of an erroneous district court decision, does the Government advance the argument.

Second, and more fundamentally, the district court erroneously chose to waive Appellants' confrontation rights without any legal or factual foundation. To the extent that Smith's murder was imputed to any one defendant, it could not, and should not be imputed to

---

[198] App. Br. 116-18.

-61-

App 889

other participants in the conspiracy merely on the speculative assumption that all participants in a
conspiracy must automatically be deemed to acquiesce in all murders. This expansion, endorsed
by the *Cherry* court, trenches upon fundamental Confrontation Clause principles.

Finally, the error was not harmless. The jury evinced substantial skepticism about
Montgomery's testimony, rejecting it in many instances. The powerful, impermissible
corroboration provided by a dead voice from the grave can only have had a substantial,
determinative influence. "[T]he improperly admitted statements . . ..helped to cement[] the
government's case by adding an invisible, presumably disinterested witness' to corroborate the
government's position."[199]

As a consequence a new trial is necessary on all counts or, at a minimum, on those counts
infected by the error of Smith's hearsay testimony.

## IV.     Appellants' convictions under the Violent Crimes In Aid Of Racketeering and the D.C. murder statute must be overturned.

Appellants' convictions for certain charges of violating the Violent Crimes In Aid Of
Racketeering statute, 18 U.S.C. § 1959 ("VICAR") and the District of Columbia murder statute
(D.C. Code § 22-2401) must be overturned because the VICAR statute is unconstitutional and
because the Government failed to show that the underlying acts were committed in furtherance
of the charged racketeering activities and/or that interstate commerce was affected.[200] In
particular Carson's conviction for an assault with intent to kill Ulysses English was unrelated to
any of the narcotics charges, which were the enterprise's *raison d'etre*.[201] Coates' convictions

---

[199] *United States v. Lopez*, 340 F.3d 169, 177 (3d Cir. 2003) (quoting *United States v. Sallins*, 993
F.2d 344, 348 (3d Cir. 1993)) (reversing conviction based upon admission of improper hearsay).

[200] To the extent this argument is accepted, the Government does not dispute that the related
firearms convictions under 18 U.S.C. § 924(c), must also be vacated, a point we made in § V of our
opening brief. *See* App. Br. 135.

[201] *See id.* at 128.

-62-

arising from the triple murder neither met the interstate commerce element nor showed that Coates' participation was attributable to his membership in the enterprise.[202] The Government has not shown cogent reasons to the contrary.

## A.    The VICAR statute is unconstitutional.

In response to our argument that the VICAR statute is unconstitutional the Government makes two arguments, one procedural (that our challenge was waived) and the other on the merits. The Government is, with respect, wrong on both accounts.

### 1.    The constitutional challenge was not waived.

The Government initially suggests that our constitutional challenge has been waived.[203] It relies on several earlier cases from this and other circuits that it reads for the proposition that constitutional challenges must be raised at the trial level before they may be considered on appeal.[204]

The Government over-states these cases and neglects their inconsistency with subsequent Supreme Court precedent. First, and most obviously, this Circuit has never held that the waiver rule is mandatory. Rather, the precedent in this Circuit is, as this Court noted in *Baucum*, that a reviewing court is empowered to make a prudential judgment: It may choose either to "refuse to address [the constitutional issues] because the defendants ha[ve] neglected to raise them below, *or* decide[] to reach them only upon determining that the lower court's failure to address them constituted 'plain error.'"[205]  The choice is discretionary and, indeed, many of the cases cited by

---

[202] *See id.* at 128-30.

[203] *See* Govt. Br. 134-35.

[204] *Id.* (citing *United States v. Badru*, 97 F.3d 1471 (D.C. Cir. 1996); *United States v. David*, 96 F.3d 1477 (D.C. Cir. 1996); *United States v. Feliciano*, 223 F.3d 102 (2d Cir. 2000); *United States v. Weathers*, 186 F.3d 948 (D.C. Cir. 1999).

[205] *United States v. Baucum*, 80 F.3d 539, 541 (D.C. Cir. 1996) (*per curiam* ) (citing cases).

-63-

the Government as examples of the waiver rule (*e.g. Feliciano*[206]) contain alternate plain error analyses – which is, of course, the only review Appellants seek.[207]

More importantly, all of the cases cited by the Government pre-date the Supreme Court's decision in *United States v. Cotton*,[208] which suggests that the plain error mode of analysis (rather than waiver) is the proper one. To be sure, *Cotton* involved a different alleged constitutional error – the error of failing to incorporate requisite factual allegations in an indictment. But if the Government's analysis of waiver were correct, then the *Cotton* court ought to have dismissed the writ of *certiorari* as improvidently granted, having concluded that the petitioner had no cognizable unwaived constitutional claim. Of course, the Court in *Cotton* did no such thing. Rather, consistent with our submission, it considered the merits of the core constitutional issues raised under the plain error review standard.[209]  We seek nothing more.

### 2.     VICAR is facially unconstitutional.

On the merits, the Government misreads our argument and the statute. Apparently the Government's theory is as follows – it is sufficient constitutionally for an act of violence to be connected to a racketeering enterprise if, in turn, the enterprise is one that the jury finds has acted in a manner effecting interstate commerce. We disagree, as has the Supreme Court. In our view, the underlying conduct that is the subject of the conviction must itself be proven to have a connection to some form to interstate commerce to support Congressional authority to legislate.

---

[206] *See Feliciano,* 223 F.3d at 125.

[207] *See* App. Br. 120 n. 374.

[208] *United States v. Cotton,* 535 U.S. 625 (2002).

[209] *See id.* at 631 (applying plain error standard of Fed. R. Crim. P. 52(b) to forfeited claims).

As we noted in our opening brief, in *United States v. Morrison*,[210] the Court emphasized

the non-economic, criminal nature of the conduct at issue. Building on the *Lopez* reasoning, the

Court in *Morrison* held that:

> We accordingly reject the argument that Congress may regulate noneconomic, violent
> criminal conduct based solely on that conduct's aggregate effect on interstate commerce.
> The Constitution requires a distinction between what is truly national and what is truly
> local. . . . In recognizing this fact we preserve one of the few principles that has been
> consistent since the Clause was adopted. The regulation and punishment of intrastate
> violence that is not directed at the instrumentalities, channels, or goods involved in
> interstate commerce has always been the province of the states. . . . Indeed, we can think
> of no better example of the police power, which the founders denied the National
> Government and reposed in the States, than the suppression of violent crime and the
> vindications of its victims.[211]

The challenged conduct in this case -- the acts of violence -- are akin to the conduct of

possessing a gun in a school zone in *Lopez* or domestic violence in *Morrison*. All of them are (as

defined in the statute) unrelated directly to any economic enterprise and to commerce of any

kind.

In an effort to rescue VICAR from facial unconstitutionality, the Government (and other

courts) has relied on a second –level argument. They recognize that the act of violence itself is

not connected to interstate commerce, but argue that it is connected to a racketeering activity

connected to interstate commerce and that the jurisdictional nexus satisfied. But this argument

proves far too much – for it allows approval of a criminal statute even when the jurisdictional

element is contained, not in the statute itself, but is imported through second-order definition.

Even the cases on which the Government relies recognize the problematic nature of this

construction. In *United States v. Crenshaw,* for example, the Eighth Circuit recognized that

VICAR must satisfy the "substantial effects" prong of the interstate commerce test. To be sure,

the *Crenshaw* court deemed that VICAR did so – but it did so in a context where the intrastate

---

[210] *United States v. Morrison,* 529 U.S. 598 (2000).

[211] *Id,* at 617-18 (citations omitted).

-65-

violence was linked explicitly to the interstate regulated drug activity.[212] Here, by contrast, the jury instructions permitted a conviction without that explicit, and constitutionally required, link.

Notably, the jury instructions charged the connections between the VICAR offenses to the enterprise in the alternative – "for the purpose of gaining entrance to, *or* increasing or maintaining the defendant's position in the enterprise *or* for the purpose of receiving money from the enterprise."[213] Because the jury returned a general verdict we cannot know which of these premises – including the attenuated "receiving money from an enterprise" requirement – formed the basis for its verdict.

But it simply cannot be that merely receiving money from an interstate enterprise is sufficient to satisfy the constitutional standard. If that were true, then given the nature of commerce in modern America, *every* economic transaction of any sort would be subject to Congressional regulation – a result utterly inconsistent with Supreme Court jurisprudence. At some point in *every* causal chain it is inevitable that the money in question used to purchase a purely local service would have been derived from some interstate commercial activity. In short, one might as well say that *Lopez* has no meaning – for there, surely, the gun was purchased with money that had been earned through some attenuated interstate commercial activity. The proper answer is that mere connection to some other interstate commercial activity is not, in and of itself, sufficient to satisfy the interstate commerce requirement.[214]

Because the VICAR statute neither regulates commercial activity nor contains a requirement that the prohibited acts be connected in any way to interstate commerce, the statute is facially unconstitutional. Defendants' convictions under the statute must be vacated.

---

[212] *See Crenshaw*, 359 F.3d at 987.

[213] (7/9/01 AM 20, App. 3780).

[214] *See also Jones v. United States*, 529 U.S. 848, 120 S. Ct. 1904 (2000) (striking arson conviction even though transaction necessarily involved interstate transfer of money).

## B.    The evidence did not establish the charged VICAR violations.

In addition to our facial challenge, we also asserted individual factual challenges to the convictions. Even assuming that VICAR is constitutional, the law is clear that there must, nonetheless be some connection between the alleged violent act, and the underlying interstate conspiracy. Despite the Government's arguments to he contrary, several of the VICAR convictions fail to meet this evidentiary threshold.

### 1.    The Government's stated reasons do not suffice to save the VICAR charge brought against Carson.

In its brief, the Government submits that Glenn English was a member of the 58th Street Crew (although it does not say that Carson believed that). According to the Government, Carson thought that English had told the 58th Street group where Carson's mother lived and so Carson enlisted Montgomery to eliminate English as a dealer on K Street.[215] After English was shot and wounded, Carson and Montgomery discussed killing him if the opportunity arose, out of concern that English would retaliate.[216]

This theory is insufficient to sustain Carson's attempted murder conviction because it is inconsistent with the overwhelming weight of the evidence. Montgomery made clear that the motive for Carson's shooting Mr. English was a concern that English would cause harm to Carson.[217] This concern was utterly unrelated to possession with intent to distribute or distribution of drugs. Thus the requisite connection to the enterprise and thus to interstate commerce was completely lacking.

---

[215] Govt. Br. at 147.

[216] *See id.* at 147-48.

[217] (3/13/01 PM 20-21, App.2567-68).

-67-

## 2. The VICAR case against Mr. Coates does not hold up any more than the one against Mr. Carson.

The Government treats the first of Mr. Coates' two arguments as if it was based on the singular theory that the enterprise did not affect interstate commerce. At least so it appears, for the Government's response to Coates' claims focuses on the motive element[218] and seems to assume that his interstate commerce argument was based on the notion that the enterprise didn't involve or affect interstate commerce. Actually, Coates' position as to the VICAR claim was not so much that the enterprise didn't affect interstate commerce (although he does not concede that it did) but rather that (1) his participation in the robbery that went awry and turned into a triple murder was not undertaken as part of or to further membership in the enterprise and (2) that the robbery of a private individual does not affect interstate commerce.[219]

We first address the motive element. We have a fundamental disagreement with the Government over whether *United States v. Thai*[220] has value as precedent for this case. As the Government concedes,[221] in *Thai* a gang was known for murder, robbery, and extortion, but not bombings. The Second Circuit reversed the VICAR conviction of the gang leader, who engaged in a side venture -- the paid bombing of a restaurant. Nothing indicated that the defendant had undertaken his act in furtherance of the gang's business or to enhance or maintain his status as the leader of the gang.[222]

That analogy holds true here. The K Street organization engaged in drug sales (usually marijuana) and fought off or eliminated competitors and informants. On very rare and widely

---

[218] *See id.* Govt. Br. 149-50.

[219] App. Br. 129-30.

[220] *United States v. Thai,* 29 F.3d 785 (2d Cir. 1994)(*cited in* App. Br. 127-28, 131).

[221] Govt. Br. 150 n. 87]

[222] *Thai,* 29 F.3d at 818. *See also United States v. Houlihan,* 92 F.3d 1271, 1293-95 (1st Cir. 1996)(reversing § 1959 conviction for murder for lack of evidentiary support).

-68-

App 896

separated occasions (two incidents in 1990 and 1993) people were kidnapped for ransom.[223] In no prior instance did the Government contend or show that Appellants were armed robbers. The planned armed robbery of Gaskins was not, therefore, an act connected to the enterprise. In other words, the fact that some of Mr. Coates' friends invited him (seemingly almost on a lark) to join in a mugging not linked to the K Street crew's normal business. This case, then, is a *Thai* scenario.

To be sure, there was evidence that the robbery was planned to gain money for the K Street group to replenish its stock of weapons. Whether true or not, the contention of our opening brief remains unrefuted: there simply was no evidence that Sean Coates knew of, much less shared the intent of Montgomery, Carson, and Sweeney to rob Gaskins in order to restock a cache of guns.[224]

The prosecution failed to prove that Mr. Coates had a common motive with Sweeney, Montgomery and Carson. The Government cannot sustain Mr. Coates' VICAR convictions for the triple murder – and the associated weapons charge.[225]

## C.    The D.C. murder convictions were misjoined.

We will respond elsewhere at length to the general issue of the joinder of the 37th Place murders: here we restrict our response to those other murders charged under the D.C. Code that were improperly joined in this Federal indictment. The entire substance of the Government's response[226] is that the murders of Hallman, Hyson, Fortune, Thomas and Lucas were all linked to the charged RICO conspiracy for the *sole* reason that they were conducted to enhance the

---

[223] Yusuf Simmons (Govt. Br. 37) and Anthony Pryor (*Id.* at 38-39).

[224] App. Br. 130.

[225] *Thai*, 29 F.3d at 818-19.

[226] *See* Govt. Br. 156-58.

-69-

App 897

reputations for violence of Montgomery, Carson, and Martin. In other words, the Government's

theory is exclusively that these murders (which otherwise allegedly relate to disputes

disconnected from any drug dealing – *i.e.* disputes over a gambling debt and disobedience in a

personal relationship) may nonetheless be linked to a RICO conspiracy because *all* violent acts

by a RICO conspirator serve to enhance the conspirator's reputation and thus serve to effectuate

the purposes of the conspiracy.

Again, this theory simply sweeps too broadly. To be sure, if there is direct evidence of

this intent, a conviction may be sustained. Thus, attacking those who affronted other gang

members in order to further the enterprise's reputation for violence and standing in the narcotics

trade is sufficient.[227]

On the other hand, even when a defendant is a member of a charged enterprise, not every

act of violence that defendant has committed necessarily will lead to VICAR liability. In *Thai*,

as discussed above, the Second Circuit reversed for insufficiency of evidence the conviction of

the leader of a gang who had given a man an incendiary device used to bomb a business. While

there was evidence the defendant had received monies to do this, there was no proof that the

defendant acted for any reason other than as a personal profit-making mercenary venture. The

prosecution had failed to present any evidence that the defendant had undertaken his act in

furtherance of the gang's business or to enhance or maintain his status as the leader of the

gang.[228] The Government's attempt to distinguish *Thai* (relegated to a footnote)[229] is unavailing.

---

[227] *E.g., United States v. Phillips,* 239 F.3d 829 (7th Cir. 2001); *United States v. Tipton,* 90 F.3d 861, 890-91 (4th Cir. 1996).

[228] *Thai,* 29 F.3d at 818. *See also United States v. Houlihan,* 92 F.3d 1271, 1293-95 (1st Cir. 1996) (reversing § 1959 conviction for murder for lack of evidentiary support).

[229] *See* Govt. Br. 150 n. 87.

-70-

*Thai* stands for a simple clear proposition – violent acts must be linked by some evidence to the underlying RICO conspiracy or the convictions may not stand.

Here, no such links were proven. [230] The Government, for example, asserts that Montgomery shot Hallman to enhance Montgomery's reputation within the organization.[231] But the evidence contains no proof of that assertion – rather it discloses only that Montgomery and Hallman got into a fight in public. There is not a scintilla of proof that Montgomery thought (or was told) that a failure to respond to the dispute would injure his reputation. Montgomery himself admitted that these murders had nothing to do with drugs, but rather stemmed from a his fight with Mr. Hallman and the fact that Mr. Hyson happened to be present and witness Mr. Montgomery's shooting Mr. Hallman.[232]

Similarly, the Government offers evidence that Fortune was killed because of a dispute over money in a craps game.[233] But, again, there is absolutely no reputational motive proven, much less alleged.

And the same is true for the murders of Thomas and Lucas. Montgomery claimed that the motive for the murders was that Carson had left one gun at Thomas' house and that she had not returned it to him. According to Montgomery, Carson acted alone and had killed Thomas only after she would not return the gun to him, but that there was no advance plan to kill her. No testimony linked these killings to the affairs of the enterprise. To the contrary, the evidence in the case suggests that Mr. Carson acted alone and that the offense was not connected with the charged conspiracies. Indeed, even the district court understood that the "government's theory

---

[230] We discuss the evidence more fully below. *See infra* § VIII.B.

[231] *See* Govt. Br. 157 (*citing* 3/12/01 AM 53-56, App. 2460-63).

[232] (3/15/01 AM 10, App. 2644).

[233] *See* Govt. Br. 157-58 (citing 3/12/01 PM 34, App. 2492). We address the Fortune murder in more detail *infra* §§ VII, VIII.B.2.

-71-

[was] that this was for want of a better term, a domestic dispute between Carson and his paramour."[234] The Government's hypothetical that Carson wanted to "send a message" to the K Street group is nothing more than that – an unsupported hypothetical. Not a shred of evidence buttresses that conclusion.

What the Government is left with is an inference without evidentiary support. Under the Government's theory *any* act of violence committed by *any* member of a RICO conspiracy is necessarily properly joined because it *a fortiori* bears upon the member's reputation. But that construction utterly drains the joinder requirements of any meaning and is contrary to the requirement that joined acts must be part of a common scheme or plan.[235] Some evidence beyond mere speculation is required and none was presented here. As a consequence, the unrelated murders of Hallman, Hyson, Fortune, Thomas and Lucas were misjoined and the convictions for murder under the D.C. Code must be vacated.

## V.    The District Court abused its discretion by excluding the grand jury testimony of unavailable witnesses.

The Government asserts that because the federal and state governments are separate sovereigns, that under Rule 804 (b)(1), Fed. R. Evid., the United States was not a party to the Maryland Grand Jury proceedings and therefore contends the trial judge acted within his discretion in refusing admission of state grand jury transcripts that would have exculpated Sweeney.[236] The Government is wrong and the error was not harmless.

---

[234] (2/6/01 PM 28, App. 2212).

[235] *United States v. Halliman*, 923 F.2d 873, 883 (D.C. Cir. 1991).

[236] *See* Govt. Br. 176.

-72-

App 900

## A.    The refusal to admit the testimony was error.

In support of its position, the United States heavily relies on *United States v. Peterson*,[237]

There the defendant sought to introduce his state grand jury investigation testimony into

evidence at his federal trial pursuant to Fed. R. Evid. 804 (b)(1).

The *Peterson* court looked to many factors in upholding the trial court's discretion to

disallow the testimony. The court, for example, noted that "Peterson was arrested on the street

by local officers on patrol, not as part of an ongoing investigation; no Federal officers were

involved."[238] But *Peterson* is not this case.

Members of the FBI arrested Sweeney at the Montgomery County Detention Center. His

arrest was the product of a joint ongoing investigation, begun in 1991, that was pursued by the

FBI, and the Metropolitan, Montgomery County and Prince George's County Police

Departments.[239] With respect to the Prince George's police involvement in the investigation of

the triple murder, Agent Lisi stated:

> They came on late, and I believe the only reason that they became involved in the
> investigation was because of the triple murder in Maryland. So that was their primary
> focus as to what happened in Maryland in that triple murder. However, the fact that they
> were assigned there—they didn't come to work at our office every day. You know they
> might show up one day a week or two days a week, sporadically. So, they might not be
> aware of all the information that is going on. We tried to keep them involved. Their
> primary focus was the triple murder. We tried to let them know everything we have on
> the triple murder.[240]

---

[237] *United States v. Peterson*, 100 F.3d.7 (2d Cir. 1996).

[238] *See id.* 100 F.3d. at 12.

[239] (1/22/01 AM 11, App. 1743).

[240] (1/22/01 AM 14, App. 1744).

-73-

In short, the FBI was sharing everything it knew about the triple murder with the Prince

George's County Police Department. That separates this case from *Peterson* where "[t]he record

[fell] short of showing any participation by the federal government in the state proceedings."[241]

Moreover, in *Peterson* the *defendant* invoked his Fifth Amendment privilege at trial and

then with some boldness sought to introduce his own prior grand jury testimony as substantive

evidence – in effect, causing his own unavailability. As the *Peterson* court noted: "When the

defendant invokes his Fifth Amendment privilege, he has made himself unavailable to any other

party, but he is not unavailable to himself."[242]

Here, by contrast, Sweeney sought the introduction of grand jury testimony of two people

whom he had never met and was never connected to in any manner. The testimony was

potentially exculpatory as it suggested that an individual with no relationship to Sweeney may

have had involvement with the triple murder.

Robert Smith was arrested on December 5, 1996. Information provided by Smith

ultimately led to Sweeney's arrest by the FBI. Pinkney and Owens testified before the Prince

George's County Grand Jury five days *after* Smith's arrest, exculpating Sweeney. The

chronology makes it clear that the State's Attorney Office in Prince George's County and the

United States Attorney's Office in Washington, D.C. had similar motives because they were

obtaining information about crimes that they were jointly investigating.

In a footnote, the Government dismisses the significance of Smith's being in federal

custody at the time of the state grand jury proceeding. "Even if the FBI had shared the

information it had obtained from Smith at the time, that information was then nothing more than

the uncorroborated statement of a cooperator, which the Prince George's County prosecutor

---

[241] *Peterson,* 100 F.3d. at 12.

[242] *See id* at 13.

-74-

App 902

would have had no reason to believe was more credible than the testimony of Pinkney and Owens."[243] The reality is that the United States built much of its case against Sweeney around statements purportedly made to Smith and received in evidence without the opportunity to examine Smith. Before this Court, the government dismisses Pinkney and Owens as people who "[f]alsely implicated a drug dealer to whom they owed money, in order to benefit themselves.[244]

The credibility of the witnesses at various stages of the proceedings is not determinative. The important factor is that Prince Georges County and the FBI conducted a joint investigation of the triple murders. The grand jury testimony of Pinkney and Owens in Prince George's County was entirely *inconsistent* with the information provided by Smith to the FBI . Therefore, the inconsistency with one of the government's most important witness would have been exculpatory and greatly aided Sweeney.

In *United States v. Miller*,[245] this court found error in the exclusion of grand jury testimony that tended to exculpate the defendant. The same circumstance arises here and Sweeney seeks the same remedy.

### B.    The error was not harmless.

There existed substantial evidence suggesting that someone other than Sweeney committed the triple murders. That evidence, in the form of the grand jury transcripts of Pinkney and Owens, and in the form of testimonial evidence from Wesley Smith, was deemed inadmissible.

---

[243] Govt. Br 182 n. 104.

[244] Govt. Br. 181.

[245] *United States v. Miller*, 904 F.2d. 65 (D.C. Cir. 1990).

-75-

App 903

With regard to the grand jury transcripts, the Government argues that "[a]ppellants offered no evidence to corroborate that Green had committed the triple murder."[246] This burden-shifting argument should be summarily dismissed because it is incorrect.

The record of the trial strongly suggests that Smith was involved in the triple murders. James Montgomery, the centerpiece of the government's case and a perpetrator of the triple murders, testified that he was worried that Smith was telling the police about his involvement in killing three people in Temple Hills, Maryland in November of 1996.[247] Montgomery's claims, however, must be viewed in the context of the testimony of Prince George's County Police Officer Robert Taylor. He testified that he interviewed triple murder eyewitness Cinema Hawkins shortly after the crimes had been committed. She described both assailants as being six feet tall.[248]

James Montgomery testified that he was five eleven in height.[249] He also testified that Robert Smith was just about the same height as he was.[250] Montgomery described William Sweeney as being shorter than him about "five foot something" and added that no one has ever gotten the two of them confused in terms of height.[251]

The record unquestionably establishes that there was a factual basis for a reasonable juror to conclude that Robert Smith had involvement with the triple murder. Thus, excluding the corroborative grand jury testimony and the testimony of Wesley Smith cannot be considered as harmless.

---

[246] Govt. Br. 183.
[247] (5/23/01 PM 46, App. 3259).
[248] (6/12/01 PM 65, App. 3401).
[249] (3/15/01 PM 49 App. 2651).
[250] *Id.*
[251] (3/14/01 PM 65 App. 2642).

-76-

App 904

## VI.    The prosecutor's rebuttal argument was improper and substantially prejudiced the Appellants.

The Government argues that a single sentence of the rebuttal argument, "viewed in isolation, could be interpreted as an argument that the jury should infer Appellants' guilt from the admissions of the cooperators."[252]  But, the Government contends, that when viewed in context, it is unlikely that the jury would have understood it that way.[253]  Beyond that concession, the Government finds nothing improper with the prosecutor's rebuttal argument.

With all due respect, that single sentence must be viewed as an argument that the defendants cannot be innocent because the cooperators were not innocent.  It is also clear, that that argument, when viewed in context with the entire case, rendered the rebuttal argument not only improper, but also overwhelmingly prejudicial.

To determine whether the error was harmless or not, this Court must consider the severity of the error, the centrality of the issue affected by it, whether there were any curative measures taken, and the closeness of the case.[254]

The Government argues first that a single misstatement, made in response to defense counsel's arguments, will not be viewed as "severe."[255]  In support, the Government relies on *Gartmon*: "[w]ithout other compelling factors, a single misstatement confined to a closing argument rarely will be viewed as 'severe.'"  *Gartmon*, however, is easily distinguishable from this case.

---

[252] Govt. Br. 192.

[253] *Id.*

[254] *United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1998).

[255] Govt. Br. 194.

-77-

App 905

In that case, the Government misstated a single sentence of testimony at trial.[256] In this case, the Government argued that the convictions of the cooperators were proof of the defendants' guilt. Unlike in *Gartmon*, the statement at issue here impacted on the entire case and was therefore overwhelmingly prejudicial. Such a patently improper argument amounts to severe misconduct.

The Government also argues that the statement was not severe because it was made in response to defense counsel's argument. In fact, the Government suggests that when the defense claims that cooperators are fabricating the facts, it is appropriate to call the jury's attention to the fact that the cooperators pled guilty. It is not necessary to address the implication of such a rule since that is not the issue in this case. The prosecutor not only brought to the jury's attention that the cooperators pled guilty, but also went beyond that and argued that because they pled guilty the defendants must also be guilty. As the Government concedes, it is "impermissible to argue that the guilty pleas of former codefendants raise an inference of the guilt of the defendants."[257]

While the Government concedes that the cooperators' testimony was central to the prosecution, it argues the closing argument did not affect the jury's assessment of the credibility of the cooperators. Put another way, the Government argues that the jury would first have to find the cooperators to be credible before it could use the fact of their convictions as proof of the Appellants' guilt. Therefore, the error was "less central that appellants make it out to be."[258]

The Government's argument is simply wrong. The fact that the cooperators pled guilty was uncontroverted. The jury did not have to find any part of their testimony relevant to

---

[256] The Government told the jury in closing that Gartmon told the victim, "If you don't keep doing it, I'm going to pull the trigger." The actual testimony was, "He told me that I will listen to everything he says and do as he says." *Gartmon*, 146 F.3d at 1025.

