ORAL ARGUMENT NOT YET SCHEDULED

# No. 21-3072

**(consolidated with Nos. 21-3073, 21-3078, 22-3016, 23-3015)**

*In the*

# United States Court of Appeals

### for the District of Columbia Circuit

————————

## UNITED STATES OF AMERICA,

*Appellee,*

v.

## SEAN COATES, WILLIAM K. SWEENEY, JEROME MARTIN, JR., AND SAMUEL CARSON,

*Appellants.*

————————

On Appeal from the
United States District Court for the District of Columbia
(Nos. 1:98-cr-00329-RCL-002, -003, -004, -006)

————————

# APPELLANTS' APPENDIX

## Volume IV of V

John Longstreth
Jonathan M. Cohen
Tre A. Holloway
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Phone: (202) 778-9000
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com

*Counsel for Jerome Martin, Jr.*

Mark Lanpher
ALLEN OVERY
  SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Phone: (202) 508-8000
mark.lanpher@aoshearman.com

Katherine Stoller
ALLEN OVERY
  SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
katherine.stoller@aoshearman.com

*Counsel for Sean Coates*

Eric Hans Kirchman
LAW OFFICE OF ERIC H. KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Phone: (202) 347-4052
kirchlaw@cs.com

*Counsel for William Sweeney*

David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
Phone: (202) 548-8911
dbs@davidbsmithpllc.com

*Counsel for Samuel Carson*

*Counsel for Appellants*

# TABLE OF CONTENTS

PAGE(S)

## VOLUME I (APP 1–141)

United States District Court Docket Report, Case No. 98-329
(accessed September 27, 2024)................................................................App 1–141

## VOLUME II (APP 141–575)

Excerpts of Transcript
(September 27, 2000)............................................................App 142–147

Excerpts of Transcript
(December 10, 1996) ...........................................................App 148–150

Excerpts of Transcript
(June 8, 2000)......................................................................App 151–173

Excerpts of Transcript
(January 8, 2001) (AM) .......................................................App 174–177

Excerpts of Transcript
(January 10, 2001) (AM) .....................................................App 178–188

Excerpts of Transcript
(January 23, 2001) (PM) ......................................................App 189–193

Excerpts of Transcript
(January 24, 2001) (AM) .....................................................App 194–212

Excerpts of Transcript
(January 30, 2001) (PM) ......................................................App 213–217

Excerpts of Transcript
(February 1, 2001) (AM) ......................................................App 218–225

Excerpts of Transcript
(February 5, 2001) (AM) ......................................................App 226–241

Excerpts of Transcript
(February 8, 2001) (PM) .......................................................App 242–260

Excerpts of Transcript
(February 12, 2001) (AM) ....................................................App 261–274

i

Excerpts of Transcript
(February 13, 2001) (AM) ................................................App 275–290

Excerpts of Transcript
(February 15, 2001) (PM) ................................................App 291–299

Excerpts of Transcript
(March 7, 2001) (PM) ................................................App 300–322

Excerpts of Transcript
(March 12, 2001) (PM) ................................................App 323–357

Excerpts of Transcript
(March 13, 2001) (PM) ................................................App 358–375

Excerpts of Transcript
(March 14, 2001) (AM) ................................................App 376–395

Excerpts of Transcript
(March 14, 2001) (PM) ................................................App 396–409

Excerpts of Transcript
(March 15, 2001) (AM) ................................................App 410–435

Excerpts of Transcript
(April 4, 2001) (AM) ................................................App 436–455

Excerpts of Transcript
(April 9, 2001) (AM) ................................................App 456–462

Excerpts of Transcript
(April 9, 2001) (PM) ................................................App 463–466

Excerpts of Transcript
(April 24, 2001) (PM) ................................................App 467–469

Excerpts of Transcript
(April 25, 2001) (AM) ................................................App 470–476

Excerpts of Transcript
(May 1, 2001) (AM) ................................................App 477–485

Excerpts of Transcript
(May 23, 2001) (AM) ................................................App 486–496

Excerpts of Transcript
(May 23, 2001) (PM) ................................................App 497–514

Excerpts of Transcript
(May 29, 2001) (PM) ...................................................................App 515–531

Excerpts of Transcript
(May 30, 2001) (AM) ..................................................................App 532–541

Excerpts of Transcript
(June 14, 2001) (PM) ..................................................................App 542–550

Excerpts of Transcript
(June 26, 2001) (AM) .................................................................App 551–565

Excerpts of Transcript
(June 26, 2001) (PM) ..................................................................App 566–569

Excerpts of Transcript
(July 2, 2001) (PM)......................................................................App 570–575

## VOLUME III (APP 576–1043)

Sweeney Motion to Compel Discovery Number 1
(February 9, 1999) (Doc. 71) .....................................................App 576–602

Carson Motion for Dismissal of Counts, to Compel Disclosure of Exculpatory Evidence,
and for Additional Sanctions Due to Violations of *Brady v. Maryland*
(July 16, 2000) (Doc. 329) ........................................................App 603–616

Sweeney Motion to Admit into Evidence the Maryland Grand Jury Testimony of Two
Unavailable Witnesses Who Were Introduced
by the State's Attorney for Prince George's County
(November 2, 2000) (Doc. 450).................................................App 617–620

Order Denying Motions to Compel (Jackson, J.)
(September 28, 2000) (Doc. 451) ..............................................App 621–625

Carson Motion to Adopt William Sweeney's Motion to Admit into Evidence the Maryland
Grand Jury Testimony of Two Unavailable Witnesses Who Were Introduced by the State's
Attorney for Prince George's County
(November 6, 2000) (Doc. 452)......................................................App 626

Government's Memorandum in Opposition to Sweeney and Hill's Motions for Admission of
Grand Jury Testimony of Unavailable Witnesses
(November 16, 2000) (Doc. 481).............................................App 627–632

Second Retyped Indictment
(July 2, 2001) (Doc. 760) .........................................................App 633–711

Verdict Form
  (August 16, 2001) (Doc. 810) ..................................................App 712–749

Order Denying Appellants' Motion to Allow Counsel to Review Specific Sealed Portions of the
  Trial Record
  (August 28, 2003) (USCA Case No. 02-3015, Doc. 769196) ......................................App 750

Brief of Appellants Sweeney, Carson, Coates, Martin, and Hill
  (April 25, 2005) ..................................................................App 751–771

Appeal from the United States District Court for the District of Columbia
  (June 14, 2005)....................................................................App 772–814

Reply Brief of Appellants Sweeney, Carson, Coates, Martin, and Hill
  (July 6, 2005) .....................................................................App 815–929

Sweeney Emergency Motion for Access to Court Records and Points and Authorities in Support
  Thereof
  (February 5, 2008) (Doc. 1013) ....................................................App 930–933

Martin Motion to Vacate, Set Aside, Correct Sentence Pursuant
  to 28 U.S.C. Section 2255
  (February 18, 2008) (Doc. 1021) ...................................................App 934–950

Sweeney Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 USC §2255
  (February 19, 2008) (Doc. 1017) ...................................................App 951–967

Martin Motion to Vacate, Set Aside, Correct Sentence Pursuant to 28 U.S.C. Section 2255
  (February 18, 2008) (Doc. 1021) ...................................................App 968–984

Carson Motion Under 28 USC § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in
  Federal Custody
  (February 18, 2008) (Doc. 1023) ...................................................App 985–990

Coates Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence
  (February 19, 2008) (Doc. 1020) ..................................................App 991–1043


## VOLUME IV (APP 1044–1456)

Carson Motion to Join the Petitions Filed by Co-Defendants for Relief
  Pursuant to 28 U.S.C. § 2255
  (March 17, 2008) (Doc. 1024) ....................................................App 1044–1045

Martin Motion to Stay the 28 U.S.C. 2255 Motion
  (May 7, 2008) (Doc. 1028) .......................................................App 1046–1050

Carson and Sweeney Joint Unopposed Motion for Extension of Time to File Supplements to
      Motions to Vacate
      (February 2, 2011) (Doc. 1065) .............................................................App 1051, 1056–1057

United States' Unopposed Motion for Extension of Time to File Response to Defendants'
      Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255
      (July 2, 2010) (Doc. 1053) ................................................................................App 1052–1055

Carson Motion to Reconsider Motion for Discovery Based Upon New Evidence
      (October 9, 2014) (Doc. 1132) ...........................................................................App 1058–1068

Sweeney Supplemental Motion to Vacate, Set
      Aside or Correct Sentence, Pursuant to 28 USC §2255 and Incorporated Memorandum of
      Facts and Law (November 28, 2014) (Doc. 1140-2) .........................................App 1069–1152

Carson Motion to Join Petitioner Sweeney's Motion to Unseal Specific Exhibits
      (January 29, 2015) (Doc. 1153) .........................................................................App 1153–1154

Coates Pro Se Supplemental
      Claims in Relation to the Original Motion Pursuant to 28 U.S.C. § 2255
      (February 24, 2015) (Doc. 1166) .......................................................................App 1155–1163

Exhibit 1 to Sweeney's Supplemental Motion
      (February 25, 2015) (Doc. 1156-2) ....................................................................App 1164–1173

Exhibit 2 to Sweeney's Supplemental Motion
      (November 28, 2014) (Doc. 1144-1, 1145-1, 1146-1, 1147-1) .........................App 1174–1226

Exhibit 3 to Sweeney's Supplemental Motion
      (November 28, 2014) (Doc. 1141-2) ..................................................................App 1227–1230

Exhibit 4 to Sweeney's Supplemental Motion
      (November 28, 2014) (Doc. 1141-3) ..................................................................App 1231–1236

Exhibit 5 to Sweeney's Supplemental Motion
      (November 28, 2014) (Doc. 1142-1) ..................................................................App 1237–1246

Exhibit 6 to Sweeney's Supplemental Motion
      (November 28, 2014) (Doc. 1143-1) ..................................................................App 1247–1268

Exhibit 7 to Sweeney's Supplemental Motion
      (November 28, 2014) (Doc. 1142-2) ..................................................................App 1269–1270

Exhibit 8 to Sweeney's Supplemental Motion
      (November 28, 2014) (Doc. 1142-3) ..................................................................App 1271–1272

Exhibit 9 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-4) .................................................App 1273–1275

Exhibit 10 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-5) .................................................App 1276–1277

Exhibit 11 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-6) .................................................App 1278–1280

Exhibit 12 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-7) .................................................App 1281–1285

Defendants' Unopposed Motion for Extension of Time to File Memorandum in Support of
Defendants' Motion to Vacate Sentence
(February 25, 2015) (Doc. 1158) ......................................................App 1286–1288

Carson Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C.
Section 2255
(April 9, 2015) (Doc. 1170) ..............................................................App 1289–1332

Government's Ex Parte Submission of Additional Materials to the Court Regarding James
Montgomery
(April 9, 2015) (Doc. 1174-3).............................................................App 1333–1363

Court Exhibit 8
(April 9, 2015) (Doc. 1175-1).............................................................App 1364–1424

Affidavit of Lexi Negin Christ
(April 9, 2015) (Doc. 1178-1).............................................................App 1425–1427

Application for Statement of Charges
(April 9, 2015) (Doc. 1178-3).............................................................App 1428–1429

Court Exhibit 4
(April 9, 2015) (Doc. 1174) ...............................................................App 1430–1456

## **VOLUME V (APP 1458–1831)**

Carson Unopposed Motion for Leave to File Under Seal
(July 23, 2015) (Doc. 1180).............................................................App 1458–1461

Martin Supplement to Motion to Vacate in Light of *Johnson v. United States*
(June 23, 2016) (Doc. 1182) ............................................................App 1462–1465

Carson Supplement to Motion to Vacate After Johnson Decision
(June 24, 2016) (Doc. 1183) ............................................................App 1466–1468

Coates Supplement to Motion to Vacate in Light of *Johnson v. United States*
    (June 27, 2016) (Doc. 1184) ...........................................................App 1469–1470

Coates Motion for Leave to Join Samuel Carson's Supplemental Motion and to File Under Seal
    and to Late File This Motion
    (June 27, 2016) (Doc. 1185) ...........................................................App 1471–1517

Carson Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C.
    Section 2255
    (June 27, 2016) (Doc. 1185-1)........................................................App 1518–1561

Order Granting Carson's Motion for a Briefing Schedule (Lamberth, R.)
    (April 7, 2017) (Doc. 1188) ............................................................App 1562–1563

Sweeney Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC
    §2255 and Incorporated Memorandum of Facts and Law
    (June 26, 2017) (Doc. 1197) ...........................................................App 1564–1647

Sweeney Supplement to Amended Supplemental Motion to Vacate, Set Aside or Correct
    Sentence Pursuant to 28 USC §2255 and Incorporated Memorandum of Facts and Law
    (October 31, 2018) (Doc. 1229).......................................................App 1648–1650

Martin Supplement to Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C.
    §2255 by a Person in Federal Custody
    (November 21, 2018) (Doc. 1233)....................................................App 1651–1688

Affidavit of Jennifer Wicks
    (October 6, 2020) (Doc. 1280).........................................................App 1689–1690

Memorandum Opinion (Lamberth, R.)
    (October 27, 2021) (Doc. 1283)........................................................App 1691–1739

Memorandum Opinion (Lamberth, R.)
    (May 23, 2022) (Doc. 1305) ............................................................App 1740–1765

Sweeney's Reply to the Government's Opposition to His Motions to Vacate, Set Aside or Correct
    Sentence Pursuant to 18 U.S.C. § 2255
    (July 14, 2020) (Doc. 1277)..............................................................App 1766–1828

Declaration of William K. Sweeney
    (October 6, 2020) (Doc. 1280-2) .....................................................App 1829–1831

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA              :


                    v.                :        CR. NO.  98-329-03 (TFH)


SAMUEL CARSON                         :

DEFENDANT'S MOTION TO JOIN THE PETITIONS FILED BY CO-DEFENDANTS
FOR RELIEF PURSUANT TO 28 U.S.C. §2255

   The defendant, through undersigned counsel, pursuant to the Federal Rules of Criminal

Procedure, and 28 U.S.C. §2255, respectfully requests that this honorable court grant him leave

to file the petitions filed by former co-defendant's Sweeney, Martin, and Coates for post

conviction relief .  In support of this request, the defendant states the following:

   1.  The defendant/petitioner is presently serving a life sentence as a result of his

conviction for a variety of narcotics related offenses and acts of violence. He has previously

requested that the time for filing a petition be extended in this matter.[1]

    2. The defendant notes that petitions for relief have already been filed by three of his

former co-defendants; Sweeney, Coates, and Martin.

   3. To the extent that these petitions raise issues in which the defendant has standing to

join, he would request that he be permitted to adopt those issues as his own. Additionally, he

requests that his previously filed request for a filing extension be granted to allow him to file a

memorandum on those claims that are his alone.

_____

       [1]In a separate motion, the defendant is requesting that counsel be appointed to aid him in
pursuit of post-conviction relief.

1

4. The granting of this request is consistent with the ends of justice and judicial economy. Further, the government will not be prejudiced by the granting of this motion.

WHEREFORE, for the foregoing reasons, the defendant respectfully requests that he be granted leave to join in the petitions filed by his former co-defendants.


_____/s_____
Edward C. Sussman, No. 174623
Counsel for Defendant
Suite 900 - South Building
601 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 737-7110



CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served electronically on all interested parties this 17th day of March, 2008.


_____/s/_____
Edward C. Sussman

2

Copies to: Judge
AUSA – Special Proceedings
DR.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

MAY – 7 2008

Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES OF AMERICA,
        PLAINTIFF, RESPONDENT,

V.

Case No. 98-329(~~TPJ~~) TFH

JEROME MARTIN,
        DEFENDANT/PETITIONER.

_____/

## MOTION TO STAY THE 28 U.S.C. 2255 MOTION

COME NOW, Jerome Martin, the defendant, acting in pro-se
and respectfully moves this Honorable Court to stay his motion
under 28 U.S.C. 2255 which was timely filed on February 18, 2008

In support of his motion the defendant shows this Court
as follows:

(1)

In July and August 2001, Martin was convicted in a jury
trial of narcotics conspiracy, RICO conspiracy, first degree
murder, and other offenses.

(2)

In the Jury trial Martin was represented by Joanne Hepworth,
ESQ.

(3)

On direct appeal of this criminal conviction, Martin was
represented by Reita Pendry, ESQ., in which was subsequently DENIED
in February of 2007. **RECEIVED**

MAY – 7 2008                          page 1 of 5

Clerk, U.S. District and
Bankruptcy Courts

(4)

Following his denial of his first appeal counsel Reita Pendry was retained[again] by Martin's family to handle this motion under 28 U.S.C. 2255, which she personally prepared.

(5)

On or about February 7, 2008 Martin received his copy of the §2255 motion which was personally filed by Joanne Hepworth and Reita Pendry in this Court sometime during this period.

(6)

That upon Martin's personal observation he discovered that counselor Pendry or Hepworth had [FORGED] his signature on all the §2255 documents, as though he had actually filed his §2255 in pro-se. Martin never consented to/or authorized this forgery.

(7)

That on or about March of 2008 Martin received a copy of [sealed] documents to United States of America v. Arthur Rice, criminal case No. 96-249(PLF), as filed in this Court which show clearly and irrefutably that counsel Reita Pendry represented Arthur Rice in a criminal matter around March of 1998, and [prior] to her representation Martin on his direct appeal and §2255 motions. See; the attached Exhibits, (A) and (B).

(8)

That counsel Pendry diligently represented Arthur Rice, a [key] government witness in Martin's criminal trial, and [never] notified Martin of this "conflict of interest", to present date.

page 2 of 5

(9)

That upon receipt of Exhibits (A) and (B), Martin has
consistently sought to inquire of counsel Pendry as to this **\*1**
"conflict of interest", and has made several serious attempts
to retain [new] counsel of record, in the effort to supplement
and/or amend his §2255 Motion with additional issues including
"conflict of interest on direct appeal" and / or "Ineffective
Assistance of Counsel on direct appeal."

(10)

That Martin's family shall effectively retain counsel to
replace counsel Pendry and amend his §2255 within the next two
or three weeks, with due diligence.

Wherefore;the defendant Jerome Martin prays this Honorable
Court  stay this § 2255  motion  for a  thirty (30) day period,
or in the alternative allow the defendant opportunity to amend
or supplement **\*2** his §2255 with issues relative to the stated
"conflict of interest" after the government's response. **\*3**

---

**\*1** Please note; counselor Reita Pendry and Joanne Hepworth, Martin's
direct appeal and trial attorney(s), respectively, have currently
opened a [joint] private practice.

**\*2** See; Rule 15 , Federal Rules of Civil Procedure.

**\*3** See; United States v. Stitt, 441 F.3d 297 (4th Cir.2006).

**page 3 of 5**

Respectfully submitted,

by: *[signature]*

Jerome Martin # 18894-083

USP-Hazelton

Bruceton Mills, WV. 26525

## CERTIFICATION

I, Jerome Martin, the undersigned, and defendant pro-se
in this motion to Stay depose and state under the penalty of
perjury that this motion is true and correct. 28 U.S.C. §1746.

EXECUTE ON: **3-15-08**

by: *[signature]*

Jerome Martin

**page 4 of 5**

## CERTIFICATE OF SERVICE

I, Jerome Martin, and the undersigned depose and state under the penalty of perjury that I have provided all parties to this cause of action with a true and exact copy of this MOTION TO STAY THE 28 U.S.C. § 2255 MOTION by enclosing their respective copy into a postage pre-paid envelope, sealed therein, and addressed to:

Jeffrey Taylor, US Attorney
555 4th Street, N.W.
Washington, D.C. 20001

Reita Pendry
Attorney at Law
PO Box 5432
Charlotte, N.C. 28299

Joanne Hepworth
601 Penn. Ave, Ste 900
South Building
Washington, D.C. 20004

; and hand-delivered to the prison mail-room authorities at the USP Hazelton, P.O. Box 2000, Bruceton Mills, WV 26525, for deposit into the U.S. Postal Service.

Executed this, _____ day of,_____, 2008.

By: _____

Jerome Martin.

**page 5 of 5**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 1:98-CR-329 (RCL) |
| | § | |
| SAMUEL CARSON, | § | |
| WILLIAM SWEENEY | § | |

**JOINT UNOPPOSED MOTION FOR EXTENSION OF TIME
TO FILE SUPPLEMENTS TO MOTIONS TO VACATE**

Defendants SAMUEL CARSON and WILLIAM SWEENEY, by and through undersigned counsel, respectfully move this Honorable Court for an extension of time to file their respective supplements to their motions to vacate.

1. Counsel for Mr. Sweeney moved for an extension of time to file supplements to motions to vacate on November 21, 2010, requesting in that motion an extension up to February 22, 2011 for Defendants Sweeney and Carson to file their supplements. This Honorable Court granted that motion on November 23, 2010.

2. Counsel for Defendants Carson and Sweeney now require additional time to supplement their motions to vacate as undersigned counsel for Mr. Carson has been unable to procure access to 26 boxes of discovery until Wednesday, February 2, 2011. The reason for same is that the boxes of documents are in storage and previous appellate counsel was unable to procure them until this date due to acts of god (last week's storm) as well as outdated computer technology.

3. Counsel for Mr. Carson has communicated with AUSA Margaret Chriss, and while the United States does not waive any timeliness arguments in this matter, the government does not oppose the Court giving Defendants Carson and Sweeney until

-1-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | **Criminal No. 98-329 (RCL)** |
| | * | |
| v. | * | |
| | * | |
| SAMUEL CARSON, | * | |
| WILLIAM SWEENEY, and | * | |
| SEAN COATES, | * | |
| Defendants. | * | |

**UNITED STATES' UNOPPOSED MOTION FOR
EXTENSION OF TIME TO FILE RESPONSE TO DEFENDANTS' MOTIONS TO
VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255**

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, respectfully files this Unopposed Motion for Extension of Time to File Its

Response to Defendants' Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28

U.S.C. § 2255 ("Section 2255 motion"). In support of this request, the United States represents

as follows:

1.    On September 18, 1998, defendants and others were charged in a multi-count indictment

with narcotics conspiracy, murder and other crimes of violence, narcotics trafficking and

weapons possession. United States v. Carson, 455 F.3d 336, 347 (D.C. Cir. 2006).

These charges arose from defendants' "organized and massive business of selling drugs"

that occurred from the 1980s to 1998 "in and around the 200 block of K Street,

Southwest, in the District of Columbia." Id. at 339. Trial began on November 15, 2000;

the presentation of evidence lasted approximately 7.5 months. On July 9, 2001, the jury

began deliberating. Id. at 347. "Throughout July and August 2001, the jury returned

guilty verdicts against [defendants] on numerous counts and not guilty verdicts on several

counts, and found some racketeering acts proven and others not proven." Id. The trial

judge imposed "lengthy terms of imprisonment," with each defendant receiving "at least a life sentence." Id. at 382. Their convictions and sentences were affirmed in their entirety on direct appeal. Id. at 339.

2.    Defendants Carson, Sweeney, and Coates each has filed a Section 2255 motion. The Court has ordered the United States to file a response to these motions by July 6, 2010.[1]

3.    This case recently was re-assigned to undersigned counsel after AUSA Mary Ann Snow, who initially was assigned to this matter, was appointed Acting Chief of the Special Proceedings Division.

---

[1] The Court has not ordered the United States to file a response to the pro se Section 2255 motion filed by defendant Jerome Martin on February 18, 2008. On May 7, 2008, defendant Martin filed a Motion to Stay. Then Chief Judge Hogan, to whom this case was assigned at the time, directed the United States to file a response to the Motion to Stay. On November 11, 2008, the government filed a Response stating that it did not oppose the motion. Based on the docket sheet, it does not appear that any further action was taken on the Motion to Stay.

On January 2, 2009, Frances D'Antuono entered her appearance as counsel for defendant Martin "for purposes of further investigating, supplementing and prosecuting" his Section 2255 motion. Undersigned counsel recently spoke with Ms. D'Antuono and understands that counsel still intends to file a supplement to defendant Martin's Section 2255 motion. However, Ms. D'Antuono informed undersigned counsel that she has been experiencing serious medical issues and considerable pain for some time, that she is taking pain medication which inhibits her ability to work, that she is scheduled for hip replacement surgery in October 2010, and thus that she cannot commit to a date by which she will be able to file a supplement to defendant Martin's Section 2255 motion. Again, the United States does not waive any timeliness arguments in this matter, but does not oppose this defendant being given additional time to file a supplement. In light of the size of this case, and to maximize judicial efficiency, the Court may wish to order the United States to file a response to defendant Martin's Section 2255 motion and stay this entire co-defendant matter until defendant Martin is able to file his supplement. To ensure that the Court is apprised of the parties' progress during this stay, the Court could order that the parties file a joint status report every six months. Undersigned counsel suggested this approach to counsel for the defendant and all counsel, save for counsel for defendant Sean Coates, were unopposed.

4.  Undersigned counsel has spoken recently with Jenifer Wicks, counsel for defendant Sweeney, and understands that counsel intends to file a supplement to defendant Sweeney's Section 2255 motion within 90 days, or by October 4, 2010.

5.  While the United States does not waive any timeliness arguments in this matter, we do not oppose the Court giving defendant Sweeney until October 4, 2010 to file a supplement to his Section 2255 motion.

6.  The United States respectfully requests that it be given 90 days after defendant Sweeney has filed his supplement, or until January 3, 2011, to file its response to the Section 2255 motions and supplements thereto filed by defendants Carson, Sweeney and Coates. This amount of time is reasonable, given that the evidentiary phase of this trial lasted over 7 months, and that the trial and appellate records relating to this case are voluminous.

7.  Undersigned counsel has communicated the proposed schedule - that defendant Sweeney have 90 days to file his supplement and that the government have 90 days thereafter to file its response - to counsel for defendants Carson, Sweeney, and Coates, and all counsel are unopposed.

8.  A proposed scheduling order is attached.

3

App 1054

**WHEREFORE**, the United States respectfully requests that defendant Sweeney be permitted to file his supplement to his Section 2255 motion by October 4, 2010, and that the United States be permitted to file its Response to the Section 2255 motions and supplements thereto filed by defendants Carson, Sweeney and Coates by January 3, 2011.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney
D.C. Bar Number 447-889

MARY ANN SNOW
Assistant United States Attorney
Acting Chief, Special Proceedings Division
D.C. Bar Number 379-757

\_\_\_/s/_____
MARGARET J. CHRISS
Assistant United States Attorney
D.C. Bar Number 452-403
Special Proceedings Division
555 4th Street, N.W.
Washington, D.C.  20530
Margaret.Chriss@usdoj.gov
(202) 307-0874

4

May 30, 2011 to file their respective supplements to their Section 2255 motions. However, the government requests 90 days in which to file its Response to the Section 2255 motions and supplements thereto filed by Defendants Carson and Sweeney, up to and including August 30, 2011 (which Defendants Carson and Sweeney do not oppose).

4. Counsel for Defendant Carson has also communicated with Veronice Holt (counsel for Mr. Coates) and Frances D'Antuano (counsel for Mr. Martin). All counsel do not object to this request.

WHEREFORE, for the foregoing reasons, as well as any additional reasons deemed meritorious by the Court, undersigned counsel and Defendants Carson and Sweeney request until May 30, 2011 for filing their respective supplements in support of their motions to vacate.

Respectfully submitted,

_____/s/_____
KIRA ANNE WEST
D.C. Bar No. 993523
1325 G Street NW, Suite 500
Washington, D.C. 20005
(202) 236-2042 Phone
(830) 816-3388 Fax
Email: kira1836@msn.com

ATTORNEY FOR DEFENDANT SAMUEL CARSON

_____/s/_____

JENIFER WICKS
Bar No. 465476
Law Offices of Jenifer Wicks
The Webster Building
503 D Street, N.W., Suite 250A
Washington, D.C. 20001
(202) 393-3004 Phone
(202) 478-0867 Fax
Email: jenifer.wicks@verizon.net

ATTORNEY FOR DEFENDANT WILLIAM SWEENEY

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading was served by the ECF System on all counsel of record on the 2nd day of February 2011.

_____/s/_____
KIRA ANNE WEST

-3-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 1:98-CR-329-03 (RCL) |
| | § | |
| SAMUEL CARSON | § | |

## DEFENDANT CARSON'S MOTION TO RECONSIDER MOTION FOR DISCOVERY BASED UPON NEW EVIDENCE

Pursuant to Rule 6 of the Rules Governing Section 2255 cases, Defendant Carson hereby requests this Honorable Court to reconsider it's previous order of September 23, 2013 (Docket entry #1124) denying further discovery regarding the extent and reason for payments made to certain witnesses in exchange for their testimony in this matter. The Supreme Court has said that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is …entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) ellipsis in original; quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969). Since the original Motion for Discovery filed by defendant Carson (Docket entry #1088), new evidence has come to light that meets the threshold required for further discovery in this case.

In support of the motion, Mr. Carson offers the following:

1. Mr. Carson was convicted of 21 counts of the indictment in this matter including Counts 35, 36 and 37 involving the use of a firearm in relation to the murder of Alonzo Gaskins (35), Darnell Mack (36) and Melody Anderson (37). The murder of these individuals will hereinafter be referred to as the "triple murder" for purposes of this motion.

2. On April 18, 2012 Mr. Carson filed a motion for discovery with regard to records of payments made to witnesses regarding the triple murder. (Docket #1088)

3. On Sept. 23, 2013, this Honorable Court granted in part and denied in part Mr. Carson's motion for additional discovery. The portion that was denied is addressed herein in this Mr. Carson's Motion for Reconsideration of His Discovery Motion Based Upon New Evidence.

4. During the past year since the denial of said motion, the counsel for Mr. Carson has hired two different private investigators trying to locate the witnesses referred to as Pinckney and Owens who had critical information about the triple murder and, in fact, stated previously, both in Grand Jury testimony and in police interviews that others, not Mr. Carson or his associates, were responsible for these murders. (See attached as Exhibit A, Prince George's County Police Department Statement of Cheree Owens, 12/8/96)

5. These witnesses formed the basis for Mr. Carson's discovery request regarding payments made and relocation provided to them after testifying in the Prince George's County Grand Jury in December of 1996.

6. Mr. Dale Vaughan, a private investigator hired by Mr. Carson, was able to determine that Mr. Pinckney is now deceased. The Death Certificate for Mr. Pinckney has been obtained pursuant to this Court's order (document #1330) of October, 2, 2014, and will be filed under seal as Exhibit B this motion.

7. Mr. Vaughan thereafter located an address in Virginia where he determined Ms. Owens might now live.

8. On May 29, 2014, counsel for Mr. Carson and Mr. Vaughan drove to Ms. Owen's home to speak with her.

9. Ms. Owens agreed to discuss the case with Mr. Vaughan and counsel for Mr. Carson at that time. She related at length the process by which the Federal Bureau of Investigation moved her and Mr. Pinckney to numerous locations and paid them money after the testimony in the Prince George's County Grand Jury relating to the triple murder.

10. Counsel for Mr. Carson and Mr. Vaughan presented Ms. Owens with a prepared affidavit containing her previously made statements and asked her to sign it so that it could be presented with this motion.

11. Ms. Owens indicated that the information was true in the affidavit but that she didn't want to sign it and get involved because she was afraid for her life and is currently under a doctor's care for health related issues.

12. Mr. Vaughan has executed an affidavit regarding these facts and it is made a part of this motion and attached as Exhibit C.

As previously detailed in the original motion filed, the pertinent facts are as follows:

1. As part of the investigation of the triple murder that took place in late November, 1996, witnesses were brought to testify before a Prince George's County (hereinafter PG County) grand jury and also interviewed by PG County Police Officers. Federal Officers also questioned at least one individual, and possibly more, regarding the triple murder investigation.

2. As part of the triple murder investigation, two witnesses, John Pinckney and Cheree Owens, testified on December 10, 1996 before a Prince George's County grand jury regarding the triple murder. In this testimony Pinckney and Owens implicated an individual named Dennis Green in the triple murders and not Mr. Carson or any of his associates. (Government's Brief on Appeal at p. 174).

3. "When Pinckney and Owens came to the police with this information, they were provided with a substantial amount of money for their relocation, which was meant to last several weeks. The couple went through the money in a matter of days and then demanded additional funds." (Id at 175).

4. At approximately the same time, the federal government, by and through the Federal Bureau of Investigations (FBI), arrested Robert Smith on December 5, 1996. It was at this time that Smith began providing information about the triple murder to the federal government. (Government's Brief at. p. 182). The Government contends that there is "no reason to believe that the FBI shared any of Smith's statements with Prince George's County as early as December 10, 1996, when Pinckney and Owens testified. (Citing Agent Lisi 5/29 Tr. 9-10, 12-13).

5. On Friday, November 22, 1996, 18 days prior to the testimony of Pinckney and Owens, The Washington Post published a story regarding the investigation of the triple murder. In that story Prince George's County Police Chief John S. Farrell stated that, "agents from the FBI and the Drug Enforcement Administration have joined the probe into two incidents that appear linked—a triple homicide in Temple Hills on Sunday and a fatal drive-by shooting nearby of a Waldorf man on Wednesday." (See Attachment A, Washington Post, November 22, 1996, Metro Section, "Prince George's Police Seek Clues to Five Killings; U.S. Joins Probe of Four That Appear Linked.")

6. According to the Government "At the time Pinckney and Owens testified the investigators had no reason to believe that either Pinckney or Owens were lying." (Government's Memorandum in Opposition to Defendants Sweeney and Hill's Motions for Admission of Grand Jury Testimony on Unavailable Witnesses, Joint Appendix 1002, n. 1).

7. According to the Government "[t]his view quickly changed." The police soon came to believe that they were being used by Pinckney and Owens. This belief was based on the fact that Pinckney and Owens were given a considerable amount of money that was to be used for their relocation and was meant to last several weeks. The pair went through the funds in a matter of days and then demanded additional funds." *Id.*

8. According to the Government, Police also learned that Pinckney and Owens owed Green (the person they testified committed the triple murder) money for drugs and that investigators found nothing to corroborate their story, and shortly thereafter Pinckney and Owens "seemingly disappeared." *Id.*[1]

---

[1] This allegation by the Government has not been proven nor is there any evidence that Pinckney and Owens owed Green anything.

9. The United States Attorney's Office in Washington, D.C. (USAODC) indicted Mr. Carson for the triple murder based on the testimony of Mr. Smith. The Maryland authorities agreed to dismiss their triple murder charges against the person charged as a result of Pinckney and Owens' testimony only under an agreement with the federal Government to bring the charges under the umbrella of a federal RICO indictment. (Carson's Brief on Appeal at p. 138)

10. There appears to be no record of a prosecution of Pinckney and Owens for obstruction of justice or theft of government funds that was brought by Maryland state authorities or federal authorities.

11. At his trial, Mr. Carson sought to introduce the grand jury testimony of Pinckney and Owens indicating that other persons, not Mr. Carson and his associates, were responsible for the triple murders. Such Grand Jury testimony had been turned over as Brady material to the defense counsel at some point prior to trial. However, because these witnesses could not be located at the time of the trial, Mr. Carson sought to introduce their grand jury testimony under Rule 804 of the Fed. R. Evid, "Exception to the Rule Against Hearsay – When the Declarant is Unavailable as a Witness."

12. Rule 804(b)(1) provides, in pertinent part, that testimony is not hearsay if it "was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and is now offered against a party who had – or, in a civil case, whose predecessor in interest had--- an opportunity and similar motive to develop it by direct, cross -, or redirect examination." Fed. Rule Evid. 804(b)(1).

13. Finding that there was "an absence of an identity of motive on the part of the government," in developing this PG county grand jury testimony, the district court ruled that the testimony was not admissible. (Government's Appellate Brief at p. 175).

14. Mr. Carson appealed this decision as an abuse of discretion by the trial judge. The Appellate Court found that the trial court did not abuse its discretion in excluding the testimony under Fed. R. Evid. 804 (b)(1). In so doing the court stated, "appellants have offered no evidence that the state authorities who directed the testimony before the Maryland grand jury were in any way controlled or even used by federal authorities." (*United States. v. Carson*, 455 F. 3d 336 at 372).

15. The Appellate Court further stated that "The only evidence the defendants point to is testimony from FBI Special Agent Lisi that "[w]e [the FBI] tried to keep them [the Prince George's County Police] involved. Their primary focus was the triple murder. We tried to let them know everything we [had] on the triple murder." (Id.). The court found that this showing was insufficient to show the Maryland grand jury proceeding was merely a "tool" for the federal authorities.

It is uncontroverted that the two individuals placed in front of a grand jury in

Prince George's County testified that other persons, not Defendant Carson and his

associates, committed the triple murders.  The facts show that Pinckney and Owens were

paid a large sum of money for this testimony by the government.  The particular entity of

the government that paid for this testimony is unclear based on the record as it stands.

Mr. Carson has uncovered new evidence indicating that the payments make to Pinckney

and Owens were controlled and orchestrated by the Federal authorities in this case.  This

is the very same federal government that sought to distance itself from the Brady material

created by these witnesses.   This is the very same federal government that mislead the

trial court into thinking a "good faith" attempt was made to locate these witnesses when

in fact there is no evidence that the government truthfully disclosed to the defendant or

the Court the real circumstances surrounding their "disappearance."   The new evidence

obtained since the original ruling on this motion for Discovery demands that further

discovery is warranted to determine the extent of the miscarriage of justice and *Brady*

violations that occurred as a result of the Government's failure to truthfully disclose the

extent of the control and amount of payments and relocation expenses made to Pinckney

and Owens and the federal government's role in secreting the whereabouts of these

witnesses prior to trial. [2]

Based upon this new information, it is clear that the government failed to

truthfully inform the District Court during trial and appeal of the last known whereabouts

of Pinckney and Owens.  Specifically, they failed to disclose the federal government's

---

[2] The Court's order of Sept. 2013 suggests that there is no error here because the
government had no duty to disclose the payments anyway.  However, when the
Government did, in fact, disclose the payments to these witnesses, they had a duty to do
so truthfully, and that did not happen.  They mislead the Court and materially prejudiced
Defendant Carson when they misrepresented the involvement in the relocation and
"disappearance" of these witnesses and the nature and extent of payments made by the
Justice Department.

involvement in the seeming "disappearance" of Pinckney and Owens shortly after their Grand Jury testimony as previously detailed. (Docket #481 governments Memorandum in Opposition to Defendants Sweeney and Hill's Motions for Admission of Grand Jury Testimony of Unavailable Witnesses.)    The Justice Department sought to distance themselves from any involvement with the Pinckney and Owens testimony. It is clear from the new evidence Mr. Carson has uncovered, that they did so by misleading the Court and Defense Counsel and presumably the U.S. Marshall's Service as to the true nature of the involvement in payments and relocation of these witnesses. This impacted the "good faith" effort to locate them at trial by obscuring the last known whereabouts of these witnesses in a veil of confusion and mystery about their disappearance.   Contrary to what they represented to the Court, The federal authorities were intimately involved and responsible for the relocation and payment of funds to theses witnesses and to others for their benefit.   The failure to truthfully inform the court of these facts perpetrated a fraud upon the Court.  Moreover, there was an orchestrated attempt to limit the length of time such payments were made by using words and phrases such as "this view quickly changed," and "a short time later, Pinckney and Owens seemingly disappeared." *Id.*

In this Court's original order denying Carson's first Discovery Motion, it was reasoned that even if Pinckney and Owens were called to testify in person, the disclosure of *Giglio* documents would have been allowed.  However, the court reasons that since they were not allowed to be called, there is no material effect of defendant's rights that they were not disclosed at the time of trial.  This rationale fails to recognize the fraud perpetrated upon the trial court by the Government's false statements regarding the last whereabouts of these witnesses and it's own involvement in their disappearance.

Furthermore, it fails to account for the impeachment material that would have been available to the defendant had he been able to question the Federal authorities about the payment of witnesses they deemed " untruthful" and who "used" the government for their own purposes.

The Government's failure to disclose this information materially affected Mr. Carson's constitutional right to due process, materially affected the outcome at trial and prejudiced the admissibility of the exculpatory statements.   Furthermore, the evidence of payments made by the federal government for testimony in this case, with conscious disregard for the truthfulness of such testimony, goes to the very heart of the case that was presented against Mr. Carson.  The evidence of payments to Pinckney and Owens not only would have impacted the evidence presented about the triple murder, it would have gone to the very heart of the defendant's case, that is; Regardless of whether the government believed Pinckney and Owens, the government continued to pay them off so that they would have influence over them.   Every witness at trial that was paid in a similar fashion is tainted with this same pattern of conduct promulgated by the federal authorities in this case.   All their testimony can be similarly impeached by the fact that the Government paid for testimony that it didn't believe to be true.  The incentive to tell the truth has now been severely diminished for each and every paid witness, as there is no reason to tell the truth and no consequence for lying at trial while testifying.  The witness is paid regardless of the truth of that testimony and paid precisely because the government wants to control that testimony for as long possible.

One of the Government's start witnesses, Robert "Butchie" Smith, had a similar deal with the government to receive benefits for cooperating.   He began to give

information to the Federal Bureau of Investigation and the U.S. Attorney's Office regarding the triple murder approximately the same time as Pinckney and Owens. The Government heard Smith's version of events, but, as we have now discovered, was still paying Pinckney and Owens for their version. That is critical impeachment information that was never turned over to Mr. Carson. Furthermore, the government was paying for this testimony for a much longer time than disclosed. This also suggests Smith's version of events was weaker than the government wanted the Court, the jury or the defense counsel to know. All this would have been highly effective impeachment evidence to be used while cross-examining Agent Lisi at trial. For example: If you believed Smith's information to the extent that it was enough to prosecute Mr. Carson here today, why were you keeping Pinckney and Owens on the witness protection payroll? This impeachment evidence and other related lines of cross-examination were crucial to the defense theory. The government led the Court and Mr. Carson to believe no such impeachment existed because the payments stopped shortly after they testified in the Prince George's grand jury. The newly acquired evidence confirms this was not the case.

The continued cover up at trial and on appeal regarding the federal government's role in the "disappearance" of these crucial witnesses suggests the witnesses were relocated after their testimony was no longer consistent with the government's theory of the case. The discovery sought by Mr. Carson would further substantiate his claims that the same federal government responsible for his prosecution was the same entity hiding witnesses from him that could have been used to defend himself against his charges. Furthermore, the new evidence provides the requisite showing needed to warrant further

discovery into the payments made to these witnesses and any and all documents in the
possession of the Federal Bureau of Investigation, the U. S. Attorney's Office of the
Department of Justice and any other related agencies regarding these witnesses, their
relocation and payments made in exchange for their testimony. These documents are
necessary for Mr. Carson to properly file his 2255, make is constitutional claims
regarding this new evidence and to demonstrate the nature and extent of the Justice
Department's illegal attempt to bolster it's case at trial against Mr. Carson and hide
crucial witnesses and impede the rights of Mr. Carson to defend himself under the Due
Process Clause of the United States Constitution.

Defendant Carson believes that there is a fundamental fairness that has been
breached by the government in this case. The government's payments and subsequent
misrepresentations about them to the Court and Mr. Carson denied Mr. Carson his
fundamental right to a fair trial. This same government repeatedly tried to wash itself
clean of any wrongdoing by pointing the finger at it's other arm. The United States'
Department of Justice claims that once the grand jury testimony happened in Prince
George's County, and they weren't there to be a party to it, their obligations ended.
However, The United States Department of Justice had an obligation to uphold the
constitutional rights of Mr. Carson in all aspects of this case from investigation through
trial and beyond. In light of their continuing financial and investigatory involvement in
the triple murder investigation, the ongoing financial support of Pinckney and Owens and
ultimate relocation out of state of these two witnesses, it is clear they had a Constitutional
duty to truthfully inform the court of the nature and extent of their involvement with
these witnesses.

What Mr. Carson seeks here is the opportunity to examine the following: documents surrounding this triple murder, the payment to these grand jury witnesses, their relocation to various locals at the instruction of the Justice Department, the names and identities of the agents who gave these instructions and payments, and a subpoena for the appearance of Ms. Owens to testify at a hearing or at a deposition before November 28, 2014, the due date from Mr. Carson's 2255 filing.

Carson's 2255 motion will rely on this new evidence and seek to show that, through the government's own actions, deliberate steps were taken to distance itself from the *Brady* evidence created by Pinckney and Owens and it's impeachment impact on their star witness Robert "Butchie" Smith.   That, even when the federal government no longer believed these witnesses to be truthful, they continued to pay and move these witnesses for many more months than disclosed.  Moreover, the government mislead the trial Court and disadvantaged the defendants at trial by covering up the true nature and extent of the Justice Department's involvement in the payments to these witnesses and their location. Continued payments also suggest that the government was not initially convinced of the veracity of Smith's version of events, therefore providing excellent impeachment of Agent Lisi that was never able to come to light.  Carson was directly prejudiced in presenting this exculpatory and impeachment evidence by the Government's misleading behavior.  At this juncture, it is clear Mr. Carson has presented the threshold showing needed to allow discovery of these documents to further support is 2255 motion for relief.

Respectfully submitted,

_____/s/_____

Kira Anne West
1325 G Street, NW
Suite 500
Washington, D.C. 20005
D.C. Bar No. 993523
202-236-2042
kiraannewest@gmail.com
Attorney for Samuel Carson

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | Criminal. No. 98-CR-00329-4 (RCL) |
| WILLIAM KYLE SWEENEY, | : | |
| Defendant. | : | |

### SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 USC §2255 AND INCORPORATED MEMORANDUM OF FACTS AND LAW

Petitioner William Sweeney, ("Sweeney") a prisoner in federal custody, by his attorneys Eric H. Kirchman and Shana Madigan, respectfully supplements his motion, pursuant to 28 U.S.C. §2255, to vacate, set aside, or correct the sentence he received in this case. As grounds for his Motion, Sweeney states as follows:

This motion is based upon all files, records and proceedings in this case.

On September 18, 1998, an indictment was returned against Sweeney and his codefendants. On March 25, 1999, a 101-count superseding indictment was filed, charging Sweeney and his codefendants with violations of 21 U.S.C. §846, Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances ("Narcotics Conspiracy"); 18 U.S.C. §1962(d), Conspiracy to Participate in a Racketeer Influenced Corrupt Organization ("RICO Conspiracy"); 22 D.C. Code §§2401 and 3202, First Degree Murder While Armed; 22 D.C. Code §§501 and 3202, Assault with Intent to Kill While Armed; 18 U.S.C. §1959, Violent Crime in Aid of Racketeering Activity; 22 D.C. Code §§2101 and 3202, Kidnapping While Armed; 22 D.C. Code §505(b), Assaulting a Police Officer; 18 U.S.C. §924(c)(1), Use of a Firearm; 22 D.C. Code §3204(b), Possession of a Firearm During a Crime of Violence; 21 U.S.C. §841(a)(1), Possession

with Intent to Distribute and Distribution of Controlled Substances; 22 D.C. Code §105, Aiding and Abetting; and, 18 U.S.C. §2, Aiding and Abetting.[1]

On August 15, 2001, after a seven-month trial, Sweeney was convicted of conspiracy to possess with intent to distribute and distribution of controlled substances, conspiracy to participate in the affairs of a racketeer influenced and corrupt organization, attempted murder in aid of racketeering, first degree murder while armed (for the murder of Donnell Whitfield), four counts of murder in aid of racketeering (for the murder of Donnell Whitfield, and the triple-murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson), five counts of use of a firearm, and possession of a firearm during a crime of violence. Petitioner Sweeney was found not guilty as to the charge of first-degree murder while armed of Glenn Jenkins, and related offenses.

On February 5, 2002, the Court sentenced Sweeney as follows:

Six concurrent terms of life imprisonment were imposed on the Narcotics Conspiracy count, the RICO Conspiracy count, and the four counts of murder. A supervised release period of five years was imposed on each of those counts, to run concurrently, along with a fine of $500,000.00 and a special assessment of $600.00.

As to Count 35[2] (Use of a Firearm in the RICO Assault of Anthony Pryor), a term of five years incarceration was imposed, to run consecutively to all other counts, and to be followed by five years of supervised release to run concurrently with all other counts. A special assessment of $100.00 was also imposed as to this count.

---

[1] A Retyped Indictment was filed on January 4, 2001. All count numbers referred to in this motion shall refer to the counts as numbered in the Retyped Indictment.

[2] This charge is listed as "Count 28" on the jury's verdict form, as well as on the ECF docket.

As to each of Counts 40, 45, 46, and 47[3] (Use of a Firearm in the RICO Murders of Donnell Whitfield, Alonzo Gaskins, Darnell Mack, and Melody Anderson), Sweeney was sentenced to 20 years incarceration, to run consecutively to each other and to all other counts.  A five-year period of supervised release was imposed on each count, to run concurrently with all other counts, and a special assessment of $100.00 was imposed on each count.

On July 21, 2006, the United States Court of Appeals for the District of Columbia Circuit affirmed Sweeney's conviction.  *United States v. Carson, et al*, 455 F.3d 336 (D.C. Cir. July 21, 2006), *petition for rehearing and rehearing en banc denied*, 2006 U.S. App. LEXIS 26335 (D.C. Cir. Oct. 23, 2006).

On February 20, 2007, the Supreme Court denied Sweeney's petition for writ of certiorari.  *Carson, et al v. United States*, 127 S. Ct. 1351 (2007).

On February 19, 2008, Sweeney timely filed his original Motion to Vacate, Set Aside or Correct Sentence, pursuant to 28 U.S.C. §2255.  At the time the motion was filed, significant portions of the trial and appellate records were unavailable to counsel appointed to investigate and litigate matters in Sweeney's §2255 proceeding, which hampered counsel's ability to effectively litigate the issues.  Sweeney sought leave of the Court to supplement his original §2255 motion, as additional material was made available.  This is that supplement.[4]

---

[3] The verdict form and ECF docket list these charges as "Counts 30, 35, 36, and 37," respectively.

[4] Counsel incorporates by reference the claims raised in Mr. Sweeney's original §2255 motion, as well as the claims raised by Mr. Sweeney's codefendants in their post-conviction petitions (original and supplemental).  Because this case was tried in a group prosecution, actions and inactions by other counsel affected the case against and defense of Mr. Sweeney.

3

For the reasons set forth below, Petitioner Sweeney prays that this Court set aside his convictions and sentence in this case.[5]

## MEMORANDUM OF FACTS AND LAW

Sweeney moves the Court to vacate his convictions and sentences on all counts on the grounds that they were obtained by denial of, and in violation of his Constitutional rights. The ultimate legal standard for motions brought pursuant to §2255 is prescribed by statute:

> If the court finds that . . . the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate. 28 U.S.C. §2255.

## BACKGROUND

In this case, Sweeney, along with his codefendants, was charged with a large-scale narcotics and RICO conspiracy. It was the prosecution's theory that Sweeney, along with his codefendants were a group of lifelong friends who grew up in the Greenleaf Gardens neighborhood of Southwest Washington, D.C. The Government alleged that as Sweeney, and his codefendants entered their teenage years, they began selling drugs. By the early 1990's, the Government alleged that a large-scale drug operation had been developed in the neighborhood, through which Sweeney, and his codefendants were selling substantial quantities of marijuana. The government also alleged that Sweeney, and his codefendants engaged in acts of violence, both for

---

[5] Pursuant to the pertinent instructions accompanying the Model Form for Motions Under 28 U.S.C. §2255, prescribed by the Rules Governing Section 2255 Cases in the United States District Courts, we have set forth in our memorandum the pertinent facts and applicable law in support of our motion. However, in discussing the facts relating to our legal claims, we do not mean to suggest that an evidentiary hearing on these claims is unnecessary. To the contrary, because our allegations involve factual, as well as legal issues, a full hearing on this motion is required.

4

purposes of self-enrichment and self-preservation (to protect themselves from both rival drug dealers and prosecution by the Government).

The bulk of the Government's evidence against Sweeney was supplied by the testimony of Government cooperators and jailhouse informants – in pursuit of substantial assistance and other relief from the consequences of their own criminal acts. The self-interested and often conflicting testimony of these witnesses was suspect at best.[6] As an example of the quality of these witnesses is Donald Nichols, a jailhouse informant and a witness who provided some of the Government's only evidence of Sweeney's involvement in drug dealing. At trial Nichols admitted that on previous occasions he had lied in order to gain his freedom. (Tr. 2/26/01 (AM) at p. 63).

The key part of the Government's case against Sweeney came from the admission of substantial hearsay statements made by Robert "Butchie" Smith. These statements of Smith were introduced, pursuant to Federal Rule of Evidence 804(b)(6). The Government called James Montgomery (a cooperating witness) and Federal Bureau of Investigation ("FBI") Agent Vincent Lisi (the Case Agent who lead the FBI's investigation) to testify as to statements allegedly made by Smith which statements incriminated Sweeney.

The Government alleged in its case that Smith was a relative of Sweeney, and was leading a double life as a drug dealer and Government informant. According to the

---

[6] The majority of these witnesses testified that prior to trial they gave false testimony under oath, or false statements to law enforcement, on numerous occasions. *See* Testimony of Reginald Switzer, Trial Tr. 1/25/01 (AM) at pp. 40-1, 62-4; Trial Tr. 1/30/01 (AM) at pp. 75-6; Testimony of James Montgomery, Trial Tr. 3/12/01 (PM) at pp. 27-30; Trial Tr. 3/15/01 (AM) at pp. 53-58; Trial Tr. 3/15/01 (PM) at pp. 3-33; Testimony of Charles Bender, Trial Tr. 4/4/01 (PM) at pp. 33-4; Testimony of Ronald Sowells, Trial Tr. 4/18/01 (AM) at pp. 30-2, 83-5; Testimony of Arthur Rice, Trial Tr. 4/25/01 (PM) at pp. 30:25, 31-33; Testimony of Paul Franklin, Trial Tr. 5/1/01 (PM) at pp. 31, 65-6; Testimony of Demetrius Hunter, Trial Tr. 5/7/01 (PM) at pp. 57-9; Testimony of John Venable, Trial Tr. 5/14/01 (PM) at p. 7.

Government, Smith implicated Sweeney in the triple murder in Temple Hills, Maryland, as well as in the murder of Donnell "Robocop" Whitfield.

These hearsay statements of Smith, a substantial number of which were testified to through the bolstering voice of an FBI Agent and were the keystone of the Government's case against Sweeney. Smith's hearsay statements were relied upon heavily by the Government in its closing argument, and to bring about the conviction of Sweeney in this case.[7]

Apart from the testimony of cooperating criminals seeking favors from the Government in exchange for their testimony, and the hearsay statements of Robert Smith, the Government's case against Sweeney was weak.

With regard to the triple murder in Temple Hills, the only physical evidence linking Sweeney to the house in which the crime was committed was a palm print on the front door of the home. While this piece of evidence might, at first appear to hurt Sweeney's case on closer examination the print was explained. The Government's fingerprint expert testified that there is no way to date prints, and stated that Sweeney's print could have been left on the door at any time. (Tr. 4/2/01 (PM) at pp. 72-3). More importantly it was made clear at trial that the house at which the murders occurred was used as a gambling house, and Sweeney had visited the house a number of times in order to gamble. (Tr. 6/6/01 (PM) at pp. 48-61).

Moreover, Shaheem Johnson, testified at trial that he had seen Sweeney in the house on a previous occasion (Johnson testified that he did not know Sweeney at the

---

[7] *See* Government's Closing Argument, Tr. 6/26/01 (AM) at pp. 24-5, 48; Tr. 6/26/01 (PM) at pp. 18, 24, 44, 62-64; Tr. 6/27/01 (PM) at pp. 6-10, 25-7, 40.

time, but that Sweeney had stood out and could be identified as a result of his Tourette Syndrome). (Tr. 6/12/01 (PM) at pp. 86:9-14, 87:15-21).

In addition the testimony of Cinama Hawkins, the Government's eyewitness and the sole survivor of the triple murder, was impeached at trial by the testimony of Prince George's County Police Officer Robert Taylor, the first person that Hawkins came into contact with after fleeing the Temple Hills house once the killers had left. Officer Taylor testified that when he interviewed Ms. Hawkins at the scene, with the facts and circumstances of the events that evening still fresh in her mind, described both of the murders as being six (6) feet tall. (Tr. 6/12/01 at pp. 59-68). Sweeney could never have been mistaken as six feet tall.

James Montgomery was used by the Government to implicate Sweeney in the triple murder. Montgomery testified that he was there with Sweeny on the night of the murders and was a participant in the crime, yet he was never able to provide a consistent statement of the events of the crime he claimed to have participated in. Montgomery's testimony at trial was inconsistent with prior statements that he had given to law enforcement and with his grand jury testimony. (Tr. 3/14/02 (AM) at pp. 51-3; 3/15/01 (PM) at pp. 16-32; 6/27/01 (PM) at pp. 22-23).

Turning now to the Government's case against Sweeney for the murder of Donnell Whitfield. The Government's case on this charge was also weak, as it relied mainly on the testimony of John Venable, whose credibility was impeached by his conflicting grand jury testimony. (Tr. 5/14/01 (PM) at pp. 9-18, 28-9, 34-5).

As will be demonstrated herein, the Government's case against Sweeney was weak. This combined with the ineffective assistance of counsel that Sweeney received at

7

both trial and on appeal, the trial court's errors and the misconduct of the Government,

there is a reasonable probability that the outcome of the proceedings would have been

different.  Sweeney was convicted, and sentenced to multiple life sentences, at a trial and

in appeal that was fundamentally unfair.  Accordingly, relief must be granted.

<div align="center">

**GROUNDS FOR RELIEF**

</div>

### A. *BRADY* AND *GIGLIO* MATERIAL WAS SUPPRESSED IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS[8]

The discovery obligations of federal prosecutors are generally established by

Federal Rules of Criminal Procedure 16 and 26.2, 18 U.S.C. §3500 (the Jencks Act),

*Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150

(1972).  In addition, the United States Attorney's Criminal Resource Manual ("USAM")

describes the Department's policy for disclosure of exculpatory and impeachment

information. *See, e.g.* USAM §9-5.001.

Prior to trial in this case, the parties conducted extensive discovery.  In addition to

all material subject to disclosure under Federal Rule of Criminal Procedure 16, Sweeney

requested that the government produce all material in its possession to which he was

entitled under *Brady*, the Jencks Act, and *Giglio*. [9]

---

[8] The withholding of this material at trial was the result of both prosecutorial misconduct and error by the trial court.  Petitioner Sweeney challenges his convictions on both of those grounds with respect to the suppressed material.

[9] In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court of the United States held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution."  Application of the *Brady* doctrine was extended to testimonial impeachment in *Giglio v. United States*, 405 U.S. 150 (1972).  In holding that favorable evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different, the Supreme Court in *United States v. Bagley*, 473 U.S. 667 (1985), disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes.  Accordingly, Petitioner refers to such evidence collectively as "*Brady* material" throughout this brief.  The Jencks Act, 18 U.S.C. § 3500 ("Jencks Act"), provides that after a government witness testifies at trial the government must produce, on request, any previously made statements by that witness which relate to the witness's

<div align="center">

8

</div>

Prior to and during trial, the Government repeatedly assured the Court and the defendants that it had fulfilled all of its discovery obligations, and that all discoverable material had been provided to the defense. *See e.g.*, Oral Argument Transcript, 9/27/00 at p. 130:17-20. Evidence that was not turned over to Sweeny before or during the trial, or during the time that Sweeny's appeal was pending, reveals that the Government's repeated assurances were wrong. The suppressed evidence contains a substantial amount of *Brady* material all of which was withheld from the defense throughout the course of the trial and appeal in this case. This systematic withholding of favorable evidence material to the defense violated Sweeney's right to due process, and rendered the entire proceeding unfair and Sweeney's convictions unreliable.

## 1. PETITIONER HAS CAUSE FOR RAISING THE SUPPRESSED *BRADY* EVIDENCE ISSUE IN HIS §2255 MOTION

Throughout trial in this case, the Government maintained a practice of submitting material to the Court *ex parte* and under seal. The justification offered by the Government for doing so was most often "security concerns." As a result, there is a large amount of material to which the defense never had access, and consequently, never had the benefit of using to challenge the Government's case at trial or on appeal.

It was not until one week prior to the running of the statute of limitations on Sweeney's filing his post-conviction motion, when Sweeney was granted access to all of the material that had been suppressed by the Government and the trial court. On February 13, 2008, prior *habeas* counsel for Sweeney filed an Emergency Motion for Access to the Entire Court Docket [#1015]. In the motion, counsel requested the Court to

---

testimony on direct examination. 18 U.S.C. § 3500(b). If the government fails to produce such statements, the court is required to strike the testimony of the witness. 18 U.S.C. § 3500(d).

order that all papers and proceedings in this matter be unsealed and that counsel be provided with a copy thereof.

On February 15, 2008, the Court granted that motion, and ordered the Clerk to provide copies of any necessary sealed pleadings in this case to counsel for Sweeney. Order, dated February 15, 2008 (TFH) [#1016].

On February 19, 2008, counsel filed Sweeney's Motion to Vacate under 28 U.S.C. § 2255, in order to preserve his claims, without having had the benefit of time to review the large volume of material that had been unsealed by the Court's order.

On December 20, 2012, undersigned counsel was appointed to represent Sweeney in this matter. Upon joining the case, undersigned counsel obtained approximately 15 boxes of material related to this matter from prior counsel. The boxes contained, *inter alia*, material from trial counsel, transcripts, and some of the previously sealed material from the case that had been obtained pursuant to the Court's February 15, 2008, Order. The documents in the boxes were not indexed, organized, or labeled in any discernable fashion. Undersigned counsel has undertaken a lengthy review of the material contained in the boxes, and discovered a trove of suppressed *Brady* material.

In *Strickler v. Greene*, 527 U.S. 263 (1999), based on facts very similar to those here, the Supreme Court found that the petitioner had demonstrated cause for his procedural default of a *Brady* claim. In *Strickler*, after exhausting both his direct and collateral state appeals, the petitioner discovered exculpatory material that had been suppressed by the government pursuant to the federal *habeas* court's order granting petitioner access to all of the police and prosecutions files in the case. *Id.* at 278. The Court held that the petitioner had established cause for failing to raise his *Brady* claim

10

earlier, because prior to the federal *habeas* court's order, the prosecution had represented that petitioner had already received all discoverable material and the petitioner had no access to the material. *Id.* at 289. Here, given the facts that (1) the Government repeatedly represented at trial that it had fulfilled all of its discovery obligations, and that all discoverable material had been provided to the defense; (2) notwithstanding those representations, discoverable *Brady* material was withheld from Petitioners and placed under seal by the trial court; and (3) Petitioner Sweeney only obtained access to the material by court order unsealing the record in this case after all direct appeals had been exhausted, Petitioner Sweeney has clearly established cause for failing to raise his *Brady* claim prior to his *habeas* proceeding. *See id.*

### 2. FAVORABLE EVIDENCE WAS SUPPRESSED IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS

A thorough review of the previously sealed material revealed that throughout the course of trial in this case, the Government repeatedly withheld exculpatory, impeachment, and bias evidence from the defense, in violation of Petitioner Sweeney's right to due process and a fair trial. This systematic withholding of favorable evidence by the Government, with the consent of the trial court, is more than enough to significantly "undermine[] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted). Accordingly, the interests of justice warrant relief, and vacate Sweeney's convictions.

### 3. SUPPRESSED EVIDENCE RELATING TO THEODORE WATSON

Theodore Watson was a key witness for the Government, having implicated Sweeney, and his codefendants in a number of crimes. Watson was one of several cooperating witnesses presented by the government.

11

Watson was a defendant in a criminal case in the United States District Court of Maryland, located in Greenbelt, Maryland. As a result of this charge Watson was being held at the Northern Neck Regional Jail at the same time that Sweeney was also being held there. During this time Watson claimed, and testified at Sweeney's trial, that Sweeney told him about his involvement, among other things, in kidnapping, murder and drugs and he further wanted to have Montgomery killed for cooperating with the Government. (Trans 2-8-01, P.M. page 45 to 70) As such Watson's creditability became a central issue for the defense at trial.

Watson in order to reduce the sentence for the crime he had been charged with in Maryland and to obtain a § 5K1.1 recommendation from the Government entered into an agreement with the U.S. Attorney's Office in Greenbelt. This was done pursuant to a plea agreement in *United States v. Theodore Watson*, No. 99-069 (PJM), in the District of Maryland, Watson was obligated to fulfill certain cooperation requirements in exchange for the possibility of receiving a § 5K1.1 recommendation from the Government. *See* Ex. 1 (Watson Plea Agreement, pp. 5-6 at ¶ 6).

Watson cooperated with the Government in Greenbelt but at his sentencing, on February 4, 2000, the Government refused to file a § 5K1.1 letter on Watson's behalf or request a reduction in his sentence, despite Watson's fervent argument that a § 5K1.1 letter and reduction in his sentence was merited given his extensive cooperation with the Government. The court unmoved by Watson's protests, imposed a sentence of 105-months on Watson.

At trial in Sweeney's case, following Watson's testimony on direct examination, the defense, naturally cross-examined Watson as to why the U.S. Attorney's Office in

12

Greenbelt had refused to file a §5K1.1 letter on his behalf when he had cooperated with

that office. Watson attempted to explain the U.S. Attorney's Office refusal as being the

result of Ms. Wilkinson, the Assistant U.S. Attorney assigned to his case, simply not

liking him.

As is shown by the following colloquy on cross-examination:

**Q.** You have already told us that you met with Ms. Wilkinson, correct?
**A.** Correct.
**Q.** And that you gave her your information, correct?
**A.** Correct.
**Q.** And you did not get the 5K1 letter for substantial assistance, correct?
**A.** Correct.
**Q.** Okay. My question is do you know why you did not get the 5K1 letter from Ms. Wilkinson?
**A.** Yes.
**Q.** What was the reason?
**A.** She made it very clear she did not like me and she didn't want to give me anything.
**THE COURT**: I am sorry?
**THE WITNESS:** She made it very clear that she did not like me and she did not want to give me anything.
**BY MR. KIERSH:**
**Q.** Okay. And when you tell us that she made it very clear that she did not like you, what did she say that led you to formulate the belief that she did not like you?
**A.** Number one was her attitude toward me, and my attorneys had told me, "Ms. Wilkinson doesn't like you, and she doesn't want to give you anything. She doesn't want to hear anything from you. She doesn't want to talk to you about anything. The only time she wants to see you is at trial."

(Tr. 2/12/01 (AM) at pp. 19-21).

Watson, later attempted to provide a reason why Wilkinson might not like him

tried to make it appear that Wilkinson was angry with him as a result of him having made

her look bad in front of another Assistant U.S. Attorney, as shown by the following

exchange:

**BY MR. KIERSH:**
**Q.** Sir, what was the substance of the conversation that day?

13

**A.** Well, Ms. Barbara Skyler, one of the prosecutors for the District Court in Greenbelt – she wanted some information that one of my attorneys had passed on to Ms. Wilkinson, which Ms. Wilkinson had passed on to Ms. Skyler. Sandra Wilkinson was the district attorney who was prosecuting my case. When I first came in, Ms. Wilkinson told me, you know, "You're not on our team, and you're not likely to be on our team. And I want you to answer all the questions that Ms. Skyler asks you truthfully and honestly." And I explained to her some things that happened in her case – two of the cases she was prosecuting. And when I finished talking with her, she made a statement – and this can be verified – she said, "Why didn't I hear about this before I gave all these lenient pleas out?" And I looked at Ms. Wilkinson and I looked at my attorney. I said, "I told you this months ago before you did that." She just looked at Ms. Wilkinson, and that was the end of it.

(Tr. 2/12/01 (AM) at p. 44).

At the conclusion of the court proceedings on February 12, 2001, the defense

made the following request:

**MR. DAVIS:** And I would ask that the United States Attorney's Office review that file.
**THE COURT:** If they have not done that, and I would ask that they call the prosecutor's office in Greenbelt to find out whether or not there is anything that could be characterized as, quote, Brady material in their file. Other than that --
**MR. DAVIS:** Thank you, your Honor.
**THE COURT:** -- that's the extent of the government's obligation. Okay?

(Tr. 2/12/01 (AM) at p. 78).

The following day the Government obtained Watson's file from the U.S.

Attorney's Office in Greenbelt, and the following exchanges occurred:

**MR. ZEIDENBERG (AUSA):** I believe we are, your Honor. Just on a matter left over from yesterday, pursuant to the Court's instruction, we contacted the U.S. Attorney's Office in Greenbelt. We retrieved their file yesterday evening and have reviewed it. There is nothing, in our view, that suggests any Brady or Jencks material in the file. The Assistant U.S. Attorney out there indicates in one letter that the reason that Mr. Watson did not get a 5K letter was simply because she didn't believe his cooperation was of a significant enough nature to qualify. **There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature.** Detective Norris – we spoke with him briefly yesterday. And he had called – we tried to get in touch with him – and he indicated similarly that Mr. Watson had never provided him with information that he felt was untrustworthy of any kind. Nevertheless, we do have

14

the file, and I don't know if the Court wishes to have it to peruse.  There are letters --

**THE COURT**:  You mean the file from Greenbelt?

**MR. ZEIDENBERG**:  Yes.  There are letters from Mr. Watson to the prosecutor, as he describes – several lengthy letters, talking about a variety of matters, including his own case and other cases that he knows about and things of that nature.

**THE COURT**: Do you want to have it made part of the court record?

**MR. KIERSH**:  Yes, your Honor.

**THE COURT**:  All right.

**MR. KIERSH**:  I ask that it be placed under seal and made a part of the record.

\*\*\*

**THE COURT**:  Number 5.  All right.  Number 5.  **I do not intend to review it in camera.**

**MR. ZUCKER**:  That would be my request.

(Tr. 2/13/01 (AM) at pp. 6-7) (emphasis added).

Despite the Government's assurances, the material contained within the Greenbelt file goes directly to the credibility of Watson as a witness.  The prosecutor, in this case, after having reviewed Watson's Greenbelt file, told the trial court that the reason that Watson had not been given a §5K1.1 letter by Ms. Wilkinson, ". . . was simply because she didn't believe his cooperation was of a significant enough nature to qualify.  There was nothing to suggest that it was not worthy of belief or it was incredible.  There was nothing of that nature."  (Tr. 2/13/01 (AM) at p. 6).  The prosecutor's statement that there was nothing in the Greenbelt file to suggest that Watson was not worthy of belief or incredible was at best an error in judgment, and at worst, a calculated lie.

The Greenbelt file was included in the material obtained by counsel when the record was unsealed in this case.  A review of that file revealed that it indeed contains a copious amount of evidence that Watson chronically lied and schemed in pursuit of a departure, and contrary to the representations of the Government at trial, that the Government was well aware of his untrustworthy nature.  The file contains several

15

lengthy letters, from Watson to the AUSA in Greenbelt, which detail the many occasions

on which he lied to investigators. For example, in one letter, Watson states:

> This letter is to sincerely thank you for allowing me a "second
> opportunity" to cooperate and help myself. I abysmally apologize for the
> asinine [sic] way I conducted myself when the option was presented to
> me. Had I just simply complied and told you the truth at our initial
> meeting, I would have avoided the unnecessary mental anguish that
> entailed… There is no denying that during my 30 years in the system, I
> have lied [,] connived and schemed to get things done."

*See* Ex. 2 (Greenbelt file, Letter from Watson, dated August 19, 1999, at pp. 1, 4).

Another letter reveals that not only was the Greenbelt AUSA (Ms. Wilkerson) well aware

that Watson was a liar, but also that she hesitated to continue cooperation with him due to

his untrustworthy nature:

> I would like to touch lightly on your harshness towards me as a liar at the
> first conference and thereafter. Ms. Wilkerson, again I apologize and
> confess that at our first conference, I lied and somewhat distorted the truth
> regardless of my reasoning… Before I attempt to put the matter in its real
> perspective and sequence, again I would like to touch briefly on your view
> towards me as a liar… I believe that I have stated to you that "yes," I have
> lied [,] schemed and connived at times to obtain my way or freedom… In
> reference to me attempting to secure assistance on my own in an effort to
> help myself, Ms. Wilkerson, you advised [my attorneys] that you did not
> want to hear or discuss anything for or about me, and you did not want to
> see me until trial.

*See id.* (Greenbelt File, undated 17-page letter, at pp. 1, 2, and 12).    A third letter,

written just after his sentencing hearing, at which the Government declined to file a

departure letter and he was sentenced to 105 months incarceration, reveals Watson's

desperation and willingness to do anything in pursuit of a reduction in sentence:

> I could have made a lot of cases from the street, but that was not to be.
> But with your blessings, I wish to try to do as much as possible from
> within. I do have pertinent information for other prosecutors at the
> moment. One case involving a multi-kilo drug dealer and "hit man." *I
> will cooperate and do exactly as you say.* I just hope and pray that I do
> and give enough to be afforded a sizable downward departure.

16

*See id.* (Greenbelt File, Letter dated February 4, 2000, at pp. 5-6) (emphasis added).

Further, Ms. Wilkinson, the Greenbelt AUSA, wrote a letter on February 21, 2000, to the court in Greenbelt concerning Watson, in which, among other things, she stated, "Finally, please be advised that, since Mr. Watson's sentencing, he mailed me a second lengthy letter regarding the information he believes he has – despite my specific directions to not contact me directly. **Mr. Watson continues to undermine his own credibility** as well and his ability to follow directions from the government." *See id.* (Greenbelt File, Ms. Wilkinson's letter, dated February 21, 2000) (emphasis added).

The refusal of the Government to give Watson a §5K1.1 letter and the statement that Mr. Watson continues to undermine his own credibility is explained by the next letter in the Greenbelt file, which is a 15 page handwritten letter from Watson to Ms. Wilkerson. In this letter Watson writes, "I would like to touch briefly on your harshness towards me as a liar at the first conference and thereafter. Ms. Wilkerson, again, I apologize and **confess that at our first conference, I lied** and somewhat distorted the truth regardless of my reasoning." *See id.* (Greenbelt File, 15 page Watson Letter at p. 1) (emphasis added). Watson, in the same letter, again addressing the point that Ms. Wilkerson thinks he is a liar, writes:

> ". . . again I would like to touch briefly on your view towards me as a liar
> 1) I believe that I have stated to you that "yes", I have lied schemed and
> connived at times to obtain my way or freedom. * * * I also stated this to
> an F.B.I. agent from the D.C. office when interviewed twice on an
> unrelated matter, his response to me was. "we all lie." Even though I
> knew this from personal experience, I was very surprised to hear a F.B.I.
> agent make that statement.
> 2) The majority of political are noted liars. There are the top heads of our
> states and county who were proven wrong doers and liars, Vice Pres. Spiro
> Agnew, President Richard Nixon, and President William Clinton, just to

name a few.  There is no way I am comparing myself with these figures other than a liar is liar regardless of who they are.

3) Ms. Wilkerson, perhaps you have not experienced it, but I am sure that you have heard of agents and or government witnesses testifying falsely under oath, and the misconduct of prosecutors.") * * *  (page 2)

4)  * * * I cannot say whether or not you have ever lied in your life, and if you have not, then you are truly blessed.  And, if not, then there is some discrepancy and contradiction in the Bible because God says in Romans 3:4  . . . .God is true even though every human being is a liar . . . . * * *

5) Again, human beings by nature instinctively lie to avoid prosecution, loss of life, freedom, bodily harm, harm to love ones, to acquire or maintain jobs or status, embarrassment and etc.  Please, Ms. Wilkerson, ask yourself if you would lie under these or any other adverse conditions? Heads and leaders of our country have. (Page 4-5)

*See id.* at pp. 1-2, 4-5.  Watson's admission that he lied to Ms. Wilkinson and his further statements that lying is an instinctive part of human nature, and is understood by God, goes to and impeaches his credibility and reliability as a witness.

The jury should have heard that the reason that Ms. Wilkinson did not like Watson, and the reason, that she did not want to give him anything and the reason he did not get the 5K letter is that Watson lied to her in the first meeting that he had with her. This is the only inference that one can take from Watson's handwritten letter in which he admits he lied to her and his lies are the reason for Ms. Wilkerson not liking Watson.

Once the Government had reviewed Watson's Greenbelt file, it should have taken steps to correct the testimony of Watson as to the reason he was not given a §5K1.1 letter in Greenbelt.  It was not because Ms. Wilkinson did not like him (I am sure she does not like many of the people to whom she had given §5K1.1 letters) and it was not because Watson had made Ms. Wilkinson look bad in front of another AUSA, but was in fact the result of Watson lying to her and that Watson wrote letters in which he states that he sees nothing wrong with lying to help himself out of a tight spot.  Watson even went so far as to quote the Bible to justify his having lied to Ms. Wilkinson.

18

Instead of doing this, the Government simply told the trial court and the defense that there was "nothing to suggest that it was not worthy of belief or it was incredible. Nothing of that nature." (Tr. 2/13/01 (AM) at p. 6). In order to make such a statement the Government had to ignore the facts that Ms. Wilkinson wrote to the court in Greenbelt that Watson continues to undermine his own credibility and that Watson admitted that he had lied to Ms. Wilkinson.

The principle that the Government may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

As the Supreme Court has made clear:

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.

*Napue v. Illinois,* 360 U.S. 264, 269 (1959) (*quoting People v. Savvides,* 136 N. E. 2d 853, 854-855 (N.Y. Ct. App. 1956)).

In *Brady,* 373 U.S. at 87, the Supreme Court held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." *See also* Ex. 3 (American Bar Association, Project on Standards for

19

Criminal Justice, Prosecution Function and the Defense Function § 3-3.11(a). When the

"reliability of a given witness may well be determinative of guilt or innocence,"

nondisclosure of evidence affecting credibility falls within this general rule. *Napue,* 360

U.S. at 269.

When as in this case " . . . the undisclosed evidence demonstrates that the

prosecution's case includes perjured testimony and that the prosecution knew, or should

have known, of the perjury.[7]  In a series of subsequent cases, the Court has consistently

held that a conviction obtained by the knowing use of perjured testimony is

fundamentally unfair,[8] and must be set aside if there is any reasonable likelihood that the

false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427

U.S. 97, 103-104 (1976)

Here, the Government's good faith is even in doubt as the Government

suppressed Watson's Greenbelt file by misrepresenting the contents of the file to both the

trial court and to the defense. Had the Government accurately reported to both the court

and the defense, that Ms. Wilkinson had written to the court in Greenbelt that Watson

continued to undermine his own credibility, and that Watson admitted that he had lied to

her, and that Watson viewed lying as a natural and justifiable method to get out of

trouble, the trial court would have ordered the file to be disclosed to the defense. Once

the file was disclosed to the defense Watson would have been cross-examined as to the

contents of his letters, his views on telling lies, and the true reason he was not given a

§5K1.1 letter in Greenbelt.[10]

---

[10] It would have been better had the Government just produced the Greenbelt file to the court and remained silent as to its contents and allowed the court to make its own determination as to the significance of the file. The reliance of the court as to the truth of the representations made by the Government, concerning

20

The reliance of the court, as to the truth of the representations made by the Government, concerning the contents of the Greenbelt file is made clear by the trial court stating that, "I do not intend to review it in camera."

Further, the Government should have turned the Greenbelt file over to the defense as *Brady* material after it had reviewed it, because the material contained therein went directly to Watson's credibility as a witness. The course of action pursued by the Government can have only one explanation, that the Government did not want the file disclosed to the defendant because it did not want the jury to hear that Watson lied to the U.S. Attorney's Office in Greenbelt – and the Government did not want the jury to hear Watson's views on lying.

As the Supreme Court held in *Brady*:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The principle of *Mooney v. Holohan* is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts." A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice...

*Brady,* 373 U.S. at 87-88 (internal citations omitted).

Watson's testimony in this case was of great importance to the Government. Not only did Watson claim that Sweeney had confessed to him his participation in a number

---

the contents of the Greenbelt file is made clear by the trial court stating that, "I do not intend to review it in camera." (Tr. 2/13/01 (AM) at pp. 6-7).

of crimes, but more importantly Watson's testimony lends creditability to the testimony

of James Montgomery.  Montgomery's testimony might have been some of the most

damaging evidence introduced against Sweeney at this trial.

Montgomery was a cooperating witness that had lied to the Government,

misrepresented his involvement in crimes to the Government and was otherwise a witness

unworthy of belief.

Montgomery's conduct, character and background made it important for the

Government to find evidence with which to bolster the credibility of Montgomery.

This the Government did by having Watson testify as follows:

> **Q.**  What was Mr. Sweeney's response when you said that?
> **A.**  You know, I still don't think they have anything on me, you know.
> **Q.**  Did he tell you what his concerns were about the case against him?
> **A.**  Yes.
> **Q.**  What was that?
> **A.**  A certain fellow by the name of James Montgomery.
> **Q.**  What did he tell you about James Montgomery?
> **A.**  That he had brought him into the organization and sort of groomed him and brought him along and then the guy turned on him.
> **Q.**  If you could just fill in the he there and tell us that again, Mr. Watson.  In other words, when he said he brought him into the organization –
> **A.**  Mr. Sweeney brought Mr. Montgomery into the organization.  Is that okay?
> **A.**  Yes, thank you.  And what did Mr. Sweeney say about that?
> **A.**  Well, he was somewhat disappointed because Mr. Montgomery had been on several murders with him and did as much as he had done and now he is flipping the script.  Because he got busted on something else, now he is flipping on him to save himself.
> **Q.**  Who is flipping on --
> **A.**  Mr. Montgomery is turning on Mr. Sweeney to save himself.
> **Q.**  Did Mr. Sweeney ask you any advice about that?
> **A.**  Yes.

22

> **Q.** What did Mr. Sweeney ask you about that?
> **A.** He asked me if he could prove that Mr. Montgomery was in on the killings and did as much killing as he did that would they, the jury or whatever, try to work in his favor. I told him no, I didn't think so because it doesn't usually work like that. I said usually the first person that testifies is usually what they go with. And if they got you targeted as the ring leader then that makes the difference.
> **Q.** What was Mr. Sweeney's response?
> **A.** Yeah, I figured as much.
> **THE COURT**: I'm sorry?
> **THE WITNESS**: Yes, I figured as much.
> **BY MR. ZEIDENBERG**:
> **Q.** Now, did Mr. Sweeney talk to you about what role Mr. Montgomery was to play in this case?
> **A.** He was suppose to testify against him.
> **Q.** Did you have any conversation about that fact?
> **A.** Yes. He was talking that Montgomery is going to testify against him. And I said, well, if you got all this muscle and all this gun power and everything, I said, why don't you just kill him, you know. And he said, we been trying to get to that mother fucker but the feds got him hid away too well.
> **Q.** Did he say where they had been looking for him?
> **A.** No.
> (Trans 2-8-01, pm, pages 61-64)

The effect of this evidence on the jury would have been to lend credibility to Montgomery as a witness against Sweeney. As the only reason that Sweeny would want to have a witness killed would be if that witness's testimony was accurate and it would hurt Sweeney at trial.

The evidence in the Greenbelt file overwhelmingly demonstrates that Watson was known by prosecutors to be dishonest, and had a powerful self-interest to do or say anything the Government wanted in his pursuit of a reduced sentence. The Government's claim to the Court that the Greenbelt file contained nothing to indicate Watson's untrustworthiness was a misrepresentation of the highest order. The failure to provide the contents of the Greenbelt file to the defense was plainly violative of the Government's discovery obligations, and Petitioner Sweeney's right to a fair trial.

23

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 4. SUPPRESSED EVIDENCE RELATING TO JAMES MONTGOMERY

James Montgomery was an essential witness for the Government. His testimony implicated the defendants in a number of criminal acts. Again, as with the majority of the Government's witnesses, the defense questioned Montgomery's credibility. Montgomery himself had admitted to, been implicated in, or been convicted of a number of violent crimes. These crimes included assault with a deadly weapon, numerous murders, and assault on a police officer while armed. The Government had promised Montgomery leniency in exchange for his testimony; in fact, Montgomery ultimately received a five (5) year sentence for committing seven (7) murders.

On March 7, 2001, trial counsel requested Agent Lisi's notes related to his interviews of James Montgomery. (Tr. 3/7/01 at p. 52). The trial court ruled that Agent Lisi's notes did not contain *Brady* material. *Id.* at p. 91. The recently unsealed material revealed Agent Lisi's notes regarding Montgomery. The notes contain valuable impeachment evidence as to Montgomery. Specifically, the notes reveal that Montgomery lied to Agent Lisi in his interview with regard to the murder of Timothy Benton. Maurice Proctor and James Montgomery were charged with Benton's murder. Agent Lisi's notes reveal that Montgomery lied, and substituted Carson for himself as one of the perpetrators of the Benton murder. This valuable impeachment evidence could have been used by the defense to further discredit Montgomery by demonstrating his proclivity for lying to protect himself from criminal prosecution, through the false incrimination of others. The suppression of the favorable evidence contained in Agent

24

Lisi's notes, which as discussed, *infra*, was material to Petitioner Sweeney's guilt and

violated Petitioner Sweeney's due process rights. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S.

at 150.                                                                      .

Assuming arguendo that the failure of the Government to turn this *Brady* material

over to the defense is excused by having the trial court review the material, then the trial

court abused its discretion in not ordering this information to be turned over to the

defense. This failure deprived Sweeney of due process as the information was material to

Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable

probability that the results of the proceedings would have been different.

### 5. SUPPRESSED EVIDENCE RELATING TO CHARLES BENDER

On February 5, 2001, trial counsel for the defense asked the court to review the

FBI's 302 reports generated from the FBI's interviews with one of the Government's

witnesses, Charles "L.A." Bender. Trial counsel wanted to know whether Bender's

testimony on the stand was consistent with the statements he gave to the Government.

(Tr. 2/5/01 (A.M.) at p. 84). The trial court ruled that Bender's testimony was consistent

with the information in the 302 reports, and denied the defense access to that material.

The newly unsealed record reveals, however, that the Bender 302 reports contained

*Brady* material, which was unconstitutionally withheld from Petitioners at trial. Indeed,

in one of the Bender 302 reports, Bender stated that codefendant Jerome Martin

confessed to Bender that he (Martin) killed Anthony Fortune. *See* Ex. 4 (Bender 302

Report). As an initial matter, this report was exculpatory *Brady* material as to

codefendant Carson, who was charged with the murder of Fortune. This was significant

25

to Petitioner Sweeney as well, as the Government's theory tied Sweeney to Carson in several murders. Further, the 302 report was valuable impeachment evidence, as it contradicted the Government's theory of the prosecution and could have been used to impeach Bender's testimony at trial. The suppression of the exculpatory and impeachment evidence contained in the Bender 302 report, which as discussed, *infra*, was material to Petitioner Sweeney's guilt, violated Petitioner Sweeney's due process rights. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 6. SUPPRESSED EVIDENCE RELATING TO ARTHUR RICE

On April 24, 2001, trial counsel requested the FBI 302 reports generated from the interview of Government witness Arthur Rice. (Tr. 4/24/01 (PM) at p. 3). Arthur Rice was a jailhouse informant, whom the Government alleged was an associate of Petitioners. The trial court reviewed the FBI 302, dated January 26, 1999, and ruled that it contained no *Brady* material. *Id.* The recently unsealed material reveals that the opposite is true. Rice's 302 reveals that he told Case Agent Lisi and Agent Kevin White, in the presence of AUSA Kenneth Wainstein, that defendant Martin, along with Carson, killed Leonard "Slick" Hyson and Maurice Hallman. In fact, Rice told the investigators that he was

26

present at the time of the murder, heard the gunshots, and then observed Martin and

Carson fleeing the scene. *See* Ex. 5 (Arthur Rice 302 Report). This evidence is favorable

to the defense because it contradicts the Government's theory of the case, which was that

it was James Montgomery who participated in the Hallman/Hyson murders with Carson.

The evidence could have been used to impeach Montgomery, who testified that he was

one of the killers of Hallman and Hyson. (Tr. 3/12/01 (AM) at pp. 55-62). The Rice 302

report was favorable to the defense, as it was both exculpatory and impeached the

credibility of the Government's witnesses; thus, as discussed *infra*, because it was also

material, the suppression of this evidence violated Petitioner Sweeney's right to a fair

trial. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material

over to the defense is excused by having the trial court review the material, then the trial

court abused its discretion in not ordering this information to be turned over to the

defense. This failure deprived Sweeney of due process as the information was material to

Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable

probability that the results of the proceedings would have been different.

### 7. SUPPRESSED EVIDENCE RELATING TO ANDRE MURRAY

On February 1, 2001, trial counsel requested material from the Government relating

to Andre Murray, a cooperating witness for the Government, with whom the Detective had a

long history of dealings. (Tr. 2/1/01 (AM) at p. 65-66). The trial court ruled that the defense

was not entitled to the evidence under the Jencks Act. *Id.* The unsealed record, however,

exposed the fact that a Government Agent's notes also contained *Brady* material.

Specifically, the Government Agent's notes reveal that Andre Murray told the Government

that Petey Johnson ("Fat Petey") killed Robert Smith to get back at Sweeney, allegedly for

killing Petey Johnson's brother, Keith Johnson. Sweeney was charged with the murder of

Keith Johnson. The Government Agent's notes contained evidence that someone other than

Sweeney was responsible for Robert Smith's death; therefore, the notes should have been

produced as *Brady* evidence.

Assuming arguendo that the failure of the Government to turn this *Brady* material

over to the defense is excused by having the trial court review the material, then the trial

court abused its discretion in not ordering this information to be turned over to the defense.

This failure deprived Sweeney of due process as the information was material to Sweeney's

guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable

probability that the results of the proceedings would have been different.

### 8. SUPPRESSED EVIDENCE RELATING TO THE MURDER OF ROBERT "BUTCHIE" SMITH AND THE GOVERNMENTS' FEDERAL RULE OF EVIDENCE 804(B)(6) MOTION.

The cornerstone of the Government's theory of Petitioner Sweeney's purported

liability in the conspiracy came from the admission of hearsay statements made by

Robert "Butchie" Smith, which were introduced through FBI Agent Vincent Lisi (the

Case Agent who lead the FBI's investigation).[11] The Government alleged that Robert

"Butchie" Smith was a relative of Petitioner Sweeney, and was leading a double life as a

drug dealer and informant. According to the prosecution, Smith implicated Petitioner

---

[11] As stated earlier, Petitioner Sweeney was convicted at trial of, *inter alia*, Count 2 in the indictment, the "RICO Conspiracy." Petitioner Sweeney received a life sentence for this conviction. In convicting Petitioner Sweeney of the RICO conspiracy count, the jury found Racketeering Act 50, the conspiracy to commit murder of Robert Smith a/k/a "Butchie," between on or about April 1997 and on or about June 17, 1997, to have been proven.

28

Sweeney in the triple murder in Temple Hills, Maryland, as well as in the murder of Donnell "Robocop" Whitfield.

At trial, the court allowed the admission of Smith's hearsay statements under Federal Rule of Evidence 804(b)(6), holding that through the murder of Smith, the defendants had forfeited their Sixth Amendment Confrontation Clause rights. Without having the opportunity to cross-examine Smith, his testimony, much of which was delivered through the bolstering voice of an FBI Agent, was the linchpin of the Government's case against Petitioner Sweeney. Indeed, this testimony was relied upon heavily by the Government in closing argument, and used to seal the Government's case.[12]

At the time of Robert Smith's murder, Petitioner Sweeney was in custody at the Prince George's County Detention Center. The Government's theory was that Petitioner Sweeney arranged for the murder of Robert Smith, a paid government informant, because he suspected that Smith was providing information to the police about criminal activity involving Petitioner Sweeney.

In addition to a multitude of requests in various forms, prior to and since, Petitioner Sweeney's Third Motion to Compel Discovery [#340], filed July 17, 2000, and specifically sought the information pertaining to Robert Smith to which he was entitled under *Brady*.

The Government sought, and was granted permission, pursuant to Federal Rule of Evidence 804(b)(6) to have FBI Special Agent Lisi, testify to certain incriminating statements allegedly made by Sweeney to his uncle Robert "Butchie" Smith.

---

[12] See Government's Closing Argument, Tr. 6/26/01 (AM) at pp. 24-5, 48; Tr. 6/26/01 (PM) at pp. 18, 24, 44, 62-64; Tr. 6/27/01 (PM) at pp. 6-10, 25-7, 40.

Rule 804(b)(6) provides that, "(6) *Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

It was the Government's contention that Carson had killed Smith after meeting with Sweeney in the Prince George's County Detention Center and being told by Sweeney that Smith had implicated Sweeney, Carson and Montgomery in the triple murder in Temple Hills, Maryland, in statements that he had made to Smith.

At the first hearing on the Government's motion, held on September 27, 2000, the defense wanted the Government to produce any evidence that it had about any other people that might have wanted to kill Smith.

The Government, in response to the request of the defense, made it clear, to both the trial court and to the defendants, that the Government had no information that anyone other than the defendants in this case wanted Smith dead, as is shown by the following:

**MS. CHATURVEDI**:  Certainly, your honor.  If I could just address this briefly. Again, it is sort of a leap of faith.  If the other people who Mr. Smith implicated -- if they knew that he was cooperating with law enforcement, perhaps they had a motive.  That is one leap of faith.

**THE COURT**:  Sure.

**MS. CHATURVEDI**:  And the second one is is there any evidence to suggest any of those people, assuming they did know about the cooperation, took any steps to harm Mr. Smith.  There is no such evidence.  If the defense is trying to raise third-party culpability, there has to be more than mere speculation.

Mr. Kiersh cited to the *Brown Beale* case from the D.C. Court of Appeals.  The *Winfield* case, which is the most most recent case on that point, says you can't just draw a blank.  You can't just pull at straws speculating that someone else may have wanted to have this person killed and we should be entitled to know that.  I will provide --

**THE COURT**:  I Agree.  There has to be some evidence that there were others who had a reason to – that there was a motive for committing the homicide known to those who were in a position to effect it.

30

**MS. CHATURVEDI**: Right. And we don't have any such information. And we recognize that if we did have such information and that steps had been taken to give that, that would be Brady information. That would have been disclosed as Brady information.

**THE COURT**: Yes.

(Trans. 9-27-00, pp. 200-202).

Ms. Chaturvedi's statement that the Government had no information that someone other than the defendants in this case had been implicated in the murder of Smith was incorrect.

The Government was aware, as early as April 2, 1999, that Andre Chappell and Anthony Ricardo Hawkins might have been involved in the murder of Smith.

One of the previously sealed documents in this case is the Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999, which was placed under seal by Judge Jackson on April 6, 1999.[13] *See* Ex. 6 (Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants). The *ex parte* pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney, and Proctor from their pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999.

In the *Ex Parte* Notice, the government states, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." *See* Ex. 6 at p. 12.[14]

---

[13] None of the material obtained pursuant to the Court's Order to unseal appear on the docket sheet in the above-captioned matter.

[14] The Government's motion does not elaborate on the evidence in its possession that led to the identification of these to individuals as those responsible for Smith's murder. Accordingly, Mr. Sweeney requests additional discovery and an evidentiary hearing with regard to this issue, as the evidence on which the Government based its statement would clearly be discoverable under *Brady*, and likely provide further evidence that the Government's misrepresentations and

31

The defense was not aware of this information and was unable to investigate it or advance this in opposition to the Government's motion to admit the statements of Smith.

The Government further suppressed the information contained within the material admitted at trial *ex parte* and under seal, and marked "Court Exhibit No. 4," namely the hand written notes relating to an interview of Andre Murray (who testified for the Government at trial) in which Murray discussed with law enforcement the murder of Keith Johnson. *See* Ex. 7 (Handwritten Andre Murray Interview Notes).

The notes of that interview state, in part:

> "Wit. Heard Gooch telling Draper to kill Keith [Keith was Petey Johnson's brother] Wit. did not hear Draper return to advise Gooch he had killed Keith. He just heard Gooch give the order.
> The word is that Fat Petey started messing with Butchie – killed Butchie to get back at Draper -→ mere rumor."

Ex. 6.

The theory being that Petey Johnson had killed Smith to punish Sweeney for having killed his brother Keith.

This information was never provided to the defense despite the defense's requests for such information and the Government's assurance to the trial court and the defense that if it had such information it would turn it over to the defendants.

---

discovery violations resulted in a trial, and subsequent appeal, that were constitutionally unsound. Mr. Sweeney hereby requests any and all files containing information about Andre Chappell and Anthony Ricardo Hawkins, relating to the murder of Robert Smith. The facts as alleged above provide "good cause" to allow discovery of the requested material. *See Bracy v. Gramley*, 520 U.S. 899, 908-09 ("Good cause" is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.") The facts above demonstrate that "good cause" has been shown; therefore, discovery is warranted. *Bracy* at 908-09.

The significance of the Government's suppression of the motive of Petey Johnson to kill Smith becomes more significant when one looks to the testimony of Agent Lisi, in the following exchange:

> A. I will tell you right now, I never after "Butchie's" murder, picked up Michael Farrar and interviewed him.
> Q. How about Petey Johnson? Did you pick him up?
> A. Yes, sir, because it was believed he was a witness.
> Q. To Robert Smith's murder?
> A. Yes, sir.
> Q. Okay. And you questioned him not just as a witness, but as a possible suspect?
> A. I would say as a witness and maybe somebody -- it was just a hunch that he was there and then he walked away, we believed, at the time "Butchie" was killed. So he may have called somebody to alert them that "Butchie" was there. (Trans. 5-30-01 (AM), pages 19-20).

The Government withheld from the defense evidence that Petey Johnson, a person the Government believed was present at the time of Smith's murder and might have had some role in Smith's murder; Johnson also had a motive to kill Smith which he might have told others about.

The defense was deprived, by the actions of the Government, of an opportunity to investigate the issue of Petey Johnson's motive to kill Smith and the involvement of Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once again had the Government disclosed the information in its possession, that Petey Johnson wanted to kill Smith in revenge for Sweeney allegedly killing his brother, Keith, Agent Lisi could have been cross examined on this point.

The Government's insistence on limiting the defense inquiry into others that might have wanted to kill Smith is further shown when during cross-examination of Agent Lisi by defense counsel, the Government objected when Agent Lisi was asked whether any suspects other than Sweeney had been developed as leads in Robert Smith's

33

murder. (Tr. 5/30/01 (AM), pp. 45-49). At sidebar, the Government argued, "The only suspect – if Mr. Kiersh wants to hear it again – the only suspect in Agent Lisi's mind that ordered that murder was William Sweeney. If Mr. Kiersh wants him to repeat it, that is fine." *Id.* at pp. 47-48.

The Government was quite sure that the defense would be unable to confront Agent Lisi with questions about Petey Johnson's motive to kill Smith or the evidence that implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder as this material had not been turned over to the defense.

The defense was deprived of the opportunity to investigate this information or to attempt to use it in opposition to the Government's motion to admit the statements of Smith.

The Government through its action in keeping this information from the defense put the defense in the position of having no evidence whatsoever to counter the Government's argument that no one other than the defendants in this case had any reason to kill Smith.

The defense being unable to present any serious opposition to the Government's motion to admit the statements of Smith, the trial court granted the motion.

The Government's need to withhold evidence that could implicate others in the murder of Smith is further shown by the weakness of the Government's evidence implicating the defendants in that murder.

The evidence relied upon, by the Government, in support of its motion to admit the statements of Smith was the testimony of Montgomery, as follows:

34

The Government first had Montgomery testify as to what he knew about the

murder of Smith which went as follows:

A.  Chin [defendant Carson] told me that Draper [defendant Sweeney] wanted me and him to come to see him.  So I told him -- I told Chin that I wasn't going to see him, and I didn't have proper ID.  I had an ID with my proper information on it, but it wouldn't have been accepted by -- probably by that jail thing.

Q.  So did you go to see Draper at the jail?

A.  No.

Q.  Did Chin go?

A.  Yes.

Q.  And after he went, did he tell you about his conversation with Draper?

A.  Chin say that him and Draper father went to see him, and --

THE COURT:  Him and Draper what?

THE WITNESS:  Him and Draper father.  Chin and Draper's father went to see Draper.

THE COURT:  Oh, I see.  Draper's father.  All right.

THE WITNESS:  And said that he asked Draper distinctively who did you tell anybody about what had happened?  And he said that Draper admitted to him that he told Butchie, and that Butchie was cooperating with the Feds.

BY MR. ZEIDENBERG:

Q.  Did Chin say what had to be done or what should be done about Butchie?

A.  So Chin told me that if they had no Butchie -- without Butchie, they don't have no case.  They wouldn't have no case.

Q.  And when you were talking about a case, what case was it that you were all concerned about?

A.  The triple murder.

Q.  Now, did you and Chin make attempts together to find and kill Butchie?

A.  Yes.

Q.  Can you tell the ladies and gentlemen about that?

A.  Sometimes when we used to -- when we would go to this carry-out, Leo's --

Q.  Where is that located?

A.  It's on N Street.

Q.  I'm sorry?

A.  South Capitol and N.

* * *

A.  That's near the area where Butchie would more than likely be, as far as when he was in Southwest.  So sometimes when we walked to Leo's we would -- we would already be going to Leo's anyhow, but we would try to see if we see Butchie out there as we are going or coming from there, and sometimes we would drive through, through there.

Q.  What were you going to do if you saw Butchie?

A.  Well, we saw him numerous amount of times, but we couldn't do nothing to him in front of like everybody just like that, do you know what I mean.  We're from

35

Southwest and he is -- he knowed the same people we know, so we couldn't just walk right up to him just like that and do anything to him.

Q. What were you hoping to find? What were you hoping to do?

A. To catch him in a nice position.

Q. What is a nice position?

A. To catch him in a nice position where we could get up on him without a person knowing who we are or without him seeing us coming.

Q. Now, was there an occasion when you and Chin were in a car and you happened to see Butchie?

A. We was in my car.

Q. Can you tell us about that?

A. We rode through housing -- I mean, through Half Street, and Butchie was out there. He was sitting on the steps that lead to Syphax playground. So we hurried up and went to Chin house, I stayed in the car. And he got out and he went and got his sweatsuit, and the gun, and his gut-buster.

Q. What's a gut-buster?

A. Like elastic velcro, like a waistband.

Q. And what's the purpose of that?

A. To hold the gun.

Q. What did Chin do with his sweatsuit -- what kind of a sweatsuit did he get?

A. It was a black sweatsuit.

Q. What did he do with it?

A. He was putting in on while I was driving.

Q. Where was he putting it on?

A. In the car.

Q. What car did you have?

A. Oldsmobile 98.

Q. Where did you go once Chin got back in the car with his gun and his sweatsuit?

A. We went down Canal Street, and then got on -- got onto First Street, and then hit M Street, and then hit South Capitol Street. And I pulled on -- he told me to pull on the side -- on the side of -- like the sidewalk. It's like a little car dealership thing right there. So I stayed right there, and Chin got out to go -- to go through the alley to try to catch him from behind.

Q. Now, was there a discussion between you and Chin about an escape route you were going to take?

A. When he came back to the car then I was suppose to pull straight over the curb and go straight across South Capitol Street Bridge so he could throw the pistol out while we were going over the river, and go around 37th. And that was going to be our alibi.

Q. And that was a plan you discussed before Chin got out of the car?

A. Right.

Q. And again, the purpose in going up and ending up at 37th Place was going to be what?

A. Our alibi.

Q. What happened when Chin got out of the car?

A. He went around there, and he came back, and he said that Butchie was gone. When he got back in the car the first thing I said, I said, what happened? Because I didn't hear the gunshots or nothing. So I said, what happened? And he said that Butchie wasn't there, that he was gone, he said he left that quick.

Q. Now, I want to talk to you about the day that Butchie was actually killed, do you remember that day?

A. Yes.

Q. Where were you the day that Butchie was killed, starting in the afternoon?

A. On Second Street.

Q. Second Street, Southwest?

A. Yes.

Q. And what were you doing there?

A. Selling weed.

THE COURT: What was the date?

MR. ZEIDENBERG: I'm sorry?

THE COURT: What was the date?

MR. ZEIDENBERG: I didn't refer to the date. It is June 16, 1997.

THE COURT: June 16th?

MR. ZEIDENBERG: Yes.

THE COURT: All right. Go ahead. I'm sorry.

BY MR. ZEIDENBERG:

Q. Where were you -- you were on Second Street?

A. Yes.

Q. And what were you doing?

A. Selling weed.

Q. Now, at some point did you see Chin?

A. Chin came out of his house and came and got my car keys.

Q. Did you give it to him?

A. Yes.

Q. Did you ask him why he needed your car?

A. No.

Q. Was it uncommon for Chin to come by and take your car?

A. No. I mean, he would get it all the time, whenever.

Q. Now, did he tell you where he was going?

A. No.

Q. Now, sometime later, after Chin -- did he leave with your car?

A. Yes.

Q. Okay. Sometime later did you come to find out that there had been a shooting over on Half Street?

A. Yes.

Q. And at some point did you learn that that was Butchie?

A. Yes.

Q. What did you do when you found out that Butchie had been killed?

A. I got somebody's -- I got a bicycle from somebody and I rode up there, I rode the bicycle up there.

Q. And where did you ride to?

37

A.   To the corner of Half and O Street.

Q.   What did you see when you got there?

A.   There was a lot of marked and unmarked police cars and a lot of people was out there.

Q.   Was Butchie's body still on the ground?

A.   I didn't see his body.  I seen like the crime scene tape and stuff like that.  I didn't go all the way down there because it was a lot of polices down there.

Q.   I take it you heard -- you had heard from people out there that it had been Butchie that was killed?

A.   Yes.

Q.   How did you feel when you heard that Butchie was killed?

A.   I was happy.

Q.   How concerned were you, prior to Butchie being killed, how concerned were you about the fact that he was still alive?

A.   It was of great concern.

Q.   Why is that?

A.   Because Draper had told him about what had happened, and I knew that if they pick us up for it that he could be a witness as to what Draper told him.

Q.   Now, after you went to the scene did you return back to Second Street?

A.   Yes.

Q.   And at some point later that evening did Chin return?

A.   Yes.

Q.   Can you tell us about that?

A.   He came -- I was standing on the corner of Second and P Street and he came from the direction -- I'm not sure if he came straight down P Street or if he turned off of First Street, but I seen him on P Street turning into the alley where I normally -- where I had my car parked at at first.  So when I seen him going into the alley, so I was walking down  -- I was walking down towards that direction.  So no soon as I seen him, so I told him, I said, you know them peoples got hit.

Q.   Your term was what?

A.   I said, you know them peoples got hit.

Q.   You used the term peoples?

A.   That's what I said.  I said, you know them peoples got hit.  He was like, yeah, I know.  So he was like, we're all right.  So I said, yeah.  He said, -- so I said, you know who I'm talking about?  He was like, yeah.  He said, man, trust me, we're all right, just like that.  And then he was like, oh, here are your keys, and gave me my keys.

Q.   Did he seem at all surprised when you told him about that?

A.   No.  And he told me to stay from up Half Street with my car and not to drive it if I didn't have to.

Q.   I'm sorry?

A.   He told me to stay from up Half Street with my car and to not drive it that much if I didn't have to.

Q.   Now, had there been a previous occasion when Mr. Carson, Chin, took your car and then later told you not to drive it in a particular neighborhood?

A.   Yes.

Q.   Can you tell us about that?

38

A.  In '94, when I had my Caddie, I let Chin keep it, him and Poo-Poo had it, and they shot at Craig out of my car at Capers.

Q.  How do you know that?

A.  Because Chin told me.  He told me to stay from up Capers in my car, and he told me that they had took my car to get it washed and wiped down because they had shot out of it.

Q.  Talking about in 1994 now, did Chin tell you why it was that you should not drive your car up to Capers?

A.  No, that was all he said.

Q.  What did you understand that to mean, why you shouldn't go up to Capers?

A.  My knowledge would be that Craig might be able to   identify my car and may think that I was the person who was shooting at him and shoot at me, or somebody else might have seen it and be able to identify my car, and they might not have known who was shooting out of it and may have been thinking that I was the one who was shooting or whatever.

Q.  Mr. Montgomery, after you had learned that Butchie had been killed what did you think -- how were you feeling in terms about that triple murder and your possibly being implicated in it?

A.  Would you repeat your question?

Q.  After you learned that Butchie had been killed how were you feeling about the fact about your chances of being implicated in the triple murder?

A.  I was feeling good pretty much.  To a certain extent I was feeling good.

Q.  Did you think you were in the clear?

A.  To a certain extent I felt as though I was in the clear.

MR. ZEIDENBERG:  I have no further questions, Your Honor.

(5-23-01, p.m., pages 22-33)

It is interesting to note that when Montgomery was with Carson, and according to Montgomery, with the express purpose of killing Smith that they did not do so as there were people around.  Montgomery's testimony is that on the day that Smith was killed Carson did not ask him to go with him on this mission, as he had before, but according to Montgomery, he went on his own.  Moreover Montgomery was not with Carson when Carson allegedly killed Smith.

Most surprising of all of Montgomery's claims is that after Carson allegedly killed Smith, Carson did not tell Montgomery he had done so.  In fact, according to Montgomery, Montgomery brought it up to Carson that Smith had been killed, in the following exchange:

39

[Montgomery] A.  I said, you know them peoples got hit.
Q.  You used the term peoples?
A.  That's what I said.  I said, you know them peoples got hit.  [Carson] was like, yeah, I know.  So he was like, we're all right.  So I said, yeah.  He said, -- so I said, you know who I'm talking about?  He was like, yeah.  He said, man, trust me, we're all right, just like that.  And then he was like, oh, here are your keys, and gave me my keys.

If in fact Carson had killed Smith, why was he unwilling to tell Montgomery he had done so?  Especially when they had, if Montgomery is to be believed, hunted Smith on numerous occasions, planned how Smith would be approached, where the car would be stopped, an escape route and a place to get rid of the gun, and they were always together when they allegedly went to kill Smith.

This all changes when Smith is killed -- Carson suddenly goes out alone, and never tells Montgomery that he killed Smith.  Instead, Montgomery brings up the subject of Smith's murder to Carson.

Moreover, if Montgomery is telling the truth about the statements allegedly made by Carson after Smith's death, that "trust me, we're all right," that would be true no matter who killed Smith.

While the evidence withheld by the Government from the defense appears not be admissible in its own right there is still a *Brady* violation in this case.

> The circuits are split on whether a petitioner can have a viable *Brady* claim if the withheld evidence itself is inadmissible. Most circuits addressing the issue have said yes if the withheld evidence would have led directly to material admissible evidence. We have never squarely ruled on this question, *but cf. United States v. Hemmer,* 729 F.2d 10, 16n. 3 (1st Cir.) *cert. denied,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed2d 371 (1984); *United States v. Ranney,* 719 F.2d 1183, 1190 (1st Cir. 1983) yet given the policy underlying *Brady,* we think it plain that evidence itself inadmissible *could* be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it. *Wood v. Bartholomew,* 516 U.S. 1, 6-8, 116 S.Ct. 7, 133 L.Ed2d 1 (1995) implicitly assumes this is so.

40

Whether the intake note at issue in this case undermines confidence in the verdict is a more difficult question. The clear implication of Jan Smith's note is that someone where Matthew made the prior allegations, told her that the allegations were false. If the defense had known about the note before trial, it presumably could have traced those who could testify as to the circumstances of the allegations and the basis for believing them to be false. Whether the evidence would convincingly establish that Matthew had lied is hard to know but surely the episode most likely would have been investigated and the implication that someone at Hampstead believed it false is strong.

If strong evidence of a prior false accusation exists, it would be very powerful. could easily have created the reasonable doubt necessary to acquit Ellsworth in what was otherwise largely a credibility contest. The lack of any significant corroborating evidence makes this case unusual and heightens the concern about any *Brady* violation. Nevertheless, it would be very odd for us to require a new trial because of a wrongly withheld lead unless the lead would, or would likely, have led to valuable new evidence which was itself arguably admissible. However unlikely it might be after eight years, the state would be entitled to retry Ellsworth if the writ were granted; yet such a remedy would be incongruous unless evidence existed that might alter the result at such a trial. Habeas doctrine is flexible enough for us to condition a grant of the writ on the outcome of a further inquiry into where the lead, even though wrongly withheld, would have taken Ellsworth. *Cf. Manko v. United States,* 87 F.3d 50, 55 (2nd Cir. 1996); Stewart v. Coalter, 48 F.3d 610, 617 (1st Cir.) *cert. denied,* 516 U.S. 853, 116 S.Ct. 153, 133 L.Ed.2d 97 (1995).

If there exists admissible evidence that Matthew made demonstrably false accusations and Ellsworth was not otherwise aware of these allegations at the time of the first trial, a new trial is required. If admissible evidence of false accusations never existed, the writ should be denied. If it did or may well have existed but has been lost because of the *Brady* violation and the ensuing delay in discovery of this fact, Ellsworth may have a good claim to a new trial, *cf. California v. Trombetta,* 467 U.S., 486-88, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

*Ellsworth v. Warden,* 333 F3d 1, 5-6 (1st Cir. 2003).

As a result of the court sealing the information relating to others implicated in the murder of Smith from counsel, there was never an opportunity for the defense to challenge the government's Rule 804(b)(6) motion, investigate the matter of Andre

41

Chappell and Anthony Ricardo Hawkins, or their relation to Carson or any of the other codefendants.

Furthermore, the Government at trial stopped short of explaining or putting on evidence as to how, or who actually killed Mr. Smith. Andre Chappell or Anthony Ricardo Hawkins was not mentioned at all during trial, either by the agents, the prosecutors, or any Witness. *See* Ex. 8 (Affidavit of William Sweeney).

In light of the evidence put forward by the Government at trial for the murder of Smith, for all that is known the evidence that Andre Chappell or Anthony Ricardo Hawkins killed Smith could have been just as strong as the evidence that implicated the defendants.

This is simply another reason that the court should require the Government to produce the evidence that it has linking Andre Chappell or Anthony Ricardo Hawkins to the murder of Smith and then conduct a full evidentiary hearing on this issue.

As a result of the actions of the Government in withholding the evidence in its possession, the Government should be required to turn over to the defense all evidence in its possession related to its investigation into the murder of Smith, and into Petey Johnson relating to the murder of Smith. In addition, the Government should have to turn over to the defense all evidence that relates to the evidence that implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once the Government has done so, and the defense has had an opportunity to investigate the information a hearing should be held.

42

Moreover, the granting of the Government's motion to admit the statements of Smith also precluded the defense from offering evidence that implicated Smith in the Triple murder in Prince George's County.

The defense had a witness, Wesley Smith, who would have testified that Robert Smith told him that he, Robert Smith, had been cheated out of $60,000.00, while gambling at the house in Temple Hills where the triple murder occurred, and that he was going back there to take care of the "guys in the house," meaning Gaskin and Mack.

Robert Smith told Wesley Smith, a week after the triple murder occurred that, "I took care of Darnell Mack and those guys." (Tr. 6/6/2001 (AM), pp. 26-34; Tr. 6/11/2001 (PM), 9-27; Tr. 6/13/2001 (AM), pp. 72-77).

This evidence would have contradicted Montgomery version of the triple murder and would have further impeached Montgomery's credibility.

It also would have been a defense in this case.

Petitioner Sweeney has demonstrated that the evidence concerning Andre Murray's statement that Petey Johnson wanted to kill Smith, combined with his presence at the time and place of the murder of Smith and the information linking Andre Chappell or Anthony Ricardo Hawkins to the murder of Smith, is all evidence that would be material to the determination of the Government's motion, pursuant to Rule 804(b)(6), to admit the statements of Smith through Agent Lisi.

"Once a defendant demonstrates that a witness can provide testimony material to his defense, then the government's interest in its evidentiary privilege must give way. The proper course in that case 'is for the district court to order production of the evidence or the witness and leave to the Government the choice of whether to comply with that

43

order.' *United States v. Moussaoui,* 382 F.3d 453, 474 (2004). "If the government

refuses to produce the information at issue—as it may properly do—the result is

ordinarily dismissal." *United States v. Rivera,* 412 F.3d 562, 569 (4th Cir. 2005)(internal

citation omitted).

      This should be the procedure that should be followed in this case. It cannot be

disputed that evidence which inculpated individuals unrelated to Petitioner Sweeney in

the murder of Robert Smith was favorable to the defense; thus, the material should have

been turned over to the defense. As discussed, *infra,* this evidence was material to

Petitioner Sweeney's guilt; therefore, the suppression of the material violated his right to

due process. *Brady,* 373 U.S. at 87.

      Assuming arguendo that the failure of the Government to turn this *Brady* material

over to the defense is excused by having the trial court review the material, then the trial

court abused its discretion in not ordering this information to be turned over to the

defense. This failure deprived Sweeney of due process as the information was material to

Sweeney's guilt, would have been used by the defense in opposition to the Government's

motion to admit the hearsay statements of Smith and the creditability of the

Government's witnesses.

      Had this information been turned over to the defense there is a reasonable

probability that the results of the proceedings would have been different.

## 9. THE *BRADY* EVIDENCE WAS MATERIAL TO PETITIONER'S GUILT, AND PETITIONERS WERE PREJUDICED BY ITS SUPPRESSION

      The standards for establishing materiality and prejudice are interchangeable as

applied to a *Brady* claim. *See Strickler,* 527 U.S. at 289-90 (prejudice); *Kyles,* 514 U.S.

at 434 (materiality). To establish materiality and prejudice, Petitioner Sweeney need not

44

show that he would more likely than not have received a different verdict with the benefit

of the suppressed evidence; the question is rather, whether in its absence he received a

fair trial, understood as a trial resulting in a verdict worthy of confidence. *See Strickler*,

527 U.S. at 289-90 (*quoting Kyles*, 514 U.S. at 434). The suppressed evidence should be

considered collectively, not item by item. *See Kyles*, 514 U.S. at 434. Here, the

cumulative impact of the pervasive suppression of *Brady* material renders the verdict

unworthy of confidence – simply put, Petitioner Sweeney did not receive a fair trial.

As the Supreme Court has long recognized, "[t]he use of informers, accessories,

accomplices, false friends, or any of the other betrayals which are 'dirty business' may

raise serious questions of credibility. To the extent that they do, a defendant is entitled to

broad latitude to probe credibility by cross-examination…" *Lee v. United States*, 343

U.S. 747, 757 (1952). At trial, the central theme of the defense was the lack of credibility

of the Government's witnesses. Accordingly, the suppressed evidence as detailed above,

taken collectively, could have been used to cast doubt upon the credibility of several of

the Government's key witnesses – delivering death by a thousand cuts to the

Government's case.

Further, the suppression of the newly discovered evidence relating to Robert

Smith prejudiced Petitioner Sweeney in particular, as it could have been used to defeat

the Government's motion to admit Smith's hearsay statements through Agent Lisi's

testimony. At trial, the court had allowed the admission of Smith's hearsay statements

under Federal Rule of Evidence 804(b)(6), holding that through the murder of Smith, the

defendants had forfeited their Sixth Amendment Confrontation Clause rights.[15]

---

[15] Federal Rule of Evidence 804(b)(6) provides, "*Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or

45

The "Greenbelt File" related to Theodore Watson was also material, and its suppression likewise prejudiced Petitioner Sweeney. Like Agent Lisi's testimony and Robert Smith's statements, Watson's testimony in this case was of great importance to the Government, as he claimed that Petitioner Sweeney had confessed to him participation in a number of crimes. The letters contained in the file could have been used by the defense to seriously undermine Watson's credibility as a witness at trial, exposed his bias and the powerful influence of the Government, by using his very own words against him. The materiality of the "Greenbelt File," and the prejudice caused by its suppression, are demonstrated by the fact that it could have been used as a powerful discrediting of Watson as a key witness.

As shown above, the Government's withholding of several of the examples of newly discovered evidence, even taken alone, would be sufficient to vacate Sweeney's conviction. Together, there can be no doubt that the suppressed *Brady* evidence rendered Petitioner Sweeney's trial fundamentally unfair, and produced a verdict that is no longer worthy of confidence. Accordingly, relief must be granted.

**10. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO ORDER THE GOVERNMENT TO PRODUCE TO THE DEFENSE THE INFORMATION CONTAINED WITHIN, AND THE INFORMATION THAT SUPPORTED THE GOVERNMENT'S CONCLUSIONS IN ITS *EX PARTE* NOTICE TO THE COURT REGARDING CHANGE IN LOCATION OF CONFINEMENT OF ABOVE-NAMED DEFENDANTS, DATED APRIL 2, 1999, AND THE INFORMATION CONTAINED WITHIN COURT EXHIBIT NUMBER 4.**

The trial court abused its discretion in sealing material relating to others that had motive to kill Robert "Butchie" Smith. The Government was granted permission by the trial court, pursuant to Federal Rule of Evidence 804(b)(6), to have FBI Special Agent

---

acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

Lisi testify to certain incriminating statements allegedly made by Sweeney to his uncle, Robert "Butchie" Smith.

Rule 804(b)(6) provides that, "(6) *Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

It was the Government's contention that Carson had killed Smith after meeting with Sweeney in the Prince George's County jail and being told by Sweeney that Smith had implicated Sweeney, Carson and Montgomery in the triple murder in Temple Hills, Maryland, in statements that he had made to Smith.

At the first hearing on the Government's motion, held on September 27, 2000, the defense wanted the Government to produce any evidence that it had about any other people that might have wanted to kill Smith.

The Government, in response to the request of the defense, made it clear, to both the trial court and to the defendants, that the Government had no information that anyone other than the defendants in this case wanted Smith dead, as is shown by the following:

**THE COURT**: I AGREE. THERE HAS TO BE SOME EVIDENCE THAT THERE WERE OTHERS WHO HAD A REASON TO – THAT THERE WAS A MOTIVE FOR COMMITTING THE HOMICIDE KNOWN TO THOSE WHO WERE IN A POSITION TO EFFECT IT.

**MS. CHATURVEDI**: RIGHT. AND WE DON'T HAVE ANY SUCH INFORMATION. AND WE RECOGNIZE THAT IF WE DID HAVE SUCH INFORMATION AND THAT STEPS HAD BEEN TAKEN TO GIVE THAT, THAT WOULD BE BRADY INFORMATION. THAT WOULD HAVE BEEN DISCLOSED AS BRADY INFORMATION.

**THE COURT**: YES.

(Trans. 9-27-00, pages 200-202).

47

However, as argued herein, the Government knew that its statement that there was no information that others had motive to kill Smith was not true. The trial court also had been provided information that there were others that had motive to kill Smith and did not order the Government to provide this information to the defense.

One of the previously sealed documents in this case is the Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999, which was placed under seal by the trial court on April 6, 1999. *See* Ex. 7. The *ex parte* pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney, and Proctor from their pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999. The Government alleged in the *Ex Parte* Notice that the, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants.

As the trial court recognized in its exchange with the Government on September 27, 2000, this information would be material that must be provided to the defense pursuant to *Brady*. Yet, the trial court after having recognized that the information concerning others, not only having a motive to murder Smith, but information that Chappell and Hawkins had in fact murdered Smith did not require the Government to turn this information over to the defense. This was an abuse of discretion on the part of the trial court. This information directly contradicted the theory upon which the

48

Government relied upon in its motion to admit, pursuant to Federal Rule of Evidence 804(b)(6) the statements of Smith.

It was the Government's theory that Carson had murdered Smith at the request of Sweeney. Yet the information in possession of the trial court was that the Government believed that Chappell and Hawkins had murdered Smith and Carson had not murdered Smith.

Moreover the Government's belief that Chappell and Hawkins had killed Smith directly contradicts Montgomery who testified at trial that Carson had murdered Smith.

The trial court when addressing the defendants' lawyers' concerns about the change of the locations of the defendants, stated, in part, that "I have reviewed the Government's *in camera* submission as to the reasons for the dispersions of the defendants to various points of detention, and I am satisfied that the order was eminently justified." (Trans. 5-21-99, page 8) The trial court went on the state that "Their conditions of detention they largely brought on themselves." (Trans. 5-21-99, page 9)

It seems strange that this information, which the trial court found sufficient to ratify the Government's decision to move the defendants, it did not find important enough to order the Government to turn over to the defense. The only explanation is that the trial court abused its discretion by failing to order that this information be produced to the defense as required by *Brady*. The defense was not aware of this information and was unable to investigate it or advance this in opposition to the Government's motion to admit the statements of Smith.

In addition, the Government submitted to the trial court, for *in camera* review, a detective's handwritten notes relating to an interview of Andre Murray (who testified for

49

the Government at trial) in which Murray discussed with law enforcement the murder of

Keith Johnson. *See* Ex. 6.

    As described earlier, the notes of that interview state, in part:

> "Wit. Heard Gooch telling Draper to kill Keith [Keith was Petey Johnson's
> brother] Wit. did not hear Draper return to advise Gooch he had killed
> Keith. He just heard Gooch give the order.
> The word is that Fat Petey started messing with Butchie – killed Butchie to
> get back at Draper -→ mere rumor."

Ex. 6.

    The theory being that Petey Johnson had killed Smith to punish Sweeney for

having killed his brother. Once more the trial court did not order this information to be

turned over to the defense after the trial court had reviewed it *in camera.*

    As argued herein, the trial court recognized that information that people other

than the defendants in this case had a motive to kill Smith was *Brady* and as such had to

be turned over to the defense, yet when the trial court was presented this information,

instead of ordering the government to provide it to the defense, the Court simply had it

marked as Court Exhibit number 4 and made part of the record under seal.

    The significance of trial court's failure to order the Government to produce this

material, detailing the motive of Petey Johnson to kill Smith becomes more significant

when on looks to the testimony of Agent Lisi, in the following exchange:

> A. I will tell you right now, I never after "Butchie's" murder,
> picked up Michael Farrar and interviewed him.
> Q. How about Petey Johnson? Did you pick him up?
> A. Yes, sir, because it was believed he was a witness.
> Q. To Robert Smith's murder?
> A. Yes, sir.
> Q. Okay. And you questioned him not just as a witness, but
> also as a possible suspect?
> A. I would say as a witness and maybe somebody – it was
> just a hunch that he was there and then he walked away, we
> believed, at the time "Butchie" was killed. So he may have called

50

> somebody to alert them that "Butchie" was there.  (Tr. 5-30-01
> (AM), pages 19-20).

The abuse of discretion on the part of the trial court deprived the defense of

evidence that Petey Johnson, a person the Government believed was present at the time

of Smith's murder and might have had some role in Smith's murder, also had a motive to

kill Smith which he might have told others about.

The defense was deprived, by the actions of the trial court, an opportunity to

investigate the issue of Petey Johnson's motive to kill Smith and the involvement of

Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once again, had the trial court ordered the Government disclosed the information

in its possession that Petey Johnson wanted to kill Smith in revenge for Sweeney

allegedly killing his brother, Keith, Agent Lisi could have been cross examined on this

point.

Moreover, the information contained within this material would have also refuted

any inference or suggestion that Petey Johnson had contacted Carson and told him where

Smith was so that Carson could murder Smith.  It seems unlikely that Petey Johnson

would have assisted Carson and Sweeney in killing Smith when Petey Johnson believed

that Sweeney had killed his brother.

This is the impression the Government attempted to create when Agent Lisi

testified that "So [Petey Johnson] may have called somebody to alert them that "Butchie"

was there."

The information contained within the detective's notes could have been used to

cross-examine Agent Lisi that Johnson, who was present at the time and place that Smith

51

was murdered, would have been unlikely to assist Sweeney and Carson in killing Smith since Johnson had his own motive to want to kill Smith.

The trial court abused its discretion in this case by failing to order the Government to produce the information, which the trial court had already concluded would constitute information required to be produced to the defense under *Brady,* contained within the detective's notes, and Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999. If the defense had had this information it could have used it in its opposition to the Government's motion to admit Smith's statement pursuant to Federal Rule of Evidence 804(b)(6), to contradict the testimony of Montgomery and Agent Lisi.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

## 11. THE CUMULATIVE EFFECT OF DEPRIVING SWEENEY OF ACCESS TO *BRADY, GIGLIO*, AND THE JENCKS ACT MATERIAL REQUIRES SWEENEY'S CONVICTIONS BE VACATED

As argued herein, Sweeney was deprived of access to materials to which he was entitled pursuant to *Brady, Giglio*, and the Jencks Act.

To show that one is entitled to relief for such depravation:

> "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Had Sweeney been able to present to the jury and to investigate the *Brady, Giglio*, and the Jencks Act material that was withheld from him, the Government's theory of the case would have been undermined, and some of its important witnesses impeached. In addition, the defense would have had arguments with which to oppose the Government's motion to admit Robert "Butchie" Smith's statements through Agent Lisi and Montgomery.

Further, the nondisclosure to the defendant of all the suppressed information, to which he was entitled, including the information contained within the sealed court exhibits concerning statements made by the Government's witnesses as set forth herein, could have been used by the defense to demonstrate that the Government's agents were so intent on building a case against the trial defendants that the Government agents communicated this, either consciously or unconsciously, to the people that they were interviewing resulting in statements incriminating the trial defendants. The defense could have argued to the jury that this resulted in those being interviewed changing the facts and the participants in crimes in order to implicate the trial defendants in crimes and thereby please the Government.

## 12. THE CUMULATIVE EFFECT OF DEPRIVING SWEENEY OF ACCESS TO *BRADY* AND THE GOVERNMENT'S *NAPUE* VIOLATION REQUIRES SWEENEY'S CONVICTION BE VACATED

As argued herein Sweeny was deprived of information that should have been turned over to the defense as *Brady* material. The Government, with regard to Watson, was guilty of a *Napue* violation as argued above. Assuming arguendo that each of the violations standing alone is not sufficient to grant Sweeney relief the violations taken together do require that Sweeny's convictions be vacated.

53

The court should take the following approach in dealing with these violations:

> The materiality analysis proceeds differently for *Brady* and *Napue*
> claims. Whereas a *Brady* violation is material when "there is a
> reasonable probability that . . . the result of the proceeding *would*
> have been different," *Bagley,* 473 U.S. at 682 (emphasis added), a
> *Napue* violation requires that the conviction be set aside whenever
> there is "*any* reasonable likelihood that the false testimony *could*
> have affected the judgment of the jury." *Hayes v. Brown,* 399 F.3d
> 972, 985 (9th Cir. 2005) (internal quotation marks omitted).[12] We
> have gone so far as to say that "`if it is established that the
> government knowingly permitted the introduction of false testimony
> reversal is virtually automatic.'" *Id* at 978 (quoting *United States v.
> Wallach,* 935 f.2d 445, 456 (2nd Cir. 1991)). Nonetheless, *Napue*
> does not create a "*per se* rule of reversal." *Id.* at 984.
> Although we must analyze *Brady* and *Napue* violations
> "collectively," the difference in the materiality standards poses an
> analytical challenge.  The *Napue* and *Brady* errors cannot all be
> collectively analyzed under *Napue*'s "reasonable likelihood"
> standard, as that would overweight the *Brady* violations. On the
> other hand, they cannot be considered in two separate groups, as that
> would fail to capture their combined effect on our confidence in the
> jury's decision. To resolve this conflict, we first consider the *Napue*
> violations collectively and ask whether there is "any reasonable
> likelihood that the false testimony *could* have affected the judgment
> of the jury." *Hayes,* 399 F.3d at 985 (emphasis added). If so, habeas
> relief must be granted. However, if the *Napue* errors are not material
> standing alone, we consider all of the *Napue* and *Brady* violations
> collectively and ask whether "there is a reasonable probability that,
> but for counsel's unprofessional errors, the result of the proceeding
> *would* have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375
> (emphasis added) (internal quotation marks omitted); *United States
> v. Zuno-Arce,* 25 F.Supp.2d 1087, 1117 (C.D. Cal. 1998) (applying a
> two-step materiality analysis to combined *Brady* and *Napue* claims),
> *aff'd,* 339 F.3d 886 (9th Cir. 2003). At both stages, we must ask
> whether the defendant "received . . . a trial resulting in a verdict
> worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555.
> *Jackson v. Brown,* 513 F.3d 1057, 1076 (9th Cir. 2008)

As has been argued herein Sweeney was deprived of substantial *Brady*

material all of which was material to his guilt and he was also subject to a *Napu* violation.

The inability of the defense to attack Watson's credibility had a direct effect on the

verdict in this case. Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### B. SIXTH AMENDMENT INEFFECTIVE ASSISTANCE OF COUNSEL

A defendant has been deprived of his Sixth Amendment right to effective assistance if "counsel's representation fell below an objective standard of reasonableness" and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Under *Strickland*, a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome of the case;" rather, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 693. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Thus, "[w]hen a defendant challenges a conviction; the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695. As detailed below, counsel was constitutionally ineffective at various stages of trial, as well as on appeal, and in various ways when representing Petitioner Sweeney.[16]

### 1. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CHALLENGE ON APPEAL THE TRIAL COURT'S *BRADY, GIGLIO*, AND JENCKS ACT RULINGS WITH REGARD TO SPECIFIC PORTIONS OF THE SEALED RECORD

On May 29, 2003, appellate counsel Steven R. Kiersh, Esq. ("Kiersh"), along with counsel for Petitioner Sweeney's fellow appellants, filed a Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record [Case No. 02-3015, ECF No. 751872]. In their motion, counsel sought access to sealed portions of the trial record in

---

[16] Mr. Sweeney was represented both at trial and on appeal, by Steven R. Kiersh, Esq.

order to mount a challenge to the trial court's rulings under *Brady v. Maryland*, 373 U.S.

83 (1963), and the Jencks Act, 18 U.S.C. § 3500. The United States Court of Appeals for

the District of Columbia Circuit ("D.C. Cir.") denied the motion, instructing counsel that

they must identify the specific rulings believed to be erroneous, and present the issue in

the appellants' brief, rather than by motion. *See* Order dated 8/28/2003 [Case No. 02-

3015, ECF No. 769196].

Here, prejudice from the failure to pursue this claim on direct appeal is presumed

because of the Government and the trial court's interference by placing the material

under seal. *See Strickland*, 466 U.S. at 692 ("In certain Sixth Amendment contexts,

prejudice is presumed... [including] various kinds of state interference with counsel's

assistance"); *United States v. Cronic*, 466 U.S. 648, 659 and n.25 (1984). Counsel was

unable to adequately challenge the suppression of the sealed material on appeal because

counsel needed access to the sealed portion of the trial record in order to establish the

materiality of the undisclosed evidence – an essential element of the prospective claim on

appeal. *See Brady*, 373 U.S. at 87.

Even if a showing of prejudice were required in this case, Petitioner Sweeney's

claim still prevails, as the prejudice here is clear. Had appellate counsel raised this

critical issue on appeal, the Court of Appeals would have reviewed the material *in

camera* and found that *Brady* and Jencks Act violations had indeed occurred, and were

widespread. *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196]

("appellants must identify [in their appellate brief] the specific rulings that they believe

are erroneous, and if they present a colorable claim, this court may review the sealed

material *in camera* to determine whether a *Brady* or Jencks Act violation has in fact

56

occurred."); 18 U.S.C. § 3500(c); *United States v. Williams-Davis*, 90 F.3d 490, 514

(D.C. Cir. 1996); *United States v. Brooks*, 966 F.2d 1500, 1505 (D.C. Cir. 1992). As

detailed *supra* in Ground One, Petitioners had more than a colorable claim with regard to

the erroneous rulings. Had the Court of Appeals reviewed the material, and discovered

the pattern of *Brady* and Jencks violations that pervaded the record at trial, the error was

more likely than not to result in reversal on appeal. Appellate counsel's failure to

challenge this critical issue on appeal was deficient, and that deficiency prejudiced

Petitioner Sweeney; therefore, his appellate assistance was unconstitutionally ineffective.

*See Strickland*, 466 U.S. at 687.[17]

There is a reasonable probability that, but for counsel's unprofessional errors, the

results of the proceedings would have been different.

## 2. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK REVIEW BY THE TRIAL COURT OF THEODORE WATSON'S GREENBELT FILE.

Assuming arguendo that the Government did not improperly suppress Watson's

Greenbelt file, Sweeney's trial counsel was constitutionally deficient in failing to ask the

court to review said file.

During the cross examination of Watson, Kiersh attempted to impeach Watson by

attempting to discover the reasons why the Government failed to a give Watson a §5K1.1

letter. Watson explained the failure of the government to provide him with a §5K1.1

---

[17] Further, counsel was ineffective for not challenging on appeal the trial court's improper *in camera* procedure used with respect to the sealed material. Although the trial court viewed the evidence *in camera*, the court failed to keep a transcribed record of the *in camera* proceedings, and failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material. No findings were made regarding the requested material, and no record was released to the defense indexing the material presented to the court. Accordingly, the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998). The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair.

letter by stating that Ms. Wilkerson, the Assistant U.S. Attorney assigned to his case, simply did not like him.  (Tr. 2-12-01 (AM), pp. 19-21).

Pressed further on this point Watson explained that Ms. Wilkerson's disliked him because he had pointed out, in front of another U.S. Attorney, that Wilkerson had failed to advise another Assistant U.S. Attorney about information that Watson had, which failure by Wilkerson had caused that other U.S. Attorney to offer lenient plea deals to the defendants in that case. (Tr. 2-12-01 (AM), p. 44).

Kiersh, and for that matter the defense as a whole, lacking any information with which to contradict Watson, during cross-examination was forced to accept Watson's answers to his questions on cross-examination.

A co-defendant's attorney apparently dissatisfied with the cross-examination of Watson, at the conclusion of the testimony on February 12, 2001, asked that the Government review Watson's Greenbelt file to determine if there was any discoverable material contained within said file concerning Watson, as set forth below.

> **MR. DAVIS**: AND I WOULD ASK THAT THE UNITED STATES ATTORNEY'S OFFICE REVIEW THAT FILE.
>
> **THE COURT**: IF THEY HAVE NOT DONE THAT, AND I WOULD ASK THAT THEY CALL THE PROSECUTOR'S OFFICE IN GREENBELT TO FIND OUT WHETHER OR NOT THERE IS ANYTHING THAT COULD BE CHARACTERIZED AS, QUOTE, *BRADY* MATERIAL IN THEIR FILE. OTHER THAN THAT --
>
> **MR. DAVIS**: THANK YOU, YOUR HONOR.
>
> **THE COURT**: -- THAT'S THE EXTENT OF THE GOVERNMENT'S OBLIGATION.  OKAY?

(Tr. 2-12-01 (AM), p. 78).

(Page 92 of Total)

In response to the court's direction, the Government not only called the U.S. Attorney's office in Greenbelt, the Government obtained and reviewed Watson's Greenbelt file.

The Government brought Watson's Greenbelt file to court and represented to both the court and the defense, that Watson's Greenbelt file did not contain anything that even " . . . suggests any *Brady* or Jencks material in the file." Following the Government's representations the following took place:

> **THE COURT**: YOU MEAN THE FILE FROM GREENBELT?
>
> * * *
>
> **THE COURT**: DO YOU WANT TO HAVE IT MADE PART OF THE COURT RECORD?
>
> **MR. KIERSH**: YES, YOUR HONOR.
>
> **THE COURT**: ALL RIGHT.
>
> **MR. KIERSH**: I ASK THAT IT BE PLACED UNDER SEAL AND MADE A PART OF THE RECORD.
>
> **THE COURT**: WE WILL PLACE IT UNDER SEAL AND MARK IT AS COURT EXHIBIT, I BELIEVE, NUMBER 3. IS THAT CORRECT, MR. WEST?
>
> **THE DEPUTY CLERK**: I BELIEVE SO, YOUR HONOR.
>
> **MR. ZUCKER**: YOUR HONOR, I CONCUR IN THAT, BUT I'D ALSO ASK THAT THE COURT --
>
> **THE COURT**: WAIT A MINUTE.
>
> **THE DEPUTY CLERK**: NUMBER 5, YOUR HONOR.
>
> **THE COURT**: NUMBER 5. ALL RIGHT. NUMBER 5. **I DO NOT INTEND TO REVIEW IT IN CAMERA.**

59

**MR. ZUCKER**: THAT WOULD BE MY REQUEST.

**THE COURT**: ALL RIGHT. ARE WE READY FOR THE JURY?

(Tr. 2-13-01(AM), pp. 6-7).

Kiersh, instead of asking the trial court to review the Greenbelt file to determine if it contained any *Brady, Giglio* or *Jencks* material just asked that the file be made part of the record and placed under seal. One wonders what was the point of having Watson's file made part of the record in the case if no one, other than the Government, was going to review the file.

The Government's production of Watson's Greenbelt file is, in and of its self, curious as the court simply asked the Government to call the U.S. Attorney's office in Greenbelt to determine if the filed contained anything that might be characterized as *Brady*. The court further stated that this was the extant of the Government's obligation.

The only reason for the Government to have produced Watson's Greenbelt file would be if the Government were unsure if the file contained *Brady* material.

Another case discussing the obligations of the Government to produce material to the defense stated:

> Although the notes are not subject to disclosure under the Jencks
> Act, fundamentals of due process require the government to produce
> them if the evidence they contain is exculpatory or would be of
> value in impeaching government witnesses. *Giglio v. United States,*
> 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v.*
> *Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963). Uncertain whether the
> notes were exculpatory or of impeachment value, the government
> properly submitted them to the district court for *in camera*
> inspection. *Pennsylvania v. Ritchie,* 480 U.S. 39, 58-62, 107 S.Ct.
> 989, 1002-03, 94 L.Ed.2d 40 (1987). *United States v. Mora,* 994
> F.2d 1129, 1139 (5th Cir. 1993).

(Page 94 of Total)

Therefore the only reason for the Government would have produced Watson's Greenbelt file, to the court, was if the Government was uncertain whether or not it contained *Brady* or *Giglio*. But there was no way the Government could have been uncertain as the information was without doubt *Brady* and *Giglio*.

As argued herein, Watson's Greenbelt file contained *Brady* and *Giglio* material.

Sweeney suffered prejudice as a direct result of his trial counsel failing to request that the trial court review Watson's Greenbelt file.

The material contained within Watson's Greenbelt file would have directly contradicted Watson's claims that the reason he was not given a §5K1.1 letter was the result of personal animus on the part of the Assistant U.S. Attorney and would have shown instead that it was the result of Watson lying to the Government.

Defense counsel's failure to seek review by the trial court of the Greenbelt file, which review would have resulted in the *Brady* and *Giglio* material contained therein being disclosed to the defense, permitted Watson to maintain his version of events during cross examination. As a result of defense counsel not having the material in the Greenbelt file, the jury instead of seeing Watson impeached as a liar, willing to say anything to help himself, the jury saw Watson maintain his version of events, and his credibility, in the face of cross-examination by several lawyers unable to contradict his claims.

Moreover, defense counsel, by failing to request that the trial court review Watson's Greenbelt file foreclosed the possibility of having the file reviewed on appeal, as defense counsel agreed with the trial court that Watson's Greenbelt file did not need to be reviewed by the court.

61

Tacit recognition of the inability to obtain appellate review of the Greenbelt file is in the omission of any reference to Watson, much less Watson's Greenbelt file, in the Appellate brief filed in this case.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 3. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CHALLENGE ON APPEAL THE TRIAL COURT'S *BRADY, GIGLIO*, AND JENCKS ACT RULINGS WITH REGARD TO SPECIFIC PORTIONS OF THE SEALED RECORD

On May 29, 2003, appellate counsel Steven R. Kiersh, Esq. ("Kiersh"), along with counsel for Petitioner Sweeney's fellow appellants, filed a Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record [Case No. 02-3015, ECF No. 751872]. In their motion, counsel sought access to sealed portions of the trial record in order to mount a challenge to the trial court's rulings under *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500. The United States Court of Appeals for the District of Columbia Circuit ("D.C. Cir.") denied the motion, instructing counsel that they must identify the specific rulings believed to be erroneous, and present the issue in the appellants' brief, rather than by motion. *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196].

Here, prejudice from the failure to pursue this claim on direct appeal is presumed because of the Government and the trial court's interference by placing the material under seal. *See Strickland,* 466 U.S. at 692 ("In certain Sixth Amendment contexts, prejudice is presumed… [including] various kinds of state interference with counsel's assistance"); *United States v. Cronic*, 466 U.S. 648, 659 and n.25 (1984). Counsel was unable to adequately challenge the suppression of the sealed material on appeal because

counsel needed access to the sealed portion of the trial record in order to establish the

materiality of the undisclosed evidence – an essential element of the prospective claim on

appeal. *See Brady*, 373 U.S. at 87.

Even if a showing of prejudice were required in this case, Petitioner Sweeney's

claim still prevails, as the prejudice here is clear. Had appellate counsel raised this

critical issue on appeal, the Court of Appeals would have reviewed the material *in

camera* and found that *Brady* and Jencks Act violations had occurred, and were

widespread. *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196]

("appellants must identify [in their appellate brief] the specific rulings that they believe

are erroneous, and if they present a colorable claim, this court may review the sealed

material *in camera* to determine whether a *Brady* or Jencks Act violation has in fact

occurred."); 18 U.S.C. § 3500(c); *United States v. v. Williams-Davis,* 90 F.3d 490, 514

(D.C. Cir. 1996); *United States v. Brooks,* 966 F.2d 1500, 1505 (D.C. Cir. 1992). As

detailed *supra* in Ground One, Petitioners had more than a colorable claim with regard to

the erroneous rulings. Had the Court of Appeals reviewed the material, and discovered

the pattern of *Brady* and Jencks violations that pervaded the record at trial, the error

would have resulted in reversal on appeal. Appellate counsel's failure to challenge this

critical issue on appeal was deficient, and that deficiency prejudiced Petitioner Sweeney;

therefore, his appellate assistance was unconstitutionally ineffective. *See Strickland*, 466

U.S. at 687.[18]

---

[18] Further, counsel was ineffective for not challenging on appeal the trial court's improper *in
camera* procedure used with respect to the sealed material. Although the trial court viewed the
evidence *in camera*, the court failed to keep a transcribed record of the in camera proceedings,
and failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and
subsequently sealing the material. No findings were made regarding the requested material, and
no record was released to the defense indexing the material presented to the court. Accordingly,

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 4. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO JAMES MONTGOMERY

In § 10, of pages 13-15, of appellate counsel's Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record, which was denied by the D.C. Circuit, counsel argued that the trial court's ruling was erroneous with regard to the material the court sealed relating to Montgomery. The motion argued that the trial court's ruling that the material it sealed was not *Brady, Giglio*, or Jencks material was erroneous. Appellate counsel further argued that F.B.I. Special Agent Lisi's notes contained *Brady* or Jencks material.

Now that Petitioner Sweeney has access to the material that the trial court sealed with regard to James Montgomery, he is able to use that material to demonstrate the prejudice that he suffered as a result of his appellate counsel failing to seek appellate review of the trial court's holding in his appellate brief as instructed by the D.C. Circuit in its order denying the motion to unseal.

The material sealed by the trial court contains impeachment evidence related to the murder of Timothy Benton. Agent Lisi's handwritten notes reveal that Montgomery described the murder of Benton, and identified Carson and Proctor as the perpetrators. The notes state as follows:

1994 Chin [Carson] borrowed Grey Cadillac
Said he & Poo-Poo [Proctor] killed Tim [Benton] in it.

---

the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998). The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair.

64

Tim owed Poo-Poo $
Chin was driving
Poo-Poo shot Tim from
Behind, he just sat there like he was DAZED

Ex. 9 (Agent Lisi's Notes of James Montgomery Interview).

Critically, it was Maurice Proctor and James Montgomery who were charged with the murder of Timothy Benton. What Montgomery did in his interview was substitute Carson for himself. The probative value of Montgomery's statement was priceless for its impeachment value. Defense counsel could have utilized that materially false and misleading narrative, contained within the Agent's notes, to further support the argument that Montgomery was not only a liar, but an incorrigible liar. *See* Tr. 3/15/01 (AM), pp. 10-13.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 5. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF TRIAL COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO ARTHUR RICE

Appellate counsel's failure to seek appellate review of the trial court's ruling with regard to the sealed material relating to Arthur Rice constituted ineffective assistance. At trial, the Court had reviewed the FBI 302 pertaining to Arthur Rice dated January 27, 1999, and stated that it contained no information that would permit it to be characterize as *Brady* material, and that it was clearly not Jencks material. (Tr. 4/24/01 (PM), p. 3). The trial court failed to state a reason why the 302 did not constitute a Jencks statement and information that should be disclosed to defense counsel.

65

If appellate counsel had raised the foregoing, and a proper review of Rice's 302 had been done by the Court of Appeals, the following would have been discovered, and counsel would have prevailed pursuant to the trial court's abuse of discretion. The cumulative effect of all the errors is such that there is a reasonable probability that, had the evidence not been sealed and instead released to the defense, the results of the proceedings would have been different.

Arthur Rice was a jailhouse witness who was allegedly an associate of the defendants. Even though Rice did not testify as to who committed the murder of Leonard "Slick" Hyson, and Maurice Hallman, the previously sealed FBI 302 reveals that Rice told Agents Vincent Lisi and Kevin White, in the presence of AUSA Kenneth Wainstein, that defendants Martin and Carson killed Hyson and Hallman. *See* Ex. 5 (Arthur Rice 302 at p. 5).

The foregoing contradicts the government's theory of prosecution that Carson and James Montgomery were the individuals who killed Hallman and Hyson. Montgomery also testified, corroborating the government's theory of prosecution, placing himself as one of the killers of Hallman and Hyson. (Tr. 3/12/01 (AM), pp. 55-62).

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 6. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO ANDRE MURRAY

As with all of the other materials place under seal by the trial court in this case Petitioner Sweeney's appellate counsel failed to include a request to have the appellate court review the rulings of the trial court which sealed the material.

66

During trial, Montgomery testified that he and Carson killed Hallman and Hyson, and prior to that, Hallman had a shoot-out with some New Yorkers. The previously sealed detective notes of interviews with Arthur Murray reveal that Murray stated that some New Yorkers killed Hallman and Hyson. This contradicts Montgomery's testimony regarding who killed Hallman and Hyson, while at the same time; Montgomery's testimony corroborates Murray's statement because Montgomery was fully aware that Hallman had a shoot-out with some New Yorkers. *See* Ex. 10 (Detective Notes of Arthur Murray Interview Regarding Hallman and Hyson Murder). Once again, all this contradiction might have left doubt in the jury's minds, towards the credibility of Montgomery, who was the government's key witness.

### 7. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CALL EXPERT WITNESS AT TRIAL

At the outset of this case, Petitioner Sweeney and his immediate family advised trial counsel that Petitioner Sweeney had been diagnosed with Tourette Syndrome ("TS"). Tourette syndrome is a neurological disorder characterized by repetitive, stereotyped, involuntary movements and vocalizations called tics. Tics often become more severe with excitement or anxiety and lessen during calm, focused activity. *See* Tourette Syndrome Fact Sheet, National Institute of Neurological Disorders and Stroke at the National Institute of Health, http://www.ninds.nih.gov/disorders/tourette/detail_tourette.htm (last visited November 28, 14).

In preparation for trial, trial counsel retained expert witness Jonathan Pincus, M.D., a distinguished professor in the field of neurology. Dr. Pincus has been qualified

67

as an expert and testified on numerous occasions, in state and federal courts. Dr. Pincus reviewed all of Petitioner Sweeney's available medical records, and on December 10, 1999, conducted a clinical evaluation of Petitioner Sweeney, during which he determined that Petitioner Sweeney suffers from Tourette Syndrome. At trial, Dr. Pincus would have explained the nature and symptoms of Tourette Syndrome to the jury, and described the individual characteristics in Petitioner Sweeney's case. Further, Dr. Pincus would have told the jury that Petitioner Sweeney's tic symptoms during trial would typically be less pronounced than those displayed by him five to ten years prior. Most importantly, Dr. Pincus would have testified that in his opinion, a high-stress event (such as a violent incident) would typically trigger the display of more pronounced tic symptoms in Petitioner Sweeney. *See* Ex. 11 (Dr. Pincus Affidavit).

This testimony was critical to Petitioner Sweeney's defense, as it would have served as exculpatory evidence with regard to the triple murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson, in Temple Hills, Maryland.[19] Dr. Pincus' testimony would have corroborated the testimony of several other witnesses who testified that Sweeney could be easily identified by his disorder. James Montgomery, who was with Petitioner Sweeney on the night of the murder, testified that Sweeney's T.S. was highly active and noticeable that night. (Tr. 3/14/01 (AM) at p. 45; 3/14/01 (PM) at pp. 74-77; 3/15/01 (PM) at p. 81). Dorene Key also testified of that she was aware for years that Petitioner Sweeney has T.S., and that his symptoms are noticeable. (Tr. 4/23/01 (PM) at p. 50). Dwight Deloach, the arresting officer in the triple murder, also testified

---

[19] As described *supra*, it was clear from the record that the Government's case against Petitioner Sweeney was weak: the credibility of nearly all of their witnesses was impeached by their admissions of prior commissions of perjury, or providing false statements to law enforcement. Further, their testimony often conflicted with that given by other witnesses, as well as with other evidence.

68

that Petitioner Sweeney's T.S. symptoms were noticeable.  (Tr. 4/24/01 (AM) at pp. 23-4).  Anthony Pryor, the alleged victim of a kidnapping and attempted murder, testified that he was fully aware of Petitioner Sweeney's T.S., and that if Sweeney had been when of the perpetrators, Pryor would have recognized him by his T.S. symptoms.  (Tr. 6/11/01 (AM) at p. 25).  Finally, Shaheem Johnson testified that even though he did not know Petitioner Sweeney personally, Sweeney was easily recognizable because of his disorder.  (Tr. 6/12/01 (PM) at pp. 68-9).

Critically, the witness to the triple murder, Cinama Hawkins, testified that neither of the assailants displayed any of the physical or verbal tics that are typical of Tourette Syndrome.[20]  (Tr. 4/2/01 (AM) at p. 75; 4/2/01 (PM) at p. 7).   There is a reasonable probability, given Ms. Hawkins' description of the triple murder assailants, that Dr. Pincus' testimony would have provided the jury with reasonable doubt that Petitioner Sweeney committed the triple murder.  Accordingly, trial counsel's failure to call Dr. Pincus at trial rendered his assistance constitutionally ineffective under *Strickland*.  *See Strickland*, 466 U.S. at 695.

### 8. SWEENEY'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RETAIN CO-COUNSEL PURSUANT TO THE TRIAL COURT'S ORDER

Petitioner Sweeney, along with co-defendant Carson, were both indicated for capital crimes in this case.  They were, therefore, pursuant to 18 U.S.C. § 3005, each appointed two attorneys to represent them in this case.

18 U.S.C. § 3005 states in part:

---

[20] The exculpatory nature of Dr. Pincus' testimony would have been bolstered by the testimony that in Ms. Hawkins' original description of the assailants, which she gave to the investigating officer at the scene, she described both men as about six feet tall.  (Trial Tr. 6/12/01 at pp. 60-61, 65, 70-72).  Mr. Sweeney is not nearly that tall.

(Page 103 of Total)

> Whoever is indicted for treason or other capital crime shall be
> allowed to make his full defense by counsel; and the court before
> which the defendant is to be tried, or a judge thereof, shall promptly,
> upon the defendant's request assign 2 such counsel, of whom at least
> 1 shall be learned in the law applicable to capital cases....

18 U.S.C. § 3005 (2000).

Not only was Sweeney entitled to have two attorneys represent him as a result of

the indictment in this case, but also the trial court was obligated to inform him of this

right.

> Cunningham contends that, in any event, the trial court should have
> advised him of his right under 18 U.S.C. § 3005 to have a second
> counsel appointed. An accused's right to additional counsel in a
> capital case should not, of course, be lost solely because of lack of
> awareness of its existence. Therefore, the trial court here should
> have advised Cunningham of his rights under § 3005.  We presume
> prejudice from the failure of the trial court so to inform him.

*Smith v. United States,* 353 F2d 838, 846-47, 122 U.S. App. D.C. 300, *cert. denied* 86
S.Ct 1350, 384 U.S. 910, 16 L.Ed 2d 362 *cert. denied* 86 S.Ct 1867, 384 U.S. 974, 16
L.Ed 2d 684 (1965).

Sweeney was, however, never advised of his right to have two attorneys represent

him in this case by the trial court.  At Petitioner Sweeney's arraignment on October 2,

1998, the Court responded to a request, by Sweeney's then-attorney Mr. O'Toole, to have

the court appoint a particular attorney to represent Sweeney along with Mr. O'Toole.

The Court stated, "I have asked Mr. Kramer to make an appointment of the second

counsel to assist you, and Mr. Kramer will make that decision." (Tr. 10/2/1998, pp. 11-

12).

Thereafter at the conclusion of the October 2, 1998, arraignment the trial court

stated ". . .  I note the presence of Mr. Kramer here in court and the obligation he has just

incurred to make at least two appointments." (Tr. 10/2/1998, p. 20).

Even though the trial court appointed two attorneys to represent Sweeney, the court at no point ever advised or otherwise informed Sweeny of his right to be represented by two attorneys, pursuant to 18 U.S.C. § 3005.

Eventually Steven Kiersh and Paul DeWolfe were appointed to represent Sweeney in this case before the Attorney General had decided whether or not to seek the death penalty against Sweeney.

By December 1999, the Attorney General had chosen not to seek the death penalty against Sweeney and Carson. During a hearing on December 16, 1999, the issue of the continued representation of Sweeney and Carson by two attorneys each was addressed by the trial court.

At this hearing the trial court stated "Well, one of the consequences of the decision made by the Attorney General not to seek the death penalty is that this case is no longer a capital case, and the law no longer authorizes two counsels for any defendant. * * *" (Tr. 12/19/99, pp. 12-13).

It was error for the trial court to find that the decision of the Attorney General not to seek the death penalty in this case, ended Sweeny's entitlement to two attorneys. As the clear language of 18 U.S.C. § 3005 states, the entitlement to two attorneys is determined at the time of indictment and not by any subsequent decision of the Attorney General whether or not to seek the death penalty in the case.

> In this case, the current language of § 3005 is clear — the requirement of two attorneys is triggered upon indictment. The statute begins with the phrase "Whoever is *indicted* for ... *capital crime* ..." (emphasis added). 18 U.S.C. § 3005 (2000). This language provides the statutory trigger for the section, and the text is clear that the statute becomes applicable upon *indictment* for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty. As discussed above, § 844(i) qualifies as a

71

capital crime because the death penalty is the maximum sentence that could be imposed on Boone.

*United States v. Boone,* 245 F.3d 352 (4th Cir 2001)

Mr. Kiersh, instead of arguing that the action of the Attorney General in not seeking the death penalty was irrelevant to Sweeney's right to be represented by two attorneys, simply remained silent on this issue at the hearing.

Moreover, the trial court's misstatement of the law that Sweeney was no longer entitled to two attorneys deprived him of his rights pursuant to 18 U.S.C. § 3005, and, therefore, prejudice should be presumed from the trial court's error. *See Smith v. United States,* 353 F2d 838, 122 U.S. App. D.C. 300, *cert. denied* 86 S.Ct 1350, 384 U.S. 910, 16 L.Ed 2d 362 *cert. denied* 86 S.Ct 1867, 384 U.S. 974, 16 L.Ed 2d 684 (1965).

One of the attorneys for Carson did, however, address the issue of the continued representation of Carson by two attorneys, but instead of arguing that this right attached upon indictment for a capital crime, pursuant to 18 U.S.C. § 3005, argued that:

> Your Honor, in this case we are talking about a ten-year conspiracy with anywhere from five to eight homicides and numerous other complicated violent charges against individual defendants.
>
> This is as complex a case as I think we can run into. It may not be Microsoft, but as a criminal case goes, it doesn't get too much more complicated that this in the United States District Court here. And I think that this court can look at this case and decide that it merits two attorneys for some of the defendants, particularly the ones who they were considering capital defendants, because of the number and the nature and the time period of the charges against them. And I would ask the court to do so . . .."

(Tr. 12/19/99, p. 13-14).

72

The trial court did not rule on the issue of continued representation by two attorneys for Carson and Sweeney at that time but asked that additional information be submitted addressing this issue.

Thereafter by way of a letter, filed with the trial court on January 3, 2000, written by Carson's counsel and signed by said attorney on behalf of Sweeney's counsel, set out the justification for the continued need for two attorneys to represent both Sweeney and Carson. The main ground advanced in the January 3, 2000, letter was the "extremely difficult" nature of the case as it pertained to Carson and Sweeney. This is simply arguing the rationale that supports the need for 18 U.S.C. §3005. As "[t]he provision was meant to insure that a sufficient number of attorneys would be appointed so the defense would not suffer from insufficient manpower. *See Crum v. Hunter,* 151 F.2d 359 (10th Cir. 1945) *cert. denied*, 325 U.S. 850, 66 S.Ct 1117, 90 L.Ed. 1623 (1946); *see also Smith,* 353 F.2d at 846-47.

Another justification contained within the letter for the continued representation of Sweeney and Carson by two attorneys each, was that:

> Dismissal of the capital attorneys is not likely to result in significant cost savings. Because there are so many serious charges over such a long period of time, to this point each defendant's counsel have divided the tasks of investigation, legal research, and legal writing between them. If only one attorney per defendant is permitted to remain in the case, he will have to spend a considerable amount of time familiarizing himself with the facts and issues previously assigned to his co-counsel.

Ex. 12 (December 28, 1999, Letter, at p. 2).

The trial court, after considering the matter agreed and by way of an order, dated January 4, 2000, determined that Sweeny's and Carson's cases were " . . . 'extremely

73

difficult cases where . . . in the interest of justice' appointment of co-counsel is appropriate." (Order (TPJ), dated January 4, 2000 [#252]).

Sometime thereafter, Paul DeWolfe, one of Sweeney's attorneys, was appointed as the Public Defender for Maryland, and withdrew as co-counsel for Sweeney.

On September 8, 2000, (a little over two months before jury selection was to begin) the trial court and Sweeney's remaining attorney all believed, that the interests of justice required that Sweeney be represented by two attorneys, otherwise why would the trial court have appointed attorney Leonard L. Long, Jr., to replace Mr. DeWolfe, as one of Sweeney's attorneys.

The Government, on October 24, 2000, filed, under seal, a motion to disqualify attorney Long, as one of Sweeney's attorneys. At a hearing on November 13, 2000, (jury selection began in this case on November 15, 2000) the trial court granted the government's motion and removed attorney Long as co-counsel for Sweeney. (Tr. 11/13/00, p. 13).

After the trial court disqualified Long, at the November 13, 2000, hearing, Sweeney's remaining attorney Mr. Kiersh argued that:

> **Mr. Kiersh**: You Honor, if I can make some other related representations, not with respect to Mr. Long, but **this creates a very significant prejudice to me and my ability to go forward**. I am not moving for a continuance right now, but I am just thinking this through.
> When we were in court at the motions hearing back in September, the Government requested that an agent be allowed to sit at their table. I asked the court if my investigator, who has been with me on this case working around the clock for the past two years on this case – if he could be seated with me at the table. And the court said, "Well, that is a problem because if I allow you to do it, then everyone else is going to ask to have their investigators."
> I have gone to each defense attorney individually and said, "Would you waive any request to have your investigators to be

present?" And they all have. They all said they don't want their
investigators to be present. I am the only one making that request.
And if Mr. Long is now being removed from the case, I am terribly
handcuffed on what I can do.

   **The Court**: Why?

   **Mr. Kiersh**: Because so much of this case is directed at Mr.
Sweeney. We have cabinets and cabinets filled with information.
That's why Mr. Long came into it. Having my investigator there,
who knows this case inside out, would be not only of assistance, but
necessary, given the amount of evidence the Government is going to
be directed towards Mr. Sweeney and what I have to do to be able to
sit there and confront it. I am having a very able co-counsel being
removed from the case, and replacing him with my investigator
doesn't seem to me to prejudice anyone.

   **The Court**: Well, there may be an occasion at which it
would be appropriate for you to have your investigator there. I don't
think your investigator has to be there for the duration of the case
and certainly not at this stage of the case.

                        * * *

   **Mr. Kiersh**: Very well. And then I would also note for the
record on behalf of Mr. Sweeney our objection to Mr. Long being
disqualified from the case.

(Tr. 11/13/2000, pp. 13-15) (emphasis added).

Following the removal of Mr. Long as co-counsel for Sweeney and with jury

selection set to begin in two days, Mr. Kiersh did not seek a continuance of the trial of

this case. This is particularly surprising in that Kiersh had told the trial court that the

removal of attorney Long created "**a very significant prejudice to me and my ability to**

**go forward.**" (Tr. 11/13/2000, pp. 13-15) (emphasis added). One would have thought

he would have been more concerned about the prejudice to Mr. Sweeney, but maybe that

is what he meant.

Mr. Kiersh had for approximately eleven months before the removal of Mr. Long

worked with another lawyer on Sweeney's case. Yet two days before jury selection

begins Kiersh is now representing Sweeney alone, and instead of asking the court to

appoint another attorney to assist him, in a case that the trial court had already determined

that as a result of the extreme difficulty of the case the interests of justice required that
Sweeney be represented by two attorneys.

Moreover, during the hearing on the removal of Mr. Long, Mr. Kiersh failed to
argue that Sweeny was entitled to two attorneys pursuant to 18 U.S.C. § 3005, as
Sweeney had been indicted for a capital offense.

In addition, the trial court did not advise Sweeney, at the time that it removed Mr.
Long, of Sweeney's right under 18 U.S.C. § 3005 to be represented by two attorneys. *See
Smith,* 353 F.2d at 846-47.

That Sweeney's trial counsel was overwhelmed by this case which resulted in
Sweeney being convicted at trial.  Sweeney's' trial counsel admitted he was prejudiced
by the removal of co-counsel and nothing was done to address that prejudice.

There is a reasonable probability that, but for counsel's unprofessional errors, the
results of the proceedings would have been different.

### 9. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL FOR THE FAILURE TO REQUEST A CONTINUANCE TO OBTAIN CO-COUNSEL

While Sweeney's remaining trial counsel recognized the **"very significant
prejudice"** that was caused by the trial court's removal of his co-counsel, he took no
steps to remedy the prejudice that the removal of Mr. Long created.  Instead of asking for
a continuance and for appointment of co-counsel to assist him in an extremely difficult
case which the interests of justice required that Sweeney be represented by two attorneys,
he asked simply that his investigator be allowed to sit with him at counsel table and when
that request was deferred by the trial court, Kiersh merely went forward with the case in
spite of the prejudice that his client would suffer as a result of Mr. Kiersh having to learn

76

and manage the "cabinets and cabinets filled with information," which was one of the reasons why the court had seen fit to appoint two attorneys to represent Sweeney in the case.

Mr. Sweeney suffered prejudice in this case by Mr. Kiersh's failure to seek a continuance to obtain co-counsel in this case. The trial court had already made a finding the case was too difficult for one attorney and that the interests of justice required that Sweeney be represented by two attorneys in this case. Kiersh himself recognized that Sweeney was prejudiced by the removal of Mr. Long, yet he failed to request a continuance or that the court conforms with its order of January 4, 2000, and appoint another attorney to replace Mr. Long.

Moreover Kiersh, by failing to request that Sweeney continued to be represented by two attorneys, as is his right under 18 U.S.C. § 3005, deprived Sweeney of this right, all of which resulted in prejudice to Sweeney.

In addition, Kiersh failed to argue at any point in the case that Sweeney's right to be represented by two attorneys attached at the time of his indictment for a capital offense and that the subsequent decision of the Attorney General not to seek the death penalty was irrelevant to his right to be represent by two attorneys.

That Sweeney's trial counsel was overwhelmed by this case which resulted in Sweeney being convicted at trial. Sweeney's' trial counsel admitted he was prejudiced by the removal of co-counsel and nothing was done to deal with that prejudice.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

## 10. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS COUNSEL FAILED TO ARGUE THAT HE WAS ENTITLED TO TWO ATTORNEYS PURSUANT TO 18 U.S.C. §3005

Petitioner Sweeney's attorneys should have argued at both the December 16, 1999, and at the November 13, 2000, hearings that the clear language of 18 U.S.C. §3005 states that the entitlement to two attorneys is determined at the time of the indictment and not by any subsequent decision of the Attorney General whether or not to seek the death penalty in a case.

> In this case, the current language of § 3005 is clear — the requirement of two attorneys is triggered upon indictment. The statute begins with the phrase "Whoever is *indicted* for ... *capital crime...*" (emphasis added). 18 U.S.C. § 3005 (2000). This language provides the statutory trigger for the section, and the text is clear that the statute becomes applicable upon *indictment* for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty. As discussed above, § 844(i) qualifies as a capital crime because the death penalty is the maximum sentence that could be imposed on Boone.

*United States v. Boone,* 245 F.3d 352 (4th Cir 2001).

Mr. Kiersh failed to argue at any point in this case that the action of the Attorney General in not seeking the death penalty was irrelevant to Sweeney's right to be represented by two attorneys.

This failure resulted in Kiersh not properly advising Sweeney that he had a right to be represented by two attorneys in this case and not bringing to the trial court's attention the authority that supports the right of Sweeney to be represented by two attorneys throughout this case.

As a result of Kiersh's failure in this regard, Sweeney was forced to go to trial, in an extremely difficult case in which the interests of justice required that he be represented by two attorneys, with only one attorney. Moreover the attorney that Sweeny was forced

78

to go to trial with had stated, two days before jury selection began, that he had suffered "a very significant prejudice" by the removal of co-counsel.

In sum, Petitioner Sweeney has shown that trial counsel's error clearly deprive him of a statutory right to representation by co-counsel, but he has also shown that throughout trial and on appeal, counsel's errors were so serious as to deprive Sweeney of a fair trial. Counsel's conduct, especially as it was hampered by the removal of co-counsel on the eve of trial, so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Accordingly, relief must be granted.

### 11. COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT AT TRIAL AND FOR NOT CHALLENGING ON APPEAL THE TRIAL COURT'S IMPROPER *IN CAMERA* PROCEDURE USED WITH RESPECT TO THE SEALED MATERIAL

Counsel for Petitioner Sweeney was ineffective for not objecting at trial and for not challenging on appeal the improper *in camera* procedure used by the trial court with respect to the material that it reviewed under seal. Throughout the trial, the Court reviewed material submitted to it by the Government *ex parte* and under seal. The D.C. Circuit has recognized that "*in camera, ex parte* submissions 'generally deprive one party to a proceeding of a full opportunity to be heard on an issue,' and thus should only be used where a compelling interest exists." In re *Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998) (*citing* In re *John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994); In re *John Doe Corp.*, 675 F.2d 482, 490 (2d Cir.1982)). Further, in *In re Sealed Case*, the D.C. Circuit instructed that once the compelling interest in keeping the material secret has been demonstrated, the proper procedure for conducting *in camera, ex parte* proceedings includes keeping a transcribed record of what transpired in any *in camera* proceeding, in

79

order to preserve the excluded party's ability to contest decisions made on the basis of the sealed material.

At trial in this case, although the trial court viewed the sealed *ex parte Brady* evidence submitted by the Government *in camera*, the trial court failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material, and further, failed to keep a transcribed record of the *in camera* proceedings. No findings were made regarding the requested material, and no record was released to the defense indexing the material presented to the court. Accordingly, the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998). The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair. Accordingly, counsel should have raised this issue on appeal.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 12. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE CUMULATIVE ERROR DOCTRINE

Assuming arguendo that no single error on the part of Sweeney's counsel denied him effective assistance of counsel, counsel's errors, when taken as a whole, denied Sweeney effective assistance of counsel.

From a review of the law of this circuit it does not appear that this court has decided if the prejudice prong of the *Strickland* test for ineffective assistance of counsel can be met as a result of the cumulative errors of counsel.

The 7th Circuit has approved of this doctrine stating:

80

> In order to obtain relief under *Strickland,* it is not sufficient that a petitioner can point to her attorney's deficient performance. In addition, she must be able to demonstrate that the complained of deficiency resulted in prejudice, or, as discussed above, a "reasonable probability" that in the absence of error the result of the proceedings would have been different, *Strickland,* 466 U.S. at 694, 104 S.Ct at 2068, and was fundamentally unfair or unreliable. *Lockhart,* ___ U.S. at ___, 113 S.Ct. at 842-43. In making this showing, a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet *Strickland*'s test. *United States ex rel. Kleba v. McGinnis,* 796 F.2d 947 (7th Cir. 1986; *Montgomery,* 846 F.2d. at 416.

*Williams v. Washington,* 59 F.3d. 673, 682 (7th Cir. 1995).

The 9th Circuit has also found that the prejudice can be found from the cumulative

errors of counsel holding that:

> We offered the cautionary comment that [i]f counsel is charged with multiple errors at trial, absence of prejudice is not established by demonstrating that no single error considered alone significantly impaired the defense — prejudice may result from the cumulative impact of multiple deficiencies. *Id.* Thus, the law in this Circuit is clear that where an allegation of ineffective assistance by counsel is premised on specific acts or omissions of counsel, the allegation must be buttressed by a showing of injury or prejudice to the defendant. And even where, as here, several specific errors are found, it is the duty of the Court to make a finding as to prejudice, although this finding may either be "cumulative" or focus on one discrete blunder in itself prejudicial.

*Ewing v. Williams,* 596 F.2d 391, 395-396 (9th Cir. 1979).

The 2nd Circuit has also approved of this doctrine stating that:

> Since Rodriguez's claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together. *See Strickland v. Washington,* 466 U.S. 668, 695-96, 104 S.Ct. 2052, 2068-69, 80 L.Ed.2d 674 (1984). "The state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole." *Grady v. LeFevre,* 846 F.2d 862, 865 (2nd Cir. 1988). Even if Rodriguez's claims, evaluated individually, might not amount to a due process violation sufficient to require habeas relief, nevertheless, given the number of

81

> questionable circumstances in this case, before a federal court intervenes, the state court should be given an opportunity to carefully review all of Rodriguez's claims together to determine whether collateral relief may be appropriate.

*Rodriguez v. Hoke,* 928 F.2d 534, 538 (2nd Cir. 1991).

Counsel failed to challenge on appeal the ruling of the trial court denying access to material of which Sweeney was entitled to under *Brady*, *Giglio* and the Jencks Act; failed to seek review by the trial court of Theodore Watson's Greenbelt file; failed to call an expert witness to testify concerning Sweeney's Tourette's Syndrome; failed to request the appointment of a second attorney; failed to seek a continuance after removal of co-counsel on the eve of jury selection; failed to argue that Sweeney was, by law entitled to be represented by two attorneys at trial and the other errors set forth herein.   Sweeney's counsel's errors at trial and on appeal had the cumulative effect of creating a "reasonable probability" that in the absence of counsel's errors the result of the proceedings would have been different.

## C. THE TRIAL COURT DENIED SWEENEY HIS RIGHT TO BE REPRESENTED BY TWO ATTORNEYS

As argued herein, 18 U.S.C. §3005 gives a defendant, who has been indicted for a capital offense, the right to be represented by two attorneys.  Petitioner Sweeney was therefore, entitled to be represented by two attorneys in this case.

The trial court incorrectly stated the law when it held, at the hearing on December 16, 1999, that once the Attorney General declined to pursue the death penalty in the case, Sweeney lost his entitlement to be represented by two attorneys.  Therefore, the trial court committed prejudicial error when it stated that Sweeney was no longer entitled to be represented by two attorneys pursuant to 18 U.S.C. §3005.

82

This error of the trial court to properly advise Sweeney of his right to be represented by two attorneys was further compounded by the court removing Mr. Long as one of Sweeney's attorneys on the eve of jury selection and by not advising Sweeney of his right to be represented by two attorneys in this case.

> An accused's right to additional counsel in a capital case should not, of course, be lost solely because of lack of awareness of its existence. Therefore, the trial court here should have advised Cunningham of his rights under § 3005. We presume prejudice from the failure of the trial court so to inform him.

*Smith,* 353 F.2d at 845-46.

Likewise in this case, the Court must now presume prejudice to Sweeney as a result of the trial court improperly advising him that, once the Attorney General declined to pursue the death penalty against Sweeney, he lost his right to be represented by two attorneys. Further, when the trial court removed Mr. Long, Sweeney, as a result of the trial court's previous decision, would not have known to insist on his entitlement to two attorneys.

Sweeney was prejudice by this as was admitted to by this trial counsel and then does not address the prejudice.

## CONCLUSION

As demonstrated above, when viewed in the light of the weakness in the Government's case against Petitioner Sweeney, given the combination of the ineffective assistance of counsel, the trial court's error, and the misconduct of the Government, there is a reasonable probability that the outcome of the proceedings would have been different. Petitioner Sweeney was convicted, and sentenced to multiple life sentences, by a trial that was fundamentally unfair. Accordingly, relief must be granted.

Pursuant to Rule 8 of the Rules Governing Section 2255 Proceedings, Petitioner Sweeney requests that an evidentiary hearing be conducted, at which proof may be offered concerning the issues raised in his motion(s) and memorandum.  After an evidentiary hearing is held, the Court should vacate Petitioner Sweeney's convictions and sentence, and grant such other relief, as it deems appropriate.

_____/s/_____
Eric Kirchman
D.C. Fed. Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@cs.com


_____/s/_____
Shana Madigan
D.C. Bar No. 1015317
Attorney for William K. Sweeney
The Law Office of Shana Madigan
6205 Massachusetts Avenue
Bethesda, Maryland 20816
(202) 270-3989

### CERTIFICATE OF SERVICE

I hereby certify, on this 28th day of November 2014, that a copy of the foregoing was mailed by first class mail, postage prepaid to:

**Margaret J. Chriss**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 1:98-CR-329 (RCL) |
| | § | |
| SAMUEL CARSON, et al. | § | |
| | § | |

**MOTION TO JOIN PETITIONER SWEENEY'S MOTION TO UNSEAL SPECIFIC EXHIBITS**

Petitioner SAMUEL CARSON, by his attorney Kira Anne West,

moves the court to allow him to join the motion seeking entry of an order unsealing Sweeney's

Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. §2255 and

the exhibits attached thereto, and as reasons states as follows:

1. That Mr. Carson adopts the reasons, namely 1 through 8,  stated in Sweeney's motion; and

2. That during a status hearing some time ago before this Honorable Court, undersigned counsel

argued that these exhibits should be unsealed as to all parties to the litigation, not just one party

and the Court orally from the bench granted that motion.

WHEREFORE, for the foregoing reasons, as well as any additional reasons deemed

meritorious by the Court, counsel requests that this Court enter an order allowing Mr. Carson to

join in the motion unsealing the named exhibits.

Respectfully submitted,

_____/s/_____
KIRA ANNE WEST
Bar No. 993523
1325 G Street NW, Suite 500
Washington, D.C. 20005
(202) 236-2042 Phone
(

1

Email: kiraannewest@gmail.com

ATTORNEY FOR DEFENDANT SAMUEL CARSON

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2015, a copy of this pleading was served by the ECF System on all counsel of record at the time of this filing.

_____/s/_____
KIRA ANNE WEST

2

Copies to: **Judge**
      **AUSA – Special Proceedings**
      **Dft.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
      Respondent,

    :

v.

    :   Crim. No. 98-cr-00329- 06 - RCL

SEAN COATES,
      Defendant.

    :

    :

    :

ooo0ooo

**FILED**

FEB 2 4 2015

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### DEFENDANT'S PRO SE SUPPLEMENTAL CLAIMS IN RELATION TO
### THE ORIGINAL MOTION PURSUANT TO 28 U.S.C. § 2255

Comes Now, the Defendant, Sean Coates, and presents the following claims in addition to those previously presented by appointed counsel, Veronice A. Holt, in the original, pending Motion to Vacate, Set Aside Or Correct Sentence Pursuant to 28 U.S.C. § 2255.

SUPPLEMENTAL CLAIM ONE:

**Supporting Facts And Argument.**

The Defendant, Sean Coates was denied his right to effective assistance of counsel and the compulsory process of calling witnesses in his behalf when his appointed trial attorney, Fred Jones, failed Defendant's direct and express order to call to trial for the defense, Dakeisha Ruffin, Defendant's sister and alibi-witness to Defendant's location and presence with her (Ms. Ruffin) at her apartment in Northeast Washington, D.C., as opposed to the Temple Hills, Maryland location and scene of three homicides for which the prosecution charged that Defendant had committed and/or participated in, on November 17, 1996, between 10:00pm and 11:00pm.

In or about January of 1999, well in advance of the commencement of the Defendant's 2001 trial, Defendant's sister, Ms. Ruffin, after Defendant's request for her to do so, contacted Defendant's attorney, Fred Jones, via the telephone and informed Mr. Jones that the Defendant was with her and her infant children at her apartment in D.C. on the night of November 17, 1996, between the hours of 10:00pm and 12:00am. (See Sworn Affidavit of Dakeisha Ruffin-Borders, attached hereto as Exhibit 1). During the telephone conversation, Mr. Jones advised Ms. Ruffin that if she insisted on coming forward with her story about Defendant's presence

RECEIVED
Mail Room

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

2

with her on the night of the tripple murders, that she may as well be charged by
the prosecution as an accessory to those murders. Mr. Jones further instructed
Ms. Ruffin to take some time to think about what she really wanted to do, also
not to discuss her decision or the case with anyone else, including her brother
(the Defendant, Sean Coates), and that he would call her back in several days to
discuss her rights and see how she still felt about testifying. Id. However, Mr.
Jones did not call back in several days nor sought further contact, interviews or
an investigation with Ms. Ruffin, but abandoned Ms. Ruffin altogether as a wit-
ness for the defense to the Temple Hills tripple murders, and in doing so, Mr.
Jones failed to inform the Defendant, the Court or the Prosecution of his contact
with Ms. Ruffin, her story and willingness and availability to appear and give
testimony for the defense, which testimony was the highly exculpatory story that
Defendant was with her at the time of the tripple murders; the same alibi story
that Defendant had himself previously told Mr. Jones about. Instead, Mr. Jones
attempted to intimidate Ms. Ruffin with false and misleading advice that she would
be prosecuted for the tripple murders, as well, if she testified in her brother's
behalf, Mr. Jones intefered with Ms. Ruffin's right to appear before the Court
and give truthful testimony, the Defendant's right to call Ms. Ruffin in his be-
half, fraudulenltly chilled exculpatory and lawful communications between Ms.
Ruffin and the Defendant, and concealed this misconduct from the Defendant, the
Court and the Prosecution. Indeed, Mr. Jones lied to the Defendant by informing
and reporting to the Defendant that Ms. Ruffin was afraid to come forward and
corroborate Defendant's alibi that he was with Ms. Ruffin, in Washington, D.C.,
at the time of the Temple Hills tripple murders, because Ms. Ruffin feared being
charged with being an accomplice to those murders, when in fact, it was Mr. Jones
who deliberately suggested and planted such statements and concerns of fearing
an accomplice liability prosecution against Ms. Ruffin. (See Statement and Affi-
davit of Defendant [Sean Coates], attached hereto as Exhibit 2). Here, clearly
Mr. Jones acted as a sabotuer of Defendant's alibi defense, and his actions did
sabotage Defendant's alibi defense to the Temple Hills Tripple murders, where
the only evidence implicating Defendant in the crime was the Prosecution's ad-
mitted and habitual liar and fabricator of incriminating evidence, statements
and testimony, James Montgomery.

    Thus, inarguably, Mr. Jones' performance was deficient, Mr. Jones' actions
were incompetent and below the standard required of him under the law, and

App 1156

3

thus Mr. Jones was ineffective within the plain meaning of Strickland v. Washington, 466 U.S. 688 (1984), to the Defendant's substantial prejudice.

SUPPLEMENTAL CLAIM TWO:

Supporting Facts And Argument.

Here, the Defendant also relies on the facts setforth in the above supplemental Claim One, and thus incorporates them herein in this Supplemental Claim Two section by reference and the attached Exhibits 1 and 2. In addition, the Defendant presents that, in or about December of 1998, he informed his appointed attorney, Fred Jones, that he could not have committed or participated in the Temple Hills tripple murders, as charged by the Prosecution, because he, the Defendant, was in Northeast Washington, D.C. with his sister, Dakeisha Ruffin and her infant children, at 4400 Quarles Street, at just after 10:00pm until 12:00am, when Defendant then departed his sister and her children and went home to bed. Defendant gave Mr. Jones his sister's contact information to verify his alibi and instructed Mr. Jones to call his sister to trial to testify for the defense. Mr. Jones advised the Defendant that he would contact and speak with Ms. Ruffin regarding Defendanat's alibi story. Also, soon after revealing the alibi to Mr. Jones, and still in December of 1998, the Defendant contacted his sister via a written letter, in which he instructed his sister to contact his attorney, Mr. Jones, and relay to Mr. Jones where he (Defendant) and Ms. Ruffin were on the night of November 17, 1996, at between 10:00pm and 12:00am. In the letter, the Defendant provided his sister with Mr. Jones' telephone number. (see Defendant's Statement and Affidavit, attached hereto as Exhibit 2).

During subsequent and multiple inquiries, throughout the year of 1999, regarding Ms. Ruffin's availability to testify and corroboration of Defendant's alibi to the Temple Hills murders, Mr. Jones repeatedly informed Defendant that he had in fact spoken to Ms. Ruffin and that she had confirmed Defendant's alibi for the Temple Hills murders, but that Ms. Ruffin was reluctant to come forward and testify because she was afraid of being accused of being involved in the murders herself. Id. The Defendant, at one point, had informed Mr. Jones that he would call his sister and see what was wrong with her, and, in response, Mr. Jones advised him not to call his sister himself because she was a potential witness and that he (Mr. Jones) would be further talking to his sister to explain her rights with coming forward. Mr. Jones further advised the Defendant

App 1157

4

not to pressure his sister about testifying for the defense because it was his (Mr. Jones) job to talk to witnesses and decide who was fit to testify or not. Id.

Then, in or about October of 2000, just before commencement of Defendant's trial, the Defendant informed Mr. Jones that his sister had been refusing to discuss his criminal case and her alibi testimony with him. Mr. Jones informed the Defendant that his sister more than likely would not agree to be a witness and testify for the defense, as to the alibi for the Temple Hills murders, because she was not represented by an attorney and afraid of being accused of being involved in the crime if she came forward with the alibi. The Defendant then informed Mr. Jones that he would take the stand himself and tell the jury about the alibi and who and where he was, and thus could not have committed or participated in the Temple Hills murders. Mr. Jones then advised Defendant that his testimony would not be believed by the jury or anyone else because his sister would not corroborate the alibi and that would hurt him even more and get him convicted quicker because the jury would think that he was trying to lie his way out of the crime. Id. Based on this reasoning and advice by Mr. Jones, the Defendant did not testify to his alibi regarding the Temple Hills murders. And after jury trial involving the Temple Hills murders, the Defendant, absent the jury ever hearing testimony of his alibi, suffered a guilty verdict on the charged Temple Hills murders.

Here, through his fraud, deceit and misconduct, Mr. Jones interfered with and prevented the Defendant from testifying in his own behalf and presenting the jury with his alibi to the Temple Hills murders, as well as enjoying the benefit of his sister's (Ms. Ruffin) corroborating alibi testimony. To be sure, the Defendant's testimony, contrary to Mr. Jones' advice, was more believable or at least as equally believable as the Prosecution's admitted lier and fabricator, James Montgomery, standing alone, and certainly provable testimony with the corroboration of Ms. Ruffin. Thus, but for Mr. Jones' fraud, deceit, and misconduct in sabotaging his alibi defense to the Temple Hills murders, the Defendant would have testified in his own behalf, if not called his sister (Ms. Ruffin) to perform the task; to put before the jury evidence of his alibi, otherwise unknown to and not considered by the jury. That Mr. Jones operated under a clear conflict and who's performance fell well below the standard of reasonableness, and professional as well as ethical norms, is plain. And that he was thus ineffective to the Defendant in

App 1158

5

in the giving of his trial advice to Defendant and enforcing and administering
and preserving the Defendant's constitutional trial rights, within the plain
and simplest meaning of <u>Strickland</u>, to Defendant's substantial detriment, is a fact.

SUPPLEMENTAL CLAIM THREE:

Supporting Facts And Argument.

The Prosecution charged Defendant under the aiding and abetting theory in
the Temple Hills tripple murders, relying on James Montgomery's testimony and
out of court debriefings with local police agencies and federal authorities,
that the codefendants recruited Defendant to assist in the crime: "They went
to get Bird [Defendant] because Bird and Lonnie was cool." (Tr. 031401am, p.34).
"They told Bird what they were going to do, but Bird did not say anything." <u>Id</u>.
"Bird was suppose to go in, but when it was time to get out of the car, Birdie
did not get out of the car." <u>Id</u>. "Me [Montgomery] and Drapper ran up to the people
and pushed them in the house. One girl ran upstairs. I did not see what the other one
did." (Tr. 031401am, p47-48). "I grabbed Darnell Mack and Drapper grabbed Lonnie.
Mack was not resisting. He [Mack] said he did not have any money. I lifted up Mack's
jacket so he [Drapper] could stun him and Drapper started shooting. I pushed the
screen door open with my thumb. I did not see Drapper shoot the girl. Draper got
in the car first and then me." (Tr. 031401am, p.53).

Here, the Prosecution's theory of culpability for the Defendant was that the
Defendant went to the scene of the murders, drove the gettaway car, and could
lure Lonnie ("a close friend") out for the codefendants, and thus the Defendant
aided and abetted the other codefendants, Chin, Draper, and Montgomery of the
first-degree, premeditated murder of Darnell Mack, Alonzo Gaskins, and Melody
Anderson, in Temple Hills, Maryland. And on July 5, 2001, the trial court (the
Honorable Judge Thomas P. Jackson), instructed the jury, that with respect to
the crimes charged in the indictment, which included murder and use of a fire-
arm in the commission of the murders and other violent crimes and drug trafficking
offenses, that: "Under aiding and abetting, any person who in some way intentionally
participates in the commission of a crime, aids and abetts the principal offender.
The law regards him guilty as guilty of the crimes as he would be if he
personally committed each of the acts that make up the crime. To find
that a Defendant aided and abetted in committing a crime, you must find
that the defendant knowingly associated himself with the persons who committed

App 1159

6

the crime, that he participated in the crime as soemthing he wished to bring
about, and that he intended his actions to make it succeed...An aider and abet-
tor is legally <u>responsible for the acts of other persons that are the natural
and probable consequence</u> of the crime in which he intentionally participates.
For example, an aider and abettor is legally responsible for the principal's
use of a weapon during an offense if...it was <u>reasonably foreseeable to the
aider and abettor</u> that soem type of weapon was required to commit the offense."
(Tr. 070501pm, "Min-U-Script" p's. 41-43)(emphasis added).

　　These aiding and abetting instructions were clearly erroneous and allowed
the jury to convict the Defendant of aiding and abetting murder and firearm use
as the principal without the Defendant having been found to have psossed the
same mental state (mens rea) as the principal required for a conviction of those
particular offenses. See e.g., <u>Wilson-Bey v. United States</u>, 903 A.2d 818, 836
(D.C. 2006)(holding new trial required where trial court instructed jury on
"natural and probable consequences" and "reasonable foreseeable" liability under
aiding and abetting theory which requires specific intent and knowledge to com-
mit murder, the same as the principal); <u>Coleman v. United States</u>, 948 A.2d 534,
552 (D.C. 2006)(extending the Wilson-Bey holding to second-degree murder and
striking down the probable consequences and reasonably foreseeable liability
theory from aiding and abetting theory of culpability); see also <u>Rosemond v.
United States</u>, 134 S.Ct. 1240, 188 L.Ed.2d 248 (2014)(reversing for new trial
and holding that for § 924(c) conviction under aiding and abetting theory of
culpability, jury must have been instructed and find that defendant had speci-
fic knowledge and intent that a firearm would be actively employed and used in
the nature that the principal intended, striking down the probable consequences
and reasonably foreseeable liability theory).

　　Because, here in the instant case, one cannot say without absolute certainty
that the Defendant was not convicted of the Temple Hills tripple murders, other
murders, and firearm use offenses in relation to violent acts and drug trafficking
crimes, as an aider and abetter as a result of Defendant's knowledge of the pro-
bale consequences or reasonable foreseeability of the principal's/codefendant's
alleged acts, as opposed to specific intent and knowledge to commit those speci-
fic acts and crimes, Defendant's trial must be redone. In fact, the trial court's
instructional example that <u>some type</u> of weapon would be used is all that is re-
quired for aiding and abetting the firearm use (§ 924(c)) crimes, ensures that a

App 1160

7

that a new trial is necessary and in order since the § 924(c) counts charged in
this case against defendant can only stand and be predicated on the employment
and actual use of a firearm, as defined in that statute, as opposed to "some type"
of weapon, otherwise the Defendant may have been convicted under § 924(c) counts
here based on some other type of weapon instead of the necessary and required
firearm.

And here, as well, Defendant's trial attorney, Fred Jones, rendered ineffec-
tive assistance to Defendant when he stood by and failed to object to the faulty
aiding and abetting instructions and the alternative of "some type" of weapon in
its example under the § 924(c) counts, thus failing to ensure a correct and fair
verdict on the aiding and abetting theory, firearms counts, and to preserve the
instructional errors for appellate review, to the Defendant's significant detri-
ment, thus satisfying Strickland's criteria for relief.

SUPPLEMENTAL CLAIM FOUR:

Supporting Facts And Argument.

At sentencing, all of the Defendant's § 924(c) counts of conviction were or-
dered ran consecutively to one another; that is, Counts 28, 34, 35, 36, and 37,
for a total of 85 consecutive years. This decision of the consecutive execution
of the firearm sentences was made by the Court on the premise that, although the
§ 924(c) counts were all charged in the same indictment and tried at the same
time, they were technically viewed as seperate and subsequent convictions from
one another, thus mandating, per the statute's penalty section, seperate and esca-
lating, consecutive minimum sentences for each count returned in the verdict fol-
lowing the first count. This practice is called "stacking," which, however, the
Sentencing Commission has since asked Congress to eliminate because it is so un-
just. See U.S. Sentencing Comm'n Report to Congress: Mandatory Minimum Penalties
in the Federal Criminal Justice System ("Mandatory Minimum Report"), at 368 (Oct.
2011). Here, Defendant Coates' stacked firearm sentences are unconstitutional,
as well as they are not true recidivism convictions; that is, Defendant Coates
did not have a prior conviction under § 924(c) at the time of his instant verdict,
thus his firearm sentence is also unfair and overly severe.

To be sure, black defendant's, like Coates, have long been disproportionately
subjected to the stacking of § 924(c) convictions arising from the same indic-
tment and trial. See Commission's Report at 363 (stating that black offenders are

App 1161

8

disproportionately convicted under § 924(c), subject to mandatory minimums at sentencing, and convicted of multiple § 924(c) counts. The Sentencing Commission's Fifteen-Year Report, in 2004, stated that black defendants accounted for 48% of offenders who qualified for a charge under § 924(c), but they represented 56% of those actually charged under the statute and 64% of those convicted under it. See Fifteen Years of Guidelines Sentencing and Racial Disparity: Assessing the Role of Prosecutors and the Effects of Booker, 123 YALE L.J.2, 28–29 (2013) (even after controlling for, inter alia, arrest offense, district, age criminal history category, and education level, black men are nearly twice as likely as white defendants to be charged with an offense carrying a mandatory minimum sentence). Thus, in its Report to the Congress on mandatory minimum penalties in the Federal Justice System, the Commission recommended that Congress lower the mandatory prison sentence in the section, make recidivism enhancements applicable only when the first offense was the result of a prior conviction, and allow for concurrent sentences on "stacked" § 924(c) counts. Id. at 368 (Oct. 2011).[1]

And thus here, because Defendant Coates did not truly have a § 924(c) conviction prior to those which occurred at the trial in the instant case, the Defendant had not committed a true recidivism involving a § 924(c) violation and, as such, justice and fairness requires the Court to exercise its authority in such circumstances and vacate the unconstitutional stacking of Defendant Coates' simultaneous § 924(c) convictions and sentences.[2] Indeed, since looking prospectively, and in view of the U.S. Sentencing Commission's Mandatory Minimum Report

---

1   Among the other Sentencing Commission recommendations to Congress about § 924(c), which include a recommendation to lower the sentences for subsequent convictions because they are too harsh, is a recommendation to make them true recidivism enhancements:

Make 924(c) a "true" recidivism statute; Congress should consider amending section 924(c) so that the increased mandatory minimum penalties for "second or subsequent" offense apply only to prior conviction. In those circumstances, the mandatory minimum penalties for multiple violations of 924(c) charged in the same indictment would continue to apply consecutively, but would require significantly shorter sentences for offenders who do not have a prior conviction under section 924(c). This would reduce the potential for overly severe sentences for offenders who have not previously been convicted of an offense under section 924(c), and ameliorate some of the demographic impacts resulting from stacking. U.S. Sentencing Comm'n Report to Congress ("Mandatory Minimum Report"), at 364 (Oct. 2011).

2   Prior to the trial and conviction in the instant case, on Counts 28, 34, 35, 36, and 37; the section 924(c) counts, Defendant Coates had never suffered a conviction for the "use, carry or possession of a firearm during, in relation to, or in furtherance of a crime of violence or drug trafficking offense, in the District of Columbia, or any other state of the United States, or foreign country.

9

recommending to Congress that § 924(c) stacking be eliminated as unconstitutional to balck offenders and overly severe to all, as well as not truly a recidivism statute, the court can reasonably conclude that section 924(c)'s stacking penalty enhancement, as it is now interpreted, no longer has or will no longer have any equity in law.

Wherefore, the Defendant, Sean Coates prays for relief in the form of a new trial, vacation of the stacked § 924(c) counts and resentencing there upon, and that he be appointed competent counsel for the new trial and sentencing where the Defendant and his attorney may be allowed allocution and the presentation of intervening and material facts and law affecting the resentencing.

Respectfully submitted,

Sean Coates, Defendant
Reg. No. 01181-748
USP-Allenwood
P.O. BOX 3000
White Deer, PA 17887

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and correct copy of the foregoing Supplemental Claims were served on the Office of the United States Attorney, at 555 4th Street, N.W., Washington, D.C. 20530, Special Proceedings Division, this 10th day of February, 2015, via forst-class mail, postage prepaid.

Sean Coates, Defendant
Reg. No. 01181-748
USP-Allenwood
P.O. BOX 3000
White Deer, PA 17887

# EXHIBIT

# 1

P.01/10



U.S. Department of Justice

United States Attorney
District of Maryland
Southern Division

Lynne A. Battaglia
United States Attorney

Sandra Wilkinson
Assistant United States Attorney

400 United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770-1249

301-344-4433

301 344-4233
FAX 301-344-4516

August 10, 1999

(Via Facsimile (401)576-9351)

Arcangelo M. Tuminelli
8 East Mulberry Street
Baltimore MD 21202-2105

Re: **United States of America v. Theodore Watson**,
Criminal No. PJM 99-069

Dear Mr. Tuminelli:

This letter confirms the plea agreement which has been offered
to your client by the United States Attorney's Office for the
District of Maryland ("this Office"). If your client accepts this
offer, please have him execute it in the spaces provided below. If
this offer has not been accepted by August 16, 1999, it will be
deemed withdrawn. The terms of the agreement are as follows:

1. Mr. Watson, your client, agrees to plead guilty to
Count(s) One through Four, Six, and Nine of the Superseding
Indictment now pending against him in which he is charged with
conspiracy to possess with intent to distribute controlled
substances in violation of 21 U.S.C. Section 846 (Count One), and
possession with intent to distribute controlled substances in
violation of 21 U.S.C. Section 841 (Counts Two through Four, Six
and Nine). Your client admits that he is in fact guilty of these
offenses and will so advise the Court.

2. The maximum sentence provided by statute for the offenses
to which your client is pleading guilty is imprisonment for not
more than ten years followed by a term of supervised release of at
least two years but not more than 4 years and a fine of $250,000
per count. In addition, your client must pay $600 as a special
assessment under 18 U.S.C. Section 3013, which will be due and
should be paid at or before time of sentencing. This Court may
also order him to make restitution pursuant to 18 U.S.C. Section
3663 and 3664. If a fine is imposed, it shall be payable
immediately. Under 21 U.S.C. Section 862, a person who has been
convicted of a Federal offense consisting of the distribution or

App 1165

possession of a controlled substance may be denied certain Federal benefits.

3.    Your client agrees to cooperate with this Office on the following terms and conditions:

(a)   Your client shall fully and truthfully respond to all questions put to him by federal and local law enforcement authorities. Specifically, your client shall fully and truthfully disclose to the government everything he knows about narcotics trafficking, firearms offenses, violent crimes, and about any other matters as to which the government may choose to inquire. Your client shall promptly turn over to the government any documents in his possession or under his control that are in any way relevant to any such matters.

(b)       Your client shall cooperate completely with federal law enforcement authorities in any matter as to which his cooperation may be relevant. Your client shall comply with any and all reasonable instructions from such authorities with respect to the specific assistance that he shall provide. To the extent that counsel is not present during the course of your client's cooperation, your client knowingly and expressly waives his/her right to have counsel present during communications with federal enforcement authorities.

(c)   In connection with criminal investigations by federal law enforcement authorities, your client shall act in an undercover capacity to the best of his ability, and allow such authorities to monitor and tape record conversations with persons who are believed to be engaged in criminal conduct.  Your client will fully comply with all reasonable instructions and directions of law enforcement authorities in this connection.

(d) Your client shall testify fully and truthfully before grand juries and at all trials of cases at which his testimony may be relevant.

(e)  Your client will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case.

(f) Your client agrees to waive and relinquish any right or entitlement to all transportation, housing, per diem and witness fees relative to all grand jury and court appearances which may be required as part of his cooperation.

4.    Your client understands that a sentencing guideline range for this case will be determined by the Court pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. Section 3551-3742 and 28 U.S.C. Sections 991 through 998.   Your client further

2

AUG-16-1999  13:27        R ATTNY /GREENBELT                    P.05/10

understands that the Court will impose a sentence within that
guideline range unless the Court finds there is a basis for
departure because there exists an aggravating or mitigating
circumstance of a kind, or to a degree, not adequately taken into
consideration by the Sentencing Commission in formulating the
guidelines which should result in a sentence different from the
guideline range.

5.    (a)    This Office and your client understand, agree and
stipulate to the attached statement of facts and the following
applicable sentencing guideline factors:

### STIPULATION

The parties agree that the Counts One through Four, Six
and Nine group under U.S.S.G. § 3D1.2.  The base offense
level for possession of controlled substances with the
intent to distribute is governed by the quantity of the
drugs involved in the offense conduct.  U.S.S.G.  §
2D1.1(a)(3).   In this case, 186,200 dosage units of
Schedule III controlled substances and 82,400 dosage
units of Schedule IV controlled substances were involved.

The sentencing guidelines require that the amounts be
converted into "marijuana" weights as follows:

186,200 units of Schedule III's = 186,200
grams of marijuana = 186.2 kilograms of
marijuana.

82,400 units of Schedule IV's = 5,150 grams of
marijuana = 5.15 kilograms of marijuana

Using the conversion method set forth in the Drug
Equivalency tables, the total amount is equivalent to
191.35 kilograms of marijuana.    Under the Drug
Equivalency Tables set forth in U.S.S.G. § 2D1.1, the
base offense level for offenses involving Schedule III
and Schedule IV substances is capped at 59.99 kilograms
of marijuana.    Thus, the base offense level is 20.
U.S.S.G § 2D1.1 (c)(10).    In addition, your client
possessed a firearm requiring a two level enhancement.
U.S.S.G. §2D1.1(b)(1).    Your client also abused a
position of trust (U.S.S.G. § 3B1.3) in the offense
conduct thereby increasing the offense level by 2
additional levels.

By pleading guilty your client demonstrated acceptance of
responsibility meriting a two level decrease.  U.S.S.G.
§ 3E1.1.(a).  Thus, the adjusted offense level is 22.

3

AUG-19-99 05:03 PM  B MORBERG,...

App 1167

(b)    In the event that your client provides substantial assistance in the investigation or prosecution of others who have committed an offense, the government will move under § 5K1.1 of the Federal Sentencing Guidelines for a downward departure of 2 levels. The Court is authorized to grant such a downward departure pursuant to 18 U.S.C §3553(e). The government shall have sole discretion in determining whether your client has provided such substantial assistance and, therefore, whether the motion under § 5K1.1 should be made.    If the government moves for a downward departure under §5K1.1, defense counsel is not bound by the departure level recommended by the government.

(c)    Your client understands that neither the U.S. Probation Office nor the Court is bound by the stipulation, and that the Court will, with the aid of the presentence report, determine the facts relevant to sentencing.    Your client understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence.    Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information.    Your client understands that if the Court ascertains factors different from those contained in the stipulation, your client cannot, for that reason alone, withdraw his guilty plea.

(d)    This Office and your client agree that no other facts, sentencing guideline factors, potential departures or adjustments will be raised or are in dispute.

(e)    Your client understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.    Your client understands that the government believes that he is, in fact, a career offender under U.S.S.G. § 4B1.1 and, as a result, his criminal history category is VI.

(f)    Your client will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case.

(g)    In the event that your client (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under §3C1.1 of the Federal Sentencing Guidelines, or (ii) fail to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the presentence report, or (iii) commits any offense in violation of federal, state or local law, then this office will be relieved of its obligations to your client as

4

reflected in this agreement. Specifically, this office will be free to argue sentencing guideline factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, the government will bear the burden of convincing the court of your client's obstructive behavior and/or failure to acknowledge personal responsibility by preponderance of the evidence. Your client acknowledges that he may not withdraw his guilty plea because this office is relieved of its obligations under the plea agreement pursuant to this paragraph.

(h) Your client agrees to forfeit all of his rights, title and interest in (i) $5,502 in United States currency seized on or about February 23, 1999 from 6200 Westchester Park Drive, #1511, College Park, Maryland and (ii) $827 in United States currency seized on or about February 23, 1999 from your client.

Your client agrees to take whatever steps are necessary to pass clear ownership to these monies to the United States.

6. In return for the complete fulfillment by your client of all of his obligations under this agreement, this Office agrees as follows:

(a) When your client appears before the Court for sentencing for the offense to which he has agreed to plead guilty, this Office will bring to the Court's attention and the Court will be entitled to consider (i) the nature and extent of his cooperation and his testimony including specific references to the criteria set forth in sentencing guideline 5K1.1(a), and (ii) all other relevant information with respect to his background, character and conduct. Specifically, this Office will be entitled to bring to the Court's attention and the Court will be entitled to consider any failure by your client to fulfill any of his obligations under this agreement.

(b) At his sentencing, this Office will (i) move that the Court make a downward departure from the guidelines pursuant to § 5K1.1 and 18 U.S.C. § 3553(e) as set forth in paragraph 5(b) above (that is, if the government has determined in its sole discretion that your client has provided substantial assistance) and, (ii) within the final guideline range, make any recommendation this Office deems appropriate.

(c) In order to permit your client to make disclosures to the government under this agreement, any information and documents that he fully and truthfully discloses to the government during the course of his cooperation pursuant to this

5

reflected in this agreement. Specifically, this office will be free to argue sentencing guideline factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, the government will bear the burden of convincing the court of your client's obstructive behavior and/or failure to acknowledge personal responsibility by preponderance of the evidence. Your client acknowledges that he may not withdraw his guilty plea because this office is relieved of its obligations under the plea agreement pursuant to this paragraph.

(h)    Your client agrees to forfeit all of his rights, title and interest in:

1.    $5,502 in United States currency seized on or about February 23, 1999 from 6200 Westchester Park Drive, #1511, College Park, Maryland.

2.    $827 in United States currency seized on or about February 23, 1999 from your client.

Your client agrees to take whatever steps are necessary to pass clear ownership to these monies to the United States.

6.    In return for the complete fulfillment by your client of all of his obligations under this agreement, this Office agrees as follows:

(a)    When your client appears before the Court for sentencing for the offense to which he has agreed to plead guilty, this Office will bring to the Court's attention and the Court will be entitled to consider (i) the nature and extent of his cooperation and his testimony including specific references to the criteria set forth in sentencing guideline 5K1.1(a), and (ii) all other relevant information with respect to his background, character and conduct. Specifically, this Office will be entitled to bring to the Court's attention and the Court will be entitled to consider any failure by your client to fulfill any of his obligations under this agreement.

(b)    At his sentencing this Office will move that the Court make a downward departure from the guidelines pursuant to § 5K1.1 and 18 U.S.C. § 3553(e) as set forth in paragraph 5(a) above and, within the final guideline range, make any recommendation this Office deems appropriate.

(c)    In order to permit your client to make disclosures to the government under this agreement, any information and documents that he fully and truthfully discloses to the government during the course of his cooperation pursuant to this

5

agreement will not be used against him, directly or indirectly, by the government in any federal criminal case, except as set forth in paragraphs 9(iv) and 10 below.

(d)   If the need arises, the government will apply for your client's admission into the Witness Protection Program of the U.S. Marshal's Service.   Your client understands that he will be admitted to that program only if he meets the eligibility requirements and that the determination as to whether he has met those requirements lies within the sole discretion of the United States Department of Justice.

7.   Your client and the United States knowingly and expressly waive all rights conferred by 18 U.S.C. Section 3742 to appeal whatever sentence is imposed, including any issues that relate to the establishment of the guideline range, reserving only the right to appeal from an upward or downward departure from the guideline range that is established at sentencing.   Your client also agrees to knowingly and expressly waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to 28 U.S.C. §2255, excepting only the right to make a challenge based on grounds of ineffective assistance of counsel or prosecutorial misconduct not known to the defendant at the time of the guilty plea.   Nothing in this agreement shall be construed to prevent either your client or the United States from invoking the provisions of Federal Rule of Criminal Procedure 35, and appealing from any decision thereunder, should a sentence be imposed that exceeds the statutory maximum allowed under the law or that is less than any applicable statutory minimum mandatory provision.

8.   Your client expressly understands that the Court is not a party to this agreement.   In the federal system, sentence is imposed by the Court, the Court is under no obligation to accept this Office's recommendations and the Court has the power to impose a sentence up to and including the statutory maximum stated above.   If the Court should impose any sentence up to the maximum established by statute, your client cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement.   Your client understands that neither the prosecutor, you, nor the Court can make a binding prediction of, or promise him, the guideline range or sentence that ultimately will apply to his case.   Your client agrees that no one has made such a binding prediction or promise.

9.   If your client has failed or should fail in any way to fulfill completely each and every one of his obligations under this agreement, then this Office will be released from its commitment to honor all of its obligations to him.   Thus, for example, if he should commit any crime, or if at any time he should knowingly withhold evidence from this Office or otherwise not be completely

6

P.07    ISS6 9LS 0T+ · SYBNROTTA TS YRREBLUM 8    MA    JUA
App 1171

truthful with this Office or in his testimony before grand juries or at trials, then this Office will be free (i) to prosecute him for perjury, false declaration, false statement and/or obstruction of justice; (ii) to prosecute the other counts of the indictment that would otherwise have been dismissed at sentencing; (iii) to charge him with other offenses, if any, that he has committed; (iv) to use against him in all of those prosecutions the information and documents that he himself has disclosed to this Office during the course of his cooperation; and (v) to recommend to the Court any sentence that this Office considers appropriate, up to an including the maximum possible sentence; (vi) to refrain from making any motion that the Court make a departure from the guidelines sentence range for substantial cooperation.

10. Whether or not your client has violated the terms of this agreement shall be determined by the Court in an appropriate proceeding at which his disclosures and documents shall be admissible and at which this Office shall be required to establish his breach by a preponderance of the evidence. Your client understands and agrees that he shall not be relieved of his obligations under this agreement or permitted to withdraw his guilty plea solely because this Office is relieved of any or all of its obligations.

11. Nothing in this agreement shall be construed to protect your client in any way from prosecution for perjury, false declaration or false statement, in violation of 18 U.S.C. §§ 1621, 1623 or 1001, obstruction of justice, in violation of 18 U.S.C. §§ 1503, 1505, 1510, or 1512, any crime of violence, or any other offense committed by him after the date of this agreement. The information and documents that he discloses to the government pursuant to this agreement may be used against him in any such prosecution.

12. Your client waives and agrees to waive any rights under the Speedy Trial Act, and he understands that his sentencing may be delayed until his cooperation has been completed so that at sentencing the court will have the benefit of all relevant information.

13. This letter states the complete plea agreement in this case and pertains solely to federal criminal charges in the District of Maryland. There are no other agreements, promises, undertakings or understandings between your client and this Office.

7

1852 915 819        SYANROTTA TS YRREBLUM 8 MP        UA

App 1172

If your client fully accepts each and every term and condition of this letter, please sign and have your client sign the original and return it to me promptly. The enclosed copy is for your file.

Very truly yours,

Lynne A. Battaglia
United States Attorney

By: _____
Sandra Wilkinson
Assistant United States Attorney

I have read this agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it.

8-11-99                 _____
Date                    Theodore Watson

I am Mr. Watson's attorney. I have carefully reviewed every part of this agreement with him. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

8/11/99                 _____
Date                    Arcangelo M. Tuminelli

8



2



THEODORE WATSON FILE
FROM USAO - GREENBELT, MD

98-329

COURT
EXHIBIT



U.S. Department of Justice

*United States Attorney*
*District of Maryland*
*Southern Division*

*Lynne A. Battaglia*
*United States Attorney*

*Sandra Wilkinson*
*Assistant United States Attorney*

*400 United States Courthouse*
*6500 Cherrywood Lane*
*Greenbelt, MD 20770-1249*

*301-344-4433*

*301-344-4235*
*FAX 301-344-4516*

## FAX COVER SHEET

**TO:**      **Arcangelo M. Tuminelli**
**FAX:**     **(410)576-9351**

**FROM:**    Sandy Wilkinson
**PHONE:**   **(301)344-4235**

**RE:**      **WATSON**

**DATE:**    **August 20, 1999**

Per our recent discussions, enclosed is a new page 5 - the only substantive change is to paragraph 6(b) but I had to reorganize a bit to keep it all on one page so that the rest of the plea agreement wasn't affected. I will talk to you about this when we both return back to the office on August 30.

CONFIDENTIAL COMMUNICATION - FOR RECIPIENT'S EYES ONLY.

U.S. Department of Justice

United States Attorney
District of Maryland
Southern Division

**FILE COPY**

| | | |
|---|---|---|
| Lynne A. Battaglia<br>United States Attorney | 400 United States Courthouse<br>6500 Cherrywood Lane<br>Greenbelt, MD 20770-1249 | 301-344-4433 |
| Sandra Wilkinson<br>Assistant United States Attorney | | 301-344-4235<br>FAX 301-344-4516 |

August 25, 1999


Arcangelo M. Tuminelli, Esq.
8 East Mulberry Street
Baltimore, MD 21202-2105

     Re: <u>United States of America v. Theodore Watson</u>
         Criminal No. PJM 99-069

Dear Mr. Tuminelli:

    Enclosed is a copy of a letter I recently received from
your client.

               Very truly yours,

               Lynne A. Battaglia
               United States Attorney

     By: _Sandra Wilkinson_
         Sandra Wilkinson
         Assistant United States Attorney

SK/kw
enclosure

8-19-99

Dear Mr. Wilkinson,

This letter is to sincerely thank you for allowing me a second opportunity to cooperate and help myself. I abysmally apologize for the asinine way I conducted myself when the option was first presented to me. Had I just simply complied and told you the truth at our initial meeting, I would have avoided the unnecessary mental anguish that entailed.

In spite of my inept attempts to secure assistance on my own, I am not an idiot or fool. I have experienced cooperating with various prosecutors. They are the boss, and they call the shots, they can help you or hurt you. So henceforth, you will always be afforded the truth from me because without your assistance or say so, in this instance, I am somewhat inert. Which brings me to this, you had previously inquired as to what information or knowledge I possessed. I had confined that to drug dealers of recent. But upon the advice of an attorney, he stated not to confine myself to just one area. He advised me to list all the areas I had

- 2 -

knowledge of. He noticed that I also had knowledge of people involved in guns and explosives. The attorney suggested that I contact the D.E.A. and A.T.F. agencies and inform them of my knowledge, then advised me to contact Mr. Iuminelli of what was transpiring so that he and the D.E.A. and A.T.F. agents could contact you to see what could be done. Fortunately, Mr. Iuminelli had worked with the A.T.F. agent, Mr. Jim Tandy. Mr. Iuminelli gave Mr. Tandy permission to visit me. In a conversation with Mr. Tandy on Thursday morning, he stated that he would contact you to ascertain what exactly could be worked out. Mr. Wilkinson, I do not expect this case to be dismissed, and I am extremely appreciative that you have worked with me thus far, and I thank God because this is one of the issues that I have prayed for.

Mr. Wilkinson, I realize that I have not won your total confidence. But one cannot prove themselve unless given the opportunity. Therefore, I implore you to please afford me this one and last chance. I am acutely aware of the elements against me

- 3 -

(A) Risk of flight. - (1) I am too old, too crippled, and too many family ties here. (2) It takes a great deal of money to even be somewhat successful in flight, I have none. (3) It's a terrible life to live and eventually you will get caught, and that's an additional 5 years. (4) At this point, I am only facing 5-6 years with a chance of reduction. (6) About 3-4 years ago I was arrested under very simular circumstances. I agreed to cooperate on just one issue and was released on personal bond. At that time, I was facing more time than I am now. But I didn't abscond.

(B) Return to drugs while cooperating.

- (1) While previously incarce- Rated I was afforded the opportunity to be consigned Kilos of heroin and cocaine

- 4 -

at the same time as fellow inmates Cornell Jones, Gerald Cashwell, Bernard Gibson, Ronald Washington, and others, I refused.

(2) I simply refuse to stand on street corners selling a few pills here and there. (3) There is no way for me to get pills from pharmceutical cos.

(c) Threaten or intimidate witnesses.

‾(1) Again, I am in a decent downward guideline departure. Why risk adding more time? Witnesses can't hurt me now.

Ms. Wilkinson, there is no denying that during my 30 or more years in the system, I have lied connived and schemed to get things done. But every attorney, bondsman, agent and prosecutor, and there have been many, will confirm that I have never gone contrary once I had "given my word." I try to avoid giving "my word" whenever possible. But when I do, I never go back on it, or break it. I know that I asking

- 5 -

an awful lot, but I have prayed to God that you would again comply to this second issue as you have on the first. I have promised God, whom I truly fear, that I am absolutely and completely through with the involvement of any type of control substances and firearms.

Ms. Wilkinson, I was informed of an incident when you had allowed someone out to cooperate and they betrayed your trust and engaged in drug activity. You have my word, that I would not betray your trust if given a chance. I never ever want to deal with Greenbelt again. You have really made a believer out of me. And, I am aware, if given this chance, and I betray your trust, all agreements are off, and you will bury me under the courthouse.

Please afford me this one last chance. I am old and wisely finished.

Respectfully submitted,

Theodore R. Watson

Theodore R. Watson

# A. MICHAEL CAPPELLETTI, ESQ.
## 2100 WAKEFIELD STREET
### ALEXANDRIA, VIRGINIA 22306

February 1, 2000

Kenneth N. Robinson, Esq.
717 D St. NW, 4th Floor
Washington, D.C. 20004

Dear Mr. Robinson,

I was a Senior Attorney for the U.S. Department of Justice for over twenty years before my retirement in 1992. Since that time I have been practicing before the DC Bar. I represented Theodore Watson in a District of Columbia Superior Court case and the ensuing civil matter in 1996-1997.

After Mr. Watson's arrest in the current case, he expressed to me his desire to make amends and cooperate with the government by giving information that he had or could readily obtain. Acting on his behalf, I communicated with the following law enforcement authorities who expressed interest in various information that Mr. Watson DID PROVIDE (including names and dates relating to several unsolved murders and area drug trafficking):

William O'Malley, a well-known supervisory attorney at the U.S. Attorney's Office (202-307-0029), sent several FBI agents to interview Mr. Watson. To verify the information provided by Mr. Watson, he was asked to take a lie detector test, which verified the validity of his information. Mr. Watson also provided information about a vendetta threatening Mr. O'Malley's life and family.

_Aaron_

Agent Rouse FBI in DC, re information and polygraph test (202-278-2370)   _LM 2:14_

Larry Neal of the FBI in Baltimore (410-265-8080). _Never spoke to him_

Tom Roberts, Montgomery Co. Police, re Mohammed Salaah (301-840-2500)

Detective W. Jefferson, veteran DC Homicide (202-727-4347) _No answer — LM + ...._

The Maryland AUSA, Ms. Wilkinson, declined to talk to me about Mr. Watson's contributions because I was not his Maryland attorney.

→ Agent TANDA - ATF in MD - (410) 579-50#  (410) 962-4115

PAGER (410) 678-8100

Pierre Mitchell - 202

Yours very truly,

A. Michael Cappelletti

A. Michael Cappelletti, Esq.

727-4515

# THE ROBINSON LAW FIRM

MARKET SQUARE

717 D STREET, N.W., FOURTH FLOOR

WASHINGTON, D.C. 20004

(202) 347-6100

FAX (202) 347-0061

INTERNET ADDRESS: RLAWGO@AOL.COM

KENNETH MICHAEL ROBINSON✦◊
CAMERON MARLO ROBINSON✦◊
NICHOLAS R. KOURTESIS⁑

✳ ADMITTED IN D.C.
✦ ADMITTED IN MD
◊ ADMITTED IN NJ
† ADMITTED IN VA

MARYLAND OFFICE
10692 INDIAN HEAD HIGHWAY
SUITE 201
FORT WASHINGTON, MARYLAND 20744
(301) 292-8325
1-800-923-8070
FAX (301) 292-7602

February 14, 2000

Mr. William O'Malley
Asst. U.S. Attorney
555  41st Street, NW
Washington, DC 20001

Bill,

I called you a couple of weeks ago about a client, Theodore Watson, who was being sentenced on a guilty plea. It was my understanding from _____, a previous lawyer for Mr. Watson, that Watson had notified the authorities about someone's stated intention to kill you and your family. Ms. Wilkinson, the prosecutor on Watson's case denied any knowledge of Watson's tip, having passed a polygraph, etc. I don't doubt her representations but I do need yours.

This letter is a request that you confirm or deny that Mr. Watson did (or did not) tip you/ the authorities off, offer to testify and take a polygraph. While you may not want to get involved in the case, I do believe that you must appreciate Mr. Watson's actions and therefore you have no objection to writing a letter to confirm what he did. Am I correct? If not, why?

I know you and I have not been fond of one another and that you are aware of my having been shot years ago. I recall a hospital visit from your wife. Therefore you know that simple gratitude, whether it will be rewarded is not too much to ask. Can't you write Judge Messite at the Greenbelt U.S. Courthouse, and confirm what Mr. Watson did? If you do not answer I will argue that your silence confirms what Mr. Watson says. Otherwise he would be working fraud in the court and you should not allow that.

Thank you,

Kenneth M. Robinson

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
6500 CHERRYWOOD LANE
GREENBELT, MARYLAND 20770

Peter J. Messitte
Judge

(301) 344-0632

## M E M O R A N D U M

TO:        Sandra Wilkinson
           Kenneth M. Robinson

FROM:      Judge Peter J. Messitte

RE:        USA v. Watson
           Criminal No. PJM 99-069

DATE:      February 18, 2000

* * * * * * * *

The Court received the attached letter from Mr. Watson on February 16, 2000. Please provide your comments upon it by return mail.

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

Attachment

cc:    Theodore R. Watson, No. 990508
       Court file (without attachment)

RECEIVED IN THE CHAMBERS OF
PETER J. MESSITTE

FEB 16 2000

UNITED STATES DISTRICT JUDGE

Dear Judge Messitte:

On or about February, 4, 2000, I, Theodore R. Watson, in case no. PJM 069, appeared before this Honorable Court. The Court sentenced me to 105 months which was the top of the guidelines, and three (3) years supervised release. The Court then, stated its opinion in reference to my character and behavior. And upon viewing my record, this Court was justified in its summation. Though the Court characterized me as a "menace to society", I am even moreso, a "menace to myself". The Court's admonishment implanted a devastating and lasting impression upon me. And, after contemplating what this Court had stated, no judicial official has ever had the impact to make me feel and realize that at my age, how foolish and damned stupid I was.

Your honor, as bad or as wrong as I may seem, I have done a lot for the less fortunate. I have bought food and clothing for widows with large families, help pay rent for some of the unemployed who had fallen on hard times, and assisted the elderly that were on "fixed incomes". Most of this assistance came from the 85,000 to 90,000 dollars profited from my wrong doings. I did not profit hundreds of thousands of dollars as the Court had stated from government reports. It is common knowledge that police officers often augment the quanity of drugs and money seized. I made it a point in my eighteen (18) page letter to AUSA, Sandra Wilkinson,

-2-

the breakdown and profit. But at this point, that's neither here nor there.

As I had stated in court, and in the presence of Mr. Zilkinson and my former attorney, Mr. Daniel Stiller, that at the very beginning, that Ms. Zilkinson had conveyed to Mr. Stiller that she did not want to talk to me, hear anything from me, discuss me, or cooperate with me in any way. And, that she didn't want have anything to do with me until trial. This was not denied by either. And Mr. Sullivan, who was my appointed attorney for about a week, and had to withdraw due to a "conflict of interest" stated to me at our initial meeting, exactly what Ms. Zilkinson had stated to Mr. Stiller. Nevertheless, I continued to acquire pertinent information in cases within the institution. I forwarded the information to Mr. Stiller, but for a long while, to no avail. Finally, I was brought up to a conference that consisted of D.E.G. agent, Bruce Roberts, a F.B.I. agent, Mr. Stiller and myself. But without the presence of Ms. Zilkinson,

I conveyed information to the F.B.I. agent, but with specific emphasis on the information about Kevin Honesty's life threats on AUSA, William O'Malley and his family. I gave the F.B.I. agent all the details. He stated that he was aware of the accuracy of all the first information, but since it meant being released on bond to cooperate, that information was of no use, and that he would pass the Kevin Honesty information on when he went through D.C.. Whether the

-3-

F.B.I. agent discussed the issue with Mr. Wilkinson, or expressed any deep concern, I cannot say.

I waited a few days and after there was no mention on the Honesty issue, I then contacted my former attorney, Mr. A. M. Cappelletti, and informed him of what had transpired at the conference. Mr. Cappelletti, a former DOJ prosecutor, understood the urgency and importance of such a matter. He was somewhat enigmatic as to why, if in fact, a AUSA was advised of this matter, why was it simply neglected. I suggested that perhaps it was just an oversight. Mr. Cappelletti stated to me that he would make some calls to try and get something done. (His efforts were in a letter, that was afforded to this at my sentencing.)

That same evening around 7: p.m., a F.B.I. agent, Dan Rouse came to interview me. The information was deemed valid enough to warrant a polygraph test. I was forewarned that if there was just one lie, I would suffer deep and grave consequences. I passed the polygraph. Some of the questions asked on the polygraph were:

Q. Did Kevin Honesty say that he was going to do something about AUSA, William O'Malley?

A. Yes.

Q. Did Kevin Honesty say that he was going to have something done about AUSA, William O'Malley?

A. Yes.

Q. Did Kevin Honesty say that he knew that AUSA

-26-

William O'Malley's wife was a F.B.I agent?

A. Yes

Q. Did Kevin Honesty say that he knew that AUSA, William O'Malley had a son?

A. Yes.

Q. Did Kevin Honesty say that he knew where AUSA, William O'Malley lived?

A. Yes.

Q. Did you have more than one discussion about this with Kevin Honesty?

A. Yes.

Q. Do you believe that in Kevin Honesty's statement, that he meant that he intended to kill AUSA, William O'Malley?

A. Yes.

Q. Do you believe that Kevin Honesty is capeable of killing AUSA, William O'Malley?

A. Yes.

Kevin Honesty stated to me that his triumph over the litigation AUSA, William O'Malley had against him was largely attributed to the huge sums of money to a private investigator to bribe and persuade some of the witnesses, while he pay others to threaten and intimidate other witnesses. Kevin stated to me that he and cohort Kenny Robinson, did in fact, kill and rob three (3) white men from Baltimore, Md., in a multi kilo cocain

- 5 -

drug deal. Honesty further boasted about his triumph in Greenbelt and Virginia wherein he only received five (5) years concurrent. To highlight the cold-blooded and viciousness of Kevin Honesty., even with the triumph in the litigation with AUSA, William O'Malley, and the huge break he received in Greenbelt and Va., he was still "hell bent" on doing away with Mr. O'Malley. And his reasoning as he had stated to me was, he did not like the way Mr. O'Malley did his job, he did not deserve to be a prosecutor, and needed to be removed. Therefore, he made a vow, and set himself up as judge and executioner. He said, he would be free early this year. Kevin Honesty is only 30 years and has murdered, involved in, or associated in several murders in the D.C., Md. and Va., and is known to be a major drug dealer. This can be attest to by, Det. Willie Jefferson, DC Homicide, a 30 year vet, who came to speak with me about other homicides. She discussed Honesty at length. He is well-known in the D.C. area. He will kill out of vindictiveness or for a price. But yet, he was given a tremendous break in Greenbelt, even if he allegedly cooperated.

The point that I am trying to make is, even in my tenure of drug involvement, I have never killed anyone, or had anyone killed. I hold life as a precious gift and in the highest esteem. You can replace many body parts and organs, but never can a life be replaced.

- 6 -

Sir, in our judicial system we have some who are considered as hard and tough judges and prosecutors, and those considered as softer and easier judges and prosecutors. But regardless I believe we have the best judicial system in the world. I have been before other judges and prosecutors, some were lenient, some were not. But even at the worst, I may have been perturbed, but never perturbed enough to plan to kill them, not even agents that deliberately testified falsely against me. I realized long ago that these are tough jobs and positions and someone has to do them. Who knows, perhaps with a better childhood and guidance, I may have been a law officer, lawyer, prosecutor or judge.

Your Honor, I am aware that you are awaiting a written response from AUSA, Sandra Wilkinson. I just wanted you also to have some first hand knowledge in support of Mr. Cappelletti's letter. It would have been further knowledgeable if F.B.I. agent Dan Kouse and D.C. Homicide Detective Willie Jefferson were present to confirm all that I have stated and written.

Judge Messitte, your are a stern but fair judge. I would humbly request that the Court equate or evaluate which is most important, AUSA, William O'Malley's life and possibly that of someone in his family being saved, or the threat being curtailed, and, my having a reasonable downward departure for my efforts, or, AUSA, William O'Malley's life or that of a family member possibly lost, and I receive no downward departure?

I have also written AUSA, Sandra Wilkinson a letter similar

to this. But also, advising her that I have pertinent information related to high profile cases at Greenbelt. One case involving a major drug dealer and hitman. Hopefully, with this and the other cooperation, and if Mr. Wilkinson will work with me, it will be enough to warrant the 5K, and a substantial downward departure. And for the moment, if the Court still has the authority, and it pleases the Court, the bottom guideline of 84 months could be afforded.

Incidently, this weekend I was informed by inmate William Hartwell that Kevin Honesty and others were aware that I had discussed matters about Kevin Honesty with the F.B.I. I am not sure if he knows the particulars. Kevin Honesty is presently incarcerated at Cumberland. I was on the STPP for cooperation within the institution. There is a contract on me. I would feel safer at Petersburg. I await this Court's response, thanking you in advance.

Respectfully submitted,

Theodore R. Watson

Theodore R. Watson    990508

2-8-00

Dear Ms. Wilkinson

Hopefully, with my sentencing behind me, perhaps we can start anew with a better rapport. On my behalf, there has never been animosity or disdain towards you. I just wanted to cooperate in an effort to obtain a downward departure. I sincerely apologize for approaching matters in the wrong way or manner. At our last conference consisting of Mr. Tuminelli, Ms. Sckalla, two other gentlemen, you and I, you stated that I was not "part of the team", and was not likely to be. And, that the information that I gave was valid, but late. The tardiness of the information was not on my behalf because all the information was forwarded via of my attorneys as soon as I received it. It was acted upon late. At sentencing, you stated that you were still willing to work with me. I am not sure at this point, since the sentencing is over, whether you can act on my behalf, or whether I must contact the prosecutors in that particular case. Please advise me as soon as possible. As you know, my time here is limited, and time is of the essence. I have very pertinent information in the Jonathan Demetrius Jennings case, the Marcell Ransom case, and others.

I would also like to bring to your attention that on Friday, 4, 2000, while in preparation to return from there to the ..C.D.C., William Hartwell had just been brought in

from Hagerstown and placed in the cell with others and me while being required to depart. He immediately started in on me by stating, "how many points" did you get today? I countered by stating my true purpose for being there in an effort to avoid problems with him or the other inmates I played it out by allowing him to make the first move as he had done before. While enroute to the C.C.D.C. he quietly got his points across by retrospecting the altercation he and I had previously and what transpired. When we arrived at the C.C.D.C. we were all placed in the same bull pen. And as soon as the opportunity presented itself, I ..O. Anderson pull me out. I explained the situation, he immediately pulled the i.d. cards and sincerely apologized and commended me for handling it as well as I did. Mr. Hartwell stated that my name was on a witness list of those testifying against him. I discreetly disputed his allegation knowing that you stated nothing in regards to me testifying against him. In furtherance, he stated Kevin Honesty, who is presently incarcerated at Cumberland, was aware, as were others, that I had discussed matters with the F.B.I. about matters concerning him. Now, in reference to Kevin Honesty, Ms. Wilkinson, it may have been an oversight on your part, but if I am not mistaken, in my letter to you, and as I stated in court in the presence of my previous attorney, Mr. Daniel Stiller, I had informed Mr. Stiller of Kevin Honesty's threat against A.U.S.A. Mr.

-3-

William O'Malley's life. I thought that this issue accompanied with whatever other information that you thought I may possess, was the reason you had scheduled the conference between D.E.C. agent Bruce Roberts, Mr. Stiller, the F.B.I. agent and me, without your presence. While conversing with the F.B.I. agent, I placed special emphsis on Kevin Honesty. The F.B.I. agent stated that he would pass it along when he went through K.C.. Whether the agent discussed the matter with you or expressed any deep concern, I cannot say. But after a few days and there was no mention on the subject, I contacted Mr. Cappelletti and apprised him of what had transpired. He stated that the matter was too important to be overlooked, and, that he would make a few phone calls to try and get something done. That same evening about 7: P.M., F.B.I. agent Dan Rouse came to interview me. The information was deemed valid enough to warrant a polygraph test. I forewarned that if there was just one lie, I would suffer deep and grave consequences. I passed the polygraph. Even though Kevin Honesty did not say the exact words, "I am going to kill him," or "I am going to have him killed," Mr. Rouse asked on the polygraph this reported statements:

Q. Did Kevin say that he was going to do something about AUSA, William O'Malley?

A. Yes.

Q. Did Kevin Honesty say that he was going to have

4

something done about AUSA, William O'Malley?

A. Yes

Q. Did Kevin Honesty say that he knew that AUSA William O'Malley's wife was a F.B.I. agent?

A. Yes.

Q. Did Kevin Honesty say that he knew that AUSA William O'Malley had a son?

A. Yes.

Q. Did Kevin Honesty say that he knew where AUSA William O'Malley lived?

A. Yes.

Q. Did you have more than one discussion about this with Kevin Honesty?

A. Yes.

Kevin Honesty stated to me that in the litigation with A.U.S.G. William O'Malley, he had beat the case involving the murder of three white men from Baltimore involving several kilos of cocaine and money. But that he and his co-defendant Kenny Robinson had in fact killed the three men from Baltimore. He bragged about how he paid a private investigator to bribe and persuade some of the witnesses, while he had other people threaten and intimidate other witnesses not to testify for the government. He also bragged of another incident of while being chased by an officer for felony warrants, that while running across a dark field, he had retrieved his gun, and in the

- 5 -

process, he fell knocking the wind out of himself, and his gun falling out of his sight and reach. Kevin Honesty stated to me with a very cool and calm reserve, that had he maintained his gun, "he would have shot that officer dead". (I will take a polygraph on all that I have stated herein).

D.C. homicide Detective Jphillie Jefferson, a 30 year vet of the force, whom I have known just as long, came to discuss some murders that I had information about. He discussed Kevin Honesty at length. He stated as I also knew that Kevin had done several murders or were involved in them around the D.C., Md. and Va. areas. Mr. Jefferson was acutely aware of the case herein mentioned, and that he was positive that Kevin Honesty had committed those three murders. He is very feared in the D.C. area. Mr. Honesty has constantly bragged of his success in the D.C. litigation and how he only received five years in Greenbelt to run concurrent with what he had in Va. Which leads up to the issue I mainly wish to discuss. First, I would like to sincerely thank you for the consideration you afforded me on the guidelines. Especially, since I hadn't given you or the other prosecutors anything to sink your teeth into. What I did have that was worth something, I delivered too late. But it was due to no fault of mine.

I could have made a lot of major cases from the street, but

- 6 -

that was not to be. But with your blessings, I wish to try
and do as much as possible from within. I do have pertinent
information for other prosecutors at the moment. One case in-
volving a multi-kilo drug dealer and "hit man". I will co-
operate and do exactly as you say. I just hope and pray that I
do and give enough to be afforded a sizable downward departure.
Mr. Wilkinson ..... Judge Messitte left a devastating and lasting
impression upon me in his statement. And viewing my record,
he was definitely justified. After contemplating what he had
stated, no judicial official has ever made me feel and realize that
at my age, how foolish and damn stupid I really was. I use past
tense "was" because as I had stated in my letters to you that I had
promised God, my love ones and myself, I am completely and
totally through with any type of control or illicit drug. And I
really mean this with all my being.
Second, in my tenure of drug involvement, I have never killed
anyone, had anyone killed, or threatened to have anyone killed.
I have always held and regarded life as extremely precious
and with the highest esteem, because you only get one life. You
can replace many organs and body parts, but never a life.
From the day of my arrest, Feb. 23, 1999, while Kevin Honesty
and I were enroute to C.C.D.C., he commenced bragging
about his triumph against AUSA William O'Malley, his poten-
tial victory forthcoming in Greenbelt, and how hell bent he
was on doing away with Mr. O'Malley, or perhaps intentionally
or unintentionally someone in his family. And to further

- 8 -

A. Yes.

Q. Do you believe that Kevin Honesty is capeable of killing AUSA, William O'Malley?

A. Yes.

In instances such as this, "an ounce of prevention is worth a pound of cure." I would have done the same for you or anyone else. Ms. Sharon Steward can attest to that.

Ms. Wilkinson, I sincerely wish to cooperate with you and the other prosecutors. I have not fabricated to you since our very first encounter. But rather than cooperate to no avail, meaning no matter what I do or give, it will never be enough, or that there be bitterness, prejudice or duplicity between us, I would respect and accept a flat out "no", and I would just go on.

Please advise me of your decision at your earliest convenience.

P.S.

Being advised that Kevin Honesty is Cumberland with knowledge of my cooperation against him, my being previously on the WPP because of institution cooperation which entailed a prison contract on me, please send me to Petersburg.

HAPPY VALENTINES DAY.

Respectfully submitted

Theodore R. Watson

990508

# THE ROBINSON LAW FIRM

MARKET SQUARE
717 D STREET, N.W., FOURTH FLOOR
WASHINGTON, D.C. 20004
(202) 347-6100
FAX (202) 347-0081
INTERNET ADDRESS: RLAWGO@AOL.COM

KENNETH MICHAEL ROBINSON✦◊
CAMERON MARLO ROBINSON ◊
NIKOLAOS P. KOURTESIS✦◊

✦ ADMITTED IN D.C.
+ ADMITTED IN MD
◊ ADMITTED IN NJ
† ADMITTED IN VA

MARYLAND OFFICE
10800 INDIAN HEAD HIGHWAY
SUITE 301
FORT WASHINGTON, MARYLAND 20744
(301) 292-9335
1-800-525-6070
FAX (301) 292-7602

February 18, 2000

Mr. William O'Malley
Assistant U.S. Attorney
555 4th Street, N.W.
Washington, D.C. 20001

RE:  Theodore Watson

Bill:

I am writing for a client who was sentenced to (105) months in the Greenbelt Federal Court (2) weeks ago. Ms. Wilkerson said she would contact you and try to confirm whether Watson did as he says he did prior to my involvement in his plea and cooperation. If he did as his enclosed letters say he did I am sure you will write Ms. Wilkerson, or even me, to confirm you were involved with Kevin Honesty, you were notified that he had threatened you and your family and Ms. Watson did or did not pass a polygraph on the topic. I know you value polygraphs with informants so surely you will consider this simple request to verify what Mr. Watson says.

Please call as I have tried your voice mail twice but the machine does not reply.

Thanks,

Kenneth M. Robinson

# THE ROBINSON LAW FIRM

KENNETH MICHAEL ROBINSON*◊
CAMERON MARLO ROBINSON*◊
NIKOLAOS P. KOURTESIS*◊

* ADMITTED IN D.C.
+ ADMITTED IN MD
◊ ADMITTED IN NJ
† ADMITTED IN VA

MARKET SQUARE
717 D STREET, N.W., FOURTH FLOOR
WASHINGTON, D.C. 20004
(202) 347-6100
FAX (202) 347-0061
INTERNET ADDRESS: RLAWGO@AOL.COM

MARYLAND OFFICE
10662 INDIAN HEAD HIGHWAY
SUITE 201
FORT WASHINGTON, MARYLAND 20744
(301) 292-9338
1-800-623-6070
FAX (301) 292-7602

February 18, 2000

Ms. Sandy Wilkerson
Assistant U.S. Attorney
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Sandy:

I just received a copy of the (2) enclosed letters which Mr. Theodore Watson sent to you and the judge recently. I was glad to see that he wished you a Happy Valentine's Day!! The purpose of this letter is to request that if you have not followed through and spoken to Bill O'Malley, then could you please do so.

Mr. O'Malley and I have long been disinterested in a friendship. I have called him twice and written a letter and he has not and will not reply. I do think that if Mr. Watson did as he said he did that he should get some consideration with that with you and the judge on some kind of Rule 35 relief.

I also have written Detective Willie Jefferson of the (7-D) Homicide Squad, MPD. Hopefully he will go see Mr. Watson and bring you some evidence of some homicides.

Could you please call or write and let me know what the forecast is for Mr. Watson, i.e. whether Mr. O'Malley is responding to your inquiries? Thank you.

Sincerely,

Kenneth M. Robinson



U.S. Department of Justice

United States Attorney
District of Maryland
Southern Division

---

Lynne A. Battaglia
United States Attorney

Sandra Wilkinson
Assistant United States Attorney

400 United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770-1249

301-344-4433

301-344-4235
FAX 301-344-4516

February 21, 2000

Honorable Peter J. Messitte
United States District Judge
United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770

     Re:    <u>United States v. Watson</u>, PJM 99-069

Dear Judge Messitte:

    Your Honor sentenced Theodore Watson on February 4, 2000. An issue arose during sentencing regarding the status of Mr. Watson's cooperation with federal law enforcement since the government did not make a motion under Section 5K1.1 as discussed in Mr. Watson's plea agreement. Specifically, Mr. Watson submitted a letter to the Court dated February 1, 2000 from attorney A. Michael Cappelletti to Kenneth N. Robinson, Mr. Watson's current attorney (copy attached), suggesting that he had provided information to the law enforcement officers listed therein. The Court requested that I follow-up on the representations made in the letter and provide a report via letter.

    Since February 4, 2000, I have attempted to contact all of the individuals mentioned in the letter and can report the following:

    1. William O'Malley. I left three voice mail messages with AUSA O'Malley with very specific details as to the purpose of my call. Mr. O'Malley has not returned my calls.

    2. Aaron Rouse. Agent Rouse was familiar with the information Mr. Watson provided regarding the "threat" on Mr. O'Malley's life. Though he confirms that Mr. Watson was subject to a polygraph examination, Agent Rouse disagrees with Mr. Watson's characterization of the information provided and did not believe the information provided rose to the level of "substantial assistance" to the government.

    3. Larry Neal. Agent Neal had never heard of Mr. Watson.

4. Tom Roberts. Detective Roberts was the undercover agent in a case I prosecuted (U.S. v. Sallah). I am familiar with the information Mr. Watson provided in that case and did not believe it alone qualified the defendant for a "substantial assistance" departure. Mr. Watson was never called as a witness in the matter.

5. Detective Jefferson and Pierre Mitchell. Both D.C. homicide officers did not return my calls even though I gave specific details regarding the purpose of my call and specifically mentioned Mr. Watson.

6. Agent Tanda. Agent Tanda has not personally debriefed Mr. Watson and had no position regarding his ability to provide "substantial assistance" to the government.

In addition, an investigator with the Department of Veteran Affairs, Larry Mark, contacted me last week to request that Mr. Watson be interviewed in connection with the facts underlying Mr. Watson's own conviction. I instructed Agent Mark to contact Mr. Robinson and, if authorized, schedule an interview with Mr. Watson. In this regard, I will await a report by Agent Mark.

Finally, please be advised that, since Mr. Watson's sentencing, he mailed me a second lengthy letter regarding the information he believes he has -- despite my specific directions to not contact me directly. Mr. Watson continues to undermine his own credibility as well as his ability to follow directions from the government.

At this time, the government will not be making a motion under Rule 35 on behalf of Mr. Watson. If that time should come, the government will submit a written memorandum to the court.

Very truly yours,

Lynne A. Battaglia
United States Attorney

By: _____
Sandra Wilkinson
Assistant United States Attorney

Encl

cc: Kenneth Robinson, Esq.

# THE ROBINSON LAW FIRM

MARKET SQUARE

KENNETH MICHAEL ROBINSON*○
CAMERON MARLO ROBINSON*○
KNOLLACE M. KOURTESEN ○

717 D STREET, N.W., FOURTH FLOOR

WASHINGTON, D.C. 20004

(202) 347-6100

FAX (202) 347-0061

INTERNET ADDRESS: RLAWGO@AOL.COM

* ADMITTED IN D.C.
+ ADMITTED IN MD
○ ADMITTED IN NJ
† ADMITTED IN VA

MARYLAND OFFICE
10805 INDIAN HEAD HIGHWAY
SUITE 201
FORT WASHINGTON, MARYLAND 20744
(301) 292-8555
1-800-823-8070
FAX (301) 292-7605

February 23, 2000

Sandra Wilkinson, AUSA
U.S. District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Messitte:

Thank you for the copy of Mr. Watson's letter to you. He had sent over one as well and I then sent the enclosed letters to Ms. Wilkinson, Mr. O'Malley and Detective Jefferson. As is, I must await any action by these people. Unless the government acts there is nothing the court can do that I am aware of.

Thank you,

Kenneth M. Robinson

cc: Sandra Wilkinson, AUSA
    Theodore Watson

Dear Sandy:
Enclosed is my reply
to the judge. Any news?

Thanks,

(K

P.S. Please excuse my cheap cover letter.



U.S. Department of Justice

FILE COPY

United States Attorney
District of Maryland
Southern Division

Lynne A. Battaglia
United States Attorney

Sandra Wilkinson
Assistant United States Attorney

400 United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770-1249

301-344-4433

301-344-4235
FAX 301-344-4516

February 23, 2000

Honorable Peter J. Messitte
United States District Judge
United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770

Re:   United States v. Watson, PJM 99-069

Dear Judge Messitte:

Since my most recent letter to you dated February 21, 2000, this Office has spoken to AUSA O'Malley as well as Mr. Manthripragada, the Maryland AUSA who prosecuted the individual against whom Mr. Watson allegedly had information regarding a threat to AUSA O'Malley. The government's position remains that Mr. Watson has not provided substantial assistance to federal law enforcement "in the investigation or prosecution of another person who has committed an offense."

Very truly yours,

Lynne A. Battaglia
United States Attorney

By: _____
Sandra Wilkinson
Assistant United States Attorney

cc: Kenneth Robinson, Esq.



U.S. Department of Justice

United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20001*

February 23, 2000

Sandra Wilkinson, Esquire
United States Attorney's Office
United States Courthouse
Suite 400
6500 Cherrywood Lane
Greenbelt, Maryland

Dear Ms. Wilkinson:

　　　　Enclosed please find the original copies of a communication I received by mail today from Kenneth M. Robinson, Esquire, counsel for Theodore Watson in a matter being prosecuted by your office. As I advised in a voicemail message to you earlier today, I will not respond to Mr. Robinson's requests unless advised to do so by you. I would appreciate it if you would make Mr. Robuinson aware that I referred the matter to you for response since you are handling the litigation on behalf of the United States.

　　　　Please let me know if you need anything further from me.

　　　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　　　WILMA A. LEWIS
　　　　　　　　　　　　　　UNITED STATES ATTORNEY


　　　　　　　　By:　　*William J. O'Malley*
　　　　　　　　　　　　WILLIAM J. O'MALLEY, JR.
　　　　　　　　　　　　Assistant United States Attorney

Enclosures

U.S. Depart:   Justice

*United States Attorney*
*District of Maryland*
*Southern Division*

---

Lynne A. Battaglia
United States Attorney

Sandra Wilkinson
Assistant United States Attorney

400 United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770-1249

FILE COPY

344-4433

301-344-4235
FAX 301-344-4516

March 7, 2000

Kenneth M. Robinson
The Robinson law Firm
Market Square
717 D Street, NW, Fourth Floor
Washington D.C.

Re:    Theodore Watson

Dear Mr. Robinson,

Please be advised that your letter to Mr. O'Malley dated February 18, 2000 has been referred to me. As I have previously indicated, I have spoken with Mr. O'Malley about this matter and the government's position has been stated in a letter to the court that you were copied on. All issues that you have regarding Mr. Watson's cooperation should be addressed through me directly.

Very truly yours,

Lynne A. Battaglia
United States Attorney

By:_____

Sandra Wilkinson
Assistant United States Attorney

cc: William J. O'Malley, Jr.

# THE ROBINSON LAW FIRM

MARKET SQUARE

717 D STREET, N.W., FOURTH FLOOR

WASHINGTON, D.C. 20004

(202) 347-6100

FAX (202) 347-0081

INTERNET ADDRESS: RLAWGO@AOL.COM

KENNETH MICHAEL ROBINSON+◊
CAMERON MARLO ROBINSON+◊

* ADMITTED IN D.C.
+ ADMITTED IN MD
◊ ADMITTED IN NJ
† ADMITTED IN VA

MARYLAND OFFICE
10808 INDIAN HEAD HIGHWAY
SUITE 201
FORT WASHINGTON, MARYLAND 20744
(301) 292-6555
1-800-923-8070
FAX (301) 292-7602

April 5, 2000

U.S. Attorney's Office
Ms. Sandra Wilkinson
Asst. U.S. Attorney
400 U.S. Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770-1249

Dear Sandy:

Thank you for your letter of March 7, 2000 in which you invited me to communicate with you rather than Mr. O'Malley and others. So the record is clear I wrote O'Malley after you told me he had not returned your call, knew he had ignored my two calls and I wanted him to answer the question. Apparently my letter to him and your conversation criss-crossed in time.

In case you don't know, Mr. O'Malley and I have had a personal dis-like for one another for over (20) years. He is a poor loser with a vindictive streak. Members of the Bar are well aware who and what he is. Therefore, when Mr. Watson and his previous attorney both told me about the notice to him of a threat on his life and his family I felt he should be put on the spot and required to answer, particularly since he even ignored your first call. I also wrote Detective Jefferson who courteously replied, visited Watson and replied he could be of no help.

Mr. O'Malley has still ignored my letter and my calls. I will not opine more on him. I will not communicate with him again, just as I have not done for many, many years. I only did this time, as I said, because he needed to know that he should respond and by doing so, define just what an ingrate and obnoxious person he is. No one really expected him to help. He is not much of a person in my opinion. But then again, he thinks less of me. I hope none of this sours your limited view of me. I was simply doing my job and addressing Mr. Watson's last surge for relief.

Thank you,

Kenneth M. Robinson

P.S. I certainly don't mind you sending a copy of this to Mr. O'Malley. It is your call on that.



COURT.
EXHIBIT
# 5

Dear Ms. Filkinson,

Please be advised that in early November, 1999, I spoke with P.S.I. Ms. Reynolds. Ms. Reynolds may possibly have misinterpreted my statement to her. If so, I apologize. First, I do not wish to withdraw my plea. Second, I stated to Ms. Reynolds that I accept full responsibility for my role in this instance. But, that there were others involved just as deep, if not deeper than me. They were the heart, nucleus and transmission of the crime. Had it not been for their knowledgeable and willing participation, the issue would never have materialized.

Ms. Filkinson, what I am conveying to you is the absolute truth, and my word that it is the truth with nothing distorted or embellished. But first, with all due respect, I would like to touch lightly on your harshness towards me as a liar at the first conference and there after. Ms. Filkinson, again, I apologize and confess that at our first conference, I lied and somewhat distorted the truth regardless of my reasoning. It was partially due to the conversation with agents upon my arrest on 2-22-9c I was advised that there were no co-defendants and that Ms. Beverly Robertson was not being charged. I immediately stated that "this was a set-up," and that when I spoke with the prosecutor, all the dirty laundry would come out in the wash. I believe the agents thought that I was indicating "money laundering". I was highly perturbed being ~~apprised~~ apprised that I           charged

- 2 -

for and with everything and no one else. And then my anger became further compounded at the first conference when you displayed your renewed "vinegar" rather than your also renewed "honey". (smile) I immediately, to my regret, became defensive and attempted to place the blame in one of the places where it was more than equally deserved.

Before I attempt to put the matter in its real perspective and sequence, again I would like to touch briefly on your view towards me as a liar.

1) I believe that I have stated to you that "yes", I have lied schemed and connived at times to obtain my way or freedom. But I have never "welched" when I gave my word. I also stated this to a F.B.I. agent from the F.C. office when interviewed twice on an unrelated matter, his response to me was, "we all lie". Even though I knew this from personal experience, I was very surprised to hear a F.B.I. agent make that statement.

2) The majority of politicians are noted as liars. Then there are the top heads of our states and country who were proven wrong doers and liars, Vice Pres. Spiro Agnew, President Richard Nixon, and President William Clinton, just to name a few. There is no way I can compare myself with these figures other than a liar is liar regardless of who they are.

3) Ms. Wilkinson, perhaps you have not experienced it, but I am sure that you have heard of agents and or government witnesses testifying falsely under oath, and the misconduct of prosecutors. See (United States v. Golding, 168 F.3d 700 (4th Cir. 1999). In the

- 3 -

sworn affidavit of Postal Inspector, Robert F. Jones, he stated on page 7, ~~paragraph~~ 19, line 8, ...... Watson has a history of ~~Watson~~ violence, such as escaping from prison and beating individuals for drugs... This is an out and out deliberate lie." First of all, I do not have a history of violence as the word violence would imply. Second, if Mr. Jones read the escape he knew that there was no violence involved. The record would have reflected that I was propositioned by the non-com officer who had been for a long time, smuggling ~~drugs,~~ money, alcohol and whatever else inmates could afford. After the deal between the officer and myself was agreed upon, I was given my street clothes, taken to the front desk, given my money credentials, portable television and released through the front door. That is not violence. There was no other case of, or any attempt to escape that would warrant the use :..... history of .....
Third, if Mr. Jones were challenged, he could not produce one case or court action against me for beating anyone for drugs or money. So other than a premeditated and deliberate lie, how can Mr. Jones support this allegation? These allegations are not just mere ~~typical errors~~ typographical errors. These lies were deliberate. This was concurred by my attorneys who further stated ~~at the~~ that even though Mr. Jones has lied, it was not enough to win a pretrial motion or a not guilty verdict at trial. Mr. Wilkinson, my point here is that should I be judge so severe and harshly, when someone who has sworn to be fair and ~~uphold~~ uphold the law, lies in a sworn affidavit. I know it WAS proof read.

- 4 -

4) Ms. Filkinson, I do not know your religion or what your religious beliefs are, nor do I comment on or challenge one's beliefs. I do not claim or pretend to be pious, but I do believe in God, his laws and commands, and the teachings of Jesus. Had I been following them as I should have, I would not be in this regretful situation, which I attribute to my own actions. I cannot say whether or not you have ever lied in your life, and if you had not, then you are truly blessed. And, if not, then there is some discrepancy and contradiction in the Bible because God says in Romans 3:4 ... God is true, even though every human being is a liar... It also states in Matthew 7:1-2 Do not judge others. Then you will not be judged. You will be judged in the same way you judge others. You will be measured in the same way you measure others.

Ms. Filkinson, please advise me as to what I have done so horrible, hideous and deplorable that you would judge me with such disdain. The crime itself is not of any monumental magnitude, without the control substance, at best this would probably have been a fraud case. The small hand gun, and I mean small, was not stolen or ever used in the commission of a crime. It was merely for house protection since I had until last year been in the 3r. P. P.

5) Again, human beings by nature instinctively lie to avoid prosecution, lose of life, freedom, bodily harm, harm to love ones, to acquire or maintain jobs or status, embarrassmen and etc. Please, Ms. Filkinson, ask yourself —— if you woul

-5-

lie under these or any other adverse conditions? Heads and leaders of our country have.

6) Ms. Wilkinson, please do not conceive this statement as flattery, to "butter you up". You are a lovely, sensuous, and intelligent lady, having both brains and beauty. You are for far from being stupid or naive. I feel confident that you are acutely aware that everyone you spoke with at Uplift has lied to you in this instance, and some deliberately lied, which perhaps I would have done, too.

This is not an effort by any means to retaliate or drag down justly or unjustly the other main participants. I have no desire to see them indicted or to testify against them. I can't see where it would serve any meaningful purpose. I just want it brought to light the other major roles played in the case by the individuals which were the heart, nucleus and transmission. One major role player knew the functions of the other, but it was not vice versa.

Regardless of the individuals ulterior motives, the case would not have come into existence without their knowledgeable and willing contributions. They are all at least 40 to 50 years of age and knew exactly what they were doing.

I realize that because of my past record, I am viewed as the target and miscreant in this issue. Aside from my record, I ask and pray that you view me in the same light and with the same fairness and leniency you have with the others involved in the case.

- 6 -

As you are aware, there existed the borrowing and some-times the ordering of pharmaceuticals from one another between Seawood and Uplift Pharmacy. I was the one who mainly transported back and forth. Ms. Carrie Harris, owner of Uplift Pharmacy, She closed each afternoon at 3: p.m. in an effort to be at her other pharmacy job. If I had to leave something for Uplift and it was after 3: p.m., I would leave it with the security officer, Captain Smith or with Ms. Beverly Robertson, employee of the Uplift Medical Care Center. Her office was adjacent to the Uplift Pharmacy. The same procedure was used if I had to pick up something after 3: p.m. or leave something for them for the next morning. Ms. Carrie Harris had run into financial difficulty and was cancelled by the local pharmaceutical company, McKesson. She in turn used Seawood to order locally for her even though she used out of state generic pharmaceutical companies Mason, Superior and VIP. There were many times when Ms. Harris found it difficult to pay Seawood. I offered her a solution. I told Ms. Harris that I could obtain the regular pharmaceuticals for her at half price, but no control sub-stances. She was elated and agreed even though she knew it was illegal. Then, Ms. Harris began to fall behind on her bill with me. I then began to have Ms. Harris order control substances for me, III and IV only. I would pay her right as she placed the order. She could not afford to pay for the merchandise if she did not have the money up front.

-7-

I remember specifically on one occasion Ms. Harris had smiled and said, you all certainly use a lot of tylenol 3's and 4's down there. I smiled and said, it's the drug of choice. But this arrangement was short lived because after a couple of months, she was going bankrupt. Ms. Wilkinson, I must admit that I became quite concerned when you opted to audit her control substance receipts. These were frequent or unusual orders of control substances III and IV, and her receipts would have fallen far short if compared with the pharmaceutical companies receipts of purchase.

Ms. Carrie Harris's financial difficulties had taken another turn for the worse. She was being compelled to close down due to financial difficulties with the building proprietors. Ms. Harris had discussed us going into business together, rent a certain available office space on Central Avenue. He would open it and I would supply the pharmaceuticals other than control substances. After a couple of weeks or so of contemplating she decided against it, stating, she did not want the headaches again. The two sisters that worked for Ms. Harris had argued for it. I asked Ms. Harris to continue to order for me. She refused. I then asked her how did she purpose to pay me? She stated, whenever She received some money. That I would have to wait in line like everyone else.

I then went to Ms. Beverly Robertson who had borrowed a few dollars from Me on occasions. I discussed the possibility of making

App 1215

- 8 -

some money by ordering the control substances III and IV through her firm. Ms. Robertson was very much for the idea but her firm was not licensed to order control substances. She decided to meet at her home later that evening to discuss other possibilities. She decided that her firm and office was idea for the base of the operation. She stated that she had the expertise to handle the transacting and communications. The D.E.A. registration certificate or license was the issue.

Ms. Wilkinson, as you may recall, Ms. Carrie Harris, when requested to present her D.E.A. registration certificate, she stated she remembered packing it away, but she could not find it. "She did pack it away."

When the license was secured and "Sabrina" (Jeannie Barnes) who was only used to call the orders in, Ms. Beverly Robertson took charge. Sabrina contacted the Superior and VIP Pharmaceutical Companies and gave them the necessary information to be verified by Ms. Beverly Robertson. This being done, Ms. Robertson got the ball rolling. After confirming "Sabrina's" status, Ms. Robertson faxed a copy of the Uplift Pharmacy's D.E.A. registration certificate to the pharmaceutical companies via Dr. Ed Mosely's fax machine, which can be proven by records of the pharmaceutical companies. This again, proves Ms. Beverly Robertson is a liar, and contradicts her statement in Mr. Robert Jone's Affidavit wherein she alledges or would have one to believe that after she had informed me that the pharmaceutical company had informed her that......the Uplift Pharmacy DEA Registration had expired and a renewed registration must b--- to them

- 9 -

before any additional controlled substances could be sent.
(see pg. 4, para. 13, line 4), she .... saw me carrying in
my hand the DEA' Registration belonging to Uplift Pharmacy
(see pg. 4, para. 13, line 11), that this was the first time
she had ever seen the registration. It is a proven fact
that Ms. Beverly Robertson between 9-97 and 10-97, she
had to have seen and touch the registration in order to have
faxed the registration to the pharmaceutical companies. But
Mr. Robert Jones in his "sworn affidavit", chose to adhere
with this fabrication and or distorted truth.
Ms. Robertson, on her initiative and desire assumed and
handled all of the intimate and intricate details. Ms. Robertson
had advised the pharmaceutical companies that if there were
any discrepancies or problems to contact her personally and no
one else. She knew that "Sabrina" would never be there. The only
other person, there that knew exactly what was going on was Ms. Gletchia
Holland - Johnson who also worked for the firm and lived
with Ms. Robertson, maybe related.
Once things materialized, Ms. Robertson bought another house.
On one occasion, (the records will reflect) I believe Superior
Pharmaceutical that sent an order directly to Ms. Carrie
Harris's home. She became very suspicious and ~~apprehen~~
apprehensive. But Ms. Beverly Robertson took the initiative
and called to ascertain what had happened to the order. She
again advised that company that all deliveries were to be
sent there and no where else. And on another occasion, an

-10-

order came and the security officer, Captain Smith sent the order back because the "Uplift" Pharmacy was closed down. Ms. Robertson found out that he had sent the order back, she reordered, and advised Captain Smith to never do that again, and to bring any deliveries for Uplift Pharmacy to her.

It was alledged by both pharmaceutical companies on page 3, paragraph 8 ...... That they were delivering Schedule III and IV controlled substances based on the altered D.E.A registration certificate from Uplift Pharmacy. Ms. Wilkinson, we all know that all the deliveries were made based on the "unauthorized use" of a "then valid" D.E.A registration certificate from Uplift Pharmacy. No, this additional lie and or distorted truth won't get me any "brownie points", but nevertheless, it's a lie, regardless of how minute. And it is directed or targeting specifically me. It was also alledged by both pharmaceutical companies on pg. 4 para. 15, ..... She "Sabrina" instructed the two pharmaceutical companies to contact her at Uplift Medical to speak to her. ...... Ms. Robertson stated that VIP Pharmaceutical contacted her at Uplift Health Care, asking to speak to "Sabrina." Ms. Robertson stated that she told VIP Pharmaceutical that "Sabrina" did not work there. This is another lie by Ms. Robertson which is adhered to and supported by D.E.A agent Bruce Roberts and Postal Inspector, Robert Jones. As you said to me at our first conference, "it doesn't make sense." Why would two ~~reptible~~ reputable pharmaceutical companies

-11-

risk or jeopardizing their business and license by delivering Scheduled Ⅲ and Ⅳ controlled substances to an unsubstantiated or unconfirmed Person at an alledged business? Someone at Uplift Health Care had to confirm "Sabrina's" association or status there. And the only other person the two companies spoke with was Ms. Beverly Robertson. There is no way the two companies would have made all those deliveries over a period of six or seven months without some definite confirmation that "Sabrina" was affiliated with Uplift Medical Health. Mr. Roberts and Mr. Jones had to see and know this, but rather chose to distort the truth. But you're so hard on me about lying.

Now, in reference to the Uplift Pharmacy D.E.A. registration certificate, Yes, Ms. Filkinson, I made the first attempt to alter the certificate to the first company and Ms. Beverly Robertson faxed it through from Uplift as per usual. Later, Ms. Robertson phoned and advised me that the certificate had not passed, but to come to her home that evening because Ms. Aletchia Holland-Johnson could alter the certificate by doctoring it up, and sending it through their copier several times, and then fax it through. That failed, too. This was also faxed from Uplift.

Ms. Filkinson, I realize that you probably have more intelligence, more education, and more knowledge in your "pinky-finger" than I have in my whole body. And if I can see as others also have, the lies and distorting of the truth in Mr. Robert F. Jones's

- 112 -

sworn affidavit, then especially, you, and those directly
involved, who proof read the affidavit could see it
Mr. Robert Jones lied and distorted the truth. This is ver
unbecoming and very unprofessional for someone of his sta
This sworn affidavit was drafted and designed to make me, th
sole perpetrator, and remove or cover up the equal guilt o
Beverly Robertson and others.

I realize that even if my assertions were proved to be true
would not have been enough to win a pretrial motion or to.
a not guilty verdict. But I am appealing to your sense of j
and fairness. I am guilty, true, but is all this necessary
simple case of this minute magnitude? Does the sword of
being double edged have double standards? Indicating it
right and just for one to lie and distort the truth as long
benefits the government, but it is not right and just for the
accused. I am further appealing to you directly because
have placed so much emphasis on individuals being trut
with you. Has each individual in this matter been truth
with you? We both know they haven't.

In reference to me attempting to secure assistance on my
in an effort to help myself. Mr. Wilkinson, you advised f
Stiller and Mr. Sullivan that you did not want to hear or d
anything for or about me, and you did not want to see me unti
trial. Now what choices or alternatives did you leave me?
and anyone else would have done what they could to try and
themselves. I advised Mr. Daniel Stiller the same day that

13

with Darius Banks and Carlos Jones. When I inquired about the said information I had given him to convey to you, and you to Ms. Barbara Schalle, he said, you didn't say anything one way or the other. And that's one of the reasons I tried help myself. And if that entailed my breaking any laws, rules or conditions than again, I must apologize.

Ms. Wilkinson, I would like to speak briefly about a few conversations with Mr. Alexander Foulkes. Though he and I never discussed his cooperation, and me trying to cooperate, we did discusse the similarities of our criminal status. He both had more than two felony convictions, a hand gun was found on or near his person in the street, a hand gun was fund hidden in the bedroom where I resided, crack cocaine was found on his person and in his car, so he alledged. I was charged with pharmaceuticals. Mr. Foulkes had stated to me, at that time, that because of the investigator from the public defenders office overhearing racial derogatory statements by the Mr. Ramer Police Dept., that you had decided to drop the gun charge, the crack cocain found on him, and just charge him with the crack cocaine found in his car. And, that he would only receive four to five years. I brought this to my attorney's attention and why the disparity. He stated that Mr. Foulkes had to be cooperating. I found it to be true on or about July 1999, when William Hartwell approached and asked did I know anything about Mr. Foulkes testifying against

App 1221

- 14 -

him and others. I saw Mr. Koulkes in the later noon and while passing by, he raised his hand displaying five fingers and his lip movement saying "I got five years." To further confirm this, we met on the van enr to Greenbelt. He discussed his coming out on top. He stated, yeah, but I had to add some to the yeast the game". That means in street talk, he had to lie embellish, or be a little of both.

Ms. Tilkinson, we both know that the government a the public are far more concerned about kilo dealers crack cocaine, powder cocaine, heroin, weapon deal explosives, murders and stolen cars than someone invi in pharmaceuticals which can be purchased easily at a pharmacy, and if prescribed and used daily. I can you all this, and the agents that have tried to work with me all know this. These agents would not want to wo with me without knowing my worth. You can speak wi any prosecutor or agent that I have worked with, and t will confirm that I never lied or welched when I gave my word, and I always produced "top of the line." No that you have to for me, but I have been advised tha you have allowed or permitted cooperation as I have : quested to do. If I have done something to offend you personally, then I humbly apologize. The lie that I told you at our first meeting was rescinded and I apologi then and now. Each time that we have met since, I ha

App 1222

-15-

cooperated truthfully. On the other hand, Mr. Beverly Robertson, Ms. Carrie Harris, Ms. Janice Buchanan, Ms. Joyce Buchanan-Isreal, Ms. Alethia Holland-Johnson and Mr. Robert Jones have lied, but there is no disdain projected towards them. You will not even allow me to help myself, even though I tell you the truth. Lets take a hypothetical situation, for instance Ms. Schilla and Carlos Jones. Lets say that it was allegedly stated that Mr. Jones had an altercation with a female associate in which Mr. Jones verbably abused and physically assaulted her. And in retaliation she stroke him in the face with an object which entailed Mr. Jones have a very ugly and permanent scar on his cheek. Mr. Jones, lets say further alledged to have said that the female was discovered later with multiple bullet wounds. Mr. Jones was further alledged to have stated that the murder had taken place in 1994 or 1995, and that in court, he, Mr. Jones and his attorney had "beat it" and "gotten out on them." This is street talk meaning, "I did a certain something and got away with it."

Remembering this is hypothetical, and you personally being aware of how I have tried cooperate, I could have taken this and lied to make it seem as though I was actually there when the murder happened. But, I told you that I would be truthful. I hope that it will account for some consideration.

Keep in mind that Ms. Skalla was very careful not to mention whether the victim was a man, woman or child. She never stated just how the victim was killed or had died, what weapon was used, or how many wounds there were. But we all know that when the government suspects, believes and or indicts someone, that 98 to 99 percent of the time they are correct. And so it is with Carlos Jones. But I will not knowingly and deliberately lie to you about him or anyone else. Now, here is some food for thought.

1) Did Ms. Beverly Robertson tell the total truth about her total involvement and the major role she played?

2) Could this incident have materialized without her knowing and willing cooperation and participation?

3) Did Ms. Carrie Harris knowingly and willingly purchase illegal pharmaceutical drugs?

4) Did Ms. Carrie Harris knowingly and willingly order controlled substance III and IV that were not for pharmaceutical use?

5) Did Ms. Carrie Harris and Ms. Janice Buchanan actually trash or flush her controlled substances away?

6) Didn't Ms. Carrie Harris claim bankruptcy, and knew that the law required her to turn in all controlled substances in?

7) Didn't Ms. Carrie Harris claim that she had

-17-

packed her D.E.A. certificate away, but it was still used?

7) Could I have accomplished this ~~out~~ without ~~th~~ D.E.A. certificate?

8) Could I have accomplished this ~~would~~ without ~~the~~ Ms. Beverly Robertson?

9) Did Mr. Robert Jones lie and distort the truth his sworn affidavit?

10) Did Ms. Aletchia Holland-Johnson ~~doctor~~ on on occasion, doctor and or alter the Uplift Pharmacy D.E. registration certificate.

Ms. Wilkinson, I want all the truth to be known. I not interested ~~I~~ in being vindictive or having anyo indicted. I just the same or equal fairness as they have. Plus, I want to do extensive cooperation in effort to gain ~~on~~ a maximum or as much ~~of~~ a down departure ~~as~~ as I can.

In furtherance, I wish to bring to your attention th Mr. Robert Jones's distorted or bogus information about street value of those controlled substances were $3-$5 a This a lie, nowhere in the D.C. Metropolitan area can collect $3-$5 for any Scheduled III and IV controlled substances. The max is $1.50 $2.00 per. Therefore, price street value for 161,000 doses is $241,500.00 to $322,000.00. But as I stated to you in a conference... were two middle people Rose Porter and Octavia to...

- 18 -

I had to split the wholesale profit with. At tops, the street value was $2.00 per pill or dose. The wholesaler made $1.00 and the retailer made $1.00. But since Ro or Octavia had the contacts for volume weight, they received $.50 of the wholesale $1.00. So therefore I only made $80,500.00,, and not $483,000 to $805,000.

Ms. Wilkinson, again, I am well aware that you are control here. And all that I am requesting is a little fairness and consideration. I am almost 69 years old I have maybe 5 to 12 more years to live, what real purpose would it serve for me to spend if incarcerated? The prison are vastly over crowded (not that they don't always have room for one). It is sad, but there so many being incarcerated with lengthy prison terms between the ages of 21 - 35. I know that you are aware that I can present or obtain cases of magnitude. And if given this opportunity, the interests of justice will still be served. There would be major convictions of those far more detrimental to society, my conviction and me still on parole and then supervised release, for another 12 to 20 years with an axe over my head. If you allow me to cooperate to the fullest, you have my solemn word and promise as does God, I will never be involved in any type of controlled substances or guns again. This will be my last and final chance or break. Thank you.

Respectfully submitted,

Theodore R. Watson

Theodore R. Watson

# EXHIBIT

# 3

USCA Case #21-3072    Document #2077668        Filed: 10/01/2024    Page 194 of 422
Case 1:98-cr-00329-RCL   Document 1141-2   Filed 11/28/14   Page 2 of 4

5/28/2014                                    Prosecution Function I Criminal Justice Section



Home > Publications > Criminal Justice Section Archive

Back to Top

Criminal Justice Section Standards

## Prosecution Function

Prosecution Function

## PART I.

## GENERAL STANDARDS

### Standard 3- 1.1 The Function of the Standards

These standards are intended to be used as a guide to professional conduct and performance. They are not intended to be used as criteria for the judicial evaluation of alleged misconduct of the prosecutor to determine the validity of a conviction. They may or may not be relevant in such judicial evaluation, depending upon all the circumstances.

### Standard 3- 1.2 The Function of the Prosecutor

(a) The office of prosecutor is charged with responsibility for prosecutions in its jurisdiction.

(b) The prosecutor is an administrator of justice, an advocate, and an officer of the court; the prosecutor must exercise sound discretion in the performance of his or her functions.

(c) The duty of the prosecutor is to seek justice, not merely to convict.

(d) It is an important function of the prosecutor to seek to reform and improve the administration of criminal justice. When inadequacies or injustices in the substantive or procedural law come to the prosecutor's attention, he or she should stimulate efforts for remedial action.

(e) It is the duty of the prosecutor to know and be guided by the standards of professional conduct as defined by applicable professional traditions, ethical codes, and law in the prosecutor's jurisdiction. The prosecutor should make use of the guidance afforded by an advisory council of the kind described in standard 4-1.5.

App 1228

fact that in the jurisdiction juries have tended to acquit persons
accused of the particular kind of criminal act in question.

(f) The prosecutor should not bring or seek charges greater in
number of degree than can reasonably be supported with
evidence at trial or than are necessary to fairly reflect the gravity
of the offense.

(g) The prosecutor should not condition a dismissal of charges,
nolle prosequi, or similar action on the accused's relinquishment
of the right to seek civil redress unless the accused has agreed to
the action knowingly and intelligently, freely and voluntarily, and
where such waiver is approved by the court.

## Standard 3-3.10 Role in First Appearance and Preliminary Hearing

(a) A prosecutor who is present at the first appearance
(however denominated) of the accused before a judicial officer
should not communicate with the accused unless a waiver of
counsel has been entered, except for the purpose of aiding in
obtaining counsel or in arranging for the pretrial release of the
accused. A prosecutor should not fail to make reasonable efforts
to assure that the accused has been advised of the right to, and
the procedure for obtaining, counsel and has been given
reasonable opportunity to obtain counsel.

(b) The prosecutor should cooperate in good faith in
arrangements for release under the prevailing system for pretrial
release.

(c) The prosecutor should not seek to obtain from an
unrepresented accused a waiver of important pretrial rights, such
as the right to a preliminary hearing.

(d) The prosecutor should not seek a continuance solely for the
purpose of mooting the preliminary hearing by securing an
indictment.

(e) Except for good cause, the prosecutor should not seek
delay in the preliminary hearing after an arrest has been made if
the accused is in custody.

(f) The prosecutor should ordinarily be present at a preliminary
hearing where such hearing is required by law.

## Standard 3-3.11 Disclosure of Evidence by the Prosecutor

(a) A prosecutor should not intentionally fail to make timely
disclosure to the defense, at the earliest feasible opportunity, of
the existence of all evidence or information which tends to negate
the guilt of the accused or mitigate the offense charged or which
would tend to reduce the punishment of the accused.

(b) A prosecutor should not fail to make a reasonably diligent
effort to comply with a legally proper discovery request.

(c) A prosecutor should not intentionally avoid pursuit of evidence because he or she believes it will damage the prosecution's case or aid the accused.

# PART IV.
## PLEA DISCUSSIONS

### Standard 3-4.1 Availability for Plea Discussions

(a) The prosecutor should have and make known a general policy or willingness to consult with defense counsel concerning disposition of charges by plea.

(b) A prosecutor should not engage in plea discussions directly with an accused who is represented by defense counsel, except with defense counsel's approval. Where the defendant has properly waived counsel, the prosecuting attorney may engage in plea discussions with the defendant, although, where feasible, a record of such discussions should be made and preserved.

(c) A prosecutor should not knowingly make false statements or representations as to fact or law in the course of plea discussions with defense counsel or the accused.

### Standard 3-4.2 Fulfillment of Plea Discussions

(a) A prosecutor should not make any promise or commitment assuring a defendant or defense counsel that a court will impose a specific sentence or a suspension of sentence; a prosecutor may properly advise the defense what position will be taken concerning disposition.

(b) A prosecutor should not imply a greater power to influence the disposition of a case than is actually possessed.

(c) A prosecutor should not fail to comply with a plea agreement, unless a defendant fails to comply with a plea agreement or other extenuating circumstances are present.

### Standard 3-4.3 Record of Reasons for Nolle Prosequi Disposition

Whenever felony criminal charges are dismissed by way of nolle prosequi (or its equivalent), the prosecutor should make a record of the reasons for the action.

# PART V.
## THE TRIAL

### Standard 3-5.1 Calendar Control

Control over the trial calendar should be vested in the court.





App 1231

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription ___2/17/98___

     CHARLES BENDER (PROTECT IDENTITY), B/M, DOB: 11/28/74, was advised of the identity of the interviewing agent and the purpose and nature of the interview. Also present during the interview was AUSA Kenneth Wainstein. BENDER voluntarily provided the following information:

     JOEY (SIMMONS), TADPOLE (BERNARD JOHNSON), WILLIE COBB, the twins DONNY and DANNY, DELMO, MANNY (SIMMONS), KIIVORY (PROCTOR) and MINUTE (RONALD SOWELLS) all sold marijuana for WOOZIE (THOMAS FIELDS).

VITO's supplier of marijuana was J. JOHN (JOHN FENNER) from Clifton Terrace.

     BENDER witnessed CHAMP murder SHAWN on Howison Place during the summer of 1995. CHAMP is now in jail for killing MINK.

     BENDER heard that PIMP (JEROME MARTIN) shot MAN from 37th Place on Delaware Avenue near M Street in 1995. KIIVORY may have been a witness.

     WOOZIE told BENDER that FACE (JERMAINE WASHINGTON) killed someone in Cappers.

     WOOZIE told BENDER that he paid someone to shoot VITO (VINCENT HILL) but the gun jammed.

     SAM (MARBURY) told BENDER that DAMO, who shot the police, shot CHIN (SAM CARSON) for WOOZIE.

     On 8/15/97, SA Kristen A. Kane and AUSA Kenneth Wainstein again met with BENDER and he provided the following information:

     BENDER heard that VITO killed PACHO because PACHO kicked VERONICA in the stomach while she was pregnant with VITO's baby.

     BENDER witnessed the murder of GO HARD (MARCUS BRYANT) in the K Street court in 1993. REGGIE, SLEDGE, WINK, GO HARD and

---

Investigation on ___8/13,15/97,___ at ___Washington, D.C.___
          ___10/7/97, 2/3/98___

File # ___166E-WF-200828___                Date dictated _____

by ___SA Kristen A. Kane___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

166E-WF-200828

Continuation of FD-302 of ___Charles Bender___ , On 8/13,15/97, , Page    2
                                                        10/7/97, 2/3/98

TONY BRODIE were all gambling.  A New Yorker called SHAKA got out
of a car and shot GO HARD.  BENDER did not see OOCH but believes
that OOCH was driving the car.

        BENDER heard that DRAPER killed ROBO (DONNELL
WHITFIELD) from SIRSUM CORDA in 1994.  DRAPER told BENDER that
he and ROBO had been involved in a shooting at the Mirage and "he
had to get ROBO before ROBO got him".

        In 1994, BENDER was selling weed for JIM SWEENEY.
BENDER sold about one half pound in one hour and made about $400
from each half pound.  BENDER sold for SWEENEY and gave him his
cut after selling the weed.

        During the spring of 1995, a green Cherokee drove into
the 200 block of K Street trying to buy marijuana.  The occupants
asked BENDER for weed and BENDER directed them to go to SHELDON
who was in the cut because it was his turn to make a sale.  A
girl in the Jeep went to the cut and as she walked back to the
Jeep someone wearing a mask came from the south side of K Street
and started shooting.  The girl jumped into the Jeep and BENDER
followed her into the Jeep.  Once inside the Jeep, BENDER pulled
a Derringer and told the driver to drive off.  The driver drove
west on K Street to 3rd Street where it turned right and headed
north toward I Street.  The Jeep turned left on I and headed
toward the Waterfront.  The Jeep pulled up next to a police car
and BENDER jumped out of the Jeep and ran.  BENDER tripped and
was apprehended by the police.  BENDER had dropped the gun while
he was running and to his knowledge it was never recovered.  A
weapon was recovered from the Jeep.  BENDER was arrested but
released at his court appearance the next day.

        During the summer of 1995 BENDER stabbed YELLOW BOY
(JAMAL MURRAY), who he knew from Oak Hill.  BENDER asked YELLOW
BOY to trade some of his marijuana because YELLOW BOY's stash was
better than BENDER's.  YELLOW BOY refused so BENDER hit him.
YELLOW BOY then hit BENDER with a chair so BENDER pulled out a
knife and stabbed YELLOW BOY several times.  BENDER did not kill
YELLOW BOY because they had been friends at Oak Hill.

        BENDER, DONTE (McDOWNEY, and MEECHIE (DEMETRIUS HUNTER)
shot a "sale" in approximately 1995.  MEECHIE had his Uncle WINK's

FD-302a (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of ___Charles Bender_____ . On 8/13,15/97, , Page ___3___
                                                                    10/7/97, 2/3/98

(LEON SHANNON) .45 and he gave it to DONTE.  When the sale asked
for weed, DONTE pulled out the gun and tried to rob the "sale".
The "sale" said he had a family and tried to grab the gun and the
gun went off.

        In 1995, HORTEZ, from Howison Place, and LUTHER, shot
DONTE and BENDER over HORTEZ's girl because HORTEZ believed that
BENDER was involved with her.  At a later date, BENDER saw HORTEZ
and approached him and held a .38 to his neck.  HORTEZ pointed
out police who were nearby so BENDER did not shoot him.  As
BENDER left the area he fired at HORTEZ but did not hit him.

        In approximately April 1997, BENDER heard POO POO
(MAURICE PROCTOR) tell DRAPER to "get at" WAYNE or SLUG.  DRAPER
told POO POO that he was going to get SLUG because SLUG could
hurt POO POO the most.

        In approximately June 1997, POO POO said that SLUG and
WAYNE (KENNETH ADAMS) were telling on him about the murder of
PHIL (CLAYBORNE).  POO POO believed that WAYNE had been let out
of jail so he could testify.  POO POO said that CHIN was looking
for WAYNE so he could kill him for POO POO.  POO POO told BENDER
that he killed PHIL at Grand China.  BENDER also heard POO POO on
the phone telling CHIN to "take care of WAYNE".

        On 10/7/97, SA Kristen A. Kane and AUSA Kenneth
Wainstein again met with BENDER and he provided the following
information:

        Several years ago, BENDER witnessed a shooting between
WOOZIE's people and THADEUS HARTRIDGE's people on Delaware Avenue.
WOOZIE, SAM MARBURY, WILLIE COBB and ANDRE WYNN were on the
street and HARTRIDGE, ROY, JUNIOR, MARK and SHANNON, from 21st
Street, NE, were in a car.  HARTRIDGE had previously robbed WYNN
of $4,000.  There was shooting by both groups.

        Toward the end of 1994, BENDER robbed a "sale" of his
"First Down" coat.  The "sale" returned to the area about twenty
minutes later and asked people on K Street about the guy who
robbed him.  The guy's car was only about ten feet away from
BENDER and when the car pulled off, BENDER shot at it.  The car
stopped and then pulled off again.  BENDER did not know if he hit

FD-302a (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of    Charles Bender                                    , On 8/13,15/97,  , Page    4
                                                                                   10/7/97, 2/3/98

the driver.

        BENDER usually got his marijuana from WOOZIE but
sometimes got it from POONIE or J. JOHN.  BENDER sold about a
quarter pound a day and made about $300 to $500 each day.  WOOZIE
usually fronted BENDER and BENDER would pay him $400 for each
half pound.  BENDER would get his weed in the M Street court and
would deal with WOOZIE or FACE.  WOOZIE kept his weed at WILLIE
COBB's house.  GREG SEABROOKSk, TYDY (TYRONE GREENFIELD), RONNIE
(HORNS), HAYGOOD, SLUG (TRAVEL RILEY), OLD DOG (CALVIN RANDOLPH),
LITTLE CHESTER (JERMAINE JACKSON), TADPOLE (BERNARD JOHSNON),
MEECHIE (DEMETRIUS HUNTER), WILLIE COBB, JOEY (SIMMONS) and MANNY
(SIMMONS) all sold drugs for WOOZIE.

        In approximately the summer of 1995, RAYMOND WASHINGTON
and DIRTY MEAT robbed CRAWFORD (HODGES) of $2,000.

        Before BUTCHIE (ROBERT SMITH) was killed, DRAPER said
that his cousin BUTCHIE was telling on him.  After BUTCHIE was
killed, DRAPER said he knew who killed BUTCHIE but did not tell
BENDER who it was.

        PIMP told BENDER that JAMES (MONTGOMERY) was snitching
on him, SAM (CARSON) and DRAPER.  PIMP said that JAMES was
snitching on PIMP for a 1991 attempted murder and on DRAPER and
SAM for a Maryland murder.  PIMP said "I'll kill his bitch ass if
I see him" about JAMES.  PIMP said that he thought he would beat
his case because the only thing the government had was JAMES.

        On 10/7/97, DRAPER told BENDER that JAMES was telling
on him, PIMP and SAM.  DRAPER said that JAMES told MICHELLE
ROBERTS that he was telling about the murders in Maryland, and
that he told the government that he saw DRAPER go in a house and
another guy with a mask go in the house.  DRAPER said that it was
a robbery and the government couldn't prove the case.  DRAPER
said that CHIN held fast but JIM told.  He used the word "we" and
even though he never said who "we" was, BENDER inferred that
DRAPER was present.  DRAPER said he was disappointed in JAMES
because they had done so much together and that he would kill for
JAMES.  DRAPER said that his discovery packet said that BIRDIE,
JAMES, POO POO, VITO and KIM from Southwest were supposed to
testify against him.  DRAPER said he hoped the government was

FD-302a (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of   Charles Bender _____ , On  8/13,15/97,  , Page    5
                                                                10/7/97, 2/3/98

trying to scare him and if so, it was a lawsuit because the
government was putting people's lives in danger by identifying
witnesses.  DRAPER said that if he couldn't get the witnesses he
would get their families.  DRAPER heard that VITO was at Occoquan
and was snitching on DRAPER because he thought DRAPER was
snitching on him.  DRAPER also said that he and PIMP knew that
ART (RICE) was snitching.

          On 2/3/98, SA Kristen A. Kane and AUSA Kenneth
Wainstein again met with BENDER and he provided the following
information:

          PIMP said that TONY FORTUNE had been robbing dudes from
58th.  While they were gambling, FORTUNE was whispering like he
was plotting on PIMP.  PIMP said he pulled a gun and shot
FORTUNE.

          PUG stabbed a guy from Simple City at the Eastside
Club.  PUG used a piece of glass from a light.

          About one week later, WINSTON ROBINSON killed OLD FACE
from 37th Place.

          About one month after OLD FACE was killed, BENDER saw
PIMP stab WINSTON ROBINSON on the dance floor of the Eastside
club in 1995.  PIMP got the knife from CAL (KYLE KNIGHT).

          WOOZIE said that he gave DAMO two pounds of weed and
$500 to shoot CHIN.

          KK (LAWRENCE DAVIS), ROB and J.R. (RONALD DAVIS) all
told BENDER that WOOZIE beat JR with a stick and knocked him
unconscious because JR owed WOOZIE money.  This occurred on L
Street during the summer of 1997.



# 5

FD-302 (Rev. 10-6-95)

- 1 -

*CR98-329*
*Sealed*

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/27/99

ARTHUR RICE (Protect Identity) DOB: 05/08/70, B/M, SS#
578986837, FBI# 560314KA1, was interviewed by SA Vince Lisi
and SA Kevin R. White in the presence of AUSA Kenneth Wainstein and
Rice's attorney, Rita Hendry.  The interview took place at 555
Fourth Street NW in Washington, D.C.  After being advised of the
identity of the interviewing agents and the purpose of the
interview, Rice provided the following information:

RICE has lived and hung around the SW section of
Washington, D.C. most of his life, especially in the K Street, L
Street, and Delaware Avenue areas.  RICE has been in and out of
jail since 1990, however, is very familiar with the violence and
drug activity that has occurred in the Southwest area over the
past few years.

## Kentucky Court Beef:

RICE stated that there was an ongoing beef between the
SW guys and the crew from Kentucky Courts.  He could recall at
least three different drive-by shootings at Kentucky Court. The
first shooting was when RICE, DRAPER, and MEETCHIE walked up on
some Kentucky Court males who were gambling.  Words were
exchanged and the three of them (RICE, DRAPER, MEETCHIE) started
to leave the area when an individual named JAMAL LNU went to his
own station wagon and retrieved a gun.  Once JAMAL LNU had the
gun, he fired it at MEETCHIE but did not hit him.  MEETCHIE,
DRAPER, and RICE made it to their car and circled the block.
Once circling the block, they returned and opened fire in the
middle of the block.  RICE was using a .380 caliber handgun until
it jammed.  He thinks a 19 year old female may have been hit in
the exchange but did not die.  During this drive-by shooting,
DRAPER fell out of the car as he was leaning out and shooting.
MEETCHIE had to return to the area to pick him up after several
minutes.

The second drive-by shooting also occurred in the early
1990's, possibly 1992, involving ERIC JONES aka Irky Burke,
CLIFTON EDWARDS aka MEETCHIE, DRAPER, RICE, SEAN COATES aka
BIRDIE, and ANTOINE GATHERS aka GUS.  They all drove to Kentucky
Courts in two cars and parked about a block away, with the
intention of sneaking up on the other crew members.  As they

---

Investigation on   01/26/99      at Washington, D.C.

File # 166E-WF-200828                          Date dictated   01/26/99

by  SA Kevin R White   SA Vince Lisi

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned
to your agency; it and its contents are not to be distributed outside your agency.

COURT
EXHIBIT
#11

FD-302a (Rev. 10-6-95)


166E-WF-200828


Continuation of FD-302 of   Arthur Rice                    , On 01/26/99   , Page    2

approached, MEETCHIE opened fire on the Kentucky Court crew
members with a Tech 9.  The Kentucky Court males fled the area
before anyone got hit.  The SW Crew left the area and again came
back at which point BIRDIE opened fire at ROMEO ROACH
(B/M,1/27/72,PDID#469803)  who was sitting in his car (possibly a
red Nissan SX) in the middle of the street talking to some
people.  BIRDIE was using a revolver for this particular
shooting.

        The third drive-by shooting at Kentucky Courts also
happened in the early 1990's.  The SW guys involved were ERIC
JONES AKA IRKY BURKE, JAMES MONTGOMERY, SAM MARBURY, and CHARLES
EDWARDS AKA SQUIRMEY .  As the SW guys opened fire on the
Kentucky Court Crew, they returned fire with at least one
shotgun.  One member from SW may have been hit that night.   They
all told RICE about the drive-by later that night.

            In reference to the shooting of MIKE JONES:

        SEAN COATES AKA BIRDIE, ANTOINE GATHERS AKA GUS,
RAYMOND WASHINGTON, DRAPER, and RICE were all present that day.
The shooting of JONES occurred because he was going to testify
against MEETCHIE in DC Superior Court.  They located JONES
sitting on his front steps on 4th Street.  RICE acted as a
lookout at the end of the street while BIRDIE and GUS walked up
on JONES.  JONES ran towards the middle of the street where
BIRDIE and GUS shot him as he tried to escape.  BIRDIE then
walked up on him and tried to shoot him in the head as JONES
tried to protect his face with his hands.  BIRDIE thought he had
killed JONES and found out the next day that JONES had actually
lived.  MEETCHIE found out in jail that JONES lived and was
supposedly very mad at BIRDIE.  Eventually, MEETCHIE and JONES
were locked up together in Lorton and MEETCHIE stabbed him.  This
occurred possibly in 1996 or late 1995.

            In reference to the kidnaping of WYSOCKI:

        DRAPER told RICE about the kidnaping in detail while
they were cellmates.  It was Vincent Hill (Vito) who planned the
crime because he knew WYSOCKI had lot of money.. Apparently
WYSOCKI and VITO used to gamble together near 4th and T Street.
VITO was hiding in the weeds and grass outside where WYSOCKI was
gambling.  Once WYSOCKI exited, VITO hit him and threw him in the

FD-302 (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of  Arthur Rice _____ , On 01/26/99 ___ , Page ___3___

car.  ANTOINE GATHERS aka GUS, was also there when WYSOCKI was
kidnaped.  DRAPER told RICE each person received $5000 from Vito
for helping him out.  RICE knew that WYSOCKI lived and DRAPER was
afraid he would get charged for this crime.

In reference to the murder of DONNELL WHITFIELD aka
ROBOCOP:

DRAPER and RICE were cellmates at one point in 1995
when they were incarcerated together.  DRAPER described the
murder of ROBO to RICE and told him the government had the case
backwards.  DRAPER told RICE that he and ERIC JONES left the
halfway house together to get ROBO.  DRAPER said he killed ROBO,
and ERIC JONES aka IRKY BURKE, drove the get-away car from Sursum
Corda.  DRAPER said the government had it wrong because they
thought JONES did the shooting and DRAPER did the driving.
Apparently this beef started when ROBO punched DRAPER at a club
and knocked him out earlier that week.

In reference to the murder of Tony Fortune:

RICE said SAM CARSON killed TONY FORTUNE after FORTUNE
lost a large sum of money while gambling but took it back and
tried to leave the area in his car.  JEROME MARTIN aka PIMP took
the credit for the killing for a long time.

In reference to the Black Hole Shootings:

According to RICE, there were at least two separate
shootings at the Black Hole night club.  SAM CARSON did the first
shooting trying to kill anyone from 5th and O Street.  RICE did
not know if anyone got hit or not.

The second shooting actually occurred down the street
from the Black Hole.  SAM CARSON was standing on the hood of a
car shooting at people.  RICE says that at least four people were
hit with gun fire and one person, possibly named JOEL
BROCKELBERRI, died during the shooting.  A car belonging to PAUL
LNU was used during this shooting and he was killed because he
talked to the police about it.

In reference to the Condon Terrace Beef:

FD-302a (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of  Arthur Rice _____ , On 01/26/99 _____ , Page   4

    RICE was incarcerated during most of the time that SW was beefing with Condon Terrace. He did see THADEUS HARTRIDGE, MAURICE PROCTOR aka POO POO, and STEVE DUNBAR return from a drive by at Condon Terrace. They were in a beat up tan station wagon that was all shot up. RICE saw them driving at a high rate of speed down M Street and turn onto Delaware Avenue.

    RICE also knows about a shooting at a gas station on South Capital Street from BIRDIE. BIRDIE, MEETCHIE, and POO POO shot at these Condon Terrace guys while at the gas station. BIRDIE hit one guy with a shot but MEETCHIE'S gun jammed when he tried to shoot at one of the Condon Terrace guys. This event may have started at the Wendy's restaurant when JERMAINE LNU got shot twice in the head.

### In reference to the P Street Shooting:

    RICE described a shooting he witnessed on P Street when ERIC JONES aka IRKY BURKE walked up on 2 guys and opened fire on them with some type of a tech 9. One unknown victim was hit and ran to the other side where he jumped into his Acura Legend which was parked in the alley between I and K Street. Before he could drive off, VINCENT HILL aka VITO, shot and finished him off. The identity of the shooting victim is unknown at this time.

### In reference to DAVE CARSON:

    DAVE CARSON is the brother of SAM CARSON. DAVE has all the money and sells large quantities of cocaine. He has a good connection in New York. DAVE used to get SAM all the guns that he wanted and needed. DAVE is also known to be very sneaky and is capable of doing harm to witnesses to help out his brother's legal problems. DAVE CARSON was also the one who told RICE that JEROME MARTIN aka PIMP was responsible for shooting "KREEKO". VITO apparently paid PIMP to do the shooting for him.

### In reference to the murder of CURTIS WILSON:

    ROY LNU, who is KENARD'S brother or cousin, shot and killed WILSON for VITO. VITO apparently needed to get a gun back from WILSON and did after the shooting. VITO got rid of the gun soon after.

FD-302a (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of ___Arthur Rice_____, On 01/26/99___, Page ___5___

In reference to the murders of MAURICE HALLMAN and "SLICK"

RICE was present with SAM CARSON, JEROME MARTIN aka PIMP, POO POO, MEETCHIE, and BIRDIE in SW that night. While talking and hanging out, SAM CARSON and PIMP slip away from the group. RICE said he knew something was going on and then heard several shots ring out in the alley. RICE sees CARSON and PIMP running from the alley. RICE later heard from IRKY BURKE that CARSON set up MAURICE HALLMAN because HALLMAN was going to testify against an individual named "TAY", who was involved in a shooting incident at Wilson High. RICE said it was common knowledge around SW that CARSON killed the two in the alley.

In reference to the GEORGE SEABROOKS murder:

RICE heard about this homicide from his friend, ERIC JONES, aka IRKY BURKE, who was there and admitted to RICE that he did the actual shooting. REGINALD SWEITZER and LEROY LNU (Same Leroy that was with "TAY" at the Wilson High shooting) were also at the Waterside Mall that day. SWEITZER had the beef with SEABROOKS after SWEITZER got shot. SWEITZER wouldn't kill SEABROOKS that day so JONES called him some names and did it himself.

In reference to the CRISSY GLADDEN HOMICIDE:

At one point before GLADDEN was killed, CARSON stepped to RICE and told him if he sees "that girl" around 37th Place, to call him and let him know. CARSON wanted RICE to pass the message on to BIG JIM and that he made it clear it was for PIMP'S trial. RICE later saw PIMP and PUG at DC Jail when they were acquitted. PIMP told RICE he didn't think "that girl" would make it to court but that SAM CARSON is out there "bullshitting around" and taking his time. PIMP asked RICE why he didn't take of the girl for him and RICE responded by saying he was too well known in the area and didn't know what she looked like. CARSON described to RICE exactly where CRISSY could be found in the circle at 37 Place.

Langston Lane Beef:

RICE also discussed the beef with some of the Langston

FD-302a (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of  Arthur Rice _____ , On 01/26/99 ____ , Page  6 ____

Lane guys.  He said all of SW was not beefing with Langston Lane
and that it was primarily CHARLES EDWARDS, aka SQUIRMEY, and
RAYMOND WASHINGTON.  There was a fight which led to a shootout
one night at the Skyline Hotel.  The guys from Langston Lane were
possibly "FROG" and "DICKY".  SQUIRMEY and WASHINGTON shot at a
guy (possibly JASON YOUNG) while in SQUIRMEY'S big blue station
wagon.  SQUIRMEY told RICE about this incident in front of IRKY
BURKE.

                Regarding ERIC JONES aka IRKY BURKE:

            RICE was very tight with JONES and would look out for
him.  RICE knew JONES to always have a large variety of guns and
would keep these guns at MEETCHIE'S grandmother's house.  JONES
also sold a lot of crack cocaine in Southwest over the years.
People in SW respected JONES because JONES was known to make good
plans for people regarding different types of crimes.  At one
time in 1992, RICE was with JONES when JONES shot DAWN ZACHARY'S
mother in the shoulder around 1:00 in the morning, on 1st Street
near MEETCHIE'S grandmother's house in Southwest.  JONES would
usually buy ½ kilos of crack cocaine at a time to package and
resell.  He would usually buy his drugs PHIL LNU from Sursum
Corda.

            In reference to SEAN COATES AKA BIRDIE:

            RICE knows BIRDIE to be a very violent person and was
close with VITO.  BIRDIE killed TERRENCE ANTHONY AKA TEFLON in a
car and then burnt the car on the highway coming from Classics
Nightclub.  It was ANTHONY'S birthday the day he was murdered.
This murder related to a beef with a male named "BLOCK" and
ANTHONY didn't want to squash the beef.

            BIRDIE also shot RONALD SOWELLS with SAM CARSON over
money owed to them.
            BIRDIE was also with SAM CARSON and others when CARSON
shot PEEWEE from Langston Lane as he was leaving Capers.

            BIRDIE stabbed an unknown male one night at the
Eastside Club in Washington, D.C.

FD-302a (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of ___Arthur Rice_____, On _01/26/99____, Page ___7___

In reference to SAM CARSON AKA CHIN:

SAM CARSON stabbed a black male from Kentucky Courts
near the Ledroit Park area in retaliation for POO POO getting
stabbed at the Howard Inn on New Years Eve in 1994.  BIRDIE was
with CARSON when they went to commit the murder.  POO POO was in
the hospital for about a month recovering from his injuries.  A
subject nicknamed "QUICK" supposedly stabbed POO POO however
QUICK is now dead.  RICE visited POO POO in the hospital several
times with some of the SW guys.  CARSON told POO POO he took care
of things for him.  CARSON said the guy he stabbed was sleeping
in an alley when he snuck up on him.  CARSON also warned SW guys
to get strapped in case of revenge tactics by the Kentucky Court
guys.

RICE also heard from several people that CARSON was
responsible for the murders of TERITA LUCAS and THERSA THOMAS.
People from 5th and O Street also said CARSON was responsible for
the killings.

SAM CARSON and BILL HILL went out Maryland several
times trying to find JERMAINE WASHINGTON AKA FACE and THOMAS
ABDUL FIELDS AKA WOOZIE so they could kill them.  WOOZIE had
apparently had VITO shot in Southwest.  There were some girls
that knew where WOOZIE AND FACE were staying and told SAM AND
BILL about it.

RICE was out in the street when CARSON had a shootout
with some Jamaicans on 2nd Street in Southwest.  CARSON got ½
pound of weed and some cash from the Jamaicans.  RICE wanted some
of the weed from CARSON but CARSON would not give him any.  POO
POO's younger brother, BOO BOO got locked up for the shooting.
One of the younger guys that went with CARSON was shot in the leg
by the Jamaicans.  CARSON told RICE that he thought he killed at
least one of the Jamaicans.  RICE could see the gun in SAM
CARSON's waistband as he left to go shoot the Jamaicans.

In reference to JEROME MARTIN AKA PIMP:

PIMP had a lot of things done to a lot of different
people and many people have been killed over the years because of
PIMP.  PIMP had obtained drugs and guns from his own father over
the years.  PIMP has a brother who is a corrections officer at DC

FD-302a (Rev. 10-6-95)


166E-WF-200828


Continuation of FD-302 of  __Arthur Rice_____ , On __01/26/99__ , Page ___8___

Jail.

     PIMP and SOUTH did a drive-by shooting at 5th and O
Street using a Nissan Maxima owned by Paul LNU from 37th Place.
They shot through the sunroof and Paul was eventually killed for
this.

    In reference to ROBERT SMITH AKA BUTCHIE:

     RICE knew BUTCHIE very well and heard CARSON saying he
was going to get him because he was sick of him.  The reason
CARSON was acting slow was because BUTCHIE was family to DRAPER.
DRAPER also had connection with a cousin in the DMV or court
system.
     RICE once got five pounds of weed from BUTCHIE and
never paid him for it.  RICE went to Lynchburg and sold it all
for $5000 which in turn he gave to his daughter.

    In reference to the STEVE DUNBAR homicide:

     DUNBAR, JONES (IRKY BURKE), and RICE were all friends
for a long time, however, a beef developed over a handgun between
JONES and DUNBAR.  JOE NICKENS and CARLOS LNU were involved in a
shooting at the Skyline Hotel with some of the Langston Lane
guys.  JOE NICKENS gave his gun to DUNBAR, who in turn gave it to
DAWN ZACHARY'S uncle in SW who is a crackhead.

     RICE eventually got the gun back from ZACHARY'S uncle
and gave it to JONES.  DUNBAR started asking RICE for the gun
back but JONES did not want to give it back to him.  Jones
thought DUNBAR was a weak person and did not trust him at this
point.  DUNBAR was getting frustrated with RICE because he
thought RICE was still holding the gun.  RICE felt like DUNBAR
was about to make a move on him and became very careful in front
of DUNBAR.  DUNBAR tried to set up RICE on two different
occassions, once at 203 N Street while gambling and again at a
go-go club.

     Two or three days later, RICE was selling weed in the K
Street alley when he was approached by JAMES MONTGOMERY and was
told that NICKENS and DUNBAR were looking for him.  RICE then hid
under a car and saw DUNBAR and NICKENS walk by with guns out.  A
short time later, RICE went into the K Street alley and could see

FD-302a (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of   Arthur Rice                              , On 01/26/99        , Page   9

DUNBAR sitting on the front stoop at 207 K Street with Charles
Edwards.  RICE could hear DUNBAR talking bad about him and then
approached him.  AS RICE approached DUNBAR, DUNBAR went for his
gun in his waistband but RICE fired first hitting him at least 5
times.  AD, POO POO, RAYMOND WASHINGTON, and ERIC JONES were also
out there that night.  After the shooting, RICE and JONES gave
their guns to AD who hid them at his girlfriend's house. EDWARDS
grabbed the gun and ran away with it.

        Later that night in SW, AD gave the guns back to ERIC
JONES and EDWARDS also gave DUNBAR'S gun to JONES.  One
individual, not associated with the SW Crew, ROGER LNU witnessed
the shooting and was shot at by WASHINGTON and JONES as he ran
away.  He eventually reported the homicide about 5 or 6 days
later.



# 6

Exhibit

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

APR 2 1999

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States of America       :
                               :
          v.                   :
                               :
Vincent Hill, a/k/a "Vito"     :     Criminal No. 98-329 (TPJ)
Jerome Martin, a/k/a "Pimp"    :
Samuel Carson, a/k/a "Chin"    :
William Kyle Sweeney,          :     (UNDER SEAL)
     a/k/a "Draper"            :
Maurice Proctor,               :
     a/k/a "Poo-Poo"           :

GOVERNMENT'S EX PARTE NOTICE TO THE COURT REGARDING CHANGE IN
LOCATION OF CONFINEMENT OF ABOVE-NAMED DEFENDANTS

          The United States of America, by and through its attorney, the

United States Attorney for the District of Columbia, submits an ex

parte pleading with the Court which sets forth in greater detail

the security concerns which gave rise to the movement of the above-

named defendants.

          On September 22, 1999, the federal indictment in this matter

was unsealed.    The grand jury returned an 87-count indictment

charging  the  above-named  defendants  and  five  additional  co-

defendants with a conspiracy to distribute and possess with intent

to distribute controlled substances, conspiracy to participate in

a racketeer influenced corrupt organization, first-degree murder

while  armed,  assault  with  intent  to  kill  while  armed,  the

commission of a violence crime in aid of racketeering activity,

kidnaping while armed, assaulting a police officer, possession of

a firearm during a crime of violence, and the possession with

intent to distribute and distribution of controlled substances.[1] The above-named defendants were subsequently arraigned on the indictment before the Honorable Magistrate Judge John Facciola. The defendants were ordered detained pending trial and committed to the custody of the Attorney General, pursuant to 18 U.S.C. 3142(I).

At the March 26, 1999, arraignment/status hearing, this Court requested that the government submit an ex parte pleading which addressed the bases upon which the above-named defendants were moved from the D.C. Jail to the Northern Neck Regional Jail in Warsaw, Virginia.[2] As set forth in the government's notice to the court of change in the conditions of the defendants' confinement (hereinafter "government's notice"), specific safety concerns have led to the movement of defendants Hill, Martin, Carson, Sweeney, and Proctor. Pursuant to the Court's request, the government hereby supplements the bases for the movement as follows:

I.  History of Intimidation/Retaliation Against Witnesses by Member of the Southwest Crew

A. Murder of Witness Chishauna Gladden and Attempts to Murder Other Witnesses to Knight and Martin's Murder of Curtis Edwards

1. On August 29, 1992, Antonio Knight and Jerome Martin, Jr. murdered Curtis Edwards in the area of the 200 block of 37th Street, SE. Edwards was murdered because he was a passenger in a

---

[1]  On Friday, March 26, 1999, a superseding indictment was unsealed in this matter which added numerous crimes of violence and three additional co-defendants.

[2]  The defendants were moved from the D.C. Jail to Northern Neck Regional Jail on or about March 9, 1999.

2

unfamiliar car with dark tinted windows that had driven through what Martin considered to be Martin's area. During the investigation of that murder, Chrishauna Gladden, Robin Williams, Tyrone Dean, Carla Washington and Douglas Eatmon were developed as witnesses. Antonio Knight and Jerome Martin, Jr. were charged with Edward's murder. Several trial dates were set and ultimately continued by the Court, and the case remained pending for over one year. For the majority of the time during which the case was pending, both Martin and Knight were held at the D.C. Jail without bond.

2. While the case was pending, confidential sources informed the Federal Bureau of Investigation (FBI) that Martin and Knight were trying to identify and harm potential witnesses against them. Because of this, Chrishauna Gladden, Robin Williams, Carla Washington and Tyrone Dean were moved from the area by the FBI for their safety.

3. On October 5, 1996, three days prior to Martin and Knight's scheduled trial date for Edward's murder, Chrishauna Gladden, one of the government's principal witnesses in the Edwards case, was murdered as she stepped out of a house in the 200 block of 37th Street, SE, where she had been attending a party. Martin and Knight were eventually tried and acquitted of all charges relating to Curtis Edwards' murder.

4. Further investigation by the FBI has revealed the following regarding attempts to kill witnesses to Martin and Knight's murder of Curtis Edwards: On November 5, 1997, W-1 entered

3

into a plea agreement with the Government, and pleaded guilty in the United States District Court for the District of Columbia to one count of participating in a Racketeering Influenced Corrupt Organization. As part of his guilty plea, W-1 acknowledged and accepted responsibility for his participation in the murder of Chrishauna Gladden.

5. W-1 has agreed to fully cooperate with the Government's investigation of the SOUTHWEST CREW and any other criminal matters of which he has knowledge. As part of that cooperation, W-1 has informed law enforcement that while Jerome Martin, Jr. and Antonio Knight were detained on First Degree Murder charges for killing Curtis Edwards, he was approached by Paul Lejohn Franklin.[3] Franklin told W-1 that he had spoken to Martin, and that Martin needed some witnesses who were going to testify against him in the Curtis Edwards murder trial killed. Franklin provided the names of the witnesses to W-1 and told him where they lived.

6. Franklin also informed law enforcement that he had a conversation with Jerome Martin, Jr. regarding who were the witnesses in Martin's murder trial. Franklin told Sam Carson the names of the witnesses as told to him by Martin. On one occasion, Franklin was in the Barry Farms area and saw one of the people whom Martin had identified as a witness. Franklin informed W-1 and Sam Carson of this sighting. W-1 and Carson then went to the Barry Farms area.

---

[3] Franklin was charged in the original indictment in the above-captioned matter. He entered into a plea agreement in the fall of 1998.

4

App 1251

7.  With respect to Carson's commitment to assisting Martin, Carson explained to W-1 that they had to treat getting rid of the witnesses against Martin like a full-time job.  According to Carson, they had to do whatever was necessary to kill the witnesses.  Once, Carson called W-1 at 4:00 A.M. and told W-1 that they had to go to watch a witness' house.  Carson had the addresses of Robin Williams (even though she had been relocated from her prior residence by the FBI for her safety) and Tyrone Dean's mother, and at different times, they surveilled those homes, looking for an opportunity to kill the witnesses as they came from or arrived at the residences.

8.  Carson and W-1 also rode around the area of the 200 block of 37th Street, SE on several occasions in an effort to find and kill Chrishauna Gladden.  On October 5, 1996, just three days before Martin and Knight were scheduled to be tried for killing Curtis Edwards, Carson and W-1 drove to the area of the 200 block of 37th Street, SE, where they were told by a close associate of Jerome Martin named Steven Chadwick that Chrishauna Gladden would be attending a party in the neighborhood that evening.  Later that evening, Carson and W-1 returned to the 200 block of 37th Street armed with a handgun and a police scanner to monitor police activity in the area. Chadwick accompanied W-1 and Carson to an abandoned house and pointed out the location of the party that Gladden would be attending.  Chadwick then waited with W-1 and Carson and pointed out Gladden when she arrived.  W-1 and Carson waited in the abandoned home, and when Gladden left the home where

5

the party was being held, Carson ran from the abandoned home and shot her multiple times.

9.    After murdering Gladden, W-1 and Carson drove to Robin Williams' apartment and hid in some bushes near her front door, hoping to kill her, as well. However, they heard over their police scanner that police cars had been dispatched to the area, so they left.

10.    W-2 is an associate of Antonio Knight and Jerome Martin, Jr.    While the Curtis Edwards murder charges against Martin and Knight were pending, W-2 had a pending felony charge in D.C. Superior Court, and agreed to provide an "off-the-record" debriefing with the government in an attempt to negotiate a plea bargain.    In April 1996, W-2 provided information about several different criminal matters, and much of the information provided by W-2 was corroborated through other investigative means.    W-2 provided no information that was proven to be false.

11.    During the debriefing, W-2 advised it knew that Steven Chadwick was trying to locate and harm witnesses that were to testify against Martin and Knight.    On one occasion, W-2 and Chadwick were near the 200 block of 37th Street, SE, when Carla Washington, a government witness in the Edwards case, walked near them.    As Chadwick saw Washington, he said something to the effect, "There goes that hot bitch right there."    Chadwick then asked another individual, known to W-2 as "Mighty", if he "got that location yet", and Mighty said that Washington lived on 48th or 49th Street.    In fact, Washington had been relocated by the FBI to

6

a residence on 49th Street, NE, Washington, D.C. Chadwick then
said that he had to hurry up and "pay her a visit."

12. On a separate occasion, W-2 was in the 200 block of 37th
Place, SE when an investigator for Martin's defense attorney
arrived there and said he was looking for "Flip," which is Tyrone
Dean's nickname. After Chadwick spoke to the investigator, he told
W-2 that "Flip" must be "telling." A day or two after the
investigator visited the area, Chadwick came from a house in the
200 block of 37th Place, SE (the same house from which Chrishauna
Gladden came when she was murdered) and said he had just spoken to
Knight, and that "Flip" was "hot". Chadwick said that he was going
to "get that nigger", which W-2 took to mean kill him. A day or two
later, W-2 was with Chadwick near the 200 block of 37th Street, SE,
when Chadwick commented that "Flip" was presently at his mother's
house, and Chadwick was waiting for Sam (Carson) so they could take
care of business. When Carson arrived, Chadwick went into an
apartment which was known by W-2 to be used by Chadwick to store
firearms. After a very short period of time, Chadwick exited the
apartment and left with Carson. After some time, Chadwick and
Carson returned, and Chadwick commented to W-2 that nobody was home
at Flip's mother's house.

13. W-3 was incarcerated with Jerome Martin, Jr. during the
time in which the Edwards murder case was pending against Martin
and Knight. While incarcerated, Martin wrote W-3 a letter, telling
him that he was not worried about his pending murder charge because
Sam (Carson) is taking care of "that" for him. W-3 took this to

7

mean that Carson was going to kill a witness for him. After W-3 and Martin were released from the D.C. Jail, they encountered each other on the street. Martin, in the presence of Carson, told W-3 that he beat his murder charge because Carson stopped a witness from coming to court. While Martin was saying that, Carson smiled and said that Martin is "his man".

14. W-3 and Martin were again incarcerated at the D.C. Jail for a second time. Martin then told W-3 that "James" (Montgomery) is telling on "Sam" (Carson), and Martin is going to kill Montgomery when he sees him on the streets.

15. W-4 has been incarcerated at the D.C. Jail for over a two year period, and while incarcerated, has had conversations with Martin and Knight regarding the murder charges that were brought against them. According to W-4, he was in the presence of Maurice Proctor, Vincent Hill, Martin and Knight when Martin and Knight were discussing a female who was to testify against them. According to Martin and Knight, they were going to get someone to kill the girl to prevent her from testifying.

16. In the first week of February, 1999, W-11 participated in an "off-the-record" debriefing with the government. This person has since pled guilty to his criminal activity in the SOUTHWEST CREW. W-11 said that he was at the East Side nightclub one evening and met a woman there (Chrishauna Gladden). Subsequent to that meeting, Sam Carson asked W-11 if he got the woman's telephone number and asked how W-11 had "left it with her." Carson wanted W-11 to get in touch with the woman, make arrangements to meet her

8

alone, and then take her to Carson or some place that was pre-determined by Carson.   W-11 inferred from the manner in which Carson was speaking that he was going to kill the woman.

17.   W-12 was interviewed by law enforcement in January 1999. W-12 informed the government that he was approached by Sam Carson. Carson told W-12 that if W-12 saw "that girl" around 37th Place (the street on which Gladden resided), to call him and let him know.    Specifically, Carson described exactly where Chrishauna Gladden resided.   Carson wanted W-12 to pass the message onto an individual named "Big Jim."   Carson made it clear that this was in reference to Jerome Martin Jr.'s trial.   W-12 then saw Martin in the D.C. Jail.   Martin told W-12 that he did not think "that girl" would make it to court but that Carson was taking too much time. Martin asked W-12 why W-12 did not take care of the girl.

B. Murder of Witness Phillip Clayborne

1.   On February 2, 1994, SOUTHWEST CREW associates Tyrone Briscoe and Aaron Miller shot and killed Kenneth Morgan and Leonard Shaw in the 1500 block of 2nd Street, SW over a drug dispute. Philip Clayborne was identified as a witness to the murders, and he cooperated with the detectives assigned the case.   Clayborne's cooperation led to the eventual arrest of Tyrone Briscoe and Aaron Miller for the double murder.

2.   On September 21, 1994, Philip Clayborne was shot and killed as he exited a carry-out in the 1200 block of South Capitol Street, SW, Washington, D.C.   Maurice Proctor, Kenneth Adams, a.k.a. "Little Wayne", and Tyrone Briscoe were later charged with

9

App 1256

Clayborne's murder. After further investigation, Kenneth Adams, Christopher Galloway and a juvenile each pleaded guilty to his role in the murder of Phillip Clayborne and agreed to cooperate with the government. Proctor and Briscoe were tried and convicted in D.C. Superior Court for the Clayborne murder. Although Briscoe was incarcerated at the time of Clayborne's murder, evidence introduced at the trial showed that he ordered the murder from the D.C. Jail by placing phone calls to Christopher Galloway, and that Clayborne was murdered because it was known that he was a witness against Briscoe and Miller for the February 2, 1994, double murder.

C. <u>Attempts To Kill Witness Kenneth Adams</u>

1. Subsequent to his plea of guilty and his agreement to cooperate with the government in the investigation and prosection of the February 2, 1994, double homicide, Kenneth Adams was released from the D.C. Jail and he and his family were relocated by the FBI from the D.C. area for their safety. While the trial of Proctor and Briscoe for the murder of witness Phillip Clayborne was pending, attempts/plans were made to kill Adams.

2. Prior to the trial of Proctor and Briscoe for the murder of witness Phillip Clayborne, the government gained the cooperation of W-5, by way of a plea agreement. W-5 was a supplier of marijuana to the SOUTHWEST CREW, and he had very close ties to some of the members. Most significantly, W-5 is the uncle of William Sweeney, and the two maintained a close relationship. Through his cooperation, W-5 advised law enforcement that Sweeney and other members of the SOUTHWEST CREW were trying to kill "Little Wayne"

10

(Kenneth Adams) because he was to testify against "Poo-Poo" (Maurice Proctor) at an upcoming murder trial. Although Sweeney was never charged with Clayborne's murder, Adams told investigators that Sweeney assisted him and others in disposing of the murder weapon used against Clayborne. According to W-5, Sweeney had a contact within the police department or court system that could provide addresses of people for him. Sweeney used that contact to locate Adams, who had been relocated by the FBI for his safety. W-5 specifically told law enforcement that Sweeney had Adams' address in Centerville, VA, and they were waiting for the right time to kill him. Adams and his family were, in fact, living in Centerville, VA.

3. As part of his cooperation, W-1 informed law enforcement that he accompanied Carson on several occasions to a townhouse in Centerville, VA, where they surveilled Adams. According to W-1, their plan was to learn Adams' habits and schedule, so that they could kill him at the most opportune time. In addition to Carson and W-1 watching Adams, Sweeney and Sean Coates also accompanied them to the Centerville, VA residence on several occasions. Sweeney even went as far as secreting a handgun in a wooded area near Adams' home so that he would not have to travel with it and risk getting caught by the police.

D. **Assault With Intent to Murder of Suspected Government Informant James Coulter**

1. On May 30, 1995, James Coulter, a.k.a. Creeko, was shot several times while in Southeast Washington, D.C. Coulter survived the shooting and was placed in protective custody within the D.C.

11

App 1258

General Hospital.

2.   While Coulter was hospitalized, Vincent Hill spoke to law enforcement officers in the 200 block of K Street, SW, Washington, D.C.   Hill made reference to Coulter as being an informant and mentioned the exact room in which Coulter was being kept at the D.C. General Hospital and the fact that he was in protective custody.   Hill went on to say that Coulter deserved what he got.

    E.   <u>Current and Recent Efforts to Influence Testimony or Eliminate Witness by Members of the Southwest Crew</u>

<u>Murder of Government Witness Robert Smith</u>

1.   On June 16, 1997, Robert Smith (W-5) was shot and killed while in the 1300 block of Half Street, SW, Washington, D.C. Investigation of that murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith.   As noted above, Smith had entered into a cooperation agreement with the government, and he was to provide testimony against Sweeney in more than a half dozen murders, to include a triple murder in Prince Georges County, MD. Investigation has shown that Sweeney theorized that Smith was cooperating with the government, so Sweeney had him killed.

2.   On April 20, 1997 Sweeney was arrested for the above mentioned triple murder.   Subsequent to Sweeney'S arrest for that triple murder, Carson spoke to W-1 about having Smith killed because he was "telling" on Sweeney. On several occasions, Carson telephonically contacted W-1, asking if Smith was in the area so that Carson could kill, or have him killed.

12

3.  One day, W-1 and Carson were driving on Half Street, S.W., and saw Smith in the block. W-1 and Carson went to Carson's house where Carson put on a hooded sweatshirt and got a handgun. W-1 and Carson drove to the area of the 1400 block of South Capitol Street where W-1 parked and waited while Carson walked through an alley toward where they had seen Smith. The plan was for Carson to kill Smith and run to the car. Carson was unsuccessful in locating Smith on that occasion.

4.  W-7 is an individual who, on March 6, 1998, pled guilty to a firearms violation in U.S. District Court, District of Columbia and agreed to cooperate with the Government in the investigation of the SOUTHWEST CREW. W-7 was told by William Sweeney's father, that he and his son had Smith killed because he was testifying against the younger Sweeney in the triple murder. The elder Sweeney went on to explain to W-7 how they came to realize that Smith was cooperating with the Government.

5.  Subsequent to W-7's arrest for a firearms violation on December 20, 1997, he was approached by the elder Sweeney, who was acting at the behest of his son, and was asked to testify on behalf of the younger Sweeney at the triple murder trial. The elder Sweeney went on to explain to W-7 that if he would agree to give perjurious testimony, "they" would have a crack addict come forward and accept responsibility for the handgun with which W-7 was arrested. Subsequent to that meeting, an investigator for the younger Sweeney visited W-7 and fabricated the fictitious testimony.

13

Threats Against Suspected Government Witness James Montgomery

6.   On September 10, 1991, Martin, W-1, Carson, and several
others attempted to do a drive-by shooting on members of a rival
drug organization near the area of 60th and Blaine Streets, NE,
Washington, D.C.  W-1 drove Martin to the area on a motorcycle,
while the rest of the group went in a mini-van which was purchased
by Martin and placed in his name.   When the group reached the
targeted area and began to shoot at several individuals, the police
happened upon the scene, and Martin began to shoot at them.   The
police returned fire, but no one was hit by either the police
officers or the group led by Martin.

7.   On September 9, 1997, based on information provided by W-1
and other corroborating evidence,  Martin was charged for his role
in that shooting, and detained at D.C. Jail pending trial.   Upon
his  arrest  for  this  offense,  Martin  commented  to  the  law
enforcement personnel that it must be James Montgomery who is
"telling" on him.   Since that time, Martin and Carson have made
comments to others regarding retaliation against Montgomery.

8.   Martin told W-3 that "James" is telling on "Sam", and
Martin is going to kill James if he sees him on the street.  Carson
commented to W-3 that he is upset by Montgomery "telling" on him
because he treated Montgomery like a son.  Carson then said that he
is going to kill Montgomery or have Raymond Washington,[4] another
known SOUTHWEST CREW member and close associate of Carson, kill

---

[4]   Raymond Washington was charged in the superseding
indictment as a participant in the crimes of violence and drug
activity.   An arrest warrant remains outstanding for Washington.

14

him. When W-3 and Martin were incarcerated together for the second time, W-3 was told by Martin that "Creeko" is telling on Martin.

9.    In July, 1998, W-6, a citizen of Southwest, Washington, D.C., was interviewed regarding another murder committed by the SOUTHWEST CREW, and during that interview, W-6 advised that "it" has heard from Raymond Washington and others that James Montgomery is cooperating with the FBI against members of the SOUTHWEST CREW, and people are trying to kill him because of it.  Washington told W-6 that Montgomery is being hidden by the FBI in Florida.  W-6 further advised that "it" has heard that there is a contract out on Montgomery.

### Efforts to Intimidate and Influence Witness Against Jerome Martin, Jr. in the Shooting of Government Witness James Coulter

10.    On April 9, 1998, based on identifications made by James Coulter and two other witnesses, Martin was charged with the May, 30, 1995 shooting of suspected government informant Coul r.  Since being charged with that crime, Martin has consistently attempted to threaten and intimidate witnesses and to obstruct justice by coercing others to perjure themselves for him at trial.

11.    On several occasions in or about June, 1998, Coulter was approached by Martin's wife, Lorraine Knight, a.k.a. "LA-LA", who was upset with Coulter because she believed he was to testify against Martin.  Knight told Coulter that he was the only reason that Martin was incarcerated, and Coulter should make a statement to Martin's investigator, stating it was not Martin who shot him.

12.    Also in or about June, 1998, Coulter was approached by

15

Michael Floyd, who witnessed Coulter's shooting. Floyd told Coulter that he had spoken to Martin on the telephone (from jail), and that Martin wanted Floyd to testify that it was not Martin who shot Coulter. When Floyd told Martin that he did not want to get involved in the matter, Floyd said Martin threatened him.

13.  In the week of July 20, 1998, Coulter was approached by Paul LeJohn Franklin and another male who is unknown to Coulter regarding Coulter's possible testimony against Martin. Franklin suggested to Coulter that it would be a mistake for him to testify against Martin, and he urged Coulter to visit Martin at the D.C. Jail to further discuss the matter, or to make a written statement to Martin's investigator, saying it was not Martin who shot him.

14.  The day after Coulter was approached by Franklin, he was again confronted by Lorraine Knight. Knight again expressed her concerns that Coulter was going to testify against Martin, making statements to the effect that she needed Martin home to help take care of her child.

15.  In the first week of August, 1998, law enforcement conducted an "off the record" debriefing with an individual who is currently incarcerated at the D.C. Jail. This person (hereafter referred to as W-10) knows Martin, Michael Floyd and Coulter. On several occasions, the most recent being in or about the beginning of August of 1998, Martin spoke to W-10 about the shooting of Coulter. Martin admitted having committed the shooting and described his attempts to have Michael Floyd testify on his behalf at the trial. According to what Martin told W-10, Martin recently

16

contacted Lorraine Knight by telephone (from the jail) and had her bring Michael Floyd to the phone. When Floyd was on the phone, Martin explained to him that he wanted Floyd to testify on his behalf, saying it was not Martin who shot Coulter. Martin told W-10 that when Floyd expressed his disinterest in doing that for Martin, Martin became very upset, and began to verbally assault Floyd. Floyd then hung up the telephone on Martin. Martin then explained to W-10 that Floyd owes him that favor because when Martin tried to shoot Coulter, Coulter, along with many others who were near him, to include Floyd, ran. While running, Floyd physically got in the way of Martin shooting Coulter. Rather than shoot Floyd, who was between Martin and Coulter, Martin waited for him to get out of the way, thus preventing Martin from killing Coulter. According to Martin, Floyd should falsely testify for him at trial because he did not also shoot him that evening.

16. Martin told W-10 that an individual nicknamed "Uddie" was present when he shot Coulter, and Martin has convinced Uddie to testify that it was not Martin who committed the crime. In order to contact Uddie, Martin told W-10 that he called one of his associates in the Southwest area (from the jail), and he had that person bring Uddie, who was involved in a crap game in the neighborhood, to the telephone. Martin then discussed his plan with Uddie who agreed to go along with it.

17. In addition, W-11 visited Martin at the D.C. Jail and spoke with him regarding the shooting of Coulter. Martin told W-11 that he was trying to get Michael Floyd to testify on his behalf

17

and to say that he was present when Coulter was shot, and that it was not Martin who shot him. Martin told W-11 that Floyd would not testify for him, and that Floyd hung up the telephone on Martin when he spoke to Floyd about it. Martin was very upset that Floyd would not testify for him, and Martin asked W-11 to kill Floyd. When W-11 refused, Martin told him that Martin has a cousin named "Dino" who had just been released from prison, and Martin wanted W-11 to point out Floyd to Dino so that Dino could kill him.

Recent Efforts by Jerome Martin, Jr. to Contact Witnesses

18.    W-11 stated that he called a woman named Katrice Haines at her grandmother's house in the 200 block of K Street, S.W., and she brought Scotland Tolbert (aka "Fat Scotty") to the telephone. Tolbert told W-11 to tell Vincent Hill that he had been trying to "tail the joker" but that the police were following him.    W-11 said that Tolbert was supposed to be responsible for killing witnesses for Hill and the others, but members of the SOUTHWEST CREW were getting upset with Tolbert because he was not carrying out the killings.

19.    After the original indictment was returned, when the co-defendants were incarcerated at the D.C. Jail, Hill told W-11, along with the other co-defendants in the case that since they could not locate a former co-defendant named Paul Franklin (aka "Dirty Meat"), that they should try to kill one of Franklin's family members in order to send a message about cooperating with the government.

18

<u>Recent Evidence Seized From Carson's Cell Regarding Witness
Identities</u>

20.   On February 19, 1999, members of the Department of
Corrections conducted a search of the cell in which defendant
Carson was housed.  Subsequent to the recovery of these items by
jail administrators, the FBI secured a search warrant in order to
review  the items which were seized.  Included among the items
seized was a three-page list of witness names (attached as Appendix
A).  The list makes reference to a number of individuals who are
potential witnesses in this case.  In addition, the list makes
mention of locating the family members of potential witnesses.

II.  <u>The Means to Conspire to Intimidate and Contact Witnesses</u>

     A.   <u>The Cellphone</u>

     1.   In addition to the above-described list of witnesses and
family members, when officials entered Carson's cell, they found
him talking on a cellular telephone that had been illegally
smuggled into the institution.[5]  Investigation into this matter has
revealed that Sweeney contacted a woman named Ashia Malvin and
asked her to arrange for a defense investigator to bring a cellular
telephone to him in the jail.  W-11 told law enforcement that the
investigator was paid by defendant Sweeney to bring the cellular
telephone to the jail.  W-11 indicated that cellular telephone was
shared between Sweeney and Carson.  In addition, the other

---

[5]   The telephone was activated on December 12, 1998.  While
a thorough investigation into the telephone records is not
complete, the government does know that the telephone has been
used regularly.  Specifically, during one seven-day period, 350
telephone calls were made using the cellular telephone.

incarcerated co-defendants were aware of the existence of the
cellular telephone in the jail. W-11 indicated that Sweeney would
be able to make arrangements for additional cellular telephones to
be brought into the jail for the other co-defendants.

B.  Separation between Defendants

1.  In addition, a separation request was placed between
defendants Carson and Martin. Notwithstanding this, these two men
have had several conversations together. W-11 informed law
enforcement that during these conversations, which also included
the other above-named codefendants, the defendants discussed
efforts to contact and intimidate witnesses.

III.  The Plan to Escape

1.  In February 1999, a reliable confidential informant who is
presently incarcerated at the D.C. Jail and who has provided
reliable information to law enforcement on countless occasions,
told law enforcement that it had a conversation with Maurice
Proctor while the two were incarcerated at the D.C. Jail. During
that conversation, Proctor told the informant that Proctor, Hill,
and "the Southwest guys" were planning an escape from the jail.
Proctor stated that "they" know that "they" were looking at life
and that "they" would not take it.

20

App 1267

IV.   Conclusion

Given the conduct in which the defendants have engaged, and the threat to the safety of others at the D.C. Jail, along with the numerous government witnesses, it is clear the transfer of the above-named defendants by the U.S. Marshal Service was necessary.

Respectfully submitted,

WILMA A. LEWIS
United States Attorney

Kenneth L. Wainstein
Assistant United States Attorney

Peter R. Zeidenberg
Assistant United States Attorney

Anjali Chaturvedi
Assistant United States Attorney

21



# 7

## Murder of Keith Johnson

Keith owed debt $50,000 to Gooch.
Gooch employed Dirgo to kill Keith Johnson = "Whitey"
    Keith = Fat Petey Johnson's brother
Gooch owns J&G Restaurant at 12ᵗʰ + Pennsylvania, SE
  (Right next to Potomac Gardens)

Wit. used to do little jobs - shaking people down
    for money + other people — for Gooch.
        Wit + Dirgo used to work for Gooch.
Wit. met Gooch thru Wayne Perry.

Wit. heard Gooch telling Dirgo to kill Keith.
Wit. did not hear Dirgo return to advise
Gooch he killed Keith. He just heard Gooch
    give the order.


The word is that Fat Petey started
messing w/ Bitchie + killed Bitchie to get
back at Dirgo ⟹ mere rumor.

App. 68



# EXHIBIT

# 8

## AFFIDAVIT OF WILLIAM KYLES SWEENEY

My name is William Kyles Sweeney. I am over eighteen (18) years of age, competent to testify and I make this affidavit having personal knowledge of the following facts, pursuant to penalty of perjury, 28 U.S.C § 1746:

  1. Through my entire life from birth to this present day, I have never met or spoken to any individuals by the name of Andre Chappell, and/or Anthony Ricardo Hawkins.

  2. I do not know either of the foregoing individuals, not familiar with these individuals or do I know any one to the best of my knowledge who is familiar or friends with these individuals.

I confirm that the foregoing is true and correct to the best of my knowledge, pursuant to the penalty of perjury, 28 U.S.C.§ 1746.

28 U.S.C. § 1746
Respectfully Submitted

Dated: March 15, 2014

/s/: _William Sweeney_
William Sweeney 06069-007
U.S.P. Lee
P.O. Box 305
Jonesville, VA 24263

1 of 1



# 9



, 1994 Chip Borrowes
Grey Cadillac
Said he ; Poo-Poo killed
Tim- Tim in it
Tim owes Poo-Poo $
Chip was driving
Poo-Poo shot Tim from
Behind, he just Sat
there like he was Dazed

Cadillac - Raymond knocked
out Jelani - Jelani shot
At the car - tonight Raymond
was driving it. Boo was
driving

Title was in Rojay's
name

Chir realized he was fucked
up. They pushed him out
of the car. Chir was
driving away & saw Tim
moving on the road so
he drove back & they
shot him again.

Chir said they wiped the
car down but said
don't drive it down
again



# 10

12/22/97

Murray   B1   Eddie O'Connell

Darnell Camp told wit that he killed

Donald "Junkie Boy" Banks had some New Yorkers kill "Slick" + "Maurice" over in Delaware Ave. – back in 1991 or 1992

Banks lived at Delaware & L St at the time.
Banks had them killed over some cocaine.

At the time, Darnell was living w/ wit's 'friend' at 44 O street ("the other side")

Donald Banks was a professional singer in DC.

One day, Darnell came running in and said "Somebody is fucking with me."
He got something & ran back out the door.
Next thing wit knew that Darnell stabbed Junkie Boy.
Junkie Boy was stabbed in 1500 block of First Street – on Roland Smith's steps

Darnell came back to the house w/ blood on his hand.
Darnell: "Man, I had to stab Junkie Boy."
wit: "Why?"
Darnell: "Junkie Boy is the one who had my people killed."
Darnell is Maurice's nephew

Mike Fulton – Mike knows re: that murder and told wit re: murder

USCA Case #21-3072 Document #2077668 Filed: 10/01/2024 Page 243 of 422

IJA 4692

# EXHIBIT

# 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES        :
                     :        98-cr-329-4
V.                   :
                     :
WILLIAM SWEENEY      :
_____ :

AFFIDAVIT OF DR. JONATHAN PINCUS

1.    My name is Jonathan Pincus and I am a neurologist who was retained by trial
counsel Steven Kiersh to examine William Sweeney which I did on December 10, 1999.

2.    Throughout my career, I have been accepted and testified as an expert in
neurology in state and federal courts.

3.    In 2008 I was contacted by habeas counsel.

4.    I am currently unable to locate my file, which contains my notes, for this
examination but I am continuing to try and locate this file. I was able to determine the exact
date of the interview of Mr. Sweeney from my bill.

5.    I recall clinically assessing William Sweeney and reviewing his available
medical records. I recall that he had Tourette Syndrome.

6.    If called to testify, I would have explained Tourette Syndrome to the jury as well
as the individual characteristics of Tourette Syndrome in Mr. Sweeney's case.

7.    I would have opined that Mr. Sweeney's tic symptoms during trial would
typically be less than those displayed by him five to ten years prior.

8.   I would have opined that typically, the tic symptoms displayed by Mr. Sweeney during a moderately low stress event such as a trial would be less than those displayed by him during a high stress event, such as a violent incident.

PURSUANT TO 28 U.S.C. § 1746, I SWEAR THAT I AM THE PERSON REFERRED TO ABOVE AND I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON 02/17/2008 · · · SIGNATURE _____

DR. JONATHAN PINCUS

# EXHIBIT

# 12

LAW OFFICES
# FISHER & HANSEN, P.C.

**RECEIVED**

SUITE 201
419 SEVENTH STREET, N.W.
WASHINGTON, D.C. 20004

JAN – 3 2000

GERALD I. FISHER*+
CURT S. HANSEN*+
KRISTIN RING

(202) 638-6700
FAX (202) 638-4279

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

STEPHEN B. BRIGHT
OF COUNSEL

December 28, 1999

*ALSO ADMITTED IN MARYLAND
+ALSO ADMITTED IN VIRGINIA

The Honorable Thomas Penfield Jackson
United States District Judge
United States District Court for
  the District of Columbia
3rd Street and Constitution Avenue, N.W.
Washington, D.C. 20001

RE:    *United States v. William Sweeney*
       *United States v. Samuel Carson*
       Case No. CR-98-329 (TPJ)

Dear Judge Jackson:

At your request, I am writing on behalf of myself, Joseph Beshouri, Steve Kiersh, and Paul DeWolfe to provide the reasons in support of our motions for authorization for two attorneys for each of our clients, Samuel Carson and William Sweeney, in the above-captioned case. Our oral motions were made at the status hearing held on December 16, 1999, after the government announced that Attorney General Reno had declined to authorize this case as a capital prosecution. In light of that decision, you indicated that you were required to relieve Mr. Carson, Mr. Sweeney, and the other two capital eligible clients of the services of their death penalty counsel. In response, we informed you that our understanding is you have the discretion to appoint two counsel and that it was our strong belief that the complexities and practicalities of this case merit that result.

There are several reasons why two counsel are appropriate for each of these defendants. We will discuss each reason in turn.

1.    **This is an exceptionally complex and far reaching indictment.**

The indictment alleges that Mr. Carson, Mr. Sweeney, and the remaining defendants participated in a major narcotics conspiracy which operated for more than ten years. Mr. Carson and Mr. Sweeney are each charged with multiple murders, conspiracies to commit murder, and other violent crimes. Specifically, the indictment charges both Mr. Carson and Mr. Sweeney with:

Page 2

     a)    A 1996 conspiracy to kill Kenneth Adams (with co-defendants Coates and Proctor).

     b)    A November 1997 murder of three individuals in Prince George's County, Maryland (with co-defendant Coates and an unindicted co-conspirator).

     c)    A 1997 conspiracy to kill Robert "Butchie" Smith.

The indictment also alleges that Mr. Sweeney, with persons other than Mr. Carson, committed the following violent crimes:

     a)    The 1992 shootings of Jermaine Hall and Michael Jones in the Kentucky Courts neighborhood of D.C. (with co-defendants Jones and Edwards).

     b)    The July 7, 1993 murder of Glen Jenkins (with co-defendant Coates).

     c)    The September 1993 shootings of several individuals in the Condon Terrace neighborhood (with co-defendant Coates).

     d)    The 1993 attempted kidnaping and attempted murder of Anthony Pryor (with co-defendants Coates and Vincent Hill).

     e)    The September 1994 murder of Darnell Whitfield (with co-defendant Jones).

Additionally, the indictment alleges that Mr. Carson committed the following murders and other acts of violence by himself or with persons other than Mr. Sweeney:

     a)    The December 1989 murder of Maurice Hallman and Leonard Hyson.

     b)    The March 1991 murder of Teresa Thomas and Terita Lucas.

     c)    The August 1991 murder of Anthony Fortune (with co-defendant Martin).

     d)    The September 10,1991 assault with intent to kill Jimmy Thomas, Jr. and four D.C. police officers (with co-defendant Martin).

     e)    The April 7, 1992 assault with intent to kill Prince George's County police officer Alfred Moss (with co-defendant Proctor and an unindicted co-conspirator).

     f)    The October 28, 1993 assault with intent to kill Ronald Brown (with an un-indicted co-conspirator).

     g)    The June 26, 1994 assault with intent to kill Ulysses English.

     h)    The August 30, 1996 assault with intent to kill Popa Mark Phillip.

     i)    An October 1996 conspiracy to murder witnesses to a murder allegedly committed by co-defendant Martin (with co-defendants Martin, Coates and an un-indicted co-conspirator).

     j)    The October 30, 1996 assault with intent to kill Ronald Sowells (with co-defendant Coates).

Any one of these charges would require the services of an experienced criminal lawyer, and were each of these charges tried separately, there would be a separate appointment of counsel for Mr. Sweeney and Mr. Carson for each of the different offenses. That the charges are joined in one indictment does not make any single incident or charge any less complicated. Nor are the possible consequences any less severe, for not only will Mr. Sweeney and Mr. Carson receive

Page 3

sentences of life without possibility of parole if they are convicted of the narcotics conspiracy, but they will receive the same sentence if convicted of any one of the homicides and many of the other charges.

    2.    **Removal of capital counsel will not result in significant cost savings.**

    Dismissal of the capital attorneys is not likely to result in significant cost savings. Because there are so many serious charges over such a long period of time, to this point each defendant's counsel have divided the tasks of investigation, legal research, and legal writing between them. If only one attorney per defendant is permitted to remain in the case, he will have to spend a considerable amount of time familiarizing himself with the facts and issues previously assigned to his co-counsel. As we informed you at the status hearing, the death penalty counsel for Mr. Sweeney and Mr. Carson respectively, Paul DeWolfe and myself, are willing to remain in the case at the reduced rate of $75.00 per hour (as opposed to the rate of $125.00 for capital cases). Though the overall cost of having two attorneys may be greater if each defendant is represented by one attorney rather than two, because of the added work the remaining attorney will have to perform to be on top of the entire case, that saving will not be substantial.

    3.    **District courts are empowered to appoint co-counsel in extremely difficult cases such as this one**

    The statute by which Mr. DeWolfe and I were originally appointed is Title 18, Section 3005 of the United States Code, which provides:

> Whoever is indicted for treason or other capital crimes shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly upon the defendant's request assign two (2) such counsel, of whom at least one (1) shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization.

Nowhere in the statute does it mandate that "learned" counsel be removed if the Attorney General chooses not to pursue the death penalty for the qualifying acts alleged in the indictment.

    The statute governing appointment of counsel in federal criminal cases generally, 18 U.S.C. § 3006A, requires that each United States district court employ a plan for furnishing "adequate representation" for indigent defendants, which includes not only provision of counsel, but other necessary services. Recognizing that some cases may be far more involved that others, the statute permits the waiver of the presumptive payment limits for representation in cases of "extended or complex representation," 18 U.S.C. § 3006A(d)(3), a determination you have already made in this case. The federal courts have interpreted this statute to allow for the appointment of co-counsel in "an extremely difficult case where the court finds it in the interest of

Page 4

justice . . . ." Vol. 7, Guide to Judicial Policies & Procedures, "Appointment of Counsel in
Criminal Cases" (1997 ed.) Part. B, §2.11B at p. 9. Regardless whether the case is deemed
"extended or complex" or "extremely difficult," the manual allows for compensation at the
prevailing rate for work performed by partners and associates of appointed counsel, and, with
prior approval of the court, work performed by outside counsel. *Id.* at Part B, § 2.11A. Thus, as
a general policy, the federal courts explicit sanction work by more than one attorney on behalf of
a single defendant.

   Although I cannot speak to the general practice of this court, in another case in which I
am involved, the presiding judge, the Honorable Emmitt Sullivan, allowed "learned counsel" for
both defendants to remain in the case – at the reduced rate of $75.00 per hour – after the
Attorney General declined to pursue the death penalty. *United States v. Oliver Campbell and
Kevin Gordon,* CR-97- 294 (EGS). That case, too, was deemed by the court to be "complex."
though it was far less involved than the cases of Mr. Carson and Mr. Sweeney, there being only
one homicide arising from one criminal incident which occurred over a two-hour time period.
Because this case charges so many more homicide and other violent offenses occurring over such
a long time period, and because of the many and varied legal issues which are likely to arise, it
would be appropriate for this court to deem this "an extremely difficult case where . . . in the
interest of justice" the appointment of two attorneys is merited.

   For all these reasons, therefore, we request that you authorize two attorneys to represent
Mr. Carson and Mr. Sweeney and that you continue to permit me and Mr. DeWolfe to remain in
the case.

                         Sincerely,

*Gerald I. Fisher*                        *Steven R. Kiersh/GF*

Gerald I. Fisher                           Steven R. Kiersh
Joseph E. Beshouri                         Paul DeWolfe

Counsel for Samuel Carson                  Counsel for William Sweeney


cc:    A.J. Kramer
       Federal Public Defender

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **Case Nos.  98-329-2 (RCL)** |
| | : | **98-329-3 (RCL)** |
| **JEROME MARTIN, JR., SAMUEL** | : | **98-329-4 (RCL)** |
| **CARSON, WILLIAM KYLE** | : | **98-329-6 (RCL)** |
| **SWEENEY & SEAN COATES** | : | |
| **Defendant** | : | |

**UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE MEMORANDUM
IN SUPPORT OF DEFENDANTS' MOTION TO VACATE SENTENCE**

Comes now the Defendants, by and through counsel, Michael E. Lawlor,

Lawlor & Englert, LLC, and files this Motion for Extension of Time to File a

Memorandum in Support of Defendant's Motion to Vacate Sentence. In support, Mr.

Martin states as follows.

1.   Mr. Martin, Mr. Carson, Mr. Sweeney and Mr. Coates, timely filed Motions

to Vacate Sentence, pursuant to 28 U.S.C. §2255.

2.   Counsel were appointed by this Court to represent the Defendants in their

§2255 proceedings.

3.   This Court previously ordered that Mr. Martin, along with co-defendants

Coates, Sweeney, and Carson, file a Memorandum in Support of their Motions by

February 25, 2015.

4.   Undersigned counsel was appointed to a potential capital case in the

District of Maryland (*U.S. v. Robin Smith*).  A meeting with U.S. Attorney's Office in

1

Maryland about the decision to seek the death penalty took place this week. Preparation for that meeting has consumed the bulk of counsel's time in recent weeks.

5.    Undersigned has made contact with counsel for Mr. Coates, Mr. Carson and Mr. Sweeney, as well as Margaret Chriss, counsel for the government.   Kira West, counsel for Mr. Carson, joins the request.  Ms. West has been in two lengthy trials in recent months:  *U.S. v. Johnson*, from December 19, 2014 until January 19, 2015; and *Lane v. District of Columbia*, from February 2, 2014 until February 12, 2015.  Mr. Kirchman, counsel for Mr. Sweeney joins the request as well.   Ms. Holt, counsel for Mr. Coates, does not object to the request.   Finally, Ms. Criss does not object to this Court granting the defendants an additional 45 days to file a Memorandum of Law in Support of Motion to Vacate Sentence.

6.    Given the above, the Defendants request that the Court grant them an additional 45 days to file a Memorandum of Law in Support of their §2255 Motions.

Respectfully submitted,

/s_____

Michael E. Lawlor
Lawlor & Englert, LLC
6304 Ivy Lane
Suite 608
Greenbelt, Maryland 20770
301.474.3404

2

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of February, 2015, a copy of the foregoing Motion for Extension of Time  was delivered to the following:

Margaret Chriss, Esquire
Office of the United States Attorney
555 Fourth Street, NW
Washington, DC 20530
Via ECF and Email

Counsel for Mr. Carson, Mr. Sweeney, and Mr. Coates
Via Email and ECF


/s_____
Michael E. Lawlor

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA §
§

V. § CASE NO. 1:98-CR-329-03 (RCL)
§
SAMUEL CARSON §

## Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. Section 2255

Mr. Samuel Carson, by and through undersigned counsel, respectfully moves this Honorable Court for relief from the sentence in this case imposed in violation of the Constitution and the laws of the United States. Mr. Carson, by and through is attorney, Kira Anne West, hereby submits this supplement to his 2255 motion for relief. Mr. Carson raises, in addition to his joinder of the claims made by his co defendants in their 2255 motions and supplements, in as much as they also apply to him, additional claims relating to fundamental violations of his Due Process rights under the United States Constitution.

## I. SUMMARY OF ARGUMENT

Mr. Carson (hereinafter "Carson") argues that through a pattern of abuses by the Government, he was denied his Constitutional Rights to Due Process and a fair trial. Additionally, Carson was denied the ability to confront and effectively cross-examine the Government's witnesses against him. Carson alleges that the Government engaged in a pattern of conduct designed to secure testimony at trial they knew or should have known was false and misleading. Furthermore, they paid benefits to witnesses in a manner designed to encourage them to improve their testimony. Carson also alleges that the Government improperly paid witnesses

1

for testimony knowing that the funds were not being used in the manner in which they were intended and often did not disclose this at trial. Carson further alleges that the Government deliberately withheld exculpatory materials and failed to turn them over in a timely manner so as to substantially prejudice his case. In some instances, *Brady* evidence was withheld until it was too late to use effectively. In other instances, Brady was withheld completely by *ex parte* and under seal submissions to the Trial Court, which the government used as a shield to evade their Constitutional duty to turn over exculpatory evidence.

Carson also argues that the failure of the Government to adequately secure, retain and make available to him the government's trial exhibits, exhibit list from trial, and a full accounting of the *Brady* and *Giglio* materials turned over at trial, has prejudiced his Constitutional Rights with regard to his ability to support certain claims in this 2255 motion. Moreover, there is no way, at this point in time, for Carson to examine the trial exhibits in support of his claims because the Government cannot locate them or their exhibit list. There is also no comprehensive list of the *Brady/Giglio* disclosures made by the government and no comprehensive list of *the in camera* materials reviewed by the Court for *Brady* material prior to and during trial. Carson's counsel is left to deduce, in many instances, that the things he challenges as *Brady* were, in fact, not turned over. The Government's continued inability to proffer such materials requested by Carson prejudices his ability to assert his claims under the Constitution.

Carson additionally argues that his trial and appellate counsel were ineffective in their representation. Carson alleges that his trial counsel was aware of their own ineffective assistance but failed to withdraw as counsel or request permission from the Court do so. They continued to represent Carson after they determined that they could no longer be effective in their representation. Such belief was based on a perceived judicial bias that rendered them ineffective

2

in their ability to represent Carson.   By choosing to protect their personal interests and avoid

judicial sanctions and backlash, the trial counsel for Carson made decisions that prejudiced

Carson's case, not for strategic purposes, but merely to avoid conflict with the Judge and

sanctions.   Their improperly placed notion that the judicial bias of the Trial Court was

insurmountable led to their failure to pursue cross-examination on bias issues, preserve issues for

appeal and make requests to recall crucial witnesses.

II.  PROCEEDINGS BELOW

In support of this motion, Carson proffers the following:

1.   This motion is based upon all the files, records and proceedings of this case, as well as

activity and inactivity outside of the record, and any such other materials as may be

subsequently submitted. [1]

2.   On September 18, 1998, Carson and his co-defendants were charged by indictment with

conspiracy to possess with intent to distribute and distribution of controlled substances,

conspiracy to participate in a racketeering influenced and corrupt organization ("RICO")

and various other substantial counts.

3.   On March 25, 1999, Carson was charged in a 101 count superseding indictment.[2]

---

[1] This brief is a supplement to the previous 2255 filed by Carson *pro se*.  It also adopts the claims
raised by Carson's co-defendants in this case in their 2255 petitions and supplemental petitions.
[2] These charges included violations of:  21 U.S.C. 846, Conspiracy to PWID; 18 USC § 1962(d)
& 1963(a), RICO conspiracy; 18 U.S.C. § 1959(a)(1), murder in aid of racketeering activity of
Chrishuahna Gladden, Alonzo Gaskins & Darnell Mack & Melody Anderson; 18 U.S.C. 2,
Aiding and Abetting; 18 U.S.C. § 924(c)(1)(A)(i), use of a firearm during and in relation to a
crime of violence or a drug trafficking crime; 22 D.C. Code § 2401& § 3202 of First Degree
Murders while armed of Maurice Hallman, Leonard Hyson, Teresa Thomas, Terita Lucas,
Anthony Fortune,  & Chrishauna Gladden; 22 D.C. Code § 501 & § 3202 , Assault with intent to
kill while armed; 22 D.C. Code 2101 & 3202, kidnapping while armed; & 22 D.C. Code
§3204(b), possession of a firearm during a crime of violence.

3

4. Carson went to trial with William Sweeney, Vincent Hill, Jerome Martin, Sean Coates and Gary Price.

5. The defendants were charged with a large-scale conspiracy. As part of this conspiracy it was alleged that Carson participated in various acts of violence in furtherance of the conspiracy.

6. On August 15, 2001, after seven months of trial, Carson was found guilty of all counts.

7. On January 31, 2002, Carson was sentenced to successive terms of life imprisonment without the possibility of supervised release or parole due to the then-mandatory Guidelines (*See* Dkt. #907). He filed a notice of appeal on this same date.

8. The United States Court of Appeals for the District of Columbia Circuit affirmed Carson's convictions. *United States v. Carson et al*, 455 F. 3d 336 (D. C. Cir. 2006), *petition for reh'g and reh'g en banc denied*, 2006 U. S. App. LEXIS 26335 (D.C. Cir., Oct. 23, 2006).

9. On Feb. 20, 2007, the Supreme Court denied Carson's petition for writ of certiorari. *Carson et al v. United States*, 127 S. Ct. 1351 (2007).

10. Carson timely filed his original Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 USC. 2255. This is his supplement to that motion.

11. At all times pursuant to the appeal of this case and in accordance with the Local Rules 56.2(b) and (c) of this Court, the original trial exhibits were in the custody and control of the U.S. Attorney for the District of Columbia and were to be preserved by that office until final disposition of the case.[3] LCrR 56.2 (b) and (c).

---

[3] The defense counsel's copy of the trial record was delivered to appellate counsel years after the case was tried. Unfortunately, due to no error on the part of appellate counsel, the storage facility that kept approximately 45 boxes of notes and evidence was inadvertently bulldozed by the company that stored the records. There are now only 10 boxes remaining that are in the possession of undersigned counsel.

4

III. POST APPEAL STATURE

12. In February, 2008, Sweeney's defense counsel discovered several sealed documents submitted to the Court during trial for *in camera* review of *Brady* material. Pursuant to a Court order, these documents were unsealed as to Sweeney. Subsequently, the documents were unsealed as to Carson and other co-defendants by this Court.

13. Section 2255 of Title 18 permits a prisoner in custody under sentence of a federal court to move the court to vacate, set aside or correct an erroneous sentence. The Supreme Court has read the statute to provide four grounds on which relief may be sought: (1) the sentence was imposed in violation of the Constitution or the laws of the United States, (2) the court was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is "otherwise subject to collateral attack." *Hill v. United States*, 368 U. S. 424, 428 (1962).

A. Underlying facts at trial

This prosecution was part of the D.C. government's push to prosecute and rid the city of drug traffickers and the homicides that often followed in the wake of drug trafficking. The government's theory was that Carson, along with several friends, engaged in large scale RICO drug distribution and killing. As in most drug cases, the evidence against Carson was in large part derived from testimony of cooperating co-defendants, namely James Montgomery, a cooperator whose lobotomy severely affected his memory and the un-cross-examined testimony of Robert Butchie Smith, a cooperator who was shot down in the streets, allegedly for being a snitch. Of course, most witnesses that testified at trial against Carson were either profiting from a

---

5

App 1293

forthcoming 5K or Rule 35 or substantial monetary payments for "security" or "moving expenses." When this testimony is viewed through the looking glass of truth, the picture becomes quite hazy. In February, 2008, sealed documents that the Government submitted *in camera* and *ex parte* were discovered and unsealed. Herein lies Carson's claim that his trial was so infected by the improper withholding of exculpatory materials and the prosecution's deliberate hiding of such evidence that his conviction cannot stand. Because of this pervasive misconduct, Carson did not get a fair trial. There is a reasonable probability that the outcome of the proceedings would have been different if the defense counsel in this case had been supplied the *Brady* material in a timely manner for use on cross examining the weak and highly biased testimony of their star paid witnesses. As a result, Caron's conviction should be set aside.

IV. CONSTITUTIONAL VIOLATIONS: <u>BRADY ISSUES: 5TH AMDT. DUE PROCESS & 6TH AMDT. CONFRONTATION CLAIMS</u>

A. <u>Background</u>

1. <u>Facts</u>

Throughout the trial and during pretrial proceedings, several of the defendants, including Carson, repeatedly asked the government to turn over all exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).[4]  (Tr. 6/16/2000 p. 5-13) (defense counsel asking for *Brady* material on triple murder); (Tr. 9/27/00 p. 78-80) (Carson's counsel asking for *Brady* on Anthony Fortune murder); *Id.* at 200-203. *See* Carson's supplemental motion to compel, Dkt #342 ; Sweeney's Third Motion to Compel Discovery, Dkt #340.   The government stated pretrial that it had complied with all of its discovery obligations. (Tr. 9/27/00 p. 130: 17-20).   However, at trial, it was clear the government had not adequately searched its files for potential *Brady* material. As

---

[4] *See also*, 1/30/01 PM 4 (defense counsel Zucker *Brady* request for notes of Mayrant murder); 2/1/01 PM 63 (defense request for AUSA notes of Andre Murray). At times, the request for *Jencks* was in reality a request for *Brady* information and only came to light after a witness testified. *Id.* at 5.

6

a result, defense counsel were left to request the documents in session or when the issue arose. This put the defense at a considerable disadvantage. The Government, rather than turn these items over once it was clear that they contained *Brady*, submitted them to the court to review *ex parte* and *in camera. See* Ex. 1. (The Court made an exhibit list and added to it throughout the course of the trial). These sealed materials were kept from the defense and no findings of fact and conclusions of law were ever made by the trial judge regarding his *Brady* rulings. Not surprisingly, based upon the one sided proffer by the government, none of the documents were determined to contain *Brady* material. There was simply an oral ruling that the items did not contain *Brady* material and the defense was shut out of the process. The Court mistakenly believed that it could not order *Brady* to be turned over and misapplied the Brady standard to this inquiry. The Court stated so during a pretrial hearing "I can't order Brady material turned over, and Brady material is that which is reasonably likely to be, quote, exculpatory, close quote." (Tr. 6/16/2000 p.23-24). This systematic withholding throughout the trial is documented in part on the Court's exhibit list. *Id.*

Long after the appeal of the convictions in 2005, one of the lawyers appointed by the Court to write the 2255 found several exhibits that were put under seal during the trial. A review of these exhibits shows that the government had within its possession, before and during the trial of the case, a great deal of *Brady* material that should have been turned over to the defense. The following discussion of some of these exhibits show how important these materials would have been at the trial.[5]

---

[5] The following is a list of the exhibits that were placed under seal during trial and discovered by 2255 counsel in 2008. Some are included in the attached Exhibits 1-11, but not in the following order: (1. Andre Murray letters to AUSA Wainstein (heavily redacted); 2. Andre Murray notes; 3. Robert Butchie Smith 302; 4. Court exhibit 2 - AUSA Notes on Switzer; 5. Court exhibit 4, AUSA notes on Andre Murray; 6. Court exhibit 5, Theodore Watson file; 7. Court exhibit 8-

7

2. <u>The Law</u>

The *Brady* rule is a rule of disclosure, not admissibility. The Supreme Court held in *Brady*

that "suppression by the prosecution of evidence favorable to an accused upon request violates

due process where the evidence is material either to guilt or to punishment, irrespective of good

faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. There are three steps in a *Brady*

violation: the evidence at issue must be favorable to the accused, either because it is exculpatory

or because it is impeaching; that evidence must have been suppressed by the State, either willfully

or inadvertently; and prejudice must have ensued. *Strickler v. Greene*, 119 S.Ct. 1936, 1948

(1999). Application of the *Brady* doctrine was extended to testimonial impeachment in *Giglio v.*

*United States*, 405 U.S. 150 (1972). A *Brady* violation is demonstrated by showing that the

undisclosed evidence could reasonably be taken to put the whole case in such a different light as

to undermine confidence in the verdict. *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). This Court

reviews an alleged due process violation under *Brady* for a reasonable probability that the result

of the proceeding would have been different had the evidence been disclosed to the defense.

*Brady v. Maryland*, 373 U.S. 83 (1963).

Thus, the government is obligated to disclose not only exculpatory evidence but also

evidence that might tend to impeach the credibility of key government witnesses. *See Brady,* 373

U.S. at 83; *Giglio*, 405 U.S. at 150. Evidence is material if there is a reasonable probability that

had the evidence been disclosed to the defense the result of the proceeding would have been

different. The Supreme Court in *United States v. Bagley*, 473 U.S. 667 (1985) disavowed any

---

Charles Bender 302, 8. Court exhibit 11-Arthur Rice 302; 9. Eugene Byars302 -Court exhibit 9;
10. Governments motion to move defendants(note: not on the Court's Exhibit list); 11. AUSA
notes on James Montgomery; 12. Additional materials James Montgomery-Agent Lisi notes; 13.
Notes; 14. Court exhibit 10-Ronald Sowells 302; 15. Use of anonymous jury(note: not on Court
Exhibit list); 16. Court exhibit 5File of Theodore Watson-; *See* Court Exhibit list, Exhibit 1 to this
supplemental motion.

8

difference between exculpatory and impeachment evidence for *Brady* purposes. Furthermore, disclosure of documents and tangible objects that are material to the preparation of the defense may be required under the rule of *Brady* without an additional showing that the request is reasonable. *United States v. McVeigh*, 954 F. Supp. 1441, 1446 (D. Colo. 1997).

*Bagley's* touchstone of materiality is defined as the reasonable probability of a different result. *Kyles,* 514 U.S. at 434. The critical question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence, he received a fair trial. This is understood as a trial resulting in a verdict worthy of confidence. *Id.* Materiality in terms of suppressed evidence should be considered collectively, not item by item. *Id.* at 436. Once there has been a *Bagley* error, it cannot subsequently be found harmless. *Id.* at 435.

Carson believes that the government purposely hid *Brady* material by submitting it to the Court as a gatekeeper rather than complying with its obligations under the law. At the behest of the Government, this process that the district court undertook was improper and prejudicial. Although the trial court viewed the evidence in question *in camera*, the court failed to keep the required transcribed record of the *in camera* proceedings. *See In re Sealed Case*, 151 F.2d 1059 (D.D.C. 1998). Moreover, the trial court failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material. No findings were made regarding the requested material, and no record has been released to the defense indexing the material presented to the Court that matches up with the documents released by the Clerk's office in 2008.[6] The prosecution never made a record as to why they were turning over certain

---

[6] Several documents turned over by the clerk in 2008 as part of the sealed exhibits are not listed on the Court's exhibit list as having been sealed. However, review of the trial transcript shows that in the case of the Theodore Watson file, it was in fact sealed after a request by defense

9

documents to the court for *in camera* inspection and in some cases they were compelled to submit documents to the Court record after having determined that no *Brady* was present.

The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him." Alleged violations of the Confrontation Clause are reviewed de novo. *United States v. Wilson*, 160 F.3d 732, 739 (D.C. Cir. 1998). Failure to turn over this *Brady* material kept Carson's counsel from effectively confronting the witnesses against him. Evidentiary errors are reviewed for abuse of discretion. *United States v. Hilliard*, 11 F.3d 618, 619 (6th Cir. 1993).

B. Sealed documents and ex parte submissions

1. Government's ex parte motion to change confinement of defendants

Trial counsel for William Sweeney, Steven Kiersh,[7] asked the Court repeatedly for *Brady* material with regard to the prior statements of Robert Butchie Smith, another Government cooperator. (Tr. 5/29/01 AM 77-end & Tr. 6/16/2000 p. 25-26). On April 2, 1999, in a sealed document,[8] the government filed an "Ex Parte Notice to Change Confinement of All Defendants." Judge Jackson put this motion under seal April 6, 1999. The defense was never given access to this motion. In that motion, the Government identifies "Andre Chappell and Anthony Ricardo Hawkins"[9] as having murdered Robert Butchie Smith. *See* Exhibit 2 @ 12. This is critical evidence because the government's theory at trial was that Carson and Sweeney killed Smith and they were convicted of the murder. Moreover, they were prejudiced by a ruling that allowed the

---

counsel that it be made part of the record. It was not, however, reviewed in camera by the Judge, over the objection of defense counsel Zucker. (Tr. 2/13/01 AM p. 6-7).

[7] According to an interview of Mr. Keirsch on 1/18/12, the defense attorneys never were told about the contents of any documents in any *in camera* exhibits. *See also* affidavit of Lexi Negin.

[8] This document was not assigned an exhibit number nor does it appear on the Court's exhibit list.

[9] These two individuals are never brought up again. This forclosed any opportunity Carson's investigator would have had to have knowledge of them or to investigate them.

10

statements of Smith to be entered into evidence by Agent Lisi so that there was not an effective way to cross-examine them. Had defense counsel known about this motion, and the fact that the Government believed others were responsible for the death of Robert Butchie Smith, defense counsel could have had their investigators try to find these two individuals and follow leads on whoever else wanted Smith dead. Furthermore, Agent Lisi could have been cross-examined on this subject and/or prevented from testifying as Smith at trial. However, at trial this information was withheld and the government argued that Agent Lisi be allowed to bring in Smith's statements under the theory was that Carson killed Smith and therefore Smith's statements should come in under FRE 804(B)(6).[10] The Court agreed and held that Smith's un-cross-examined statements could all come in through Agent Lisi, and they did. Had these names been provided to the defense and thoroughly investigated, the Court would have been hard pressed to find that Carson killed Smith by a preponderance of the evidence. The only testimony that it was Carson who killed Smith was the uncorroborated testimony of James Montgomery, their star witness with a history of lying and who lacked credibility on many levels. (Tr. 5/23/01 PM 22-33).

This information was clearly *Brady* material in that the government, at that time, thought someone other than Sam Carson killed Robert Smith. This information would have also impeached Montgomery's version of events. In the pretrial hearing on September 27, 2000 regarding the Government's request to have Smith's statements come in at trial through agent Lisi, the government represented directly to the Court that no other suspects wanted Smith dead in this case and that if that information existed it would be considered *Brady* and should be turned over. (Tr. 9/27/00 p. 200-202). The Court agreed. However, this is exactly what the government failed to turn over to the defense at trial. The prejudice extends not only to the admission of the

---

[10] The Court found by a preponderance of the evidence that Carson had waived his objections to Mr. Smith's hearsay statements when he killed this witness. (Tr. 5/29/01 AM p.88-89).

testimony of Smith through Lisi at trial, but to the inability to present the defense Carson would

have presented at trial.

An earlier pretrial discussion between the Court, Carson's counsel, and the prosecutor

illustrate how this is clearly *Brady* material. At a pretrial hearing, Carson's counsel asked for the

name of a person who overheard Mr. Martin say that he (Martin) was responsible for the killing

of Anthony Fortune. The prosecutor, Mr. Zeidenberg, refused to give him the name.  Carson's

counsel argued:

> MR. BESHOURI:  …I ought to be able to investigate it. I ought to be able to be in a
> position to present it.  That means I need to be able to talk to that witness—that witness who
> heard Mr. Martin.
> THE COURT:  I don't know what more you need to be given in the way of Brady
> information.  The Government has informed you—has acknowledged there is a witness who will
> be called at trial and who will testify that at one point—or who is alleged to have said, whether he
> testifies to it or not, at one point that he was responsible for a particular homicide.
> Now if they had further evidence of some description corroborative that the individual
> was, in fact, responsible for that homicide, then I suppose that could qualify as Brady material,
> but you already know all that Brady requires in the absence of the existence of any such other
> evidence.
> *Id.* at 78-81.

Here, the Court acknowledges that if there is evidence that someone else committed a

murder, that it's *Brady,* but the Court does not order the Government to turn it over. Instead the

Court goes on, presciently:

> THE COURT: It is incumbent upon the government to reveal evidence which is
> exculpatory of your client, but the government is in control of that evidence.  And you would not
> know about it but for the fact that the government makes you privy to that information.
> *Id.* at 82.

After further discussion, the AUSA agrees to give information regarding a separate

murder, but is allowed to make the decision as to all other Brady information.

    2.  Court Sealed Exhibit #4 –Interview Notes of Andre Murray

12

In addition to the information that Andre Chappell and Anthony Ricardo Hawkins killed Butchie, the sealed Court Exhibit #4, AUSA notes of an interview with Andre Murray demonstrate that he stated that "Fat Petey" was rumored to have killed Butchie Smith as well to get back at Draper for murdering his brother, Keith Johnson. *See* Sealed Court Exhibit #4, Exhibit # 3 to this Motion. The rumor that Petey Johnson aka "Fat Petey" killed Smith was further bolstered by Agent Lisi's own testimony at trial confirming at trial that Petey Johnson was picked up by police as a possible witness to Smith's murder and was present at the time of the murder. (Tr. 5/30/01 AM p. 19-20).

The information indicating this additional suspect in the murder of Smith was never turned over to the defense or disclosed to the defense at trial despite repeated requests for this very type of information. Withholding this information prejudiced the defense in their ability to argue against the wholesale admission of Smith's testimony and the forfeiture of the defendants' confrontation clause and hearsay objections to that testimony. It would have also been very valuable impeachment testimony of Agent Lisi as to his failure to consider Petey Johnson as a suspect, question him as a suspect and follow leads supplied by Andre Murray. All this points to the tunnel vision Lisi and the Government had to make a case against the defendants at any cost.

Notably, the Government's case against Carson for the murder of Smith was weak and supplied completely by cooperating witness, James Montgomery.[11] Montgomery was a known liar and had admitted to several murders and a lifetime of crime. Significantly, his testimony about Carson's participation in the murder of Smith was largely uncorroborated and premised on a theory that Carson and Montgomery were working together to kill Smith. However, at trial the testimony was that Carson acted alone and did not even tell Montgomery his plans or the fact that

---

[11] This was so even though an Assistant United States Attorney (Oscar Mayers) in a superior court case previously described him saying "this man is unreliable." (Tr. 6/16/2000 p.17).

13

he had accomplished their joint mission.  It is well accepted that testimony of a cooperating witness must be "viewed with great caution." *United States v. Curry*, 187 F.3d 762, 766 (7th Cir. 1999).  In this case, James Montgomery's testimony was all the Government needed because his credibility was bolstered enormously by the systematic removal of all other versions of events. The jury was forced to believe Montgomery as the only evidence available because all other evidence was withheld suggesting that Smith was killed by someone other than Carson.  The withholding of the information regarding other people believed to have the opportunity and motive to kill Smith is a prime example of the pattern of deceit that infected this trial from start to finish.

The resulting prejudicial effect of the government's withholding of the valuable *Brady* materials as they relate to the Smith murder was significant and casts into doubt the fairness of the verdict reached in this case.  The Government cannot shield itself from it's known *Brady* obligations by claiming that they submitted the materials *in camera* for inspection when it is clear they represented to the Court, on the record, false statements regarding their knowledge of the lack of other persons thought to have motive and opportunity to kill Smith.  This evidence amounted to more than mere speculation and would have formed the basis for effective cross-examination of Montgomery, Lisi and Andre Murray, as well as formed the basis for challenging the government's motion to admit Smith's statements pursuant to Rule of Evidence 804(b)(6).

3. James Montgomery sealed information - the murder of Timothy Benton

James Montgomery was the Government's star witness.  Thus, defense counsel asked the Court for any *Jencks* on Montgomery, specifically, the 302s and notes of Agent Lisi.  (Tr. 3/7/01 (PM) 52-52).  The Court stated that it had earlier reviewed this information and that it contained no *Brady* material.  *Id*. at 91.  However, the notes did contain valuable impeachment evidence.

14

)

Court exhibit #7, attached as Exhibit 4.[12]  (Tr. 3/6/01 p. 1 PM).

On 3/22/99, Special Agent Lisi testified in the Federal Grand Jury as to what James Montgomery told him about the Benton murder.  (GRJ–77, p. 29-35).  Lisi testified that Montgomery told him that "Poo Poo" (aka Maurice Proctor) had killed Benton.  Lisi further testified that two weeks later, Montgomery called him and said he had more to tell him.  *Id.* at 35.[13]

At trial, the story changed.  Montgomery testified that he (Montgomery) and Proctor  had killed Benton.  (Tr. 3/13/01 p. 30-36).

A third story exists that sheds even more doubt as to Montgomery's credibility.  Again, it's a story the government didn't want anyone to know about.  This story only appears in the notes taken by Agent Lisi of his first interview with James Montgomery.  These are the same notes submitted *in camera* to the Court. These notes show that Montgomery first lied to Agent Lisi about the Timothy Benton murder. Although Montgomery was charged with Benton's murder, Lisi's notes prove that Montgomery lied and substituted Carson for himself (as he was prone to do) as one of Benton's killers. This is significant because it was Carson's theory that Montgomery did this in other crimes he testified about and that this was a pattern of behavior by Montgomery to secure leniency and benefits from the government.  It was also his attempt to push the blame for his own crimes on others while being able to give details making him seem credible to his Government handlers.

Significantly, the government is the only party uniquely qualified, and under a Constitutional obligation, to identify *Brady* and turn it over.  The Court's procedure for *in camera*

---

[12] Court exhibit #7(Exhibit 4) says AUSA Notes of James Montgomery.  However, the actual *in camera* submission appears to be both AUSA and Agent Lisi's notes.
[13] This is based upon the redacted copy of Lisi's Grand Jury testimony supplied by the Government as a result of this Court's order dated 9/23/2013. (Dkt. #1123).

15

inspection was improper with respect to these sealed materials and the Government used it as a shield to hide *Brady* evidence from the defendants and bolster the credibility of their paid witnesses. The Court's complicity in this scheme is confusing at best. What is certain is that the Court abused it's discretion and failed to keep a transcribed record of the *in camera* proceedings, failed to articulate a compelling interest for reviewing the *Brady* materials *in camera*, failed to make findings regarding the requested material, and failed to make a record to the defense indexing the material presented to the Court. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir 1998). All of these errors prejudiced Carson at trial and on appeal and only served to render the trial unfair and verdict unreliable.

### 4. Murder of Anthony Fortune – 302s of Bender

Carson and Jerome Martin were both charged and convicted of the murder of Anthony Fortune. At trial, defense counsel was told by the District Judge that the FBI 302's of a testifying witness relating to this murder, Mr. Charles Bender, did not contain *Brady* material. (Tr. 2/05/01 AM p. 84). At trial, both Bender, and another witness, Eugene Byers, testified that Martin confessed to killing Fortune. (Tr. 4/4/01 PM p. 94); (4/9/01 PM p.14).

However, in sealed Court exhibit #8, "302's of Charles Bender", information from a 302 report of Special Agent Kristen Kane taken on 2/17/98, page 5, notes that Bender told the agent and AUSA during the interview that "Pimp" killed Anthony Fortune. *See* Exhibit # 5. Also, sealed Court exhibit #9, the 302 interview of Eugene Byers taken on 5/25/99 says that "pimp then killed Fortune." *See* Exhibit #6. The 302 says in part:

With regard to the murder of Anthony Fortune, source heard that FORTUNE was gambling in the area of 58th with PIMP (JEROME MARTIN) and BOO BOO. BOO BOO supposedly broke FORTUNE and FORTUNE tried to get his money back. PIMP then killed FORTUNE. FORTUNE had a reputation for robbing a lot of people. PIMP provided this information to the source approximately 4-5 months after the murder. FORTUNE's partner, RODNEY SHORT, was later incarcerated with the source at Lorton and he told the source he was

16

planning to kill PIMP if PIMP was sent to Lorton.  The source warned PIMP about SHORT but PIMP as not sent to Lorton while SHORT was there.

This information is clearly exculpatory as to Martin and Carson.  Had these 302's been turned over, defense counsel could have used this to impeach these witnesses.

Additionally, the only purported eyewitness to the Fortune murder, Charlene Wilson, was shaky at best regarding the identification of the shooter she says she saw.[14]  In fact, she identified Sean Coates in the courtroom as Carson during her testimony.  (Tr. 2/13/01 AM p.16.).  The information in the 302s that was withheld from the defense clearly violated Carson's due process rights as the information was material to Carson's guilt or innocence.

5.  Murder of Steven Dunbar

In sealed court exhibit 8, the notes of either the AUSA or the agent (it's not clear) show that Charles Bender told them that "Art said he killed Steve…"  Bates # 905167.   Exhibit #5.  In Court exhibit #7, the AUSA notes of James Montgomery interview, reflect that "Erik and Art both talked about killing Dunbar."  Exhibit #4.  The same page goes on to say "Vito issued hit b/c he wasn't supposed to be a Wysocki hit."  *Id.*  This is something that Carson's defense team could have investigated and could have cross-examined Agent Lisi on at length.

Defendants contend that the district Court's ruling to exclude these sealed exhibits was in error.  The defendants needed all information regarding the credibility and potential bias of the government's witnesses as well as any information that exculpated  Carson.   This Court has often stated that bias evidence is always relevant.  *Williams v. United States*, 642 A.2d 1317, 1322 (D.C. 1994).  Moreover, Agent Lisi offered his testimony in the form of a narrative.  The

---

[14] Wilson testified at trial that she saw Carson shoot Fortune.  (Tr. 2/13/01 AM p. 24-27).[14] Four months later in the trial, fortuitously, Agent Warrener testified that Wilson previously told him she had HEARD that Sam had killed him (emphasis added).  (Tr. 6/14/01 PM p. 55).  This came as a shock to the defense counsel and was only uncovered as a result of cross-examining Agent Warrener.

17

*McVeigh* court held it impermissible for the government to suppress or secrete information known to them which does not fit into the narrative, or which may diminish the credibility of the evidence relied on to tell the story. *McVeigh*, 954 F.Supp. at 1449. Furthermore, the Supreme Court noted in *Giglio* that nondisclosure of impeachment evidence falls within the general rule of *Brady* when the "reliability of a given witness may well be determinative of guilt or innocence." *Ritchie,* 480 U.S. at 66. Robert Smith was an essential government witness and the lack of opportunity for defendant to cross-examine him or view the statements he gave to the government was fatal. Carson contended that Mr. Smith was an unreliable witness.

With regard to the triple murder, sealed exhibit 7 states that "Chin: told James not my world get $250k; chin later told J not to believe Bam had paid Draper $50k to hit Gaskins." See Exhibit #4. Montgomery later testified that Carson actually was involved in the triple murder yet the AUSA did not correct this false testimony. (Tr. 3/14/01 PM p. 8). There was also mention of another suspect that was "another dude was in kitchen; don't know what happened to him." This would have been another lead for the investigators on the defense team.

### 6. Theodore Watson Dilemma – Watson Case File Withheld from Defense

Another cooperating co-defendant, Theodore Watson testified against the defendants. While incarcerated on a separate federal case out of Greenbelt, Maryland, he became friendly with co-defendant Sweeney and claimed that Sweeney told him everything about his criminal activity including wanting to kill James Montgomery for snitching. (Tr. 2/8/01, PM p. 45-70). Thus, his testimony was such that Carson needed to challenge it in any way possible. However, despite his cooperation, he was not given the 5K he thought he deserved. This undoubtedly perplexed defense counsel and thus he was cross-examined about why he did not get a 5K from the Government. Watson's response was that he didn't get the 5K because the prosecutor did not

18

like him. (Tr. 2/12/01, AM p. 19-21). After hearing this testimony, defense counsel made a request of the Court that the prosecution obtain and review the Watson Greenbelt file for any *Brady* information. *Id.* at 8 & 78.

The next day, the Government obtained the Watson file and represented to the Court that after reviewing the entire file, there was nothing "that suggests any Brady or Jencks material in the file." AUSA Zeidenberg goes on to explain that the Greenbelt AUSA's reason for not giving the 5K "was simply because she didn't believe his cooperation was of a significant enough nature to qualify. There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature." (Tr. 2/13/01 AM at p. 6-7). The defendants requested the letters addressed to the prosecutor from Watson. (Tr. 2/13/01 AM 5-6, 90). The Court denied this request and the Watson file was marked as Sealed exhibit #5 of the Court. *See* Exhibit 7. Although defense counsel asked that the Court review it, the Court refused. (Tr. 2/13/01 AM 5-6, 90).

AUSA Zeidenberg's representation to the Court was way off the mark and highly suspect. Not only did the file contain *Brady* material, it contained several instances of conduct that is *Brady* material. Watson, in an attempt to curry favor with the AUSA who held his fate in his hands, admitted to lying repeatedly in several letters written to her. For instance, in one letter, Watson says to the AUSA: "had I just simply complied and told you the truth at our initial meeting, I would have avoided the unnecessary mental anguish that entailed…there is no denying that during my 30 years in the system, I have lied, connived and schemed to get things done." *See* Exhibit 7, letter dated August 19, 1999. In yet another letter Watson describes himself thusly: "Ms. Wilkerson, again I apologize and confess that at our first conference, I lied and somewhat distorted the truth…" *See* p. 1 of 17, undated letter.

19

Not only did Watson admit to being a liar, but the Greenbelt AUSA, Sandra Wilkinson stated in a letter to the Court in Greenbelt that stated in part: "…despite my specific directions to not contact me directly.  Mr. Watson continues to undermine his own credibility as well as his ability to follow directions from the government." *See* Exhibit 7, 2/21/2000 letter to District Judge Messitte.

Had the prosecution turned over this file to defense counsel, or had the Court reviewed the file, Carson's lawyers could have cross examined Watson on his propensity to lie and his reasons therefore.  His credibility was in issue.  Unfortunately, again, these documents remained sealed until 2008, long after trial and appeal. More telling however is the fact that the prosecutor KNEW the contents of these letters and lead the Court to believe there was nothing in the way of *Brady*[15] in the file.  This is extremely problematic because there was virtually no evidence linking Carson to several of the alleged crimes other than the uncorroborated story of James Montgomery.  Given that, Watson's testimony was a much needed fortification of Montgomery's credibility.  The information that Watson was a liar, a manipulator and working the Government system for all he could get was critical impeachment material necessary for the defense to use in order to obtain a fair trial.  As the Supreme Court has made clear, the prosecutor:

"has the responsibility and duty to correct what he knows to be false and elicit the truth…That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for it's impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." *Napue v. Illinois*, 360 U.S. 264, 269 (1959) quoting *People v. Savvides*, 136 N.E. 2d 853, 854-855 (N.Y. Ct. App. 1956).  Moreover, it is a due process violation when the Government fails to disclose evidence of a witness' perjury.

*United States v. Cuffie*, 80 F.3d 514, 518 (D.C.Cir 1996).

---

[15] Although undersigned counsel refers to this as "*Brady*" material, it is in the purest sense *Giglio* material; material that would be used to impeach as opposed to exculpate. However, the Supreme Court later held in *United States v. Bagley*, 473 U.S. 667 (1985) that *Brady* and *Giglio* evidence are basically one and the same.

20

### C.  Other Brady Violations and Government Misconduct

#### 1.  Payments to Witnesses regarding the Triple Murder

One significant claim in this 2255 motion for relief stems the investigation and prosecution of the triple murder that was committed in November of 1996. The initial investigation of these murders resulted in the arrest for these charges of another individual, not Mr. Carson and his codefendants.  During the initial investigation, *Brady* and *Giglio* materials were created by and/or made known to the federal government in this case in the form of Grand Jury testimony of two witnesses stating that an individual named Dennis Green was responsible for the triple murders.  These grand jury statements form the basis for several of the claims asserted here in this brief.

The two witnesses, John Pinckney and Cheree Owens, testified on December 10, 1996 before a PG County grand jury and implicated an individual named Dennis Green in the triple murders and not Mr. Carson or any of his associates.  (Government's Brief on Appeal at p. 174). According to the Government, "When Pinckney and Owens came to the police with this information, they were provided with a substantial amount of money for their relocation, which was meant to last several weeks.   The couple went through the money in a matter of days and then demanded additional funds." (*Id.* at 175). [16]  Police learned that Pinckney and Owens owed Green money for drugs.  After further investigation, investigators found nothing to corroborate their story, and shortly thereafter Pinckney and Owens disappeared. (*Id. citing* Joint Appendix 1002 n. 1).

At approximately the same time, December 5, 1996, the Federal Bureau of Investigations arrested Robert Smith.  It was at this time that Smith began providing information about the triple

---

[16] There is no evidence that these are the facts but only supposition on the part of the Government.

21

murder to the federal government. (*Id.* at. 182). The Government contends that there is "no reason to believe that the FBI shared any of Smith's statements with Prince George's County as early as December 10, 1996, when Pinckney and Owens testified. *(Id. citing* Agent Lisi 5/29 Tr. 9-10, 12-13).

The United States Attorney's Office in Washington, D.C. indicted Carson for the triple murder based on the testimony of Mr. Smith. The Maryland authorities agreed to dismiss their triple murder charges only under an agreement with the federal Government to bring the charges under the umbrella of a federal RICO indictment. (Carson's Brief on Appeal at p. 138).

At his trial, Carson sought to introduce the grand jury testimony of Pinckney and Owens. However, because these witnesses could not be located at the time of the trial, Carson sought to introduce their grand jury testimony under the former testimony exception to the hearsay rule of the Federal Rules of Evidence, Rule 804(b)(1). Finding that there was "an absence of an identity of motive on the part of the government" in developing this PG county grand jury testimony, the district court ruled that the testimony was not admissible. (Government's Appellate Brief at p. 175). Carson appealed this decision as an abuse of discretion by the trial judge. The Appellate Court found that the trial court did not abuse its discretion in excluding the testimony under Fed. R. Evid. 804 (b)(1). In so doing the court stated, "appellants have offered no evidence that the state authorities who directed the testimony before the Maryland grand jury were in any way controlled or even used by federal authorities." *United States. v. Carson*, 455 F. 3d 336 at 372. The Appellate Court further stated that "The only evidence the defendants point to is testimony from FBI Special Agent Lisi that "[w]e [the FBI] tried to keep them [the Prince George's County Police] involved. Their primary focus was the triple murder. We tried to let them know

22

everything we [had] on the triple murder." *Id.* The court found that this showing was insufficient to show the Maryland grand jury proceeding was merely a "tool" for the federal authorities.

On April 18, 2012 Mr. Carson filed a Motion for Discovery with regard to the record of payments to the witnesses Pinckney and Owens and other documents, including the Grand Jury Testimony of Agent Lisi. (Dkt. #1088). On Sept. 13, 2013 this motion was denied in part and granted in part by this Court. The portion that was denied pertained to the discovery of payments made to Pinckney and Owens and any involvement by the federal government in those payments and relocation of those witnesses. On May 29, 2014, after several attempts and months of searching, counsel for Carson and Carson's investigator, Mr. Vaughan, were able to locate an address of Ms. Owens and drove to her home to speak with her. Ms. Owens agreed to discuss the case with Mr. Vaughan and counsel for Carson at that time. She related at length the process by which the Federal Bureau of Investigation moved her and Mr. Pinckney to numerous locations and paid them money after the testimony in the Prince George's County Grand Jury relating to the triple murder. She said they never heard from the FBI or government counsel after they were moved. Counsel for Mr. Carson and Mr. Vaughan presented Ms. Owens with a prepared affidavit containing her previously made statements and asked her to sign it so that it could be presented with this motion. Ms. Owens indicated that the information was true in the affidavit but that she didn't want to sign it and get involved because she was afraid for her life and is currently under a doctor's care for health related issues. Mr. Vaughan executed an affidavit regarding these facts and it was made a part a new motion filed on October 9, 2014, for Discovery based upon newly

23

discovered evidence. (Dkt. # 1132).    Also, attached to that motion were the affidavit of Mr.

Vaughan, the Death Certificate of Mr. Pinckney, and the prior statements of Cheree Owens.[17]

The new evidence provided by Ms. Owens demonstrates that the federal government

participated in, paid for and facilitated the "disappearance" of these two witnesses.  Pinckney and

Owens' testimony did not support the federal government's new theory of the triple murder in

December 1996 supplied by Robert Butchie Smith, their newest informant and cooperator.  The

government created the fiction that these first witnesses were unreliable and "seemingly

disappeared" a short time after giving their exculpatory testimony.  Moreover, they created an

illusion that Pinckney and Owens had somehow been proven untrustworthy and that they had tried

to abuse the relationship with the government by misusing government funds.   There is no

evidence in the record to support these claims.  The government proffered that "[p]olice learned

that Pinckney and Owens owed Green money for drugs.  After further investigation, investigators

found nothing to corroborate their story, and shortly thereafter Pinckney and Owens disappeared."

(Joint Appendix, fn 1002, n.1).

Ms. Owen's version of events is in direct contradiction to the story promoted by the

government and used as a tool to support it's motion to have the grand jury transcripts of these

unavailable witnesses excluded at trial.  The result was a deprivation of  Carson's Constitutional

Rights to Due Process and his right to present his defense at trial.  Moreover, this newly

discovered evidence demonstrates that Carson was deprived of valuable impeachment material to

combat the testimony of Robert Smith in this case.  According to the government, "Smith was

'opened up' as a confidential informant on 12/17/96.  From that date until the date of his murder

the FBI provided financial assistance in the amount of $12,744.19.  This money went to pay rent,

---

[17] All of these documents, the affidavit of Mr. Vaughan, the Death Certificate of Mr. Pinckney,
and the prior statements of Cheree Owens are incorporated by reference in this motion.

24

a car, living expenses, hotel rooms used to debrief Smith, cellular phone bills." (Dkt. #451).

Evidence now demonstrates that, even though Smith began cooperating in December of 1996, and

began providing information regarding the involvement of the K street crew in various crimes,

including the triple murder, the government was still "paying" for testimony provided by

Pinckney and Owens. Their theory was totally different from Smith's theory of who committed

that crime. It would be easy to infer that these payments to Pinckney and Owens functioned as a

"back up" plan in the event that Smith did not improve his testimony over time to the satisfaction

of the government in this case.

A pattern of paying for the improvement of witness testimony over time was clearly

established, but went unnoticed at trial. The continued payments to Pinckney and Owens would

have been highly valuable impeachment material against agent Lisi and others who stamped

nearly inscrutable credibility on Smith's testimony. As mentioned earlier, Smith was an

unreliable individual with a lengthy criminal history who was engaged in narcotics trafficking

in D.C. and Maryland. (Dkt. #340). At the time of his death many persons had a motive to kill

Smith for his cooperation. *Id.* The payments by the government to Pinckney and Owens were

occurring simultaneously with Smith's cooperation. The cover-up regarding this indicates

payments made to Smith were possibly used to secure improvements to his version over time.[18]

The information regarding the federal government's "determination" that Pinckney and

Owens were no longer trustworthy was also not made available to Carson. The United States

Attorneys Manual, 9-21.100 Eligibility for Witness Security Program states that:

To avoid any unnecessary delay in processing a Program application, government

---

[18]  Carson cannot ascertain the exact length of the continued payments to Pickney and Owens or who paid them because the payment records have not been made available. It is possible that the payments to these witnesses extended even after Butchie Smith was murdered, suggesting that these witnesses continued to be believed credible.

25

attorneys should note the following:

A.  In order to make certain that each application for entry of a witness into the Program is both appropriate and timely, the witness should, prior to his/her acceptance into the Program, either appear and testify before the grand jury or in some other manner have committed himself/herself to providing testimony at trial. This requirement relates to the commitment of the witness to testify, and is intended to ensure that the witness's testimony is available at the time of trial. **It is equally as important a requirement that the prosecutor intend to have the witness testify, and that the witness's testimony be significant and essential to the success of the prosecution.**

B.  The protection and relocation of witnesses and family members are expensive and complicated. In addition, DOJ is obligated to provide for the safety and welfare of a protected witness and family members long after the witness has testified. It is imperative, therefore, that the request for entry of a witness into the Program be made only after the sponsoring attorney has determined that the witness's testimony is significant and essential to the success of the prosecution, as well as credible and certain in coming.

(emphasis added).

The longer Pinckney and Owens were in the program, the stronger the suggestion is that their testimony was considered significant and essential to the success of the prosecution, as well as credible. The failure of the Government to disclose the nature and extent of this relationship in a truthful manner casts doubt on the fairness of the verdict in this case and the credibility of the testimony of Robert Smith, who otherwise could not be cross examined.

Carson was also prejudiced because no investigation of these individuals could be independently conducted in a timely manner by his trial counsel. The government proffered that Pinckney and Owens were "later discredited", and that no more evidence could be found to corroborate their story.[19] Considering that James Montgomery, the government's star witnesses, a

---

[19] On 6/16/00, a motions hearing was held in which Mr. Kiersch asks for the investigation file of Dennis Green. The Government proffered that Pinckney and Owens had been investigated by police and had not been found truthful. However the Government agreed any materials relating to their testimony would be considered *Brady* and turned over. *Id.* p. 9. Although defense counsel

26

paid snitch, known and admitted killer, convicted criminal and a person who suffered brain damage, testified at trial to many things with little to no corroboration, it seems unsupportable that this fact alone could have proven these witnesses discredited.  Moreover, at trial, Carson's counsel was falsely led to believe that pursuing the lines of questioning regarding Mr. Green would be unsuccessful and that further investigation into Mr. Green would be unprofitable.

The government argued successfully, both at trial and on appeal, that they had nothing to do with Prince George's County investigation and the *Brady* material they created.  They distanced themselves from anything that happened in that investigation by claiming that they had no knowledge of the Grand Jury Proceedings until afterwards and that they had no similar motive to examine these witnesses at the time.  Instead, however, the new evidence of payments to these witnesses demonstrates that the Federal Government misstated the status of their involvement with these witnesses, assisted in procuring their unavailability, and actively hid this fact for tactical advantage before trial, at trial and on appeal.   The misleading information provided by the Government prejudiced Carson from being able to offer the exculpatory his ability to argue in his defense.

The concerns raised here in this 2255 go to the very core of the reliability and credibility of all the witnesses at trial, not just Smith or Pinckney and Owens.  The suggestion that *Brady* material was created by a joint investigation but then pushed under the rug under the guise of an "independent" act by PG County prosecutors, calls into question fundamental fairness of the trial against Mr. Carson.  It also raises questions as to the reliability of the testimony of Smith, Agent Lisi and every witness that was paid for testimony and told they would suffer penalties of perjury if they lied.  Since a large number of civilian government witnesses that appeared in this trial

---

was given their grand jury testimony, they were never given any proof of this alleged investigation of Pinckney and Owens.

27

were paid, either monetarily, with relocation funds or with favorable plea agreements, the issues

surrounding the payments to Pinckney and Owens raise the legitimate inquiry into what, if

anything, would have happened to any of the civilian government witnesses if they were found to

have lied.   The evidence suggests a pattern by law enforcement to pay for testimony with

disregard for its truth.  Witnesses were paid, witnesses lied, and the Government didn't seem to

care as long as the right witnesses were there at trial and testified to the right story to convict the

people they wanted.   They kept the best version of events, but paid for them all until it was time

to choose.

    2. <u>Cash payments for favorable testimony disguised as legitimate expenses</u>

      The Government's misconduct in paying for witness testimony and failing to disclose the

real nature of the payments in this case deprived Carson of his Constitutional right of Due

Process.  The Government conducted itself with intentional disregard for the rights of Mr. Carson

when it paid witnesses money for testimony and then, knowing that such witnesses had not used

the payments as agreed, failed to reveal the true nature of the payments to defense counsel at trial

or actively represented that the money was used for purposes it knew or should have known were

false.

      The Government has the ability to incentivize witnesses testimony with cash incentives

and rewards.  They cannot, however, lie about these payments and characterize them as relocation

payments, when in fact, they were not.  In this case that is exactly what the Government did with

several key witnesses.  Many, if not most of the witnesses in this case, were paid cash or

otherwise incentivized by some form benefit as part of the bargain for their testimony.  The

payments in cash were often characterized as various types of expenses, from relocation to

witness protection and lodging.   However, at trial, it was revealed that some witnesses were paid

28

for relocation expenses and never moved. The failure to disclose this information prejudiced Carson and the other defendants in their ability to cross-examine these witnesses regarding the funds and the government's complicity in handing out money to witnesses with no strings attached. The prejudice experienced by Carson could not be remedied on the stand with these witnesses given the time constraints imposed by the Court and the substantial effort it would take mid-trial to track down the actual use of the funds by the witnesses. Moreover, the disclosure of this information qualified as *Giglio* that should have been given over to the defendant when known by the government agents and certainly prior to the witnesses taking the stand and being asked about this on cross examination.

    3.  Failure of government to maintain trial exhibits, documents and case file

    Mr. Carson is being denied his right to effective assistance of counsel, as great portions of the trial file and appellate file are unavailable to counsel appointed to investigate and litigate these matters in this 2255 proceeding. While some of the documents are available, the Government has failed to produce for counsel the trial exhibits or exhibit list for review.[20] This denies Carson the opportunity and right to review the record against him and make an effective 2255 claim. Moreover, in challenging the adequacy of the government's performance in discharging their *Brady* and *Giglio* obligations at trial, there is no way to determine with accuracy what disclosures were made.

    Counsel for Carson has requested that the government produce an exhibit at trial entered by William Clelland, the crime scene investigator for the triple murder. The government has informed the Court this piece of evidence, the card entered into evidence at trial that was used to

---

[20] Margaret Chriss, opposing counsel for the Government on this brief has searched tirelessly for all exhibits and trial record that undersigned counsel has asked her to locate. Despite her best efforts, a great deal is still missing.

29

identify Sweeney's fingerprint, and any other fingerprint cards taken at the scene, cannot be located. (Dkt. #1168). Carson contends that the review of this fingerprint card and the other fingerprint cards in evidence is necessary to determine the nature and extent of the trial counsel's ineffective assistance in failing to question the fingerprint analyst regarding other suspects used as comparisons for the print identification. Additionally, Carson is now precluded from having the fingerprint cards tested to see if Green, Smith or any other of their known associates fingerprints were, in fact, found at the crime scene but not tested for or disclosed by the government at trial.


V. – <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

    A.  Legal standard and factual basis

     Carson submits that his convictions in this matter were imposed in violation of his right to effective assistance of counsel.  The cause of action of ineffective assistance of counsel is based on the Sixth Amendment right to counsel, which exists "in order to protect the fundamental right to a fair trial." *Lockhart v. Fretwell*, 506 U.S. 364 (1933).

    The Supreme Court in *Strickland v. Washington*, 466 U. S. 688 recognized that the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defense" entails that defendants are entitle to be represented by an attorney who meets at least a minimum standard of competence. *Id.* at 685-687. "Under Strickland, we first determine whether counsel's representation 'fell below an objective standard of reasonableness.' Then we ask whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (*quoting Strickland, supra*, at 694).

One of the many challenges criminal defense attorneys face in the course of representing a client is appropriately balancing zealous representation against the contempt powers of the court. As a leading authority on this issue, Prof. Louis S. Ravenson notes that "this exercise of contempt power, and even the potential danger for it's exercise, can have a serious chilling effect on the vigor of advocacy." Louis S. Ravenson, *Advocacy and Contempt: Constitutional Limitations on the Judicial Contempt Power* , Part One, 65 Wash. L. Rev. 477, 481-82 (1990). There is a natural tension caused by the court's need to maintain its authority and the need of an attorney to zealously represent her client.

An attorney's duty to advocate on behalf of a client is directed by constitutional requirements and professional rules of responsibility. In recognizing the conflict this creates, the Supreme Court has vowed to defend the work of zealous advocates from frivolous contempt charges. *Sacher v. United States*, 343 U.S. 1 (1952). The Court writes that "our criminal processes are adversary in nature and rely upon the self-interest of the litigants and counsel for full and adequate development of their respective cases. The nature of the proceedings presupposes, or at least stimulates, zeal in the opposing lawyers." *Id.* at 9.

The Sixth Amendment of the United States Constitution guarantees defendants a right "to have the Assistance of Counsel for his defense." United States Constitution, Amendment 6. The First Amendment of the United States Constitution protects freedom of speech. United States Constitution, Amendment 1. Taken together, these fundamental protections in the Bill of Rights create a judicial system where attorneys are required to represent the interests of the criminal defendant, and they are allowed to do so using protected speech when the language used is critical of the judicial system or officers of the court.

31

In the case of *Holt v Virginia*, 381 U. S. 131 (1965), two attorneys were convicted of contempt based upon motions filed for change of venue based upon claims of local prejudice and the bias and intimidating conduct of the trial judge. The United States Supreme Court reversed the conviction noting,

> The right to be heard must necessarily embody a right to file motions and pleadings essential to present claims and raise relevant issues … And since 'A fair trial and a fair tribunal is a basic requirement of due process', … it necessarily follows that motion for a change of venue to escape a biased tribunal raise constitutional issues both relevant and essential … Consequently, neither [of the two lawyers involved] could consistently with due process be convicted for contempt for filing these motions unless it might be thought that there is something about the language used which would justify the conviction."

*Id.* at p. 136-137,The Court found the motion for change of venue to have been proper and the falseness of the charges irrelevant. The Court concluded:

> Our conclusion is that these petitioners have been punished by Virginia for doing nothing more than exercising the constitutional right of an accused and his counsel in contempt cases such as this to defend against the charges made.

This position taken by the Supreme Court appears to afford relatively generous latitude in arguing on behalf of clients without fear of contempt charges. *Raveson, supra* Note 2. The Supreme Court has also considered the appeal of an attorney who had been convicted of contempt for telling the presiding judge "we have the right to ask questions, and we propose to do so until some bailiff stops us" in an attempt to preserve important issues for appeal and zealously represent the client." *In Re McConnell*, 370 U.S. 230, 235 (1962).

> While we appreciate the necessity for a judge to have the power to protect himself from actual obstruction in the courtroom, or even from conduct so near to the court as to actually obstruct justice, it is also essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases. An independent judiciary and a vigorous independent bar are both indispensable parts of our system of justice. To preserve the kind of trials that our system envisages, Congress has limited the summary contempt power vested in courts to the least possible power adequate to prevent actual obstruction of justice, and we think that power did not extend to this case.

32

*Id.* at 235.

In Mr. Carson's case, the attorneys who represented him, Mr. Beshouri and Ms. Negin-Christ, met with judicial prejudice they deemed not only insurmountable, but legally and constitutionally incompatible with a fair trial for their client. On Appeal, Carson's appellate counsel argued that the District Court implemented trial procedures that were restrictive and even punitive at times. (Appellants' Brief at page 76). The District Court curtailed legitimate cross-examination of witnesses as to bias, imposed unreasonable time limitations on cross examinations, demanded that only one counsel be permitted to cross-examine a witness as to bias, and prohibited witnesses who appeared numerous times during trial to be cross-examined about bias more than once. *Id.* The Court would also "interrupt cross-examinations" and urge counsel to "use your time wisely." In practice, counsel were preclude from even doing that. *Id.*

The Appellate record is clear that the Court's seemingly arbitrary rules regarding limiting cross examination "hobbled the defense." *Id.* at 78. In some instances, counsel was not allowed at all to cross-examine witnesses on matters relating to their bias, although inquiry designed to expose bias is almost always relevant. *Id.* In one telling example, Counsel for the defense was given a late disclosure of an FBI report reflecting an oral statement of the witness Charlene Wilson. The report revealed that she was not an eye witness to the murder of Mr. Fortune, but had only heard about it from others. This was inconsistent with her sworn trial testimony in this case in which she claimed to be an eyewitness and to have seen Carson. The FBI report was turned over to defense counsel four months after Wilson left the witness stand. *Id.* at 90. On appeal it was argued that counsel was not able to recall Wilson to the stand to impeach her with this information because of the "time constraints placed upon defense counsel by the judge." Id at 91.

33

In another instance, defense counsel complained that the Government had not disclosed close to a thousand pages of *Jencks* material in sufficient time to be read and understood. The Judge characterized this as "defense counsel's problem" and ordered them to commence cross-examination or forego it. *Id* at 91. The Court also incorrectly told the defense counsel, in ruling against them regarding the government's failure to disclose impeachment materials on Ronald Sowells, that it was their burden to investigate whether there was *Brady* information regarding any witness that the Government had not turned over. *Id.* at 92. Additionally, for closings, the court refused to allow counsel a one day request to prepare, commenting that "given the out of court time for which counsel had billed, they should have been ready for argument" *Id* at 93. All the difficulties faced by defense counsel were further compounded by the Court's unwarranted suggestions that appointed counsel had an "ulterior motive" of trying to provoke a mistrial or unduly prolong the case, for which the court threatened to disallow compensation. *Id* at 75. The implicit threat being that risking one's livelihood and reputation would not be a worthwhile endeavor in zealously defending these clients.

These examples are but some of those listed by counsel in the appellate brief for this case. The most important piece of information is the proffer by counsel that, "[t]he judge's repeated admonitions and threats were intended to **and did have a chilling effect on defense counsel's advocacy**." *Id.* at 96 (emphasis added). On appeal the D.C. Circuit found that the judicial comments did not reach a level of hostility that prevented a fair trial. *U.S. v. Carson*, 455 F. 3d. 336, 372 U.S. App. D.C. 251. The opinion went on to state that "in sum, considering the challenged rulings, procedures and comments, together in the context of a long and difficult trial, we are not persuaded that 'the judge's behavior was not so prejudicial that it denied [the

34

defendant] a fair, as opposed to perfect trial.'" *Id*, (*quoting*, *United States v. Logan*, 998 F. 2d at 1029), (*quoting United States v. Pisani*, 773 F. 2d 397, 402 (2d Cir. 1985). *Id*.

　　Carson was represented by Mr. E. Joseph Beshouri and Ms. Lexi Negin-Christ at trial. Ms. Negin has supplied an affidavit that is attached to this motion as Exhibit 8.   In this affidavit, Ms. Negin describes the nature of her representation and how she and her co-counsel rendered ineffective assistance to Carson during his trial.  She details how in numerous instances, they failed to move for mistrials, preserve objections, cross-examine important witnesses as to their bias, follow up on defense theories, and recall witnesses shown to have lied on the stand because of the restraints imposed by the Court and for fear of sanctions and "disappointing" the Court.

　　In addressing the two prong *Strickland* analysis, the above reference facts indicate that Carson's trial counsels' performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U. S. at 687.  The first prong of the test is "necessarily linked to the practice and expectation of the legal community: "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Padilla v Kentucky*, 559 U.S. 356, 366 (2010) (*quoting Stickland, supra,* at 688, 694).  Under that standard, it was unreasonable for Carson's lawyers to forgo making the Constitutionally required effort to preserve the record for appeal by moving for mistrial when necessary, impeaching key witnesses with bias testimony, objecting to the Court's incorrect application of legal standards regarding *Brady* disclosures and forgoing other areas of cross examination for a real or imagined fear of incurring negative treatment by the Court.

　　Knowing that they possessed a conflict of personal interest, (here it was the attorneys' personal interests which interfered with their zealous representation of Carson), and failing to raise this conflict with the Court and seek disqualification, was not objectively reasonable.  It is

35

one thing to know that the Court is implicitly your employer when you are a CJA lawyer, and quite another to be threatened by that employer with the fear of financial punishment. Carson's attorneys feared being seen as "unreasonable" by their employer and this fear kept them from acting in Carson's best interests. They knew many of the Court's rulings were in error, detrimental to Carson's case and chilled their ability to be effective in their representation of him. In light of these facts, counsel had a duty to zealously challenge the application of these rules or inform the client that they had no intention of fighting zealously for his defense and seek to withdraw from the case. At the very least, counsel had the duty to preserve the record every time such a rule was imposed by objecting in some fashion or moving for a mistrial if warranted. Their failure to put aside personal interest for fear of risking a professional reputation or personal financial security deprived Carson of the right to counsel guaranteed by the Sixth Amendment.

The facts of this case demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694. Given the admission by Carson's counsel that they did not pursue many relevant and material areas on cross examination, it is now necessary to examine some specific instances how this prejudiced the defense and denied Mr. Carson of both a fair trial.

B.  Specific Failures by Counsel and the Resulting Prejudicial Effect

1.  Failure to Cross Examine Fingerprint Experts Regarding Alternative Suspects

Counsel for Carson was ineffective in failing cross-examine the fingerprint examiner Elores Clark regarding the suspect Dennis Green. No inquiry was made by defense counsel into whether Green's fingerprints had been run as a match to the eight separate fingerprint cards collected at the scene. During Ms. Clark's cross-examination she was asked what other suspects

36

were used as comparisons against the fingerprints submitted in this case and used in making the fingerprint report. At that point there was an objection by the government and a bench conference ensued. During the bench conference it was revealed that the government agents gave the fingerprint examiner a list of suspects to compare the fingerprint card against. On that list were the names of the various defendants. Mr. Dennis Green's name was not one that list. The bench conference ended with a ruling that the defendants would be allowed to cross-examine the witness regarding other suspects in this case or other known matches.[21] (Tr. 4/02/01 PM p.77).

In a case replete with examples of the Court ruling unfavorably for the defense, here is an instance when the Court led the charge in helping defense counsel pursue a very important line of questioning. Having been prevented from offering the grand jury testimony of Pinckney and Owens at trial, the next best thing would have been to cross examine the fingerprint examiner about other suspects, especially Dennis Green. The fingerprints were first examined in February of 1997, nearly three months after the triple murder and the date the fingerprints were taken from the crime scene.[22] (Tr. 4/02/01 PM p. 71) During those three months, while the fingerprint cards presumably sat in PG County offices, Mr. Dennis Green, was arrested for the triple murder based

---

[21] THE COURT: Throughout this case there has been the suggestion that there is someone other than those who have been implicated by the only eye witness to testify to it.
MR. ZEIDENBERG: That's fine, Your Honor. I don't care. I don't mean to argue with Your Honor.
THE COURT: I think they ought to be able to pursue that.
MR. ZEIDENBERG: I made my objection.
MR. DAVIS: I would ask Your Honor to give some type of cautionary instruction, because there is absolutely no evidence linking Mr. Hill to this at all, there is just nothing. As a matter of fact, I believe -- what's the date on that, the date that this incident took place, do you remember?
THE COURT: I think you are entitled to bring out the fact that there was no match.
MR. DAVIS: Well, Your Honor, I can't question this lady about why he was on there. And it could have been on a whim, it could have been on anything, and that's the problem. She knows nothing about it. All she knows is –
THE COURT: There have been other suspects in this case. I think it's a legitimate area of inquiry.
MR. DAVIS: I would object for those reasons.
THE COURT: Objection overruled.
(Tr. 4/02/01 PM p. 77)

[22] From the trial testimony it appears all prints were lifted that same day of the murder, but because counsel for the government cannot locate that actual card in evidence for review this remains a question that is unanswered.

37

upon a complaint filed on January 6, 1997. (Complaint PG County, Dennis Green, signed by Detective Deloatch, Attached as Exhibit 9) It was unreasonable for Carson's counsel not to question the fact that the government agents never checked for Dennis Green's fingerprints at the crime scene.[23]  Additionally, the fingerprints were not run until February of 1997 and then only out of the federal government's desire to make a case against Carson and his co-defendants. According to the testimony at trial, one fingerprint was found linking Sweeney to the crime. (Tr. 4/02/01 p. 49). However, at least eight fingerprint cards were submitted from the crime scene and each card could have contained more than one fingerprint. (Tr. 4/02/01 p. 57-58). Any of those cards could have contained the prints of Dennis Green or his associates, or any other suspects, but the Federal Bureau of Investigation never asked to run Green or his associates as comparisons. (Tr. 4/02/01 p. 78). The only known comparisons run by the fingerprint examiner were for Sweeney, Montgomery, Carson, Coates, Hill and Maurice Anthony Proctor. *Id.* Carson's Counsel should have extensively cross-examined the fingerprint examiner, the evidence collector, Agent Lisi and the agents who submitted the comparison list regarding these additional suspects. Moreover, defense counsel was aware at the time of the fingerprint testimony that a witness for the defense, Wesley Smith, was told by Butchie Smith that he (Butchie) was cheated out of $60,000 while gambling in the triple murder house in Temple Hills. About a week after the triple murder, Butchie also told Wesley that "I took care of Darnell Mack and those guys." (Tr. 6/06/01 AM, p. 26-34; Tr. 6/11/01 PM p.9-27; Tr. 6/13/01 AM) p. 72-77). Cleary there were multiple suspects considered for the triple murder. Competent and effective counsel would have

---

[23] This does not even factor into the equation the fact that the government went to great efforts to hide the details of Pinckney and Owens' relocation during that time period and the payments made to them that were not disclosed. Moreover, without explanation, Pinckney and Owens were dismissed as credible witnesses and the sole focus of the government agents in this case were the defendants, as evidenced by the suspects they submitted for comparisons.

38

tailored their questioning to show the bias in the government's investigation against Carson and his co-defendants.

   2. Failure to Recall Charlene Wilson

   Counsel was ineffective when they failed to recall Charlene Wilson to the stand after discovering that she was not an eyewitness to the murder of Anthony Fortune as she had testified to earlier during trial.  The circumstances surrounding Charlene Wilson's testimony alone demonstrate how material the impeachment of this witnesses would have been to the outcome of this case.  Given "Wilson's status as the only witness to the alleged crime, there is no colorable argument to be made that the potentially significant cross-examination was not "material." (Appellate Brief at page 147).

   Initially, the Government's failure to disclose the *Brady* material regarding Ms. Wilson created surprise for defense.  Agent Warrener asked to use his report to refresh his recollection and having done so, the Court ordered it to be turned over to defense over the objection of the Government.  (Tr. 6/14/01 PM p. 44; 48-49).  When defense counsel reviewed his report, it was revealed for the first time that Ms. Wilson's initial statement regarding the Fortune murder was that she had HEARD Carson committed the murder and had not in fact been an eyewitness.  Once this devastating contradiction in her testimony was discovered, counsel for Carson acted unreasonably by failing to make a proper objection to preserve the record and to attempt to recall Ms. Wilson for impeachment.  Defense counsel stated that they could not do so because of the time constraints placed upon them by the Court.  (Appellants Brief p. 147).  This is an unreasonable explanation.  The attempt alone, and possible denial, would have preserved this important point on the record for appeal.

   3. Failure to cross-examine witnesses on use of payments by the government

Trial counsel for Carson also failed to adequately question government witnesses when they admitted on the stand that they were paid by the government for undisclosed purposes in connection with their testimony. There was a strong indication from the start of the case that most witnesses were paid in some form of cash or other incentive (plea agreements) for favorable testimony. In fact, the first government civilian witness to take the stand in this case, Reginald Switzer, testified that his family was paid thousands of dollars for relocation due to a security concern and that nearly two and a half years later, at the time of trial, his mother still lived on K Street and had not yet moved.[24] (Tr. 1/30/01 p. 33). Once this witness admitted to receiving funds from the government and failing to use those funds for the purpose stated in the government's *Giglio* disclosure, several things should have happened: First, a reasonable attorney would have cross examined this witness extensively on why the funds had not been used for moving, who paid the funds, whether there was a receipt for the funds, how the amount was calculated, and what the money was actually spent on. Second, defense counsel should have moved for a continuance and asked to review the witness file of the government including the FBI about the payment information in question. Third, a record should be made that the *Giglio* disclosure by the Government was not accurate and falsely represented that the funds had been used for relocation. Finally, every government witness in this case should be asked the same questions

Counsel was ineffective in failing to seek sanctions against the Government for mischaracterization of those payments as relocation expenses when they knew or should have known that Mr. Switzer had never moved. Incredibly, Mr. Switzer's payment situation was not unique.

---

[24] The Government *Giglio* disclosure indicate that Mr. Switzer's wife and mother were paid $6,100 for relocation due to a security concern. Exhibit 10.

40

For example, Cinema Hawkins was paid $750 for relocation expenses. *See* Exhibit 11. She was never asked if she used those funds to relocate. Moreover, no questions were pursued as to why her payment for relocation was so small in comparison to others who never even moved, such as Switzer. Charlene Wilson was also paid $4,900 for moving expenses by the government to relocate but did not do so for over four years. (Tr. 2/13/01 AM p. 40 & PM p. 33). Eugene Byers' sister, was paid $5,592.53 for moving expenses in connection with his testimony and he testified he had no idea about this payment. (Tr. 4/09/01 PM p. 57-58).

This line of cross-examination would have been material impeachment evidence to show bias on the part of these witnesses and control by the government over these witnesses. This pattern of conduct evidences an implicit agreement with these witnesses to testify favorably for the prosecution in exchange for the government turning a "blind eye" towards the use of those funds. In order to be effective, once counsel knew that the government had failed to disclose the actual use of the cash payments, they needed to investigate the actual use of funds by all witnesses and the degree to which the government made, and failed to disclose, the implicit agreement that the cash could be spent in any way the witness wanted.

### 4. Other Instances of Ineffective Assistance

a) Counsel was ineffective in failing to follow up on information supplied by Carson at trial that he had a rental car during the time period he was accused of borrowing a car for the murder of Robert Smith. Documents showing that he was in possession of a rental car would rebut testimony that he needed to borrow a car on the day in question. Records are no longer retained by the rental car company for the date in question.

b) Carson also argues that Counsel was ineffective in failing to pursue arguments regarding Montgomery's mental impairments and medical health history that could effect his

41

memory or ability to be manipulated by government agents. Trial counsel failed to make a timely showing for a need for an expert witness to address this issue and present information showing that Mr. Montgomery was an individual who, due to mental slowness, was easily manipulated by people who showed him attention, friendship or who held a position of power over him. The defense team was denied access to Montgomery's witness protection file and medical information, but their failure to then question the witness regarding his memory and propensity to be easily manipulated by powerful individuals, such as FBI Case Agent and the government prosecutors, was unreasonable and counsel's failure to point this out through cross examination and through the use of expert testimony rose to the level of Constitutional ineffectiveness.

c) Caron's trial counsel was ineffective for failing to object at trial to the improper in camera inspection procedure adopted by the Court with regard to sealed *Brady* materials. This procedure prejudiced Carson and allowed the Court to be used as a tool of the Government in their scheme to withhold exculpatory material from the defense. It has been held that *in camera* proceedings should only be used where there is a compelling interest to do so. *In re Sealed Case*, 151 F. 2d 1059 (D. C. Cir. 1998). The proper procedure for conducting *in camera* proceedings was not followed in this case. Trial Counsel for Carson failed to make an objection on the record and challenge the improper procedure by the Court. There was no compelling reason for these documents to be submitted *in camera* and *ex parte* to the Court and failure to object to this was ineffective on the part of counsel. Furthermore, counsel failed to request findings be made on the record and a full index of the documents submitted for *in camera* review be disclosed to the defense. This conduct prejudiced Carson's ability to present his case at trial and on appeal.

42

d) Appellate Counsel was also ineffective in failing to seek appellate review the Trial Court's
rulings regarding the sealed materials. In denying defendants' motion to Allow Counsel
to Review Certain portions of the Trial Record, The United States Court of Appeals for
the District of Columbia Circuit (D.C. Circuit) instructed counsel that they must identify
the specific rulings believed to be erroneous, and present the issue in the appellants' brief,
rather than by motion. *See* Order dated 8/28//2003 [Case No. 02-3015, ECF No. 769196].
As evidence by the numerous instances of *Brady* material contained in the sealed
documents and discussed supra, challenging them would have proved successful on
appeal. However, Appellate counsel failed to pursue this claim on direct appeal. Had the
petitioners raised the issue on appeal, the Court of Appeals would have reviewed the
materials *in camera*. *Id.* The violations would have then come to light and demonstrated
the pattern of abuse that was perpetrated by the Government in this case and the
fundamentally unfair resulting verdict. The result would have been a reversal on appeal.
Failure to raise these issues was unreasonable on the part of appellate counsel and the
deficiency so prejudiced Carson that counsel's assistance was unconstitutionally
ineffective. [25]

## Conclusion

Carson did not receive a fair trial. The Government systematically hid *Brady* and *Giglio*
evidence. The District Court abused his discretion by finding that there was no *Brady* evidence in
the sealed documents and failed to keep an adequate list of what was presented and considered by

---

[25] Counsel also incorporates by reference the claims raised by co-defendants in their post
conviction petitions related to trial and appellate counsel's ineffectiveness, based on actions and
omissions, as due to the fact that in this group prosecution, actions and inactions by other counsel
affected the case against and defense of Carson. Moreover, any other Constitutional errors raised
by co-defendants, in as much as they apply to Carson as well, are incorporated by reference
herein.

43

him. Witnesses were paid for their testimony. Defense trial counsel was ineffective.  Therefore,

Carson requests discovery and an evidentiary hearing on this motion and seeks leave to

supplement the issues when discovery is received.

      Wherefore, for the foregoing reasons, both singularly and in the aggregate, for the reasons

set forth in legal memorandum and exhibits and for such other reasons as may be subsequently

submitted or may appear at the hearing in this matter, counsel and Mr. Carson respectfully ask

that the Court set aside his conviction.

      Respectfully submitted,


_____/s/_____

KIRA ANNE WEST
Bar No. 993523
1325 G Street NW, Suite 500
Washington, D.C. 20005
(202) 236-2042
Email: kiraannewest@gmail.com

    ATTORNEY FOR SAMUEL CARSON

## CERTIFICATE OF SERVICE

    I hereby certify that on April 9, 2015, a copy of this pleading was served by email to
Government counsel of record, Ms. Margaret Chriss, as this filing is filed under seal.


_____/s/_____

KIRA ANNE WEST

44

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FILED**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |

**SEP 1 4 2000**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

v.                                     :

Vincent Hill, a/k/a "Vito"            :        **Criminal No. 98-329-01-06 (TPJ)**
Jerome Martin, a/k/a "Pimp"           :
Samuel Carson, a/k/a "Chin"           :
William Kyle Sweeney,                  :        **Under Seal**
    a/k/a "Draper"  :
Maurice Proctor,                       :
    a/k/a "PooPoo"  :
Sean Coates, a/k/a "Birdy"            :

---

Gary Price, a/k/a "Harry O"           :
                 :        **Criminal No. 99-348-01 (TPJ)**
      **Defendants.** :
                 :        **Under Seal**
                 :

---

### Government's Ex Parte Submission of Additional Materials to the Court Regarding James Montgomery

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits the additional notes of Special Agent Vincent Lisi and Assistant United States Attorney Peter R. Zeidenberg in connection with interviews of James Montgomery.

Pursuant to the Court's order of June 16, 2000, the government has previously provided the "investigative files" pertaining to James Montgomery to the Court for its inspection. At the time of its initial submission, the government was collecting the notes regarding James Montgomery from Special Agent Vincent Lisi (Appendix A) and Assistant United States Attorney Peter R. Zeidenberg (Appendix B). Those notes have been collected and are now being submitted for the Court's review.

Respectfully submitted,

WILMA A. LEWIS
United States Attorney

*Peter R. Zeidenberg*

PETER R. ZEIDENBERG
Assistant United States Attorney
Bar No. 440-803
(202) 353-8831
555 4th Street, N.W.
Washington, D.C. 20001

*Anjali Chaturvedi*

ANJALI CHATURVEDI
Assistant United States Attorney
Bar No. 446-177
(202) 353-8827
555 4th Street, N.W.
Washington, D.C. 20001

9.14.00

2

# Appendix A

FILED

SEP 1 4 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT





Chin → Lou

learned about it first night    summer '94.
few people out there - Same left.
Said be careful @ Lou - because he
is him to Keith Hole is.
Lou knew where Sam Lives.

Poo-Poo : Sam had guns.
Sam night - went to hand Chin. Came
back Sam typed up. Police were out there.
asked what happened - Samebody said Lou got SHOT.
Next day- Sam Chin    Chin said he didn't die
Chin said he didn't think Lou would snitch but
Lou was sneaky. In Car with Sam / Poo-Poo

Poo-Poo was worried about telling the Police.
Chin's hand was broken from fighting a dude
names Rizzell in Barry Farms. - Soft Cast. couldn't take
it off.

Exhibit 4

① lockes up when Poo-Poo got stabbed.

② Home for a few months when they did the drive-by
on a motorcycle - Droppes - little 250 Honda
left it behind. Police took it.

MD. Police impounoes Cadillac    near Free-State cycles
had to get a release order - Car was around the corner.
poss. P.G. Co. - pulled over in front of P.G. PLAZA.
used MARK JOHNSON'S name to say went & got car.
lockes up in August. THEY took it from Jennings or I

~~~~~ TIM-TIM number.
Car impounoes before

James, I.S., And, Pov-Poo ──── went to Barry Farms — Sears
Station wagon to kill K.K. - after Steve Daulns.
                                    #
                              Not Lawrence Davis

ERLI SAD  ~~port~~  shoot because a girl was w/ him.

THEN TO OLD-TOWN looking for some ●         148 s'posed to
kill. a -

7/24/00   J.

AND, ST, V.

KATRINA CARSON - possibly
rented the MINI-VAN
possibly returned it the
next DAY. TURQUOISE
enterprise or budget
she lives in Greenbelt.

talk to _____   3.5 hands from
1st ST   A/ 1st
Alley
FAT JOE (Stanley) from JAMES
Cruz was DAVE CAESAR's packing

James  12/2

Step Doc's mother

Got info for them

tags, etc.


Draper also had an

INVESTIGATOR.

took Draper to see Army

Kemp when D ? had

wee on the run-

ned him at D.C. Jail

& Gave him Some $

Sam's cousin TRINA — maybe
rented the van for Carson
the III

* Draper called Bird.
From his cell phone
when they were on the
way.

1/23    PACINO

MACK (Beav)

Poo-Poo

Little Wayne    }    Snatched for
                    old man
Draper

        Dion't know what to do --
got Chin - got Beav's van.
Beat him to death.

Foach Gave White's notes 50K

III →    BIRDIE  wore    ABERCOMBIE
                        & FITCH
                        pullover
                        lined
                        DARK colors

Draper →
    Warner Bros sweatshirt - characters
on the front.

KIM said when Draper
Dace robbed the old guy,
they took some
Dope from him.



3/4/99　PACINO

TRIPLE →

Chin & Draper Go to Vegas
for fight. They come back
Chin & Draper said they
saw Lonnie in alot of
money. ($50K)

Draper had a female
at a travel agency in D.C.
Chin said so.
Thinks Chin got his
ticket there

Chin was also talking about
Bon & Lonnie having problems

(Page 311 of Total)

Chin was saying that
Draper & Ben were hanging
real close.

Drapers Bolivo mother & Dave
are real close.

Went there earlier that day.
Draper, Chin, Jim.
went in the van Chins
Cousin Trina rented the
van - She lives in Greenbelt
Plymouth  Mini-van maybe
            Greinsh

There was a car out back
that never moves.

Later that night,
Jim, Draper, Chr are
at James' mothers home
call Bird, went & Picked
him up from his mothers
house in Kenilworth

Dark outside maybe 9:00

Draper empties the gun
— when B gets in, Draper
racks-it & points at at
B.
They get to the house
B's asking what's on'
the agenda.



Park near the house +
watch it.
One of the girls had a
white neon. Before they
got in to car together,
one of the girls went to
a neon.

Darnel Mack  }
Lonnie       } came out of
2- Girls     } house

Draper said they were going
to eat or funk.
Draper said Lonnie goes to
a Hotel near Branch Ave +
the Beltway, so they went
there + looked for their

car. It wasn't there
so they go back to
D-Don's house to see if
the car was there. It
wasn't. While sitting
here, Bird come up
with the idea of
covering the tags with
other tags. Took tags
from a car near D-Don's

They went to Jim's
mothers + got skull caps.
Cut the eyes out
→ Dropped mothers house
put them on in her
parking lot. James
put them on

The cover tags
were thrown in a wooded
area near Alabama
Ave.
(Just one tag on the
back)

Hillcrest Gym

Driving away thought
a car was following.
Draper wanted to shoot at
them. Chin said no.
They lost the car

Go back to D. Dons house
after switching tags

Stun Gun was Drapers.
He bought it on
Central Ave. at a
SPY SHOP

In the VAN Draper
had the Glock 40
At 1st James had the
Stun gun. Gave it
to BIRD.

Sit & WATCH THE HOUSE
PARKED on same side of
Street. One of the
Neighbors Came out &
smoked a cigarette. EVERyone

Got down, but the
van was started.
When the guy went back
in they moved the van
to the opposite side of
the st.

⊕
Chris Jin
Biao

Draper
Saw the car coming
from Iverson st.

Once they parked,
Chris pulled out, forced

to turn the lights on

Lonnie's car parks in
front, seeing him walk
to the rear of the car.
Thinks he hesitates
because the lights of the
van were off.

Chris turns the lights on
& drives away from her

Chris drove

Lonnie



Lonnie, Dowell > start
2 Girls        Walking
                in the
                house.
Bud & Draper Ran rush
him.
Van pulls to front.
Hear the SHOTS
THE GIRL ON the Porch
Was in Shock.
HEAR SHOTS, CHIN SAYS
Go PUSH THE GIRL IN

the house. As James
is Getting out of the
VAN to do that,
Draper comes out, shoots
her in the head. He
fired more than once.
James runs back to
VAN. Bird comes out
not far behind Draper.

Once they cross into D.C. Loop
the was. Jim wears Kermit
Cole Jacket. Chin - D BJ. he
was shot in,

\# Earlier that day, James
went by i knocked on the
DOOR. to there i C B was there

Bird Abercrombie fitch
pullovers.

~~Took S. Hand okay.~~
hid the gun in an
Alley near where Anne lives.

Then go to Drapers Grandm
home.
While here, Draper had
Blood on him so he washed
himself with Bleach.

Then talk about it.

While in the van Cli...

asks what happened.
B said he didn't
Know. He was trying
to stack D-Dom.
B- Heard gunfire, lookin up
Draper was shooting.


B- said there was a dude
in there before they got in
there.


Bird said Draper almost
shot him when he shot
D Don.
    Draper said Lonnie

was reaching, he
never likes D-Don
Anyway. because he acted
all big.

Draper was wearing blue Jeans,
Black Sweatshirt that
said Players on it, multi
colored
some coat over top. stitch
leather

At House: Tony to figure
out what happened
Jim is pissed because he
lost out on $180 K

James gets gun from alley,
hides it in ~~Regina's base~~

basement in 1450
block of Canal, to
left of Poo-Poo.
Crack head Regina finds
it & tries to sell it
to Chin

Draper went to get gun from
alley — it was gone. He told
Chin. Chin told him Jim
hid it. When Jim took Draper to
get it it was gone. After a
couple of days Regina tries to
sell the gun to Chin. He told
her it was his gun & Chin
gives it to Draper
Draper said the gun belongs to ~~Skip~~ Skip Carter

Stay at Drapers house
45-60 minutes.

Talk about making another
move on a dude names
Freddy D.

(Page 325 of Total)

his it. When Jim took Draper to
Get it it was gone. After a
couple of DAYS REGINA tries to
sell the gun to Chin. He told
her it was his gun & Chin
Gives it to DRAPER
Draper said the gun belonks to

Stay at Drapers house
45-60 minutes.

Talk about making another
Move on a DUDE NAMED
Freddy. Draper & Chin
Knew Freddy.

Everyone said don't let
Vito Know.

Butchie.

After Draper cets locked
up, Chin Goes to see
him. Thinks he went
with Drapers father.

Chin said Draper
said Butchie was the
only one he told - so
he must be the witness.

He said that Butchie told
on everyone so they
had to get him before
Everyone got locked.

If Butchie gets it,
their problems are over.

Chin starts clocking
Butchie DOWN S.W.

On one occasion
Chin tells James to
wait on S. Cap. near
the Taxi lot
Jim waits in Blue car
He walks though alley.
He had on A hoodie
He comes back & says
he wasn't there

1st Drove though & see him
there. Go to Chins
house to get the hoodie
& gun. Go back.

Plan was to hit him
& throw gun in River

then hang out in @
37th all DAY.

After Butchie got hit,
James thought either
Chin BJ. DID it or get
Pug or to do it.

Steve Dunbar

Icky Bunk paid James Bono
to come home, so he
hung with them when he
came out.

Art come to DeAmo
& said they took an Hit

*METROPOLITAN POLICE DEPARTMENT*
*WASHINGTON, D.C.*

## *Criminal Investigations Division*

P.D. 854 REV. 01/94

# REPORT OF INVESTIGATION

| *FILE TITLE* | *DATE OF OCCURRENCE* | |
|---|---|---|
| *SOUTHWEST CREW; ET AL; ITAR-CRIMES OF VIOLENCE* | 09-18-97 | |
| *TYPE OF CASE* | *CCN* | *FILE NO.* |
| *REFERENCE: 166E-WF-200828* | | |

| *NARRATIVE:* | *SYNOPSIS OF CASE INVESTIGATION* |
|---|---|

SOUTHWEST CREW
ET AL;
ITAR-CRIMES OF VIOLENCE
OO:WMFO

*Sealed*

COURT EXHIBIT # 8
CR 98-329

INTERVIEWEE: Charles Edward Bender B/M   DOB: 11-28-74
             AKA "LA"
             234 I Street, S.W.
             MPDC PDID #449-678

     As part of an ongoing debriefing process relative to this
investigation the above named subject, hereinafter referred to as "LA",
was interviewed in person on 09-18-97 at 555 4th Street, N.W. (United
States Attorneys Office). A synopsis of the interview is provided in the
following information:

     "LA" was incarcerated from sometime in 1991 into the month of October
1994. He was out of jail from sometime in October 1994 into the month of
September 1995. He was then arrested for Murder and has been incarcerated
since that time.

     Sam Marbury shot "Joey" (Simmons) while Joey was on a bike. Sam got
"Ronnie" and "Slugger" to call Joey over into the cut off of L street. Sam
then walked up and shot Joey in the head.

     Not long before the murder Joey tried to make Sam get into a car at
gunpoint. He pistol whipped Sam but Sam broke and ran. Sam didn't let
Ronnie and Slugger know that he was going to kill Joey when he told them
to call Joey into the cut.

     Sometime in 1991/1992 Sam shot some guy from Langston Lane who had
robbed "Disco Duck" and somebody else on Delaware Avenue. The guy got back
in his car and drove away. Switzer gave him the gun to do it. Sam told
"LA" this while they were on the street.

| CASE STATUS:   __OPEN   __CLOSED   __OTHER(Explain) | | PAGE 1 OF 5 PAGES |
|---|---|---|
| INVESTIGATOR'S SIGNATURE   *Mark W. Ammons* | DATE   11-28-97 | |
| SUPERVISOR'S SIGNATURE   *Sgt.* ___ 5-354 | DATE   12-1-97 | 7A |

This report & the contents are property of the Metropolitan Police Department, Washington, D.C.
Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

METROPOLITAN POLICE DEPARTMENT
WASHINGTON, D.C.

## Criminal Investigations Division

# REPORT OF INVESTIGATION

P.D. 854 REV. 01/94

| FILE TITLE | | DATE OF OCCURRENCE |
| --- | --- | --- |
| SOUTHWEST CREW; ET AL; ITAR-CRIMES OF VIOLENCE | | 09-18-97 |

| TYPE OF CASE | CCN | FILE NO. |
| --- | --- | --- |
| REFERENCE: 166E-WF-200828 | | |

**NARRATIVE:**                    *SYNOPSIS OF CASE INVESTIGATION*

Carjacking is Sam's thing. Sometime in late October of 1994 Sam carjacked a blue caprice from a young dude on Delaware Avenue. Sam was talking to the guy from the passenger side. The dude got out of the car and Sam slid over from the passenger side and then drove away. The guy was mad.

While in jail "LA" was at a Muslim service with "Pimp", "Pug", "PooPoo", and "Vito". LA overhears Pimp saying that he needs to get a girl "smashed" because she is telling on him and Pug in one of their cases. Pimp is telling Vito that he has it all set up.

In the summer of 1995 LA and Joey (Simmons) robbed a sale (buyer) in southwest. They got some money and jewelry and Joey got the guy's coat.

In the summer of 1995 LA and "Delmo" robbed someone at a pay phone in a gas station on New York Avenue.

In early 1995 LA and "Dario" robbed a subject (B/M, 20s) at gunpoint near Howard University. They were using Malik's car and LA was driving. Dario saw the guy walking. He walked up, drew his gun, and robbed the guy of his coat and some money.

LA and Dario also robbed people on a "Weed" strip on 14th Street near Clifton Terrace.

LA and Dario robbed a guy at Galveston and South Capitol Street. Dario was driving. The guy was parked and in his vehicle and LA asked for a light. He then robbed the guy of some money.

LA also robbed a guy at gunpoint and got only ten dollars. He was arrested and convicted for this robbery and served his sentence at Oak Hill.

| CASE STATUS: | _OPEN | _CLOSED | _OTHER(Explain) | | PAGE 2 OF 5 PAGES |
| --- | --- | --- | --- | --- | --- |

| INVESTIGATOR'S SIGNATURE | | | DATE 11-28-97 |
| --- | --- | --- | --- |
| SUPERVISOR'S SIGNATURE | | 5-354 | DATE 12-1-97 |

This report is the property of the Metropolitan Police Department, Washington, D.C. Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

## METROPOLITAN POLICE DEPARTMENT
## WASHINGTON, D.C.

### Criminal Investigations Division

## REPORT OF INVESTIGATION

P.D. 854 REV. 01/94

| FILE TITLE | DATE OF OCCURRENCE |
|---|---|
| SOUTHWEST CREW; ET AL; ITAR-CRIMES OF VIOLENCE | 09-18-97 |

| TYPE OF CASE | CCN | FILE NO. |
|---|---|---|
| REFERENCE: 166E-WF-200828 | | |

| NARRATIVE: | SYNOPSIS OF CASE INVESTIGATION |
|---|---|

        LA witnessed a stabbing at the East Side Club in southwest which
occurred sometime in 1994-1995. "Pimp", "Cal", "Pug", "Larry", and "Vito"
were all at the East Side club. They see a dude named "Winston" from
"Simple City" who used to be around 37th Place. They thought that Winston
was responsible for "Old Face" getting stabbed. Cal gave Pimp a knife.
Pimp then snuck up on the dude (Winston) and stabbed him in the gut.

        In the summer of 1995 "Pug" stabbed some guy in the chest and shoulder
at the East Side club. The guy lived.


                                        Mark A. Barrows
                                        Detective Grade II
                                        Safe Streets Task Force

CASE STATUS:  __OPEN  __CLOSED  __OTHER(Explain)                    PAGE 5 OF 5 PAGES

| INVESTIGATOR'S SIGNATURE | | DATE 11-28-97 |
|---|---|---|
| SUPERVISOR'S SIGNATURE | S-354 | DATE 12-1-97 |

This report is the property of the Metropolitan Police Department, Washington, D.C.
Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    2/17/98

       CHARLES BENDER (PROTECT IDENTITY), B/M, DOB: 11/28/74,
was advised of the identity of the interviewing agent and the
purpose and nature of the interview.  Also present during the
interview was AUSA Kenneth Wainstein.  BENDER voluntarily
provided the following information:

       JOEY (SIMMONS), TADPOLE (BERNARD JOHNSON), WILLIE COBB,
the twins DONNY and DANNY, DELMO, MANNY (SIMMONS), KIIVORY
(PROCTOR) and MINUTE (RONALD SOWELLS) all sold marijuana for
WOOZIE (THOMAS FIELDS).

VITO's supplier of marijuana was J. JOHN (JOHN FENNER) from
Clifton Terrace.

       BENDER witnessed CHAMP murder SHAWN on Howison Place
during the summer of 1995.  CHAMP is now in jail for killing
MINK.

       BENDER heard that PIMP (JEROME MARTIN) shot MAN from
37th Place on Delaware Avenue near M Street in 1995.  KIIVORY may
have been a witness.

       WOOZIE told BENDER that FACE (JERMAINE WASHINGTON)
killed someone in Cappers.

       WOOZIE told BENDER that he paid someone to shoot VITO
(VINCENT HILL) but the gun jammed.

       SAM (MARBURY) told BENDER that DAMO, who shot the
police, shot CHIN (SAM CARSON) for WOOZIE.

       On 8/15/97, SA Kristen A. Kane and AUSA Kenneth
Wainstein again met with BENDER and he provided the following
information:

       BENDER heard that VITO killed PACHO because PACHO
kicked VERONICA in the stomach while she was pregnant with VITO's
baby.

       BENDER witnessed the murder of GO HARD (MARCUS BRYANT)
in the K Street court in 1993.  REGGIE, SLEDGE, WINK, GO HARD and

---

Investigation on    8/13,15/97,   at   Washington, D.C.
                10/7/97, 2/3/98

File #   166E-WF-200828            Date dictated

by   SA Kristen A. Kane

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to
your agency; it and its contents are not to be distributed outside your agency.

(Page 330 of 419)

FD-302a (Rev. 10-6-95)


166E-WF-200828


Continuation of FD-302 of ___ Charles Bender _____ , On 8/13,15/97, , Page   4
                                                                   10/7/97, 2/3/98

the driver.

        BENDER usually got his marijuana from WOOZIE but
sometimes got it from POONIE or J. JOHN.  BENDER sold about a
quarter pound a day and made about $300 to $500 each day.  WOOZIE
usually fronted BENDER and BENDER would pay him $400 for each
half pound.  BENDER would get his weed in the M Street court and
would deal with WOOZIE or FACE.  WOOZIE kept his weed at WILLIE
COBB's house.  GREG SEABROOKSk, TYDY (TYRONE GREENFIELD), RONNIE
(HORNS), HAYGOOD, SLUG (TRAVEL RILEY), OLD DOG (CALVIN RANDOLPH),
LITTLE CHESTER (JERMAINE JACKSON), TADPOLE (BERNARD JOHSNON),
MEECHIE (DEMETRIUS HUNTER), WILLIE COBB, JOEY (SIMMONS) and MANNY
(SIMMONS) all sold drugs for WOOZIE.

        In approximately the summer of 1995, RAYMOND WASHINGTON
and DIRTY MEAT robbed CRAWFORD (HODGES) of $2,000.

        Before BUTCHIE (ROBERT SMITH) was killed, DRAPER said
that his cousin BUTCHIE was telling on him.  After BUTCHIE was
killed, DRAPER said he knew who killed BUTCHIE but did not tell
BENDER who it was.

        PIMP told BENDER that JAMES (MONTGOMERY) was snitching
on him, SAM (CARSON) and DRAPER.  PIMP said that JAMES was
snitching on PIMP for a 1991 attempted murder and on DRAPER and
SAM for a Maryland murder.  PIMP said "I'll kill his bitch ass if
I see him" about JAMES.  PIMP said that he thought he would beat
his case because the only thing the government had was JAMES.

        On 10/7/97, DRAPER told BENDER that JAMES was telling
on him, PIMP and SAM.  DRAPER said that JAMES told MICHELLE
ROBERTS that he was telling about the murders in Maryland, and
that he told the government that he saw DRAPER go in a house and
another guy with a mask go in the house.  DRAPER said that it was
a robbery and the government couldn't prove the case.  DRAPER
said that CHIN held fast but JIM told.  He used the word "we" and
even though he never said who "we" was, BENDER inferred that
DRAPER was present.  DRAPER said he was disappointed in JAMES
because they had done so much together and that he would kill for
JAMES.  DRAPER said that his discovery packet said that BIRDIE,
JAMES, POO POO, VITO and KIM from Southwest were supposed to
testify against him.  DRAPER said he hoped the government was

FD-302a (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of ___Charles Bender___ , On 8/13,15/97, , Page ___5___
10/7/97, 2/3/98

trying to scare him and if so, it was a lawsuit because the government was putting people's lives in danger by identifying witnesses.  DRAPER said that if he couldn't get the witnesses he would get their families.  DRAPER heard that VITO was at Occoquan and was snitching on DRAPER because he thought DRAPER was snitching on him.  DRAPER also said that he and PIMP knew that ART (RICE) was snitching.

On 2/3/98, SA Kristen A. Kane and AUSA Kenneth Wainstein again met with BENDER and he provided the following information:

PIMP said that TONY FORTUNE had been robbing dudes from 58th.  While they were gambling, FORTUNE was whispering like he was plotting on PIMP.  PIMP said he pulled a gun and shot FORTUNE.

PUG stabbed a guy from Simple City at the Eastside Club.  PUG used a piece of glass from a light.

About one week later, WINSTON ROBINSON killed OLD FACE from 37th Place.

About one month after OLD FACE was killed, BENDER saw PIMP stab WINSTON ROBINSON on the dance floor of the Eastside club in 1995.  PIMP got the knife from CAL (KYLE KNIGHT).

WOOZIE said that he gave DAMO two pounds of weed and $500 to shoot CHIN.

KK (LAWRENCE DAVIS), ROB and J.R. (RONALD DAVIS) all told BENDER that WOOZIE beat JR with a stick and knocked him unconscious because JR owed WOOZIE money.  This occurred on L Street during the summer of 1997.

**METROPOLITAN POLICE DEPARTMENT**
**WASHINGTON, D.C.**

### *Criminal Investigations Division*

P.D. 854 REV. 01/94

## *REPORT OF INVESTIGATION*

| FILE TITLE | DATE OF OCCURRENCE |
|---|---|
| SOUTHWEST CREW; ET AL; ITAR-CRIMES OF VIOLENCE | 09-18-97 |

| TYPE OF CASE | CCN | FILE NO. |
|---|---|---|
| REFERENCE: 166E-WF-200828 | | |

**NARRATIVE:**            *SYNOPSIS OF CASE INVESTIGATION*

SOUTHWEST CREW
ET AL;
ITAR-CRIMES OF VIOLENCE
OO:WMFO

*Sealed*

INTERVIEWEE: Charles Edward Bender B/M  DOB: 11-28-74
            AKA "LA"
            234 I Street, S.W.
            MPDC PDID #449-678

*CR 98-329*

     As part of an ongoing debriefing process relative to this
investigation the above named subject, hereinafter referred to as "LA",
was interviewed in person on 09-18-97 at 555 4th Street, N.W. (United
States Attorneys Office). A synopsis of the interview is provided in the
following information:

     "LA" was incarcerated from sometime in 1991 into the month of October
1994. He was out of jail from sometime in October 1994 into the month of
September 1995. He was then arrested for Murder and has been incarcerated
since that time.

     Sam Marbury shot "Joey" (Simmons) while Joey was on a bike. Sam got
"Ronnie" and "Slugger" to call Joey over into the cut off of L street. Sam
then walked up and shot Joey in the head.

     Not long before the murder Joey tried to make Sam get into a car at
gunpoint. He pistol whipped Sam but Sam broke and ran. Sam didn't let
Ronnie and Slugger know that he was going to kill Joey when he told them
to call Joey into the cut.

     Sometime in 1991/1992 Sam shot some guy from Langston Lane who had
robbed "Disco Duck" and somebody else on Delaware Avenue. The guy got back
in his car and drove away. Switzer gave him the gun to do it. Sam told
"LA" this while they were on the street.

| CASE STATUS: | __OPEN | __CLOSED | __OTHER(Explain) | | PAGE 1 OF 5 PAGES |
|---|---|---|---|---|---|

| INVESTIGATOR'S SIGNATURE | | DATE | 11-28-97 |
|---|---|---|---|
| SUPERVISOR'S SIGNATURE  Sgt | 5-354 | DATE | 12-1-97 |

This report & its contents are the property of the Metropolitan Police Department, Washington, D.C.
Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

# METROPOLITAN POLICE DEPARTMENT
## WASHINGTON, D.C.

### Criminal Investigations Division

## REPORT OF INVESTIGATION

P.D. 854 REV. 01/94

| FILE TITLE | DATE OF OCCURRENCE |  |
|---|---|---|
| SOUTHWEST CREW; ET AL; ITAR-CRIMES OF VIOLENCE | 09-18-97 | |
| TYPE OF CASE | CCN | FILE NO. |
| REFERENCE: 166E-WF-200828 | | |

| NARRATIVE: | SYNOPSIS OF CASE INVESTIGATION |
|---|---|

Carjacking is Sam's thing. Sometime in late October of 1994 Sam carjacked a blue caprice from a young dude on Delaware Avenue. Sam was talking to the guy from the passenger side. The dude got out of the car and Sam slid over from the passenger side and then drove away. The guy was mad.

While in jail "LA" was at a Muslim service with "Pimp", "Pug", "PooPoo", and "Vito". LA overhears Pimp saying that he needs to get a girl "smashed" because she is telling on him and Pug in one of their cases. Pimp is telling Vito that he has it all set up.

In the summer of 1995 LA and Joey (Simmons) robbed a sale (buyer) in southwest. They got some money and jewelry and Joey got the guy's coat.

In the summer of 1995 LA and "Delmo" robbed someone at a pay phone in a gas station on New York Avenue.

In early 1995 LA and "Dario" robbed a subject (B/M, 20s) at gunpoint near Howard University. They were using Malik's car and LA was driving. Dario saw the guy walking. He walked up, drew his gun, and robbed the guy of his coat and some money.

LA and Dario also robbed people on a "Weed" strip on 14th Street near Clifton Terrace.

LA and Dario robbed a guy at Galveston and South Capitol Street. Dario was driving. The guy was parked and in his vehicle and LA asked for a light. He then robbed the guy of some money.

LA also robbed a guy at gunpoint and got only ten dollars. He was arrested and convicted for this robbery and served his sentence at Oak Hill.

| CASE STATUS: | __OPEN | __CLOSED | __OTHER(Explain) | PAGE 2 OF 5 PAGES |
|---|---|---|---|---|

| INVESTIGATOR'S SIGNATURE | | DATE 11-28-97 |
|---|---|---|
| SUPERVISOR'S SIGNATURE | 5-354 | DATE 12-1-97 |

This report is the property of the Metropolitan Police Department, Washington, D.C. Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

METROPOLITAN POLICE DEPARTMENT
WASHINGTON, D. C.

### Criminal Investigations Division

P.D. 854 REV. 01/94

## REPORT OF INVESTIGATION

| FILE TITLE | DATE OF OCCURRENCE |
|---|---|
| SOUTHWEST CREW; ET AL; ITAR-CRIMES OF VIOLENCE | 09-18-97 |

| TYPE OF CASE | CCN | FILE NO. |
|---|---|---|
| REFERENCE: 166E-WF-200828 | | |

| NARRATIVE: | SYNOPSIS OF CASE INVESTIGATION |
|---|---|

In the summertime of 1995 LA and "Dante" robbed a "Sale" (buyer) over by the James Creek area (Howison Place). Two guys drove up in a black truck wanting to buy some "Boat" (PCP). One subject was a black male and the other was a mexican male. LA told the black male subject to get out of the truck. Dante pulled a gun and LA pulled a knife. LA cut the subject on the cheek and they robbed him of #100.00. They then told the subject to get back in his truck and leave.

Sometime in the winter of 1995 LA and "Jelani" (Johnson) robbed the "White sales" (W/M and W/F) while inside of a red sentra or camry on L street, S.W. They got into the car, sold them some weed, then robbed them. They took the male's ring, his timberlands (boots), watch, and two leather coats (one white, one black) from the male and female. Both LA and Jelani had guns.

Around April of 1995 LA and "AD" robbed "Warren" (Wink's nephew) on K street while he was selling weed. AD came up behind Warren and put him in a choke hold. Warren subsequently lost consiousness. LA and AD then took his weed, watch, ring, and timberlands. LA also cut Warren on the face with a knife. LA had a mask on during the robbery but AD did not.

Sometime in 1995 (weather was warm) LA, Dante, and "Meechie" robbed a sale in the alley rear of the 900 Block of 3rd Street, S.W. The subject was a black male approximately 30 years of age. Meechie shot the guy in the stomach during which time he started running on foot. LA grabbed the gun from Meechie and fired several more shots at the subject as he was running. LA told Meechie that he couldn't let a guy get away after he had shot him because the subject saw his face.

LA also robbed Meechie of a coat one time because he thought that Meechie had stolen some stuff from him.

Vito, Dante, and "Black" were driving near the receiving home in northeast when they saw a guy hustling. They walked up on him and Black pulled a gun. Dante then took his money.

| CASE STATUS: | ___ OPEN | ___ CLOSED | ___ OTHER(Explain) | PAGE 3 OF 5 PAGES |
|---|---|---|---|---|

| INVESTIGATOR'S SIGNATURE | | DATE | 11-28-97 |
|---|---|---|---|
| SUPERVISOR'S SIGNATURE | | DATE | 12-1-97 |

This report is the property of the Metropolitan Police Department, Washington, D.C.
Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

METROPOLITAN POLICE DEPARTMENT
WASHINGTON, D.C.

## Criminal Investigations Division

### REPORT OF INVESTIGATION

P.D. 854 REV. 01/94

| FILE TITLE | | DATE OF OCCURRENCE | |
|---|---|---|---|
| SOUTHWEST CREW; ET AL; ITAR-CRIMES OF VIOLENCE | | 09-18-97 | |
| TYPE OF CASE | | CCN | FILE NO. |
| REFERENCE: 166E-WF-200828 | | | |

**NARRATIVE:**         *SYNOPSIS OF CASE INVESTIGATION*

In early 1995 around 2:00 or 3:00 in the morning a green Jeep Cherokee was in the 200 Block of K Street, S.W., attempting to buy weed. "LA" was standing by the jeep and had directed one of the occupants over to sellers on the sidewalk. Subject(s) then approached the jeep and started shooting. LA jumped into the jeep, displayed a handgun, and ordered the driver to drive away. A marked police car was observed approaching the vehicle during which time LA jumped from same and fled on foot. He was apprehended by MPDC Officers and subsequently arrested. However, the charges were dropped the following morning and LA was released.

In August of 1995 LA, while in the alley rear of the 200 Block of K Street, S.W., was involved in an altercation with a subject known to him as "Yellow Boy" (Jamal Murray) over trading some "Weed" (marijuana). Yellow Boy had better weed than LA and LA wanted to trade some bags. Yellow Boy was not agreeable to that and a fight ensued. LA subsequently stabbed the subject several times in the stomach and upper body (MPDC Report #490-568).

LA heard about, but did not witness, the A.P.O. that happened back in the alley in 1995. "Tony Brodie" hit the police officer fom behind. There were a whole lot of people out there including Switzer and Bill Hill.

In 1995 LA saw "Vito" beat Barbara Gordon with a baseball bat in the 200 Block of K Street, S.W., because she was taking sales on K Street. LA thinks that she went to the hospital. Barbara used to live on K Street. She now lives at 58th Street and Southern Avenue.

Vito also shot Kim Richardson (Moochie's daughter) on K Street. Vito was mad because she was taking sales on K Street. She said that Vito had on a mask but she recognized him. LA heard about this shooting before he left for Oak Hill (Robbery conviction).

CASE STATUS:   __OPEN   __CLOSED   __OTHER(Explain)         PAGE 4 OF 5 PAGES

| | | DATE | |
|---|---|---|---|
| INVESTIGATOR'S SIGNATURE   Mark C. Savan | | 11-28-97 | |
| SUPERVISOR'S SIGNATURE   Sgt   9-354 | | 12-1-97 | |

This report is the property of the Metropolitan Police Department, Washington, D.C. Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

# METROPOLITAN POLICE DEPARTMENT
## WASHINGTON, D.C.

### Criminal Investigations Division

## REPORT OF INVESTIGATION

P.D. 154 REV. 01/94

| FILE TITLE | DATE OF OCCURRENCE | |
|---|---|---|
| SOUTHWEST CREW; ET AL; ITAR-CRIMES OF VIOLENCE | 09-18-97 | |
| TYPE OF CASE | CCN | FILE NO. |
| REFERENCE: 166E-WF-200828 | | |

| NARRATIVE: | SYNOPSIS OF CASE INVESTIGATION |
|---|---|

     LA witnessed a stabbing at the East Side Club in southwest which
occurred sometime in 1994-1995. "Pimp", "Cal", "Pug", "Larry", and "Vito"
were all at the East Side club. They see a dude named "Winston" from
"Simple City" who used to be around 37th Place. They thought that Winston
was responsible for "Old Face" getting stabbed. Cal gave Pimp a knife.
Pimp then snuck up on the dude (Winston) and stabbed him in the gut.

     In the summer of 1995 "Pug" stabbed some guy in the chest and shoulder
at the East Side club. The guy lived.

*Mark A. Barrows*

Mark A. Barrows
Detective Grade II
Safe Streets Task Force

CASE STATUS: ___OPEN ___CLOSED ___OTHER(Explain)          PAGE 5 OF 5 PAGES

| INVESTIGATOR'S SIGNATURE | | DATE | 11-28-97 |
|---|---|---|---|
| SUPERVISOR'S SIGNATURE | | DATE | 12-1-97 |

This report is the property of the Metropolitan Police Department, Washington, D.C.
Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____2/17/98_____

      CHARLES BENDER (PROTECT IDENTITY), B/M, DOB: 11/28/74, was advised of the identity of the interviewing agent and the purpose and nature of the interview.  Also present during the interview was AUSA Kenneth Wainstein.  BENDER voluntarily provided the following information:

      JOEY (SIMMONS), TADPOLE (BERNARD JOHNSON), WILLIE COBB, the twins DONNY and DANNY, DELMO, MANNY (SIMMONS), KIIVORY (PROCTOR) and MINUTE (RONALD SOWELLS) all sold marijuana for WOOZIE (THOMAS FIELDS).

VITO's supplier of marijuana was J. JOHN (JOHN FENNER) from Clifton Terrace.

      BENDER witnessed CHAMP murder SHAWN on Howison Place during the summer of 1995.  CHAMP is now in jail for killing MINK.

      BENDER heard that PIMP (JEROME MARTIN) shot MAN from 37th Place on Delaware Avenue near M Street in 1995.  KIIVORY may have been a witness.

      WOOZIE told BENDER that FACE (JERMAINE WASHINGTON) killed someone in Cappers.

      WOOZIE told BENDER that he paid someone to shoot VITO (VINCENT HILL) but the gun jammed.

      SAM (MARBURY) told BENDER that DAMO, who shot the police, shot CHIN (SAM CARSON) for WOOZIE.

      On 8/15/97, SA Kristen A. Kane and AUSA Kenneth Wainstein again met with BENDER and he provided the following information:

      BENDER heard that VITO killed PACHO because PACHO kicked VERONICA in the stomach while she was pregnant with VITO's baby.

      BENDER witnessed the murder of GO HARD (MARCUS BRYANT) in the K Street court in 1993.  REGGIE, SLEDGE, WINK, GO HARD and

---

Investigation on   8/13,15/97,   at  Washington, D.C.
               10/7/97, 2/3/98

File # 166E-WF-200828                           Date dictated  _____

by  SA Kristen A. Kane

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to it and its contents are not to be distributed outside your agency.

App 1375

FD-302a (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of _____Charles Bender_____ ,On _8/13,15/97,_ ,Page __2__
                                                                  10/7/97, 2/3/98

TONY BRODIE were all gambling.  A New Yorker called SHAKA got out
of a car and shot GO HARD.  BENDER did not see OOCH but believes
that OOCH was driving the car.

        BENDER heard that DRAPER killed ROBO (DONNELL
WHITFIELD) from SIRSUM CORDA in 1994.  DRAPER told BENDER that
he and ROBO had been involved in a shooting at the Mirage and "he
had to get ROBO before ROBO got him".

        In 1994, BENDER was selling weed for JIM SWEENEY.
BENDER sold about one half pound in one hour and made about $400
from each half pound.  BENDER sold for SWEENEY and gave him his
cut after selling the weed.

        During the spring of 1995, a green Cherokee drove into
the 200 block of K Street trying to buy marijuana.  The occupants
asked BENDER for weed and BENDER directed them to go to SHELDON
who was in the cut because it was his turn to make a sale.  A
girl in the Jeep went to the cut and as she walked back to the
Jeep someone wearing a mask came from the south side of K Street
and started shooting.  The girl jumped into the Jeep and BENDER
followed her into the Jeep.  Once inside the Jeep, BENDER pulled
a Derringer and told the driver to drive off.  The driver drove
west on K Street to 3rd Street where it turned right and headed
north toward I Street.  The Jeep turned left on I and headed
toward the Waterfront.  The Jeep pulled up next to a police car
and BENDER jumped out of the Jeep and ran.  BENDER tripped and
was apprehended by the police.  BENDER had dropped the gun while
he was running and to his knowledge it was never recovered.  A
weapon was recovered from the Jeep.  BENDER was arrested but
released at his court appearance the next day.

        During the summer of 1995 BENDER stabbed YELLOW BOY
(JAMAL MURRAY), who he knew from Oak Hill.  BENDER asked YELLOW
BOY to trade some of his marijuana because YELLOW BOY's stash was
better than BENDER's.  YELLOW BOY refused so BENDER hit him.
YELLOW BOY then hit BENDER with a chair so BENDER pulled out a
knife and stabbed YELLOW BOY several times.  BENDER did not kill
YELLOW BOY because they had been friends at Oak Hill.

        BENDER, DONTE (McDOWNEY, and MEECHIE (DEMETRIUS HUNTER)
shot a "sale" in approximately 1995.  MEECHIE had his Uncle WINK's

FD-302a (Rev. 10-6-95)


166E-WF-200828


Continuation of FD-302 of ___Charles Bender_____ , On 8/13,15/97,  , Page __3__
                                                                10/7/97, 2/3/98

(LEON SHANNON) .45 and he gave it to DONTE.  When the sale asked
for weed, DONTE pulled out the gun and tried to rob the "sale".
The "sale" said he had a family and tried to grab the gun and the
gun went off.

        In 1995, HORTEZ, from Howison Place, and LUTHER, shot
DONTE and BENDER over HORTEZ's girl because HORTEZ believed that
BENDER was involved with her.  At a later date, BENDER saw HORTEZ
and approached him and held a .38 to his neck.  HORTEZ pointed
out police who were nearby so BENDER did not shoot him.  As
BENDER left the area he fired at HORTEZ but did not hit him.

        In approximately April 1997, BENDER heard POO POO
(MAURICE PROCTOR) tell DRAPER to "get at" WAYNE or SLUG.  DRAPER
told POO POO that he was going to get SLUG because SLUG could
hurt POO POO the most.

        In approximately June 1997, POO POO said that SLUG and
WAYNE (KENNETH ADAMS) were telling on him about the murder of
PHIL (CLAYBORNE).  POO POO believed that WAYNE had been let out
of jail so he could testify.  POO POO said that CHIN was looking
for WAYNE so he could kill him for POO POO.  POO POO told BENDER
that he killed PHIL at Grand China.  BENDER also heard POO POO on
the phone telling CHIN to "take care of WAYNE".

        On 10/7/97, SA Kristen A. Kane and AUSA Kenneth
Wainstein again met with BENDER and he provided the following
information:

        Several years ago, BENDER witnessed a shooting between
WOOZIE's people and THADEUS HARTRIDGE's people on Delaware Avenue.
WOOZIE, SAM MARBURY, WILLIE COBB and ANDRE WYNN were on the
street and HARTRIDGE, ROY, JUNIOR, MARK and SHANNON, from 21st
Street, NE, were in a car.  HARTRIDGE had previously robbed WYNN
of $4,000.  There was shooting by both groups.

        Toward the end of 1994, BENDER robbed a "sale" of his
"First Down" coat.  The "sale" returned to the area about twenty
minutes later and asked people on K Street about the guy who
robbed him.  The guy's car was only about ten feet away from
BENDER and when the car pulled off, BENDER shot at it.  The car
stopped and then pulled off again.  BENDER did not know if he hit

FD-302a (Rev. 10-6-95)

166E-WF-200828

Continuation of FD-302 of ___ Charles Bender _____ , On 8/13,15/97, , Page ___4___
10/7/97, 2/3/98

the driver.

BENDER usually got his marijuana from WOOZIE but sometimes got it from POONIE or J. JOHN. BENDER sold about a quarter pound a day and made about $300 to $500 each day. WOOZIE usually fronted BENDER and BENDER would pay him $400 for each half pound. BENDER would get his weed in the M Street court and would deal with WOOZIE or FACE. WOOZIE kept his weed at WILLIE COBB's house. GREG SEABROOKSk, TYDY (TYRONE GREENFIELD), RONNIE (HORNS), HAYGOOD, SLUG (TRAVEL RILEY), OLD DOG (CALVIN RANDOLPH), LITTLE CHESTER (JERMAINE JACKSON), TADPOLE (BERNARD JOHSNON), MEECHIE (DEMETRIUS HUNTER), WILLIE COBB, JOEY (SIMMONS) and MANNY (SIMMONS) all sold drugs for WOOZIE.

In approximately the summer of 1995, RAYMOND WASHINGTON and DIRTY MEAT robbed CRAWFORD (HODGES) of $2,000.

Before BUTCHIE (ROBERT SMITH) was killed, DRAPER said that his cousin BUTCHIE was telling on him. After BUTCHIE was killed, DRAPER said he knew who killed BUTCHIE but did not tell BENDER who it was.

PIMP told BENDER that JAMES (MONTGOMERY) was snitching on him, SAM (CARSON) and DRAPER. PIMP said that JAMES was snitching on PIMP for a 1991 attempted murder and on DRAPER and SAM for a Maryland murder. PIMP said "I'll kill his bitch ass if I see him" about JAMES. PIMP said that he thought he would beat his case because the only thing the government had was JAMES.

On 10/7/97, DRAPER told BENDER that JAMES was telling on him, PIMP and SAM. DRAPER said that JAMES told MICHELLE ROBERTS that he was telling about the murders in Maryland, and that he told the government that he saw DRAPER go in a house and another guy with a mask go in the house. DRAPER said that it was a robbery and the government couldn't prove the case. DRAPER said that CHIN held fast but JIM told. He used the word "we" and even though he never said who "we" was, BENDER inferred that DRAPER was present. DRAPER said he was disappointed in JAMES because they had done so much together and that he would kill for JAMES. DRAPER said that his discovery packet said that BIRDIE, JAMES, POO POO, VITO and KIM from Southwest were supposed to testify against him. DRAPER said he hoped the government was

FD-302a (Rev. 10-6-95)


166E-WF-200828


Continuation of FD-302 of ___Charles Bender_____ ,On 8/13,15/97, ,Page __5__
10/7/97, 2/3/98

trying to scare him and if so, it was a lawsuit because the
government was putting people's lives in danger by identifying
witnesses.  DRAPER said that if he couldn't get the witnesses he
would get their families.  DRAPER heard that VITO was at Occoquan
and was snitching on DRAPER because he thought DRAPER was
snitching on him.  DRAPER also said that he and PIMP knew that
ART (RICE) was snitching.

     On 2/3/98, SA Kristen A. Kane and AUSA Kenneth
Wainstein again met with BENDER and he provided the following
information:

     PIMP said that TONY FORTUNE had been robbing dudes from
58th.  While they were gambling, FORTUNE was whispering like he
was plotting on PIMP.  PIMP said he pulled a gun and shot
FORTUNE.

     PUG stabbed a guy from Simple City at the Eastside
Club.  PUG used a piece of glass from a light.

     About one week later, WINSTON ROBINSON killed OLD FACE
from 37th Place.

     About one month after OLD FACE was killed, BENDER saw
PIMP stab WINSTON ROBINSON on the dance floor of the Eastside
club in 1995.  PIMP got the knife from CAL (KYLE KNIGHT).

     WOOZIE said that he gave DAMO two pounds of weed and
$500 to shoot CHIN.

     KK (LAWRENCE DAVIS), ROB and J.R. (RONALD DAVIS) all
told BENDER that WOOZIE beat JR with a stick and knocked him
unconscious because JR owed WOOZIE money.  This occurred on L
Street during the summer of 1997.



*F.B.I. Agent Working on New Task Force.*
*Targetting Big Drug Dealers*

son 84 Anthoney Dewitt (Worked for Dept of Housing )

Farther 85 Sunny Dewitt owne (Houses) on Carrollsbough St. S.W.

   86 Rag's  Hang out at a sometime

   87 Pope - owne ( Head - To - Toe ) beauty salon

   88 Darrell - owne ( water company )

Brothers [ 89 Boo - House in ( Atlanta )

   90 Bam - Horses (Paskattaway ) MD.

   91 Ja-barri - Girl friend owne (Show Time) beauty salon

   92 Fat Rob Boo owne (Barber shop, Beauty salon) N.C.

   93 Dawayne - owne (Sports store)

   94 The Twins part owner (Horss N Dickies) H St N.E.

   95 Bay Bay , Shawn.   3rd St. S.W.

   96 Darlean Spincer - Husband - owne (Car dealer) ~~Richmon hollellewsth~~ AVE NE

   97 Vernon Nelson   7th St and 9th St NW

 * 98 Antwan Signo (Carlos Harrison) part ner

 * 99 Eric Taylor - (Swiszer) can give you better info

 * 100. Curley  (Le Droit Park) NW

 * 101. Terry Clipper  First N North Capital NW

 * 102 Clifton Cipper  First N North Capital N.W.

   103. I gave help finding (Bam) his girl house in S.W.

   104. Morrey (Car dealer)

   105. Rico Coats and Me - (owne Hoopty Auto) Goodhope Rd S.i

 * 106 Gary Green ( Rag's is his conection )

 * 107 Erney Hooks  with (Mad Ness shop )

 * 108. Derk Gaskines

 * 109. Kevin Gaskines

   110. Eric N Reggie Paris

905141



Sibbiu
Pitti

90514

## Lived in 203

*Alston Gathers aka (Gus)*    1st Floor  (vi/o)
*Terry Leak aka (Fly)*    1st Floor
*Ronnell Leak aka (Farley)*    1st Floor
*Rodrick Hays aka (Rick)*    1st Floor
*Larry Johnson aka (Hi Hi)*    2nd Floor
*Shawn Johnson*    2nd Floor
*Shawn Coats aka (Bird)*    2nd Floor
*Kevin Harris aka (Doobee)*    2nd Floor
*Daanell Rice aka (Rice Man)*    2nd Floor
*Victor Taylor aka (Gambino)*    3rd Floor  (vi/o)
*Spank (Victors brother)*    3rd Floor  (vi/o)
*Raymond Washington aka (Ray Roo)*    4th Floor
*Anthony Chandler aka (Santese, Noriagga)*    4th Floor
*Marlon ? aka (Kooky Eye)*    ? Floor
*Steve Dunbar aka (Herald)*    5th Floor
*Donald ? aka (Disco)*    2nd Floor  (vi/o)
*Raymond Sholders aka (Big Youngen)*    ? Floor  (vi/o)
*Lou Floor ?*

## Hung over 203

*James Montgomery aka (Jim) or (Bammer)*
*Samual Carson aka (Chin)*
*Erick Jones aka (Ericky Berk)* (vi/o, slim)
*Wayne Perry aka (Slim, silk)*
*Harry (Slim)*
*Paul Franklen aka (Dirty Meat)* (vi/o)
*Reganald Barrett Swisser aka (DooDoo)* (slim, vi/o)
*Antwan Smith aka (Shorty Black)* (Slim)
*Ricky Hester aka (Big Face)* (Slim)
*Derek Young aka (Di Roo)* (Slim, vi/o)
*Herbby (Di Roos Brother)* (Slim)
*Gregory ? aka (Kirky)* (Victors cousin)
*Rodney Rardon aka (Tay)* (vi/o)
*Wayne Green* (vi/o)
*Joseph Nickens aka (Joe-Squably)* (vi/o)
*David Buyers aka (Boon)* (vi/o, Slim)

Suger Boy
Shorty
Moolyo (vito)
B.U. (slim)
RoJay Richardson aka (Ro)
Mark Johnson aka (Beave)
Shot Gun (slim, vito)
Keith Lawson aka (killer)
Scottie (slim, vito)
Donnald Nickols aka (Hard Rock) (vito)
Terry Hooks
Gerald Hooks aka (Gost Buster)
Roy Washington (vito)
Marice Proctor aka (PooPoo, Hog, shity)
Cliffton Edwards aka (Meechy, GoHard) (slim)
Charles Edwards aka (Sguirmmy, Thight Mike)
Kevin White
Peanut
Dillam Hill aka (Bill)
Vincent Hill aka (vito)
Darald Hines aka (Pooncy)
Millton White aka (Black)
Tyrone ? aka (Lex Luthor)
Warren Hallmen
Jerome Martin aka (Pimp)
Reganald Horn aka (koonta)
? Mathews aka (Broozer)
White Peady
Ashly Hines aka (Mint)
? Hines aka (Dino)
Paul Adams aka (South)
Pinto
Tyrone ? aka (Mink)
Kevin Patterson aka (L.L.)
Duck Sause
Calvin Turner aka (Fats)
Salles Price (slim, vito)
Grim (slim)
Cory Young (victor's cousin)

Christapher Young aka (sleepy) (victor's cousin)
Michalle Sonders
Lop (slim)(vito)
/ ? Hines aka (Tank)
Pernell ? aka (Nelly) (slim)
Tink
Arthor Rice aka (Art, Ak-47) or (Franky G) (vito)
Jeffery Pinnix aka (Gator) (vito)
Brian Locksly (vito)
Tod
David Carson (vito)
David Mathews
Kevin Caldwell aka (Cold Bones)
Christapher Franklin aka (Jiffy Lube) (vito)
Jeffer Bronner (vito)
ivedin 203 Wine Lip
Darnell Hardsberry aka (Party Ardy)
Avery White

905144

[redacted]

1. Where Drapper put the gun.

2. Where the gun's Are at in the water.

3. Where Sam moved to.

4. Where Joe's House is at.

5. Dirt Bike At shop.

6. Jay John's Weed Connection

7. RoJay House

905145

App 1386

People not likely to snitch

Vincent
Bill
Pimp
Chin
David
Tay
Poopoo
Drapper
ErickieBerk

People likely to snitch

Dirty meat
Gus
Rock
South
Herry yo
Bird
Swicer
Sam M.
Tony Washington
KayKay
Peatty
J.R
Man
Kafonnie
Jalonnie
Jake
Cavery
Vance
907

Woozie
Ronnie
Boo
Slugger
Youseff
Jermain
Manny
Tappole
Telly
Ronnie Tee
Wink
L.T
Punken
Manute-50/50
Twin-50/50
Leon Shannon
Bay Bay-50/50
Shacon-50/50
A.K.

16

People likely to send a hit.

Vincent
Bill
Pimp
Chin
David
Tay
Poopoo
Drapper
Erickie Berk

People likely to get hit now.

Dirty meat - Pimp, Vincent, Chin
Gus - Pimp, Vincent, Eric
Rock - Pimp, Chin
Bird - Pimp, Chin, Vincent, Poopoo, David, Drapper
South - Pimp, Vincent
Herryo - Pimp, Vincent
Sam M - Chin, Vincent, Bill
Swicer - Eric, Pimp, Vincent, Drapper
Me - All of they above

People likely to do it.

Pud
Big Jim
David
Tay

App 1388

9/10/9    323-4500

66~

Sammy
901- Kiedra
Lorrie Hoes
Billy
Mountain possibly

Harry O ¡ Buck chases
the Guy who shot Vic
¡ saw him get in
runald Sowells station
wagon

Draty rest saw wood
shoot Bill

Lorrie T ¡ Wink shot
Eric Dean    Sam Carson
said so

*Agent Lisi's notes*

SAM SAID Bill killed
Joey.

1/4 pours a day with
Peter
after Poonie got killed
when Poonie was alive
1/4 pound a day.
couple of months
Got he weed though
sammy 3 four Poonie

Gene serned a few
loads

Gene stop by 2nd St.

905149

Probation 670-2196
MS FRAZIER

RHZ

610-2886

G.F   ANDREAN BOSEMAN
      1520 Butler St SE
                       # 103

B.M   Jerika Green
      3741 JAY NE #4
      ARMY Green = 10 MO.S
      398-1074

✓   1 Tory Frazier.
✓   2. Donato Sawells - Birdie's Sam
✓   3  Joey     Bill Hill - stabbed
    4  Birdie   ~~ PH: #        someone
✓/  5 - PACHO        ~~~~~       JOCCU"
✓/  6.  Cheeks
✓   7. Steve Dunbar - Squirrely
       sitting on steve.
✓ WYSOCKI

       Little Wayne was in on
   WYSOCKI

905150

Draper knew Wayne
is in Centerville

Sam, Tate, Sid - WITH DARREL
someone is locked up
for it now.
Cherokee belongs to
DARRYL

DO-CITIES ADRIAN killes PAUL
whitey

Sean 89 Gold MAXIMA
pounds for $1400.00
always on a certain
DAY because he has
someone in an Airport.
BAY- winks broken - small
red hatchback

Meds et al.
Dealt with them in 94
Got them in 94

905152

Tony Fortune →
on 1/2 way home escape.

Called 203 - Terry said Boo-Boo
was killed
Called Sam -
then went to see him
in S.W. at his mothers
house.
Sam, Pimp, South were
there. Pimp was upset.
Pimp said he kept telling
Boo-Boo to drop a gun.
then Anthony + Slue Boy
came down with some
bullets.
They all went to the East
Side

James On the run and only
Coming out in the evening

after a few days
Started hanging around 37th
riding the M.C.

Sam asked Pimp if "do
you want me to kill
this piece of shit"
quietly. They started
gambling again, the
Sam killed Tony.

James went to Boo-Boo's
in the hole & they were cleaning
guns - 3/4 handguns, &
AK-47
Pimp got a call from Cal, said
Block and then just rode
through.

905154

Pimp Askes James if
he wanted to go.
James went - they gave
him a .38 & another
gun

went to 50th. got out
of the car, & walked
up. None of Blocks
people were there. &
the left.

⊕

Pimp - South in Antwin's
Grey MAXIMA

THE James

On the way back, Some
Blocks white van
They went back & waited for
them. Started walking away
from the trash cans

happened not long after Boo-Boo got killed

Blocks var shot.

the white van came & they all busted off. Then ran back to Boo-Boo's house.

Sam told James he killed Tony @ late AUG, early Sept 93. They were in a car together

Drive By Shoot Tony Boo-Boo Pimp had the MAZDA van got illegal paper tags for Pimp's van.

They said they needed another vehicle.
went looking for Brotherhip. @ Taylor Road
Pimp    South
James
Sam.

905156

rode to all of the
ones where black would
be.

Didn't see anyone went
back out later

SAM      SOUTH
VAN
MAN   steve Bay

M.C.
James
pimp

Turned a corner near
Blaine + some dudes saw
them and ran.

905157

(Page 364 of Total)

when they stopped. 2 guys
in a car were next
to the van i fired a
couple of SHOTS.

Pimp jumped off the
M.C. i started shooting
at the car. He took
his helmet off i
exchanged kept shooting called them
fire w/ 59th down the street.
Hi House Left the area, pimp
it was jumped in the van
police
DRIVING AWAY Pimp
SHOOTS AT someone on
the street.

005158

PIMP SAID he left his
ID in the van
~~They~~ PIMP on ~~same~~ left
their pager in the van

X 9/91

~~told~~ They had to go
pick ~~anyone~~ up who
bailed out of the van

Kevin Hand — HE SAID / She SAID it
WAS PIMP ; POO-POO

Donald "Mante"
Bird had his Q ; said he
saw mante on the Hwy
near 295 — mante in his
station wagon there was a
BURG Q (007) in front of

Donald.

Nothing happened.

Birdie was saying he didn't have a gun & that wasn't good because one of them would get.

Sam was driving his rental car (goldish/silver grey possible Corolla.

Saw Manute near Anacostia station. Sam pulled up right next to him. Bird shot him, Manute fell over, but had a gun & tried to shoot through the window. Sam & Bird thought Manute was dead. Came to 2ND/CANAL

905160

st , talked about it
to James. Sam or
Sean said Manute shot
through his own roof.

Because of the Squeamy
Vito shootings.

PACHO        88-89

Cold outside ~~keeping~~ A Green
Jacket with madness white
on it. Let little Bits
wear the jacket to work.
Leave Candy Vandy & Gary
tried to jump little Bits
+ Ramire at the mall.

905161

They fucked the joint
up.

① living @ 1321 1st st
walking down 1st st. Saw
Pachos Body on
the st. heard that
Vito DID it then heard
Lop DID it.

Creeko — he was shot

J.M @ Y.C. and heard
from word that Creeko
got shot.

I drove past Dec : K
J.M PIMP, SAM, DIRTY MEAT
Bus on Bird. across the st.

005162

Boo said Creeho told an him

Pimp started talking
said that it was trying
to give d him the
Creeho beef. Pimp was
saying he has a mask
on so noone could
say it was him

James Sam Bras Poo-Poo
went to the mixture together

Cal was in P Bras Q with
him

DOOBY?

<u>Joey</u>

Bill said he was driving
down Delaware & Joey
shot at him.

Carlton (Squirrels Brother) said
he overheard Joey saying he
shouldn't have killed that
nigga. He reeces the gun
more than Woozie

Woozie & Little Cobb tried to
come through the back
alley to get James and

Woozie keeps getting people to
shoot for him.

James: Some ball through
the Martin's old Cadillac & went
to 2nd St.

905164

Poo-Poo Sister Confronted
James that he killed
Joey
James told Sam
what LEELI SAID

2 a month later, Bill
came around 2ns st
i asked James for a gun.
He SAID he fucked up
his gun. He SAID he
lost "shorty". James
SAID who are you talking
about i he SAID Joey.

905



905166



905167

much in MS but they
Drove the car to Cyrus.
they were going to burn the
car but the police got it
1st.

_____

Whitey J.M. Draper, Sam
Sam                possibly    Bird
                              he saying    he;
                         POG
Draper                Step came to ___ and
                had a soft cast on his foot
A Sam said Draper: Step
           tried to rob whitey
Drapers nervous condition caused
his gun to go off;
shot Step in the Foot.
They struggled to get Whitey
in the VAN but he wouldn't go

905168

Draper said he heard this from ~100.

So they killed him.

Draper said he met Gooch at a rest + he had his wife or G.F. Draper told Gooch that he heard his name was mentioned as killing Whitey + Gooch needs to secure his thoughts.

Draper doesn't thinks Gooch is going to try to have him killed.

Bird is at 301.
Bird 613-1219 or 1912
used that # last week.

905169

RODREY
/ REARDON

SAM, TATE, SYD
A female who works at
SAFEWAY was messing
with a dude. The
girl was setting the dude
up from SYD. SYD took
TATE, TATE TOOK SAM.

SYD told the girl everything

Darnell & SYD are looked up for
it. They got some coke.

905170

SEAN PATRICK

Curtis Wilson
~~Micheal Stevens~~ . . 1/2 ÷ 0
st by he store

Sam killed him because.
Curtis & Rob were

Rob & Curtis were going to
Rob  Sam & sean too.
      ↑ poo-poo

Sam.      Sam said he
was gone to Get them
for thinking about it.

Summer, wet
Came down to S.W. the
next day.      Sam said
he rode past, saw Curtis
with his back to the st.
Sam went home, put his
stuff on & came back

~~Came up 1st, turned~~
in

Came up the alley behind
Friendlys. Snuck up on
him. Said Hey.
Curtis turned around, tried
to run, same shot
him. Stood over him
& 'shot Same more in
the head. The gun
Jammed & he shot him
Some more. He ran
length the alley that
11 1/2 st. He
jumped in a trash can,
where he left his clothes
& gun. He came
back later & Got his
gun.

905172

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 379 of 422

Neds, Tony, Lee.
Yogi, Chris,

↓

Said Chris Got killed.

Yogi moved to Whitter St.

$10.5 pounds total

saw Neds w/ a gun 3-4

Got weed from them the
whole winter of 95

Buy from 1/4 to 1/2 # 1/2 an week-end

Yogi - old Yellow Nova   take ok
5-6 times

Neds - light blue Taurus.   took Eric near to

96 Blizzard, they serves some night he got killed

Dude 10 pounds.

8/8/97    DINAN, V, JaM.

Jelani's sister- Kimmika
out there when Saugany Got
killed.) Her father SAW it
in front of 907

DOB:
9-24-70

Heard that Sam Marbury
would jack cars but never
SAW him

Kimanis murder - 1300 blk 1st
Jan 97                        St

heard it was over A Girl
the guy is locked up

went to Texas in 87 came
back 4/1/88 - released - family
placement

905174

Came home, coach was
it.

hiring { Teeny Lark - lockers up w/ Carlos
w/ fresh { Ronnel - Teeny Brother
when
came
home

Solo in the 1400 block
of 1st

Got the stuff from ES Brown,
buying working halves

1st week of Jan Serves an
undercover, got lockers up.
Sentenced to 18.54 mos.
Att. Distr.

Came home 2/91   3-4/91
escape from 1/2 way house,
Dion't rattle - took peoples $

905175

Loretta Morgan - Sister,
Gerald Morgan - Brother

Diont come to S.W. much,

took $3,700 from same
dude that came to S.W.
He was smoking boat -
nobody knew the guy.

Summer invested that $ in same coke -
'91 got it from his brother
got 3 ounces of powder
from brother.
Gave that to people to sell
- Brother sold same
Gerald sold it to people.

never went hand to hand
when on the run.

Gots locked up again on 11/11/91
did 27 months at Lorton

9051



905177



Didn't know anything about weed.

1st Gold w/200 length SO Got A 1/4

#Souvery per James.

So Couldn't let James know who his account was.

'94 Best year still 1.5 #s pa Day's

Stuck with someone's man for a while, So just Played middle man



Came home 6/2/95
Got well from Petey
& Poonie

Butchie was dealing with
Poonie & Petey

just found out that Petey
won't f/ w/ Butchie anymore.

Sam & Poonie were close

Sam Christian
have Charlie to
talk to
Poonie

905180

(Page 387 of Total)





905182



1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 1:98-CR-329-03 (RCL) |
| | § | |
| SAMUEL CARSON | § | |

### AFFIDAVIT OF LEXI NEGIN CHRIST

1. My name is Alexandra Negin. When I practiced in Washington, D.C. I went by my nickname "Lexi" Negin and used my married name "Christ". I represented Mr. Samuel Carson in his trial in the above referenced case.

2. During trial I was responsible for drafting legal arguments, presenting and cross-examining witnesses, making legal determinations affecting defenses presented at trial and making motions for mistrial when necessary along with my co-counsel Joseph E. Beshouri.

3. During the trial the judicial bias that I and Mr. Beshouri encountered was insurmountable. It rendered us unable to effectively cross examine witnesses, respond to late *Brady* disclosures and impeach witnesses as to bias. On several occasions, we failed to make effective strategic decisions to combat this prejudice, such as moving for mistrial or sanctions against the government prosecutors.

4. We were never aware that material was submitted to the Court ex parte for in camera review. If we had known such a practice had taken place, we would have demanded that the government make a record and that the Court make factual findings. It was critical to the defense that we be able to show each and every instance where James Montgomery or Charles Bender lied. Since Agent Lisi was essentially sponsoring and bolstering the testimony given by James Montgomery and Charles Bender at trial, we would have used each and every instance of Montgomery and Bender lying to Agent Lisi to impeach Montgomery, and Bender, to raise doubt about Lisi's credibility in light of his faith in Montgomery's and Bender's stories, and to attack the government for supporting Montgomery and Bender. Although the defense was able to demonstrate inconsistencies in Montgomery's ever changing stories, and in some of Bender's, every instance where they lied to law enforcement was critical to our defense because we argued Montgomery, Bender and the other cooperating witnesses could not be trusted in the absence of objective corroboration and the cumulative affect of every lie piling up was critical.

5. The fact that we were not provided *Brady* material or *Jencks* in the form of notes of Agent Lisi that demonstrated that Montgomery lied to him about the murder of Benton and that Bender lied about the killing of Steven Dunbar, materially affected the outcome of the case by depriving the defense of every lie told by Montgomery.

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 392 of 422
Case 1:98-cr-00329-RCL   Document 1178-1   Filed 04/09/15   Page 2 of 3

2

6. The Watson file, that contained letters written in his own words describing himself as a liar, conniver and schemer would certainly have been the most powerful impeachment of his testimony possible. Not disclosing that information deprived the defense of critical impeachment.

7. Trial counsel for Mr. Carson, and all the defendants, were limited in making objections, asking for mistrials, cross-examining and impeaching witnesses, and preparing effectively for cross examination and argument in light of the Court's bias and arbitrary time constraints. Moreover, all this was exacerbated by the government's failure to turn over Brady material in a timely manner.

8. One instance where we were hindered in effective representation was the failure to call Charlene Wilson back to the stand to impeach her regarding her eyewitness account of the shooting of Anthony Fortune.

9. Once it was determined that Ms. Wilson's prior trial testimony was in question, that at least one FBI report placed into doubt whether she was an eye witness, and that the government had failed to disclose this information until four months after she had already testified, in order to be effective counsel, we should have moved for a mistrial, demanded a chance to recall Ms. Wilson, even if he deemed it futile.

10. Failure to do so was not objectively reasonable, prejudiced Mr. Carson, and failed to preserve the record for appeal.

11. Seeking to recall Ms. Wilson for impeachment purposes should have been vigorously pursued as she claimed to be an eyewitness to Mr. Carson's involvement in the shooting. Neither Mr. Beshouri or myself effectively pursued this impeachment.

12. The judicial bias and arbitrary rules imposed by the Court at trial made it impossible for Mr. Beshouri and myself to be able to effectively develop Mr. Carson's case on cross examination, or show the bias through the impeachment of government witnesses. Time constraints were placed upon counsel as to cross examination and use of impeachment materials

13. The contempt charges brought against two of the attorneys at trial, and later dropped after trial, as well as the search warrant executed on one of the attorney's offices during trial by the prosecution team, had a chilling effect on us in the representation of Mr. Carson.

14. This chilling effect caused us to forgo objections, forgo asking for mistrials when the facts warranted it, and to forgo the filing of motions and other challenges to the Judge's arbitrary rulings regarding time limits, cross examination and use of impeachment evidence.

15. We were aware that the judge was the one reviewing and approving our payments and that by winning the approval of the judge during the trial would most likely mean our vouchers would be fully paid.

16. Due to the length of trial, many, if not all the attorneys involved, had to clear their case docket to participate in this trial. Loss of payment for these services would have been a substantial financial burden. The implicit threats by the Court that compensation would be disallowed if he perceived delay tactics placed all the attorneys in the case in a position of conflict of personal interest.

USCA Case #21-3072    Document #2077668    Filed: 10/01/2024    Page 393 of 422
Case 1:98-cr-00329-RCL   Document 1178-1   Filed 04/09/15   Page 3 of 3

3

17. During the trial, I believed that Mr. Beshouri felt that if we were in the good graces with the Judge by being "reasonable" in the judge's eyes during the trial, that the judge's prejudicial rulings, contempt sanctions, and biased comments would be directed at other attorneys. I believed that our strategy was driven by an unreasonable desire to avoid these actions by the judge toward us, rather than defend our client to the best of our abilities.

18. I felt that the Judge put us in the position of having to choose between advocating forcefully for our client and be subjected to his prejudicial rulings, contempt sanctions, and biased comments or be viewed as "reasonable" in the judge's eyes by giving up objections, arguments and motions that would irritate the judge, thereby appeasing the judge.

19. The decision to appease the judge, rather than to pursue valid objections, arguments and motions was not a reasonable one and I believe we were ineffective by making that choice.

20. The appeasement of the judge gained us no tactical advantage during trial. It was not a valid decision to choose being in the favor of the judge over effectively defending our client.

21. Mr. Beshouri and I continued representation of Mr. Carson knowing that the chilling effect had risen to the level where we could no longer be Constitutionally effective in our representation.


Further your Affiant sayeth not.

Lexi Negin

# DISTRICT COURT OF MARYLAND FOR PRINCE GEORGE'S

(City/County)

LOCATED AT (COURT ADDRESS)
MAIN ST., UPPER MARLBORO, MD.

DC Case No. E00061797   RELATED CASES:

| COMPLAINANT/APPLICANT | DEFENDANT |
|---|---|

DETECTIVE DWIGHT S. DELOATCH

GREEN, DENNIS STANLEY

Name          (Print)
5400 BARLOWE RD.

Name          (Print)
4443 23rd. PKWY

Address  (Number and Street)
LANDOVER, MD. 20785   772-4925

Address  (Number and Street)
Temple Hills, Md.

City, State, and Zip Code
MD0172100        1035

Telephone

City, State, and Zip Code
CC#

Telephone

Agency, Sub-Agency, and I.D. #   (Officer Only)

DEFENDANT'S DESCRIPTION: Driver's License # .................................................. Sex **M** Race **B** Ht **5-7** Wt **210**

Hair **B** Eyes **Brn** Complexion **dark** Other .......................... D.O.B. **06-16-76** ..... ID .............

## APPLICATION FOR STATEMENT OF CHARGES    Page 1 of _____

I, the undersigned, apply for a statement of charges and a summons or warrant which may lead to the arrest of the
above named Defendant because on or about **November 28, 1996**

Date

at **2717 Iverson St., Temple Hills, Prince George's County, Maryland** , the above named Defendant

On November 26, 1996, the defendant stayed overnight at victims John Pinckney and Cheree

(Concise statement of facts showing that there is probable cause to believe that a crime has been committed or that the Defendant has committed it):

Owens residence at 2717 Iverson St., Temple Hills, Prince George's County, Maryland. On

this date, Ms. Owens heard the defendant talking on the telephone to an unknown person.

The defendant told the unknown person that "you should have came around here, we (khalis H

Herring and Freak) took three people out up the street. On November 17, 1996, three people

were killed in the 3900 block of 25th Ave., Temple Hills, Maryland. On November 29, 1996

(Continued on attached ................ pages) (DC/CR 1A)

I solemnly affirm under the penalties of perjury that the contents of this Application are true to the best of my knowledge,
information and belief.

**January 06, 1997**
Date

_DW D.S.B. Bothen 35_
Officer's Signature

I have read or had read to me and I understand the Notice on the back of this form.

_____
Date                                             Applicant's Signature

Subscribed and sworn to before me this **6** day of _____, 19 **97**

Time: **5:12 P.M** Judge/Commissioner _____ I.D. **5384**

I understand that a charging document has been issued and that I must appear for trial ☐ on _____
Date

at _____ ☐ when notified by the Clerk, at the Court location shown at the top of this form.
Time

_____
Applicant's Signature

☐ I declined to issue a charging document because of lack of probable cause.

_____          _____
Date                                             Commissioner          I.D.

Witnesses' Names and Addresses:

| | | |
|---|---|---|
| Name | Number and Street/Agency/Sub-agency/I.D. | City, State, Zip |
| Name | Number and Street/Agency/Sub-agency/I.D. | City, State, Zip |
| Name | Number and Street/Agency/Sub-agency/I.D. | City |



DEFENDANT'S EXHIBIT



DISTRICT COURT OF MARYLAND FOR PRINCE GEORGE'S _____ (City/County)

LOCATED AT (COURT ADDRESS)
MAIN ST., UPPER MARLBORO, MD.

DISTRICT COURT CASE NUMBER
1E000 61797

DEFENDANT'S NAME (LAST, FIRST, M.I.)
GREEN, DENNIS STANLEY

## APPLICATION FOR STATEMENT OF CHARGES (CONTINUED)    Page _9_ of _2_

the defendant and a person known only by the first name of craig, approached Mr. Pinckney at his residence.  The defendant told Mr. Pinckney that he wanted two hundred dollars from him for them not to say anything about the telephone conversation that Ms. owens over heard between the defendant and an unknown person.  If he (Mr. Pinckney) did not give him the money, he (defendant) would hate to see what happened to the people up the street "happen to them."  Craig then pulled up his sirt and showed Mr. Pinckney a handgun that he had in his waistband.

On December 06, 1996, the defendant approached Ms. owens and told her that he wanted two hundred dollars ($200.00) or he was going to beat up Mr. Pinckney, in order for them to be quiet.

On December 07, 1996, the defendant approached Ms. Owens and stated that he now needed two hundred saventy dollars ($270.00), because theydid not honor the two hundred do request.  Also, on this date, later that evening, the defendant and a person known to the victims as Freak, kicked the back door in to the victim's residence, damaging the door fra and the locks to the door.  The defendant and Freak was not able to entered the residence because the victims had barricade themselves inside their residence.  The defendant told the victims that they had to come out sometime.

On December 08, 1996, the victims contacted thes police department and was removed from their residence and placed in a witness protection program for their personal safety.

January 06, 1997
_____
Date

_____
Applicant's Signature

DC/CR 1A (Rev. 8/94)

TRACKING NUMBER
97A00100 0696

① Porsche

Porsche was a Gambino's house where
Vito, Wayne, Tyron etc were talking
but shot to do O/c Patcho was
recently out of jail and was moving
into Deleware Ave side.


Eddie Brown was at there w/ brothers
Dacey + Alfonso (Cary is deadman)
Eddie Brown is in the Feds.



98-329

COURT
EXHIBIT
#4

6/11/98
— Det Rivera

① Parole

Probe was a Corrections have the
Vic, Wayne, Tyron etc were talking
Let Art to do O/c Patcho was
recently at a jail and was moving
into Delaware Bruce sick.

Eddie Brown was at there w/ brothers
Darryl + Alfonso (Larry is deadron)
Eddie Brown is in the Feds.

App 1431

J 15-7860

4-7066

① Came-Up for George Joyner.

— He was with Shide when Shide shot
Donald Thompson.

— He used to hang w/ Wayne.

② "Smith" — he used to say how he wanted
to testify vs. Wayne b/c Wayne
killed his sister & dumped her
on the highway in MD.

- He; on the street now
- Hangs at 1410 Girard St.

③      Rodney Smith

Mtg. w/ Andre Murray — 7/15/97

— Jim Dinn
— Vince Cox
— Pat Skilly

Wit. was locked up on 3/28/97.

He used to do stings for the Johnson brothers — he sold weed,
twos — he etc.

_____

A few days before wit. got locked up, wit.
met w/ Gooch & Proyer.
Proyer Gooch told wit. he could go
with Proyer on robbery time. He said
Proyer needs money and : "he's on
stick-up time."

Keep in Mind re: Crigler:

Murray was given a plea offer to
aggravated assault before he
started talking to me or Brad Wimberton.
So, he didn't get a plea bargain for
his cooperation.

7/17/97

① Wit Gloria Paylor, Sonia ___ were
pulling getting high on 1st Street between O + P.
They were in the vestibule. They saw
Vito was attack w/ light-skinned guy.
Wit saw dude named Gerald (she think)
fell down the pavement steps
building across the street.
Right before that wit saw Vito walk
up to Gerald (?) at the door.
Wit could see arm going forward thru the
window of the building across the street.
They guy fell down the stairs.

Then, he saw Vito + light-skinned dude drive off
in a black truck.
Amber came + got "Gerald"

② Vito getting shot

Supposedly Jamie did it.

③ Vito

④ <u>Vito beat Net</u>
 - Net smtr sella o sells for his hdsaft
 - He wa tryg to sell a X St. i flo. to street
 - Vito throated him
 - Wit o Patty wm nullty lam stud      - Patty Bella Chima
 - Vito had his gun                         ~~toado~~ i Delan fitu
 - Beat him w/ steck                        ( L i M That )
 - Bill wa there

⑤ Vito beat Big Moose we $25 debt
     - "I'll give it to ya o th hit"
     - ○  "No, your gonna wait it ff ron."
     - Beat to th Knees

⑥ Savon Carson
     Sm him w/              - Broth Dewr had a c380
         .45
         9 mm.

⑦ "Pops"
     3 Guys o a girl ran. th all run "Pops" house i
     1300 block of First Street to rob samon o Pops
     got i th way. They there
                            shot him

7/17/97

(1) Wit Gloria Paylor, Sonia ___ were:
killing getting high on 1st Street between O & P.
They were in the vestibule. They saw
Vito was outside w/ light-skinned guy.
Wit. saw dude named Gerald (he thinks)
fell down the basement steps in
building across the street.
Right before that wit saw Vito walk
up to Gerald (?) at the door.
Wit could see arm going forward thru the
window of the building across the street.
Then guy fell down the stairs.

Then, he saw Vito & light-skinned dude drive off
in a black Acura.
Ambulance came & got "Gerald."

(2) Vito ~~[illegible]~~ Getting Shot

Supposedly Jermie did it.

(3) Vito Beat Budd
Budd took Vito's stash & tried to sell it @ 2nd & Canal St.
Vito beat him w/ stick
– "You shouldn't have stole my stash."

(4) Vito beat Net
- Net smokes crack & sells it for his habit
- He was trying to sell a rock ... f/o ... K Street
- Vito thrashed him
- Vito & Batty were walking down street — Patty Butler ([illegible] ~~[illegible]~~, Delaware betw. L + M Street)
- Vito had his gun
- Beat him w/ stick
- Bill was there

(5) Vito beat Big Moose over $25 debt
- "I'll give it to you on the first"
- D "No, you're gonna walk it off now"
- Beat to the knees

(6) Sam Carson
See him w/ .45, 9 mm's — Both Dave had a .380

(7) "Pops"
3 guys & a girl ran into old man "Pops" house in 1300 block of First Street to rob someone & Pops got in the way. They threw him down steps and kicked him.
Pops — about 70 yoa & smoked coke
Girl = Tracey
Guys = Keith, Darnell, Fat Eddie

Darnell took a plea to it.

Tracy is [illegible] halfway house..
Kevin & Fat Eddie are in jail for it.

Fat Eddie admitted it to wit. – he said he was robbing the place & accidentally pushed him down stairs.

Sam Maxberry

(1) Carries a gun
Summer of 1996
(2) Hispanic guys:
- They came for weed
- Second St. & Canal
- Hit them across the head
- Red Corolla
- Wit. was standing in f/o Shaun's porch.

- Other witnesses:
  - Sharon – Jeffrey Brown's GF
  - Jeffrey Brown (brother of Tyrone)
    - lives on corner of 2nd & P
  - Carter
  - George
  - Patty Bell

- D kept car for a couple of weeks

(3) Smith
- Wayne Perry killed his [illegible]
- He hangs w/ Sam.

(4) ~~[illegible]~~

(4) Sam is messing w/ Tracy Wanzer [illegible]
care of 2nd + P.

(5) Coordination between dealers:
- On Palmer Side:
- They'll yell at

~~[illegible]~~ Col. Khalil did that in front of wit.

Vito ~~[illegible]~~ Murdered wits to came in & tell Police it was Tyrone Brawner.

Wits he did this to:

1) Alvin Paylor

2) Got Margie Parker
= lives on 2nd St. across from FT McNair

3) Amanda ___?___
– lives at 44 O Street.

Case 1:[redacted]

Tyrone Brauner (Brawner)
- locked up in [illegible], MD
Vito put the word out that
Murray + Brauner had killed Pacho.
Brauner went to 1D + turned
himself in. He spent 9 months in jail
and case got dismissed.

<u>People At There</u>:
Kim Scholfield
Eddie Brown - locked up
Was living at 44 O St.

Carmelita Johnson
Wayne
David Wimms
Marsha Johnson - lives a corner of 1st + O
Cookie

Occurred At 1st + O St.
He saw Vito creep up + shoot Pacho in head
- had mask
- Wit. recognized Vito.

Their beef was over:
- ~~weed~~ 5 spots on Delaware Ave
- Over Dee

Dee - lives on Pennsylvania Avenue
- highrise ~~[illegible]~~ - ~~[illegible]~~ right on Penn [illegible] Southern Ave
- 1st building - ~~[illegible]~~
- Blair tall building

12/22/97

Andre Murray          B1          Eddie O'Connell

Darnell Ring told w.t that he killed

the Donald "Jackie Boy" Banks had some
New Yorkers kill "Slick" + Maurice
over in Delaware Ave. — back in 1991 or 1992

Banks lived at Delaware - L. St at the time.
Banks had them killed over some cocaine.

At the time, Darnell was living w/wife or "Brenda"
at 44 O Street ("the other side")

Donald Banks was a professional singer in DC.

One day. Darnell came running in, and said
"Somebody is fucking with me."
He got smithy a van but out the door.
Next thing w.t hears that Darnell stabbed Jackie Boy.
Jackie Boy was stabbed in the 1500 block
of First Street - on Roland Smith's steps.

Darnell came back to the house w/ blood on his hands.
Darnell; "Man, I had to stab Jackie Boy."
w.t; "Why?"
Donald; "Jackie Boy is the a
                                                     1.

_With to the murder:_

- Rolland Smith
- Tammy — lived in 1500 1st St.

Banks' sister = Peaches

Comp is locked up in Youth Center on some misdemeanors

## Murder of Kieth Johnson

Kieth owed dont $50,000 to Booch.
Booch employed Dragn to kill Kieth Johnson = "Whitey"
Kieth = Fat Petey Johnson's brother
Booch owns J&G Restaurant at 12th & Pennsylvania, SE
(Right next to Potomac Gardens)

Wit. used to do little jobs - shaking people down
for money - rob people — for Booch.
Wit + Dragn used to work for Booch.
Wit. met Booch thru Wayne Perry.

Wit heard Booch telling Dragn to kill Kieth.
Wit. did not hear Dragn return to advise
Booch he killed Kieth. He just heard Booch
give the order.

The word is that Fat Petey started
missing ~/ Bubbie - killed Bubbie to get
back at Dragn ⟹ mere rumor.

## Starbucks

Sweitzer has a little crew on Delaware that does weed selling & stickups.

Sweitzer's crew = Keith Mathis, Clutter, Met, Mar Johnson etc.

Sweitzer's crew hangs out in 1015 Delaware Av.

<u>Merle Watson</u> — told wit. that he got caught a a.k.a "Mummy" film at a CVS in Uptown. When we in D.C. Jail on Park violation (?) when he talked to wit.

"Curtis" = son of "Pie"; Lives : 1500 block of 1st St. S.E.
Curtis is saying that Merle is caught on the films.
~~Kevin~~ Curtis was up in court last clay.
Andre came up here to B-y.
Curtis is now in D.C. Jail on a robbery (?)

Mummy — he raised "Sweitzer"
— He's part of Sweitzer's crew.

Sweitzer — He's sent wit. and others to businesses given
— gas stations
— clothing stores

App-1447

Tyrone Briscoe

Wit. heard Tyrone and Poo Poo talking re: how they were gonna have Margie Perkin's daughter Killed b/c Margie Testified. They're gonna kill her daughter b/c it would be more painful to Ms. Perkins.

Poo Poo told wit. that he sent his mother, Beverly Morgan, to threaten Margie out of testifying. Poo Poo told wit. that his mother told Margie "Don't expect to see Davon alive again." Davon = Margie's daughter

Once, PooPoo & wit. were in jail — black — together at DC Jail. Once, they were going to court one day. Squirrel was in a protective custody cell. PooPoo told wit. to talk to Squirrel. Wit. went over and called "Squirrel" was next to testify vs. PooPoo. Squirrel (Antoine) said he wouldn't say anything. But, later on, PooPoo said "That nigger testified ..."

Tyson

He said he's gonna kill the prosecutor who
got him a 127 years if he
gets his hands on him.

He also said he was gonna kill Dave Bowen his
ryba - for getting him in this shit.

---

Jarvis

Jarvis told wit that he strangled the
bug. that he killed the dude who
killed Squiny.

Per Andre's phone call - 12/8/97
    Darnell Gump
  Killed    Donald Banks
       Across from 1500 P St.
    I think to serve that

Woozy – his tattly ~ Killy Vito.

Gerald Thopsn - Killed ~ "othasil"
        Tayner stabbed him - he admitted it.
                    He said he didn't mean to kill him
                    but stabbed him 14 times.

In Re: Vincent Hill Et. Al

GJ Jur #4

Case #24

Rep: BJN

7/17/97

Per Andre's phone call - 12/8/97
Darnell Gump
Killed Donald Banks
Across from 1500 P St.

I think he saw them

Eddie -
The Corbish

Andre Murray 12/5/97

① Sees Paule Bond - April 1999

② Maybe a Rick 55

③ ~~Patty~~ Baker BF - a bullyer from Canton
Lives at 20_ 3rd St.
— Andre Murray will get his name
— He's in Youth Center 1 One

Patty Baker lives in 205 ~~[illegible]~~ Street

Murder - Kid killed on Carrollburg Place, SW
- Summer
- Wit ~~was~~ in cell next to ~~Andre~~ Kevil Ad -
He Told wit did it

Ken Wante
Prosecuting Atty
Hom. Division
MPD HQ

Wit has seen Being held to Bricsoe re: murder etc

[handwritten notes, illegible]