ORAL ARGUMENT NOT YET SCHEDULED

# No. 21-3072

**(consolidated with Nos. 21-3073, 21-3078, 22-3016, 23-3015)**

In the

# United States Court of Appeals

### for the District of Columbia Circuit
———————————

## UNITED STATES OF AMERICA,

*Appellee,*

v.

## SEAN COATES, WILLIAM K. SWEENEY, JEROME MARTIN, JR., AND SAMUEL CARSON,

*Appellants.*
———————————

On Appeal from the
United States District Court for the District of Columbia
(Nos. 1:98-cr-00329-RCL-002, -003, -004, -006)
———————————

# APPELLANTS' APPENDIX

## Volume V of V

John Longstreth
Jonathan M. Cohen
Tre A. Holloway
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Phone: (202) 778-9000
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com

*Counsel for Jerome Martin, Jr.*

Mark Lanpher
ALLEN OVERY
  SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Phone: (202) 508-8000
mark.lanpher@aoshearman.com

Katherine Stoller
ALLEN OVERY
  SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
katherine.stoller@aoshearman.com

*Counsel for Sean Coates*

Eric Hans Kirchman
LAW OFFICE OF ERIC H. KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Phone: (202) 347-4052
kirchlaw@cs.com

*Counsel for William Sweeney*

David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
Phone: (202) 548-8911
dbs@davidbsmithpllc.com

*Counsel for Samuel Carson*

*Counsel for Appellants*

**TABLE OF CONTENTS**

PAGE(S)

## VOLUME I (APP 1–141)

United States District Court Docket Report, Case No. 98-329
(accessed September 27, 2024)..................................................................................App 1–141

## VOLUME II (APP 141–575)

Excerpts of Transcript
(September 27, 2000) ...........................................................................App 142–147

Excerpts of Transcript
(December 10, 1996) ...........................................................................App 148–150

Excerpts of Transcript
(June 8, 2000)......................................................................................App 151–173

Excerpts of Transcript
(January 8, 2001) (AM) .......................................................................App 174–177

Excerpts of Transcript
(January 10, 2001) (AM) .....................................................................App 178–188

Excerpts of Transcript
(January 23, 2001) (PM) ......................................................................App 189–193

Excerpts of Transcript
(January 24, 2001) (AM) .....................................................................App 194–212

Excerpts of Transcript
(January 30, 2001) (PM) ......................................................................App 213–217

Excerpts of Transcript
(February 1, 2001) (AM) ......................................................................App 218–225

Excerpts of Transcript
(February 5, 2001) (AM) ......................................................................App 226–241

Excerpts of Transcript
(February 8, 2001) (PM) ......................................................................App 242–260

Excerpts of Transcript
(February 12, 2001) (AM) ....................................................................App 261–274

Excerpts of Transcript
(February 13, 2001) (AM) ...................................................App 275–290

Excerpts of Transcript
(February 15, 2001) (PM) ...................................................App 291–299

Excerpts of Transcript
(March 7, 2001) (PM) ........................................................App 300–322

Excerpts of Transcript
(March 12, 2001) (PM) ......................................................App 323–357

Excerpts of Transcript
(March 13, 2001) (PM) ......................................................App 358–375

Excerpts of Transcript
(March 14, 2001) (AM) ......................................................App 376–395

Excerpts of Transcript
(March 14, 2001) (PM) ......................................................App 396–409

Excerpts of Transcript
(March 15, 2001) (AM) ......................................................App 410–435

Excerpts of Transcript
(April 4, 2001) (AM) ..........................................................App 436–455

Excerpts of Transcript
(April 9, 2001) (AM) ..........................................................App 456–462

Excerpts of Transcript
(April 9, 2001) (PM) ..........................................................App 463–466

Excerpts of Transcript
(April 24, 2001) (PM) ........................................................App 467–469

Excerpts of Transcript
(April 25, 2001) (AM) ........................................................App 470–476

Excerpts of Transcript
(May 1, 2001) (AM) ...........................................................App 477–485

Excerpts of Transcript
(May 23, 2001) (AM) .........................................................App 486–496

Excerpts of Transcript
(May 23, 2001) (PM) ..........................................................App 497–514

Excerpts of Transcript
  (May 29, 2001) (PM) ..................................................................App 515–531

Excerpts of Transcript
  (May 30, 2001) (AM) .................................................................App 532–541

Excerpts of Transcript
  (June 14, 2001) (PM) .................................................................App 542–550

Excerpts of Transcript
  (June 26, 2001) (AM) .................................................................App 551–565

Excerpts of Transcript
  (June 26, 2001) (PM) .................................................................App 566–569

Excerpts of Transcript
  (July 2, 2001) (PM) ....................................................................App 570–575

## VOLUME III (APP 576–1043)

Sweeney Motion to Compel Discovery Number 1
  (February 9, 1999) (Doc. 71) .....................................................App 576–602

Carson Motion for Dismissal of Counts, to Compel Disclosure of Exculpatory Evidence,
  and for Additional Sanctions Due to Violations of *Brady v. Maryland*
  (July 16, 2000) (Doc. 329) .........................................................App 603–616

Sweeney Motion to Admit into Evidence the Maryland Grand Jury Testimony of Two
  Unavailable Witnesses Who Were Introduced
  by the State's Attorney for Prince George's County
  (November 2, 2000) (Doc. 450)...................................................App 617–620

Order Denying Motions to Compel (Jackson, J.)
  (September 28, 2000) (Doc. 451) ................................................App 621–625

Carson Motion to Adopt William Sweeney's Motion to Admit into Evidence the Maryland
  Grand Jury Testimony of Two Unavailable Witnesses Who Were Introduced by the State's
  Attorney for Prince George's County
  (November 6, 2000) (Doc. 452)........................................................App 626

Government's Memorandum in Opposition to Sweeney and Hill's Motions for Admission of
  Grand Jury Testimony of Unavailable Witnesses
  (November 16, 2000) (Doc. 481)................................................App 627–632

Second Retyped Indictment
  (July 2, 2001) (Doc. 760) ...........................................................App 633–711

iii

Verdict Form
  (August 16, 2001) (Doc. 810) ...................................................................App 712–749

Order Denying Appellants' Motion to Allow Counsel to Review Specific Sealed Portions of the
  Trial Record
  (August 28, 2003) (USCA Case No. 02-3015, Doc. 769196) ......................................App 750

Brief of Appellants Sweeney, Carson, Coates, Martin, and Hill
  (April 25, 2005) ...........................................................................................App 751–771

Appeal from the United States District Court for the District of Columbia
  (June 14, 2005)............................................................................................App 772–814

Reply Brief of Appellants Sweeney, Carson, Coates, Martin, and Hill
  (July 6, 2005) .............................................................................................App 815–929

Sweeney Emergency Motion for Access to Court Records and Points and Authorities in Support
  Thereof
  (February 5, 2008) (Doc. 1013) .......................................................................App 930–933

Martin Motion to Vacate, Set Aside, Correct Sentence Pursuant
  to 28 U.S.C. Section 2255
  (February 18, 2008) (Doc. 1021) .....................................................................App 934–950

Sweeney Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 USC §2255
  (February 19, 2008) (Doc. 1017) .....................................................................App 951–967

Martin Motion to Vacate, Set Aside, Correct Sentence Pursuant to 28 U.S.C. Section 2255
  (February 18, 2008) (Doc. 1021) .....................................................................App 968–984

Carson Motion Under 28 USC § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in
  Federal Custody
  (February 18, 2008) (Doc. 1023) .....................................................................App 985–990

Coates Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence
  (February 19, 2008) (Doc. 1020) ...................................................................App 991–1043

## VOLUME IV (APP 1044–1456)

Carson Motion to Join the Petitions Filed by Co-Defendants for Relief
  Pursuant to 28 U.S.C. § 2255
  (March 17, 2008) (Doc. 1024) .....................................................................App 1044–1045

Martin Motion to Stay the 28 U.S.C. 2255 Motion
  (May 7, 2008) (Doc. 1028) ..........................................................................App 1046–1050

Carson and Sweeney Joint Unopposed Motion for Extension of Time to File Supplements to
    Motions to Vacate
    (February 2, 2011) (Doc. 1065) .............................................................App 1051, 1056–1057

United States' Unopposed Motion for Extension of Time to File Response to Defendants'
    Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255
    (July 2, 2010) (Doc. 1053) ................................................................App 1052–1055

Carson Motion to Reconsider Motion for Discovery Based Upon New Evidence
    (October 9, 2014) (Doc. 1132)...........................................................App 1058–1068

Sweeney Supplemental Motion to Vacate, Set
    Aside or Correct Sentence, Pursuant to 28 USC §2255 and Incorporated Memorandum of
    Facts and Law (November 28, 2014) (Doc. 1140-2) ........................................App 1069–1152

Carson Motion to Join Petitioner Sweeney's Motion to Unseal Specific Exhibits
    (January 29, 2015) (Doc. 1153) .......................................................App 1153–1154

Coates Pro Se Supplemental
    Claims in Relation to the Original Motion Pursuant to 28 U.S.C. § 2255
    (February 24, 2015) (Doc. 1166) .......................................................App 1155–1163

Exhibit 1 to Sweeney's Supplemental Motion
    (February 25, 2015) (Doc. 1156-2).......................................................App 1164–1173

Exhibit 2 to Sweeney's Supplemental Motion
    (November 28, 2014) (Doc. 1144-1, 1145-1, 1146-1, 1147-1) ........................App 1174–1226

Exhibit 3 to Sweeney's Supplemental Motion
    (November 28, 2014) (Doc. 1141-2) ....................................................App 1227–1230

Exhibit 4 to Sweeney's Supplemental Motion
    (November 28, 2014) (Doc. 1141-3) ....................................................App 1231–1236

Exhibit 5 to Sweeney's Supplemental Motion
    (November 28, 2014) (Doc. 1142-1) ....................................................App 1237–1246

Exhibit 6 to Sweeney's Supplemental Motion
    (November 28, 2014) (Doc. 1143-1) ....................................................App 1247–1268

Exhibit 7 to Sweeney's Supplemental Motion
    (November 28, 2014) (Doc. 1142-2) ....................................................App 1269–1270

Exhibit 8 to Sweeney's Supplemental Motion
    (November 28, 2014) (Doc. 1142-3) ....................................................App 1271–1272

Exhibit 9 to Sweeney's Supplemental Motion
   (November 28, 2014) (Doc. 1142-4) .................................................App 1273–1275

Exhibit 10 to Sweeney's Supplemental Motion
   (November 28, 2014) (Doc. 1142-5) .................................................App 1276–1277

Exhibit 11 to Sweeney's Supplemental Motion
   (November 28, 2014) (Doc. 1142-6) .................................................App 1278–1280

Exhibit 12 to Sweeney's Supplemental Motion
   (November 28, 2014) (Doc. 1142-7) .................................................App 1281–1285

Defendants' Unopposed Motion for Extension of Time to File Memorandum in Support of
   Defendants' Motion to Vacate Sentence
   (February 25, 2015) (Doc. 1158) .....................................................App 1286–1288

Carson Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C.
   Section 2255
   (April 9, 2015) (Doc. 1170) .............................................................App 1289–1332

Government's Ex Parte Submission of Additional Materials to the Court Regarding James
   Montgomery
   (April 9, 2015) (Doc. 1174-3)..........................................................App 1333–1363

Court Exhibit 8
   (April 9, 2015) (Doc. 1175-1)..........................................................App 1364–1424

Affidavit of Lexi Negin Christ
   (April 9, 2015) (Doc. 1178-1)..........................................................App 1425–1427

Application for Statement of Charges
   (April 9, 2015) (Doc. 1178-3)..........................................................App 1428–1429

Court Exhibit 4
   (April 9, 2015) (Doc. 1174) .............................................................App 1430–1456

## <u>VOLUME V (APP 1458–1831)</u>

Carson Unopposed Motion for Leave to File Under Seal
   (July 23, 2015) (Doc. 1180).............................................................App 1458–1461

Martin Supplement to Motion to Vacate in Light of *Johnson v. United States*
   (June 23, 2016) (Doc. 1182) ............................................................App 1462–1465

Carson Supplement to Motion to Vacate After <u>Johnson</u> Decision
   (June 24, 2016) (Doc. 1183) ............................................................App 1466–1468

Coates Supplement to Motion to Vacate in Light of *Johnson v. United States*
(June 27, 2016) (Doc. 1184) ............................................................App 1469–1470

Coates Motion for Leave to Join Samuel Carson's Supplemental Motion and to File Under Seal and to Late File This Motion
(June 27, 2016) (Doc. 1185) ............................................................App 1471–1517

Carson Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. Section 2255
(June 27, 2016) (Doc. 1185-1)..........................................................App 1518–1561

Order Granting Carson's Motion for a Briefing Schedule (Lamberth, R.)
(April 7, 2017) (Doc. 1188) ..............................................................App 1562–1563

Sweeney Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC §2255 and Incorporated Memorandum of Facts and Law
(June 26, 2017) (Doc. 1197) ............................................................App 1564–1647

Sweeney Supplement to Amended Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC §2255 and Incorporated Memorandum of Facts and Law
(October 31, 2018) (Doc. 1229)........................................................App 1648–1650

Martin Supplement to Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255 by a Person in Federal Custody
(November 21, 2018) (Doc. 1233) ....................................................App 1651–1688

Affidavit of Jennifer Wicks
(October 6, 2020) (Doc. 1280)..........................................................App 1689–1690

Memorandum Opinion (Lamberth, R.)
(October 27, 2021) (Doc. 1283)........................................................App 1691–1739

Memorandum Opinion (Lamberth, R.)
(May 23, 2022) (Doc. 1305) ............................................................App 1740–1765

Sweeney's Reply to the Government's Opposition to His Motions to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. § 2255
(July 14, 2020) (Doc. 1277)..............................................................App 1766–1828

Declaration of William K. Sweeney
(October 6, 2020) (Doc. 1280-2) ......................................................App 1829–1831

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 1:98-CR-329-3 (RCL) |
| | § | |
| SAMUEL CARSON, et al. | § | |
| | § | |

**UNOPPOSED MOTION FOR LEAVE TO FILE UNDER SEAL**

Petitioner SAMUEL CARSON, by his attorney Kira Anne West, moves the court to

allow him to file under seal two additional exhibits to his Supplemental Motion to Vacate, Set

Aside or Correct Sentence Pursuant to 28 U.S.C. §2255, and as reasons states as follows:

1. The exhibits contain information previously sealed by the District Court.

2. This case involved many cooperating co-defendants and cooperators who may still fear some

sort of retaliation for their testimony.

3. The affidavit of Lexi Christ is a duplicate of one previously filed with the exception that the

one filed with this motion was notarized. The affidavit of Mr. Carson is additional information

that pertains to the affidavit of Ms. Christ.

4. Undersigned counsel has conferred with opposing counsel, Ms. Chriss, who is unopposed to

this motion and amendment.

WHEREFORE, for the foregoing reasons, as well as any additional reasons deemed

meritorious by the Court, counsel requests that this Court enter an order allowing Mr. Carson to

file his supplemental motion under seal.

Respectfully submitted,

_____/s/_____
KIRA ANNE WEST

1

Bar No. 993523
1325 G Street NW, Suite 500
Washington, D.C. 20005
(202) 236-2042 Phone
Email: kiraannewest@gmail.com

ATTORNEY FOR SAMUEL CARSON

## CERTIFICATE OF SERVICE

    I hereby certify that on July 23rd, 2015, a copy of this pleading was served by email on opposing counsel, AUSA Margaret Chriss.

                         /s/
                      KIRA ANNE WEST

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 1:98-CR-329 (RCL) |
| | § | |
| SAMUEL CARSON, | § | |
| | § | |

**O R D E R**

Upon consideration of Defendant Carson's request to file under seal two additional

exhibits to his supplemental 2255, it is HEREBY,

ORDERED that the Motion is  GRANTED  /   DENIED.

SO ORDERED this _____ day of _____, 2015.

_____
ROYCE C. LAMBERTH
United States District Judge

1

My name is, Samuel Carson, I am over (18) years of age compentent
to testify and make this affidavit having personal knowledge of
the following, pursuant to penalty of perjury, 28 U.S.C. § 1746:

1. I Samuel Carson have never seen the unseal documents that Ms.
   Jenifer Wicks got from the Clerk's Office during trial or during
   direct appeal.

2. I've never seen nor was shown the statement of Steven Thomas
   before or after trial.

3. I also asked my trial lawyer several times to check the rental
   car agency (records) to show what color of car I was driving
   during the month of June 16, 1997.

I confirm that the foregoing is true and correct to the best
of my knowledge, pursuant to penalty of perjury 28 U.S.C. § 1746.


Dated April ___3___, 2015.


                                        28 U.S.C. § 1746

                                      Respectfully Submitted

                                      _Samuel Carson_
                                      Samuel Carson
                                      Reg.#01182-748
                                      FCI Butner-2
                                      P.O. Box 1500
                                      Butner, NC 27509


FEDERAL CORRECTIONAL INST. #2
P.O. BOX 1500
BUTNER, NORTH CAROLINA 27509
DATE: _____4/3/15_____
        "SPECIAL LEGAL MAIL"

The enclosed letter was processed through special mailing
procedures for forwarding to you. The letter has been
neither opened or inspected. If the writer raises a question
or problem over which this facility has jurisdiction, you
may wish to return the material for further information
or clarification. If the writer enclosed correspondence for
forwarding to another addressee, please return the enclosed
to the above address.

                            1 of 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal No. 98-329-2 (RCL)** |
| | : | |
| **JEROME MARTIN, JR., SAMUEL** | : | |

**SUPPLEMENT TO MOTION TO VACATE IN LIGHT OF
*JOHNSON v. UNITED STATES***

Comes now the Defendant, Jerome Martin, by and through counsel, Michael

E. Lawlor, Lawlor & Englert, LLC, and hereby supplements his previously filed

motion pursuant to 28 U.S.C. § 2255 with a claim in light of the Supreme Court's

ruling in *Johnson v. United States*, 135 S. Ct. 2551 (2015).

Mr. Martin was convicted of one count of using a firearm during and in relation

to a "crime of violence" in violation of 18 U.S.C. § 924(c) (Count 31 of the second

retyped indictment, July 2, 2001).[1] Specifically, the count alleged that the underlying

"crime of violence" for the § 924(c) charge was Count 18, which charged Mr. Martin

with attempted murder (under 22 D.C. Code Sections 501 and 3202) in aid of

---

[1]     Mr. Martin was also convicted of: conspiracy to distribute and possession with
intent to distribute controlled substances (Count 1); conspiracy to participate in a
Racketeer Influenced Corrupt Organization (Count 2); First degree murder while
armed (Count 8); assaulting, resisting and interfering with a police officer with a
dangerous weapon (Count 9); violent crime in aid of racketeering (Count 18);
distribution of a controlled substance (Counts 49, 53, 55); and possession with intent
to distribute a controlled substance (Count 64).

1

racketeering. However, post-*Johnson*, attempted murder categorically fails to qualify as a "crime of violence." Therefore, Mr. Martin is now innocent of the § 924(c) offense, and his conviction for that offense is void.

The relevant portion of § 924(c) defining a "crime of violence" has two clauses. The first clause – § 924(c)(3)(A) – is commonly referred to as the force clause. The other – § 924(c)(3)(B) – is commonly referred to as the residual clause.[2]   The § 924(c) residual clause is materially indistinguishable from the Armed Career Criminal Act (ACCA) residual clause (18 U.S.C. § 924(e)(2)(B)(ii)) that the Supreme Court in *Johnson* struck down as void for vagueness. It follows that the § 924(c) residual clause is likewise unconstitutionally vague.  Hence, an attempted murder offense cannot qualify as a "crime of violence" under the § 924(c) residual clause. Likewise, attempted murder categorically fails to qualify as a "crime of violence" under the remaining § 924(c) force clause. Therefore, the "crime of violence" element of § 924(c) cannot be satisfied here, and a conviction cannot be constitutionally

---

[2]    Under § 924(c)(3), "crime of violence" is defined as follows:

> (3)    For purposes of this subsection, the term "crime of violence" means an offense that is a felony and –
>
> (A)    has as an element the use, attempted use, or threatened use of physical force against the person or property of another [known as the force clause], or
>
> (B)    that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense [known as the residual clause.]

2

sustained under the statute.

As a result, Mr. Martin's § 924(c) conviction 1) violates due process, 2) violates the laws of the United States and results in a fundamental miscarriage of justice, and 3) was entered in excess of this Court's jurisdiction. Therefore, he is entitled to relief under 28 U.S.C. § 2255(a).

Mr. Martin's claim is timely under 28 U.S.C. § 2255(f)(3) because he filed it within one year of the Supreme Court's decision in *Johnson* – a ruling which established a "newly recognized" right that is "retroactively applicable to cases on collateral review." Therefore, Mr. Martin respectfully requests that this Court grant his § 2255 motion and vacate his conviction.

Due to time constraints, counsel cannot at this time fully brief the issues presented in this pleading. Nonetheless, counsel will supplement this argument together with the supplemental memorandum of law on the claims Mr. Martin raised in his initial motion to vacate.

Respectfully submitted,

/s_____
Michael E. Lawlor
Lawlor & Englert, LLC
6304 Ivy Lane
Suite 608
Greenbelt, Maryland 20770
301.474.3404

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of June 2016, a copy of the foregoing motion was delivered to the following via ECF:

Margaret Chriss, Esquire
Office of the United States Attorney
555 Fourth Street, NW
Washington, DC 20530

Kira Anne West
1325 G Street, NW
Suite 500
Washington, DC 20005
Counsel for Mr. Carson

Eric Hans Kirchman
KIRCHMAN & KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Counsel for Mr. Sweeney

Veronice Annette Holt
VERONICE A. HOLT, ESQ.
3003 Van Ness Street, N.W.
Washington, DC 20008-4808
Counsel for Mr. Coates

/s_____
Michael E. Lawlor

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 1:98-CR-329-03 (RCL) |
| | § | |
| SAMUEL CARSON | § | |

## SUPPLEMENT TO MOTION TO VACATE AFTER <u>JOHNSON</u> DECISION

Pursuant to the Rules Governing Section 2255 cases, Defendant Samuel Carson hereby files this SUPPLEMENT TO MOTION TO VACATE through his counsel, Kira Anne West, and hereby supplements his previously filed motion pursuant to 28 U.S.C. § 2255 with a claim in light of the Supreme Court's ruling in <u>Johnson v. United States</u>, 135 S. Ct. 2551 (2015). Mr. Carson was convicted at trial in 2001 of violations of the following statutes: 21 U.S.C. §846, Conspiracy to PWID; 18 USC §§ 1962(d) & 1963(a), RICO conspiracy; 18 U.S.C. §1959(a)(1), murder in aid of racketeering activity (Chrishuahna Gladden, Alonzo Gaskins & Darnell Mack & Melody Anderson); 18 U.S.C. §2, Aiding and Abetting; 18 U.S.C. §924(c)(1)(A)(i), use of a firearm during and in relation to a crime of violence or a drug trafficking crime; 22 D.C. Code §2401 & §3202, First Degree Murder while armed (Maurice Hallman, Leonard Hyson, Teresa Thomas, Terita Lucas, Anthony Fortune, & Chrishauna Gladden); 22 D.C. Code §501 & §3202, Assault with intent to kill while armed; 22 D.C. Code §2101 & §3202, kidnapping while armed; and, 22 D.C. Code §3204(b), possession of a firearm during a crime of violence.[1]

---

[1] On 1/04/2001, Dkt #517, the Government filed a "RETYPED INDICTMENT" for SAMUEL CARSON. It renumbered the charges to: Former count 1s is now count 1rs. Former cou

Mr. Carson challenges his conviction for using a firearm during a "crime of violence" in violation of 18 U.S.C. § 924(c).   Mr. Carson's claim is timely under 28 U.S.C. § 2255(f)(3) because he filed it within one year of the Supreme Court's decision in Johnson – a ruling which established a "newly recognized" right that is "retroactively applicable to cases on collateral review." Therefore, Mr. Carson respectfully requests that this Court grant his § 2255 motion and vacate his conviction. Due to time constraints, counsel cannot at this time fully brief the issues presented in this pleading. Nonetheless, counsel will supplement this argument at a later date.

Respectfully submitted,

_____/s/_____
Kira Anne West
1325 G Street, NW
Suite 500
Washington, D.C. 20005
D.C. Bar No. 993523
202-236-2042
kiraannewest@gmail.com
Attorney for Samuel Carson

---

count 5s is now count 4rs. Former count 6s is now count 5rs. Former count 7s is now count 6rs. Former count 8s is now count 7rs. Former count 23s is now count 13rs. Former count 29s is now count 16rs. Former count 30s is now count 17rs. Former count 42s is now count 26rs. Former count 43s is now count 27rs. Former count 44s is now count 28rs. Former count 45s is now count 29rs. Former count 46s is now count 30rs. Former count 47s is now count 31rs. Former count 48s is now count 32rs. Former count 49s is now count 33rs. Former count 50s is now count 34rs. Former count 51s is now count 35rs. Former count 53s is now count 36rs. Former count 54s is now count 37rs. Former count 55s is now count 38rs. Former count 56s is now count 39rs. Former count 57s is now count 40rs. Former count 58s is now count 41rs. Former count 61s is now count 42rs. Former count 62s is now count 43rs. Former count 63s is now count 44rs. Former count 64s is now count 45rs. Former count 65s is now count 46rs. Former count 66s is now count 47rs. Former count 67s is now count 48rs. Former count 68s is now count 49rs. Former count 71s is now count 50rs. Former count 72s is now count 51rs. Former count 73s is now count 52rs. Former count 74s is now count 53rs. Former count 75s is now count 54rs. Former count 76s is now count 55rs. Former count 78s is now count 56rs. Former count 79s is now count 57rs. Former count 80s is now count 58rs.

**Certificate of Service**

I hereby certify that on this 24th day of June, 2016, a true and correct copy of the foregoing Defendant's Motion was served via the ECF system on the other counsel registered with ECF in this matter:

/s/ _____
Kira Anne West

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## UNITED STATES OF AMERICA

UNITED STATES OF AMERICA    :
                         :
        v.                :      CASE NO. **1:98-CR-329 (RCL)**
                         :
SEAN COATES

## SUPPLEMENT TO MOTION TO VACATE
## IN LIGHT OF *JOHNSON v. UNITED STATES*

Comes now the Defendant, Sean Coates, by and through counsel, Veronice A.

Holt, Esq and hereby supplements his previously filed motion pursuant to 28 U.S.C.

§ 2255 with a claim in light of the Supreme Court's ruling in ***Johnson v. United***

***States***, 135 S. Ct. 2551 (2015).  Mr. Coates challenges his convictions for using a

firearm during a "crime of violence" in violation of 18 U.S.C. § 924(c).  This motion

will be supplemented by October 26, 2016, in accordance with the June 2, 2016,

Standing Order .

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that on this 26th  day of June 2016, a copy of the
foregoing motion was delivered to the following via ECF:

Margaret Chriss, Esquire
Office of the United States Attorney

555 Fourth Street, NW
Washington, DC 20530

Kira Anne West
1325 G Street, NW
Suite 500
Washington, DC 20005
Counsel for Mr. Carson

Eric Hans Kirchman
KIRCHMAN & KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Counsel for Mr. Sweeney

Michael E. Lawlor
Lawlor & Englert, LLC
6304 Ivy Lane
Suite 608
Greenbelt, Maryland 20770
Counsel for Jerome Martin

_____

Veronice  A. Holt, Esq.

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## UNITED STATES OF AMERICA

**FILED UNDER SEAL**

UNITED STATES OF AMERICA    :
                            :
        v.                :      CASE NO. **1:98-CR-329 (RCL)**
                            :
SEAN COATES

## MOTION FOR LEAVE TO JOIN SAMUEL CARSON'S SUPPLEMENTAL MOTION AND TO  FILE UNDER SEAL AND TO LATE FILE THIS MOTION

Petitioner SEAN COATES, by his attorney VERONICE A. HOLT, Esq., moves

the court to allow him to file under seal his joinder to Samuel Cartson's Supplemental

Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. §2255 and the

exhibits attached thereto, and as reasons states as follows:

1.    The motion and exhibits contain information previously sealed by the District

      Court.

2.    This case involved many cooperating co-defendants and cooperators who may

      still fear some sort of retaliation for their testimony.

3.    The motion filed by Mr. Carson was filed under seal.

Counsel further states that AUSA Mary Chriss stated that she does not object to the late filing of this motion.

**WHEREFORE,** for the foregoing reasons, as well as any additional reasons deemed meritorious by the Court, Counsel requests that this Court enter an order allowing Mr. Coates to Join Mr. Carson's supplemental motion under seal.

Respectfully submitted,

_____/s/_____

Veronice A. Holt, Esq. 183756
W111 3003 Van Ness, NW
Washington, D.C. 20008
202-244-2659 tel
202-244-6242 fax
veroniceholt@msn.com
ATTORNEY FOR SEAN COATES

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of June 2016, a copy of the foregoing motion was EMAILED to the following:

Margaret Chriss, Esquire
Office of the United States Attorney
555 Fourth Street, NW
Washington, DC 20530
margaret.chriss@usdoj.gov

Kira Anne West
1325 G Street, NW
Suite 500
Washington, DC 20005
Counsel for Mr. Carson
kiraannewest@gmail.com

Eric Hans Kirchman
KIRCHMAN & KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Counsel for Mr. Sweeney
kirchlaw@cs.com

Michael E. Lawlor
Lawlor & Englert, LLC
6304 Ivy Lane
Suite 608
Greenbelt, Maryland 20770
Counsel for Jerome Martin
mlawlor@verizon.net


_____/s/_____
VERONICE A. HOLT, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA        §
                                §

V.                              §          CASE NO. 1:98-CR-329-03 (RCL)
                                §
SAMUEL CARSON                   §

### Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. Section 2255

Mr. Samuel Carson, by and through undersigned counsel, respectfully moves this Honorable Court for relief from the sentence in this case imposed in violation of the Constitution and the laws of the United States. Mr. Carson, by and through is attorney, Kira Anne West, hereby submits this supplement to his 2255 motion for relief. Mr. Carson raises, in addition to his joinder of the claims made by his co defendants in their 2255 motions and supplements, in as much as they also apply to him, additional claims relating to fundamental violations of his Due Process rights under the United States Constitution.

### I. SUMMARY OF ARGUMENT

Mr. Carson (hereinafter "Carson") argues that through a pattern of abuses by the Government, he was denied his Constitutional Rights to Due Process and a fair trial. Additionally, Carson was denied the ability to confront and effectively cross-examine the Government's witnesses against him. Carson alleges that the Government engaged in a pattern of conduct designed to secure testimony at trial they knew or should have known was false and misleading. Furthermore, they paid benefits to witnesses in a manner designed to encourage them to improve their testimony. Carson also alleges that the Government improperly paid witnesses

for testimony knowing that the funds were not being used in the manner in which they were

intended and often did not disclose this at trial. Carson further alleges that the Government

deliberately withheld exculpatory materials and failed to turn them over in a timely manner so as

to substantially prejudice his case. In some instances, *Brady* evidence was withheld until it was

too late to use effectively. In other instances, Brady was withheld completely by *ex parte* and

under seal submissions to the Trial Court, which the government used as a shield to evade their

Constitutional duty to turn over exculpatory evidence.

Carson also argues that the failure of the Government to adequately secure, retain and

make available to him the government's trial exhibits, exhibit list from trial, and a full accounting

of the *Brady* and *Giglio* materials turned over at trial, has prejudiced his Constitutional Rights

with regard to his ability to support certain claims in this 2255 motion. Moreover, there is no

way, at this point in time, for Carson to examine the trial exhibits in support of his claims because

the Government cannot locate them or their exhibit list. There is also no comprehensive list of

the *Brady/Giglio* disclosures made by the government and no comprehensive list of *the in camera*

materials reviewed by the Court for *Brady* material prior to and during trial. Carson's counsel is

left to deduce, in many instances, that the things he challenges as *Brady* were, in fact, not turned

over. The Government's continued inability to proffer such materials requested by Carson

prejudices his ability to assert his claims under the Constitution.

Carson additionally argues that his trial and appellate counsel were ineffective in their

representation. Carson alleges that his trial counsel was aware of their own ineffective assistance

but failed to withdraw as counsel or request permission from the Court do so. They continued to

represent Carson after they determined that they could no longer be effective in their

representation. Such belief was based on a perceived judicial bias that rendered them ineffective

in their ability to represent Carson.  By choosing to protect their personal interests and avoid

judicial sanctions and backlash, the trial counsel for Carson made decisions that prejudiced

Carson's case, not for strategic purposes, but merely to avoid conflict with the Judge and

sanctions.  Their improperly placed notion that the judicial bias of the Trial Court was

insurmountable led to their failure to pursue cross-examination on bias issues, preserve issues for

appeal and make requests to recall crucial witnesses.

## II.  PROCEDINGS BELOW

In support of this motion, Carson proffers the following:

1. This motion is based upon all the files, records and proceedings of this case, as well as

   activity and inactivity outside of the record, and any such other materials as may be

   subsequently submitted. [1]

2. On September 18, 1998, Carson and his co-defendants were charged by indictment with

   conspiracy to possess with intent to distribute and distribution of controlled substances,

   conspiracy to participate in a racketeering influenced and corrupt organization ("RICO")

   and various other substantial counts.

3. On March 25, 1999, Carson was charged in a 101 count superseding indictment.[2]

---

[1] This brief is a supplement to the previous 2255 filed by Carson *pro se*.  It also adopts the claims
raised by Carson's co-defendants in this case in their 2255 petitions and supplemental petitions.
[2] These charges included violations of:  21 U.S.C. 846, Conspiracy to PWID; 18 USC § 1962(d)
& 1963(a), RICO conspiracy; 18 U.S.C. § 1959(a)(1), murder in aid of racketeering activity of
Chrishuahna Gladden, Alonzo Gaskins & Darnell Mack & Melody Anderson; 18 U.S.C. 2,
Aiding and Abetting; 18 U.S.C. § 924(c)(1)(A)(i), use of a firearm during and in relation to a
crime of violence or a drug trafficking crime; 22 D.C. Code § 2401& § 3202 of First Degree
Murders while armed of Maurice Hallman, Leonard Hyson, Teresa Thomas, Terita Lucas,
Anthony Fortune,  & Chrishauna Gladden; 22 D.C. Code § 501 & § 3202 , Assault with intent to
kill while armed; 22 D.C. Code 2101 & 3202, kidnapping while armed; & 22 D.C. Code
§3204(b), possession of a firearm during a crime of violence.

4. Carson went to trial with William Sweeney, Vincent Hill, Jerome Martin, Sean Coates and Gary Price.

5. The defendants were charged with a large-scale conspiracy. As part of this conspiracy it was alleged that Carson participated in various acts of violence in furtherance of the conspiracy.

6. On August 15, 2001, after seven months of trial, Carson was found guilty of all counts.

7. On January 31, 2002, Carson was sentenced to successive terms of life imprisonment without the possibility of supervised release or parole due to the then-mandatory Guidelines (*See* Dkt. #907). He filed a notice of appeal on this same date.

8. The United States Court of Appeals for the District of Columbia Circuit affirmed Carson's convictions. *United States v. Carson et al*, 455 F. 3d 336 (D. C. Cir. 2006), *petition for reh'g and reh'g en banc denied*, 2006 U. S. App. LEXIS 26335 (D.C. Cir., Oct. 23, 2006).

9. On Feb. 20, 2007, the Supreme Court denied Carson's petition for writ of certiorari. *Carson et al v. United States*, 127 S. Ct. 1351 (2007).

10. Carson timely filed his original Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 USC. 2255. This is his supplement to that motion.

11. At all times pursuant to the appeal of this case and in accordance with the Local Rules 56.2(b) and (c) of this Court, the original trial exhibits were in the custody and control of the U.S. Attorney for the District of Columbia and were to be preserved by that office until final disposition of the case. [3] LCrR 56.2 (b) and (c).

---

[3] The defense counsel's copy of the trial record was delivered to appellate counsel years after the case was tried. Unfortunately, due to no error on the part of appellate counsel, the storage facility that kept approximately 45 boxes of notes and evidence was inadvertently bulldozed by the company that stored the records. There are now only 10 boxes remaining that are in the possession of undersigned counsel.

III. POST APPEAL STATURE

12. In February, 2008, Sweeney's defense counsel discovered several sealed documents submitted to the Court during trial for *in camera* review of *Brady* material. Pursuant to a Court order, these documents were unsealed as to Sweeney. Subsequently, the documents were unsealed as to Carson and other co-defendants by this Court.

13. Section 2255 of Title 18 permits a prisoner in custody under sentence of a federal court to move the court to vacate, set aside or correct an erroneous sentence. The Supreme Court has read the statute to provide four grounds on which relief may be sought: (1) the sentence was imposed in violation of the Constitution or the laws of the United States, (2) the court was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is "otherwise subject to collateral attack." *Hill v. United States*, 368 U. S. 424, 428 (1962).

A. Underlying facts at trial

This prosecution was part of the D.C. government's push to prosecute and rid the city of drug traffickers and the homicides that often followed in the wake of drug trafficking. The government's theory was that Carson, along with several friends, engaged in large scale RICO drug distribution and killing. As in most drug cases, the evidence against Carson was in large part derived from testimony of cooperating co-defendants, namely James Montgomery, a cooperator whose lobotomy severely affected his memory and the un-cross-examined testimony of Robert Butchie Smith, a cooperator who was shot down in the streets, allegedly for being a snitch. Of course, most witnesses that testified at trial against Carson were either profiting from a

forthcoming 5K or Rule 35 or substantial monetary payments for "security" or "moving expenses." When this testimony is viewed through the looking glass of truth, the picture becomes quite hazy. In February, 2008, sealed documents that the Government submitted *in camera* and *ex parte* were discovered and unsealed. Herein lies Carson's claim that his trial was so infected by the improper withholding of exculpatory materials and the prosecution's deliberate hiding of such evidence that his conviction cannot stand. Because of this pervasive misconduct, Carson did not get a fair trial. There is a reasonable probability that the outcome of the proceedings would have been different if the defense counsel in this case had been supplied the *Brady* material in a timely manner for use on cross examining the weak and highly biased testimony of their star paid witnesses. As a result, Caron's conviction should be set aside.

### IV. CONSTITUTIONAL VIOLATIONS: <u>BRADY ISSUES: 5TH AMDT. DUE PROCESS & 6TH AMDT. CONFRONTATION CLAIMS</u>

A. <u>Background</u>

1. <u>Facts</u>

Throughout the trial and during pretrial proceedings, several of the defendants, including Carson, repeatedly asked the government to turn over all exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).[4]   (Tr. 6/16/2000 p. 5-13) (defense counsel asking for *Brady* material on triple murder); (Tr. 9/27/00 p. 78-80) (Carson's counsel asking for *Brady* on Anthony Fortune murder); *Id.* at 200-203. *See* Carson's supplemental motion to compel, Dkt #342 ; Sweeney's Third Motion to Compel Discovery, Dkt #340.   The government stated pretrial that it had complied with all of its discovery obligations. (Tr. 9/27/00 p. 130: 17-20).   However, at trial, it was clear the government had not adequately searched its files for potential *Brady* material. As

---

[4] *See also*, 1/30/01 PM 4 (defense counsel Zucker *Brady* request for notes of Mayrant murder); 2/1/01 PM 63 (defense request for AUSA notes of Andre Murray). At times, the request for *Jencks* was in reality a request for *Brady* information and only came to light after a witness testified. *Id.* at 5.

a result, defense counsel were left to request the documents in session or when the issue arose. This put the defense at a considerable disadvantage. The Government, rather than turn these items over once it was clear that they contained *Brady*, submitted them to the court to review *ex parte* and *in camera. See* Ex. 1. (The Court made an exhibit list and added to it throughout the course of the trial). These sealed materials were kept from the defense and no findings of fact and conclusions of law were ever made by the trial judge regarding his *Brady* rulings. Not surprisingly, based upon the one sided proffer by the government, none of the documents were determined to contain *Brady* material. There was simply an oral ruling that the items did not contain *Brady* material and the defense was shut out of the process. The Court mistakenly believed that it could not order *Brady* to be turned over and misapplied the Brady standard to this inquiry. The Court stated so during a pretrial hearing "I can't order Brady material turned over, and Brady material is that which is reasonably likely to be, quote, exculpatory, close quote." (Tr. 6/16/2000 p.23-24). This systematic withholding throughout the trial is documented in part on the Court's exhibit list. *Id.*

Long after the appeal of the convictions in 2005, one of the lawyers appointed by the Court to write the 2255 found several exhibits that were put under seal during the trial. A review of these exhibits shows that the government had within its possession, before and during the trial of the case, a great deal of *Brady* material that should have been turned over to the defense. The following discussion of some of these exhibits show how important these materials would have been at the trial.[5]

---

[5] The following is a list of the exhibits that were placed under seal during trial and discovered by 2255 counsel in 2008. Some are included in the attached Exhibits 1-11, but not in the following order: (1. Andre Murray letters to AUSA Wainstein (heavily redacted); 2. Andre Murray notes; 3. Robert Butchie Smith 302; 4. Court exhibit 2 - AUSA Notes on Switzer; 5. Court exhibit 4, AUSA notes on Andre Murray; 6. Court exhibit 5, Theodore Watson file; 7. Court exhibit 8-

2. <u>The Law</u>

The *Brady* rule is a rule of disclosure, not admissibility. The Supreme Court held in *Brady*

that "suppression by the prosecution of evidence favorable to an accused upon request violates

due process where the evidence is material either to guilt or to punishment, irrespective of good

faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. There are three steps in a *Brady*

violation: the evidence at issue must be favorable to the accused, either because it is exculpatory

or because it is impeaching; that evidence must have been suppressed by the State, either willfully

or inadvertently; and prejudice must have ensued. *Strickler v. Greene*, 119 S.Ct. 1936, 1948

(1999). Application of the *Brady* doctrine was extended to testimonial impeachment in *Giglio v.*

*United States*, 405 U.S. 150 (1972). A *Brady* violation is demonstrated by showing that the

undisclosed evidence could reasonably be taken to put the whole case in such a different light as

to undermine confidence in the verdict. *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). This Court

reviews an alleged due process violation under *Brady* for a reasonable probability that the result

of the proceeding would have been different had the evidence been disclosed to the defense.

*Brady v. Maryland*, 373 U.S. 83 (1963).

Thus, the government is obligated to disclose not only exculpatory evidence but also

evidence that might tend to impeach the credibility of key government witnesses. *See Brady,* 373

U.S. at 83; *Giglio*, 405 U.S. at 150. Evidence is material if there is a reasonable probability that

had the evidence been disclosed to the defense the result of the proceeding would have been

different. The Supreme Court in *United States v. Bagley*, 473 U.S. 667 (1985) disavowed any

---

Charles Bender 302, 8. Court exhibit 11-Arthur Rice 302; 9. Eugene Byars302 -Court exhibit 9;
10. Governments motion to move defendants(note: not on the Court's Exhibit list); 11. AUSA
notes on James Montgomery; 12. Additional materials James Montgomery-Agent Lisi notes; 13.
Notes; 14. Court exhibit 10-Ronald Sowells 302; 15. Use of anonymous jury(note: not on Court
Exhibit list); 16. Court exhibit 5File of Theodore Watson-; *See* Court Exhibit list, Exhibit 1 to this
supplemental motion.

difference between exculpatory and impeachment evidence for *Brady* purposes.  Furthermore,

disclosure of documents and tangible objects that are material to the preparation of the defense

may be required under the rule of *Brady* without an additional showing that the request is

reasonable. *United States v. McVeigh*, 954 F. Supp. 1441, 1446 (D. Colo. 1997).

   *Bagley's* touchstone of materiality is defined as the reasonable probability of a different

result. *Kyles,* 514 U.S. at 434.  The critical question is not whether the defendant would more

likely than not have received a different verdict with the evidence, but whether in its absence, he

received a fair trial.  This is understood as a trial resulting in a verdict worthy of confidence. *Id.*

Materiality in terms of suppressed evidence should be considered collectively, not item by item.

*Id.* at 436.  Once there has been a *Bagley* error, it cannot subsequently be found harmless. *Id.* at

435.

   Carson believes that the government purposely hid *Brady* material by submitting it to the

Court as a gatekeeper rather than complying with its obligations under the law.  At the behest of

the Government, this process that the district court undertook was improper and prejudicial.

Although the trial court viewed the evidence in question *in camera*, the court failed to keep the

required transcribed record of the *in camera* proceedings. *See In re Sealed Case*, 151 F.2d 1059

(D.D.C. 1998).  Moreover, the trial court failed to articulate a compelling interest for reviewing

the *Brady* material *in camera* and subsequently sealing the material.  No findings were made

regarding the requested material, and no record has been released to the defense indexing the

material presented to the Court that matches up with the documents released by the Clerk's office

in 2008.[6]  The prosecution never made a record as to why they were turning over certain

---

[6] Several documents turned over by the clerk in 2008 as part of the sealed exhibits are not listed
on the Court's exhibit list as having been sealed.  However, review of the trial transcript shows
that in the case of the Theodore Watson file, it was in fact sealed after a request by defense

documents to the court for *in camera* inspection and in some cases they were compelled to submit documents to the Court record after having determined that no *Brady* was present.

The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right...to be confronted with the witnesses against him." Alleged violations of the Confrontation Clause are reviewed de novo. *United States v. Wilson*, 160 F.3d 732, 739 (D.C. Cir. 1998). Failure to turn over this *Brady* material kept Carson's counsel from effectively confronting the witnesses against him. Evidentiary errors are reviewed for abuse of discretion. *United States v. Hilliard*, 11 F.3d 618, 619 (6th Cir. 1993).

B. Sealed documents and ex parte submissions

1. Government's ex parte motion to change confinement of defendants

Trial counsel for William Sweeney, Steven Kiersh,[7] asked the Court repeatedly for *Brady* material with regard to the prior statements of Robert Butchie Smith, another Government cooperator. (Tr. 5/29/01 AM 77-end & Tr. 6/16/2000 p. 25-26). On April 2, 1999, in a sealed document,[8] the government filed an "Ex Parte Notice to Change Confinement of All Defendants." Judge Jackson put this motion under seal April 6, 1999. The defense was never given access to this motion. In that motion, the Government identifies "Andre Chappell and Anthony Ricardo Hawkins"[9] as having murdered Robert Butchie Smith. *See* Exhibit 2 @ 12. This is critical evidence because the government's theory at trial was that Carson and Sweeney killed Smith and they were convicted of the murder. Moreover, they were prejudiced by a ruling that allowed the

---

counsel that it be made part of the record. It was not, however, reviewed in camera by the Judge, over the objection of defense counsel Zucker. (Tr. 2/13/01 AM p. 6-7).
[7] According to an interview of Mr. Keirsch on 1/18/12, the defense attorneys never were told about the contents of any documents in any *in camera* exhibits. *See also* affidavit of Lexi Negin.
[8] This document was not assigned an exhibit number nor does it appear on the Court's exhibit list.
[9] These two individuals are never brought up again. This foreclosed any opportunity Carson's investigator would have had to have knowledge of them or to investigate them.

statements of Smith to be entered into evidence by Agent Lisi so that there was not an effective

way to cross-examine them. Had defense counsel known about this motion, and the fact that the

Government believed others were responsible for the death of Robert Butchie Smith, defense

counsel could have had their investigators try to find these two individuals and follow leads on

whoever else wanted Smith dead. Furthermore, Agent Lisi could have been cross-examined on

this subject and/or prevented from testifying as Smith at trial. However, at trial this information

was withheld and the government argued that Agent Lisi be allowed to bring in Smith's

statements under the theory was that Carson killed Smith and therefore Smith's statements should

come in under FRE 804(B)(6).[10] The Court agreed and held that Smith's un-cross-examined

statements could all come in through Agent Lisi, and they did. Had these names been provided to

the defense and thoroughly investigated, the Court would have been hard pressed to find that

Carson killed Smith by a preponderance of the evidence. The only testimony that it was Carson

who killed Smith was the uncorroborated testimony of James Montgomery, their star witness with

a history of lying and who lacked credibility on many levels. (Tr. 5/23/01 PM 22-33).

This information was clearly *Brady* material in that the government, at that time, thought

someone other than Sam Carson killed Robert Smith. This information would have also

impeached Montgomery's version of events. In the pretrial hearing on September 27, 2000

regarding the Government's request to have Smith's statements come in at trial through agent

Lisi, the government represented directly to the Court that no other suspects wanted Smith dead in

this case and that if that information existed it would be considered *Brady* and should be turned

over. (Tr. 9/27/00 p. 200-202). The Court agreed. However, this is exactly what the government

failed to turn over to the defense at trial. The prejudice extends not only to the admission of the

---

[10] The Court found by a preponderance of the evidence that Carson had waived his objections to
Mr. Smith's hearsay statements when he killed this witness. (Tr. 5/29/01 AM p.88-89).

testimony of Smith through Lisi at trial, but to the inability to present the defense Carson would

have presented at trial.

An earlier pretrial discussion between the Court, Carson's counsel, and the prosecutor

illustrate how this is clearly *Brady* material. At a pretrial hearing, Carson's counsel asked for the

name of a person who overheard Mr. Martin say that he (Martin) was responsible for the killing

of Anthony Fortune. The prosecutor, Mr. Zeidenberg, refused to give him the name. Carson's

counsel argued:

MR. BESHOURI: …I ought to be able to investigate it. I ought to be able to be in a
position to present it. That means I need to be able to talk to that witness—that witness who
heard Mr. Martin.
THE COURT: I don't know what more you need to be given in the way of Brady
information. The Government has informed you—has acknowledged there is a witness who will
be called at trial and who will testify that at one point—or who is alleged to have said, whether he
testifies to it or not, at one point that he was responsible for a particular homicide.
Now if they had further evidence of some description corroborative that the individual
was, in fact, responsible for that homicide, then I suppose that could qualify as Brady material,
but you already know all that Brady requires in the absence of the existence of any such other
evidence.
*Id.* at 78-81.

Here, the Court acknowledges that if there is evidence that someone else committed a

murder, that it's *Brady,* but the Court does not order the Government to turn it over. Instead the

Court goes on, presciently:

THE COURT: It is incumbent upon the government to reveal evidence which is
exculpatory of your client, but the government is in control of that evidence. And you would not
know about it but for the fact that the government makes you privy to that information.
*Id.* at 82.

After further discussion, the AUSA agrees to give information regarding a separate

murder, but is allowed to make the decision as to all other Brady information.

2. Court Sealed Exhibit #4 –Interview Notes of Andre Murray

In addition to the information that Andre Chappell and Anthony Ricardo Hawkins killed Butchie, the sealed Court Exhibit #4, AUSA notes of an interview with Andre Murray demonstrate that he stated that "Fat Petey" was rumored to have killed Butchie Smith as well to get back at Draper for murdering his brother, Keith Johnson. *See* Sealed Court Exhibit #4, Exhibit # 3 to this Motion. The rumor that Petey Johnson aka "Fat Petey" killed Smith was further bolstered by Agent Lisi's own testimony at trial confirming at trial that Petey Johnson was picked up by police as a possible witness to Smith's murder and was present at the time of the murder. (Tr. 5/30/01 AM p. 19-20).

The information indicating this additional suspect in the murder of Smith was never turned over to the defense or disclosed to the defense at trial despite repeated requests for this very type of information. Withholding this information prejudiced the defense in their ability to argue against the wholesale admission of Smith's testimony and the forfeiture of the defendants' confrontation clause and hearsay objections to that testimony. It would have also been very valuable impeachment testimony of Agent Lisi as to his failure to consider Petey Johnson as a suspect, question him as a suspect and follow leads supplied by Andre Murray. All this points to the tunnel vision Lisi and the Government had to make a case against the defendants at any cost.

Notably, the Government's case against Carson for the murder of Smith was weak and supplied completely by cooperating witness, James Montgomery.[11] Montgomery was a known liar and had admitted to several murders and a lifetime of crime. Significantly, his testimony about Carson's participation in the murder of Smith was largely uncorroborated and premised on a theory that Carson and Montgomery were working together to kill Smith. However, at trial the testimony was that Carson acted alone and did not even tell Montgomery his plans or the fact that

---

[11] This was so even though an Assistant United States Attorney (Oscar Mayers) in a superior court case previously described him saying "this man is unreliable." (Tr. 6/16/2000 p.17).

he had accomplished their joint mission. It is well accepted that testimony of a cooperating

witness must be "viewed with great caution." *United States v. Curry*, 187 F.3d 762, 766 (7th Cir.

1999). In this case, James Montgomery's testimony was all the Government needed because his

credibility was bolstered enormously by the systematic removal of all other versions of events.

The jury was forced to believe Montgomery as the only evidence available because all other

evidence was withheld suggesting that Smith was killed by someone other than Carson. The

withholding of the information regarding other people believed to have the opportunity and

motive to kill Smith is a prime example of the pattern of deceit that infected this trial from start to

finish.

The resulting prejudicial effect of the government's withholding of the valuable *Brady*

materials as they relate to the Smith murder was significant and casts into doubt the fairness of the

verdict reached in this case. The Government cannot shield itself from it's known *Brady*

obligations by claiming that they submitted the materials *in camera* for inspection when it is clear

they represented to the Court, on the record, false statements regarding their knowledge of the

lack of other persons thought to have motive and opportunity to kill Smith. This evidence

amounted to more than mere speculation and would have formed the basis for effective cross-

examination of Montgomery, Lisi and Andre Murray, as well as formed the basis for challenging

the government's motion to admit Smith's statements pursuant to Rule of Evidence 804(b)(6).

3. James Montgomery sealed information - the murder of Timothy Benton

James Montgomery was the Government's star witness. Thus, defense counsel asked the Court

for any *Jencks* on Montgomery, specifically, the 302s and notes of Agent Lisi. (Tr. 3/7/01 (PM)

52-52). The Court stated that it had earlier reviewed this information and that it contained no

*Brady* material. *Id*. at 91. However, the notes did contain valuable impeachment evidence.

Court exhibit #7, attached as Exhibit 4.[12] (Tr. 3/6/01 p. 1 PM).

On 3/22/99, Special Agent Lisi testified in the Federal Grand Jury as to what James Montgomery told him about the Benton murder. (GRJ–77, p. 29-35). Lisi testified that Montgomery told him that "Poo Poo" (aka Maurice Proctor) had killed Benton. Lisi further testified that two weeks later, Montgomery called him and said he had more to tell him. *Id.* at 35.[13]

At trial, the story changed. Montgomery testified that he (Montgomery) and Proctor had killed Benton. (Tr. 3/13/01 p. 30-36).

A third story exists that sheds even more doubt as to Montgomery's credibility. Again, it's a story the government didn't want anyone to know about. This story only appears in the notes taken by Agent Lisi of his first interview with James Montgomery. These are the same notes submitted *in camera* to the Court. These notes show that Montgomery first lied to Agent Lisi about the Timothy Benton murder. Although Montgomery was charged with Benton's murder, Lisi's notes prove that Montgomery lied and substituted Carson for himself (as he was prone to do) as one of Benton's killers. This is significant because it was Carson's theory that Montgomery did this in other crimes he testified about and that this was a pattern of behavior by Montgomery to secure leniency and benefits from the government. It was also his attempt to push the blame for his own crimes on others while being able to give details making him seem credible to his Government handlers.

Significantly, the government is the only party uniquely qualified, and under a Constitutional obligation, to identify *Brady* and turn it over. The Court's procedure for *in camera*

---

[12] Court exhibit #7(Exhibit 4) says AUSA Notes of James Montgomery. However, the actual *in camera* submission appears to be both AUSA and Agent Lisi's notes.

[13] This is based upon the redacted copy of Lisi's Grand Jury testimony supplied by the Government as a result of this Court's order dated 9/23/2013. (Dkt. #1123).

inspection was improper with respect to these sealed materials and the Government used it as a

shield to hide *Brady* evidence from the defendants and bolster the credibility of their paid

witnesses. The Court's complicity in this scheme is confusing at best. What is certain is that the

Court abused it's discretion and failed to keep a transcribed record of the *in camera* proceedings,

failed to articulate a compelling interest for reviewing the *Brady* materials *in camera*, failed to

make findings regarding the requested material, and failed to make a record to the defense

indexing the material presented to the Court. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir

1998). All of these errors prejudiced Carson at trial and on appeal and only served to render the

trial unfair and verdict unreliable.

4. <u>Murder of Anthony Fortune – 302s of Bender</u>

      Carson and Jerome Martin were both charged and convicted of the murder of Anthony

Fortune. At trial, defense counsel was told by the District Judge that the FBI 302's of a testifying

witness relating to this murder, Mr. Charles Bender, did not contain *Brady* material. (Tr. 2/05/01

AM p. 84). At trial, both Bender, and another witness, Eugene Byers, testified that Martin

confessed to killing Fortune. (Tr. 4/4/01 PM p. 94); (4/9/01 PM  p.14).

      However, in sealed Court exhibit #8, "302's of Charles Bender", information from a 302

report of Special Agent Kristen Kane taken on 2/17/98, page 5, notes that Bender told the agent

and AUSA during the interview that "Pimp" killed Anthony Fortune. *See* Exhibit # 5. Also,

sealed Court exhibit #9, the 302 interview of Eugene Byers taken on 5/25/99 says that "pimp then

killed Fortune." *See* Exhibit #6. The 302 says in part:

    With regard to the murder of Anthony Fortune, source heard that FORTUNE was
gambling in the area of 58th with PIMP (JEROME MARTIN) and BOO BOO. BOO BOO
supposedly broke FORTUNE and FORTUNE tried to get his money back. PIMP then killed
FORTUNE. FORTUNE had a reputation for robbing a lot of people. PIMP provided this
information to the source approximately 4-5 months after the murder. FORTUNE's partner,
RODNEY SHORT, was later incarcerated with the source at Lorton and he told the source he was

planning to kill PIMP if PIMP was sent to Lorton. The source warned PIMP about SHORT but PIMP as not sent to Lorton while SHORT was there.

This information is clearly exculpatory as to Martin and Carson. Had these 302's been turned over, defense counsel could have used this to impeach these witnesses.

Additionally, the only purported eyewitness to the Fortune murder, Charlene Wilson, was shaky at best regarding the identification of the shooter she says she saw.[14] In fact, she identified Sean Coates in the courtroom as Carson during her testimony. (Tr. 2/13/01 AM p.16.). The information in the 302s that was withheld from the defense clearly violated Carson's due process rights as the information was material to Carson's guilt or innocence.

5. Murder of Steven Dunbar

In sealed court exhibit 8, the notes of either the AUSA or the agent (it's not clear) show that Charles Bender told them that "Art said he killed Steve…" Bates # 905167. Exhibit #5. In Court exhibit #7, the AUSA notes of James Montgomery interview, reflect that "Erik and Art both talked about killing Dunbar." Exhibit #4. The same page goes on to say "Vito issued hit b/c he wasn't supposed to be a Wysocki hit." *Id.* This is something that Carson's defense team could have investigated and could have cross-examined Agent Lisi on at length.

Defendants contend that the district Court's ruling to exclude these sealed exhibits was in error. The defendants needed all information regarding the credibility and potential bias of the government's witnesses as well as any information that exculpated Carson. This Court has often stated that bias evidence is always relevant. *Williams v. United States*, 642 A.2d 1317, 1322 (D.C. 1994). Moreover, Agent Lisi offered his testimony in the form of a narrative. The

---

[14] Wilson testified at trial that she saw Carson shoot Fortune. (Tr. 2/13/01 AM p. 24-27).[14] Four months later in the trial, fortuitously, Agent Warrener testified that Wilson previously told him she had HEARD that Sam had killed him (emphasis added). (Tr. 6/14/01 PM p. 55). This came as a shock to the defense counsel and was only uncovered as a result of cross-examining Agent Warrener.

*McVeigh* court held it impermissible for the government to suppress or secrete information known to them which does not fit into the narrative, or which may diminish the credibility of the evidence relied on to tell the story. *McVeigh*, 954 F.Supp. at 1449. Furthermore, the Supreme Court noted in *Giglio* that nondisclosure of impeachment evidence falls within the general rule of *Brady* when the "reliability of a given witness may well be determinative of guilt or innocence." *Ritchie*, 480 U.S. at 66. Robert Smith was an essential government witness and the lack of opportunity for defendant to cross-examine him or view the statements he gave to the government was fatal. Carson contended that Mr. Smith was an unreliable witness.

With regard to the triple murder, sealed exhibit 7 states that "Chin: told James not my world get $250k; chin later told J not to believe Bam had paid Draper $50k to hit Gaskins." See Exhibit #4. Montgomery later testified that Carson actually was involved in the triple murder yet the AUSA did not correct this false testimony. (Tr. 3/14/01 PM p. 8). There was also mention of another suspect that was "another dude was in kitchen; don't know what happened to him." This would have been another lead for the investigators on the defense team.

### 6. Theodore Watson Dilemma – Watson Case File Withheld from Defense

Another cooperating co-defendant, Theodore Watson testified against the defendants. While incarcerated on a separate federal case out of Greenbelt, Maryland, he became friendly with co-defendant Sweeney and claimed that Sweeney told him everything about his criminal activity including wanting to kill James Montgomery for snitching. (Tr. 2/8/01, PM p. 45-70). Thus, his testimony was such that Carson needed to challenge it in any way possible. However, despite his cooperation, he was not given the 5K he thought he deserved. This undoubtedly perplexed defense counsel and thus he was cross-examined about why he did not get a 5K from the Government. Watson's response was that he didn't get the 5K because the prosecutor did not

like him. (Tr. 2/12/01, AM p. 19-21). After hearing this testimony, defense counsel made a request of the Court that the prosecution obtain and review the Watson Greenbelt file for any *Brady* information. *Id.* at 8 & 78.

The next day, the Government obtained the Watson file and represented to the Court that after reviewing the entire file, there was nothing "that suggests any Brady or Jencks material in the file." AUSA Zeidenberg goes on to explain that the Greenbelt AUSA's reason for not giving the 5K "was simply because she didn't believe his cooperation was of a significant enough nature to qualify. There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature." (Tr. 2/13/01 AM at p. 6-7). The defendants requested the letters addressed to the prosecutor from Watson. (Tr. 2/13/01 AM 5-6, 90). The Court denied this request and the Watson file was marked as Sealed exhibit #5 of the Court. *See* Exhibit 7. Although defense counsel asked that the Court review it, the Court refused. (Tr. 2/13/01 AM 5-6, 90).

AUSA Zeidenberg's representation to the Court was way off the mark and highly suspect. Not only did the file contain *Brady* material, it contained several instances of conduct that is *Brady* material. Watson, in an attempt to curry favor with the AUSA who held his fate in his hands, admitted to lying repeatedly in several letters written to her. For instance, in one letter, Watson says to the AUSA: "had I just simply complied and told you the truth at our initial meeting, I would have avoided the unnecessary mental anguish that entailed…there is no denying that during my 30 years in the system, I have lied, connived and schemed to get things done." *See* Exhibit 7, letter dated August 19, 1999. In yet another letter Watson describes himself thusly: "Ms. Wilkerson, again I apologize and confess that at our first conference, I lied and somewhat distorted the truth…" *See* p. 1 of 17, undated letter.

Not only did Watson admit to being a liar, but the Greenbelt AUSA, Sandra Wilkinson stated in a letter to the Court in Greenbelt that stated in part: "…despite my specific directions to not contact me directly. Mr. Watson continues to undermine his own credibility as well as his ability to follow directions from the government." *See* Exhibit 7, 2/21/2000 letter to District Judge Messitte.

Had the prosecution turned over this file to defense counsel, or had the Court reviewed the file, Carson's lawyers could have cross examined Watson on his propensity to lie and his reasons therefore. His credibility was in issue. Unfortunately, again, these documents remained sealed until 2008, long after trial and appeal. More telling however is the fact that the prosecutor KNEW the contents of these letters and lead the Court to believe there was nothing in the way of *Brady*[15] in the file. This is extremely problematic because there was virtually no evidence linking Carson to several of the alleged crimes other than the uncorroborated story of James Montgomery. Given that, Watson's testimony was a much needed fortification of Montgomery's credibility. The information that Watson was a liar, a manipulator and working the Government system for all he could get was critical impeachment material necessary for the defense to use in order to obtain a fair trial. As the Supreme Court has made clear, the prosecutor:

"has the responsibility and duty to correct what he knows to be false and elicit the truth…That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for it's impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." *Napue v. Illinois*, 360 U.S. 264, 269 (1959) quoting *People v. Savvides*, 136 N.E. 2d 853, 854-855 (N.Y. Ct. App. 1956). Moreover, it is a due process violation when the Government fails to disclose evidence of a witness' perjury.

*United States v. Cuffie,* 80 F.3d 514, 518 (D.C.Cir 1996).

---

[15] Although undersigned counsel refers to this as "*Brady*" material, it is in the purest sense *Giglio* material; material that would be used to impeach as opposed to exculpate. However, the Supreme Court later held in *United States v. Bagley*, 473 U.S. 667 (1985) that *Brady* and *Giglio* evidence are basically one and the same.

C.  Other Brady Violations and Government Misconduct

    1.  Payments to Witnesses regarding the Triple Murder

One significant claim in this 2255 motion for relief stems the investigation and

prosecution of the triple murder that was committed in November of 1996. The initial

investigation of these murders resulted in the arrest for these charges of another individual, not

Mr. Carson and his codefendants.  During the initial investigation, *Brady* and *Giglio* materials

were created by and/or made known to the federal government in this case in the form of Grand

Jury testimony of two witnesses stating that an individual named Dennis Green was responsible

for the triple murders.  These grand jury statements form the basis for several of the claims

asserted here in this brief.

The two witnesses, John Pinckney and Cheree Owens, testified on December 10, 1996

before a PG County grand jury and implicated an individual named Dennis Green in the triple

murders and not Mr. Carson or any of his associates.  (Government's Brief on Appeal at p. 174).

According to the Government, "When Pinckney and Owens came to the police with this

information, they were provided with a substantial amount of money for their relocation, which

was meant to last several weeks.   The couple went through the money in a matter of days and

then demanded additional funds." (*Id.* at 175). [16]  Police learned that Pinckney and Owens owed

Green money for drugs.  After further investigation, investigators found nothing to corroborate

their story, and shortly thereafter Pinckney and Owens disappeared. (*Id. citing* Joint Appendix

1002 n. 1).

At approximately the same time, December 5, 1996, the Federal Bureau of Investigations

arrested Robert Smith.  It was at this time that Smith began providing information about the triple

---

[16] There is no evidence that these are the facts but only supposition on the part of the Government.

murder to the federal government. (*Id.* at. 182). The Government contends that there is "no reason to believe that the FBI shared any of Smith's statements with Prince George's County as early as December 10, 1996, when Pinckney and Owens testified. (*Id. citing* Agent Lisi 5/29 Tr. 9-10, 12-13).

The United States Attorney's Office in Washington, D.C. indicted Carson for the triple murder based on the testimony of Mr. Smith. The Maryland authorities agreed to dismiss their triple murder charges only under an agreement with the federal Government to bring the charges under the umbrella of a federal RICO indictment. (Carson's Brief on Appeal at p. 138).

At his trial, Carson sought to introduce the grand jury testimony of Pinckney and Owens. However, because these witnesses could not be located at the time of the trial, Carson sought to introduce their grand jury testimony under the former testimony exception to the hearsay rule of the Federal Rules of Evidence, Rule 804(b)(1). Finding that there was "an absence of an identity of motive on the part of the government" in developing this PG county grand jury testimony, the district court ruled that the testimony was not admissible. (Government's Appellate Brief at p. 175). Carson appealed this decision as an abuse of discretion by the trial judge. The Appellate Court found that the trial court did not abuse its discretion in excluding the testimony under Fed. R. Evid. 804 (b)(1). In so doing the court stated, "appellants have offered no evidence that the state authorities who directed the testimony before the Maryland grand jury were in any way controlled or even used by federal authorities." *United States. v. Carson*, 455 F. 3d 336 at 372. The Appellate Court further stated that "The only evidence the defendants point to is testimony from FBI Special Agent Lisi that "[w]e [the FBI] tried to keep them [the Prince George's County Police] involved. Their primary focus was the triple murder. We tried to let them know

everything we [had] on the triple murder." *Id.* The court found that this showing was insufficient to show the Maryland grand jury proceeding was merely a "tool" for the federal authorities.

On April 18, 2012 Mr. Carson filed a Motion for Discovery with regard to the record of payments to the witnesses Pinckney and Owens and other documents, including the Grand Jury Testimony of Agent Lisi. (Dkt. #1088). On Sept. 13, 2013 this motion was denied in part and granted in part by this Court. The portion that was denied pertained to the discovery of payments made to Pinckney and Owens and any involvement by the federal government in those payments and relocation of those witnesses. On May 29, 2014, after several attempts and months of searching, counsel for Carson and Carson's investigator, Mr. Vaughan, were able to locate an address of Ms. Owens and drove to her home to speak with her. Ms. Owens agreed to discuss the case with Mr. Vaughan and counsel for Carson at that time. She related at length the process by which the Federal Bureau of Investigation moved her and Mr. Pinckney to numerous locations and paid them money after the testimony in the Prince George's County Grand Jury relating to the triple murder. She said they never heard from the FBI or government counsel after they were moved. Counsel for Mr. Carson and Mr. Vaughan presented Ms. Owens with a prepared affidavit containing her previously made statements and asked her to sign it so that it could be presented with this motion. Ms. Owens indicated that the information was true in the affidavit but that she didn't want to sign it and get involved because she was afraid for her life and is currently under a doctor's care for health related issues. Mr. Vaughan executed an affidavit regarding these facts and it was made a part a new motion filed on October 9, 2014, for Discovery based upon newly

discovered evidence. (Dkt. # 1132).    Also, attached to that motion were the affidavit of Mr.

Vaughan, the Death Certificate of Mr. Pinckney, and the prior statements of Cheree Owens.[17]

The new evidence provided by Ms. Owens demonstrates that the federal government

participated in, paid for and facilitated the "disappearance" of these two witnesses.  Pinckney and

Owens' testimony did not support the federal government's new theory of the triple murder in

December 1996 supplied by Robert Butchie Smith, their newest informant and cooperator.  The

government created the fiction that these first witnesses were unreliable and "seemingly

disappeared" a short time after giving their exculpatory testimony.  Moreover, they created an

illusion that Pinckney and Owens had somehow been proven untrustworthy and that they had tried

to abuse the relationship with the government by misusing government funds.   There is no

evidence in the record to support these claims.  The government proffered that "[p]olice learned

that Pinckney and Owens owed Green money for drugs.  After further investigation, investigators

found nothing to corroborate their story, and shortly thereafter Pinckney and Owens disappeared."

(Joint Appendix, fn 1002, n.1).

Ms. Owen's version of events is in direct contradiction to the story promoted by the

government and used as a tool to support it's motion to have the grand jury transcripts of these

unavailable witnesses excluded at trial.  The result was a deprivation of  Carson's Constitutional

Rights to Due Process and his right to present his defense at trial.  Moreover, this newly

discovered evidence demonstrates that Carson was deprived of valuable impeachment material to

combat the testimony of Robert Smith in this case.  According to the government, "Smith was

'opened up' as a confidential informant on 12/17/96.  From that date until the date of his murder

the FBI provided financial assistance in the amount of $12,744.19.  This money went to pay rent,

---

[17] All of these documents, the affidavit of Mr. Vaughan, the Death Certificate of Mr. Pinckney,
and the prior statements of Cheree Owens are incorporated by reference in this motion.

a car, living expenses, hotel rooms used to debrief Smith, cellular phone bills." (Dkt. #451).

Evidence now demonstrates that, even though Smith began cooperating in December of 1996, and

began providing information regarding the involvement of the K street crew in various crimes,

including the triple murder, the government was still "paying" for testimony provided by

Pinckney and Owens. Their theory was totally different from Smith's theory of who committed

that crime. It would be easy to infer that these payments to Pinckney and Owens functioned as a

"back up" plan in the event that Smith did not improve his testimony over time to the satisfaction

of the government in this case.

A pattern of paying for the improvement of witness testimony over time was clearly

established, but went unnoticed at trial. The continued payments to Pinckney and Owens would

have been highly valuable impeachment material against agent Lisi and others who stamped

nearly inscrutable credibility on Smith's testimony. As mentioned earlier, Smith was an

unreliable individual with a lengthy criminal history who was engaged in narcotics trafficking

in D.C. and Maryland. (Dkt. #340). At the time of his death many persons had a motive to kill

Smith for his cooperation. *Id.* The payments by the government to Pinckney and Owens were

occurring simultaneously with Smith's cooperation. The cover-up regarding this indicates

payments made to Smith were possibly used to secure improvements to his version over time.[18]

The information regarding the federal government's "determination" that Pinckney and

Owens were no longer trustworthy was also not made available to Carson. The United States

Attorneys Manual, 9-21.100 Eligibility for Witness Security Program states that:

To avoid any unnecessary delay in processing a Program application, government

---

[18] Carson cannot ascertain the exact length of the continued payments to Pickney and Owens or
who paid them because the payment records have not been made available. It is possible that the
payments to these witnesses extended even after Butchie Smith was murdered, suggesting that
these witnesses continued to be believed credible.

attorneys should note the following:

A.  In order to make certain that each application for entry of a witness into the Program is both appropriate and timely, the witness should, prior to his/her acceptance into the Program, either appear and testify before the grand jury or in some other manner have committed himself/herself to providing testimony at trial. This requirement relates to the commitment of the witness to testify, and is intended to ensure that the witness's testimony is available at the time of trial. **It is equally as important a requirement that the prosecutor intend to have the witness testify, and that the witness's testimony be significant and essential to the success of the prosecution.**

B.  The protection and relocation of witnesses and family members are expensive and complicated. In addition, DOJ is obligated to provide for the safety and welfare of a protected witness and family members long after the witness has testified. It is imperative, therefore, that the request for entry of a witness into the Program be made only after the sponsoring attorney has determined that the witness's testimony is significant and essential to the success of the prosecution, as well as credible and certain in coming.

(emphasis added).

The longer Pinckney and Owens were in the program, the stronger the suggestion is that

their testimony was considered significant and essential to the success of the prosecution,

as well as credible.  The failure of the Government to disclose the nature and extent of

this relationship in a truthful manner casts doubt on the fairness of the verdict in this case

and the credibility of the testimony of Robert Smith, who otherwise could not be cross

examined.

Carson was also prejudiced because no investigation of these individuals could be

independently conducted in a timely manner by his trial counsel.  The government proffered that

Pinckney and Owens were "later discredited", and that no more evidence could be found to

corroborate their story.[19]  Considering that James Montgomery, the government's star witnesses, a

---

[19] On 6/16/00, a motions hearing was held in which Mr. Kiersch asks for the investigation file of Dennis Green. The Government proffered that Pinckney and Owens had been investigated by police and had not been found truthful. However the Government agreed any materials relating to their testimony would be considered *Brady* and turned over. *Id.* p. 9. Although defense counsel

paid snitch, known and admitted killer, convicted criminal and a person who suffered brain damage, testified at trial to many things with little to no corroboration, it seems unsupportable that this fact alone could have proven these witnesses discredited. Moreover, at trial, Carson's counsel was falsely led to believe that pursuing the lines of questioning regarding Mr. Green would be unsuccessful and that further investigation into Mr. Green would be unprofitable.

The government argued successfully, both at trial and on appeal, that they had nothing to do with Prince George's County investigation and the *Brady* material they created. They distanced themselves from anything that happened in that investigation by claiming that they had no knowledge of the Grand Jury Proceedings until afterwards and that they had no similar motive to examine these witnesses at the time. Instead, however, the new evidence of payments to these witnesses demonstrates that the Federal Government misstated the status of their involvement with these witnesses, assisted in procuring their unavailability, and actively hid this fact for tactical advantage before trial, at trial and on appeal. The misleading information provided by the Government prejudiced Carson from being able to offer the exculpatory his ability to argue in his defense.

The concerns raised here in this 2255 go to the very core of the reliability and credibility of all the witnesses at trial, not just Smith or Pinckney and Owens. The suggestion that *Brady* material was created by a joint investigation but then pushed under the rug under the guise of an "independent" act by PG County prosecutors, calls into question fundamental fairness of the trial against Mr. Carson. It also raises questions as to the reliability of the testimony of Smith, Agent Lisi and every witness that was paid for testimony and told they would suffer penalties of perjury if they lied. Since a large number of civilian government witnesses that appeared in this trial

---

was given their grand jury testimony, they were never given any proof of this alleged investigation of Pinckney and Owens.

were paid, either monetarily, with relocation funds or with favorable plea agreements, the issues

surrounding the payments to Pinckney and Owens raise the legitimate inquiry into what, if

anything, would have happened to any of the civilian government witnesses if they were found to

have lied.   The evidence suggests a pattern by law enforcement to pay for testimony with

disregard for its truth.  Witnesses were paid, witnesses lied, and the Government didn't seem to

care as long as the right witnesses were there at trial and testified to the right story to convict the

people they wanted.   They kept the best version of events, but paid for them all until it was time

to choose.

      2.  Cash payments for favorable testimony disguised as legitimate expenses

The Government's misconduct in paying for witness testimony and failing to disclose the

real nature of the payments in this case deprived Carson of his Constitutional right of Due

Process.  The Government conducted itself with intentional disregard for the rights of Mr. Carson

when it paid witnesses money for testimony and then, knowing that such witnesses had not used

the payments as agreed, failed to reveal the true nature of the payments to defense counsel at trial

or actively represented that the money was used for purposes it knew or should have known were

false.

The Government has the ability to incentivize witnesses testimony with cash incentives

and rewards.  They cannot, however, lie about these payments and characterize them as relocation

payments, when in fact, they were not.  In this case that is exactly what the Government did with

several key witnesses.  Many, if not most of the witnesses in this case, were paid cash or

otherwise incentivized by some form benefit as part of the bargain for their testimony.  The

payments in cash were often characterized as various types of expenses, from relocation to

witness protection and lodging.   However, at trial, it was revealed that some witnesses were paid

for relocation expenses and never moved. The failure to disclose this information prejudiced
Carson and the other defendants in their ability to cross-examine these witnesses regarding the
funds and the government's complicity in handing out money to witnesses with no strings
attached.  The prejudice experienced by Carson could not be remedied on the stand with these
witnesses given the time constraints imposed by the Court and the substantial effort it would take
mid-trial to track down the actual use of the funds by the witnesses.   Moreover, the disclosure of
this information qualified as *Giglio* that should have been given over to the defendant when
known by the government agents and certainly prior to the witnesses taking the stand and being
asked about this on cross examination.

    3.  <u>Failure of government to maintain trial exhibits, documents and case file</u>

    Mr. Carson is being denied his right to effective assistance of counsel, as great portions of
the trial file and appellate file are unavailable to counsel appointed to investigate and litigate these
matters in this 2255 proceeding.  While some of the documents are available, the Government has
failed to produce for counsel the trial exhibits or exhibit list for review.[20]  This denies Carson the
opportunity and right to review the record against him and make an effective 2255 claim.
Moreover, in challenging the adequacy of the government's performance in discharging their
*Brady* and *Giglio* obligations at trial, there is no way to determine with accuracy what disclosures
were made.

    Counsel for Carson has requested that the government produce an exhibit at trial entered
by William Clelland, the crime scene investigator for the triple murder.  The government has
informed the Court this piece of evidence, the card entered into evidence at trial that was used to

---

[20] Margaret Chriss, opposing counsel for the Government on this brief has searched tirelessly for
all exhibits and trial record that undersigned counsel has asked her to locate. Despite her best
efforts, a great deal is still missing.

identify Sweeney's fingerprint, and any other fingerprint cards taken at the scene, cannot be located. (Dkt. #1168). Carson contends that the review of this fingerprint card and the other fingerprint cards in evidence is necessary to determine the nature and extent of the trial counsel's ineffective assistance in failing to question the fingerprint analyst regarding other suspects used as comparisons for the print identification. Additionally, Carson is now precluded from having the fingerprint cards tested to see if Green, Smith or any other of their known associates fingerprints were, in fact, found at the crime scene but not tested for or disclosed by the government at trial.


V. – INEFFECTIVE ASSISTANCE OF COUNSEL

   A. Legal standard and factual basis

   Carson submits that his convictions in this matter were imposed in violation of his right to effective assistance of counsel. The cause of action of ineffective assistance of counsel is based on the Sixth Amendment right to counsel, which exists "in order to protect the fundamental right to a fair trial." *Lockhart v. Fretwell*, 506 U.S. 364 (1933).

   The Supreme Court in *Strickland v. Washington*, 466 U. S. 688 recognized that the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defense" entails that defendants are entitle to be represented by an attorney who meets at least a minimum standard of competence. *Id.* at 685-687. "Under Strickland, we first determine whether counsel's representation 'fell below an objective standard of reasonableness.' Then we ask whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (*quoting Strickland, supra*, at 694).

One of the many challenges criminal defense attorneys face in the course of representing a client is appropriately balancing zealous representation against the contempt powers of the court. As a leading authority on this issue, Prof. Louis S. Ravenson notes that "this exercise of contempt power, and even the potential danger for it's exercise, can have a serious chilling effect on the vigor of advocacy." Louis S. Ravenson, *Advocacy and Contempt: Constitutional Limitations on the Judicial Contempt Power* , Part One, 65 Wash. L. Rev. 477, 481-82 (1990). There is a natural tension caused by the court's need to maintain its authority and the need of an attorney to zealously represent her client.

An attorney's duty to advocate on behalf of a client is directed by constitutional requirements and professional rules of responsibility.    In recognizing the conflict this creates, the Supreme Court has vowed to defend the work of zealous advocates from frivolous contempt charges. *Sacher v. United States*, 343 U.S. 1 (1952). The Court writes that "our criminal processes are adversary in nature and rely upon the self-interest of the litigants and counsel for full and adequate development of their respective cases.  The nature of the proceedings presupposes, or at least stimulates, zeal in the opposing lawyers." *Id.* at 9.

The Sixth Amendment of the United States Constitution guarantees defendants a right "to have the Assistance of Counsel for his defense." United States Constitution, Amendment 6. The First Amendment of the United States Constitution protects freedom of speech. United States Constitution, Amendment 1.  Taken together, these fundamental protections in the Bill of Rights create a judicial system where attorneys are required to represent the interests of the criminal defendant, and they are allowed to do so using protected speech when the language used is critical of the judicial system or officers of the court.

In the case of *Holt v Virginia*, 381 U. S. 131 (1965), two attorneys were convicted of

contempt based upon motions filed for change of venue based upon claims of local prejudice and

the bias and intimidating conduct of the trial judge.  The United States Supreme Court reversed

the conviction noting,

> The right to be heard must necessarily embody a right to file motions and pleadings
> essential to present claims and raise relevant issues … And since 'A fair trial and a fair
> tribunal is a basic requirement of due process', … it necessarily follows that motion for a
> change of venue to escape a biased tribunal raise constitutional issues both relevant and
> essential … Consequently, neither [of the two lawyers involved] could consistently with
> due process be convicted for contempt for filing these motions unless it might be thought
> that there is something about the language used which would justify the conviction."

*Id.* at p. 136-137,The Court found the motion for change of venue to have been proper and

the falseness of the charges irrelevant.  The Court concluded:

> Our conclusion is that these petitioners have been punished by Virginia for doing nothing
> more than exercising the constitutional right of an accused and his counsel in contempt
> cases such as this to defend against the charges made.

This position taken by the Supreme Court appears to afford relatively generous latitude in

arguing on behalf of clients without fear of contempt charges. *Raveson, supra*  Note 2.   The

Supreme Court has also considered the appeal of an attorney who had been convicted of contempt

for telling the presiding judge "we have the right to ask questions, and we propose to do so until

some bailiff stops us" in an attempt to preserve important issues for appeal and zealously

represent the client." *In Re McConnell*, 370 U.S. 230, 235 (1962).

> While we appreciate the necessity for a judge to have the power to protect himself from
> actual obstruction in the courtroom, or even from conduct so near to the court as to
> actually obstruct justice, it is also essential to a fair administration of justice that lawyers
> be able to make honest good-faith efforts to present their clients' cases.  An independent
> judiciary and a vigorous independent bar are both indispensable parts of our system of
> justice.  To preserve the kind of trials that our system envisages, Congress has limited the
> summary contempt power vested in courts to the least possible power adequate to prevent
> actual obstruction of justice, and we think that power did not extend to this case.

*Id.* at 235.

In Mr. Carson's case, the attorneys who represented him, Mr. Beshouri and Ms. Negin-Christ, met with judicial prejudice they deemed not only insurmountable, but legally and constitutionally incompatible with a fair trial for their client. On Appeal, Carson's appellate counsel argued that the District Court implemented trial procedures that were restrictive and even punitive at times. (Appellants' Brief at page 76). The District Court curtailed legitimate cross-examination of witnesses as to bias, imposed unreasonable time limitations on cross examinations, demanded that only one counsel be permitted to cross-examine a witness as to bias, and prohibited witnesses who appeared numerous times during trial to be cross-examined about bias more than once. *Id.* The Court would also "interrupt cross-examinations" and urge counsel to "use your time wisely." In practice, counsel were preclude from even doing that. *Id.*

The Appellate record is clear that the Court's seemingly arbitrary rules regarding limiting cross examination "hobbled the defense." *Id.* at 78. In some instances, counsel was not allowed at all to cross-examine witnesses on matters relating to their bias, although inquiry designed to expose bias is almost always relevant. *Id.* In one telling example, Counsel for the defense was given a late disclosure of an FBI report reflecting an oral statement of the witness Charlene Wilson. The report revealed that she was not an eye witness to the murder of Mr. Fortune, but had only heard about it from others. This was inconsistent with her sworn trial testimony in this case in which she claimed to be an eyewitness and to have seen Carson. The FBI report was turned over to defense counsel four months after Wilson left the witness stand. *Id.* at 90. On appeal it was argued that counsel was not able to recall Wilson to the stand to impeach her with this information because of the "time constraints placed upon defense counsel by the judge." Id at 91.

In another instance, defense counsel complained that the Government had not disclosed close to a thousand pages of *Jencks* material in sufficient time to be read and understood. The Judge characterized this as "defense counsel's problem" and ordered them to commence cross-examination or forego it. *Id* at 91. The Court also incorrectly told the defense counsel, in ruling against them regarding the government's failure to disclose impeachment materials on Ronald Sowells, that it was their burden to investigate whether there was *Brady* information regarding any witness that the Government had not turned over. *Id.* at 92. Additionally, for closings, the court refused to allow counsel a one day request to prepare, commenting that "given the out of court time for which counsel had billed, they should have been ready for argument" *Id* at 93. All the difficulties faced by defense counsel were further compounded by the Court's unwarranted suggestions that appointed counsel had an "ulterior motive" of trying to provoke a mistrial or unduly prolong the case, for which the court threatened to disallow compensation. *Id* at 75. The implicit threat being that risking one's livelihood and reputation would not be a worthwhile endeavor in zealously defending these clients.

These examples are but some of those listed by counsel in the appellate brief for this case. The most important piece of information is the proffer by counsel that, "[t]he judge's repeated admonitions and threats were intended to **and did have a chilling effect on defense counsel's advocacy**." *Id.* at 96 (emphasis added). On appeal the D.C. Circuit found that the judicial comments did not reach a level of hostility that prevented a fair trial. *U.S. v. Carson*, 455 F. 3d. 336, 372 U.S. App. D.C. 251. The opinion went on to state that "in sum, considering the challenged rulings, procedures and comments, together in the context of a long and difficult trial, we are not persuaded that 'the judge's behavior was not so prejudicial that it denied [the

defendant] a fair, as opposed to perfect trial.'" *Id*, (*quoting*, *United States v. Logan*, 998 F. 2d at 1029), (*quoting United States v. Pisani*, 773 F. 2d 397, 402 (2d Cir. 1985). *Id.*

Carson was represented by Mr. E. Joseph Beshouri and Ms. Lexi Negin-Christ at trial. Ms. Negin has supplied an affidavit that is attached to this motion as Exhibit 8. In this affidavit, Ms. Negin describes the nature of her representation and how she and her co-counsel rendered ineffective assistance to Carson during his trial. She details how in numerous instances, they failed to move for mistrials, preserve objections, cross-examine important witnesses as to their bias, follow up on defense theories, and recall witnesses shown to have lied on the stand because of the restraints imposed by the Court and for fear of sanctions and "disappointing" the Court.

In addressing the two prong *Strickland* analysis, the above reference facts indicate that Carson's trial counsels' performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U. S. at 687. The first prong of the test is "necessarily linked to the practice and expectation of the legal community: "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Padilla v Kentucky*, 559 U.S. 356, 366 (2010) (*quoting Stickland, supra,* at 688, 694). Under that standard, it was unreasonable for Carson's lawyers to forgo making the Constitutionally required effort to preserve the record for appeal by moving for mistrial when necessary, impeaching key witnesses with bias testimony, objecting to the Court's incorrect application of legal standards regarding *Brady* disclosures and forgoing other areas of cross examination for a real or imagined fear of incurring negative treatment by the Court.

Knowing that they possessed a conflict of personal interest, (here it was the attorneys' personal interests which interfered with their zealous representation of Carson), and failing to raise this conflict with the Court and seek disqualification, was not objectively reasonable. It is

one thing to know that the Court is implicitly your employer when you are a CJA lawyer, and quite another to be threatened by that employer with the fear of financial punishment. Carson's attorneys feared being seen as "unreasonable" by their employer and this fear kept them from acting in Carson's best interests. They knew many of the Court's rulings were in error, detrimental to Carson's case and chilled their ability to be effective in their representation of him. In light of these facts, counsel had a duty to zealously challenge the application of these rules or inform the client that they had no intention of fighting zealously for his defense and seek to withdraw from the case. At the very least, counsel had the duty to preserve the record every time such a rule was imposed by objecting in some fashion or moving for a mistrial if warranted. Their failure to put aside personal interest for fear of risking a professional reputation or personal financial security deprived Carson of the right to counsel guaranteed by the Sixth Amendment.

The facts of this case demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694. Given the admission by Carson's counsel that they did not pursue many relevant and material areas on cross examination, it is now necessary to examine some specific instances how this prejudiced the defense and denied Mr. Carson of both a fair trial.

B.  Specific Failures by Counsel and the Resulting Prejudicial Effect

1.  Failure to Cross Examine Fingerprint Experts Regarding Alternative Suspects

Counsel for Carson was ineffective in failing cross-examine the fingerprint examiner Elores Clark regarding the suspect Dennis Green. No inquiry was made by defense counsel into whether Green's fingerprints had been run as a match to the eight separate fingerprint cards collected at the scene. During Ms. Clark's cross-examination she was asked what other suspects

were used as comparisons against the fingerprints submitted in this case and used in making the

fingerprint report.  At that point there was an objection by the government and a bench conference

ensued.  During the bench conference it was revealed that the government agents gave the

fingerprint examiner a list of suspects to compare the fingerprint card against.  On that list were

the names of the various defendants.  Mr. Dennis Green's name was not one that list.  The bench

conference ended with a ruling that the defendants would be allowed to cross-examine the witness

regarding other suspects in this case or other known matches.[21] (Tr. 4/02/01 PM p.77).

In a case replete with examples of the Court ruling unfavorably for the defense, here is an

instance when the Court led the charge in helping defense counsel pursue a very important line of

questioning.  Having been prevented from offering the grand jury testimony of Pinckney and

Owens at trial, the next best thing would have been to cross examine the fingerprint examiner

about other suspects, especially Dennis Green. The fingerprints were first examined in February

of 1997, nearly three months after the triple murder and the date the fingerprints were taken from

the crime scene.[22]   (Tr. 4/02/01 PM p. 71) During those three months, while the fingerprint cards

presumably sat in PG County offices, Mr. Dennis Green, was arrested for the triple murder based

---

[21] THE COURT: Throughout this case there has been the suggestion that there is someone other than those who have been implicated by the only eye witness to testify to it.
MR. ZEIDENBERG: That's fine, Your Honor. I don't care. I don't mean to argue with Your Honor.
THE COURT: I think they ought to be able to pursue that.
MR. ZEIDENBERG: I made my objection.
MR. DAVIS: I would ask Your Honor to give some type of cautionary instruction, because there is absolutely no evidence linking Mr. Hill to this at all, there is just nothing. As a matter of fact, I believe -- what's the date on that, the date that this incident took place, do you remember?
THE COURT: I think you are entitled to bring out the fact that there was no match.
MR. DAVIS: Well, Your Honor, I can't question this lady about why he was on there. And it could have been on a whim, it could have been on anything, and that's the problem. She knows nothing about it. All she knows is --
THE COURT: There have been other suspects in this case. I think it's a legitimate area of inquiry.
MR. DAVIS: I would object for those reasons.
 THE COURT: Objection overruled.
(Tr. 4/02/01 PM p. 77)

[22] From the trial testimony it appears all prints were lifted that same day of the murder, but because counsel for the government cannot locate that actual card in evidence for review this remains a question that is unanswered.

upon a complaint filed on January 6, 1997. (Complaint PG County, Dennis Green, signed by

Detective Deloatch, Attached as Exhibit 9)  It was unreasonable for Carson's counsel not to

question the fact that the government agents never checked for Dennis Green's fingerprints at the

crime scene.[23]  Additionally, the fingerprints were not run until February of 1997 and then only

out of the federal government's desire to make a case against Carson and his co-defendants.

According to the testimony at trial, one fingerprint was found linking Sweeney to the crime. (Tr.

4/02/01 p. 49).  However, at least eight fingerprint cards were submitted from the crime scene and

each card could have contained more than one fingerprint. (Tr. 4/02/01 p. 57-58).  Any of those

cards could have contained the prints of Dennis Green or his associates, or any other suspects, but

the Federal Bureau of Investigation never asked to run Green or his associates as comparisons.

(Tr. 4/02/01 p. 78).  The only known comparisons run by the fingerprint examiner were for

Sweeney, Montgomery, Carson, Coates, Hill and Maurice Anthony Proctor.  *Id.*  Carson's

Counsel should have extensively cross-examined the fingerprint examiner, the evidence collector,

Agent Lisi and the agents who submitted the comparison list regarding these additional suspects.

Moreover, defense counsel was aware at the time of the fingerprint testimony that a witness for

the defense, Wesley Smith, was told by Butchie Smith that he (Butchie) was cheated out of

$60,000 while gambling in the triple murder house in Temple Hills.  About a week after the triple

murder, Butchie also told Wesley that "I took care of Darnell Mack and those guys." (Tr.

6/06/01 AM, p. 26-34; Tr. 6/11/01 PM p.9-27; Tr. 6/13/01 AM) p. 72-77).  Cleary there were

multiple suspects considered for the triple murder.  Competent and effective counsel would have

---

[23] This does not even factor into the equation the fact that the government went to great efforts to
hide the details of Pinckney and Owens' relocation during that time period and the payments
made to them that were not disclosed.  Moreover, without explanation, Pinckney and Owens were
dismissed as credible witnesses and the sole focus of the government agents in this case were the
defendants, as evidenced by the suspects they submitted for comparisons.

tailored their questioning to show the bias in the government's investigation against Carson and his co-defendants.

### 2. Failure to Recall Charlene Wilson

Counsel was ineffective when they failed to recall Charlene Wilson to the stand after discovering that she was not an eyewitness to the murder of Anthony Fortune as she had testified to earlier during trial. The circumstances surrounding Charlene Wilson's testimony alone demonstrate how material the impeachment of this witnesses would have been to the outcome of this case. Given "Wilson's status as the only witness to the alleged crime, there is no colorable argument to be made that the potentially significant cross-examination was not "material." (Appellate Brief at page 147).

Initially, the Government's failure to disclose the *Brady* material regarding Ms. Wilson created surprise for defense. Agent Warrener asked to use his report to refresh his recollection and having done so, the Court ordered it to be turned over to defense over the objection of the Government. (Tr. 6/14/01 PM p. 44; 48-49). When defense counsel reviewed his report, it was revealed for the first time that Ms. Wilson's initial statement regarding the Fortune murder was that she had HEARD Carson committed the murder and had not in fact been an eyewitness. Once this devastating contradiction in her testimony was discovered, counsel for Carson acted unreasonably by failing to make a proper objection to preserve the record and to attempt to recall Ms. Wilson for impeachment. Defense counsel stated that they could not do so because of the time constraints placed upon them by the Court. (Appellants Brief p. 147). This is an unreasonable explanation. The attempt alone, and possible denial, would have preserved this important point on the record for appeal.

### 3. Failure to cross-examine witnesses on use of payments by the government

Trial counsel for Carson also failed to adequately question government witnesses when they admitted on the stand that they were paid by the government for undisclosed purposes in connection with their testimony. There was a strong indication from the start of the case that most witnesses were paid in some form of cash or other incentive (plea agreements) for favorable testimony. In fact, the first government civilian witness to take the stand in this case, Reginald Switzer, testified that his family was paid thousands of dollars for relocation due to a security concern and that nearly two and a half years later, at the time of trial, his mother still lived on K Street and had not yet moved.[24] (Tr. 1/30/01 p. 33). Once this witness admitted to receiving funds from the government and failing to use those funds for the purpose stated in the government's *Giglio* disclosure, several things should have happened: First, a reasonable attorney would have cross examined this witness extensively on why the funds had not been used for moving, who paid the funds, whether there was a receipt for the funds, how the amount was calculated, and what the money was actually spent on. Second, defense counsel should have moved for a continuance and asked to review the witness file of the government including the FBI about the payment information in question. Third, a record should be made that the *Giglio* disclosure by the Government was not accurate and falsely represented that the funds had been used for relocation. Finally, every government witness in this case should be asked the same questions

Counsel was ineffective in failing to seek sanctions against the Government for mischaracterization of those payments as relocation expenses when they knew or should have known that Mr. Switzer had never moved. Incredibly, Mr. Switzer's payment situation was not unique.

---

[24] The Government *Giglio* disclosure indicate that Mr. Switzer's wife and mother were paid $6,100 for relocation due to a security concern. Exhibit 10.

For example, Cinema Hawkins was paid $750 for relocation expenses. *See* Exhibit 11. She was never asked if she used those funds to relocate. Moreover, no questions were pursued as to why her payment for relocation was so small in comparison to others who never even moved, such as Switzer. Charlene Wilson was also paid $4,900 for moving expenses by the government to relocate but did not do so for over four years. (Tr. 2/13/01 AM p. 40 & PM p. 33). Eugene Byers' sister, was paid $5,592.53 for moving expenses in connection with his testimony and he testified he had no idea about this payment. (Tr. 4/09/01 PM p. 57-58).

This line of cross-examination would have been material impeachment evidence to show bias on the part of these witnesses and control by the government over these witnesses. This pattern of conduct evidences an implicit agreement with these witnesses to testify favorably for the prosecution in exchange for the government turning a "blind eye" towards the use of those funds. In order to be effective, once counsel knew that the government had failed to disclose the actual use of the cash payments, they needed to investigate the actual use of funds by all witnesses and the degree to which the government made, and failed to disclose, the implicit agreement that the cash could be spent in any way the witness wanted.

4. Other Instances of Ineffective Assistance

a) Counsel was ineffective in failing to follow up on information supplied by Carson at trial that he had a rental car during the time period he was accused of borrowing a car for the murder of Robert Smith. Documents showing that he was in possession of a rental car would rebut testimony that he needed to borrow a car on the day in question. Records are no longer retained by the rental car company for the date in question.

b) Carson also argues that Counsel was ineffective in failing to pursue arguments regarding Montgomery's mental impairments and medical health history that could effect his

memory or ability to be manipulated by government agents. Trial counsel failed to make a timely showing for a need for an expert witness to address this issue and present information showing that Mr. Montgomery was an individual who, due to mental slowness, was easily manipulated by people who showed him attention, friendship or who held a position of power over him. The defense team was denied access to Montgomery's witness protection file and medical information, but their failure to then question the witness regarding his memory and propensity to be easily manipulated by powerful individuals, such as FBI Case Agent and the government prosecutors, was unreasonable and counsel's failure to point this out through cross examination and through the use of expert testimony rose to the level of Constitutional ineffectiveness.

c) Caron's trial counsel was ineffective for failing to object at trial to the improper in camera inspection procedure adopted by the Court with regard to sealed *Brady* materials. This procedure prejudiced Carson and allowed the Court to be used as a tool of the Government in their scheme to withhold exculpatory material from the defense. It has been held that *in camera* proceedings should only be used where there is a compelling interest to do so. *In re Sealed Case*, 151 F. 2d 1059 (D. C. Cir. 1998). The proper procedure for conducting *in camera* proceedings was not followed in this case. Trial Counsel for Carson failed to make an objection on the record and challenge the improper procedure by the Court. There was no compelling reason for these documents to be submitted *in camera* and *ex parte* to the Court and failure to object to this was ineffective on the part of counsel. Furthermore, counsel failed to request findings be made on the record and a full index of the documents submitted for *in camera* review be disclosed to the defense. This conduct prejudiced Carson's ability to present his case at trial and on appeal.

d) Appellate Counsel was also ineffective in failing to seek appellate review the Trial Court's rulings regarding the sealed materials. In denying defendants' motion to Allow Counsel to Review Certain portions of the Trial Record, The United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) instructed counsel that they must identify the specific rulings believed to be erroneous, and present the issue in the appellants' brief, rather than by motion. *See* Order dated 8/28//2003 [Case No. 02-3015, ECF No. 769196]. As evidence by the numerous instances of *Brady* material contained in the sealed documents and discussed supra, challenging them would have proved successful on appeal. However, Appellate counsel failed to pursue this claim on direct appeal. Had the petitioners raised the issue on appeal, the Court of Appeals would have reviewed the materials *in camera*. *Id.* The violations would have then come to light and demonstrated the pattern of abuse that was perpetrated by the Government in this case and the fundamentally unfair resulting verdict. The result would have been a reversal on appeal. Failure to raise these issues was unreasonable on the part of appellate counsel and the deficiency so prejudiced Carson that counsel's assistance was unconstitutionally ineffective. [25]

## Conclusion

Carson did not receive a fair trial. The Government systematically hid *Brady* and *Giglio* evidence. The District Court abused his discretion by finding that there was no *Brady* evidence in the sealed documents and failed to keep an adequate list of what was presented and considered by

---

[25] Counsel also incorporates by reference the claims raised by co-defendants in their post conviction petitions related to trial and appellate counsel's ineffectiveness, based on actions and omissions, as due to the fact that in this group prosecution, actions and inactions by other counsel affected the case against and defense of Carson. Moreover, any other Constitutional errors raised by co-defendants, in as much as they apply to Carson as well, are incorporated by reference herein.

him. Witnesses were paid for their testimony. Defense trial counsel was ineffective.  Therefore,

Carson requests discovery and an evidentiary hearing on this motion and seeks leave to

supplement the issues when discovery is received.

Wherefore, for the foregoing reasons, both singularly and in the aggregate, for the reasons

set forth in legal memorandum and exhibits and for such other reasons as may be subsequently

submitted or may appear at the hearing in this matter, counsel and Mr. Carson respectfully ask

that the Court set aside his conviction.

Respectfully submitted,


_____/s/_____
KIRA ANNE WEST
Bar No. 993523
1325 G Street NW, Suite 500
Washington, D.C. 20005
(202) 236-2042
Email: kiraannewest@gmail.com

ATTORNEY FOR SAMUEL CARSON

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2015, a copy of this pleading was served by email to
Government counsel of record, Ms. Margaret Chriss, as this filing is filed under seal.


_____/s/_____
KIRA ANNE WEST

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA  §
                          §

V.                        §        CASE NO. 1:98-CR-329-03 (RCL)
                          §
SAMUEL CARSON             §

**Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C.
Section 2255**

Mr. Samuel Carson, by and through undersigned counsel, respectfully moves this

Honorable Court for relief from the sentence in this case imposed in violation of the Constitution

and the laws of the United States. Mr. Carson, by and through is attorney, Kira Anne West,

hereby submits this supplement to his 2255 motion for relief. Mr. Carson raises, in addition to his

joinder of the claims made by his co defendants in their 2255 motions and supplements, in as

much as they also apply to him, additional claims relating to fundamental violations of his Due

Process rights under the United States Constitution.

I. SUMMARY OF ARGUMENT

Mr. Carson (hereinafter "Carson") argues that through a pattern of abuses by the

Government, he was denied his Constitutional Rights to Due Process and a fair trial.

Additionally, Carson was denied the ability to confront and effectively cross-examine the

Government's witnesses against him. Carson alleges that the Government engaged in a pattern of

conduct designed to secure testimony at trial they knew or should have known was false and

misleading. Furthermore, they paid benefits to witnesses in a manner designed to encourage them

to improve their testimony. Carson also alleges that the Government improperly paid witnesses

for testimony knowing that the funds were not being used in the manner in which they were

intended and often did not disclose this at trial. Carson further alleges that the Government

deliberately withheld exculpatory materials and failed to turn them over in a timely manner so as

to substantially prejudice his case. In some instances, *Brady* evidence was withheld until it was

too late to use effectively. In other instances, Brady was withheld completely by *ex parte* and

under seal submissions to the Trial Court, which the government used as a shield to evade their

Constitutional duty to turn over exculpatory evidence.

Carson also argues that the failure of the Government to adequately secure, retain and

make available to him the government's trial exhibits, exhibit list from trial, and a full accounting

of the *Brady* and *Giglio* materials turned over at trial, has prejudiced his Constitutional Rights

with regard to his ability to support certain claims in this 2255 motion. Moreover, there is no

way, at this point in time, for Carson to examine the trial exhibits in support of his claims because

the Government cannot locate them or their exhibit list. There is also no comprehensive list of

the *Brady/Giglio* disclosures made by the government and no comprehensive list of *the in camera*

materials reviewed by the Court for *Brady* material prior to and during trial. Carson's counsel is

left to deduce, in many instances, that the things he challenges as *Brady* were, in fact, not turned

over. The Government's continued inability to proffer such materials requested by Carson

prejudices his ability to assert his claims under the Constitution.

Carson additionally argues that his trial and appellate counsel were ineffective in their

representation. Carson alleges that his trial counsel was aware of their own ineffective assistance

but failed to withdraw as counsel or request permission from the Court do so. They continued to

represent Carson after they determined that they could no longer be effective in their

representation. Such belief was based on a perceived judicial bias that rendered them ineffective

in their ability to represent Carson.   By choosing to protect their personal interests and avoid

judicial sanctions and backlash, the trial counsel for Carson made decisions that prejudiced

Carson's case, not for strategic purposes, but merely to avoid conflict with the Judge and

sanctions.   Their improperly placed notion that the judicial bias of the Trial Court was

insurmountable led to their failure to pursue cross-examination on bias issues, preserve issues for

appeal and make requests to recall crucial witnesses.

II.  PROCEDINGS BELOW

In support of this motion, Carson proffers the following:

1.  This motion is based upon all the files, records and proceedings of this case, as well as

activity and inactivity outside of the record, and any such other materials as may be

subsequently submitted. [1]

2.  On September 18, 1998, Carson and his co-defendants were charged by indictment with

conspiracy to possess with intent to distribute and distribution of controlled substances,

conspiracy to participate in a racketeering influenced and corrupt organization ("RICO")

and various other substantial counts.

3.  On March 25, 1999, Carson was charged in a 101 count superseding indictment.[2]

---

[1] This brief is a supplement to the previous 2255 filed by Carson *pro se*.  It also adopts the claims
raised by Carson's co-defendants in this case in their 2255 petitions and supplemental petitions.
[2] These charges included violations of:  21 U.S.C. 846, Conspiracy to PWID; 18 USC § 1962(d)
& 1963(a), RICO conspiracy; 18 U.S.C. § 1959(a)(1), murder in aid of racketeering activity of
Chrishuahna Gladden, Alonzo Gaskins & Darnell Mack & Melody Anderson; 18 U.S.C. 2,
Aiding and Abetting; 18 U.S.C. § 924(c)(1)(A)(i), use of a firearm during and in relation to a
crime of violence or a drug trafficking crime; 22 D.C. Code § 2401& § 3202 of First Degree
Murders while armed of Maurice Hallman, Leonard Hyson, Teresa Thomas, Terita Lucas,
Anthony Fortune,  & Chrishauna Gladden; 22 D.C. Code § 501 & § 3202 , Assault with intent to
kill while armed; 22 D.C. Code 2101 & 3202, kidnapping while armed; & 22 D.C. Code
§3204(b), possession of a firearm during a crime of violence.

4. Carson went to trial with William Sweeney, Vincent Hill, Jerome Martin, Sean Coates and Gary Price.

5. The defendants were charged with a large-scale conspiracy. As part of this conspiracy it was alleged that Carson participated in various acts of violence in furtherance of the conspiracy.

6. On August 15, 2001, after seven months of trial, Carson was found guilty of all counts.

7. On January 31, 2002, Carson was sentenced to successive terms of life imprisonment without the possibility of supervised release or parole due to the then-mandatory Guidelines (*See* Dkt. #907). He filed a notice of appeal on this same date.

8. The United States Court of Appeals for the District of Columbia Circuit affirmed Carson's convictions. *United States v. Carson et al*, 455 F. 3d 336 (D. C. Cir. 2006), *petition for reh'g and reh'g en banc denied*, 2006 U. S. App. LEXIS 26335 (D.C. Cir., Oct. 23, 2006).

9. On Feb. 20, 2007, the Supreme Court denied Carson's petition for writ of certiorari. *Carson et al v. United States*, 127 S. Ct. 1351 (2007).

10. Carson timely filed his original Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 USC. 2255. This is his supplement to that motion.

11. At all times pursuant to the appeal of this case and in accordance with the Local Rules 56.2(b) and (c) of this Court, the original trial exhibits were in the custody and control of the U.S. Attorney for the District of Columbia and were to be preserved by that office until final disposition of the case.[3] LCrR 56.2 (b) and (c).

---

[3] The defense counsel's copy of the trial record was delivered to appellate counsel years after the case was tried. Unfortunately, due to no error on the part of appellate counsel, the storage facility that kept approximately 45 boxes of notes and evidence was inadvertently bulldozed by the company that stored the records. There are now only 10 boxes remaining that are in the possession of undersigned counsel.

III. POST APPEAL STATURE

12.  In February, 2008, Sweeney's defense counsel discovered several sealed documents

submitted to the Court during trial for *in camera* review of *Brady* material.  Pursuant to a Court

order, these documents were unsealed as to Sweeney.  Subsequently, the documents were

unsealed as to Carson and other co-defendants by this Court.

13.  Section 2255 of Title 18 permits a prisoner in custody under sentence of a federal court to

move the court to vacate, set aside or correct an erroneous sentence.  The Supreme Court

has read the statute to provide four grounds on which relief may be sought: (1) the sentence

was imposed in violation of the Constitution or the laws of the United States, (2) the court

was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the

maximum authorized by law; or (4) the sentence is "otherwise subject to collateral attack."

*Hill v. United States*, 368 U. S. 424, 428 (1962).

A.  Underlying facts at trial

This prosecution was part of the D.C. government's push to prosecute and rid the city of

drug traffickers and the homicides that often followed in the wake of drug trafficking.  The

government's theory was that Carson, along with several friends, engaged in large scale RICO

drug distribution and killing.  As in most drug cases, the evidence against Carson was in large part

derived from testimony of cooperating co-defendants, namely James Montgomery, a cooperator

whose lobotomy severely affected his memory and the un-cross-examined testimony of Robert

Butchie Smith, a cooperator who was shot down in the streets, allegedly for being a snitch.  Of

course, most witnesses that testified at trial against Carson were either profiting from a

forthcoming 5K or Rule 35 or substantial monetary payments for "security" or "moving expenses." When this testimony is viewed through the looking glass of truth, the picture becomes quite hazy. In February, 2008, sealed documents that the Government submitted *in camera* and *ex parte* were discovered and unsealed. Herein lies Carson's claim that his trial was so infected by the improper withholding of exculpatory materials and the prosecution's deliberate hiding of such evidence that his conviction cannot stand. Because of this pervasive misconduct, Carson did not get a fair trial. There is a reasonable probability that the outcome of the proceedings would have been different if the defense counsel in this case had been supplied the *Brady* material in a timely manner for use on cross examining the weak and highly biased testimony of their star paid witnesses. As a result, Caron's conviction should be set aside.

## IV. CONSTITUTIONAL VIOLATIONS: BRADY ISSUES: 5TH AMDT. DUE PROCESS & 6TH AMDT. CONFRONTATION CLAIMS

### A. Background

#### 1. Facts

Throughout the trial and during pretrial proceedings, several of the defendants, including Carson, repeatedly asked the government to turn over all exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).[4]   (Tr. 6/16/2000 p. 5-13) (defense counsel asking for *Brady* material on triple murder); (Tr. 9/27/00 p. 78-80) (Carson's counsel asking for *Brady* on Anthony Fortune murder); *Id.* at 200-203. *See* Carson's supplemental motion to compel, Dkt #342 ; Sweeney's Third Motion to Compel Discovery, Dkt #340.   The government stated pretrial that it had complied with all of its discovery obligations. (Tr. 9/27/00 p. 130: 17-20).   However, at trial, it was clear the government had not adequately searched its files for potential *Brady* material. As

---

[4] *See also*, 1/30/01 PM 4 (defense counsel Zucker *Brady* request for notes of Mayrant murder); 2/1/01 PM 63 (defense request for AUSA notes of Andre Murray). At times, the request for *Jencks* was in reality a request for *Brady* information and only came to light after a witness testified. *Id.* at 5.

a result, defense counsel were left to request the documents in session or when the issue arose. This put the defense at a considerable disadvantage. The Government, rather than turn these items over once it was clear that they contained *Brady*, submitted them to the court to review *ex parte* and *in camera. See* Ex. 1. (The Court made an exhibit list and added to it throughout the course of the trial). These sealed materials were kept from the defense and no findings of fact and conclusions of law were ever made by the trial judge regarding his *Brady* rulings. Not surprisingly, based upon the one sided proffer by the government, none of the documents were determined to contain *Brady* material. There was simply an oral ruling that the items did not contain *Brady* material and the defense was shut out of the process. The Court mistakenly believed that it could not order *Brady* to be turned over and misapplied the Brady standard to this inquiry. The Court stated so during a pretrial hearing "I can't order Brady material turned over, and Brady material is that which is reasonably likely to be, quote, exculpatory, close quote." (Tr. 6/16/2000 p.23-24). This systematic withholding throughout the trial is documented in part on the Court's exhibit list. *Id.*

Long after the appeal of the convictions in 2005, one of the lawyers appointed by the Court to write the 2255 found several exhibits that were put under seal during the trial. A review of these exhibits shows that the government had within its possession, before and during the trial of the case, a great deal of *Brady* material that should have been turned over to the defense. The following discussion of some of these exhibits show how important these materials would have been at the trial.[5]

---

[5] The following is a list of the exhibits that were placed under seal during trial and discovered by 2255 counsel in 2008. Some are included in the attached Exhibits 1-11, but not in the following order: (1. Andre Murray letters to AUSA Wainstein (heavily redacted); 2. Andre Murray notes; 3. Robert Butchie Smith 302; 4. Court exhibit 2 - AUSA Notes on Switzer; 5. Court exhibit 4, AUSA notes on Andre Murray; 6. Court exhibit 5, Theodore Watson file; 7. Court exhibit 8-

## 2. The Law

The *Brady* rule is a rule of disclosure, not admissibility. The Supreme Court held in *Brady*

that "suppression by the prosecution of evidence favorable to an accused upon request violates

due process where the evidence is material either to guilt or to punishment, irrespective of good

faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.   There are three steps in a *Brady*

violation:  the evidence at issue must be favorable to the accused, either because it is exculpatory

or because it is impeaching; that evidence must have been suppressed by the State, either willfully

or inadvertently; and prejudice must have ensued. *Strickler v. Greene*, 119 S.Ct. 1936, 1948

(1999). Application of the *Brady* doctrine was extended to testimonial impeachment in *Giglio v.

United States*, 405 U.S. 150 (1972).  A *Brady* violation is demonstrated by showing that the

undisclosed evidence could reasonably be taken to put the whole case in such a different light as

to undermine confidence in the verdict. *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  This Court

reviews an alleged due process violation under *Brady* for a reasonable probability that the result

of the proceeding would have been different had the evidence been disclosed to the defense.

*Brady v. Maryland*, 373 U.S. 83 (1963).

Thus, the government is obligated to disclose not only exculpatory evidence but also

evidence that might tend to impeach the credibility of key government witnesses. *See Brady,* 373

U.S. at 83; *Giglio*, 405 U.S. at 150.  Evidence is material if there is a reasonable probability that

had the evidence been disclosed to the defense the result of the proceeding would have been

different.  The Supreme Court in *United States v. Bagley*, 473 U.S. 667 (1985) disavowed any

---

Charles Bender 302, 8. Court exhibit 11-Arthur Rice 302; 9.  Eugene Byars302 -Court exhibit 9;
10. Governments motion to move defendants(note: not on the Court's Exhibit list); 11.  AUSA
notes on James Montgomery; 12. Additional materials James Montgomery-Agent Lisi notes; 13.
Notes; 14.  Court exhibit 10-Ronald Sowells 302; 15. Use of anonymous jury(note: not on Court
Exhibit list); 16. Court exhibit 5File of Theodore Watson-; *See* Court Exhibit list, Exhibit 1 to this
supplemental motion.

difference between exculpatory and impeachment evidence for *Brady* purposes. Furthermore, disclosure of documents and tangible objects that are material to the preparation of the defense may be required under the rule of *Brady* without an additional showing that the request is reasonable. *United States v. McVeigh*, 954 F. Supp. 1441, 1446 (D. Colo. 1997).

*Bagley's* touchstone of materiality is defined as the reasonable probability of a different result. *Kyles*, 514 U.S. at 434. The critical question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence, he received a fair trial. This is understood as a trial resulting in a verdict worthy of confidence. *Id.* Materiality in terms of suppressed evidence should be considered collectively, not item by item. *Id.* at 436. Once there has been a *Bagley* error, it cannot subsequently be found harmless. *Id.* at 435.

Carson believes that the government purposely hid *Brady* material by submitting it to the Court as a gatekeeper rather than complying with its obligations under the law. At the behest of the Government, this process that the district court undertook was improper and prejudicial. Although the trial court viewed the evidence in question *in camera*, the court failed to keep the required transcribed record of the *in camera* proceedings. *See In re Sealed Case*, 151 F.2d 1059 (D.D.C. 1998). Moreover, the trial court failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material. No findings were made regarding the requested material, and no record has been released to the defense indexing the material presented to the Court that matches up with the documents released by the Clerk's office in 2008.[6] The prosecution never made a record as to why they were turning over certain

---

[6] Several documents turned over by the clerk in 2008 as part of the sealed exhibits are not listed on the Court's exhibit list as having been sealed. However, review of the trial transcript shows that in the case of the Theodore Watson file, it was in fact sealed after a request by defense

documents to the court for *in camera* inspection and in some cases they were compelled to submit

documents to the Court record after having determined that no *Brady* was present.

The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy

the right…to be confronted with the witnesses against him." Alleged violations of the

Confrontation Clause are reviewed de novo. *United States v. Wilson*, 160 F.3d 732, 739 (D.C.

Cir. 1998). Failure to turn over this *Brady* material kept Carson's counsel from effectively

confronting the witnesses against him. Evidentiary errors are reviewed for abuse of discretion.

*United States v. Hilliard*, 11 F.3d 618, 619 (6th Cir. 1993).

B.  Sealed documents and ex parte submissions

1. Government's ex parte motion to change confinement of defendants

Trial counsel for William Sweeney, Steven Kiersh,[7] asked the Court repeatedly for *Brady*

material with regard to the prior statements of Robert Butchie Smith, another Government

cooperator. (Tr. 5/29/01 AM 77-end & Tr. 6/16/2000 p. 25-26). On April 2, 1999, in a sealed

document,[8] the government filed an "Ex Parte Notice to Change Confinement of All Defendants."

Judge Jackson put this motion under seal April 6, 1999. The defense was never given access to

this motion. In that motion, the Government identifies "Andre Chappell and Anthony Ricardo

Hawkins"[9] as having murdered Robert Butchie Smith. *See* Exhibit 2 @ 12. This is critical

evidence because the government's theory at trial was that Carson and Sweeney killed Smith and

they were convicted of the murder. Moreover, they were prejudiced by a ruling that allowed the

---

counsel that it be made part of the record. It was not, however, reviewed in camera by the Judge,
over the objection of defense counsel Zucker. (Tr. 2/13/01 AM p. 6-7).

[7] According to an interview of Mr. Keirsch on 1/18/12, the defense attorneys never were told
about the contents of any documents in any *in camera* exhibits. *See also* affidavit of Lexi Negin.

[8] This document was not assigned an exhibit number nor does it appear on the Court's exhibit list.

[9] These two individuals are never brought up again. This forclosed any opportunity Carson's
investigator would have had to have knowledge of them or to investigate them.

statements of Smith to be entered into evidence by Agent Lisi so that there was not an effective way to cross-examine them. Had defense counsel known about this motion, and the fact that the Government believed others were responsible for the death of Robert Butchie Smith, defense counsel could have had their investigators try to find these two individuals and follow leads on whoever else wanted Smith dead. Furthermore, Agent Lisi could have been cross-examined on this subject and/or prevented from testifying as Smith at trial. However, at trial this information was withheld and the government argued that Agent Lisi be allowed to bring in Smith's statements under the theory was that Carson killed Smith and therefore Smith's statements should come in under FRE 804(B)(6).[10] The Court agreed and held that Smith's un-cross-examined statements could all come in through Agent Lisi, and they did. Had these names been provided to the defense and thoroughly investigated, the Court would have been hard pressed to find that Carson killed Smith by a preponderance of the evidence. The only testimony that it was Carson who killed Smith was the uncorroborated testimony of James Montgomery, their star witness with a history of lying and who lacked credibility on many levels. (Tr. 5/23/01 PM 22-33).

This information was clearly *Brady* material in that the government, at that time, thought someone other than Sam Carson killed Robert Smith. This information would have also impeached Montgomery's version of events. In the pretrial hearing on September 27, 2000 regarding the Government's request to have Smith's statements come in at trial through agent Lisi, the government represented directly to the Court that no other suspects wanted Smith dead in this case and that if that information existed it would be considered *Brady* and should be turned over. (Tr. 9/27/00 p. 200-202). The Court agreed. However, this is exactly what the government failed to turn over to the defense at trial. The prejudice extends not only to the admission of the

---

[10] The Court found by a preponderance of the evidence that Carson had waived his objections to Mr. Smith's hearsay statements when he killed this witness. (Tr. 5/29/01 AM p.88-89).

testimony of Smith through Lisi at trial, but to the inability to present the defense Carson would

have presented at trial.

An earlier pretrial discussion between the Court, Carson's counsel, and the prosecutor

illustrate how this is clearly *Brady* material. At a pretrial hearing, Carson's counsel asked for the

name of a person who overheard Mr. Martin say that he (Martin) was responsible for the killing

of Anthony Fortune. The prosecutor, Mr. Zeidenberg, refused to give him the name. Carson's

counsel argued:

> MR. BESHOURI: …I ought to be able to investigate it. I ought to be able to be in a
> position to present it. That means I need to be able to talk to that witness—that witness who
> heard Mr. Martin.
> THE COURT: I don't know what more you need to be given in the way of Brady
> information. The Government has informed you—has acknowledged there is a witness who will
> be called at trial and who will testify that at one point—or who is alleged to have said, whether he
> testifies to it or not, at one point that he was responsible for a particular homicide.
> Now if they had further evidence of some description corroborative that the individual
> was, in fact, responsible for that homicide, then I suppose that could qualify as Brady material,
> but you already know all that Brady requires in the absence of the existence of any such other
> evidence.
> *Id.* at 78-81.

Here, the Court acknowledges that if there is evidence that someone else committed a

murder, that it's *Brady,* but the Court does not order the Government to turn it over. Instead the

Court goes on, presciently:

> THE COURT: It is incumbent upon the government to reveal evidence which is
> exculpatory of your client, but the government is in control of that evidence. And you would not
> know about it but for the fact that the government makes you privy to that information.
> *Id.* at 82.

After further discussion, the AUSA agrees to give information regarding a separate

murder, but is allowed to make the decision as to all other Brady information.

2. Court Sealed Exhibit #4 –Interview Notes of Andre Murray

In addition to the information that Andre Chappell and Anthony Ricardo Hawkins killed

Butchie, the sealed Court Exhibit #4, AUSA notes of an interview with Andre Murray

demonstrate that he stated that "Fat Petey" was rumored to have killed Butchie Smith as well to

get back at Draper for murdering his brother, Keith Johnson. *See* Sealed Court Exhibit #4,

Exhibit # 3 to this Motion. The rumor that Petey Johnson aka "Fat Petey" killed Smith was

further bolstered by Agent Lisi's own testimony at trial confirming at trial that Petey Johnson was

picked up by police as a possible witness to Smith's murder and was present at the time of the

murder. (Tr. 5/30/01 AM p. 19-20).

The information indicating this additional suspect in the murder of Smith was never turned

over to the defense or disclosed to the defense at trial despite repeated requests for this very type

of information.  Withholding this information prejudiced the defense in their ability to argue

against the wholesale admission of Smith's testimony and the forfeiture of the defendants'

confrontation clause and hearsay objections to that testimony.  It would have also been very

valuable impeachment testimony of Agent Lisi as to his failure to consider Petey Johnson as a

suspect, question him as a suspect and follow leads supplied by Andre Murray.  All this points to

the tunnel vision Lisi and the Government had to make a case against the defendants at any cost.

Notably, the Government's case against Carson for the murder of Smith was weak and

supplied completely by cooperating witness, James Montgomery.[11]  Montgomery was a known

liar and had admitted to several murders and a lifetime of crime.  Significantly, his testimony

about Carson's participation in the murder of Smith was largely uncorroborated and premised on

a theory that Carson and Montgomery were working together to kill Smith.  However, at trial the

testimony was that Carson acted alone and did not even tell Montgomery his plans or the fact that

---

[11] This was so even though an Assistant United States Attorney (Oscar Mayers) in a superior
court case previously described him saying "this man is unreliable." (Tr. 6/16/2000 p.17).

he had accomplished their joint mission. It is well accepted that testimony of a cooperating witness must be "viewed with great caution." *United States v. Curry*, 187 F.3d 762, 766 (7th Cir. 1999). In this case, James Montgomery's testimony was all the Government needed because his credibility was bolstered enormously by the systematic removal of all other versions of events. The jury was forced to believe Montgomery as the only evidence available because all other evidence was withheld suggesting that Smith was killed by someone other than Carson. The withholding of the information regarding other people believed to have the opportunity and motive to kill Smith is a prime example of the pattern of deceit that infected this trial from start to finish.

The resulting prejudicial effect of the government's withholding of the valuable *Brady* materials as they relate to the Smith murder was significant and casts into doubt the fairness of the verdict reached in this case. The Government cannot shield itself from it's known *Brady* obligations by claiming that they submitted the materials *in camera* for inspection when it is clear they represented to the Court, on the record, false statements regarding their knowledge of the lack of other persons thought to have motive and opportunity to kill Smith. This evidence amounted to more than mere speculation and would have formed the basis for effective cross-examination of Montgomery, Lisi and Andre Murray, as well as formed the basis for challenging the government's motion to admit Smith's statements pursuant to Rule of Evidence 804(b)(6).

3. James Montgomery sealed information - the murder of Timothy Benton

James Montgomery was the Government's star witness. Thus, defense counsel asked the Court for any *Jencks* on Montgomery, specifically, the 302s and notes of Agent Lisi. (Tr. 3/7/01 (PM) 52-52). The Court stated that it had earlier reviewed this information and that it contained no *Brady* material. *Id.* at 91. However, the notes did contain valuable impeachment evidence.

Court exhibit #7, attached as Exhibit 4.[12]  (Tr. 3/6/01 p. 1 PM).

On 3/22/99, Special Agent Lisi testified in the Federal Grand Jury as to what James Montgomery told him about the Benton murder.  (GRJ–77, p. 29-35).  Lisi testified that Montgomery told him that "Poo Poo" (aka Maurice Proctor) had killed Benton.  Lisi further testified that two weeks later, Montgomery called him and said he had more to tell him.  *Id.* at 35.[13]

At trial, the story changed.  Montgomery testified that he (Montgomery) and Proctor  had killed Benton.  (Tr. 3/13/01 p. 30-36).

A third story exists that sheds even more doubt as to Montgomery's credibility.  Again, it's a story the government didn't want anyone to know about.  This story only appears in the notes taken by Agent Lisi of his first interview with James Montgomery.  These are the same notes submitted *in camera* to the Court. These notes show that Montgomery first lied to Agent Lisi about the Timothy Benton murder. Although Montgomery was charged with Benton's murder, Lisi's notes prove that Montgomery lied and substituted Carson for himself (as he was prone to do) as one of Benton's killers. This is significant because it was Carson's theory that Montgomery did this in other crimes he testified about and that this was a pattern of behavior by Montgomery to secure leniency and benefits from the government.  It was also his attempt to push the blame for his own crimes on others while being able to give details making him seem credible to his Government handlers.

Significantly, the government is the only party uniquely qualified, and under a Constitutional obligation, to identify *Brady* and turn it over.  The Court's procedure for *in camera*

---

[12] Court exhibit #7(Exhibit 4) says AUSA Notes of James Montgomery.  However, the actual *in camera* submission appears to be both AUSA and Agent Lisi's notes.

[13] This is based upon the redacted copy of Lisi's Grand Jury testimony supplied by the Government as a result of this Court's order dated 9/23/2013. (Dkt. #1123).

inspection was improper with respect to these sealed materials and the Government used it as a

shield to hide *Brady* evidence from the defendants and bolster the credibility of their paid

witnesses. The Court's complicity in this scheme is confusing at best. What is certain is that the

Court abused it's discretion and failed to keep a transcribed record of the *in camera* proceedings,

failed to articulate a compelling interest for reviewing the *Brady* materials *in camera*, failed to

make findings regarding the requested material, and failed to make a record to the defense

indexing the material presented to the Court. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir

1998). All of these errors prejudiced Carson at trial and on appeal and only served to render the

trial unfair and verdict unreliable.

4. Murder of Anthony Fortune – 302s of Bender

Carson and Jerome Martin were both charged and convicted of the murder of Anthony

Fortune. At trial, defense counsel was told by the District Judge that the FBI 302's of a testifying

witness relating to this murder, Mr. Charles Bender, did not contain *Brady* material. (Tr. 2/05/01

AM p. 84). At trial, both Bender, and another witness, Eugene Byers, testified that Martin

confessed to killing Fortune. (Tr. 4/4/01 PM p. 94); (4/9/01 PM p.14).

However, in sealed Court exhibit #8, "302's of Charles Bender", information from a 302

report of Special Agent Kristen Kane taken on 2/17/98, page 5, notes that Bender told the agent

and AUSA during the interview that "Pimp" killed Anthony Fortune. *See* Exhibit # 5. Also,

sealed Court exhibit #9, the 302 interview of Eugene Byers taken on 5/25/99 says that "pimp then

killed Fortune." *See* Exhibit #6. The 302 says in part:

With regard to the murder of Anthony Fortune, source heard that FORTUNE was
gambling in the area of 58th with PIMP (JEROME MARTIN) and BOO BOO. BOO BOO
supposedly broke FORTUNE and FORTUNE tried to get his money back. PIMP then killed
FORTUNE. FORTUNE had a reputation for robbing a lot of people. PIMP provided this
information to the source approximately 4-5 months after the murder. FORTUNE's partner,
RODNEY SHORT, was later incarcerated with the source at Lorton and he told the source he was

planning to kill PIMP if PIMP was sent to Lorton. The source warned PIMP about SHORT but PIMP as not sent to Lorton while SHORT was there.

This information is clearly exculpatory as to Martin and Carson. Had these 302's been turned over, defense counsel could have used this to impeach these witnesses.

Additionally, the only purported eyewitness to the Fortune murder, Charlene Wilson, was shaky at best regarding the identification of the shooter she says she saw.[14] In fact, she identified Sean Coates in the courtroom as Carson during her testimony. (Tr. 2/13/01 AM p.16.). The information in the 302s that was withheld from the defense clearly violated Carson's due process rights as the information was material to Carson's guilt or innocence.

5. Murder of Steven Dunbar

In sealed court exhibit 8, the notes of either the AUSA or the agent (it's not clear) show that Charles Bender told them that "Art said he killed Steve…" Bates # 905167. Exhibit #5. In Court exhibit #7, the AUSA notes of James Montgomery interview, reflect that "Erik and Art both talked about killing Dunbar." Exhibit #4. The same page goes on to say "Vito issued hit b/c he wasn't supposed to be a Wysocki hit." *Id.* This is something that Carson's defense team could have investigated and could have cross-examined Agent Lisi on at length.

Defendants contend that the district Court's ruling to exclude these sealed exhibits was in error. The defendants needed all information regarding the credibility and potential bias of the government's witnesses as well as any information that exculpated Carson. This Court has often stated that bias evidence is always relevant. *Williams v. United States*, 642 A.2d 1317, 1322 (D.C. 1994). Moreover, Agent Lisi offered his testimony in the form of a narrative. The

---

[14] Wilson testified at trial that she saw Carson shoot Fortune. (Tr. 2/13/01 AM p. 24-27).[14] Four months later in the trial, fortuitously, Agent Warrener testified that Wilson previously told him she had HEARD that Sam had killed him (emphasis added). (Tr. 6/14/01 PM p. 55). This came as a shock to the defense counsel and was only uncovered as a result of cross-examining Agent Warrener.

*McVeigh* court held it impermissible for the government to suppress or secrete information known to them which does not fit into the narrative, or which may diminish the credibility of the evidence relied on to tell the story. *McVeigh*, 954 F.Supp. at 1449. Furthermore, the Supreme Court noted in *Giglio* that nondisclosure of impeachment evidence falls within the general rule of *Brady* when the "reliability of a given witness may well be determinative of guilt or innocence." *Ritchie,* 480 U.S. at 66. Robert Smith was an essential government witness and the lack of opportunity for defendant to cross-examine him or view the statements he gave to the government was fatal. Carson contended that Mr. Smith was an unreliable witness.

With regard to the triple murder, sealed exhibit 7 states that "Chin: told James not my world get $250k; chin later told J not to believe Bam had paid Draper $50k to hit Gaskins." See Exhibit #4. Montgomery later testified that Carson actually was involved in the triple murder yet the AUSA did not correct this false testimony. (Tr. 3/14/01 PM p. 8). There was also mention of another suspect that was "another dude was in kitchen; don't know what happened to him." This would have been another lead for the investigators on the defense team.

### 6.  Theodore Watson Dilemma – Watson Case File Withheld from Defense

Another cooperating co-defendant, Theodore Watson testified against the defendants. While incarcerated on a separate federal case out of Greenbelt, Maryland, he became friendly with co-defendant Sweeney and claimed that Sweeney told him everything about his criminal activity including wanting to kill James Montgomery for snitching. (Tr. 2/8/01, PM  p. 45-70). Thus, his testimony was such that Carson needed to challenge it in any way possible. However, despite his cooperation, he was not given the 5K he thought he deserved. This undoubtedly perplexed defense counsel and thus he was cross-examined about why he did not get a 5K from the Government. Watson's response was that he didn't get the 5K because the prosecutor did not

like him. (Tr. 2/12/01, AM p. 19-21). After hearing this testimony, defense counsel made a request of the Court that the prosecution obtain and review the Watson Greenbelt file for any *Brady* information. *Id.* at 8 & 78.

The next day, the Government obtained the Watson file and represented to the Court that after reviewing the entire file, there was nothing "that suggests any Brady or Jencks material in the file." AUSA Zeidenberg goes on to explain that the Greenbelt AUSA's reason for not giving the 5K "was simply because she didn't believe his cooperation was of a significant enough nature to qualify. There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature." (Tr. 2/13/01 AM at p. 6-7). The defendants requested the letters addressed to the prosecutor from Watson. (Tr. 2/13/01 AM 5-6, 90). The Court denied this request and the Watson file was marked as Sealed exhibit #5 of the Court. *See* Exhibit 7. Although defense counsel asked that the Court review it, the Court refused. (Tr. 2/13/01 AM 5-6, 90).

AUSA Zeidenberg's representation to the Court was way off the mark and highly suspect. Not only did the file contain *Brady* material, it contained several instances of conduct that is *Brady* material. Watson, in an attempt to curry favor with the AUSA who held his fate in his hands, admitted to lying repeatedly in several letters written to her. For instance, in one letter, Watson says to the AUSA: "had I just simply complied and told you the truth at our initial meeting, I would have avoided the unnecessary mental anguish that entailed…there is no denying that during my 30 years in the system, I have lied, connived and schemed to get things done." *See* Exhibit 7, letter dated August 19, 1999. In yet another letter Watson describes himself thusly: "Ms. Wilkerson, again I apologize and confess that at our first conference, I lied and somewhat distorted the truth…" *See* p. 1 of 17, undated letter.

Not only did Watson admit to being a liar, but the Greenbelt AUSA, Sandra Wilkinson stated in a letter to the Court in Greenbelt that stated in part: "…despite my specific directions to not contact me directly. Mr. Watson continues to undermine his own credibility as well as his ability to follow directions from the government." *See* Exhibit 7, 2/21/2000 letter to District Judge Messitte.

Had the prosecution turned over this file to defense counsel, or had the Court reviewed the file, Carson's lawyers could have cross examined Watson on his propensity to lie and his reasons therefore. His credibility was in issue. Unfortunately, again, these documents remained sealed until 2008, long after trial and appeal. More telling however is the fact that the prosecutor KNEW the contents of these letters and lead the Court to believe there was nothing in the way of *Brady*[15] in the file. This is extremely problematic because there was virtually no evidence linking Carson to several of the alleged crimes other than the uncorroborated story of James Montgomery. Given that, Watson's testimony was a much needed fortification of Montgomery's credibility. The information that Watson was a liar, a manipulator and working the Government system for all he could get was critical impeachment material necessary for the defense to use in order to obtain a fair trial. As the Supreme Court has made clear, the prosecutor:

"has the responsibility and duty to correct what he knows to be false and elicit the truth…That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for it's impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." *Napue v. Illinois*, 360 U.S. 264, 269 (1959) quoting *People v. Savvides*, 136 N.E. 2d 853, 854-855 (N.Y. Ct. App. 1956). Moreover, it is a due process violation when the Government fails to disclose evidence of a witness' perjury.

*United States v. Cuffie*, 80 F.3d 514, 518 (D.C.Cir 1996).

---

[15] Although undersigned counsel refers to this as "*Brady*" material, it is in the purest sense *Giglio* material; material that would be used to impeach as opposed to exculpate. However, the Supreme Court later held in *United States v. Bagley*, 473 U.S. 667 (1985) that *Brady* and *Giglio* evidence are basically one and the same.

C.  Other Brady Violations and Government Misconduct

    1.  Payments to Witnesses regarding the Triple Murder

One significant claim in this 2255 motion for relief stems the investigation and prosecution of the triple murder that was committed in November of 1996. The initial investigation of these murders resulted in the arrest for these charges of another individual, not Mr. Carson and his codefendants.  During the initial investigation, *Brady* and *Giglio* materials were created by and/or made known to the federal government in this case in the form of Grand Jury testimony of two witnesses stating that an individual named Dennis Green was responsible for the triple murders.  These grand jury statements form the basis for several of the claims asserted here in this brief.

The two witnesses, John Pinckney and Cheree Owens, testified on December 10, 1996 before a PG County grand jury and implicated an individual named Dennis Green in the triple murders and not Mr. Carson or any of his associates.  (Government's Brief on Appeal at p. 174). According to the Government, "When Pinckney and Owens came to the police with this information, they were provided with a substantial amount of money for their relocation, which was meant to last several weeks.  The couple went through the money in a matter of days and then demanded additional funds." (*Id.* at 175). [16]  Police learned that Pinckney and Owens owed Green money for drugs.  After further investigation, investigators found nothing to corroborate their story, and shortly thereafter Pinckney and Owens disappeared. (*Id. citing* Joint Appendix 1002 n. 1).

At approximately the same time, December 5, 1996, the Federal Bureau of Investigations arrested Robert Smith.  It was at this time that Smith began providing information about the triple

---

[16] There is no evidence that these are the facts but only supposition on the part of the Government.

murder to the federal government. (*Id.* at 182). The Government contends that there is "no reason to believe that the FBI shared any of Smith's statements with Prince George's County as early as December 10, 1996, when Pinckney and Owens testified. (*Id. citing* Agent Lisi 5/29 Tr. 9-10, 12-13).

The United States Attorney's Office in Washington, D.C. indicted Carson for the triple murder based on the testimony of Mr. Smith. The Maryland authorities agreed to dismiss their triple murder charges only under an agreement with the federal Government to bring the charges under the umbrella of a federal RICO indictment. (Carson's Brief on Appeal at p. 138).

At his trial, Carson sought to introduce the grand jury testimony of Pinckney and Owens. However, because these witnesses could not be located at the time of the trial, Carson sought to introduce their grand jury testimony under the former testimony exception to the hearsay rule of the Federal Rules of Evidence, Rule 804(b)(1). Finding that there was "an absence of an identity of motive on the part of the government" in developing this PG county grand jury testimony, the district court ruled that the testimony was not admissible. (Government's Appellate Brief at p. 175). Carson appealed this decision as an abuse of discretion by the trial judge. The Appellate Court found that the trial court did not abuse its discretion in excluding the testimony under Fed. R. Evid. 804 (b)(1). In so doing the court stated, "appellants have offered no evidence that the state authorities who directed the testimony before the Maryland grand jury were in any way controlled or even used by federal authorities." *United States. v. Carson*, 455 F. 3d 336 at 372. The Appellate Court further stated that "The only evidence the defendants point to is testimony from FBI Special Agent Lisi that "[w]e [the FBI] tried to keep them [the Prince George's County Police] involved. Their primary focus was the triple murder. We tried to let them know

everything we [had] on the triple murder." *Id.* The court found that this showing was insufficient to show the Maryland grand jury proceeding was merely a "tool" for the federal authorities.

On April 18, 2012 Mr. Carson filed a Motion for Discovery with regard to the record of payments to the witnesses Pinckney and Owens and other documents, including the Grand Jury Testimony of Agent Lisi. (Dkt. #1088). On Sept. 13, 2013 this motion was denied in part and granted in part by this Court. The portion that was denied pertained to the discovery of payments made to Pinckney and Owens and any involvement by the federal government in those payments and relocation of those witnesses.   On May 29, 2014, after several attempts and months of searching, counsel for Carson and Carson's investigator, Mr. Vaughan, were able to locate an address of Ms. Owens and drove to her home to speak with her.  Ms. Owens agreed to discuss the case with Mr. Vaughan and counsel for Carson at that time. She related at length the process by which the Federal Bureau of Investigation moved her and Mr. Pinckney to numerous locations and paid them money after the testimony in the Prince George's County Grand Jury relating to the triple murder.  She said they never heard from the FBI or government counsel after they were moved.  Counsel for Mr. Carson and Mr. Vaughan presented Ms. Owens with a prepared affidavit containing her previously made statements and asked her to sign it so that it could be presented with this motion. Ms. Owens indicated that the information was true in the affidavit but that she didn't want to sign it and get involved because she was afraid for her life and is currently under a doctor's care for health related issues.  Mr. Vaughan executed an affidavit regarding these facts and it was made a part a new motion filed on October 9, 2014, for Discovery based upon newly

discovered evidence. (Dkt. # 1132).     Also, attached to that motion were the affidavit of Mr.

Vaughan, the Death Certificate of Mr. Pinckney, and the prior statements of Cheree Owens.[17]

The new evidence provided by Ms. Owens demonstrates that the federal government

participated in, paid for and facilitated the "disappearance" of these two witnesses.  Pinckney and

Owens' testimony did not support the federal government's new theory of the triple murder in

December 1996 supplied by Robert Butchie Smith, their newest informant and cooperator.  The

government created the fiction that these first witnesses were unreliable and "seemingly

disappeared" a short time after giving their exculpatory testimony.  Moreover, they created an

illusion that Pinckney and Owens had somehow been proven untrustworthy and that they had tried

to abuse the relationship with the government by misusing government funds.   There is no

evidence in the record to support these claims.  The government proffered that "[p]olice learned

that Pinckney and Owens owed Green money for drugs.  After further investigation, investigators

found nothing to corroborate their story, and shortly thereafter Pinckney and Owens disappeared."

(Joint Appendix, fn 1002, n.1).

Ms. Owen's version of events is in direct contradiction to the story promoted by the

government and used as a tool to support it's motion to have the grand jury transcripts of these

unavailable witnesses excluded at trial.  The result was a deprivation of  Carson's Constitutional

Rights to Due Process and his right to present his defense at trial.  Moreover, this newly

discovered evidence demonstrates that Carson was deprived of valuable impeachment material to

combat the testimony of Robert Smith in this case.  According to the government, "Smith was

'opened up' as a confidential informant on 12/17/96.  From that date until the date of his murder

the FBI provided financial assistance in the amount of $12,744.19.  This money went to pay rent,

---

[17] All of these documents, the affidavit of Mr. Vaughan, the Death Certificate of Mr. Pinckney,
and the prior statements of Cheree Owens are incorporated by reference in this motion.

a car, living expenses, hotel rooms used to debrief Smith, cellular phone bills." (Dkt. #451).

Evidence now demonstrates that, even though Smith began cooperating in December of 1996, and

began providing information regarding the involvement of the K street crew in various crimes,

including the triple murder, the government was still "paying" for testimony provided by

Pinckney and Owens. Their theory was totally different from Smith's theory of who committed

that crime. It would be easy to infer that these payments to Pinckney and Owens functioned as a

"back up" plan in the event that Smith did not improve his testimony over time to the satisfaction

of the government in this case.

　　　A pattern of paying for the improvement of witness testimony over time was clearly

established, but went unnoticed at trial. The continued payments to Pinckney and Owens would

have been highly valuable impeachment material against agent Lisi and others who stamped

nearly inscrutable credibility on Smith's testimony.  As mentioned earlier, Smith was an

unreliable individual with a lengthy criminal history who was engaged in narcotics trafficking

in D.C. and Maryland. (Dkt. #340). At the time of his death many persons had a motive to kill

Smith for his cooperation. *Id.* The payments by the government to Pinckney and Owens were

occurring simultaneously with Smith's cooperation. The cover-up regarding this indicates

payments made to Smith were possibly used to secure improvements to his version over time.[18]

　　　The information regarding the federal government's "determination" that Pinckney and

Owens were no longer trustworthy was also not made available to Carson. The United States

Attorneys Manual, 9-21.100 Eligibility for Witness Security Program states that:

　　To avoid any unnecessary delay in processing a Program application, government

---

[18] Carson cannot ascertain the exact length of the continued payments to Pickney and Owens or
who paid them because the payment records have not been made available.  It is possible that the
payments to these witnesses extended even after Butchie Smith was murdered, suggesting that
these witnesses continued to be believed credible.

attorneys should note the following:

    A.  In order to make certain that each application for entry of a witness into the Program is both appropriate and timely, the witness should, prior to his/her acceptance into the Program, either appear and testify before the grand jury or in some other manner have committed himself/herself to providing testimony at trial. This requirement relates to the commitment of the witness to testify, and is intended to ensure that the witness's testimony is available at the time of trial. **It is equally as important a requirement that the prosecutor intend to have the witness testify, and that the witness's testimony be significant and essential to the success of the prosecution.**

    B.  The protection and relocation of witnesses and family members are expensive and complicated. In addition, DOJ is obligated to provide for the safety and welfare of a protected witness and family members long after the witness has testified. It is imperative, therefore, that the request for entry of a witness into the Program be made only after the sponsoring attorney has determined that the witness's testimony is significant and essential to the success of the prosecution, as well as credible and certain in coming.

    (emphasis added).

The longer Pinckney and Owens were in the program, the stronger the suggestion is that

their testimony was considered significant and essential to the success of the prosecution,

as well as credible.  The failure of the Government to disclose the nature and extent of

this relationship in a truthful manner casts doubt on the fairness of the verdict in this case

and the credibility of the testimony of Robert Smith, who otherwise could not be cross

examined.

    Carson was also prejudiced because no investigation of these individuals could be

independently conducted in a timely manner by his trial counsel.  The government proffered that

Pinckney and Owens were "later discredited", and that no more evidence could be found to

corroborate their story.[19]  Considering that James Montgomery, the government's star witnesses, a

---

[19] On 6/16/00, a motions hearing was held in which Mr. Kiersch asks for the investigation file of Dennis Green. The Government proffered that Pinckney and Owens had been investigated by police and had not been found truthful. However the Government agreed any materials relating to their testimony would be considered *Brady* and turned over. *Id.* p. 9. Although defense counsel

paid snitch, known and admitted killer, convicted criminal and a person who suffered brain damage, testified at trial to many things with little to no corroboration, it seems unsupportable that this fact alone could have proven these witnesses discredited.  Moreover, at trial, Carson's counsel was falsely led to believe that pursuing the lines of questioning regarding Mr. Green would be unsuccessful and that further investigation into Mr. Green would be unprofitable.

The government argued successfully, both at trial and on appeal, that they had nothing to do with Prince George's County investigation and the *Brady* material they created.  They distanced themselves from anything that happened in that investigation by claiming that they had no knowledge of the Grand Jury Proceedings until afterwards and that they had no similar motive to examine these witnesses at the time.  Instead, however, the new evidence of payments to these witnesses demonstrates that the Federal Government misstated the status of their involvement with these witnesses, assisted in procuring their unavailability, and actively hid this fact for tactical advantage before trial, at trial and on appeal.   The misleading information provided by the Government prejudiced Carson from being able to offer the exculpatory his ability to argue in his defense.

The concerns raised here in this 2255 go to the very core of the reliability and credibility of all the witnesses at trial, not just Smith or Pinckney and Owens. The suggestion that *Brady* material was created by a joint investigation but then pushed under the rug under the guise of an "independent" act by PG County prosecutors, calls into question fundamental fairness of the trial against Mr. Carson.  It also raises questions as to the reliability of the testimony of Smith, Agent Lisi and every witness that was paid for testimony and told they would suffer penalties of perjury if they lied.  Since a large number of civilian government witnesses that appeared in this trial

---

was given their grand jury testimony, they were never given any proof of this alleged investigation of Pinckney and Owens.

were paid, either monetarily, with relocation funds or with favorable plea agreements, the issues

surrounding the payments to Pinckney and Owens raise the legitimate inquiry into what, if

anything, would have happened to any of the civilian government witnesses if they were found to

have lied.   The evidence suggests a pattern by law enforcement to pay for testimony with

disregard for its truth.  Witnesses were paid, witnesses lied, and the Government didn't seem to

care as long as the right witnesses were there at trial and testified to the right story to convict the

people they wanted.   They kept the best version of events, but paid for them all until it was time

to choose.

### 2.  Cash payments for favorable testimony disguised as legitimate expenses

The Government's misconduct in paying for witness testimony and failing to disclose the

real nature of the payments in this case deprived Carson of his Constitutional right of Due

Process.  The Government conducted itself with intentional disregard for the rights of Mr. Carson

when it paid witnesses money for testimony and then, knowing that such witnesses had not used

the payments as agreed, failed to reveal the true nature of the payments to defense counsel at trial

or actively represented that the money was used for purposes it knew or should have known were

false.

The Government has the ability to incentivize witnesses testimony with cash incentives

and rewards.  They cannot, however, lie about these payments and characterize them as relocation

payments, when in fact, they were not.  In this case that is exactly what the Government did with

several key witnesses.  Many, if not most of the witnesses in this case, were paid cash or

otherwise incentivized by some form benefit as part of the bargain for their testimony.  The

payments in cash were often characterized as various types of expenses, from relocation to

witness protection and lodging.   However, at trial, it was revealed that some witnesses were paid

for relocation expenses and never moved. The failure to disclose this information prejudiced Carson and the other defendants in their ability to cross-examine these witnesses regarding the funds and the government's complicity in handing out money to witnesses with no strings attached. The prejudice experienced by Carson could not be remedied on the stand with these witnesses given the time constraints imposed by the Court and the substantial effort it would take mid-trial to track down the actual use of the funds by the witnesses. Moreover, the disclosure of this information qualified as *Giglio* that should have been given over to the defendant when known by the government agents and certainly prior to the witnesses taking the stand and being asked about this on cross examination.

    3. Failure of government to maintain trial exhibits, documents and case file

    Mr. Carson is being denied his right to effective assistance of counsel, as great portions of the trial file and appellate file are unavailable to counsel appointed to investigate and litigate these matters in this 2255 proceeding. While some of the documents are available, the Government has failed to produce for counsel the trial exhibits or exhibit list for review.[20] This denies Carson the opportunity and right to review the record against him and make an effective 2255 claim. Moreover, in challenging the adequacy of the government's performance in discharging their *Brady* and *Giglio* obligations at trial, there is no way to determine with accuracy what disclosures were made.

    Counsel for Carson has requested that the government produce an exhibit at trial entered by William Clelland, the crime scene investigator for the triple murder. The government has informed the Court this piece of evidence, the card entered into evidence at trial that was used to

---

[20] Margaret Chriss, opposing counsel for the Government on this brief has searched tirelessly for all exhibits and trial record that undersigned counsel has asked her to locate. Despite her best efforts, a great deal is still missing.

identify Sweeney's fingerprint, and any other fingerprint cards taken at the scene, cannot be located. (Dkt. #1168). Carson contends that the review of this fingerprint card and the other fingerprint cards in evidence is necessary to determine the nature and extent of the trial counsel's ineffective assistance in failing to question the fingerprint analyst regarding other suspects used as comparisons for the print identification. Additionally, Carson is now precluded from having the fingerprint cards tested to see if Green, Smith or any other of their known associates fingerprints were, in fact, found at the crime scene but not tested for or disclosed by the government at trial.


## V. – INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Legal standard and factual basis

Carson submits that his convictions in this matter were imposed in violation of his right to effective assistance of counsel. The cause of action of ineffective assistance of counsel is based on the Sixth Amendment right to counsel, which exists "in order to protect the fundamental right to a fair trial." *Lockhart v. Fretwell*, 506 U.S. 364 (1933).

The Supreme Court in *Strickland v. Washington*, 466 U. S. 688 recognized that the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defense" entails that defendants are entitle to be represented by an attorney who meets at least a minimum standard of competence. *Id.* at 685-687. "Under Strickland, we first determine whether counsel's representation 'fell below an objective standard of reasonableness.' Then we ask whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (*quoting Strickland, supra*, at 694).

One of the many challenges criminal defense attorneys face in the course of representing a client is appropriately balancing zealous representation against the contempt powers of the court. As a leading authority on this issue, Prof. Louis S. Ravenson notes that "this exercise of contempt power, and even the potential danger for it's exercise, can have a serious chilling effect on the vigor of advocacy." Louis S. Ravenson, *Advocacy and Contempt: Constitutional Limitations on the Judicial Contempt Power* , Part One, 65 Wash. L. Rev. 477, 481-82 (1990). There is a natural tension caused by the court's need to maintain its authority and the need of an attorney to zealously represent her client.

An attorney's duty to advocate on behalf of a client is directed by constitutional requirements and professional rules of responsibility.    In recognizing the conflict this creates, the Supreme Court has vowed to defend the work of zealous advocates from frivolous contempt charges. *Sacher v. United States*, 343 U.S. 1 (1952). The Court writes that "our criminal processes are adversary in nature and rely upon the self-interest of the litigants and counsel for full and adequate development of their respective cases. The nature of the proceedings presupposes, or at least stimulates, zeal in the opposing lawyers." *Id.* at 9.

The Sixth Amendment of the United States Constitution guarantees defendants a right "to have the Assistance of Counsel for his defense." United States Constitution, Amendment 6. The First Amendment of the United States Constitution protects freedom of speech. United States Constitution, Amendment 1. Taken together, these fundamental protections in the Bill of Rights create a judicial system where attorneys are required to represent the interests of the criminal defendant, and they are allowed to do so using protected speech when the language used is critical of the judicial system or officers of the court.

In the case of *Holt v Virginia*, 381 U. S. 131 (1965), two attorneys were convicted of

contempt based upon motions filed for change of venue based upon claims of local prejudice and

the bias and intimidating conduct of the trial judge.  The United States Supreme Court reversed

the conviction noting,

> The right to be heard must necessarily embody a right to file motions and pleadings
> essential to present claims and raise relevant issues … And since 'A fair trial and a fair
> tribunal is a basic requirement of due process', … it necessarily follows that motion for a
> change of venue to escape a biased tribunal raise constitutional issues both relevant and
> essential … Consequently, neither [of the two lawyers involved] could consistently with
> due process be convicted for contempt for filing these motions unless it might be thought
> that there is something about the language used which would justify the conviction."

*Id.* at p. 136-137,The Court found the motion for change of venue to have been proper and

the falseness of the charges irrelevant.  The Court concluded:

> Our conclusion is that these petitioners have been punished by Virginia for doing nothing
> more than exercising the constitutional right of an accused and his counsel in contempt
> cases such as this to defend against the charges made.

This position taken by the Supreme Court appears to afford relatively generous latitude in

arguing on behalf of clients without fear of contempt charges.  *Raveson, supra*  Note 2.    The

Supreme Court has also considered the appeal of an attorney who had been convicted of contempt

for telling the presiding judge "we have the right to ask questions, and we propose to do so until

some bailiff stops us" in an attempt to preserve important issues for appeal and zealously

represent the client."  *In Re McConnell*, 370 U.S. 230, 235 (1962).

> While we appreciate the necessity for a judge to have the power to protect himself from
> actual obstruction in the courtroom, or even from conduct so near to the court as to
> actually obstruct justice, it is also essential to a fair administration of justice that lawyers
> be able to make honest good-faith efforts to present their clients' cases.  An independent
> judiciary and a vigorous independent bar are both indispensable parts of our system of
> justice.  To preserve the kind of trials that our system envisages, Congress has limited the
> summary contempt power vested in courts to the least possible power adequate to prevent
> actual obstruction of justice, and we think that power did not extend to this case.

*Id.* at 235.

In Mr. Carson's case, the attorneys who represented him, Mr. Beshouri and Ms. Negin-Christ, met with judicial prejudice they deemed not only insurmountable, but legally and constitutionally incompatible with a fair trial for their client. On Appeal, Carson's appellate counsel argued that the District Court implemented trial procedures that were restrictive and even punitive at times. (Appellants' Brief at page 76). The District Court curtailed legitimate cross-examination of witnesses as to bias, imposed unreasonable time limitations on cross examinations, demanded that only one counsel be permitted to cross-examine a witness as to bias, and prohibited witnesses who appeared numerous times during trial to be cross-examined about bias more than once. *Id.* The Court would also "interrupt cross-examinations" and urge counsel to "use your time wisely." In practice, counsel were preclude from even doing that. *Id.*

The Appellate record is clear that the Court's seemingly arbitrary rules regarding limiting cross examination "hobbled the defense." *Id.* at 78. In some instances, counsel was not allowed at all to cross-examine witnesses on matters relating to their bias, although inquiry designed to expose bias is almost always relevant. *Id.* In one telling example, Counsel for the defense was given a late disclosure of an FBI report reflecting an oral statement of the witness Charlene Wilson. The report revealed that she was not an eye witness to the murder of Mr. Fortune, but had only heard about it from others. This was inconsistent with her sworn trial testimony in this case in which she claimed to be an eyewitness and to have seen Carson. The FBI report was turned over to defense counsel four months after Wilson left the witness stand. *Id.* at 90. On appeal it was argued that counsel was not able to recall Wilson to the stand to impeach her with this information because of the "time constraints placed upon defense counsel by the judge." Id at 91.

In another instance, defense counsel complained that the Government had not disclosed

close to a thousand pages of *Jencks* material in sufficient time to be read and understood.  The

Judge characterized this as "defense counsel's problem" and ordered them to commence cross-

examination or forego it.  *Id* at 91. The Court also incorrectly told the defense counsel, in ruling

against them regarding the government's failure to disclose impeachment materials on Ronald

Sowells, that it was their burden to investigate whether there was *Brady* information regarding

any witness that the Government had not turned over.  *Id.* at 92.  Additionally, for closings, the

court refused to allow counsel a one day request to prepare, commenting that "given the out of

court time for which counsel had billed, they should have been ready for argument"  *Id* at 93. All

the difficulties faced by defense counsel were further compounded by the Court's unwarranted

suggestions that appointed counsel had an "ulterior motive" of trying to provoke a mistrial or

unduly prolong the case, for which the court threatened to disallow compensation. *Id* at 75. The

implicit threat being that risking one's livelihood and reputation would not be a worthwhile

endeavor in zealously defending these clients.

These examples are but some of those listed by counsel in the appellate brief for this case.

The most important piece of information is the proffer by counsel that, "[t]he judge's repeated

admonitions and threats were intended to **and did have a chilling effect on defense counsel's**

**advocacy**." *Id.* at 96 (emphasis added).  On appeal the D.C. Circuit found that the judicial

comments did not reach a level of hostility that prevented a fair trial. *U.S. v. Carson*, 455 F. 3d.

336, 372 U.S. App. D.C. 251.  The opinion went on to state that "in sum, considering the

challenged rulings, procedures and comments, together in the context of a long and difficult trial,

we are not persuaded that 'the judge's behavior was not so prejudicial that it denied [the

defendant] a fair, as opposed to perfect trial.'" *Id*, (*quoting*, *United States v. Logan*, 998 F. 2d at

1029), (*quoting United States v. Pisani*, 773 F. 2d 397, 402 (2d Cir. 1985). *Id.*

      Carson was represented by Mr. E. Joseph Beshouri and Ms. Lexi Negin-Christ at trial. Ms.

Negin has supplied an affidavit that is attached to this motion as Exhibit 8. In this affidavit, Ms.

Negin describes the nature of her representation and how she and her co-counsel rendered

ineffective assistance to Carson during his trial. She details how in numerous instances, they

failed to move for mistrials, preserve objections, cross-examine important witnesses as to their

bias, follow up on defense theories, and recall witnesses shown to have lied on the stand because

of the restraints imposed by the Court and for fear of sanctions and "disappointing" the Court.

      In addressing the two prong *Strickland* analysis, the above reference facts indicate that

Carson's trial counsels' performance was deficient and that the deficient performance prejudiced

the defense. *Strickland*, 466 U. S. at 687. The first prong of the test is "necessarily linked to the

practice and expectation of the legal community: "The proper measure of attorney performance

remains simply reasonableness under prevailing professional norms." *Padilla v Kentucky*, 559

U.S. 356, 366 (2010) (*quoting Stickland, supra,* at 688, 694). Under that standard, it was

unreasonable for Carson's lawyers to forgo making the Constitutionally required effort to

preserve the record for appeal by moving for mistrial when necessary, impeaching key witnesses

with bias testimony, objecting to the Court's incorrect application of legal standards regarding

*Brady* disclosures and forgoing other areas of cross examination for a real or imagined fear of

incurring negative treatment by the Court.

      Knowing that they possessed a conflict of personal interest, (here it was the attorneys'

personal interests which interfered with their zealous representation of Carson), and failing to

raise this conflict with the Court and seek disqualification, was not objectively reasonable. It is

one thing to know that the Court is implicitly your employer when you are a CJA lawyer, and

quite another to be threatened by that employer with the fear of financial punishment.  Carson's

attorneys feared being seen as "unreasonable" by their employer and this fear kept them from

acting in Carson's best interests.  They knew many of the Court's rulings were in error,

detrimental to Carson's case and chilled their ability to be effective in their representation of him.

In light of these facts, counsel had a duty to zealously challenge the application of these rules or

inform the client that they had no intention of fighting zealously for his defense and seek to

withdraw from the case.  At the very least, counsel had the duty to preserve the record every time

such a rule was imposed by objecting in some fashion or moving for a mistrial if warranted.

Their failure to put aside personal interest for fear of risking a professional reputation or personal

financial security deprived Carson of the right to counsel guaranteed by the Sixth Amendment.

　　　The facts of this case demonstrate that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.  A

reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Strickland*, 466 U. S. at 694.  Given the admission by Carson's counsel that they did not pursue

many relevant and material areas on cross examination, it is now necessary to examine some

specific instances how this prejudiced the defense and denied Mr. Carson of both a fair trial.

　　　B.  Specific Failures by Counsel and the Resulting Prejudicial Effect

　　　　1.  Failure to Cross Examine Fingerprint Experts Regarding Alternative Suspects

　　　Counsel for Carson was ineffective in failing cross-examine the fingerprint examiner

Elores Clark regarding the suspect Dennis Green.  No inquiry was made by defense counsel into

whether Green's fingerprints had been run as a match to the eight separate fingerprint cards

collected at the scene.  During Ms. Clark's cross-examination she was asked what other suspects

were used as comparisons against the fingerprints submitted in this case and used in making the

fingerprint report. At that point there was an objection by the government and a bench conference

ensued. During the bench conference it was revealed that the government agents gave the

fingerprint examiner a list of suspects to compare the fingerprint card against. On that list were

the names of the various defendants. Mr. Dennis Green's name was not one that list. The bench

conference ended with a ruling that the defendants would be allowed to cross-examine the witness

regarding other suspects in this case or other known matches.[21] (Tr. 4/02/01 PM p.77).

In a case replete with examples of the Court ruling unfavorably for the defense, here is an

instance when the Court led the charge in helping defense counsel pursue a very important line of

questioning. Having been prevented from offering the grand jury testimony of Pinckney and

Owens at trial, the next best thing would have been to cross examine the fingerprint examiner

about other suspects, especially Dennis Green. The fingerprints were first examined in February

of 1997, nearly three months after the triple murder and the date the fingerprints were taken from

the crime scene.[22]   (Tr. 4/02/01 PM p. 71) During those three months, while the fingerprint cards

presumably sat in PG County offices, Mr. Dennis Green, was arrested for the triple murder based

---

[21]  THE COURT: Throughout this case there has been the suggestion that there is someone other than those who have
been implicated by the only eye witness to testify to it.
MR. ZEIDENBERG: That's fine, Your Honor. I don't care. I don't mean to argue with Your Honor.
THE COURT: I think they ought to be able to pursue that.
MR. ZEIDENBERG: I made my objection.
MR. DAVIS: I would ask Your Honor to give some type of cautionary instruction, because there is absolutely no
evidence linking Mr. Hill to this at all, there is just nothing. As a matter of fact, I believe -- what's the date on that, the
date that this incident took place, do you remember?
THE COURT: I think you are entitled to bring out the fact that there was no match.
MR. DAVIS: Well, Your Honor, I can't question this lady about why he was on there. And it could have been on a
whim, it could have been on anything, and that's the problem. She knows nothing about it. All she knows is –
THE COURT: There have been other suspects in this case. I think it's a legitimate area of inquiry.
MR. DAVIS: I would object for those reasons.
 THE COURT: Objection overruled.
(Tr. 4/02/01 PM p. 77)

[22] From the trial testimony it appears all prints were lifted that same day of the murder, but
because counsel for the government cannot locate that actual card in evidence for review this
remains a question that is unanswered.

upon a complaint filed on January 6, 1997. (Complaint PG County, Dennis Green, signed by Detective Deloatch, Attached as Exhibit 9) It was unreasonable for Carson's counsel not to question the fact that the government agents never checked for Dennis Green's fingerprints at the crime scene.[23] Additionally, the fingerprints were not run until February of 1997 and then only out of the federal government's desire to make a case against Carson and his co-defendants. According to the testimony at trial, one fingerprint was found linking Sweeney to the crime. (Tr. 4/02/01 p. 49). However, at least eight fingerprint cards were submitted from the crime scene and each card could have contained more than one fingerprint. (Tr. 4/02/01 p. 57-58). Any of those cards could have contained the prints of Dennis Green or his associates, or any other suspects, but the Federal Bureau of Investigation never asked to run Green or his associates as comparisons. (Tr. 4/02/01 p. 78). The only known comparisons run by the fingerprint examiner were for Sweeney, Montgomery, Carson, Coates, Hill and Maurice Anthony Proctor. *Id.* Carson's Counsel should have extensively cross-examined the fingerprint examiner, the evidence collector, Agent Lisi and the agents who submitted the comparison list regarding these additional suspects. Moreover, defense counsel was aware at the time of the fingerprint testimony that a witness for the defense, Wesley Smith, was told by Butchie Smith that he (Butchie) was cheated out of $60,000 while gambling in the triple murder house in Temple Hills. About a week after the triple murder, Butchie also told Wesley that "I took care of Darnell Mack and those guys." (Tr. 6/06/01 AM, p. 26-34; Tr. 6/11/01 PM p.9-27; Tr. 6/13/01 AM) p. 72-77). Cleary there were multiple suspects considered for the triple murder. Competent and effective counsel would have

---

[23] This does not even factor into the equation the fact that the government went to great efforts to hide the details of Pinckney and Owens' relocation during that time period and the payments made to them that were not disclosed. Moreover, without explanation, Pinckney and Owens were dismissed as credible witnesses and the sole focus of the government agents in this case were the defendants, as evidenced by the suspects they submitted for comparisons.

tailored their questioning to show the bias in the government's investigation against Carson and his co-defendants.

### 2. Failure to Recall Charlene Wilson

Counsel was ineffective when they failed to recall Charlene Wilson to the stand after discovering that she was not an eyewitness to the murder of Anthony Fortune as she had testified to earlier during trial. The circumstances surrounding Charlene Wilson's testimony alone demonstrate how material the impeachment of this witnesses would have been to the outcome of this case. Given "Wilson's status as the only witness to the alleged crime, there is no colorable argument to be made that the potentially significant cross-examination was not "material." (Appellate Brief at page 147).

Initially, the Government's failure to disclose the *Brady* material regarding Ms. Wilson created surprise for defense. Agent Warrener asked to use his report to refresh his recollection and having done so, the Court ordered it to be turned over to defense over the objection of the Government. (Tr. 6/14/01 PM p. 44; 48-49). When defense counsel reviewed his report, it was revealed for the first time that Ms. Wilson's initial statement regarding the Fortune murder was that she had HEARD Carson committed the murder and had not in fact been an eyewitness. Once this devastating contradiction in her testimony was discovered, counsel for Carson acted unreasonably by failing to make a proper objection to preserve the record and to attempt to recall Ms. Wilson for impeachment. Defense counsel stated that they could not do so because of the time constraints placed upon them by the Court. (Appellants Brief p. 147). This is an unreasonable explanation. The attempt alone, and possible denial, would have preserved this important point on the record for appeal.

### 3. Failure to cross-examine witnesses on use of payments by the government

Trial counsel for Carson also failed to adequately question government witnesses when they admitted on the stand that they were paid by the government for undisclosed purposes in connection with their testimony. There was a strong indication from the start of the case that most witnesses were paid in some form of cash or other incentive (plea agreements) for favorable testimony. In fact, the first government civilian witness to take the stand in this case, Reginald Switzer, testified that his family was paid thousands of dollars for relocation due to a security concern and that nearly two and a half years later, at the time of trial, his mother still lived on K Street and had not yet moved. [24] (Tr. 1/30/01 p. 33). Once this witness admitted to receiving funds from the government and failing to use those funds for the purpose stated in the government's *Giglio* disclosure, several things should have happened: First, a reasonable attorney would have cross examined this witness extensively on why the funds had not been used for moving, who paid the funds, whether there was a receipt for the funds, how the amount was calculated, and what the money was actually spent on. Second, defense counsel should have moved for a continuance and asked to review the witness file of the government including the FBI about the payment information in question. Third, a record should be made that the *Giglio* disclosure by the Government was not accurate and falsely represented that the funds had been used for relocation. Finally, every government witness in this case should be asked the same questions

Counsel was ineffective in failing to seek sanctions against the Government for mischaracterization of those payments as relocation expenses when they knew or should have known that Mr. Switzer had never moved. Incredibly, Mr. Switzer's payment situation was not unique.

---

[24] The Government *Giglio* disclosure indicate that Mr. Switzer's wife and mother were paid $6,100 for relocation due to a security concern. Exhibit 10.

For example, Cinema Hawkins was paid $750 for relocation expenses.  *See* Exhibit 11.

She was never asked if she used those funds to relocate.  Moreover, no questions were pursued as

to why her payment for relocation was so small in comparison to others who never even moved,

such as Switzer.  Charlene Wilson was also paid $4,900 for moving expenses by the government

to relocate but did not do so for over four years.  (Tr. 2/13/01 AM p. 40 & PM p. 33).   Eugene

Byers' sister, was paid $5,592.53 for moving expenses in connection with his testimony and he

testified he had no idea about this payment.  (Tr. 4/09/01 PM p. 57-58).

This line of cross-examination would have been material impeachment evidence to show

bias on the part of these witnesses and control by the government over these witnesses.  This

pattern of conduct evidences an implicit agreement with these witnesses to testify favorably for

the prosecution in exchange for the government turning a "blind eye" towards the use of those

funds.   In order to be effective, once counsel knew that the government had failed to disclose the

actual use of the cash payments, they needed to investigate the actual use of funds by all

witnesses and the degree to which the government made, and failed to disclose, the implicit

agreement that the cash could be spent in any way the witness wanted.

### 4.  Other Instances of Ineffective Assistance

a)  Counsel was ineffective in failing to follow up on information supplied by Carson at trial

   that he had a rental car during the time period he was accused of borrowing a car for the

   murder of Robert Smith.  Documents showing that he was in possession of a rental car

   would rebut testimony that he needed to borrow a car on the day in question.  Records are

   no longer retained by the rental car company for the date in question.

b)  Carson also argues that Counsel was ineffective in failing to pursue arguments regarding

   Montgomery's mental impairments and medical health history that could effect his

memory or ability to be manipulated by government agents. Trial counsel failed to make a timely showing for a need for an expert witness to address this issue and present information showing that Mr. Montgomery was an individual who, due to mental slowness, was easily manipulated by people who showed him attention, friendship or who held a position of power over him. The defense team was denied access to Montgomery's witness protection file and medical information, but their failure to then question the witness regarding his memory and propensity to be easily manipulated by powerful individuals, such as FBI Case Agent and the government prosecutors, was unreasonable and counsel's failure to point this out through cross examination and through the use of expert testimony rose to the level of Constitutional ineffectiveness.

c) Caron's trial counsel was ineffective for failing to object at trial to the improper in camera inspection procedure adopted by the Court with regard to sealed *Brady* materials.  This procedure prejudiced Carson and allowed the Court to be used as a tool of the Government in their scheme to withhold exculpatory material from the defense.  It has been held that *in camera* proceedings should only be used where there is a compelling interest to do so.  *In re Sealed Case*, 151 F. 2d 1059 (D. C. Cir. 1998).  The proper procedure for conducting *in camera* proceedings was not followed in this case.  Trial Counsel for Carson failed to make an objection on the record and challenge the improper procedure by the Court. There was no compelling reason for these documents to be submitted *in camera* and *ex parte* to the Court and failure to object to this was ineffective on the part of counsel.  Furthermore, counsel failed to request findings be made on the record and a full index of the documents submitted for *in camera* review be disclosed to the defense.   This conduct prejudiced Carson's ability to present his case at trial and on appeal.

d) Appellate Counsel was also ineffective in failing to seek appellate review the Trial Court's rulings regarding the sealed materials.  In denying defendants' motion to Allow Counsel to Review Certain portions of the Trial Record, The United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) instructed counsel that they must identify the specific rulings believed to be erroneous, and present the issue in the appellants' brief, rather than by motion.  *See* Order dated 8/28//2003 [Case No. 02-3015, ECF No. 769196]. As evidence by the numerous instances of *Brady* material contained in the sealed documents and discussed supra, challenging them would have proved successful on appeal.  However, Appellate counsel failed to pursue this claim on direct appeal.  Had the petitioners raised the issue on appeal, the Court of Appeals would have reviewed the materials *in camera. Id.*  The violations would have then come to light and demonstrated the pattern of abuse that was perpetrated by the Government in this case and the fundamentally unfair resulting verdict.  The result would have been a reversal on appeal. Failure to raise these issues was unreasonable on the part of appellate counsel and the deficiency so prejudiced Carson that counsel's assistance was unconstitutionally ineffective. [25]

## Conclusion

Carson did not receive a fair trial. The Government systematically hid *Brady* and *Giglio* evidence.  The District Court abused his discretion by finding that there was no *Brady* evidence in the sealed documents and failed to keep an adequate list of what was presented and considered by

---

[25] Counsel also incorporates by reference the claims raised by co-defendants in their post conviction petitions related to trial and appellate counsel's ineffectiveness, based on actions and omissions, as due to the fact that in this group prosecution, actions and inactions by other counsel affected the case against and defense of Carson.   Moreover, any other Constitutional errors raised by co-defendants, in as much as they apply to Carson as well, are incorporated by reference herein.

him. Witnesses were paid for their testimony. Defense trial counsel was ineffective. Therefore,

Carson requests discovery and an evidentiary hearing on this motion and seeks leave to

supplement the issues when discovery is received.

Wherefore, for the foregoing reasons, both singularly and in the aggregate, for the reasons

set forth in legal memorandum and exhibits and for such other reasons as may be subsequently

submitted or may appear at the hearing in this matter, counsel and Mr. Carson respectfully ask

that the Court set aside his conviction.

Respectfully submitted,


_____/s/_____
KIRA ANNE WEST
Bar No. 993523
1325 G Street NW, Suite 500
Washington, D.C. 20005
(202) 236-2042
Email: kiraannewest@gmail.com

ATTORNEY FOR SAMUEL CARSON

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2015, a copy of this pleading was served by email to
Government counsel of record, Ms. Margaret Chriss, as this filing is filed under seal.


_____/s/_____
KIRA ANNE WEST

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No: 98-cr-329-RCL |
| | ) |
| WILLIAM SWEENEY (4), | ) |
| JEROME MARTIN, JR. (2), | ) |
| SAMUEL CARSON (3), | ) |
| SEAN COATES (6), | ) |
| | ) |
| Defendants. | ) |

## ORDER

Four of the defendants in the above captioned case have filed motions to vacate, set aside, or correct their sentences under 28 U.S.C. § 2255. Defendant William Sweeney filed his original motion on February 19, 2008 [ECF No. 1017], supplemented his motion (under seal) on November 28, 2014 [ECF No. 1140], and amended the supplement (under seal) on February 25, 2015 [ECF No. 1164]. Defendant Jerome Martin filed his original motion on February 18, 2008 [ECF No. 1021], and supplemented his motion on June 23, 2016 [ECF No. 1182]. Defendant Samuel Carson filed his original motion on February 28, 2008 [ECF No. 1023], supplemented his motion (under seal) on April 9, 2015 [ECF No. 1170], and again supplemented his motion on June 24, 2016 [ECF No. 1183]. Defendant Sean Coates filed his original motion on February 19, 2008 [ECF No. 1020], supplemented his motion on February 24, 2015 [ECF No. 1166], and again supplemented his motion on June 27, 2016 [ECF No. 1184].

After setting a briefing schedule in 2013, this Court granted several extensions of time for the parties to file supplemental briefs, and several supplemental briefs were eventually filed. No response has been filed by the government. Counsel for Mr. Carson has filed an unopposed motion

requesting a new briefing schedule and/or a status conference, stating that the government has not

filed a response because it is waiting for a supplemental brief from.

Defendant Carson's motion for a briefing schedule [ECF No. 1186] is hereby **GRANTED**.

It is hereby **ORDERED** that defendants shall file any supplements to their motions to vacate, set

aside, or correct his sentence under 28 U.S.C. § 2255 within thirty (30) days from the date of entry

of this Order.  The United States shall file its response to the defendants' § 2255 motions and

supplements thereto within sixty (60) days thereafter.

It is **SO ORDERED**.

Date: April 6, 2017

Royce C. Lamberth
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :

        v.          :          Criminal. No. 98-CR-00329-4 (RCL)

WILLIAM KYLE SWEENEY,          :

        Defendant.          :

### SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT
### SENTENCE PURSUANT TO 28 USC §2255 AND INCORPORATED
### MEMORANDUM OF FACTS AND LAW

Petitioner William Sweeney, ("Sweeney") a prisoner in federal custody, by his

attorneys Eric H. Kirchman and Shana Madigan, respectfully supplements his motion,

pursuant to 28 U.S.C. §2255, to vacate, set aside, or correct the sentence he received in

this case.  As grounds for his Motion, Sweeney states as follows:

This motion is based upon all files, records and proceedings in this case.

On September 18, 1998, an indictment was returned against Sweeney and his

codefendants.  On March 25, 1999, a 101-count superseding indictment was filed,

charging Sweeney and his codefendants with violations of 21 U.S.C. §846, Conspiracy to

Distribute and Possess with Intent to Distribute Controlled Substances ("Narcotics

Conspiracy"); 18 U.S.C. §1962(d), Conspiracy to Participate in a Racketeer Influenced

Corrupt Organization ("RICO Conspiracy"); 22 D.C. Code §§2401 and 3202, First

Degree Murder While Armed; 22 D.C. Code §§501 and 3202, Assault with Intent to Kill

While Armed; 18 U.S.C. §1959, Violent Crime in Aid of Racketeering Activity; 22 D.C.

Code §§2101 and 3202, Kidnapping While Armed; 22 D.C. Code §505(b), Assaulting a

Police Officer; 18 U.S.C. §924(c)(1), Use of a Firearm; 22 D.C. Code §3204(b),

Possession of a Firearm During a Crime of Violence; 21 U.S.C. §841(a)(1), Possession

with Intent to Distribute and Distribution of Controlled Substances; 22 D.C. Code §105,

Aiding and Abetting; and, 18 U.S.C. §2, Aiding and Abetting.[1]

On August 15, 2001, after a seven-month trial, Sweeney was convicted of

conspiracy to possess with intent to distribute and distribution of controlled substances,

conspiracy to participate in the affairs of a racketeer influenced and corrupt organization,

attempted murder in aid of racketeering, first degree murder while armed (for the murder

of Donnell Whitfield), four counts of murder in aid of racketeering (for the murder of

Donnell Whitfield, and the triple-murder of Alonzo Gaskins, Darnell Mack, and Melody

Anderson), five counts of use of a firearm, and possession of a firearm during a crime of

violence. Petitioner Sweeney was found not guilty as to the charge of first-degree murder

while armed of Glenn Jenkins, and related offenses.

On February 5, 2002, the Court sentenced Sweeney as follows:

Six concurrent terms of life imprisonment were imposed on the Narcotics

Conspiracy count, the RICO Conspiracy count, and the four counts of murder. A

supervised release period of five years was imposed on each of those counts, to run

concurrently, along with a fine of $500,000.00 and a special assessment of $600.00.

As to Count 35[2] (Use of a Firearm in the RICO Assault of Anthony Pryor), a term

of five years incarceration was imposed, to run consecutively to all other counts, and to

be followed by five years of supervised release to run concurrently with all other counts.

A special assessment of $100.00 was also imposed as to this count.

---

[1] A Retyped Indictment was filed on January 4, 2001. All count numbers referred to in this motion shall refer to the counts as numbered in the Retyped Indictment.

[2] This charge is listed as "Count 28" on the jury's verdict form, as well as on the ECF do ˙

As to each of Counts 40, 45, 46, and 47[3] (Use of a Firearm in the RICO Murders

of Donnell Whitfield, Alonzo Gaskins, Darnell Mack, and Melody Anderson), Sweeney

was sentenced to 20 years incarceration, to run consecutively to each other and to all

other counts. A five-year period of supervised release was imposed on each count, to run

concurrently with all other counts, and a special assessment of $100.00 was imposed on

each count.

On July 21, 2006, the United States Court of Appeals for the District of Columbia

Circuit affirmed Sweeney's conviction. *United States v. Carson, et al*, 455 F.3d 336

(D.C. Cir. July 21, 2006), *petition for rehearing and rehearing en bank denied*, 2006 U.S.

App. LEXIS 26335 (D.C. Cir. Oct. 23, 2006).

On February 20, 2007, the Supreme Court denied Sweeney's petition for writ of

certiorari. *Carson, et al v. United States*, 127 S. Ct. 1351 (2007).

On February 19, 2008, Sweeney timely filed his original Motion to Vacate, Set

Aside or Correct Sentence, pursuant to 28 U.S.C. §2255. At the time the motion was

filed, significant portions of the trial and appellate records were unavailable to counsel

appointed to investigate and litigate matters in Sweeney's §2255 proceeding, which

hampered counsel's ability to effectively litigate the issues. Sweeney sought leave of the

Court to supplement his original §2255 motion, as additional material was made

available. This is that supplement.[4]

---

[3] The verdict form and ECF docket list these charges as "Counts 30, 35, 36, and 37," respectively.

[4] Counsel incorporates by reference the claims raised in Mr. Sweeney's original §2255 motion, as well as the claims raised by Mr. Sweeney's codefendants in their post-conviction petitions (original and supplemental). Because this case was tried in a group prosecution, actions and inactions by other counsel affected the case against and defense of Mr. Sweeney.

3

For the reasons set forth below, Petitioner Sweeney prays that this Court set aside

his convictions and sentence in this case.[5]

## MEMORANDUM OF FACTS AND LAW

Sweeney moves the Court to vacate his convictions and sentences on all counts on

the grounds that they were obtained by denial of, and in violation of his Constitutional

rights. The ultimate legal standard for motions brought pursuant to §2255 is prescribed

by statute:

> If the court finds that . . . the sentence imposed was not authorized by law
> or otherwise open to collateral attack, or that there has been such a denial
> or infringement of the constitutional rights of the prisoner as to render the
> judgment vulnerable to collateral attack, the court shall vacate and set the
> judgment aside and shall discharge the prisoner or resentence him or grant
> a new trial or correct the sentence as may appear appropriate. 28 U.S.C.
> §2255.

## BACKGROUND

In this case, Sweeney, along with his codefendants, was charged with a large-

scale narcotics and RICO conspiracy. It was the prosecution's theory that Sweeney,

along with his codefendants were a group of lifelong friends who grew up in the

Greenleaf Gardens neighborhood of Southwest Washington, D.C. The Government

alleged that as Sweeney, and his codefendants entered their teenage years, they began

selling drugs. By the early 1990's, the Government alleged that a large-scale drug

operation had been developed in the neighborhood, through which Sweeney, and his

codefendants were selling substantial quantities of marijuana. The government also

alleged that Sweeney, and his codefendants engaged in acts of violence, both for

---

[5] Pursuant to the pertinent instructions accompanying the Model Form for Motions Under 28 U.S.C. §2255, prescribed by the Rules Governing Section 2255 Cases in the United States District Courts, we have set forth in our memorandum the pertinent facts and applicable law in support of our motion. However, in discussing the facts relating to our legal claims, we do not mean to suggest that an evidentiary hearing on these claims is unnecessary. To the contrary, because our allegations involve factual, as well as legal issues, a full hearing on this motion is required.

purposes of self-enrichment and self-preservation (to protect themselves from both rival drug dealers and prosecution by the Government).

The bulk of the Government's evidence against Sweeney was supplied by the testimony of Government cooperators and jailhouse informants – in pursuit of substantial assistance and other relief from the consequences of their own criminal acts. The self-interested and often conflicting testimony of these witnesses was suspect at best.[6] As an example of the quality of these witnesses is Donald Nichols, a jailhouse informant and a witness who provided some of the Government's only evidence of Sweeney's involvement in drug dealing. At trial Nichols admitted that on previous occasions he had lied in order to gain his freedom. (Tr. 2/26/01 (AM) at p. 63).

The key part of the Government's case against Sweeney came from the admission of substantial hearsay statements made by Robert "Butchie" Smith. These statements of Smith were introduced, pursuant to Federal Rule of Evidence 804(b)(6). The Government called James Montgomery (a cooperating witness) and Federal Bureau of Investigation ("FBI") Agent Vincent Lisi (the Case Agent who lead the FBI's investigation) to testify as to statements allegedly made by Smith which statements incriminated Sweeney.

The Government alleged in its case that Smith was a relative of Sweeney, and was leading a double life as a drug dealer and Government informant. According to the

---

[6] The majority of these witnesses testified that prior to trial they gave false testimony under oath, or false statements to law enforcement, on numerous occasions. *See* Testimony of Reginald Switzer, Trial Tr. 1/25/01 (AM) at pp. 40-1, 62-4; Trial Tr. 1/30/01 (AM) at pp. 75-6; Testimony of James Montgomery, Trial Tr. 3/12/01 (PM) at pp. 27-30; Trial Tr. 3/15/01 (AM) at pp. 53-58; Trial Tr. 3/15/01 (PM) at pp. 3-33; Testimony of Charles Bender, Trial Tr. 4/4/01 (PM) at pp. 33-4; Testimony of Ronald Sowells, Trial Tr. 4/18/01 (AM) at pp. 30-2, 83-5; Testimony of Arthur Rice, Trial Tr. 4/25/01 (PM) at pp. 30:25, 31-33; Testimony of Paul Franklin, Trial Tr. 5/1/01 (PM) at pp. 31, 65-6; Testimony of Demetrius Hunter, Trial Tr. 5/7/01 (PM) at pp. 57-9; Testimony of John Venable, Trial Tr. 5/14/01 (PM) at p. 7.

Government, Smith implicated Sweeney in the triple murder in Temple Hills, Maryland, as well as in the murder of Donnell "Robocop" Whitfield.

These hearsay statements of Smith, a substantial number of which were testified to through the bolstering voice of an FBI Agent and were the keystone of the Government's case against Sweeney. Smith's hearsay statements were relied upon heavily by the Government in its closing argument, and to bring about the conviction of Sweeney in this case.[7]

Apart from the testimony of cooperating criminals seeking favors from the Government in exchange for their testimony, and the hearsay statements of Robert Smith, the Government's case against Sweeney was weak.

With regard to the triple murder in Temple Hills, the only physical evidence linking Sweeney to the house in which the crime was committed was a palm print on the front door of the home. While this piece of evidence might, at first appear to hurt Sweeney's case on closer examination the print was explained. The Government's fingerprint expert testified that there is no way to date prints, and stated that Sweeney's print could have been left on the door at any time. (Tr. 4/2/01 (PM) at pp. 72-3). More importantly it was made clear at trial that the house at which the murders occurred was used as a gambling house, and Sweeney had visited the house a number of times in order to gamble. (Tr. 6/6/01 (PM) at pp. 48-61).

Moreover, Shaheem Johnson, testified at trial that he had seen Sweeney in the house on a previous occasion (Johnson testified that he did not know Sweeney at the

---

[7] *See* Government's Closing Argument, Tr. 6/26/01 (AM) at pp. 24-5, 48; Tr. 6/26/01 (PM) at pp. 18, 24, 44, 62-64; Tr. 6/27/01 (PM) at pp. 6-10, 25-7, 40.

time, but that Sweeney had stood out and could be identified as a result of his Tourette
Syndrome). (Tr. 6/12/01 (PM) at pp. 86:9-14, 87:15-21).

In addition the testimony of Cinama Hawkins, the Government's eyewitness and
the sole survivor of the triple murder, was impeached at trial by the testimony of Prince
George's County Police Officer Robert Taylor, the first person that Hawkins came into
contact with after fleeing the Temple Hills house once the killers had left. Officer Taylor
testified that when he interviewed Ms. Hawkins at the scene, with the facts and
circumstances of the events that evening still fresh in her mind, described both of the
murders as being six (6) feet tall. (Tr. 6/12/01 at pp. 59-68). Sweeney could never have
been mistaken as six feet tall.

James Montgomery was used by the Government to implicate Sweeney in the
triple murder. Montgomery testified that he was there with Sweeny on the night of the
murders and was a participant in the crime, yet he was never able to provide a consistent
statement of the events of the crime he claimed to have participated in. Montgomery's
testimony at trial was inconsistent with prior statements that he had given to law
enforcement and with his grand jury testimony. (Tr. 3/14/02 (AM) at pp. 51-3; 3/15/01
(PM) at pp. 16-32; 6/27/01 (PM) at pp. 22-23).

Turning now to the Government's case against Sweeney for the murder of
Donnell Whitfield. The Government's case on this charge was also weak, as it relied
mainly on the testimony of John Venable, whose credibility was impeached by his
conflicting grand jury testimony. (Tr. 5/14/01 (PM) at pp. 9-18, 28-9, 34-5).

As will be demonstrated herein, the Government's case against Sweeney was
weak. This combined with the ineffective assistance of counsel that Sweeney received at

both trial and on appeal, the trial court's errors and the misconduct of the Government, there is a reasonable probability that the outcome of the proceedings would have been different. Sweeney was convicted, and sentenced to multiple life sentences, at a trial and in appeal that was fundamentally unfair. Accordingly, relief must be granted.

**GROUNDS FOR RELIEF**

### A. *BRADY* AND *GIGLIO* MATERIAL WAS SUPPRESSED IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS[8]

The discovery obligations of federal prosecutors are generally established by Federal Rules of Criminal Procedure 16 and 26.2, 18 U.S.C. §3500 (the Jencks Act), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). In addition, the United States Attorney's Criminal Resource Manual ("USAM") describes the Department's policy for disclosure of exculpatory and impeachment information. *See, e.g.* USAM §9-5.001.

Prior to trial in this case, the parties conducted extensive discovery. In addition to all material subject to disclosure under Federal Rule of Criminal Procedure 16, Sweeney requested that the government produce all material in its possession to which he was entitled under *Brady*, the Jencks Act, and *Giglio*. [9]

---

[8] The withholding of this material at trial was the result of both prosecutorial misconduct and error by the trial court. Petitioner Sweeney challenges his convictions on both of those grounds with respect to the suppressed material.

[9] In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court of the United States held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." Application of the *Brady* doctrine was extended to testimonial impeachment in *Giglio v. United States*, 405 U.S. 150 (1972). In holding that favorable evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different, the Supreme Court in *United States v. Bagley*, 473 U.S. 667 (1985), disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes. Accordingly, Petitioner refers to such evidence collectively as "*Brady* material" throughout this brief. The Jencks Act, 18 U.S.C. § 3500 ("Jencks Act"), provides that after a government witness testifies at trial the government must produce, on request, any previously made statements by that witness which relate t̶ ̶ ̶ ̶ ̶

8

Prior to and during trial, the Government repeatedly assured the Court and the defendants that it had fulfilled all of its discovery obligations, and that all discoverable material had been provided to the defense. *See e.g.*, Oral Argument Transcript, 9/27/00 at p. 130:17-20. Evidence that was not turned over to Sweeny before or during the trial, or during the time that Sweeny's appeal was pending, reveals that the Government's repeated assurances were wrong. The suppressed evidence contains a substantial amount of *Brady* material all of which was withheld from the defense throughout the course of the trial and appeal in this case. This systematic withholding of favorable evidence material to the defense violated Sweeney's right to due process, and rendered the entire proceeding unfair and Sweeney's convictions unreliable.

## 1. PETITIONER HAS CAUSE FOR RAISING THE SUPPRESSED *BRADY* EVIDENCE ISSUE IN HIS §2255 MOTION

Throughout trial in this case, the Government maintained a practice of submitting material to the Court *ex parte* and under seal. The justification offered by the Government for doing so was most often "security concerns." As a result, there is a large amount of material to which the defense never had access, and consequently, never had the benefit of using to challenge the Government's case at trial or on appeal.

It was not until one week prior to the running of the statute of limitations on Sweeney's filing his post-conviction motion, when Sweeney was granted access to all of the material that had been suppressed by the Government and the trial court. On February 13, 2008, prior *habeas* counsel for Sweeney filed an Emergency Motion for Access to the Entire Court Docket [#1015]. In the motion, counsel requested the Court to

---

testimony on direct examination. 18 U.S.C. § 3500(b). If the government fails to produce such statements, the court is required to strike the testimony of the witness. 18 U.S.C. § 3500(d).

order that all papers and proceedings in this matter be unsealed and that counsel be provided with a copy thereof.

On February 15, 2008, the Court granted that motion, and ordered the Clerk to provide copies of any necessary sealed pleadings in this case to counsel for Sweeney. Order, dated February 15, 2008 (TFH) [#1016].

On February 19, 2008, counsel filed Sweeney's Motion to Vacate under 28 U.S.C. § 2255, in order to preserve his claims, without having had the benefit of time to review the large volume of material that had been unsealed by the Court's order.

On December 20, 2012, undersigned counsel was appointed to represent Sweeney in this matter. Upon joining the case, undersigned counsel obtained approximately 15 boxes of material related to this matter from prior counsel. The boxes contained, *inter alia*, material from trial counsel, transcripts, and some of the previously sealed material from the case that had been obtained pursuant to the Court's February 15, 2008, Order. The documents in the boxes were not indexed, organized, or labeled in any discernable fashion. Undersigned counsel has undertaken a lengthy review of the material contained in the boxes, and discovered a trove of suppressed *Brady* material.

In *Strickler v. Greene*, 527 U.S. 263 (1999), based on facts very similar to those here, the Supreme Court found that the petitioner had demonstrated cause for his procedural default of a *Brady* claim. In *Strickler*, after exhausting both his direct and collateral state appeals, the petitioner discovered exculpatory material that had been suppressed by the government pursuant to the federal *habeas* court's order granting petitioner access to all of the police and prosecutions files in the case. *Id.* at 278. The Court held that the petitioner had established cause for failing to raise his *Brady* claim

earlier, because prior to the federal *habeas* court's order, the prosecution had represented

that petitioner had already received all discoverable material and the petitioner had no

access to the material. *Id.* at 289. Here, given the facts that (1) the Government

repeatedly represented at trial that it had fulfilled all of its discovery obligations, and that

all discoverable material had been provided to the defense; (2) notwithstanding those

representations, discoverable *Brady* material was withheld from Petitioners and placed

under seal by the trial court; and (3) Petitioner Sweeney only obtained access to the

material by court order unsealing the record in this case after all direct appeals had been

exhausted, Petitioner Sweeney has clearly established cause for failing to raise his *Brady*

claim prior to his *habeas* proceeding. *See id.*

### 2. FAVORABLE EVIDENCE WAS SUPPRESSED IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS

A thorough review of the previously sealed material revealed that throughout the

course of trial in this case, the Government repeatedly withheld exculpatory,

impeachment, and bias evidence from the defense, in violation of Petitioner Sweeney's

right to due process and a fair trial. This systematic withholding of favorable evidence by

the Government, with the consent of the trial court, is more than enough to significantly

"undermine[] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419,

434 (1995) (internal quotation marks omitted). Accordingly, the interests of justice

warrant relief, and vacate Sweeney's convictions.

### 3. SUPPRESSED EVIDENCE RELATING TO THEODORE WATSON

Theodore Watson was a key witness for the Government, having implicated

Sweeney, and his codefendants in a number of crimes. Watson was one of several

cooperating witnesses presented by the government.

Watson was a defendant in a criminal case in the United States District Court of Maryland, located in Greenbelt, Maryland. As a result of this charge Watson was being held at the Northern Neck Regional Jail at the same time that Sweeney was also being held there. During this time Watson claimed, and testified at Sweeney's trial, that Sweeney told him about his involvement, among other things, in kidnapping, murder and drugs and he further wanted to have Montgomery killed for cooperating with the Government. (Trans 2-8-01, P.M. page 45 to 70) As such Watson's creditability became a central issue for the defense at trial.

Watson in order to reduce the sentence for the crime he had been charged with in Maryland and to obtain a § 5K1.1 recommendation from the Government entered into an agreement with the U.S. Attorney's Office in Greenbelt. This was done pursuant to a plea agreement in *United States v. Theodore Watson*, No. 99-069 (PJM), in the District of Maryland, Watson was obligated to fulfill certain cooperation requirements in exchange for the possibility of receiving a § 5K1.1 recommendation from the Government. *See* Ex. 1 (Watson Plea Agreement, pp. 5-6 at ¶ 6).

Watson cooperated with the Government in Greenbelt but at his sentencing, on February 4, 2000, the Government refused to file a § 5K1.1 letter on Watson's behalf or request a reduction in his sentence, despite Watson's fervent argument that a § 5K1.1 letter and reduction in his sentence was merited given his extensive cooperation with the Government. The court unmoved by Watson's protests, imposed a sentence of 105-months on Watson.

At trial in Sweeney's case, following Watson's testimony on direct examination, the defense, naturally cross-examined Watson as to why the U.S. Attorney's Office in

12

Greenbelt had refused to file a §5K1.1 letter on his behalf when he had cooperated with

that office.  Watson attempted to explain the U.S. Attorney's Office  refusal as being the

result of Ms. Wilkinson, the Assistant U.S. Attorney assigned to his case, simply not

liking him.

As is shown by the following colloquy on cross-examination:

**Q.** You have already told us that you met with Ms. Wilkinson, correct?
**A.** Correct.
**Q.** And that you gave her your information, correct?
**A.** Correct.
**Q.** And you did not get the 5K1 letter for substantial assistance, correct?
**A.** Correct.
**Q.** Okay.  My question is do you know why you did not get the 5K1 letter from Ms. Wilkinson?
**A.** Yes.
**Q.** What was the reason?
**A.** She made it very clear she did not like me and she didn't want to give me anything.
**THE COURT**: I am sorry?
**THE WITNESS:**  She made it very clear that she did not like me and she did not want to give me anything.
**BY MR. KIERSH:**
**Q.** Okay.  And when you tell us that she made it very clear that she did not like you, what did she say that led you to formulate the belief that she did not like you?
**A.** Number one was her attitude toward me, and my attorneys had told me, "Ms. Wilkinson doesn't like you, and she doesn't want to give you anything.  She doesn't want to hear anything from you.  She doesn't want to talk to you about anything.  The only time she wants to see you is at trial."

(Tr. 2/12/01 (AM) at pp. 19-21).

Watson, later attempted to provide a reason why Wilkinson might not like him

tried to make it appear that Wilkinson was angry with him as a result of him having made

her look bad in front of another Assistant U.S. Attorney, as shown by the following

exchange:

**BY MR. KIERSH:**
**Q.** Sir, what was the substance of the conversation that day?

A. Well, Ms. Barbara Skyler, one of the prosecutors for the District Court in Greenbelt – she wanted some information that one of my attorneys had passed on to Ms. Wilkinson, which Ms. Wilkinson had passed on to Ms. Skyler. Sandra Wilkinson was the district attorney who was prosecuting my case. When I first came in, Ms. Wilkinson told me, you know, "You're not on our team, and you're not likely to be on our team. And I want you to answer all the questions that Ms. Skyler asks you truthfully and honestly." And I explained to her some things that happened in her case – two of the cases she was prosecuting. And when I finished talking with her, she made a statement – and this can be verified – she said, "Why didn't I hear about this before I gave all these lenient pleas out?" And I looked at Ms. Wilkinson and I looked at my attorney. I said, "I told you this months ago before you did that." She just looked at Ms. Wilkinson, and that was the end of it.

(Tr. 2/12/01 (AM) at p. 44).

At the conclusion of the court proceedings on February 12, 2001, the defense

made the following request:

MR. DAVIS: And I would ask that the United States Attorney's Office review that file.
THE COURT: If they have not done that, and I would ask that they call the prosecutor's office in Greenbelt to find out whether or not there is anything that could be characterized as, quote, Brady material in their file. Other than that --
MR. DAVIS: Thank you, your Honor.
THE COURT: -- that's the extent of the government's obligation. Okay?

(Tr. 2/12/01 (AM) at p. 78).

The following day the Government obtained Watson's file from the U.S.

Attorney's Office in Greenbelt, and the following exchanges occurred:

MR. ZEIDENBERG (AUSA): I believe we are, your Honor. Just on a matter left over from yesterday, pursuant to the Court's instruction, we contacted the U.S. Attorney's Office in Greenbelt. We retrieved their file yesterday evening and have reviewed it. There is nothing, in our view, that suggests any Brady or Jencks material in the file. The Assistant U.S. Attorney out there indicates in one letter that the reason that Mr. Watson did not get a 5K letter was simply because she didn't believe his cooperation was of a significant enough nature to qualify. **There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature.** Detective Norris – we spoke with him briefly yesterday. And he had called – we tried to get in touch with him – and he indicated similarly that Mr. Watson had never provided him with information that he felt was untrustworthy of any kind. Nevertheless, we do have

14

the file, and I don't know if the Court wishes to have it to peruse. There are letters --

**THE COURT**: You mean the file from Greenbelt?

**MR. ZEIDENBERG**: Yes. There are letters from Mr. Watson to the prosecutor, as he describes – several lengthy letters, talking about a variety of matters, including his own case and other cases that he knows about and things of that nature.

**THE COURT**: Do you want to have it made part of the court record?

**MR. KIERSH**: Yes, your Honor.

**THE COURT**: All right.

**MR. KIERSH**: I ask that it be placed under seal and made a part of the record.

***

**THE COURT**: Number 5. All right. Number 5. **I do not intend to review it in camera.**

**MR. ZUCKER**: That would be my request.

(Tr. 2/13/01 (AM) at pp. 6-7) (emphasis added).

Despite the Government's assurances, the material contained within the Greenbelt file goes directly to the credibility of Watson as a witness. The prosecutor, in this case, after having reviewed Watson's Greenbelt file, told the trial court that the reason that Watson had not been given a §5K1.1 letter by Ms. Wilkinson, ". . . was simply because she didn't believe his cooperation was of a significant enough nature to qualify. There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature." (Tr. 2/13/01 (AM) at p. 6). The prosecutor's statement that there was nothing in the Greenbelt file to suggest that Watson was not worthy of belief or incredible was at best an error in judgment, and at worst, a calculated lie.

The Greenbelt file was included in the material obtained by counsel when the record was unsealed in this case. A review of that file revealed that it indeed contains a copious amount of evidence that Watson chronically lied and schemed in pursuit of a departure, and contrary to the representations of the Government at trial, that the Government was well aware of his untrustworthy nature. The file contains several

App 1578

lengthy letters, from Watson to the AUSA in Greenbelt, which detail the many occasions

on which he lied to investigators. For example, in one letter, Watson states:

> This letter is to sincerely thank you for allowing me a "second
> opportunity" to cooperate and help myself. I abysmally apologize for the
> asinine [sic] way I conducted myself when the option was presented to
> me. Had I just simply complied and told you the truth at our initial
> meeting, I would have avoided the unnecessary mental anguish that
> entailed... There is no denying that during my 30 years in the system, I
> have lied [,] connived and schemed to get things done."

*See* Ex. 2 (Greenbelt file, Letter from Watson, dated August 19, 1999, at pp. 1, 4).

Another letter reveals that not only was the Greenbelt AUSA (Ms. Wilkerson) well aware

that Watson was a liar, but also that she hesitated to continue cooperation with him due to

his untrustworthy nature:

> I would like to touch lightly on your harshness towards me as a liar at the
> first conference and thereafter. Ms. Wilkerson, again I apologize and
> confess that at our first conference, I lied and somewhat distorted the truth
> regardless of my reasoning... Before I attempt to put the matter in its real
> perspective and sequence, again I would like to touch briefly on your view
> towards me as a liar... I believe that I have stated to you that "yes," I have
> lied [,] schemed and connived at times to obtain my way or freedom... In
> reference to me attempting to secure assistance on my own in an effort to
> help myself, Ms. Wilkerson, you advised [my attorneys] that you did not
> want to hear or discuss anything for or about me, and you did not want to
> see me until trial.

*See id.* (Greenbelt File, undated 17-page letter, at pp. 1, 2, and 12).    A third letter,

written just after his sentencing hearing, at which the Government declined to file a

departure letter and he was sentenced to 105 months incarceration, reveals Watson's

desperation and willingness to do anything in pursuit of a reduction in sentence:

> I could have made a lot of cases from the street, but that was not to be.
> But with your blessings, I wish to try to do as much as possible from
> within. I do have pertinent information for other prosecutors at the
> moment. One case involving a multi-kilo drug dealer and "hit man." *I
> will cooperate and do exactly as you say.* I just hope and pray that I do
> and give enough to be afforded a sizable downward departure.

*See id.* (Greenbelt File, Letter dated February 4, 2000, at pp. 5-6) (emphasis added).

Further, Ms. Wilkinson, the Greenbelt AUSA, wrote a letter on February 21, 2000, to the court in Greenbelt concerning Watson, in which, among other things, she stated, "Finally, please be advised that, since Mr. Watson's sentencing, he mailed me a second lengthy letter regarding the information he believes he has – despite my specific directions to not contact me directly. **Mr. Watson continues to undermine his own credibility** as well and his ability to follow directions from the government." *See id.* (Greenbelt File, Ms. Wilkinson's letter, dated February 21, 2000) (emphasis added).

The refusal of the Government to give Watson a §5K1.1 letter and the statement that Mr. Watson continues to undermine his own credibility is explained by the next letter in the Greenbelt file, which is a 15 page handwritten letter from Watson to Ms. Wilkerson. In this letter Watson writes, "I would like to touch briefly on your harshness towards me as a liar at the first conference and thereafter. Ms. Wilkerson, again, I apologize and **confess that at our first conference, I lied** and somewhat distorted the truth regardless of my reasoning." *See id.* (Greenbelt File, 15 page Watson Letter at p. 1) (emphasis added). Watson, in the same letter, again addressing the point that Ms. Wilkerson thinks he is a liar, writes:

> ". . . again I would like to touch briefly on your view towards me as a liar
> 1) I believe that I have stated to you that "yes", I have lied schemed and
> connived at times to obtain my way or freedom. * * * I also stated this to
> an F.B.I. agent from the D.C. office when interviewed twice on an
> unrelated matter, his response to me was. "we all lie." Even though I
> knew this from personal experience, I was very surprised to hear a F.B.I.
> agent make that statement.
> 2) The majority of political are noted liars. There are the top heads of our
> states and county who were proven wrong doers and liars, Vice Pres. Spiro
> Agnew, President Richard Nixon, and President William Clinton, just to

> name a few. There is no way I am comparing myself with these figures
> other than a liar is liar regardless of who they are.
> 3) Ms. Wilkerson, perhaps you have not experienced it, but I am sure that
> you have heard of agents and or government witnesses testifying falsely
> under oath, and the misconduct of prosecutors.") * * * (page 2)
> 4) * * * I cannot say whether or not you have ever lied in your life, and if
> you have not, then you are truly blessed. And, if not, then there is some
> discrepancy and contradiction in the Bible because God says in Romans
> 3:4 . . . .God is true even though every human being is a liar . . . . * * *
> 5) Again, human beings by nature instinctively lie to avoid prosecution,
> loss of life, freedom, bodily harm, harm to love ones, to acquire or
> maintain jobs or status, embarrassment and etc. Please, Ms. Wilkerson,
> ask yourself if you would lie under these or any other adverse conditions?
> Heads and leaders of our country have. (Page 4-5)

*See id.* at pp. 1-2, 4-5. Watson's admission that he lied to Ms. Wilkinson and his further

statements that lying is an instinctive part of human nature, and is understood by God,

goes to and impeaches his credibility and reliability as a witness.

The jury should have heard that the reason that Ms. Wilkinson did not like

Watson, and the reason, that she did not want to give him anything and the reason he did

not get the 5K letter is that Watson lied to her in the first meeting that he had with her.

This is the only inference that one can take from Watson's handwritten letter in which he

admits he lied to her and his lies are the reason for Ms. Wilkerson not liking Watson.

Once the Government had reviewed Watson's Greenbelt file, it should have taken

steps to correct the testimony of Watson as to the reason he was not given a §5K1.1 letter

in Greenbelt. It was not because Ms. Wilkinson did not like him (I am sure she does not

like many of the people to whom she had given §5K1.1 letters) and it was not because

Watson had made Ms. Wilkinson look bad in front of another AUSA, but was in fact the

result of Watson lying to her and that Watson wrote letters in which he states that he sees

nothing wrong with lying to help himself out of a tight spot. Watson even went so far as

to quote the Bible to justify his having lied to Ms. Wilkinson.

18

App 1581

Instead of doing this, the Government simply told the trial court and the defense that there was "nothing to suggest that it was not worthy of belief or it was incredible. Nothing of that nature." (Tr. 2/13/01 (AM) at p. 6). In order to make such a statement the Government had to ignore the facts that Ms. Wilkinson wrote to the court in Greenbelt that Watson continues to undermine his own credibility and that Watson admitted that he had lied to Ms. Wilkinson.

The principle that the Government may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

As the Supreme Court has made clear:

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.

*Napue v. Illinois,* 360 U.S. 264, 269 (1959) (*quoting People v. Savvides,* 136 N. E. 2d 853, 854-855 (N.Y. Ct. App. 1956)).

In *Brady,* 373 U.S. at 87, the Supreme Court held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." *See also* Ex. 3 (American Bar Association, Project on Standards for

Criminal Justice, Prosecution Function and the Defense Function § 3-3.11(a)). When the

"reliability of a given witness may well be determinative of guilt or innocence,"

nondisclosure of evidence affecting credibility falls within this general rule. *Napue,* 360

U.S. at 269.

When as in this case " . . . the undisclosed evidence demonstrates that the

prosecution's case includes perjured testimony and that the prosecution knew, or should

have known, of the perjury.[7]  In a series of subsequent cases, the Court has consistently

held that a conviction obtained by the knowing use of perjured testimony is

fundamentally unfair,[8] and must be set aside if there is any reasonable likelihood that the

false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427

U.S. 97, 103-104 (1976)

Here, the Government's good faith is even in doubt as the Government

suppressed Watson's Greenbelt file by misrepresenting the contents of the file to both the

trial court and to the defense.  Had the Government accurately reported to both the court

and the defense, that Ms. Wilkinson had written to the court in Greenbelt that Watson

continued to undermine his own credibility, and that Watson admitted that he had lied to

her, and that Watson viewed lying as a natural and justifiable method to get out of

trouble, the trial court would have ordered the file to be disclosed to the defense.  Once

the file was disclosed to the defense Watson would have been cross-examined as to the

contents of his letters, his views on telling lies, and the true reason he was not given a

§5K1.1 letter in Greenbelt.[10]

---

[10] It would have been better had the Government just produced the Greenbelt file to the court and remained silent as to its contents and allowed the court to make its own determination as to the significance of the file.  The reliance of the court as to the truth of the representations made by the Governm

The reliance of the court, as to the truth of the representations made by the Government, concerning the contents of the Greenbelt file is made clear by the trial court stating that, "I do not intend to review it in camera."

Further, the Government should have turned the Greenbelt file over to the defense as *Brady* material after it had reviewed it, because the material contained therein went directly to Watson's credibility as a witness. The course of action pursued by the Government can have only one explanation, that the Government did not want the file disclosed to the defendant because it did not want the jury to hear that Watson lied to the U.S. Attorney's Office in Greenbelt – and the Government did not want the jury to hear Watson's views on lying.

As the Supreme Court held in *Brady*:

We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The principle of *Mooney v. Holohan* is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts." A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice...

*Brady,* 373 U.S. at 87-88 (internal citations omitted).

Watson's testimony in this case was of great importance to the Government. Not only did Watson claim that Sweeney had confessed to him his participation in a number

---

the contents of the Greenbelt file is made clear by the trial court stating that, "I do not intend to review it in camera." (Tr. 2/13/01 (AM) at pp. 6-7).

of crimes, but more importantly Watson's testimony lends creditability to the testimony

of James Montgomery.  Montgomery's testimony might have been some of the most

damaging evidence introduced against Sweeney at this trial.

Montgomery was a cooperating witness that had lied to the Government,

misrepresented his involvement in crimes to the Government and was otherwise a witness

unworthy of belief.

Montgomery's conduct, character and background made it important for the

Government to find evidence with which to bolster the credibility of Montgomery.

This the Government did by having Watson testify as follows:

> **Q.** What was Mr. Sweeney's response when you said that?
> **A.** You know, I still don't think they have anything on me, you know.
> **Q.** Did he tell you what his concerns were about the case against him?
> **A.** Yes.
> **Q.** What was that?
> **A.** A certain fellow by the name of James Montgomery.
> **Q.** What did he tell you about James Montgomery?
> **A.** That he had brought him into the organization and sort of groomed him and brought him along and then the guy turned on him.
> **Q.** If you could just fill in the he there and tell us that again, Mr. Watson.  In other words, when he said he brought him into the organization –
> **A.** Mr. Sweeney brought Mr. Montgomery into the organization.  Is that okay?
> **A.** Yes, thank you.  And what did Mr. Sweeney say about that?
> **A.** Well, he was somewhat disappointed because Mr. Montgomery had been on several murders with him and did as much as he had done and now he is flipping the script.  Because he got busted on something else, now he is flipping on him to save himself.
> **Q.** Who is flipping on --
> **A.** Mr. Montgomery is turning on Mr. Sweeney to save himself.
> **Q.** Did Mr. Sweeney ask you any advice about that?
> **A.** Yes.

> **Q.** What did Mr. Sweeney ask you about that?
> **A.** He asked me if he could prove that Mr. Montgomery was in on
> the killings and did as much killing as he did that would they, the
> jury or whatever, try to work in his favor. I told him no, I didn't
> think so because it doesn't usually work like that. I said usually the
> first person that testifies is usually what they go with. And if they
> got you targeted as the ring leader then that makes the difference.
>> **Q.** What was Mr. Sweeney's response?
>> **A.** Yeah, I figured as much.
>> **THE COURT**: I'm sorry?
>> **THE WITNESS**: Yes, I figured as much.
>> **BY MR. ZEIDENBERG**:
> **Q.** Now, did Mr. Sweeney talk to you about what role Mr.
> Montgomery was to play in this case?
>> **A.** He was suppose to testify against him.
>> **Q.** Did you have any conversation about that fact?
> **A.** Yes. He was talking that Montgomery is going to testify against
> him. And I said, well, if you got all this muscle and all this gun
> power and everything, I said, why don't you just kill him, you know.
> And he said, we been trying to get to that mother fucker but the feds
> got him hid away too well.
>> **Q.** Did he say where they had been looking for him?
>> **A.** No.
> (Trans 2-8-01, pm, pages 61-64)

The effect of this evidence on the jury would have been to lend credibility to

Montgomery as a witness against Sweeney. As the only reason that Sweeny would want

to have a witness killed would be if that witness's testimony was accurate and it would

hurt Sweeney at trial.

The evidence in the Greenbelt file overwhelmingly demonstrates that Watson was

known by prosecutors to be dishonest, and had a powerful self-interest to do or say

anything the Government wanted in his pursuit of a reduced sentence. The Government's

claim to the Court that the Greenbelt file contained nothing to indicate Watson's

untrustworthiness was a misrepresentation of the highest order. The failure to provide the

contents of the Greenbelt file to the defense was plainly violative of the Government's

discovery obligations, and Petitioner Sweeney's right to a fair trial.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 4. SUPPRESSED EVIDENCE RELATING TO JAMES MONTGOMERY

James Montgomery was an essential witness for the Government. His testimony implicated the defendants in a number of criminal acts. Again, as with the majority of the Government's witnesses, the defense questioned Montgomery's credibility. Montgomery himself had admitted to, been implicated in, or been convicted of a number of violent crimes. These crimes included assault with a deadly weapon, numerous murders, and assault on a police officer while armed. The Government had promised Montgomery leniency in exchange for his testimony; in fact, Montgomery ultimately received a five (5) year sentence for committing seven (7) murders.

On March 7, 2001, trial counsel requested Agent Lisi's notes related to his interviews of James Montgomery. (Tr. 3/7/01 at p. 52). The trial court ruled that Agent Lisi's notes did not contain *Brady* material. *Id.* at p. 91. The recently unsealed material revealed Agent Lisi's notes regarding Montgomery. The notes contain valuable impeachment evidence as to Montgomery. Specifically, the notes reveal that Montgomery lied to Agent Lisi in his interview with regard to the murder of Timothy Benton. Maurice Proctor and James Montgomery were charged with Benton's murder. Agent Lisi's notes reveal that Montgomery lied, and substituted Carson for himself as one of the perpetrators of the Benton murder. This valuable impeachment evidence could have been used by the defense to further discredit Montgomery by demonstrating his proclivity for lying to protect himself from criminal prosecution, through the false incrimination of others. The suppression of the favorable evidence contained in Agent

24

Lisi's notes, which as discussed, *infra*, was material to Petitioner Sweeney's guilt and violated Petitioner Sweeney's due process rights. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

## 5. SUPPRESSED EVIDENCE RELATING TO CHARLES BENDER

On February 5, 2001, trial counsel for the defense asked the court to review the FBI's 302 reports generated from the FBI's interviews with one of the Government's witnesses, Charles "L.A." Bender. Trial counsel wanted to know whether Bender's testimony on the stand was consistent with the statements he gave to the Government. (Tr. 2/5/01 (A.M.) at p. 84). The trial court ruled that Bender's testimony was consistent with the information in the 302 reports, and denied the defense access to that material. The newly unsealed record reveals, however, that the Bender 302 reports contained *Brady* material, which was unconstitutionally withheld from Petitioners at trial. Indeed, in one of the Bender 302 reports, Bender stated that codefendant Jerome Martin confessed to Bender that he (Martin) killed Anthony Fortune. *See* Ex. 4 (Bender 302 Report). As an initial matter, this report was exculpatory *Brady* material as to codefendant Carson, who was charged with the murder of Fortune. This was significant

25

to Petitioner Sweeney as well, as the Government's theory tied Sweeney to Carson in several murders. Further, the 302 report was valuable impeachment evidence, as it contradicted the Government's theory of the prosecution and could have been used to impeach Bender's testimony at trial. The suppression of the exculpatory and impeachment evidence contained in the Bender 302 report, which as discussed, *infra*, was material to Petitioner Sweeney's guilt, violated Petitioner Sweeney's due process rights. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 6. SUPPRESSED EVIDENCE RELATING TO ARTHUR RICE

On April 24, 2001, trial counsel requested the FBI 302 reports generated from the interview of Government witness Arthur Rice. (Tr. 4/24/01 (PM) at p. 3). Arthur Rice was a jailhouse informant, whom the Government alleged was an associate of Petitioners. The trial court reviewed the FBI 302, dated January 26, 1999, and ruled that it contained no *Brady* material. *Id.* The recently unsealed material reveals that the opposite is true. Rice's 302 reveals that he told Case Agent Lisi and Agent Kevin White, in the presence of AUSA Kenneth Wainstein, that defendant Martin, along with Carson, killed Leonard "Slick" Hyson and Maurice Hallman. In fact, Rice told the investigators that he was

26

present at the time of the murder, heard the gunshots, and then observed Martin and

Carson fleeing the scene. *See* Ex. 5 (Arthur Rice 302 Report). This evidence is favorable

to the defense because it contradicts the Government's theory of the case, which was that

it was James Montgomery who participated in the Hallman/Hyson murders with Carson.

The evidence could have been used to impeach Montgomery, who testified that he was

one of the killers of Hallman and Hyson. (Tr. 3/12/01 (AM) at pp. 55-62). The Rice 302

report was favorable to the defense, as it was both exculpatory and impeached the

credibility of the Government's witnesses; thus, as discussed *infra*, because it was also

material, the suppression of this evidence violated Petitioner Sweeney's right to a fair

trial. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material

over to the defense is excused by having the trial court review the material, then the trial

court abused its discretion in not ordering this information to be turned over to the

defense. This failure deprived Sweeney of due process as the information was material to

Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable

probability that the results of the proceedings would have been different.

### 7. SUPPRESSED EVIDENCE RELATING TO ANDRE MURRAY

On February 1, 2001, trial counsel requested material from the Government relating

to Andre Murray, a cooperating witness for the Government, with whom the Detective had a

long history of dealings. (Tr. 2/1/01 (AM) at p. 65-66). The trial court ruled that the defense

was not entitled to the evidence under the Jencks Act. *Id.* The unsealed record, however,

exposed the fact that a Government Agent's notes also contained *Brady* material.

Specifically, the Government Agent's notes reveal that Andre Murray told the Government

that Petey Johnson ("Fat Petey") killed Robert Smith to get back at Sweeney, allegedly for

killing Petey Johnson's brother, Keith Johnson. Sweeney was charged with the murder of

Keith Johnson. The Government Agent's notes contained evidence that someone other than

Sweeney was responsible for Robert Smith's death; therefore, the notes should have been

produced as *Brady* evidence.

Assuming arguendo that the failure of the Government to turn this *Brady* material

over to the defense is excused by having the trial court review the material, then the trial

court abused its discretion in not ordering this information to be turned over to the defense.

This failure deprived Sweeney of due process as the information was material to Sweeney's

guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable

probability that the results of the proceedings would have been different.

### 8. SUPPRESSED EVIDENCE RELATING TO THE MURDER OF ROBERT "BUTCHIE" SMITH AND THE GOVERNMENTS' FEDERAL RULE OF EVIDENCE 804(B)(6) MOTION.

The cornerstone of the Government's theory of Petitioner Sweeney's purported

liability in the conspiracy came from the admission of hearsay statements made by

Robert "Butchie" Smith, which were introduced through FBI Agent Vincent Lisi (the

Case Agent who lead the FBI's investigation).[11] The Government alleged that Robert

"Butchie" Smith was a relative of Petitioner Sweeney, and was leading a double life as a

drug dealer and informant. According to the prosecution, Smith implicated Petitioner

---

[11] As stated earlier, Petitioner Sweeney was convicted at trial of, *inter alia*, Count 2 in the indictment, the "RICO Conspiracy." Petitioner Sweeney received a life sentence for this conviction. In convicting Petitioner Sweeney of the RICO conspiracy count, the jury found Racketeering Act 50, the conspiracy to commit murder of Robert Smith a/k/a "Butchie," between on or about April 1997 and on or about June 17, 1997, to have been proven.

28

Sweeney in the triple murder in Temple Hills, Maryland, as well as in the murder of

Donnell "Robocop" Whitfield.

At trial, the court allowed the admission of Smith's hearsay statements under

Federal Rule of Evidence 804(b)(6), holding that through the murder of Smith, the

defendants had forfeited their Sixth Amendment Confrontation Clause rights. Without

having the opportunity to cross-examine Smith, his testimony, much of which was

delivered through the bolstering voice of an FBI Agent, was the linchpin of the

Government's case against Petitioner Sweeney. Indeed, this testimony was relied upon

heavily by the Government in closing argument, and used to seal the Government's

case.[12]

At the time of Robert Smith's murder, Petitioner Sweeney was in custody at the

Prince George's County Detention Center. The Government's theory was that Petitioner

Sweeney arranged for the murder of Robert Smith, a paid government informant, because

he suspected that Smith was providing information to the police about criminal activity

involving Petitioner Sweeney.

In addition to a multitude of requests in various forms, prior to and since,

Petitioner Sweeney's Third Motion to Compel Discovery [#340], filed July 17, 2000, and

specifically sought the information pertaining to Robert Smith to which he was entitled

under *Brady*.

The Government sought, and was granted permission, pursuant to Federal Rule of

Evidence 804(b)(6) to have FBI Special Agent Lisi, testify to certain incriminating

statements allegedly made by Sweeney to his uncle Robert "Butchie" Smith.

---

[12] See Government's Closing Argument, Tr. 6/26/01 (AM) at pp. 24-5, 48; Tr. 6/26/01 (PM) at pp. 18, 24, 44, 62-64; Tr. 6/27/01 (PM) at pp. 6-10, 25-7, 40.

Rule 804(b)(6) provides that, "(6) *Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

It was the Government's contention that Carson had killed Smith after meeting with Sweeney in the Prince George's County Detention Center and being told by Sweeney that Smith had implicated Sweeney, Carson and Montgomery in the triple murder in Temple Hills, Maryland, in statements that he had made to Smith.

At the first hearing on the Government's motion, held on September 27, 2000, the defense wanted the Government to produce any evidence that it had about any other people that might have wanted to kill Smith.

The Government, in response to the request of the defense, made it clear, to both the trial court and to the defendants, that the Government had no information that anyone other than the defendants in this case wanted Smith dead, as is shown by the following:

**MS. CHATURVEDI**: Certainly, your honor. If I could just address this briefly. Again, it is sort of a leap of faith. If the other people who Mr. Smith implicated -- if they knew that he was cooperating with law enforcement, perhaps they had a motive. That is one leap of faith.

**THE COURT**: Sure.

**MS. CHATURVEDI**: And the second one is is there any evidence to suggest any of those people, assuming they did know about the cooperation, took any steps to harm Mr. Smith. There is no such evidence. If the defense is trying to raise third-party culpability, there has to be more than mere speculation.

Mr. Kiersh cited to the *Brown Beale* case from the D.C. Court of Appeals. The *Winfield* case, which is the most most recent case on that point, says you can't just draw a blank. You can't just pull at straws speculating that someone else may have wanted to have this person killed and we should be entitled to know that. I will provide --

**THE COURT**: I Agree. There has to be some evidence that there were others who had a reason to – that there was a motive for committing the homicide known to those who were in a position to effect it.

**MS. CHATURVEDI**: Right. And we don't have any such information. And we recognize that if we did have such information and that steps had been taken to give that, that would be Brady information. That would have been disclosed as Brady information.

**THE COURT**: Yes.

(Trans. 9-27-00, pp. 200-202).

Ms. Chaturvedi's statement that the Government had no information that someone other than the defendants in this case had been implicated in the murder of Smith was incorrect.

The Government was aware, as early as April 2, 1999, that Andre Chappell and Anthony Ricardo Hawkins might have been involved in the murder of Smith.

One of the previously sealed documents in this case is the Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999, which was placed under seal by Judge Jackson on April 6, 1999.[13] *See* Ex. 6 (Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants). The *ex parte* pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney, and Proctor from their pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999.

In the *Ex Parte* Notice, the government states, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." *See* Ex. 6 at p. 12.[14]

---

[13] None of the material obtained pursuant to the Court's Order to unseal appear on the docket sheet in the above-captioned matter.

[14] The Government's motion does not elaborate on the evidence in its possession that led to the identification of these to individuals as those responsible for Smith's murder. Accordingly, Mr. Sweeney requests additional discovery and an evidentiary hearing with regard to this issue, as the evidence on which the Government based its statement would clearly be discoverable under *Brady*, and likely provide further evidence that the Government's misrepresentat⋅

31

The defense was not aware of this information and was unable to investigate it or advance this in opposition to the Government's motion to admit the statements of Smith.

The Government further suppressed the information contained within the material admitted at trial *ex parte* and under seal, and marked "Court Exhibit No. 4," namely the hand written notes relating to an interview of Andre Murray (who testified for the Government at trial) in which Murray discussed with law enforcement the murder of Keith Johnson. *See* Ex. 7 (Handwritten Andre Murray Interview Notes).

The notes of that interview state, in part:

> "Wit. Heard Gooch telling Draper to kill Keith [Keith was Petey Johnson's brother]  Wit. did not hear Draper return to advise Gooch he had killed Keith.  He just heard Gooch give the order.
> The word is that Fat Petey started messing with Butchie – killed Butchie to get back at Draper -→ mere rumor."

Ex. 6.

The theory being that Petey Johnson had killed Smith to punish Sweeney for having killed his brother Keith.

This information was never provided to the defense despite the defense's requests for such information and the Government's assurance to the trial court and the defense that if it had such information it would turn it over to the defendants.

---

discovery violations resulted in a trial, and subsequent appeal, that were constitutionally unsound. Mr. Sweeney hereby requests any and all files containing information about Andre Chappell and Anthony Ricardo Hawkins, relating to the murder of Robert Smith. The facts as alleged above provide "good cause" to allow discovery of the requested material. *See Bracy v. Gramley*, 520 U.S. 899, 908-09 ("Good cause" is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.")  The facts above demonstrate that "good cause" has been shown; therefore, discovery is warranted. *Bracy* at 908-09.

The significance of the Government's suppression of the motive of Petey Johnson
to kill Smith becomes more significant when one looks to the testimony of Agent Lisi, in
the following exchange:

> A. I will tell you right now, I never after "Butchie's" murder,
> picked up Michael Farrar and interviewed him.
> Q. How about Petey Johnson? Did you pick him up?
> A. Yes, sir, because it was believed he was a witness.
> Q. To Robert Smith's murder?
> A. Yes, sir.
> Q. Okay. And you questioned him not just as a witness, but as a
> possible suspect?
> A. I would say as a witness and maybe somebody – it was just a
> hunch that he was there and then he walked away, we believed, at the time
> "Butchie" was killed. So he may have called somebody to alert them that
> "Butchie" was there. (Trans. 5-30-01 (AM), pages 19-20).

The Government withheld from the defense evidence that Petey Johnson, a person
the Government believed was present at the time of Smith's murder and might have had
some role in Smith's murder; Johnson also had a motive to kill Smith which he might
have told others about.

The defense was deprived, by the actions of the Government, of an opportunity to
investigate the issue of Petey Johnson's motive to kill Smith and the involvement of
Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once again had the Government disclosed the information in its possession, that
Petey Johnson wanted to kill Smith in revenge for Sweeney allegedly killing his brother,
Keith, Agent Lisi could have been cross examined on this point.

The Government's insistence on limiting the defense inquiry into others that
might have wanted to kill Smith is further shown when during cross-examination of
Agent Lisi by defense counsel, the Government objected when Agent Lisi was asked
whether any suspects other than Sweeney had been developed as leads in Robert Smith's

murder. (Tr. 5/30/01 (AM), pp. 45-49). At sidebar, the Government argued, "The only suspect – if Mr. Kiersh wants to hear it again – the only suspect in Agent Lisi's mind that ordered that murder was William Sweeney. If Mr. Kiersh wants him to repeat it, that is fine." *Id.* at pp. 47-48.

The Government was quite sure that the defense would be unable to confront Agent Lisi with questions about Petey Johnson's motive to kill Smith or the evidence that implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder as this material had not been turned over to the defense.

The defense was deprived of the opportunity to investigate this information or to attempt to use it in opposition to the Government's motion to admit the statements of Smith.

The Government through its action in keeping this information from the defense put the defense in the position of having no evidence whatsoever to counter the Government's argument that no one other than the defendants in this case had any reason to kill Smith.

The defense being unable to present any serious opposition to the Government's motion to admit the statements of Smith, the trial court granted the motion.

The Government's need to withhold evidence that could implicate others in the murder of Smith is further shown by the weakness of the Government's evidence implicating the defendants in that murder.

The evidence relied upon, by the Government, in support of its motion to admit the statements of Smith was the testimony of Montgomery, as follows:

34

The Government first had Montgomery testify as to what he knew about the

murder of Smith which went as follows:

      A.  Chin [defendant Carson] told me that Draper [defendant Sweeney] wanted me
and him to come to see him.  So I told him -- I told Chin that I wasn't going to see him,
and I didn't have proper ID.  I had an ID with my proper information on it, but it wouldn't
have been accepted by -- probably by that jail thing.
      Q.  So did you go to see Draper at the jail?
      A.  No.
      Q.  Did Chin go?
      A.  Yes.
      Q.  And after he went, did he tell you about his conversation with Draper?
      A.  Chin say that him and Draper father went to see him, and --
      THE COURT:  Him and Draper what?
      THE WITNESS:  Him and Draper father.  Chin and Draper's father went to see
Draper.
      THE COURT:  Oh, I see.  Draper's father.  All right.
      THE WITNESS:  And said that he asked Draper distinctively who did you tell
anybody about what had happened?  And he said that Draper admitted to him that he told
Butchie, and that Butchie was cooperating with the Feds.
      BY MR. ZEIDENBERG:
      Q.  Did Chin say what had to be done or what should be done about Butchie?
      A.  So Chin told me that if they had no Butchie -- without Butchie, they don't
have no case.  They wouldn't have no case.
      Q.  And when you were talking about a case, what case was it that you were all
concerned about?

      A.  The triple murder.
      Q.  Now, did you and Chin make attempts together to find and kill Butchie?
      A.  Yes.
      Q.  Can you tell the ladies and gentlemen about that?
      A.  Sometimes when we used to -- when we would go to this carry-out, Leo's --
      Q.  Where is that located?
      A.  It's on N Street.
      Q.  I'm sorry?
      A.  South Capitol and N.
      * * *
      A.  That's near the area where Butchie would more than likely be, as far as when
he was in Southwest.  So sometimes when we walked to Leo's we would -- we would
already be going to Leo's anyhow, but we would try to see if we see Butchie out there as
we are going or coming from there, and sometimes we would drive through, through
there.
      Q.  What were you going to do if you saw Butchie?
      A.  Well, we saw him numerous amount of times, but we couldn't do nothing to
him in front of like everybody just like that, do you know what I mean.  We're from

Southwest and he is -- he knowed the same people we know, so we couldn't just walk right up to him just like that and do anything to him.

Q. What were you hoping to find? What were you hoping to do?

A. To catch him in a nice position.

Q. What is a nice position?

A. To catch him in a position where we could get up on him without a person knowing who we are or without him seeing us coming.

Q. Now, was there an occasion when you and Chin were in a car and you happened to see Butchie?

A. We was in my car.

Q. Can you tell us about that?

A. We rode through housing -- I mean, through Half Street, and Butchie was out there. He was sitting on the steps that lead to Syphax playground. So we hurried up and went to Chin house, I stayed in the car. And he got out and he went and got his sweatsuit, and the gun, and his gut-buster.

Q. What's a gut-buster?

A. Like elastic velcro, like a waistband.

Q. And what's the purpose of that?

A. To hold the gun.

Q. What did Chin do with his sweatsuit -- what kind of a sweatsuit did he get?

A. It was a black sweatsuit.

Q. What did he do with it?

A. He was putting in on while I was driving.

Q. Where was he putting it on?

A. In the car.

Q. What car did you have?

A. Oldsmobile 98.

Q. Where did you go once Chin got back in the car with his gun and his sweatsuit?

A. We went down Canal Street, and then got on -- got onto First Street, and then hit M Street, and then hit South Capitol Street. And I pulled on -- he told me to pull on the side -- on the side of -- like the sidewalk. It's like a little car dealership thing right there. So I stayed right there, and Chin got out to go -- to go through the alley to try to catch him from behind.

Q. Now, was there a discussion between you and Chin about an escape route you were going to take?

A. When he came back to the car then I was suppose to pull straight over the curb and go straight across South Capitol Street Bridge so he could throw the pistol out while we were going over the river, and go around 37th. And that was going to be our alibi.

Q. And that was a plan you discussed before Chin got out of the car?

A. Right.

Q. And again, the purpose in going up and ending up at 37th Place was going to be what?

A. Our alibi.

Q. What happened when Chin got out of the car?

A. He went around there, and he came back, and he said that Butchie was gone. When he got back in the car the first thing I said, I said, what happened?  Because I didn't hear the gunshots or nothing.  So I said, what happened?  And he said that Butchie wasn't there, that he was gone, he said he left that quick.

Q. Now, I want to talk to you about the day that Butchie was actually killed, do you remember that day?

A. Yes.

Q. Where were you the day that Butchie was killed, starting in the afternoon?

A. On Second Street.

Q. Second Street, Southwest?

A. Yes.

Q. And what were you doing there?

A. Selling weed.

THE COURT:  What was the date?

MR. ZEIDENBERG:  I'm sorry?

THE COURT:  What was the date?

MR. ZEIDENBERG:  I didn't refer to the date.  It is June 16, 1997.

THE COURT:  June 16th?

MR. ZEIDENBERG:  Yes.

THE COURT:  All right.  Go ahead.  I'm sorry.

BY MR. ZEIDENBERG:

Q. Where were you -- you were on Second Street?

A. Yes.

Q. And what were you doing?

A. Selling weed.

Q. Now, at some point did you see Chin?

A. Chin came out of his house and came and got my car keys.

Q. Did you give it to him?

A. Yes.

Q. Did you ask him why he needed your car?

A. No.

Q. Was it uncommon for Chin to come by and take your car?

A. No.  I mean, he would get it all the time, whenever.

Q. Now, did he tell you where he was going?

A. No.

Q. Now, sometime later, after Chin -- did he leave with your car?

A. Yes.

Q. Okay.  Sometime later did you come to find out that there had been a shooting over on Half Street?

A. Yes.

Q. And at some point did you learn that that was Butchie?

A. Yes.

Q. What did you do when you found out that Butchie had been killed?

A. I got somebody's -- I got a bicycle from somebody and I rode up there, I rode the bicycle up there.

Q. And where did you ride to?

A.  To the corner of Half and O Street.

Q.  What did you see when you got there?

A.  There was a lot of marked and unmarked police cars and a lot of people was out there.

Q.  Was Butchie's body still on the ground?

A.  I didn't see his body.  I seen like the crime scene tape and stuff like that.  I didn't go all the way down there because it was a lot of polices down there.

Q.  I take it you heard -- you had heard from people out there that it had been Butchie that was killed?

A.  Yes.

Q.  How did you feel when you heard that Butchie was killed?

A.  I was happy.

Q.  How concerned were you, prior to Butchie being killed, how concerned were you about the fact that he was still alive?

A.  It was of great concern.

Q.  Why is that?

A.  Because Draper had told him about what had happened, and I knew that if they pick us up for it that he could be a witness as to what Draper told him.

Q.  Now, after you went to the scene did you return back to Second Street?

A.  Yes.

Q.  And at some point later that evening did Chin return?

A.  Yes.

Q.  Can you tell us about that?

A.  He came -- I was standing on the corner of Second and P Street and he came from the direction -- I'm not sure if he came straight down P Street or if he turned off of First Street, but I seen him on P Street turning into the alley where I normally -- where I had my car parked at at first.  So when I seen him going into the alley, so I was walking down  -- I was walking down towards that direction.  So no soon as I seen him, so I told him, I said, you know them peoples got hit.

Q.  Your term was what?

A.  I said, you know them peoples got hit.

Q.  You used the term peoples?

A.  That's what I said.  I said, you know them peoples got hit.  He was like, yeah, I know.  So he was like, we're all right.  So I said, yeah.  He said, -- so I said, you know who I'm talking about?  He was like, yeah.  He said, man, trust me, we're all right, just like that.  And then he was like, oh, here are your keys, and gave me my keys.

Q.  Did he seem at all surprised when you told him about that?

A.  No.  And he told me to stay from up Half Street with my car and not to drive it if I didn't have to.

Q.  I'm sorry?

A.  He told me to stay from up Half Street with my car and to not drive it that much if I didn't have to.

Q.  Now, had there been a previous occasion when Mr. Carson, Chin, took your car and then later told you not to drive it in a particular neighborhood?

A.  Yes.

Q.  Can you tell us about that?

A.  In '94, when I had my Caddie, I let Chin keep it, him and Poo-Poo had it, and they shot at Craig out of my car at Capers.

Q.  How do you know that?

A.  Because Chin told me.  He told me to stay from up Capers in my car, and he told me that they had took my car to get it washed and wiped down because they had shot out of it.

Q.  Talking about in 1994 now, did Chin tell you why it was that you should not drive your car up to Capers?

A.  No, that was all he said.

Q.  What did you understand that to mean, why you shouldn't go up to Capers?

A.  My knowledge would be that Craig might be able to  identify my car and may think that I was the person who was shooting at him and shoot at me, or somebody else might have seen it and be able to identify my car, and they might not have known who was shooting out of it and may have been thinking that I was the one who was shooting or whatever.

Q.  Mr. Montgomery, after you had learned that Butchie had been killed what did you think -- how were you feeling in terms about that triple murder and your possibly being implicated in it?

A.  Would you repeat your question?

Q.  After you learned that Butchie had been killed how were you feeling about the fact about your chances of being implicated in the triple murder?

A.  I was feeling good pretty much.  To a certain extent I was feeling good.

Q.  Did you think you were in the clear?

A.  To a certain extent I felt as though I was in the clear.

MR. ZEIDENBERG:  I have no further questions, Your Honor.

(5-23-01, p.m., pages 22-33)

It is interesting to note that when Montgomery was with Carson, and according to Montgomery, with the express purpose of killing Smith that they did not do so as there were people around.  Montgomery's testimony is that on the day that Smith was killed Carson did not ask him to go with him on this mission, as he had before, but according to Montgomery, he went on his own.  Moreover Montgomery was not with Carson when Carson allegedly killed Smith.

Most surprising of all of Montgomery's claims is that after Carson allegedly killed Smith, Carson did not tell Montgomery he had done so.  In fact, according to Montgomery, Montgomery brought it up to Carson that Smith had been killed, in the following exchange:

[Montgomery] A.    I said, you know them peoples got hit.
Q.    You used the term peoples?
A.    That's what I said.  I said, you know them peoples got hit.  [Carson] was like, yeah, I know.  So he was like, we're all right.  So I said, yeah.  He said, -- so I said, you know who I'm talking about?  He was like, yeah.  He said, man, trust me, we're all right, just like that.  And then he was like, oh, here are your keys, and gave me my keys.

If in fact Carson had killed Smith, why was he unwilling to tell Montgomery he had done so?  Especially when they had, if Montgomery is to be believed, hunted Smith on numerous occasions, planned how Smith would be approached, where the car would be stopped, an escape route and a place to get rid of the gun, and they were always together when they allegedly went to kill Smith.

This all changes when Smith is killed -- Carson suddenly goes out alone, and never tells Montgomery that he killed Smith.  Instead, Montgomery brings up the subject of Smith's murder to Carson.

Moreover, if Montgomery is telling the truth about the statements allegedly made by Carson after Smith's death, that "trust me, we're all right," that would be true no matter who killed Smith.

While the evidence withheld by the Government from the defense appears not be admissible in its own right there is still a *Brady* violation in this case.

> The circuits are split on whether a petitioner can have a viable *Brady* claim if the withheld evidence itself is inadmissible. Most circuits addressing the issue have said yes if the withheld evidence would have led directly to material admissible evidence. We have never squarely ruled on this question, *but cf. United States v. Hemmer,* 729 F.2d 10, 16n. 3 (1st Cir.) *cert. denied,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984); *United States v. Ramey,* 719 F.2d 1183, 1190 (1st Cir. 1983) yet given the policy underlying *Brady,* we think it plain that evidence itself inadmissible *could* be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it. *Wood v. Bartholomew,* 516 U.S. 1, 6-8, 116 S.Ct. 7, 133 L.Ed2d 1 (1995) implicitly assumes this is so.

40

Whether the intake note at issue in this case undermines confidence in the verdict is a more difficult question. The clear implication of Jan Smith's note is that someone where Matthew made the prior allegations, told her that the allegations were false. If the defense had known about the note before trial, it presumably could have traced those who could testify as to the circumstances of the allegations and the basis for believing them to be false. Whether the evidence would convincingly establish that Matthew had lied is hard to know but surely the episode most likely would have been investigated and the implication that someone at Hampstead believed it false is strong.

If strong evidence of a prior false accusation exists, it would be very powerful. could easily have created the reasonable doubt necessary to acquit Ellsworth in what was otherwise largely a credibility contest. The lack of any significant corroborating evidence makes this case unusual and heightens the concern about any *Brady* violation. Nevertheless, it would be very odd for us to require a new trial because of a wrongly withheld lead unless the lead would, or would likely, have led to valuable new evidence which was itself arguably admissible. However unlikely it might be after eight years, the state would be entitled to retry Ellsworth if the writ were granted; yet such a remedy would be incongruous unless evidence existed that might alter the result at such a trial. Habeas doctrine is flexible enough for us to condition a grant of the writ on the outcome of a further inquiry into where the lead, even though wrongly withheld, would have taken Ellsworth. *Cf. Manko v. United States,* 87 F.3d 50, 55 (2nd Cir. 1996); Stewart v. Coalter, 48 F.3d 610, 617 (1st Cir.) *cert. denied,* 516 U.S. 853, 116 S.Ct. 153, 133 L.Ed.2d 97 (1995).

If there exists admissible evidence that Matthew made demonstrably false accusations and Ellsworth was not otherwise aware of these allegations at the time of the first trial, a new trial is required. If admissible evidence of false accusations never existed, the writ should be denied. If it did or may well have existed but has been lost because of the *Brady* violation and the ensuing delay in discovery of this fact, Ellsworth may have a good claim to a new trial, *cf. California v. Trombetta,* 467 U.S., 486-88, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

*Ellsworth v. Warden,* 333 F3d 1, 5-6 (1st Cir. 2003).

As a result of the court sealing the information relating to others implicated in the murder of Smith from counsel, there was never an opportunity for the defense to challenge the government's Rule 804(b)(6) motion, investigate the matter of Andre

41

Chappell and Anthony Ricardo Hawkins, or their relation to Carson or any of the other codefendants.

Furthermore, the Government at trial stopped short of explaining or putting on evidence as to how, or who actually killed Mr. Smith. Andre Chappell or Anthony Ricardo Hawkins was not mentioned at all during trial, either by the agents, the prosecutors, or any Witness. *See* Ex. 8 (Affidavit of William Sweeney).

In light of the evidence put forward by the Government at trial for the murder of Smith, for all that is known the evidence that Andre Chappell or Anthony Ricardo Hawkins killed Smith could have been just as strong as the evidence that implicated the defendants.

This is simply another reason that the court should require the Government to produce the evidence that it has linking Andre Chappell or Anthony Ricardo Hawkins to the murder of Smith and then conduct a full evidentiary hearing on this issue.

As a result of the actions of the Government in withholding the evidence in its possession, the Government should be required to turn over to the defense all evidence in its possession related to its investigation into the murder of Smith, and into Petey Johnson relating to the murder of Smith. In addition, the Government should have to turn over to the defense all evidence that relates to the evidence that implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once the Government has done so, and the defense has had an opportunity to investigate the information a hearing should be held.

Moreover, the granting of the Government's motion to admit the statements of Smith also precluded the defense from offering evidence that implicated Smith in the Triple murder in Prince George's County.

The defense had a witness, Wesley Smith, who would have testified that Robert Smith told him that he, Robert Smith, had been cheated out of $60,000.00, while gambling at the house in Temple Hills where the triple murder occurred, and that he was going back there to take care of the "guys in the house," meaning Gaskin and Mack.

Robert Smith told Wesley Smith, a week after the triple murder occurred that, "I took care of Darnell Mack and those guys." (Tr. 6/6/2001 (AM), pp. 26-34; Tr. 6/11/2001 (PM), 9-27; Tr. 6/13/2001 (AM), pp. 72-77).

This evidence would have contradicted Montgomery version of the triple murder and would have further impeached Montgomery's credibility.

It also would have been a defense in this case.

Petitioner Sweeney has demonstrated that the evidence concerning Andre Murray's statement that Petey Johnson wanted to kill Smith, combined with his presence at the time and place of the murder of Smith and the information linking Andre Chappell or Anthony Ricardo Hawkins to the murder of Smith, is all evidence that would be material to the determination of the Government's motion, pursuant to Rule 804(b)(6), to admit the statements of Smith through Agent Lisi.

"Once a defendant demonstrates that a witness can provide testimony material to his defense, then the government's interest in its evidentiary privilege must give way. The proper course in that case 'is for the district court to order production of the evidence or the witness and leave to the Government the choice of whether to comply with that

43

order.' *United States v. Moussaoui,* 382 F.3d 453, 474 (2004). "If the government refuses to produce the information at issue—as it may properly do—the result is ordinarily dismissal." *United States v. Rivera,* 412 F.3d 562, 569 (4th Cir. 2005)(internal citation omitted).

This should be the procedure that should be followed in this case. It cannot be disputed that evidence which inculpated individuals unrelated to Petitioner Sweeney in the murder of Robert Smith was favorable to the defense; thus, the material should have been turned over to the defense. As discussed, *infra,* this evidence was material to Petitioner Sweeney's guilt; therefore, the suppression of the material violated his right to due process. *Brady,* 373 U.S. at 87.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt, would have been used by the defense in opposition to the Government's motion to admit the hearsay statements of Smith and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

## 9. THE *BRADY* EVIDENCE WAS MATERIAL TO PETITIONER'S GUILT, AND PETITIONERS WERE PREJUDICED BY ITS SUPPRESSION

The standards for establishing materiality and prejudice are interchangeable as applied to a *Brady* claim. *See Strickler,* 527 U.S. at 289-90 (prejudice); *Kyles,* 514 U.S. at 434 (materiality). To establish materiality and prejudice, Petitioner Sweeney need not

44

App 1607

show that he would more likely than not have received a different verdict with the benefit

of the suppressed evidence; the question is rather, whether in its absence he received a

fair trial, understood as a trial resulting in a verdict worthy of confidence. *See Strickler*,

527 U.S. at 289-90 (*quoting Kyles*, 514 U.S. at 434). The suppressed evidence should be

considered collectively, not item by item. *See Kyles*, 514 U.S. at 434. Here, the

cumulative impact of the pervasive suppression of *Brady* material renders the verdict

unworthy of confidence – simply put, Petitioner Sweeney did not receive a fair trial.

As the Supreme Court has long recognized, "[t]he use of informers, accessories,

accomplices, false friends, or any of the other betrayals which are 'dirty business' may

raise serious questions of credibility. To the extent that they do, a defendant is entitled to

broad latitude to probe credibility by cross-examination…" *Lee v. United States*, 343

U.S. 747, 757 (1952). At trial, the central theme of the defense was the lack of credibility

of the Government's witnesses. Accordingly, the suppressed evidence as detailed above,

taken collectively, could have been used to cast doubt upon the credibility of several of

the Government's key witnesses – delivering death by a thousand cuts to the

Government's case.

Further, the suppression of the newly discovered evidence relating to Robert

Smith prejudiced Petitioner Sweeney in particular, as it could have been used to defeat

the Government's motion to admit Smith's hearsay statements through Agent Lisi's

testimony. At trial, the court had allowed the admission of Smith's hearsay statements

under Federal Rule of Evidence 804(b)(6), holding that through the murder of Smith, the

defendants had forfeited their Sixth Amendment Confrontation Clause rights.[15]

---

[15] Federal Rule of Evidence 804(b)(6) provides, "*Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongful'⸍⸍⸍⸍ ⸍

The "Greenbelt File" related to Theodore Watson was also material, and its suppression likewise prejudiced Petitioner Sweeney. Like Agent Lisi's testimony and Robert Smith's statements, Watson's testimony in this case was of great importance to the Government, as he claimed that Petitioner Sweeney had confessed to him participation in a number of crimes. The letters contained in the file could have been used by the defense to seriously undermine Watson's credibility as a witness at trial, exposed his bias and the powerful influence of the Government, by using his very own words against him. The materiality of the "Greenbelt File," and the prejudice caused by its suppression, are demonstrated by the fact that it could have been used as a powerful discrediting of Watson as a key witness.

As shown above, the Government's withholding of several of the examples of newly discovered evidence, even taken alone, would be sufficient to vacate Sweeney's conviction. Together, there can be no doubt that the suppressed *Brady* evidence rendered Petitioner Sweeney's trial fundamentally unfair, and produced a verdict that is no longer worthy of confidence. Accordingly, relief must be granted.

### 10. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO ORDER THE GOVERNMENT TO PRODUCE TO THE DEFENSE THE INFORMATION CONTAINED WITHIN, AND THE INFORMATION THAT SUPPORTED THE GOVERNMENT'S CONCLUSIONS IN ITS *EX PARTE* NOTICE TO THE COURT REGARDING CHANGE IN LOCATION OF CONFINEMENT OF ABOVE-NAMED DEFENDANTS, DATED APRIL 2, 1999, AND THE INFORMATION CONTAINED WITHIN COURT EXHIBIT NUMBER 4.

The trial court abused its discretion in sealing material relating to others that had motive to kill Robert "Butchie" Smith. The Government was granted permission by the trial court, pursuant to Federal Rule of Evidence 804(b)(6), to have FBI Special Agent

---

acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

Lisi testify to certain incriminating statements allegedly made by Sweeney to his uncle, Robert "Butchie" Smith.

Rule 804(b)(6) provides that, "(6) *Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

It was the Government's contention that Carson had killed Smith after meeting with Sweeney in the Prince George's County jail and being told by Sweeney that Smith had implicated Sweeney, Carson and Montgomery in the triple murder in Temple Hills, Maryland, in statements that he had made to Smith.

At the first hearing on the Government's motion, held on September 27, 2000, the defense wanted the Government to produce any evidence that it had about any other people that might have wanted to kill Smith.

The Government, in response to the request of the defense, made it clear, to both the trial court and to the defendants, that the Government had no information that anyone other than the defendants in this case wanted Smith dead, as is shown by the following:

**THE COURT**: I AGREE. THERE HAS TO BE SOME EVIDENCE THAT THERE WERE OTHERS WHO HAD A REASON TO – THAT THERE WAS A MOTIVE FOR COMMITTING THE HOMICIDE KNOWN TO THOSE WHO WERE IN A POSITION TO EFFECT IT.

**MS. CHATURVEDI**: RIGHT. AND WE DON'T HAVE ANY SUCH INFORMATION. AND WE RECOGNIZE THAT IF WE DID HAVE SUCH INFORMATION AND THAT STEPS HAD BEEN TAKEN TO GIVE THAT, THAT WOULD BE BRADY INFORMATION. THAT WOULD HAVE BEEN DISCLOSED AS BRADY INFORMATION.

**THE COURT**: YES.

(Trans. 9-27-00, pages 200-202).

47

App 1610

However, as argued herein, the Government knew that its statement that there was no information that others had motive to kill Smith was not true. The trial court also had been provided information that there were others that had motive to kill Smith and did not order the Government to provide this information to the defense.

One of the previously sealed documents in this case is the Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999, which was placed under seal by the trial court on April 6, 1999. *See* Ex. 7. The *ex parte* pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney, and Proctor from their pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999. The Government alleged in the *Ex Parte* Notice that the, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants.

As the trial court recognized in its exchange with the Government on September 27, 2000, this information would be material that must be provided to the defense pursuant to *Brady.* Yet, the trial court after having recognized that the information concerning others, not only having a motive to murder Smith, but information that Chappell and Hawkins had in fact murdered Smith did not require the Government to turn this information over to the defense. This was an abuse of discretion on the part of the trial court. This information directly contradicted the theory upon which the

48

Government relied upon in its motion to admit, pursuant to Federal Rule of Evidence 804(b)(6) the statements of Smith.

It was the Government's theory that Carson had murdered Smith at the request of Sweeney. Yet the information in possession of the trial court was that the Government believed that Chappell and Hawkins had murdered Smith and Carson had not murdered Smith.

Moreover the Government's belief that Chappell and Hawkins had killed Smith directly contradicts Montgomery who testified at trial that Carson had murdered Smith.

The trial court when addressing the defendants' lawyers' concerns about the change of the locations of the defendants, stated, in part, that "I have reviewed the Government's *in camera* submission as to the reasons for the dispersions of the defendants to various points of detention, and I am satisfied that the order was eminently justified." (Trans. 5-21-99, page 8) The trial court went on the state that "Their conditions of detention they largely brought on themselves." (Trans. 5-21-99, page 9)

It seems strange that this information, which the trial court found sufficient to ratify the Government's decision to move the defendants, it did not find important enough to order the Government to turn over to the defense. The only explanation is that the trial court abused its discretion by failing to order that this information be produced to the defense as required by *Brady*. The defense was not aware of this information and was unable to investigate it or advance this in opposition to the Government's motion to admit the statements of Smith.

In addition, the Government submitted to the trial court, for *in camera* review, a detective's handwritten notes relating to an interview of Andre Murray (who testified for

the Government at trial) in which Murray discussed with law enforcement the murder of

Keith Johnson.  *See* Ex. 6.

As described earlier, the notes of that interview state, in part:

"Wit. Heard Gooch telling Draper to kill Keith [Keith was Petey Johnson's
brother]  Wit. did not hear Draper return to advise Gooch he had killed
Keith.  He just heard Gooch give the order.
The word is that Fat Petey started messing with Butchie – killed Butchie to
get back at Draper -→ mere rumor."

Ex. 6.

The theory being that Petey Johnson had killed Smith to punish Sweeney for

having killed his brother.  Once more the trial court did not order this information to be

turned over to the defense after the trial court had reviewed it *in camera.*

As argued herein, the trial court recognized that information that people other

than the defendants in this case had a motive to kill Smith was *Brady* and as such had to

be turned over to the defense, yet when the trial court was presented this information,

instead of ordering the government to provide it to the defense, the Court simply had it

marked as Court Exhibit number 4 and made part of the record under seal.

The significance of trial court's failure to order the Government to produce this

material, detailing the motive of Petey Johnson to kill Smith becomes more significant

when on looks to the testimony of Agent Lisi, in the following exchange:

A. I will tell you right now, I never after "Butchie's" murder,
picked up Michael Farrar and interviewed him.
Q. How about Petey Johnson? Did you pick him up?
A. Yes, sir, because it was believed he was a witness.
Q. To Robert Smith's murder?
A. Yes, sir.
Q. Okay.  And you questioned him not just as a witness, but
also as a possible suspect?
A. I would say as a witness and maybe somebody – it was
just a hunch that he was there and then he walked away, we
believed, at the time "Butchie" was killed.  So he may have called

50

somebody to alert them that "Butchie" was there. (Tr. 5-30-01 (AM), pages 19-20).

The abuse of discretion on the part of the trial court deprived the defense of evidence that Petey Johnson, a person the Government believed was present at the time of Smith's murder and might have had some role in Smith's murder, also had a motive to kill Smith which he might have told others about.

The defense was deprived, by the actions of the trial court, an opportunity to investigate the issue of Petey Johnson's motive to kill Smith and the involvement of Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once again, had the trial court ordered the Government disclosed the information in its possession that Petey Johnson wanted to kill Smith in revenge for Sweeney allegedly killing his brother, Keith, Agent Lisi could have been cross examined on this point.

Moreover, the information contained within this material would have also refuted any inference or suggestion that Petey Johnson had contacted Carson and told him where Smith was so that Carson could murder Smith. It seems unlikely that Petey Johnson would have assisted Carson and Sweeney in killing Smith when Petey Johnson believed that Sweeney had killed his brother.

This is the impression the Government attempted to create when Agent Lisi testified that "So [Petey Johnson] may have called somebody to alert them that "Butchie" was there."

The information contained within the detective's notes could have been used to cross-examine Agent Lisi that Johnson, who was present at the time and place that Smith

was murdered, would have been unlikely to assist Sweeney and Carson in killing Smith

since Johnson had his own motive to want to kill Smith.

The trial court abused its discretion in this case by failing to order the

Government to produce the information, which the trial court had already concluded

would constitute information required to be produced to the defense under *Brady*,

contained within the detective's notes, and Government's *Ex Parte* Notice to the Court

Regarding Change in Location of Confinement of Above-Named Defendants, dated April

2, 1999. If the defense had had this information it could have used it in its opposition to

the Government's motion to admit Smith's statement pursuant to Federal Rule of

Evidence 804(b)(6), to contradict the testimony of Montgomery and Agent Lisi.

Had this information been turned over to the defense there is a reasonable

probability that the results of the proceedings would have been different.

## 11. THE CUMULATIVE EFFECT OF DEPRIVING SWEENEY OF ACCESS TO *BRADY, GIGLIO,* AND THE JENCKS ACT MATERIAL REQUIRES SWEENEY'S CONVICTIONS BE VACATED

As argued herein, Sweeney was deprived of access to materials to which he was

entitled pursuant to *Brady, Giglio*, and the Jencks Act.

To show that one is entitled to relief for such depravation:

> "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Had Sweeney been able to present to the jury and to investigate the *Brady, Giglio*, and the Jencks Act material that was withheld from him, the Government's theory of the case would have been undermined, and some of its important witnesses impeached. In addition, the defense would have had arguments with which to oppose the Government's motion to admit Robert "Butchie" Smith's statements through Agent Lisi and Montgomery.

Further, the nondisclosure to the defendant of all the suppressed information, to which he was entitled, including the information contained within the sealed court exhibits concerning statements made by the Government's witnesses as set forth herein, could have been used by the defense to demonstrate that the Government's agents were so intent on building a case against the trial defendants that the Government agents communicated this, either consciously or unconsciously, to the people that they were interviewing resulting in statements incriminating the trial defendants. The defense could have argued to the jury that this resulted in those being interviewed changing the facts and the participants in crimes in order to implicate the trial defendants in crimes and thereby please the Government.

## 12. THE CUMULATIVE EFFECT OF DEPRIVING SWEENEY OF ACCESS TO *BRADY* AND THE GOVERNMENT'S *NAPUE* VIOLATION REQUIRES SWEENEY'S CONVICTION BE VACATED

As argued herein Sweeny was deprived of information that should have been turned over to the defense as *Brady* material. The Government, with regard to Watson, was guilty of a *Napue* violation as argued above. Assuming arguendo that each of the violations standing alone is not sufficient to grant Sweeney relief the violations taken together do require that Sweeny's convictions be vacated.

The court should take the following approach in dealing with these violations:

> The materiality analysis proceeds differently for *Brady* and *Napue* claims. Whereas a *Brady* violation is material when "there is a reasonable probability that . . . the result of the proceeding *would* have been different," *Bagley,* 473 U.S. at 682 (emphasis added), a *Napue* violation requires that the conviction be set aside whenever there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes v. Brown,* 399 F.3d 972, 985 (9th Cir. 2005) (internal quotation marks omitted).[12] We have gone so far as to say that "`if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.'" *Id* at 978 (quoting *United States v. Wallach,* 935 f.2d 445, 456 (2nd Cir. 1991)). Nonetheless, *Napue* does not create a "*per se* rule of reversal." *Id.* at 984.
> Although we must analyze *Brady* and *Napue* violations "collectively," the difference in the materiality standards poses an analytical challenge. The *Napue* and *Brady* errors cannot all be collectively analyzed under *Napue*'s "reasonable likelihood" standard, as that would overweight the *Brady* violations. On the other hand, they cannot be considered in two separate groups, as that would fail to capture their combined effect on our confidence in the jury's decision. To resolve this conflict, we first consider the *Napue* violations collectively and ask whether there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes,* 399 F.3d at 985 (emphasis added). If so, habeas relief must be granted. However, if the *Napue* errors are not material standing alone, we consider all of the *Napue* and *Brady* violations collectively and ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 (emphasis added) (internal quotation marks omitted); *United States v. Zuno-Arce,* 25 F.Supp.2d 1087, 1117 (C.D. Cal. 1998) (applying a two-step materiality analysis to combined *Brady* and *Napue* claims), *aff'd,* 339 F.3d 886 (9th Cir. 2003). At both stages, we must ask whether the defendant "received . . . a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555.
> *Jackson v. Brown,* 513 F.3d 1057, 1076 (9th Cir. 2008)

As has been argued herein Sweeney was deprived of substantial *Brady* material all of which was material to his guilt and he was also subject to a *Napu* violation. The inability of the defense to attack Watson's credibility had a direct effect on the

54

verdict in this case. Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### B. SIXTH AMENDMENT INEFFECTIVE ASSISTANCE OF COUNSEL

A defendant has been deprived of his Sixth Amendment right to effective assistance if "counsel's representation fell below an objective standard of reasonableness" and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Under *Strickland*, a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome of the case;" rather, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 693. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Thus, "[w]hen a defendant challenges a conviction; the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695. As detailed below, counsel was constitutionally ineffective at various stages of trial, as well as on appeal, and in various ways when representing Petitioner Sweeney.[16]

### 1. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CHALLENGE ON APPEAL THE TRIAL COURT'S *BRADY, GIGLIO*, AND JENCKS ACT RULINGS WITH REGARD TO SPECIFIC PORTIONS OF THE SEALED RECORD

On May 29, 2003, appellate counsel Steven R. Kiersh, Esq. ("Kiersh"), along with counsel for Petitioner Sweeney's fellow appellants, filed a Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record [Case No. 02-3015, ECF No. 751872]. In their motion, counsel sought access to sealed portions of the trial record in

---

[16] Mr. Sweeney was represented both at trial and on appeal, by Steven R. Kiersh, Esq.

order to mount a challenge to the trial court's rulings under *Brady v. Maryland*, 373 U.S.

83 (1963), and the Jencks Act, 18 U.S.C. § 3500. The United States Court of Appeals for

the District of Columbia Circuit ("D.C. Cir.") denied the motion, instructing counsel that

they must identify the specific rulings believed to be erroneous, and present the issue in

the appellants' brief, rather than by motion. *See* Order dated 8/28/2003 [Case No. 02-

3015, ECF No. 769196].

Here, prejudice from the failure to pursue this claim on direct appeal is presumed

because of the Government and the trial court's interference by placing the material

under seal. *See Strickland*, 466 U.S. at 692 ("In certain Sixth Amendment contexts,

prejudice is presumed... [including] various kinds of state interference with counsel's

assistance"); *United States v. Cronic*, 466 U.S. 648, 659 and n.25 (1984). Counsel was

unable to adequately challenge the suppression of the sealed material on appeal because

counsel needed access to the sealed portion of the trial record in order to establish the

materiality of the undisclosed evidence – an essential element of the prospective claim on

appeal. *See Brady*, 373 U.S. at 87.

Even if a showing of prejudice were required in this case, Petitioner Sweeney's

claim still prevails, as the prejudice here is clear. Had appellate counsel raised this

critical issue on appeal, the Court of Appeals would have reviewed the material *in*

*camera* and found that *Brady* and Jencks Act violations had indeed occurred, and were

widespread. *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196]

("appellants must identify [in their appellate brief] the specific rulings that they believe

are erroneous, and if they present a colorable claim, this court may review the sealed

material *in camera* to determine whether a *Brady* or Jencks Act violation has in fact

occurred."); 18 U.S.C. § 3500(c); *United States v. Williams-Davis*, 90 F.3d 490, 514

(D.C. Cir. 1996); *United States v. Brooks*, 966 F.2d 1500, 1505 (D.C. Cir. 1992). As

detailed *supra* in Ground One, Petitioners had more than a colorable claim with regard to

the erroneous rulings. Had the Court of Appeals reviewed the material, and discovered

the pattern of *Brady* and Jencks violations that pervaded the record at trial, the error was

more likely than not to result in reversal on appeal. Appellate counsel's failure to

challenge this critical issue on appeal was deficient, and that deficiency prejudiced

Petitioner Sweeney; therefore, his appellate assistance was unconstitutionally ineffective.

*See Strickland*, 466 U.S. at 687.[17]

There is a reasonable probability that, but for counsel's unprofessional errors, the

results of the proceedings would have been different.

### 2. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK REVIEW BY THE TRIAL COURT OF THEODORE WATSON'S GREENBELT FILE.

Assuming arguendo that the Government did not improperly suppress Watson's

Greenbelt file, Sweeney's trial counsel was constitutionally deficient in failing to ask the

court to review said file.

During the cross examination of Watson, Kiersh attempted to impeach Watson by

attempting to discover the reasons why the Government failed to a give Watson a §5K1.1

letter. Watson explained the failure of the government to provide him with a §5K1.1

---

[17] Further, counsel was ineffective for not challenging on appeal the trial court's improper *in camera* procedure used with respect to the sealed material. Although the trial court viewed the evidence *in camera*, the court failed to keep a transcribed record of the *in camera* proceedings, and failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material. No findings were made regarding the requested material, and no record was released to the defense indexing the material presented to the court. Accordingly, the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998). The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair.

letter by stating that Ms. Wilkerson, the Assistant U.S. Attorney assigned to his case, simply did not like him. (Tr. 2-12-01 (AM), pp. 19-21).

Pressed further on this point Watson explained that Ms. Wilkerson's disliked him because he had pointed out, in front of another U.S. Attorney, that Wilkerson had failed to advise another Assistant U.S. Attorney about information that Watson had, which failure by Wilkerson had caused that other U.S. Attorney to offer lenient plea deals to the defendants in that case. (Tr. 2-12-01 (AM), p. 44).

Kiersh, and for that matter the defense as a whole, lacking any information with which to contradict Watson, during cross-examination was forced to accept Watson's answers to his questions on cross-examination.

A co-defendant's attorney apparently dissatisfied with the cross-examination of Watson, at the conclusion of the testimony on February 12, 2001, asked that the Government review Watson's Greenbelt file to determine if there was any discoverable material contained within said file concerning Watson, as set forth below.

> **MR. DAVIS**: AND I WOULD ASK THAT THE UNITED STATES ATTORNEY'S OFFICE REVIEW THAT FILE.
>
> **THE COURT**: IF THEY HAVE NOT DONE THAT, AND I WOULD ASK THAT THEY CALL THE PROSECUTOR'S OFFICE IN GREENBELT TO FIND OUT WHETHER OR NOT THERE IS ANYTHING THAT COULD BE CHARACTERIZED AS, QUOTE, *BRADY* MATERIAL IN THEIR FILE. OTHER THAN THAT --
>
> **MR. DAVIS**: THANK YOU, YOUR HONOR.
>
> **THE COURT**: -- THAT'S THE EXTENT OF THE GOVERNMENT'S OBLIGATION. OKAY?

(Tr. 2-12-01 (AM), p. 78).

In response to the court's direction, the Government not only called the U.S. Attorney's office in Greenbelt, the Government obtained and reviewed Watson's Greenbelt file.

The Government brought Watson's Greenbelt file to court and represented to both the court and the defense, that Watson's Greenbelt file did not contain anything that even " . . . suggests any *Brady* or Jencks material in the file." Following the Government's representations the following took place:

> **THE COURT**:  YOU MEAN THE FILE FROM GREENBELT?
>
> * * *
>
> **THE COURT**:  DO YOU WANT TO HAVE IT MADE PART OF THE COURT RECORD?
>
> **MR. KIERSH**:  YES, YOUR HONOR.
>
> **THE COURT**:  ALL RIGHT.
>
> **MR. KIERSH**:  I ASK THAT IT BE PLACED UNDER SEAL AND MADE A PART OF THE RECORD.
>
> **THE COURT**:  WE WILL PLACE IT UNDER SEAL AND MARK IT AS COURT EXHIBIT, I BELIEVE, NUMBER 3.  IS THAT CORRECT, MR. WEST?
>
> **THE DEPUTY CLERK**:  I BELIEVE SO, YOUR HONOR.
>
> **MR. ZUCKER**:  YOUR HONOR, I CONCUR IN THAT, BUT I'D ALSO ASK THAT THE COURT --
>
> **THE COURT**:  WAIT A MINUTE.
>
> **THE DEPUTY CLERK**:  NUMBER 5, YOUR HONOR.
>
> **THE COURT**: NUMBER 5.  ALL RIGHT.  NUMBER 5.  **I DO NOT INTEND TO REVIEW IT IN CAMERA.**

**MR. ZUCKER**: THAT WOULD BE MY REQUEST.

**THE COURT**: ALL RIGHT. ARE WE READY FOR THE JURY?

(Tr. 2-13-01(AM), pp. 6-7).

Kiersh, instead of asking the trial court to review the Greenbelt file to determine if it contained any *Brady, Giglio* or *Jencks* material just asked that the file be made part of the record and placed under seal. One wonders what was the point of having Watson's file made part of the record in the case if no one, other than the Government, was going to review the file.

The Government's production of Watson's Greenbelt file is, in and of its self, curious as the court simply asked the Government to call the U.S. Attorney's office in Greenbelt to determine if the filed contained anything that might be characterized as *Brady.* The court further stated that this was the extant of the Government's obligation.

The only reason for the Government to have produced Watson's Greenbelt file would be if the Government were unsure if the file contained *Brady* material.

Another case discussing the obligations of the Government to produce material to the defense stated:

> Although the notes are not subject to disclosure under the Jencks Act, fundamentals of due process require the government to produce them if the evidence they contain is exculpatory or would be of value in impeaching government witnesses. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963). Uncertain whether the notes were exculpatory or of impeachment value, the government properly submitted them to the district court for *in camera* inspection. *Pennsylvania v. Ritchie,* 480 U.S. 39, 58-62, 107 S.Ct. 989, 1002-03, 94 L.Ed.2d 40 (1987). *United States v. Mora,* 994 F.2d 1129, 1139 (5th Cir. 1993).

Therefore the only reason for the Government would have produced Watson's Greenbelt file, to the court, was if the Government was uncertain whether or not it contained *Brady* or *Giglio*. But there was no way the Government could have been uncertain as the information was without doubt *Brady* and *Giglio*.

As argued herein, Watson's Greenbelt file contained *Brady* and *Giglio* material.

Sweeney suffered prejudice as a direct result of his trial counsel failing to request that the trial court review Watson's Greenbelt file.

The material contained within Watson's Greenbelt file would have directly contradicted Watson's claims that the reason he was not given a §5K1.1 letter was the result of personal animus on the part of the Assistant U.S. Attorney and would have shown instead that it was the result of Watson lying to the Government.

Defense counsel's failure to seek review by the trial court of the Greenbelt file, which review would have resulted in the *Brady* and *Giglio* material contained therein being disclosed to the defense, permitted Watson to maintain his version of events during cross examination. As a result of defense counsel not having the material in the Greenbelt file, the jury instead of seeing Watson impeached as a liar, willing to say anything to help himself, the jury saw Watson maintain his version of events, and his credibility, in the face of cross-examination by several lawyers unable to contradict his claims.

Moreover, defense counsel, by failing to request that the trial court review Watson's Greenbelt file foreclosed the possibility of having the file reviewed on appeal, as defense counsel agreed with the trial court that Watson's Greenbelt file did not need to be reviewed by the court.

Tacit recognition of the inability to obtain appellate review of the Greenbelt file is in the omission of any reference to Watson, much less Watson's Greenbelt file, in the Appellate brief filed in this case.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 3. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CHALLENGE ON APPEAL THE TRIAL COURT'S *BRADY, GIGLIO*, AND JENCKS ACT RULINGS WITH REGARD TO SPECIFIC PORTIONS OF THE SEALED RECORD

On May 29, 2003, appellate counsel Steven R. Kiersh, Esq. ("Kiersh"), along with counsel for Petitioner Sweeney's fellow appellants, filed a Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record [Case No. 02-3015, ECF No. 751872]. In their motion, counsel sought access to sealed portions of the trial record in order to mount a challenge to the trial court's rulings under *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500. The United States Court of Appeals for the District of Columbia Circuit ("D.C. Cir.") denied the motion, instructing counsel that they must identify the specific rulings believed to be erroneous, and present the issue in the appellants' brief, rather than by motion. *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196].

Here, prejudice from the failure to pursue this claim on direct appeal is presumed because of the Government and the trial court's interference by placing the material under seal. *See Strickland,* 466 U.S. at 692 ("In certain Sixth Amendment contexts, prejudice is presumed… [including] various kinds of state interference with counsel's assistance"); *United States v. Cronic*, 466 U.S. 648, 659 and n.25 (1984). Counsel was unable to adequately challenge the suppression of the sealed material on appeal because

counsel needed access to the sealed portion of the trial record in order to establish the

materiality of the undisclosed evidence – an essential element of the prospective claim on

appeal. *See Brady*, 373 U.S. at 87.

Even if a showing of prejudice were required in this case, Petitioner Sweeney's

claim still prevails, as the prejudice here is clear. Had appellate counsel raised this

critical issue on appeal, the Court of Appeals would have reviewed the material *in

camera* and found that *Brady* and Jencks Act violations had occurred, and were

widespread. *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196]

("appellants must identify [in their appellate brief] the specific rulings that they believe

are erroneous, and if they present a colorable claim, this court may review the sealed

material *in camera* to determine whether a *Brady* or Jencks Act violation has in fact

occurred."); 18 U.S.C. § 3500(c); *United States v.  v. Williams-Davis,* 90 F.3d 490, 514

(D.C. Cir. 1996); *United States v. Brooks,* 966 F.2d 1500, 1505 (D.C. Cir. 1992). As

detailed *supra* in Ground One, Petitioners had more than a colorable claim with regard to

the erroneous rulings. Had the Court of Appeals reviewed the material, and discovered

the pattern of *Brady* and Jencks violations that pervaded the record at trial, the error

would have resulted in reversal on appeal. Appellate counsel's failure to challenge this

critical issue on appeal was deficient, and that deficiency prejudiced Petitioner Sweeney;

therefore, his appellate assistance was unconstitutionally ineffective. *See Strickland*, 466

U.S. at 687.[18]

---

[18] Further, counsel was ineffective for not challenging on appeal the trial court's improper *in
camera* procedure used with respect to the sealed material. Although the trial court viewed the
evidence *in camera*, the court failed to keep a transcribed record of the in camera proceedings,
and failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and
subsequently sealing the material. No findings were made regarding the requested material, and
no record was released to the defense indexing the material presented to the court. Accordingly,

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 4. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO JAMES MONTGOMERY

In § 10, of pages 13-15, of appellate counsel's Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record, which was denied by the D.C. Circuit, counsel argued that the trial court's ruling was erroneous with regard to the material the court sealed relating to Montgomery. The motion argued that the trial court's ruling that the material it sealed was not *Brady, Giglio,* or Jencks material was erroneous. Appellate counsel further argued that F.B.I. Special Agent Lisi's notes contained *Brady* or Jencks material.

Now that Petitioner Sweeney has access to the material that the trial court sealed with regard to James Montgomery, he is able to use that material to demonstrate the prejudice that he suffered as a result of his appellate counsel failing to seek appellate review of the trial court's holding in his appellate brief as instructed by the D.C. Circuit in its order denying the motion to unseal.

The material sealed by the trial court contains impeachment evidence related to the murder of Timothy Benton. Agent Lisi's handwritten notes reveal that Montgomery described the murder of Benton, and identified Carson and Proctor as the perpetrators. The notes state as follows:

> 1994 Chin [Carson] borrowed Grey Cadillac
> Said he & Poo-Poo [Proctor] killed Tim [Benton] in it.

---

the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998). The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair.

Tim owed Poo-Poo $
Chin was driving
Poo-Poo shot Tim from
Behind, he just sat there like he was DAZED

Ex. 9 (Agent Lisi's Notes of James Montgomery Interview).

Critically, it was Maurice Proctor and James Montgomery who were charged with
the murder of Timothy Benton. What Montgomery did in his interview was substitute
Carson for himself. The probative value of Montgomery's statement was priceless for its
impeachment value. Defense counsel could have utilized that materially false and
misleading narrative, contained within the Agent's notes, to further support the argument
that Montgomery was not only a liar, but an incorrigible liar. *See* Tr. 3/15/01 (AM), pp.
10-13.

There is a reasonable probability that, but for counsel's unprofessional errors, the
results of the proceedings would have been different.

### 5. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF TRIAL COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO ARTHUR RICE

Appellate counsel's failure to seek appellate review of the trial court's ruling with
regard to the sealed material relating to Arthur Rice constituted ineffective assistance.
At trial, the Court had reviewed the FBI 302 pertaining to Arthur Rice dated January
27, 1999, and stated that it contained no information that would permit it to be
characterize as *Brady* material, and that it was clearly not Jencks material. (Tr. 4/24/01
(PM), p. 3). The trial court failed to state a reason why the 302 did not constitute a
Jencks statement and information that should be disclosed to defense counsel.

65

If appellate counsel had raised the foregoing, and a proper review of Rice's 302 had been done by the Court of Appeals, the following would have been discovered, and counsel would have prevailed pursuant to the trial court's abuse of discretion. The cumulative effect of all the errors is such that there is a reasonable probability that, had the evidence not been sealed and instead released to the defense, the results of the proceedings would have been different.

Arthur Rice was a jailhouse witness who was allegedly an associate of the defendants. Even though Rice did not testify as to who committed the murder of Leonard "Slick" Hyson, and Maurice Hallman, the previously sealed FBI 302 reveals that Rice told Agents Vincent Lisi and Kevin White, in the presence of AUSA Kenneth Wainstein, that defendants Martin and Carson killed Hyson and Hallman. *See* Ex. 5 (Arthur Rice 302 at p. 5).

The foregoing contradicts the government's theory of prosecution that Carson and James Montgomery were the individuals who killed Hallman and Hyson. Montgomery also testified, corroborating the government's theory of prosecution, placing himself as one of the killers of Hallman and Hyson. (Tr. 3/12/01 (AM), pp. 55-62).

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 6. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO ANDRE MURRAY

As with all of the other materials place under seal by the trial court in this case Petitioner Sweeney's appellate counsel failed to include a request to have the appellate court review the rulings of the trial court which sealed the material.

During trial, Montgomery testified that he and Carson killed Hallman and Hyson, and prior to that, Hallman had a shoot-out with some New Yorkers. The previously sealed detective notes of interviews with Arthur Murray reveal that Murray stated that some New Yorkers killed Hallman and Hyson. This contradicts Montgomery's testimony regarding who killed Hallman and Hyson, while at the same time; Montgomery's testimony corroborates Murray's statement because Montgomery was fully aware that Hallman had a shoot-out with some New Yorkers. *See* Ex. 10 (Detective Notes of Arthur Murray Interview Regarding Hallman and Hyson Murder). Once again, all this contradiction might have left doubt in the jury's minds, towards the credibility of Montgomery, who was the government's key witness.

### 7. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CALL EXPERT WITNESS AT TRIAL

At the outset of this case, Petitioner Sweeney and his immediate family advised trial counsel that Petitioner Sweeney had been diagnosed with Tourette Syndrome ("TS"). Tourette syndrome is a neurological disorder characterized by repetitive, stereotyped, involuntary movements and vocalizations called tics. Tics often become more severe with excitement or anxiety and lessen during calm, focused activity. *See* Tourette Syndrome Fact Sheet, National Institute of Neurological Disorders and Stroke at the National Institute of Health, http://www.ninds.nih.gov/disorders/tourette/detail_tourette.htm (last visited November 28, 14).

In preparation for trial, trial counsel retained expert witness Jonathan Pincus, M.D., a distinguished professor in the field of neurology. Dr. Pincus has been qualified

67

as an expert and testified on numerous occasions, in state and federal courts. Dr. Pincus reviewed all of Petitioner Sweeney's available medical records, and on December 10, 1999, conducted a clinical evaluation of Petitioner Sweeney, during which he determined that Petitioner Sweeney suffers from Tourette Syndrome. At trial, Dr. Pincus would have explained the nature and symptoms of Tourette Syndrome to the jury, and described the individual characteristics in Petitioner Sweeney's case. Further, Dr. Pincus would have told the jury that Petitioner Sweeney's tic symptoms during trial would typically be less pronounced than those displayed by him five to ten years prior. Most importantly, Dr. Pincus would have testified that in his opinion, a high-stress event (such as a violent incident) would typically trigger the display of more pronounced tic symptoms in Petitioner Sweeney. *See* Ex. 11 (Dr. Pincus Affidavit).

This testimony was critical to Petitioner Sweeney's defense, as it would have served as exculpatory evidence with regard to the triple murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson, in Temple Hills, Maryland.[19] Dr. Pincus' testimony would have corroborated the testimony of several other witnesses who testified that Sweeney could be easily identified by his disorder. James Montgomery, who was with Petitioner Sweeney on the night of the murder, testified that Sweeney's T.S. was highly active and noticeable that night. (Tr. 3/14/01 (AM) at p. 45; 3/14/01 (PM) at pp. 74-77; 3/15/01 (PM) at p. 81). Dorene Key also testified of that she was aware for years that Petitioner Sweeney has T.S., and that his symptoms are noticeable. (Tr. 4/23/01 (PM) at p. 50). Dwight Deloach, the arresting officer in the triple murder, also testified

---

[19] As described *supra*, it was clear from the record that the Government's case against Petitioner Sweeney was weak: the credibility of nearly all of their witnesses was impeached by their admissions of prior commissions of perjury, or providing false statements to law enforcement. Further, their testimony often conflicted with that given by other witnesses, as well as with other evidence.

that Petitioner Sweeney's T.S. symptoms were noticeable. (Tr. 4/24/01 (AM) at pp. 23-4). Anthony Pryor, the alleged victim of a kidnapping and attempted murder, testified that he was fully aware of Petitioner Sweeney's T.S., and that if Sweeney had been when of the perpetrators, Pryor would have recognized him by his T.S. symptoms. (Tr. 6/11/01 (AM) at p. 25). Finally, Shaheem Johnson testified that even though he did not know Petitioner Sweeney personally, Sweeney was easily recognizable because of his disorder. (Tr. 6/12/01 (PM) at pp. 68-9).

Critically, the witness to the triple murder, Cinama Hawkins, testified that neither of the assailants displayed any of the physical or verbal tics that are typical of Tourette Syndrome.[20] (Tr. 4/2/01 (AM) at p. 75; 4/2/01 (PM) at p. 7). There is a reasonable probability, given Ms. Hawkins' description of the triple murder assailants, that Dr. Pincus' testimony would have provided the jury with reasonable doubt that Petitioner Sweeney committed the triple murder. Accordingly, trial counsel's failure to call Dr. Pincus at trial rendered his assistance constitutionally ineffective under *Strickland*. *See Strickland*, 466 U.S. at 695.

### 8. SWEENEY'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RETAIN CO-COUNSEL PURSUANT TO THE TRIAL COURT'S ORDER

Petitioner Sweeney, along with co-defendant Carson, were both indicated for capital crimes in this case. They were, therefore, pursuant to 18 U.S.C. § 3005, each appointed two attorneys to represent them in this case.

18 U.S.C. § 3005 states in part:

---

[20] The exculpatory nature of Dr. Pincus' testimony would have been bolstered by the testimony that in Ms. Hawkins' original description of the assailants, which she gave to the investigating officer at the scene, she described both men as about six feet tall. (Trial Tr. 6/12/01 at pp. 60-61, 65, 70-72). Mr. Sweeney is not nearly that tall.

> Whoever is indicted for treason or other capital crime shall be
> allowed to make his full defense by counsel; and the court before
> which the defendant is to be tried, or a judge thereof, shall promptly,
> upon the defendant's request assign 2 such counsel, of whom at least
> 1 shall be learned in the law applicable to capital cases....

18 U.S.C. § 3005 (2000).

Not only was Sweeney entitled to have two attorneys represent him as a result of

the indictment in this case, but also the trial court was obligated to inform him of this

right.

> Cunningham contends that, in any event, the trial court should have
> advised him of his right under 18 U.S.C. § 3005 to have a second
> counsel appointed. An accused's right to additional counsel in a
> capital case should not, of course, be lost solely because of lack of
> awareness of its existence. Therefore, the trial court here should
> have advised Cunningham of his rights under § 3005.  We presume
> prejudice from the failure of the trial court so to inform him.

*Smith v. United States,* 353 F2d 838, 846-47, 122 U.S. App. D.C. 300, *cert. denied* 86
S.Ct 1350, 384 U.S. 910, 16 L.Ed 2d 362 *cert. denied* 86 S.Ct 1867, 384 U.S. 974, 16
L.Ed 2d 684 (1965).

Sweeney was, however, never advised of his right to have two attorneys represent

him in this case by the trial court.  At Petitioner Sweeney's arraignment on October 2,

1998, the Court responded to a request, by Sweeney's then-attorney Mr. O'Toole, to have

the court appoint a particular attorney to represent Sweeney along with Mr. O'Toole.

The Court stated, "I have asked Mr. Kramer to make an appointment of the second

counsel to assist you, and Mr. Kramer will make that decision." (Tr. 10/2/1998, pp. 11-

12).

Thereafter at the conclusion of the October 2, 1998, arraignment the trial court

stated ". . .  I note the presence of Mr. Kramer here in court and the obligation he has just

incurred to make at least two appointments." (Tr. 10/2/1998, p. 20).

Even though the trial court appointed two attorneys to represent Sweeney, the court at no point ever advised or otherwise informed Sweeny of his right to be represented by two attorneys, pursuant to 18 U.S.C. § 3005.

Eventually Steven Kiersh and Paul DeWolfe were appointed to represent Sweeney in this case before the Attorney General had decided whether or not to seek the death penalty against Sweeney.

By December 1999, the Attorney General had chosen not to seek the death penalty against Sweeney and Carson. During a hearing on December 16, 1999, the issue of the continued representation of Sweeney and Carson by two attorneys each was addressed by the trial court.

At this hearing the trial court stated "Well, one of the consequences of the decision made by the Attorney General not to seek the death penalty is that this case is no longer a capital case, and the law no longer authorizes two counsels for any defendant. * * *" (Tr. 12/19/99, pp. 12-13).

It was error for the trial court to find that the decision of the Attorney General not to seek the death penalty in this case, ended Sweeny's entitlement to two attorneys. As the clear language of 18 U.S.C. § 3005 states, the entitlement to two attorneys is determined at the time of indictment and not by any subsequent decision of the Attorney General whether or not to seek the death penalty in the case.

> In this case, the current language of § 3005 is clear — the requirement of two attorneys is triggered upon indictment. The statute begins with the phrase "Whoever is *indicted* for ... *capital crime* ..." (emphasis added). 18 U.S.C. § 3005 (2000). This language provides the statutory trigger for the section, and the text is clear that the statute becomes applicable upon *indictment* for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty. As discussed above, § 844(i) qualifies as a

>capital crime because the death penalty is the maximum sentence
>that could be imposed on Boone.

*United States v. Boone,* 245 F.3d 352 (4th Cir 2001)

Mr. Kiersh, instead of arguing that the action of the Attorney General in not

seeking the death penalty was irrelevant to Sweeney's right to be represented by two

attorneys, simply remained silent on this issue at the hearing.

Moreover, the trial court's misstatement of the law that Sweeney was no longer

entitled to two attorneys deprived him of his rights pursuant to 18 U.S.C. § 3005, and,

therefore, prejudice should be presumed from the trial court's error. *See Smith v. United*

*States,* 353 F2d 838, 122 U.S. App. D.C. 300, *cert. denied* 86 S.Ct 1350, 384 U.S. 910,

16 L.Ed 2d 362 *cert. denied* 86 S.Ct 1867, 384 U.S. 974, 16 L.Ed 2d 684 (1965).

One of the attorneys for Carson did, however, address the issue of the continued

representation of Carson by two attorneys, but instead of arguing that this right attached

upon indictment for a capital crime, pursuant to 18 U.S.C. § 3005, argued that:

>Your Honor, in this case we are talking about a ten-year conspiracy
>with anywhere from five to eight homicides and numerous other
>complicated violent charges against individual defendants.
>
>This is as complex a case as I think we can run into. It may not be
>Microsoft, but as a criminal case goes, it doesn't get too much more
>complicated that this in the United States District Court here. And I
>think that this court can look at this case and decide that it merits
>two attorneys for some of the defendants, particularly the ones who
>they were considering capital defendants, because of the number and
>the nature and the time period of the charges against them. And I
>would ask the court to do so . . .."

(Tr. 12/19/99, p. 13-14).

72

The trial court did not rule on the issue of continued representation by two attorneys for Carson and Sweeney at that time but asked that additional information be submitted addressing this issue.

Thereafter by way of a letter, filed with the trial court on January 3, 2000, written by Carson's counsel and signed by said attorney on behalf of Sweeney's counsel, set out the justification for the continued need for two attorneys to represent both Sweeney and Carson. The main ground advanced in the January 3, 2000, letter was the "extremely difficult" nature of the case as it pertained to Carson and Sweeney. This is simply arguing the rationale that supports the need for 18 U.S.C. §3005. As "[t]he provision was meant to insure that a sufficient number of attorneys would be appointed so the defense would not suffer from insufficient manpower. *See Crum v. Hunter,* 151 F.2d 359 (10th Cir. 1945) *cert. denied*, 325 U.S. 850, 66 S.Ct 1117, 90 L.Ed. 1623 (1946); *see also Smith,* 353 F.2d at 846-47.

Another justification contained within the letter for the continued representation of Sweeney and Carson by two attorneys each, was that:

> Dismissal of the capital attorneys is not likely to result in significant cost savings. Because there are so many serious charges over such a long period of time, to this point each defendant's counsel have divided the tasks of investigation, legal research, and legal writing between them. If only one attorney per defendant is permitted to remain in the case, he will have to spend a considerable amount of time familiarizing himself with the facts and issues previously assigned to his co-counsel.

Ex. 12 (December 28, 1999, Letter, at p. 2).

The trial court, after considering the matter agreed and by way of an order, dated January 4, 2000, determined that Sweeny's and Carson's cases were " . . . 'extremely

73

difficult cases where . . . in the interest of justice' appointment of co-counsel is

appropriate." (Order (TPJ), dated January 4, 2000 [#252]).

Sometime thereafter, Paul DeWolfe, one of Sweeney's attorneys, was appointed

as the Public Defender for Maryland, and withdrew as co-counsel for Sweeney.

On September 8, 2000, (a little over two months before jury selection was to

begin) the trial court and Sweeney's remaining attorney all believed, that the interests of

justice required that Sweeney be represented by two attorneys, otherwise why would the

trial court have appointed attorney Leonard L. Long, Jr., to replace Mr. DeWolfe, as one

of Sweeney's attorneys.

The Government, on October 24, 2000, filed, under seal, a motion to disqualify

attorney Long, as one of Sweeney's attorneys. At a hearing on November 13, 2000, (jury

selection began in this case on November 15, 2000) the trial court granted the

government's motion and removed attorney Long as co-counsel for Sweeney. (Tr.

11/13/00, p. 13).

After the trial court disqualified Long, at the November 13, 2000, hearing,

Sweeney's remaining attorney Mr. Kiersh argued that:

> **Mr. Kiersh**: You Honor, if I can make some other related
> representations, not with respect to Mr. Long, but **this creates a
> very significant prejudice to me and my ability to go forward**. I
> am not moving for a continuance right now, but I am just thinking
> this through.
> When we were in court at the motions hearing back in
> September, the Government requested that an agent be allowed to sit
> at their table. I asked the court if my investigator, who has been
> with me on this case working around the clock for the past two years
> on this case – if he could be seated with me at   the table. And the
> court said, "Well, that is a problem because if I allow you to do it,
> then everyone else is going to ask to have their investigators."
> I have gone to each defense attorney individually and said,
> "Would you waive any request to have your investigators to be

present?" And they all have. They all said they don't want their investigators to be present. I am the only one making that request. And if Mr. Long is now being removed from the case, I am terribly handcuffed on what I can do.

**The Court**: Why?

**Mr. Kiersh**: Because so much of this case is directed at Mr. Sweeney. We have cabinets and cabinets filled with information. That's why Mr. Long came into it. Having my investigator there, who knows this case inside out, would be not only of assistance, but necessary, given the amount of evidence the Government is going to be directed towards Mr. Sweeney and what I have to do to be able to sit there and confront it. I am having a very able co-counsel being removed from the case, and replacing him with my investigator doesn't seem to me to prejudice anyone.

**The Court**: Well, there may be an occasion at which it would be appropriate for you to have your investigator there. I don't think your investigator has to be there for the duration of the case and certainly not at this stage of the case.

\* \* \*

**Mr. Kiersh**: Very well. And then I would also note for the record on behalf of Mr. Sweeney our objection to Mr. Long being disqualified from the case.

(Tr. 11/13/2000, pp. 13-15) (emphasis added).

Following the removal of Mr. Long as co-counsel for Sweeney and with jury selection set to begin in two days, Mr. Kiersh did not seek a continuance of the trial of this case. This is particularly surprising in that Kiersh had told the trial court that the removal of attorney Long created "**a very significant prejudice to me and my ability to go forward.**" (Tr. 11/13/2000, pp. 13-15) (emphasis added). One would have thought he would have been more concerned about the prejudice to Mr. Sweeney, but maybe that is what he meant.

Mr. Kiersh had for approximately eleven months before the removal of Mr. Long worked with another lawyer on Sweeney's case. Yet two days before jury selection begins Kiersh is now representing Sweeney alone, and instead of asking the court to appoint another attorney to assist him, in a case that the trial court had already determined

75

that as a result of the extreme difficulty of the case the interests of justice required that

Sweeney be represented by two attorneys.

Moreover, during the hearing on the removal of Mr. Long, Mr. Kiersh failed to

argue that Sweeny was entitled to two attorneys pursuant to 18 U.S.C. § 3005, as

Sweeney had been indicted for a capital offense.

In addition, the trial court did not advise Sweeney, at the time that it removed Mr.

Long, of Sweeney's right under 18 U.S.C. § 3005 to be represented by two attorneys. *See*

*Smith,* 353 F.2d at 846-47.

That Sweeney's trial counsel was overwhelmed by this case which resulted in

Sweeney being convicted at trial. Sweeney's' trial counsel admitted he was prejudiced

by the removal of co-counsel and nothing was done to address that prejudice.

There is a reasonable probability that, but for counsel's unprofessional errors, the

results of the proceedings would have been different.

### 9. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL FOR THE FAILURE TO REQUEST A CONTINUANCE TO OBTAIN CO-COUNSEL

While Sweeney's remaining trial counsel recognized the "**very significant**

**prejudice"** that was caused by the trial court's removal of his co-counsel, he took no

steps to remedy the prejudice that the removal of Mr. Long created. Instead of asking for

a continuance and for appointment of co-counsel to assist him in an extremely difficult

case which the interests of justice required that Sweeney be represented by two attorneys,

he asked simply that his investigator be allowed to sit with him at counsel table and when

that request was deferred by the trial court, Kiersh merely went forward with the case in

spite of the prejudice that his client would suffer as a result of Mr. Kiersh having to learn

and manage the "cabinets and cabinets filled with information," which was one of the reasons why the court had seen fit to appoint two attorneys to represent Sweeney in the case.

Mr. Sweeney suffered prejudice in this case by Mr. Kiersh's failure to seek a continuance to obtain co-counsel in this case. The trial court had already made a finding the case was too difficult for one attorney and that the interests of justice required that Sweeney be represented by two attorneys in this case. Kiersh himself recognized that Sweeney was prejudiced by the removal of Mr. Long, yet he failed to request a continuance or that the court conforms with its order of January 4, 2000, and appoint another attorney to replace Mr. Long.

Moreover Kiersh, by failing to request that Sweeney continued to be represented by two attorneys, as is his right under 18 U.S.C. § 3005, deprived Sweeney of this right, all of which resulted in prejudice to Sweeney.

In addition, Kiersh failed to argue at any point in the case that Sweeney's right to be represented by two attorneys attached at the time of his indictment for a capital offense and that the subsequent decision of the Attorney General not to seek the death penalty was irrelevant to his right to be represent by two attorneys.

That Sweeney's trial counsel was overwhelmed by this case which resulted in Sweeney being convicted at trial. Sweeney's' trial counsel admitted he was prejudiced by the removal of co-counsel and nothing was done to deal with that prejudice.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 10. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS COUNSEL FAILED TO ARGUE THAT HE WAS ENTITLED TO TWO ATTORNEYS PURSUANT TO 18 U.S.C. §3005

Petitioner Sweeney's attorneys should have argued at both the December 16,

1999, and at the November 13, 2000, hearings that the clear language of 18 U.S.C. §3005

states that the entitlement to two attorneys is determined at the time of the indictment and

not by any subsequent decision of the Attorney General whether or not to seek the death

penalty in a case.

> In this case, the current language of § 3005 is clear — the requirement of two attorneys is triggered upon indictment. The statute begins with the phrase "Whoever is *indicted* for ... *capital crime...*" (emphasis added). 18 U.S.C. § 3005 (2000). This language provides the statutory trigger for the section, and the text is clear that the statute becomes applicable upon *indictment* for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty. As discussed above, § 844(i) qualifies as a capital crime because the death penalty is the maximum sentence that could be imposed on Boone.

*United States v. Boone,* 245 F.3d 352 (4th Cir 2001).

Mr. Kiersh failed to argue at any point in this case that the action of the Attorney

General in not seeking the death penalty was irrelevant to Sweeney's right to be

represented by two attorneys.

This failure resulted in Kiersh not properly advising Sweeney that he had a right

to be represented by two attorneys in this case and not bringing to the trial court's

attention the authority that supports the right of Sweeney to be represented by two

attorneys throughout this case.

As a result of Kiersh's failure in this regard, Sweeney was forced to go to trial, in

an extremely difficult case in which the interests of justice required that he be represented

by two attorneys, with only one attorney.  Moreover the attorney that Sweeny was forced

78

to go to trial with had stated, two days before jury selection began, that he had suffered "a very significant prejudice" by the removal of co-counsel.

In sum, Petitioner Sweeney has shown that trial counsel's error clearly deprive him of a statutory right to representation by co-counsel, but he has also shown that throughout trial and on appeal, counsel's errors were so serious as to deprive Sweeney of a fair trial. Counsel's conduct, especially as it was hampered by the removal of co-counsel on the eve of trial, so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Accordingly, relief must be granted.

## 11. COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT AT TRIAL AND FOR NOT CHALLENGING ON APPEAL THE TRIAL COURT'S IMPROPER *IN CAMERA* PROCEDURE USED WITH RESPECT TO THE SEALED MATERIAL

Counsel for Petitioner Sweeney was ineffective for not objecting at trial and for not challenging on appeal the improper *in camera* procedure used by the trial court with respect to the material that it reviewed under seal. Throughout the trial, the Court reviewed material submitted to it by the Government *ex parte* and under seal. The D.C. Circuit has recognized that "*in camera*, *ex parte* submissions 'generally deprive one party to a proceeding of a full opportunity to be heard on an issue,' and thus should only be used where a compelling interest exists." In re *Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998) (*citing* In re *John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994); In re *John Doe Corp.*, 675 F.2d 482, 490 (2d Cir.1982)). Further, in *In re Sealed Case*, the D.C. Circuit instructed that once the compelling interest in keeping the material secret has been demonstrated, the proper procedure for conducting *in camera*, *ex parte* proceedings includes keeping a transcribed record of what transpired in any *in camera* proceeding, in

79

order to preserve the excluded party's ability to contest decisions made on the basis of the

sealed material.

At trial in this case, although the trial court viewed the sealed *ex parte Brady*

evidence submitted by the Government *in camera*, the trial court failed to articulate a

compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing

the material, and further, failed to keep a transcribed record of the *in camera* proceedings.

No findings were made regarding the requested material, and no record was released to

the defense indexing the material presented to the court. Accordingly, the trial court

failed to follow the proper procedure in regard to *in camera* review of *Brady* material.

*See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998). The court's improper procedure

with regard to the sealed material compounded the error in suppressing *Brady* evidence,

and rendered the trial fundamentally unfair. Accordingly, counsel should have raised this

issue on appeal.

There is a reasonable probability that, but for counsel's unprofessional errors, the

results of the proceedings would have been different.

### 12. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE CUMULATIVE ERROR DOCTRINE

Assuming arguendo that no single error on the part of Sweeney's counsel denied

him effective assistance of counsel, counsel's errors, when taken as a whole, denied

Sweeney effective assistance of counsel.

From a review of the law of this circuit it does not appear that this court has

decided if the prejudice prong of the *Strickland* test for ineffective assistance of counsel

can be met as a result of the cumulative errors of counsel.

The 7th Circuit has approved of this doctrine stating:

80

> In order to obtain relief under *Strickland*, it is not sufficient that a petitioner can point to her attorney's deficient performance. In addition, she must be able to demonstrate that the complained of deficiency resulted in prejudice, or, as discussed above, a "reasonable probability" that in the absence of error the result of the proceedings would have been different, *Strickland*, 466 U.S. at 694, 104 S.Ct at 2068, and was fundamentally unfair or unreliable. *Lockhart*, ___ U.S. at ___, 113 S.Ct. at 842-43. In making this showing, a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet *Strickland*'s test. *United States ex rel. Kleba v. McGinnis*, 796 F.2d 947 (7th Cir. 1986; *Montgomery*, 846 F2d. at 416.

*Williams v. Washington*, 59 F.3d. 673, 682 (7th Cir. 1995).

The 9th Circuit has also found that the prejudice can be found from the cumulative

errors of counsel holding that:

> We offered the cautionary comment that [i]f counsel is charged with multiple errors at trial, absence of prejudice is not established by demonstrating that no single error considered alone significantly impaired the defense — prejudice may result from the cumulative impact of multiple deficiencies. *Id.* Thus, the law in this Circuit is clear that where an allegation of ineffective assistance by counsel is premised on specific acts or omissions of counsel, the allegation must be buttressed by a showing of injury or prejudice to the defendant. And even where, as here, several specific errors are found, it is the duty of the Court to make a finding as to prejudice, although this finding may either be "cumulative" or focus on one discrete blunder in itself prejudicial.

*Ewing v. Williams*, 596 F.2d 391, 395-396 (9th Cir. 1979).

The 2nd Circuit has also approved of this doctrine stating that:

> Since Rodriguez's claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together. *See Strickland v. Washington*, 466 U.S. 668, 695-96, 104 S.Ct. 2052, 2068-69, 80 L.Ed.2d 674 (1984). "The state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole." *Grady v. LeFevre*, 846 F.2d 862, 865 (2nd Cir. 1988). Even if Rodriguez's claims, evaluated individually, might not amount to a due process violation sufficient to require habeas relief, nevertheless, given the number of

questionable circumstances in this case, before a federal court intervenes, the state court should be given an opportunity to carefully review all of Rodriguez's claims together to determine whether collateral relief may be appropriate.

*Rodriguez v. Hoke,* 928 F.2d 534, 538 (2nd Cir. 1991).

Counsel failed to challenge on appeal the ruling of the trial court denying access to material of which Sweeney was entitled to under *Brady, Giglio* and the Jencks Act; failed to seek review by the trial court of Theodore Watson's Greenbelt file; failed to call an expert witness to testify concerning Sweeney's Tourette's Syndrome; failed to request the appointment of a second attorney; failed to seek a continuance after removal of co-counsel on the eve of jury selection; failed to argue that Sweeney was, by law entitled to be represented by two attorneys at trial and the other errors set forth herein. Sweeney's counsel's errors at trial and on appeal had the cumulative effect of creating a "reasonable probability" that in the absence of counsel's errors the result of the proceedings would have been different.

### C. THE TRIAL COURT DENIED SWEENEY HIS RIGHT TO BE REPRESENTED BY TWO ATTORNEYS

As argued herein, 18 U.S.C. §3005 gives a defendant, who has been indicted for a capital offense, the right to be represented by two attorneys. Petitioner Sweeney was therefore, entitled to be represented by two attorneys in this case.

The trial court incorrectly stated the law when it held, at the hearing on December 16, 1999, that once the Attorney General declined to pursue the death penalty in the case, Sweeney lost his entitlement to be represented by two attorneys. Therefore, the trial court committed prejudicial error when it stated that Sweeney was no longer entitled to be represented by two attorneys pursuant to 18 U.S.C. §3005.

This error of the trial court to properly advise Sweeney of his right to be represented by two attorneys was further compounded by the court removing Mr. Long as one of Sweeney's attorneys on the eve of jury selection and by not advising Sweeney of his right to be represented by two attorneys in this case.

> An accused's right to additional counsel in a capital case should not, of course, be lost solely because of lack of awareness of its existence. Therefore, the trial court here should have advised Cunningham of his rights under § 3005. We presume prejudice from the failure of the trial court so to inform him.

*Smith,* 353 F.2d at 845-46.

Likewise in this case, the Court must now presume prejudice to Sweeney as a result of the trial court improperly advising him that, once the Attorney General declined to pursue the death penalty against Sweeney, he lost his right to be represented by two attorneys. Further, when the trial court removed Mr. Long, Sweeney, as a result of the trial court's previous decision, would not have known to insist on his entitlement to two attorneys.

Sweeney was prejudice by this as was admitted to by this trial counsel and then does not address the prejudice.

## CONCLUSION

As demonstrated above, when viewed in the light of the weakness in the Government's case against Petitioner Sweeney, given the combination of the ineffective assistance of counsel, the trial court's error, and the misconduct of the Government, there is a reasonable probability that the outcome of the proceedings would have been different. Petitioner Sweeney was convicted, and sentenced to multiple life sentences, by a trial that was fundamentally unfair. Accordingly, relief must be granted.

Pursuant to Rule 8 of the Rules Governing Section 2255 Proceedings, Petitioner

Sweeney requests that an evidentiary hearing be conducted, at which proof may be

offered concerning the issues raised in his motion(s) and memorandum.  After an

evidentiary hearing is held, the Court should vacate Petitioner Sweeney's convictions and

sentence, and grant such other relief, as it deems appropriate.


_____/s/_____
Eric Kirchman
D.C. Fed. Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@cs.com


_____/s/_____
Shana Madigan
D.C. Bar No. 1015317
Attorney for William K. Sweeney
The Law Office of Shana Madigan
6205 Massachusetts Avenue
Bethesda, Maryland 20816
(202) 270-3989

## CERTIFICATE OF SERVICE

I hereby certify, on this 28th day of November 2014, that a copy of the foregoing
was mailed by first class mail, postage prepaid to:

**Margaret J. Chriss**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :

        v.               :      Criminal. No. 98-CR-00329-4 (RCL)

WILLIAM KYLE SWEENEY,      :

      Defendant.      :

## SUPPLEMENT TO DEFENDANT SWEENEY'S AMENDED SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 USC §2255 AND INCORPORATED MEMORANDUM OF FACTS AND LAW

Petitioner William Sweeney, a prisoner in federal custody, by his attorneys Eric H. Kirchman and Shana Madigan, supplements his previously file Amended Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC §2255 and Incorporated Memorandum of Facts and Law and states as follows:

## SWEENEY'S SENTENCE OF LIFE IMPRISONMENT ON COUNT ONE, IS CRUEL AND UNUSUAL PUNISHMENT AND VIOLATES THE 8TH AMENDMENT TO THE U.S. CONSTITUTION.

In Count One Sweeney was convicted of conspiracy to distribute and possess with intent to distribute a controlled dangerous substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. The jury further found that the amount of drugs was 1,000 kilograms or more of marijuana. As a result of this conviction Sweeney was sentenced to life in prison.

As the Sentencing Reform Act of 1984 abolished parole for persons convicted after November 1, 1987, Sweeny's sentence of life in prison is the equivalent to a sentence of life without parole.

Sweeney was born during 1976 and would, therefore, not have attained the age of 18 years until 1994.

The jury convicted Sweeney of being involved in a drug distribution conspiracy, which is alleged to have begun in 1988, when Sweeney would have been at most 12 years old.

For at least six years of the alleged 11 years of the conspiracy Sweeny would have been a juvenile.

That the jury made no findings as to when, any of the alleged 1,000 kilograms or more of marijuana for which Sweeny was found to be responsible for passed through the conspiracy, it only found an aggregate amount.

All, or most of the marijuana, for which Sweeny was found to be responsible, could have passed through the conspiracy while Sweeney was a minor.

Sweeny was convicted for conduct which is alleged to have begun when he was 12 years old and given a life sentence.

> This Court now holds that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole. This clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment. Because "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood," those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime. *Roper,* 543 U.S., at 574, 125 S.Ct. 1183. *Graham v. Florida,* 560 U.S. 48, 75-76 (2010)

*Miller v. Alabama,* 567 U.S. 460 (2012) would expand this prohibition to include homicide as well.

Sweeny was sentenced to life in prison for a nonhomicide offense that is alleged to have occurred, at least in part, when he was a minor.

It is, therefore, cruel and unusual punishment and a violation of the 8th Amendment to the U.S. Constitution to have sentenced Sweeney to life for conducted that he is alleged to have committed as a juvenile.

The life sentence as to Count One should be vacated.

**DEFENDANT SWEENEY HEREBY ADOPTS HEREIN ALL ARGUMENTS RAISED IN CODEFENDANT'S MARTIN SUPPLEMENT TO MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 USC §2255 BY A PERSON IN FEDERAL CUSTODY.**

_____/s/_____
Eric Kirchman
D.C. Fed. Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@cs.com

**CERTIFICATE OF SERVICE**

I hereby certify, on this 31st day of October 2018, that a copy of the foregoing served by the court's efiling system on all counsel of records, and to:

**Pamala Satterfield, Esquire**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001

_____/s/_____
Eric Kirchman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| v. | : | Criminal No. 98-329-2 RCL |
| | : | |
| JEROME MARTIN, JR., | : | |
| | : | |
| *Petitioner.* | : | |

## SUPPLEMENT TO MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. §2255 BY A PERSON IN FEDERAL CUSTODY

The Petitioner, Jerome Martin, by and through counsel, Michael E. Lawlor, moves this Court for relief from his convictions and sentences which were obtained in violation of the United States Constitution. Mr. Martin joins in the claims made by his co-defendants to the extent they apply to him. In addition, he files this Supplement to his previously filed Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255 by a Person in Federal Custody.

### I.    PROCEDURAL HISTORY

Petitioner, Jerome Martin, and codefendants Vincent Hill, Samuel Carson, William Sweeney, and Sean Coates, were initially charged on September 18, 1998, by indictment for numerous offenses including drug conspiracy, participation in a

Racketeering Influenced and Corrupt Organization (RICO), and numerous other offenses.

On March 25, 1999, the government filed a 101-count superseding Indictment. Martin was charged with: conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §846 (Count 1, narcotics conspiracy); racketeering influenced corrupt organization in violation of 18 U.S.C. §1962(d) (Count 2, RICO conspiracy); first-degree murder of Anthony Fortune, in violation of 22 D.C. Code §§105, 2401 and 3202 (Count 9); numerous charges relating to a shootout with police on September 10, 1991 (Counts 10-19);[1] first-degree murder of Maurice Proctor, in violation of 22 D.C. Code §§105, 2401 and 3202 (Count 20); and

[1]Count 10—assault with intent to kill while armed (Keith Bradley), in violation of 22 D.C. Code §§105, 2401 and 3202; Count 11—assault with intent to kill while armed (Jimmy Thomas), in violation of 22 D.C. Code §§105, 2401 and 3202; Count 12—assault with intent to kill while armed (Ofc. Adrian Treadwell), in violation of 22 D.C. Code §§105, 501 and 3202; Count 13—assaulting, resisting and interfering with a police officer with a dangerous weapon, in violation of 22 D.C. Code §§105, 505(b); Count 14—assault with intent to kill while armed (Ofc. Edward McDonald), in violation of 22 D.C. Code §§105, 501 and 3202; Count 15—assaulting, resisting and interfering with a police officer with a dangerous weapon, in violation of 22 D.C. Code §§105, and 505(b); Count 16—assault with intent to kill while armed (Ofc. Marc Little), in violation of 22 D.C. Code §§105, 501 and 3202; Count 17—assaulting, resisting and interfering with a police officer with a dangerous weapon (Ofc. Marc Little), in violation of 22 D.C. Code §§105, and 505(b); Count 18—assault with intent to kill while armed (Ofc. Alvin Ray), in violation of 22 D.C. Code §§105, 501 and 3202; Count 19—assaulting, resisting and interfering with a police office with a dangerous weapon (Ofc. Alvin Ray), in violation of 22 D.C. Code §§105, and 505(b).

numerous charges regarding the shooting of James Coulter (Counts 37, 38, 58, 67);[2]

and several drug-related charges (Counts 84, 88, 90, 101).[3]

Trial commenced on November 15, 2000, and jury deliberations began on July

9, 2001.

The superseding indictment was retyped before submission to the jury (Dkt

No. 760, filed July 2, 2001). Martin was found guilty and sentenced as follows:

| Re-typed Count | | Sentence |
|---|---|---|
| 1 | Conspiracy to distribute narcotics<br>1988 through March 1999 | Life concurrent w/Count 2<br>Fine $500,000 |
| 2 | RICO– conspiracy<br>1988 through March 1999 | Life concurrent w/Count 1 |
| 8 | First degree murder while armed,<br>Aiding and abetting<br>(August 6, 1991, Anthony Fortune) | 240 months to life<br>consecutive to<br>Counts 1 and 2 |

[2] Count 37—assault with intent to kill James Coulter, in violation of 22 D.C. Code §§501 and 3202; Count 38—attempted murder in aid of racketeering activity (James Coulter), in violation of 18 U.S.C. §1959(a)(3) & (5); Count 58—use of a firearm (assault on James Coulter), in violation of 18 U.S.C. §§2 and 924(c); Count 67—possession of a firearm during a crime of violence or dangerous offense (assault on James Coulter), in violation of 22 D.C. Code §§105 and 3204(b).

[3] Count 84—distribution of marijuana on November 15, 1995, in violation of 21 U.S.C. §841(a)(1); Count 88—distribution of marijuana on December 6, 1995, in violation of 21 U.S.C. §841(a)(1) ; Count 90—distribution of marijuana on December 13, 1995, in violation of 21 U.S.C. §841(a)(1); Count 101—possession with intent to distribute marijuana on February 1, 1996, in violation of 18 U.S.C. §2 and 21 U.S.C. §§841(a)(1) and 841(b)(1)(D).

| 9 | Assault or Impede Officer w/weapon<br>Aiding and abetting<br>September 10, 1991 | 40-120 months<br>consecutive to<br>Counts 1, 2, and 8 |
|---|---|---|
| 18 | Attempted murder VICAR<br>(May 30, 1995, James Coulter) | 240 months concurrent |
| 31 | Use of firearm on James Coulter<br>May 30, 1995, RICO assault | 60 months consecutive to<br>Counts 1, 2, 8, 9 |
| 49, 53<br>55, 64 | Distribution of marijuana | 60 months<br>on each of four counts<br>concurrent with each other and<br>all other counts |

On direct appeal, the defendants jointly argued that: the Court erred in dismissing a juror after deliberations had begun and ordering the remaining 11 jurors to continue to verdict; and the Court was biased against appellants. Martin and Carson also argued that murders charged under D.C. Code §22-2401 were mis-joined with the narcotics conspiracy and RICO conspiracy charges.[4] The defendants additionally challenged their sentences under *United States v. Booker*, 543 U.S. 220 (2005) because the guidelines were mandatory at the time they were sentenced. The United States Court of Appeals for the District of Columbia Circuit affirmed all convictions and

---

[4] Sweeney, Carson, and Coates also argued that their right to confront witnesses was violated when Agent Vincent Lisi was permitted to testify about statements made by a deceased witness; Carson and Sweeney claimed that the Court erred in refusing to admit the transcript testimony of two witnesses who had testified before a Maryland grand jury investigating the murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson.

sentences. *See United States v. Carson et al.*, 455 F.3d 336 (D.C. Cir. 2006), *petition for rehearing and rehearing en banc denied.*

The United States Supreme court denied *certiorari* on February 20, 2007. *Carson et al. v. United States*, 549 U.S. 1246 (2007).

On February 18, 2008, Martin filed, *pro se*, a Motion to Vacate, Set Aside, Correct Sentence Pursuant to 28 U.S.C. §2255 (Dkt. No. 1021).

On June 23, 2016, undersigned counsel filed a Supplement to Motion to Vacate in Light of *Johnson v. United States*, 135 S.Ct. 2551 (2015).

## II.    FACTS RELATING TO MARTIN'S CONVICTIONS

The government charged Martin and others with a large-scale narcotics and racketeering conspiracy to which it attributed numerous murders and other acts of violence. The facts underlying Martin's convictions may be grouped broadly into: events involving the drug and RICO conspiracies generally, including a shootout in which Martin and others unwittingly engaged four police officers; the murder of Anthony Fortune; and the attempted murder of James Coulter. As to the individual distributions of marijuana, Martin conceded that he sold marijuana on the four occasions alleged by the government, but contended that he sold them as an individual and was not part of any conspiracy. (Tr. 1/9/01 AM p. 33-34).

### *Narcotics and RICO Conspiracy*

The government claimed that from 1988 through March 1999, Vincent Hill led a conspiracy to distribute primarily marijuana, but also crack cocaine and PCP, in the 200 block of K Street, SW, and surrounding areas (Retyped Indictment p. 3-5, Dkt. No. 760). The government alleged that Hill protected his territory from other drug dealers by beating them with sticks or using firearms to settle disputes. (Dkt. No. 760. at 22-23).

The government alleged that Martin began selling marijuana in the 200 block of K Street, SW, and, in 1991, extended his activity to crack cocaine sales in the area of 37th Place, SE. (Dkt. No. 760 p. 23). Anthony Fortune, a member of a rival group from the 58th Street neighborhood, had robbed Martin and others at gunpoint. According to the government, Martin and Samuel Carson retaliated by killing Fortune. *Id.* A feud ensued between the two groups, resulting in increased violence and drive-by shootings. Martin, Carson, and others, were alleged to have engaged in a shootout on September 10, 1991, with four individuals who, unbeknownst to defendants, were police officers who happened to be in the neighborhood. *Id.* at 24.

Much of the evidence was supplied by cooperators who were complicit in the drug dealing and violence in the neighborhood. Chief among them were James Montgomery, who admitted to multiple murders in addition to drug and RICO conspiracies and was facing life without parole (Tr. 3/7/01 PM p. 74-75), and Donald

Nichols, who was also facing life in prison without the possibility of parole (Tr. 2/27/01 PM p. 83).

The government's witnesses testified that people took turns selling on the street--out of respect for each other and not because of any agreement. (Testimony of Reginald Switzer, Tr. 1/24/01 PM p. 23-24, 26; Testimony of Paul Franklin Tr. 5/2/01 PM p. 69). Hill sold most of the $50 bags of marijuana while others sold $20 bags. *Id.* at 24. Hill would tell outsiders trying to sell marijuana to leave. *Id.* Government witnesses also admitted that Martin did not answer to anyone and came and went as he pleased as far as selling marijuana. (Testimony of Paul Franklin Tr. 5/2/01 PM p. 67-68).

Martin was also charged with four counts of distribution of marijuana. Martin conceded that he was guilty of those four distributions (Tr. 1/9/01 AM p. 33; Tr. 7/2/01 PM p. 51), but maintained that he was not part of a drug conspiracy.

### *Uncharged Overt Acts and Violent Crimes in Aid of Racketeering (VICAR)*

The government introduced evidence of several murders that were not charged in the indictment but were included as racketeering or overt acts to the conspiracy. Martin was alleged to have encouraged Antonio Knight to shoot Curtis Edwards who was driving in a car with tinted windows and was suspected to be from 58th Street. (Dkt. No. 760 p. 35). The government alleged that Martin directed co-conspirators to kill Chrishauna Gladden, who he believed was a witness against him in a murder trial

in the Superior Court of the District of Columbia. (Dkt. No. 760 p. 24). James Montgomery testified that he and Carson sought out Gladdon to kill her and prevent her from testifying against Martin in the Curtis Edwards' murder. Montgomery testified that he saw Carson shoot and kill Gladden (Tr. 3/13/01 PM p. 38-39, 59-61). Arthur Rice testified that Carson was looking for Gladden because she was a witness against Martin in his murder case. (Tr. 4/25/01 PM p. 46-47).

### *Murder of Anthony Fortune*

Anthony Fortune was shot and killed on August 6, 1991. The government alleged that Martin grew up in the Southwest neighborhood with the other co-defendants. Subsequently, Martin's friend moved to 37th Place, SE, and Martin began frequenting that neighborhood and selling drugs there. (Tr. 1/8/01 PM p. 14-15). Anthony Fortune disliked Martin encroaching on his neighborhood and robbed him on one occasion. On August 6, 1991, Martin, Carson, and others were playing a craps game on the street when Fortune approached. According to the government, Carson asked Martin whether he should shoot Fortune and then shot and killed Fortune. *Id.* at 15-16.

The government's only eye-witness to the murder was Charlene Wilson. Wilson testified that on the night of Fortune's murder, she visited a friend, Regina[5] Knight, who lived in the building at the street where Fortune was shot. (Tr. 2/13/01 AM p.

[5] This witness testified that her name was "Reena Knight" Tr. 6/21/01 PM p.41).

13-14). She remembered there were approximately a dozen people in Knight's apartment, including Martin and Carson. *Id.* at 14-17. There was a discussion about disliking Fortune because he robbed people. However, she could not recall what any particular person said. *Id.* at 19-22.

Later that evening, Wilson accompanied a friend outside to wait for a ride. *Id.* at 24. Across the street, Fortune was participating in a craps game. *Id.* at 56-57. She saw a group of five people, including Carson and Martin, exit the building, *Id.* at 24. Approximately five to seven minutes later, she heard gunshots and saw Carson walking toward Fortune, shooting. *Id.* at 25; Tr. 2/13/01 PM p. 44. Fortune had robbed the craps game and was walking toward his car when he was shot. (Tr. 2/13/01 AM p. 25). After shooting Fortune, Carson ran down the street and got into a white Astro Van. According to Wilson, Martin was the driver of the van. *Id.* at 26-27. On cross-examination, Wilson clarified that she did not actually see Fortune robbing anyone at the craps game but had heard from others that Fortune had committed a robbery at the craps game. (Tr. 2/13/01 PM p. 7).

Wilson did not initially tell police that she witnessed the shooting, claiming that she feared for her safety. (Tr. 2/13/01 AM p. 31-32). Her ire was roused, however, because drug dealers refused her demand to stop putting drugs in her mailbox and she risked losing her housing. *Id.* at 31-33. It was then, months later, that she gave police information about the Fortune murder. *Id.* The government paid her approximately

$3,600 for information about the Fortune murder, *id.* at 35-37, 47, and possibly paid another $4,900 for moving expenses (Tr. 2/13/01 PM p. 33).

FBI Agent Chris Warrener testified that it was about three or four months after the FBI began paying Wilson for information, that she started talking about the Fortune shooting. (Tr. 6/14/01 PM p. 30-31). In his report documenting Wilson's statement about Fortune's murder, Warrener wrote that Wilson had *heard* about the details of Fortune's murder and did not say that she actually witnessed the shooting. *Id.* at 55. Warrener explained that it was a writing style he used to protect witnesses and that Wilson said she did witness the shooting. *Id.* at 60. Nonetheless, Warrener confirmed that no arrests were made in the Fortune murder case for many years after Wilson provided the information. *Id.* at 59.

Other government witnesses testifying about the Fortune murder were not eye-witnesses but testified about circumstantial evidence or statements allegedly made by Carson or Martin. Officer Tyrone Best testified that a day or so after learning about Fortune's murder, he saw that Martin's right hand appeared to have two hash marks which could have been made by the slide of a weapon. (Tr. 3/6/01 PM p. 70). Many witnesses testified pursuant to a plea agreement and expected to benefit from a reduced sentence in exchange for their testimony.

Donald Nichols testified that Martin told him that Fortune tried or did rob a craps game and that Martin said he shot Fortune (Tr. 2/15/01 PM p. 58-59). Nichols

was facing a sentence of up to life in prison without the possibility of parole. (Tr. 2/27/01 AM p. 83).

James Montgomery, who was facing life in prison, testified that Carson told him that Martin won most of the money at the craps game and Fortune said that Martin could not quit but had to give some of the money back. Carson whispered in Martin's ear, asking if he should kill Fortune. Carson did not say how Martin responded, but Carson retrieved a gun from his car and shot Fortune. (Tr. 3/12/01 PM p. 34-35).

Charles Bender testified that Martin said that Fortune was making motions like he was going to rob the craps game and that Martin said he punished him. Bender understood that to mean that Martin killed Fortune. (Tr. 4/4/01 AM p. 85-87). This contradicted Wilson's testimony that Carson, and not Martin, shot Fortune. Bender pleaded guilty to RICO conspiracy and admitted to murder, armed robbery, and narcotics distribution. He was awaiting sentencing and was hoping to be released. (Tr. 4/4/01 AM, p. 50-54).

Eugene Byars testified that, while incarcerated, he was receiving medical care at D.C. General Hospital and saw Martin there. Martin told him that Fortune was trying to take advantage of them while gambling and that Martin shot Fortune. (Tr. 4/9/01 PM p. 13-14). This contradicted Wilson's testimony that Carson, and not Martin, shot Fortune. Byars was facing a sentence of up to 60 years. (Tr. 4/9/01 PM, p. 41-42).

Arthur Rice testified that Fortune was from 58th Place and was nicknamed "Cookie Monster" because he would take people's property. (Tr. 4/25/01 AM p. 35-36). Rice believed for a time that Martin had shot Fortune but later found out that Carson had killed Fortune. Rice testified that he said to Carson, "man, all that time I thought it was [Martin], and come to find out it was you, man." Carson started laughing and said "well now you know." (Tr. 4/25/01 AM p. 40-41).

Reena Knight, a witness for Martin, testified that Martin was married to her niece and was a friend of her son. On the evening Fortune was shot, she recalled that Martin and others were in her apartment. (Tr. 6/21/01 PM p. 42-44). She testified that Martin was not with anyone else that evening. She did not know Carson and did not recognize a photograph of him. *Id.* at 44-46.

### Assault with intent to kill James Coulter

The government's theory was that Hill and Martin believed that Coulter was cooperating with law enforcement and wanted him dead. On May 30, 1995, Martin shot Coulter at Hill's behest and wounded him. (Tr. 1/8/01 PM p. 37). At trial, there were no eye-witness to the shooting and no physical evidence connecting Martin to the shooting. The government presented numerous witnesses who claimed that Hill or Martin made inculpatory statements. These witnesses expected a reduced sentence in their own cases in exchange for their testimony.

The government presented several witnesses to show that Hill thought Coulter was cooperating with police. Cindy Perkins, who was Coulter's girlfriend, testified that a few days after the shooting, Hill gestured toward her and said, "little hot bitch . . . She's hot just like her boyfriend."[6] (Tr. 1/30/01 PM p. 54-57, 62).

Donald Nichols testified that in 1995, Hill made general comments saying that Coulter was "hot." Nichols interpreted Hill to be suggesting that Coulter should be killed (Tr. 2/15/01 PM p. 62). After Coulter was shot, he heard Hill talking to Martin and say something to the effect of, "you should have used two guns, and what the fuck the gun had to jam for." *Id.* at 62. Nichols further testified that after Martin was arrested for shooting Coulter, Martin asked Nichols to take his lawyer's investigator to get a statement from Coulter. (Tr. 2/15/01 PM p. 63-64). Coulter told Nichols that he did not know who the shooter was so there was no reason to give a statement; Coulter did not want to go to court and did not want to get involved. (Tr. 2/15/01 PM p. 63-64; Tr. 2/26/01 PM p. 22-23).

Martin also asked Nichols to get Michael Floyd to testify about what he saw that night, but Floyd did not want to get involved with the FBI. *Id.* at 65. According to Nichols, Martin asked him to show Coulter and Floyd to Martin's uncle, Dino, presumably so that Dino could do some harm to Floyd. *Id.* at 65, 69. Despite the government's intimation that Martin was seeking to harm witnesses, Nichols admitted

[6] "Hot" was a term used to mean cooperating with police.

that Martin only wanted statements and did not ask him to harm anyone. (Tr. 2/26/01 PM p. 23). Nichols was facing a sentence of up to life without parole and was hoping for a reduction in sentence in exchange for his cooperation with the government. (Tr. 2/26/01 PM p. 83).

Eugene Byars claimed that that Martin said he started shooting Coulter at a craps game. Coulter tried to run, so Martin ran behind him and continued to shoot, but the gun jammed. (Tr. 4/9/01 PM p. 22-23). Byars testified that when he saw Martin in D.C. Jail, he jokingly said, "Creeko [Coulter], what's up?" Martin said don't play with him, he's going to kill his ass.[7] (Tr. 4/9/01 PM p. 24).

Paul Franklin testified that after Coulter had been shot, Martin asked him (Franklin) to see if Coulter and Michael Floyd were going to testify in court. Franklin testified that by telling Coulter that Martin asked if he was coming to court, Martin was sending a message to Coulter to not testify. (Tr. 5/2/01 PM p. 55). Coulter gave Franklin a phone number to give to Martin, but Martin complained that the phone number was fake. Martin then told Franklin to visit Coulter with his uncle, Dino. Franklin believed Dino wanted to see what Coulter looked like so he could kill him. (Tr. 5/2/01 PM p. 56). According to Franklin, Michael Floyd told him to tell Martin that he was not going to court. (Tr. 5/2/01 PM p. 56).

---

[7]James Coulter's nickname was "Creeko." *See* Tr. 5/22/01 AM p. 9.

Cross-examination brought out Franklin's bias against Martin. Franklin admitted that he was jealous of Martin because Martin had a relationship with his son's mother. Franklin was often teased about whether or not his son was fathered by Martin. On one occasion, Franklin punched Martin for teasing him. (Tr. 5/2/01 PM p. 60-61).

Michael Smith testified that he first met Martin in jail in 1998, three years after the Coulter shooting. Smith knew both Coulter and Michael Floyd. Martin wanted Floyd to make a statement saying that he did not know who shot Coulter because it was a person with a drawstring and had a pistol at the craps game. (Tr. 5/22/01 AM p. 17-19). Smith told Martin that he would contact Floyd but, not wanting to get involved, did not do so. *Id.* at 20-21. A week later, Martin said, "I'm fucked up at your man—I talked to your man on the phone and that bitch ass nigger hung the phone up on me and started crying, and if it wasn't for him Creeko [Coulter] would be dead, I should have hit him in his head." (Tr. 5/22/01 AM p. 22). Martin said that Floyd owed him a favor because if it wasn't for Floyd getting in the way, Coulter would be dead. (Tr. 5/22/01 AM p. 22). This contradicted Donald Nichols' testimony that Coulter was not killed because the gun jammed. Smith was facing up to 20 years of imprisonment for heroin distribution and carrying a pistol without a license. (Tr. 5/22/01 AM p. 32).

On cross examination, defense counsel sought to establish it was unlikely that Martin would speak to Smith about criminal conduct. Smith testified that he was not from the neighborhoods that Martin frequented and was not friends with Martin. They were total strangers until they had the conversations in jail. (Tr. 5/22/01 PM p. 40-43). Smith then testified that Martin "never told me he shot Creeko [Coulter]. He never said that to me, never." (Tr. 5/22/01 PM p. 42).

Smith admitted that he had in the past been convicted of numerous drug offenses. At the time of his testimony, he had been convicted of four counts of heroin distribution and was awaiting sentencing. His convictions were serious enough to keep him in jail for the rest of his life. (Tr. 5/22/01 PM p. 25-26). Nevertheless, after he testified against Martin before in grand jury, he was released and remained free while awaiting sentencing. *Id.* at 50. Despite the possibility of receiving 240 years of imprisonment, he hoped for a sentence of probation in exchange for his testimony. (Tr. 5/22/01 PM p. 31-32).

Agent Vincent Lisi testified that on June 5, 1995, he was in the 200 block of K Street with Detective Neal Trugman and Detective Steve Kirschner. (Tr. 5/23/01 AM p. 7). They saw Vincent Hill who yelled to Detective Trugman something to the effect that, "oh yeah, Truman [sic]. By the way, all your snitches are going to die." *Id.* at 8. Hill repeated, "you heard me. All your snitches are going to die, including your little buddy who is over at the hospital now with four holes in him under the name of John

Doe, whose [sic] in room 2299 . . . he shouldn't be alive right now." *Id.* Lisi testified

that Hill was referring to Coulter, who had been shot and was hospitalized as "John

Doe." *Id.* at 9. A few hours later, Lisi received a phone call from Coulter's girlfriend,

who was very upset. As a result, the government relocated her and her family. *Id.* at

10.

James Montgomery testified that he was in jail at the time Coulter was shot.

(Tr. 5/23/01 AM p. 45). After he was released in June 1995, he recalled a time when

he, Coates, Carson, and Martin were sitting outside. Montgomery asked everyone,

including Martin, for money, but they were all broke. (Tr. 5/24/01 PM p. 38). Martin,

specifically, did not give Montgomery any money. Montgomery claimed that Martin

started talking about the Coulter shooting and said, "They keep fucking with me . . .

they keep trying to push it on me." (Tr. 5/23/01 *Id.* at 47). "He said that they are

trying to say that he had something to do with 'Creeko' getting shot. And he was like,

'they can't prove it. I had a mask on.'" *Id.* Defense counsel cross-examined

Montgomery on a critical difference in Agent Lisi's report of Montgomery's statement

to law enforcement—that Martin said, "mother fucker had a mask on" (Tr. 5/24/01

PM p. 40). This was in contrast to Montgomery's trial testimony that Martin said, "I

had a mask on."

Montgomery testified extensively in Martin's trial about facts the government

used to establish a conspiracy and also testified about numerous acts of violence.

Montgomery himself admitted to involvement in numerous murders, including the murders of Maurice Hallman and Leonard Hyson (Tr. 3/12/01 PM p. 3). He not only admitted to several murders but also admitted to falsely accusing someone of murder to benefit himself. For example, after he escaped from a halfway house and was charged with assault on a police officer while armed, Montgomery called law enforcement and falsely accused Wayne Perry of three murders. (Tr. 3/12/01 PM p. 27-30).

## III. ARGUMENT

### A.    Introduction

28 U.S.C. §2255 permits a person in federal custody to bring a motion to vacate, set aside, or correct a sentence on the grounds that: the sentence was imposed in violation of the Constitution or laws of the United States; the Court lacked jurisdiction to enter the judgment; the sentence exceeded the maximum allowed by law; or the judgment or sentence is otherwise subject to collateral review. A hearing is to be held "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. §2255(b).

In this case, Martin's claims center on prosecutorial misconduct and ineffective assistance of counsel regarding the murder of Anthony Fortune and the shooting of James Coulter. Because those offenses formed the basis for his drug and RICO

conspiracy convictions, he is entitled to a new trial on the conspiracies as well as the counts related to the Fortune and Coulter incidents.

### B. The Government Withheld Evidence of Martin's Innocence in the Anthony Fortune Murder and Violated his Right to Due Process.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87. Later, the Court recognized that the prosecution had a duty to disclose favorable evidence even without a defense request. *See United States v. Agurs*, 427 U.S. 97 (1976). The state's duty to disclose exculpatory evidence is to ensure that a defendant receives a fair trial. *See Brady*, 373 U.S. at 87 ("[s]ociety wins not only when the guilty are convicted but when criminal trials are fair"). *See also United States v. Bagley*, 473 U.S. 667, 675 (1985) (stating that the *Brady* rule is "based on the requirement of due process . . . [T]he prosecutor is . . . to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial").

Three elements must be satisfied to prevail on a *Brady* claim:

(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material.

*Strickler v. Green*, 527 U.S. 263, 280-82 (1999); *United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C. Cir. 2010). Favorable evidence includes evidence affecting a witness's credibility. *See United States v. Walter Bowie*, 198 F.3d 905, 908 (D.C. Cir. 1999) (stating that "[e]vidence affecting the credibility of government witnesses is a category of exculpatory information potentially within *Brady*'s, disclosure obligation") (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996) (stating that the prosecutor has the same duty to disclose impeachment as exculpatory evidence).

Evidence is "suppressed" even if withheld unintentionally. *See Strickler*, 527 U.S. at 288 (quoting *United States v. Agurs*, 427 U.S. 97, 110 (1976)). The prosecution must disclose the evidence in a timely manner, "to allow the defense to use the favorable material effectively in the preparation and presentation of its case . . . " *United States v. Celis*, 608 F.3d 818, 835 (D.C. Cir. 2009) (quoting *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976)).

Evidence is material, requiring a new trial, if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *Bagley*, 473 U.S. at 682). The Supreme Court has explained that the test is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence" in its outcome. *Kyles*, 514 U.S. at 435; *Strickler*, 427 U.S. at

290. "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Kyles*, 514 U.S. at 434. This Court has held, "to reverse a conviction for a *Brady* violation, it does not have to be more likely than not that the defendant would have been acquitted had the evidence been disclosed." *Bowie*, 198 F.3d at 909.

When there are multiple nondisclosures, this Court must consider the cumulative effect of the nondisclosures. "The effect of each nondisclosure must not only be considered alone, but the cumulative effect of the nondisclosures might require reversal even though, standing alone, each bit of omitted evidence may not be sufficiently material to justify a new trial." *United States v. Lloyd*, 71 F.3d 408, 411 (D.C. Cir. 1995) (quotations and citation omitted).

Years after the trial in this case, defense counsel Joanne Hepworth located a witness, Steven Thomas, who was an eye-witness to Anthony Fortune's murder. Thomas was interviewed by Hepworth's investigator. Thomas stated he was present at the Fortune shooting; that he knew what Martin looked like; and that the shooter was not Martin. Thomas stated that the shooter had a very dark complexion, was stocky, and taller than Martin. Thomas further stated that police officers interviewed him on the evening of the shooting and that he gave the same description of the

shooter to police. This was exculpatory information that should have been disclosed to defense counsel.

The government's theory was that Carson shot and killed Fortune at Martin's urging and left the scene in a van driven by Martin. Thomas's description of the shooter as having a very dark complexion ruled out both Martin and Carson as the shooter. This was exculpatory evidence directly encompassed by *Brady* and its progeny.

The evidence was suppressed by the government. Evidence is "suppressed" even if withheld unintentionally. "[A]n inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment. 'If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.'" *Strickler*, *supra*, at 288 (quoting *Agurs*, *supra*, at 110). Accordingly, the prosecutor is responsible for disclosing *Brady* information in police files. *See In re Sealed Case*, *supra*, at 896 (stating that, "prosecutors in this District are responsible for disclosing Brady information contained in MPD files, 'given the close working relationship between the Washington Metropolitan police and the U.S. Attorney'").

Thomas stated that he gave his description of the shooter to law enforcement officers on the night of the shooting. Yet defense counsel never received information about this witness or the substance of what he told police. It matters not whether it

was suppressed willfully or inadvertently—only that the government possessed this information failed to give it to Martin in time for him to use it. *See Strickler*, 527 U.S. at 288.

There is a reasonable probability that, had the government fulfilled its obligation to disclose the information, the result of the trial would have been different. Trial counsel would have interviewed Thomas and called him as a witness to testify. Charlene Wilson was the government's only eye-witness to the Fortune shooting. She testified that she saw Carson shoot Fortune and then run down the street and enter a van driven by Martin. Her view of the driver was fleeting at best. Thomas's testimony would have directly contradicted the government's theory.

As detailed further in section C, Wilson was not a credible, reliable witness. She did not report the information to the police for several months; she was paid for giving information to the police; and she testified about events as if she had witnessed them even though she had only heard about it from others.

Certainly, there is a reasonable probability of a different result. The United States Court of Appeals for the D.C. Circuit has noted the following about "reasonable probability" in the context of a *Brady* claim:

> What is a "reasonable probability"? Probability is often expressed in terms of percentages, with 100% representing certainty. We know, because the Supreme Court has told us, that a "reasonable probability" can be less than 50.01%. In other words, to reverse a conviction for a Brady violation, it does not have to be more likely than not that the

> defendant would have been acquitted had the evidence been disclosed. *See Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. We are also sure that a "reasonable probability" is somewhat greater than 1%. How much greater? Enough, the Supreme Court says, to "undermine confidence in the verdict," *id.* at 435, 115 S.Ct. 1555, which may lead us in a circle: one cannot be confident of the outcome when there is a "reasonable" probability that it may be wrong, and a "reasonable" probability is one high enough to undermine confidence in the outcome.

*Bowie*, 198 F.3d at 909.

Here, the government failed to disclose evidence critical to Martin's defense. As the D.C. Circuit recognized in *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996), the "focus is on the potential impact that the undisclosed evidence might have had on the fairness of the proceedings rather than on the overall strength of the government's case." Furthermore, "we must look not to the ways defense counsel was able to impeach . . . [the witness], but to the ways in which the witness' testimony was allowed to stand unchallenged." *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996). Here, because of the government's non-disclosure, Charlene Wilson's testimony was allowed to stand unchallenged. Thomas's description of the shooter that was contrary to the government's case would have put the case in such a different light as to undermine confidence in the outcome. *See Kyles*, 514 U.S. at 435. Thus, a new trial is required.

### C. The Government's Refusal to Produce James Coulter to Testify as a Defense Witness Violated Martin's Right to Present a Defense and Right to Compulsory Process.

There can be no question that the right to present witness testimony is fundamental to our criminal justice system. The right to present a defense is guaranteed by the Due Process clause of the Fifth Amendment. "Few rights are more fundamental than that of an accused to present witnesses in his own defense. Indeed, this right is an essential attribute of the adversary system itself." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). As the Supreme Court has stated,

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Webb v. Texas*, 409 U.S. 95 (1972).

The right to present witnesses in one's defense is grounded in the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The right to compulsory process is integral to the right to present a defense.

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and

> public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of the courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

*United States v. Nixon*, 418 U.S. 683, 709 (1974); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) ("[t]he right to offer the testimony of witnesses and to compel their attendance, if necessary, is in plain terms the right to present a defense"). *See also Washington*, 388 U.S. at 19; *Taylor*, 484 U.S. at 409 (stating, "[t]he right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words"). "The Compulsory Process clause protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling by the trial judge." *Government of the Virgin Islands v. Mills*, 956 F.2d 443, 445 (3d Cir. 1992). *See also*, *Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (acknowledging that to the extent a statute operates to prevent a criminal defendant from presenting relevant evidence, the defendant's ability to present a defense is diminished).

In this case, the government charged Martin with shooting and wounding James Coulter, but did not produce Coulter to testify. Coulter had previously stated to a defense investigator that Martin did not shoot him or that he did not know who had shot him. Defense counsel attempted to subpoena Coulter to testify, believing that his

testimony would exonerate Martin. Counsel was unable to locate Coulter and sought the government's assistance in serving a subpoena. The government represented that it had no knowledge of Coulter's whereabouts and Coulter never testified. Yet the government was able to locate Coulter when needed for its own purposes.

Martin was convicted of shooting Coulter in the guilty verdicts rendered on August 7, 2001. Approximately six months later, on February 13, 2002, Coulter was arrested and charged in this district with a drug offense in violation of 21 U.S.C. §841(a)(1) in case no. 02-mj-00104-AK.[8] According to the docket in that case, Magistrate Judge Alan Kay ordered Coulter to be temporarily detained "to permit revocation of conditional release, deportation or exclusion." There is no evidence that Coulter is subject to deportation or exclusion and therefore only "revocation of conditional release" was applicable. The order suggests that Coulter was being supervised at the time, such that he would be subject to revocation of conditional release. If Coulter was being supervised, the government would have been able to locate him for trial. Even if Coulter was not being supervised, the government was able to locate him for its own case. The government's representation that it would not be able to serve a subpoena on Coulter for Martin's trial constituted prosecutorial misconduct.

---

[8] The docket sheet to case no. 02-mj-00104-AK states that the magistrate's case merged into criminal case no. 02-074. However, that criminal case number does not appear on the public docket.

Some courts have held that the government may be compelled to grant immunity to a potential defense witness where the government's refusal is an abuse of discretion under the Immunity Act. *See United States v. Moussaoui*, 365 F.3d 292 (4th Cir. 2004); s*ee also United States v.* Abbas, 74 F.3d 506, 511-12 (4th Cir. 1996) (holding that a district court may compel the government to grant immunity upon a showing of prosecutorial misconduct and materiality); *United States v. Westerdahl*, 945 F.2d 1083 (9th Cir. 1991) (recognizing that government's grant of immunity to government witness while denying immunity to a contradictory defense witness would deny the defendant a fair trial).

Actions by the government tending to make a witness unavailable to the defense may constitute prosecutorial misconduct warranting a new trial. *United States v. Lord*, 711 F.2d 887 (9th Cir. 1983) (remanding for an evidentiary hearing where the record suggested that prosecutorial misconduct caused a witness to invoke his Fifth Amendment privilege against self-incrimination and denied the defendant a fair trial); *cf. United States v. Quinn*, 728 F.3d 243, 248 (3d Cir. 2013) (stating that government refusing to immunize a witness in order to keep clearly exculpatory and essential testimony from trial without a strong countervailing reason constitutes a type of prosecutorial misconduct).

Here, Coulter was a crucial witness for the defense. The government represented that it did not know how to find Coulter. Yet, the government was able

to arrest Coulter just months after Martin was convicted. The government's mis-representation deprived Martin of his right to present a defense and his right to a fair trial.

###   D.   Trial Counsel Was Ineffective For Failing to Recall Charlene Wilson to Impeach Her Testimony that She had Witnessed Fortune's Shooting.

A defendant's Sixth Amendment right to counsel includes the right to effective assistance of counsel. *See Yarborough v. Gentry*, 540 U.S. 1, 5, (2003); *Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000); *Strickland v. Washington*, 466 U.S. 668, 685-86, (1984); *Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir. 2002). Therefore, a defendant is entitled to reasonably competent counsel who gives advice within the range of competence required in criminal cases. *See Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003); *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986); *Strickland*, 466 U.S. at 687; *United States v. Mohammed*, 863 F.3d 885 (D.C. Cir. 2017).

To prevail on a claim of ineffective assistance of counsel, a petitioner must meet the two-prong requirement set forth in *Strickland* and show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Id.*, 466 U.S. at 687. To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 688. There is a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Mohammed*, 863 F.3d at 889 (D.C. Cir. 2017).

While deference is accorded to trial counsel's reasonable trial strategies, such strategies must, at the outset, be reasonable. *See, e.g., Huynh v. King*, 95 F.3d 1052, 1057-58 (11th Cir. 1996) (holding that purposeful strategy of trial counsel was unreasonable); *Holsomback v. White*, 133 F.3d 1382, 1387-88 (11th Cir. 1998) (holding that trial counsel's failure to investigate was unreasonable and therefore his failure to introduce medical evidence was not based on an informed tactical decision); *Berryman v. Norton*, 100 F.3d 1089 (3d Cir. 1996) (holding that trial counsel's decisions were unreasonable because they were not supported by adequate investigation or sound trial strategy and the defendant was prejudiced).

First and foremost, counsel must make an informed decision taking into consideration the state of the law and its consequences. *See Kimmelman v. Morrison*, 477 U.S. 365 (1986) (concluding that trial counsel's failure to conduct discovery and consequent failure to file a timely motion to suppress evidence constituted deficient performance).

In this case, the government's key witness in the Fortune murder, Charlene Wilson, testified that she saw Carson shoot Fortune and enter a van driven by Martin. Approximately four months later in the trial, Agent Chris Warrener testified that Wilson began providing information to the FBI in mid-August 1992, approximately

one year after the Fortune shooting. (Tr. 6/14/01 PM p. 28). She initially provided

information about drug activity without payment, and then the FBI began paying

Wilson for information shortly thereafter. *Id.* at 28-29. Warrener testified that Wilson

was supporting two children and was struggling financially. *Id.* at 29. Warrener did not

indicate that there was any limit to how much money he would pay her, and she may

have had the impression that some types of information would be more valuable than

others. (Tr. 6/14/01 PM p. 30). According to Warrener, approximately three or four

months after she first approached the F.B.I with information, and after she began

receiving payments, she began speaking to police about the Fortune murder. *Id.* at 30-

31.

Because Warrener used his 302 report to refresh his recollection during his

testimony, a copy was provided to the defense over the government's objection. (Tr.

6/14/01 PM p. 48). Defense counsel discovered that Warrener had written in his

report that Wilson had *heard* the information about Fortune's murder—not that she

had witnessed it first-hand as she had testified. (Tr. 6/14/01 PM p. 55). Upon cross-

examination about this point, Warrener acknowledged that the report said that Wilson

had only heard about the Fortune murder. Warrener contended that he had phrased

the report in that way to protect Wilson's identity. *Id.* at 55-56. He testified, however,

that when he took Wilsons's statement, he did not intend for her to testify at trial and

he wrote the information in the form of an investigative insert to protect her identity. *Id.* at 35, 55-56.

Warrener's report also provided new information about how long Wilson waited before she began talking about the Fortune murder. Warrener's report showed that Wilson first began providing information about the shooting on January 28, 1993, more than 16 months after Fortune's death. (Tr. 6/14/01 PM p. 56).

Having obtained a copy of Warrener's report, trial counsel discovered evidence to contradict Wilson's claim that she witnessed Fortune's shooting. Counsel failed, however, to use this information to Martin's advantage. Counsel should have, but failed, to recall Wilson for cross-examination and establish whether she had only heard about the events she had testified to earlier. There was no strategic or tactical reason not to recall the witness after obtaining the 302. The jury had already heard Wilson testify that Carson was the shooter and that Martin drove Carson away after the shooting. That testimony stood virtually unchallenged. Agent Warrener's report indicated that Wilson was not an eye-witness as she had claimed.

Trial counsel also should have cross-examined Wilson about how long she waited before giving information to police. Whereas previously it was thought that Wilson began providing information about the shooting a few months after the shooting, Warrener's report showed that it was more than 16 months—a year longer

than previously thought. This was an additional area of cross-examination counsel could have used to defeat Wilson's credibility.

There is a reasonable probability that, had trial counsel recalled Wilson to cross-examine her with the new evidence, the result of the trial would have been different. Warrener's report stating that she had only heard about the shooting was not the first time Wilson claimed to have seen something she had only heard about. During her testimony, she said that while she was standing outside, there was a craps game going on across the street and that Fortune had robbed the craps game.

> Q.    At what point did you notice Tony Fortune being out there?
>
> A.    While I was standing out there with Regina, he was walking towards his car. There was a crapgame [sic] going on across the street where he had robbed and was on his way to his car.

Tr. 2/13/01 AM p. 25. The next day, Wilson admitted that she did not actually see Fortune commit a robbery.

> Q.    Did you see Anthony Fortune rob someone at that crap game?
>
> A.    No, I didn't see it. *It was told.*

(Tr. 2/13/01 PM p. 7) (emphasis added). In her testimony, Wilson did not distinguish between what she saw and what she heard from someone else. In the above excerpt, she testified as if she witnessed all the events first-hand. Cross-examination revealed that she did not witness Fortune committing a robbery but had only heard about it. With new evidence that Wilson did not see everything she reported, it was incumbent

on trial counsel to recall Wilson and examine her further about what she had actually witnessed and what she had heard from others.

The additional information that Wilson had waited more than a year to provide information about the shooting further lessened her credibility. It was telling that police did not act on Wilson's information. Even after Wilson told Warrener that she saw Carson shoot Fortune and get into a car driven by Martin, the police did not arrest anyone in connection with Fortune's murder for many years. (Tr. 6/14/01 PM p. 58-59). Given Wilson's importance in the government's case, trial counsel was ineffective for failing to pursue additional opportunities to cross-examine her.

### E.  Trial Counsel Was Ineffective For Failing to Investigate and Present Evidence that Martin Did Not Shoot Coulter.

Adequate investigation by trial counsel is fundamental to a defendant's right to effective assistance of counsel. "Only when reasonable investigation has been performed is counsel in a position to make informed tactical decisions." *United States v. Barbour*, 813 F.2d 1232, 1234 (D.C. Cir. 1987). "In assessing the reasonableness of an attorney's investigation ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527, (2003).

Here, Coulter was shot while playing craps in the company of other people. Yet no eye-witnesses testified for the government or the defense. After Martin's trial, his

family retained an investigator to pursue witnesses to the Coulter shooting. The investigator located and interviewed Michael Floyd, who was playing craps next to Coulter at the time the gunman approached the group. Michael Floyd stated that a man ran up and pulled out a gun; he believed there was about to be a robbery. He ran, and Coulter ran past him. Michael Floyd further stated that he had known Martin for approximately four years and that the gunman was not Martin. *Id.*

Martin's investigator furthermore talked to Juan Floyd who was also present when Coulter was shot. Juan saw the gunman's face and recognized him as someone he knew by name of Avery. Juan Floyd believed that Avery shot Coulter because of a financial dispute. *Id.*

Trial counsel was ineffective for failing to conduct an adequate pre-trial investigation. "[A]n attorney must, at a minimum, 'conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself enough time for reflection and preparation for trial.'" *Sneed v. Smith*, 670 F.2d 1348, 1353 (4th Cir. 1982) (quoting *Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir. 1968)). Furthermore, "[c]ounsel must ordinarily 'investigate possible methods for impeaching prosecution witnesses.'" *See Huffington v. Nuth*, 140 F.3d 572 (4th Cir. 1998) (quoting *Hoots v. Allsbrook*, 785 F.2d 1214, 1221 (4th Cir. 1986)).

There is a reasonable probability that, had trial counsel conducted an adequate investigation and presented the testimony of Michael Floyd and Juan Floyd at trial,

Martin would not have been convicted of shooting Coulter. The government's evidence against Martin consisted of cooperator testimony about inculpatory statements made by Hill or Martin. There was no physical evidence connecting Martin to the shooting and the government did not present a single witness who was on the scene of the shooting.

Michael Floyd and Juan Floyd were eye-witnesses to the shooting. Their testimony that Martin was not the shooter, and that Juan Floyd recognized the shooter as Avery, would have been powerful evidence in Martin's defense. Given the government's weak circumstantial case against Martin, there is a reasonable probability that Martin would not have been convicted of shooting Coulter if this evidence had been presented in his trial.

### F.    A New Trial is Required on Martin's Drug Conspiracy and RICO Conspiracy Convictions.

The government presented the murder of Antonio Fortune and shooting of James Coulter as evidence of Martin's participation in a drug conspiracy and a RICO conspiracy. The Fortune murder was charged as an overt act of the drug conspiracy (Second Retyped Indictment, Dkt No. 760 p. 9), and the government alleged that the Fortune murder started a violent feud between Hill's group and a rival group of drug dealers. *Id.* p. 23. The Fortune murder was also charged as a racketeering act supporting the RICO conspiracy charge. (See Racketeering Act 23, *id.* p. 33). The

Coulter shooting was similarly charged as an overt act of the drug conspiracy, *id.* p. 13, and as a racketeering act. (See Racketeering Act 44, *id.* p. 46). In closing arguments, the government emphasized that violence, including the murder of Fortune, was connected to "beefs" between rival drug groups. (Tr. 6/26/01 PM p. 72-74).

The indictment alleged that Martin shot Coulter "for the purpose of gaining entrance to and maintaining and increasing his position in . . . an enterprise engaged in racketeering activity . . . " *id.* p. 65. The government alleged that Martin shot Coulter at Vincent Hill's behest, because Coulter was seen talking to a homicide detective and was believed to be cooperating with police. Tr. 1/8/01 PM p. 36-37.

The drug conspiracy and RICO conspiracy convictions rest on the violent acts of the Fortune murder and Coulter shooting. Because of Martin's convictions arising out of the Fortune murder and Coulter shooting were obtained in violation of the Constitution, his convictions for drug conspiracy and RICO conspiracy cannot stand. A new trial is required on those counts.

## IV. CONCLUSION

For the forgoing reasons, Martin requests a new trial and sentencing.

Respectfully submitted,

/s_____
Michael E. Lawlor
6305 Ivy Lane
Suite 700
Greenbelt, Maryland 20770

301.474.0044

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of November 2018, a copy of the

foregoing was delivered via ECF to all interested parties.

/s _____
Michael E. Lawlor

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA           :

           v.                                    :           Criminal. No. 98-CR-00329-4 (RCL)

WILLIAM KYLE SWEENEY,              :

           Defendant.                    :

## AFFIDAVIT OF JENIFER WICKS

This Affidavit is made upon personal knowledge, and I believe that I am competent to testify to the facts set forth herein.

1. Upon my motion, the court ordered the clerk of the court to allow me to see all of the documents filed under seal in this case on February 15, 2008. I requested this order so I could view the exhibits sealed by the court during trial.

2. I filed a petition pursuant to Section 2255 on behalf of Mr. Sweeney on February 19, 2008.

3. Prior to me filing the 2255 petition Mr. Sweeney had discussed with me, and had written to me on November 18, 2007, asking that I raise every issue in his case as he did not want to procedurally barred from raising an issue later.

4. I have reviewed correspondence from dated March 16, 2008, October 9, 2008, October 19, 2008, March 26, 2009, February 26, 2008, and April 29, 2010, in which Mr. Sweeney wrote to me generally inquiring if I had obtained the sealed exhibits and been able to review them and would the delay in obtaining the documents result in him being time barred as to any issue. During this time, he and I also discussed this during phone conferences. Over this period of time, I believed and advised Mr. Sweeney that

he would not be time barred as any helpful information in the materials sealed by the

Court as the documents would relate back to the timely filed *Brady* claims in the 2255

petition that I had filed.

    6. I went to the clerk's office numerous times between February 2008 and June

2010 requesting the sealed materials in the case. I kept going back because the clerk's

office had not provided me with the sealed court exhibits from trial -I finally obtained

the sealed court exhibits on June 17, 2010.

    THE PURSUANT TO 28 U.S.C. § 1746, I SWEAR THAT I AM THE PERSON
REFERRED TO ABOVE AND I DECLARE UNDER PENALTY OF Perjury THAT
FOREGOING IS TRUE AND CORRECT.

Date: 9/27/2020

Jenifer Wicks

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

JEROME MARTIN, JR.,
SAMUEL CARSON,
WILLIAM KYLE SWEENEY,
SEAN COATES,

     *Defendants.*

Case No. 98-cr-329-RCL

### MEMORANDUM OPINION

    In 2001, defendants Jerome Martin, Jr., Samuel Carson, William Sweeney, and Sean Coates were each convicted for narcotics- and racketeer-influenced corrupt organization ("RICO") conspiracies, murder and other violent crimes, violent crimes in aid of racketeering, narcotics trafficking, and weapons possession. The trial court sentenced each defendant to lengthy prison terms in 2002. In February 2008, defendants each moved under 28 U.S.C. § 2255 to vacate, set aside, or correct their sentences. ECF Nos. 1017, 1020, 1021, 1023. Years later—beginning in 2014—defendants filed numerous amendments to their initial motions.[1] ECF Nos. 1104, 1140, 1156, 1166, 1170, 1182, 1183, 1184, 1191, 1192, 1197, 1198, 1229, 1233, 1273. The government then filed an omnibus response in opposition. ECF No. 1255.

    Defendants pepper their motions with claims alleging government misconduct, ineffective assistance of counsel, and unconstitutional sentences. Many are time-barred or procedurally

---

[1] Defendants style these filings as "supplements," but they are better understood as amendments to the original § 2255 motions per Rule 15 of the Federal Rules of Civil Procedure. *See United States v. Hicks*, 283 F.3d 380, 386 (D.C. Cir. 2002).

1

defaulted. Some claims are one-sentence assertions with no factual support. And other claims misrepresent the record. All told, defendants have alleged nearly ninety claims for the Court to adjudicate. After considering defendants' filings, the government's response, and the entire record, the Court will **DENY** defendants' motions to vacate, set aside, or correct their sentences.

## I.    BACKGROUND

### A. Factual Background

This case is a "story of mayhem and disorder." *United States v. Carson*, 455 F.3d 336, 339–47 (D.C. Cir. 2006). Defendants organized and operated a massive narcotics conspiracy around the 200 block of K Street, Southwest, in the District of Columbia for nearly twenty years. *Id.* at 339. Their drug business "led to an astonishing amount of violence and a seemingly complete repudiation of civil society and respect for human life." *Id.* Defendants' drug conspiracy ended only after a multiyear investigation by the Federal Bureau of Investigation ("FBI") resulted in their arrests. *Id.* Though defendants' § 2255 motions focus on the crimes listed below, these events are only a fraction of defendants' overall misconduct.

In 1991, defendant Carson shot and killed Anthony Fortune after a dispute over a craps game. An eyewitness testified that Carson "walk[ed] towards [Fortune], shooting," then "stood over top of him and shot him." 02/13/01 (AM) Tr. 25, ECF No. 668. Carson then got into a car driven by Martin and the two drove away. *Id.* at 27. Other witnesses testified that Martin and Carson bragged about shooting Fortune years later. *See, e.g.*, 03/12/01 (PM) Tr. 34–35, ECF No. 954 (James Montgomery).

In 1993, the defendants kidnapped Anthony Pryor—who testified against them at trial. A Maryland resident awoke to the sound of four individuals outside. *Carson*, 455 F.3d at 343. She saw four men arguing with Anthony Pryor. *Id.* After an argument, the men began to fight him.

2

*Id.* Pryor started to run, but an assailant shot him twice and the men kidnapped him. *Id.* As the car drove off, the witness saw that the door to the trunk had come off of the car. *Id.* Later that night, police investigated a car that was missing a trunk door and had "bloodstains," "clothing items, car parts, and duct tape . . . scattered all around." *Id.* Defendant Coates's fingerprints were found on the car. *Id.* Coates later told James Montgomery—the government's key witness at trial—that he had kidnapped someone who had broken the trunk door of a car to escape. *Id.*

In 1996, K Street members committed a robbery that resulted in the triple murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson. *Id.* at 344. Sweeney, Coates, and Montgomery drove to Gaskins's craps house in Temple Hills, Maryland. *Id.* at 345. Sweeney brought a .40 caliber Glock firearm with him. *Id.* at 345. Sweeney and Montgomery jumped out of the car to rob the house; Coates stayed behind. *Id.* "Without attempting to rob Gaskins, Sweeney shot Gaskins, shot Mack, and then shot Anderson on his way out." *Id.* Montgomery recounted this story in detail at trial.

Seemingly undeterred by the blood on their hands, defendants soon began killing off potential witnesses. In 1997, the FBI arrested Robert Smith, one of the K Street gang's main suppliers. *Id.* at 346. Smith agreed to cooperate and gave statements incriminating the defendants in crimes of violence—including the Maryland triple murder. *Id.* at 347. Carson and Montgomery looked for opportunities to kill Smith, but he was often with others. *Id.* On June 16, 1997, Carson borrowed Montgomery's car. *Id.* Smith was shot later that day. *Id.* Though the government presented no eyewitness testimony at trial, Montgomery testified that when Carson returned with the car, Carson said, "man, trust me, we're all right" and told Montgomery to avoid the crime scene. *Id.* Smith was shot eleven times—seven times in the head. *Id.*

3

**B. Procedural Background**

On September 18, 1998, the government indicted defendants for a narcotics conspiracy, a racketeering conspiracy, murders, other violent crimes, narcotics trafficking, and weapons possession. *Id.* at 347. Judge Thomas Penfield Jackson presided over a nine-month joint trial of all the defendants. *Id.* Ultimately, the jury returned guilty verdicts against defendants on most counts in the indictment. *Id.* The Court sentenced each defendant to life imprisonment, with consecutive sentences based on 18 U.S.C. § 924(c) to run after the life sentences. *See id.* at 382. In 2006, the D.C. Circuit affirmed defendants' convictions. *Id.* at 339. The Supreme Court denied defendants' petitions for writs of certiorari on February 20, 2007. *Carson v. United States*, 549 U.S. 1246 (2007).

These collateral proceedings then began. On February 15, 2008, then-Chief Judge Thomas F. Hogan ordered the Clerk's Office to provide "copies of any necessary sealed pleadings in this matter" to defendant Sweeney's counsel. ECF No. 1016. The remaining defendants indicated that they received access to these materials at that time. *See, e.g.*, ECF No. 1170 at 9 n.6 (stating that the records were "turned over by the clerk in 2008"). Defendants all filed their first § 2255 motions between February 18 and 28, 2008. ECF Nos. 1017, 1020, 1021, 1023.

Years later—starting in November 2014—defendants each filed amendments to their § 2255 motions. ECF Nos. 1156, 1166, 1170, 1197, 1198, 1273. After *Johnson v. United States*, 135 S. Ct. 2251 (2015), and *Davis v. United States*, 139 S. Ct. 2319 (2019), defendants submitted arguments that their convictions under 18 U.S.C. § 924(c) were unconstitutional. ECF Nos. 1182, 1183, 1184, 1192, 1229. Defendants also moved to adopt arguments in their co-defendants' motions. ECF Nos. 1024, 1185, 1228, 1229 1230, 1249, 1279. On March 18, 2020, the government filed an omnibus response to these filings. ECF No. 1255.

4

## II.    LEGAL STANDARD

Under 28 U.S.C. § 2255, a federal prisoner may move to vacate, set aside, or correct his

sentence if: (1) the sentence was imposed "in violation of the Constitution or laws of the United

States; (2) the court lacked jurisdiction to impose the sentence; (3) the sentence "was in excess of

the maximum authorized by law"; or (4) the sentence is "otherwise subject to collateral attack."

28 U.S.C. § 2255(a). The petitioner bears the burden to prove his right to relief by a preponderance

of the evidence. *United States v. Baugham*, 941 F. Supp. 2d 109, 112 (D.D.C. 2012). Moreover,

a district court need not hold an evidentiary hearing when "the motion and the files and records of

the case conclusively show the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

Obtaining collateral relief requires a defendant to clear several procedural hurdles. First,

§ 2255 motions are subject to a one-year statute of limitations. 28 U.S.C. § 2255(f). The

limitations period begins on the latest of:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* § 2255(f)(1)–(4). In most cases, the operative date will be the date that the "judgment of

conviction becomes final." *Dodd v. United States*, 545 U.S. 353, 357 (2005). If a defendant seeks

Supreme Court review, the judgment is "final" when the Supreme Court affirms the conviction on

the merits or denies the certiorari petition altogether. *See Clay v. United States*, 537 U.S. 522, 527 (2003).

Claims raised after the one-year limitations period may still be considered if they "relate back" to timely claims. Claims relate back to the date of the initial § 2255 motion if they "arose out of the conduct, transaction or occurrence set out . . . in the original [motion]." Fed. R. Civ. P. 15(c)(1)(B); *see United States v. Hicks*, 283 F.3d 380, 383 (D.C. Cir. 2002). But later-raised claims will not relate back when they "assert[] a new ground for relief" based on "facts that differ in both time and type" from the facts supporting the original pleading. *Mayle v. Felix*, 545 U.S. 644, 650 (2005); *see United States v. Coughlin*, 251 F. Supp. 3d 212, 218–19 (D.D.C. 2017).

Second, a defendant procedurally defaults any claims not raised on direct appeal unless he can show (1) cause excusing the default and (2) prejudice resulting from the alleged error. *United States v. Hughes*, 514 F.3d 15, 17 (D.C. Cir. 2008) (citing *Massaro v. United States*, 538 U.S. 500, 503 (2003)). To establish cause, a defendant must demonstrate "'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim," such as government interference or that the factual or legal basis for the claim was not reasonably available. *McCleskey v. Zant*, 499 U.S. 467, 493–94 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Prejudice requires that the defendant show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). This procedural-default limitation, however, does not apply to claims for ineffective assistance of counsel. *Massaro*, 538 U.S. at 509.

Finally, a district court may deny § 2255 motions that "offer only bald legal conclusions with no supporting factual allegations." *Mitchell v. United States*, 841 F. Supp. 2d 322, 328

6

(D.D.C. 2012) (citing *Sanders v. United States*, 373 U.S. 1, 19 (1963)). And "conclusory arguments may be summarily dismissed" by a district court. *United States v. Geraldo*, 523 F. Supp. 2d 14, 22 (D.D.C. 2007) (citing *United States v. Morrison*, 98 F.3d 619, 626 (D.C. Cir. 1996)).

## III.   DISCUSSION

Defendants raise copious challenges to their convictions. But the Court need not evaluate the merits of all these claims. Some claims are barred by § 2255(f)'s statute of limitations. Others are procedurally defaulted after not being raised on direct appeal. And many are conclusory legal assertions without supporting facts. Defendants' remaining claims fall into in three groups: (1) allegations of government misconduct, (2) allegations of ineffective assistance of counsel, and (3) arguments that some of their sentences under 18 U.S.C. § 924(c) are unconstitutional. Ultimately, the Court finds that none of defendants' arguments warrant a vacated sentence and will **DENY** their § 2255 motions.

### A. Government Misconduct

The Court begins with defendants' claims that the government violated their Fifth Amendment rights through misconduct. In criminal cases, the prosecution must disclose material evidence to the defense that is favorable to an accused, including potential impeachment evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972). This duty vindicates the Fifth Amendment's fair-trial guarantee and ensures that miscarriages of justice do not occur. *See United States v. Straker*, 800 F.3d 570, 602 (D.C. Cir. 2015). A *Brady* violation occurs when the prosecution: (1) "fails to disclose to the defense, whether willfully or inadvertently," (2) "exculpatory or impeachment evidence that is favorable to the accused," and

7

(3) "the withholding of that information prejudices the defense." *Straker*, 800 F.3d at 603; *see Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

To show prejudice, a petitioner must show that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler*, 527 U.S. at 289 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Put another way, the question is whether it is reasonably likely that the favorable evidence would have put the case in such a different light that it "undermine[s] confidence in the verdict." *Kyles*, 514 U.S. at 435. For example, the failure to disclose potential impeachment material will not violate *Brady* when it "would have been negligible and cumulative of similar evidence presented to the jury." *United States v. Oruche*, 484 F.3d 590, 599 (D.C. Cir. 2007); *see United States v. Brodie*, 524 F.3d 259, 268–69 (D.C. Cir. 2008). When disclosure "happen[s] late rather than not at all," the defendant must show a "reasonable probability that an earlier disclosure would have changed the trial's result" to establish prejudice. *Straker*, 800 F.3d at 603 (quotations omitted).

A court should evaluate prejudice under *Brady* based on the suppressed evidence as a whole rather than an "item by item" basis. *Kyles v. Whitley*, 514 U.S. 419, 420 (1995). That is, individual pieces of evidence may not have impacted a trial—meaning that the government's failure to disclose was not a *Brady* violation. "But the synergistic force of the omitted evidence considered together might well generate a reasonable probability of altering the evidentiary balance." *Straker*, 800 F.3d at 608. The Court will address each defendant individually in its analysis.

### i. *Jerome Martin*

On February 18, 2008, Jerome Martin filed a timely § 2255 motion. ECF No. 1021. He raised two claims in this initial motion:

8

- The government violated *Brady* by withholding information that an eyewitness, Steven Thomas, described the shooter of Anthony Fortune as someone other than Martin or Carson. *Id.* at 8–10.

- The government, by representing that shooting victim James Coulter could not be found, violated Martin's due-process rights by preventing him from calling Coulter as a witness. *Id.* at 11–12.

Martin reiterated these claims in an amendment to his § 2255 motion. ECF No. 1233. These claims are either procedurally barred or meritless.

### a. *Steven Thomas's Description of Anthony Fortune's Murderer*

At trial, the jury found Carson and Martin guilty of murdering Anthony Fortune. The government successfully argued that Carson shot the victim while Martin aided and abetted. *See Carson*, 455 F.3d at 342. One witness, Charlene Wilson, testified that she saw Carson shoot Fortune, then get into a car driven by Martin. 02/13/01 (AM) Tr. 25–28, ECF No. 668; 02/13/01 (PM) Tr. 34, ECF No. 950. Other witnesses testified that Carson and Martin later admitted to shooting Fortune. *See* 02/15/01 (PM) Tr. 58–59, ECF No. 951 (Donald Nichols); 03/12/01 (PM) Tr. 34–35, ECF No. 954 (James Montgomery); 04/04/01 (AM) 85–86, ECF No. 689 (Charles Bender); 04/09/01 (PM) Tr. 14, ECF No. 963 (Eugene Byars); 04/25/01 Tr. Tr. 04/25/01 AM 40–41, ECF 696 (Arthur Rice).

Martin claims that the government withheld evidence that another witness—Steven Thomas—exonerated Martin and Carson for this murder. ECF No. 1021 at 10–11. Martin's counsel hired a private investigator who interviewed Thomas about the shooting. *See* ECF No. 1021 at 10; ECF No. 1233 at 21–22. Thomas represented that, shortly after Fortune's murder, he told police that neither Martin nor Carson had shot Anthony Fortune. ECF No. 1021 at 14–15. Rather, the shooter was someone "very dark-complected, stocky and taller than Martin." *Id.* Martin argues that the government possessed and withheld this exculpatory information from him and Carson, violating *Brady*. ECF No. 1021 at 10–11; ECF No. 1233 at 22–2?

But Martin procedurally defaulted this claim by not raising it during his direct appeal. Martin's only evidence of Thomas's statements is an affidavit from Martin's investigator. *See* ECF No. 1021 at 14–15. This affidavit does not state when the investigator interviewed Thomas, so Martin has not shown that he lacked this information while the direct appeal was pending. Nor has he shown cause and prejudice excusing this default. *See Hughes*, 514 F.3d at 17.

Martin cannot show prejudice excusing his default because even if the Court were to consider his claim, the trial court committed no error. By the time of trial, the government possessed two of Thomas's statements: (1) a Metro Police Department ("MPD") form detailing Thomas's police interview and (2) Thomas's grand-jury testimony about the murder.[2] According to the MPD form, Thomas told police that he was sitting in his car when he heard gunshots from behind him. Thomas did not describe the shooter or say that he saw the shooter. Thomas later testified to a grand jury about this murder. When asked if he saw the shooter, Thomas replied, "No." Since Thomas did not describe the shooter to police or the grand jury, this evidence was not exculpatory. The government therefore bore no *Brady* obligation to provide this evidence to the defense. Either under procedural-default principles or as a *Brady* violation, Martin's claim fails.

### b. *Defense Access to Witness James Coulter*

Martin next argues that the government violated his Fifth Amendment rights by preventing James Coulter from appearing as a witness. *See* ECF No. 1021 at 11–12; ECF No. 1233 at 25–26. The jury found Martin guilty for attempting to murder Coulter and for using a firearm during the attempted murder. *See* ECF No. 810 at 14. In his § 2255 motions, Martin represents that Coulter

---

[2] The government disclosed these documents to Martin on June 6, 2019. ECF No. 1268 at 103. The government also provided these documents to the Court, which it has reviewed.

10

gave a "signed, witnessed statement" that Martin did not shoot him, meaning that Martin "would have called Coulter to testify" as a "crucial witness" if possible. ECF No. 1021 at 12; ECF No. 1233 at 28. But Martin's claim is procedurally defaulted, and he has not identified any "objective factors" showing cause. Since Martin has not identified any cause excusing his default, this claim is procedurally barred.[3]

### ii. Samuel Carson

Samuel Carson's first § 2255 motion—filed *pro se*—included three grounds for relief. ECF No. 1023 at 5. Carson offered no factual support for these claims, instead referencing an "Attached Memorandum of Law and Facts." *See id.* Carson did not attach this memorandum to his first § 2255 motion and has not provided it to the Court. Even "liberally constru[ing]" Carson's motion, *United States v. Gooch*, 842 F.3d 1274, 1278 (D.C. Cir. 2016), the Court may summarily deny the following bare-bones claims.[4]   *See Mitchell*, 841 F. Supp. 2d at 328; *Geraldo*, 523 F. Supp. 2d at 22.

- Carson was deprived of his Sixth Amendment right to effective assistance of counsel because of a "Failure to Investigate" and a "Failure to Object to Inadmissible Evidence." ECF No. 1023 at 5.

---

[3] Additionally, Martin has not shown that this missing testimony prejudiced him at trial—i.e., "infect[ed] his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. Martin has not provided Coulter's "signed, witnessed statement that Martin did not shoot him" to the Court. Moreover, the evidence presented at trial inculpated Martin. In 1995, defendant Vincent Hill implied that Coulter needed to be killed. 02/15/01 (PM) Tr. 60, ECF No. 951. Coulter was shot later that year. 01/30/01 (PM) Tr. 54–55, ECF No. 944. One witness—Eugene Byars—testified that Martin complained about trying (but failing) to kill Coulter at a craps game. 04/09/01 (PM) Tr. 23, ECF No. 963. Another witness—Donald Nichols—heard defendant Hill ask Martin why his gun jammed when shooting Coulter and tell Martin that he should have used two guns. 02/15/01 (PM) Tr. 62, ECF No. 951. Since Martin has not proven cause or prejudice, his claim must fail for procedural default.

[4] Carson's motion raises a timing issue as well. His first § 2255 motion was filed on February 28, 2008—eight days after § 2255(f)(1)'s one-year statutory deadline. *See* ECF No. 1023; 28 U.S.C. § 2255(f)(1). However, Carson signed and dated the motion as of February 18, 2008—two days before that deadline. *See* ECF No. 1023 at 7. For *pro se* § 2255 motions, the date of filing is the date the motion is placed in the prison mailing system. *Houston v. Lack*, 487 U.S. 266, 270–71 (1988). The government maintains that Carson has failed to show when he placed the motion in the prison mailing system, which Carson answers by attesting that he mailed his § 2255 motion on February 18. *See* ECF No. 1255 at 80–81; ECF No. 1278-1 at 1. The Court need not decide this issue because it may summarily deny Carson's claims.

- Carson's sentence was "Imposed in Violation of The United States Constitution." *Id.*

- "Newly Discovered Evidence" establishes that Carson was denied his Fifth Amendment right to due process. *Id.*

Years later, Carson filed an amended § 2255 motion. ECF No. 1170. This amended motion included the following government-misconduct claims, two of which are time-barred:

- The government violated Carson's due-process rights by failing to maintain the trial exhibits, including a fingerprint card lifted from the Maryland triple murder. *Id.* at 29–30.

- The government violated *Brady* and *Giglio* by withholding documents that it submitted to the trial court for *in camera* review before and during trial. *See* ECF No. 1170 at 10–20.[5]

- The government violated *Brady* by failing to disclose that it paid benefits to two witnesses—Cheree Owens and John Pinckney—who testified before a grand jury regarding the Maryland triple murder. Pinckney and Owens did not testify in the K Street trial. Carson posits that the government paid these witnesses to "disappear[]." *Id.* at 21–29.

Carson asserts a new ground for relief with his due-process claim about the fingerprint card, making it time-barred. *See Mayle*, 545 U.S. at 650. Nor will the Court consider his *Brady* claim regarding documents submitted for *in camera* review. Chief Judge Hogan unsealed this case's trial records on February 15, 2008. ECF No. 1016. Carson acknowledged that, in 2008, he had access to these records. *See, e.g.*, ECF No. 1170 at 9 n.6. Under § 2255(f)(4), Carson could raise claims based on this newly discovered evidence until February 15, 2009. *See* 28 U.S.C. § 2255(f)(4). But Carson submitted this claim in 2015, years after the statutory deadline. Further, it is a stretch to say that this *Brady* claim relates back when Carson's original claim for "[n]ewly [d]iscovered [e]vidence" lacked any detail.

---

[5] Chief Judge Hogan unsealed these documents during these § 2255 proceedings on February 15, 2008. ECF No. 1016.

12

However, Carson's *Brady* claim about the Maryland triple-murder witnesses is neither time-barred nor procedurally defaulted. Carson argues that the government paid Cheree Owens and John Pinckney to prevent them from testifying at the K Street trial. ECF No. 1170 at 21–29. Carson discovered this evidence when his private investigator interviewed Owens, on May 29, 2004. According to Carson's investigator, Owens divulged that the government moved her and Pinckney to several locations and paid for moving and housing costs after their grand-jury testimony. ECF No. 1133-2 at 10. Since Carson filed his amended § 2255 motion within a year of discovering this evidence, this claim is not time-barred. *See* 28 U.S.C. § 2255(f)(4). And because Carson lacked this evidence on his direct appeal, the claim is not procedurally defaulted.

Even still, Carson cannot succeed because the government did not violate *Brady*. This Court previously denied Carson's request for discovery on this issue. Mem. Op. at 7, ECF No. 1124. Because Owens and Pinckney did not testify at the K Street trial, the government only had a duty to disclose *Brady* material. *Id.* And as this Court has noted, "the government met its *Brady* obligations" by disclosing "(1) Owens's and [Pinckney's] testimony that someone other than Carson killed the three victims; (2) the relocation payments to Owens and [Pinckney]; and (3) the fact that [Pinckney] and Owens absconded with the government's money." *Id.* Therefore, this *Brady* claim fails.

### iii.  William Sweeney

William Sweeney filed many claims in his § 2255 motions, most of which are time-barred. Sweeney raised three government-misconduct claims in his first § 2255 motion:

- The government violated *Brady* and *Giglio* by not turning over evidence impeaching the credibility of government witness James Montgomery that it used in *United States v. Steven Dewitt*, No. 1991 FEL 5548 (D.C. Super. Ct. Dec. 17, 2004). *Id.* at 16.

13

- The government committed prosecutorial misconduct by obtaining testimony "by any means necessary" from its key witnesses. *Id.*

- The government violated Sweeney's Sixth Amendment rights by obtaining "jailhouse" confessions implicating Sweeney for several crimes. *Id.* at 16–17.

ECF No. 1017 at 16–17.

Sweeney raised additional government-misconduct claims in an amended motion on November 28, 2014. ECF No. 1140-2. He reiterated these arguments in another amended § 2255 motion on February 25, 2015. ECF No. 1156. And on October 31, 2018, Sweeney attempted to add a claim alleging cruel and unusual punishment under the Eighth Amendment. ECF No. 1227 at 2–3. These new claims are untimely by several years, so the Court will not consider them:

- The government violated *Brady* and *Giglio* by not disclosing that government witness James Montgomery lied to an FBI investigator about the murder of Timothy Benton. *Id.* at 24–25.

- The government violated *Brady*, *Giglio*, and *Napue v. Illinois*, 360 U.S. 264 (1959), by not disclosing that a cooperating witness—Theodore Watson— had "chronically lied and schemed in pursuit of a departure" in his own prosecution in another jurisdiction. *Id.* at 11–24.

- The government violated *Brady* and *Giglio* by not disclosing that another witness—Charles Bender—stated that co-defendant Martin had confessed to murdering Anthony Fortune. *Id.* at 25–26.

- The government violated *Brady* and *Giglio* when it did not disclose a report regarding a cooperating witness, Arthur Rice. At trial, James Montgomery had testified that he and Carson killed two individuals. Rice, however, told the FBI that he was present at the time of the murder, heard gunshots, and saw only Martin and Carson fleeing the scene. This information would have impeached Montgomery's credibility. *Id.* at 26–27.

- The government violated *Brady* and *Giglio* by not disclosing that a cooperating witness—Andrew Murray—told the government that another individual killed informant Robert Smith. *Id.* at 27–28.

- The government violated *Brady* and *Giglio* by not disclosing information pertaining to the murder of informant Robert Smith. *Id.* at 28–46.

14

- The trial court abused its discretion by sealing government documents showing that others had a motive to kill, or in fact killed, informant Robert Smith. *Id.* at 46–55.

- The trial court sentenced Sweeney to life without parole for the narcotics conspiracy. This sentence should be vacated based on *Miller v. Alabama*, 567 U.S. 460 (2012), because Sweeney was a juvenile for some years of the conspiracy. ECF No. 1229 at 2–3.

Even if the Court assumes that Sweeney's prior counsel could not access the previously sealed evidence at issue until June 17, 2010, Sweeney had until June 17, 2011 to raise new claims. *See* ECF No. 1280 at 3; 28 U.S.C. § 2255(f)(4). Because he filed these new claims years after that date, they are untimely.[6] Therefore, the Court will discuss only the claims in Sweeney's first § 2255 motion.

### a. *Evidence Impeaching James Montgomery's Credibility*

Sweeney first asks the Court to find a *Giglio* violation based on an unrelated case. In 1992, the D.C. Superior Court convicted a man named Steven Dewitt for murdering Paul Ridley. *United States v. Steven Dewitt*, No. 1991 FEL 5548 (D.C. Super. Ct. Dec. 17, 2004). After serving thirteen years in prison, Dewitt filed an actual-innocence claim. *Id.* at 3–4. Dewitt claimed that Samuel Carson—the defendant in this case—killed Paul Ridley. *Id.* "If [Carson] did, Dewitt did not; there [was] no room in the evidence for finding that both did." *Id.* at 3. James Montgomery testified at the actual-innocence proceedings that Carson told him about murdering Paul Ridley. *Id.* at 13, 15. As the opposing party, the government tried to impeach Montgomery's credibility at a hearing on

---

[6] Sweeney argues that the Court should equitably toll the statute of limitations because of his prior counsel's "extraordinary negligence"—she purportedly failed to respond to his messages and did not file the amended motion promptly. ECF No. 1277 at 15–16. The Court is unconvinced. A court may equitably toll § 2255(f)'s statute of limitations if the defendant has "pursu[ed] his rights diligently" and "some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010); *see United States v. McDade*, 699 F.3d 499, 504 (D.C. Cir. 2012). Equitable tolling should be employed "only sparingly." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). The Court cannot see that Sweeney's delays amount to an extraordinary circumstance. Given that Sweeney wrote a letter to his counsel in August 2010 laying out the *Brady* material "in impressive detail," ECF No. 1277 at 4, nothing prevented him from filing the motion *pro se* if he no longer felt that his counsel was sufficiently engaged.

15

this claim. *Id.* at 15–18. The Superior Court ultimately found Dewitt was "more likely than not" innocent and ordered a new trial. *Id.* at 94.

Sweeney takes the Court on an inferential journey. He points out that the government "did not believe" Montgomery's testimony in the *Dewitt* actual-innocence proceedings. ECF No. 1017 at 16. Because the government sought to impeach Montgomery's credibility in *Dewitt*, Sweeney argues that the government *must* have had materials it relied on in that case. *See id.* So, the government *must* have had those materials during the K Street trial. *See id.* By not turning those materials over, the government violated *Giglio*. *See id.*

But Sweeney cannot overcome his procedural default on this claim. The *Dewitt* proceedings took place in 2004, all while Sweeney's appeal pended before the D.C. Circuit. Sweeney has not identified "objective factor[s]" that caused him not to raise this claim on appeal. *Cf. McCleskey*, 499 U.S. at 493. More importantly, no prejudice resulted from this purported error. The government tried to undermine Montgomery's credibility in *Dewitt* in two ways: (1) by suggesting that "Carson may have been lying to [Montgomery]" to "enhance his reputation as a killer" of informants; or (2) that Montgomery "could be lying," as he struggled to remember some details of Ridley's murder. *Dewitt*, No. 1991 FEL 5548 at 15–17.[7] Any impeachment material the government had concerned the *Dewitt* proceedings—not this case. The Court will not draw the counterfactual inference that Sweeney requests.

### b. *Misconduct in Obtaining Witness Testimony*

Next, Sweeney speculates that the government obtained witness testimony "by any means necessary," thereby committing prosecutorial misconduct. ECF No. 1017 at 16. This argument

---

[7] Even still, the Superior Court found Montgomery's testimony credible. Montgomery "ha[d] no stake" in the *Dewitt* litigation," "[did] not know Dewitt," and got "no benefit out of testifying . . . against his former friend." *Id.* at 18.

fails for two reasons. First, Sweeney could have brought this claim on direct appeal and has not established cause or prejudice excusing his procedural default. Second, Sweeney has not provided any detail or explanation other than identifying two issues: (1) the government procured Arthur Rice's testimony "by misrepresentation and bending of the [Rule 35] procedural rules"; and (2) the government entered plea agreements with James Montgomery "after he lied and violated previous plea agreements." *Id.* In other words, this claim is vague and conclusory. *See Mitchell*, 841 F. Supp. 2d at 328; *Geraldo*, 523 F. Supp. 2d at 22. For both reasons, this claim must fail.

### c.  *Misconduct in Procuring Jailhouse Confessions*

Finally, Sweeney asserts that the government "procur[ed] 'jailhouse' confessions" violating his Sixth Amendment rights under *Massiah v. United States*, 377 U.S. 201 (1964). ECF No. 1017 at 16; *see id.* at 11 (listing alleged confessions).[8] But Sweeney did not raise this claim on direct appeal. Since Sweeney has not shown cause or prejudice excusing this default, this claim is procedurally barred.

#### iv.  *Sean Coates*

Sean Coates raised three government-misconduct claims in his first § 2255 motion, which he timely filed within § 2255(f)'s one-year statute of limitations. ECF No. 1020 at 4–5, 47–50. These claims are that:

- The government violated *Brady* and *Giglio* by withholding evidence impeaching the credibility of government witness James Montgomery. *Id.* at 50.

- The government violated Coates's right to due process when it sought the admission of fingerprint evidence implicating Coates in Anthony Pryor's

---

[8] Further, Sweeney's reliance on *Massiah* is unfounded. He raises this claim in a section alleging *Brady* violations and prosecutorial misconduct. ECF No. 1017 at 16–17. But *Massiah*'s holding implicates a defendant's Sixth Amendment right to *counsel*, not the Fifth Amendment's right to due process. *See Massiah*, 377 U.S. at 206. The Court discusses Sweeney's ineffective-assistance *Massiah* claims in Section III(B)(iii)(d), *infra*.

kidnapping when it "knew [the fingerprint] had admissibility problems." *Id.*
at 47–48.

- The government violated Coates's right to due process by eliciting false
  testimony regarding Coates's involvement in the murder of Michael Jones.
  *Id.* at 48–49.

These claims were available to Coates on direct appeal, but he did not raise them. Therefore, they

are procedurally defaulted. Coates identifies no cause or prejudice to excuse this default. Indeed,

Coates cannot show prejudice because these claims are meritless.

### a. *Evidence Impeaching James Montgomery's Credibility*

Coates makes the same *Giglio* argument as Sweeney regarding James Montgomery's

testimony at the Steven Dewitt proceedings. *See supra* Section III(A)(iii)(a). By withholding that

it tried to impeach Montgomery's credibility in the Dewitt proceedings, the government

purportedly violated *Giglio*. ECF No. 1020 at 4, 50. As explained above, Coates has procedurally

defaulted this claim. Coates did not raise it on direct appeal and has not shown cause or prejudice

excusing the default.

### b. *Fingerprint Evidence Regarding Anthony Pryor's Kidnapping*

Next, Coates argues that the trial court erred by admitting testimony about Coates's

fingerprint on the car used to kidnap Anthony Pryor. This claim misrepresents the record and is

procedurally barred.

In October 1993, several men shot and kidnapped Pryor by placing him in the trunk of a

Cadillac. *Carson*, 455 F.3d at 343. Pryor broke the trunk door off and escaped. *Id.* Police found

Coates's fingerprint on the Cadillac. *Id.* In Coates's telling, the government "knew it had

admissibility problems" with this fingerprint: it "improperly elicited [the fingerprint] through rank

hearsay," "did not put on any foundational evidence" supporting its admission, and did not supply

18

a "fingerprint expert to testify whether the fingerprint matched" Coates's fingerprint. ECF No. 1020 at 4.

This claim is procedurally defaulted because Coates did not raise it on direct appeal. Nor has Coates explained cause and prejudice excusing his default. Coates does not identify any objective factors causing his failure to bring this claim on appeal *Cf. McCleskey*, 499 U.S. at 493. Even assuming the trial court erred, Coates has not shown prejudice. Other witnesses implicated Coates in the crime. James Montgomery testified that Coates had robbed someone and put the victim in the trunk of a "burgundy Cadillac" who "ended up breaking the trunk off the car." 03/13/01 (AM) Tr. 21, ECF No. 680. Sweeney corroborated these details in a jailhouse confession. *See* 02/08/01 (PM) Tr. 60–61, ECF No. 948. These details matched the Cadillac missing a trunk and covered in bloodstains that police recovered. 04/23/01 (PM) Tr. 64, ECF No. 694. It is hard to say that any error worked to Coates's "actual and substantial disadvantage" here, much less that Coates has demonstrated prejudice. *Cf. Frady*, 456 U.S. at 170. Coates therefore cannot overcome his procedural default.[9]

### c. Allegedly False Testimony Regarding the Michael Jones Shooting

Finally, Coates makes a conclusory allegation that the government "knowingly elicited false testimony" about his involvement in the June 20, 1992 shooting of Michael Jones. ECF No. 1020 at 5. Coates did not raise this claim on direct appeal and has not shown cause or prejudice regarding his procedural default. Nor would Coates succeed on the merits of this claim. Coates asserts that "not one scintilla of evidence point[s] to [his] involvement" in this shooting, ECF No.

---

[9] Additionally, Coates misrepresents the record when describing the fingerprint evidence. Sergeant Dwight Deloatch testified that police found Coates's fingerprint on the car used to kidnap Pryor. 04/24/01 (AM) Tr. 30–31. The government did not elicit this testimony on direct examination. Rather, Sweeney's counsel asked Sergeant Deloatch about the fingerprints on cross-examination. *Id.* at 17. Judge Jackson warned Sweeney's counsel about "open[ing] the door" to this testimony, but Sweeney's counsel proceeded. *Id.* On redirect, the government elicited Deloatch's testimony that the fingerprint belonged to Coates. *Id.* at 30–31.

19

1020 at 49, but this assertion contravenes the record.  At trial, government witness Arthur Rice

testified that Coates and another individual "rode up on [Michael Jones]," that Jones "tried to run,"

and that Coates "shot at him." 04/24/01 (PM) Tr. 54, ECF No. 970.  Coates then "stood over top

of [Jones]" and "hit him about four times." *Id.*  Since the government elicited eyewitness testimony

about this shooting and Coates has not shown where any falsehoods lie, this misconduct claim also

fails.

*    *    *

In short, the Court will **DENY** defendants' government-misconduct claims.

### B.  Ineffective Assistance of Counsel

To prevail on an ineffective-assistance-of-counsel claim, a defendant must prove: (1) that

"counsel's performance was deficient," and (2) "the deficient performance prejudiced the

defendant." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  If a defendant fails to prove

either element, a court need not analyze the other. *United States v. McLendon*, 944 F.3d 255, 260–

61 (D.C. Cir. 2019) (citing *Strickland*, 466 U.S. at 697).  Counsel's performance is deficient when

it "[falls] below an objective standard of reasonableness." *Id.* at 688.  A district court must also

"indulge a strong presumption that the counsel's conduct falls within the wide range of reasonable

professional assistance." *Id.* at 689.  To establish prejudice, a defendant must show "that there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *United States v. Udo*, 795 F.3d 24, 30 (D.C. Cir. 2015).  A reasonable

probability is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at

689.  Finally, a district court may summarily dismiss ineffective-assistance claims if the defendant

"fail[s] to allege sufficient facts or circumstances" to show "constitutionally deficient

20

App 1710

performance," or if the defendant fails to provide evidentiary support for his allegations. *See United States v. Taylor*, 139 F.3d 924, 933 (D.C. Cir. 1998).

### i. *Jerome Martin*

Martin did not bring any ineffective-assistance claims in his first § 2255 motion. He added two claims in his amended § 2255 motion:

- Trial counsel should have recalled Charlene Wilson to impeach her testimony about Anthony Fortune's murder. ECF No. 1233 at 29–34.

- Trial counsel did not investigate or present evidence showing that Martin did not shoot James Coulter. *Id.* at 34–36.

These claims are time-barred. Martin submitted his amended § 2255 motion on November 21, 2018, nearly nine years after his conviction. *See* 28 U.S.C. § 2255(f)(1). Since Martin did not raise any ineffective-assistance claims in his first § 2255 motion, these claims do not relate back. The Court cannot consider these time-barred claims.

### ii. *Samuel Carson*

In his first § 2255 motion, Carson included an ineffective-assistance claim for his trial counsel's "Failure to Investigate" and "Failure to Object to Inadmissible Evidence." ECF No. 1023 at 5. He gave no further details in this motion. Instead, Carson referenced a nonexistent "Memorandum of Law and Facts." *See id.* These conclusory allegations cannot overcome the strong presumption that an attorney rendered adequate services. *See Parker v. United States*, 199 F. Supp. 3d 88, 91 (D.D.C. 2016); *see also United States v. Gwyn*, 481 F.3d 849, 855 (D.C. Cir. 2007) (requiring a defendant alleging counsel's failure to investigate to show "precisely what information would have been discovered through further investigation").

Years later, on April 9, 2015, Carson filed an amended § 2255 motion. *See* ECF No. 1170 at 30–43. This motion contained the following ineffective-assistance claims:

21

- Trial counsel did not cross-examine a fingerprint examiner regarding Dennis Green. *Id.* at 36–39.

- Trial counsel should have recalled Charlene Wilson to impeach her based on her prior testimony. *Id.* at 39.

- Trial counsel did not cross-examine witnesses about alleged government payments in exchange for their testimony. *Id.* at 39–41.

- Trial counsel did not investigate whether Carson had a rental car when others accused him of borrowing a car to murder Robert Smith. *Id.* at 41.

- Trial counsel should have argued that James Montgomery's mental impairments could have affected his memory or susceptibility to government manipulation. *Id.* at 41–42.

- Trial counsel did not object to the trial court's *in camera* review of potential *Brady* and *Giglio* material. *Id.* at 42.

- Appellate counsel did not seek review of the trial court's decisions to seal purported *Brady* material. *Id.* at 43.

Most of these claims run into § 2255(f)'s time bar. Only one claim plausibly relates back to Carson's allegation of trial counsel's "failure to investigate"—the failure to investigate whether Carson had a rental car when Smith was murdered. The remaining claims in Carson's second motion do not relate back and come years after § 2255(f)'s time limit.

But Carson cannot succeed on his claim about the rental car. The jury found Carson guilty of conspiracy to murder a potential witness, Robert Smith. ECF No. 810 at 22. James Montgomery provided the key testimony for this charge. In Montgomery's telling, Carson and Sweeney were aware that Smith "was cooperating with the Feds" about the Maryland triple murder case. 05/23/01 (PM) Tr. 23, ECF No. 972. Carson told Montgomery that "without [Smith], they don't have no case." *Id.* So, Montgomery and Carson sought to "catch" Smith and kill him. *See id.* at 24–26. Carson borrowed Montgomery's car the night of the shooting. *Id.* at 28. Later that evening, Carson returned and told Montgomery to stay away from the murder scene and "not to

22

drive [his car] if [he] didn't have to." *Id.* at 31. Montgomery did not see the shooting. *See id.* at 28–31.

Carson argues that his counsel should have investigated whether he "had a rental car" the night that Smith was killed. ECF No. 1170 at 41. If so, then Carson would have had no need to borrow Montgomery's car. *See id.* Carson hoped to cast doubt on Montgomery's version of the events leading to Smith's murder. *See id.*

The Court cannot see how this alleged failure to investigate prejudiced Carson. First, the argument is outlandish. Even if Carson had rented a car, he could still have borrowed Montgomery's car to kill Smith. Moreover, Carson's counsel had opportunities to—and did— impeach Montgomery's credibility on other grounds. The trial judge even acknowledged that he could not "imagine a witness that you could have for which there is more impeachment material than has already been supplied here." ECF No. 1170 at 62–63. On cross-examination, Montgomery admitted that he was "happy that [Smith] was dead" because "another snitch [was] off the street" who could have hurt him. 05/23/01 (PM) Tr. 46, ECF No. 972. And Montgomery thought that he would be "in the free and clear regarding the [Maryland] triple murder" if Smith were dead. *Id.* at 46–47. The jury knew that Montgomery had a motive to kill Smith, but it still found Carson guilty. Evidence that Carson had a rental car that evening would not raise a reasonable probability of a different result.

### *iii. William Sweeney*

Sweeney throws everything but the kitchen sink toward his ineffective-assistance argument, raising twenty claims in his first motion. In an amendment on November 28, 2014, Sweeney added seven new ineffective-assistance claims. ECF No. 1140-2. On February 25, 2015, Sweeney filed a second amended motion reiterating these claims. ECF No. 1156 at 68–69. To

23

begin with, § 2255(f) bars all of Sweeney's new claims—i.e., the claims in Sweeney's second and third § 2255 motions. Sweeney raised these claims long after the one-year statutory deadline, and the claims do not relate back to his first § 2255 motion.

- Trial counsel did not ask the trial court to review Theodore Watson's personnel file from another jurisdiction, which would have impeached his credibility as a government witness. ECF No. 1140-2 at 57–62.

- Appellate counsel did not seek review of sealed materials related to government witness James Montgomery. *Id.* at 64–65.

- Appellate counsel did not seek review of sealed materials related to government witness Arthur Rice. *Id.* at 65–66.

- Appellate counsel did not seek review of sealed materials related to government witness Andre Murray. *Id.* at 66–67.

- Appellate counsel did not seek review of sealed materials related to government witness Charles Bender. *Id.* at 68–69.

- Trial counsel did not object to the trial court's *in camera* procedure to review *Brady* material. *Id.* at 79–80.

- Trial counsel was ineffective under the cumulative-error doctrine. *Id.* at 80.

Thus, the Court will dismiss these claims as time-barred.

Next, the Court will dismiss Sweeney's claims for which he provided little-to-no detail or explanation. *See Parker*, 199 F. Supp. 3d at 91 (noting that "vague or conclusory allegations" cannot prove an ineffective-assistance claim).

- Trial counsel did not call Anthea Henry as an alibi witness for the Donell Whitfield murder. ECF No. 1017 at 7–8.

- Trial counsel did not recall Charlene Wilson and Ronald Sowells after the government disclosed *Brady* material casting doubt on their credibility. *Id.* at 8–10.

- Trial counsel did not impeach James Montgomery through prior inconsistent statements and material showing bias. *Id.* at 10.

24

- Trial counsel did not give support "for the cross examination of John Venable about his arrest for criminal charges that were dismissed during the time between the alleged crime and his testimony at trial." *Id.* at 10.

- Trial counsel did not request that the Court admit evidence showing James Montgomery's unreliability. *Id.* at 10–11.

- Trial counsel did not give an opening statement at the beginning of the case. *Id.* at 11.

- Trial counsel did not "corroborate jail records with court records" to impeach a government witness testifying to the veracity of business records. *Id.* at 11–12.

- Trial counsel did not properly object to or appeal the trial court's admission of reputation evidence concerning Wayne Perry. *Id.* at 12.

- Trial counsel did not properly object to, or appeal, the trial court's admission of hearsay evidence that another man—"Lil Ty"—killed one of Sweeney's alleged victims. *Id.* at 12.

Sweeney's motion raises these arguments without explaining why they indicate deficient performance or how they prejudiced him at trial. Therefore, the Court will dismiss them as vague and conclusory.

Thus, the Court will discuss only those claims in Sweeney's motions that are timely and substantive. These are that:

- Trial counsel did not call an expert to testify about Sweeney's Tourette Syndrome. *Id.* at 7.

- Trial counsel did not recall Reginald Switzer to cross-examine him about the murder of Donnell Whitfield, when *Brady* disclosures showed that Switzer conspired with government witness James Montgomery to kill Whitfield. *Id.* at 8–9.

- Trial counsel did not ask the court to admit testimony by Wesley Smith and Frederick Miller, which would have exonerated Sweeney for two alleged murders. *Id.* at 15.

- Trial counsel did not make a *Massiah* demand as to Sweeney's jailhouse confession to Charles Bender. *Id.* at 11.

25

- Trial counsel did not object to the *ex parte* communications between the Court and Juror Number Three and failed to argue the issue properly on appeal. *Id.*

- Trial counsel did not properly object to nor appeal the testimony of Dr. Jonathan Arden about autopsies he had not conducted. *Id.* at 12.

- Trial counsel did not properly object to nor appeal the testimony of "a police officer" about "fingerprint evidence he had not lifted." *Id.*

- Trial counsel did not properly object to the trial court's admission of statements by Robert Smith to FBI Agent Lisi. *Id.*

- Appellate counsel "failed to note sections of sealed matters" for the D.C. Circuit to review and failed "to cite authority for those requests." *Id.*

- The trial court denied Sweeney his right to effective assistance of counsel by permitting only one attorney to represent him at trial. *Id.* at 14.

The Court takes each of these arguments in turn.

### a. Failure to Call Expert to Testify About Tourette Syndrome

Sweeney argues that his trial counsel was ineffective by not calling a neurologist, Dr. Jonathan Pincus, to testify about Sweeney's Tourette Syndrome. Sweeney's condition causes him to "bark" every few seconds. *See* 04/03/01 (AM) Tr. 18–20, 43 ECF No. 688; 06/11/01 (AM) Tr. 25, ECF No. 716. Dr. Pincus would have explained that even if Sweeney did not exhibit tic symptoms at trial, high-stress events tended to trigger Sweeney's tics. ECF No. 1017 at 7. Because several murders in this case involved unknown assailants who did *not* have tic symptoms, Sweeney hoped this testimony would lead the jury to infer that he did not commit those crimes. *See id.* This argument fails, however, because Sweeney cannot show how his counsel's performance prejudiced him at trial.

Dr. Pincus's testimony would have been cumulative to evidence the jury already considered in its findings. When police officers arrested Sweeney for the Maryland triple murder, they saw someone "very cool," "calm," and "relaxed." 04/03/01 (AM) Tr. 18–20. Those officers

26

did not hear Sweeney "bark" when interviewing him. *Id.* at 18–20, 43. But kidnapping victim Anthony Pryor testified that Sweeney "make[s] a noise every five seconds." 06/11/01 (AM) Tr. 25. Pryor explained that Sweeney "has a disorder" and makes noises "all the time." *Id.* So, Pryor "would have picked him out immediately when I was trying to . . . figure out a voice [while being kidnapped]." *Id.* Sweeney admits that his counsel "crossed almost every eyewitness" to Sweeney's crimes about whether they heard someone exhibiting "barking" or "tics." ECF No. 1017 at 7. Since Pryor already told the jury that Sweeney had tic symptoms, Dr. Pincus's testimony would have been cumulative. Thus, the Court does not find that any error here prejudiced Sweeney.

### b. *Failure to Recall Reginald Switzer to Testify*

Sweeney next points to his trial counsel's failure to recall government witness Reginald Switzer. ECF No. 1017 at 8. This claim likewise fails because no prejudice resulted from this purported error.

The jury found Sweeney guilty of killing Donnell "Robocop" Whitfield. ECF No. 810 at 32. Switzer testified that he heard Sweeney confess to killing Whitfield. 05/15/01 (PM) Tr. 8–9, ECF No. 991. Later in the trial, James Montgomery testified that he had offered to help Switzer kill Whitfield. 05/23/01 (AM) Tr. 53–54, ECF No. 711. Sweeney's counsel raised a *Brady* objection about this testimony.[10] 05/23/01 (PM) Tr. 3, ECF No. 972. The defense's theory was that Switzer killed Whitfield, not Sweeney. *Id.* at 4. So, had Sweeney's counsel known that Montgomery's testimony would corroborate that theory, "he could have made use of that corroborative evidence" when cross-examining Switzer and Montgomery. *Id.* at 9.

---

[10] The government noted that Montgomery's recollection was "unknown to [them] until several days" prior to his testimony. 05/23/01 (PM) Tr. 11, ECF No. 972.

But the jury found Sweeney guilty for murdering Donnell Whitfield despite plenty of evidence inculpating Switzer. Switzer believed Whitfield had previously shot him. 05/15/01 (PM) Tr. 6, ECF No. 991. No surprise, then, that Switzer admitted his open desire to kill Whitfield himself:

> Q: And you thought you had a good reason for murdering [Whitfield], and that's because it was retaliation against his shooting you, correct?
> A: Yes.
> Q: And you wanted him dead?
> A: Yes.

*Id.* at 34; *see id.* at 9, 40. In fact, Switzer testified that he had staked out Whitfield's home at least twice—while armed—but did not seize the opportunity to kill Whitfield. *Id.* at 7–8. And Switzer told the jury that he was "upset" when he learned about Whitfield's death because Switzer had "wanted to do it [him]self." *Id.* at 9. James Montgomery's testimony merely corroborated that Switzer "wanted to get" Whitfield in retaliation. *See* 05/23/01 (AM) Tr. 53–54, ECF No. 711. Since the jury considered this inculpatory evidence when it found Sweeney guilty, Sweeney suffered no prejudice from his counsel's failure to recall Switzer to testify. *Cf. United States v. Mitchell*, 216 F.3d 1126, 1131 n.2 (D.C. Cir. 2005) (finding cumulative evidence "plainly insufficient" to satisfy *Strickland*).

### c. (Purported) Failure to Seek Admission of Wesley Smith and Frederick Miller's Testimony

Sweeney also claims that his trial counsel did not try to admit testimony by Wesley Smith and Frederick Miller. ECF No. 1017 at 10–11. But this argument misconstrues the record. In fact, Sweeney's trial counsel *did* seek admission of these individuals' testimony.

Trial counsel argued that Wesley Smith's testimony would show that Robert Smith—rather than Sweeney—committed the Maryland triple murder. 06/06/01 (AM) Tr. 29, ECF No. 715. He

28

argued that Robert Smith's out-of-court statements to Wesley Smith were admissible under various hearsay exceptions. *Id.* at 29–32; 06/11/01 (PM) Tr. 11, ECF No. 977. The trial court rejected these arguments. 06/11/01 (PM) Tr. 19, ECF No. 977. Because the trial court found probable cause to believe that Sweeney had murdered Robert Smith, it held that Sweeney could not use any out-of-court statements by Smith at trial. *Id.* at 19; *cf.* Fed. R. Evid. 804(a).

Sweeney's counsel also proffered that a witness named Frederick Miller would testify that "someone named Little Ty" admitted to murdering Glenn Jenkins, rather than Sweeney. 06/25/01 (PM) Tr. 3, ECF No. 982. Little Ty's admission, counsel argued, was a statement against penal interest. *Id.* The trial court disagreed. *Id.* at 5. The penal-interest hearsay exception requires that "corroborating circumstances . . . clearly indicate [the statement's] trustworthiness." Fed. R. Evid. 804(b)(3). Since counsel provided "nothing to corroborate" Little Ty's out-of-court statement, the trial court refused a request for Miller to testify. 06/25/01 (PM) Tr. 5. Since Sweeney's counsel *did* take the actions that Sweeney sought, his counsel did not perform deficiently.

### d. Failure to Make a Massiah Demand as to Sweeney's Jailhouse Confession to Charles Bender

Sweeney next posits that his trial counsel was ineffective by not raising a *Massiah* issue with respect to Sweeney's jailhouse confession to Charles Bender.[11] In *Massiah v. United States*, the Supreme Court held that the government violates a criminal defendant's Sixth Amendment right to counsel by (1) expressly or impliedly (2) using an informant (3) to elicit incriminating statements from a person (4) whose right to counsel has attached. *Massiah*, 377 U.S. at 206. At trial, Charles Bender testified that Sweeney confessed to "punishing" Donell "Robocop" Whitfield

---

[11] Sweeney brings the same claim as to his jailhouse confessions to Donald Nichols, Eugene Byars, Theodore Watson, Reginald Switzer, and Arthur Rice. But Sweeney has not provided any transcript citations or argument beyond a one-sentence conclusory statement regarding these witnesses. The Court will not do his work for him here. *See United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (noting that courts "are not required to fashion Defendant's arguments for him where his allegations are merely conclusory in nature and without supporting factual averments").

29

and to being "on a case . . . in Maryland, a triple homicide." 04/04/01 (AM) Tr. 69–71, ECF No. 689.

But nothing suggests that the government used Bender as a jailhouse informant. Sweeney relies heavily on *Watson v. United States* (*Watson I*), 940 A.2d 182, 185 (D.C. 2008), another case in which Bender gave testimony incriminating the defendant. The D.C. Court of Appeals remanded *Watson I* to determine if Bender was a government informant.[12]   After another round of appeals, the D.C. Court of Appeals held "that the government *did not* bid Bender, implicitly or otherwise, to engage in freelance investigative sorties on its behalf [when speaking to Sweeney], nor did the government acquiesce in his doing so." *Watson v. United States* (*Watson II*), 66 A.3d 542, 547 (D.C. 2013) (emphasis added).[13]   Sweeney has not explained how Bender acted as a government agent. And regardless, this Court credits the finding of the D.C. Court of Appeals that Bender was not acting as a government agent when hearing Sweeney's confessions. A lawyer "is not ineffective when he fails to file a meritless motion," *United States v. Sayan*, 968 F.2d 55, 65 (D.C. Cir. 1992), so Sweeney's trial counsel was not ineffective for failing to raise this losing argument.

> e. *Failure to Object to the Trial Court's Ex Parte Communication with Juror Number Three, and Failure to Raise on Appeal*

The Court will dismiss Sweeney's next argument because his counsel did not perform deficiently. During the jury's deliberations, the trial court excused Juror Number Three. Several jurors expressed concerns that Juror Number Three had lied about a drinking problem and had

---

[12] The issue in *Watson I*—whether Bender acted as a government agent when eliciting incriminating statements from a suspect in a wholly different murder case—is unrelated to this proceeding. However, Bender was cooperating with the government's K Street investigation at the time, so some of the facts given at Watson's remand hearing involved Sweeney's jailhouse confessions to Bender. *See Watson II*, 66 A.3d at 544–45.

[13] The *Watson II* opinion refers to Sweeney as "Draper," one of his known aliases. *See Carson*, 455 F.3d at 336.

30

become "visibly despondent." *Carson*, 455 F.3d at 349. The jurors brought these concerns up by speaking to a deputy marshal and the judge *ex parte*. *See id.* Sweeney argues that his counsel should have objected to these *ex parte* communications and raised the issue on appeal. In Sweeney's view, the *ex parte* conversations directly led to Juror Number Three's dismissal. *See* ECF No. 1017 at 11. But, as the D.C. Circuit noted on direct appeal, the trial court relied on a "combination of factors" to dismiss Juror Number Three—including that he "had lied about his symptoms before visiting the hospital, provided inaccurate voir dire responses about mental health treatment[,] and was," according to other jurors, "distracted and unfocused (and even threatening) during deliberations." *Carson*, 455 F.3d at 352. Because the trial court dismissed Juror Number Three for reasons other than the *ex parte* discussion, Sweeney's counsel had nothing to gain by objecting to the discussion. As the D.C. Circuit explained:

> [T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication.

*Id.* at 354 (cleaned up). Sweeney's trial counsel was not deficient for failing to raise a meritless objection.[14] *Cf. Sayan*, 968 F.2d at 65.

### f.  The Government's Alleged Use of Inadmissible Evidence

Next, Sweeney posits that his counsel should have objected to and appealed rulings admitting (1) testimony of Dr. Jonathan Arden, "who testified as to autopsies he had not conducted," (2) testimony of a police officer "regarding fingerprint evidence he had not lifted,

---

[14] Though Sweeney also argues that his counsel did not "raise this issue properly on appeal," ECF No. 1017 at 11, his counsel *did* raise the issue on appeal—as evidenced by the D.C. Circuit's discussion of the issue. The Court will not find defective performance based solely on counsel losing an argument.

examine[d,] or compared with the known prints," and (3) out-of-court statements made by Robert
Smith. ECF No. 1017 at 12. All three arguments fail.

First, the autopsy claim. Dr. Arden, a forensic pathology expert, testified at trial about
autopsies that other doctors performed. *See* 02/08/01 (AM) Tr. 22, ECF No. 670. At the time, the
Supreme Court's holding in *Ohio v. Roberts*, 448 U.S. 56 (1980), authorized this practice. But
after the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), autopsy
reports are likely testimonial in this Circuit. *See, e.g., United States v. Moore*, 651 F.3d 30, 72–73
(D.C. Cir. 2011) (holding that autopsy reports are generally testimonial); *United States v. Bostick*,
791 F.3d 127, 149–50 (D.C. Cir. 2015) (assuming without deciding that autopsy reports were
testimonial). If autopsy reports are testimonial, an expert violates the Sixth Amendment's
Confrontation Clause by testifying about autopsies the expert did not personally perform. *See
Moore*, 651 F.3d at 74.

Sweeney's counsel did not perform deficiently by not raising this issue at trial or on appeal.
The Supreme Court decided *Crawford* in 2004—three years after Sweeney's trial, and two years
before the decision in Sweeney's direct appeal. *See Crawford*, 541 U.S. at 36. At the time of trial,
*Roberts* provided the operative rule for Confrontation Clause issues relating to autopsies. It would
be a stretch to find Sweeney's counsel deficiently performed for following then-existing law. Nor
did Sweeney's counsel perform deficiently by not raising this Confrontation Clause issue on
appeal. *Crawford* did not specify the contours defining a testimonial statement. And by 2009,
"every court post-*Crawford* ha[d] held that autopsy reports are *not* testimonial." *Melendez-Diaz
v. Massachusetts*, 557 U.S. 305, 335 (2009) (Kennedy, J., dissenting) (citing Comment, *Toward a
Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial
Statement*, 96 Calif. L. Rev. 1093, 1094, 1115 (2008)). Courts in this Circuit only began discussing

32

the issue years after Sweeney's appeal concluded. *See United States v. Moore*, 651 F.3d 30, 72–73 (D.C. Cir. 2011); *United States v. Williams*, 740 F. Supp. 2d 4 (D.D.C. 2010).[15]  Sweeney's counsel did not perform deficiently by "failing to foresee a change in the law." *See United States v. Williams*, 374 F. Supp. 2d 173, 175–76 (D.D.C. 2005).

Second, Sweeney fares no better regarding his claim that an unnamed "police officer" testified about fingerprint evidence that the officer "had not lifted, examine[d,] or compared with the known prints." ECF No. 1017 at 12. Police lifted Sweeney's fingerprint from a door of the house where the Maryland triple murder occurred. Only two people testified about this fingerprint: evidence technician William McClellan, who testified to lifting the fingerprint off of the door, and fingerprint examiner Elores Clark, who determined that the print matched Sweeney's left middle finger. *See* 04/02/01 (PM) Tr. 17, 49, 71–72, ECF No. 960. Contrary to Sweeney's claim, the record shows that McClellan testified to lifting the fingerprint himself, and Clark testified to examining and comparing that fingerprint and Sweeney's fingerprint. Sweeney's counsel was not ineffective for failing to raise this meritless issue.

Third, Sweeney argues that his trial counsel should have objected to the trial court's admission of statements by Robert Smith that incriminated Sweeney. Yet—again—Sweeney's counsel *did exactly that*. Counsel opposed the government's pretrial motion to admit these statements. *See* ECF Nos. 341 & 491. But the trial court admitted Smith's statements. Though the statements were made out of court, the trial court found that Smith was a co-conspirator and Sweeney's statements to him were in furtherance of the conspiracy. 05/29/01 (AM) Tr. 88–89,

---

[15] Moreover, the issue remains unsettled among the circuits. *Compare United States v. De La Cruz*, 514 F.3d 121, 134 (1st Cir. 2008); *United States v. James*, 712 F.3d 79, 99 (2d Cir. 2013); *Mitchell v. Kelly*, 520 F. App'x 329 (6th Cir. 2013) (per curiam); *McNeiece v. Lattimore*, 501 F. App'x 634, 636 (9th Cir. 2012); *United States v. MacKay*, 715 F.3d 807, 831–32 (10th Cir. 2013), *with United States v. Ignasiak*, 667 F.3d 1217, 1232 (11th Cir. 2012); *Bostick*, 791 F.3d at 127.

App 1723

ECF No. 712. The court also noted that Carson had killed Smith, thereby making him unavailable. *Id.*; *cf.* Fed. R. Evid. 804(a). Sweeney's counsel *did* challenge this decision on appeal, and the D.C. Circuit upheld the trial court's ruling. *Carson*, 455 F.3d at 360, 367. At every step, Sweeney's counsel took the necessary steps to challenge these statements' admissibility. Sweeney cannot prove deficient performance simply because his counsel did not win an argument.

### g. Appellate Counsel's Failure to Challenge the Trial Court's Decision to Seal Portions of the Record

While defendants' case was on direct appeal, the D.C. Circuit denied defense counsels' motion to review "all sealed portions of the trial record." Order at 1, *United States v. Carson*, No. 02-3015 (D.C. Cir. Oct. 2, 2002). The D.C. Circuit noted that it would review sealed materials *in camera* if counsel identified "specific evidentiary rulings of the district court [he] claim[ed] were erroneous." *Id.* Defense counsel then filed a second motion arguing the same, which the D.C. Circuit also rejected. Order at 1, *United States v. Carson*, No. 02-3015 (D.C. Cir. Aug. 28, 2003). Sweeney argues that his appellate counsel gave a defective performance by "fail[ing] to note sections of sealed matters for the [D.C. Circuit] to review." ECF No. 1017 at 12; ECF No. 1156-1 at 60–62. Again, this argument fails because Sweeney misrepresents the record. Defense counsel moved for the D.C. Circuit to review these *Brady* materials. The D.C. Circuit denied those motions. The Court cannot find that Sweeney's attorney performed defectively simply for losing a motion.

### h. Failure to Challenge the Trial Court's Ruling that Sweeney Was Not Entitled to Two Attorneys at Trial

Sweeney's next challenge concerns his representation at trial. A grand jury indicted Sweeney for violent crimes in aid of racketeering ("VICAR")—crimes permitting the death penalty. *See* Second Retyped Indictment 64, ECF No. 760; 18 U.S.C. § 1959(a)(1). From

November 1998 through August 2000, Steven Kiersh and Paul DeWolfe jointly represented Sweeney. *See* ECF Nos. 37, 45. At a status hearing on December 16, 1999, the government informed defense counsel that it would not seek the death penalty in these cases. ECF No. 1026 at 4. Weeks later, Sweeney's counsel requested that the trial court authorize appointment of two attorneys for Sweeney based on the complexity of the case, notwithstanding the government's decision to forego the death penalty. ECF Nos. 1142-7 On January 4, 2000, the trial court granted this request. ECF No. 252.

Later that year, DeWolfe withdrew from representing Sweeney. ECF No. 356. The trial court then appointed Leonard Long, Jr. as Sweeney's co-counsel. *See* ECF No. 408. This appointment came with controversy. Counsel Long had represented a co-conspirator, Stephon Mason, in a different matter. 11/13/01 Tr. 12, ECF No. 639. The government moved to disqualify Long, which the trial court granted. *Id.* at 13. From then on, Kiersh was Sweeney's sole attorney.

Sweeney argues that trial counsel should have appealed Long's disqualification, requested a second counsel or a continuance after Long's disqualification, or argued that 18 U.S.C. § 3005 entitled Sweeney to two attorneys at trial. ECF No. 1017 at 14–15; ECF No. 1156-1 at 75–87. Again, Sweeney has not shown how these errors resulted in prejudice. As this Court has discussed at length in this opinion, the government presented a comprehensive case against Sweeney. Sweeney's counsel did object to Long's disqualification. And at the time, it was far from clear whether 18 U.S.C. § 3005 even entitled Sweeney to two attorneys.[16] Sweeney has not shown that this purported failure deprived him of a fair trial. *Cf. Strickland*, 466 U.S. at 687.

---

[16] Per 18 U.S.C. § 3005:

> Whoever is indicted for treason or other capital crime [sic] shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried . . . shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases . . . .

35

    *i.   Not Securing Admission of Statements by Cheree Owens and John Pinckney Regarding the Maryland Triple Murder*

Sweeney also argues that the trial court erroneously excluded statements by Cheree Owens and John Pinckney—who "implicat[ed] Dennis Green and his friends" in the Maryland triple murder—because of his trial counsel's "ineffective attempts." ECF No. 1017 at 15. Sweeney also contends that counsel "compounded the problem by not raising this issue" on appeal. *Id.* Though Sweeney does not elaborate on what these "ineffective attempts" were, he overlooks that his counsel *did* move the trial court to admit Owens and Pinckney's testimony. *See* ECF Nos. 450 & 507. Further, Sweeney's counsel *did* challenge the issue on appeal—the D.C. Circuit simply ruled against him. *See Carson*, 455 F.3d at 378–80. Since Sweeney has not proven deficient performance, this claim fails as well.

    *j.   Failure to Challenge Consecutive Sentences Under 18 U.S.C. § 924(c)*

Finally, Sweeney claims that his trial counsel should have challenged the consecutive sentences he received for using a firearm while committing a "crime of violence" under 18 U.S.C. § 924(c). ECF No. 1017 at 13. As explained below, *see infra* Section III(C), the trial court did not err in sentencing Sweeney. Sweeney's counsel was not ineffective for failing to raise a losing argument.

### iv.  Sean Coates

Like Sweeney, Coates sweeps all sorts of conduct into an argument that his counsel was "totally ineffective throughout the entire [trial]." ECF No. 1020 at 1. Coates brought more than

---

18 U.S.C. § 3005. The government charged Sweeney with a capital crime—murder in aid of racketeering. *See* Second Retyped Indictment 64, ECF No. 760; 18 U.S.C. § 1959(a)(1). But the government did not seek the death penalty against Sweeney. ECF No. 1026 at 4. At the time of trial, the Eleventh Circuit had held § 3005 did not entitle a defendant to two court-appointed attorneys when the government stopped seeking the death penalty. *United States v. Grimes*, 142 F.3d 1342, 1347 (11th Cir. 1998). Starting in 2002, a majority of circuits have agreed with this interpretation. *See United States v. Cordova*, 806 F.3d 1085, 1101–02 (D.C. Cir. 2015) (collecting cases).

twenty ineffective-assistance claims in his first § 2255 motion, timely filed on February 19, 2008.

ECF No. 1020. Coates raised three new ineffective-assistance claims in an amended § 2255

motion filed on February 24, 2015.[17] Since Coates filed the new claims long after § 2255(f)'s one-

year deadline, the Court will summarily deny them. The Court discusses Coates's remaining

claims below.

### a. Failure to Cross-Examine Various Witnesses

First, Coates argues that his trial counsel represented him ineffectively by declining to

cross-examine several government witnesses, or by cross-examining them deficiently. ECF No.

1020 at 9–15. These witnesses were:

- FBI Agent Lisi, who identified Coates on several videos presented to the jury depicting individuals picking up and selling drugs. *Id.* at 9–10.

- Ronald Switzer, who testified that Coates and co-defendant Hill were "the people out there making big money in 1996 and 1997." *Id.* at 11.

- Donald Nichols, who testified that Coates "would be out selling on a typical day." *Id.*

- James Montgomery, who testified that Coates "[was] selling drugs" in 1989. *Id.*

- Charles Bender, who testified that he sold drugs with Coates in 1994 and 1995. *Id.* at 13.

- Ronald Sowells, who testified that "30 or 40 people" sold marijuana in the alley behind Delaware Avenue and K Street, including Coates. *Id.* at 13.

- Paul Franklin, who testified that Coates sold marijuana in the alley behind Delaware Avenue and K Street and that he had "bagged up [marijuana]" at Coates's mother's home. *Id.* at 14.

---

[17] These ineffective-assistance claims were that: (1) trial counsel did not call Coates's sister as an alibi witness for the Maryland triple murder; (2) trial counsel did not advise Coates to testify that he was with his sister on the night of the Maryland triple murder; and (3) trial counsel did not object to faulty aiding-and-abetting jury instructions. ECF No. 1166 at 1–7.

- Demetrius Hunter, who testified that "he occasionally sold [marijuana]" for Coates in 1994 and 1995. *Id.* at 15.

Even if Coates's counsel were deficient in cross-examining all eight of these witnesses about Coates's drug-selling practices, this claim fails because Coates has not demonstrated prejudice. The government not only relied on these witnesses' testimony, but also introduced video evidence showing Coates moving drugs. 01/23/01 (PM) Tr. 33–35, ECF 940. FBI Agent Lisi identified Coates as the person on the video. *See id.* That video evidence, combined with the direct testimony of these witnesses, makes it hard to believe that a "reasonable probability" exists that Coates would not have been convicted for this charge. *Cf. Udo*, 795 F.3d at 30.

### b. Alleged Pretrial and Trial Errors

Next, Coates marshals arguments about purported errors that his counsel committed at trial. These errors are that:

- Trial counsel did not use the "rich fodder for cross-examination" when the government called Ronald Sowells, who testified about Coates attempting to murder him. *Id.* at 18–23.

- Trial counsel lodged only a "nonspecific objection" about the fingerprints on the car used to kidnap Anthony Pryor. A police officer testified that those fingerprints belonged to Coates. *Id.* at 24.

- Trial counsel "sat down without laying a finger" on government witness James Montgomery after Montgomery testified about Coates's involvement in the Maryland triple murder. *Id.* at 24–27.

- Trial counsel gave an "obviously off the cuff" opening statement and failed to challenge several of Coates's many charged crimes. *Id.* at 33.

- Trial counsel did not adequately prepare for trial. *Id.* at 34–40.

- Trial counsel did not make discovery requests relating to Coates's charged crimes. *Id.* at 34–36.

- Trial counsel did not properly cross-examine detective Robert Mitchell about Ronald Sowell's shooting. *Id.* at 35.

38

- Trial counsel did not object to testimony by police sergeant Dwight Deloatch about Anthony Pryor's kidnapping. *Id.* at 38–40.

- Trial counsel did not participate in the discussion of jury instructions. *Id.* at 40.

- Trial counsel "misunderstood" the dispute over the admissibility of Robert Smith's out-of-court statements. The issue concerned whether Coates had caused Smith's unavailability, thereby waiving a hearsay objection. *See* Fed. R. Evid. 804(a). Counsel did not challenge this issue nor cross-examine the government's witness on this point. ECF No. 1020 at 40–41.

- Trial counsel "continuously failed to object to hearsay solicitations" by the government. *Id.* at 41–42.

- Trial counsel gave a closing argument that "barely passed the giggle test given the seriousness of his allegations." *Id.* at 43–45.

Other than highlighting these inadequacies, Coates has made no showing that his counsel performed deficiently or that these errors prejudiced his case. Nor could Coates do so. The jury found Coates guilty for conspiring to distribute marijuana, for conspiring to engage in racketeering activity (including multiple felony murders), and for using firearms when committing crimes of violence. ECF No. 810 at 34–40. To support these charges, the government put on a strong evidentiary showing. Multiple witnesses testified with personal knowledge that Coates sold drugs. *See, e.g.,* 01/25/01 (PM) Tr. 5–6, ECF No. 942 (Ronald Switzer); 02/15/01 (AM) Tr. 31–32 (Donald Nichols). The government showed the jury video of Coates picking up drugs. *See* 01/23/01 (PM) Tr. 33–35. And forensic evidence—Coates's fingerprints—showed he was present at the scene of an attempted kidnapping. 04/24/01 (AM) Tr. 31, ECF No. 695. Amid all of this evidence, Coates is hard-pressed to explain how there exists a reasonable probability that his trial could have had a different result. None of the errors Coates alleges could have overcome this evidence, even when considered in the aggregate. *Cf. Udo,* 795 F.3d at 33. Thus, these arguments fail.

39

*c. Ineffective Cross-Examination of Yusef Simmons About His Kidnapping*

Coates next takes issue with his trial counsel "appear[ing] to be caught off guard" when the government called Yusef Simmons to the stand, despite counsel knowing ahead of time that Simmons would testifying. ECF No. 1020 at 16. Simmons testified at trial that Coates and other K Street members kidnapped him as part of a feud between the K Street and L Street gangs. 02/06/01 (AM) Tr. 22–23, ECF No. 672. However, Coates has not shown how his trial counsel gave a deficient performance. The record tells a contrary story. Coates's trial counsel got Simmons to admit that the kidnapping was about money rather than a conflict with the K Street gang. *Id.* at 70–72. Simmons also admitted that he never saw Coates holding a gun during the kidnapping and that he did not name Coates in his statement to the police. *Id.* If Coates's counsel was "caught off guard" by Simmons taking the stand, he appeared to have recovered quickly. In any event, this cross-examination does not appear so inadequate as to fall outside of the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

*d. Ineffective Cross-Examination of Arthur Rice*

Coates's next ineffective-assistance claim concerns the shooting of Michael Jones. As part of the racketeering case against Coates, the jury found that Coates conspired to murder Jones. *See* ECF No. 1020 at 27. The government relied on Arthur Rice as its key witness to prove this crime— Rice testified that he saw Coates "pump bullets into" Jones. 04/30/01 (AM) Tr. 10, ECF No. 698. Coates takes issue with his counsel's cross-examination of Rice. ECF No. 1020 at 27–32. After Rice had testified that he saw Coates shoot Jones, Coates's counsel asked Rice: "Now that, sir, is a lie, isn't that correct?" *Id.* Rice replied that he was not lying. *Id.* Coates's counsel did not ask further questions about this shooting. *See id.* While Coates's counsel arguably could have challenged Rice further, Coates has not proven that any error was prejudicial. Coates takes

40

umbrage that his counsel's cross-examination was cursory. *See* ECF No. 1020 at 30. But Coates has not identified how his counsel could have challenged Rice's testimony. And Rice testified that Coates "pump[ed] bullets" into Jones. 04/30/01 (AM) Tr. 10. Without further explanation about how Rice's testimony could have been impeached, the Court finds it hard to believe that further cross-examination could have changed the jury's mind.

### e. Ineffective Assistance of Appellate Counsel

Coates raises three arguments to suggest that his appellate counsel performed deficiently:

- Appellate counsel did not challenge the admission of Coates's fingerprint, which police had found on the car used to kidnap Anthony Pryor. *Id.* at 45.

- Appellate counsel did not identify specific *Brady* rulings Coates believed to be erroneous, as directed by the D.C. Circuit. Instead, appellate counsel included a section titled, "The Court's response to *Brady* and *Jencks* Request [sic] was Lackadaisical." *Id.* at 46.

- Appellate counsel did not bring an ineffective-assistance claim on appeal about the admission of the fingerprint evidence and the out-of-court statements by Robert Smith. *Id.*

None of these arguments meet the mark.

First, Coates argues that appellate counsel should have objected to the admission of fingerprint evidence regarding the Anthony Pryor kidnapping. *Id.* at 45. Police found Coates's fingerprints on the Cadillac used to kidnap Pryor. 04/24/01 (AM) Tr. 31, ECF No. 695. This argument fails because Coates cannot show prejudice. As noted above, the government presented a strong case that Coates kidnapped Pryor. *See supra* Section III(A)(iv)(b). James Montgomery testified that Coates told him about kidnapping Pryor. *See* 03/13/01 (AM) Tr. 20–22. And the details Coates provided to Montgomery—specifically, the broken trunk—matched the Cadillac found with a missing trunk. *See id.* Without a showing of prejudice, Coates fails on this argument.

Second, Coates objects to his appellate counsel's method of challenging purported *Brady*, *Giglio*, and Jencks Act violations. ECF No. 1020 at 46. But Coates has not sho⸻

performed deficiently. As discussed above, *supra* Section III(B)(iii)(g), the D.C. Circuit denied defense counsels' motion to review "all sealed portions of the trial record" while on direct appeal. Order at 1, *United States v. Carson*, No. 02-3015 (D.C. Cir. Oct. 2, 2002). The Circuit agreed to review sealed materials *in camera* if counsel challenged "specific evidentiary rulings." *Id.* Defense counsel, in a joint brief, challenged these rulings in a section titled "The Court's Response to *Brady* and Jencks Requests Was Lackadaisical." *See* ECF No. 1020 at 46. Coates argues that his counsel performed deficiently by not complying with the D.C. Circuit's order. *Id.* at 45–46. In effect, Coates challenges the tactical methods that his attorneys used to challenge his conviction on appeal. Because attorneys have "wide latitude . . . in making tactical decisions," *Strickland*, 466 U.S. at 689, the Court will not find that Coates's counsel performed deficiently on this ground.

Third, Coates contends that his appellate counsel should have brought an ineffective-assistance claim against his trial counsel for not objecting to the admissibility of (1) Coates's fingerprint and (2) out-of-court statements by Robert Smith. ECF No. 1020 at 46. This Court is unconvinced. The trial court's admission of Coates's fingerprint did not prejudice him because the government presented a strong case that he kidnapped Anthony Pryor—even without Coates's fingerprint on the kidnapping car. *See supra* Section III(A)(iv)(b). Moreover, Coates's appellate counsel *did challenge* the admissibility of Robert Smith's out-of-court statements on direct appeal. *See Carson*, 455 F.3d at 360–67. The D.C. Circuit rejected that argument. *Id.* Without a showing of prejudice, the Court cannot find that Coates's appellate counsel was ineffective.

*       *       *

Therefore, the Court will **DENY** defendants' claims for ineffective assistance of counsel.

42

## C. Challenges to Convictions Under 18 U.S.C. § 924(c)

Defendants also challenge their convictions for using a firearm "during and in relation to any crime of violence or drug trafficking crime." *See* 18 U.S.C. § 924(c). Two defendants argue that their § 924(c) sentences should merge into a single sentence. All of the defendants argue that their sentences are unconstitutional in light of *United States v. Davis*, 139 S. Ct. 2319 (2019).

### i. Sweeney and Coates's Ineffective-Assistance Claims Fail

In addition to their ineffective-assistance claims listed above, Sweeney and Coates argued that their counsel should have challenged their consecutive sentences under § 924(c). ECF No. 1017 at 13 (arguing these sentences violated the Double Jeopardy Clause); ECF No. 1020 at 47. At trial, the jury found Sweeney and Coates guilty of multiple § 924(c) offenses for the Maryland triple murder. *See* ECF No. 810. These § 924(c) sentences were to run consecutively following their life sentences. In defendants' view, the multiple § 924(c) sentences should have merged because they stemmed from the use of a single weapon during (what they contend was) a single crime of violence. Coates also argues that his consecutive § 924(c) sentences were improper because he did not have a prior § 924(c) conviction before this case. ECF No. 1166 at 7–9. Neither of these arguments have merit, so defendants did not suffer prejudice from their lawyers' conduct.

First, Sweeney and Coates may be charged with separate § 924(c) charges for each murder they committed. Section 924(c)(1)(A) applies to individuals who "use[]," "carr[y]," or "possess[]" a firearm in furtherance of a "crime of violence." 18 U.S.C. § 924(c)(1)(A). Courts have struggled to interpret this provision, but several guideposts seem apparent. When a defendant commits only one predicate offense, the government may charge only one § 924(c) violation. *United States v. Anderson*, 59 F.3d 1323, 1334 (D.C. Cir. 1995) (en banc). And if a defendant "uses" a firearm only once, even if he commits multiple predicate offenses when doing so, the government may

still charge only one § 924(c) violation. *United States v. Wilson*, 160 F.3d 732, 749–50 (D.C. Cir. 1998). This case differs. Sweeney used his firearm three distinct times to commit three distinct predicate offenses—the murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson. ECF No. 810 at 32–33. Accordingly, the separate § 924(c) charges for each of these offenses are proper.[18]

Second, Coates's argument also fails. Coates contends that the trial court should not have applied the "second or subsequent" penalty of twenty years per conviction under § 924(c) because he did not have a prior conviction at the time of his instant verdict. ECF No. 1166 at 7–8. The Supreme Court previously held to the contrary. In *Deal v. United States*, the Supreme Court held that § 924(c)'s "second or subsequent conviction" language referred to a *finding of guilt* rather than a judgment of conviction. 508 U.S. 129, 132–37.[19] The jury found Sweeney and Coates guilty on a § 924(c) violation for possessing a firearm while kidnapping Anthony Pryor. ECF No. 810 at 32, 40. Accordingly, the trial court sentenced Sweeney and Coates only to a five-year sentence on that charge. *See* ECF No. 860 at 16; ECF No. 928 at 5. The remaining findings of guilt under § 924(c)—including those for the Maryland triple murder—correctly had a twenty-

---

[18] The D.C. Circuit has alluded to this possibility in dicta. *See Anderson*, 59 F.3d at 1334 (suggesting that the government could charge separate § 924(c) violations when a defendant "fires a gun on separate and distinct occasions"); *Wilson*, 160 F.3d at 749 (explaining that multiple predicate offenses "could support more than one § 924(c) charge"). Other circuits have approved this interpretation. *See, e.g., United States v. Rentz*, 777 F.3d 1105, 1115 (10th Cir. 2015); *United States v. Sandstrom*, 594 F.3d 634, 659 (8th Cir. 2010); *United States v. Rahim*, 431 F.3d 753, 757 (11th Cir. 2005).

[19] In the First Step Act of 2018, Congress modified § 924(c)(1)(C) to eliminate this practice of "stacking" § 924(c) penalties for first-time offenders. The penalty now applies only "after a prior [§ 924(c)] conviction . . . has become final." 18 U.S.C. § 924(c)(1)(C). However, the text of the First Step Act makes clear that this language applies only to offenses committed "before the date of enactment . . . if a sentence for the offence has *not been imposed* as of such date of enactment." First Step Act of 2018, Pub. L. No. 115-391, § 403(b), 132 Stat. 5194, 5222 (emphasis added); *cf. Dorsey v. United States*, 567 U.S. 260, 264, 272 (2012) (opining that statutes reducing criminal sentences generally do not apply to crimes committed before enactment). The trial court sentenced Coates in 2002—long before the First Step Act came into law—so the Court will not apply the prohibition against "stacking" to him. *Cf. United States v. Hodge*, 948 F.3d 160, 162 (3d Cir. 2020); *United States v. Cruz-Rivera*, 954 F.3d 410, 413 (1st Cir. 2020).

year sentence applied. Since the trial court correctly sentenced Sweeney and Coates, they suffered

no prejudice and cannot succeed on their ineffective-assistance claims.

### ii. *Defendants'* **Johnson/Davis** *Claims Fail*

In a final set of arguments, defendants challenge their convictions under 18 U.S.C. § 924(c)

in light of two intervening Supreme Court decisions: *Johnson v. United States*, 576 U.S. 591

(2015), and *United States v. Davis*, 139 S. Ct. 2319 (2019). They filed amended motions raising

these claims or adopting claims raised by their co-defendants. *See* ECF Nos. 1182, 1183, 1184,

1192, 1229.

Section 924(c) sets out mandatory minimum sentences for using, carrying, or possessing a

firearm "during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C.

§ 924(c)(1)(A). A "crime of violence" is a felony offense that:

> (A) has as an element the use, attempted use, or threatened use of
> physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force
> against the person or property of another may be used in the course
> of committing the offense.

*Id.* § 924(c)(3). The first clause is known as the "elements" clause, the second as the "residual"

clause. *Davis*, 139 S. Ct. at 2324. When the trial court sentenced defendants in 2002, a prior

conviction could be a crime of violence under either clause. But in 2019, the Supreme Court held

§ 924(c)(3)(B), the residual clause, to be unconstitutionally vague. *Davis*, 139 S. Ct. at 2336. The

Court did not invalidate § 924(c)(3)(A), the elements clause. *See id.*

Although these defendants cannot be convicted under § 924(c)(3)'s residual clause, the

question remains: Do their § 924(c) convictions qualify as crimes of violence under the elements

clause? Answering this question requires applying a "categorical approach" to the offense. *See*

*Taylor v. United States*, 495 U.S. 575, 600 (1990); *United States v. Kennedy*, 133 F.3d 53, 56 (D.C.

Cir. 1998). Under the categorical approach, a court must look to whether the statutory elements

of the offense necessarily require the "use, attempted use, or threatened use of physical force." *See*

18 U.S.C. § 924(c)(3)(A). If so, then the Court may uphold defendants' convictions. Even though

the underlying convictions may be state-law crimes, federal courts should compare these elements

for themselves. *See Johnson v. United States*, 559 U.S. 133, 138 (2010).

### a. Denying Sweeney and Coates's Claims

Before addressing the merits of defendants' arguments, the Court will deny Sweeney and

Coates's § 924(c) claims. Sweeney never filed an amended motion raising a § 924(c) argument.

Rather, he filed a motion adopting the arguments in Martin's amended motion. *See* ECF No. 1229

at 3. Martin argued that his § 924(c) conviction—based on attempting to murder James Coulter—

should be vacated. The government did not charge Sweeney with this attempted murder, nor did

Sweeney make his own arguments about his § 924(c) convictions. *See Kelly*, 552 F.3d at 831.

The Court will dismiss this inapposite argument.

Coates's argument also fails. First, his entire *Johnson/Davis* argument arises from a one-

paragraph supplement filed after the *Johnson* decision. ECF No. 1184 at 1. This claim, which

Coates never explained further, is too conclusory for this Court to grant relief. *See Mitchell*, 841

F. Supp. 2d at 328. Second, his *Johnson/Davis* claim is time-barred. The Supreme Court decided

*Johnson* on June 26, 2015. *Johnson*, 576 U.S. at 591. But Coates filed his supplement on June

27, 2016, making it untimely. For either reason, Coates's *Johnson/Davis* claim fails.

### b. Jerome Martin

Martin's § 924(c) conviction involves several layers of offenses. The § 924(c) conviction

stemmed from Martin's attempted murder of James Coulter, a VICAR charge. ECF No. 810 at

14. Martin's conviction for assault with intent to kill while armed ("AWIKWA") formed the basis

of this VICAR charge. *Id.* at 13. In the District of Columbia, AWIKWA requires (1) an assault (2) with specific intent to kill (3) while armed. *Nixon v. United States*, 730 A.2d 145, 148 (D.C. 1999); *see* D.C. Code §§ 22-401, 22-4502 (2001). "A specific intent to kill exists when a person acts with the purpose or conscious intention of causing the death of another." *Logan v. United States*, 483 A.2d 664, 671 (1984). Proof of a "conscious disregard of the risk of death or serious injury" does not amount to specific intent to kill. *See Graure v. United States*, 18 A.3d 743, 759 (D.C. 2011).

Martin contends that AWIKWA is not a "crime of violence" under 18 U.S.C. § 924(c)(3).[20] This charge requires the Court to assess a newly drawn line by the Supreme Court. In *Borden v. United States*, 141 S. Ct. 1817 (2021), the Supreme Court held that reckless offenses do not qualify as crimes of violence under the ACCA's elements clause. *Id.* at 1825. So, if someone can commit AWIKWA with a reckless *mens rea*, then Martin's conviction should be vacated. *See* ECF No. 1272 at 20–21, 21 n.14. This Court finds this distinction unavailing here. A person acts recklessly by "consciously disregard[ing] a substantial and unjustifiable risk" that a certain result will occur. Model Penal Code § 2.02 (Am. L. Inst. 2020). Since AWIKWA requires the specific intent to kill another—which, by definition, requires more than "consciously disregarding" the risk of death— it is impossible for someone to commit AWIKWA recklessly. And AWIKWA involves the "use, attempted use, or threatened use" of force against another. *See* 18 U.S.C. § 924(c)(3). Therefore, Martin's VICAR conviction—based on an AWIKWA charge—is a crime of violence under § 924(c)(3)'s elements clause, so the Court will affirm Martin's § 924(c) conviction.

---

[20] The jury found Martin guilty for § 924(c) offenses based on: (1) using a firearm when attempting to murder Coulter and (2) possessing a firearm while committing AWIKWA against Coulter. His *Johnson/Davis* motion addresses only his attempted-murder charge. *See* ECF No. 1182 at 1–2. Because the trial court only imposed a sentence for the § 924(c) charge based on AWIKWA, *see* ECF No. 1268 at 123 n.66, the Court addresses only the AWIKWA charge in this discussion.

### c.  Samuel Carson

Carson fares no better.  The Court begins by dismissing several of Carson's § 924(c) arguments as untimely.  On June 24, 2016, Carson filed a timely placeholder motion challenging his § 924(c) convictions. ECF No. 1183.  One year later, Carson filed an amended motion raising three new challenges—the § 924(c) convictions for the Maryland triple murder. ECF No. 1191. After the government filed its omnibus response, ECF No. 1255, Carson supplemented his *Johnson* motion challenging his § 924(c) convictions for D.C. crimes. ECF No. 1272.  The Court will not permit Carson's D.C. supplement to relate back to his original *Johnson* motion.  The "central policy of the relation-back doctrine" is to ensure the non-moving party has "sufficient notice of the facts and claims giving rise to the proposed amendment." *Hicks*, 283 F.3d at 388 (quoting *Anthony v. Cambra*, 236 F.3d 568, 576 (9th Cir. 2000)).  Permitting Carson's D.C.-related arguments to relate back would defeat this policy altogether.  A supplement that does not "merely . . . elaborate upon his earlier claims," but rather "introduce[s] a new legal theory based on facts different from those underlying the timely claims" should be rejected. *See Hicks*, 283 F.3d at 388–89.  Therefore, the Court will not consider Carson's D.C.-related § 924(c) convictions.

The Court has little trouble affirming Carson's remaining § 924(c) convictions based on the Maryland triple murder.  The jury found Carson guilty of felony murder as to Alonzo Gaskins, Darnell Mack, and Melody Anderson. ECF No. 810 at 21–22.  The Court's categorical analysis thus depends on the elements of the predicate offense—murder.  *See id.*; *cf. United States v. García-Ortiz*, 904 F.3d 102, 105–06 (1st Cir. 2018).  This Court has previously held that murder, in Maryland, is a crime of violence under § 924(c)(3)'s elements clause.  *United States v. Machado-Erazo*, 986 F. Supp. 2d 39, 53–54 (D.D.C. 2013).  The intervening eight years have only strengthened this Court's conclusion.  Maryland's first-degree murder statute requires "a

48

deliberate, premeditated, and willful killing." Md. Code Ann. § 27–407 (West 2001). Since "the intentional causation of bodily injury necessarily involves the use of physical force," *United States v. Castleman*, 572 U.S. 157, 169 (2014), the Court again concludes that murder, in Maryland, is a crime of violence within the meaning of § 924(c)(3)'s elements clause. Carson's § 924(c) convictions are affirmed.

### D. Defendants' Adoption of Co-Defendants' Claims

Finally, defendants moved at various times to adopt the claims in their co-defendants' motions. ECF Nos. 1024, 1185, 1228, 1229 1230, 1249, 1279. Because the Court finds that all of defendants' claims are time-barred, procedurally defaulted, conclusory, or meritless, it must also **DENY** these adopted claims.

## IV.   CONCLUSION

In sum, none of defendants' arguments in their original § 2255 motions or amendments are convincing.[23] For the reasons discussed above, the Court will **DENY** the § 2255 motions and supplements of defendants Jerome Martin, Jr., Samuel Carson, William Sweeney, and Sean Coates. ECF Nos. 1017, 1020, 1021, 1023, 1170, 1182, 1183, 1184, 1185, 1191, 1197, 1198, 1229. A separate order shall issue this date addressing the remaining motions on this docket.

Date: October 26, 2021

Royce C. Lamberth
United States District Judge

---

[23] Any claim not specifically discussed in this opinion is summarily denied.

49

App 1739

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.                                          Case No. 1:98-cr-329-RCL

JEROME MARTIN, JR.,
SAMUEL CARSON,
WILLIAM KYLE SWEENEY,
SEAN COATES,

　　　*Defendants.*

## MEMORANDUM OPINION

Defendants—Jerome Martin, Samuel Carson, William Sweeney, and Sean Coates—were convicted for various conspiracies, murders, violent crimes in aid of racketeering, and narcotics-trafficking crimes, among others, and sentenced to lengthy prison terms. Years later, they filed motions under 28 U.S.C. § 2255 to vacate, set aside, or correct their sentences. The Court denied defendants' motions in their entirety. *United States v. Martin*, No. 1:98-cr-329 (RCL), 2021 WL 4989983 (D.D.C. Oct. 27, 2021). Defendants then filed notices of appeal to the D.C. Circuit. *See* ECF Nos. 1287, 1289, 1292, 1297, 1300. The D.C. Circuit held these appeals in abeyance and directed this Court to "determin[e] whether a certificate of appealability is warranted." *See, e.g.*, ECF No. 1295 (citing *Mitchell v. Reno*, 216 F.3d 1126 (D.C. Cir. 2000)). Upon consideration of the parties' § 2255 briefing, applicable law, and the record in this case, the Court will **DENY** defendants' requests for certificates of appealability.

## I.    BACKGROUND

In the 1980s and 1990s, defendants organized and operated a massive narcotics conspiracy around the 200 block of K Street, Southwest, in the District of Columbia. *United States v. Carson*, 455 F.3d 336, 339 (D.C. Cir. 2006). This conspiracy "led to an astonishing amount of violence

1

and a seemingly complete repudiation of civil society and respect for human life." *Id.* After a nine-month trial, a jury returned guilty verdicts against defendants for multiple narcotics, racketeering, murder, and weapons-possession charges. *Id.* at 347; *see* ECF No. 810. The trial court sentenced each defendant to life imprisonment, and the D.C. Circuit affirmed. *Carson*, 455 F.3d. at 339. The Supreme Court denied defendants' petitions for writs of certiorari on February 20, 2007. *Carson v. United States*, 549 U.S. 1246 (2007).

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), defendants had until February 20, 2008, to file motions to vacate their sentences under 28 U.S.C. § 2255. *See* 28 U.S.C. § 2255(f)(1). On February 15, 2008, then-Chief Judge Hogan granted a motion by defendant Sweeney to unseal all docket entries, trial materials, and records in this case. ECF No. 1016. Defendants filed their first § 2255 motions before the February 20, 2008 deadline. ECF Nos. 1017, 1020, 1021.[1]

On March 5, 2010, this Court ordered the government to respond to the § 2255 motions. ECF Nos. 1042, 1043, 1044. Coordination problems then reared their head. The defendants expressed a desire to file supplements to their first § 2255 motions. *See, e.g.*, ECF No. 1053 at 2 n.1. In light of this request, the Court granted motions for extensions of time for defendants to file their supplements and for the government to respond. *See, e.g.*, ECF Nos. 1064, 1066, 1073, 1074, 1081. The government consistently emphasized that it did not oppose extensions of time but stated that it did "not waive any timeliness arguments." ECF No. 1053 at 3; *accord* ECF No. 1067 at 1–2; 05/17/13 Tr. 5:1–19, ECF No. 1219.

---

[1] Defendant Carson's motion was not docketed until February 28, 2008—eight days after AEDPA's one-year deadline. ECF No. 1023. Carson blamed the prison mail system for this error and attested that he mailed his § 2255 motion before the deadline. *See* ECF No. 1278 at 5–7. The Court did not address this issue because it denied Carson's claims as vague and conclusory. *Martin*, 2021 WL 4989983, at *6 n.4.

2

After granting further extensions of time and holding status conferences on December 20, 2012, May 17, 2013, and August 29, 2013, the Court set the supplement deadline for November 28, 2014. *See* ECF Nos. 1122 & 1128. The supplements then began arriving. Defendant Sweeney filed a supplement on November 28, 2014. ECF No. 1140. Defendant Carson—after obtaining another extension—filed his supplement on April 9, 2015. ECF No. 1170. All four defendants filed more supplements between 2015 and 2020. *See, e.g.*, ECF Nos. 1182, 1183, 1184 (asserting claims based on *Johnson v. United States*, 135 S. Ct. 2551 (2015)).

The United States then filed an omnibus brief in opposition. ECF No. 1268. In its brief, the government argued that many claims that defendants brought in supplements fell outside of § 2255(f)'s statute of limitations and did not relate back to timely filed claims. *See generally id.* Defendants Sweeney and Carson replied to this brief. ECF Nos. 1277 & 1278. They asserted that their claims did relate back or, in the alternative, that the Court should equitably toll the statute of limitations. *See* ECF No. 1277 at 8–21. The Court ultimately denied all of defendants' § 2255 claims. ECF No. 1283 & 1284.

With their § 2255 claims denied, defendants filed notices of appeal to the D.C. Circuit. The D.C. Circuit held these appeals in abeyance and referred them to this Court to determine whether these cases warranted certificates of appealability. *See, e.g.*, ECF No. 1295. The Court will now do so.

## II.    LEGAL STANDARD

In 1996, Congress passed AEDPA—an act imposing "gatekeeping" mechanisms that restrict (often frivolous) post-conviction collateral attacks. *See Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Felker v. Turpin*, 518 U.S. 651, 657 (1996). One of these restrictions is a "certificate of appealability." Under AEDPA, a defendant has "no absolute entitlement" to appeal the denial

3

of a post-conviction motion. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003) (citing 28 U.S.C. § 2253). Instead, when a district court enters a final order adverse to a defendant's § 2255 motion, the court must "issue or deny a certificate of appealability." Rules Governing § 2255 Proceedings, Rule 11(a). The defendant may not appeal a final order without this certificate of appealability, which requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c).

The Supreme Court has counseled that courts should not issue certificates of appealability as "a matter of course." *Miller-El*, 537 U.S. at 337. A defendant must demonstrate that "reasonable jurists could debate whether . . . the petition could have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). When a district court denies relief on procedural grounds, the defendant must show that "jurists of reason would find it debatable" (1) "whether the district court was correct in its procedural ruling" and (2) "whether the petition states a valid claim of the denial of a constitutional right." *United States v. Baxter*, 761 F.3d 17, 26 n.10 (D.C. Cir. 2014) (quoting *Slack*, 529 U.S. at 484).

### III.  DISCUSSION

None of the defendants have moved for a certificate of appealability or briefed disputed issues. The Court therefore treats their notices of appeal as motions for certificates of appealability. *See Slack*, 529 U.S. at 483 (treating a notice of appeal as an application for a certificate of appealability); *West v. Schneiter*, 485 F.3d 393, 395 (7th Cir. 2007) ("A notice of appeal acts as a request for a certificate whether or not the prisoner files a separate application.");

4

*accord United States v. King*, No. 1:18-cr-318 (JDB), 2022 WL 1165932, at *1 (D.D.C. Apr. 20, 2022).

The Court denied defendants' § 2255 claims on four grounds. First, defendants raised many claims for the first time in supplements filed long after AEDPA's one-year statute of limitations. Second, defendants procedurally defaulted many claims by failing to raise them on direct appeal. Third, defendants offered claims with vague or conclusory arguments. And finally, defendants' remaining claims were meritless. The Court will evaluate its conclusions in turn. After reviewing defendants' § 2255 motions, supplements, and replies, the government's opposition, applicable law, and the record as a whole, the Court will **DENY** defendants' requests for certificates of appealability.

### A. Timeliness Issues

During trial, defendants' counsel repeatedly requested *Brady*, *Giglio*, and Jencks Act materials from the government.[2] The government turned over disputed material either in redacted form or by filing it with the trial court under seal. On direct appeal, defendants' attorneys jointly moved to review these sealed documents. Mot. to Allow Counsel to Review Specific Sealed Portions of the Trial Record ("Mot. to Review"), *United States v. Carson*, No. 02-3015 (D.C. Cir. May 29, 2003), Doc. No. 751872. The attorneys identified thirteen sets of sealed materials, explained their suspicions, and tied those suspicions to suspected *Brady*, *Giglio*, or Jencks Act violations. *See id.* The D.C. Circuit refused to allow defendants to review these documents. *See* Order, *United States v. Carson*, No. 02-3015 (D.C. Cir. Aug. 28, 2003),

---

[2] *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); Jencks Act, 18 U.S.C. § 3500.

Doc. No. 769196. Instead, the Circuit ordered defendants to raise these alleged *Brady* violations in their appellate brief. *Id.* Defendants did not do so.

In their § 2255 supplements (filed in 2014 and 2015), defendants Sweeney and Carson included claims alleging (1) *Brady*, *Giglio*, and Jencks Act violations about those sealed materials, (2) ineffective assistance of trial counsel for not challenging the trial court's *in camera* reviewing procedures, and (3) ineffective assistance of appellate counsel for failing to challenge these alleged violations on direct appeal. In defendants' view, relation-back and equitable-tolling principles excused their late filings. *See* ECF Nos. 1277 & 1278. The Court instead concluded that AEDPA's one-year statute of limitations barred these claims. *See, e.g.*, *Martin*, 2021 WL 4989983, at *7–8. It stands by this conclusion for three reasons: (1) AEDPA's statute of limitations ended on February 20, 2008; (2) the claims in defendants' supplements do not relate back to those in their first § 2255 motions; and (3) the facts of this case do not warrant equitable tolling.

### *i. Statute of Limitations Issues*

The Court denied many of defendants' claims because they were raised after AEDPA's one-year limitations period had passed. Post-conviction collateral attacks under § 2255 carry a one-year statute of limitations. 28 U.S.C. § 2255(f). This period begins on the latest of the date when (1) "the judgment of conviction becomes final," (2) an "impediment to making a motion created by governmental action" in violation of the Constitution or statutes is removed, (3) the Supreme Court newly recognizes a right and makes it "retroactively applicable" to collateral proceedings, or (4) "the facts supporting the claim . . . could have been discovered through the exercise of due diligence." *Id.*[3]

---

[3] The Court will rely on cases concerning both § 2244(d) and § 2255(f) in its analysis. Because the limitations provisions in § 2244(d) and § 2255(f) are nearly identical, courts often interpret the two statutes in tandem. *See, e.g.*, *Gonzalez v. Thaler*, 565 U.S. 134, 149 (2012); *Scott v. United States*, 890 F.3d 1239, 1247 n.2 (11th Cir. 2018); *United States v. Winkles*, 795 F.3d 1134, 1140–41 (9th Cir. 2015) (Lamberth, J., sitting by designation).

Critical here is whether defendants' access to alleged *Brady, Giglio*, and Jencks Act materials triggered § 2255(f)(4), thereby resetting AEDPA's statute of limitations. Under § 2255(f)(1), defendants had until February 20, 2008 to file their motions. *See* 28 U.S.C. § 2255(f)(1); *Carson v. United States*, 549 U.S. 1246 (2007) (denying petition for writ of certiorari). But Sweeney's counsel attested that the Clerk's Office did not provide her these materials—which had been sealed—until June 17, 2010. Wicks Aff., ECF No. 1280 at 3. In challenging the government's timeliness arguments, Sweeney thus relied on § 2255(f)(4)'s alternative deadline. *See* ECF No. 1277 at 7.

The time limit under § 2255(f)(4) begins "when the prisoner knows (or through diligence could discover) the important facts" supporting a claim, "not when the prisoner recognizes their legal significance." *United States v. Pollard*, 290 F. Supp. 2d 153, 160 (D.D.C. 2003). "The case law is legion in this regard." *Id.* Diligence "must merely be 'due' or 'reasonable' under the circumstances." *United States v. Rodriguez*, 858 F.3d 960, 962 (5th Cir. 2017) (quoting *Starns v. Andrews*, 524 F.3d 612, 619 (5th Cir. 2008)). And it "can be shown by prompt action on the part of the petitioner" once he "realize[s] that he has an interest" in raising the claim. *Johnson v. United States*, 544 U.S. 295, 308 (2005). Until an event in the defendant's case "clearly shows that diligence is in order," § 2255(f)(4) will not apply. *Id.*

Though the D.C. Circuit has not opined on this standard, two conclusions appear prevalent among the circuits that have discussed the issue. First, the facts supporting a § 2255 claim may differ from the evidence involved with the claim. *See McAleese v. Brennan*, 483 F.3d 206, 214 (3d Cir. 2007). A defendant has no statutory right to "an extended delay . . . while [he] gathers every possible scrap of evidence that might . . . support his claim." *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998). New information discovered "that merely supports or

7

strengthens a claim that could have been properly stated without the discovery" will not renew the statute of limitations. *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012). So, some circuits look to awareness of "vital facts" underlying a claim—the facts "without which the claim would necessarily be dismissed." *Id.*; *see McAleese*, 483 F.3d at 214. The Fifth Circuit, stating the standard differently, looks to "the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim." *In re Davila*, 888 F.3d 179, 189 (5th Cir. 2018) (quoting *In re Young*, 789 F.3d 518, 528 (5th Cir. 2015)).

Second, a defendant's awareness of potential *Brady*, *Giglio*, or Jenks Act material affects this analysis. Criminal defendants "are entitled to place their faith" in the government's representations that they have turned over *Brady*, *Giglio*, or Jencks Act material. *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 293 (3d Cir. 2021); *accord Carter v. Bigelow*, 787 F.3d 1269, 1282 (10th Cir. 2015); *Willis v. Jones*, 329 F. App'x 7, 16–17 (6th Cir. 2009). When a defendant has no reason to suspect that the government violated its disclosure obligations, newly discovered evidence may trigger § 2255(f)(4) and reset AEDPA's statute of limitations. *See Bracey*, 986 F.3d at 293.[4] But once there exists "a reasonable basis for a [defendant] to believe additional investigation will yield undisclosed *Brady* material, that [defendant] must investigate or risk the statutory consequences." *Id.* at 294.[5]

---

[4] *See also Jefferson v. United States*, 730 F.3d 537, 544–45 (6th Cir. 2013) (holding that § 2255(f)(4) "does not require a [defendant] repeatedly to seek out information that the government unconstitutionally failed to disclose"); *cf. In re Will*, 970 F.3d 536, 542–43 (5th Cir. 2020) (explaining, in the second-or-successive context, that a prisoner could not have discovered a *Brady* claim's factual predicate after the government represented that it would produce all *Brady* materials before trial).

[5] *Cf. Smith v. Vannoy*, 848 F. App'x 624, 627 (5th Cir. 2021) (finding that the operative date for a habeas petitioner was when he "became aware" of undisclosed materials); *Solorio v. Muniz*, 896 F.3d 914, 920–21 (9th Cir. 2018) (holding, in the second-or-successive context, that "[a] petitioner must exercise due diligence in investigating new facts where he is on notice that new evidence *might* exist"); *Ford v. Gonzalez*, 683 F.3d 1230, 1236 (9th Cir. 2012)

8

Contrary to Sweeney's argument, this case's history demonstrates that defendants' limitations period ended on February 20, 2008. Defendants discovered the existence of undisclosed materials during the trial itself, as counsel raised many *Brady*, *Giglio*, and Jencks Act objections during the government's case in chief. *See, e.g.*, 01/30/01 (PM) Tr. 4–6; 02/12/01 (AM) Tr. 5–8; 04/24/01 (PM) Tr. 3. Consider also defendants' motion to unseal these alleged *Brady* materials on direct appeal. Defendants' appellate counsel (1) acknowledged that they objected to the sealing of these materials at trial, (2) laid out specific documents and specific rulings that they believed violated *Brady*, *Giglio*, and the Jencks Act, and (3) explained why they suspected that violations had occurred. *See* Mot. to Review 5–16. Defendants did not rely on the government's representations about *Brady* evidence; they actively challenged the government's failure to disclose certain materials, both at trial and on direct appeal. These facts indicate that defendants had reason to believe that the government may have violated its disclosure obligations years before AEDPA's one-year deadline. The operative deadline for defendants' claims, then, was February 20, 2008.

Case law from other circuits confirms this conclusion. In *Ford v. Gonzalez*, for example, a prisoner discovered that a cooperating witness "had received favorable dispositions of her own criminal cases" during the prisoner's trial. *Ford*, 683 F.3d at 1234. The prisoner discovered this information only after filing his habeas petition. *See id.* In an amended petition, the prisoner added *Brady* and ineffective-assistance claims about the cooperating witness. *Id.* The Ninth Circuit held that these claims were untimely. *Id.* at 1236. "[T]he testimony at trial gave ample reason for a reasonable person in [the prisoner's] position to investigate" whether the witness

---

(refusing to delay AEDPA's statute of limitations because he "relie[d] on a factual predicate and speculative inferences therefrom which [had] been present since the trial itself").

9

"sought and received benefits in return for assisting law enforcement." *Id.* Similarly, in *Smith v. Vannoy*, a prisoner filed a successive habeas petition raising *Brady* claims. *Smith*, 848 F. App'x at 626. The prisoner conceded that he "knew of the undisclosed evidence in September 2001." *Id.* at 627 n.4. The Fifth Circuit held that "the limitations period began to run" as of that September 2001 date. *Id.* at 627–28. As that court explained, "[t]he facts underlying [the prisoner's] claim consist of the evidentiary materials that were undisclosed to him, and he became aware of their existence in September 2001." *Id.* at 627.

This case is no different. Defendants' trial counsel objected to undisclosed *Brady*, *Giglio*, and Jencks Act materials at many points during the trial. And defendants' appellate counsel knew enough information to file a motion listing the alleged violations in detail. In short, the "trap" that post-conviction defendants sometimes face—file early and risk their undeveloped claims being dismissed, or file late and risk their later-brought claims being time-barred—is not present in this case. *See Jefferson*, 730 F.3d 537, 547 (6th Cir. 2013). Defendants had reason to believe they might have meritorious *Brady*, *Giglio*, or Jencks Act claims long before § 2255(f)(1)'s February 20, 2008 deadline. The Court, therefore, finds that no reasonable jurist could debate that AEDPA's statute of limitations for these claims ended on February 20, 2008.

> ii.    *Relation-Back Issues*

Even if defendants' claims were brought outside of the limitations period, the Court could have considered them if they related back to timely claims. Claims "relate back" if they form part of the same "conduct, transaction, or occurrence" as those originally brought. *Mayle v. Felix*, 545 U.S. 644, 656–57 (2005). But the relevant conduct, transaction, or occurrence cannot be defined as generally as a defendant's entire "trial, conviction, or sentence." *Id.* To do so would circumvent the central policy of relation-back doctrine: ensuring an opposing party has "sufficient

10

notice" about facts and arguments that a party might bring in an amendment. *United States v. Hicks*, 283 F.3d 380, 388 (D.C. Cir. 2002). So, "an amendment that shares 'some elements and some facts in common'" with an original pleading "does not relate back if its effect is 'to fault [an opposing party] for conduct different from that identified'" in the original pleading. *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009) (quoting *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 866 (D.C. Cir. 2008)). Conclusory claims also bear a close look, as they may not provide the government with fair notice of the grounds on which the defendant asserts relief. *See Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984).

All four defendants brought untimely claims that did not relate back. The Court will begin with Martin and Coates. Years after AEDPA's one-year deadline, Martin and Coates each raised new ineffective-assistance claims. *See* ECF No. 1233 at 29–36; ECF No. 1166 at 1–7. The Court concluded that these claims fell outside of AEDPA's limitation period and did not relate back. *Martin*, 2021 WL 4989983, at *11, *20. The facts underlying Martin's new ineffective-assistance claims (counsel's conduct at trial) differed from those underlying his original *Brady* claims (the government's alleged failure to disclose information), making relation back inappropriate. *See Mayle*, 545 U.S. at 650. Coates's newly raised claims failed as well. A defendant cannot satisfy Rule 15's relation-back standard "merely by raising some type of ineffective assistance in his original petition, and then amending the petition to assert another ineffective assistance claim based upon an entirely distinct type of attorney malfeasance." *United States v. Stover*, 576 F. Supp. 2d 134, 140 (D.D.C. 2008) (quoting *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005)). Coates did just that. *See Martin*, 2021 WL 4989983, at *20–21 & n.17. The Court finds that no reasonable jurist could debate these conclusions.

11

Neither did defendant Carson's claims relate back. "New and distinct factual theories raised in an untimely motion . . . do not qualify for relation back under Rule 15(c) in the § 2255 context." *United States v. Palmer*, 902 F. Supp. 2d 1, 13–16 (D.D.C. 2012). Carson's first § 2255 motion consisted of three one-sentence claims: (1) ineffective assistance of counsel for failure to investigate and failure to object to inadmissible evidence; (2) an unconstitutional sentence; and (3) that "Newly Discovered Evidence" established a Fifth Amendment due-process violation. ECF No. 1023 at 5. Though Carson referenced an attached "Memorandum of Law and Facts" in this motion, it was not attached in the filing. *See* ECF No. 1023. The record does not contain this memorandum, and the Court has not been able to locate it. Years later, Carson filed a supplement alleging due-process, *Brady*, and ineffective-assistance claims. ECF No. 1170. These supplemental claims offered new and distinct factual theories because Carson did not provide facts in his first § 2255 motion. Permitting these later-raised claims to relate back would have circumvented AEDPA's focus on finality and disregarded the principle of fair notice that the relation-back doctrine aims to ensure. *See Hall*, 2018 WL 6434772, at *5 (rejecting a relation-back argument because a defendant alleged "bald legal conclusions" and "failed to raise any facts" supporting a claim); *see also Hicks*, 283 F.3d at 388 (noting that "[s]uch a result would be difficult to square with Congress's decision to expedite collateral attacks" through "stringent time restrictions"). Because the Court's conclusion adhered to established case law in this Circuit, the Court finds that no reasonable jurist could debate that Carson's claims did not relate back.

Sweeney's claims require more analysis. In his first § 2255 motion, Sweeney alleged that prosecutors "engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure and late disclosure of *Brady* information." ECF No. 1017 at 16. He also requested, due to allegedly "cumulative *Brady* errors, both

12

non[]disclosure and late disclosure . . . that [the] Court review in camera the materials sealed by the trial court." *Id.* at 13. After making these general statements, Sweeney alleged a single, specific *Brady* claim about undisclosed evidence that would have impeached a cooperating witness. *Id.* at 16.[6] Sweeney's supplement, however, raised alleged *Brady* violations with respect to the materials sealed by the trial court. *See* ECF No. 1140 at 8–52. In Sweeney's telling, these claims "all arise out of the conduct, transaction[,] or occurrence set forth in his initial motion"— the government's "misconduct and failure to turn over *Brady* information to the defense." ECF No. 1277 at 10. The Court disagreed and denied these claims as untimely. *See Martin,* 2021 WL 4989983, at *8.

At issue is the scope of the "conduct, transaction, or occurrence" that Sweeney alleged in his first motion. *See* Fed. R. Civ. P. 15(c). The Supreme Court has warned that courts should not define "conduct, transaction, or occurrence" so broadly as to encompass a prisoner's "trial, conviction, or sentence," for under that standard "virtually any new claim introduced in an amended petition will relate back." *Mayle,* 545 U.S. at 656–57. Instead, courts should assess whether the motion and amendment "state claims that are tied to a common core of operative facts." *Id.* at 664. The problem? Sweeney first pleaded *Brady* violations at a high level of generality. *See* ECF No. 1017 at 12, 16 (alleging "nondisclosure and late disclosure" of potential *Brady* evidence). These overly broad claims cannot anchor the myriad *Brady* violations Sweeney raised in his supplement.

*Mayle* and case law from the federal courts of appeals confirm this conclusion. The Supreme Court, in *Mayle,* approved of two cases' reasoning about relation-back principles. *See Mayle,* 664 n.7 (citing *Mandacina v. United States,* 328 F.3d 995, 1000–01 (8th Cir. 2003) and

---

[6] The Court disposed of this claim on the merits in its memorandum opinion. *Martin,* 2021 WL 4989983, at *9.

13

*Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001)). In *Mandacina*, a prisoner

originally alleged that the government "failed to properly disclose . . . any and all information

related by [a victim] prior to his death in which [the victim] implicated any other person in any

criminal activity." *Mandacina*, 328 F.3d at 1000. The prisoner amended his motion to include a

*Brady* claim about a previously nondisclosed police report. *Id.* at 1001. The Eighth Circuit held

that this claim related back—the police report at issue "support[ed] a defense theory that, before

he died, [the victim] implicated other persons involved in organized criminal activity" with a

motive to retaliate, thereby "providing the government with the notice that the statutes of limitation

were intended to provide." *Id.* Similarly, in *Woodward*, the Tenth Circuit held relation back proper

when an original claim challenged the trial court's admission of "recanted statements" and a

subsequent claim concerned the court's refusal to let the defendant provide evidence of those

recantations. *Woodward*, 263 F.3d at 1142. This claim "simply 'clarifie[d] or amplifie[d] a claim

or theory in the original' petition." *Id.*

But a defendant must allege *some* operative facts out of which their claim arises in order

for later-raised claims to relate back.[7] Take *Hill v. Mitchell*, 842 F.3d 910 (6th Cir. 2016), which

expressly distinguished *Mandacina* and *Woodward*. In *Hill*, the defendant had alleged a *Brady*

claim "completely bereft of specific fact allegations or evidentiary support [that] was not tied to

any particular theory of relief." *Id.* at 924. "The original claim did not identify, even in general

terms, the nature of any suppressed information believed to be exculpatory or impeaching." *Id.*

*Mandacina* and *Woodward*, in contrast, concerned original claims that "presented an actual theory

---

[7] *See, e.g., Ross v. Williams*, 950 F.3d 1160, 1168 (9th Cir. 2020) (construing the common core of operative facts as "defense counsel's purported failure to object" to a state witness's testimony about pickpocketing and theft by distraction); *United States v. Santarelli*, 929 F.3d 95, 101 (3d Cir. 2019) (defining the "common core of operative facts" as a defendant's ineffective-assistance allegation about "allegedly failing to argue . . . that the [presentencing report] included certain errors").

for relief" and amendments that "only 'set forth certain particulars of [those] claim[s].'" *Id.*

(quoting *Cowan v. Stovall*, 645 F.3d 815, 819 (6th Cir. 2011)). The Sixth Circuit rejected any

analogy to *Mandacina* and *Woodward*. The defendant's amended claim did not "share a 'common

core of operative facts' with the original [claim] . . . because the original [claim] alleged no

operative facts out of which the amended claim could also be deemed to have arisen." *Id.* at 925

(citing *Mayle*, 545 U.S. at 650).

Like the defendant in *Hill*, Sweeney alleged *Brady* claims in broad strokes. He requested

that, "due to the cumulative *Brady* errors [at trial] . . . that [the] Court review in camera the

materials sealed by the trial court." ECF No. 1017 at 13. Sweeney also stated the following:

> In reviewing the files and records that are currently available[,]
> Counsel for Mr. Sweeney believes that the prosecutors engaged in
> deliberate misrepresentations and other prosecutorial misconduct,
> including but not limited to the nondisclosure and late disclosure of
> *Brady* information and the use of perjured testimony, in violation of
> Mr. Sweeney's constitutional rights, but counsel needs further
> investigation as well as a complete set of discovery, [Jencks Act],
> *Brady*[,] and *Giglio* [material] provided to trial counsel.

*Id.* at 16. Sweeney then raised allegations about suppressed evidence that would have impeached

James Montgomery's credibility, "[p]rosecutorial misconduct in obtaining testimony by any

means necessary," and misconduct relating to jailhouse confessions. *Id.* at 16. These broad

statements did not provide sufficient notice that he would assert *Brady* claims about the sealed

materials in a supplement. "A claim that the [government] was suppressing an unspecified

*something* is much different from a claim regarding *what*, specifically, the [government] was

suppressing and how it would have benefitted [a defendant] at trial had it been disclosed." *Hill*,

842 F.3d at 924. Moreover, Sweeney's statements merely assert a suspicion that he *might* discover

constitutional violations. These statements lack the specific details found in *Mandacina*,

*Woodward*, and other cases that would justify relation back.

15

Sweeney's argument—defining the relevant "conduct, transaction, or occurrence" as the "misconduct and failure to turn over *Brady* information to the defense"—has another problem. ECF No. 1277 at 10. By construing the "conduct, transaction, or occurrence" to encompass a bare-bones *Brady* claim, even if "devoid of *Brady* material or specific factual allegations," a defendant could "include a catch-all *Brady* claim" in his original motion, then "hope that evidence eventually turns up" because "any subsequent amendment would relate back." *Hill*, 842 F.3d at 925. This approach would "eviscerate AEDPA's statute of limitations for *Brady* claims and would run directly contrary to Congress's intent." *Id.* In light of AEDPA's principle of finality and this relevant case law, the Court finds that no reasonable jurist could debate whether Sweeney's supplemental claims related back.

iii.     *Equitable Tolling Issues*

Finally, Carson and Sweeney argued that the Court should equitably toll AEDPA's statute of limitations with respect to claims raised in their supplements. ECF Nos. 1277 & 1278. A defendant moving for relief under § 2255 "is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *United States v. Baxter*, 761 F.3d 17, 30–31 (D.C. Cir. 2014) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 391 (2013)). "To count as sufficiently 'extraordinary' to support equitable tolling, the circumstances that caused a litigant's delay must have been beyond [his] control." *Head v. Wilson*, 792 F.3d 102, 107 (D.C. Cir. 2015) (citation omitted). The test requires not merely that an extraordinary circumstance existed. Rather, the extraordinary circumstances must have "[made] it impossible to file a petition on time." *United States v. Pollard*, 416 F.3d 48, 56 (D.C. Cir. 2005).

Equitable tolling should be employed "only sparingly." *Cicero*, 214 F.3d at 203 (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)). It requires a "case-by-case" approach drawing "upon decisions made in other similar cases for guidance." *Holland v. Florida*, 560 U.S. 631, 650 (2010). The threshold showing "necessary to trigger equitable tolling is very high," *Miranda v. Castro*, 292 F.3d 1063, 1066 (9th Cir. 2002), because courts should not "create a loophole . . . contrary to the legislative intent [of AEDPA] of insuring a greater degree of finality," *Jones v. United States*, 304 F.3d 1035, 1039 (11th Cir. 2002). In light of these principles, courts in this Circuit rarely permit equitable tolling for § 2255 motions. *See King*, 2022 WL 579483, at *9 (listing the three cases "[i]n the last ten years" in which "courts in this Circuit have granted equitable tolling of § 2255(f)'s limitations period").

Reasonable jurists could not debate whether equitable tolling is appropriate in this context. Defendants contended that equitable tolling was proper on four grounds: (1) misconduct by Sweeney's attorney, (2) Sweeney's lack of counsel after his attorney withdrew, (3) unsettled relation-back and equitable-tolling case law, and (4) the Court's orders extending defendants' time to file their supplements. *See* ECF No. 1277. The Court disagreed and continues to disagree.

### a. Attorney Misconduct

First, the conduct of Sweeney's attorney did not constitute an extraordinary circumstance for equitable-tolling purposes. A defendant's attorney is "[his] agent when acting, or failing to act, in furtherance of the litigation," meaning that "the [defendant] must bear the risk of attorney error." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). To be sure, equitable tolling may be warranted for an attorney who abandons a defendant. *See Maples v. Thomas*, 565 U.S. 266, 282 (2012). But the attorney's behavior must be "so outrageous or so incompetent as to render it extraordinary." *Pollard*, 416 F.3d at 56. That type of misconduct is rare indeed. Courts have

17

routinely held that extraordinary circumstances do not include an attorney who miscalculates filing deadlines,[8] misrepresents the case's status,[9] becomes overburdened with cases,[10] or misunderstands governing law.[11]

· Sweeney did not demonstrate that his attorney's conduct, even if negligent, constituted an extraordinary circumstance. He argued that her inaction in the face of his insistent requests for her to file a § 2255 supplement constitutes misconduct or abandonment. ECF No. 1277 at 16. The record tells a different story. · Sweeney's attorney communicated with him. *See, e.g.,* ECF No. 1277-3 at 2 (noting a "recent fusillade of emails"); ECF No. 1277-4 at 4 (referencing a March 9, 2010 email). This communication may have been sporadic. *See, e.g.,* ECF No. 1277-4 at 2 (explaining that Sweeney's family "made several attempts to contact [her] to no avail"); ECF No. 1277-5 at 2 (complaining of "[i]nept communication"). But it did not rise to wholesale abandonment. *Compare, e.g., Foley v. Biter,* 793 F.3d 998, 1003 (9th Cir. 2015) (holding that an attorney abandoned a client by failing to communicate, to preserve an appeal, and to withdraw from the case); *Doe v. Busby,* 661 F.3d 1001, 1012 (9th Cir. 2011) (permitting equitable tolling for an attorney who did not file a habeas petition, despite promises to the contrary, and took six months to return requested files). And when the attorney–client relationship reached an impasse, Sweeney's attorney withdrew. ECF No. 1083. While this relationship may not have been ideal,

---

[8] *See, e.g., Lawrence v. Florida,* 549 U.S. 327, 336–37 (2007); *United States v. Rice,* 727 F. App'x 697 (D.C. Cir. 2018); *Byers v. United States,* 561 F.3d 832, 836–37 (8th Cir. 2009); *David v. Hall,* 318 F.3d 343, 346 (1st Cir. 2003); *Wilson v. Battles,* 302 F.3d 745, 748 (7th Cir. 2002).

[9] *See, e.g., United States v. Merise,* No. 1:06-cr-42-1 (JDB), 2020 WL 1930306, at *2 (D.D.C. Apr. 21, 2020) ("[T]he fact, if true, that [the defendant's] attorney advised him 'that there was nothing else for him to do, and not to talk to other prisoners about the case' . . . does not rise to the level of an 'extraordinary circumstance.'"); *Evans v. Lockett,* No. 1:17-cv-2619 (ABJ), 2019 WL 1003412 (D.D.C. Mar. 1, 2019) (denying equitable tolling when counsel provided "incorrect information" about a defendant's appeals and erroneously "advised that the Supreme Court" was his only avenue for relief).

[10] *See, e.g., Lookingbill v. Cockrell,* 293 F.3d 256, 264 (5th Cir. 2002).

[11] *See, e.g., Cadet v. Fla. Dep't of Corr.,* 853 F.3d 1216, 1333–34 (11th Cir. 2017) (reasoning that counsel's "sincere but persistent misreading" of the statute of limitations did not qualify as an extraordinary circumstance).

18

Case 1:98-cr-00329-RCL    Document 1305    Filed 05/23/22    Page 19 of 26

this conduct does not rise to the level of attorney malfeasance or abandonment constituting an extraordinary circumstance.

### b. *Counsel's Withdrawal and* Pro Se *Representation*

Sweeney next argues that equitable tolling is proper for the period "when no new counsel was appointed to represent him." ECF No. 1277 at 19. Well-established case law forecloses this argument. Courts in this circuit and other circuits have expressly refused equitable tolling for a prisoner proceeding *pro se*. *See, e.g.*, *United States v. Crews*, No. 11-cr-372-1 (EGS), 2021 WL 5798033, at *13 (D.D.C. Dec. 7, 2021); *Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006); *Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004); *Delaney v. Matesanz*, 264 F.3d 7, 14 (1st Cir. 2001). Nor will a prisoner's search for new post-conviction counsel constitute an extraordinary circumstance. *See Jihad v. Hvass*, 267 F.3d 803, 806 (8th Cir. 2001). After all, "there generally is no *constitutional* right to effective counsel in collateral proceedings." *United States v. Scurry*, 992 F.3d 1060 (D.C. Cir. 2021) (citing *Garza v. Idaho*, 139 S. Ct. 738, 749 (2019)). No reasonable jurist could find, in light of this case law, that Sweeney's lack of counsel qualified as an extraordinary circumstance.

### c. *Court-Ordered Extensions*

Between 2010 and 2014, the Court entered orders extending defendants' time to file their § 2255 supplements. Sweeney argues that these "blanket extensions of the filing deadline" should justify equitable tolling. ECF No. 1277 at 19–20. Again, case law indicates otherwise. A district court's actions may qualify as an extraordinary circumstance when the court has "affirmatively misled" a defendant. *Pliler v. Ford*, 542 U.S. 225, 234 (2004). The Court did not do so in this case.

19

Defendants filed their first § 2255 motions in February 2008. ECF Nos. 1017, 1020, 1021, 1023. They expressed their desire to supplement these motions only in March 2010, after the Court ordered the government to respond. *See* ECF Nos. 1042, 1043, 1044. The Court did grant motions for extensions of time for defendants to file their supplements. *See, e.g.*, ECF Nos. 1064, 1066, 1073, 1074 1081.[12] But these extensions came long after AEDPA's one-year statute of limitations had run. In addition, the government—from the first motion for extension of time— consistently emphasized that it would object to newly raised claims as untimely. *See* ECF No. 1053 at 3; ECF No. 1067 at 1–2. The D.C. Circuit has denied equitable tolling for a defendant who argued that he "relied on orders entered by the district judge" when those orders came "two months after the filing deadline had passed" and "three days after [the defendant] filed his [§ 2255] motion." *United States v. Baxter*, 761 F.3d 17, 31 (D.C. Cir. 2014). That logic applies equally here. Defendants can hardly blame the Court for their delay in bringing § 2255 claims based on extensions of time after they missed AEDPA's one-year deadline.

Sweeney highlights *Sossa v. Diaz*, 729 F.3d 1225 (9th Cir. 2013), and *Prieto v. Quarterman*, 456 F.3d 511 (5th Cir. 2006), to argue that court-ordered extensions of time may justify equitable tolling. But the facts here differ greatly from those cases. In *Sossa*, the Ninth Circuit held that a prisoner was entitled to equitable tolling when a federal court dismissed his habeas petition "with leave to amend within thirty days." *Sossa*, 729 F.3d at 1227. By granting the extensions, the judge affirmed a belief that "the [amended] petition would be deemed timely" if filed by the new deadline. *Id.* at 1233. Similarly, in *Prieto*, the Fifth Circuit held equitable

---

[12] As the Court explained above, defendants were aware of the vital facts underlying the sealed-material *Brady* claims long before AEDPA's February 20, 2008 deadline. *See supra* Part III.A.i. Defendants may not have gained access to these materials until June 17, 2010, as Sweeney's attorney has attested. Wicks Aff., ECF No. 1280 at 3. But they had reason to believe these *Brady* claims might be at issue—meaning that § 2255(f)(4) did not reset the statute of limitations upon their discovery of this evidence in 2010.

tolling appropriate when a prisoner had moved to extend his deadline for a habeas petition. *Prieto*,
456 F.3d at 513. The prisoner—who had moved for an extension before AEDPA's statute of
limitations had run—had "relied to his detriment" on the extension orders, entitling him to
equitable tolling. *Id.*

Defendants' motions for extension of time occurred long after AEDPA's one-year statute
of limitations had run. The record shows no effort to supplement their motions or request
extensions of time between February 2008 and March 2010. Sweeney—in particular—also missed
a July 30, 2012 filing deadline without filing a motion for extension of time. *See* ECF No. 1081.
In light of these facts, this case is more analogous to *Baxter* than *Sossa* or *Prieto*. Because the
Court's extensions of time came *after* AEDPA's statute of limitations had run, no reasonable jurist
could debate whether the Court's actions justified equitable tolling.

### d. Unsettled Relation-Back and Equitable-Tolling Case Law

Finally, Sweeney argued that "[u]nsettled case law about the time for filing a habeas
petition" qualifies as an extraordinary circumstance. ECF No. 1277 at 21. The Court disagreed.
Equitable tolling may be justified for a defendant who "relied on controlling circuit precedent to
file what he thought would be a timely federal petition, only to see the circuit precedent
subsequently overruled." *Williams v. Filson*, 908 F.3d 546, 558 (9th Cir. 2018); *see York v.
Galetka*, 314 F.3d 522, 527–28 (10th Cir. 2003). This case presented nothing akin to this type of
reliance. The Supreme Court issued its seminal decisions in these areas—*Mayle, Holland*, and
*Lawrence*—before 2008. *See Mayle*, 545 U.S. at 644; *Holland*, 560 U.S. at 631; *Lawrence*,
549 U.S. at 327. While the contours of the relation-back and equitable-tolling doctrines may not
be fully developed, that development is natural for the "case-by-case approach" required when

21

applying them. *See Holland*, 560 U.S. at 650. No reasonable jurist could debate that equitable

tolling is appropriate while doctrinal issues percolate in the lower courts.

*    *    *

The Court denied many of defendants' § 2255 claims as untimely. It stands by its

conclusions. Defendants brought their claims long after § 2255(f)'s one-year statute of limitations.

Those claims did not relate back to those in defendants' original motions. And case law established

that equitable tolling was not warranted. The Court finds that no reasonable jurist could debate

these conclusions.

### B. Procedural Default

Defendants procedurally defaulted many other § 2255 claims by failing to raise them on

direct appeal. If a defendant does not raise a claim on direct appeal, he many not raise that claim

in a § 2255 motion unless he can show (1) cause excusing the default and (2) prejudice resulting

from the alleged error. *United States v. Hughes*, 514 F.3d 15, 17 (D.C. Cir. 2008) (citing *Massaro*

*v. United States*, 538 U.S. 500, 503 (2003)). Defendants rarely identified cause for their defaults.

*See Martin*, 2021 WL 4989983, at *4, *9–11. Even assuming cause existed, no prejudice resulted

from these alleged errors. *See, e.g., id.* at *10–11. Defendants even misstated the record for many

of these procedurally defaulted claims. *See id.* at *10 n.9. In accordance with its reasoning in the

memorandum opinion, the Court finds that no reasonable jurist would debate these conclusions.

### C. Summary Denials Based on Conclusory Arguments

Many of defendants' claims involved conclusory arguments lacking factual support.

Carson's original § 2255 petition, for example, included one-sentence Fifth and Sixth Amendment

claims without listing supporting facts. *Id.* at *6. Sweeney also offered constitutional arguments

with little-to-no detail or explanation. *Id.* at *13–14. The Court may deny a § 2255 motion that

22

App 1761

states "only bald legal conclusions with no supporting factual allegations." *Sanders v. United States*, 373 U.S. 1, 19 (1963).    And "conclusory arguments may be summarily dismissed." *Mitchell v. United States*, 841 F. Supp. 2d 322, 328 (D.D.C. 2012) (quoting *United States v. Geraldo*, 523 F. Supp. 2d 14, 22 (D.D.C. 2007)). The Court finds that no reasonable jurist could debate whether these claims showed the denial of a constitutional right.

### D. Merits Denials

Finally, the Court denied defendants' remaining claims on the merits. The Court divided these claims into three categories: (1) government-misconduct claims, (2) ineffective assistance of counsel claims, and (3) arguments regarding sentences for § 924(c) violations. The Court denied these claims for various reasons. For some, defendants overlooked the record. *See, e.g., Martin*, 2021 WL 4989983, at *7 (pointing out a prior holding that "the government met its *Brady* obligations" with respect to challenged testimony).    At other times, defendants misstated or misrepresented the record. *See, e.g., id.* at *15, *18, *20–21 (highlighting misrepresentations by a defendant). Other government-misconduct and ineffective-assistance claims failed because no prejudice resulted. *See, e.g., id.* at *12, *14, *21–22. And many of defendants' arguments incorrectly stated the law or were meritless. *See, e.g., id.* at *16–18. Finally, defendants' § 924(c) arguments ran into opposing case law from the Supreme Court, the federal courts of appeals, the D.C. Court of Appeals, and this Court. *See, e.g., id.* at *24–26. For the remaining claims, the Court finds that no reasonable jurist could debate its conclusions for the reasons stated in the Court's memorandum opinion.

The Court will review its conclusion for one ineffective-assistance claim. Sweeney argued that his appellate counsel provided ineffective assistance by "fail[ing] to note sections of sealed matters" and "to cite authority for those requests." ECF No. 1017 at 12; ECF No. 1140 at 55–67;

ECF No. 1277 at 22. Essentially, Sweeney argues that his counsel should have brought *Brady* claims about the trial court's sealed materials. The Court concluded that Sweeney's counsel did not perform defectively. It reiterates that conclusion here.

Courts evaluate ineffective-assistance claims under *Strickland v. Washington*'s familiar standard. 466 U.S. 668 (1984). A defendant must show (1) that counsel's performance "fell-below an objective standard of reasonableness" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–88. This standard applies equally to appellate counsel. *Payne v. Stansberry*, 760 F.3d 10, 13 (D.C. Cir. 2014). And a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Appellate counsel "need not (and should not) raise every nonfrivolous claim" on appeal. *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). Counsel "may select from among [those claims] in order to maximize the likelihood of success on appeal." *Id.* A decision not to assert a claim on appeal "is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017). This analysis must be viewed "from counsel's perspective at the time"—not with the benefit of hindsight. *Smith v. Murray*, 477 U.S. 527, 536 (1986).

The facts boil down as follows. On direct appeal, Sweeney's appellate counsel moved to review alleged *Brady*, *Giglio*, and Jencks Act materials sealed by the trial court. The D.C. Circuit denied this motion and requested that counsel "identify . . . specific evidentiary rulings" for the Circuit to review *in camera*. Order, *Carson*, No. 02-3015 (D.C. Cir. Oct. 2, 2002),

Doc. No. 705475.[13]  So, in a joint motion, defendants identified thirteen sets of potential *Brady*

materials they sought to review.  *See generally* Mot. to Review.  The D.C. Circuit, again, denied

the request.  Order, *Carson*, No. 02-3015 (D.C. Cir. Aug. 28, 2003), Doc. No. 769196.  The Circuit

ordered defendants to present any *Brady* arguments in their brief.  *Id.*  If these arguments

"present[ed] a colorable claim," then the Circuit would "review the sealed material *in camera*" to

assess whether a constitutional violation occurred.  *Id.*  Defendants' counsel filed a joint brief

containing more than two hundred pages of argument.  Br. of Appellants, *United States v. Carson*,

No. 02-3015 (D.C. Cir. Apr. 25, 2005).  They did not include argument about these potential *Brady*

violations.

The Court concluded that Sweeney's counsel did not perform defectively by failing to

include these materials.  It stands by this conclusion.  If "the record does not explicitly disclose . . .

counsel's actual strategy or lack thereof," the presumption of effective assistance "may only be

rebutted by showing that no sound strategy posited by the [opposing party, here the government]

could have supported the conduct." *United States v. Abney*, 812 F.3d 1079, 1087 (D.C. Cir. 2016)

(quoting *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005)).  Nothing on the record or in

defendants' briefing shows that no "sound strategy" supported counsel's decision to leave out this

argument.  Sweeney's § 2255 briefs drew no comparisons between the alleged *Brady* violations

and the claims raised on appeal.  *See* ECF Nos. 1017, 1140, 1277.  Appellate counsel may have

determined that other claims had a better chance of success.  *Accord United States v. Benbow*,

2021 WL 3268384, at *10 (D.D.C. July 30, 2021) (citing *Abney*, 812 F.3d at 1087).  After all,

defendants' joint counsel raised two hundred pages' worth of detailed constitutional and

---

[13] *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987) ("A defendant's right to exculpatory evidence does not include the unsupervised authority to search through the [government's] files."); *United States v. N. Am. Reporting, Inc.*, 761 F.2d 735, 740 (D.C. Cir. 1985) (explaining that it would "defeat [the] design [of the Jencks Act] to hold that the defense may see statements in order to argue whether it should be allowed to see them").

evidentiary arguments—one of which included a judicial-bias argument mentioning the alleged *Brady* violations. Br. of Appellants 90–92. Without a showing that appellate counsel's conduct lacked a strategic basis, and in light of criminal defendants' lack of a constitutional right "to have appellate counsel raise every nonfrivolous issue that the defendant requests," *Jones*, 463 U.S. at 754 n.7, the Court finds that no reasonable jurist could debate this conclusion.

## IV.  CONCLUSION

For the reasons explained above, the Court finds that no reasonable jurist could debate its procedural rulings or could find that defendants validly stated a claim for the denial of a constitutional right. The Court will **DENY** defendants' requests for certificates of appealability. A separate order consistent with this memorandum opinion shall issue this date.

Date: May 23, 2022

Royce C. Lamberth
United States District Judge

26

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

WILLIAM SWEENEY

Crim. No. 98-329-4 (RCL)

**WILLIAM SWEENEY'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS
MOTIONS TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 18
U.S.C. § 2255**

William K. Sweeney, petitioner, by his attorney replies to the Government's Opposition

to his Motions to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. § 2255, and states

as follows:

**THE CLAIMS MADE IN MR. SWEENEY'S SUPPLEMENTS ARE NOT TIME
BARRED**

**The Collateral Proceedings**

        In May 2007, the Court appointed Jenifer Wicks as counsel to represent Mr. Sweeney in

post-conviction collateral proceedings.  Dkts. 1010, 1011.  On February 13, 2008, Mr. Sweeney,

through counsel, filed a motion to access material that had been filed *ex parte* and sealed by the

District Court during the course of the trial.  *See* Dkts. 1015.  On February 15, 2008—five days

before the expiration of one year since the denial of certiorari—the Court granted Mr. Sweeney's

motion and ordered the Clerk's Office to provide "copies of any necessary sealed pleadings in this

matter to counsel for Mr. William Sweeney."  Dkt. 1016.  That same day, Ms. Wicks went to the

Clerk's Office, order in hand, looking for the documents, but the Clerk's Office was not able to

locate them.  *See* Ex. 1 (Nov. 2015 Wicks Letter).

On February 19, 2008, Mr. Sweeney timely filed a motion to vacate his convictions pursuant to 28 U.S.C. § 2255.  *See* Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. § 2255 ("Initial Petition"), Dkt. 1017.  Three of his co-defendants also sought post-conviction collateral relief at this time.  *See* Dkts. 1023 (Carson 2255), 1020 (Coates 2255), 1021 (Martin 2255).

While Mr. Sweeney did not yet have the benefit of access to the sealed documents, Mr. Sweeney's Initial Petition included the following claim: the prosecution "engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure and late disclosure of *Brady* information."  Initial Petition at 16.  Mr. Sweeney explicitly reserved the right to supplement his petition when his counsel got access to additional documents.  *See* Initial Petition at 15, 17.[1]

Over the next two years, Ms. Wicks—at Mr. Sweeney's insistence—repeatedly returned to the Clerk's Office to inquire about the missing documents.  *See* Ex. 1 (Nov. 2015 Wicks Letter) (describing how she went to the Clerk's Office three or four times); *see also, e.g.*, Ex. __ (Mar. 2008 Sweeney Letter) at 2 ("Have you had a chance to pursue the judges latest order?"); Ex. 2 (Oct. 9, 2008 Sweeney Letter) at 2 ("[D]id you retrieve all the documents the court unsealed[?]"); Ex. 5 (Oct. 19, 2008 Sweeney Letter) at 4 ("Did you retrieve the unsealed documents that the court afforded us the opportunity to obtain?').  It was not until June 2010, however, that the Clerk's Office located the previously sealed documents, which included the documents that underpin the

---

[1] Mr. Sweeney's Initial Petition also raised the argument that his trial counsel was ineffective in failing effectively to navigate the issues created by the government's *Brady* violations.  *See* Initial Petition at 5, 8, 12-13.

habeas claim made by Mr. Sweeney in his Initial Petition that the government violated his rights at trial through the non-disclosure of *Brady* material.   *See* Ex. 1 (Nov. 2015 Wicks Letter).

Over time, Mr. Sweeney's and Ms. Wicks' relationship began to deteriorate.  Mr. Sweeney grew increasingly frustrated with Ms. Wicks' failure to communicate with him about a supplemental petition, interview witnesses, investigate additional facts that could bolster his claims for relief, and correct factual errors in his original petition.  *See, e.g.*, Ex. 10 (Mar. 2008 Sweeney Letter) at 1-2; Ex. 2 (Oct. 9, 2008 Sweeney Letter) at 1-2; Ex. 5 (Oct. 19, 2008 Sweeney Letter) at 3-4; Ex. 3 (Feb. 2010 Sweeney Letter) at 1; Ex. 4 (Apr. 2010 Sweeney Letter) at 2-3.  Mr. Sweeney wrote no fewer than nine letters asking Ms. Wicks to file a supplemental petition promptly and complaining about the fact that she had not returned his or his family's calls, and how, when she did answer, she hung up on him.[2]

Ms. Wicks informed the Court that she had experienced personal and family illness that left her mentally and physically unable to work and asked for extensions of time to file a

---

[2] *See, e.g.*, Ex. 2 (Oct. 9, 2008 Sweeney Letter) ("You've shown repudiation and disrespect for me with hanging up the phone or worst [sic] not answering, or ignoring my calls.");  Ex. 5 (Oct. 19, 2008 Sweeney Letter) ("It is your obligation to represent this case zealously and competently.  This includes effective and sufficient *communication* and all concerns I might present.  Frankly, as this date, you have shown lengthy disrespect to my phone calls; especially the dates you hung up on me with absolutely disregard to any consideration I might suggest to my case.");  Ex. 3 (Feb. 2010 Sweeney Letter) ("Hopefully, this letter will convince you of how important it is to me that you prepare and send me a "draft" of an amended and/or supplemental motion to my pending § 2255.  I ask that this be completed without further delay.");  Ex. 4 (Apr. 2010 Sweeney Letter) ("I am very dissatisfied and frustrated because you continually force me to ask you the same questions pertaining to . . . the drafting of any supplemental pleadings on my behalf.  Members of my family have also made several attempts to contact you to no avail.");  Ex. 6 ("Mar. 2011 Sweeney Letter") ("I've wrote you at least five (5) letters since December and you have yet responded to any of them.  I've called your office on numerous times and has left you many messages with Ms. Sharon Chavnis as well as left messages on your voice mail.  I've also had my family call your office and leave messages with Ms. Chavis for you, but all to no avail.  I haven't spoken with you since October of last year, which has now been five (5) months.  What we are now going through is a repeat of what we went through in 2009 and again in 2010 at which time you assured me that it wouldn't happen again.").

supplemental habeas petition on Mr. Sweeney's behalf due to these illnesses and the defendants' difficulties in accessing the record. *See* Dkts. 1056 (September 1, 2010 request for an extension of time to file supplement until November 22, 2010), 1062 (November 21, 2010 request for extension of time to file supplement until February 22, 2011), 1065 (February 2, 2011 request for extension of time to file supplement until May 30, 2011), 1067 (April 11, 2011 request for an extension of time to file supplement until November 30, 2011), 1070 (April 20 motion to join motion at Dkt. 1067), 1080 (November 27, 2011 motion for an extension of time to file until July 30, 2012); *see also* Ex. 7 (Feb. 2011 Wicks Letter) (mentioning illness). The Court granted each of these requests. *See* Dkts. 1057 (order granting extension until November 22, 2010 signed September 3, 2010), 1064 (order granting extension until February 22, 2011 signed November 23, 2010), 1066 (order granting extension until May 30, 2011 signed February 2, 2011), 1073 (order granting extension until November 30, 2011 signed May 27, 2011), 1074 (same), 1081 (order granting extension until July 30, 2012 signed December 5, 2011). In none of the orders from the Court granting extensions did the Court give any indication that the statute of limitations would run independent of the Court's order or otherwise even reference the statute of limitations. Rather, the Court granted each extension without any reservation.

During this period, Mr. Sweeney continued to write detailed letters to Ms. Wicks about the arguments he wanted her to make—including on August 9, 2010, when, after having received the previously sealed materials located by the Clerk's Office in June 2010, he laid out in impressive detail the *Brady* material that makes up the bulk of his current claims. *See* Ex. 8 (Aug. 2010 Sweeney Letter) at 1-5. Eventually, the relationship between Ms. Wicks and Mr. Sweeney deteriorated to the point where Ms. Wicks moved to withdraw. *See* Dkt. 1082; *see also* Ex. 6 (Mar. 2011 Sweeney Letter) at 4 ("I think it's time for you to really consider whether or not you can give

my case the time required or is this where we go our separate ways?").  (Mr. Sweeny has attempted to obtain an affidavit from Ms. Wicks with regard to her efforts to obtain the sela material from the clerk's office and her communication with Mr. Sweeney but at the time of filing, as a result of an illness, she has been unable to provide one.  Once the affidavit is obtained it will be provided)

On December 16, 2011, the Court granted Ms. Wicks' motion and referred the case to the Office of the Federal Public Defender ("FPD") for appointment of counsel to represent Mr. Sweeney.  Dkt. 1083.  In December 2012, Eric Kirchman and Shana Madigan were appointed as CJA counsel to represent Mr. Sweeney.  Dkts. 1105, 1110.  They inherited fifteen boxes of unindexed material.

On December 20, 2012 and May 17, 2013, the Court held status hearings regarding the defendants' habeas petitions.  By this time, Sweeney's codefendants Mr. Carson and Mr. Martin also had new counsel.  Dkts. 1058 (September 7, 2010 motion to withdraw from Mr. Carson's counsel Mr. Edward Sussman), 1060 (November 5, 2010 appearance by Mr. Carson's new counsel Ms. Kira West), 1076 (June 21, 2011 motion to withdraw from Mr. Martin's counsel Mr. Frances D'Antuono), 1086 (March 8, 2012 appearance by Mr. Martin's new counsel Mr. Michael Lawlor).  At these hearings, the Court heard from defense counsel about the difficulties they were having getting access to the record in this case and their intention to file supplements to their clients' initial habeas petitions.

The Court, in recognition of the volume of work new defense counsel had before them, declined to set a deadline to file the supplements during those hearings.  Instead, it set a further hearing on August 29, 2013 to discuss a schedule.  *See* 5/17/2013 Hr'g Tr. at 19, Dkt. 1219.  On August 29, 2013, the Court held that status conference, and, on September 3, 2013, and about eight-and-a-half months after Mr. Kirchman and Ms. Madigan entered their appearances, it granted

the oral motion of Defendants Sweeney, Martin, Carson, and Coates to set May 29, 2014 as the deadline for them to file supplemental petitions. Dkts. 1122, 1219. On May 29, 2014, the Court granted the four defendants an additional six-month extension. Dkt. 1128. On November 28, 2014, consistent with the deadline set by the Court, Mr. Sweeney filed a supplement to his Initial Petition, raising the claims presently before the Court.

On November 26, 2014, the Court signed an order—filed five days later—granting Mr. Sweeney and the other defendants an extension until February 25, 2015 to file any further supplements. Dkt. 1149. On February 25, 2015, Mr. Sweeney filed a second supplemental petition, which, as the government concedes, raises "for the most part, the same claims that he raised in his first supplemental November 28, 2014, pleading." Dkt. 1255 ("Gov. Omnibus Br.") at 28.

Having never filed an opposition to Mr. Sweeney's Initial Petition in 2008 or to his supplemental petitions in late 2014 and early 2015, on March 18, 2020, the government filed an omnibus opposition. Dkt. 1255. The government's opposition makes no argument on the merits related to nearly all of the specific claims made by Mr. Sweeney in the supplemental petitions. Rather, it argues the merits of the claims made in the Initial Petition twelve years earlier and argues that that the specific claims in the supplemental petitions, while filed in accordance with the deadlines set by the Court, are untimely, because they do not "relate back" to his initial habeas petition.[3]

The "untimely" claims that do not relate back, according to the government, include essentially all of the *Brady* and related ineffective assistance of counsel claims detailed in his first

---

[3] The government's brief concedes that the first supplemental petition is "timely." Gov. Omnibus Br. 26. Nonetheless, the government argues that most of the claims in that petition are untimely under the relation back doctrine.

supplemental petition, which was filed after he was finally provided access to the previously sealed *Brady* material. Despite the fact that Mr. Sweeney explicitly raised *Brady* violations and ineffective assistance of trial counsel in vindicating his rights under *Brady* in his Initial Petition, the Government argues that because he could not at that point make those claims with specificity, because he had no access to the *Brady* materials, the subsequent specific *Brady* claims do not relate back to the more general *Brady* claim in the Initial Petition. See Gov. Omnibus Br. 32, 74.

### STATEMENT OF LAW

AEDPA's one-year statute of limitations begins to run on the date a defendant's conviction becomes final or the date "on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(1)-(4). However, defendants are permitted to file supplemental petitions to support their timely filed petitions as long as the claims in the supplemental petitions "relate back" to their timely ones consistent with Federal Rule of Civil Procedure 15. *See United States v. Hicks*, 283 F.3d 380, 388 (D.C. Cir. 2002).

In addition, AEDPA's one-year limit is equitably tolled when the petitioner diligently pursued his rights, but was prevented from filing a timely petition by extraordinary circumstances. *See United States v. McDade*, 699 F.3d 499, 505 (D.C. Cir. 2012). Extraordinary circumstances include serious attorney negligence, court-ordered extensions of the deadline to file the habeas petition, and unsettled law pertaining to relation-back and equitable tolling. *See id.* at 503–06 (attorney negligence); *Sossa v. Diaz*, 729 F.3d 1225, 1235 (9th Cir. 2013) (extension grants); *Prieto v. Quarterman*, 456 F.3d 511, 513 (5th Cir. 2006) (same); *York v. Galetka*, 314 F.3d 522, 528 (10th Cir. 2003) (unsettled equitable tolling law); *Williams v. Filson*, 908 F.3d 546, 561 (9th Cir. 2018) (unsettled relation back law).

**ARGUMENT**

**I.   MR. SWEENEY'S *BRADY* AND RELATED INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS RELATE BACK TO HIS INITIAL 2255 MOTION.**

The Government argues that some of the claims raised in Mr. Sweeney's supplements are barred by limitations as they do not relate back to his initial filing. The Government, however, does not take the time to explain how the claims it argues are time barred did not arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in Mr. Sweeney's initial filing.

In that original filing Mr. Sweeney made a claim that the Government, "engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure and late disclosure of *Brady* information and the use of perjured testimony" relating to James Montgomery, Arthur Rice and "jailhouse confessions."   Initial Petition at 16. (The Government has labeled this as Claim A17 in its Opposition)

Mr. Sweeney's supplement of November 28, 2014, raises these claims of prosecutorial misconduct, jailhouse confessions, and suppression of *Brady* information, just in more detail.  (The Government has labeled these as Claim A19 through A25 in its Opposition)

The Government argues that the following claims of Mr. Sweeney's, which arise out of his claims of prosecutorial misconduct and the Government's failure to disclose *Brady* material to the defense are untimely.  These clams are as follows: failing to disclose *Brady* information with regard to: Theodore Watson's Greenbelt file, in which there was evidence that Watson had lied to the U.S. Attorney in Greenbelt and his lies were the reason he was not given a 5K1 letter and the prosecutors telling the court that there was nothing in the file that Watson would cast doubt on Watson's credibility (A19); failing to disclose James Montgomery's *Brady* information contained with the notes of Special Agent Lisi concerning the murder of Timothy Benton (A20); failing to

disclose the *Brady* information contained within the F.B.I. 302's relating to Charles Bender's statements to F.B.I. agents that Jerome Martin confessed to the murder of Anthony Fortune (A21); failing to disclose the *Brady* information relating to Arthur Rice statements contained with the F.B.I. 302's where Rice stated that he was present at the murder of Leonard "Slick" Hyson and Maurice Hallman which would have impeached Montgomery (A22); failing to disclose the *Brady* information contained within a detective's notes that cooperating witness Andre Murray had told the police that Petey Johnson had killed Robert "Butchie" Smith to get back at Mr. Sweeney (A23); failing to disclose the *Brady* information related to the murder of Robert "Butchie" Smith (A24); failing to disclose the *Brady* information contained within the Government's *Ex Parte* Notice to the Court Regarding Change of Location of Confinement, which stated that the Government had information that people other than the defendants in this case had a motive to murder Robert "Butchie" Smith (A25).

Mr. Sweeney had also set forth in his original filing the claim that his appellate counsel was ineffective for failing "to note sections of sealed matters for the [appellate] court to review." (The Government has labeled this as Claim A12 in its Opposition.) As with his *Brady* claims, Mr. Sweeney's supplement of November 28, 2014, raises these claims but in more detail. The claims in the supplemental filing, that the Government contends do not relate back to the original filing, are that appellate counsel failed to seek appellate review of sealed material related to James Montgomery (A29), failed to seek appellate review of sealed material related to Arthur Rice (A30), failed to seek appellate review of sealed material related to Andre Murray (A31).

An amendment to a section 2255 motion is "permitted to relate back [to the original filing] only when 'the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.'" *United*

*States v. Hicks*, 283 F.3d 380, 388 (D.C. Cir. 2002) (quoting Fed. R. Civ. P. 15(c)(2)).  A proposed

amendment does not relate back when it "makes claims or is based on occurrences 'totally separate

and distinct, in both time and type from those raised in [the] original motion.'"  *Id.*  (quoting *United*

*States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir.2000))  "[W]here the prisoner's amendment

seeks merely to elaborate upon his earlier claims, this effort should not generally be barred by the

statute of limitations."  *Id.*; *see also Dean v. United States,* 278 F.3d 1218, 1222, (11th Cir. 2002)

("When the nature of the amended claim supports specifically the original claim, the facts there

alleged implicate the original claim, even if the original claim contained insufficient facts to

support it.  One purpose of an amended claim is to fill in facts missing from the original claim.");

*United States v. Duffus*, 174 F.3d 333, 337 (3d Cir.1999) ("Certainly the court could have permitted

an amendment to clarify a claim initially made.").

 The claims advanced by Mr. Sweeney in his supplements all arise out of the conduct,

transaction or occurrence set forth in his initial motion.  The *Brady* claims all relate to the

Government's misconduct and failure to turn over *Brady* information to the defense.  What Mr.

Sweeney has done in his supplements is to elaborate upon his earlier claims.[4]

 The Government in addressing Mr. Sweeney's *Brady* claims, (A.17), in its opposition

states "Sweeney does not elaborate on or further develop these arguments in any of his

supplemental filings".  Gov. Omnibus Br. at 71.  To make such a statement the Government has

to ignore the arguments that Mr. Sweeney made in the what the Government has labeled Claims

A19, A20, A21, A22, A23, A24, and A25.  In these claims, had the Government looked closely, it

---

[4] Mr. Sweeney is entitled to advance his cumulative errors claim as it arises out of the same set of facts as set out in his initial filing and which are expanded and elaborated in his supplemental filings.  This is simple a new legal theory which applies to the same conduct, transaction or occurrence that Sweeney has set out in his initial filing.

would have found the elaboration and development of the arguments it claims are missing.  In Claims A19, A20, A21, A22, A23, A24, and A25 Mr. Sweeney develops and elaborates on the claim raised in Claim A17.

Instead of addressing these claims on the merits the Government has just decided to argue that they are time barred.  Moreover the Government has failed to argue why it believes the claims raised in Claims A19, A20, A21, A22, A23, A24, and A25 are totally separate and distinct, in both time and type from those raised in the original motion.  The Government has concluded that they are and we must accept its conclusion.

The same applies to the claims that appellate counsel failed to seek appellate review of sealed material which the Government labels as Claim A12.  Once again, the Government ignores Mr. Sweeney's supplements where in Claims A29, A30 and A31 he elaborates on the original argument.  Once again, these Claims arise out of the original claim contained within A12 and are all related to the same conduct, transaction, or occurrence set forth therein.  Mr. Sweeney in his supplements simply elaborates and develops the claim he had made in his initial filing that his appellate counsel had failed to raise on appeal.

The Government appears to discount Mr. Sweeney's claims raised in Claim A19 through A25 and A29 through A31 because these claims argue facts that were in the sealed material.  This, however, ignores the fact that Mr. Sweeney raised the claims of the Government suppressing *Brady* material and engaging in prosecutorial misconduct and the failure of his appellate counsel to raise the issue of the seal material on appeal in his initial filing and Mr. Sweeney, in his supplements develops and supports the claims with arguments and facts that were contained within the sealed material.

In *Mayle v. Felix*, the Supreme Court explained that "relation back" is permitted pursuant to Federal Rule of Civil Procedure 15 when "the original and amended petitions state claims that are tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005); *see also* Fed. R. Civ. P. 15(c)(1)(B) (relation back permitted where the amended pleading "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—*or attempted to be set out*—in the original pleading") (emphasis added). The Supreme Court in *Mayle v. Felix* specifically cited *Mandacina v. United States*, 328 F.3d 995 (8th Cir. 2003), as an appropriate application of this doctrine. *See Mayle*, 545 U.S. at 664 n.7.

In *Mandacina*, the defendant's initial habeas petition contained "only generalized assertions that evidence obtained by the . . . Police Department was withheld" in violation of *Brady*. *Mandacina*, 328 F.3d at 1000. The defendant's amended petition, filed several years later, complained about the suppression of a particular police report. *Id.* at 1001. Nevertheless, the Eighth Circuit concluded that the amended petition related back to the original petition. *Id.* The Supreme Court endorsed this view. *See Mayle*, 545 U.S. at 664 n.7.

Similarly, Mr. Sweeney's Initial Petition laid out in general terms the precise claim that is a centerpiece of his supplemental petitions: the prosecutors "engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure . . . of *Brady* information." Initial Petition at 16; *see also id.* at 13 ("[D]ue to the cumulative *Brady* errors . . . counsel requests that this Court review in camera the materials sealed by the trial court."). This alone means that each of the *Brady* and related ineffective assistance counsel claims in the supplemental petitions elaborating on this general claim once additional information—the previously sealed documents—was available to Mr. Sweeney, relate back to the

general claims in his Initial Petition that his rights at trial were violated through the non-disclosure of *Brady* materials.

The government demands far greater specificity from Mr. Sweeney's Initial Petition than the claim he explicitly raised. But the relation back doctrine does not require that, especially where, as here, the information necessary to make those claims was unknown to the petitioner at the time of the initial petition. With respect to the *Brady* claims, Mr. Sweeney had not had access to the *Brady* material when the Initial Petition was filed. With respect to the ineffective assistance of counsel claims, Mr. Sweeney could not fully brief the prejudice, for example, he experienced from his counsel's failure to seek appellate review of the district courts' rulings on previously sealed *Brady* material and his counsel's failure to object and seek appellate review of the district court's *in camera* procedure to review that material until Mr. Sweeney had access to it himself.

## II. THE STATUTE OF LIMITATIONS ON MR. SWEENEY'S *BRADY* AND RELATED INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS DID NOT BEGIN TO RUN UNTIL AT LEAST AUGUST 2010, WHEN THE UNDERLYING FACTS COULD BE PRESENTED TO THE COURT WITH REASONABLE DILIGENCE.

Section 2255(f)(4) says that the one-year statute of limitations commences on "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." The government guesses that it could have taken 90 or 120 days after the Court's order to get to access to the *Brady* material in question. Gov. Omnibus Br. 32 n.21. Unfortunately, that optimism is misplaced. It took over two years. As discussed above, the Clerk's Office did not make the previously sealed *Brady* materials available to Mr. Sweeney's counsel until June 2010. Acting diligently, Mr. Sweeney had articulated the *Brady* claims to his counsel with considerable specificity by August 2010. Thus, had his counsel acted diligently, the claims

could have been presented to the Court shortly thereafter.  August 2010, therefore, is the earliest that the one-year limitations period for these claims commenced.[5]

On the same date the Court issued its unsealing order, Ms. Wicks went to the Clerk's Office asking for the sealed documents, but the Clerk's Office could not find them.  She returned again and again—at Mr. Sweeney's persistent insistence—over the course of two years asking for the documents.  *See* Ex. 1 (Nov. 2015 Wicks Letter).  It was not until June 2010, however, that the Clerk's Office located the over one thousand pages of documents, including the *Brady* material that supports Mr. Sweeney's current claims, and turned them over to Ms. Wicks.  *See* Ex. 1 (Nov. 2015 Wicks Letter).

Thus, the statute of limitations could not have begun to run until Ms. Wicks and Mr. Sweeney got access to the materials and had a reasonable period of time to review those materials to ascertain the facts underlying the *Brady* claims.  Acting with diligence, Mr. Sweeney reviewed the materials provided by the Clerk's Office and wrote a letter to Mr. Wicks laying out many of the most critical facts that undergird his current supplemental petition.  *See* Ex. 8 (Aug. 2010 Sweeney Letter).  Had Ms. Wicks acted with diligence, she could have presented the Court with those claims shortly thereafter.  Instead, starting just three weeks after Mr. Sweeney himself had laid out the *Brady* claims in detail to his counsel, on September 1, 2010, Ms. Wicks sought and

---

[5] The Government concedes that the statute of limitations did not begin running on the claims arising from this *Brady* material until, at the absolute earliest, the Court's order on February 15, 2020 granting Mr. Sweeney access to the sealed documents and likely not for an additional 90 or 120 days after that, presumably to allow the Clerk's Office time to comply with the unsealing order and for Mr. Sweeney to review the materials.  *See* Gov. Omnibus Br. 31 n. 21.  Thus, the government concedes, the statute of limitations did not begin to run until some point between February 15, 2008 and June 15, 2008 (120 days).  *Id.*  But the reality is that it was another two years before Mr. Sweeney through the exercise of reasonable diligence was able to access the materials.  Allowing 60 days for those materials to be reviewed to ascertain the facts underlying the *Brady* claims, the statute of limitations would start running in August 2010.

obtained a series of extensions from the Court, through when she withdrew from the case in December 2011.

## III. THE ONE-YEAR LIMITATIONS PERIOD WAS EQUITABLY TOLLED BY THE GROSS NEGLIGENCE OF COUNSEL AND THE COURT'S EXTENSION ORDERS.

The one-year AEDPA limitations period was tolled by Ms. Wicks' extraordinary negligence, the Court's extension orders, and the delay in appointing new counsel.

### 1. The statute was tolled from August 2010 through December 2011 when Ms. Wicks withdrew.

#### a. Ms. Wicks' extraordinary negligence and Mr. Sweeney's diligence in pursing his rights tolled the statute of litigations.

Section 2255's one-year statute of limitations is non-jurisdictional and subject to equitable tolling upon a showing of diligence and extraordinary circumstances. *See United States v. McDade*, 699 F.3d 499, 503–06 (D.C. Cir. 2012). Serious attorney negligence by petitioner's counsel, as opposed to mere "garden variety" negligence, is an extraordinary circumstance. *Id.*; *United States v. Rice*, 727 F. App'x 697, 701 (D.C. Cir. 2018) (per curiam) (no extraordinary circumstance where Ms. Wicks, the same lawyer who represented Mr. Sweeney in this case, merely miscalculated the deadline to file the habeas petition). In *United States v. McDade*, the D.C. Circuit found equitable tolling was warranted where the defendant researched and gathered evidence in support of his claim, told his counsel what he hoped to be included in his petition, expressed his desire to file the petition expeditiously, requested counsel send him a draft of the motion, and his counsel failed to comply. 699 F.3d at 501-05. In *Holland v. Florida*, the Supreme Court suggested that equitable tolling was likewise warranted where counsel failed to communicate with his client over a period of years despite repeated pleas for information. 560 U.S. 631, 652 (2010) (indicating that tolling was very likely warranted, but remanding to the lower court to decide that question in the first instance).

The record here is unequivocal. Mr. Sweeney repeatedly and diligently took steps to preserve his legal rights. He identified relevant legal precedent for Ms. Wicks. *See* Ex. 3 (Feb. 2010 Sweeney Letter) at 2-3. He highlighted witnesses for her to speak to, records for her to review, and even went so far as to review reams of unsealed material to identify *Brady* evidence himself. *See, e.g.*, Ex. 9 (Mar. 2009 Sweeney Letter) at 1-2 (listing parts of the record where material was placed under seal); Ex. 8 (Aug. 2010 Sweeney Letter) at 1-5 (describing *Brady* material). Mr. Sweeney wrote up detailed notes and theories of relief that he sent to Ms. Wicks for inclusion in his supplemental petition. *See* Ex. 2 (Oct. 9, 2008 Sweeney Letter); Ex. 5 (Oct. 19, 2008 Sweeney Letter); Ex. 4 (Apr. 2010 Sweeney Letter); Ex. 8 (Aug. 2010 Sweeney Letter); Ex. 3 (Feb. 2010 Sweeney Letter). He also emphasized the importance of filing his supplemental petition promptly and requested she send him a draft. *See* Ex. 3 (Feb. 2010 Sweeney Letter) at 1; Ex. 4 (Apr. 2010 Sweeney Letter) at 1; Ex. 6 (Mar. 2011 Sweeney Letter). Ms. Wicks, however, failed to act on his requests. Over a period of years, she failed to return his calls and the calls of his family members, and even hung up on him on multiple occasions. *See* supra n.3; *Holland*, 560 U.S. at 653 (equitable tolling is appropriate where a lawyer "abandons" her client). Ms. Wicks' extraordinary failure to pursue Mr. Sweeney's claims despite his own diligence in seeking to have her do so warrants tolling for the period she represented him.

### b. Even if not tolled by Ms. Wicks' gross negligence, the statute was tolled by the Court's orders granting her extensions of time.

Courts have the authority to grant extensions to a petitioner's deadline to file his habeas petition before it has expired. *See United States v. Thomas*, 713 F.3d 165, 173-74 (3d Cir. 2013). Where they do, the petitioner's deadline is tolled. *See Sossa v. Diaz*, 729 F.3d 1225, 1235 (9th Cir. 2013); *Prieto v. Quarterman*, 456 F.3d 511, 513 (5th Cir. 2006); Federal Habeas Manual § 9A:111; *Cf. United States v. Baxter*, 761 F.3d 17, 30–31 (D.C. Cir. 2014) (equitable tolling

inapplicable where petitioner allowed limitations period to lapse before moving for an extension of time).

In *Sossa v. Diaz*, the Ninth Circuit concluded that a magistrate judge's orders extending the deadline for a defendant to file his petition were misleading because the orders did not make clear that they were not intended to extend the statute of limitations.  729 F.3d at 1233-35.  Therefore, the limitations period was tolled until the expiration of the Court's extension.  *Id.* at 1235.  The Fifth Circuit reached the same conclusion in *Prieto v. Quarterman*.  456 F.3d at 513.  As in *Sossa* and *Prieto*, the Court's extension orders contain no disclaimer that they did not extend the statute of limitations.  *See also Duarte v. Williams*, No. 2:12-CV-01305-JAD-PAL, 2016 WL 4473415, at *3 (D. Nev. Aug. 23, 2016) (absence of admonishment that have an obligation to calculate statute of limitation independent of court orders tolled statute of limitations).

In fact, the text of the Court's orders here are similar to the orders in *Sossa* and *Prieto*.  *Compare Sossa*, 729 F.3d at 1231 ("Petitioner shall file his [First Amended Petition for Writ of Habeas Corpus] no later than June 9, 2008"); *and Prieto*, 456 F.3d at 514 ("Petitioner's writ of habeas corpus shall be filed no later than September 6, 2002."); *with* Dkt. 1057 ("[I]t is . . . ORDERED that Defendant Sweeney file any supplement to his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than November 22, 2010."); Dkt. 1064 ("[I]t is . . . ORDERED that defendant Sweeney file any supplement to his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than February 22, 2011."); Dkt. 1066 ("[I]t is . . . ORDERED that Defendants Carson and Sweeney file any supplements to their respective Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than May 30, 2011."); Dkt. 1073 ("[I]t is . . . ORDERED that Defendants Carson, Sweeney and Coates file any supplements to their respective Motions to Vacate, Set Aside or

Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than November 30, 2011."); *and* Dkt. 1081 ("[I]t is . . . ORDERED that Defendants Carson, Sweeney and Coates file any supplements to their respective Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than July 30, 2012."). By extending the filing deadline without stating that the limitations period would continue to run, the Court's extension orders tolled the statute of limitations.[6]

The government's brief argues that, when it consented to those extensions, it reserved the right to argue that Mr. Sweeney's petition was untimely. But whether the government has the right to raise that argument is a separate question from whether it should prevail on it.[7]

Indeed, the fact that despite the government's explicitly stating that it might oppose any subsequent filing on the grounds of timeliness, the Court nonetheless did not include in its orders any indication that Mr. Sweeney was obligated to calculate statute of limitation independent of court orders, only adds weight to the argument that these orders tolled statute of limitations. The fact that the government set forth its possible position and the Court failed to adopt that position,

---

[6] All of Ms. Wicks' extension requests were filed before the expiration of the Court's previous deadline. However, two of the Court's extension orders were signed after the expiration of the previous deadline. *See* Dkts. 1064 (order signed by the Court on November 23, 2010 extending the November 22, 2010 deadline set by Dkt. 1057); 1081 (order signed by the Court on December 5, 2020 extending the November 30, 2011 deadline set by Dkt. 1073). To the extent the statute of limitations began running again in the window in which the extension requests were pending but before the Court ruled, that period was extremely limited—a matter of a single day in the first instance and six days in the second. In aggregate, no more than a month elapsed during which the limitations period was not tolled from the commencement of the limitations period, the date Mr. Sweeney laid out the *Brady* claims in his August 9, 2010 letter to Ms. Wicks, to Ms. Wicks' withdrawal from the case in December 2011.

[7] The *Sossa* Court noted that the government should "object to an extension of time beyond the statutory deadline if it intends to seek dismissal of the petition as untimely." *Sossa*, 729 F.3d at 1235. But this comment did not change the fact that what the court found decisive was the language in the magistrate judge's extension order, not whether the government had objected.

or even reference it in its orders, only provided further assurance to Mr. Sweeney and his counsel

that the extensions the Court was granting would toll the limitations period.  The Court's

extensions, entered prior to the expiration of the statute of limitations (indeed just a few weeks

after the facts underlying the *Brady* claims were known to Mr. Sweeney and with diligence could

have been presented to the Court), reasonably led Mr. Sweeney and his counsel to believe that if

they filed his supplemental petitions by the deadlines set by the Court, those petitions would be

timely.

**2. The statute was further tolled from December 2011 through December 2012 by the delay in the appointment of new counsel.**

Tolling is also warranted for the period following Ms. Wicks' withdrawal when no new

counsel was appointed to represent him.  The Court granted Ms. Wicks' motion to withdraw and

referred the case to the FPD for appointment of new counsel in December 2011.  Dkt. 1083.  But

new CJA counsel was not identified and did not enter an appearance for another full year, until

December 2012.  *See Jurado v. Wong*, No. 08-CV-1400 JLS (JMA), 2009 WL 3320494, at *5

(S.D. Cal. Oct. 14, 2009) (equitable tolling granted where there was a delay in appointing counsel).

**3. The Court's orders extending the deadline for Mr. Sweeney to file his petition during Mr. Kirchman's and Ms. Madigan's representation of him further equitably tolled the statute of limitations.**

As set forth above, the statute was tolled until Mr. Kirchman and Ms. Madigan were

appointed to represent Mr. Sweeney in December 2012.  The Court did not set a new deadline for

the filing of Mr. Sweeney's supplement immediately given the sheer volume of work Mr.

Kirchman and Ms. Madigan had to do to get up to speed on the case.  Instead, a little less than nine

months later and well before the expiration of the previously tolled one-year limitations period,

the Court set May 29, 2014 as the deadline for Mr. Sweeney to file his supplemental petition.  Dkt.

1122.  In the following months, the Court signed orders granting two additional extensions before the expiration of the previous extensions.  Dkts. 1128, 1149.

Those orders again provided blanket extensions of the filing deadline with no reservation allowing the limitations period to continue running.  Again, the text of the Court's orders was similar to the orders in *Sossa* and *Prieto*.  *Compare Sossa*, 729 F.3d at 1231 ("Petitioner shall file his [First Amended Petition for Writ of Habeas Corpus] no later than June 9, 2008"); *and Prieto*, 456 F.3d at  514 ("Petitioner's writ of habeas corpus shall be filed no later than September 6, 2002."); *with* Dkt. 1122 ("[T]he defendants shall file the supplements to their pending § 2255 motions by May 29, 2014."); Dkt. 1128 ("[T]he Defendants will file a Memorandum of Law in Support of Motion to Vacate Sentence, pursuant to 28 U.S.C. § 2255, within 6 months of this Order."); *and* Dkt. 1149 ("[T]he Defendants Sweeney and Coates will file a Memorandum of Law in Support of Motion to Vacate Sentence, pursuant to 28 U.S.C. § 2255, no later than Feb. 25, 2015.").  The Court's extensions again tolled the statute of limitations.

In any event, the government has taken the position that the time for filing Mr. Sweeney's supplemental petition expired before the first extension was granted to Mr. Kirchman and Ms. Madigan, during Ms. Wicks' representation of Mr. Sweeney.  *See* Gov. Omnibus Br. 32, 74.  As discussed above, this is incorrect, because it fails to take into account that Mr. Sweeney did not have access to the *Brady* materials until June 2010, Ms. Wicks' gross negligence, or the extension orders she obtained.  Having relied solely on the flawed argument that the statute expired during Ms. Wicks' representation, however, the government has never taken the position that the statute of limitations *continued to run* during the Court-ordered extensions granted to Mr. Kirchman and Ms. Madigan, to which the government consented. Accordingly, even if the fact that the government noted that it was reserving the right to object could somehow override a court order

that provided a blanket extension without any indication that the extension might not toll the limitations period, the position the government reserved (its argument that the limitations period previously expired, not that it would expire during the prospective court-ordered extensions) did not affect the extensions of the limitations period. Mr. Sweeney's petition is timely.

## IV.    THE UNSETTLED RELATION-BACK AND TOLLING CASE LAW ALSO EQUITABLY TOLLED THE STATUTE OF LIMITATIONS.

Unsettled case law about the time for filing a habeas petition is an extraordinary circumstance that justifies equitable tolling of the statute of limitations. *York v. Galetka*, 314 F.3d 522, 528 (10th Cir. 2003) (unsettled law about whether the AEDPA one-year deadline would be equitably tolled during the period in which the defendant's second federal habeas petition was pending justified tolling); *Williams v. Filson*, 908 F.3d 546, 560-61 (9th Cir. 2018) (equitable tolling was appropriate where the case law about whether the petitioner's subsequent claims would "relate back" to his initial habeas petition was unsettled and noting that the district court's scheduling order and approval of two extension requests only made sense if it understood the law to permit petitioner's supplemental petition to relate back to his initial one).

Here, the Court should find, for the reasons stated above, that his prior attorney's gross negligence, the Court's extension orders, and the delay in the appointment of new counsel equitably tolled the statute of limitations. Alternatively, the Court should find that Mr. Sweeney's claim is timely because it relates back to his Initial Petition. If this Court does not reach either of those conclusions, however, it should recognize that, at a minimum, the case law in these areas is unsettled and therefore that the limitations period is tolled on that basis. Mr. Sweeney's habeas petition is therefore timely for this reason as well.

## V.    BRADY/INEFFECTIVE ASSISTANCE OF COUNSEL ARGUMENTS

   **1.  Appellate counsel failed to raise the issue of sealed material in Mr. Sweeney's appellate brief.**

The Government, in regard to Claim A12, A26 and A46, argues that Mr. Sweeney's contention that his appellate counsel was ineffective for failing to note sections of sealed matters to be reviewed on appeal should be denied because appellate counsel did precisely that.

The Government is incorrect that Mr. Sweeney's appellate counsel failed to include any argument in the brief asking the appellate court to review any of the material sealed by the trial court.  While as the Government points out appellate counsel attempted to have the court unseal the material it had sealed, he was unsuccessful.  Appellate counsel's failing is in having ignored the appellate court's instruction that he should raise the issue of the sealed material in Mr. Sweeney's appellate brief.

By failing to do so Mr. Sweeney was denied appellate review of the actions of the trial judge in sealing so much material that contained information that should have been turned over to the defense as *Brady*.  Now, after having had an opportunity to review the sealed material and the significance of the material as argued in the supplements to Mr. Sweeney's 2255 motion, one can see the prejudice that Mr. Sweeney has suffered as a result of failure of his appellate counsel to raise the issue of the sealed material in the brief.

## 2. Mr. Sweeney is not procedurally barred from raising his *Brady* and *Massiah* claims.

The Government argues that Mr. Sweeney is procedural barred from raising his claim identified as A17, because he has failed to explain why these claims were not included in his appellate brief and by failing to raise these claims in his appellate brief he is procedural barred from raising them now.

To begin with the reason that these arguments were not included in Mr. Sweeney's appellate brief is that the information on which these arguments are based was under seal and Mr.

Sweeney was unaware of exactly what was contained in the material that had been placed under seal.

The Government is attempting to profit from its misconduct in this case. It wrongfully withheld Brady material from Mr. Sweeney before, during, and after trial, and during Mr. Sweeney's appeal. Mr. Sweeney did not obtain access to the sealed material until after he had already lost his appeal. Yet the Government now argues that he is procedural barred from advancing this claim.

The cause for Mr. Sweeney's failure to raise any of these claims on appeal is that the information that Sweeney need to raise these claims on appeal was kept from him by the misconduct of the Government in failing to turn over *Brady* material to the defense.

The prejudice is adequality set forth in the supplements that Mr. Sweeney has filed to his initial motion filed herein.

## CONCLUSION

The government has chosen not to argue the merits of Mr. Sweeney's *Brady* and related ineffective assistance of counsel claims, but, rather, it rests its opposition to those claims on timeliness and procedural bar grounds alone. If the Court finds that Mr. Sweeney's claims are timely and not procedurally barred, it should grant Mr. Sweeney's requested relief: vacatur of Mr. Sweeney's convictions.

                    _____/s/_____
                    Eric H. Kirchman
                    D.C. Fed Bar No. MD09002
                    Attorney for William K. Sweeney
                    15 West Montgomery Avenue, Suite 205
                    Rockville, Maryland 20850
                    (301) 762-2909
                    Kirchlaw@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify, on this 14th day of July 2020, that a copy of the foregoing was served on all parties entitled to notice in this case by the court's filing system and to:


Pamela S. Satterfield, Esquire
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001


_____/s/_____
Eric H. Kirchman

# Exhibit 1

# JENIFER WICKS

ATTORNEY AT LAW

THE JENIFER BUILDING
400 SEVENTH STREET N.W. SUITE 202
WASHINGTON, D.C. 20004

TELEPHONE (202) 393-3004
FACSIMILE (202) 478-0867
EMAIL: JENIFER@JWICKSLAW.COM

November 3, 2015

William Sweeney
#06069-007
P.O. Box 1000
Lewisburg, PA 17837

Dear Mr. Sweeney:

Notwithstanding your attempts at creativity, I in fact went several times to the clerk's office
with the order, including February 2008 when it was issued, and I kept going back, hoping that
those court exhibits still existed. They first located other folders, which I copied and provided
copies to you. It was not until June 2010 that the files containing the exhibits were located by
a clerk in the clerk's office. I believe I went 3 or 4 times total before those exhibits were
located. As I discussed with codefendants' counsel at the time, we believed that all these
documents related back to the Brady claims raised in your 2255, specifically paragraphs 11 and
16 of the 2255 petition.

Sincerely,

JENIFER WICKS

# Exhibit 2

October 9, 2008

JENIFER WICKS
Attorney At Law
The Webster Building
503 D Street, N.W.
Washington, D.C. 20001

In Re:  United States of America versus William Sweeney

Dear Ms. Wicks:

The purpose to this letter is to address what I consider "perplexed"
attorney/client communication.

For instance, I mailed you some informaiton with a detailed interpre-
tation of my comprehension of concerns I entertained relevant to my
case.

Specifically, those concerns involved (1) two indictments with sepcific
dates and criminal agreements. I fashion that the dates in both
indictments did not match and more importantly criminal conduct alleged
beyond my indictment had absolutely nothing to do with my case.

Therefore,, I now deem that the government presented two distinct theories
of conspiracies. One of which was strong while the other relatively
weak. I gather this perception from Griffin v. United States  and the
language found in Yates v. United States.

Frankly, it is my understanding that, two theories of conspiracy are
reversible error, "if" one of the theories is weak and perhaps the other
strong. I amiled this perception to you months past, but as of this
date you have shown absolutely no responsiveness.

Secondly, Rule 11 plea agreements procedures. I shared a rather
interesting procedure with the government and its key witness Montgomery
and the means by which he repeated his plea agreement. Clearly, the
evidence supplied by this witness was known during his original plea
of guilty, so its my position that to withdraw a plea agreement and
make a new requires a completely different agreement.

Should this be correct, it is my position that the government must
reveal all benefits obtained by this witness who waived his plea agree-
ment more than twice, with supplying information he knew or should
have known, but avoided "obstruction of justice" actions.

P.#3

WILIAM SWEENEY
October 9, 2008
Con't Page two

Notwithstanding, obstruction of justice, but I also find Mr. Mongomery's
entire contract under Rule 11 tainted.  Exactly, what I mean is this,
Mr. Montgomery was able to withdraw his original plea agreement to
add information he knew but withheld.  The government knew he was
withholding additional criminal conduct, yet kept it secret in my
opinion to afford Mr. Montgomery favors in violation of  Criminal Rule
201 (c).

Which brings us to this point.  The government withheld all these
tactics from the defense.  Clearly, Rule 11 plea agreements are
contracts, and to withdraw an agreement, the government must void
the original contract and establish a new one.  Is this correct?

This did not occur with Montgomery, therefore, to violate Rule 11
and obstruct justice with criminal conduct must and should be dis-
closed to the defense.

Next, I must express my discontent with how you continue to ignore
my suggestions.  I sometime ago requested your duty interviewing two
United States Marshall's, this you have yet to perform or at best
notified me with your results.  Equally, you've shown repudiation
and disrespect for me with hanging up the phone or worst not answering,
or ingoring my calls.

As you well know, it is your duty to this case that you represent the
depths of my interest competently and zealously.  Unfortunately, you
continue to ignore this obligation.  Added to this fact, you must
keep me informed of every detail or result you take in this case.
Once again I'm afraid you've fallen short.

Finally, you have not kept me informed of all intentions insofar as
the Section 2255.  A very inmportant litigation that could cost me
considerably should I lose.

Based upon these failures and your inept moral disregard for my case
I now must instruct you to follow your legal oath of the Model Code
of Professional Responsibility, by performing as a lawyer and not
some mere acquanitance.

Therefore, I seek your due diligence with responding contemporaneously
to this letter, by keeping me informed on all details with this case
or section 2255, and most importantly responding to several questions
(e.g., did you retrieve all  the documents the court unsealed), and
answering the listed legal questions I've forwarded to your office.

In closing, I do hope that this letter improves our communication,
however, should it not, I encourage you to realize "in a world of
silk purses and pig ears...'it is not wise to be a pig ear.'"

Your endulgence is always appreciated, and acknowledged.

P.# 4

                    Sincerely,

          /s/  *William Sweeney*

# Exhibit 3

William K. Sweeney
Reg. No. 06069-007
U.S. Penitentiary McCreary
P.O. Box 3000
Pine Knot, Kentucky 42635

February 26, 2010

Jenifer Wicks, Esquire
Attorney at Law
The Webster Building
503 D Street, NW, Suite 250A
Washington, DC 20001

RE:  PENDING MOTION FOR RELIEF UNDER § 2255

Dear Ms. Wicks:

I am writing as a follow-up to our recent fusillade of
e-mails. My purpose is to provide you with a more detailed
discussion of my thoughts, concerns and research. Hopefully,
this letter will convince you of how important it is to me
that you prepare and send me a "draft" of an amended and/or
supplemental motion to my pending § 2255. I ask that this be
completed without further delay.

To my knowledge, the government has not submitted any
responsive pleading to my 2255, nor has the judge ordered them
to do so. It is not my desire to have you file just anything,
just to get things stirred up, and prompt the court to rush
me a denial. However, after two years since the motion has
been filed, I do not think it is in my best interest for us
to keep sitting without continuing the fight. If we move
within a reasonably foreseeable time, we can avoid the pitfalls
of the government claiming prejudice based on if they submit
any response before we amend. Additionally, we should be able
to amend/supplement at least as a matter of right without the
court's permission before a responsive pleading. I need you
to be diligent in your efforts in helping me win post-convic-
tion relief.

Next, as you well know, I have expressed continued concern
about the status of my request to you about Dr. Pincus. Have
you taken the time to follow through and speak with recently?
An updated affidavt from Dr. Pincus may have a strong impact
on whether the court grants an evidentiary hearing. I request
that you specifically advise me as to our best course of ac-
tion with this essential witness.

$P. \#^{11}$

App 1796

Jenifer Wicks, Esquire
February 26, 2010
Page 2


Before you submit an amended and/or supplemental § 2255 pleading, I request that you review the following cases:

**Mayle v. Felix,** 545 U.S. 644 (2005)

Felix lost in the Supreme Court. This is the controlling case for both state and federal prisoners dealing with amended habeas petitions. It discusses the "relation back" doctrine. I want you to be aware that if you put any new grounds for relief supported by facts that differ in both time and type from my original pleading, the amended 2255 will probably be denied because it does not relate back. So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order. Id. at 664.

**U.S. v. Hicks,** 283 F.3d 380 (D.C. Cir. 2002)

Hicks was a member of the "First Street Crew." This case is a must reading for any prisoner or attorney preparing to file an amended/supplemental 2255. Offers a deep and detailed discussion of almost every facet of how Rule 15 of the Federal Rules of Civil Procedure applies to criminal cases in § 2255 proceedings. The distinction between "Amendments" and "Supplementary" pleadings under Rule 15 is also explained.

**U.S. v. Palmer,** 296 F.3d 1135, 1141 (D.C. Cir. 2002)

Relation back discussion. Just prior to Hicks. Reversed dismissal of motion as not successive, while discussing that courts have applied Rule 15 of the Federal Rules of Civil Procedure, which governs amended and supplemental pleadings to amended § 2255 motions.

**Jones v. Bernanke,** 557 F.3d 670 (D.C. Cir. 2009)

Discussing relation back doctrine citing Hicks at 674.

**U.S. v. Naranjo,** 254 F.3d 311, 313 (D.C. Cir. 2001)

Even A.J. Kramer, Amicus Curiae for Naranjo, was denied because appellate court stated that the amended motion will not relate back.

P.#12

Jenifer Wicks, Esquire
February 26, 2010
Page 3

## U.S. v. Anderson, 2006 U.S. Dist. LEXIS 23077 (D.D.C. 2006)

Interesting reading for several reasons. This is the
judge that our 2255 is currently before: Thomas F. Hogan.
In Anderson, when Hogan was then-Chief Judge, the 2255 motion
remained dormant for more than four years after it was filed.
Anderson followed-up with two amended pleadings seeking to
add claims under Blakely and Booker in 2004 and 2005. Had
Anderson not filed his amended pleadings, it is probable that
his original 2255 would have continued to be ignored indefin-
itely. The two years that my 2255 has been pending may not
be unreasonable considering the length of the trial and the
complexity of the case. However, it concerns me that Judge
Hogan has not ordered the Government to respond. Once Anderson
began filing the amended pleadings, the government and the
court apparently gave the case full attention. I just want
you to be fully prepared when we submit any further pleadings.

## U.S. v. Thomas, 2002 U.S. Dist. LEXIS 8946 (D.D.C. 2002)

Another Judge Hogan rulig. Refers to Hicks the same as
in Anderson.

## Melendez-Diaz v. Massachusettes, 129 S.Ct. 2527 (2009)

Please give me your thoughts as to whether we can use
this powerful decision regarding any of the testimony that
was introduced aginst me.

I ask that you make a plan and let me know what that plan
entails. Although your other trials did take longer than you
anicipated, I did not think it was unreasonable for us to set
a "self-imposed" deadline for you to get me a draft of whatever
you think will further support my pending claims. You smartly
left us a way to justify a relation back (Rule 15) pleading by
making the claim in the original motion that we were awaiting
more transcripts. I hope you are ready to move forward at this
time.

Sincerely,

William K. Sweeny
Reg No. 06069-007

P.#13

WKS/

# Exhibit 4

William K. Sweeney
Reg. No. 06069-007
U.S. Penitentiary McCreary
P.O. Box 3000
Pine Knot, Kentucky 42635

April 29, 2010

Jenifer Wicks, Esquire
Attorney at Law
The Webster Building
503 D Street, NW, Suite 250A
Washington, DC 20001

RE:   UNFINISHED MOTION FOR POST-CONVICTION
      RELIEF PURSUANT TO 28 USC § 2255

Dear Ms. Wicks:

It is imperative that you write **immediately** and provide me
with a full report of your progress on the supplement to my
§ 2255 motion. In just 68 days from the date of this letter
Judge Lamberth's order requires the government to file their re-
sponse (July 6, 2010). In all fairness to me, you need to con-
tact me now and let me know where you stand.

You originally filed my § 2255 motion 26 months ago (Feb-
ruary 2008). Since that filing I have furnished you with what-
ever information that you have requested of me to help you win
this case. Even before you filed my 2255, I sent you a letter
detailing every instance in the trial transcript that I could
find where attorney Kiersh questioned witnesses about my Tourette's.
Some of the transcript cites reference Dr. Pincus and support the
allegation of Kiersh's ineffectiveness for failing to call Dr.
Pincus as my principal defense expert witness. (See my letter
dated January 6, 2008). Your letter dated March 5, 2008, along
with several of our conversations, shows that you are fully aware
of the critical importance of Dr. Pincus's testimony. I am very
dissatisfied and frustrated because you continually force me to
ask you the same questions pertaining to Dr. Pincus and the draft-
ing of any supplemental pleadings on my behalf.

Members of my family have also made several attempts to con-
tact you to no avail. My son's mother, Ms. Lucille "Vernell"
Allen, has called you repeatedly but can never catch up with you.
Although Vernell has left messages, she states that you have not
returned any of her calls. Vernell is trying to get with you to
provide an affidavit in support of my 2255. If she is correct,

P. # 14

Jenifer Wicks, Esquire
April 29, 2010
Page 2

that you are either too busy, or don't think it's important enough
to return her calls, then you are indeed acting very inconsiderate.
Surely you must recall our conversation where you agreed that it
would be good to obtain an affidavit from Vernell, a non-expert,
who could butress Dr. Pincus by explaining her personal observa-
tions of my Tourette's specifically during the time and over the
years in which the violent acts took place.

My uncle, Mr. Andre Smith, is willing to provide a similar
affidavit to that of Vernell's. He cannot reach you either. And,
like Vernell, he says you have not returned any of his calls.

## THE § 2255 MOTION HAS NOT BEEN COMPLETED

In at least two places you reserve the right to "supplement"
the 2255 with additional material and issues. 2255 Motion, p.15,
17. You told me that you would develop some of the arguments
at a later date after you reviewed the discovery materials and
had time to do more research. You also stated in the motion that
you "may withdrawal [sic] some claims after review of the now un-
known materials are provided." Motion, p. 15. First, I request
that you "withdraw" all issues that are factually wrong, are re-
futed by the record, and are not prejudicial. For example, on
page 9, don't you think that the allegation we're making about
trial counsel not havig recalled Charlene Wilson to impeach her
statement made to Detective Warrener should come out? This con-
cerned the "Tony Fortune" murder implicating Carson. I was not
tied to this murder. It's not on my verdict form either.

On page 10, ¶(E), dealing with the cross-examination of
John Venable on the Morris Hallman murder, there was no gun lo-
cated during execution of the search warrant.

On page 11, ¶(I), "Failure to provide an opening statement
at the beginning of the case," should come out. Kiersh reserved
the right to give a defense opening statement on my behalf until
after the close of the government's case. This was clearly ex-
plained to the jury. How is that ineffective?

On page 15, ¶14, anything about the testimony of Frederick
Miller regarding Little Ty's confession to killing Glenn Jenkins
should come out. The jury verdict form shows I was found not
guilty of counts ten and 38 regarding the murder of Jenkins.
Moreover, this issue was briefed on my direct appeal. Where is
the prejudice from Judge Penfield Jackson's blocking Frederick
Miller from testifying for my defense?

P.#15

Jenifer Wicks, Esquire
April 29, 2010
Page 3

On page 12, ¶(K)(2), where you state, "the testimony of po-
lice officer regarding fingerprint evidence he had not lifted,
examine or compared with the known prints." What "police offi-
cer" are you talking about? Where are the cites to the trial
record that support this claim? Judge Lamberth, or any other
federal judge, is not required to review my trial transcript in
an effort to elucidate the specific facts supporting my 2255
claims. You're making vague and conclusory allegations that will
give the judge leeway to say that I am not entitled to § 2255
relief.

On page 12, ¶(K)(4), "statements of Robert Smith aka Butchie
to SA Vincent Lisi," was extensively litigated on direct appeal.
See U.S. v. Carson, 455 F.3d 336, 364-67 (D.C. Cir. 2006). It is
true that this claim was presented on behalf of co-defendants
Carson and Coates that my alleged statements to Smith were not
made "during the course and in furtherance of the conspiracy,"
and for that reason were inadmissible under Rule 801(d)(2)(E).
However, you do not even attempt to give any facts or explain
how we can overcome the D.C. Circuit's detailed denial of this
claim.

Right now you have left a lot of holes in the § 2255 you pre-
pared for me. Yet you continue to seem to think that the right
thing to do is wait until the government files their opposition
before we submit any further pleadings. In your e-mail to me
dated March 9, 2010, you state that "we passed the laugh test
and now we can respond to their bullshit without showing our hand
first." This is troubling. Why is it that now, after more than
two years since you initially filed my 2255, all of a sudden you
don't want to amend/supplement the 2255 until after the govern-
ment responds? You changed on me, Ms. Wicks. All this time you
led me to believe that you would strengthen my 2255 motion and
clean up any errors. Moreover, you have still not taken the
time to respond in detail to my letter dated February 26, 2010.
I feel that you are not being straightforward with me.

Additionally, you assured me that you would further develop
the prosecutorial misconduct argument relating to government wit-
ness Arthur Rice. You briefly mention Rice in the 2255 twice.
See 2255 Motion, p. 11, 16. In both instances only a passing
reference is made to Rice. First, on page 11, I don't think the
Massiah claim as written is developed enough to win. Too many
unanswered questions remain. Did Keiersh just overlook the po-
tential Massiah claim completely? Why don't you provide support-
ing facts and cites to record? The way you've written it

P. # 16

Jenifer Wicks, Esquire
April 29, 2010
Page 4

Arther Rice holds no special weight in the <u>Massiah</u> argument be-
cause he's lumped together with Charles Bender, Donald Nichols,
Eugene Byars, Theodore Watson, and Reginald Switzer.

Second, you state that the government procured Arthur
Rice's testimony by "misrepresentation." But again, you don't
explain how the government misrepresented the procurement of
Rice's testimony. You barely mention Rice's Rule 35 Motion for
reduction based on substantial assistance. This is the core
of the argument concerning Rice. Then, within the same sentence,
you insert the phrase, "two subsequent plea agreements with
James Montgomery." To the reader, the point you're trying to
make becomes muddled. You give no transcript cites. There is
absolutely no factual development of the allegations of mis-
conduct and misrepresentation. Here we are two years down the
road and you've still not completed the job as you promised. I
complained to you long ago how dissatisfied I was with how weak
you wrote the argument on Arthur Rice.

There's one case in particular I request that you review.
<u>U.S. v. Gibson</u>, 577 F.Supp.2d 317 (D.D.C. 2008). It is worth
the time to read in its entirety because it shows just how
closely Judge Lamberth analyzes IAC claims raised on § 2255.
<u>Gibson</u> alleged that his lawyers were ineffective during the
pre-trial, trial, sentencing, and appellate stages. Some of
the attorneys whose competence being challenged you may know:
Barry Coburn (pretrial), Michael Olshonsky (pretrial), Charles
Stow (pretrial, trial, sentencing), Jame Rudasill (sentencing),
and Jonathan Zucker (appeal). Study closely Judge Lamberth's
reference to <u>U.S. v. Pollard</u>, 959 F.2d 1011, 1020 (D.C. Cir.
1992)(In addition, "in a § 2255 collateral challenge, [a defen-
dant], in order to gain relief under any claim, is obliged to
show a good deal more than would be sufficient on a direct
appeal from his sentence). Our direct appeal, as you know,
was voluminous. Nonetheless, the D.C. Circuit batted us down
hard on every claim. Any mistake, factual or legal, contained
within my § 2255 will detract from the credibility of the
overall Motion.

I am enclosing a recent article from the Washington Post's
Health & Science section, Tuesday, April 13, 2010, Section E,
on Living With Tourette's," by Anne Miller. It is so timely!
Think about incorporating this into your supplement.

p. #17

Jenifer Wicks, Esquire
April 29, 2010
Page 5


    Finally, I prepared another draft of the affidavit in
support of my § 2255 from me.  See if this is better.

    I hope to hear back from you shortly.  Write to win.


                Sincerely,

                William K. Sweeney


WKS/
Enclosures (2)

P. #18

# Exhibit 5

Date
10/19/2008

pg 3

plea Agreement, should he wish to proceed
to trial. In the case of Mr. Montgomery, he
was able to manipulate the plea proceeding
with the government's help, and supply additional
criminal Information. This additional criminal
Information he knew prior to his original
plea Agreement.

In the legal profession, what Mr. Montgomery
did Is called "obstruction of justice". And
as I last read this conduct Is punishable
by law.

Evenwithstanding. this unquestionable violation
of law., It Is also clear that the government
with-held disclosure of the favors Mr.
Montgomery received for violating his Rule 11
plea Agreement. This disclosure Is definitely
found under Criminal Rule 201(c).

So, we are confronted with both "obstruction
of justice" by A government witness and
most certainly prosecutorial misconduct
with non-disclosure of the favors given
for violating the law.

Finally, I must take you back to the
discontent I sustain from your Inept
communication. I am completely lost

P#5.

pg. 4

with your Intentions with the Section 2255. I'm confused As to when, IF ever, you Intend to bring me up to speed with several request I've repeatedly made. This Includes, "did you Interview the two (2) United States Marshal's yet?" "Did you retrieve the unsealed documents that the court Afforded us the opportunity to obtain?" And most Importantly; "when do you Intend to address the specific legal concerns sent to your office?"

Jenifer, there Appears to be An Impass. You know the Model Code of Professional Responsibility Cannon Laws. However, should I remind you, It Is your obligation to represent this case zealously And Competently. This Includes Effective And sufficient communication And All concerns I might present.

Frankly, As this date, you have Shown lengthy disrespect to my phone calls; especially, the dates you hung up on me with Absolutely disregard to Any consideration I might suggest to my case. Basically, It Is this type of lackadaisical-ness that I now state specificly that you Acknowledge this letter, respond to the

P. #6

listed concerns, And most Importantly discon-
tinue this Inept communication behavior
you have subjected your client to.
  In closing, I pray that this communication
Is Improved, and that your oath with
representing this case Is etched In stone
with the language of the Model Code Of
Professional Responsibility and Common Laws.
  Your Endulgence Is Appreciated.

                                    10-19-08.

                    Sincerely
                    William Sweeney

PS Enclosed with this letter Is A
copie of the letter you sent me concerning
the legal packet I sent you back In June which
concers the above requests.

P. #1

# Exhibit 6



P. # 24

3-7-16

Dear Ms. Wicks:

While reading this letter please put yourself In my shoes. I pray this letter find you well and In the best of health possible.

Within this letter I Intend to thoroughly Address some serious concerns I have As It pertains to your representation of my case. It Is never my Intentions to offend or disrespect you In any way, so please don't take this as such. I understand and respect the fact that you have other clients, cases, and a life of your own that require your attention on a daily basis. However, Ms. Wicks when you agreed to take my case, you knew firsthand that my case wasn't your ordinary case and would be a huge undertaking that would require your undivided attention as well.

Years ago before you became an attorney we had a discussion About how some Attorney's such as, Mark Rochon, Michelle Roberts and Bernard Grimm just to name a few, took on too many cases which wouldn't Allow them to give Every case their undivided Attention and the time required which All cases mandate. I expressed to you back then the potential I saw In you to be a much better Attorney than each of them. I also shared with you my view of their handling of too many cases At one time and I cautioned you not to do the same because doing so would cost you to not be Able to give each of your clients cases your un-

P. #25

In turn would cost some of your clients to be shortchanged which is not fair or a good look. You agreed that such representation amounted to NO representation at all and gave me your word that you wouldn't ever do that to any of your clients. Do you recall you and I having said conversation? It's my position now that this is exactly the case with your representation of my case, let me share with you why.

I've wrote you at least five (5) letters since December and you have yet responded to any of them. I've called your office on numerous times and has left you many messages with Ms. Sharon Chavis as well as left messages on your voice mail. I've also had my family call your office and leave messages with Ms. Chavis for you, but all to NO AVAIL. I haven't spoke with you since October of last year which has now been five (5) months. What we are now going through is a repeat of what we went through in 2009 and again in 2010 at which time you assured me that it wouldn't happen again. Now that we have some serious prosecutorial misconduct issues that has the potential to get me my freedom, It seems that for some reason you are not, as adamant about given my case the time required to effectively prevail. I say that for a number of reasons—1, Every since we've been in possession of the newly discovered material you've been pro-mising me a draft of the arguments to be briefs

P. #26

hich I have yet to receive after almost a year.
Keep In Mind That The Win Is In The Rewr-
e)..... 2. You still haven't sent me the Brady ma-
rial concerning government Charles Bender as
t pertains to the William Watson matter which
ou've promised to send me the last two (2) times
ve spoke. 3. It seems to me that the only time you
ork on or give attention to my case Is a month or
o prior to every deadline we've had, If I'm
rong I stand to be corrected and I humbly
apologize. 4. You have requested at least two (2) to
three (3) extensions with still not a draft to
date, 5. You still haven't got the affidavit from
r. Pincus, that I requested and you assured me
you would over two (2) years ago. 6. You haven't
followed up on Mr. Brad Heath from USA Today
like you told me you would. 7. You still haven't gave
me a draft of the original arguments to be
amended to the 2255.

Ms. Wicks when I requested that you repre-
sent me, I did so only because I trust you,
knew you was an excellent attorney and believ-
ed that you would always have my best Inter-
est. I don't want to believe that this has
changed, but I can't understand for the life
of me, why It seems as though you've eased
up as oppose to smashing your foot on the gas
and turning the heat all the way up now that
we have something as strong and serious as what

P. #27

ur actions, I keep coming up with— for you
2 be so busy that you don't have the time to
espond to my letters, messages and set up
legal call, you must have entirely too much
2 your plate where it won't allow you the
me, to give my case and others your undiv-
ed attention. If that be the case, I think
it's time for you to really consider whether
ir not you can give my case the time required.
Jr is this where we go our separate ways?
I hope not, but it's a must that we see eye
2 eye.

Jenifer, every since we've known each other
I've always kept it 110% real with you and
have gave you none other than the utmost respect.
Although we've had our ups and downs my
respect for you never faltered to this day. I'm
the same Draper that had faith in you and trusted
you to be my Investigator. I'm the same Draper
that was there before, while and after things
didn't go so well for you with your first two
(2) attempts with the Bar Exam, and as you
can remember, I was genuinely there by your
side every step of the way and was instru-
mental and adamant in not allowing you
to give up and encouraging you to do it
again because I knew you could and would
prevail. I believed in you when you didn't
believe in yourself. I say all of that not



P. #28

you that we share too much history to fall out about what you and I both know is right. All I'm asking is that you be the Jenifer I once knew you to be, the dedicated to WIN and not give up Jenifer. The give it your all, or nothing Jenifer, The give me a fair shake and allow me to be Instrumental In all aspects of my case Jenifer. The Jenny from the block Jenifer. (smile) We've come too far to ease up In the fourth quarter. So what will it be?

I'm enclosing with this letter, a copy of a letter I received from the Office of Professional Responsibility (OPR). I haven't wrote them about our case, so this must've come as a result of me writing the Attorney General Mr. Eric Holder Jr. back In November! I need you to do a follow up on this letter because I didn't go Into detail In my letter to him, so I don't think they know exactly what they are looking for—Re Sealed material.

In closing, I don't wish to argue, fuss or cuss with you, but rather have a meeting of the minds and see If we can make some sense out of it all. I look forward to hearing from you and speaking with you soon. My counselor Ms. Lassiter works Tuesday through Friday so please arrange a legal call.
Thanks for your time.

Sincerely,

# Exhibit 7

# JENIFER WICKS
## ATTORNEY AT LAW

THE WEBSTER BUILDING
503 D STREET NW
SUITE 250A
WASHINGTON, D.C. 20001

CHAUNCEY WOOD (D.C., MA, NY)
OF COUNSEL

TELEPHONE (202) 393-3004
FACSIMILE (202) 478-0867
EMAIL Jenifer.Wicks@verizon.net

February 3, 2011

William Sweeney
06069-007

Dear Mr. Sweeney:

Due to my sickness in January and Mr. Carson's new counsel needing more time (and apparently getting access to the only complete set of discovery etc. which she will allow me to look at as well), Ms. West filed a motion for more time. I enclose her motion and the court's order granting the motion today.

Sincerely,

JENIFER WICKS

# Exhibit 8

William Sweeney
Register No. 06069-007
U.S.P. McCreary
P.O. Box 3000
Pine Knot, KY  42635-3000

August 9, 2010

Jenifer Wicks, Esquire
   Attorney at Law
The Webster Building
   Suite 250A
503 D Street NW
Washington, D.C.  20001

Dear Ms. Wicks:

The following is a list of the things that I found in the paperwork that you sent to me.  You will also find the dates and times that these issues were addressed in the trial transcripts. The Government and the judge that presided over my trial was aware of all of this Brady and Jencks material and failed to disclose this information.

1.  Government witness Arthur Rice's FBI 302 reports.  Rice told Agent Lisi and Agent Kevin White (in the presence of AUSA Kenneth Wainstein) that Vito paid Pimp for the shooting of "Kreeko."  He also told them that he was present the night that Maurice Hallman and Slick were killed and Jerome Martin and Sam Carson killed the two in the alley.  He said that they killed them because Hallman was going to testify against an individual named "Tay" who was involved in a shooting incident at Wilson High School.

On April 24, 2001 (Afternoon Session trial transcript page 3), Judge Jackson said that the record will reflect that over the noon hour, he had reviewed the FBI 302 dated 1-27-99, as being the 302 related to testimony about to be given by Mr. Rice, and he found nothing in it to permit it to be characterized as Brady material and it is clearly not a Jencks Act statement.

2.  The Government's ex parte motion filed under seal to change the defendant's location of confinement.  On page 12, as it pertains to the murder of Government witness Robert Smith.  It says that Smith was shot and killed while in the 1300 Block of Half Street, SW DC.  Investigation of that murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Carson, as having murdered Smith.  (This said motion was filed with my trial judge, Jackson).  So he, along with the Government, was aware of this information.

P #19

Jenifer Wicks, Esquire
August 9, 2010
Page 2

On May 29, 2001 (Afternoon Session on page 45), Mr. Kiersh
asked Agent Lisi were there a lot of violent people out there who
were looking to kill or have Robert "Butchie" Smith killed.  Agent
Lisis answered--"Not that I know of."

On May 30, 2001 (Morning Session pages 45-49), Mr. Kiersh
asked Agent Lisi, after Butchie was killed in '97, other than Petey
Johnson, did he speak with anyone else, either as a suspect or as
a potential witness regarding this event, and he answered, "Yes,
sir," and then Mr. Kiersh asked who and Agent Lisi attempted to
answer by saying Richards--and was cut off by Ms. Chaturvedi
objecting and asking to approach the bench.  After the bench con-
ference, Mr. Kiersh asked Agent Lisi again, did he question other
suspects and he answered, "Yes."  Then Mr. Kiersh asked him how
many and Agent Lisi said "one" and Mr. Kiersh moved on.

On May 30, 2001 (Morning Session pages 19 and 20), as well.
Agent Lisi testifying about picking up Petey Johnson after Butchie
was killed.  Says he thinks Petey may have called someone to alert
them that Butchie was out there.  Said that he heard Petey was
with Butchie and then walked away.

ALSO MUST READ motion transcript dated 9-27-00, pages 123-137
and pages 199-204, all Re: Butchie Material.

3.  FBI 302 dated 11-7-00.  Special Agent Michael T. Brown
interviewed a source whose identify was not revealed.  The source
said that Pimp and Vito Hill killed Tony Fortune.

4.  Notes of someone else, whose name I cannot make out, on
behalf of the Government.  Dated 12-22-97, of interview with Govern-
ment's witness Andre Murry.  He said that Fat Petey messing with
Butchie and killed Butchie to get back at me for killing his brother
Keith Johnson.  This same witness also told an investigator inter-
viewing him on behalf of the Government that someone named Donnell
"Jackie Boy" Burks had some New Yorkers kill Slick and Maurice on
Delaware Avenue in 1991 or 1992.

On 2-1-01 (Afternoon Session pages 3-5 of the trial transcript):
Mr. Kiersh requested that Judge Jackson review the notes of the pro-
secution team and also any notes that police officers took from
witness Murray and to review them in camera to see if there is any
Jencks.  On page 56 of this same transcript, Judge Jackson told Mr.
Kiersh that he had looked through the notes and that there was some
suggestion in there that Murry and Lop were responsible for the
murder of Patcho, which might conceivably be deemed to be Brady
material, and they will be placed under seal.

On 2-5-01 (Morning Session pages 4 and 5), Judge Jackson said

P.#20

Jenifer Wicks, Esquire
August 9, 2010
Page 3

that he had reviewed these notes again and once again he finds
that they contain nothing that could be characterized as either
Jencks or Brady material and they will as was done with respect
to other similar materials be placed under seal and kept as part
of the court record as a court exhibit.

    5. Government witness Theodore Watson. The Government
retrieved a file from the Greenbelt AUSA which included letters
from Watson to a prosecutor and a judge admitting that he has lied,
schemed, and connived at times to obtain his way or freedom. In
one of the letters, he said that he told this to FBI agents from
the D.C. Office when interviewed twice on an unrelated matter. He
also said that the Agent told him "we all lie." In one letter, he
said that he was attempting to secure assistance on his own in an
effort to help himself.

    Also in this file was information that a prosecutor advised
Watson's lawyers that she didn't want to hear or discuss anything
for or about Watson. Must read 2-12-01 Morning Session (page 76)
and 2-12-01 Afternoon Session (pages 30-33), as it pertains to
Government witness Theodore Watson.

    On 2-13-01 (Morning Session pages 5 and 6), the following took
place between Judge Jackson, Mr. Kiersh, AUSA Zeidenberg, and Mr.
Zucker.

    **Zeidenberg:** I believe we are, your Honor, just on a matter
    left over from yesterday, pursuant to the Court's instruc-
    tion, we contacted the U.S. Attorney's Office in Greenbelt.
    We retrieved their file yesterday evening and have reviewed
    it. There is nothing, in our view, that suggests any Brady
    or Jencks material. In the file, the AUSA out there indi-
    cates in one letter that the reason that Mr. Watson did not
    get a 5K letter was simply because she didn't believe his
    cooperation was of a significant nature to qualify. There
    was nothing to suggest that it was not worthy of belief or
    it was incredible. There was nothing of that nature.

    Detective Norris--we spoke with him briefly yesterday, and
    he had called--we tried to get in touch with him--and he
    indicated similarly that Mr. Watson had never provided him
    with information that he felt was untrustworthy of any kind.
    Nevertheless, we do have the file, and I don't know if the
    Court wishes to have it to pursue. There are letters--

    **The Court:** You mean the file from Greenbelt?

    **Mr. Zeidenberg:** Yes, there are letters from Mr. Watson to

P.#21

Jenifer Wicks, Esquire
August 9, 2010
Page 4

the prosecutor, as he describes--several lengthly letters,
talking about a variety of matters, including his own case
and other cases that he knows about and things of that
nature.

**The Court:** Do you want to have it made part of the court
record?

**Mr. Kiersh:** Yes, your Honor.

**The Court:** All right.

**Mr. Kiersh:** I ask that it be placed under seal and made a
part of the record.

**The Court:** We will place it under seal, and mark it as a
court exhibit, I believe, Number 3.  Is that correct, Mr.
West?

**The Deputy Clerk:** I believe so, your Honor.

**Mr. Zucker:** Your Honor, I concur in that, but I'd also ask
that the court--

**The Court:** Wait a minute.

**The Deputy Clerk:** Number 5, your Honor.

**The Court:** Number 5, all right, Number 5, I do not intend to
review it in camera.

**Mr. Zucker:** That would be my request.

**The Court:** All right, are we ready for the jury?

The Greenbelt file contains the direct opposite of what AUSA
Zeidenberg represented to the Court.  The file has nothing but
Jencks and Brady material in it as it pertains to Mr. Watson.

6.  On April 4, 2001 (Afternoon Session page 3), Judge Jackson
said he examined the FBI 302's Re: Charles Bender in camera and did
not find that those 302's represent Jencks Act material in the cir-
cumstances.

Special Agent Kristen A. Kane FBI 302 dated 2-17-98 (page 5),
Charles Bender says Pimp told him that he shot Tony Fortune.  This
is clearly Brady material for Carson as he stands convicted for
Fortune's murder.

P.#22

Jenifer Wicks, Esquire
August 9, 2010
Page 5

Ms. Wicks, these are my findings.  Can you please copy the
rest of that material and send it to me ASAP so I may go through
it and find what's in that stack as well?

This is what I call a conspiracy on behalf of the Judge, the
prosecuting attorneys, and Agent Lisi to WIN AT ALL COST.  Now
it's time for us to WIN . . .

I look forward to hearing from you soon.

Sincerely,

William Sweeney

cc: file

P. # 23

# Exhibit 9

3-26-09

Dear. Ms Wicks,

I hope this letter reaches you In the best of health possible. As for myself, I'm still fighting to regain my freedom.

Here are the dates and transcript cites where judge Jackson placed some material under seal as It pertains to the trial transcripts that I have In my possession.

1. Reginald Switzer 1-30-01 Afternoon Session pgs. 4 And 5. Handwritten notes of Mr. Zeidenberg And Ms. Chaturvedi.

2. Andre Murray 2-1-01 Afternoon Session pgs. 56-58, Handwritten letters to Mr. Ken Wainstein

3. Andre Murray 2-5-01. Morning Session pgs. 4 And 5, Mr. Zeidenberg's notes of his Interviews of Mr. Murray.

4. Concerning Theodore Watson 2-13-01 Morning Session pgs. 5 and 6. A file from the Greenbelt U.S. Attorneys Office that contains several lengthy letters from Watson to prosecutors. Placed Under Seal And marked Court Exhibit Number 5.

5. James Montgomery 3-6-01 Afternoon Session pgs. 3 And 4
6. James Montgomery 3-7-01. Afternoon Session pgs. 86 And 87 Witness Protection File.

7. Charles Bender 4-4-01. Morning Session pgs. 94 And 95,

P. # 9

A FBI 302 And Another Investigative Report.
8. Charles Bender 4-4-01 Afternoon Session pg. 3
302 And Report.
9. Charles Bender 4-5-01 Afternoon Session pgs.
77 And 78, FBI 302's.
10. Eugene Byars Afternoon Session 4-9-01. pg. 72
FBI 302's.
11. Ronald Sowells 4-18-01 Afternoon Session pgs.
74 And 75 FBI 302's dated 11-27-98.
12. Arthur Rice 4-24-01 Afternoon Session pg. 3
302's dated 1-27-99.
13. Paul Franklin 5-2-01 Afternoon Session
pgs. 49-51 Paternity File.
        When you get A chance can you please
make copies of this stuff And send It to
me?

                              Thanks In
                              Advance.

                          Mr. William Sweeney


                              P. # 10

# Exhibit 10

*turn over →*

What's Up Jenifer?

3-16-08

While going through some of my legal material
I found a letter that Mr. Kiersh wrote me back
In 2004, It's In regards to a conversation
he had with Dr. Pincus after I requested that
he send me a copie of Dr. Pincus report. Hopefully
It can be of some help to us.

Enclosed with this letter you will find a
copie of the letter that I spoke about above, as
well as a copie of an affidavit that I had Mr.
Kiersh make part of the record In my case that sets
forth my objections to any of my codefendants *lawyers,* arguing
or ~~prepring~~ preparing anything, In regards to my appeal
process, and some of the decisions my lawyer made without
consulting with me. Also, you will find a copie of a lette
that my codefendant Sam's lawyer sent him telling
him which lawyers were working on different
Issues. Lastly, you will also find a copie of a
Email that C. Sam's lawyer sent to the other lawyer-
regarding a meeting they all had.
I hope this stuff can help us with our
case somehow. I will call you at the end of
the month. Take care.
                                    - Draper -

Have you _____ through _____ before sending me a letter that I sent you? If so get back to me concerning your thoughts? What do you think about the two (2) Doctor reports that I sent you? Do you think that they can support our position with Dr. Pincus? Also, before I forget - have you had a chance to pursue the judge's latest order?

Dated
3/16/08

P. #2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. No. 98-329-4 (RCL) |
| WILLIAM SWEENEY | |

## DECLARATION OF WILLIAM K. SWEENEY

I, William K. Sweeney, state as follows:

1. I am over the age of twenty-one, and I am competent in all respects to make this declaration. The facts stated in this declaration are within my personal knowledge or are based upon my information and belief.

2. I was represented in this case by Ms. Jenifer Wicks from May 2007 to ~~November 2014.~~ December 2011 *WS*

3. Ms. Wicks filed an initial habeas petition for me in February 2008. But the plan was always for her to supplement it. That is why she reserved the right to supplement in the initial petition. But it never happened. She never made good on her promise.

4. From the time Ms. Wick's became my lawyer to the time she stopped, I spent a ton of time and effort writing to Ms. Wicks. Even after she filed my initial petition, I wrote her letters filled with detailed notes and legal theories, identified relevant legal cases and records for her to read, and witnesses to interview, all to prepare for my supplement.

5. I also repeatedly told Ms. Wicks that my case would take a lot of time and worked very hard to try to make sure she investigated my case promptly and made filings on time.

6. It was at my urging that Ms. Wicks went back to the Clerk's Office again and again to try to get them to find the sealed documents the court ordered that I should have access to.

7. From what I remember, I learned the Clerk's Office had found the documents sometime in July or August of 2010, thousands of pages of which were then mailed to me.

8. I reviewed unsealed court records and sent Ms. Wicks summaries of the evidence I found, which I understand to have been illegally withheld by the government in violation of the U.S. Constitution.

9. I expected Ms. Wicks to put that evidence in my supplemental petition and file it fast. I told her I wanted her to file the petition quickly and asked her to send me drafts. She did not.

10. In fact, I had an extremely difficult time communicating with Ms. Wicks while she was my lawyer. She often would not return my calls, letters, and emails. She even hung up on me multiple times. She did not return the calls of my family members either.

11. Ms. Wick's recognized she wasn't being responsive and making the progress on my case that she needed to and apologized to me and my family several different times. She told me she had been sick, and then that a family member of hers was sick, and that that explained why she wasn't doing her job. She promised to do better.

12. The reason I did not ask for a new lawyer or try to file a supplemental petition myself was that I believed Ms. Wicks when she made her promises. I also understood that she was filing extension requests in my case and that if she filed by the new dates the court would order, my supplemental petition would be on time and I would not be missing any deadlines. This made sense to me.

13. When it finally became clear to me that Ms. Wicks was never going to do her job and write my supplemental petition, I suggested we go our separate ways.

14. She stopped being my lawyer in ~~November 2014~~. December 2011 WS

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct.

This ___17th___ day of September, 2020.

_William K. Sweeney_
William K. Sweeney