ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE

———————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

Nos. 21-3072, 21-3073, 21-3078, 22-3016, 23-3015

———————————

UNITED STATES OF AMERICA,                          Appellee,

v.

SEAN COATES, WILLIAM SWEENEY,
JEROME MARTIN, JR., and SAMUEL CARSON,        Appellants.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

EDWARD R. MARTIN, JR.
United States Attorney

CHRISELLEN R. KOLB
JOHN P. MANNARINO
* ELIZABETH GABRIEL
MD Bar
Assistant United States Attorneys
* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Elizabeth.Gabriel@usdoj.gov
(202) 252-6829

Cr. Nos. 98-cr-00329 (RCL)

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

The parties to this appeal are appellants, Sean Coates, William K. Sweeney, Jerome Martin, Jr., and Samuel Carson; and appellee, the United States of America.

## Rulings Under Review

This is an appeal from an order by the Honorable Royce C. Lamberth denying appellants' motions under 28 U.S.C. § 2255 to vacate, set aside, or correct their sentences. *United States v. Martin*, 2021 WL 4989983 (D.D.C. Oct. 27, 2021). Appellants allege that the district court erred in denying their motions, and request that this Court vacate their convictions and dismiss the indictment or remand for a new trial. In a written order issued on May 23, 2022, the district court further explicated its decision denying the § 2255 motions and denied a certificate of appealability. *United States v. Martin*, 2022 WL 1618869 (D.D.C. May 23, 2022).

# Related Cases

Appellee is unaware of any related cases.

# STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained in the attached Addendum.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE............................................ 1

The Trial ...........................................................................3

The Murder of Anthony Fortune.........................................4

The Murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson ..................................................................5

The Murder of Robert "Butchie" Smith .............................6

The Trial Court's Review of *Brady*, *Giglio*, and Jencks Act Requests...........................................................................8

Post-Conviction Proceedings .............................................12

    Appellants' § 2255 Claims .............................................16

        1.   William Sweeney......................................................16

        2.   Samuel Carson ........................................................20

        3.   Sean Coates.............................................................23

        4.   Jerome Martin..........................................................24

    The Government's Omnibus Opposition ...............................25

        1.   William Sweeney......................................................25

        2.   Samuel Carson ........................................................29

        3.   Sean Coates.............................................................31

        4.   Jerome Martin..........................................................32

    The District Court's Ruling .................................................32

        1.   William Sweeney......................................................33

        2.   Samuel Carson ........................................................35

3.  Sean Coates................................................................37

4.  Jerome Martin.............................................................37

SUMMARY OF ARGUMENT.................................................................38

ARGUMENT .......................................................................................41

I.  Appellants' Claims of Government Misconduct Were Procedurally Barred, Untimely, or Meritless. .........................41

A.  Standard of Review and Legal Principles .........................42

1.  § 2255 Principles .........................................................42

2.  *Brady* and Jencks Act Principles................................45

B.  Discussion ........................................................................47

1.  Appellants' Initial *Brady* Claims Were Procedurally Barred.....................................................47

2.  Most of Appellant's Subsequent *Brady* Claims Were Untimely and Did Not Relate Back to the Initial Claims. ...........................................................50

a.  The Later Claims Did Not Relate Back...............52

b.  Most of the Supplemental Misconduct Claims Were Untimely. .....................................................58

c.  Appellants Are Not Entitled to Equitable Tolling...................................................................64

3.  Even If Not Procedurally Barred or Untimely, Appellants' Government-Misconduct Claims Lack Merit. ...................................................................74

a.  Documents Allegedly Revealing Evidence of Alternative Theories. ...........................................75

b.  Documents Revealing Alleged Lies by Government Witnesses .......................................88

v

      c.    Information Regarding Relocation Assistance
to Witnesses ......................................................... 97

II.  Appellants' Claim that the Trial Court Erred by Reviewing Submissions In Camera and Placing Them Under Seal is Not Properly Before this Court and Is, In Any Event, Procedurally Barred, Untimely, and Meritless ....................... 103

    A.   The COA Does Not Encompass Appellants' Challenge to the Trial Court's In-Camera-Review Procedures ......... 104

    B.   Appellants' Claim is Procedurally Defaulted and Time Barred. ........................................................................... 106

    C.   Appellants' Claim of Trial-Court Error is Meritless. ........ 107

III.  Appellate Counsel Was Not Ineffective in Failing to Challenge on Direct Appeal the Trial Court's Specific Evidentiary Rulings Pertaining to the Sealed Material. ......... 114

    A.   Standard of Review and Legal Principles ....................... 115

    B.   Discussion .................................................................... 118

IV.  Carson's Claim of Ineffective Assistance of Trial Counsel is Not Properly Before This Court, and In Any Event, Is Untimely and Meritless. ...................................................... 126

CONCLUSION ................................................................... 137

# TABLE OF AUTHORITIES*

*Andrew v. White*, 62 F.4th 1299 (10th Cir. 2023) ...................................97

*Baldayaque v. United States*, 338 F.3d 145 (2d Cir. 2003) ....................71

*Baldwin County Welcome Center v. Brown*, 466 U.S. 141 (1984) ..........67

*Bousley v. United States*, 523 U.S. 614 (1998) .......................................44

*Bracey v. Superintendent Rockview SCI*, 986 F.3d 274
  (3d Cir. 2021) ...............................................................................61, 62

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................8, 113

*Buck v. Davis*, 580 U.S. 100 (2017) .......................................................105

*Carson v. United States*, 549 U.S. 1246 (2007)................................14, 48

*Clay v. United States*, 537 U.S. 522 (2003)..............................................48

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)................................................132

*Dodd v. United States*, 454 U.S. 353 (2005)............................................47

*Downs v. McNeil*, 520 F.3d 1311 (11th Cir. 2008)..................................70

*Fierro v. Cockrell,* 294 F.3d 674 (5th Cir. 2002) ....................................66

*Flanagan v. Johnson,* 154 F.3d 196 (5th Cir. 1998).............................63

*Ford v. Gonzalez*, 683 F.3d 1230 (9th Cir. 2012) ...................................61

---

\*    Authorities upon which we chiefly rely are marked with asterisks.

*Giglio v. United States*, 405 U.S. 150 (1972) ............................................8

*Goldberg v. United States*, 425 U.S. 94 (1976) .....................................107

*Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011)....................................93

\* *Hill v. Mitchell*, 842 F.3d 910 (6th Cir. 2016) ...........................52, 55, 58

*Holland v. Florida*, 560 U.S. 631 (2010)............................................65, 69

*In re Davila*, 888 F.3d 179 (5th Cir. 2018)..............................................61

*In re Sealed Case No. 99-3096*, 185 F.3d 887 (D.C. Cir. 1999)..............78

*In re Sealed Case*, 809 F. App'x 6 (D.C. Cir. 2020) ..............................128

*Jimerson v. Payne*, 957 F.3d 916 (8th Cir. 2020)....................................64

*Johnson v. United States*, 135 S. Ct. 2551 (2015)............................23, 24

*Johnson v. United States*, 544 U.S. 295, 307 (2005)...................59, 61, 69

*Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009) .................................53

*Kreutzer v. Bowersox*, 231 F.3d 460 (8th Cir. 2000) ..............................67

*Lesko v. Secretary Pennsylvania Department of Corrections*,
  34 F.4th 211 (3d Cir. 2022) ..................................................................80

*Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107 (2d Cir. 2000) ........64

*Mandacina v. United States*, 328 F.3d 995 (8th Cir. 2003)..............57, 58

*Massaro v. United States*, 538 U.S. 500 (2003) ......................................44

*Mayle v. Felix*, 545 U.S. 644 (2005)........................................38, 43, 52, 53

*Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857 (D.C. Cir. 2008)...................54

viii

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ...........................................128

*Napue v. United States*, 360 U.S. 264 (1959)...................................23

*Nix v. Whiteside*, 475 U.S. 157 (1986)...............................................115

*Owens v. Boyd*, 235 F.3d 356 (7th Cir.2000)...........................................59

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ............................................115

*Palermo v. United States*, 360 U.S. 343 (1959)...........................108, 123

*Payne v. Stansberry*, 760 F.3d 10 (D.C. Cir. 2014) ..............................125

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987)................................108, 113

*Prieto v. Quarterman*, 456 F.3d 511 (5th Cir. 2006)..............................67

*Roy v. Lampert*, 465 F.3d 964 (9th Cir. 2006) ........................................69

*S.E.C. v. Banner Fund Intern.*, 211 F.3d 602(D.C. Cir. 2000) ..............41

*Schlueter v. Varner*, 384 F.3d 69 (3d Cir. 2004) ....................................72

*Schmitt v. Zeller*, 354 F. App'x 950 (5th Cir. 2009) ...............................65

*Smith v. Cain*, 565 U.S. 73 (2012)..........................................................94

*Smith v. Murray*, 477 U.S. 527 .........................................................116

*Smith v. Robbins*, 528 U.S. 259 (2000) ................................................116

*Smith v. Stewart*, 140 F.3d 1263 (9th Cir. 1998)...................................77

*Smith v. Vannoy*, 848 F. App'x 624 (5th Cir. 2021)..............................64

*Spirko v. Mitchell*, 368 F.3d 603 (6th Cir. 2004) ...................................79

ix

\* *Strickland v. Washington*, 466 U.S. 668 (1984) ....... 40, 41, 115, 116, 117

*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................46

*Turner v. United States*, 582 U.S. 313 (2017) .........................................84

*United States v. Abney*, 812 F.3d 1079 (D.C. Cir. 2016).............. 117, 124

*United States v. Aguiar*, 894 F.3d 351 (D.C. Cir. 2018) .......................118

*United States v. Agurs*, 427 U.S. 97 (1976)..............................................46

*United States v. Ahrensfield*, 698 F.3d 1310 (10th Cir. 2012)...............78

*United States v. Bagley*, 473 U.S. 667 (1985) ................................... 45, 46

*United States v. Baxter*, 761 F.3d 17 (D.C. Cir. 2014)................... 66, 119

*United States v. Bertram*, 762 F. App'x 1 (D.C. Cir. 2019)..................105

*United States v. Borda*, 848 F.3d 1044 (D.C. Cir. 2017).........................79

*United States v. Brinson-Scott*, 714 F.3d 616 (D.C. Cir. 2014) ............115

*United States v. Brodie*, 524 F.3d 259 (D.C. Cir. 2008)................... 45, 46

*United States v. Brooks*, 966 F.2d 1500
  (D.C. Cir. 1992)........................................................ 108, 111, 113, 114

*United States v. Bruce*, 89 F.3d 886 (D.C. Cir. 1996) ..........................133

*United States v. Buchanan*, 891 F.2d 1436 (10th Cir. 1989).................95

*United States v. Caldwell*, 7 F.4th 191 (4th Cir. 2021) .......................108

*United States v. Cardillo*, 316 F.2d 606 (2d Cir. 1963) .......................112

*United States v. Carson*, 455 F.3d 336

x

(D.C. Cir. 2006)2, 3, 5, 13, 14, 26, 80, 82, 83, 84, 88, 98, 99, 102, 111, ............................................................................... 130, 131, 134

*United States v. Ciampi*, 419 F.3d 20 (1st Cir. 2005) ..................... 43, 129

\* *United States v. Cicero*, 214 F.3d 199
  (D.C. Cir. 2000) ...............................................39, 45, 63, 65, 68, 69, 73, 74

*United States v. Cronic*, 466 U.S. 648 (1984) ..................................... 126

*United States v. Derr*, 990 F.2d 1330, 1335–36
  (D.C. Cir. 1993) ............................................................. 77, 87, 94, 103

*United States v. Doost*, 3 F.4th 432 (D.C. Cir. 2021) ........................... 121

*United States v. Dyess*, 730 F.3d 354 (4th Cir. 2013) ........................... 130

*United States v. Emor*, 573 F.3d 778 (D.C. Cir. 2009) ........................... 87

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000) ........... 43

*United States v. Flores-Rivera*, 787 F.3d 1 (1st Cir. 2015) ................... 120

*United States v. Frady*, 456 U.S. 152 (1982) ................................... 44, 45

*United States v. Gray-Burriss*, 791 F.3d 50 (D.C. Cir. 2015) ............... 133

*United States v. Green*, 178 F.3d 1099 (10th Cir. 1999) ....................... 101

*United States v. Henderson*, 108 F.4th 899 (D.C. Cir. 2024) ................. 45

*United States v. Hernandez*, 436 F.3d 851 (8th Cir. 2006) ............. 67, 129

*United States v. Hickey*, 767 F.2d 705 (10th Cir. 1985) ....................... 111

*United States v. Hicks*, 283 F.3d 380 (D.C. Cir. 2002) ............... 43, 52, 54

*United States v. Hsia*, 30 F. App'x 1 (D.C. Cir. 2001)............................78

*United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003)............................96

*United States v. Jackson*, 627 F.2d 1198 (D.C. Cir. 1980) ...................134

*United States v. Kennedy*, 890 F.2d 1056 (9th Cir. 1989) .....................77

*United States v. Long*, 997 F.3d 342 (D.C. Cir. 2021) ..........................113

*United States v. Martin*, 2021 WL 4989983
 (D.D.C. Oct. 27, 2021)2, 5, 14, 16, 32, 33, 34, 35, 36, 37, 38, 49, 50, 60,
 ........................................................................ 64, 88, 101, 127, 129

*United States v. Martin*, 2022 WL 1618869
 (D.D.C. May 23, 2022) ............................3, 8, 12, 34, 54, 57, 61, 68, 125

*United States v. Mason*, 523 F.2d 1122 (D.C. Cir. 1975).....................107

*United States v. McDade*, 699 F.3d 499 (D.C. Cir. 2012) ......................73

*United States v. McGill,* 815 F.3d 846 (D.C. Cir. 2016) ........................82

*United States v. Minsky*, 963 F.2d 870 (6th Cir. 1992) ........................108

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011).................. 113, 123

*United States v. Mullins*, 22 F.3d 1365 (6th Cir. 1994).......................101

*United States v. North American Reporting, Inc.*, 761 F.2d 735
 (D.C. Cir. 1985).........................................................................109

*United States v. Oruche,* 484 F.3d 590 (D.C. Cir. 2007)...................47, 95

*United States v. Pettigrew*, 346 F.3d 1139 (D.C. Cir. 2003) ..................44

*United States v. Petty*, 530 F.3d 361 (5th Cir. 2008) .............................69

*United States v. Pole*, 741 F.3d 120 (D.C. Cir. 2013)...........................136

\* *United States v. Pollard*, 416 F.3d 48 (D.C. Cir. 2005) ........ 59, 70, 72, 73

*United States v. Robinson*, 68 F.4th 1340 (D.C. Cir. 2023) ....................45

*United States v. Santos*, 486 F. App'x 133 (2d Cir. 2012)......................77

*United States v. Scurry*, 992 F.3d 1060 (D.C. Cir. 2021).......................69

\* *United States v. Shark*, 51 F.3d 1072 (D.C. Cir. 1995) ............... 131, 132

*United States v. Spencer*, 618 F.2d 605 (9th Cir. 1980).........................47

*United States v. Stuart*, 923 F.2d 607 (8th Cir. 1991).........................113

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988) ................108

\* *United States v. Taylor*, 139 F.3d 924 (D.C. Cir. 1998)................ 132, 134

*United States v. Thomas*, 97 F.3d 1499 (D.C. Cir. 1996)......................46

*United States v. Watson*, 717 F.3d 196 (D.C. Cir. 2013)......................119

*United States v. Weaver*, 195 F.3d 52 (D.C. Cir. 1999).......................104

*United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010).........................96

*Walberg v. Israel*, 766 F.2d 1071 (7th Cir. 1985)......................... 133, 134

*Waters v. Lockett*, 896 F.3d 559 (D.C. Cir. 2018).. 105, 116, 117, 127, 128

*Watkins v. Stephenson*, 57 F.4th 576 (6th Cir.), *cert. denied sub nom.*
  *Watkins v. Chapman*, 144 S. Ct. 222 (2023) ........................................129

## OTHER REFERENCES

18 U.S.C. § 924(c) ..................................................................................23

18 U.S.C. § 3500 ................................................................................8, 46

18 U.S.C. § 3500(b) .............................................................................112

18 U.S.C. § 3500(c) .............................................................................107

18 U.S.C. § 3500(e) ........................................................................47, 123

18 U.S.C. § 3500(e)(1).........................................................................123

18 U.S.C. § 3500(e)(2).........................................................................124

28 U.S.C. § 2244(d) ..............................................................................61

28 U.S.C. § 2253(c)(1)(B) ...................................................................104

28 U.S.C. § 2253(c)(2) .........................................................................104

28 U.S.C. § 2255
    2, 14, 15, 16, 17, 19, 20, 21, 23, 24, 25, 29, 33, 35, 38, 42, 43, 47, 48, 51,
    ......52, 54, 62, 66, 67, 70, 71, 72, 105, 107, 118, 125, 126, 129, 130, 131

28 U.S.C. § 2255(4).............................................................................59

28 U.S.C. § 2255(a).............................................................................42

28 U.S.C. § 2255(f)........................................... 28, 38, 47, 127, 129, 130

28 U.S.C. § 2255(f)(1) .................................................. 39, 42, 51, 58, 61

28 U.S.C. § 2255(f)(4) ....................................30, 35, 38, 39, 42, 58, 59, 62

D.C. Code § 22-4135 ............................................................. 27, 29, 40

D.C. Code § 2254 .................................................................... 43, 64

Fed. R. App. P. 28(a)(8) ............................................................... 41

Fed. R. Civ. P. 15(c)(2)................................................................. 43

## ISSUES PRESENTED

I.    Whether the district court erred by denying the government-misconduct claims raised in appellants' initial and supplemental 28 U.S.C. § 2255 motions, where these claims were procedurally defaulted, untimely, and/or meritless.

II.    Whether this Court should consider appellants' claim that the trial judge erred by reviewing alleged *Brady* and Jencks Act material in camera and placing the material under seal, where this claim is not encompassed by the certificate of appealability ("COA") and in any event is procedurally barred, untimely, and meritless.

III.    Whether the district court erred by rejecting appellants' challenges to their appellate counsel's representation, where appellants established neither deficient performance nor prejudice arising from their counsel's failure to raise *Brady* claims based on material previously sealed by the trial court.

IV.    Whether this Court should consider Carson's claim of ineffective assistance of trial counsel, where this claim is beyond the scope of the COA, and in any event is untimely and meritless.

xvi

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

Nos. 21-3072, 21-3073, 21-3078, 22-3016, 23-3015

———————————

UNITED STATES OF AMERICA,                    Appellee,

v.

SEAN COATES, WILLIAM SWEENEY,
JEROME MARTIN,JR., and SAMUEL CARSON,    Appellants.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

BRIEF FOR APPELLEE

———————————

## COUNTERSTATEMENT OF THE CASE

Appellants Sean Coates, William Sweeney, Jerome Martin, Jr., and Samuel Carson were members of the notorious K Street Crew, a gang that, in the 1980s and 1990s, engaged in an "organized and massive business of selling drugs" that "led to an astonishing amount of violence and a seemingly complete repudiation of civil society and respect for

human life[,]" including the murders of at least 11 people. *United States v. Carson*, 455 F.3d 336, 339 (D.C. Cir. 2006). On September 18, 1998, appellants and several others were charged in a multi-count indictment with narcotics conspiracy, racketeer influenced corrupt organization ("RICO") conspiracy, violent crime in aid of racketeering ("VICAR") offenses, murder and other violent crimes, narcotics trafficking, and weapons possession. *Id.* at 347. Following a nine-month trial before the Honorable Thomas Penfield Jackson, a jury convicted each appellant of, inter alia, narcotics conspiracy, RICO conspiracy, and murder. *See* App. 720-747; *Carson*, 455 F.3d at 382 nn.37-38, 40. Judge Jackson sentenced each appellant to life in prison on multiple counts. *Carson*, 455 F.3d at 382 nn.37-38, 40.

Appellants appealed their convictions and sentences, which this Court affirmed "in toto." *Carson*, 455 F.3d at 339. Appellants then sought post-conviction relief under 28 U.S.C. § 2255, ultimately raising "copious challenges to their convictions." *United States v. Martin*, 2021 WL 4989983, at *1, 4 (D.D.C. Oct. 27, 2021). On October 27, 2021, the Honorable Royce C. Lamberth denied the motions. *Id.* at *1. Appellants

2

filed timely notices of appeal (App. 138).[1] Judge Lamberth subsequently declined to issue a certificate of appealability ("COA"). *United States v. Martin*, 2022 WL 1618869, at *7-8 (D.D.C. May 23, 2022).

On December 23, 2022, this Court granted a COA on two questions: "(1) whether the government's allegedly improper withholding of certain materials submitted to the district court under seal violated appellants' due process rights; and (2) whether appellate counsel was ineffective for failing to challenge on direct appeal specific evidentiary rulings made by the district court pertaining to that sealed material." *United States v. Coates*, No. 21-3072 (Order, December 23, 2022).

## The Trial

This Court described the facts of this case in *Carson*, 455 F.3d at 339:

> This case is a story of mayhem and disorder in and around the 200 block of K Street, Southwest, in the District of Columbia from the 1980s until 1998. Underlying the violence was appellants' organized and massive business of selling drugs, for which they stand convicted of participating in a narcotics conspiracy to distribute over 1,000 kilograms of marijuana.

---

[1] "App. Br." refers to appellants' brief. "App." refers to the appendix filed with appellants' brief. "Supp. App." refers to the supplemental appendix filed with appellee's brief. "Dkt." refers to documents on the district court docket by number.

According to evidence believed by a jury, that drug business led to an astonishing amount of violence and a seemingly complete repudiation of civil society and respect for human life. Individual appellants in this case, sometimes acting in concert, stand convicted of the murders of eleven people[.] . . . Some appellants also were convicted for numerous attempted murders, crimes of violence, and firearms offenses. All appellants were convicted for a racketeering conspiracy.