[257] Govt. Br. 193 n. 107.

[258] Govt. Br. 195.

-78-

Appellants to be true before accepting that they pled guilty. The very reason the prosecutor's argument was erroneous was because it "raises the concern that a defendant might be convicted based upon the disposition of the charges against the co-conspirator, rather than upon an individual assessment of the remaining defendant's personal culpability."[259] That is, the argument is unacceptable because it suggests that the jury may find the defendants' guilty based solely on the cooperator's guilty plea, without ever scrutinizing their testimony at all. If the Government's approach to the issue were to be accepted, the Government would be free to always argue as it did in this case. That simply runs afoul of the law.

The error is especially problematic in complex conspiracy cases such as this. "In a conspiracy trial, which by definition contemplates two or more culpable parties, courts must be especially vigilant to ensure that defendants are not convicted on the theory that guilty 'birds of a feather are flocked together.'"[260] Because the argument went to the very issue of guilt, it was central to the entire case.

Third, the Government argues that "where the instruction so clearly addressed the very issue now raised by appellants, any possible prejudice from misinterpretation of the prosecutor's comment was greatly minimized, if not dispelled completely."[261] That misconstrues the instruction actually given to the jury. The instruction was directed at the plea agreements and the admissions contained within the agreements, which had been entered into evidence.[262] The rebuttal argument did not speak to the plea agreements, but rather, to the fact that the cooperators

---

[259] *United States v. Blevins*, 960 F.2d 1252, 1260 (4th Cir. 1992).

[260] *United States v. Griffin*, 778 F.2d 707, 711 (11th Cir. 1985) (citing, *Krulewitch v. United States*, 336 U.S. 440, 454 (1949)).

[261] Govt. Br. 195.

[262] (7/5/01 PM 29-30, App. 3764-65).

"came in and admitted their guilt [and] were really guilty."[263] This is no small distinction. On the one hand, the jury was instructed that they *could not* use the plea agreements entered into evidence as evidence against Appellants. On the other hand, the Government told the jurors that they *could* use the fact that the cooperators admitted their guilt and were guilty as evidence against the defendants on trial. Thus, contrary to the Government's argument, no instruction ever addressed the issue now on appeal, let alone dispelled it completely.

Finally, as expected, the Government argues that this was such a strong case against all of the defendants, that any error was not prejudicial.[264] But the Government ignores that the very foundation of its case was its cooperating witnesses. The jury was invited, absent any limiting instruction, to use those witnesses' guilt as proof of guilt against Appellants. Additionally, the improper argument was the first thing the jurors heard on the last day of the case. It was not "buried in a lengthy rebuttal argument."[265] The prosecutor's rebuttal argument effectively vitiated the jurors' legitimate consideration of the evidence and allowed the jury to render verdicts on impermissible grounds.

Because the Government is unable to bear its burden of showing that the improper argument did not have a substantial and injurious effect or influence in determining the jury's verdict,[266] the convictions must be reversed.

---

[263] (7/5/01 AM 9, App. 3700).

[264] Govt. Br. 196.

[265] Govt. Br. 196.

[266] *United States v. Smart*, 98 F.3d 1379, 1390 (D.C. Cir. 1996).

-80-

"came in and admitted their guilt [and] were really guilty."[263] This is no small distinction. On the one hand, the jury was instructed that they *could not* use the plea agreements entered into evidence as evidence against Appellants. On the other hand, the Government told the jurors that they *could* use the fact that the cooperators admitted their guilt and were guilty as evidence against the defendants on trial. Thus, contrary to the Government's argument, no instruction ever addressed the issue now on appeal, let alone dispelled it completely.

Finally, as expected, the Government argues that this was such a strong case against all of the defendants, that any error was not prejudicial.[264] But the Government ignores that the very foundation of its case was its cooperating witnesses. The jury was invited, absent any limiting instruction, to use those witnesses' guilt as proof of guilt against Appellants. Additionally, the improper argument was the first thing the jurors heard on the last day of the case. It was not "buried in a lengthy rebuttal argument."[265] The prosecutor's rebuttal argument effectively vitiated the jurors' legitimate consideration of the evidence and allowed the jury to render verdicts on impermissible grounds.

Because the Government is unable to bear its burden of showing that the improper argument did not have a substantial and injurious effect or influence in determining the jury's verdict,[266] the convictions must be reversed.

---

[263] (7/5/01 AM 9, App. 3700).

[264] Govt. Br. 196.

[265] Govt. Br. 196.

[266] *United States v. Smart*, 98 F.3d 1379, 1390 (D.C. Cir. 1996).

-80-

App 909

VII.    The failure to disclose Wilson's prior inconsistent statement was a *Brady* violation, requiring reversal of Carson and Martin's convictions for the murder of Anthony Fortune.

Though the Government strains mightily,[267] all of its argument cannot obscure a simple fact: The *sole* alleged eye-witness to the murder of Anthony Fortune, Ms. Charlene Wilson -- the witness whose oral testimony identified Carson and Martin as the perpetrators of the alleged crime -- had (according to the Government's own notes of interview) earlier told government agents that she had *not seen* the crime take place. And the defense was not provided with this contradictory prior statement until four months *after* Ms. Wilson testified. Even then the disclosure occurred by accident because of a tactical error by a government witness.

Now, the Government has any number of explanations for this rather stunning contradiction. The one offered at trial was the remarkable explanation that the agent recording Ms. Wilson's statements (Agent Warrener) had deliberately lied in his notes – a incredible explanation that presupposes the Agent disregarded his training, and one which the Government wisely does not defend to any great degree on appeal.

The explanation offered in its response fares no better. The Government nowhere contends that Ms. Wilson's earlier statement was not significant *Brady* information that ought to have been disclosed. Rather, its position appears to be that the belated, fortuitous disclosure of Ms. Wilson's inconsistent statements does not warrant relief because the defendants were able to cross-examine Agent Warrener, who took the statement, as to this drastic inconsistency, even though they were not able to reexamine Ms. Wilson.

Apparently, the Government's theory is as follows:

---

[267] *See* Govt. Br. 197-202.

-81-

App 910

- defendants may repeatedly, regularly and routinely request the disclosure of *Brady* information;

- the district court may routinely grant the motion and express its faith that the Government is complying with its obligations;

- the district court may routinely reject requests from the defendants for more extensive inquiry in to the Government's representations that it has complied with its *Brady* obligations;

- the Government may, thereafter, call as a witness an individual whose FBI interview directly contradicts her oral testimony and fail to disclose the prior inconsistent statement to defendants, in violation of its *Brady* obligations;

- if the discovery of this *Brady* violation occurs, not through the Government's purposeful disclosure and acknowledgment of the error, but through happenstance because the testifying agent fortuitously chose to rely on the written statement in refreshing his recollection, then the district court may require it to be made available to defendants;

- the information disclosed may directly contradict the only testimonial evidence of the crime in question;

- defendants may complain of the error; and

- yet, despite all this, no error has occurred because the defendants could cross examine the author of the statement and failed to complain loudly enough that they could not examine the witness whose statements are at issue.

The Government's theory is self-evidently wrong. Indeed, it cites no case – not a single one – for the proposition that belated fortuitous discovery and questioning of an alternate

-82-

App 911

non-percipient witness can suffice to cure a *Brady* violation.[268] The Government cites any number of cases where the delayed disclosure of *Brady* information did not hinder cross-examination, but *none* involve the case where the disclosure occurred *after* the witness's testimony had been completed.

In *United States v. Tarantino*, for example, the witness statements were turned over in a timely fashion under the Jencks Act *before* the defendants were afforded the opportunity to cross examine the witness whose statements were at issue.[269] Similarly, in *United States v. (Ralph) Wilson*, the two statements of the testifying witness were belatedly disclosed to defendants, but the disclosure was still *before* the witness testified.[270] And in *United States v. Pollack,* the statements disclosed were, again, provided to the defendants the day *before* opening statements.[271]

In short, there has never been a case in this Circuit (at least not one that the Government has cited or of which Appellants are aware) in which a fortuitous *Brady* disclosure months *after* the witness has testified has been held to be harmless because of defendants' opportunity to cure the failure by recalling the witness. Not one. This is unsurprising, as the general rule for nearly 30 years in this jurisdiction has focused on disclosure in a *timely* manner: "Disclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure."[272] The practical reality is that disclosure more than *four months*

---

[268] *See* Govt. Br. 200-02.

[269] *See United States v. Tarantino*, 846 F.2d 1384, 1416-17 (D.C. Cir. 1988).

[270] *See United States v. (Ralph) Wilson*, 160 F.3d 732, 742 (D.C. Cir. 1998).

[271] *See United States v. Pollack*, 534 F.2d 964, 973-74 (D.C. Cir. 1976).

[272] *Id.* at 973 (citing *United States v. Elmore*, 423 F.2d 775, 779 (4th Cir. 1970); *United States v. Deutsch*, 373 F.Supp. 289- 290-91 (S.D.N.Y. 1974).

-83-

after the witness' testimony has been completed is altogether too late and cure at that point is
impossible.

One further aspect of the Government's conduct bears comment – the apparent
unwillingness of the Government, even at this late juncture, to acknowledge any form of error.
No party to this proceeding disputes the materiality of the written record in question – the
Government challenges its weight but acknowledges, as it must, that the written record is facially
contradictory to Ms. Wilson's oral testimony. Yet the plain fact remains, to this very day, that
had Agent Warrener not made the tactical error on the witness stand of referring to the written
record of his conversation with Ms. Wilson, that record would never have been disclosed. It is
only the sheer happenstance of a mistake by the FBI that revealed the Government's
concealment. And when, at literally the 11th hour, the evidence was -- to the Government's
discomfort – revealed, the Government's principal answer now is that the defendants cannot
complain because they failed to seek a continuance.

But with five trial days left in a trial that lasted more than six months and with a judge
who, as we have already demonstrated,[273] was vigorous in short-circuiting the presentation of the
defense case, that solution was impractical. The Government would have this Court believe that
the same judge who would not even allow defense counsel to make a complete record of their
objections,[274] who required defense counsel to cross-examine without the benefit of Jencks
materials,[275] who threatened to close the defendants' case if there were no witnesses present in

---

[273] *See* App. Br. 76-82, 92-95.

[274] *Id.* at 83 (*citing e.g.* 1/4/01 PM 30-40, App. 1625-35).

[275] *Id.* at 91 (*citing* 1/22/01 AM 34, App.1745).

-84-

court at all times,[276] and who, at the end of a months-long trial denied the defendants even a single day to prepare for closing argument,[277] would have granted such a continuance.

Alternatively, the Government offers the odd suggestion that the cross-examination of Agent Warrener was an adequate substitute for the opportunity to examine Ms. Wilson. To read the Government's brief, one would think that examination of the note taker is equivalent to that of the principal – as if speaking to Boswell were the same as speaking to Dr. Johnson. But more saliently, such a substitute inquiry is inadequate for the same reason that all hearsay is inadequate to establish the truth of a matter asserted – our adversarial system is founded on the right to confront one's accuser, not the accuser's amanuensis.

To establish a *Brady* violation based on the prosecution's failure to disclose information, a defendant must show that: "(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material."[278] Here, the Government's suppression of Charlene Wilson's oral statements to the FBI clearly met all three prongs of this Court's test.

When she testified on February 13th, her testimony was damning for several Appellants. As the only purported eyewitness to Fortune's death, she first testified that she saw "Sam" (*i.e.,* Mr. Carson) come out of the building. While engaged in conversation she purportedly heard gunshots and turned to look "to where the shots were being fired." When she looked in that direction, she claimed, she saw Carson "walking towards Tony Fortune, shooting. He then stood over top of him and shot him." She further averred that she then saw Carson run down the street

---

[276] *Id.* at 93 (*citing* 6/18/01 AM 57, 97; 6/20/01 AM 102, App. 3453, 3459, 3492).

[277] *Id.* at 93 (*citing* 6/25/01 PM 57-61, App. 3535-39).

[278] *Spicer v. Roxbury Corr. Inst.,* 194 F.3d 547, 555 (4th Cir. 1999).

-85-

and get into a van driving by "Pimp" (*i.e.* Mr. Martin) and drive away.[279] Manifestly, this testimony about a cold-blooded murder (which everyone agrees was the *only* substantive testimony linking either Carson or Martin to the Fortune shooting) could only have had a powerful effect on the jury. If credited, it would be sufficient evidence to establish their guilt.

Cross-examination of Ms. Wilson would, therefore, have been substantially effected had the defendants known at the time she took the stand that her oral statement to the FBI differed materially from her direct testimony. There was, as we noted in our opening brief, *no* forensic or other significant corroborative evidence of this crime.[280] But the only truly probative testimony was that of Ms. Wilson – and the Government's misconduct deprived appellants of their ability to adequately examine Ms. Wilson.

For this reason, as well as those identified in our opening brief, Mr. Carson and Mr. Martin's convictions for the murder of Mr. Fortune must be vacated.

## VIII. The First Degree Murder charges and the charges related to 37th Place were not properly joined.

"If wishes were horses, beggars would ride" appropriately characterizes the Government's recital of the evidence at the trial of this case that purportedly justifies joinder of two entirely separate sets of offenses. In its brief, the Government advances the scenario offered in its opening statement -- the two sets of offenses were part of a common plan or scheme -- and ignores the manifest fact that the evidence actually adduced at trial did not support its theory of the case. The murders of Maurice Hallman, Leonard Hyson, Anthony Fortune, Teresa Thomas,

---

[279] (2/13/01 AM 24, 25-27, App. 2264-67).

[280] *See* App. Br. 146-48.

-86-

App 915

and the shootings at 37th Place had no real connection to the K Street conspiracy.[281] The response improperly conflates the prosecutors' pre-trial theory with the trial evidence.

## A.    The Government incorrectly perceives the standard of review.

The Government asserts that Rule 8, Fed. R. Crim.P., joinder was permissible based on its allegations in the indictment and at the pretrial hearing even though the evidence it proffered was not forthcoming. As a consequence, according to the Government's theory, this Court must merely review for abuse of discretion for a failure to grant severance under Rule 14, Fed. R. Crim. P. That argument is not well founded.

In *United States v. Spriggs*,[282] the court noted that a preserved challenge to joinder under Rule 8 is reviewed for harmless error, while the denial of a motion for severance is reviewed for abuse of discretion.[283] Thus this court *can* make an independent determination whether joinder was proper under Rule 8 and is not bound by the trial court's findings that were based solely upon the indictment and the pretrial proceedings considering misjoinder.

That is only logical because otherwise the Government could forestall any challenge to misjoinder simply by alleging sufficient facts in an indictment to justify joinder and by proffering those same facts if misjoinder was claimed pretrial. Then regardless of whether the Government had proven its theory at trial an appellate court would be limited to considering whether denial of severance was an abuse of discretion, rather than considering whether, as a

---

[281] Govt. Br 156.

[282] 102 F.3d 1245, 1255 (D.C. Cir. 1996) (*citing United States v. Brown*, 16 F.3d 423 (D.C. Cir. 1994)).

[283] *Cf., United States v. Perry*, 731 F.2d 985, 990 (D.C. Cir. 1984) (discussing whether Government *must* make pretrial showing supporting Rule 8(b) joinder by allegations in indictment and at pretrial hearing or whether showing could be delayed to trial of case; since pretrial showing was sufficient to support joinder court did not reach question whether joinder could have been upheld by trial evidence).

-87-

App 916

legal matter, joinder under Rule 8 was permissible, and if not, whether the Government could show that the misjoinder was harmless.[284]

## B.    These proceedings violated Rule 8.

Rule 8 requires a logical relationship between the offenses before joinder is permitted. Where that relationship is lacking, joinder is improper.[285] In *United States v. (John) Richardson*, this Circuit reiterated that "[j]oinder under Rule 8 is not infinitely malleable; it cannot be stretched to cover offenses, like those here [firearms, threats], which are discrete and dissimilar and which do not constitute parts of a common scheme or plan."[286]

### 1.    There was no basis for joinder of the murders of Hallman and Hyson.

The Government strains to paint a picture of two sets of offenses -- those involving 37th Place and those involving K Street -- as joined by a common scheme or plan. For example, the Government contends that the murder of Maurice Hallman was in retaliation for Hallman embarrassing Montgomery in front of Hill and other K Street members.[287] But the evidence demonstrates that the Government has put a spin on the facts that is not warranted.

Montgomery testified that "we" were "hustling" on Delaware Avenue and Hallman was showing off in front of Hill, punching Montgomery to the body. Montgomery told Hallman to stop. When he did not, Montgomery hit him. Hallman got mad and retrieved a handgun. He came back out and pointed the gun at Montgomery. Montgomery cursed him. Hallman put the

---

[284] The Government is wrong that Martin did not object to the evidence when it came in at trial. He objected to evidence of the execution of a search warrant that he asserted was not related to the alleged conspiracy. The Government countered that people in the house that was searched were part of Martin's 37th Place "crew" and participated in shootings with him. The court overruled the objection. (3/5/01 AM 6-10, App. 2418-22). Martin also objected to admission of a gun seized from a vehicle connected to him. (*Id.* 10, App. 2422). The court deferred ruling. When officers who participated in the search testified, the objection was renewed, and again overruled. (*Id.* 39-40, 54 App. 2523-35).

[285] *United States v. (John) Richardson*, 161 F.3d 728, 734 (D.C. Cir. 1998).

[286] *Id.* at 733.

[287] Govt. Br. at 156-57.

gun in Montgomery's side. Montgomery told Hallman to "do it" but warned that when he did, Montgomery would "knock your ass out." Hill tried to take the gun from Hallman, who then hit Montgomery on the head with it. In front of unnamed witnesses, Montgomery threatened Hallman. Carson told Montgomery he should not have threatened Hallman in front of witnesses, because if something happened to him, Montgomery would be the first suspect. Later Montgomery apologized to Hallman in front of witnesses, so it would appear that they had made up but confided to Carson that "I'm going to get his ass." Montgomery waited for an opportune time and shot and killed Hallman. Carson was not present at the shooting. That same night, Carson allegedly murdered Leonard Hyson. According to Montgomery, Carson took both guns and threw the shells into the sewer.[288]

Montgomery later learned that Raymond Washington was talking about the killings. He proposed to Carson that they kill Washington but Carson rejected the idea. Montgomery decided to kill him anyway, but eventually abandoned any plan to kill Washington.[289]

Thus, the Government's assertion that "[t]he evidence showed that the murder of Maurice Hallman was in retaliation for Hallman embarrassing Montgomery in front of Vincent Hill and

---

[288] (3/12/01 AM 53-65, App. 2460-72).

[289] Consistent with the over-reading of the record that we note in text, the Government misstates the record with respect to the Washington assault as well. The Government alleges that "Carson told Montgomery that he should kill Washington." *See* Govt. Br. 19 (citing 3/12/01 AM 65-67, App. 2472-74) The evidence is to the contrary. As Montgomery testified:

A.   I told "Chin" [*i.e.* Carson] that we should bust – that we should kill him. That we should kill Raymond.

Q.   So did he agree with you?

A.   No. He said that he was mad about it, but he said that Ray was cool with him, and he didn't want to have to do [it] to him. So I told him I would do it.

(3/12/01 AM 66, App. 2473). When Montgomery later saw Washington and said he wanted to kill him, Carson acquiesced. *See id.* (Montgomery says "I can hit him where he is now" and Carson responds "If you can do it, then do it.). But the Government's mischaracterization converts Mr. Carson's alleged failure to dissent, into a command.

-89-

App 918

other K Street members"[290] is groundless. Nor is there support for its contention that "[t]o gain respect and enhance his reputation in the organization, Montgomery waited for an opportunity to kill Hill [sic], then told Carson of his intent."[291] Likewise the Government's assertion that "[a]lthough Carson could have turned away, because of his allegiance to Montgomery, and to enhance his reputation for violence, he willingly came along"[292] is as much rank conjecture as its saying that "[s]ince this was Montgomery's first murder . . . , it cemented his status in the group."[293]

In fact, the testimony proved that Montgomery decided on his own to shoot Washington, in spite of Carson's objections, and then decided not to shoot him when he could not get him alone. Thus the prosecutors' version of the "facts" is nothing more than what they wish they had proven, not what was proved.

## 2.    Joinder of the Fortune murder was improper.

Equally flawed is the Government's version of the Tony Fortune murder and its claim that this episode was part of a common scheme or plan of retaliation against those who disrespected the K Street organization or its members. Actually the Government's evidence demonstrated that the murder occurred because certain persons, including Carson and Martin, believed that Fortune "would rob your mother."[294] The Government notion that it was Martin who expressed his dislike for Fortune is unduly under-inclusive.[295] Charlene Wilson, testified that Martin was present at a discussion in which not one person, but everyone present, agreed

---

[290] Govt. Br. 156.
[291] Govt. Br. 157.
[292] Id
[293] Id.
[294] (2/13/01 AM 19, App. 2259).
[295] Govt. Br 152. 157-58.

-90-

App 919

that Fortune was a thief and was thus disliked. In spite of repeated attempts by the Government to lead Wilson to say that Martin spoke during the conversation, she steadfastly maintained that it was the group speaking of Fortune, not Martin or any one particular person.[296]

Moreover, though there is good reason to doubt Wilson's testimony,[297] even accepting it as true disproves the Government's theory. Wilson testified that later she saw Fortune leave a building and walk toward his black Mercedes after he had robbed a craps game. She heard shots and saw Carson firing at Fortune. She did not see Martin there but glimpsed him driving the van that Carson ran to after the shooting.[298] Hence the Government's assertion that Carson's shooting of Fortune was "a move clearly designed to enhance his own reputation for violence, as well as that of the K Street organization," is speculative and is not supported by the trial testimony.[299] The killing was committed out of a personal animus and not K Street business.

### 3. The Thomas-Lucas murders also were misjoined.

The Government also attempts to justify the joinder of the murders of Teresa Thomas and Terita Lucas, and the court's denial of severance motions, by more hypothesizing. According to the Government, these murders were in retaliation for Thomas's disobedience to her then-boyfriend, Carson, and to enhance Carson's reputation as a violent enforcer in the K Street

---

[296] (2/13/01 AM 19-20, App. 2259-60).

[297] *See supra* § VII.

[298] (2/13/01 AM 25-27, App. 2265-67).

[299] The Government cites to testimony by James Montgomery that Carson told him that he had whispered to Martin when a dispute arose between Martin and Fortune after a crap game: "Do you want me to kill this piece of shit?" (Govt. Br. 157-58. It did not mention that according to Montgomery, Martin made no response and that Carson got a gun and shot Fortune, acting on his own. (3/12/01 PM 34, App. 2492). Even Montgomery's version of events does not support the Government's allegation that the killing of Fortune had any connection whatsoever to the alleged K Street "organization."

-91-

App 920

organization.[300] The notion that the killings were to enhance Carson's reputation for violence is a further attempt to turn an unrelated murder into an act of the conspiracy.

Thomas and Lucas were murdered, according to the Government's evidence, because Carson was angry with Thomas about her relationship with another man, and about her giving Carson's gun to the man. While the Government says that Carson was worried that Thomas had given his gun – an instrumentality of the organization's business – to someone else,[301] that concern was not demonstrated to have a logical nexus to the underlying conspiracy and the contention that Carson was worried about losing an "instrumentality of the organization's business" was sheer speculation.

### 4.    Joinder of the 37th St. shootings was also impermissible.

In addition, the Government's argument that joinder was proper in this case must fail because the evidence at trial makes it absolutely clear that there was no common scheme or plan of which the events regarding 37th Place and those involving K Street were part.

The Government accuses the defense of attempting to "artificially split one conspiracy into two based simply on geographic lines."[302] Of course, geographic lines are not the basis of the defense position that the events at 37th Place and K Street are two entirely different sets of events. The defense demonstrated that the Government produced no evidence whatsoever of drug dealing on 37th Place by any member of this alleged conspiracy. Nor did the Government produce any evidence that any of the events related to 37th Place served the ends of the alleged K Street organization.

---

[300] Govt. Br. 158.

[301] *See id.*

[302] Govt. Br 164.

The Government claims that "the link between Southwest (including K Street) and 37th Place was forged when several families originally from Southwest were relocated to 37th Place, S.E. in the 1980s," and cites to testimony by Charles Bender.[303] Bender testified that he sold marijuana on K and L Streets, S.W.[304] Hill, Price, Franklin, Coates, Switzer, and others (the latter apparently having no alleged connection to this case) regularly sold in the 200 block of K Street. [305] People gambled on the K Street court, including Coates, Price, Franklin, Switzer and others not named in the indictment. [306] Bender sometimes saw Carson gambling on K Street court. He also saw Sweeney standing among the group, but did not see him gambling.[307]

In 1994 and 1995, Bender went to the area of Ridge Road and 37th Place, Southeast. He described the area as "just another part of southwest." He went there because "a lot of dudes in southwest hung out up there. And I would go up there to purchase P.C.P., and I smoked with the dudes up there." He regularly saw Martin as well as "Bill" and Franklin, "everybody, I mean everybody."[308] He went to nightclubs where people from Southwest and from 37th Place were partying. There "it was like they were together. . . . One, Because I am from the southwest neighborhood. Two, because I mean they would call out the neighborhood."[309] When asked to elaborate, Bender said that when a neighborhood would be called out at a club, "I would say 'southwest.' . . . That's just basically saying where you're from, I mean. That is basically just saying your neighborhood, you know. Sometimes beefs would start because of that. But I mean

---

[303] Govt. Br 164 n. 96.

[304] (4/4/01 AM 54, 56, App. 2713, 2715).

[305] (4/4/01 AM 56, App. 2715).

[306] (4/4/01 AM 61, App. 2717).

[307] (*Id* at 62-63, App. 2718-19).

[308] (*Id.* at 63-64, App. 2719-20).

[309] (*Id.* at 64, App. 2720).

-93-

that was just a form of representing your neighborhood."[310] When the Government pressed Bender for more details, asking "When that would happen, either the D.J. doing it or someone in the club yelling out 'southwest,' what would happen in response?" he replied, "37th would yell out their neighborhood."[311] If Bender was at a nightclub and a fight broke out, or a shooting occurred, 37th Place/Ridge Road and Southwest would join together to respond.[312]

Nothing in Bender's testimony supports the conclusion that people from K St. and 37th Place acted together in furtherance of a drug conspiracy or a RICO conspiracy. If similar conduct was observed between youngsters from Georgetown and Tenley Circle, Northwest, no one would claim that such innocuous activities bespoke a conspiracy.

The Government nonetheless contends that its evidence was sufficient to show that the shootout at 60th Street and East Capitol, the murder of Curtis Edwards and the shootings of Burton Jones were in furtherance of the common goal of the enterprise.[313] This is baseless. Actually from the Government's own recitation of the evidence, Fortune's shooting resulted in a retaliatory shooting of Curtis Buchman. The shootings at 60th Street and East Capitol then were spawned by that event. But Fortune's shooting had nothing whatsoever to do with the alleged K Street conspiracy, was not done to further any aims of the conspiracy, and was not done in connection with any drug activity, as we have shown. The Government's argument rests upon a faulty premise, and because it does, its conclusion that these events are connected to a narcotics conspiracy must fail.

---

[310] (*Id.* at 65, App. 2721).
[311] (*Id.* at 65-66 App. 2721-22).
[312] (4/9/01 PM 19-20 App.2766-67).
[313] Govt. Br 166.