The beginning of the end of the K Street drug network came in late 1995, when the Federal Bureau of Investigation ("FBI" or "Bureau") started a comprehensive investigation into illegal drug sales in the area. . . .

The FBI's investigation lasted three years and suggested a long history of drug-dealing and an extraordinary breadth of violent acts. Crucial to the government's case was testimony from former associates of appellants and nearby residents— testimony that was undoubtedly difficult to obtain given evidence, as discussed below, that some of the appellants have a history of murdering or attempting to murder potential witnesses against them.

As pertinent to this appeal, the evidence also showed the following:

### The Murder of Anthony Fortune

Carson shot and killed Anthony Fortune in August 1991, after a dispute between Martin, Carson, and Fortune in a craps game. Carson described the killing to [James] Montgomery, recalling that he had shot Fortune and after Fortune fell Carson "went over top of him [sic] and hit him some more." A witness saw Martin and Carson earlier, and heard Martin talking about how he "didn't like Tony Fortune robbing people, and [how Fortune] would kill your mother." Later that evening, the witness saw Carson "walking towards Tony Fortune, shooting." Carson "then stood over [the] top of him and shot him."

4

*Carson*, 455 F.3d at 342. After the shooting, Carson "got into a car driven by Martin and the two drove away. Other witnesses testified that Martin and Carson bragged about shooting Fortune years later." *Martin*, 2021 WL 4989983, at *1 (internal citations omitted). Charles Bender, who was later incarcerated with Martin, testified that Martin told him that he (Martin) had killed Fortune (Supp. App. 516-517).

### The Murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson

A robbery by K Street members resulted in the triple murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson. Carson, Sweeney, and other K Street members went to Las Vegas in 1996 to see the Evander Holyfield/Mike Tyson boxing match. Carson saw Gaskins win about $50,000 in Las Vegas. Carson, Montgomery, and Sweeney discussed robbing Gaskins, hoping to get $250,000 and divide it three ways. They planned to use money from the Gaskins robbery to kill Thomas Fields and others from a nearby neighborhood on L Street.

Montgomery explained that the group conducted significant surveillance on Gaskins in Temple Hills, Maryland. Then, on the day of the attempted robbery, Sweeney brought a .40 caliber Glock firearm and a stun gun, and after further preparation, the group arrived at Gaskins's craps house. Montgomery and Sweeney jumped out of the group's van, but Coates stayed behind. Without attempting to rob Gaskins, Sweeney shot Gaskins, shot Mack, and then shot Anderson on his way out. When confronted by Montgomery as to why he started shooting everyone, Sweeney claimed that Gaskins was reaching for a weapon, which Montgomery disputed.

5

*Carson*, 455 A.3d at 344–45.

## The Murder of Robert "Butchie" Smith

K Street members sought to kill yet another government witness in 1997[.] . . . When the FBI opened its investigation in 1995, Robert Smith, one of the main suppliers of marijuana to Southwest, was immediately a focus of the Bureau's inquiry. Smith was arrested after a sting operation and agreed to cooperate, describing for the FBI his drug-related activities and several crimes of violence committed by appellant Sweeney, his relative, and Sweeney's associates. An FBI Special Agent conducting the investigation testified that Smith and the Bureau tried "to make sure that nobody on the street thought that [Smith] was cooperating." That effort proved unsuccessful. After Sweeney was arrested for the triple murders in Temple Hills, he realized, according to Montgomery's testimony, that Smith was the only person he told about the murders. Carson told Montgomery that if the group "hit [Smith], then [the government] don't have no case, but eventually, they was going to come and get us, if we don't hit" Smith. After that, Carson and Montgomery would look for Smith when they were out and about in Southwest. Although they saw him a number of times, he was never alone.

On June 16, 1997, Carson borrowed Montgomery's car. Later, Montgomery heard that Smith had been shot on Half Street, Southwest. Carson returned that evening and, after discussing the fact that Smith had been killed, told Montgomery, "man, trust me, we're all right," and returned Montgomery's car keys. Carson directed Montgomery to stay away "from up Half Street" and "not to drive" the car if he "didn't have to." Smith was shot eleven times, seven of which were in the head.

*Id.* at 346–47.

6

Smith's murder was not charged as a substantive offense in the indictment, but was included as a predicate act of the RICO conspiracy. At trial, the government introduced Smith's statements to the lead FBI investigator, Special Agent ("SA") Vincent Lisi, including information about narcotics activities in Southwest, as well as information about violent crimes committed by appellants and others, much of which Smith learned from Sweeney (Supp. App. 574-591). These included statements about the shooting of Michael Jones; the attempts to find and kill Kenneth Adams; the kidnaping and shooting of Anthony Pryor; the murder of Donnell Whitfield; and the triple murders of Gaskins, Mack, and Anderson (Supp. App. 582-591).[2]

---

[2] Lisi's testimony about Smith's statements did not provide new information about any violent crimes that had not already been provided by other witnesses, but it did corroborate details of other witnesses' testimony. On direct appeal, this Court rejected hearsay and Confrontation Clause challenges to the admission of Smith's statements. *Carson*, 455 F.3d at 362-367.

## The Trial Court's Review of
## *Brady*, *Giglio*, and Jencks Act Requests

Both before and during trial, "[appellants'] counsel repeatedly requested *Brady*, *Giglio*, and Jencks Act[3] materials from the government." *Martin*, 2022 WL 1618869, at *3. Due to security concerns, "the government turned over disputed material either in redacted form or by filing it with the trial court under seal." *Id.*

Sweeney, for example, filed several pretrial motions to compel discovery of statements and information pertaining to government cooperator James Montgomery and Robert "Butchie" Smith (App. 576; Supp. App. 001, 021). Carson similarly moved for disclosure of exculpatory and impeachment evidence related to Montgomery (App. 603). Following a motions hearing on June 16, 2000, the district court reviewed the government's investigative file of Montgomery and ordered disclosure of specific *Brady* material pertaining to the Maryland triple murders (Supp. App. 019-020).

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); Jencks Act, 18 U.S.C. § 3500.

8

At a subsequent pretrial hearing, on September 27, 2000, the trial court ordered the government to turn over all *Brady* and *Giglio* information pertaining to Smith (Supp. App. 290-295).[4] Appellants' counsel complained that they had been given redacted copies of the FBI 302 reports, and asked the court to review in camera the unredacted versions of those reports and all other written statements in the government's possession (Supp. App. 296-298, 301). The court agreed to do so (Supp. App. 298, 301-302). Over the following weeks, the government filed disclosures in accordance with the trial court's order (Supp. App. 035-077).[5]

During trial, the court routinely reviewed documents in the government's possession for potential *Brady* and Jencks Act material at appellants' request. Before the government's first witness, SA Lisi, took the stand, defense counsel complained that they had received his grand

_____

[4] In a written order issued the following day, the court specified that the government was to "disclose any and all evidence in its possession which may impeach the out-of-court statements of Smith . . . or may indicate that persons other than defendants attempted or had reason to murder Smith" (Supp. App. 030-031).

[5] The government also made pretrial *Brady* disclosures regarding the murders of Maurice Hallman, Leonard Hyson, Teresa Thomas, Terita Lucas, and Timothy Benton (Supp. App. 013-017).

jury testimony and FBI 302 reports with redactions (Supp. App. 305-312). Sweeney's counsel suggested that the court "conduct a full in camera evaluation" of all grand jury testimony and 302 reports and place those documents under seal (App. 181-182). The court agreed to do so, noting that the Jencks Act "requires it" (App. 183).

On March 12, 2001, Carson filed another motion for production of documents containing alleged *Brady* and Jencks Act information related to James Montgomery (Supp. App. 078). Carson requested that, in the alternative, the court conduct a second ex parte review of the material to determine if it contained impeachment evidence (Supp. App. 082-083). The court did so and determined that all of SA Lisi's FBI 302 reports documenting Montgomery's statements constituted Jencks Act material (Supp. App. 426-427). The court permitted the government to redact certain information raising "security concerns" before turning the material over to the defense (Supp. App. 427-428).[6]

---

[6] The trial court also reviewed Lisi's notes of interviews with Montgomery, and determined that they contained neither *Brady* nor Jencks Act material (App. 321-322).

On April 4, 2001, defense counsel requested that the court review the FBI 302 reports related to Charles Bender for *Brady* and Jencks Act material (Supp. App. 518). The court agreed to do so, noting, "Some 302's, in my judgement, are Jencks material. Some are not." (Supp. App. 519.) The following day, the court indicated that nothing in the 302s was inconsistent with Bender's trial testimony or otherwise required disclosure (Supp. App. 526-527). At Sweeney's request, the court placed the documents under seal and made them part of the record (Supp. App. 527).

A few days later, during the testimony of government cooperator Eugene Byars, the defense again requested that "the same process on any FBI 302s be employed that we've used in the past[,] that the court conduct an in camera review" (Supp. App. 534). The court again did as requested (Supp. App. 534-535).

The court twice reviewed in camera the January 27, 1999, FBI 302 report related to Arthur Rice (App. 469; Supp. App. 543). The court found "nothing in it to permit it to be characterized as *Brady* material," and ruled that "it [wa]s clearly not a Jencks Act statement" (App. 469). Appellants did not challenge this ruling.

11

Over the course of the trial, the court assigned exhibit numbers to the sealed documents and kept an exhibit list detailing when each document was marked and placed under seal (Supp. App. 123). At no point during trial did appellants raise any objection to the district court's in-camera-review procedure.

### Post-Conviction Proceedings

During the pendency of appellants' direct appeals, Sweeney filed a motion in this Court to review all sealed portions of the trial record to support an argument that the district court erred in ruling that the sealed materials did not contain Jencks or *Brady* information (Supp. App. 090). On October 2, 2002, this Court denied the motion, explaining that it would "undertake its own in camera review of the materials in dispute" if Carson were to identify on appeal "specific evidentiary rulings of the district court [he] claim[ed] were erroneous" (*id.*).

On May 29, 2003, Sweeney, joined by the other appellants, filed another motion asking this Court to review the sealed materials, this time identifying "thirteen sets of sealed materials, explain[ing] their suspicions, and t[ying] those suspicions to suspected *Brady*, *Giglio*, or Jencks Act violations." *See Martin*, 2022 WL 1618869, at *3 (citing

12

*Carson*, No. 02-3015 (D.C. Cir. May 29, 2003) (Doc. No. 751872)); Supp. App. 092-108. Appellants highlighted materials relating to numerous government witnesses, including SA Lisi, Robert Smith, Reginald Switzer, Andre Murray, Theodore Watson, Charles Bender, James Montgomery, Arthur Rice, Paul Franklin and others (Supp. App. 092-108). On August 28, 2003, this Court again rejected the request, reiterating that appellants would not be permitted to review the material themselves but that the Court would undertake an in camera review if appellants presented "a colorable claim" of a *Brady* or Jencks Act violation (App. 750). The Court advised that "[a]ny future arguments concerning the district court's application of *Brady* and/or the Jencks Act should be presented in the appellants' brief, rather than by motion" (*id.*).

On appeal, appellants did not assert substantive *Brady* or Jencks Act claims related to the sealed material; instead, they alleged belated disclosures related to Charlene Wilson and James Montgomery, and raised a judicial-bias claim that challenged, among other things, the district court's rulings regarding the "timing of disclosure of exculpatory material under *Brady* . . . and of witness statements to the government under the Jencks Act." *Carson*, 455 F.3d at 355.

13

On July 21, 2006, this Court affirmed appellants' convictions. *Carson,* 455 F.3d at 336. The Court subsequently denied appellants' petition for rehearing or rehearing en banc. On February 20, 2007, the Supreme Court denied appellants' petitions for a writ of certiorari. *Carson v. United States*, 549 U.S. 1246 (2007).

On February 13, 2008, Sweeney, through counsel, filed a motion in the district court for access to the sealed trial material (Supp. App. 111-114). On February 15, 2008, the Honorable Thomas Hogan granted Sweeney's motion and ordered the clerk's office to provide "copies of any necessary sealed pleadings in this matter" to counsel for Sweeney (Supp. App. 116). "The remaining defendants indicated that they received access to these materials at that time." *Martin*, 2021 WL 4989983, at *2 (citing ECF No. 1170 at 9 n.6 (stating that the records were "turned over by the clerk in 2008")); *see also* App. 1295 at n.5 (listing documents that were placed under seal "and discovered by 2255 counsel in 2008"). Between February 18 and 28, 2008, appellants filed motions to vacate their convictions pursuant to 28 U.S.C. § 2255 (App. 951, 968, 985, 991).

Between 2010 and 2013, appellants sought extensions of time in which to file supplements to their respective § 2255 motions (see, eg., Dkt.

14

1062, 1065, 1067, 1080, 1096, 1101, 1114), which the district court granted (Supp. App. 117-119; Dkt. 1073, 1074, 1097, 1103, 1115). At a status hearing on August 29, 2013, defense counsel requested an additional nine months to file any supplements to their original § 2255 motions (Supp. App. 655-657). The court ordered supplements to be filed by May 29, 2014 (App. 128; Dkt. 1122). Subsequently, the Court granted appellants several additional motions for extension of time (see, e.g., Dkt. 1128, 1137, 1148, 1149).

Between November 2014 and June 2017, appellants filed supplements to their original § 2255 motions (App. 1069, 1155, 1289, 1462, 1466, 1469, 1518, 1564). At a status hearing on August 3, 2018, counsel for Martin indicated his intention to file additional supplements (Supp. App. 660). Carson filed supplements to his § 2255 motion on October 28 and 31, 2018 (Supp. App. 124, 133). Coates filed a motion to join Carson's supplement on October 30, 2018 (Dkt. 1228). Sweeney filed a supplemental § 2255 motion on October 31, 2018 (App. 1648). Martin filed a supplement to his § 2255 motion on November 21, 2018 (App. 1651).

15

*Appellants' § 2255 Claims*

Appellants' initial § 2255 motions and numerous supplemental motions raised "nearly ninety claims" "alleging government misconduct, ineffective assistance of counsel, and unconstitutional sentences." *Martin*, 2021 WL 4989983, *1. Below we summarize those claims that are pertinent to the instant appeal.

### 1.    William Sweeney

On February 19, 2008, Sweeney, through counsel Jenifer Wicks, timely filed a § 2255 motion that raised 17 claims alleging ineffective assistance of trial and appellate counsel, trial-court error, and government misconduct (App. 951). As relevant here, Sweeney claimed, inter alia, that:

(1) his appellate counsel was ineffective in failing "to note sections of sealed matters for [this] Court to review and to cite authority for those requests, in contradiction of the Circuit's direct order (October 2, 2002), although such authority had been provided in the joint co-appellants' motion" (App. 962), and

(2) the government had engaged in misconduct by (a) failing to disclose impeachment information regarding James Montgomery,

16

namely the government's assessment that Montgomery had previously testified unreliably by implicating Carson in a murder for which Steven DeWitt was convicted in D.C. Superior Court; (b) "procuring Arthur Rice's testimony by misrepresentation" and obtaining Montgomery's testimony "after he lied and violated previous plea agreements"; and (c) "procuring 'jailhouse' confessions" in violation of Sweeney's Sixth Amendment rights (App. 966-967).

In addition, Sweeney generally asserted that "the prosecutors engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure and late disclosure of *Brady* information and the use of perjured testimony" (App. 966). Sweeney noted that his counsel "need[ed] further investigation" to support this belief (*id.*).

Over six years later, on November 28, 2014, Sweeney, through new § 2255 counsel, filed a supplement to his original § 2255 motion (App. 1069). In pertinent part, Sweeney claimed that the government violated *Brady*/*Giglio* by failing to disclose information that was sealed during the

17

trial but was later released to appellants pursuant to the district court's February 15, 2008, order, including the following:

(1) impeachment information about cooperating witness Theodore Watson that was contained in Watson's prosecution file from another jurisdiction (App. 1079-1092);

(2) statements by James Montgomery to SA Lisi implicating Carson in the murder of Timothy Benton (App. 1092-1093);

(3) statements by cooperating witness Charles Bender that appellant Martin confessed to the 1991 murder of Anthony Fortune (App. 1093-1094);

(4) statements by cooperating witness Arthur Rice that he was present when Martin and Carson killed Leonard Hyson and Maurice Hallman, contradicting Montgomery's trial testimony that he (Montgomery) and Carson had killed Hallman and Hyson (App. 1094-1095);

(5) statements by cooperating witness Andre Murray that Petey Johnson killed Robert "Butchie" Smith in 1997 to get back at Sweeney for allegedly killing Petey's brother, Keith Johnson (App. 1095-1096); and

18

(6) information that others had a motive to kill, or were thought to

have killed, Smith (App. 1096-1112). In support of this claim,

Sweeney noted that in a pleading entitled, "Government's Ex Parte

Notice to the Court Regarding Change in Location of Confinement

of Above-Named Defendants," filed under seal on April 2, 1999

(App. 1248), the government represented that it had identified

Andre Chappelle and Anthony Hawkins as suspects in Smith's

murder.[7]

---

[7] The notice described in detail the security concerns, particularly appellants' history of murdering and intimidating witnesses, that gave rise to the movement of appellants from the D.C. jail to the Northern Neck Regional Jail in Warsaw, Virginia, following their arraignment (App. 1248-1249). Smith's murder was among the incidents recounted (App. 1259-1260).

Years after Sweeney filed his first supplemental § 2255 motion, on November 9, 2019, Sweeney filed a motion for discovery, seeking further information about Chappelle and Hawkins (Supp. App. 127-130). The district court did not rule on this motion before rejecting Sweeney's supplemental claims as untimely. The government currently is in the process of providing appellants' counsel material supporting its early theory that Chappelle and Hawkins were suspects in Smith's murder. This follows an extensive review of the government's trial file. Because the available file appears to be incomplete, the government has been unable to ascertain whether this material was previously provided to the defense.

Sweeney further claimed that his trial counsel was ineffective in failing to object to the trial court's in camera review of the sealed materials (App. 1147-1148). Relatedly, Sweeney argued that his appellate counsel was ineffective in failing to highlight portions of the sealed material for this Court to review on direct appeal (App. 1123-1125), and for failing to challenge the trial court's ultimate rulings regarding the material related to James Montgomery, Arthur Rice, and Andre Murray (App. 1130-1135).[8]

### 2.    Samuel Carson

On February 28, 2008, Carson's pro se § 2255 motion was docketed by the district court (App. 985). The motion stated three claims: (1) "The Petitioner Was Deprived His Sixth Amendment Right to Effective Assistance of Counsel" due to "A) Failure to Investigate[, and] B) Failure to Object to Inadmissible Evidence"; (2) "Sentence Imposed in Violation of The United States Constitution"; and (3) "Newly Discovered Evidence

---

[8] On February 25, 2015, Sweeney filed a second supplemental § 2255 motion raising, for the most part, the same claims that he raised in his November 28, 2014, supplemental motion (Dkt. 1164-1). On October 31, 2018, Sweeney filed a third supplemental motion, raising claims that are not relevant to the instant appeal (App. 1648).

Establishes That The Petitioner Was Denied his Fifth Amendment Right to Due Process" (App. 988). Carson referred to an "Attached Memorandum of Law and Facts" (*id.*); however, no such document was attached to his pro se motion, nor was one ever produced during the course of the § 2255 proceedings in the district court.

On April 9, 2015, Carson, through counsel, filed a supplement to his § 2255 motion (App. 1289), raising in relevant part the following claims:

(1) The government violated *Brady/Giglio* by failing to disclose documents that were filed with and/or submitted to the trial court under seal before and during trial. Carson acknowledged that these documents were made available to the defense by then-Chief Judge Hogan's February 15, 2008, order (App. 1298-1308)[9];

---

[9] Like Sweeney, Carson relied on the following documents: 1) the government's "Ex Parte Notice to Change Confinement" of appellants, identifying Andre Chappelle and Anthony Hawkins as suspects in the Robert Smith murder; 2) interview notes of Andre Murray, wherein Murray repeated a rumor that Petey Johnson (a.k.a "Fat Petey") was believed to have killed Smith; 3) interview notes that James Montgomery had originally told SA Lisi that Carson killed Timothy Benton; 4) FBI 302 reports noting that Charles Bender indicated that Martin had killed Anthony Fortune; 5) notes that Charles Bender told law enforcement that "Art" killed Steve Dunbar; and 6) the Theodore Watson case file from an unrelated Maryland case, in which Watson allegedly admitted to a prosecutor that he had lied in the past (App. 1298-1308).

21

(2) The government engaged in misconduct by paying benefits to John Pinkney and Cheree Owens, witnesses who testified in a Maryland grand jury about the 1996 triple murder, "in a manner designed to encourage them to improve their testimony" and facilitate their "disappearance," and by failing to disclose the payments to the defense (App. 1309-1316);

(3) Trial counsel were ineffective for failing to zealously represent Carson because of an alleged conflict between counsel and the trial judge (App. 1318-1324). In an affidavit attached to Carson's motion, trial counsel Lexi Negin-Christ averred that she and her co-counsel faced "insurmountable" judicial bias which prevented them from, inter alia, "effectively cross-examin[ing] witnesses, respond[ing] to late *Brady* disclosures[,] . . . [and] mak[ing] effective strategic decisions" (App. 1425). She claimed that their desire to "appease" the judge caused them to render ineffective assistance to Carson (App. 1427);

(4) Trial counsel was ineffective in failing to object to the trial court's in-camera-inspection procedure for reviewing alleged *Brady* material (App. 1330); and

(5) Appellate counsel was ineffective in failing to seek appellate review of the trial court's rulings regarding the sealed material (App. 1331).[10]

On October 28, 2018, Carson filed a pleading requesting that the district court consider *Napue v. United States*, 360 U.S. 264 (1959), when assessing the issues raised in his previous filings (Supp. App. 133).