-94-

The Government addresses Appellants' prejudice argument by insisting that there was no spillover effect from the presentation of this entirely unrelated evidence because it tried the counts of the indictment discretely and the court instructed the jury to consider each count separately. The Government ignores the fact that the bulk of the evidence of violence introduced against Carson and Martin related to events occurring in the 37th Place area, which were unrelated to any narcotics or RICO conspiracy. Had Carson and Martin proceeded to trial on the marijuana conspiracy, without being bombarded with evidence of violence that had nothing to do with his selling marijuana on K Street and nothing to do with his alleged participation in an enterprise that sold marijuana on K Street, the result of this case would probably have been different. The severance motion should have been granted, and the prejudice was so enormous that the Government can never show that the error of misjoinder was harmless.

## IX.    *Ex parte* contacts between the Judge and the Jurors violated Rule 43 and the Due Process Clause.

In *United States v. Gagnon,*[314] the Supreme Court addressed the issue of a defendant's Due Process Right to be present when a trial judge holds a conference with a juror in chambers. In its brief, the Government addresses *Gagnon*.[315] However, the analysis of *Gagnon* employed by the United States is narrow, superficial and unpersuasive in the context of the facts presently before this Court.

In *Gagnon*, four defendants were indicted and tried together in a large scale narcotics distribution conspiracy. During trial, a courtroom marshal informed the court that he had been advised by a juror of a concern that one of the defendants was sketching portraits of the jury. The defendant's counsel admitted that the defendant had been drawing such sketches.

---

[314] 470 U.S. 522 (1985).

[315] Govt. Br. 92-93.

The trial judge ordered the defendant to cease drawing the sketches. Defendant's counsel suggested that the juror be questioned to determine whether the sketching prejudiced the juror. In response, and in the presence of each defendant and his counsel, the trial judge announced that he would talk to the juror in chambers and make a determination. There were no objections to the trial judge's pronouncement and no defendant requested to be present in chambers for the conference.

The judge went to chambers and called for the courtroom bailiff and the defendant's (Gagnon) counsel. In the presence of Gagnon's counsel, the judge discussed the sketching with the juror. The juror stated: "I just thought that perhaps because of the seriousness of the trial, and because of – whichever way the deliberations go, it kind of – it upset me, because – of what could happen afterward."[316] The juror was assured that the sketching would stop and that the drawings that were made would be confiscated. The judge further elicited the juror's willingness to continue as an impartial juror.

Gagnon's counsel was permitted to question the juror. After posing questions, Gagnon's counsel stated that he was satisfied. A transcript of the in camera proceedings in chambers was made available to all parties. There were no motions made to disqualify any of the other jurors.

The Ninth Circuit Court of Appeals reversed the convictions of each of the defendants. The basis for the reversals was the determination that the in camera chambers conference was in violation of Rule 43 and the Due Process Clause of the Fifth Amendment.[317]

The Supreme Court ultimately reversed the Ninth Circuit. However, the reversal was for reasons not similar to those in the record before this Court. Indeed, the *Gagnon* holding, in the

---

[316] *Gagnon*, 470 U.S. at 524.

[317] *United States v. Gagnon*, 721 F.2d 672 (9th Cir. 1983), *rev'd*, 470 U.S. 522 (1985).

-96-

context of the facts that are before this Court, clearly requires a reversal of the subject convictions.

In this case, the district judge took it upon himself, in cooperation with Marshal Adams, to conduct a private inquiry of Juror No. 3. Thus, defendants were precluded from invoking their Rule 43 rights to be present during the inquiry. There is no transcript of the private inquiry and we are left with nothing but the trial judge's recollection of the in chambers conference. The failure of the trial judge to require a transcription of the chambers conference immensely prejudiced defendants, as there is no accurate memorialization of the proceedings.

Moreover, the district judge prohibited the defendants from questioning Jurors #3, 1 and 17 and defendants moved for a mistrial after Juror #3 was dismissed.

The actions of the district court were far more prejudicial and far more secretive than those of the trial judge in *Gagnon*. Defendants were deprived of their ability to adequately assess the conduct of Juror No. 3 and impermissibly and inexplicably denied the ability to review a transcription of the in camera conference between the trial judge and the Juror.

In concluding that it was not constitutional error to preclude Gagnon's presence at the chambers at the chambers conference, the Supreme Court noted that the encounter was a "short interlude" and that "the Fifth Amendment does not require that all the parties be present when the judge inquires into such a *minor occurrence*."[318]

The issue regarding Juror No. 3 was anything but a minor occurrence. It was an ongoing matter. After initially speaking to Judge Jackson in chambers without the presence of counsel, Marshal Adams was approached by Jurors Nos. 1 and 17 to express concerns about Juror No. 3. The jurors communicated with Judge Jackson through a written note stating, "We wish to speak

---

[318] *Gagnon*, 470 U.S. at 527 (emphasis supplied).

-97-

App 926

to you directly on a matter of considerable importance, and we wish to do so right away."[319] The note from the jurors was unambiguous. This was a matter of serious concern that required the immediate attention of the trial court.

Juror No. 3, by contrast, expressed to the Court that he felt he would have no difficulty fulfilling his obligation,[320] and urged his fellow jurors to "[L]et's go back to what we're doing, Let's continue."[321]

It was utterly inappropriate for the trial court to conduct its own inquiry of a juror, fail to have the inquiry transcribed or otherwise memorialized, and then deny counsel's request to voir dire the individually involved jurors. This was not harmless error. This was a complete denial of due process.

In *United States Gypsum Co.*, the Supreme Court very carefully and thoroughly addressed why an *in camera* communication between a juror and a trial court has great potential for prejudice.

> Any ex parte meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error. The record amply demonstrates that even an experienced trial judge cannot be certain to avoid all the pitfalls inherent in such an enterprise. First, it is difficult to contain, much less to anticipate, the direction the conversation will take at such a meeting. Unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury – all the more so when counsel are not present to challenge the statements.[322]

In the context of the particular facts before this Court, it is clear that the dramatic actions of the trial judge were in clear violation of the due process rights of the

---

[319] (7/24 PM Tr. 10, App. 3796).

[320] (7/24 PM 8, App. 3794),

[321] (7/25 AM 11, App. 3809)

[322] *United States v. United States Gypsum Co.*, 438 U.S. 422, 460 (1978).

-98-

defendants. The extent of the prejudice cannot be adequately assessed because the trial judge

chose not to memorialize critical portions of his interaction with the Juror and precluded counsel

from conducting an appropriate *voir dire* of the involved jurors. The only remedy is a reversal of

the convictions and a remand to the trial court.

## CONCLUSION

For the foregoing reasons as well as those set forth in our opening brief, Appellants are

entitled, both individually and collectively, to a new trial. Each is also entitled to resentencing in

light of *Booker*.[323] In the alternative, to the extent requested, each Appellant is entitled to have

his conviction on the various counts challenged, reversed, and his case remanded for retrial as to

those counts or, as appropriate, resentencing.

Dated: July 6, 2005

Respectfully submitted,

Steven R. Kiersh, Esq
717 D. St. NW, Ste 400
Washington, DC 20004
*Attorney for William Sweeney*

Stephen C. Leckar, Esq.
1301 Pennsylvania Ave., NW, Ste. 500
Washington, DC 20004
*Attorney for Sean Coates*

Reita Pendry, Esq.
P.O. Box 42249
Charlotte, NC 28215
*Attorney for Jerome Martin*

Paul Rosenzweig, Esq.
c/o Heritage Foundation[*]
214 Massachusetts Ave., NE
Washington, DC 20002
*Attorney for Samuel Carson*

Mary Davis, Esq.
Christopher Davis, Esq.
The Lincoln Bldg.
514 10th St. NW, Ninth Flr.
Washington, DC 20004

Jensen E. Barber, Esq.
400 7th St. NW, Ste. 400
Washington, DC 20004
*Attorneys for Vincent Hill*

---

[323] *See* App. Br. § XV.

[*] For identification and mailing purposes only

App 928

## CERTIFICATE OF COMPLIANCE

I certify that this brief has been prepared using Microsoft Word Times New Roman 12-point typeface. Exclusive of the table of contents; table of citations; certificate of compliance; and certificate of service, the brief contains 32,060 words in conformance with the Court's Order of February 23, 2005 respecting brief length.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line printout.

Paul Rosenzweig

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by Electronic Mail and First Class Mail on this 6th day of July 2005 upon:

John R. Fisher, Esq.
Mary McCord Esq.
Assistant United States Attorney
555 4th St. NW
Washington, DC 20004

Paul Rosenzweig

App 929

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES | : |
| | : 98-cr-329-4 (TFH) |
| V. | : |
| | : |
| WILLIAM SWEENEY | : |
| | : |

## EMERGENCY MOTION FOR ACCESS TO COURT RECORDS
## AND POINTS AND AUTHORITIES IN SUPPORT THEREOF

William Sweeney, by and through undersigned counsel, respectfully moves this Court to

order that all court papers and proceedings of the above captioned matter be unsealed.  In

support of this Motion, Petitioner upon information and belief states the following:

1.      Mr. Sweeney was a defendant in this matter.

2.      Based on the transcripts of the proceedings in this matter on November 13, 2000

in this matter, counsel knows that there was an *ex parte* motion to disqualify defense counsel

Leonard Long in November 2000 and an opposition filed by Mr. Long prior to the November

13, 2000 trial date.  Both of these pleadings still appear to be sealed still, as they do not appear

on the docket sheet for this matter.

3.      Counsel needs access to copies of these motions to adequately represent Mr.

Sweeney in this matter.  His 2255 petition is due February 20, 2008.

4.      In the alternative, counsel requests that the Court redact the pleadings and

provide counsel with redacted copies, as the November 13, 2000 transcript, *see* Exhibit 1,

details that the hearing before the court that aired a portion of the motion, was conveyed to Mr.

Sweeney by Mr. Kiersh, so there should be no need to maintain at least that portion of the

motion and opposition.

5.    Mr. Sweeney also has an historic First Amendment right of access which should

not be abridged under the circumstances. The courts of our nation are presumptively open."

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980); *see also Press Enterprise*

*Co. v. Superior Court*, 464 U.S. 501, 508 (1984); *Craig v. Harney*, 331 U.S. 367 (1947). This

right of public access is derived not only from the common law but is guaranteed by the First

Amendment to the United States Constitution. *Richmond Newspapers*, 448 U.S. at 576 ("The

First Amendment guarantees of speech and press . . . prohibit the government from summarily

closing courtroom doors.").

Since *Richmond Newspapers*, our courts have made it abundantly clear that the right of

public access extends not only to trials but to pretrial proceedings as well. *See, e.g., Press*

*Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) (preliminary hearings); *Press Enterprise*

*Co. v. Superior Court*, 464 U.S. 501 (1984) (voir dire examinations); *In re Knight Publishing*

*Co.*, 743 F.2d 231, 233-34 (4th Cir. 1984) (pretrial motions, affidavit and hearings). The right

of access is never more important than in criminal hearings. *See Press Enterprise Co. v.*

*Superior Court*, 464 U.S. at 508.

The right of access to pretrial criminal proceedings traces not only the right to attend

but also the right to copy related court records. *See, e.g., Nixon v. Warner Communications*,

435 U.S. 589, 597 (1978) (longstanding common law right to access to court records); *In re*

*Globe Newspaper Co.*, 729 F.2d 47, 52 (Ist Cir. 1984) (recognizing First Amendment right of

access to pretrial criminal documents); *Associated Press v. United States District Court*, 705

F.2d 1143 (9th Cir. 1983) ("There can be no dispute that the press and public have historically

had a common law right of access to most pretrial documents . . . ."); *In re National*

*Broadcasting Co..*, 653 F2d 609, 612 (D.C. Cir. 1981) ("[T]he existence of the common law

right to inspect and copy judicial records is indisputable.")

Although this Court may impose reasonable limitations on public access in very limited circumstances, restrictive orders are tolerated only to the extent that "the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co.*, 457 U.S. at 606-7. Here, however, there is nothing in the record that suggests that any compelling governmental interest necessitate the sealing of the transcript and court papers. Without a showing of compelling governmental interest, the sealing order should no longer stand.

This matter should be unsealed from the Court pursuant to Mr. Sweeney's right to effective assistance of counsel.

Finally, the public's right of access is protected by strict procedural rules.[1] As far as Mr Sweeney knows, none of these procedures were followed in this case. Thus, at a minimum Mr. Sweeney requests hearing on the matter, affording the public and Mr. Sweeney an opportunity to state why further sealing is impermissible unless the Court finds that sealing is necessary to serve a compelling governmental interest.

Because Mr. Sweeney has at issue crucial constitutional rights under the First, Fifth and Sixth Amendments to the United States Constitution, comprehending his rights to public access, to a fair trial, to effective assistance of counsel, and to the due process of law, counterbalanced by no substantial governmental interest of record, and certainly by none

---

[1] The party seeking closure must make a showing, on the public record, as to why access must be denied. *Globe Newspaper Co*, 457 U.S. at 608. The court must then make findings in the public record to support closure and inquire whether alternatives to closure are available. *Richmond Newspapers*, 448 U.S. at 508-11. The findings must be specific enough "that a reviewing court can determine whether the closure order was properly entered." *Press Enterprise Co.*, 464 U.S. at 510. Finally, in advance of the sealing order, the public is entitled to notice and an opportunity to object. *Gannet Co. v. DePasquale*, 443 U.S. 368, 401 (1979) (Powell, J., concurring in part and dissenting in part); *Globe Newspaper Co.*, 457 U.S. at 609 n.24.

sufficient to outweigh Petitioner's vital trial rights, he respectfully requests that this Court grant

the instant motion and unseal the specific proceedings in this matter.

      WHEREFORE, for the foregoing reasons, and any others which may appear to the

Court at a hearing on this motion, Mr. Sweeney respectfully requests that this Court grant the

motion for access to court records.

                               Respectfully submitted,

                               _____

                               JENIFER WICKS
                               Bar No. 465476

                               Law Offices of Jenifer Wicks
                               The Webster Building
                               503 D Street, N.W.
                               Suite 250A
                               Washington, D.C.  20001
                               (202) 326-7100

Copies to: Judge
AUSA – Special Proceedings
Dft.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )          Crim. No. 98-329 (TPJ)  ~~TFJ~~ 7 7 H/
        v.                         )
                                   )          **FILED**
JEROME MARTIN,                     )
                                   )          FEB 18 2008
                Defendant          )
                                   )          Clerk, U.S. District and
                                              Bankruptcy Courts

### MOTION TO VACATE, SET ASIDE, CORRECT SENTENCE
### PURSUANT TO 28 U.S.C. SECTION 2255

For the reasons set forth below, defendant Jerome Martin respectfully requests that the

court vacate, set aside or correct his sentence. This motion is made pursuant to 28 U.S.C. section

2255.

### FACTS

**A.    Procedural History**

On September 18, 1998, Jerome Martin was charged along with several co-defendants in

a multi-count indictment alleging a narcotics conspiracy, racketeering conspiracy, murder and

other violent crimes, narcotics trafficking, and weapons offenses.   A superseding indictment was

filed on March 25, 2999.   Trial began on November 15, 2000.   A second retyped superseding

indictment was filed on July 2, 2001, containing all the counts that were submitted to the jury.

In July and August, 2001, the jury returned guilty verdicts against all defendants.   Jerome Martin

was convicted of Count 1, narcotics conspiracy, Count 2, RICO conspiracy, Count 8, first-degree

murder while armed of Anthony Fortune, Count 9, assaulting a police officer with a dangerous

weapon, Count 17, assault with intent to kill while armed of James Coulter, Count 18, attempted

murder of James Coulter in aid of racketeering, Count 31, use of firearm during and in relation to attempted murder of James Coulter, Count 42, possession of firearm during crime of violence against James Coulter, and Counts 49, 53, 55, 64, related to marijuana trafficking.

Martin was sentenced under the then-existing mandatory determinate Federal guidelines system. Pursuant to that system the Probation Office calculated a  sentencing guideline mandating life imprisonment and Martin was sentenced to that term.

On appeal, the United States Court of Appeals for the District of Columbia Circuit affirmed Martin's convictions. *United States v. Carson, et al.*, 372 U.S. App. D.C. 251, 455 F.3d 336 (2006).

The United States Supreme Court denied Martin's petition for writ of certiorari on February 20, 2007. *Samuel Carson, et al. v. United States,* Docket No. 06-9046.

### B. The Government's Evidence[1]

Martin and others were charged with a large-scale narcotics and RICO conspiracy. In furtherance of the conspiracy, Martin was alleged to have engaged in extensive narcotics trafficking and multiple acts of violence. By way of an overview, it was the prosecution's theory that Martin and the other defendants were lifelong friends who grew up during the 1980s in the Greenleaf Gardens neighborhood in southwest Washington. As they entered their teenage years they began selling drugs. By the early 1990s, the Government claimed, most of them were selling substantial quantities of marijuana, along with less significant quantities of other drugs. Most of the sales were made on the 200 block of K Street, SW, and on the corner of Delaware

---

[1]Only such evidence as is necessary for an understanding of the issues raised in this Motion is recited herein.

2

Avenue and K Street, SW.  The Government charged that Martin and the other defendants ran

these locations as cooperative markets in which they rotated serving marijuana to customers

driving into the area from the D.C. Metro area.  The prosecution depicted Vincent Hill as the

leader of this "crew," and Martin as one of its members.

Government law enforcement witnesses testified to sales of marijuana by Martin in 1995

and early 1996 in the 200 block of K Street, SW, some of which were preserved on audio or

videotapes.  According to cooperating witnesses, Martin sold marijuana on K Street regularly

during 1993 and 1994, and 1996 through 1998.

The Government also asserted that Martin and the other defendants engaged in ventures

other than drug dealing, both for purposes of self-enrichment and protection.  For example,

through the testimony of informants and cooperating insiders, evidence was presented that

Appellants sometimes committed kidnappings to fund weapons, drugs or living expenses.

Witnesses testified that Martin and others were responsible for a number of acts of violence,

some planned and others spontaneous.  Martin, the other defendants, and their allies, in

particular a group from 37th St., SE, which Martin was said to have organized, engaged in

frequent confrontations ("beefs") with competing factions.  Several witnesses attested to fights,

drive-by shootings, and occasional homicides between the K St. And 37th St. members, on the

one hand, and groups operating out of Condon Terrace and L St., SW (these being gangs of drug

dealers that frequently warred with Martin and the others over control of territory).  Other

witnesses recounted instances where persons who had disrespected members of the K St. Group,

such as the so-called 58th St. crew, were attacked.

Martin and the others were alleged to have resorted to force and violence where believed

3

App 936

necessary to prevent rival drug dealers from operating in their territory.   Sometimes this

extended to acts intended to punish suppliers believed to have knowingly supplied inferior drugs

or to have shortchanged some of them in transactions.

The Government claimed that Martin's marijuana selling in the 200 block of K Street,

SW was related to several acts of violence occurring on 37th Street, S.E. and 58th Street, N.E., one

of which was the killing of Anthony Fortune.   Every Government witness who testified about

the Fortune killing attributed it to a personal dispute between Martin and Fortune, and most

attributed the dispute to Fortune trying to rob or actually robbing Martin at a craps game.

Charlene Wilson, the only eyewitness to testify, said that Carson did the shooting, and that

Martin drove Carson from the scene.   Some cooperating witnesses testified that Carson admitted

shooting Fortune, while others claimed that Martin did so.   They, too, variously ascribed a

singular motive for the shooting: a dispute arising from a crap game.

According to the Government's evidence, the Fortune shooting triggered a dispute

between Martin and the 58th Street group.   In that dispute, the 58th Street group killed Curtis

Buchmon in retaliation for Fortune's killing.   Martin and Buchmon were very close, and after

his killing, Martin, Carson and Montgomery allegedly went gunning for the 58th Street group.

There was a shootout between them and the 58th Street group, during which the police arrived.

Martin and his associates exchanged gunfire with the police.   Edwards, Burton and Jones came

into the 37th Street area in a car with tinted windows, and Martin assumed they were with the

58th Street group.   Concerned about a drive-by shooting, he gave Antonio Knight a gun, and

Knight shot into the car, killing Edwards and wounding Burton and Jones.

Testimony was presented that accused Martin and the others of involvement in murders

4

or shootings which supposedly were undertaken to track down or silence persons believed

(correctly or otherwise) to be potential Government witnesses in prosecutions or grand jury

investigations against members of the organization. One of the persons Martin was accused of

shooting was James Coulter.   According to the Government, in 1995, Vincent Hill complained

to Martin and others that Coulter was "hot," and needed to be killed.   On May 30, 1995, Coulter

was shot.   A cooperating witness was on the corner of Delaware and K Street when he heard Hill

and Martin talking about Coulter's shooting.   Hill told Martin that Martin should have used two

guns, and asked why the gun jammed.   Some time later, another cooperating witness overheard

Martin talking with Coates and Carson about Coulter's shooting.   Martin said that they were

trying to say he had something to do with Coulter getting shot but they could not prove it because

he had a mask on.   Martin complained to another informant that he had tried to shoot Coulter at

a crap game but his gun jammed.

         After Martin was arrested for Coulter's shooting, he reportedly asked an informant to talk

to Coulter and have Coulter give his investigator a statement about the shooting.   The informant

talked to Coulter twice at Martin's request; Coulter refused to give a statement, but said he was

not going to come to court.   Martin also asked the informant to contact a witness to the shooting,

which the informant did.   When neither man would give a statement, at Martin's request the

informant showed Martin's uncle where Coulter and the eyewitness lived.   Martin also asked an

acquaintance who was in jail at the same time as Martin to contact the eyewitness and ask him to

say that he did not know who shot Coulter, but that it was someone with a sweatshirt and a pistol

at a crap game.   Martin said that the eyewitness owed him a favor because his head was in the

way when Martin shot Coulter, and if it was not for the witness, Coulter would be dead .   Coulter

5

App 938

gave a statement to a former attorney representing Martin that he did not see who shot him.

## C. **Constitutional Violations**

### 1.   Withholding of Exculpatory Evidence

The centerpiece of the Government's case against Martin was not drug trafficking, but violence - the shooting of Fortune and the 58th Street beef, and the shooting of Coulter as a potential witness.   Martin recently located a witness about whom he was unaware at the time of the trial of this case who was an eyewitness to the shooting of Anthony Fortune and who can testify under oath that the Government's twin theories that Martin shot Coulter himself, or that he had Carson do so, are wrong.   The witness, Steven Thomas, knows that Martin did not shoot Fortune.   He also describes Fortune's shooter as very dark complected, taller than Martin (whom he knows) and heavy set, which would eliminate Carson, who is light-complected, tall and thin, as the shooter.   Equally importantly, Steven Thomas was interviewed by police on the very evening of the Fortune shooting, and he told them the description of the man he had seen doing the shooting.   The police knew on the eve of the shooting that an eyewitness described the shooter as someone other than Martin or Carson.   The defense was never provided Steven Thomas' name, address or the exculpatory information he gave police.   The Affidavit of George Steel, the private investigator who interviewed Steven Thomas, is attached hereto as Exhibit A.

### 2.   Impeding the Presentation of Martin's Defense

At the trial of this case, counsel for Jerome Martin sought to compel Coulter's attendance at the trial.   Based upon the sworn statement Coulter gave a former attorney for Martin, Martin did not shoot Coulter.   Counsel had a good-faith basis for believing that Coulter would exonerate Martin if he could be subpoenaed to testify at the trial.   The   Government represented

6

App 939

that it did not know Coulter's whereabouts, or even if he was alive, at the time of the trial.  The

trial ended with verdicts in July and August, 2001.  Just a few months later, sometime before

February, 2002, the Government indicted Coulter in a major narcotics conspiracy in this court.

Coulter was arrested on February 13, 2002.  *United States v. James Christopher Coulter,*

02-mj-00104-AK (2/14/02).  On February 14, 2002, the case before the magistrate judge was

terminated because it merged into criminal case No. 02-074.  Proceedings in the criminal case

against Coulter are not available on PACER, and are presumably under seal.  Martin intends to

file a Motion with this court to unseal the proceedings, because the complaint and indictment in

the case will likely reveal that the government was investigating Coulter for the months prior to

his arrest in February 13, 2002 and that when the government represented to the trial court that

Coulter had disappeared and could be dead, they knew his whereabouts, knew that he was alive

and well, and subject to subpoena or writ of habeas corpus ad testificandum.     The docket report

from 02-mj-00104-AK is attached hereto as Exhibit B.

## ARGUMENT

### INTRODUCTION

A motion filed under 28 U.S.C. section 2255 must allege that (1) the judgment was

imposed in violation of the Constitution, or (2) the judgment was imposed by a court lacking

jurisdiction, or (3) the sentence imposed exceeded the statutory maximum, or (4) the judgment

was otherwise subject to collateral attack.  The suppression of evidence favorable to the accused

is a ground for relief under the statute; likewise, prosecutorial misconduct is a ground if it

violates the accused's right to Due Process of law.  *Rafael Moreno-Morales v. United States,*

334 F.3d 140, 148 (1st Cir. 2003).

7

App 940

## I.    THE GOVERNMENT VIOLATED MARTIN'S RIGHT TO DUE PROCESS OF LAW BY WITHHOLDING EVIDENCE OF HIS INNOCENCE OF THE ANTHONY FORTUNE MURDER.

Suppression of evidence favorable to an accused and material to guilt or innocence is a violation of Martin's right to due process of law, guaranteed by the Fifth Amendment to the United States Constitution. *Brady v. Maryland*, 373 U.S. 83 (1963). If the evidence suppressed is material, that is, its suppression undermines confidence in the outcome of the trial, a new trial is warranted. *United States v. Bagley*, 473 U.S. 667 (1985). The question is not whether a different verdict would more likely than not have resulted if the suppressed evidence had been available to the defense, but whether in the absence of the evidence, Martin received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 4343 (1995). Materiality of evidence is assessed cumulatively, not item by item. *Id.* at 436.

There are three components of a *Brady* violation: (1) the withheld evidence is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the government willfully or inadvertently; and (3) prejudice resulted. *Strickler v. Greene*, 527 U.S. 263 (1999). The government's duty to disclose evidence extends beyond material in the possession of the prosecution. The prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including police. *Kyles v. Whitley*, 514 U.S. at 437.

The petitioner need not show that after discounting inculpatory evidence in light of the undisclosed evidence, there would not be enough evidence to convict. The possibility of acquittal on a criminal charge does not imply an insufficient evidentiary basis for a conviction. The law makes it easier to obtain a new trial where the government engineered an unfair trial by

8

App 941

withholding material exculpatory to the accused.  *Conley v. United States*, 415 F.3d 183, 188 (1st

Cir. 2005), citing *Kyles v. Whitley*, 415 U.S. at 434-35.

The "reasonable probability" standard can be problematic, as noted by our circuit in

*United States v. Bowie*, 198 F.3d 905, 908-09 (D.C. Cir. 1999):

> "What is a 'reasonable probability'?   Probability is often expressed in terms of
> percentages, with 100% representing certainty.   We know, because the Supreme
> Court has told us, that a 'reasonable probability' can be less than 50.01%.
> In other words, to reverse a conviction for a *Brady* violation, it does not have
> to be more likely than not that the defendant would have been acquitted had the
> evidence been disclosed.   *See Kyles*, 514 U.S. at 434.   We are also sure that
> a 'reasonable probability' is somewhat greater than 1%.   How much greater?
> Enough, the Supreme Court says, to 'undermine confidence in the verdict,'
> *id. at 435*, which may lead us in a circle: one cannot be confident of the
> outcome when there is a 'reasonable' probability that it may be wrong, and
> a 'reasonable' probability is one high enough to undermine confidence
> in the outcome."

Another circuit explained it thusly:   The   "sufficient to undermine confidence in the

outcome" formula means that reversal will be warranted even if there is less than an even chance

that the withheld evidence would produce an acquittal.   The petitioner is not required to show

that a different outcome is certain with the presentation of the evidence.   The value of the

withheld evidence is evaluated in context of the entire record to determine materiality.   *Conley*

*v. United States*, 415 F.3d at188.   Put another way, the petitioner need only show that the

favorable evidence could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict.   *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir.