### 3.    Sean Coates

On February 19, 2008, Coates, through counsel, timely filed a § 2255 motion (App. 991), raising, inter alia, the following claims:

(1) the government violated *Brady* by allegedly withholding information about James Montgomery's credibility, specifically that Montgomery had accused Carson or Sweeney of a murder for which Steven DeWitt had been convicted (App. 994, 1040);

(2) appellate counsel was ineffective in failing to "obey" this Court's order regarding sealed portions of the trial record, namely its directive to "identify the specific rulings" appellants' believed were

---

[10] On June 24, 2016, and June 14, 2017, Carson filed supplemental § 2255 motions challenging his convictions under 18 U.S.C. § 924(c) in light of *Johnson v. United States*, 135 S. Ct. 2551 (2015) (App. 1466; Dkt. 1192). That claim is not at issue in this appeal.

23

erroneous, and for failing to raise on appeal a claim of ineffective assistance of trial counsel (App. 1035-1036).[11]

### 4.    Jerome Martin

On February 18, 2008, Martin timely filed a pro se § 2255 motion (App. 934). Martin claimed, inter alia, that:

(1)   the government violated *Brady* by withholding exculpatory evidence regarding the 1991 killing of Anthony Fortune; i.e., that an eyewitness, Steven Thomas, was interviewed by the police and purportedly described the shooter as someone other than Martin and Carson (App. 939, 941-944); and

(2)   the government impeded Martin's ability to call shooting victim James Coulter as a witness by falsely representing to the district court that Coulter could not be found or was possibly deceased (App. 939-940, 944-945).[12]

---

[11] Coates filed pro se supplemental § 2255 motions on February 24, 2015 (App. 1155), and June 27, 2016 (App. 1469), raising new claims. Those claims are not at issue in this appeal.

[12] On June 23, 2016, Martin filed a supplement to his § 2255 motion, raising a claim under *Johnson*, 135 S. Ct. at 2551 (App. 1462). This claim is not raised in the instant appeal. On November 21, 2018, Martin filed a second supplemental motion in which he provided additional detail and

(continued . . . )

All appellants moved to adopt or join the § 2255 claims raised by their co-appellants (App. 1044, 1291, 1331; Supp. App. 124; Dkt. 1279 (Carson); App. 1471 (Coates); App. 1650, 1071 n.4 (Sweeney); App. 1651 (Martin)).

### *The Government's Omnibus Opposition*

On March 18, 2020, the government filed an omnibus opposition to appellants' § 2255 motions (Supp. App. 135). The government argued that appellants' claims were procedurally barred, time barred, or otherwise meritless (*id.*). As to the issues raised in the instant appeal, the government responded as follows.

### 1.    William Sweeney

Regarding Sweeney's claim that his appellate counsel (who was also trial counsel) failed to note sections of sealed material for this Court to review, the government argued that this claim was meritless because appellate counsel did just that (Supp. App. 195). During the direct appeal, Sweeney's appellate counsel filed a motion in this Court seeking permission to review all sealed portions of the trial record (Supp. App.

---

argument pertaining to his two original claims about the murder of Anthony Fortune and the shooting of James Coulter (App. 1651). Martin also raised three new claims, none of which are at issue here.

25

196). When that motion was denied on grounds that Sweeney had not made a "colorable claim" that the material he wished to review contained evidence favorable to him, Sweeney's appellate counsel tried again. In a joint, 17-page "Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record" (Supp. App. 092-108), appellate counsel alleged that the government had suppressed *Brady* information, and specifically sought materials relating to numerous government witnesses, including SA Lisi, Robert "Butchie" Smith, Reginald Switzer, Andre Murray, Theodore Watson, Charles Bender, James Montgomery, Arthur Rice, and others (*id.*).

On August 28, 2003, this Court denied the joint motion, ruling that the appellants "must identify the specific rulings that they believe are erroneous" and instructing that any "future arguments concerning the district court's application of *Brady* and/or the Jencks Act should be presented in the appellants' brief, rather than by motion" (App. 750). Although, on direct appeal, none of the appellants challenged the trial court's rulings on the sealed materials, they incorporated a challenge to the court's *Brady* rulings in their claim of judicial bias. *See Carson*, 455 F.3d at 355 ("appellants object to discrete allegedly biased rulings by the

26

trial judge which (1) set the timing of disclosure of exculpatory material under *Brady*, . . . and of witness statements under the Jencks Act").

Based on this record, the government argued that Sweeney's complaint about his appellate counsel's performance was unfounded because counsel filed pleadings and advanced arguments seeking to unseal specific matters reviewed by the trial court; he simply was unsuccessful (Supp. App. 197).

The government argued that Sweeney's claims alleging the suppression of *Brady* information about James Montgomery and Arthur Rice were procedurally barred because Sweeney failed to raise them on direct appeal and had not established cause and prejudice to excuse his procedural default (Supp. App. 205). Regarding the alleged *Brady* information pertaining to Montgomery—namely, that the government had found unreliable Montgomery's testimony in a D.C. Superior Court case, *United States v. Steven Dewitt*,[13] No. 1991 FEL 5548—the

---

[13] Dewitt, who was convicted of murdering Paul Ridley (in a case unrelated to the K Street investigation), pursued a claim under the District of Columbia's Innocence Protection Act, D.C. Code § 22-4135, asserting that he was innocent because Samuel Carson was in fact the culprit (Supp. App. 205). At an evidentiary hearing on DeWitt's claim, Montgomery testified that Carson had admitted to him that he had killed

(continued . . .)

27

government argued that this information was available to Sweeney in 2004, during his direct appeal (Supp. App. 206). As to Sweeney's claim that the government engaged in misconduct by obtaining Rice's testimony "by any means necessary," the government asserted that summary denial was appropriate because this claim was vague and conclusory (Supp. App. 207).

As to the claims raised in Sweeney's first and second supplemental motions, filed on November 28, 2014, and February 25, 2015, respectively, the government asserted that they were untimely under 28 U.S.C. § 2255(f) and did not relate back to any timely filed claims (Supp. App. 208). Because those claims were based upon materials that were unsealed by then-Chief Judge Hogan on February 15, 2008, they were time barred as of February 15, 2009 (*id.*).[14]

---

Ridley (Supp. App. 206). In granting DeWitt's motion in 2004, the Superior Court noted that the government "sought to undermine" Montgomery's testimony at the hearing (*id.*).

[14] In reply, Sweeney submitted an affidavit of post-conviction counsel Jenifer Wicks, who asserted that despite her efforts to obtain the unsealed material from the clerk's office between February 2008 and June 2010, she did not gain access to the material until June 17, 2010 (App. 1689-1690).

## 2.   Samuel Carson

The government argued that Carson's original pro se motion was untimely,[15] and meritless in any event because it was vague and conclusory (Supp. App. 214-215). Even if deemed timely and liberally construed as a "placeholder § 2255 motion," the government argued, most of Carson's claims nevertheless failed because, with the possible exception of one claim, none of the later-raised claims related back to the "placeholder" claims (Supp. App. 215-216).

The one possible exception—Carson's supplemental claim alleging the discovery of "new evidence" that the government had paid for and facilitated the "disappearance" of John Pinkney and Cheree Owens—was nonetheless meritless (Supp. App. 217-218). The government noted that the "new evidence" proffered by Carson was a May 29, 2014, interview of Owens by Carson's § 2255 counsel and an investigator, Dale Vaughan. During that interview, Owens purportedly stated that the FBI had

---

[15] The government asserted that the motion, which was docketed by the district court on February 28, 2008, was untimely under the "prisoner mailbox rule" because although Carson's motion was signed on February 18, 2008, there was no evidence as to when he placed it in the prison mail system (Supp. App. 214-215).

"moved her and Mr. Pinkney to numerous locations and paid them money after the testimony in the Prince George's County Grand Jury relating to the triple murder" (Supp. App. 217 (citing Dkt. 1132, at 2)). Owens refused to sign an affidavit. Vaughan apparently executed an affidavit, but that affidavit was not attached to Carson's April 9, 2015, supplemental motion (Supp. App. 217).

The government argued that although this claim was timely under 28 U.S.C. § 2255(f)(4) because it was filed within one year of the discovery of the evidence, the claim was meritless because (1) Carson had not substantiated it with an affidavit from Vaughan or Owens; (2) Carson's assertion that the government had made Pinkney and Owens "disappear" was a "mischaracterization" of Owens's alleged statements and failed to take into account that other reasons, such as witness safety, might have motivated the payments; (3) as the district court had previously noted, the government was not required to disclose *Giglio* information regarding Pinkney and Owens because they did not testify at appellants' trial; and (4) the evidence of Carson's guilt in the triple murder was strong, and therefore Carson could not establish that the "new evidence" was material (Supp. App. 218).

30

The government argued that Carson's remaining supplementary claims were untimely (Supp. App. 218-220). For example, his claims of ineffective assistance of trial and appellate counsel should have been filed on or before February 20, 2008 (Supp. App. 219). Similarly, his *Brady*/*Giglio* claims were "time-barred by a number of years" because the sealed documents upon which they were based were provided to the defense pursuant to then-Chief Judge Hogan's February 15, 2008, order; thus, they should have been raised by February 15, 2009 (Supp. App. 216-217).

### 3.    Sean Coates

The government argued that Coates's *Brady* claim regarding Montgomery's testimony in the Steven Dewitt case (the same claim raised by Sweeney) was procedurally barred and meritless for the same reasons as Sweeney's motion (Supp. App. 226).

As to Coates's claim that his appellate counsel rendered ineffective assistance by "fail[ing] to obey [this Court's] order relating to sealed portions of the record," the government argued that this claim was meritless because appellate counsel had in fact challenged the trial

court's response to the *Brady* and Jencks Act requests, and, in any event, Coates had failed to demonstrate prejudice (Supp. App. 229-230).

### 4. Jerome Martin

The government argued that Martin's *Brady* claim regarding Steven Thomas's statements and his claim alleging government misrepresentation of James Coulter's whereabouts were procedurally barred and meritless (Supp. App. 235-246).[16] The remainder of Martin's claims were untimely or meritless (Supp. App. 246-247).

### *The District Court's Ruling*

The district court rejected all of appellants' § 2255 claims on the basis that they were "time-barred, procedurally defaulted, conclusory, or meritless." *Martin*, 2021 WL 4989983, at *26. In so concluding, the court examined each appellant's claims in turn.

---

[16] On the merits, the government noted that the information was not exculpatory; contrary to Martin's assertion, Thomas did not tell police that he saw Fortune's murderer, or describe the assailant (Supp. App. 237). Further, the government did not "thwart the defense's ability to call Coulter as a witness"; Coulter was accessible to the defense, as Martin's counsel's acknowledged that she had information that he was "on the street" (Supp. App. 244). In any event, the government argued, Martin could not show prejudice (Supp. App. 238-241, 246).

### 1. William Sweeney

The district court found that the claims raised in Sweeney's first § 2255 motion were procedurally defaulted because he failed to raise them on direct appeal and had not shown cause and prejudice to excuse his default. *Martin,* 2021 WL 4989983, at \*9.

The district court declined to consider the government-misconduct claims raised in Sweeney's supplemental § 2255 motions because they were "untimely by several years." *Martin*, 2021 WL 4989983, at \*8. Among those claims were those alleging *Brady* and *Giglio* violations based on the government's alleged nondisclosure of documents it had submitted to the trial court for in camera review (*e.g.*, statements of James Montgomery about the Timothy Benton murder; the prosecution file on Theodore Watson from another jurisdiction; statements of Charles Bender regarding the Fortune murder; statements of Arthur Rice; statements of Andre Murray about Robert Smith's killer; and information indicating that others had a motive to kill Smith). *Id.* at \*8. The court explained: even "assum[ing] that Sweeney's prior counsel could not access the previously sealed evidence at issue until June 17, 2010,

Sweeney had until June 17, 2011 to raise new claims. Because he filed these new claims years after that date, they are untimely." *Id.*

Sweeney's supplemental ineffective-assistance-of-counsel claims were likewise time-barred. *Martin*, 2021 WL 4989983, at *13. Those claims included Sweeney's challenges to appellate counsel's failure to seek review of the sealed material related to James Montgomery, Arthur Rice, Andre Murray, and Charles Bender. *Id.*

The district court rejected on the merits Sweeney's claim that his appellate counsel was ineffective in failing to note specific sections of the sealed materials for this Court to review on direct appeal. *Martin*, 2021 WL 4989983, at *18. Noting that Sweeney "misrepresent[ed] the record," the court found that appellate counsel had in fact moved this Court to review the materials at issue but had simply lost the motion. *Id.*[17]

---

[17] In denying a COA, the district court added to its analysis of this claim. The court concluded that Sweeney's appellate counsel did not perform deficiently by failing to present *Brady* claims based on the sealed material, because, in filing appellants' 200-page brief raising "detailed constitutional and evidentiary arguments," "[a]ppellate counsel may have determined that other claims had a better chance of success." *Martin*, 2022 WL 1618869, at *13. Because "[n]othing on the record or in defendants' briefing show[ed] that no 'sound strategy' supported counsel's decision to leave out this argument," Sweeney's claim lacked merit. *Id.*

## 2.    Samuel Carson

The district court summarily denied the "bare-bones" claims raised in Carson's first, pro se § 2255 motion because Carson "offered no factual support for these claims." *Martin*, 2021 WL 4989983, at *6.[18]

As to the claims raised in Carson's 2015 supplemental motion, the court ruled, in pertinent part, that those claims were time-barred or meritless. The court declined to consider the allegation that the government violated *Brady* by failing to disclose documents that it had submitted to the trial court for in camera review. *Martin*, 2021 WL 4989983, at *7. The district court noted that then-Chief Judge Hogan had unsealed those documents on February 15, 2008, and that "Carson acknowledged that, in 2008, he had access to these records." *Id.* (citing ECF No. 1170 at 9 n.6). Thus, the court reasoned, "[u]nder § 2255(f)(4), Carson could raise claims based on this newly discovered evidence until February 15, 2009." *Id.* Because Carson raised this claim in 2015, "years after the statutory deadline," it was time-barred. *Id.* Further, the court

---

[18] Because it denied the motion on this basis, the district court did not decide whether the motion was untimely under the "prisoner mailbox rule." *Martin*, 2021 WL 4989983, at *6 n.4.

35

found that it did not relate back to Carson's original claim alleging newly discovered evidence because the original claim "lacked any detail." *Id.*

However, the same could not be said for Carson's *Brady* claim alleging nondisclosure of government payments to Cheree Owens and John Pinkney. *Martin*, 2021 WL 4989983, at \*7. The district court concluded that this claim was "neither time-barred nor procedurally defaulted." *Id.*[19] Nonetheless, the court rejected it on its merits. *Id.* The court noted that because Owens and Pinkney did not testify at appellants' trial, the government was only required to disclose *Brady* material. *Id.* The court found that the government had complied with its *Brady* obligations by disclosing: "(1) Owens's and [Pinkney's] testimony that someone other than Carson killed the three victims; (2) the relocation payments to Owens and [Pinkney]; and (3) the fact that [Pinkney] and Owens absconded with the government's money." *Id.* (citing ECF No. 1124 at 7) (alteration in original).

---

[19] The court explained that Carson raised this claim within one year of discovering the evidence (i.e., Owens's May 29, 2014, statements to Carson's investigator). *Martin*, 2021 WL 4989983, at \*7.

As to Carson's claims that trial and appellate counsel were ineffective in failing to challenge the trial court's review of the sealed material, the district court found that these claims were time-barred and did not relate back to any timely claims. *Martin*, 2021 WL 4989983, at *12.

### 3.    Sean Coates

The district court rejected the government-misconduct claims raised in Coates's first § 2255 motion on the basis that they were procedurally defaulted, unexcused by a valid showing of cause and prejudice. *Martin*, 2021 WL 4989983, at *10.

As with Sweeney's claim challenging his appellate counsel's alleged failure to identify specific portions of the sealed material for this Court to review, the district court denied Coates's analogous claim for the same reason: during the direct appeal, counsel had in fact challenged the trial court's rulings on the sealed materials. *Martin*, 2021 WL 4989983, at *22.

### 4.    Jerome Martin

The district court ruled that Martin's *Brady* claim alleging that the government withheld Steven Thomas's statements about the Fortune murder was procedurally barred and meritless, and that his due process

37

claim alleging that the government had prevented Coulter from appearing as a witness was also procedurally barred. *Martin*, 2021 WL 4989983, at *5-6. The court found that Martin had failed to establish either cause or prejudice to overcome his procedural default. *Id.*

## SUMMARY OF ARGUMENT

The district court did not err in denying appellants' 28 U.S.C. § 2255 motions. The court correctly found that appellants' government-misconduct claims were procedurally barred, untimely, or meritless. Sweeney, Coates, and Martin procedurally defaulted their initial, timely claims of government misconduct, and did not establish cause and prejudice to excuse their failure to raise those claims on direct appeal.

Appellants' supplemental misconduct claims were barred by § 2255(f)'s statute of limitations because they were filed years after the one-year limitations period had expired. And because they did not "arise from the same core facts as the timely filed claims," but instead "depend[ed] on events separate in 'both time and type' from the originally raised episodes," *see Mayle v. Felix*, 545 U.S. 644, 659 (2005), the later-raised claims did not relate back to the original claims. Nor did those supplemental claims merit an extension of the limitations period under

38

§ 2255(f)(4)'s exception for newly discovered evidence, because appellants failed to exercise due diligence in pursuing them. Even assuming subsection (f)(4) allowed for additional tolling, appellants' supplemental motions were nonetheless untimely because they were filed long after the extended deadline.

Further, as the district court correctly found, appellants were not entitled to equitable tolling of the limitations period because they failed to demonstrate that they pursued their rights diligently and that some "extraordinary circumstance" beyond their control prevented timely filing. *See United States v. Cicero*, 214 F.3d 199, 203 (D.C. Cir. 2000). In any event, even if they were not procedurally barred or untimely, appellants' government-misconduct claims were meritless.

This Court should decline to consider appellants' claim that the trial court erred by reviewing submissions in camera and placing them under seal, because this claim is not within the scope of the COA. In any event, the claim is procedurally barred, time barred, and meritless. Appellants failed to raise this challenge on direct appeal despite being aware of the factual basis for the claim, and raised it only after § 2255(f)(1)'s statute of limitations had expired. On its merits, this claim

39

fails because the trial court followed the appropriate procedures for review of alleged *Brady* and Jencks Act material, and any error was invited.

The district court did not err in rejecting appellants' challenges to appellate counsel's representation. Because appellants did not establish either deficient performance or prejudice arising from their counsel's failure to challenge the district court's evidentiary rulings regarding the sealed material, appellants failed to carry their burden under *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Finally, Carson's claim of ineffective assistance of trial counsel is also outside the scope of the COA, and therefore not properly before this Court. In any event, this claim is untimely and meritless. Carson did not allege that his trial counsel labored under a conflict of interest until more than seven years after the February 20, 2008, deadline for filing his § 2255 motion. Even if it were timely, this claim must fail because, under this Court's precedent, Carson cannot show an actual conflict of interest that adversely affected his counsel's performance. Nor can he show that any perceived conflict caused his counsel's performance to fall below

"prevailing professional norms" or resulted in *Strickland* prejudice. 466 U.S. at 688.

## ARGUMENT

### I. Appellants' Claims of Government Misconduct Were Procedurally Barred, Untimely, or Meritless.

Appellants' "Statement of the Case" is filled with sweeping allegations of government misconduct and unsupported assertions that the government "engaged in a deliberate pattern of withholding and sealing substantial information, including *Brady/Giglio* and Jencks Act material" relating to nearly every cooperating witness (App. Br. 8). In their "Argument" section, however, appellants brief only a subset of those claims. We address those below.[20] For the reasons discussed infra, the district court properly rejected those claims as procedurally barred, untimely, or meritless.

---

[20] This Court has made clear that "it will not address an 'asserted but unanalyzed' argument." *S.E.C. v. Banner Fund Intern.*, 211 F.3d 602, 613-14 (D.C. Cir. 2000). Appellants have forfeited those arguments that they have raised in "less than half-hearted" fashion, as those "fleeting passage[s]" are "insufficient to put [their] objection[s] before this [C]ourt." *Id.* at 613-614; see also Fed. R. App. P. 28(a)(8).

### A.     Standard of Review and Legal Principles

### 1.     § 2255 Principles

Under 28 U.S.C. § 2255, a defendant may move the sentencing court to vacate, set aside, or correct its sentence if the defendant believes that his sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") enacted a one-year period of limitations on the filing of § 2255 motions. Under AEDPA, "the limitation period shall run from the latest of," inter alia, "the date on which the judgment of conviction becomes final," 28 U.S.C. § 2255(f)(1), or "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4).

Claims that are untimely may be considered if they "relate back" to timely filed claims. Federal Rule of Civil Procedure 15 prescribes the manner in which civil pleadings, like § 2255 motions, may be amended and supplemented. *See United States v. Hicks*, 283 F.3d 380, 386 (D.C.

42

Cir. 2002) (holding that a §2255 motion may be amended under the terms of Rule 15); *see also Mayle*, 545 U.S. at 655 (applying Rule 15 in the §2254 context). "An amendment of a pleading relates back to the date of the original pleading when . . . the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . ." Fed. R. Civ. P. 15(c)(2). "[I]n the habeas corpus context, the Rule 15 'relation back' provision is to be strictly construed, in light of 'Congress' decision to expedite collateral attacks by placing stringent time restrictions on [them].'" *See United States v. Ciampi*, 419 F.3d 20, 23 (1st Cir. 2005) (quoting *Mayle*, 545 U.S. at 125); *United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000) (cautioning that overly broad application of Rule 15(c) "would be tantamount to judicial rescission of AEDPA's statute of limitations period").

"An amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit for filing pleadings) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle*, 545 U.S. at 650. Hence, claims raised in an amendment to a § 2255 motion will be

43

considered timely "only [if] the claims added . . . arise from the same core facts as the timely filed claims, and not [if] the new claims depend on events separate in 'both time and type' from the originally raised episodes." *Id.* at 659.