2007) (*en banc*), citing *Kyles v. Whitley*, 514 U.S. at 435.

Once the court finds a *Brady* violation, meaning that non-disclosure of the evidence is so

serious that there is a reasonable probability that the suppressed evidence would have produced a

9

App 942

different result, the court must grant a new trial. *Strickler v. Greene*, 527 U.S. 263, 281 (1999);
*In re Sealed Case*, 285 F.3d 887, 892 (D.C. Cir.1999).

In the instant case, the only direct evidence linking Martin to the murder of Anthony

Fortune came from a witness named Charlene Wilson. Ms. Wilson claimed to be an eyewitness

to the shooting, that Sam Carson shot Fortune and that Martin drove Carson from the scene of the

murder. Very late in the trial, well after Wilson testified, the defense stumbled on withheld

*Brady* material, in the form of the notes of a police officer who had interviewed Wilson right

after the shooting. To that officer, Wilson said she heard about the murder later but was not

actually present at the scene. The police officer attempted to explain Wilson's contradictory

statements by saying that he created a false report to shield Wilson's identity. In addition to

Wilson's contradictory versions of events, the government called several informants who

claimed that Martin confessed to shooting Fortune, that Carson confessed to shooting Fortune,

and that one goaded the other to do the deed.

In Steven Thomas' statement, we have an unrelated eyewitness who exonerates Martin as

the shooter and who identifies the perpetrator in a way that eliminates Carson as the shooter.

The evidence is clearly material, applying the case law developed by the Supreme Court and by

our circuit. According to Thomas, his evidence was made known to the police on the night of

the Fortune murder. The evidence was therefore in the government's possession as early as the

night of the shooting. The evidence was never made available to the defense. Because the

evidence was withheld, Martin was precluded from calling a witness who would have testified

that he and Carson were innocent of the shooting. The evidence creates a reasonable

probability, a probability sufficient to undermine confidence in the verdict, that a different result

10

App 943

would have obtained at trial had the evidence been available.    The government used the Anthony

Fortune shooting as evidence of Martin's participation in the marijuana conspiracy and the RICO

conspiracy.    Had evidence of Martin's innocence of the Fortune shooting been available to the

jury, the result of the entire proceedings, not just the count involving Fortune, would have been

different.    Martin is entitled to a new trial.

## II.    THE GOVERNMENT IMPEDED THE PRESENTATION OF MARTIN'S DEFENSE ON THE CHARGE OF SHOOTING JAMES COULTER.

The government violated Martin's right to Due Process of law when it impeded his

counsel from procuring the testimony of James Coulter at the trial of this case.    Defense counsel

could not locate Coulter to subpoena him to trial, and petitioned the trial court for assistance in

securing his presence.    The government claimed to have no knowledge of Coulter's

whereabouts.    The government even suggested to the trial court that Coulter was deceased.    On

information and belief, around the time the government was making these representations to the

court and counsel, Coulter was the subject of a prosecution by the United States Attorney's

Office, and a federal Grand Jury investigation into narcotics trafficking.    He was indicted for

narcotics trafficking and arrested on February 13, 2002,   six months after verdicts in the case.

*See, United States v. James C. Coulter*, 02-mj-00104-AK, consolidated with Criminal Number

02-074.    According to the docket sheet in 02-mj-00104-AK, the government sought detention

after Coulter's arrest on February 13, to "permit revocation of conditional release, deportation or

exclusion."    Since there is no evidence that Coulter is an alien, in his case the revocation would

have been based on the fact that he was on conditional release.    The government would

necessarily have known of the case in which he was on conditional release, since the government

11

i

would be the prosecuting authority in that case.[2]

Because the representations of the government at the trial of the instant case that it lacked knowledge of Coulter's whereabouts, and that he could be deceased, were false, and because the government's conduct prevented petitioner from securing Coulter's testimony at trial, the govern-ment violated petitioner's Due Process rights.  Prosecutorial misconduct is a ground for relief under 28 U.S.C. section 2255 if it violates the accused's right to Due Process of law. *Rafael Moreno-Morales v. United States,* 334 F.3d 140, 148 (1st Cir. 2003).

Coulter gave petitioner's counsel a signed, witnessed statement that Martin did not shoot him.  Based upon that statement, Martin would have called Coulter to testify in his defense if he could have located him and placed him under subpoena, or if he was incarcerated, petitioned the court for a writ of habeas corpus ad testificandum.  The government's conduct prevented Martin from presenting exculpatory evidence.  If that evidence had been available, it is unlikely the jury would have convicted Martin of the four counts in the indictment related to Coulter.  As with the Anthony Fortune shooting, the government used the Coulter shooting as evidence of Martin's participation in the marijuana conspiracy and the RICO conspiracy.  Had evidence of Martin's innocence of the Coulter shooting been available to the jury, the result of the entire proceedings would have been different.  Martin is entitled to a new trial as a result of the government's conduct which deprived him of Due Process of law.

## CONCLUSION

For all the above reasons, and any others that may appear to the court at a hearing on this

---

[2]A check of PACER reveals that the criminal case with which the magistrate case was consolidated is not available for public inspection.  Petitioner will seek discovery, including an Order from this court unsealing the court records to permit the full development of this claim.

12

Motion, petitioner respectfully requests, pursuant to 28 U.S.C. section 2255, that the court

vacate, set aside or correct his sentence and grant him a new trial.



                                        Respectfully submitted,



                                        Jerome Martin, *Pro Se*
                                        Federal Register Number 18894-083
                                        USP Hazelton
                                        PO Box 2000
                                        Bruceton Mills, WV   26525


## CERTIFICATE OF SERVICE

        I, Jerome Martin, appearing *pro se* in the instant case, DO HEREBY CERTIFY

that I have this day served a copy of the foregoing Motion to Vacate, Set Aside or Correct

Sentence Pursuant to 28 U.S.C. section 2255, by depositing a copy in the United States Mail,

postage prepaid, addressed to Jeffrey Taylor, United States Attorney, 555 4th Street, NW,

Washington, DC 20530, this the — day of February, 2008.



                                        Jerome Martin, *Pro Se*




                                        13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     )
        )
        Plaintiff,     )
        )     **Crim. No. 98-329 (TPJ)**
    v.        )
        )
**JEROME MARTIN,**     )
        )
        **Defendant**     )

## A F F I D A V I T

I, George Steel, do hereby aver and say, upon penalty of perjury, that:

1. My name is George Steel. I reside in Frederick, Maryland. I am a private investigator and I work in the District of Columbia on cases where I am retained by the parties and on cases where I am appointed by the courts.

2. I am a former detective with the Metropolitan Police Department of the District of Columbia.

3. I was retained to conduct a post-conviction investigation in the case of *United States v. Jerome Martin.*

4. In the course of my investigation, I interviewed Steven Thomas, who resides in Maryland.

5. Mr. Thomas advised me of the following:

a. He knows Jerome Martin and knew Anthony Fortune.

b. In August 1991, he was present on 58th Street in Washington, D.C. when Anthony Fortune was shot and killed.

c. He saw the person who shot Anthony Fortune. He knows Jerome Martin and knows that Jerome Martin was not the person who shot Fortune.

d. The person who shot Fortune was very dark-complected, stocky and taller than Jerome Martin.

e. On the evening of the Fortune shooting, police officers interviewed him as an

eyewitness to the shooting. He described the shooter to the officers and gave them the same information about the shooter that he gave to me. He was never called by the government to testify about Fortune's killing.

I swear upon penalty of perjury that the foregoing information is true and accurate to the best of my knowledge.

This the 1 8 day of February, 2008.

_____
George Steel

District of Columbia live database          Document #2077668          Filed: 10/01/2024          Page 383 Page 477 of 2
USCA Case #21-3072
Case 1:98-cr-00329-RCL   Document 1021   Filed 02/18/08   Page 16 of 17

CLOSED

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:02-mj-00104-AK-1

Case title: USA v. COULTER                    Date Filed: 02/14/2002

Assigned to: Magistrate Judge Alan Kay

### Defendant (1)
**JAMES CHRISTOPHER COULTER**
*TERMINATED: 02/14/2002*

| Pending Counts | Disposition |
|---|---|
| None | |

**Highest Offense Level (Opening)**
None

| Terminated Counts | Disposition |
|---|---|
| None | |

**Highest Offense Level (Terminated)**
None

| Complaints | Disposition |
|---|---|
| Complaint filed in violation of 21:841(a)(1) | |

**Plaintiff**
**UNITED STATES OF AMERICA**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/13/2002 | | DEFENDANT JAMES CHRISTOPHER COULTER arrested. (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 1 | MAGISTRATE COMPLAINT and Affidavit filed against JAMES CHRISTOPHER COULTER in violation of 21:841(a)(1). (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | PDID AND DATE OF BIRTH for JAMES CHRISTOPHER COULTER : PDID #: 386-197 DOB: 1/10/69 (jdc) (Entered: 02/15/2002) |

| 02/14/2002 | | Prison Registration Number for JAMES CHRISTOPHER COULTER : Reg.#: 24717-016. (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | INITIAL APPEARANCE on magis complaint for JAMES CHRISTOPHER COULTER held before Magistrate Judge Alan Kay : Attorney appearance for JAMES CHRISTOPHER COULTER by Tony Axam. Detention hearing set for 9:30 2/15/02 for JAMES CHRISTOPHER COULTER ., Defendant committed/commitment issued. Pro-typist, Inc.; Tape & Lines: Courtroom 7) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | DEFENDANT(S) JAMES CHRISTOPHER COULTER ordered held without bond by Magistrate Judge Alan Kay . (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 2 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : of temporary detention pending hearing pursuant to Bail Reform Act (N) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 3 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : of temporary detention to permit revocation of conditional release, deportation or exclusion (N) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | Magistrate case closed as to JAMES CHRISTOPHER COULTER. Merged into criminal case no. 02-074. (erd) (Entered: 02/19/2002) |
| 02/15/2002 | | DETENTION HEARING before Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : Bond set to HWOB. Criminal indictment has been filed against the defendant and assigned to Judge Robertson. Defendant committed/commitment issued. Court Reporter: Courtroom 7 (jdc) (Entered: 02/15/2002) |
| 02/15/2002 | 4 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : committing defendant to the custody of the U.S. Attorney General. (N) (jdc) (Entered: 02/15/2002) |

| PACER Service Center | | |
| --- | --- | --- |
| Transaction Receipt | | |
| 02 18 2008 12 31.32 | | |
| PACER Login: | jh0114 | Client Code: |
| Description: | Docket Report | Search Criteria: | 1 02-mj-00104-AK |
| Billable Pages: | 1 | Cost: | 0.08 |

RECEIVED
U.S. COURT OF APPEALS
FOR THE D.C. CIRCUIT

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

2008 FEB 19 PM 6: 25

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : FILING DEPOSITORY |
| **v.** | : **Cr. No. 98-CR-00329-4** |
| | : |
| **WILLIAM SWEENEY** | : |
| | : |

### MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE

### PURSUANT TO 18 USC §2255

Mr. William Sweeney, by and through undersigned counsel, respectfully moves this Honorable Court for relief from the sentence in this case imposed in violation of the Constitution and laws of the United States.

In support of this motion, counsel states:

1.      This motion is based upon all files, records and proceedings in this case, as well as activity and inactivity outside of the record, and any such other materials as may be subsequently submitted.

2.      On September 18, 1998, Mr. Sweeney and codefendants were charged by indictment with conspiracy to possess with intent to distribute and distribution of controlled substances, conspiracy to participate in the affairs of a racketeer influenced and corrupt organization ("RICO") and various substantial counts.

2.      On March 25, 1999, Mr. Sweeney was charged by the superceding indictment.

3.      Mr. Sweeney went to trial with Vincent Hill, Jerome Martin, Sean Coates, Samual Carson and Gary Price.

The defendants were charged with a large-scale narcotics and RICO conspiracy. In furtherance of the conspiracy, Mr. Sweeney was alleged to have engaged in multiple acts of violence; there was no evidence presented at trial that he participated directly in narcotics

- 1 -

distributions. By way of an overview, it was the prosecution's theory that Mr. Sweeney and the other defendants were lifelong friends who grew up during the 1980s in the Greenleaf Gardens neighborhood in southwest Washington. As they entered their teenage years they began selling drugs. By the early 1990s, the Government claimed, most of them were selling substantial quantities of marijuana, along with less significant quantities of other drugs. Most of the sales were made on the 200 block of K Street, SW, and on the corner of Delaware Avenue and K Street, SW. The Government charged that the defendants ran these locations as cooperative markets in which they rotated serving marijuana to customers driving into the area from the D.C. Metro area. The prosecution depicted Vincent Hill as the leader of this "crew," and Mr. Sweeney as one of its members.

The Government also asserted that Mr. Sweeney, along with other defendants, engaged in ventures other than drug dealing, both for purposes of self-enrichment and protection. For example, through the testimony of informants and cooperating insiders, evidence was presented that the defendants sometimes committed kidnappings to fund weapons, drugs or living expenses. Witnesses testified that Mr. Sweeney and others were responsible for a number of acts of violence, some planned and others spontaneous.

On August 15, 2001, a jury found Mr. Sweeney guilty of conspiracy to possess with intent to distribute and distribution of controlled substances[1] (count 1rrs), conspiracy to participate in the affairs of a racketeer influenced and corrupt organization ("RICO")[2] (count

---

[1] Counsel would note that there was no evidence of any drug selling by Mr. Sweeney at trial is this matter but Mr. Sweeney's participation in the conspiracy was by way of other alleged crimes of violence.

[2] Again there was no evidence presented of any drug dealing by Mr. Sweeney but instead, other activities that "contributed" to the conspiracy. In addition to the substantive counts charged, which were incorporated as overt acts of Counts 1 and 2, Mr. Sweeney was also charged with other conspiracies to murder individuals and another murder, which was unproven as an overt act and he was found not guilty. *See* Verdict Form, Docket Entry 810.

App 952

2rrs), attempted murder of Anthony Pryor in aid of racketeering (count 11rrs), first degree murder while armed of Donnell Whitfield (count 15rrs), murder of Donnell Whitfield in aid of racketeering (count 16rrs), murder of Alonzo Gaskins in aid of racketeering (count 25rrs), murder of Darnell Mack in aid of racketeering (count 26rrs), murder of Melody Anderson in aid of racketeering (count 27rrs), use of firearm during and in relation to attempted murder of Anthony Pryor (count 28rrs), use of firearm during and in relation to murder of Donnell Whitfield (count 30rrs), use of firearm during and in relation to murder of Alonzo Gaskins (count 35rrs), use of firearm during and in relation to murder of Darnell Mack (count 36rrs), and use of firearm during and in relation to murder of Melody Anderson (count 37rrs), and possession of a firearm during a crime of violence (murder of Donnell Whitfield (count 41rrs).

  4. On February 5, 2002, the Court sentenced Mr. Sweeney as follows:

   (A) As to counts 1rrs, 2rrs , 16rrs , 25rrs , 26rrs , 27rrs:  Mr. Sweeney was sentenced to life imprisonment on each of counts 1rrs, 2rrs, 16rrs, 25rrs, 26rrs and 27rrs; sentences to run concurrently to each other. A supervised release period of 5 years is imposed on each count and is to run concurrently by the counts and concurrently to count 11rrs. A Fine of $500,000.00 is imposed on count 1rrs and is due immediately. It shall be paid through the U.S. Bureau of Prisons Inmate Financial Responsibility Program. A special assessment of $100.00 is imposed on each count and is due immediately.

   (B) Count 11rrs: the deft. is sentenced to 20 years incarceration, to run concurrently with all other counts; followed by a 3 year period of supervised release, to run concurrently with all other counts. A special assessment of $100.00 is imposed and is due immediately.

   (C) Count 28rrs: the deft. is sentenced to 5 years incarceration, to run

- 3 -

App 953

consecutively to all other counts; followed by 5 years supervised release, to run concurrently with all other counts. A special assessment of $100.00 is imposed and is due immediately.

(D)    Counts 30rrs, 35rrs, 36rrs, and 37rrs: the deft. is sentenced to 20 years incarceration on each of counts 30rrs, 35rrs, 36rrs and 37rrs; to run consecutively to each other and to all other counts. A five year period of supervised release is imposed on each count, to run concurrently with all other counts. A special assessment of $100.00 is imposed on each count and is due immediately.

(E)    On that date, the oral motion of government to vacate counts 15rrs and 41rrs was granted (Count 15rrs merges with count 16rrs and count 41rrs merges with count 30rrs).

5.    The United States Court of Appeals for the District of Columbia Circuit affirmed Mr. Sweeney's convictions. *United States v. Carson et al*, 372 U.S. App. D.C. 251; 455 F.3d 336 (D.C. Cir. July 21, 2006), *petition for rehearing and rehearing en banc denied*, 2006 U.S. App. LEXIS 26335 (D.C. Cir., Oct. 23, 2006).

6.    On February 20, 2007, the Supreme Court denied Mr. Sweeney's petition for writ of certiorari. *Carson et al v. United States*, 127 S. Ct. 1351 (Feb. 20, 2007).

7.    This petition is timely filed because it is filed within one year of the date that the Supreme Court denied Mr. Sweeney's petition for writ of certiorari.

8.    There have been no previous post-conviction petitions, applications, motions, or proceedings filed or maintained by Mr. Sweeney in this or any other federal court with respect to the judgment entered in this case.

9.    Section 2255 of Title 28 permits a prisoner in custody under sentence of a federal

court to move the court to vacate, set aside or correct an erroneous sentence. The Supreme Court

has read the statute to provide four grounds on which relief may be claimed: (1) the sentence

was imposed in violation of the Constitution or the laws of the United States; (2) the court was

without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum

authorized by law; or (4) the sentence is "otherwise subject to collateral attack." *Hill v. United

States*, 368 U.S. 424, 428 (1962).

      10.    Mr. Sweeney submits that his convictions in this matter were imposed in violation

of his right to counsel and right to effective assistance of counsel, both on the trial and appellate

levels. The cause of action for ineffective assistance of counsel is based on the Sixth

Amendment right to counsel, which exists "in order to protect the fundamental right to a fair

trial." *Lockhart v. Fretwell*, 506 U.S. 364 (1993). In *Strickland v. Washington*, 466 U.S. 668

(1984), the United States Supreme Court established a two-part test to determine whether a

defendant was denied effective assistance of counsel. Under *Strickland*, the defendant must

show that (a) counsel's performance was so deficient that it fell below an objective standard of

reasonableness, and (b) counsel's performance prejudiced defendant to such an extent that the

result of the proceeding was unreliable. *Id.* at 669. With respect to the "deficient performance"

prong, the court must examine the entire proceedings and determine "whether, in light of all the

circumstances, the [conduct of defendant's trial counsel was] outside the wide range of

professionally competent assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986)

(quoting *Strickland*, 466 U.S. at 690). *Strickland* specifies that an unreliable result means "that

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceedings would have been different. A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Id.* at 694. The defendant must show that counsel's

performance fell below an objective standard of reasonableness under the prevailing professional norms. *Id.* at 688. In order to obtain relief, the defendant must make both showings. *Id.* However, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case;" rather, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 693. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* Appellate counsel has an obligation to raise all cognizable issues on appeal. *Smith v. Murray,* 477 U.S. 527 (1986); *Evitts v. Lucey,* 469 U.S. 387 (1985).

In failing to properly investigate this case, and in failing to call necessary witnesses at trial and to produce documentary evidence at trial, counsel rendered ineffective assistance of counsel as defined in *Strickland v. Washington,* 466 U.S. 668 (1984). Under the standards set forth in *Strickland,* counsel is obligated to conduct pretrial investigation, including locating and interviewing potential defense witnesses, and subpoenaing favorable witnesses to testify at trial. *Williams v. Washington,* 59 F.3d 673 (7th Cir. 1995); *Sanders v. Ratelle,* 21 F.3d 1446 (9th Cir. 1994); *Bryan v. Scott,* 28 F.3d 1411 (5th Cir. 1994); *Chambers v. Armontrout,* 907 F.2d 8225 (8th Cir. 1990); *United States v. Gray,* 878 F.2d 720 (3d Cir. 1989); *Tosh v. Lockhart,* 879 F.2d 412 (8th Cir. 1989); *Code v. Montgomery,* 799 F.2d 1481 (11th Cir. 1986); *Thomas v. Lockhart,* 738 F.3d 304 (8th Cir. 1984). This rule applies to expert as well as lay witnesses. *United States v. Tarricone,* 996 F.2d 1414 (2d Cir. 1993). Counsel has a similar obligation to investigate evidence that might favor the defense. *Foster v. Lockhart,* 9 F.3d 722 (8th Cir. 1993); *Sims v. Livesay,* 970 F.2d 1575 (6th Cir. 1992).

Mr. Sweeney's counsel's performance at trial was deficient because he failed to adequately prepare for trial, failed to adequately interview and prepare witnesses for testimony,

App 956

failed to adequately represent Mr. Sweeney at trial and preserve issues for appeal. His same counsel's performance in handling his appeal was deficient because he failed to raise issues and raise issues in an appropriate manner on appeal. Mr. Sweeney is entitled to relief because his convictions were obtained in violation of his Sixth Amendment right to counsel and to effective assistance of counsel when:

(A) Trial counsel failed call Dr. Jonathan Pincus, a neurologist who examined Mr. Sweeney, to describe Mr. Sweeney's Tourette Syndrome and to refute the witness's testimony that he displayed no symptoms during violent acts and to rebut the importance of witnesses' testimony and the jurors view of Mr. Sweeney and his symptoms in 2001, as his symptoms would be less in court than during stressful events and less severe in 2001 as compared to five to ten years earlier. While defense counsel crossed almost every eyewitness on the barking / tics that Mr. Sweeney exhibited when they knew him or during an alleged incident, other than the defense testimony of Anthony Pryor and Shaheem Johnson, two career criminals, there was no context for this evidence and Mr. Kiersh provided the jury with no explanation for any differences between the witnesses' testimony as well as no explanation for what the jurors saw and heard from Mr. Sweeney during the trial as compared with the eyewitness testimony that one would hear the barks and throat clearing every few minutes or so. Dr. Pincus was announced as a potential witness to the jury and discussed numerous times as a potential witness during the defense case but was not called.

(B)    Trial counsel failed to call an alibi witness for the Donnell Whitfield (September 24, 1994) murder, Anthea Henry, who was announced as a potential witness to the jury but declined to be called during the defense case. Courts have found that a

=7=

lawyer's failure to investigate potential defense witnesses, as here, combined with the

showing of the specific necessity of the importance of the witness' testimony rendered

counsel's strategic choice unreasonable and therefore counsel's performance deficient.

See, e.g., *Garcia v. Portuondo*, 466 F. Supp. 2d 488 (S.D.N.Y. Dec. 21, 2006)(counsel

ineffective in second-degree murder case for failing to adequately investigate and present

alibi evidence); *Sanders v. Ratelle*, 21 F.3d 1446, 1457-58 (9th Cir. 1994); *Chambers v.

Armontrout*, 907 F.2d 825 (8th Cir. 1990), *cert. denied*, 111 S. Ct. 369 (1990); *Tosh v

Lockhart*, 879 F.2d 412 (8th Cir. 1989); *Code v. Montgomery*, 799 F.2d 1481, 1483 (11th

Cir. 1986); *Gomez v. Beto*, 462 F.2d 596, 596-97 (5th Cir. 1972).

      (C)     Failure to Recall Witnesses after *Brady* materials were disclosed late

          (i)     Trial counsel failed to recall Reginald Switzer after the late

disclosure of *Brady* materials.  The defense theory at trial was that Reginald

Switzer had killed Donnell Whitfield aka Robocop in retaliation for having been

shot by Whitfield and George Seabrooks in 1989 or 1990 (5/23PM Tr. 4). Indeed,

Switzer testified that he had killed Seabrooks in retaliation for the shooting and

that he had staked out Whitfield's residence at least twice, while armed, but did

not take the opportunity to kill him (5/15PM Tr. 7-8). Trial counsel cross-

examined Switzer about his motive to kill Whitfield and his attempts to do so

(5/15PM Tr. 30-35) and also elicited that, when Sweeney had a conversation with

Switzer about Sweeney's altercation with Whitfield at a nightclub, Switzer told

Sweeney not to kill Whitfield because Switzer wanted to kill Whitfield (5/15PM

Tr. 40). When Montgomery was recalled after Switzer, he then testified that

before Whitfield's murder, Switzer had told him about Switzer's desire to "get"

Whitfield (5/23.AM Tr. 53) and that Montgomery and Switzer were *in* a car together at the time of this conversation, and they drove past the building where Whitfield was hustling (id.) When they did so, Montgomery claimed that he offered to "go up there and blast [Whitfield's] ass right now," but that Switzer said he did not have a gun with him (5/23.AM Tr. 54). Montgomery further testified that he later told Carson that Switzer wanted him to kill Whitfield for Switzer, and Carson advised him not to do it because Switzer should handle it himself (id.). After a recess, but before cross-examination of Montgomery had begun, Sweeney's counsel moved the court to sanction the government for failing to disclose that "Mr. Montgomery had cooperated with Mr. Switzer in planning to *kill* Robocop, aka Donnell Whitfield" (5/23PM Tr. 3). Counsel declined the opportunity to recall Switzer and engage in this cross-examination. 5/23PM Tr.5. Counsel should have recalled Switzer to cross him on this subject, both to preserve the issue and to further impeach the individual the defense was accusing of the crime.

(ii)     Similarly, trial counsel should have recalled Charlene Wilson to impeach her statement made to Detective Warrener that she had merely heard about the murder of rather than she had actually seen the murder. (5/14PM Tr. 55-56).

(iii)     Finally, trial counsel should have recalled cooperating witness Ronald Sowells. When testifying, Ronald Sowells described an incident where two guys were squeezing people's marijuana bags and then said that they said that they did not want to buy it; he said Sean Coates aka Chin asked for a gun, Sowells

gave him one, Chin chased the guy down, the guy fell and William Bumbrey ran

over and shot him. (4/17/01 pm 47-49) After Sowells' testimony, the complainant

Roland Brown gave a very different version of events (4/24/01am 41-42) . Trial

counsel failed to recall Ronald Sowells to challenge his version of the events.

(D)    Trial counsel failed to impeach James Montgomery with prior inconsistent

statements made to a defense investigator as well as cross examine him regarding

additional bias material.

(E)    Trial counsel failed to provide the trial court with any authority for cross

examination of John Venable about his arrest for criminal charges that were dismissed

during the time between the alleged crime and his testimony at trial as well as the fact

that he perfectly matched the description of the person who murdered Morris Hallman,

which lead to a search warrant authorizing police to search his house, and locating the

gun and ammunition.    *E.g.*, *United States v. Anderson,* 881 F.2d 1128 (D.C. Cir 1989)

("district court's denial of cross-examination of a prosecution witness regarding an

unrelated murder indictment against her, dismissed without prejudice eleven months

before trial, violated appellants' confrontation rights under the Sixth Amendment....for

the jury might reasonably have found that the government's ability to reinstate the murder

charge furnished the witness with a motive for favoring the prosecution in her

testimony"); *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986); *Davis v. Alaska*, 415

U.S. 308, 316-17, 318 (1974); *Alford v. United States*, 282 U.S. 687 (1931).

(F)    Failure to request admission of evidence – admission of party opponent

(pleading by USA re unreliability of James Montgomery), Grand Jury witnesses'

transcripts as well as Wesley Smith and Frederick Miller's testimony, even if

- 10 -

inadmissible under hearsay rules, given the introduction of this evidence implicated Mr.