Where a defendant fails to raise an available challenge on direct appeal, he is procedurally barred from raising that claim in a subsequent collateral attack unless he shows cause for his failure to do so and prejudice as a result of the alleged error. *Bousley v. United States*, 523 U.S. 614, 622 (1998); *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991); *United States v. Frady*, 456 U.S. 152, 168 (1982); *United States v. Pettigrew*, 346 F.3d 1139, 1144 (D.C. Cir. 2003).[21] To establish cause, a defendant must demonstrate "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim," such as government interference or that the factual or legal basis for the claim was not reasonably available. *McCleskey*, 499 U.S. at 493-94 (internal quotation omitted). In addition to establishing cause, the defendant must show "'actual prejudice' resulting from the errors of which [he]

---

[21] This procedural bar does not apply to claims of ineffective assistance of counsel. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

complains." *Frady*, 456 U.S. at 168. That is, the defendant must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 170 (emphasis in original).

This Court reviews de novo a district court's decision denying a habeas corpus petition as untimely. *See Cicero*, 214 F.3d at 203. This Court also applies de novo review to questions of procedural default. *See United States v. Henderson*, 108 F.4th 899, 904 (D.C. Cir. 2024).

## 2.    *Brady* and Jencks Act Principles

"The *Brady* rule . . . requires prosecutors to 'disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.'" *United States v. Robinson*, 68 F.4th 1340, 1347 (D.C. Cir. 2023) (quoting *United States v. Bagley*, 473 U.S. 667, 675 (1985)). "There are three components of a true Brady violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *United States v. Brodie*, 524 F.3d 259, 268 (D.C. Cir. 2008)

(citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "To satisfy the prejudice component, the withheld evidence must be 'material'; that is, there must be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Brodie*, 524 F.3d at 268 (internal quotation and citations omitted). "[T]he omission must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

The Jencks Act, 18 U.S.C. § 3500, requires the government, on the motion of a defendant, to produce any "statement" of a government witness that relates to the subject matter of the witness's testimony, after the witness has testified on direct examination. *See United States v. Thomas*, 97 F.3d 1499, 1501 (D.C. Cir. 1996). A "statement" is defined as:

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

46

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e). "Under the definition in subparagraph (e), notes of a conversation are not generally Jencks Act material (unless they represent a full transcription)." *United States v. Oruche*, 484 F.3d 590, 597 (D.C. Cir. 2007); *United States v. Spencer*, 618 F.2d 605, 606 (9th Cir. 1980) ("notes [that] are not complete, are truncated in nature, or have become an unsiftable mix of witness testimony, investigators' selections, interpretations, and interpolations" are not Jencks Act statements). "Violations of the Jencks Act are subject to harmless-error review." *Oruche*, 484 F.3d at 597.

### B.    Discussion

#### 1.    Appellants' Initial *Brady* Claims Were Procedurally Barred.

Under 28 U.S.C. § 2255(f), a defendant generally must file a § 2255 motion within one year of the date on which his conviction becomes final. *See Dodd v. United States*, 454 U.S. 353, 357 (2005) (recognizing that "[i]n most cases, the operative date from which the limitation period is measured will be . . . the date on which the judgment of conviction becomes final"). "Finality attaches when [the Supreme] Court affirms a

47

conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003).

Here, the Supreme Court denied appellants' petitions for a writ of certiorari on February 20, 2007. *Carson v. United States*, 549 U.S. 1246 (2007). Thus, appellants had one year from that date – until February 20, 2008 – to timely file their § 2255 motions. As discussed supra, in their original § 2255 motions, which were timely filed, appellants raised the following government-misconduct claims:

| Sweeney | (1) Government failed to disclose information undermining Montgomery's credibility, specifically as it related to Montgomery's testimony implicating Carson in the Steven DeWitt case; and (2) government obtained witness testimony, specifically Montgomery's and Rice's testimony, "by any means necessary" (App. 966). |
| --- | --- |
| Coates | Same as Sweeney's claim (1) (App. 994, 1040). |
| Martin | (1) Government withheld exculpatory evidence regarding murder of Anthony Fortune, i.e, information that Steven Thomas purportedly described the shooter as someone other than Martin and Carson (App. 939, 941-944); and |

48

| | (2) government impeded Martin's ability to call shooting victim James Coulter as a witness (App. 939-940, 944-945). |
|---|---|

The district court correctly concluded that Sweeney's and Coates's claims that the government had violated *Brady* by not disclosing information undermining Montgomery's testimony in the DeWitt case was procedurally barred because the DeWitt proceedings took place in 2004, during the pendency of appellants' direct appeal, and appellants had not established, or even attempted to establish, cause for their failure to raise the claim on appeal. Further, appellants could not demonstrate prejudice; as the court noted, any impeachment material the government possessed specifically "concerned the Dewitt proceedings - not this case." *Martin*, 2021 WL 4989983, at *9.[22]

Martin's government-misconduct claims were also procedurally barred. Martin's claim regarding Steven Thomas rested entirely on an

---

[22] Likewise, Sweeney procedurally defaulted his claim that the government procured witness testimony "by any means necessary," because he failed to raise it on direct appeal and had not shown the requisite cause and prejudice. Moreover, as the district court noted, this blanket assertion was vague and conclusory, and therefore did not merit review. *Martin*, 2021 WL 4989983, at *9.

49

undated affidavit from Martin's investigator, and Martin had not shown that he did not possess this information during the pendency of his direct appeal. *See Martin*, 2021 WL 4989983, at *5. Martin's claim regarding the government's representations about Coulter's availability was similarly procedurally barred. *See id.* at *6. In neither instance did Martin show cause for the procedural default or prejudice arising from the claimed errors.[23]

> ### 2. Most of Appellant's Subsequent *Brady* Claims Were Untimely and Did Not Relate Back to the Initial Claims.[24]

Appellants' subsequent *Brady* claims, filed six or more years after their initial § 2255 motions, were properly rejected as untimely. As noted,

---

[23] Regardless of the procedural bar, these claims were meritless. As the district court noted, there was no evidence that Thomas described Anthony Fortune's shooter to the police or the grand jury, and therefore no evidence that the government had violated its *Brady* obligations. *See Martin*, 2021 WL 4989983, at *5. As to Coulter, Martin never provided the court with Coulter's alleged statement purporting to exonerate Martin. *Id.* at *6 n.3. Even assuming such a statement existed, it was unlikely to overcome the strong evidence of Martin's guilt. *See id.*

[24] The only exception was Carson's claim that the government withheld information regarding payments to John Pinckney and Cheree Owens. As the government acknowledged (Supp. App. 217-218) and the district court found, *Martin*, 2021 WL 4989983, at *7, this claim was neither

(continued . . . )

appellants were required to file their § 2255 motions by February 20, 2008.

Appellants argue that they "could not have made within the one-year deadline of § 2255(f)(1), the kinds of detailed claims required by Habeas Corpus Rule 2(c)" because they did not have access to the sealed materials until after the deadline (App. Br. 102). To avoid § 2255(f)(1)'s time bar, appellants assert that their later claims were timely because (1) they related back to the original, timely filed claims, (2) they fell within the one-year statute of limitations applicable to newly discovered evidence under § 2255(f)(4), and (3) they were entitled to equitable tolling of the limitations period (App. Br. 102-103). None of these grounds is availing.

---

procedurally defaulted nor time barred because it was raised within one year of the discovery of new evidence – i.e., the May 29, 2014, interview of Owens in which she described the government's efforts to move the couple and the related financial assistance they received. As explained in more detail infra, the district court properly rejected this claim as meritless.

51

### a. The Later Claims Did Not Relate Back.

Appellants' supplemental government-misconduct claims did not relate back to their timely filed claims. That is because they did not "arise from the same core facts as the timely filed claims," but instead "depend[ed] on events separate in 'both time and type' from the originally raised episodes." *Mayle*, 545 U.S. at 659.

Carson did not even raise a claim of government misconduct in his initial § 2255 motion. While he alleged, inter alia, that his sentence was imposed in violation of the constitution and that "newly discovered evidence" showed that he was deprived of his Fifth Amendment right to due process (App. 988), he provided no further details and made no mention of *Brady*. Thus, the *Brady* claims he raised seven years later based on the previously sealed materials bore no relation to his initial claims. *See Hicks*, 283 F.3d at 388 ("while amendments that expand upon or clarify facts previously alleged will typically relate back, those that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously"); *Hill v. Mitchell*, 842 F.3d 910, 924 (6th Cir. 2016) (later-raised *Brady* claim did not relate back to original claim that was "completely bereft of specific fact

52

allegations or evidentiary support and was not tied to any particular theory of relief").

Although Sweeney's initial motion alleged that the government had violated *Brady* by not disclosing impeachment evidence regarding Montgomery's testimony in an unrelated case (the Dewitt case), he made no mention of alleged *Brady* violations connected to the sealed materials, including Montgomery's purported statements about the Timothy Benton murder, the prosecution file on Theodore Watson from another jurisdiction, statements of Charles Bender regarding the Fortune murder, statements of Arthur Rice, statements of Andre Murray about Robert Smith's killer, or information indicating that others had a motive to kill Smith. Although these later claims invoked the legal principles of *Brady* and *Giglio*, they did not share a "common 'core of operative facts'" with the original claim. *See Mayle*, 545 U.S. at 659; *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009) ("even an amendment that shares some elements and some facts in common with the original claim does not relate back if its effect is to fault [the opposing party] for conduct different from that identified in the original complaint" (internal quotation marks and citation omitted)). Indeed, they were "based on

occurrences 'totally separate and distinct, 'in both time and type' from [the claim] raised in his original motion." *See Hicks*, 283 F.3d at 388. As the district court correctly noted, to allow relation back under these circumstances would "circumvent the central policy of relation-back doctrine: ensuring an opposing party has 'sufficient notice' about facts and arguments that a party might bring in an amendment." *Martin*, 2022 WL 1618869, at *5 (citing *Hicks*, 283 F.3d at 388); *see also Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 866 (D.C. Cir. 2008) ("The underlying question is whether the original complaint adequately notified the defendants of the basis for liability the plaintiffs would later advance in the amended complaint."). Here, the government could not have known that Sweeney would raise *Brady* claims based on the sealed materials in this case when his initial claim only involved an allegation of misconduct stemming from the Dewitt case in D.C. Superior Court.[25]

---

[25] Coates also argued in his first § 2255 motion that the government violated *Brady* by failing to disclose impeachment evidence stemming from Montgomery's testimony in the Dewitt case (App. 994, 1040). Although he did not subsequently raise government-misconduct claims based on the sealed materials, he moved to join appellants' motions raising those claims (App. 1471). Martin likewise moved to join his co-defendants' motions (App. 1651). To the extent Coates and Martin can be
(continued . . . )

Appellants contend that these supplemental claims were "encompassed" within Sweeney's initial claim that "the government had engaged in 'the nondisclosure and late disclosure of *Brady* information and the use of perjured testimony'" (App. Br. 108). But this broad and unspecified allegation of misconduct does not sweep in any and all subsequent *Brady* claims. "Such a result would eviscerate AEDPA's statute of limitations for *Brady* claims and would run directly contrary to Congress's intent." *Hill*, 842 F.3d at 925.

The Sixth Circuit's decision in *Hill*, 842 F.3d at 910, is instructive. Like appellants, Hill initially made a "sweeping assertion" that the government had "*Brady* material that it [wa]s refusing or unable to produce," and complained that he had "asked to review the prosecutor's and investigating officers' files, but was not allowed to do so." *Id.* at 920. Hill later discovered a police report that allegedly contained *Brady* material, but he then waited over three years to bring it to the district court's attention. *Id.* On appeal, the Sixth Circuit held that the later, specific *Brady* claim did not relate back to the original "catch-all" claim.

---

deemed to have adopted those claims, they are not entitled to relief for the reasons discussed infra.

55

*Id.* at 924. Although both motions asserted *Brady* claims, the original claim "was completely bereft of specific fact allegations or evidentiary support and was not tied to any particular theory of relief." *Id.* The court explained:

> The original claim did not identify, even in general terms, the nature of any suppressed information believed to be exculpatory or impeaching or how such suppressed information was material to the defense. A claim that the State was suppressing an unspecified *something* is much different from a claim regarding *what*, specifically, the State was suppressing and how it would have benefitted Hill at trial had it been disclosed. . . . Hill's original [c]laim . . . did not even raise a potential claim for relief. Even though Hill asserted that the prosecution was suppressing evidence, the basis for a *Brady* claim is the *evidence that was being suppressed*—not a suspicion that *something* was being suppressed.

*Id.* at 924-925 (emphasis in original). Because the original claim "alleged no operative facts out of which the amended claim could also be deemed to have arisen," the later claim did not relate back. *Id.* at 925. To hold otherwise, the Sixth Circuit explained, would run counter to AEDPA's purpose:

> Applying the relation-back doctrine to such a broad, unsupported claim would also create a greater problem: if a catch-all *Brady* claim, devoid of *Brady* material or specific factual allegations, were sufficient to justify relation back under Rule 15(c), then habeas petitioners could routinely circumvent AEDPA's statute of limitations on *Brady* claims.

> All a petitioner would need to do is include a catch-all *Brady* claim in his original petition (with no *Brady* evidence) and hope that evidence eventually turns up. If evidence did turn up, the petitioner could then file an amended petition at any time, because any subsequent amendment would relate back and skirt AEDPA's statute of limitations.

*Id.*

The same concerns arise in this case. Sweeney's "catch-all" *Brady* claim failed to allege specific facts to which his later claims could relate back. The district court correctly recognized that, as in *Hill*, the "overly broad" *Brady* allegations raised in Sweeney's first motion "did not provide sufficient notice that he would assert *Brady* claims about the sealed materials in a supplement." *Martin*, 2022 WL 1618869, at *7-8. Because Sweeney "merely assert[ed] a suspicion that he *might* discover constitutional violations[,] . . . [they] lack[ed] the specific details . . . that would justify relation back." *Id.* at *8 (emphasis in original).[26]

---

[26] *Mandacina v. United States*, 328 F.3d 995, 1001 (8th Cir. 2003), is not to the contrary. In *Mandacina,* a habeas petitioner originally alleged that the government "failed to properly disclose . . . any and all information related by [the victim] prior to his death in which [the victim] implicated any other person in any criminal activity." 328 F.3d at 1000. The petitioner later amended his motion to include a *Brady* claim about a previously undisclosed police report (the "Borland Report"). The Eighth Circuit held that this claim related back because the report "support[ed] a defense theory that, before he died, [the victim] implicated other

(continued . . . )

### b. Most of the Supplemental Misconduct Claims Were Untimely.

Because, as explained supra, Carson's and Sweeney's amended *Brady* claims did not relate back to their original pleadings, those claims were untimely, as they were filed several years after the February 20, 2008, limitations deadline applicable under 28 U.S.C. § 2255(f)(1). Appellants contend that the relevant limitations period is governed by § 2255(f)(4), rather than (f)(1), because they did not discover "the facts supporting the claim or claims presented," until after the February 20, 2008, deadline had passed (App. Br. 112). They argue that "the statute of limitations did not begin running until the district court's order granting access to the sealed documents" (*id.*), and that, to be more precise, "October 2010 is a reasonable time for appellants to be deemed to have obtained access to the *Brady/Giglio* materials such that the statute of

---

persons involved in organized criminal activity" with a motive to retaliate against him. *Id.* at 1001. Unlike in this case, "Mandacina's original *Brady* claim was . . . quite specific, in terms of the information alleged to have been suppressed and its materiality to the defense," and "the amended *Brady* claim was a slightly *more* specific iteration of the original *Brady* claim, premised more specifically on the suppression of *names* of suspects identified by Borland." *See Hill*, 842 F.3d at 923 (discussing *Mandacina*, 328 F.3d at 1000-1001) (emphasis in original).

58

limitations could be deemed to be running" (*id.* at 115). Appellants ignore § 2255 (f)(4)'s due-diligence requirement and, even if correct, still fail to demonstrate that their supplemental claims were timely.

Section 2255 (f)(4)'s "exception for newly discovered facts . . . tolls the deadline to one year from 'the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.'" *United States v. Pollard*, 416 F.3d 48, 54 (D.C. Cir. 2005). "[F]or the purposes of § 2255(4), '[t]ime begins when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance.'" *Id.* at 55 (quoting *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir.2000)). "Where," as here, "one 'discovers' a fact that one has helped to generate, . . . whether it be the result of a court proceeding or of some other process begun at the petitioner's behest, it does not strain logic to treat required diligence in the 'discovery' of that fact as entailing diligence in the steps necessary for the existence of that fact." *See Johnson v. United States*, 544 U.S. 295, 307, 310 (2005) (rejecting argument that "§ 2255 petition is timely under paragraph four as long as [petitioner] brings it within a year of learning he succeeded in attacking [a] prior conviction [enhancing his federal

59

sentence], no matter how long he may have slumbered before starting the successful proceeding").

Here, appellants knew, or through diligence, could have discovered the important facts well before the February 20, 2008, filing deadline. They simply chose not to. Appellants acknowledge that they "knew evidence had been suppressed" and that they "repeatedly asked for the sealed material to be disclosed to them, first at trial and then on appeal" (App. Br. 112, 114).[27] As the district court noted, at trial, defense counsel "raised many *Brady*, *Giglio*, and Jencks Act objections during the government's case in chief." *Martin*, 2022 WL 1618869, at *5 (citing, e.g., 01/30/01 (PM) Tr. 4–6; 02/12/01 (AM) Tr. 5–8; 04/24/01 (PM) Tr. 3). Subsequently, appellants' motion to review the sealed documents during the direct appeal "identified thirteen sets of sealed materials, explained their suspicions, and tied those suspicions to suspected *Brady*, *Giglio*, or Jencks Act violations." *Id.* at *3. Appellants thus "had reason to believe

---

[27] For example, appellants knew, based on Theodore Watson's testimony, that he had written letters to a prosecutor in Greenbelt, Maryland, offering information in exchange for "more lenient treatment" (Supp. App. 400-401). Defense counsel requested disclosure of those letters during trial, but the court denied the request (Supp. App. 402).

they might have meritorious *Brady*, *Giglio*, or Jencks Act claims long before § 2255(f)(1)'s February 20, 2008 deadline." *Martin*, 2022 WL 1618869, at \*5. *See In re Davila*, 888 F.3d 179, 189 (5th Cir. 2018) (statute of limitations runs from "the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim").

Yet, it was not until February 13, 2008, one week before their § 2255 motions were due, that Sweeney moved the district court to unseal the documents. Appellants offer no explanation for why they waited until the eleventh hour to seek unsealing of documents that, years before, they suspected contained favorable material. Their lack of diligence dooms their late-filed *Brady* claims. *See Johnson*, 544 U.S. at 308 (diligence requires "prompt action on the part of the petitioner as soon as he is in a position to realize that he has an interest in [raising a] challeng[e]"); *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 294 (3d Cir. 2021) ("If there is a reasonable basis for a petitioner to believe additional investigation will yield undisclosed *Brady* material, that petitioner must investigate or else risk the statutory consequences" of 28 U.S.C. § 2244(d).); *Ford v. Gonzalez,* 683 F.3d 1230, 1236 (9th Cir. 2012)

61

(amended *Brady* claim was untimely where "factual predicate . . . could have been discovered at the time of his trial through the exercise of due diligence").[28]

Appellants contend that the government had the burden of disclosing *Brady* material and that they were not required to seek out such information to show due diligence (App. Br. 117). But the fact that the government has an affirmative obligation to disclose *Brady* evidence does not relieve defendants of their duty to exercise diligence under § 2255(f)(4). While defendants generally are "entitled to presume that prosecutors have . . . shar[ed] all material exculpatory information in their possession," *Bracey*, 986 F.3d at 289, "'where the record demonstrates that the defendant or defense counsel was aware of the potential *Brady* material but failed to pursue investigation of that ultimate claim,' . . . [the] consequences that AEDPA attaches to a lack of due diligence" will apply with full force. *Id.* at 294 (citations omitted).

---

[28] Although appellants made efforts to discover the sealed material during trial and then on appeal, they apparently abandoned those efforts in 2003, when this Court denied their request to review the sealed documents. Nearly five years passed before appellants moved the district court to unseal the documents in 2008, only one week before their § 2255 motions were due.

Even assuming arguendo that appellants did not know, or could not have discovered the evidence supporting their claims through the exercise of due diligence, before the district court unsealed the documents on February 15, 2008, their supplemental *Brady* claims would still be time barred. Appellants had until February 15, 2009, to raise their amended claims. Even under the most generous assessment—assuming appellants did not have access to the documents until June 17, 2010, and could not have reasonably reviewed them until October 2010 (see App. Br. at 114-115)—appellants' motions were due no later than October 2011. *See Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998) (there is no "statutory right to an extended delay . . . while a habeas petitioner gathers every possible scrap of evidence that might . . . support his claim").[29] Yet Sweeney did not file his first amended motion until over three years later, on November 28, 2014, with the other appellants

---

[29] Appellants cite no authority for their assertion that they were entitled to an additional 120 days beyond the one-year limitations period because of the "volume of the materials" and the fact that they were incarcerated at the time (App. Br. 114-115). Appellants have not shown that these circumstances were "extraordinary" and therefore justified equitable tolling. *See Cicero*, 214 F.3d at 203. We do not concede that any extra time was warranted, but even assuming arguendo that it was, appellants cannot establish that their claims were timely.

63

following suit between 2015 and 2018. The district court thus correctly found that the amended claims were "untimely by several years." *Martin*, 2021 WL 4989983, at *8. *See Smith v. Vannoy*, 848 F. App'x 624, 628 (5th Cir. 2021) (28 U.S.C. § 2254 petition raising *Brady* claim was untimely where it was filed more than one year after petitioner learned of facts underlying claim); *Jimerson v. Payne*, 957 F.3d 916, 925 (8th Cir. 2020) (*Brady* claim raised in habeas petition was untimely where petition was filed 6 days after expiration of one-year limitations period for newly discovered evidence); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111, 113 (2d Cir. 2000) (*Brady* claim was time-barred where § 2254 petition was filed almost two years after petitioner obtained exculpatory materials).