Sweeney's right to present a defense. *See Chambers v. Mississippi*, 410 U.S. 284

(1973)(holding that the exclusion, under state hearsay rules, of exculpatory testimony that

another party had committed the crime, which under the circumstances was likely to be

trustworthy and within the rationale of the exception for declarations against penal

interest denied him a trial in accord with fundamental standards of due process).

(G)     Failure to make a *Massiah* demand and litigate issues related to jailhouse

confessions allegedly made to including but not limited to Charles Bender, Donald

Nichols, Eugene Byars, Theodore Watson, Reginald Switzer, and Arthur Rice. *See*

*Watson v United States*, 2008 D.C. App. LEXIS 12 (January 28, 2008)(matter remanded

for hearing based on nondisclosure during trial by government regarding witness (the

same) Charles Bender) ; *Massiah v. United States*, 377 U.S. 201 (1964).

(H)     Failure to object to the *ex parte* communications between the Court and

juror #3 and subsequent failure to raise this issue properly on appeal. Counsel did not

object to not being present for *voir dire* of witness – although asked after the fact for *voir*

*dire* after excused. Based on these *ex parte* communications, Mr. Sweeney's deliberating

jury was reduced to 11. This was a critical point[3] where Mr. Sweeney, by and through

counsel, had a right to be present and provide input into the process.

(I)      Failure to provide an opening statement at the beginning of the case.

(J)      Failure to corroborate jail records with court records which show the same

time period of detention, after government counsel crossed the business records custodian

---

[3] A defendant has the right to be informed of the substance of all communications from the
jury and has a right to be heard before the court provides a response. *See Rogers v. United States*,
422 U.S. 35 (1975) (right to be present under Fed. R. Crim. P.43); *United States v. United States*

on the alleged unreliability of the records.

     (K)    Failure to properly object and then appeal the court's ruling permitting voluminous use of inadmissible and/or hearsay evidence to establish material facts including, but not limited to (1) the testimony of Medical Examiner Jonathan Arden, who testified as to autopsies he had not conducted, (2) the testimony of police officer regarding fingerprint evidence he had not lifted, examine or compared with the known prints, (3) reputation evidence concerning alleged conspiracy member Wayne Perry, (4) statements of Robert Smith aka Butchie to SA Vincent Lisi, and (5) the constant hearsay testimony, material to the government's case and never proven by competent evidence, that Lil Ty kill Dihru.

11.    In violation of Mr. Sweeney's right to effective assistance on appeal[4], appellate counsel failed to note sections of sealed matters for the Court to review and to cite authority for those requests, in contradiction of the Circuit's direct order (October 2, 2002), although such authority had been provided in the joint co-appellants' motion, so Mr. Sweeney's convictions in this matter were without judicial review of the undisclosed materials and also not providing a statement of facts. Counsel would note that without a statement of facts, the court of appeals cannot know the extent of prejudice and therefore can not ascribe levels of error[5].

---

*Gypsum Co.*, 438 U.S. 422, 460 (1978) (discussing the "hazards of *ex parte* communications with a deliberating jury or any of its members")

[4] *See Cirilo-Munoz v. United States* 404 F.3d 527 (1st Cir. 2005); *United States v. Reinhart*, 357 F.3d 521 (5th Cir. 2004); *United States v. Skurdal*, 341 F.3d 921 (9th Cir. 2003); *Brown v. United States*, 167 F.3d 109 (2nd Cir. 1999); *Jackson v. Leonardo*, 162 F.3d 81 (2nd Cir. 1998); *Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998).

[5] The Court of Appeals stated "[f]irst, the appellants object to discrete, allegedly biased rulings by the trial judge which (1) set the timing of disclosure of exculpatory material under *Brady v. Maryland,* 373 U.S. 83 (1963), and of witness statements to the government under the *Jencks* Act, 18 U.S.C. Â§ 3500; (2) denied defense motions to strike jurors for cause; (3) overruled defense objections to hearsay and opinion testimony of government witnesses and excluded as

Counsel incorporates by reference the requests made in the appellate motion and requests that this Court review the requested materials. In addition, due to the cumulative *Brady* errors, both non disclosure and late disclosure, as well as allegations of prosecutorial misconduct, counsel requests that this Court review in camera the materials sealed by the trial court.

12.    Mr. Sweeney is sentenced to consecutive sentences in violation of the Double Jeopardy Clause of the United States Constitution when counsel failed to object to and did not raise on appeal the consecutive sentences Mr. Sweeney received for using a firearm in relation to a crime of violence, Counts 35rrs, 36rrs, and 37rrs, namely the triple homicide. *See Matthews v. United States,* 892 A.2d 1100 (D.C. 2006); *Monroe v. United States,* 600 A.2d 98 (DC 1991); *Nixon v. United States,* 730 A.2d 145, 153 (D.C. 1999)(holding that multiple PFCV convictions will merge, even if the predicate felony offenses do not merge, if they arise out of a defendant's uninterrupted possession of a single weapon during a single act of violence); *United States v. Chalan,* 812 F.2d 1302 (10th Cir. 1987)(imposition of consecutive sentences for 2 violations of 18 USCS § 924 violates Double Jeopardy Clause, since legislative history does not indicate that

---

hearsay testimony of a defense witness; and (4) limited the scope of defense cross-examination. But "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky,* 510 U.S. at 555 (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 583 (1966)). "Almost invariably, they are proper grounds for appeal, not for recusal." *Id.* "In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they . . . can only in the rarest circumstances evidence the degree of favoritism or antagonism required when no extra-judicial source is involved." *Id.* The isolated unfavorable rulings the appellants cite in the course of a trial proceeding lasting some nine months do not constitute such "rare circumstances." Nor does the fact that the judge may have ruled in favor of the government more often than he did in favor of the defense, as the appellants contend, by itself show bias. *See Edmond,* 52 F.3d at 1100 ("Appellants do not claim that a greater percentage of government requests than defense requests were granted, but even if that were the case such a disproportion would be insufficient by itself to establish bias." (citing *United States v. Pisani,* 773 F.2d 397, 402 (2d Cir. 1985) ("[A] trial judge must rule on countless objections, and a simple numerical tally of those sustained and overruled, one which here favors the government, is not enough to establish that the scales of justice were tipped against a defendant.")). The record here does not show that the judge did so disproportionately or unjustifiably."

App 963

Congress foresaw how court should determine number of crimes of violence that have occurred in single criminal transaction); *Bruce v. United States, 471 A.2d 1005*(D.C. 1984).

13.    Mr. Sweeney's convictions were imposed in violation of his right to counsel of choice and right to effective assistance of counsel, specifically by the Court refusing to appoint counsel (Kenneth Robinson) who had been retained for the triple homicide in Prince George's County (the center of the case against Mr. Sweeney) and later disqualifying defense counsel who was appointed with prior second counsel moved to withdrawal due to a career change. This egregious error was compounded by counsel's failure to immediately appeal, *see United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975) (citing *Cohen v. Beneficial Industrial Loan Corp*., 337 U.S. 541 (1949)), or subsequently appeal the Court's pretrial denial of Mr. Sweeney's right to counsel – denial of Mr. Sweeney's Motion for Appointment of Counsel (Kenneth Robinson) and the November 13, 2000 order granting the government's motion to disqualify[6] Leonard Long as counsel for Mr. Sweeney. The government had further exacerbated the problem when it moved to disqualify[7] Leonard Long, a mere three weeks before trial, without justifiable reason and in interference with Mr. Sweeney's rights, based on a theory of conflict regarding Leonard Long's previous representation of Stephon Mason, who was a possible codefendant as an accessory after the fact for a murder (of Keith Johnson) Mr. Sweeney was not charged with in this case. This resulted in Mr. Sweeney proceeding to trial with one counsel, after the Court had found that his

---

[6] Mr. Long was allegedly conflicted due to his prior representation of Stephon Mason. Both Mr. Sweeney and Mr. Mason would waive this potential conflict and since there was no actual conflict, the discharge of Mr. Long was based on a non issue. As such, this was error and in violation of Mr. Sweeney's Sixth Amendment rights. See *Harling v. United States*, 387 A.2d 1101 (DC 1978)(holding that once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney, over the objections of both the defendant and his counsel); *see also English v. State*, 259 A.2d 822, 826 (MD 1969); *McKinnon v. State*, 526 P.2d 18 (Alaska 1974); *Smith v. Superior Court of Los Angeles County*, 68 Cal.2d 547, 68 Cal.Rptr. 1, 440 P.2d 65 (1968) (*en banc*).

matters necessitated two attorneys to stay appointed, even after the death penalty was taken out
of the case. This then was compounded by the failure of counsel to request any remedial
measure such as additional second counsel or a continuance.

14.     Mr. Sweeney's convictions were obtained in violation of his right to present a
defense, secured by his rights under the Due Process Clause of the United States Constitution,
when between counsel's ineffective attempts, the government's opposition, and the court's
rulings, the testimony that exculpated Mr. Sweeney from both the Donnell Whitfield murder,
Glenn Jenkins murder (that he was acquitted of) and triple homicide was not admitted in the
Court, namely, (1)the sworn statements of Cheree Owens and John Pinkney in the Prince
George's County Grand Jury implicating Dennis Green and his friends in the triple homicide, (2)
the proferred testimony of Wesley Smith, to whom Robert Smith aka Butchie confessed
involvement in the triple homicide, and (3) the testimony of Frederick Miller, regarding Little
Ty's confession to killing Glenn Jenkins. Counsel compounded the problem by not raising this
issue, the violation of Mr. Sweeney's constitutional right, on appeal.

15.     Mr. Sweeney has been denied his right to effective assistance of counsel, as great
portions of the trial file and appellate file are unavailable to counsel appointed to investigate and
litigate matters in this 18 USC § 2255 proceeding. While counsel does have *some* of the
materials provided in discovery and during trial, most were not provided by previous counsel and
counsel will therefore need leave of this Court to supplement with additional material as it
becomes available (and likewise may withdrawal some claims after review of the now unknown
materials are provided) but Mr. Sweeney is also prejudiced without possible remedy, as
apparently defense work product has also been lost, which may irreparably harm Mr. Sweeney in
attempting to litigate his ineffective claim and other post conviction matters in this case.

16.    In reviewing the files and records that are currently available Counsel for Mr.

Sweeney believes that the prosecutors engaged in deliberate misrepresentations and other

prosecutorial misconduct, including but not limited to the nondisclosure and late disclosure of

*Brady* information and the use of perjured testimony, in violation of Mr. Sweeney's

constitutional rights, but counsel needs further investigation as well as a complete set of

discovery, *Jencks*, *Brady*[8] and *Giglio* provided to trial counsel. Initially, counsel raises the

following matters in this category:

(i)    Suppression of information impeaching James Montgomery's credibility –

noteably the basis for the government's admission of his unreliability in 1991 and its

subsequent assessment of his unreliability pertaining to the homicide of Paul Ridley

(information conveyed to and assessed by the government *before* Mr. Sweeney's trial) as

litigated in the *United States v. Steven Dewitt*, who was locked up for the murder of Paul

Ridley for a decade, when apparently the government had learned but did not believe

James Montgomery's information that Sam Carson had confessed the murder to him.

(ii)    Prosecutorial misconduct in obtaining testimony by any means necessary,

including but not limited to procuring Arthur Rice's testimony by misrepresentation and

bending of the procedural rules in his Rule 35 motion for reduction and the initial and

then two subsequent plea agreements with James Montgomery after he lied and violated

previous plea agreements. *Mooney v Holohan* 294 U.S. 103 (1935)(Government has an

obligation to the truth).

(iii)    procuring "jailhouse" confessions in violation of Mr. Sweeney's Sixth

---

[8] Counsel speaks of materials disclosable under *Brady v. Maryland*, 373 U.S. 83 (1963) and
subsequent caselaw, noteably, *United States v. Agurs*, 427 U.S. 971 (1976), *United States v.
Bagley*, 473 U.S. 667 (1985); *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d
286 (1999).

Amendment rights. *See Massiah v. United States*, 377 U.S. 201 (1964).

17.     Counsel also incorporates by reference the claims raised by co-defendants in their

post conviction petitions related to trial and appellate counsel's ineffectiveness, based on actions

and omissions, as due to the fact that in this group prosecution, actions and inactions by other

counsel affected the case against and defense of Mr. Sweeney.

18.     Mr. Sweeney requests discovery and an evidentiary hearing on this motion and

seeks leave to supplement the issues when discovery is received or provided access to transcripts

currently unavailable to counsel.

WHEREFORE, for the foregoing reasons, both singularly and in the aggregate, for the

reasons set forth in legal memorandum and exhibits and for such other reasons as may be

subsequently submitted or may appear at a hearing in this matter, counsel and Mr. Sweeney ask

that the Court grant this motion.

Respectfully submitted,

/s/

JENIFER WICKS
Bar No. 465476

Law Offices of Jenifer Wicks
The Webster Building
503 D Street, N.W.
Suite 250A
Washington, D.C.  20001
(202) 393-3004
Facsimile (202) 478-0867

Copies to: Judge
AUSA – Special Proceedings
Dft.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　　　)　　Crim. No. 98-329 (TPJ)  *TFH*
　　　v.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
JEROME MARTIN,　　　　　　　　)　　**FILED**
　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant　　　　　)　　FEB 18 2008
　　　　　　　　　　　　　　　　　　　Clerk, U.S. District and
　　　　　　　　　　　　　　　　　　　Bankruptcy Courts

## MOTION TO VACATE, SET ASIDE, CORRECT SENTENCE PURSUANT TO 28 U.S.C. SECTION 2255

　　　　For the reasons set forth below, defendant Jerome Martin respectfully requests that the

court vacate, set aside or correct his sentence. This motion is made pursuant to 28 U.S.C. section

2255.

## FACTS

### A.　Procedural History

　　　　On September 18, 1998, Jerome Martin was charged along with several co-defendants in

a multi-count indictment alleging a narcotics conspiracy, racketeering conspiracy, murder and

other violent crimes, narcotics trafficking, and weapons offenses.   A superseding indictment was

filed on March 25, 2999.   Trial began on November 15, 2000.   A second retyped superseding

indictment was filed on July 2, 2001, containing all the counts that were submitted to the jury.

In July and August, 2001, the jury returned guilty verdicts against all defendants.   Jerome Martin

was convicted of Count 1, narcotics conspiracy, Count 2, RICO conspiracy, Count 8, first-degree

murder while armed of Anthony Fortune, Count 9, assaulting a police officer with a dangerous

weapon, Count 17, assault with intent to kill while armed of James Coulter, Count 18, attempted

murder of James Coulter in aid of racketeering, Count 31, use of firearm during and in relation to

attempted murder of James Coulter, Count 42, possession of firearm during crime of violence

against James Coulter, and Counts 49, 53, 55, 64, related to marijuana trafficking.

Martin was sentenced under the then-existing mandatory determinate Federal guidelines

system. Pursuant to that system the Probation Office calculated a   sentencing guideline

mandating life imprisonment and Martin was sentenced to that term.

On appeal, the United States Court of Appeals for the District of Columbia Circuit

affirmed Martin's convictions. *United States v. Carson, et al.*, 372 U.S. App. D.C. 251, 455

F.3d 336 (2006).

The United States Supreme Court denied Martin's petition for writ of certiorari on

February 20, 2007. *Samuel Carson, et al. v. United States,* Docket No. 06-9046.

### B.  The Government's Evidence[1]

Martin and others were charged with a large-scale narcotics and RICO conspiracy. In

furtherance of the conspiracy, Martin was alleged to have engaged in extensive narcotics

trafficking and multiple acts of violence. By way of an overview, it was the prosecution's

theory that Martin and the other defendants were lifelong friends who grew up during the 1980s

in the Greenleaf Gardens neighborhood in southwest Washington. As they entered their teenage

years they began selling drugs. By the early 1990s, the Government claimed, most of them were

selling substantial quantities of marijuana, along with less significant quantities of other drugs.

Most of the sales were made on the 200 block of K Street, SW, and on the corner of Delaware

---

[1]Only such evidence as is necessary for an understanding of the issues raised in this
Motion is recited herein.

2

App 969

Avenue and K Street, SW.   The Government charged that Martin and the other defendants ran

these locations as cooperative markets in which they rotated serving marijuana to customers

driving into the area from the D.C. Metro area.   The prosecution depicted Vincent Hill as the

leader of this "crew," and Martin as one of its members.

Government law enforcement witnesses testified to sales of marijuana by Martin in 1995

and early 1996 in the 200 block of K Street, SW, some of which were preserved on audio or

videotapes.   According to cooperating witnesses, Martin sold marijuana on K Street regularly

during 1993 and 1994, and 1996 through 1998.

The Government also asserted that Martin and the other defendants engaged in ventures

other than drug dealing, both for purposes of self-enrichment and protection.   For example,

through the testimony of informants and cooperating insiders, evidence was presented that

Appellants sometimes committed kidnappings to fund weapons, drugs or living expenses.

Witnesses testified that Martin and others were responsible for a number of acts of violence,

some planned and others spontaneous.   Martin, the other defendants, and their allies, in

particular a group from 37th St., SE, which Martin was said to have organized, engaged in

frequent confrontations ("beefs") with competing factions.   Several witnesses attested to fights,

drive-by shootings, and occasional homicides between the K St. And 37th St. members, on the

one hand, and groups operating out of Condon Terrace and L St., SW (these being gangs of drug

dealers that frequently warred with Martin and the others over control of territory).   Other

witnesses recounted instances where persons who had disrespected members of the K St. Group,

such as the so-called 58th St. crew, were attacked.

Martin and the others were alleged to have resorted to force and violence where believed

3

App 970

necessary to prevent rival drug dealers from operating in their territory. Sometimes this extended to acts intended to punish suppliers believed to have knowingly supplied inferior drugs or to have shortchanged some of them in transactions.

The Government claimed that Martin's marijuana selling in the 200 block of K Street, SW was related to several acts of violence occurring on 37th Street, S.E. and 58th Street, N.E., one of which was the killing of Anthony Fortune. Every Government witness who testified about the Fortune killing attributed it to a personal dispute between Martin and Fortune, and most attributed the dispute to Fortune trying to rob or actually robbing Martin at a craps game. Charlene Wilson, the only eyewitness to testify, said that Carson did the shooting, and that Martin drove Carson from the scene. Some cooperating witnesses testified that Carson admitted shooting Fortune, while others claimed that Martin did so. They, too, variously ascribed a singular motive for the shooting: a dispute arising from a crap game.

According to the Government's evidence, the Fortune shooting triggered a dispute between Martin and the 58th Street group. In that dispute, the 58th Street group killed Curtis Buchmon in retaliation for Fortune's killing. Martin and Buchmon were very close, and after his killing, Martin, Carson and Montgomery allegedly went gunning for the 58th Street group. There was a shootout between them and the 58th Street group, during which the police arrived. Martin and his associates exchanged gunfire with the police. Edwards, Burton and Jones came into the 37th Street area in a car with tinted windows, and Martin assumed they were with the 58th Street group. Concerned about a drive-by shooting, he gave Antonio Knight a gun, and Knight shot into the car, killing Edwards and wounding Burton and Jones.

Testimony was presented that accused Martin and the others of involvement in murders

4

or shootings which supposedly were undertaken to track down or silence persons believed

(correctly or otherwise) to be potential Government witnesses in prosecutions or grand jury

investigations against members of the organization. One of the persons Martin was accused of

shooting was James Coulter.  According to the Government, in 1995, Vincent Hill complained

to Martin and others that Coulter was "hot," and needed to be killed.  On May 30, 1995, Coulter

was shot.  A cooperating witness was on the corner of Delaware and K Street when he heard Hill

and Martin talking about Coulter's shooting.  Hill told Martin that Martin should have used two

guns, and asked why the gun jammed.  Some time later, another cooperating witness overheard

Martin talking with Coates and Carson about Coulter's shooting.  Martin said that they were

trying to say he had something to do with Coulter getting shot but they could not prove it because

he had a mask on.  Martin complained to another informant that he had tried to shoot Coulter at

a crap game but his gun jammed.

After Martin was arrested for Coulter's shooting, he reportedly asked an informant to talk

to Coulter and have Coulter give his investigator a statement about the shooting.  The informant

talked to Coulter twice at Martin's request; Coulter refused to give a statement, but said he was

not going to come to court.  Martin also asked the informant to contact a witness to the shooting,

which the informant did.  When neither man would give a statement, at Martin's request the

informant showed Martin's uncle where Coulter and the eyewitness lived.  Martin also asked an

acquaintance who was in jail at the same time as Martin to contact the eyewitness and ask him to

say that he did not know who shot Coulter, but that it was someone with a sweatshirt and a pistol

at a crap game.  Martin said that the eyewitness owed him a favor because his head was in the

way when Martin shot Coulter, and if it was not for the witness, Coulter would be dead .  Coulter

5

App 972

gave a statement to a former attorney representing Martin that he did not see who shot him.

## C. **Constitutional Violations**

### 1.  Withholding of Exculpatory Evidence

The centerpiece of the Government's case against Martin was not drug trafficking, but violence - the shooting of Fortune and the 58th Street beef, and the shooting of Coulter as a potential witness.  Martin recently located a witness about whom he was unaware at the time of the trial of this case who was an eyewitness to the shooting of Anthony Fortune and who can testify under oath that the Government's twin theories that Martin shot Coulter himself, or that he had Carson do so, are wrong.  The witness, Steven Thomas, knows that Martin did not shoot Fortune.  He also describes Fortune's shooter as very dark complected, taller than Martin (whom he knows) and heavy set, which would eliminate Carson, who is light-complected, tall and thin, as the shooter.  Equally importantly, Steven Thomas was interviewed by police on the very evening of the Fortune shooting, and he told them the description of the man he had seen doing the shooting.  The police knew on the eve of the shooting that an eyewitness described the shooter as someone other than Martin or Carson.  The defense was never provided Steven Thomas' name, address or the exculpatory information he gave police.  The Affidavit of George Steel, the private investigator who interviewed Steven Thomas, is attached hereto as Exhibit A.

### 2.  Impeding the Presentation of Martin's Defense

At the trial of this case, counsel for Jerome Martin sought to compel Coulter's attendance at the trial.  Based upon the sworn statement Coulter gave a former attorney for Martin, Martin did not shoot Coulter.  Counsel had a good-faith basis for believing that Coulter would exonerate Martin if he could be subpoenaed to testify at the trial.  The  Government represented

6

App 973

that it did not know Coulter's whereabouts, or even if he was alive, at the time of the trial. The

trial ended with verdicts in July and August, 2001. Just a few months later, sometime before

February, 2002, the Government indicted Coulter in a major narcotics conspiracy in this court.

Coulter was arrested on February 13, 2002. *United States v. James Christopher Coulter,*

02-mj-00104-AK (2/14/02). On February 14, 2002, the case before the magistrate judge was

terminated because it merged into criminal case No. 02-074. Proceedings in the criminal case

against Coulter are not available on PACER, and are presumably under seal. Martin intends to

file a Motion with this court to unseal the proceedings, because the complaint and indictment in

the case will likely reveal that the government was investigating Coulter for the months prior to

his arrest in February 13, 2002 and that when the government represented to the trial court that

Coulter had disappeared and could be dead, they knew his whereabouts, knew that he was alive

and well, and subject to subpoena or writ of habeas corpus ad testificandum. The docket report

from 02-mj-00104-AK is attached hereto as Exhibit B.

## ARGUMENT

### INTRODUCTION

A motion filed under 28 U.S.C. section 2255 must allege that (1) the judgment was

imposed in violation of the Constitution, or (2) the judgment was imposed by a court lacking

jurisdiction, or (3) the sentence imposed exceeded the statutory maximum, or (4) the judgment

was otherwise subject to collateral attack. The suppression of evidence favorable to the accused

is a ground for relief under the statute; likewise, prosecutorial misconduct is a ground if it

violates the accused's right to Due Process of law. *Rafael Moreno-Morales v. United States,*

334 F.3d 140, 148 (1st Cir. 2003).

7

App 974

## I.   THE GOVERNMENT VIOLATED MARTIN'S RIGHT TO DUE PROCESS OF LAW BY WITHHOLDING EVIDENCE OF HIS INNOCENCE OF THE ANTHONY FORTUNE MURDER.

Suppression of evidence favorable to an accused and material to guilt or innocence is a violation of Martin's right to due process of law, guaranteed by the Fifth Amendment to the United States Constitution. *Brady v. Maryland*, 373 U.S. 83 (1963). If the evidence suppressed is material, that is, its suppression undermines confidence in the outcome of the trial, a new trial is warranted. *United States v. Bagley*, 473 U.S. 667 (1985). The question is not whether a different verdict would more likely than not have resulted if the suppressed evidence had been available to the defense, but whether in the absence of the evidence, Martin received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 4343 (1995). Materiality of evidence is assessed cumulatively, not item by item. *Id.* at 436.

There are three components of a *Brady* violation: (1) the withheld evidence is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the government willfully or inadvertently; and (3) prejudice resulted. *Strickler v. Greene*, 527 U.S. 263 (1999). The government's duty to disclose evidence extends beyond material in the possession of the prosecution. The prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including police. *Kyles v. Whitley*, 514 U.S. at 437.

The petitioner need not show that after discounting inculpatory evidence in light of the undisclosed evidence, there would not be enough evidence to convict. The possibility of acquittal on a criminal charge does not imply an insufficient evidentiary basis for a conviction. The law makes it easier to obtain a new trial where the government engineered an unfair trial by

8

App 975

withholding material exculpatory to the accused.   *Conley v. United States*, 415 F.3d 183, 188 (1st

Cir. 2005), citing *Kyles v. Whitley*, 415 U.S. at 434-35.

The "reasonable probability" standard can be problematic, as noted by our circuit in

*United States v. Bowie*, 198 F.3d 905, 908-09 (D.C. Cir. 1999):

> "What is a 'reasonable probability'?   Probability is often expressed in terms of
> percentages, with 100% representing certainty.   We know, because the Supreme
> Court has told us, that a 'reasonable probability' can be less than 50.01%.
> In other words, to reverse a conviction for a *Brady* violation, it does not have
> to be more likely than not that the defendant would have been acquitted had the
> evidence been disclosed.   *See Kyles*, 514 U.S. at 434.   We are also sure that
> a 'reasonable probability' is somewhat greater than 1%.   How much greater?
> Enough, the Supreme Court says, to 'undermine confidence in the verdict,'
> *id. at 435*, which may lead us in a circle: one cannot be confident of the
> outcome when there is a 'reasonable' probability that it may be wrong, and
> a 'reasonable' probability is one high enough to undermine confidence
> in the outcome."

Another circuit explained it thusly:   The   "sufficient to undermine confidence in the

outcome" formula means that reversal will be warranted even if there is less than an even chance

that the withheld evidence would produce an acquittal.   The petitioner is not required to show

that a different outcome is certain with the presentation of the evidence.   The value of the

withheld evidence is evaluated in context of the entire record to determine materiality.   *Conley*

*v. United States*, 415 F.3d at188.   Put another way, the petitioner need only show that the

favorable evidence could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict.   *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir.

2007) *(en banc)*, citing *Kyles v. Whitley*, 514 U.S. at 435.

Once the court finds a *Brady* violation, meaning that non-disclosure of the evidence is so

serious that there is a reasonable probability that the suppressed evidence would have produced a

9

App 976

different result, the court must grant a new trial.  *Strickler v. Greene*, 527 U.S. 263, 281 (1999);

*In re Sealed Case*, 285 F.3d 887, 892 (D.C. Cir.1999).