### c.    Appellants Are Not Entitled to Equitable Tolling.

In an effort to revive their time-barred claims, appellants assert that they are entitled to equitable tolling of the limitations period because (1) the district court granted numerous extensions of time for the filing of their supplemental motions and the government's response, and (2) some of the appellants were either unrepresented or had been

64

effectively abandoned by counsel during the delay (App. Br. 118-124). Neither of these circumstances justifies equitable tolling in this case.

A defendant is "entitled to equitable tolling" only if he shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal quotation marks and citation omitted); *see also Cicero*, 214 F.3d at 203 (to warrant equitable tolling, the petitioner must demonstrate that "'extraordinary circumstances' beyond [his] control [made] it impossible to file [his claim] on time"). This Court has emphasized that equitable tolling "is to be employed 'only sparingly.'" *Cicero*, 214 F.3d at 203.

As discussed supra, appellants were not diligent in pursuing their belated *Brady* claims. They waited until just days before the expiration of the one-year limitations period to request that the district court unseal the documents they believed would support their claim. *See Schmitt v. Zeller*, 354 F. App'x 950, 951-952 (5th Cir. 2009) ("[A] component of the obligation to pursue rights diligently is not to wait until near a deadline to make a filing, then seek equitable tolling when something goes awry. . . . Leaving little margin for error is incautious and not diligent."). Then,

even after the court unsealed the documents, appellants waited another six or more years before filing their supplements.

Appellants contend that the extensions of time granted by the district court tolled the statute of limitations (App. Br. 118, 124), but nothing in the record demonstrates that the court meant to toll the limitations period, misled appellants, or lulled them into inaction. Appellants requested, and the court granted, extensions of time starting in 2010, long after the February 20, 2008, limitations deadline had passed. There was thus no period of time left to toll, and the district court's orders could not have induced appellants to late file. *See United States v. Baxter*, 761 F.3d 17, 31 (D.C. Cir. 2014) (rejecting argument that defendant was entitled to equitable tolling because he "'relied on orders entered by the district judge' that enlarged the time for filing" his § 2255 motion, where judge entered extension order two months after filing deadline had passed; "[defendant] could not have let the deadline pass in reliance upon an order that the court had not yet entered"); *Fierro v. Cockrell,* 294 F.3d 674, 683-84 (5th Cir. 2002) (district court's scheduling order predicated on "mistaken assumption" about statute of limitations "could not have contributed to [petitioner's] failure to comply with the

66

one-year statute of limitations," where order was issued weeks after limitations period had expired); *Kreutzer v. Bowersox*, 231 F.3d 460, 463 (8th Cir. 2000) (order granting extension of time two days *after* expiration of statute of limitations did not "lull[] [petitioner] into inaction"); *cf. Prieto v. Quarterman*, 456 F.3d 511, 515 (5th Cir. 2006) (equitable tolling warranted where petitioner "requested and received his extension of time *before* the deadline to file his habeas petition passed" (emphasis in original)).

In ruling on appellants' motions for extensions of time (see, e.g., Supp. App. 117-119), the district court did not indicate, either explicitly or implicitly, that it would excuse an untimely filing. *See Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151 (1984) (noting that equitable tolling may be appropriate where "court has led the plaintiff to believe that she had done everything required of her"); *United States v. Hernandez*, 436 F.3d 851, 858 (8th Cir. 2006) (district court's order permitting filing of supplemental § 2255 motion did not "lull" defendant into inaction; "[n]othing in the order referred to the statute of limitations

or to filing additional claims").[30] And, as the court noted, "the government—from the first motion for extension of time—consistently emphasized that it would object to newly raised claims as untimely." *Martin*, 2022 WL 1618869, at \*10.[31] On these facts, the district court's extension orders, granted at appellants' requests, did not create "'extraordinary circumstances' beyond [appellants'] control." *Cicero*, 214 F.3d at 203.

---

[30] Notably, appellants' motions did not request tolling of the statute of limitations or suggest that they were entitled to a one-year period starting in June or October 2010 because of their alleged inability to access the previously sealed documents.

[31] At a status conference on May 17, 2013, the government reiterated:

> [T]he one-year deadline has long since come and gone for filing a 2255. These defendants have filed, in one guise or another, 2255s, and so what they're trying to do now is supplement. And, of course, we're not on just an open field anymore when it comes to supplements. In order to be timely, whatever claims they raise at this point have to relate back to the claims that they made in their timely filed 2255s.

> And I wanted to make that point because I know, since I've entered the case, I've always said to the lawyers who want extensions that I don't oppose any requests for extensions, but we are not waiving any statute of limitations in this case. (Supp. App. 652.)

68

Nor did appellants' allegedly sub-par representation or lack of representation by counsel. This Court has held that a "prisoner's ignorance of the law or unfamiliarity with the legal process will not excuse his untimely filing, nor will a lack of representation during the applicable filing period." *See Cicero*, 214 F.3d at 203; *see also Johnson*, 544 U.S. at 311 ("we have never accepted pro se representation alone or procedural ignorance as an excuse for prolonged inattention when a statute's clear policy calls for promptness"); *United States v. Petty*, 530 F.3d 361, 365 (5th Cir. 2008) ("Proceeding pro se is alone insufficient to equitably toll the AEDPA statute of limitation."); *Roy v. Lampert*, 465 F.3d 964, 970 (9th Cir. 2006) ("It is clear that pro se status, on its own, is not enough to warrant equitable tolling."). Of course, it is well settled that "there generally is no constitutional right to effective counsel in collateral proceedings." *United States v. Scurry*, 992 F.3d 1060, 1069 (D.C. Cir. 2021).

Although an attorney's "professional misconduct . . . could nonetheless amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling," *Holland*, 560 U.S. at 651, Sweeney has not shown that his attorney's conduct was "so outrageous

69

or so incompetent as to render it extraordinary." *See Pollard*, 416 F.3d at 56 (quotation marks and citation omitted). Sweeney cites letters he had written his first habeas counsel (Jenifer Wicks) expressing his frustration with their communication and dissatisfaction with her efforts to pursue collateral relief (see App. 1793-1814), but nothing in the record demonstrates abandonment. To the contrary, Wicks timely filed Sweeney's initial § 2255 motion, raising 17 claims of ineffective assistance of trial and appellate counsel, trial-court error, and prosecutorial error (App. 951); made efforts to obtain the documents unsealed by then-Chief Judge Hogan (App. 1791); and communicated with Sweeney about the proceedings (*see* App. 1796 (Sweeney letter to Wicks describing "our recent fusillade of e-mails"); App. 1800 (Sweeney letter to Wicks noting "[Wicks's] letter dated March 5, 2008, along with several of our conversations"); App. 1802 (Sweeney letter to Wicks referring to "your e-mail to me dated March 9, 2010")). *See Downs v. McNeil*, 520 F.3d 1311, 1321-22 (11th Cir. 2008) (cataloguing cases of equitable tolling and distinguishing between "attorney negligence" (e.g., missed deadlines), which do not warrant tolling, and "serious misconduct" (e.g., repeated misrepresentations, failure to file any § 2255

70

motion, and refusal to communicate with defendant), which may support tolling); *Baldayaque v. United States*, 338 F.3d 145, 151-152 (2d Cir. 2003) ("while the normal errors made by attorneys may not justify equitable tolling," tolling may be justified where attorney does no legal research on defendant's case, does not attempt to speak with him, and "fail[s] to file [any § 2255] petition at all").

In any event, even if Wicks unreasonably delayed filing a supplemental motion, nothing prevented Sweeney himself from complying with AEDPA's statute of limitations by filing a pro se supplement. Sweeney clearly understood that time was of the essence (*see* App. 1796 (Sweeney letter to Wicks discussing § 2255 amendment procedure and urging pursuit of supplemental motion "without further delay" and to "avoid the pitfalls" of "sitting without continuing the fight")). Having been present at his own trial and having received access to the previously sealed material, he was well versed in the factual underpinnings of his asserted *Brady* claims. Indeed, in a letter to counsel dated August 9, 2010, he meticulously laid out six potential *Brady* and Jencks Act claims based on the previously sealed documents, with citations to the "dates and times that these issues were addressed in the

71

trial transcripts" (App. 1818-22), and over a year earlier he had composed a detailed list of transcript cites indicating when suspected *Brady* information had been placed under seal (App. 1824-25). Sweeney also highlighted relevant legal authority (App. 1797-98), and suggested additional grounds for relief (App. 1793-1794, 1800). Sweeney was thus aware of the factual basis for his supplemental claims and demonstrated sufficient understanding of their legal significance that he could have timely asserted his claims even without the assistance of counsel. At the very least, he has not shown that "the actions of . . . his initial habeas counsel . . . made it impossible for him to file his [supplemental] § 2255 motion within AEDPA's statute of limitations, as required." *See Pollard*, 416 F.3d at 56 (defendant could not show "extraordinary circumstances" justifying equitable tolling, where, notwithstanding habeas counsel's alleged deficiencies, there was "nothing that prevented [defendant] . . . from researching or further analyzing the facts that he knew to determine if they presented a valid claim"); *see also Schlueter v. Varner*, 384 F.3d 69, 76 (3d Cir. 2004) (equitable tolling not warranted where,

72

despite attorney's alleged malfeasance, defendant could have filed "a pro se petition and save[d] his . . . claims from dismissal as untimely").[32]

Sweeney's reliance (at 121-122) on *United States v. McDade*, 699 F.3d 499 (D.C. Cir. 2012), is misplaced. In *McDade*, the defendant researched an ineffective-assistance-of-counsel claim, obtained affidavits to support it, and "advised post-conviction counsel by letters of his wish to raise [the] claim." 699 F.3d at 505. His post-conviction counsel inadvertently omitted the claim from the initial § 2255 motion but filed an amended motion including the claim "only 30 days past the one-year limitations period." *Id.* In concluding that equitable tolling was warranted, this Court distinguished McDade's case from *Pollard* and *Cicero*, where the defendants waited years past the limitations deadline to file supplemental motions. *Id.* This case is more like *Pollard* and *Cicero* than *McDade*. Here, Sweeney waited nearly six years after the February 20, 2008, limitations deadline to raise *Brady* claims he could have raised

---

[32] This Court has denied equitable tolling "in far more grievous circumstances, as in *Cicero*, where the prisoner was unable to finish his legal research before the statute of limitations expired after being stabbed by another inmate, hospitalized, placed in protective segregation with highly limited access to a law library, and separated from his legal papers." *Pollard*, 416 F.3d at 56 (citing *Cicero*, 214 F.3d at 201, 203-04).

in his initial motion had he exercised due diligence. As discussed supra, even if Sweeney did not gain access to the previously sealed documents until June 2010, his supplemental motion came more than three years after the expiration of the extended limitations period for newly discovered evidence. Unlike McDade, then, Sweeney did not demonstrate an "unusual level of diligence" or fall victim to "extraordinary" circumstances that prevented him from filing on time; instead, he "sat upon his rights." *Cicero*, 214 F.3d at 203.

### 3. Even If Not Procedurally Barred or Untimely, Appellants' Government-Misconduct Claims Lack Merit.

On appeal, appellants specifically challenge the district court's rulings as to what they categorize as three classes of *Brady* material: "(1) documents revealing evidence of alternative theories of key charged crimes; (2) documents regarding acknowledged lies by government witnesses; and (3) information revealing benefits provided to government witnesses" (App. Br. 54). We address these categories in turn.

74

### a.    Documents Allegedly Revealing Evidence of Alternative Theories.

Appellants argue that the government "knowingly withheld" evidence that undermined the government's theory at trial or that reflected "alternative leads" and "inconsistent accounts" (App. Br. 55). Specifically, appellants point to (1) information suggesting "other suspects" in the murder of Robert Smith (App. Br. 55), (2) interview notes documenting allegedly inconsistent statements by James Montgomery regarding the murder of Timothy Benton (App. Br. 63), and (3) prior statements of Charles Bender that purportedly conflicted with his trial testimony regarding the murder of Anthony Fortune (App. Br. 65). Appellants fail to sustain their burden of demonstrating that any of these alleged violations requires reversal under *Brady*.

### i.    The Robert Smith Murder

Appellants assert that the government violated its *Brady* obligations by failing to disclose two documents previously sealed by the trial court: (1) notes of an interview of government witness Andre Murray reporting rumors that Petey Johnson (a.k.a. "Fat Petey") had killed Smith, and (2) an ex parte pleading in which the government indicated

75

that it had identified Andre Chappelle and Anthony Hawkins, "a known associate of Samuel Carson" (App. 1259), as Smith's murderers (App. Br. 55-56). Appellants have not established a reasonable probability that disclosure of either of these documents would have resulted in a different outcome.

First, Andre Murray's statements had only minimal, if any, exculpatory value. Titled "Murder of Keith Johnson," the notes read in pertinent part:

> Wit. heard Gooch telling Draper to kill Keith. Wit. did not hear Draper return to advise Gooch he killed Keith. He just heard Gooch give the order.
>
> The word is that Fat Petey started messing w/Butchie – killed Butchie to get back at Draper → mere rumor. (App. 1270.)

According to appellants, this information was exculpatory because it showed that Petey Johnson had a motive to kill Smith (as revenge for Sweeney having killed Petey's brother, Keith), and may have in fact killed Smith (App. Br. 60-61).[33] But, as the note makes clear, this information was "mere rumor" (App. 1270). Nothing in the document indicates where or when Murray may have heard this rumor. Without

_____

[33] Petey Johnson and Smith were "drug-dealing partners" (5/30/01AM Tr. 16).

more, this unsubstantiated hearsay was not *Brady* material. *See United States v. Derr*, 990 F.2d 1330, 1335–36 (D.C. Cir. 1993) (no *Brady* violation where witness's statement was "hearsay that would not be admissible within any recognized exception to the rule excluding such evidence" (citing *United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989) (to be "material" under *Brady*, undisclosed information or evidence acquired through that information must be admissible)); *see also United States v. Santos*, 486 F. App'x 133, 135 (2d Cir. 2012) (witness's statement was not *Brady* because it "consisted of rumors amounting to inadmissible hearsay[] [and] would not have led to admissible evidence because [witness] could not identify a single source for the statements"); *Smith v. Stewart*, 140 F.3d 1263, 1273 (9th Cir. 1998) (failure to disclose "rumor" was not *Brady* violation where evidence was "so weak, so remote, and so inconclusive that it is highly unlikely that it would have had any effect whatever upon the verdict").

Furthermore, the record shows that, at the time of trial, appellants already knew or suspected that Petey Johnson was a person of interest in the Smith murder. In cross-examining SA Lisi about his investigation of the murder, defense counsel elicited the following:

77

Sweeney's counsel: How about Petey Johnson? Did you pick him up?

Lisi: Yes, sir, because it was believed he was a witness.

Sweeney's counsel: To Robert Smith's murder?

Lisi: Yes, sir.

Sweeney's counsel: Okay. And you questioned him not just as a witness, but as a possible suspect?

Lisi: I would say as a witness and maybe somebody – it was just a hunch that he was there and then he walked away, we believed, at the time "Butchie" was killed. So he may have called somebody to alert them that "Butchie" was there. (App. 535-536.)

Thus, appellants knew that Johnson was on the scene and that he was suspected of assisting in the murder. Given what they knew, appellants have not explained how Murray's report of inadmissible hearsay would have materially contributed to their defense. *See United States v. Hsia*, 30 F. App'x 1, 3 (D.C. Cir. 2001) (finding no *Brady* violation where defendant "was fully aware of the information"); *In re Sealed Case No. 99-3096*, 185 F.3d 887, 897 (D.C. Cir. 1999) (information may "not be material for *Brady* purposes" if it "is the equivalent of that which the defense already had"); *see also United States v. Ahrensfield*, 698 F.3d 1310, 1321 (10th Cir. 2012) ("Because the [undisclosed] information . . . duplicated information defendant already had, it was not material.");

78

*Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004) (noting that several circuits agree that "where the defendant was 'aware of the essential facts that would enable him to take advantage of the exculpatory evidence,' the government's failure to disclose it did not violate *Brady*").

Second, although the information about Chappelle and Hawkins was exculpatory, appellants have not shown a reasonable probability that disclosure of this information, or of Murray's statements, would have resulted in a different outcome. Appellants have failed to develop any evidence that Chappelle and Hawkins were the perpetrators, despite having had access to the ex parte pleading since at least 2010. Likewise, appellants have known about Petey Johnson's alleged role in the Smith murder since at least May 30, 2001, when SA Lisi testified about his suspicions. Yet, in the 24 years since then, appellants have proffered no evidence supporting a theory that Johnson was the actual perpetrator.[34]

---

[34] Even assuming they had no knowledge of Johnson's suspected participation in the murder until they received the unsealed material in June 2010, appellants made no apparent effort to investigate or develop a theory of third-party liability in the nearly 15 years since they have had access to the information. It is appellants' burden to demonstrate materiality under *Brady*. *See United States v. Borda*, 848 F.3d 1044, 1066-67 (D.C. Cir. 2017).

Their failure to develop these alternative theories is not surprising given this Court's determination that there was "[a]mple evidence" that "Carson murdered Smith, 'either alone or in conjunction with others,'" and that "[t]he evidence was more than sufficient . . . to conclude that Smith's murder was in furtherance of the conspiracy." *Carson*, 455 F.3d at 363-364. Appellants thus fail to establish how the unsubstantiated "word" on the street speculating that Petey Johnson might have killed Smith, or the government's early identification of Chappelle and Hawkins, would have seriously undermined the government's evidence of Carson's and Sweeney's agreement to murder Smith. *See Lesko v. Secretary Pennsylvania Department of Corrections*, 34 F.4th 211, 233 (3d Cir. 2022) (where, for 20 years, defendant possessed suppressed document indicating that witness had psychiatric condition but "never presented any evidence" that said condition would affect witness's ability to testify accurately, defendant could not rely on "pure speculation" to establish *Brady* materiality).

Appellants claim that they were prevented from "challeng[ing] Special Agent Lisi with his apparent bias and investigative tunnel-vision" concerning the Smith murder (App. 88). However, they ignore

that they were provided all of Lisi's unredacted notes and FBI 302 reports in advance of his testimony (Supp. App. 571-573).[35] Using these notes and reports, defense counsel thoroughly cross-examined Lisi about other people who might have had a motive to kill Smith (Supp. App. 592-610, 616-619), including unindicted individuals who attempted to kill Smith in the early 1990s (Supp. App. 600-601, 607-610), and further elicited that the FBI had interviewed one other suspect in Smith's murder who was not an identified member of the charged conspiracy (Supp. App. 622).

Moreover, even assuming arguendo that the alleged *Brady* material would have caused the jury to view the evidence of Smith's murder in a different light, it still would not have changed the outcome. Smith's murder was not charged as a substantive offense, but only as a racketeering act (conspiracy to murder) and, even then, only as to Sweeney and Carson (App. 685-687). However, strong evidence supported multiple other predicate acts found by the jury, only two of

---

[35] Weeks before trial, the government disclosed a redacted copy of the notes which contained unredacted names of drug suppliers and others, including Petey Johnson, with whom Smith had dealt drugs, and police reports identifying suspects in the 1991 shooting of Smith at Hope Village halfway house (Supp. App. 047-077).

81

which were required for conviction (App. 729-733, 739-740; Supp. App. 636-641, 645-649). *See United States v. McGill*, 815 F.3d 846, 946 (D.C. Cir. 2016) (finding any error as to one predicate act harmless where "it could not have had any effect on the RICO judgment because at least two unchallenged convictions for predicate acts remained regardless").

Additionally, even assuming that the nondisclosure prejudiced appellants' ability to challenge the admission of Smith's statements under the Confrontation Clause,[36] there is no reasonable probability that it affected the verdict because there was substantial evidence other than Smith's statements (recounting Sweeney's admissions) to support the charges about which his statements were admitted. Notably, several of the crimes Smith referenced were not even charged as substantive offenses in the indictment (Supp. App. 611-613 (e.g., the Keith Johnson

---

[36] To establish *Brady* materiality as to the admission of Smith's statements, appellants would have to show that (1) had this information been disclosed, there was a reasonable probability that the trial court would not have found by a preponderance of the evidence that Smith was murdered by appellants, *see Carson*, 455 F.3d at 362 ("preponderance of the evidence" standard applies to "predicate factual findings" supporting admission of statements under Federal Rule of Evidence 804(b)(6)), and (2) had Smith's statements not been admitted, it was reasonably probable that appellants would have been acquitted. As explained infra, appellants make neither showing.

82

murder and Michael Jones shooting)). As to others, such as the Maryland triple murder, the trial court noted that there was a "considerable amount of evidence" apart from Smith's testimony (Supp. App. 620-621). *See infra* at 102-103 (discussing strength of triple-murder evidence).

Likewise, the evidence of the Anthony Pryor kidnapping was overwhelming: (1) an eyewitness saw four men arguing with Pryor, demand that he get out of his truck, and shoot him as he tried to run away, and subsequently saw the trunk door of the assailants' car in the street after they fled with the victim; (2) another eyewitness saw the trunkless car pull into the Arthur Cappers housing complex in D.C., and saw Sweeney and others abandon the car and throw clothing and other items into the trash; (3) police found the trunkless car with bloodstains on the rear bumper, and clothing items, car parts, and duct tape in and around it; (4) Coates's fingerprints were on the car; and (5) Coates and Sweeney admitted to other co-conspirators their roles in the offense. *See Carson*, 455 F.3d at 343 & n.5 (summarizing evidence).

Strong evidence also supported Sweeney's guilt of the Donnell Whitfield murder: (1) Whitfield's cousin, John Venable, who was with Whitfield shortly before the shooting, testified that he heard gunshots,

saw Sweeney run from the scene with a gun in his hand, and found Whitfield lying on the ground, dying (Supp. App. 547-550); (2) cartridge casings recovered from the scene of the murder were found to have been fired from a 9-millimeter gun recovered from Sweeney's grandmother's apartment (Supp. App. 553-554); and (3) Sweeney separately confessed the killing to co-conspirators Reginald Switzer, Arthur Rice, Charles Bender, and James Montgomery (Supp. App. 557 (Switzer); App. 440-441 (Bender); Supp. App. 538-539 (Rice); Supp. App. 561-563 (Montgomery)).