  In the instant case, the only direct evidence linking Martin to the murder of Anthony

Fortune came from a witness named Charlene Wilson.  Ms. Wilson claimed to be an eyewitness

to the shooting, that Sam Carson shot Fortune and that Martin drove Carson from the scene of the

murder.  Very late in the trial, well after Wilson testified, the defense stumbled on withheld

*Brady* material, in the form of the notes of a police officer who had interviewed Wilson right

after the shooting.  To that officer, Wilson said she heard about the murder later but was not

actually present at the scene.  The police officer attempted to explain Wilson's contradictory

statements by saying that he created a false report to shield Wilson's identity.  In addition to

Wilson's contradictory versions of events, the government called several informants who

claimed that Martin confessed to shooting Fortune, that Carson confessed to shooting Fortune,

and that one goaded the other to do the deed.

  In Steven Thomas' statement, we have an unrelated eyewitness who exonerates Martin as

the shooter and who identifies the perpetrator in a way that eliminates Carson as the shooter.

The evidence is clearly material, applying the case law developed by the Supreme Court and by

our circuit.  According to Thomas, his evidence was made known to the police on the night of

the Fortune murder.  The evidence was therefore in the government's possession as early as the

night of the shooting.  The evidence was never made available to the defense.  Because the

evidence was withheld, Martin was precluded from calling a witness who would have testified

that he and Carson were innocent of the shooting.  The evidence creates a reasonable

probability, a probability sufficient to undermine confidence in the verdict, that a different result

10

App 977

would have obtained at trial had the evidence been available.  The government used the Anthony

Fortune shooting as evidence of Martin's participation in the marijuana conspiracy and the RICO

conspiracy.  Had evidence of Martin's innocence of the Fortune shooting been available to the

jury, the result of the entire proceedings, not just the count involving Fortune, would have been

different.  Martin is entitled to a new trial.

## II.    THE GOVERNMENT IMPEDED THE PRESENTATION OF MARTIN'S DEFENSE ON THE CHARGE OF SHOOTING JAMES COULTER.

The government violated Martin's right to Due Process of law when it impeded his

counsel from procuring the testimony of James Coulter at the trial of this case.  Defense counsel

could not locate Coulter to subpoena him to trial, and petitioned the trial court for assistance in

securing his presence.  The government claimed to have no knowledge of Coulter's

whereabouts.  The government even suggested to the trial court that Coulter was deceased.  On

information and belief, around the time the government was making these representations to the

court and counsel, Coulter was the subject of a prosecution by the United States Attorney's

Office, and a federal Grand Jury investigation into narcotics trafficking.  He was indicted for

narcotics trafficking and arrested on February 13, 2002,  six months after verdicts in the case.

*See, United States v. James C. Coulter*, 02-mj-00104-AK, consolidated with Criminal Number

02-074.  According to the docket sheet in 02-mj-00104-AK, the government sought detention

after Coulter's arrest on February 13, to "permit revocation of conditional release, deportation or

exclusion."    Since there is no evidence that Coulter is an alien, in his case the revocation would

have been based on the fact that he was on conditional release.  The government would

necessarily have known of the case in which he was on conditional release, since the government

11

i

App 978

would be the prosecuting authority in that case.[2]

Because the representations of the government at the trial of the instant case that it lacked knowledge of Coulter's whereabouts, and that he could be deceased, were false, and because the government's conduct prevented petitioner from securing Coulter's testimony at trial, the govern-ment violated petitioner's Due Process rights.    Prosecutorial misconduct is a ground for relief under 28 U.S.C. section 2255 if it violates the accused's right to Due Process of law. *Rafael Moreno-Morales v. United States,* 334 F.3d 140, 148 (1st Cir. 2003).

Coulter gave petitioner's counsel a signed, witnessed statement that Martin did not shoot him.    Based upon that statement, Martin would have called Coulter to testify in his defense if he could have located him and placed him under subpoena, or if he was incarcerated, petitioned the court for a writ of habeas corpus ad testificandum.    The government's conduct prevented Martin from presenting exculpatory evidence.    If that evidence had been available, it is unlikely the jury would have convicted Martin of the four counts in the indictment related to Coulter.    As with the Anthony Fortune shooting, the government used the Coulter shooting as evidence of Martin's participation in the marijuana conspiracy and the RICO conspiracy.    Had evidence of Martin's innocence of the Coulter shooting been available to the jury, the result of the entire proceedings would have been different.    Martin is entitled to a new trial as a result of the government's conduct which deprived him of Due Process of law.

## CONCLUSION

For all the above reasons, and any others that may appear to the court at a hearing on this

---

[2]A check of PACER reveals that the criminal case with which the magistrate case was consolidated is not available for public inspection.    Petitioner will seek discovery, including an Order from this court unsealing the court records to permit the full development of this claim.

12

Motion, petitioner respectfully requests, pursuant to 28 U.S.C. section 2255, that the court

vacate, set aside or correct his sentence and grant him a new trial.


                              Respectfully submitted,


                              _Jerome Martin_, *Pro Se*
                              Federal Register Number 18894-083
                              USP Hazelton
                              PO Box 2000
                              Bruceton Mills, WV   26525


                    **CERTIFICATE OF SERVICE**

         I, Jerome Martin, appearing *pro se* in the instant case, DO HEREBY CERTIFY

that I have this day served a copy of the foregoing Motion to Vacate, Set Aside or Correct

Sentence Pursuant to 28 U.S.C. section 2255, by depositing a copy in the United States Mail,

postage prepaid, addressed to Jeffrey Taylor, United States Attorney, 555 4th Street, NW,

Washington, DC 20530, this the — day of February, 2008.


                              _Jerome Martin_, *Pro Se*


                                    13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | )     **Crim. No. 98-329 (TPJ)** |
| **v.** | ) |
| | ) |
| **JEROME MARTIN,**      ) | |
| | ) |
| **Defendant** | ) |

### A F F I D A V I T

I, George Steel, do hereby aver and say, upon penalty of perjury, that:

1. My name is George Steel. I reside in Frederick, Maryland. I am a private investigator and I work in the District of Columbia on cases where I am retained by the parties and on cases where I am appointed by the courts.

2. I am a former detective with the Metropolitan Police Department of the District of Columbia.

3. I was retained to conduct a post-conviction investigation in the case of *United States v. Jerome Martin.*

4. In the course of my investigation, I interviewed Steven Thomas, who resides in Maryland.

5. Mr. Thomas advised me of the following:

a. He knows Jerome Martin and knew Anthony Fortune.

b. In August 1991, he was present on 58th Street in Washington, D.C. when Anthony Fortune was shot and killed.

c. He saw the person who shot Anthony Fortune. He knows Jerome Martin and knows that Jerome Martin was not the person who shot Fortune.

d. The person who shot Fortune was very dark-complected, stocky and taller than Jerome Martin.

e. On the evening of the Fortune shooting, police officers interviewed him as an

eyewitness to the shooting.  He described the shooter to the officers and gave them the same information about the shooter that he gave to me.  He was never called by the government to testify about Fortune's killing.

I swear upon penalty of perjury that the foregoing information is true and accurate to the best of my knowledge.

This the 18 day of February, 2008.

George Steel

CLOSED

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:02-mj-00104-AK-1

Case title: USA v. COULTER                    Date Filed: 02/14/2002

Assigned to: Magistrate Judge Alan Kay

__Defendant (1)__
**JAMES CHRISTOPHER COULTER**
*TERMINATED: 02/14/2002*

| Pending Counts | Disposition |
|---|---|
| None | |

__Highest Offense Level (Opening)__
None

| Terminated Counts | Disposition |
|---|---|
| None | |

__Highest Offense Level (Terminated)__
None

| Complaints | Disposition |
|---|---|
| Complaint filed in violation of 21:841(a)(1) | |

**Plaintiff**
**UNITED STATES OF AMERICA**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/13/2002 | | DEFENDANT JAMES CHRISTOPHER COULTER arrested. (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 1 | MAGISTRATE COMPLAINT and Affidavit filed against JAMES CHRISTOPHER COULTER in violation of 21:841(a)(1). (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | PDID AND DATE OF BIRTH for JAMES CHRISTOPHER COULTER : PDID #: 386-197 DOB: 1/10/69 (jdc) (Entered: 02/15/2002) |

| 02/14/2002 | | Prison Registration Number for JAMES CHRISTOPHER COULTER : Reg.#: 24717-016. (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | INITIAL APPEARANCE on magis complaint for JAMES CHRISTOPHER COULTER held before Magistrate Judge Alan Kay : Attorney appearance for JAMES CHRISTOPHER COULTER by Tony Axam. Detention hearing set for 9:30 2/15/02 for JAMES CHRISTOPHER COULTER ., Defendant committed/commitment issued. Pro-typist, Inc.; Tape & Lines: Courtroom 7) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | DEFENDANT(S) JAMES CHRISTOPHER COULTER ordered held without bond by Magistrate Judge Alan Kay . (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 2 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : of temporary detention pending hearing pursuant to Bail Reform Act (N) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 3 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : of temporary detention to permit revocation of conditional release, deportation or exclusion (N) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | Magistrate case closed as to JAMES CHRISTOPHER COULTER. Merged into criminal case no. 02-074. (erd) (Entered: 02/19/2002) |
| 02/15/2002 | | DETENTION HEARING before Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : Bond set to HWOB. Criminal indictment has been filed against the defendant and assigned to Judge Robertson. Defendant committed/commitment issued. Court Reporter: Courtroom 7 (jdc) (Entered: 02/15/2002) |
| 02/15/2002 | 4 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : committing defendant to the custody of the U.S. Attorney General. (N) (jdc) (Entered: 02/15/2002) |

**PACER Service Center**

**Transaction Receipt**

02/18/2008 12:31:32

| PACER Login: | jh0114 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:02-mj-00104-AK |
| Billable Pages: | 1 | Cost: | 0.08 |

Case 1:98-cr-00329-RCL Document 1023 Filed 02/28/08 Page 1 of 6

Copies to: Judge
AUSA – Special Proceedings
Dft.

AO 243
REV 6/82

MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District **District of Columbia** |
|---|---|

| Name of Movant **SAMUEL CARSON** | Prisoner No. **01182-748** | Docket No. **98-329** TPJ |
|---|---|---|

Place of Confinement
**USP LEWISBURG**

(include name upon which convicted)

UNITED STATES OF AMERICA    V.    **SAMUEL CARSON**

(full name of movant)

**FILED**

FEB 2 8 2008

**Clerk, U.S. District and Bankruptcy Courts**

## MOTION

1. Name and location of court which entered the judgment of conviction under attack **District of Columbia Circuit, Washington D.C.**

2. Date of judgment of conviction **January 30, 2002**

3. Length of sentence **Life and 220 Years**

4. Nature of offense involved (all counts) **Drug conspiracy in violation of 21 U.S.C. §846 Rico Conspiracy in violation 18 U.S.C.§1962(d); and VICAR in violation 18 U.S.C. § 1959**

5. What was your plea? (Check one)
   (a) Not guilty ☒X
   (b) Guilty ☐
   (c) Nolo contendere ☐

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details.

   **N/A**

6. Kind of trial: (Check one)
   (a) Jury ☒X
   (b) Judge only ☐

7. Did you testify at the trial?
   Yes ☐ No ☒X

8. Did you appeal from the judgment of conviction?
   Yes ☒ No ☐

Case 1:98-cr-00329-RCL   Document 1023   Filed 02/28/08   Page 2 of 6

AO 243
REV 6/82

9. If you did appeal, answer the following.

    (a) Name of court _____ D.C. Court of Apppeals _____

    (b) Result _____ Affirmed _____

    (c) Date of result _____ July 21, 2006 _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?
Yes ☐ No ☒

11. If your answer to 10 was "yes," give the following information:

    (a)(1) Name of court _____ N/A _____

    (2) Nature of proceeding _____

    _____

    (3) Grounds raised _____ N/A _____

    _____

    _____

    _____

    _____ N/A _____

    (4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

    (5) Result _____ N/A _____

    (6) Date of result _____

    (b) As to any second petition, application or motion give the same information: _____ N/A _____

    (1) Name of court _____

    (2) Nature of proceeding _____

    _____

    (3) Grounds raised _____ N/A _____

    _____

    _____

    _____

    _____

(3)

AO 243
REV 6/82

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result _____ N/A _____

(6) Date of result _____

(c) As to any third petition, application or motion, give the same information:

(1) Name of court _____

(2) Nature of proceeding _____ N/A _____

(3) Grounds raised _____

_____ N/A _____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result _____ N/A _____

(6) Date of Result _____

(d) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?

(1) First petition, etc.     Yes ☐ No ☐
(2) Second petition, etc.    Yes ☐ No ☐    N/A
(3) Third petition, etc.     Yes ☐ No ☐

(e) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____ N/A _____

_____

12. State concisely every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

CAUTION: If you fail to set forth all grounds in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(4)

AO 243
REV 6/82

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e) Conviction obtained by a violation of the privilege against self-incrimination.
(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g) Conviction obtained by a violation of the protection against double jeopardy
(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.
(i) Denial of effective assistance of counsel.
(j) Denial of right of appeal.

A. Ground one:  The Petitioner Was Deprived His Sixth Amendment
Right To Effective Assistance of Counsel

Supporting FACTS (tell your story *briefly* without citing cases or law:
A) Failure to Investigate; B) Failure to Object to Inadmissable
Evidence

See Attached Memorandum of Law and Facts


B. Ground two:  Sentence Imposed in Violation of The United States
Constitution

Supporting FACTS (tell your story *briefly* without citing cases or law):
See Attached Memorandum of Law and Facts


C. Ground three:  Newly Discovered Evidence Establishes That The
Petitioner Was Denied His Fifth Amendment Right  To Due Process

Supporting FACTS (tell your story *briefly* without citing cases or law):

See Attached Memorandum of Law and Facts

(5)

AO 243
REV 6/82

D  Ground four _____

N/A

Supporting FACTS (tell your story *briefly* without citing cases or law): _____

N/A

13. If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them: _____

Ineffective assistance of counsel claims are to be raised on appeal; appellate counsel ineffective for not raising sentencing issues; New evidence established due process violations.

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?
Yes ☐ No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:    Joseph Beshouri and Lexi Negin Christ  419 7th Street N.W.

(a) At preliminary hearing _____ Washington, D.C. 20004

(b) At arraignment and plea _____ Same

(c) At trial _____ Same

(d) At sentencing _____ Same

(6)

AO 243
REV 6/82

(e) On appeal ___Paul Rosenzweig 214 Massachusetts Avenue., N.E. Washington D.C. 20002; /___

___Edward Sussman 601 Pennsylvania Ave., N.W. South Building, Washington D.C. 20004 (Certiorari)___

(f) In any post-conviction proceeding _____
N/A

(g) On appeal from any adverse ruling in a post-conviction proceeding _____
N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?
Yes XX No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No XX

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

_____
N/A

(b) Give date and length of the above sentence: _____

_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No XX

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____N/A_____

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on
___February 18, 2008___
(date)

_Samuel Carson_
Signature of Movant

*Reassigned to*
*Chief Judge Hogan*
*on 2/25/08.*
*m x8*

Copies to: Judge
AUSA – Special Proceedings
Dft.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :

      *v.*                                            :

                        :        *Cr. No. 98-329 ~~(TPJ)~~ ( TFH )*

**SEAN COATES**                                :

           *Defendant.*                 :

                        :

## FILED

FEB 19 2008

Clerk, U.S. District and
Bankruptcy Courts

## MOTION PURSUANT TO 28 U.S.C. § 2255 TO
## VACATE, SET ASIDE OR CORRECT SENTENCE

### INTRODUCTION

Defendant, Sean Coates, by and through his Counsel, Veronice A. Holt,

Esq., hereby moves, pursuant to 28 U.S.C. § 2255, to vacate, set aside or correct

his judgment and his sentence on the grounds that: 1) Trial Counsel, Frederick

Jones,[1] was totally ineffective throughout the entire proceeding; 2) the

---

    [1]    Counsel has not spoken to Mr. Jones concerning this matter.
Counsel has learned that in late 2007, Mr. Jones withdrew his appearance in
representing Glendale Earl Lee in *United States v. Suggs et al* 07-cr-00152-ESH
because of illness and moved to Arizona.   There are several references to Mr.
Jones having health problems during the trial and this may account for his poor
performance.  At one point, Mr. Jones needs to recess the trial to pass a kidney
stone.  At another point he mention the need to go to the hospital weekly to give
a blood sample.  Finally during closing Mr. Jones notes that he has had a cold for
six months.

    Mr. Jones:  your honor, this is the time each week that I have to go down
to G. W.  I have never been late before. I just want to alert the court that

Government intentionally failed to disclose *Brady* information and otherwise engaged in misconduct; and 3) Appellate Counsel failed to appeal the admission of an identification of Coates fingerprint by hearsay testimony; and 4) both Trial and Appellate Counsel failed to inform the Court that Coates three convictions for Use of a Firearm During and in Relation to a Crime of Violence or Drug Trafficking on or about November 17, 1996 merged. Trial Counsel, Frederick Jones, was clearly unprepared for trial. Most importantly,  Mr. Jones failed to exercise Mr. Coates Sixth Amendment right to confront the evidence and the witnesses against him.  For the most part, he did not cross examine witnesses at all. On the occasions, that he did, he simply winged it for a few minutes and then sat down without challenging the witnesses substantive testimony.  Mr. Jones made promises in open statement that he did not keep, failed to make a hearsay objection  to  fingerprint  evidence  that  was  admitted  without  a  copy  of  the

---

I have to go down and give some blood.  So I will be right back as soon as I can.

"Excuse me.  I'll tell you one thing.  This old man has had a cold ever since we started this thing.  I have been carrying it throughout.  As a matter of fact, colds have been going around these two tables here, but, nonetheless, fresh air is soon to be found." (Tr.070301 am p.33)

2

fingerprint or expert opinion regarding the print, consistently allowed hearsay evidence to be put before the jury without objection, and failed to make arguments on the law and facts that any competent lawyer would have recognized the need to make. He filed only one original pretrial pleading.[2] That pleading was a supplement to a pleading filed by a co-defendant and it failed to make a critical legal argument. In six months of testimony, Mr. Jones did not introduce a single exhibit and only on one occasion completed an impeachment by presenting a document. Mr. Jones did not make any discovery requests and appeared confused about the scope of the charges against his client. The first substantive witness to give testimony against Mr. Coates was Yusef Simmons. Simmons testified about a kidnapping for which Coates had been adjudicated as a juvenile. Although Jones had mentioned this incident in opening statement, he appeared to be surprised when Simmons was called as a witness until he was informed that this was an overt act charged in the indictment. Jones then proceeded to cross examine Simmons as if Simmons were making this up.

Mr. Jones failed to preserve his client's files and records. The documents

---

[2]     Jones did file joinders to motions filed by other counsel.

that Jones turned over to Appellate Counsel did not include any discovery.[3]

Mr. Coates further asserts that the Government withheld critical *Brady* information.   The Government at all times knew that a critical government witness, James Montgomery, had accused co-defendant William Kyle Sweeney of a murder that another person, Steven Dewitt, had been convicted by a jury of and had been incarcerated on for 10 years.  Because this evidence would have sharply challenged Montgomery's testimony, the Government chose to withhold it until after the convictions in this case.

Coates, further asserts that the Government engaged in willful misconduct. The Government knew it had admissibility problems with the fingerprint attributed to the kidnapping of Anthony Pryor.  It therefore improperly elicited the fingerprint evidence through rank hearsay and did not put on any foundational evidence or a fingerprint expert to testify to whether the fingerprint matched.

---

[3]Counsel has obtained a copy of the numbered discovery produced by overt act from another attorney involved in this matter.   Counsel has also obtained FBI Agent Lisi's Grand Jury testimony, but does not have *Jencks* or *Giglio* for any other witness. Counsel has not been able to obtain a copy of a relevant videotape, Government's Exhibit V-35.   Subsequent to filing this case, Counsel will requests an opportunity to obtain the missing records through discovery and to examine the FBI 302's that were sealed during the trial and to obtain certain records, for example medical records that should have been a part of the discovery in this case or obtained through defense subpoena.

4

Coates also asserts that the Government knowingly elicited false testimony regarding his involvement in the June 20th shooting of Michael Jones. Counsel has reviewed the discovery provided with respect to this incident and the Government simply did not have a good faith basis for the testimony it elicited placing Mr. Coates as being involved in this incident. More importantly, the government did not have a good faith basis for suggesting that Michael Jones was a victim of the June 20, 1992 shooting. Jones was neither shot nor shot at. He was a witness to the shooting of Jermaine Hall. Although the jury found this Racketeering Act (No.25) unproved, it added ballast to the assertion that Mr. Coates was involved in the conspiracy to kill Michael Jones and shooting Michael Jones on June 28, 1992.

Both Trial Counsel and Appellate Counsel were ineffective in their failure to assert that Mr. Coates three convictions for Use of Firearm During and in Relation to a Crime of Violence or Drug Trafficking on or About November 17, 1996 (The Triple) Counts 35, 36, and 37 merged. Mr. Coates received a total sentence of 60 years for these counts. He should have received 20. The total sentence that Mr. Coates received for Use of a Firearm During and in Relation to a Crime of Violence or Drug Trafficking was 85 years. These 85 years were cited

5

App 995

by the Court of Appeals in denying Mr. Coates *Coles* remand[4].

## *I.  PROCEDURAL HISTORY*

Sean Coates was arrested on October 2, 1998 and charged in a multiple

count indictment, commonly referred to as the "K Street Case".  On August 16,

---

4

" Finally, we turn to the appellants' challenges to their sentences under *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Coles,* 403 F.3d 764 (D.C. Cir. 2005). Appellants argue that the district court erred under Booker when it imposed their sentences and that our decision in Coles requires us to remand their case to the district court because, they assert, the record is insufficient to determine if the district court's errors were prejudicial. We conclude that a remand is not required and affirm each appellant's sentence.***[38] In setting these sentences, the district court treated the Guidelines as mandatory. It made no statements regarding what it might have done were the Guidelines only advisory, nor did it provide alternative sentences. None of the appellants objected. At issue before us is whether the district court's sentencing of the appellants is consistent with *United States v. Booker*, 543 U.S. 220 (2005), and this Court's subsequent application of Booker.***[38] No remand is needed for Carson, Coates, and Sweeney because the  Violent Crime in Aid of Racketeering statute (VICAR), 18 U.S.C. § 1959(a)(1), and not the Guidelines, mandates that each of them receives a  life sentence for their convictions.

[38] ...Coates received concurrent life sentences for each federal offense of narcotics conspiracy, RICO conspiracy, and three counts of murder in aid of racketeering. [He] also received a 20-year concurrent sentence for the federal offense of attempted murder in aid of racketeering, as well as a statutorily-mandated 5-year consecutive sentence for the federal offense of use of a firearm during and in relation to attempted murder, and 20 years each on four additional counts of use of a firearm during and in relation to murder.

6

2001, the jury returned the following verdicts against Sean Coates.

Count 2:    RICO

                Racketeering Acts

                Racketeering Act 1:     Marijuana Conspiracy 1988 through 1999

                Racketeering Act 27:    Conspiracy to murder Michael Jones from June 20-June 28, 1992

                Racketeering Act 28:    Assault with Intent to Murder while Armed - Michael Jones on June 28, 1992

                Racketeering Act 33:    Kidnapping while armed of Norman Yusuf Simmons April 28, 1990

                Racketeering Act 35:    AWIMW/A Ronald Sowells, October 30, 1996

                Racketeering Act 39:    Kidnapping W/A Anthony Pryor October 22, 1993

                Racketeering Act 49:    Attempted Robbery W/A Alonzo Gaskins, Darnell Mack, and Melody Anderson, November 17, 1996

                                          First-degree Felony Murder W/A of Alonzo Gaskins, November 17, 1996

                                          First-Degree Felony Murder of Darnell Mack

                                          First-degree Felony Murder W/A of Melody Anderson

7

COUNT 11:       Attempted Murder in aid of Racketeering Activity of Anthony
                Pryor, October 30, 1996

COUNT 23:       AWIKW/A Ronald Sowells on or about October 30, 1996

COUNT 24:       Attempted Murder in Aid of Racketeering Activity of Ronald
                Sowells, October 30, 1996

COUNT 25:       Murder in Aid of Racketeering Activity of Alonzo Gaskins,
                November 17, 1996

COUNT 26:       Murder in Aid of Racketeering Activity of Darnell Mack,
                November 17, 1996

COUNT 27:       Murder in Aid of Racketeering Activity of Melody Anderson,
                November 17, 1996

COUNT 28:       Use of firearm During and in Relation to a Crime of Violence
                or Drug Trafficking on or About October 22, 1993 (Anthony
                Pryor)

COUNT 34:       Use of firearm During and in Relation to a Crime of Violence
                or Drug Trafficking on or About October 30, 1996 (Ronald
                Sowells)

COUNT 35:       Use of firearm During and in Relation to a Crime of Violence
                or Drug Trafficking on or About November 17, 1996 (The
                Triple)

COUNT 36:       Use of firearm During and in Relation to a Crime of Violence
                or Drug Trafficking on or About November 17, 1996 (The
                Triple)

COUNT 37:       Use of firearm During and in Relation to a Crime of Violence
                or Drug Trafficking on or About November 17, 1996 (The
                Triple)

8

COUNT 45:       Possession of a Firearm during a Crime of Violence on
                Dangerous Offense on or about October 30, 1996[5]

The Court of Appeals for the District of Columbia denied Coates' appeal

on July 21, 2006. ***United States v. Carson*** 455 F.3d 336, (D.C. Cir. 2006)

The Supreme Court denied his petition for certiorari on February 20, 2007,

Order List 02/20/2007.

## II.   THE EVIDENCE RELATED TO SEAN COATES AND TRIAL COUNSEL'S FAILURE TO CONFRONT THE EVIDENCE

## 1.   DRUG CONSPIRACY

Mr. Jones' first blunder came in the cross examination of the first witness,

Agent Lisi. Agent Lisi had pointed out various co-defendants making sales on

videotapes. He did not show a picture of Jones. On cross Jones pointed out that

Coates was not doing anything illegal in any of the videos Lisi had shown the

jury. (Tr.012301 am  p.14)    In redirect, the government was permitted to

introduce evidence of a video of a person who Lisi identified as Coates going to

a stash (Tr.012301 p.33-35) Mr. Jones did not cross examine Agent Lisi on the

video. Therefore, the jury would accept the fact that the video was exactly what

---

[5]       The following Rico Acts were found not proven: 1) Act 1 Cocaine
and PCP; 2) Act 26 AWIMW/A Jermaine Hall and Michael Jones; 3) Act 29 First-
degree Murder Glenn Jenkins; and 4) Act 31 AWIMW/A In Kentucky Courts
neighborhood.

9

Lisi said it was – a photo of Sean Coates engaged in criminal activity.

Mr. Jones and Sean Coates[6] had previously viewed the videotapes and Coates had informed Jones that the person on the tape was not him. Coates believed that the individual on the tape was Sam Marbury.[7] The face of the person on the tape was not shown. The person on the tape was going over the fence. He was not holding drugs. Jones did not request an opportunity to recross on this new evidence. He did not challenge the identity of the person on the tape. This videotape was the only "hard" evidence that Coates was a part of the drug conspiracy. No drugs were ever seized from him. He did not make any sales to undercover agents. Jones, having "opened the door" for Lisi's identification of Coates failed to challenge the identification and thus conceded his client's presence on the videotape and his strongest argument that he was not a part of the drug dealing conspiracy. [8]

---

[6]    Mr. Coates sworn statement will follow.

[7]    Sam Marbury is an actual identifiable party and is twice mentioned in the transcript Tr.031901 am p.28; Tr.312101 am p.65; Tr. 050701 am p.25; Tr050801 am p.16; Tr.070201 am.