In sum, "[c]onsidering the withheld evidence in the context of the entire record, . . . it is too little, too weak, or too distant from the main evidentiary points to meet *Brady*'s standards." *See Turner v. United States*, 582 U.S. 313, 326 (2017) (internal quotation marks and citation omitted).[37]

---

[37] Notably, none of appellants' *Brady* claims, even if successful, undermines their convictions for narcotics conspiracy and RICO conspiracy, for each of which appellants received life sentences. The evidence supporting these conspiracy convictions was overwhelming. The FBI investigated appellants for three years and discovered "a long history of drug-dealing and an extraordinary breadth of violent acts." *Carson*, 455 F.3d at 339. FBI video cameras captured Martin, Carson, and Coates selling drugs. *Id.* "In addition to dealing marijuana, appellants Carson and Sweeney would help supply other members of the group." *Id.* at 340. "Indeed, "[t]he evidence was overwhelming that Sweeney, Carson, and

(continued . . . )

### ii. Montgomery's Prior Statements about the Benton Murder

Appellants next contend that the government violated *Brady* by failing to disclose SA Lisi's notes reflecting statements by James Montgomery about the Timothy Benton murder that were inconsistent with Montgomery's trial testimony (App. Br. 63-64). At trial, Montgomery testified that he and Maurice Proctor killed Benton (App. 360-365). However, according to Lisi's notes, Montgomery previously stated that Proctor and Carson were the murderers (App. 1274).

We agree that the prior statements were impeaching, but once again, appellants fail to show *Brady* materiality. Appellants were not charged with the Benton murder, either as a substantive offense or as a predicate of their drug-conspiracy or RICO-conspiracy charges. Indeed, as Montgomery acknowledged, the murder had nothing to do with the K

---

Coates were coconspirators[.]" *Id.* at 365. Likewise, there was substantial evidence supporting the RICO conspiracy convictions, even excluding those offenses implicated by the alleged *Brady* violations. For each appellant, the jury unanimously agreed upon many more than the two racketeering acts necessary to support such a conviction (see App. 720-747).

85

Street conspiracy (Supp. App. 432-434), and Montgomery himself pled guilty to the murder (Supp. App. 416-420).

Furthermore, any impeachment value was minimal at best. Montgomery's credibility was extensively impeached on a wide range of topics. Over the course of five days, defense counsel vigorously cross-examined him on (1) his lengthy criminal history, including his guilty plea to RICO conspiracy, and his admitted participation in seven murders and numerous violent crimes; (2) his inconsistent and evolving accounts of the events charged in this case; and (3) his admitted past lies to prosecutors, law enforcement, grand juries, and judges (see, e.g., Supp. App. 435-454, 463-480, 483-494).[38] "The trial judge even acknowledged that he could not 'imagine a witness that you could have for which there is more impeachment material than has already been supplied here.'" *Martin*, 2021 WL 4989983, at *12 (citing ECF No. 1170 at 62–63). There

---

[38] Montgomery entered three separate cooperation agreements in connection with his involvement in the K Street conspiracy (Supp. App. 413-421). He acknowledged that he had not been completely forthcoming with the government under the first two agreements, particularly with respect to his involvement in the murders of Chrishauna Gladden, Maurice Hallman, Leonard Hyson, Timothy Benton, and the triple murders in Maryland (Supp. App. 449-454,457-461).

86

is no reason to believe any additional impeachment, about an uncharged murder, would have persuaded the jury to view the evidence of appellants' guilt differently. *See United States v. Emor*, 573 F.3d 778, 782 (D.C. Cir. 2009) ("Cumulative impeachment evidence is generally not material because the marginal effect of additional impeachment is relatively small and unlikely to result in a different outcome."); *Derr*, 990 F.2d at 1336 ("an incremental amount of impeachment evidence on an already compromised witness does not create a 'reasonable probability' that the balance would have swung in favor of [defendant]"). In fact, there is good reason to believe the opposite; Montgomery's prior statements *implicated* Carson in the Benton murder and therefore carried a substantial risk of prejudice. As such, there is no reasonable probability that, had the jurors learned of the statements, they would have returned an acquittal.

### iii. Charles Bender's prior statements about the Anthony Fortune Murder.

As to the prior statements of Charles Bender, appellants have not shown the suppression of information that is exculpatory or impeaching. Bender testified at trial that Martin told him that he (Martin) had killed

Fortune (App. 453-454). This testimony was consistent with a prior statement noted in an FBI 302 report, wherein Bender related that Martin admitted that he had "pulled a gun and shot Fortune" (App. 1369, 1379). In neither instance did Bender mention Carson in relation to the Fortune murder. Because the two statements were fully consistent, the prior statement did not constitute *Brady* material.

That Carson was proven to have been the actual shooter does not render Bender's statements exculpatory. Although, in the wake of the murder, Martin had boasted to Bender and others that he had pulled the trigger (see App. 453-454 (Bender); Supp. App. 530-533 (Byars); Supp. App. 540-541 (Rice)), Martin was ultimately convicted on an aiding and abetting theory. *See Martin*, 2021 WL 4989983, at * 5 (citing *Carson*, 455 F.3d at 342).

### b.   Documents Revealing Alleged Lies by Government Witnesses

Appellants next contend that the government violated *Brady* by failing to disclose the prosecution file on government witness Theodore Watson from another jurisdiction (App. Br. 66-73). Appellants claim that the file contained letters in which Watson "repeatedly acknowledged to the government . . . his own history of duplicity" (*id.* at 66).

88

Watson was convicted of an unrelated drug charge in the United States District Court in Greenbelt, Maryland (Supp. App. 344-345). While he was serving his sentence at Northern Neck Regional Jail in Virginia, he met Sweeney, who was also incarcerated (Supp. App. 346). Sweeney told Watson about his exploits, including the kidnapping and shooting of Anthony Pryor and the kidnapping of Keith Johnson (Supp. App. 347-349). He also confessed to having killed a couple of women (Supp. App. 352). Sweeney told Watson that he had been trying to locate James Montgomery because he knew that Montgomery was going to testify against him (Supp. App. 351).

Watson was extensively cross-examined on his lengthy criminal record and his history of cooperating with the government. Watson, who at the time of trial was 60 years old, had been in and out of prison for much of his adult life (Supp. App. 358). From 1963 to 2000, Watson was convicted of receiving stolen property, possession with intent to distribute heroin (twice), escape, and conspiracy to distribute a controlled substance (twice) (Supp. App. 354-357). His Greenbelt conviction was based on his fraudulent acquisition of a DEA registration number, which he obtained through his position as a pharmacy assistant, and which he

then used to illegally procure narcotics "for [his] own benefit" (Supp. App. 363, 369). Watson explained to the prosecutors in Greenbelt that someone else had devised the pharmaceutical scheme, but they did not believe him (Supp. App. 369-370).

Watson had been a cooperator "since the '70's" (Supp. App. 373), and had provided information to law enforcement in Washington, D.C., Maryland, and California (Supp. App. 380-385). At the same time, however, he had continued to deal drugs (Supp. App. 385-387). Watson acknowledged that he "had been around the system long enough to know that . . . [he] could work off [his] sentence by providing substantial assistance to the federal authorities" (Supp. App. 360), and that was his purpose for testifying in this case (Supp. App. 371-372).

Watson acknowledged that he entered into a plea agreement in the Greenbelt case with the hope of receiving a 5K1.1 letter from the government recommending a downward sentencing departure for substantial assistance (Supp. App. 359-360). Watson explained that he ultimately did not receive a 5K1.1 letter because he "didn't provide the

substantial assistance that they needed" and because the prosecutor in that case "did not like [him]" (Supp. App. 360-362).[39]

On the belief that the Greenbelt prosecutor had found Watson unreliable, defense counsel requested that the government review the Greenbelt prosecution file for *Brady* material (Supp. App. 374-376). The court ordered the government to do so (Supp. App. 376).

The following day, the government represented that it had reviewed the Greenbelt file and that there was "nothing . . . that suggest[ed] any *Brady* or Jencks material" (Supp. App. 409). The government explained that the assistant U.S. attorney in that case, Sandra Wilkinson, had indicated in a letter that Watson did not receive a 5K1.1 letter because she "didn't believe his cooperation was of a significant enough nature to qualify," not because "it was not worthy of belief or it was incredible" (*id.*). The government had also spoken with an MPD detective with whom Watson had cooperated, and "he indicated similarly that Mr. Watson had never provided him with information that

---

[39] Watson testified that he wrote several letters to the Greenbelt prosecutor, offering information in exchange for "more lenient treatment" (Supp. App. 400-401). Defense counsel requested that those letters be turned over as Jencks, but the court denied the request (Supp. App. 402).

he felt was untrustworthy of any kind" (*id.*). The government offered the file for the trial court to review, but the court declined to do so (Supp. App. 409-410). Nevertheless, the court placed the file under seal at defense counsel's request (Supp. App. 410).

Appellants now claim that the file, which was unsealed by the district court in 2008, contains a "copious amount of evidence that Watson chronically lied and schemed in pursuit of a sentencing departure" and that "the government was well aware of his untrustworthy nature" (App. Br. 69). Appellants specifically highlight letters in which Watson acknowledged that he had not told the truth in his initial meeting with the Greenbelt prosecutor and claimed that he had in the past "lied[,] connived and schemed to get things done" or to "obtain [his] . . . freedom" (*id.* at 70 (citing App. 1178, 1181, 1209-1210). However, none of Watson's self-serving statements undermines confidence in the verdict.

First, although the few isolated statements (buried in 37 handwritten pages) that appellants rely upon are arguably impeaching in that they suggest that Watson was previously untruthful, their impeachment value is minimal at best. In context, these broad,

92

unspecified claims of falsehood are reasonably understood as a *mea culpa* offered in a desperate attempt to convince the Greenbelt prosecutor of Watson's changed ways and desire to cooperate.[40] Overly general and unmoored to any specific facts, these statements are only weakly impeaching. *See Gonzalez v. Wong*, 667 F.3d 965, 985 (9th Cir. 2011) (contrasting, in context of *Brady* claim, impeachment value of "hard evidence" of witness's past lies with witness's admission on cross-examination that he "could lie," and noting that "everyone can lie").

Second, contrary to appellants' contention (at 71-72), the statements at issue do not support the conclusion that Watson did not receive a 5K1.1 letter because the Greenbelt prosecutor determined that he had lied. Indeed, in two separate letters to the district court in Maryland, AUSA Wilkinson explained that she had concluded that Watson did not provide substantial assistance warranting a sentencing

---

[40] Watson followed his admissions of having lied in the past with assurances that he had never "lied or welched" or "gone contrary once [he] had given '[his] word'" (App. 1181, 1210, 1222). Watson's letters were replete with supplications to Wilkinson to give him another chance at cooperating and/or recommend a reduced sentence (see, e.g., App. 1178-1179, 1181-1182, 1193, 1198-1199, 1225-1226).

departure (App. 1202-1203, 1205). Wilkinson made no suggestion that Watson's credibility or reliability factored into this determination.

In any event, there is no reasonable probability that had the jury learned of Watson's statements, they would have returned a different verdict. "While evidence that promises dramatic impeachment is certainly a legitimate basis for a *Brady* argument, this evidence does not meet the 'reasonable probability of acquittal' test." *See Derr*, 990 F.2d at 1336 (internal citation omitted) (noting that suppressed impeachment evidence would not overcome the evidence of guilt). Watson was a minor witness whose only contribution to the government's case was to recount Sweeney's admissions to having participated in the kidnappings of Anthony Pryor and Keith Johnson. The Johnson kidnapping was not charged in the indictment. As to the Pryor kidnapping, the government presented strong evidence apart from Watson's corroborating testimony, as discussed supra. Thus, Watson's testimony likely had little, if any, impact on the outcome. *See Smith v. Cain*, 565 U.S. 73, 76 (2012) (noting that "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict," but may be material if it is "the *only* evidence linking [the

94

defendant] to the crime" (emphasis in original)); *United States v. Buchanan*, 891 F.2d 1436, 1444 (10th Cir. 1989) ("where a prosecuting witness is not key to the government's case, his credibility is not material; hence the failure to reveal impeachment evidence concerning a minor witness does not violate *Brady*").

Further, Watson was already substantially impeached on a number of topics including his lengthy criminal record, his history of serving as a government informant in hopes of obtaining reduced sentences, and his deceitful conduct giving rise to his Greenbelt conviction (*see, e.g.*, Supp. App. 354-360, 363-373, 381-401).[41] Any additional impeachment with statements of unspecified falsehoods would have been merely cumulative, and therefore immaterial. *See Oruche*, 484 F.3d at 599 (failure to disclose grand jury transcript of witness's admission to lying in another case was not *Brady* violation where witness was "thoroughly impeached" regarding prior convictions, benefits received in exchange for

---

[41] Notably, the trial court instructed the jury that the testimony of cooperating witnesses should be examined "with caution" and weighed with "great care" because "[a] witness who realizes that he may be able to obtain his freedom, receive a lighter sentence, or obtain other benefits by giving testimony favorable to the prosecution, has a motive to testify falsely" (Supp. App. 629).

95

testimony, and past lies, and impeachment value of grand jury testimony "would have been negligible and cumulative"); *United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003) ("[A] new trial is generally not required . . . when the suppressed impeachment evidence merely furnished an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.").

Finally, any prejudice here was to Sweeney alone. The district court instructed the jury:

> The statements testified to by Mr. Watson is evidence limited to Mr. Sweeney and cannot be considered as evidence against any of the other co-defendants. . . . [Y]ou may consider Mr. Watson's testimony with respect to the charges against . . . Sweeney, but you may not consider it in any way when deciding whether the government has proved beyond a reasonable doubt that any of the other defendants have committed any crime. (Supp. App. 404.)

Accordingly, even assuming error, Coates, Carson, and Martin have no grounds for relief.[42]

---

[42] This Court has never subscribed to the principle that "there is no need to conduct a defendant-by-defendant analysis of how the violations impacted each defendant or each count" (App. Br. 89). To the contrary, the Court has carefully parsed the materiality of alleged *Brady* violations in cases involving multiple defendants and multiple charges. *See*, *e.g.*, *United States v. Wilson*, 605 F.3d 985, 1007-1011 (D.C. Cir. 2010) (analyzing effect of *Brady* violation as to each defendant and each

(continued . . . )

### c. Information Regarding Relocation Assistance to Witnesses

Appellants claim that the government "withheld information related to the improper payments to, and hidden locations of, two one-time government witnesses, John Pinkney and Cheree Owens, whom appellants were unable to call for their own defense at trial" (App. Br. 73). Appellants argue that, contrary to the government's representations at trial that it was unaware of Pinkney's and Owens's whereabouts, an interview with Owens in 2014 showed that the government "deliberately moved" the two and then "either lost track of them or consciously decided not to disclose their location or make efforts to find them" (App. Br. 75). This assertion is unsupported by the record.

On December 10, 1996, Pinkney and Owens testified before a Maryland grand jury investigating the triple murders of Alonzo Gaskins,

---

relevant count). By suggesting that prejudice should be presumed because "one cannot know what piece of evidence the jury found most persuasive" (App. Br. at 89-90), appellants attempt to evade their burden of proving materiality and ignore that the jury was expressly instructed to consider each defendant and each charge separately (Supp. App. 626-628, 630-632). *See Andrew v. White*, 62 F.4th 1299, 1329 (10th Cir. 2023) (rejecting argument that there is a "presumption of materiality" for some *Brady* violations).

97

Darnell Mack, and Melody Anderson, which took place down the street from where Pinkney and Owens lived. *Carson*, 455 F.3d at 376. Owens testified that, about two weeks after the murders, she overheard Dennis Green on his cell phone saying that he and others "just took three people out of the street." *Carson*, 455 F.3d at 376. Pinkney and Owens both testified that Green later threatened them and tried to extort money from them. *Id.* at 377. The government subsequently developed evidence that Sweeney and others committed the murder.

"After the United States Marshals Service and an investigator hired by Sweeney's attorney could not locate Owens and Pinkney to call them as witnesses during the trial, Sweeney and Carson moved to admit into evidence the transcript of the Maryland grand jury testimony of Owens and Pinkney." *Id.* In a written opposition filed on November 16, 2000, the government noted that after Pinkney and Owens testified in the Maryland grand jury, "[t]he police soon came to believe that they were being used by Pinkney and Owens" (App. 628 at n.1). The government explained:

> This belief was based on the fact that Pinkney and Owens were given a considerable amount of money that was to be used for their relocation and was meant to last several weeks. The pair went through the funds in a matter of days and then

demanded additional funds. The police also learned that Pinkney and Owens owed Dennis Green . . . money for drugs. After investigating more fully, the police found nothing to corroborate the stories of Pinkney and Owens. A short time later, Pinkney and Owens seemingly disappeared. (*Id.*)

The trial court ultimately denied appellants' motion for admission of the grand jury testimony, and this Court upheld that ruling on direct appeal. *See Carson*, 455 F.3d at 376.

During post-conviction proceedings, Carson represented that on May 29, 2014, his attorney and an investigator, Dale Vaughan, located Owens in Virginia and interviewed her at her home (App. 1059). Owens refused to sign an affidavit, but Vaughan executed an affidavit recounting her statements (App. 1059; Supp. App. 120-122). According to Vaughan's affidavit, Owens stated that the FBI moved her and Pinkney "at least ten times in the six months that followed [their] testimony" and paid for their moving expenses and housing (Supp. App. 121). About seven months after Pinkney testified, the FBI moved the couple to Tampa, Florida (*id.*). Owens admitted that, after staying in the Tampa apartment "a short time," she and Pinkney "moved to a house on their own" (*id.*). Owens claimed that they never heard from anyone in the FBI or Prince Georges County after they moved to Florida (*id.*).

99

Contrary to appellants' assertion (at 75-76), Owens's 2014 statements do not demonstrate that that the government misrepresented its payments to Pinkney and Owens or suppressed information about their whereabouts. Indeed, Owens's description of the assistance she received from the government was consistent with the government's pretrial representations. Owens stated that the government relocated her and Pinkney and gave Pinkney money to cover their rent and moving expenses, but that she and Pinkney eventually moved to a new home on their own (Supp. App. 121). The government represented that Pinkney and Owens "were given a considerable amount of money that was to be used for their relocation," and that they ultimately "disappeared" (App. 628 at n.1). Nothing in Owens's interview suggests that the government was aware of Owens's and Pinkney's location at the time of trial, three years after the final relocation to Tampa; had given them additional, undisclosed payments; or had maintained contact with them.[43] Indeed,

---

[43] Whereas Carson indicated in a post-conviction pleading that his counsel and his investigator had located Owens in Virginia (App. 1059), appellants' brief indicates that Carson's investigator located Owens in Florida (App. Br. 43). Appellants repeatedly cite to appendix pages 1766-1768 to support their factual assertions regarding Owens, but those pages are inapposite.

100

Owens made clear that the couple had no further contact with the government after they were moved to Florida, seven months after their 1996 grand jury appearance, and that they in fact consciously decided to part ways with the government shortly after the Florida move.

In any event, as the district court recognized, *Martin*, 2021 WL 4989983, at \*7, the government complied with its *Brady* obligations by disclosing before trial Pinkney's and Owens's grand jury testimony, the relocation payments, and the fact that the couple absconded with the government's money. The government was under no obligation to disclose any additional *Giglio* information because neither Pinkney nor Owens testified at trial. *See United States v. Green*, 178 F.3d 1099, 1109 (10th Cir. 1999) (holding that *Giglio* did not apply when the government "did not ever call" its confidential informant as a witness); *United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir. 1994) (finding "no authority that the government must disclose promises of immunity made to individuals the government does not have testify at trial").

Furthermore, there is no reasonable likelihood that, even if the jury had heard from Owens and Pinkney, it would have acquitted Sweeney, Carson, and Coates of the triple murder. The government presented

101

substantial evidence that Sweeney, Carson, and Coates killed Gaskins, Mack, and Anderson during the course of a botched robbery attempt concocted after Sweeney and Carson saw Gaskins win a large sum of money in Las Vegas. *See Carson*, 455 F.3d at 344-345 (summarizing evidence). Montgomery's testimony about the details of the crime was largely corroborated by (1) Cinama Hawkins, the lone surviving victim of the attack (Supp. App. 498-502); (2) evidence that all 12 .40-caliber shell casings recovered from the scene were consistent with having been fired by a Glock, as Montgomery said they were (Supp. App. 506, 513-514); (3) Sweeney's fingerprint, which was recovered from the crime scene (Supp. App. 505, 509-510); and (4) incriminating statements made by Sweeney and Coates about their roles in the offense and their suspicions that Montgomery was cooperating against them, *see Carson*, 455 F.3d at 345 n.7. In contrast, Pinkney's and Owens's expected testimony, even if believed, would have been of little value to appellants, as it did nothing more than suggest that Green and his cohorts did something to three people in the street. Neither Pinkney nor Owens had witnessed anything that Green and his accomplices had done, nor had they clarified that Green was talking about the triple murder, as opposed to something else.

102

Indeed, it is unlikely that their testimony would have been admissible at all, given that it simply relayed hearsay. *See Derr*, 990 F.2d at 1335–36 (inadmissible hearsay not material under *Brady*). And, in the nearly 25 years since appellants have known about Pinkney's and Owens's grand-jury testimony (see Supp. App. 268-269 (discussing disclosure)), they have offered no evidence to corroborate that Green committed the triple murder. Further, had Pinkney and Owens testified, they would have been subject to substantial impeachment based on their motive to implicate Green, given the drug debt they owed him, and their apparent misuse or theft of government funds intended for their relocation. Balanced against the strongly corroborated evidence of Sweeney's, Carson's, and Coates's guilt, there is no reason to believe that the jury would have credited their testimony.