[8]    Donald Nichols also identified the person on the videotape introduced during Agent Lisi's redirect as being Mr. Coates making a sale in a video. (Tr.01/26/01 am p.11) Counsel has not viewed the videotape because Mr. Jones did not turn over discovery items to appellate counsel. Counsel has not

10

Ronald Switzer testified that Coates and Vincent Hill were the people out there making big money in 1996 and 1997 (Tr.012501 p.m. p.6 - 9). Mr. Jones, having blundered his cross examination of Agent Lisi, chose not to cross examine Switzer. "I have nothing your honor."  (Tr.013001 am p.18) Thus Switzer's testimony regarding Coates remained uncontradicted.

Donald Nichols "Hard Rock" made an in-court identification of Sean Coates – identifying him by his nickname "Birdy". Nichols said that he knew Birdy from when he was five or six. (Tr.021401 pm p.81)   Nichols identified Coates as one of the people who would be out selling on a typical day. (Tr.021501 am p.31-32) Jones did not cross examine Nichols. Thus Nichols' testimony remained uncontradicted.  "No questions."  (Tr.02201 pm p.54)

James Montgomery testified that in 1989, Montgomery, Chin, Meechie, Bird, Art, Eric, and Poo Poo were selling drugs around Delaware and 203 P Street. 0301201 p.38.    He denied having any conversation with Vincent Hill about who was permitted to sell drugs in area. When Montgomery came home in '95, business was bad but Bird still seemed to have money.

"I was coming down K Street. I caught the subway downthere, and I don't

---

been able to contact Mr. Jones

11

think they knew I was home, and I walked up on them,[9] and I told them that I was -- my words to them was that I'm fucked up, letting them know that I need some money. They told me that you can't -- they said, everybody fucked up. You came home at the wrong time, like that. Q. And what did you interpret that to mean? What did you understand them to mean? *** they didn't have no money to give me." (Tr.031301 pm 15-16)

Q.    Did you notice at that time whether or not Birdy appeared to have any money?

A.    He still had his car. He still had his Q. Then like a few days later -- I had eventually got some money. I borrowed some money from Squirmy, and like a few days later, me and Bird was talking. They was having a -- there's going to be a  cabaret somewhere sitting downtown, and Bird had all this Versace stuff in his trunk, and he was showing – *** All this Versace stuff, clothes, like shirts and jeans and stuff like that. So in my mind I was like, man, just the other day you told me you was fucked up, you know, meaning that he was broke. (Tr.031301 pm 16)

Mr. Jones did not cross examine Montgomery on his testimony about Sean "Birdy" Coates being out their selling drug in 1989.  (Tr.043001 am 9-59) Despite Montgomery having handed Jones a motive for him to lie about Sean Coates, Jones never confronted him about it.  He had a perfect line of questioning that could have exploited the fact that Montgomery was not a big time drug dealer.  He was a stick up boy who ran around sticking his gun in people's face and who spent most of the relevant period incarcerated. Now that

---

[9]    Chin, Bird, and Pimp.

12

his crimes had come back to haunt him, he was trying to implicate Coates to get from under.

Charles Bender "L.A." testified that in 1994 and 1995, to the best of his recollection, He, Vito, Harry O, Dirty Meat, Birdy, Switzer, "Gus," his brother Antoine Bender and Bill Hill were out in the 200 block of K Street SW. (Tr.040401 am p.56) "I have no questions, Your Honor." (Tr.040501 pm p.62)

Ronald Sowells ("Manute")was charged in the L Street case. ( Tr.041701 pm p.5) He started selling marijuana when he came home in 1993. Business was prosperous. Sowells testified that there were 30 or 40 people out there selling marijuana in the alley; including, Hodges, Ben, Morris, Hallman, Birdy, Draper and Chin. (Tr.041701 pm p.25) Sales started to slow down and in '94 or '95, they moved out of the alley to Delaware and K. Vito, Chin, Draper, Harry O, Bird were selling on K street. (Tr.041701 pm p.31) Vito appeared to be running the strip. When Vito was out there, everyone would let him sell his weed. When they were selling on K street, they would rotate. (17 pm 36) Sowells said that he frequently sold with Birdy. (Tr.041701 pm p.40) Jones cross examined Sowells, but he did not question him about his allegations of drug dealing. (Tr.041801 pm p.30-51)

13

Paul Franklin "Dirty Meat" testified about marijuana sales in Southeast.

He identified Birdy as someone who has known for 15 years and had a "cool"

relationship with. (Tr.050101 am, p.53)  Franklin identified Bird as one of the

people selling marijuana in the area of the alley, Delaware and K streets.   In

addition to the Defendants, he said  that Rock, Switzer and James Montgomery

were out there. (Tr.050101 am p.70) Franklin testified that they sold drugs in

"rotation". (01 am p.78)  Franklin also said that he "bagged up" weed at Birdy's

Mother house in Kenilworth. (Tr.050101 am p.81)   In cross examination of

Franklin, Jones attempted to show that Coates primary reason for being on K

street was to gamble. When Franklin resisted him, Jones asked Franklin it he had

anything to do with the murder of Sibley Hamilton.  Franklin denied it.  Jones

rested his cross and the never again visited the issue in the trial.[10]

---

10

Q.   As part of your plea agreement, you were required to inform the
     government of all of your criminal activities,isn't that correct?
A.   Correct.
Q.   Now, did you inform them about a young man by the name of Sibley
     Hamilton?
A.   Who?
Q.   Sibley Hamilton.
A.   I can't recall if I did.
Q.   Do you know a man by the name of Sibley Hamilton?
A.   Yes.
Q.   As a matter of fact, did you have something to do with his murder?

14

Demetrius Hunter, from L Street, identified Birdy as someone he knew from Southwest. (Tr.050301 pm p.69) According to him he occasionally sold weed for Birdy and Draper in '94 and '95. (Tr.050301 pm p.77) Jones cross examined Hunter about his drug dealing. He did not challenge Hunter's assertion that he sold weed for Birdy and Draper in '94 and '95.

## 2.    *KIDNAPPING OF YUSEF SIMMONS*

On January 22, 2001, Mr. Zeidenberg made clear his intent to elicit Yusef Simmons testimony regarding the kidnapping for which Sean Coates had been adjudicated as a juvenile.[11]

---

A.    No, I didn't.
Q.    Back in 1990?
A.    No, I didn't.
Q.    Mr. Jones: The Court's indulgence.
The Court: Sure.
Mr. Jones: I have no further questions, your honor. (Tr.050101 am p.18)

[11]

| Mr. Zeidenberg: | And the other thing, your honor, is I have trial testimony from a juvenile trial of a witness that we are going to be calling, and I just would ask the court to order that disclosed. It is jencks, however, because it was a juvenile trial. I wanted the court's authority to release it. |
| The Court: | You may release it. Yes. |
| Mr. zeidenberg: | Thank you. |
| Mr. Jones: | I would object to that on behalf of Mr. Coates. I am going to object to any reference to this juvenile proceeding that took place when Mr. Coates was years of age. It violates all of the — |

15

App 1005

Fourteen days later when the Government called Simmons on February 5,

2001, Jones, again, appeared to be caught off guard.

JONES:      Your Honor, on behalf of Mr. Coates, I'm asking the Court to bar this
            testimony of Mr. Simmons.  It's a matter that occurred when Mr.
            Coates was 17 years old, some years ago, Your Honor.  It has
            nothing to do with this conspiracy trial.  To let this testimony in –

THE COURT: I don't know what testimony he's going to give.

JONES:      Well, he's giving testimony about a kidnapping that Mr. Coates was
            charged with and tried in a juvenile court in the District of Columbia
            back in 1990, and as far as I'm concerned, Your Honor, it violates all
            the laws against confidentiality as far as juvenile offenses are
            concerned.  It's a situation that does not purport to be, as far as I can
            see from the evidence, it doesn't have anything to do with this case
            at all, and we would object to the idea.  What it amounts to, Your
            Honor, is propensity evidence.

THE COURT:  What is its relevance?

MS. CHATURVEDI:     A couple of things, Your Honor.  First of all, it's not
                    charged as a substantive count.  It's just a racketeering
                    count.  It's charged in the indictment.  It is part of this
                    conspiracy in that Mr. Simmons was kidnapped, it's our
                    allegation, and Mr. Simmons was a member  of the L
                    Street group.  He was kidnapped by Sean Coates and
                    others who were part of the K Street group.  It goes

---

The Court:    It, nevertheless, is *Jencks* material.
Mr. Jones:    Well, we object to Mr. Yusef Simmons coming in and testifying
              at all about that juvenile matter.
The Court:    Well, let's deal with the  testimony  when the testimony is
              presented.
Mr. Jones:    Okay. (Tr. 012201 am p.62)

16

directly to show the animosity between K Street and L Street, which by our calculation began in 1990. The greater escalation occurred in 1996. But this is one of the events, precipitating events that caused a conflict between K Street and L Street.

THE COURT:   Okay. And Coates was, in fact, 17 at the time?

MS. CHATURVEDI:   That's right, Your Honor. I actually -- Mr. Jones and I have talked about this issue prior to this discussion at the bench, and I've provided him with two cases that discuss the propriety of the --

THE COURT:   I think it's admissible. (Tr.020501 pm p.25-26)

The prosecution began its examination of Simmons by talking about events in 1996 during the war between L Street and K Street. Jones objected and the Court stated that his objection was frivolous.[12] Thereafter, Jones rarely objected:[13]

---

[12]

| | |
|---|---|
| Jones: | I object to this line of questioning. Judge, we're talking about 1996 and she is ostensibly bringing this man in to talk about a kidnapping that occurred back in 1990. I don't know the relevance of this." |
| Court: | She perhaps has not gotten to the subject of the kidnapping. I don't know. The witness may have other relevant testimony to offer. What is the nature of your objection? |
| Jones: | My objection is relevance, Your Honor. We're talking about brothers being murdered. We are talking about everything other than what she brought him in here to talk about. |
| Court: | I don't know what she brought him in here to talk about and either do you. Your objection is overruled. It's a frivolous objection and you know it. Now, let's proceed. (Tr.020501 pm p.35-36) |

[13]   Jones made one more frivolous objection when Simmons testified that after Coates was no longer on the scene the gunman said "Where's your

17

During his direct, Simmons provided detailed testimony about his abduction at gunpoint and being put in a car driven by Sean Coates. Simmons was put in another car and never saw Coates after that. The demand for money was made after Coates was no longer there. Despite the prior adjudication and the fact that the police had been called, Jones began his cross-examination by referring to the "so-called kidnapping back in 1990". Jones got Simmons to admit that in his original statement, he did not name Coates as someone who was involved. Jones did not identify introduce the relevant portion of the statement. (Tr.020601 am p. 70-71) Jones did get Simmons to admit that the kidnapping was just about money. It had nothing to do with K street. (Tr.020601 am p.71-72)

### 3.    ATTEMPTED MURDER OF RONALD SOWELLS

Prior to Sowells taking the witness stand, Detective Robert Mitchell testified that on October 30, 1996, he was called to interview the victim of a shooting at 1100 Howard Rd. Mr. Sowells told him that Bird who hung out in the 200 Blk of Delaware Southwest. "I ask him did he know his real name , and he told me

money." His objection was based on hearsay. The statement was clearly part of the *res gestae*. The objection was overruled. (Tr.020601 am p.28)

18

the guy's name was Sean Coates." (Tr.041701 am 38)  Detective Mitchell's partner went to the hospital with him, but he did not go into the room while the statement was being taken.    The Detective took notes, but they were not verbatim.  (Tr.041701 am 40)

Mitchell was asked by Counsel for Carson whether he had sought an arrest warrant for Coates.  His answer was no.  (Tr.0417 am p.47) Jones had lots of good fodder for cross. Mitchell had an established crime scene, the forensic evidence was recovered and he said he had an identification by name.  Under the circumstances there could not be any rational basis for an identification. Police officers are required to preserve statements of identification.  Why had Dectective Mitchell not done so.  Jones did not even inquire whether Mitchell recorded this information in his police notebook.  As usual, there was no examination about the crime scene or the witnesses ability to observe the incident.

Sowells[14] testified that he saw Birdy driving his Q45 in the opposite

_____

[14]    According to Sowells although the people from K Street and L Street did not get along and he was associated with Woozie and L Street, he hung out with the people from K Street.  It was all a plot to rock them to sleep so they could kill Vito, Chin, Draper, and Pimp.  (Tr.041701 pm p.51) Woozie and people from L street thought Vito and Chin had something to do with Patcho getting killed, Hallman getting killed, Yusef getting kidnapped and Donnell

19

direction. He blew his horm and waived. Birdy saw him and sped off. He was

going to going to tell Birdy to stay out of it and mind his business. When Birdy

sped off, he knew he was scared. (Tr.011801 am p.13) Sowells went to the

barber shop, drove down Pennsylvania Ave and picked up his brother. He was

going to drop his brother off at the Anacostia Metro. His brother got out of the

car. When he was pulling out, he saw Birdie "pulling up". "He was at an angle

trying to block the car in so I couldn't back out." The prosecutor asked what

happened after Birdie pulled up behind him, The door kind of slid open. Birdie

was in the passenger seat. The car pulled back to the side. He knew that Birdie

was about to shoot. As Birdie was about to shoot, Sowells sat back and after

Birdie shot and got close, he shot back three or four times (Tr.041801 am p,16)

Birdie was no longer in the Q45. He was in something like a Dodge Stratus. He

was shot twice in the arm. "As he was pulling up some more, he just started

shooting." The car Birdie was in was pulled off.

Although Sowells story provides rich fodder for cross-examination, Jones,

as usual did not examine Sowells on his story. He did not inquire about the

_____

Burroughs getting killed. (Tr.041701 pm p.52) Sowells and Vincent Hill could
not stand each other. (Tr.041701 pm p.59)    According to Sowells, when Vito
got shot, Price saw a guy hop in his car and he went back and told. (Tr.041701
pm. p,59).

20

placement of objects on the crime scene. He ask nothing about the medical records even thought there is a glaring disparity between the testimony of Mitchell and Sowells. Sowell's story would depend upon a tremendous coincidence. Coates see him while are driving his Q45. Sowells picks he brother up and gives him a ride to the metro. Thus Sowell was someplace he did not intend to be. Yet, Coates has changed cars, located him at this coincidental location and come prepared to ambush him. That does not make sense.

The government did not present any pictures of Sowells injuries. There was no medical testimony about his injury. As a former prosecutor, Mr. Jones should know that when the prosecutor leaves out this type of evidence, he is spinning his facts.

Although there was a glaring disparity between Detective Mitchell's testimony and Sowell's regarding the interview, Jones never explored that discrepancy. Detective Mitchell had said that he waited until after Sowells' surgery. Sowells' testified that he did not have surgery – "that they ain't never take the bullets out." (Tr.041801 pm p.49)   He said that the Detective's interviewed him while they were doing the x-ray. [15]

---

[15] Further undercutting his credibility, Sowells admitted lying about seeing who shot Kim Richardson, seeing Kevin Hart get shot, and seeing Joey Simmons

21

Jones starts his cross-examination (Tr.041801 pm p.30-53)  by asking about how much money Sowells' made dealing drugs.  Thus, he gave the impression that he was running away from the witness rather than cross examining him.  Jones then elicited that at the time of the shooting, Birdy and Sowells were fine with each other.

Sowell said on direct that you pulled up next to him and started shooting. Jones got Sowells to say that the first shot came through the back which would be consistent with the window. (18 pm 37)  Mr, Jones ask Sowells whether he told FBI agent McCauley that he was not able to identify the two black males that

get killed.   (Tr.041801 am p.22-24) Sowells described an incident where two guys were squeezing people's marijuana bags and then said that they said that they did not want to buy this shit.  Chin asked for a gun. Sowells gave him one. Chin chased the guy down. The guy fell. William Bumbrey ran over and shot him.  (Tr.041701 pm p.47-49)

Roland Brown, the man who Sowells testified was shot because he was squeezing marijuana bags and then did not buy them, testified about the incident. His version of events was very different from Sowells.  He took a urine by the tennis courts and then went to buy marijuana.  He was approached by a gentleman with marijuana who asked him why did he piss on the street. Somebody said kill them niggers.  His friend told him to run and he ran and a hail of gunfire let loose.  He got hit between L and M and fell.  Some one with a coat on ran up behind him and shot him in the shoulder.  He was shot six times and remained in the hospital 43 days.  (Tr.042401 am p.41-42) Brown did not know who shot him.  (Tr.042401 am p.48)

22

were in the car shooting. He denied saying it. (18 am 40) Jones did not show him the document to refresh his recollection.[16]

Jones then becomes accusatory and accused Sowells of lying. He ended his cross-examination up by saying improperly "I'm not going to waste the juror's time." (18 pm 51)

Montgomery said he loaned Bird his gun so that they could go after Ron Sowells. Montgomery said Bird gave the gun back after the shooting and Montgomery threw it in the river. According to Montgomery, Bird told him that Manute was sitting in the Anacostia subway station and Bird pulled up on Manute and blasted him. Chin later complained because Bird did not finish Manute off. (Tr.031201 pm p.90) Jones not ask the obvious questions to undergird a defense that Montgomery committed the offense. The weapon was Montgomery. He was the last person in possession of it. Montgomery is about the same height and complexion as Coates. [17]

---

[16]    Counsel anticipates that she will have additional points to make once she obtains the discovery, *Jencks*, and medical records for this incident.

[17]    Lisi also testified regarding the Sowells shooting. Montgomery took him to the waterfront to find the gun. He saw the harbor police retrieve the gun. (Tr.041701 am p.15-16) Joe Welsh from the Harbor Patrol testified that he recovered the .30 carbine from the river. Jones asked one question – whether Montgomery was there. (Tr.041701 am p.81-82) The answer was no.

23

## 4.    KIDNAPING OF ANTHONY "WYSOCKI" PRYOR

Sergeant DeLoatch testified that he was assigned to investigate the kidnapping of Anthony Pryor, "Wysocki". The kidnapping occurred in Oxon Hill. He went to the home of Doreen Key and looked out her window and saw the dumpster in the alley. (Tr.042301 pm p.90-91) Key gave a physical description of Draper, said that she knew him four years and that he cleared his throat a lot. (Tr.042301 pm p.95-98) In cross examination, Kiersh established that Sweeney's fingerprints were not recovered from the car. (Tr.042401 am 17). Jones examined DeLoatch about the location of the car. (24 am 30) In redirect, the prosecutor was permitted over a non specific objection by Jones to elicit that the prints belonged to Sean Coates. (Discussed further below)

## 5.    MURDER OF ALONZO GASKINS, DARNELL MACK AND MELODY ANDERSON, "THE TRIPLE"

---

Keith Slaughter testified about the processing of the crime scene for Sowells shooting. The tan Chevrolet was in front of the metro station. The rear driver's window was shot out. (Tr.041701 am p.62) He seized a Taurus handgun, a magazine, (from a Book Bag) 9 mm shell casings and .30 carbine shell casings. (Tr.041701 am p.58-61) The nine millimeters came from inside the car. (Tr.041701 am p.65) The .30 carbine casings were found outside the car. Slaughter did not prepare a crime scene diagram. One of the 9 millimeters was recovered from the drivers seat. He does not know where the other's came from. (Tr.041701 am p.67) There were no bullet holes in the body of the car. The shell casings were within 8 to ten feet of the station wagon. (Tr.041101 am p.69) Chaturvedi showed the witness a photograph with one of the 9 mm.

24

According to Montgomery, initially Chin did not want Bird on the triple because Bird did not ever want to do anything – he always wants to be the driver. (Tr.031401 am p,17) Chin, Draper and Montgomery had 2 to 4 conversations about doing Lonnie. Montgomery said if we are going to do, this let's do. They did not have any guns. Draper went and got a .40 caliber Glock and a stun gun. After Chin Draper, and Montgomery spent some time looking for Lonnie, they went to get Bird because Bird and Lonnie was cool. (Tr.0314 am p.34) Bird did not know what they had planned when they went to get him. Draper played a joke and pretended to shoot Bird. They told Bird what they were going to do. He does not remember Bird saying anything.    Bird, Chin, Draper, and Montgomery were sitting in the van when Lonnie, Darnell Mack and the 3 girls came out. Mack was a close friend of Vito, Lonnie, Darnell and the girls got in a car and left.

Montgomery, Chin, Draper and Bird went back to Montgomery's house and Montgomery made 4 masks out of black skull caps, one for each of them. Montgomery and Birdie took a tag off a car and put it on the van. Birdie was supposed to go in, but when it was time to get out of the car, Birdie did not get out of the car. Montgomery and Draper ran up to the people and pushed them in the house. One girl ran upstairs. He did not see what the other one did. (Tr.031401 am p.47-48) Montgomery grabbed Darnell Mack and Draper grabbed Lonnie. Mack was not resisting. He said he did not have any money. Montgomery lifted up Mack's jacket so he could stun him and Draper started shooting. He pushed the screen door open with his thumb. He did not see Draper shoot the girl. Draper got to the car first and then Montgomery. (Tr.031401 am p.53)

Montgomery testified that he was mad about Draper shooting. Draper claimed that Lonnie was reaching. Chin believed that Draper hit Lonnie or Darnell for Boo and Bam, drug dealers. (Tr.031401 am p.73)

Chin said that Draper told him that the only person that he had told about the murder in Temple Hills (the Triple) was Butchie. Chin said that they had to hit Butchie and that there would be no case. On July 31, 1997, Montgomery and Chin were arrested for the Temple Hill's murders. The police told them that they definitely had Draper. Montgomery in a hand written statement told the police that Draper was the only person who got out of the car, and that shortly after, they heard gunshots. He said that Bird, Chin, and himself remained in the

25

car. He went to the grand jury in PG on August 5, 1997 and testified that the statement he gave the PG police was true. Montgomery was charged in District of Columbia and Lisi explained to him that they had videotapes of him making drug transactions on K Street.

When he went to the grand jury, he lied about the guns in the 60th and East Capitol shooting. (Tr.031401 pm p, 27) After he pled to the narcotics conspiracy, he was released and the government supported him. (Tr.301401 pm p.28) Lisi would come to visit Montgomery and Montgomery told him about T.T. and Terita and Chrissy. He provided more information because he was concerned that if he withheld anything people could snitch on him. Bird could tell them about the Triple. Raymond could tell about Maurice and Slick. He then entered the second plea agreement (14 am 30-33). He was concern that Poo-poo would say that he was the shooter in Tim-Tim's case so that Poo-poo could get his time back.

In November of 1999, Montgomery told Lisi and Chateverdi that he had not been in the house during the Triple. He said that Bird went in. About a month latter, Montgomery called Ziedenburg and told him that he did go in the house. (Tr.031401 pm p.41). The government again asked to have his release revoked, but Judge Jackson allowed him to remain on release. Montgomery went into witness protection. He left witness protection and came back to D.C. He understood that witness protection was voluntary. After leaving the program, Montgomery's release was revoked. (Tr.0314101 pm 43)

While Montgomery and Chin were in the cellblock, Chin told him that he knew what Montgomery had told the detectives. Chin was angry that Montgomery put them on the scene. Chin said that if he got out, he was going "to hit heads". (Tr.031401 pm p.45)

Mr. Jones began his cross examining Montgomery about Coates' daughter. He is shut down by the Judge when he says "And you know Birdie is crazy about 'Shanese'." (Tr.032101 am p.25) He brought up the point about Coates having "feminine ways", but that was not meant to suggest that you were homosexual. (Tr.032101 am p.28)   Montgomery said he was not sure whether he told the government that you would snitch. (Tr.032101 am p.30).

Jones received permission from the Court to go over some things that had Montgomery had already been questioned about. (Tr.032101 am p.30) So he was not constricted by the Court's earlier rule limiting repetition. Jones then

26

repeats the fact that Coates was eligible for the death penalty. (21 am 41) Jones questioned Montgomery about the admitted lie he had told in Maryland – that Coates went into the house with Sweeney and not him. According to Jones, Chaturvedi had stressed to him "that it didn't matter whether I went in or stayed outside of the house. The point is it happened. I stressed to them that no one was supposed to get killed. So it happened in the commission of another crime. And whether we had guns or not, that all of us was liable to the same degree." (Tr.042101 am p.41)

Jones had Montgomery say again that from his perspective he was not involved in a conspiracy. (Tr.032101 am p.55) Jones sat down without laying a finger on Montgomery.

## 6. FEUD WITH CONDON TERRACE

Sean Coates[18] was charged with three racketeering acts related to the feud

between Condon Terrace and Southwest:

| Racketeering Act 26: | AWIMW/A Jermaine Hall and Michael Jones (Not proven) |
| --- | --- |
| Racketeering Act 27: | Conspiracy to murder Michael Jones from June 20-June 28, 1992 (Proven) |
| Racketeering Act 28: | Assault with Intent to Murder while Armed - Michael Jones on June 28, 1992 |

Several witnesses testified to the feud between Condon Terrace and

Southwest. At least two possible motives were put forward for the feud.[19] With

---

[18] Coates was the only defendant charged with these offenses. Thus his counsel could not expect to benefit from spillover from his codefendants' cases.

[19] James Montgomery testified to a fistfight at a club, Cherry's. A guy threaten to slap Clifton Edwards (Meechie). Montgomery said that he, "Chin,

27

respect to the June 20, 1992 shooting of Montgomery testified that Meechie told

him that he had a pistol, Poo-Poo had a pistol and Bird had a machine gun, and

that he was going to kill Bird when he came home because Bird did not shoot.

(Tr.031201 pm p. 75-76)

The government had absolutely no factual basis to infer that Sean Coates

was involved in the January 20 or had a machine gun.    The discovery

documents show that there was never an allegation of anyone having a machine

gun  During direct, Montgomery admitted that he did not want Meechie to pled

guilty because he was a co-defendant with Meechie in another case.[20] (Tr.031201

pm p.77)

---

Bird, Erik, Hard Rock, Morris, Crawford" were the people he remembered being
there.  (Tr.031201 pm p.72-73) Arthur Rice testified that a guy named Motor
from Condon Terrace actually punched Meechie in his face.  Montgomery also
testified about the 1993 murder of Dihru (Wayne Perry's nephew) by Condon
Terrace but this occurred in 1993. (Tr.031201 pm p.74-75)

Eric Gray testified that at the courthouse during a case involving Michael
Jones in the summer of 1992 people from Condon Terrace got into a fight with
Irky Berk, Draper, Skinny Pimp and Sam. (050801 pm p.13-15)

[20]    In addition to pleading to shooting Jermaine Hall, Clifton Edwards
pled guilty to UUV in case number F-6465-92. Edwards admitted that he was
driving a car without the owner's permission which was stopped on November
13, 1991.  Montgomery was in the front passenger seat when the car was
stopped.  (Tr.052593 p.11-13)

28

Arthur Rice was not sure when the incident happened, but after the incident Meechie got locked up.    He said that he spoke to Meechie and Birdy about a shooting at a Exxon station on South Capital – said some dudes was up there in a Accura and either Meechie or Birdy chased them, one of there guns jammed, but the guys got away. (Tr.042501 pm 47-49)

Arthur Rice testified about Michael Jones being shot on June 28, 1992. According to him, after the June 20th incident, Meechie call and spoke with Birdy and himself. Meechie said that a dude name Michael Jones is testifying against him. Rice testified that Birdy knew where to go. They went somewhere around Condon Terrace.[21]  According to Rice, Birdy and Gus walked up to Michael Jones. They shot at him. Without objection, the government elicited from Rice that after Mike survived, Meechie pled guilty. (Tr.042401 pm p.55)

Also without a hearsay or confrontation clause objection, the Government admitted Edward's plea (Ex M78) proffer into evidence without objection. The Government deleted a portion of the proffer as agreed to by Edwards which

---

[21]    Actually Michael Jones was shot in Congress Heights at 10th Place and 4th Street.