## II.   Appellants' Claim that the Trial Court Erred by Reviewing Submissions In Camera and Placing Them Under Seal is Not Properly Before this Court and Is, In Any Event, Procedurally Barred, Untimely, and Meritless.

Appellants assert that the trial court improperly reviewed materials in camera for alleged *Brady* and Jencks violations and erred in placing these materials under seal (App. Br. 76-83). They claim that the

103

court "failed to follow the procedures this Court has set out for in camera review," neglected its duty to review the evidence for *Brady* and Jencks material, and "encouraged" the government's "repeated failures to meet its disclosure obligations" (*id.* at 77-80). This claim is not within the scope of the COA, and even if it were, it is procedurally barred, time barred, and meritless.

### A.    The COA Does Not Encompass Appellants' Challenge to the Trial Court's In-Camera-Review Procedures.

Pursuant to 28 U.S.C. § 2253(c)(1)(B), appellants must obtain a COA before this Court may entertain their claim that the trial court improperly reviewed documents in camera. Section 2253(c)(2) provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." The statute further requires that the certificate of appealability "indicate which specific issue or issues satisfy the showing required by paragraph (2)." 28 U.S.C. § 2253(c)(3).

"Appellate review is limited to the issue(s) specified in the COA." *United States v. Weaver*, 195 F.3d 52, 53 (D.C. Cir. 1999). "[O]rdinarily, to present new claims on the merits, a habeas petitioner 'would have to

104

amend his habeas petition to add his new claims' or 'file a second or successive habeas application.'" *Waters v. Lockett*, 896 F.3d 559, 571 (D.C. Cir. 2018) (citation omitted). This Court will not grant a COA on any claim that the district court did not consider. *Id. See also Buck v. Davis*, 580 U.S. 100 (2017) ("When a court of appeals sidesteps [the COA] process by first deciding the merits of an appeal, . . . it is in essence deciding an appeal without jurisdiction." (citation omitted)).

This Court granted a COA on only two specific questions: "(1) whether the government's allegedly improper withholding of certain materials submitted to the district court under seal violated appellants' due process rights; and (2) whether appellate counsel was ineffective for failing to challenge on direct appeal specific evidentiary rulings made by the district court pertaining to that sealed material." *Coates*, No. 21-3072 (Order, December 23, 2022). Appellants have not sought an expansion of the COA. The Court should therefore decline to review this claim. *See United States v. Bertram*, 762 F. App'x 1, 5 (D.C. Cir. 2019) (declining to consider arguments "made for the first time on appeal [from denial of § 2255 motion], even though the relevant facts were fully known to [defendant] when he was before the district court").

### B. Appellants' Claim is Procedurally Defaulted and Time Barred.

Even if this Court were to grant an expansion of the COA, appellants still would not be entitled to relief because their challenge to the trial court's in camera review of the sealed material is procedurally barred and untimely. Appellants failed to raise this challenge on direct appeal despite being aware of the factual basis for the claim. As discussed infra, the trial court indicated on the record and in appellants' presence, often at appellants' request, that it would review certain materials in camera (see, e.g., App. 183; Supp. App. 262- 273, 277), and it made a point of having those materials marked as court exhibits (Supp. App. 123). During the pendency of their direct appeal, appellants filed a motion to review the sealed documents, describing in detail the specific documents they suspected contained possible *Brady* or Jencks material (Supp. App. 092-108). Nonetheless, they failed to challenge the trial court's in-camera-review procedures in their direct appeal. Appellants make no attempt to establish the requisite cause and prejudice to excuse their procedural default. Moreover, because they did not raise this claim on or

106

before February 20, 2008, within the one-year statute of limitations for their § 2255 motions, this claim is time barred.[44]

### C.    Appellants' Claim of Trial-Court Error is Meritless.

Even on its merits, appellants' challenge to the trial court's review procedures must fail. The Jencks Act expressly provides that a court must conduct an in camera inspection of any statement the government claims is not subject to disclosure under the Act. *See* 18 U.S.C. § 3500(c); *Goldberg v. United States*, 425 U.S. 94, 108 (1976) ("We have recognized that a government objection to production may require that the trial court inspect documents or hold a hearing to gather extrinsic evidence bearing on the extent to which the documents are statements producible under s 3500."). Additionally, if any portion of a statement is withheld from a defendant and the defendant objects, "the court shall . . . seal the entire statement for appellate review." *United States v. Mason*, 523 F.2d 1122, 1128 (D.C. Cir. 1975) (citing 18 U.S.C. § 3500(c)).

---

[44] Although Sweeney's and Coates's initial § 2255 motions challenged their appellate counsel's failure to identify portions of the sealed material for this Court to review on direct appeal (App. 962, 1035-1036), none of the appellants challenged the trial court's use of the in-camera-review procedure or its decision to place the reviewed material under seal.

As to alleged *Brady* material, this Court has noted that "prosecutorial review of possible *Brady* materials [i]s normally sufficient"; however, in camera review may be appropriate where a defendant has "identified 'exculpatory evidence [that the prosecution] withheld,'" or where there is "a need to balance a special interest in secrecy (apart from normal prosecutorial interests) against the interest in defense access to marginal exculpatory material." *See United States v. Brooks*, 966 F.2d 1500, 1505 (D.C. Cir. 1992) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987)); *see also United States v. Caldwell*, 7 F.4th 191, 208 (4th Cir. 2021) (in camera review appropriate where defendant makes "plausible showing" that "information sought exists and that it would be both material and favorable to his defense" (cleaned up)); *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992) (in camera review of FBI 302s "was not only proper, but probably required"). Neither *Brady* nor the Jencks Act gives the defendant "the unsupervised authority to search through the [government's] files." *See Ritchie*, 480 U.S. at 59 (*Brady*); *Palermo v. United States*, 360 U.S. 343, 354 (1959) (Jencks); *United States v. Tarantino*, 846 F.2d 1384, 1416–17 (D.C. Cir. 1988) ("[U]nder *Brady*, 'the prosecutor is not required to deliver his entire

108

file to defense counsel[.]"); *United States v. North American Reporting, Inc.*, 761 F.2d 735, 740 (D.C. Cir. 1985) ("[defendants] were not entitled to access to the prosecutors' notes" in search of Jencks material).

Here, the trial court followed the appropriate procedures for review of alleged Jencks and *Brady* material, and in nearly every instance did so at the defense's request. For example, when the government provided the defense redacted copies of SA Lisi's grand jury testimony and FBI 302 reports upon his first appearance on the witness stand in January 2001, Sweeney's counsel requested the following:

> Your Honor, we would ask, and we think it's consistent with the very specific language of the Jencks Act that the . . . redacted information – not that it just be placed under seal, but that the court review it in camera.
>
> And I would submit to the court the Act requires the court to conduct a full in camera evaluation of the substance of the testimony, and . . . this is very important.
>
> . . . I would ask the court to review all of the grand jury testimony that is redacted and all the 302's so that the court can make an independent evaluation, because I would submit to the court that, Your Honor, you are in a much, much better situation and posture to evaluate this testimony than the court of appeals is. You're familiar with this case. You know what the respective parties' theories are. You have much more ability to give this a contextual analysis than the court of appeals can. So we would ask for that process to be done (App. 181-183.)

109

The court agreed to do so, noting that the Jencks Act "requires it" (App. 183). Subsequently, when Lisi retook the stand in May 2001 to testify about Robert Smith's statements, defense counsel again requested that the court review Lisi's unredacted 302 reports for information about other people who may have wanted to kill Smith (Supp. App. 566-568). The court ultimately ordered the government to turn over the unredacted reports (Supp. App. 571-572).

Appellants also asked the court to review the FBI 302 reports and notes of interviews with Charles Bender for *Brady* and Jencks material (Supp. App. 522-527). When the court completed its review and failed to detect further evidence requiring disclosure, appellants requested that the documents be placed under seal and made part of the record (Supp. App. 527).

Similarly, during a pretrial hearing on June 16, 2000, Sweeney's counsel asked to review the government's "investigative file" on James Montgomery for undisclosed *Brady* material (Supp. App. 262-264, 273; *see also* App. 576 ("Motion to Compel Discovery")). Counsel explained that he had learned from an earlier *Brady* disclosure that Montgomery had accused unindicted individuals of committing some of the charged

murders (Supp. App. 271-272). When the trial court suggested that it, rather than defense counsel, could review the file, Sweeney's counsel acknowledged that special security concerns might justify in camera review (Supp. App. 264, 267).[45] The court ruled that it would review the file and hold a second hearing if necessary (Supp. App. 272-273). In a written order issued on July 13, 2000, the trial court indicated that its review of the file, which contained, inter alia, numerous FBI 302 reports,

---

[45] The security concerns were well founded. As this Court has noted, "some of the appellants have a history of murdering or attempting to murder potential witnesses against them." *Carson*, 455 F.3d at 339. The government presented ample evidence that appellants had intimidated and committed, or conspired to commit, acts of violence against numerous witnesses, including Montgomery. *See id.* at 345-347 & n.7; App. 254; Supp. App. 565 (government had identified 15 witnesses whom appellants had conspired to kill). In Carson's words, they needed to "approach it like a full time job." *Carson*, 455 F.3d at 346. In light of the "special interest in secrecy" arising from these security concerns, s*ee Brooks*, 966 F.2d at 1505, the trial court correctly concluded that in camera inspection was appropriate. *See also United States v. Hickey*, 767 F.2d 705, 709 (10th Cir. 1985) (holding that in camera review of file containing details of witness's plea agreement was justified, where, given defendant's "propensity for violence" and conviction of plotting the murder of another witness, government had "justifiable concern with safety").

Similar security concerns supported the government's filing ex parte a notice to the court regarding changes to appellants' location of confinement (App. 1248). In that notice, the government described in detail appellants' history of intimidation and retaliation against witnesses (App. 1249-1267).

111

notes of interviews, and grand-jury testimony, revealed *Brady* information to which Sweeney was entitled—namely, that Robert Smith had informed Prince George's County authorities that Montgomery (and not Sweeney) had committed the triple murders (Supp. App. 019-020). Later, when Montgomery took the stand at trial, Carson moved for disclosure of all FBI 302 reports recounting Montgomery's statements (Supp. App. 426). The court reviewed the reports a second time, agreed that they constituted Jencks Act material, and ordered disclosure of the reports in their entirety (Supp. App. 426-427).[46]

The record thus belies appellants' assertion that the court abused the in-camera-review procedure and failed to thoroughly examine the disputed material or hold the government to its disclosure obligations.[47]

---

[46] The court permitted the government to redact information that raised "security concerns," such as "the location of a particular interview" (Supp. App. 427-428).

[47] Contrary to appellant's contention (at 79-80), Theodore Watson's Greenbelt prosecution file was not subject to disclosure under the Jencks Act because it did not "relate[] to the subject matter as to which [Watson] ha[d] testified." 18 U.S.C. § 3500(b). *See United States v. Cardillo*, 316 F.2d 606, 614-15 (2d Cir. 1963) ("[I]f the statement deals only with the witness's general background and personal history and does not deal with the events and activities testified to on direct examination, it is not producible under the Act."). "[A] defendant cannot compel a district court

(continued . . . )

To the extent there was error, any error was invited. *See United States v. Long*, 997 F.3d 342, 353 (D.C. Cir. 2021) ("It is settled that a defendant 'may not complain about invited error' on appeal.").

Nor is there support for appellants' accusation that the trial court "made clear to the government that it could avoid its disclosure obligations with impunity" (App. Br. 82-83). To the contrary, the court repeatedly reminded the government of its obligations under *Brady* and the Jencks Act (see, e.g., Supp. App. 290-292 (regarding murder of Robert

---

judge to sift through every record in the government's possession merely by speculating that somewhere in those records there might be Jencks Act statements." *United States v. Moore*, 651 F.3d 30, 75 (D.C. Cir. 2011). Although the court did not independently review the file for *Brady* material, it was justified in accepting the government's representations that the file contained no such material, because appellants failed to specifically "identif[y] 'exculpatory evidence [that the prosecution] withheld.'" *See Brooks*, 966 F.2d at 1505; *see also Ritchie*, 480 U.S. at 59 ("In the typical case where a defendant makes only a general request for exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963), it is the [government] that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final."); *United States v. Stuart*, 923 F.2d 607, 613 (8th Cir. 1991) ("speculat[ion] . . . that evidence might exist in other files in other jurisdictions does not require either the government to turn files over to a defendant wholesale, or the trial court to conduct an in camera review of government files for evidence favorable to the accused"). In any event, the court placed Watson's file under seal at appellants' request (see App. 279).

113

Smith); Supp. App. 263-267, 274-277 (regarding triple murders and murder of Donnell Whitfield); App. 274 (regarding Theodore Watson)), and specifically ordered the government to disclose "any and all evidence in its possession which . . . may indicate that persons other than [appellants] attempted or had reason to murder [Robert] Smith" (App. 621-622). Where appellants proffered a reason to believe that certain material contained *Brady* information, the court indicated that it would review the material, make an independent assessment, and hold a further hearing if necessary (see, e.g., Supp. App. 263-273, 277 (regarding triple murders and James Montgomery); Supp. App. 522-527 (regarding Charles Bender)). This approach fully comported with this Court's precedent. *See Brooks*, 966 F.2d at 1505. Thus, even if appellants could surmount the jurisdictional, procedural, and time bars that apply to this claim, they cannot establish that they are entitled to relief on the merits.

### III. Appellate Counsel Was Not Ineffective in Failing to Challenge on Direct Appeal the Trial Court's Specific Evidentiary Rulings Pertaining to the Sealed Material.

Appellants assert that their appellate counsel rendered ineffective assistance by failing to challenge the district court's evidentiary rulings

114

regarding the sealed material, and therefore failing to raise their *Brady* claims (App. Br. 91). Because appellants have demonstrated neither deficient performance nor prejudice, this contention too must fail.

## A.    Standard of Review and Legal Principles

To establish ineffective assistance of counsel, a defendant must prove that: (1) his counsel's performance was deficient, and (2) his counsel's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687.

To demonstrate "deficient performance," a defendant must show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687. This standard requires a defendant to show that, in light of all the circumstances as they appeared at the time of the conduct, "counsel's representations fell below an objective standard of reasonableness," or "prevailing professional norms." *Id*. at 688, 690; *Nix v. Whiteside*, 475 U.S. 157, 165 (1986). "'Surmounting [this] high bar is never an easy task.'" *United States v. Brinson-Scott*, 714 F.3d 616, 623 (D.C. Cir. 2014) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "Judicial    scrutiny    of    counsel's    performance    must    be    highly

deferential. . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

"The objective standard of reasonableness for appellate counsel does not require counsel to pursue every possible argument on behalf of a criminal defendant." *Waters*, 896 F.3d at 568. Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). "This process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (internal quotation marks and citation omitted). "When a defendant argues appellate counsel failed to raise a particular claim, it is difficult to demonstrate that counsel was incompetent, because generally only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Waters*, 896

116

F.3d at 568 (internal quotation marks and citations omitted). Where, as here, "the record does not explicitly disclose . . . counsel's actual strategy or lack thereof . . . , the presumption may only be rebutted through a showing that no sound strategy posited by the [opposing party, here the government] could have supported the conduct." *United States v. Abney*, 812 F.3d 1079, 1087 (D.C. Cir. 2016) (citation omitted; alteration in original).

To satisfy the prejudice prong of *Strickland*, the defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, he must show that counsel's errors "actually had an adverse effect on the defense." *Id.* This Court has noted that "when it comes to ineffective-assistance claims leveled against appellate counsel, there is not much daylight between *Strickland*'s deficiency prong and its prejudice prong." *Lockett*, 896 F.3d at 570. "If appellate counsel reasonably opts not to raise an issue with little or no likelihood of success, then there is usually no 'reasonable probability' that

117

raising the issue would have changed the result of a defendant's appeal."

*Id.*

This Court reviews the denial of a § 2255 motion on the ground of ineffective assistance of counsel de novo. *United States v. Aguiar*, 894 F.3d 351, 355 (D.C. Cir. 2018).

### B.    Discussion

Appellants argue that their appellate counsel performed deficiently by failing to comply with this Court's "repeated directives" to identify in their brief on direct appeal specific evidentiary rulings made by the trial court based on the sealed material, and that this "unreasonable error" "effectively blocked appellants from having their strongest arguments considered" (App. Br. 93-94). Because appellants cannot show that the ignored issues were stronger than the issues presented, much less demonstrate a reasonable probability that, had they been presented, appellants would have been successful on appeal, appellants are not entitled to relief.

First, contrary to appellants' assertion (at 92-94), appellate counsel did not violate any order of this Court by not raising the identified *Brady* issues in their brief on direct appeal. This Court did not order counsel to

raise those issues; rather, it made clear that any such issues were to be presented in their brief instead of by motion to the Court (App. 750). Although appellate counsel did not choose to challenge the precise rulings they had identified in their joint motion for review of the sealed material, they did raise several *Brady* claims in their brief. They argued that (1) the government's belated disclosure of FBI notes showing an alleged inconsistency in Charlene Wilson's testimony materially prejudiced the defense (*Carson*, No., 02-3015, App. Br. 143), (2) the government violated its *Brady* obligations by failing to disclose that Montgomery claimed he and Reginal Switzer had planned to kill Donnell Whitfield (*id.* at 179), and (3) the district court responded "lackadaisically" to their numerous *Brady* and Jencks Act requests, demonstrating judicial bias (*id.* at 90-92). That these arguments were ultimately rejected does not mean that appellate counsel was deficient in failing to press the *Brady* claims they chose to forgo.

To the contrary, as discussed supra, those claims were meritless, and, as this Court has held, "counsel does not perform deficiently by declining to pursue a losing argument." *See United States v. Watson*, 717 F.3d 196, 198 (D.C. Cir. 2013); *see also Baxter*, 761 F.3d at 24 n.4 (noting

119

that defendant's ineffective-assistance claim predicated on meritless *Brady* claim "fail[ed] for the same reason his *Brady* claim fail[ed]"; "test for prejudice under *Brady* and *Strickland* is the same").

Appellants highlight five government witnesses (Theodore Watson, James Montgomery, Reginald Switzer, Andre Murray, and Arthur Rice) about whom *Brady* and/or Jencks Act material was requested by trial counsel (App. Br. 95-97), but in no instance have appellants established that the undisclosed material would have created a reasonable probability of a different outcome, such that appellate counsel's failure to challenge the nondisclosure was both deficient and prejudicial. Regarding Watson, as we have argued supra, the letters contained in his Greenbelt prosecution file had minimal, if any, impeachment value and would have been merely cumulative of other efforts to discredit Watson on cross-examination.[48]

---

[48] Appellants' reliance (at 100) on *United States v. Flores-Rivera*, 787 F.3d 1 (1st Cir. 2015), is misplaced. In that case, the suppression of letters and notes of conversations involving a cooperating witness was held to be material because (1) the information undermined the credibility of the government's "star witness"; (2) it could have been used to show that the witness and two other cooperators had perjured themselves or had coordinated their testimony, which they had denied doing; (3) the government's case "pivoted entirely on the credibility of [the witness] and

(continued . . . )

As to Montgomery, appellants complain only that they were given redacted FBI 302 reports when they requested information pertaining to the Robert Smith murder (App Br. 95), but since the unsealing of the unredacted reports by the district court in 2008, appellants have failed to identify any undisclosed information in those reports that amounted to *Brady* or Jencks material. Likewise, as to Reginal Switzer, appellants dispute the trial court's ruling that the prosecutors' notes were not Jencks material (App. Br. 96), but they do not explain why this ruling was erroneous. *See United States v. Doost*, 3 F.4th 432, 437 (D.C. Cir. 2021) ("The defendant bears the burden of demonstrating both elements of ineffective assistance under the *Strickland* standard.").

With respect to Murray, appellants contend that they were erroneously denied disclosure of the following Jencks material: (1) records kept by Detective Michael Fulton documenting information

---

his two cohorts"; and (4) it "rais[ed] the prospect that [the witness] and the prosecutor were hiding something from the jury." *Id.* at 18-21. In this case, by contrast, Watson was a minor witness whose letters to a prosecutor in an unrelated case, vaguely claiming to have lied in the past, offered little in the way of impeachment and were merely "collateral because they did not directly bear on the factual evidence underlying the government's case." *See id.* at 20.

121

provided by Murray, and (2) unredacted letters Murray had written to AUSA Kenneth Wainstein (App. Br. 96). In neither instance have they shown trial-court error, much less appellate-counsel error for failing to raise these claims. Murray testified that he had previously served as an informant, providing Fulton information about the location of guns on the street and who possessed them (Supp. App. 313-315). The government represented that this information was not Jencks because it was entirely unrelated to the subject matter of Murray's trial testimony (Supp. App. 316-317). Nothing in the record belies this representation or suggests that the court erred in determining that any such information was not subject to disclosure.[49] As to Murray's letters to AUSA Wainstein, appellants ignore that they successfully used the letters to impeach Murray's claim that he had not sought any assistance from the government, and that the trial court permitted them to offer the letters into evidence if they wished (Supp. App. 318-339). Appellants have not

---

[49] It is unclear from the record whether Detective Fulton had ever even possessed a written or recorded statement from Murray that would qualify as a "statement" within the meaning of the Jencks Act, 18 U.S.C. § 3500(e). Appellants point to no such statement, and we are aware of none.

shown how the redacted information, which pertained to offenses unrelated to this case (Supp. App. 323), would have been relevant or admissible, and would have undermined confidence in the verdict.