29

would strongly suggest only one person was involved in the June 20 shooting. [22]

(Tr.043001 pm p.23-24)

Mr. Jones entire cross-examination regarding Arthur Rice's testimony about

the Condon Terrace shootings was as follows:

BY MR. JONES:

Q.    Good morning, Mr. Rice.
A.    Good morning.
Q.    My name is Jones. I represent "Birdie."
A.    All right.
Q.    Sean Coates.
A.    Yes.
Q.    Now, Mr. Rice, you have talked a lot about -- well, you mentioned a few
       incidents in which you observed "Birdie," and one of them which sticks in
       my mind is the incident involving Mike -- this guy named Mike?
A.    Yes, sir.
Q.    Now, in what neighborhood did that shooting take place?
A.    Southeast.
Q.    Southeast. There is no other -- you can't break it down any further than
       that?
A.    Over there towards Condon terrace, over there by fourth street and 10th
       Place. That area over there.
Q.    Now, you said you posted up at some street?
A.    Yes.
Q.    What street did you post up at?
A.    I can't recall.
Q.    You don't recall?
A.    No, sir.

---

[22]    Mr. Kiresh (Sweeney's lawyer) objected because he thought that
Edwards was a member of L street. He was confusing Clifton Edwards with
Demetrius Hunter also nicknamed Meechie. (Tr.043001 pm 21)

30

Q.    Now, you indicated, sir, that you saw "Birdie", Sean Coates, stand over top
      of this man named Mike and pump bullets into him?
A.    Yes, sir.
Q.    Now, that, sir, is a lie, isn't that correct?
A.    No, sir. (Tr.043001 am p.9-10)

      Also Agent Lisi testified to the following statement made by Co-Defendant

Sweeney to Michael "Butchie" Smith.

Q.    Did Mr. Smith tell you about conversations he had with Mr. Sweeney
      involving the shooting of an individual by the name of Michael Jones?
A.    Yes, but he didn't know the name Michael Jones. What he told me was
      that, he said that back in 1992, Meechie, and that's just the name he gave
      me, Meechie was charged with shooting somebody from Condon Terrace.
Q.    Let me just stop you for a second. When you say he told you, this is what
      Mr. Smith told you? (Tr.052901 pm p.29-30)
A.    Yes, ma'am.
Q.    And the source of his knowledge was what?
A.    Mr. Sweeney.
Q.    All right. I'm sorry to interrupt.
A.    That's okay. So Mr. Smith is telling me that Mr. Sweeney told him that
      Meechie got charged with shooting a person from Condon Terrace, and
      that one of the persons or the victims was cooperating against Mr. ,-- was
      cooperating against Meechie. So that Mr. Sweeney went to an area in
      Southeast nearMississippi Avenue to kill the person who was testifying or
      who was going to testify against Meechie. And Mr. Smith was under the
      impression that the person did die, that there actually was a murder. And
      he said that Mr. Sweeney went down there, chased a person through the
      alley and it was some place near Mississippi Avenue, caught up with him,
      shot him, and stood over him and shot him some more. And it was Mr.
      Smith's understanding that the person died. And I tried going back and
      finding this crime, and this is an example of where I'd call him and ask him
      a question, and I'm trying to find -- I said, hey, you know, tell me about
      that again. And then he told me that, yeah, he said, it was Draper or
      Shorty are the words he used and Birdy and he knew Birdy. He said Birdy

31

was with Draper when they went down there, and he said Birdy also shot somebody during the same event. So we looked back through and based on what he had told us, it matched up exactly with the shooting of Michael Jones. However, Michael Jones did not die. Let me back up. Match exactly. (Tr.052901 pm p.29-30)

Although not a single question had been asked about Condon Terrace, Mr. Jones when asked whether he had cross, responded: "Your honor, most of the questions have been asked. At this point, I don't think I am going to have any questions." (TR053001 am p.89)[23]

---

[23] Mr. Jones did call a witness, a police officer who testified that Michael Jones said that Wayne Perry shot him. (Tr.061401 pm p.22-23)

32

## III.   COUNSEL'S OTHER FAILURES

### 1.   Opening Statement

Mr. Jones' opening statement is obviously off the cuff. It is less than seven transcript pages. (Tr.010901 pm p.10-16)   The first three pages are just generalized statements that do nothing to refute the charges. Jones explicitly states "... there's not going to be any physical evidence linking [Sean Coates] to any crime." (p.11)

Jones then implied that he will present an alibi defense for the triple. "The evidence will show that Sean Coates wasn't even there."[24] Jones said he is going to cross examine Mr. Montgomery. (p.14) With respect to Michael Jones, Mr. Jones informs the jury that they will hear that Michael Jones said that William Perry shot him. (p.4) He makes no mention of the other Condon Terrace shooting. Jones told the jury that they would hear about a gun that Coates pled to years ago. "And you will hear another set of facts describing the incident when he was a juvenile." (p.14 ) Jones does not mention the marijuana or RICO conspiracies. Jones did not mention the shooting of Ronald Sowells or the kidnapping of Anthony Pryor.

---

[24]   Jones did intend to present an alibi witness, Coates' sister, but he did not.

33

App 1023

## 2. *Jones Trial Preparation and Representation of Mr. Coates at Trial*

Current Counsel does not have Mr. Jones' files to access his trial preparation. Further, as set forth above, Counsel does not currently have access to Mr. Jones.       There is, however, information in the record which points to the paucity of Jones preparation. First there is the issue of his failure to make discovery request. Perhaps he anticipated that with so many lawyers, it would not be necessary.

The problem with that thought process is illustrated by the Condon Terrace allegations. Defendant Coates was the only defendant who had to defend against the Condon Terrace allegations. The Bates Stamp numbered discovery related to Condon Terrace is 900215-900353. That discovery relates solely to the June 20, 1992 shooting of Michael Jones. There was no discovery related to the June 28, 1992, the Racketeering Act that was found proven. In trial, Jones did not mention the June 28, 1992 shooting in his opening. He obviously did not have a plan for cross examination and simply had Rice repeat his testimony without challenging it.

Likewise with Ronald "Manute" Sowells. Jones did not mention this crime in his opening statement. Sowells was potentially the most dangerous witness

34

App 1024

against Mr. Coates. AUSA Zeidenberg said in opening statement:

> "Well, you know what's going to happen to Ronald Sowells. On October
> 30, 1996, Sean Coates and Sam Carson find out Ronald Sowells is in the
> neighborhood at the Anacostia Metro. They go back to Southwest, get a
> gun. Carson is driving. Coates is in the passenger seat, pulls up alongside
> the car where Ronald Sowells is, blasts Ronald Sowells from right next
> door, shoots him in his side. He lives, and he will come in, and he will
> testify, *as will other witnesses*, that the shooter was Sean Coates, and
> it was Sam Carson that was with him. (Tr.010801 pm p.24-25)"

The discovery documents that are available to Current Counsel do not
include any documents regarding Sowells. Defendant Coates joined motion
previously filed by his codefendants including their motion for pretrial
identification procedures. (Docket Entry 313 06/06/2000) The government did
not present any evidence regarding a pretrial identification of Coates by Sowells.
Mr. Zeidenberg did not mention that Sowells had made an identification of
Coates to Detective Mitchell. When Mitchell took the stand and testified to the
identification, Mr. Jones did not make any objection. More importantly, Mr.
Jones apparently failed to notice that the Government did not move Sowells
medical records into evidence. That should have been a red flag. Generally, the
Government will want the jury to know how badly the complainant was injured.
When these records are not produced, it is a red flag for the defense. Even when
they are produced, many defense counsel routinely obtain their own copies of

35

these records to make sure nothing has been omitted.  Even if he did not receive

the records in discovery, after the conflict between Sowells and Detective

Mitchell's testimony regarding the circumstances of the identifical became clear,

Jones should have immediately ask the Court to execute a subpoena for the

medical records.[25]  Counsel for Carson later introduced the records in his case.

(Tr.062501 am p.39)[26]

Mr. Jones most egregious error of pretrial preparation was going to trial

unaware of the fact that the Government claimed to have matched his client's

fingerprint to a print taken from the car that Anthony "Wysocki" Pryor had been

kidnapped.  Surely, he was unaware because he told the jury in opening that

there would be no physical evidence linking his client to any of the crimes.

---

[25]     There is an indication in the record that the Government was in
possession of these records.  Counsel for Proctor requested medical records
which he did not receive from his predecessor.  Mr. Zeidenberg responded:

> "We literally have a dozen binders of the materials that were turned over
> two years ago.  And, since that time, we have a box, for instance, of
> medical records that are probably several thousand pages. *** he can
> come over to our office and review the discovery binders, and if there is
> something specific that he sees that he doesn't have, obviously, we'll make
> a copy."  (Tr.092700 p.165)

[26]     Carson put on a very aggressive defense to this Racketeering Action
and it was found not proven.

36

Discovery Document 300475 disclosed to the defense that a Brown 1983 Cadillac, license number unknown, VIN 1 G6AD698D9214743 was towed to a Prince Georges County Impound at 7600 Barlowe Rd. Landover. The report says that the owner of the victim is unknown.

Document 300484 and 300485 relate to the fingerprint examination of the Cadillac. Document Number 300484 is a Prince Georges County Police Department Evidence Report which states that of the Cadillac "...which had previously been fumed for latent fingerprints utilizing cyanocrylate ester pm 10/22/93, was fumed for the presence of any developed latents with none of value being obtained.

Document 300485 is a mostly illegible copy of the Request for Latent Fingerprints. Coates name can barely be made out in the report section but whether or not there was a match is illegible. In redirect examination of Sargeant Deloatch, found an opportunistic moment to elicit the following.

Q.    Sergeant Deloatch, you were asked about some fingerprints that were taken -- latent prints that were taken from the car compared to known prints.

A.    Yes.

Q.    Do you recall being asked about that?

A.    Yes.

Q.    Do you recall whose known prints were found on the car?

(Page 461 of Total)

Mr. Jones: Objection, your honor.

The Court: Overruled.

The witness: Coates.

Mr. Zeidenberg: Sean Coates'?

The witness: Yes.

Mr. Zeidenberg: No further questions, your honor.(Tr.042401 am 30-31)

Mr. Jones did not make a proper objection, hearsay and no foundation. Indeed despite the criticality of this evidence, he did not even asks to approach the bench to explain his objection.  Here is on of those examples where it is clear that Mr. Jones is winging it -- not acting with the skill and knowledge that would be expected of a lawyer trying a case of this magnitude. The court inquires whether there is anything further.  Rather than approach the bench and ask the Court to strike that evidence if the Government does not produce the foundational evidence, Mr. Jones proceeds to reinforce the notion that this is his client's finger print:

Mr. Jones:

Q.    You have indicated that it's your understanding that Mr. Coates' prints were found on the car?
A.    Yes.
Q.    Those prints were found on the outside of that automobile, isn't that

38

correct?
A.    I'm not sure.
Q.    Isn't it a fact that those prints were found on the right rear taillight?
A.    Now, that you mention that, yes.  Yes, it is. (Tr.042401 am p.31)

At this point, Mr. Jones has not only failed his duty as an advocate.  He has

become his client nemesis.    Rather than making proper objections, he is

supplying information to affirm the Government's case against his client.

In his cross examination of Sergeant DeLoacth about the ownership of the

Cadillac and where was it, Jones elicited clearly false testimony from Deloatch

and made no effort to correct DeLoatch's suggestion that the Cadillac was given

back to the owner was clearly false and unsupported by the evidence.

By Mr. Jones:

Q.    Good morning, Mr. Deloatch, or Sergeant.
A.    Good morning.
Q.    Sergeant, where is that car, the Cadillac?
A.    Where is it now?
Q.    Yes.
**A.    It was probably given back to the owner.  I know we impound it
and we take it to the impound lot.**  And the officer that was involved
in the case back in '93 should have contacted the owner so the owner
could pick the car up.  Where it is now, I couldn't tell you.
Q.    Have you ever seen the car?
A.    No.
Mr. Jones:  I have no further questions. (Tr.042401 am p.30)

According to the incident report, the owner of the vehicle was unknown.

39

No record of the car being returned to its owner was produced in discovery. [27]

Finally, Jones did not participate in the discussion of jury instructions.

### 3.    Michael "Butchie" Smith

Agent Lisi's rendition of Michael Butchie Smith statements was obviously prejudicial to Mr. Coates. Since Coates was not alleged to have any involvement in the death of Butchie, the question as to him was whether his conduct resulted in a waiver. Smith's motion merely rehashed what the Government and the other defendants had said. He did not look at the issue from the perspective of his Client's rights. The question for Mr. Coates was whether he had made a waiver. The law from the Supreme Court is quite clear. "There is a presumption against the waiver of constitutional rights. . . and for a waiver to be effective it must be clearly established that there was `an intentional relinquishment or abandonment of a known right or privilege.' *Johnson v. Zerbst,* 304 U.S. 458, 464." Jones did not cite or argue *Johnson*' applicability.

As the transcript further establishes Mr. Jones, as usual, misunderstood the nature of the evidence that the government intended to present.

---

[27] The points made herein about Mr. Jones disastrous trial preparation and performance are meant to be representational and not exclusive.

40

Mr. Jones:   But in their statements, your honor, they list Coates as a participant in the triple homicide. and I just want to know what he is going to say before he gets up there and says it. I mean if he says that Sweeney told him that Coates was part of that -- in the 302 it says James Montgomery and Draper and Others. And that's always been what we have been under the impression of. "And others." This is page 3 of the 302's, your honor.

The Court: that's fine. Ask him about his 302's and what is the explanation for this glaring omission. A set forth above, Agent Lisi testified to something different. Mr. Jones did not cross examine the glaring omission or admit the statement in evidence. Jones said that most of his questions have been asked. He does not think he will asks any questions. (Tr.052901 pm. p.89 During closing argument Mr. Jones did not mentioned Butchie.

## 4. *Failure to Object to Continuous Hearsay Solicitation by Government*

Trial counsel continuously failed to object to hearsay solicitations by the

Government. For example, to bolster its case about the feud between Condon

Terrace and K Street, the Government elicited this hearsay testimony about the

murder of Wayne Perry's nephew from James Montgomery.

By Mr. Ziedenberg:

Q.   Okay. Now, are you familiar with someone named Dihru?
A.   Yes.
Q.   Who is Dihru?
A.   Dihru is Darryl Young.
Q.   And was he a friend of -- where was he from?
A.   Southwest.
Q.   Was he related to someone else from Southwest?
A.   Yeah.

41

Q.    Who was he related to?
A.    Wayne.
Q.    Wayne Perry?
A.    Yes.
Q.    Now, directing your attention to around 1993, was Dihru killed?
A.    To my knowledge. I was locked up.
Q.    What was your understanding of who was responsible – what part of the city was responsible for his murder?
A.    Condon Terrace.
Q.    Now, you said you were incarcerated in 1993?
A.    Yes.
Q.    How long had you been incarcerated, was that since November of '91?
A.    Yes." (Tr.031201 pm p.74-75)

Without objection, the plea of Clifton "Meechie" Edwards was admitted into evidence.   Even before **Crawford v. Washington,** competent lawyers in theDistrict of Columbia routinely made hearsay objections to these plea proffers.[28]

As another example, the prosecutor asked Sowells what was his understanding of where Joey Simmons got killed and whether Simmons was armed. Without objection Sowells testified behind Harry's O's house and he was armed. There was absolutely no foundation laid for Sowell's having personal knowledge of this fact or having even learned it from a co-conspirator. (Tr.041701 p.79)

---

[28]    See for example **Morten v. United States**, 856 A.2d 595 (D.C. 2004)

42

## 5.    *Closing Argument*

Having consistently failed to challenge the evidence against Coates at trial,

Jones gave a rambling closing statement in which much of what he had to say

barely passed the giggle test given the seriousness of the allegations.    He

suggested that Montgomery's testimony against Coates was motivated by

Montgomery's perception that Coates had "feminine ways" Tr.070301 am p.19)

He adopted the argument put forward by codefendants that special agent Lisi

driving through the K street area and, "lo and behold, Vincent Hill and some

others have the nerve to talk to them.  They have the nerve to be argumentative

and nasty with them.  They didn't show them the proper respect."(Tr.070301 am

p.11)

As to the Triple, Jones argued:

> "Well, he figures that out by saying, well, yeah, as a matter of fact, he
> helped me change the tags.  We went and stole some tags from a car and
> put it on the van.  That, you see, gets him involved.  Aiding and abetting.
> That's it.  He takes a part in the actual crime itself.  But, look, did anybody
> bring anybody in here to  tell you about a police report filed for a missing
> tag or stolen tag?  No.  Nothing.  Just Montgomery."

There was an obvious defense to Montgomery's pointing the finger at

Coates.  Montgomery's fingerprints were at the crime scene.  He was death

penalty eligible.  The only way for Montgomery to improve his situation was to

43

point the finger at someone who was not placed at the scene by incriminating physical evidence. By the time that Montgomery told his story, it is impossible to corroborate or disprove the underlying details -- such as the car.

Montgomery's allegations against Coates on the Triple were not compelling. He could not even say with certainty that Coates knew what the plan was.

As to Butchie, there was reasonable doubt that he actually did point the finger at Coates. After Michael Smith cooperated, Sweeney and Montgomery were initial charged with the Triple, not Coates. More importantly, Coates was not allege to be involved in the hunt for Smith. If Coates was involved in the Triple, he would have had a motive to be involved in the hunt for Smith. More importantly, Montgomery had an enormous reason to eliminate Smith. Revenge. These, and many other inferences favorable to Coates, could have been drawn by any lawyer of reasonable competence.

Having failed to make a proper argument to the Court for exclusion of the fingerprint, Jones then argued to the jury that the fingerprint should not have been admitted. In making his argument, he improved the government's evidence.

44

"...then they talk about a fingerprint that is supposed to be on Sean Coates' own car -- on the outside of the car. But who did you hear that from? The **crime scene search officer**. You didn't hear it from the fingerprint expert. The fingerprint expert from Maryland didn't come in here and tell you anything about any fingerprint. And I objected to the fact that they tried to elicit this information from the crime scene search officer. **He has no business testifying about a fingerprint**. But that's what you got."[29]

The fingerprint evidence came from Sgt. Deloatch, the detective investigating the kidnapping of Wysocki, not a crime scene officer.

## IV.   INEFFECTIVENESS OF APPELLATE COUNSEL

### 1.   *Failure to Appeal Admission of Fingerprint by Hearsay Evidence without foundation*

Although, the admission of the fingerprint was readily recognizable as rank hearsay that did not fit within any exception of the hearsay rule, Appellate Counsel did not appeal the overruling of the objection on appeal.

### 2.   *Failure to Obey Court's Order Related to Sealed Portions of Transcript*

In the Court of Appeals, Defendants' moved to review the sealed portions of the record in order to mount a challenge to the District's Court's *Brady* rulings. By order dated 28, 2003, the Court entered an order denying their request and directing them to:

---

[29]    Here again, these examples are representative.

45

"...identify the specific rulings that they believe are erroneous, and if they present a colorable claim, this court may review the sealed material *in camera* to determine whether a *Brady* or *Jencks* act violation has in fact occurred.\*\*\*Any future arguments concerning the district court's application of *Brady* and or the *Jencks* Act should be presented in appellant's brief, rather than by motion."

Rather than comply with the Court's order, Appellate Counsel included a section in its Brief titled "The Court's response to *Brady* and *Jencks* Request was Lackadaisical."

### 3.    *Failure to Raise Issue of Ineffectiveness on Appeal*

On appeal, Appellate Counsel relied on structural issues (except the issues related to Robert Smith) that had almost no chance of success and were indeed dismissed *per curiam*.  Appellate Counsel chose to attack the Court as biased but failed to address the glowing deficiencies of trial counsel that were obvious in the record. Jones failure to move to strike the fingerprint identification as rank hearsay was obviously deficient performance, but Appellate Counsel failed to address it.  With respect to the issues regarding Robert Smith, Appellate Counsel cited **Johnson v. Zerbst, supra**, but did not assert that the Court below rendered its opinion without argument on its applicability because the Trial Counsel failed to raise the issue.

46

## V.    INEFFECTIVENESS BY TRIAL AND APPELLATE COUNSEL

Coates was convicted of three counts of Use of firearm During and in
Relation to a Crime of Violence or Drug Trafficking on or about November 17,
1996 (Count's 34, 35, and 36). He was sentenced to 240 months on counts to
be served consecutive to each other and all other counts. Although it is uniformly
held that gun possession that is uninterupted merges, Trial Counsel did not raise
this issue at sentencing or file a motion to correct the sentence. Matthews v.
United States, No. 03-CF-432 (D.C. 2006); *Bruce v. United States*, 471 A.2d
1005 (DC 1984); *Monroe v. United States*, 600 A.2d 98 (DC 1991); *United
States v Chalan* 812 F2d 1302 (1987, 10th Cir.). Appellate Counsel did not
seek remand to merge the counts.

## VI.    PROSECUTORIAL MISCONDUCT

In reviewing the files and records that are currently available Counsel for
Coates believes that the prosecutors engaged in deliberate misrepresentations
and other misconduct but needs further investigation and a complete set of
discovery, *Giglio, Jencks* and the sealed 302s. For example, the prosecution had
asked Coates to stipulate to the fingerprints in reference to Anthony Pryor. In
light of the earlier report saying no fingerprints of value and the claim that the car

47

had been disposed of, it is not surprising that the Government was concerned about getting the fingerprint admitted. When Coates refused to stipulate, it purposefully violated the rules of evidence and admitted the fingerprint identification as pure rank hearsay with no intention to later lay the foundation.

Counsel believes the Government made deliberate misrepresentations regarding the Condon Terrace counts. For example the Government put on evidence regarding a fight between Condon Terrace and Southeast in summer of 1992 while Michael Jones was there for a court hearing in June of 1992. [30] It

---

30

Q.  Was there a time in the summer of 1992, Mr. Gray, when you were down at the court building, D.C. Superior Court, in connection with the case involving a friend of yours by the name of Mike?

A.  Yes.

Q.  Do you know Mike's full name?

A.  Michael Jones.

Q.  And what neighborhood was Michael Jones from?

A.  Condon Terrace.

Q.  When you went to the court building in Superior Court, did you go there by yourself or with other people?

A.  With other people.

Q.  The other people that went with you, what neighborhood were they all from?

A.  Condon Terrace.

Q.  When you got down there, did you see any people from Southwest?

A.  Couple.

Q.  Got to keep your voice up.

A.  A couple of them.

Q.  Okay. Did anything happen between you and the peoplethat you were

48

should be noted that it was Ms. Chaterverdi who supplied the date in her question. Counsel has reviewed the Superior Court records. According to Superior Court records, Michael Jones had a case pending in 1992, but that case was disposed of on March 20, 1992.

Counsel also notes that there was not one scintilla of evidence pointing to Coates involvement in the June 20, 1992 shooting or that Michael Jones was shot at. The Government asserted that Michael Jones was a victim in order to bolster its case for the shooting on June 28, 1992. Knowing that Michael Jones had said that Wayne Perry had shot him, the government sought to connect Coates to a non-existent earlier attempt on Jones life. Counsel also wants to investigate whether Mr. Ziedenberg had a good faith basis for his representation that Michael Jones told the police in the hospital that it was one of Wayne Perry's boys and Wayne Perry who shot Michael Jones.

The testimony of Detective Mitchell that Sowells named Coates on the date

---

with versus the people that were from Southwest?
A.    We was about to get in a beef. ***
A.    I say, we was about to get in a beef.
Q.    What was about to happen? What was happening?
A.    A lot of arguments, this and that, and before, you know, we got into it, there, you know, police got involved with it.
(Tr.050801 p,9-10)

49

of the shooting as his assailant makes absolutely no sense and Counsel intends to further investigate this as an instance of misconduct.

Finally, James Montgomery had told the Government that Sam Carson had killed Paul Ridley. Another man Steven R. DeWitt had been convicted of this murder and been incarcerated for 10 years. The fact that Montgomery was accusing Carson of a murder for which someone else had been convicted had the potential to seriously undermine Montgomery's credibility and the Government's. Although this was clearly *Brady,* the government elected to withhold this information until after the conviction of Coates.

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE

Mr. Coates was charged with the most serious offenses possible, four murders, two kidnappings, several shootings, RICO conspiracy and a Marijuana Conspiracy. He did not select his counsel. His counsel was appointed by the Court and clearly here, Counsel did not function in the manner required by the Sixth Amendment right to Counsel.

> **"Thus, a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding.** The right to counsel plays a crucial role in the adversarial system embodied in the Sixth

50

Amendment, since access to counsel's skill and knowledge is necessary to accord defendants  the "ample opportunity to meet the case of the prosecution" to which they are entitled. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275,  276 (1942); see *Powell v. Alabama, supra*, at 68-69.\*\*\*

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.\*\*\*

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a  trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a  breakdown in the adversary process that renders the result unreliable.\*\*\* When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective  standard of reasonableness.\*\*\* The proper measure of attorney performance remains simply reasonableness under  prevailing professional norms.  Counsel also has a duty to bring to bear such skill and knowledge as will render the trial  a reliable adversarial testing process. *See Powell v. Alabama*, 287 U.S., at 68-69. \*\*\*  Moreover, the purpose of the effective assistance guarantee of the Sixth  Amendment is \*\*\*simply to ensure that criminal defendants receive a fair trial." **Strickland v. Washington**, 466 U.S. 668, ___ 1984)

Appellate Counsel was likewise ineffective for failure to raise on appeal

clear errors in the proceedings below. **Cirilo-Munoz v. United States** 404 F.3d

51

527 (1st Cir. 2005); ***United States v. Reinhart***, 357 F.3d 521 (5th Cir. 2004);

***United States v. Skurdal***, 341 F.3d 921 (9th Cir. 2003); ***Brown v. United***

***States***, 167 F.3d 109 (2nd Cir. 1999); ***Jackson v. Leonardo,*** 162 F.3d 81

(2nd Cir. 1998); and ***Roe v. Delo***, 160 F.3d 416 (8th Cir. 1998)

Mr. Coates further asserts that the government breached its obligation to

the truth under ***Mooney v Holohan*** 294 U.S. 103 (1935); failed to disclose

exculpatory information of ***Kyles v. Whitley***, 115 S.Ct. 1555 (1995), ***Brady v.***

***Maryland,*** 373 U.S. 83 (1963), ***United States v. Agurs***, 427 U.S. 971 (1976),

United States v. Bagley, 473 U.S. 667 (1985); ***Strickler v. Greene***, 527 U.S.

263, 119  S.Ct. 1936, 144 L.Ed.2d 286 (1999)  and deliberately engaged in

misconduct.

## ***CONCLUSION***

For the foregoing reasons and for such other reasons as should appear

from supplementation of the record, that this Court should grant a hearing,

vacate Mr. Coates convictions on each and every count and vacate his sentence.

Respectfully submitted,

_____/ s /_____

Veronice A. Holt, Esq. 183756
W111 3003 Van Ness, NW
Washington, D.C. 20008
(202) 244 - 2659      52

202-244-2659 tel
202-244-6242 fax
veroniceholt@msn.com

### *CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that on February 19 , 2008, a copy of the foregoing
Motion Pursuant To 28 U.S.C. § 2255 To Vacate, Set Aside Or Correct Sentence
wash and delivered to the office of Assistant United States Attorney Robert D.
Okun, Chief, Special Proceedings Division, Room 10-836, 555 4th Street, N.W.,
Washington, D.C.  20530.

                              VERONICE A. HOLT