Finally, as to Rice, appellants complain (at 97) that the district court did not provide a more fulsome explanation for its conclusion that the FBI 302 report pertaining to Rice was "clearly not a Jencks Act statement" (App. 469). But other than reciting the legal standard, they point to no evidence in the record to undermine the court's assessment. Lisi's 302 reports were in "the nature of witness summaries" (Supp. App. 311). Nothing in the record suggests that the report at issue was "signed or otherwise adopted or approved by" Rice, 18 U.S.C. § 3500(e)(1), or was "a substantially verbatim recital of an oral statement made by [Rice] and recorded contemporaneously with the making of such oral statement," § 3500(e)(2). *See United States v. Moore*, 651 F.3d 30, 75 (D.C. Cir. 2011), ("interview reports . . . written by law enforcement officers, not by the witnesses themselves[,] generally do not qualify as Jencks Act statements"); *see also Palermo*, 360 U.S. at 350 (noting that Jencks Act was meant to prevent "the undiscriminating production of agent's summaries of interviews regardless of their character or completeness,"

123

and that it would be "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations").[50]Given the weakness of these claims, appellants cannot show that "no sound strategy" justified appellate counsel's decision to forgo them in favor of other challenges. *See Abney*, 812 F.3d at 1087.[51] This is especially so considering the breadth and complexity of the case (a multi-defendant trial spanning nine months and involving a 64-count indictment) and the difficulty, and necessity, of selecting only a

---

[50] In their "Statement of the Case," appellants suggest that Rice's 302 should have been turned over as *Brady* material because Rice claimed to have seen Martin and Carson fleeing the scene of the murders of Maurice Hallman and Leonard Hyson, while Montgomery testified at trial that he (Montgomery) and Carson were the shooters (App. Br. 25). Appellants do not address this in the "Argument" section of their brief, but we note that this claim is meritless nonetheless. Rice's statement was not exculpatory; rather, it was clearly *inculpatory* as to both Martin and Carson. To the extent it would have undermined Montgomery's testimony, what little impeachment value it carried was vastly outweighed by its potential prejudice to Martin and Carson.

[51] That the record is bereft of evidence of appellate counsel's strategy is chargeable to appellants alone. Appellants had 14 years—from February 20, 2007, when their convictions became final, to October 27, 2021, when the district court denied their § 2255 motions—to develop a factual basis for their ineffective-assistance claims. Nothing prevented them from obtaining affidavits from their appellate attorneys during that 14-year period.

limited set of issues to raise on appeal. *See Jones*, 463 U.S. at 746. "Experienced advocates have emphasized the importance of winnowing out weaker arguments on appeal . . . . Selecting the most promising issues for review has assumed a greater importance in an era when the time for oral argument is strictly limited in most courts and when page limits on briefs are widely imposed."); *Payne v. Stansberry*, 760 F.3d 10, 13 (D.C. Cir. 2014) (citations omitted) (noting that "strong presumption" of reasonable professional assistance, together with "the reality that effective appellate advocacy often entails screening out weaker issues," means that appellate counsel need not raise "every colorable or non-frivolous issue on appeal" (citations omitted)). Appellate counsel jointly filed a brief "rais[ing] two hundred pages' worth of detailed constitutional and evidentiary arguments." *Martin*, 2022 WL 1618869, at *13. Because appellants have not established that any of the unraised claims were clearly stronger than those that were asserted on appeal, they cannot show deficient performance, and because they have not shown a reasonable probability that any of the unraised claims would have

resulted in reversal of their convictions, they cannot demonstrate *Strickland* prejudice.[52]

## IV. Carson's Claim of Ineffective Assistance of Trial Counsel Is Not Properly Before This Court, and In Any Event, Is Untimely and Meritless.

In his supplemental § 2255 motion, filed on April 9, 2015, Carson argued for the first time that his trial counsel rendered ineffective assistance due to an alleged conflict of interest (App. 1318-1324). In an affidavit attached to Carson's motion, trial counsel Lexi Negin-Christ averred that she and her co-counsel, Joseph Beshouri, faced "insurmountable" judicial bias which prevented them from, inter alia, "effectively cross-examin[ing] witnesses, respond[ing] to late *Brady* disclosures[,] . . . [and] mak[ing] effective strategic decisions" (App. 1425). She also asserted that she feared the court would withhold payment for

---

[52] Appellants contend that prejudice must be presumed (App. Br. 97), but this case does not present the sort of Sixth Amendment deprivations of counsel that the Supreme Court has recognized as presumptively prejudicial. *See Strickland*, 466 U.S. at 692 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance."); *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984) (prejudice presumed when "counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding").

126

her services or hold her in contempt if she pressed objections and arguments that would "irritate the judge" (App. 1426-1427). The district court found that this ineffective-assistance claim was untimely under § 2255(f). *Martin*, 2021 WL 4989983, at *12.[53] Carson contends that the district court erred by rejecting this claim without a hearing (App. Br. 129). This Court should decline to entertain Carson's claim because it is not properly before the Court. Alternatively, this claim should be rejected as time barred and meritless.

As appellants acknowledge (at 124 n.20), this Court's certificate of appealability did not include Carson's challenge to his trial counsel's representation. Appellants nonetheless attempt to tether this challenge to their claim that the trial court erred by placing documents under seal and failing to appropriately examine them for *Brady* material (*id.*). As explained supra, however, that claim is also outside the scope of the COA. Appellants do not ask this Court to expand the COA, *see Waters*, 896 F.3d

---

[53] Carson's supplemental motion asserted a number of deficiencies in his trial counsel's representation (App. 1318-1330). Although the district court did not specifically mention the alleged conflict of interest in denying Carson's claim, it noted that all of the asserted deficiencies, with the exception of one (not raised in this appeal), were time barred. *See Martin*, 2021 WL 4989983, at *12.

at 571 (suggesting that explicit request for expansion of COA is required). Accordingly, this Court should decline to consider Carson's ineffective-assistance-of-trial-counsel claim. *See In re Sealed Case*, 809 F. App'x 6, 9 (D.C. Cir. 2020) (declining to consider claim that appellate counsel had conflict of interest, "because it [wa]s not encompassed within the certificate of appealability").

Even if appellants' brief is construed to implicitly request an expansion of the COA, this Court should decline to do so. "When making a COA determination, [this Court] 'look[s] to the District Court's application of AEDPA to petitioner's constitutional claims and ask[s] whether that resolution was debatable amongst jurists of reason." *Waters*, 896 F.3d at 571 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). Here, no reasonable jurist could doubt the district court's conclusion that Carson's ineffective-assistance claim was time barred.

Carson's initial § 2255 motion broadly alleged ineffective assistance of trial counsel based on a "failure to investigate" and "failure to object to inadmissible evidence" (App. 988). As the district court correctly noted, only one of Carson's supplemental ineffective-assistance claims "plausibly relate[d] back to Carson's allegation of trial counsel's 'failure

128

to investigate'—the failure to investigate whether Carson had a rental car when Smith was murdered." *Martin*, 2021 WL 4989983, at \*12. "The remaining claims in Carson's second motion," including the allegation that his counsel labored under a conflict of interest, "d[id] not relate back and c[a]me years after § 2255(f)'s time limit." *Id. See Watkins v. Stephenson*, 57 F.4th 576, 581 (6th Cir.), *cert. denied sub nom. Watkins v. Chapman*, 144 S. Ct. 222 (2023) (amended habeas petition alleging ineffective assistance of trial counsel "for failing to request self-defense jury instructions, failing to object to [an] allegedly biased juror, and failing to communicate with [defendant] before trial" did not relate back to original claim alleging that counsel "failed 'to investigate and raise a defense'"); *Hernandez*, 436 F.3d at 858 ("claim of ineffective assistance of counsel on cross-examination did not relate back to the claims contained in the original [§ 2255] motion" alleging "failure to object to the admission of evidence"); *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005) ("[A] petitioner does not satisfy the Rule 15 'relation back' standard merely by raising some type of ineffective assistance in the original petition, and then amending the petition to assert another ineffective

129

assistance claim based upon an entirely distinct type of attorney misfeasance.").

Carson ignores § 2255(f)'s time bar; instead, he asserts that this Court should grant him relief on the merits. This, however, the Court should not do. Carson's allegation that his trial counsel labored under a conflict of interest is a thinly veiled attempt to revive the meritless judicial-bias claim he asserted on direct appeal. "[I]t is well settled that [a defendant] cannot 'circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255 motion.'" *United States v. Dyess*, 730 F.3d 354, 360 (4th Cir. 2013) (ellipses in original; citation omitted).

On direct appeal, this Court rejected appellants' argument that the trial court, inter alia, "improperly 'demeaned' and 'threatened' defense counsel during trial when he cut them off and instructed them to be seated, referred to (and admonished against) 'frivolous' objections, suggested they were attempting to delay the trial or cause a mistrial, warned of possible contempt citations, and in fact cited two defense lawyers for contempt." *Carson*, 455 F.3d at 358 (internal citations omitted). Appellants contended that "these remarks, taken together, reveal[ed] such bias on the part of the trial judge that they could not, and

130

did not, receive a fair trial." *Id.* Carson's trial counsel made the same claims in her affidavit supplementing Carson's § 2255 motion (App. 1425-1427), and Carson repeats those claims in the present appeal (App. Br. 124-130). However, this Court has already held that "[t]he judge's comments during the trial did not reach a level of hostility that prevented a fair trial"; rather, "the trial comments reflect[ed] the judge's attempt to exercise his discretion to control the trial." *Carson*, 455 F.3d at 358. While this Court on direct appeal was focused on the question of judicial bias, Carson's present claim relies on the same factual predicate: the allegedly biased comments of the trial judge. The Court found that those comments were not sufficiently "belittling" or frequent, particularly "in the context of a long and difficult trial," to require reversal. *Carson*, 455 F.3d at 359-360. Carson should not be permitted to relitigate issues this Court has already resolved.

Should the Court choose to consider the merits of Carson's claim, it nevertheless must affirm. *United States v. Shark*, 51 F.3d 1072, 1076 (D.C. Cir. 1995), is dispositive. In *Shark*, this Court held that "friction between trial counsel and the court" was "insufficient as a matter of law" to establish a conflict-of-interest claim under *Cuyler v. Sullivan*, 446 U.S.

131

335, 349-350 (1980) (holding that if "an actual conflict of interest adversely affected his lawyer's performance," a defendant need not demonstrate prejudice). *Shark*, 51 F.3d at 1076. The Court explained:

> We very much doubt that mere fear of rebuke from the court could ever give rise to a conflict of interest sufficient to establish a predicate for ineffective assistance. Were that the case, any provocation of the court, even on the smallest matter, could be maneuvered into an excuse for invalidating a conviction. Usually, when a defendant claims that a judge's hostility impaired defense counsel's zealous advocacy, the right that defendant seeks to redeem on appeal is the right to a fair trial. . . .
>
> Of course, if judicial expressions of dissatisfaction were severe enough to lead defense counsel to make decisions that are both objectively deficient and prejudicial, the *Strickland* requirements for showing ineffective assistance would be satisfied. But a defendant cannot avoid those requirements by seeking to make out a claim of ineffective assistance under the more lenient *Cuyler* standard when the asserted conflict of interest is said to arise from ordinary friction between a judge and defense counsel at trial.

*Id.*

Subsequently, the Court, relying on *Shark*, held that, standing alone, fear of a contempt sanction is "insufficient to show a conflict of interest." *United States v. Taylor*, 139 F.3d 924, 931-932 (D.C. Cir. 1998) ("Because all attorneys potentially face contempt citations, no particular attorney can be considered ineffective due to a concern that he or she

132

might be so cited."). Together, *Shark* and *Taylor* foreclose Carson's conflict-of-interest claim.[54]

Under *Strickland*, Carson's claim also must fail, for he establishes neither deficient performance nor prejudice. Although Carson's trial counsel asserted in her affidavit that the trial judge made "implicit threats" to withhold compensation if the attorneys did not comply with the court's directives (App. 1426), nothing in the record supports this assertion. Unlike the judge in *Walberg v. Israel*, 766 F.2d 1071, 173 (7th Cir. 1985), upon which Carson relies (at 126-127), the judge here never threatened to deny a request for payment by any of the attorneys, nor did he suggest that he would take any action directed at the attorneys' financial interests if they did not do as the court said.[55]

---

[54] "This [C]ourt has been careful . . . to reject 'defendants' attempts to force their ineffective assistance claims into the 'actual conflict of interest' framework . . . and thereby supplant the strict *Strickland* standard with the far more lenient *Cuyler* test." *United States v. Gray-Burriss*, 791 F.3d 50, 62–63 (D.C. Cir. 2015) (quoting *United States v. Bruce*, 89 F.3d 886, 893 (D.C. Cir. 1996)).

[55] In *Walberg*, 766 F.2d at 1075, the Seventh Circuit noted that "it is implicit in any system where trial judges appoint counsel who receive fees—indeed in any system where judges rule on attorney's fees, whether or not the judge appointed counsel—that counsel has an economic incentive to comply with the judge's wishes, and this may at times create

(continued . . . )

133

While the judge did ultimately hold two of the defense attorneys in contempt for violating his orders,[56] as this Court concluded, such a sanction was well within the court's discretion and did not exhibit bias. *See Carson*, 455 F.3d at 358-359; *see also United States v. Jackson*, 627 F.2d 1198, 1205 n.18 (D.C. Cir. 1980) (rejecting bias claim where trial judge's comment that counsel was "courting a contempt citation" was "an expression of his disciplinary powers to maintain order in the court and to ensure adherence to his rulings"; "[j]udges also have some obligation to protect the respect due their position lest they lose their necessary stature with the jury."). Notably, Judge Jackson never threatened to hold Carson's attorneys in contempt or take any disciplinary action against them. Indeed, Carson points to no specific statement of the court that

---

a division of loyalties." This generally will not render a lawyer "incapable of representing his client in a constitutionally adequate fashion." *Id. Cf. United States v. Taylor*, 139 F.3d 924, 932 & n.8 (D.C. Cir. 1998) (noting that "[a]lthough a 'defendant's failure to pay fees may cause some divisiveness between attorney and client,' courts generally presume that counsel will subordinate his or her pecuniary interests and honor his or her professional responsibility to a client"). It is only "in extreme cases [that] a fatal conflict of interest may arise." *Walberg*, 766 F.2d at 1075. Carson has not shown this to be an "extreme case."

[56] Counsel for former codefendants Gary Price and Vincent Hill were held in contempt during trial (Supp. App. 340-341, 623-624). The district court vacated the contempt rulings after the case had ended (App. 97-98).

134

could even arguably suggest that it would take disciplinary measures against Carson's attorneys. Carson thus fails to demonstrate that the court's comments and rulings had a detrimental impact on his counsel's representation.

Further, any perceived conflict was belied by counsel's performance throughout the trial. Carson's counsel vigorously cross-examined witnesses; filed motions for, inter alia, disclosure of *Brady* and Jencks Act information (see, e.g., Dkt. 329, 412, 554), mistrial and severance (Dkt. 527), exclusion of evidence (Dkt. 588, 596), and remedies for the government's belated disclosure of *Brady* material (Dkt. 594); and forcefully argued that the government had violated its obligations under *Brady* and the Jencks Act (see, e.g., Supp. App. 281-289). Despite Ms. Negin's broad assertions that she and co-counsel Beshouri attempted to "appease" the judge by "giving up objections, arguments and motions that would irritate the judge" (App. 1427), she failed to indicate any specific objection, argument, or motion that they chose to forgo to protect their own interests.[57] Even now on appeal, Carson identifies no action he

---

[57] Should this Court determine that Carson has made a "colorable claim" of ineffective assistance of trial counsel, and that the record does not

(continued . . . )

believes his counsel should have taken, much less any action that would have made a different verdict reasonably likely. Carson thus fails to carry his burden under *Strickland.*

---

"conclusively demonstrate" whether he is entitled to relief, the proper remedy would be to remand for the district court to make any necessary factual findings. *See United States v. Pole*, 741 F.3d 120, 126 (D.C. Cir. 2013) (citation omitted).

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney

CHRISELLEN R. KOLB
JOHN P. MANNARINO
Assistant United States Attorneys

_____/s/_____

ELIZABETH GABRIEL
MD Bar
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Elizabeth.Gabriel@usdoj.gov
(202) 252-6829

137

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 28081 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
ELIZABETH GABRIEL
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 4th day of April, 2025, I have caused a copy of the foregoing brief for appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellants:

John Longstreth
Jonathan M. Cohen
Tre Holloway
K&L Gates LLP
1601 K Street NW
Washington, DC 20006
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com

Mark Lanpher
Allen Overy
Shearman Sterling US LLP
1101 New York Avenue NW
Washington, D.C. 20005
mark.lanpher@aoshearman.com

Katherine Stoller
Allen Overy
Shearman Sterling US LLP
599 Lexington Avenue
New York, NY 10022
katherine.stoller@aoshearman.com

2

Eric Hans Kirchman
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
kirchlaw@cs.com

David B. Smith
108 North Alfred Street
Alexandria, VA 22314
dbs@davidbsmithpllc.com

/s/
_____

ELIZABETH GABRIEL
Assistant United States Attorney

3

# A D D E N D U M

USCA Case #21-3072    Document #2109456    Filed: 04/04/2025    Page 159 of 166

> United States Code Annotated
>   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
>     Part VI. Particular Proceedings
>       Chapter 153. Habeas Corpus (Refs & Annos)

28 U.S.C.A. § 2253

§ 2253. Appeal

Currentness

**(a)** In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

**(b)** There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

**(c)(1)** Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from--

  **(A)** the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

  **(B)** the final order in a proceeding under section 2255.

**(2)** A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

**(3)** The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

**CREDIT(S)**

   (June 25, 1948, c. 646, 62 Stat. 967; May 24, 1949, c. 139, § 113, 63 Stat. 105; Oct. 31, 1951, c. 655, § 52, 65 Stat. 727; Pub.L. 104-132, Title I, § 102, Apr. 24, 1996, 110 Stat. 1217.)

28 U.S.C.A. § 2253, 28 USCA § 2253
Current through P.L. 119-4. Some statute sections may be more current, see credits for details.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

USCA Case #21-3072    Document #2109456    Filed: 04/04/2025    Page 160 of 166

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part VI. Particular Proceedings
      Chapter 153. Habeas Corpus (Refs & Annos)

28 U.S.C.A. § 2255

§ 2255. Federal custody; remedies on motion attacking sentence

Currentness

**(a)** A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

**(b)** Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

**(c)** A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

**(d)** An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

**(e)** An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

**(f)** A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of--

  **(1)** the date on which the judgment of conviction becomes final;

  **(2)** the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

USCA Case #21-3072      Document #2109456      Filed: 04/04/2025      Page 161 of 166

**(3)** the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

**(4)** the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

**(g)** Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

**(h)** A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain--

**(1)** newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

**(2)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

### CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 967; May 24, 1949, c. 139, § 114, 63 Stat. 105; Pub.L. 104-132, Title I, § 105, Apr. 24, 1996, 110 Stat. 1220; Pub.L. 110-177, Title V, § 511, Jan. 7, 2008, 121 Stat. 2545.)

28 U.S.C.A. § 2255, 28 USCA § 2255
Current through P.L. 119-4. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

> United States Code Annotated
>    Title 18. Crimes and Criminal Procedure (Refs & Annos)
>       Part II. Criminal Procedure
>          Chapter 223. Witnesses and Evidence (Refs & Annos)

18 U.S.C.A. § 3500

§ 3500. Demands for production of statements and reports of witnesses

Currentness

**(a)** In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)** After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

**(c)** If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

**(d)** If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

**(e)** The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means--

   **(1)** a written statement made by said witness and signed or otherwise adopted or approved by him;

**(2)** a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

**(3)** a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

## CREDIT(S)

(Added Pub.L. 85-269, Sept. 2, 1957, 71 Stat. 595; amended Pub.L. 91-452, Title I, § 102, Oct. 15, 1970, 84 Stat. 926.)

18 U.S.C.A. § 3500, 18 USCA § 3500
Current through P.L. 119-4. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #21-3072      Document #2109456      Filed: 04/04/2025      Page 164 of 166

United States Code Annotated
    Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
        Title III. Pleadings and Motions

Federal Rules of Civil Procedure Rule 15

Rule 15. Amended and Supplemental Pleadings

Currentness

**(a) Amendments Before Trial.**

**(1) *Amending as a Matter of Course.*** A party may amend its pleading once as a matter of course no later than:

**(A)** 21 days after serving it, or

**(B)** if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

**(2) *Other Amendments.*** In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

**(3) *Time to Respond.*** Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

**(b) Amendments During and After Trial.**

**(1) *Based on an Objection at Trial.*** If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

**(2) *For Issues Tried by Consent.*** When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

**(c) Relation Back of Amendments.**

**(1)** *When an Amendment Relates Back.* An amendment to a pleading relates back to the date of the original pleading when:

**(A)** the law that provides the applicable statute of limitations allows relation back;

**(B)** the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or

**(C)** the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

**(i)** received such notice of the action that it will not be prejudiced in defending on the merits; and

**(ii)** knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

**(2)** *Notice to the United States.* When the United States or a United States officer or agency is added as a defendant by amendment, the notice requirements of Rule 15(c)(1)(C)(i) and (ii) are satisfied if, during the stated period, process was delivered or mailed to the United States attorney or the United States attorney's designee, to the Attorney General of the United States, or to the officer or agency.

**(d) Supplemental Pleadings.** On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

**CREDIT(S)**

(Amended January 21, 1963, effective July 1, 1963; February 28, 1966, effective July 1, 1966; March 2, 1987, effective August 1, 1987; April 30, 1991, effective December 1, 1991; amended by Pub.L. 102-198, § 11, December 9, 1991, 105 Stat. 1626; amended April 22, 1993, effective December 1, 1993; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009; April 24, 2023, effective December 1, 2023.)

**<Amendments received through April 1, 2024>**

**Footnotes**

USCA Case #21-3072      Document #2109456      Filed: 04/04/2025      Page 166 of 166

1      If the proposed amendment to Rule 15(a)(3) ... changing the time period is approved by the Judicial Conference, the following additional sentence will be added to the Committee Note: "Amended Rule 15(a)(3) extends from 10 to 14 days the period to respond to an amended pleading."

Fed. Rules Civ. Proc. Rule 15, 28 U.S.C.A., FRCP Rule 15

Including Amendments Received Through 4-1-2025

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.